## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Desolation Holdings LLC, *et al.*,[1] | Case No. 23-10597 (BLS) |
| Debtors. | (Joint Administration Pending) |

**DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PRE-PETITION OBLIGATIONS RELATED THERETO, AND (C) CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS, (II) GRANTING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS TO POST-PETITION INTERCOMPANY BALANCES, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (this "Motion").

## RELIEF REQUESTED

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"): (a) authorizing, but not directing, the Debtors to (i) continue to operate their Cash Management System (as defined below); (ii) honor certain pre-petition obligations related thereto; (iii) pay any pre-petition or post-petition amounts outstanding on account of the Bank Fees (as defined below); and (iv) continue to perform Intercompany Transactions (as defined below); (b) granting superpriority administrative expense status to post-petition intercompany balances; and (c) granting related relief. In addition, the Debtors request that the Court schedule a final hearing 21

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Holdings Ltd. (2227); and Bittrex Malta Ltd. (1764). The mailing and service address of the Debtors is 701 5th Avenue, Suite 4200, Seattle, WA 98104.

days after the commencement of these chapter 11 cases, or as soon thereafter as is convenient for the Court, to consider approval of this Motion on a final basis.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware. Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rule[s]"), the Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105, 345, 363, 364, and 503 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-1.

## BACKGROUND

5.      The Debtors, together with their non-debtor affiliates (collectively, "Bittrex"), operate cryptocurrency exchanges for both retail and institutional customers in several jurisdictions. Bittrex, Inc. ("BUS"), a Georgia corporation, operates Bittrex's cryptocurrency exchange for U.S. customers, whereas two foreign non-debtor affiliates operate Bittrex's cryptocurrency exchange for non-U.S. customers. The global Bittrex platform has approximately 1.55 million customers, including over 600,000 in the United States.

6.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Evan Hengel, Co-Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* ("Hengel Declaration" or "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.[2]

7.      As described in more detail in the First Day Declaration, the Debtors commenced these Chapter 11 Cases for the purpose of allowing customer withdrawals, consistent with Bittrex's terms of service and applicable law, within an orderly wind down of Bittrex's U.S. and Malta operations.  Through these Chapter 11 Cases, the Debtors seek to complete the previously announced wind down of its U.S. business and implement the wind down of its Malta business, and accomplish, as soon as practicable, a comprehensive process that will (a) maximize value for the Debtors' creditors and stakeholders; (b) maintain intact Bittrex's non-U.S. business operations (other than its Malta business) for the benefit of non-U.S. customers; and (c) fairly separate the non-U.S. operations.  Concurrent with the filing of this Motion, the Debtors have filed their proposed chapter 11 plan, which provides, among other things, that the Debtors' customers entitled to distributions will receive under the plan a 100 percent like-kind cryptocurrency distribution.  This means that with respect to customers, they will be entitled to access the Bittrex platform and withdraw cryptocurrencies consistent with the plan and with their allowed claims.  The Debtors do not intend to monetize cryptocurrencies reserved for like-kind distributions to holders of allowed customer claims, and any change in the value of such assets following the Petition Date would be borne by the Debtors' customers.

---

[2]    Capitalized terms not defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

8.     The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committees have been appointed or designated.

### THE CASH MANAGEMENT SYSTEM

**I.     Overview.**

9.     In the ordinary course of business, the Debtors maintain a cash and cryptocurrency management system (the "Cash Management System") comparable to the systems used by similarly situated companies to manage the cash and digital assets on their platform in a cost-effective and efficient manner.  The Debtors' Cash Management System is critical to the Debtors' business, as it streamlines the Debtors' ability to collect, transfer, and disburse cash and cryptocurrency generated from their operations and to facilitate cash and digital asset monitoring, forecasting, and reporting.

10.     As of the Petition Date, the Cash Management System is comprised of seven active bank accounts (collectively, the "Bank Accounts").  As illustrated on the Cash Management System diagram attached as **Exhibit 1** to both **Exhibit A** and **Exhibit B** hereto, the Debtors maintain four bank accounts at Customers Bank ("Customers Bank"), two accounts at Prime Trust ("Prime Trust"), one account at United Texas Bank ("United Texas Bank"), and one account at Goldman Sachs ("Goldman Sachs" and together with Customers Bank, Prime Trust, and United Texas Bank, the "Cash Management Banks").  The Bank Accounts are identified on **Exhibit 2** annexed to both **Exhibit A** and **Exhibit B** hereto.  The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  The Debtors' accounting department reconciles the

Debtors' accounts payable on a weekly basis, and closes the books monthly with bank reconciliations.

11.     As part of the Debtors' Cash Management System, the Debtors maintain a cryptocurrency management system that allows the Debtors to facilitate the trading of various cryptocurrency and to store digital currencies on the Debtors' platform.

12.     As described more fully herein, the Cash Management System is an essential component of the Debtors' businesses.  Any interruption of the Cash Management System would severely disrupt the Debtors' operations and result in harm to the Debtors' estates and their stakeholders.  Accordingly, the Debtors seek authority to continue using their Cash Management System in the ordinary course of business on a post-petition basis in a manner consistent with past practice, and to pay any pre-petition fees related to the Cash Management System.

## II.     The Bank Accounts and Flow of Funds.

13.     As noted above, the Cash Management System consists of seven bank accounts. BUS receives income in the form of exchange commissions, withdrawal fees, staking revenue, advising fees, dormant account fees, and blockchain recovery fees ("Commission Fees").  The Commission Fees are collected in the form of cryptocurrency to BUS corporate trading accounts that transact on the exchange, converted to USD, and then transferred to BUS's operating account at Customers Bank ("Bittrex Operating Account").  BUS also maintains an operating account at Customers Bank designated as an OTC account ("OTC Account").  The OTC Account is used for settlements with third-party trading desks (e.g., Galaxy Digital).  BUS liquidates larger blocks (over $50,000 USD) with cryptocurrency institutional market makers, and third-party trading desks wire those proceeds to the OTC Account, which is then swept to the Bittrex Operating Account.

14.     The Bittrex Operating Account funds BUS's disbursements, automated-clearing house ("ACH") transfers, and wires for BUS's operating, capital, and general administrative expenses, and other cryptocurrency exchange related operating, capital, and general administrative expenses.

15.     BUS maintains two FBO accounts for the purpose of handling customer Cash Deposits (defined below) and Withdrawals (defined below).  One of the FBO accounts is at Customers Bank ("Customers FBO Account"), and the other is at Prime Trust ("Prime Trust FBO Account" and with the Customers FBO Account, the "FBO Accounts").  Customer Cash Deposits are wired into the Customers FBO Account, while customer Cash Deposits provided through ACH are deposited into the Prime Trust FBO Account.  BUS also maintains a reserve account at Prime Trust ("Reserve Account") for the purpose of maintaining an ACH reserve.

16.     BUS further maintains two dormant accounts at United Texas Bank and Goldman Sachs (the "United Texas Dormant Account", the "Goldman Sachs Dormant Account", and together, the "Dormant Accounts").  The Dormant Accounts are not currently in use and contain de minimis amounts.

17.     As of the Petition Date, the Debtors have approximately $10,903,808.48 in the FBO Accounts, approximately $540,334.61 in the Bittrex Operating and OTC Accounts, and approximately $1,000,000 in the Reserve Account.  The Bank Accounts and Cash Management System are described further in the following table:

| Bank Account | Account Description |
|---|---|
| Bittrex Operating Account | The Operating Account is the primary operating account for BUS that is used to pay operating, capital, and general administrative expenses. |
| OTC Account | The OTC Account is used by BUS for settlements with third-party trading desks. |

| | Funds are swept from the OTC Account to the Bittrex Operating Account on an ad hoc basis depending on when the trades are made. |
|---|---|
| Customers FBO Account | The Customers FBO Account is used by BUS to fund customer's accounts in order to buy and sell cryptocurrency through the Bittrex Platform. Deposits and withdrawals from the Customers FBO Account are made through wire payments. |
| Prime Trust FBO Account | The Prime Trust FBO Account is used by BUS to fund customer's accounts in order to buy and sell cryptocurrency through the Bittrex Platform. Deposits and withdrawals from the Prime Trust FBO Account are made through ACH payments. |
| Reserve Account | The Reserve Account is used by BUS to maintain a reserve for ACH payments. |
| United Texas Dormant Account | The United Texas Dormant Account is an account that was set up by BUS but is not currently in use. |
| Goldman Sachs Dormant Account | The Goldman Sachs Dormant Account is an inactive asset management account that is not currently in use. |

## III.    The Bittrex Platform

18.    As set forth in the First Day Declaration, the Debtors operate as a cryptocurrency exchange.  Through the Debtors' platform ("Bittrex Platform"), customers are able to trade various cryptocurrency and store digital currencies on the Debtors' platform (either through an application or website) through a self-custody custodian, Fireblocks, Inc. ("Fireblocks").

19.    *Cash Deposits.* The Debtors maintain a unique platform whereby customers can fund their account on the Bittrex Platform using either cash or cryptocurrency assets.  To fund a Bittrex Platform account with cash, a customer must link their personal bank account to the Bittrex

Platform.  Once the customer's personal bank account is verified, a customer may transfer funds from their Bittrex Platform account via ACH to the Prime Trust FBO Account.[3]  The Prime Trust FBO Account holds the majority of cash transferred by the Debtors' customers.   The Prime Trust FBO Account holds FDIC insurance on cash deposits up to a maximum of $250,000. The Debtors also maintain the Customers FBO Account to allow customers to transfer funds from their Bittrex Platform account via wire transfer rather than ACH.  The Debtors also process wire transfers to their customers from the Customers FBO Account.  The Customers FBO Account holds FDIC insurance on cash deposits up to a maximum of $250,000.

20.    Prime Trust and Customers Bank provide cash management and payment concentration services through such custodial "for the benefit of" accounts whereby the movement of a customer's cash into the FBO Accounts are in such customer's name and payments through the FBO Accounts are charged against the bank accounts of the Debtors' customers via ACH or wire transfer.

21.    *Buying Crypto.* Customers may order cryptocurrencies on the Bittrex Platform either through an instant purchase using existing funds, through a credit/debit/ACH transfer, or by trading into the desired cryptocurrency in the target market.  BUS holds the cryptocurrency in an omnibus wallet through the self-custody custodian Fireblocks.

22.    *Selling Crypto.* Conversely, when a customer executes an order to sell cryptocurrency on the Bittrex Platform, the Debtors transfer the cryptocurrency held in the omnibus wallet to the third-party exchange or market-maker. The third-party exchange or market-maker then receives and deposits cash in the applicable FBO Account, which, if the customer

---

[3]    The Debtors use the "for the benefit of" account to manage funds on behalf of their customers.

chooses, is then transferred to the customer's personal bank account via ACH or wire transfer, as applicable.

23.      *Withdrawals.*  Customers may also request to withdraw the cash attributable to their cryptocurrency trades from the Bittrex Platform.  The Debtors instruct the requested amount of cash to be withdrawn from the applicable account and subsequently transferred via ACH or wire transfer to the customer's linked bank account.  Such transfer typically takes approximately 1-3 business days from the time the withdrawal is initiated.

24.      *Reconciliation.*  On average over the last 12 months, approximately $47.4 million has been held in the FBO Accounts for the benefit of customers, which.  As of the Petition Date, the FBO Accounts held approximately $10,903,808.48.  This amount is lower than the historical average because the Debtors began their wind down process in early April and permitted customers to withdraw funds until April 30, 2023.  Customer fiat liability is reconciled as a part of the month-end close process, and individual customer fiat liabilities based on trading activity are calculated within the Bittrex Platform.

## IV.    Cryptocurrency Transactions.

25.      Through the Bittrex Platform, a customer may also fund their account by initiating a transfer of cryptocurrency assets from a customer's external wallet to their account.  When a customer makes a deposit, it enters BUS's omnibus wallet, and the customer no longer has control over the cryptocurrency.  The Debtors do not maintain individual cryptocurrency wallets for each customer.  Instead, each cryptocurrency asset (e.g., bitcoin, ethereum) is commingled basis into an omnibus wallet.  To ensure a customer is credited for the proper amount of cryptocurrency they transferred to the Debtors, the Debtors attribute a unique address within the omnibus wallet to each customer.  Customers withdraw cryptocurrencies by initiating a transfer to an external wallet via the Bittrex Platform.

## V.     ACH Activity.

26.     ACH transactions, while critical to the Debtors' flow of funds, also leave the Debtors susceptible to fraudulent activity.  This generally occurs when the customer empties their account prior completion of the ACH transaction.  This practice is fraud, and harms the Debtors and their legitimate customers.  The Debtors are in the process of assessing how many illegitimate transactions account holders have engaged in, particularly given the volatility of the cryptocurrency business in recent months.  Moreover, as of April 27, 2023, customers were no longer able to withdraw via ACH or wire from Bittrex Platform.

## VI.    Bank Fees.

27.     In the ordinary course, the Debtors incur periodic service charges, payment processing fees, and other fees in connection with maintaining the Cash Management System (collectively, the "Bank Fees").  The Debtors incur between approximately $31,000 and $45,000 in Bank Fees each month under the Cash Management System in the aggregate.  Of that amount, Prime Trust charges a flat fee of $27,000 per month, with the remainder varying based on the number of incoming and outgoing transactions each month.  The Debtors estimate that approximately $0 in pre-petition Bank Fees remain outstanding as of the Petition Date.  To ensure continued access to their Bank Accounts without disruption, the Debtors' seek authority to pay any such due and owing Bank Fees, including pre-petition Bank Fees, in the ordinary course on a post-petition basis, consistent with historic practice.

## VII.   U.S. Trustee Guidelines and the Bankruptcy Code.

28.     The Cash Management Banks are not designated as authorized depositories in the District of Delaware by the Office of the United States Trustee (the "U.S. Trustee"), pursuant to the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines").  The Debtors attempted to enter into banking relationships with

authorized depositories, however, many of them are unwilling to provide services to cryptocurrency companies.[4]  The Debtors therefore located banks willing to do business with cryptocurrency companies, that are well capitalized , are financially stable, and that are insured by the Federal Deposit Insurance Corporation (the "FDIC"), so that maintenance of the Bank Accounts will not jeopardize any party in interest.  The amounts as of the Petition Date held in the: (i) Bittrex Operating Account are approximately $540,334.61 in the aggregate and are fully insured up to the FDIC limit; (ii) Bittrex OTC Account are approximately $35 in the aggregate and are fully insured up to the FDIC limit; (iii) Customers FBO Account are approximately $10,070,257.82 in the aggregate and are fully insured up to the FDIC limit; (iv) Prime Trust FBO Account are approximately $833,550.66 in the aggregate and are fully insured up to the FDIC limit; and (v) Reserve Account are approximately $1,000,000 in the aggregate and are fully insured up to the FDIC limit.

29.     In addition, the Debtors hold cryptocurrency assets through a self-custody custodian, Fireblocks.  Requiring the Debtors to collateralize their digital asset holdings, including cryptocurrency, would be prohibitively expensive (if possible at all).  Further, requiring the Debtors to liquidate their digital assets and transfer the resulting cash to an authorized depository would be value destructive to the debtors and their stakeholders.

30.     Requiring the Debtors to transfer the cash funds held in non-authorized depositories to authorized depositories or for the Debtors to post a bond for their crypto custodial accounts would similarly place a needless administrative and financial burden on the Debtors, imposing unnecessary and avoidable costs on the Debtors' estates to the detriment of their efforts to

---

[4]   *See See* Rachel Louise Ensign, *Banks Are Breaking Up With Crypto During Regulatory Crackdown*, Wall St. J. (Feb. 16, 2023), https://on.wsj.com/3G8hCEG; Katie Haun, *How U.S. Regulators Are Choking Crypto*, Wall St. J. (Mar. 27, 2023), https://on.wsj.com/40KMTp8.

maximize value for stakeholders.   Many authorized depositories will not create accounts with cryptocurrency businesses.   The Debtors have attempted to create accounts with authorized depositories, but have not yet been able to do so, and will continue reaching out to authorized depositories to find suitable banks.   In the event that any of the Bank Accounts cease to comply with, or do not comply with, the requirements of section 345(b) of the Bankruptcy Code during the chapter 11 cases, the Debtors request that the Court provide the Debtors with 45 days without prejudice to seeking an additional extension from the entry of the Interim Order, to either (a) bring the Bank Accounts into compliance with section 345(b) of the Bankruptcy Code or (b) to seek appropriate relief from the Court.

## VIII.   Intercompany Transactions.

### A.   Overview.

31.   BUS is party to a Transitional Services Agreement dated as of May 5, 2023 ("TSA") with Trexie Management, LLC ("Trexie").   Pursuant to the TSA, BUS and Trexie maintain relationships with each other (the "Intercompany Transactions") resulting in intercompany receivables and payables in the ordinary course of business (the "Intercompany Balances").

32.   In the ordinary course of business, BUS and Trexie make Intercompany Transactions pursuant to which: (a) BUS provides legal and general administrative services to Trexie; and (b) Trexie provides services relating to information technology, customer support, data science, wallet support, accounting and finance, and compliance to BUS.

33.   However, Trexie has not yet set up its bank account.   Until it does, BUS is paying expenses related to both its and Trexie's employees, accounting for payments attributable to Trexie's employees, and submitting such payments to Trexie for reimbursement.

34.     In connection with the daily operation of the Cash Management System, as funds are swept and disbursed throughout the Cash Management System and as business is transacted between the Debtors, at any given time there may be Intercompany Balances owing.  Certain Intercompany Balances are settled in cash while others are reflected as journal entry receivables and payables, as applicable.  The Debtors track all fund transfers through their accounting system and can ascertain, trace, and account for all Intercompany Transactions.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.[5]

**B.     Importance of the Intercompany Transactions.**

35.     The Debtors' ability to engage in Intercompany Transactions is essential to the smooth and uninterrupted operation of the Debtors' business.  The Intercompany Transactions are crucial for the Debtors' business.  The Debtors would be unduly burdened both financially and logistically if they were required to halt or otherwise modify the Intercompany Transactions at this time.  As a practical matter, deconsolidation likely would require extensive renegotiation with and outreach to vendors and other third parties.  Hasty changes to this established system likely would disrupt the Debtors' ability to timely and properly process receivables and payables.

36.     Moreover, the Intercompany Transactions are comparable to those of other companies with similarly complex corporate structures.   Importantly, all Intercompany Transactions can be, and will be, tracked on a post-petition basis, and fully subject to monthly

---

[5]     This Motion provides an overview of the Debtors' typical Intercompany Transactions. The relief requested herein is applicable with respect to all Intercompany Transactions and is not limited to those Intercompany Transactions described in this Motion. To the extent that there are any outstanding pre-petition obligations related to Intercompany Transactions not described herein, the Debtors, out of an abundance of caution, seek authority to honor such obligations.

reviews by the Debtors.   Any discrepancies can, and will be, addressed consistent with past practice.

## IX.   Corporate Cards.

37.   As part of the Cash Management System, the Debtors have provided seven employees with corporate credit cards (the "Corporate Cards") issued by American Express to cover legitimate business expenses, including related to information technology, marketing, and business development, incurred in the ordinary course of business in connection with their employment.   Historically, the Debtors accrued and paid approximately $25,000 per month on account of the Corporate Cards, which hold a $100,000 aggregate credit limit.   As of the Petition Date, the Corporate Cards hold a balance of approximately $5,375.64.   The costs incurred through use of the Corporate Cards are billed directly to the Debtors and do not pass through the applicable employee's personal financial account.   The Corporate Card payments are paid on a monthly basis.

38.   The Corporate Cards are an integral part of the Debtors' cash management and account functions.   The ability of the Debtors to use the Corporate Cards on a go-forward basis is essential to the continued operation of the Debtors' business and the corporate administration thereof in order for the relevant employees and vendors to have assurance that they will be able to purchase certain business expenses without having to seek reimbursement from their own account or otherwise seek proper remittance.   Accordingly, the Debtors' inability to maintain the Corporate Cards would result in unnecessary hardship on the continued operation of the Debtors' business.   Out an abundance of caution, the Debtors seek authorization to continue honoring obligations in relation to the Corporate Cards on a post-petition basis in the ordinary course of business.

## X.   Business Forms and Books and Records

39.   As part of their Cash Management System, the Debtors use various preprinted business forms such as checks (the "Business Forms") in the ordinary course.   To minimize

expenses to their estates and to avoid confusion during the pendency of these chapter 11 cases, the Debtors request that the Court authorize the Debtors continued use of all existing preprinted correspondence and Business Forms (including, without limitation, letterhead, checks, invoices, and other Business Forms) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as chapter 11 debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering new Business Forms as required by the U.S. Trustee Guidelines.  The Debtors submit that once they have exhausted their existing stock of Business Forms, they shall ensure that any new Business Forms are clearly labeled "Debtor in Possession," and with respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor in Possession."

## BASIS FOR RELIEF

### I.    Maintaining the Existing Cash Management System Is Essential to Maximizing the Value of the Debtors' Estates.

40.    The U.S. Trustee Guidelines require debtors in possession to, among other things: (a) close all existing bank accounts and open new debtor-in-possession bank accounts; (b) establish one debtor-in-possession account for all estate monies required for the payment of taxes, including payroll taxes; (c) physically set aside all monies required by law to be withheld from employees or collected from others for taxes; (d) open a new set of books and records as of the commencement date of the case; (e) use new business forms indicating the debtor-in-possession status of the chapter 11 debtor; and (f) make all disbursements of estate funds by check with a notation representing the reason for the disbursement.  *See* U.S. Trustee Guidelines.  These requirements are designed to provide a clear line of demarcation between pre-petition and post-petition transactions and operations and to prevent inadvertent payment of pre-petition claims.

Considering, however, the complex Cash Management System that the Debtors have in place for the transfer and distribution of funds, which ties into the Debtors' existing corporate accounting and cash forecasting reporting, enforcement of this provision of the U.S. Trustee Guidelines during these chapter 11 cases would disrupt the Debtors' ability to efficiently administer these chapter 11 cases.

41.     Continuation of the Cash Management System is nevertheless permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course without notice or a hearing." 11 U.S.C. § 363(c)(1). *See, e.g.*, *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) ("Section 363(c)(1) of the Bankruptcy Code authorizes a debtor-in-possession to enter into transactions involving property of the estate within the ordinary course of business without notice or a hearing."); *In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1562202, at *15 (Bankr. S.D.N.Y. Mar. 21, 2003) (stating same). Included within the purview of section 363(c) of the Bankruptcy Code is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system. *In re Frigitemp Corp.*, 34 B.R. 1000, 1010 (S.D.N.Y. 1983), aff'd, 753 F.2d 230 (2d Cir. 1985); *see also Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996).

42.     Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter." *See In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). Additionally, courts have noted that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in*

*part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993).  As a result, courts have concluded that the requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient."  *Id.* at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (noting that maintaining an existing cash management system allows debtors "to administer more efficiently and effectively its financial operations and assets").

43.     Here, the Debtors respectfully request that the Court allow them to continue operating each of the Bank Accounts identified on Exhibit 2 annexed to Exhibit A and Exhibit B attached.  The Bank Accounts will be maintained in the ordinary course as they were before the Petition Date and are necessary to conduct the Debtors' routine pre-petition transactions.  As noted in the cases above, maintaining the Cash Management System and Bank Accounts allows efficient utilization of the Debtors' cash resources and will enable the Debtors' businesses to continue operating.

## II.     Maintaining the Existing Cash Management System Will Not Harm Parties-in-Interest.

44.     The Debtors' continued use of their Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies, expenses, and distraction associated with disrupting this system and minimizing delays in the payment of post-petition obligations.  The Debtors respectfully submit that parties-in-interest will not be harmed by the Debtors' maintenance of their existing Cash Management System, including maintenance of the Bank Accounts and continuance of the Intercompany Transactions, because the Debtors have developed and implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.  Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of pre-petition debts without the prior approval of

the Debtors' accounting department.  In light of such protective measures, the Debtors submit that

maintaining the Cash Management System is in the best interests of their estates and creditors.

### III.    Authorizing the Debtors to Continue Using Debit, Wire, and ACH Transfers Is Warranted.

45.    The Debtors request that the Court grant further relief from the U.S. Trustee

Guidelines to the extent they require the Debtors to make all disbursements by check.  The U.S.

Trustee Guidelines require that all receipts and all disbursements of estate funds must be made by

check with a notation representing the reason for the disbursement.  The Debtors conduct a large

number of transactions on a daily basis through ACH transfers and other similar methods.  If the

Debtors' ability to conduct transactions by debit, wire, ACH transfer, or other similar methods is

impaired, the Debtors' day-to-day activities may be unnecessarily disrupted, and the estates will

incur additional costs.  Therefore, the Debtors submit that authorizing the continuation of using

debit, wire, and ACH transfers is warranted.

### IV.    Authorizing the Banks to Continue to Maintain, Service, and Administer the Bank Accounts in the Ordinary Course is Warranted.

46.    The Debtors respectfully request that the Court authorize the Banks to continue to

maintain, service, and administer the Bank Accounts, without interruption and in the ordinary

course.  In this regard, the Debtors request that, the Banks be authorized to (a) receive, process,

honor, and pay any and all checks, ACH transfers, and other instructions and drafts payable

through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or

other parties entitled to issue instructions with respect thereto; (b) accept and honor all

representations from the Debtors as to which checks, drafts, wires, or ACH transfers should be

honored or dishonored consistent with any order of the Court and governing law, whether such

checks, drafts, wires, or ACH transfers are dated before or subsequent to the Petition Date; and (c)

continue to charge the Debtors the Bank Fees and charge-back returned items to the Bank

Accounts, whether such items are dated before, on, or subsequent to the Petition Date, in the ordinary course.

47.     The Debtors also request that to the extent a Bank honors a pre-petition check or other item drawn on any account either: (a) at the direction of the Debtors; (b) in a good-faith belief that the Court has authorized such pre-petition check or item to be honored; or (c) as a result of an innocent mistake made despite implementation of customary item handling procedures, such Bank will not be deemed to be liable to the Debtors or to the estates on account of such pre-petition check or other item honored post-petition.  This is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.  The Debtors also request that the Court authorize the Debtors to pay any pre-petition Bank Fees for pre-petition transactions that are charged post-petition.

**V.     The Court Should Authorize the Debtors to Continue Conducting Intercompany Transactions in the Ordinary Course and Grant Superpriority Administrative Expense Status to Post-petition Intercompany Balances Among the Debtors.**

48.     The Debtors' funds move through the Cash Management System as described above. At any given time, there may be Intercompany Balances owing. Intercompany Transactions are made in the ordinary course as part of the Cash Management System.[6]  The Debtors track all fund transfers in their accounting system and can ascertain, trace, and account for all Intercompany Transactions previously described.  The Debtors, moreover, will continue to maintain records of such Intercompany Transactions.

---

[6]  Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises like it, the Debtors submit that the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors seek express authority to engage in such transactions on a post-petition basis.  Moreover, the continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their businesses as debtors in possession.

49.     If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls could be disrupted to the Debtors' and the estates' detriment.   In addition, a number of critical services would be interrupted.   The Debtors respectfully request the authority to continue conducting the Intercompany Transactions in the ordinary course of business without need for further Court order.

## VI.     The Court Should Authorize the Debtors to Continue Using Their Existing Business Forms.

50.     To avoid disruption of the Cash Management System and the incurrence of unnecessary expense, the Debtors request that they be authorized to continue to use their existing Business Forms (including, without limitation, letterhead, checks, and other Business Forms) substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession.   The Debtors submit that parties-in-interest will not be prejudiced if they are authorized to continue to use their Business Forms substantially in the forms existing immediately before the Petition Date.   Such parties will undoubtedly be aware of the Debtors' status as debtors in possession and, thus, changing Business Forms is unnecessary and would be unduly burdensome.   The Debtors further submit that once they have exhausted their existing stock of Business Forms, they shall ensure that any new Business Forms are clearly labeled "Debtor-In-Possession."   With respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor-In-Possession."

## VII.     Cause Exists for Waiving the U.S. Trustee Guidelines Regarding Authorized Depositories on an Interim and Final Basis.

51.     The Debtors seek a waiver of the deposit and investment requirements set forth in section 345 of the Bankruptcy Code.

52.     Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposit or investment of money of estates, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  For deposits that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of a corporate security, "unless the court for cause orders otherwise."  Additionally, under the U.S. Trustee Guidelines, debtors in possession must, among other things, close pre-petition bank accounts and open new "debtor in possession" operating, payroll, and tax accounts at one or more approved depositories.

53.     Courts may waive compliance with the Bankruptcy Code section 345 and the U.S. Trustee Guidelines for "cause." In evaluating whether "cause" exists, courts have considered a number of factors such as:

(1)     the sophistication of the debtor's business;

(2)     the size of the debtor's business operations;

(3)     the amount of the investments involved;

(4)     the bank ratings (Moody's and Standard & Poor) of the financial institutions where the debtor in possession funds are held;

(5)     the complexity of the case;

(6)     the safeguards in place within the debtor's own business for ensuring the safety of the funds;

(7)     the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

(8)     the benefit to the debtor;

(9)    the harm, if any, to the debtor;

(10)   the harm, if any, to the estate; and

(11)   the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

*See In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

54.    Because the Bank Accounts are vital to the Cash Management System, requiring the Debtors to transfer funds to other banks would be unduly burdensome to the Debtors' operations and potentially cause severe tax consequences to the detriment of the Debtors' estates. It is not even clear that the Debtors could transfer funds to other banks. As discussed above, the Debtors attempted to find suitable banks that are authorized depositories, but many of them are unwilling to provide services to cryptocurrency companies. The Debtors therefore located banks that are well-capitalized, highly-rated, and FDIC-insured. The Debtors believe that the Bank Accounts provide protections that are comparable to those contemplated by section 345 of the Bankruptcy Code. Therefore, the Debtors submit that cause exists to waive the U.S. Trustee Guidelines and allow the Debtors to continue to maintain the Bank Accounts in the ordinary course of business. *See, e.g., In re King Mountain Tobacco Co., Inc.*, 623 B.R. 323, 332-33 (Bankr. E.D. Wash. 2020) (authorizing the debtors to use existing cash management systems even though banks were not approved depositories).

55.    Additionally, requiring the Debtors to collateralize their digital asset holdings, including cryptocurrency, would be prohibitively expensive (if possible at all). Further, requiring the Debtors to liquidate their digital assets and transfer the resulting cash to an authorized depository would be value destructive to the Debtors and their stakeholders.

56.     To allay the concerns addressed by section 345(b) of the Bankruptcy Code, the Debtors will engage with the U.S. Trustee in good faith discussion to determine potential modifications to the Debtors' Cash Management System.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003(B) ARE SATISFIED

57.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support the relief requested herein.

## WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

58.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

59.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular

claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NOTICE

60.     The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable: (a) the United States Trustee for the District of Delaware; (b) the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the lender under the Debtors' post-petition financing facility; (d) counsel to Debtors' non-debtor affiliate Bittrex Global GmbH; (e) counsel to Debtors' non-debtor affiliates RBR Holdings, Inc., and Aquila Holdings Inc.; (f) the Cash Management Banks; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

61.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court (a) enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, (b) enter the Final Order, substantially in the form attached hereto as **Exhibit B**, and (c) grant such other and further relief as is just and proper.

Date: May 8, 2023
Wilmington, DE

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Robert S. Brady*

Robert S. Brady (Delaware Bar No. 2847)
Kenneth Enos (Delaware Bar No. 4544)
Joshua Brooks (Delaware Bar No. 6765)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: 302-571-6600
Facsimile: 302-571-1253
Email: rbrady@ycst.com
Email: kenos@ycst.com
Email: jbrooks@ycst.com

-and-

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

Susheel Kirpalani *(pending pro hac vice)*
Patricia B. Tomasco *(pending pro hac vice)*
Daniel Holzman *(pending pro hac vice)*
Alain Jaquet *(pending pro hac vice)*
Razmig Izakelian *(pending pro hac vice)*
Valerie Ramos (*pending pro hac vice*)
Joanna D. Caytas *(pending pro hac vice)*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: 212-849-7000
Facsimile: 212-849-7100
Email: susheelkirpalani@quinnemanuel.com
Email: pattytomasco@quinnemanuel.com
Email: danielholzman@quinnemanuel.com
Email: alainjaquet@quinnemanuel.com
Email: razmigizakelian@quinnemanuel.com
Email: valerieramos@quinnemanuel.com
Email: joannacaytas@quinnemanuel.com

**PROPOSED COUNSEL FOR THE DEBTORS**

**<u>EXHIBIT A</u>**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Desolation Holdings LLC, *et al.,*[1] | Case No. 23-10597 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No.** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PRE-PETITION OBLIGATIONS RELATED THERETO, AND (C) CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS, (II) GRANTING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS TO POST-PETITION INTERCOMPANY BALANCES, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"): (a) authorizing, but not directing, the Debtors to (i) continue to operate their cash management system (the "Cash Management System"); (ii) honor certain pre-petition obligations related thereto; and (iii) continue to perform Intercompany Transactions consistent with historical practice; (b) granting superpriority administrative expense status to post-petition intercompany balances; and (c) scheduling a final hearing to consider approval of the Motion on a final basis, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, entered February 29, 2012; and that this Court having the power to enter a final order consistent with Article III of the United States

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Holdings Ltd. (2227); and Bittrex Malta Ltd. (1764). The mailing and service address of the Debtors is 701 5th Avenue, Suite 4200, Seattle, WA 98104.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that proper and adequate notice of the Motion and the relief requested therein has been provided in accordance with the Bankruptcy Rules and the Local Rules, and that, except as otherwise ordered herein, no other or further notice is necessary; and objections (if any) to the Motion having been withdrawn, resolved or overruled on the merits; and a hearing having been held to consider the relief requested in the Motion and upon the record of the hearing and all of the proceedings had before this Court; and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT**

1.      The Motion is granted on an interim basis as set forth herein.

2.      The final hearing with respect to this Motion shall be held on **_____, 2023 at __:__ __.m (prevailing Eastern Time)**. Any objections or responses to entry of the proposed Final Order shall be filed on or before **__:__ __.m. (prevailing Eastern Time)** on **_____, 2023** and served on the following parties: (a) proposed co-counsel to the Debtors, (i) Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Ave 22nd floor, New York, NY 10010, Attn: Susheel Kirpalani (susheelkirpalani@quinnemanuel.com); Patricia B. Tomasco (pattytomasco@quinnemanuel.com), Daniel Holzman (danielholzman@quinnemanuel.com), and qe-bittrex@quinnemanuel.com, and (ii) Young Conaway Stargatt & Taylor, LLP, Wilmington, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Robert S. Brady (rbrady@ycst.com), Kenneth Enos (kenos@ycst.com), and Joshua Brooks (jbrooks@ycst.com); (b) counsel to any statutory committee appointed in these Chapter 11 Cases; (c) the U.S. Trustee,

844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Richard L. Schepacarter (richard.schepacarter@usdoj.gov); and (d) to the extent not listed herein, those parties requesting notice pursuant to Bankruptcy Rule 2002.  If no objections are timely filed, this Court may enter the Final Order without further notice or a hearing.

3.      The Debtors are authorized, on an interim basis and in their sole discretion, to: (a) continue operating the Cash Management System, substantially as illustrated on Exhibit 1 attached hereto; (b) honor their pre-petition obligations related thereto; and (c) continue to perform Intercompany Transactions consistent with historical practice.

4.      The Debtors are authorized, on an interim basis and in their sole discretion, to: (a) continue to use, with the same account numbers, the Bank Accounts in existence as of the Petition Date, including those Bank Accounts identified on Exhibit 2 attached hereto; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) deposit funds in and withdraw funds from the Bank Accounts by all usual means, including checks, wire transfers, and other debits; (d) pay all pre-petition Bank Fees; and (e) pay any ordinary course Bank Fees incurred in connection with the Bank Accounts, irrespective of whether such fees arose prior to the Petition Date, and to otherwise perform their obligations under the documents governing the Bank Accounts.

5.      The Debtors are authorized, but not directed, to continue using, in their present form, the Business Forms, as well as checks and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession; *provided* that once the Debtors have exhausted their existing stock of Business Forms, the Debtors shall ensure that any new Business Forms are clearly labeled "Debtor-In-Possession"; *provided*, *further*, with respect to any Business Forms that exist or are generated

3

electronically, to the extent reasonably practicable, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor-In-Possession."

6.       The Banks at which the Bank Accounts are maintained are authorized to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession without interruption and in the ordinary course, and to receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, and ACH transfers issued and drawn on the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be.

7.       All Banks provided with notice of this Interim Order maintaining any of the Bank Accounts shall not honor or pay any bank payments drawn on the listed Bank Accounts, or otherwise issued before the Petition Date, absent further direction from the Debtors.

8.       The Debtors will maintain records in the ordinary course reflecting transfers of cash, if any, including Intercompany Transactions, so as to permit all such transactions to be ascertainable.

9.       In the course of providing cash management services to the Debtors, the Banks at which the Bank Accounts are maintained are authorized, without further order of the Court, to deduct the applicable fees and expenses associated with the nature of the deposit and cash management services rendered to the Debtors, whether arising pre-petition or post-petition, from the appropriate accounts of the Debtors, and further, to charge back to, and take and apply reserves from, the appropriate accounts of the Debtors any amounts resulting from returned checks or other returned items, including returned items that result from ACH transactions, wire transfers, merchant services transactions or other electronic transfers of any kind, regardless of whether such

items were deposited or transferred pre-petition or post-petition and regardless of whether the returned items relate to pre-petition or post-petition items or transfers.

10.     Each Bank is authorized to debit the Debtors' accounts in the ordinary course of business without the need for further order of the Court for: (a) all checks drawn on the Debtors' accounts which are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (b) all checks or other items deposited in one of the Debtors' accounts with such Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; (c) all undisputed pre-petition amounts outstanding as of the date hereof, if any, owed to any Bank as service charges for the maintenance of the Cash Management System; and (d) all reversals, returns, refunds, and chargebacks of checks, deposited items, and other debits credited to Debtor's account after the Petition Date, regardless of the reason such item is returned or reversed (including, without limitation, for insufficient funds or a consumer's statutory right to reverse a charge).

11.     The Debtors are authorized to open any new bank accounts or close any existing Bank Accounts as they may deem necessary and appropriate in their sole discretion; *provided* that in the event the Debtors open a new bank account they shall open one at an authorized depository and shall timely indicate the opening of such account on the Debtors' monthly operating report and shall provide advance notice of the opening of any new bank accounts or closing of any Bank Account to the U.S. Trustee.

12.     Each of the Banks may rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this or any other order of the Court, and such Bank shall not

have any liability to any party for relying on such representations by the Debtors as provided for herein.

13.     Those agreements existing between the Debtors and the Banks shall continue to govern the post-petition cash management relationship between the Debtors and the Banks, subject to applicable bankruptcy or other law, all of the provisions of such agreements, including the termination, fee provisions, rights, benefits, offset rights and remedies afforded under such agreements shall remain in full force and effect absent further order of the Court or, with respect to any such agreement with any Bank (including, for the avoidance of doubt, any rights of a Bank to use funds from the Bank Accounts to remedy any overdraft of another Bank Account to the extent permitted under the applicable deposit agreement), unless the Debtors and such Bank agree otherwise, and any other legal rights and remedies afforded to the Banks under applicable law shall be preserved, subject to applicable bankruptcy law.

14.     The requirement to establish separate bank accounts for cash collateral and/or tax payments is hereby waived.

15.     Notwithstanding anything to the contrary set forth herein, the Debtors are authorized, but not directed, to continue Intercompany Transactions arising from or related to the operation of their businesses in the ordinary course; *provided* that each Debtor shall (a) continue to pay its own obligations consistent with such Debtor's past practice with respect to Intercompany Transactions and related obligations, and in no event shall any of the Debtors pay for the pre-petition or post-petition obligations incurred or owed by any of the other Debtors in a manner inconsistent with past practices; and (b) beginning on the Petition Date, maintain (i) current records of intercompany balances; (ii) a Debtor by Debtor summary on a monthly basis of any post-petition Intercompany Transactions involving the transfer of cash for the preceding month (to be available

on the 21st day of the following month); and (iii) reasonable access to the Debtors' advisors with respect to such records.

16.    Notwithstanding the Debtors' use of a consolidated Cash Management System, the Debtors shall calculate quarterly fees under 28 U.S.C. § 1930(a)(6) based on the disbursements of each Debtor, regardless of which entity pays those disbursements.

17.    Those certain existing deposit and service agreements between the Debtors and the Banks shall continue to govern the post-petition cash management relationship between the Debtor and the Banks, and that all of the provisions of such agreements, including, without limitation, the termination, chargeback, and fee provisions, shall remain in full force and effect.

18.    The Debtors and the Banks may, without further order of the Court, agree to and implement changes to the Cash Management System and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts; *provided* that in the event the Debtors open a new bank account they shall open one at an authorized depository; *provided, further*, that the Debtors shall give notice of the opening of any new bank accounts or closing of any Bank Account to the U.S. Trustee.

19.    The Debtors are authorized to issue post-petition checks, or to effect post-petition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to pre-petition amounts owed in connection with any Bank Fees.

20.    Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d)

an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. Any payment made pursuant to this Interim Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

21.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the pre-petition obligations approved herein are authorized and directed to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

22.     Nothing in this Interim Order shall modify or impair the ability of any party in interest to contest how the Debtors account, including, without limitation, the validity or amount set forth in such accounting for any Intercompany Transaction or Intercompany Balance. The rights of all parties in interest with the respect thereto are fully preserved.

23.     The Debtors shall have forty-five (45) days, without prejudice to seeking an additional extension, from the entry of this Interim Order to either come into compliance with section 345(b) of the Bankruptcy Code or to seek appropriate relief from the Court.

24.     As soon as practicable after entry of this Interim Order, the Debtors shall serve a copy of this Interim Order on the Banks.

25.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

26.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

27.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

28.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

29.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

## **Exhibit 1**

**Cash Management System Schematic**



## Exhibit 2

**Bank Accounts**

| No. | Entity | Bank Name | Last Four Digits of Account No. | Account Type |
|---|---|---|---|---|
| 1 | Bittrex, Inc. | Customers Bank | 3217 | Operating Account |
| 2 | Bittrex, Inc. | Customers Bank | 0675 | OTC Account |
| 3 | Bittrex, Inc. | Customers Bank | 2017 | FBO Account |
| 4 | Bittrex, Inc. | United Texas Bank | 2423 | Dormant Account |
| 5 | Bittrex, Inc. | Prime Trust Bank | 4450 | FBO Account |
| 6 | Bittrex, Inc. | Prime Trust Bank | 1241 | Reserve Account |
| 7 | Bittrex, Inc. | Goldman Sachs | 2601 | Dormant Account |

**EXHIBIT B**

**Proposed Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Desolation Holdings LLC, *et al.*,[1] | Case No. 23-10597 (BLS) |
| | (Jointly Administered) |
| Debtors. | **Ref. Docket No.** |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO
OPERATE THEIR CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PRE-
PETITION OBLIGATIONS RELATED THERETO, AND (C) CONTINUE TO
PERFORM INTERCOMPANY TRANSACTIONS, (II) GRANTING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS TO POST-PETITION INTERCOMPANY
BALANCES, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of a final order (this "Final Order"): (a) authorizing, but not

directing, the Debtors to (i) continue to operate their cash management system (the "Cash

Management System"); (ii) honor certain pre-petition obligations related thereto; (iii) continue to

perform Intercompany Transactions consistent with historical practice; (b) granting superpriority

administrative expense status to post-petition intercompany balances; and (c) granting related

relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and upon the

Court having entered the Interim Order; and this Court having jurisdiction over this matter

pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Holdings Ltd. (2227); and Bittrex Malta Ltd. (1764). The mailing and service address of the Debtors is 701 5th Avenue, Suite 4200, Seattle, WA 98104.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

District Court for the District of Delaware, entered February 29, 2012; and that this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that proper and adequate notice of the Motion and the relief requested therein has been provided in accordance with the Bankruptcy Rules and the Local Rules, and that, except as otherwise ordered herein, no other or further notice is necessary; and objections (if any) to the Motion having been withdrawn, resolved or overruled on the merits; and a hearing having been held to consider the relief requested in the Motion and upon the record of the hearing and all of the proceedings had before this Courts; and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT**

1. The Motion is granted on a final basis as set forth herein.

2. The Debtors are authorized, in their sole discretion, to: (a) continue operating the Cash Management System, substantially as illustrated on Exhibit 1 attached hereto; (b) honor their pre-petition obligations related thereto; and (c) continue to perform Intercompany Transactions consistent with historical practice.

3. The Debtors are further authorized, in their sole discretion, to: (a) continue to use, with the same account numbers, the Bank Accounts in existence as of the Petition Date, including those Bank Accounts identified on Exhibit 2 attached hereto; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) deposit funds in and withdraw funds from the Bank Accounts by all usual means, including checks, wire transfers, and other

debits; (d) pay all pre-petition Bank Fees; and (e) pay any ordinary course Bank Fees incurred in connection with the Bank Accounts, irrespective of whether such fees arose prior to the Petition Date, and to otherwise perform their obligations under the documents governing the Bank Accounts.

4.      The Debtors are authorized, but not directed, to continue using, in their present form, the Business Forms, as well as checks and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession; *provided* that once the Debtors have exhausted their existing stock of Business Forms, the Debtors shall ensure that any new Business Forms are clearly labeled "Debtor-In-Possession"; *provided*, *further*, with respect to any Business Forms that exist or are generated electronically, to the extent reasonably practicable, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor-In-Possession."

5.      The Banks at which the Bank Accounts are maintained are authorized to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession without interruption and in the ordinary course, and to receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, and ACH transfers issued and drawn on the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be.

6.      All Banks provided with notice of this Final Order maintaining any of the Bank Accounts shall not honor or pay any bank payments drawn on the listed Bank Accounts, or otherwise issued before the Petition Date, absent further direction from the Debtors.

7.     The Debtors will maintain records in the ordinary course reflecting transfers of cash, if any, including Intercompany Transactions, so as to permit all such transactions to be ascertainable.

8.     In the course of providing cash management services to the Debtors, the Banks at which the Bank Accounts are maintained are authorized, without further order of the Court, to deduct the applicable fees and expenses associated with the nature of the deposit and cash management services rendered to the Debtors, whether arising pre-petition or post-petition, from the appropriate accounts of the Debtors, and further, to charge back to, and take and apply reserves from, the appropriate accounts of the Debtors any amounts resulting from returned checks or other returned items, including returned items that result from ACH transactions, wire transfers, merchant services transactions or other electronic transfers of any kind, regardless of whether such items were deposited or transferred pre-petition or post-petition and regardless of whether the returned items relate to pre-petition or post-petition items or transfers.

9.     Each Bank is authorized to debit the Debtors' accounts in the ordinary course of business without the need for further order of the Court for: (a) all checks drawn on the Debtors' accounts which are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (b) all checks or other items deposited in one of the Debtors' accounts with such Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; (c) all undisputed pre-petition amounts outstanding as of the date hereof, if any, owed to any Bank as service charges for the maintenance of the Cash Management System; and (d) all reversals, returns, refunds, and chargebacks of checks, deposited items, and other debits credited to Debtor's account after the

Petition Date, regardless of the reason such item is returned or reversed (including, without limitation, for insufficient funds or a consumer's statutory right to reverse a charge).

10.     The Debtors are authorized to open any new bank accounts or close any existing Bank Accounts as they may deem necessary and appropriate in their sole discretion; *provided* that in the event the Debtors open a new bank account they shall open one at an authorized depository and shall timely indicate the opening of such account on the Debtors' monthly operating report and shall provide advance notice of the opening of any new bank accounts or closing of any Bank Account to the U.S. Trustee.

11.     Each of the Banks may rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date and should be honored pursuant to this or any other order of the Court, and such Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

12.     Those agreements existing between the Debtors and the Banks shall continue to govern the post-petition cash management relationship between the Debtors and Banks, subject to applicable bankruptcy or other law, all of the provisions of such agreements, including the termination, fee provisions, rights, benefits, offset rights and remedies afforded under such agreements shall remain in full force and effect absent further order of the Court or, with respect to any such agreement with any Bank (including, for the avoidance of doubt, any rights of a Bank to use funds from the Bank Accounts to remedy any overdraft of another Bank Account to the extent permitted under the applicable deposit agreement), unless the Debtors and such Bank agree otherwise, and any other legal rights and remedies afforded to the Banks under applicable law shall be preserved, subject to applicable bankruptcy law.

13.     The requirement to establish separate bank accounts for cash collateral and/or tax payments is hereby waived.

14.     Notwithstanding anything to the contrary set forth herein, the Debtors are authorized, but not directed, to continue Intercompany Transactions arising from or related to the operation of their businesses in the ordinary course; *provided* that each Debtor shall (a) continue to pay its own obligations consistent with such Debtor's past practice with respect to Intercompany Transactions and related obligations, and in no event shall any of the Debtors pay for the pre-petition or post-petition obligations incurred or owed by any of the other Debtors in a manner inconsistent with past practices; and (b) beginning on the Petition Date, maintain (i) current records of intercompany balances; (ii) a Debtor by Debtor summary on a monthly basis of any post-petition Intercompany Transactions involving the transfer of cash for the preceding month (to be available on the 21st day of the following month); and (iii) reasonable access to the Debtors' advisors with respect to such records.

15.     Notwithstanding the Debtors use of a consolidated Cash Management System, the Debtors shall calculate quarterly fees under 28 U.S.C. § 1930(a)(6) based on the disbursements of each Debtor, regardless of which entity pays those disbursements.

16.     Those certain existing deposit and service agreements between the Debtors and the Banks shall continue to govern the post-petition cash management relationship between the Debtors and the Banks, and that all of the provisions of such agreements, including, without limitation, the termination, chargeback, and fee provisions, shall remain in full force and effect.

17.     The Debtors and the Banks may, without further order of the Court, agree to and implement changes to the Cash Management System and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts; *provided* that in

the event the Debtors open a new bank account they shall open one at an authorized depository; *provided, further*, that the Debtors shall give notice of the opening of any new bank accounts or closing of any Bank Account to the U.S. Trustee.

18.     The Debtors are authorized to issue post-petition checks, or to effect post-petition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to pre-petition amounts owed in connection with any Bank Fees.

19.     Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. Any payment made pursuant to this Final Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

20.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the pre-petition obligations approved herein are authorized and directed to receive, process, honor, and pay all such checks and electronic payment requests

when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

21.     Nothing in this Final Order shall modify or impair the ability of any party in interest to contest how the Debtors account, including, without limitation, the validity or amount set forth in such accounting for any Intercompany Transaction or Intercompany Balance. The rights of all parties in interest with the respect thereto are fully preserved.

22.     Section 345 of the Bankruptcy Code and any provision of the U.S. Trustee Guidelines requiring that the Bank Accounts be U.S. Trustee authorized depositories is waived with respect to the Bank Accounts existing as of the Petition Date.

23.     As soon as practicable after entry of this Final Order, the Debtors shall serve a copy of this Final Order on the Banks.

24.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

25.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

26.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

27.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

**Exhibit 1**

**Cash Management System Schematic**



s

**Exhibit 2**

**Bank Accounts**

| No. | Entity | Bank Name | Last Four Digits of Account No. | Account Type |
|---|---|---|---|---|
| 1 | Bittrex, Inc. | Customers Bank | 3217 | Operating Account |
| 2 | Bittrex, Inc. | Customers Bank | 0675 | OTC Account |
| 3 | Bittrex, Inc. | Customers Bank | 2017 | FBO Account |
| 4 | Bittrex, Inc. | United Texas Bank | 2423 | Dormant Account |
| 5 | Bittrex, Inc. | Prime Trust Bank | 4450 | FBO Account |
| 6 | Bittrex, Inc. | Prime Trust Bank | 1241 | Reserve Account |
| 7 | Bittrex, Inc. | Goldman Sachs | 2601 | Dormant Account |