**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Desolation Holdings LLC, *et al.*,[1] | Case No. 23-10597 (BLS) |
| Debtors. | (Joint Administration Pending) |

**DECLARATION OF EVAN HENGEL,**
**CO-CHIEF RESTRUCTURING OFFICER OF THE DEBTORS,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Evan Hengel, Co-Chief Restructuring Officer of Bittrex Inc. ("BUS"), Desolation

Holdings LLC ("Desolation"), Bittrex Malta Holdings Ltd. ("Malta Holdings") and Bittrex Malta

Ltd. ("Malta OpCo") (collectively, the "Debtors"), hereby declare under penalty of perjury:

**INTRODUCTION**

1.      The Debtors operated a cryptocurrency exchange as part of a larger group of

companies.  The Debtors provided an online platform for access to the exchange to customers in

different jurisdictions with certain non-debtor entities (collectively, Debtor and non-debtor

entities, "Bittrex").  *See* Part III below.  Non-debtors Bittrex Global GmbH  ("BG") and Bittrex

Global (Bermuda) Ltd. ("BGB") operate Bittrex's cryptocurrency exchange outside of the United

States ("U.S.").  Debtor BUS, a Georgia corporation, operated a cryptocurrency exchange in the

U.S., serving U.S. customers.  As such, BUS fell under U.S. regulatory oversight and was affected

by U.S. macroeconomic trends.  Malta Holdings and Malta OpCo served non-U.S. customers, but

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Holdings Ltd. (2227); and Bittrex Malta Ltd. (1764). The mailing and service address of the Debtors is 701 5th Avenue, Suite 4200, Seattle, WA 98104.

as part of Bittrex's previous reorganization and expansion, ceased operating in 2019 after notifying their customers to transfer their accounts to BG.

2.      The lack of regulatory clarity in the U.S. created a substantial negative economic impact on the digital asset industry and resulted in overlapping regulatory burdens and soaring regulatory costs, on both the state and federal level.  As a result, the Debtors faced an untenable regulatory and economic environment that compelled them to initiate a restructuring process and an orderly wind down of their U.S. operations.  *First*, on March 31, 2023, BUS urged its customers to withdraw their cryptocurrency deposits from BUS.  At the same time, BUS ceased accepting new customers and worked with its advisors to responsibly repay customers 100 percent of their respective cryptocurrency and U.S. dollars on deposit with BUS.  As the final phase of this wind-down effort, the Debtors filed for chapter 11 to complete the orderly wind down of their U.S. and long-dormant Malta operations.  Unlike other recent cryptocurrency bankruptcies, the Debtors did not risk, hypothecate, or loan cryptocurrencies needed to meet their contractual obligations to their customers, and the proposed chapter 11 plan contemplates payment in full of the claims of the Debtors' customers.

3.      Historically, the Debtors and their non-debtor operating affiliates (collectively, "Bittrex") operated cryptocurrency exchanges that allowed customers to buy, sell, trade, and store cryptocurrency on an easy-to-use platform.  Bittrex provided a wide selection of cryptocurrencies in the United States along with fast trade execution and dependable digital wallets, all protected by industry-leading security practices.  The Debtors' customers could trade approximately 150 unique digital assets.  Bittrex strived to provide its customers with the tools to enter the cryptocurrency industry on their own terms in a way that was tailored to the needs of each customer.  BUS operated a cryptocurrency exchange in the U.S. and, as of March 27, 2023, had

over 600,000 active users (i.e., with a balance in the respective accounts), both retail and institutional, in 46 states, and 1.2 million customers overall (i.e., with and without a balance in the respective accounts). Bittrex, globally, had over 1.5 million active users through BUS, BG and BGB and over 5.4 million customers overall.

4.      Commencing in 2022, events in the world economy caused a downturn in traditional markets that exacerbated challenges in cryptocurrency markets. In the wake of the COVID-19 pandemic, rampant inflation spread worldwide, causing the U.S. Federal Reserve to raise interest rates in response. This led to the re-valuation of risk and technology assets worldwide, including cryptocurrencies. This resulted in the net wealth of U.S. households declining by $4 trillion in 2022[2] and the index S&P 500 falling by 926.68 or (19%) in 2022:



5.      These macroeconomic trends acutely affected the cryptocurrency market. All major coins and cryptocurrency-focused companies experienced significant declines. Several major liquidity events in the cryptocurrency space, including the implosion of Terra LUNA

---

[2]     *See* Federal Reserve Statistical Release, Z.1 Financial Accounts of the United States, at 8 (March 9, 2023), available at https://www.federalreserve.gov/releases/z1/20230309/z1.pdf. Household net worth is calculated as the difference between total assets and liabilities of the household and nonprofit organizations sector.

("Luna") (as discussed in Part IV of this Declaration), accelerated the onset of a "crypto winter" and an industry-wide sell-off to manage risk in 2022.  The CoinDesk Currency Index (CCY), measuring the market capitalization weighted performance of digital currencies, fell by more than 65 percent over the course of 2022.[3]



6.      The rising interest rates, steering investment away from alternative assets such as cryptocurrencies, were also reflected in macroeconomic trends: for example, as reflected in the diagram below, in the last two calendar years, the NASDAQ Composite Index declined by 19 percent, the value of long-term Treasury Bonds declined by 37 percent, and the Bitcoin price declined by 48 percent.

---

[3]     CoinDesk, CoinDesk Currency Index (CCY), https://www.coindesk.com/indices/ccy/.



7.    As a cryptocurrency exchange generating revenue from trading commissions, Bittrex experienced lower trading volumes and reduced platform account balances, which resulted in a dramatic decrease in revenues.  In addition, new competitors entered the space in the late 2010s.  Many of these competitors obtained market share by spending large amounts of money on advertising and/or offering yield (essentially an interest rate on what customers deposit), along with other inducements to attract new customers.  BUS did not offer yield-based products.



8.    Despite the growth of the cryptocurrency industry, the U.S. regulators did not clarify which agency serves as the primary regulator for cryptocurrency or whether

cryptocurrencies will be considered a commodity, currency, security, or novel asset under the law. Similarly, existing agencies provided little guidance on these issues. The Securities and Exchange Commission ("SEC"), for example, has only issued limited, high-level guidance, including the July 2017 "DAO Report"[4] and the April 2019 staff guidance "Framework for 'Investment Contract' Analysis of Digital Assets"[5] on the circumstances in which cryptocurrencies would be deemed securities, neither of which provides any concrete guidance as to which specific assets the SEC views to be securities.

9.      Like many U.S.-based cryptocurrency exchanges, the SEC served and, BUS responded to, numerous subpoenas since 2017. The SEC never indicated during its investigation which of the digital assets listed by BUS fit the SEC's definition of securities. Although BUS attempted to cooperate with the SEC, including trying to register BUS with the SEC, the SEC was unable to offer a path forward for BUS to comply with registration requirements for a national securities exchange and still remain in business. On March 9, 2023, the SEC staff served BUS a Wells Notice[6] indicating that the staff intended to recommend the SEC charge BUS with operating an unregistered securities exchange, an unregistered broker dealer, and an unregistered clearing agency.

10.      Following failed efforts to resolve these allegations consensually, on April 17, 2023, the SEC brought an enforcement action in federal court in the Western District of Washington (Seattle) against BUS, its former CEO, and its international sister company, BG, seeking injunctive relief, fines, and disgorgement. The SEC alleges that BUS did not register as

---

[4]      https://www.sec.gov/news/press-release/2017-131#:~:text=The%20SEC%27s%20Report%20of%20Investigation%20found%20that%20tokens,and%20therefore%20subject%20to%20the%20federal%20securities%20laws.

[5]      https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

[6]      The SEC staff also attempted to serve a Wells Notice on BUS' non-U.S. affiliate, BG.

national securities exchange, broker-dealer, and clearing agency.  The SEC also charged BG for failing to register as a national securities exchange in connection with its operation of a single shared order book along with BUS.  *See SEC v. Bittrex, Inc., Bittrex Global GmbH, and William Hiroaki Shihara*, No. 2:23-cv-00580 (W.D. Wash. filed April 17, 2023).

11.    The SEC alleges that six of the crypto assets listed on the Bittrex platform were securities: OMG, DASH, ALGO, TKN, NGC, and IHT. This was the first time in at least 6 years that the SEC disclosed which digital assets listed by BUS it deemed to be securities.

12.    The SEC now alleges that, because BUS brought together buyers and sellers of assets it regards as securities, BUS should have registered as an exchange.  The SEC further alleges that BUS should have registered as a clearing agency because it acted as an intermediary in making payments and deliveries upon matching sell and buy orders and maintained custody of customer assets.  Finally, the complaint alleges that Bittrex should have registered as a broker because it regularly engaged in the business of effecting transactions for the accounts of others.

13.    Additionally, after years of investigations  by the U.S. Department of the Treasury Financial Crimes Enforcement Network ("FinCEN") and the U.S. Department of the Treasury Office of Foreign Assets Control ("OFAC"), in October 2022, BUS settled with both FinCEN and OFAC, agreeing to pay fines of more than $29 million for BUS-related conduct from February 2014 through December 2018, and $24 million for BUS-related conduct between March 2014 and December 2017, respectively (the "Settlement[s]").  As part of the Settlement, FinCEN credited to BUS the OFAC fine, such that BUS owes an additional $5 million to FinCEN after paying the OFAC fine.  Neither Settlement required any remediation by, nor ongoing oversight of, BUS, which, for the periods following those covered by the Settlements, has fully complied with (a) the Bank Secrecy Act (BSA) and FinCEN's implementing regulations; and (b) any OFAC regulations.

BUS has paid the initial required installment of $1.5 million towards the settlement, and the remainder is to be repaid over the next two years.

14.     Uncertainty at the federal regulatory level concerning classification and oversight of cryptocurrencies coincided with greater scrutiny of the crypto industry at the state level.  BUS, as a national platform, held money transmitter licenses in the majority of U.S. states where it operated.  Each state had unique books and records requirements as well as the ability to initiate examinations.  Following the sudden collapse of cryptocurrency exchange FTX, which filed for chapter 11 protection on November 11, 2022, BUS received significantly increased audit requests from state regulators, further diverting substantial resources away from daily operations.  Then, several states alleged that BUS was undercapitalized and demanded that BUS immediately surrender its money transmitter licenses in those states.  In response, BUS's legal team engaged with the states to arrive at a wind-down plan that offered BUS's customers a uniform and orderly withdrawal process culminating in the surrender of BUS's money transmitter licenses and these chapter 11 cases.

15.     Regulatory uncertainty created other stresses in the cryptocurrency infrastructure, including the liquidation of Silvergate Capital, a critical banking partner of BUS, that made it difficult to secure long-term banking service providers necessary to run an optimal trading platform for customers.

16.     As a result of these costly regulatory investigations and related penalties, coupled with dramatically lower revenue, Bittrex's management team immediately began to explore potential strategic solutions.  Initially, BUS retained Lazard Ltd. and engaged in numerous discussions with a number of third parties regarding the possible sale of all or part of Bittrex's assets, including customer lists, and potential sources of new liquidity through debt or equity

investments.   Thereafter, BUS retained Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") as its restructuring counsel (having previously retained Quinn Emanuel as its SEC defense counsel), and this engagement grew to include all of the Debtors, but no non-Debtor Bittrex affiliates.   On March 1, 2023, BUS appointed Timothy Pohl with TRP Advisors, LLC to serve as an independent non-employee director to act for the sole benefit of BUS in any transactions involving the rest of the non-debtor corporate group.   BUS subsequently retained Berkeley Research Group ("BRG") as its financial advisor on March 20, 2023 and appointed me and Robert Duffy to act as Co-Chief Restructuring Officers on April 17, 2023.

17.     While some third parties expressed interest in a potential acquisition or partnership with Bittrex's primary international company, BG, few expressed interest in Bittrex's domestic entity, likely as a result of the current market conditions and inhospitable regulatory environment in the U.S. and consistent with minimal interest in asset sales of other leading distressed crypto exchanges.  With the assistance of their advisors, the Debtors ultimately determined that an in-court process would be necessary to yield the swiftest, predictable and most value-maximizing path forward available to creditors of the Debtors, particularly the Debtors' customers, while giving the Debtors a centralized forum and process to address claims and potential disruptions in operations caused by third parties and related financial pressures.

18.     As explained more fully below, consistent with the Debtors' mission to protect their customers against loss, this is not a "free-fall" filing without careful planning and consideration. On the contrary, the Debtors took extensive action pre-petition to ensure full customer recovery, and plan to swiftly bring these chapter 11 cases to a responsible conclusion for the benefit of their customers, despite regulatory challenges.  To that end, the Debtors filed their proposed chapter 11 plan (attached hereto as **Exhibit C**, the "Plan") to facilitate an orderly wind down of the Debtors

and anticipated payment in full of customers and, depending on the level of disputed, contingent, and unliquidated claims by the SEC and other regulatory bodies, other unsecured creditors.  The Plan effectuates the Debtors' consummate goal—to pay customers' claims in full as soon as possible.

## **BACKGROUND**

19.     I am a Co-Chief Restructuring Officer ("CRO") of BUS, and have served in this capacity since April 17, 2023.  Immediately prior to my appointment as CRO, I provided consulting services to BUS in my capacity as a Managing Director of BRG since March 20, 2023.

20.     I received my bachelor's degree in finance from the University of Kansas and I am a Certified Insolvency & Restructuring Advisor.  I am currently a Managing Director at BRG, a financial consulting firm that specializes in, among other things, bankruptcy and restructuring consulting, interim management, and financial and operational consulting to financially troubled companies.  I have approximately sixteen years of experience working in distressed situations and transactions.  My experience includes in- and out-of-court restructurings, operational turnarounds, asset sales, and refinancing transactions, including multiple engagements on behalf of distressed crypto firms.  I have served in interim executive capacities to companies undergoing significant restructurings and as the chairman of the board of directors of an apparel company.

21.     The Debtors retained BRG to provide financial advisory and consulting services on or about March 20, 2023, shortly before I was appointed as a CRO.

22.     I have formerly served as Chief Restructuring Officer of The Collected Group, LLC and Chief Transformation Officer of other companies.  I have been involved in in- and out-of-court restructurings of multiple companies, including crypto companies Voyager Digital Holdings,

Inc., BlockFi, Inc., and SALT Lending on the debtor side, as well as representing the Unsecured Creditors Committee in the bankruptcy case of Genesis Global Holdco, LLC.

23.     In my capacity as Co-Chief Restructuring Officer, I have become familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration to assist the Bankruptcy Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions.

24.     Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  I am over the age of eighteen and authorized to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

25.     On May 8, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the Court.  To minimize the adverse effects on their business, the Debtors filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions").  I submit this declaration (the "Declaration") to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and First Day Motions filed contemporaneously herewith.

26.     To familiarize the Court with the Debtors, their business, the circumstances leading up to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration into five sections as follows:

- **Part I** provides a general overview of the cryptocurrency market;

- **Part II** provides an overview of Bittrex's history and operations;

- **Part III** describes Bittrex's pre-petition corporate and capital structure; and

- **Part IV** provides an overview of circumstances leading to these chapter 11 cases.

I.    **Overview of Cryptocurrency and Blockchain Industry**

27.    The cryptocurrency industry represents an emerging market, and many of the technologies and terminologies discussed in this Declaration may be unfamiliar to the general public.  This section provides an overview of some of the key elements of the cryptocurrency ecosystem discussed throughout this Declaration.

A.    **Cryptocurrency and the Blockchain**

28.    A cryptocurrency is a digital currency designed to serve as a medium of exchange or store of value.  Cryptocurrency utilizes encryption techniques to control the creation of units and to verify the transfer of funds.  The transactions are recorded on a blockchain, a digital technology that verifies transactions through mining, a rigorous mathematical process that awards a freshly minted cryptocurrency to the miner who first computationally verifies a transaction and ensures a consensus transaction history.  This mechanism is known as the proof of work mechanism, while certain other cryptocurrencies utilize different consensus mechanisms, such as proof of stake, among others. Blockchain technology can be used for a variety of applications beyond cryptocurrencies, such as data storage, supply chain management, voting systems, identity management, and more. In these cases, the primary focus is on creating a decentralized, transparent, and secure system for storing and managing data rather than facilitating a medium of exchange. Blockchains are called digital ledgers because they function as a distributed, decentralized record-keeping system for digital transactions or data. A ledger is a record of transactions, traditionally used in accounting to keep track of financial activities. Similarly, a

blockchain serves as a digital ledger to record transactions or data, but with added benefits of decentralization, transparency, and security.

29.    The largest cryptocurrencies in circulation are decentralized, in that cryptocurrencies are not issued or transmitted by a central authority, but instead, the infrastructure is collectively maintained by a centralized user base.  Cryptocurrency blockchains enable secure peer-to-peer transactions without third-party intermediaries.  Transactions are anonymous, but each transaction is recorded on the blockchain and viewable by the users of the platform.  More specifically, when a participant requests a transaction, a peer-to-peer computer network uses algorithms to validate the transaction and the user's status, and then combines the transaction with other transactions to create a new block of data, which is then added to the existing blockchain permanently, completing the transaction in a final, unalterable way.  Each new block connects with the immediately prior solved block associated with it, adding elements to the blockchain, similar to a new link being added to a chain.

30.    Each cryptocurrency account on the blockchain is identified solely by its unique public key, which renders it effectively anonymous, and is secured with its associated private key. The combination of private and public cryptographic keys constitutes a secure digital identity in the form of a digital signature, providing strong control of ownership.  Users can send and receive the tokens around the world by executing and digitally signing a token transaction with a private key.  A cryptocurrency stored on the blockchain can only be accessed by a private key held by the cryptocurrency's owner.  Cryptocurrency keys are held in cryptocurrency wallets that allow the owner to easily and securely manage the keys to their cryptocurrency assets.

### B.    Cryptocurrency Landscape Overview

31.    There are thousands of cryptocurrencies and blockchain protocols.  The value of each cryptocurrency is determined by various factors including the supply and demand for its units,

market sentiment, market capitalization, utility and adoption, underlying technology, competition, inflation, monetary policy, and regulatory environment, among others.  Units of digital assets can be converted to fiat currencies, such as the U.S. dollar, at fluctuating market rates determined on cryptocurrency exchanges.  Digital asset prices are quoted on several exchanges and can be extremely volatile.  Certain cryptocurrencies and blockchain protocols offer specific advantages or use benefits.  Two cryptocurrencies have dominated the industry: Bitcoin and Ethereum.

32.     In October 2008, a white paper titled "Bitcoin: A Peer-to-Peer Electronic Cash System" was published under the anonymous pseudonym "Satoshi Nakamoto," proposing a new electronic payment system using a decentralized network of computers to validate transactions and create new units of digital currency.  Bitcoin, or "BTC," was launched in 2009 as the first ever cryptocurrency, becoming the most successful early cryptocurrency and its name was sometimes used interchangeably with "cryptocurrency."  Bitcoin is often viewed as the father of modern cryptocurrency.   Current market capitalization of Bitcoin is approximately $541 billion.



33.     In 2013, a group of developers led by Vitalik Buterin published a white paper outlining a new decentralized platform called Ethereum. The white paper proposed a blockhain-based platform that would allow developers to build and deploy decentralized applications (dApps)

using smart contracts. The Ethereum blockchain and it's token, Ether, better known as Ethereum or "ETH,". were launched in 2015, and Ether is now the second-largest cryptocurrency in circulation.  Notable use cases for the Ethereum blockchain include the popular "NFT," or non-fungible token, market for unique digital assets mostly stored on the Ethereum blockchain.  Current market capitalization of Ether is approximately $225 billion.



34.    Other large  cryptocurrencies by market capitalization include XRP, Cardano, Dogecoin, Matic and Solana.  All provide similar general utility of Bitcoin or Ethereum, but each uses different blockchain technologies and may provide certain unique benefits to participants.

35.    Stablecoins are an important sub-component of the cryptocurrency ecosystem, helping onramp fiat into crypto and provide stability to cryptocurrency markets.  A stablecoin is a type of cryptocurrency that is pegged to another currency, financial instrument, or commodity. Stablecoins reduce volatility and help facilitate transactions on a blockchain. The largest circulating cryptocurrencies by market cap include Tether, USDC, Binance Coin, among others. One example of stablecoin mechanics is  USD Coin (or "USDC"), which is pegged 1:1 with the U.S. Dollar and redeemable for $1.  USDC is collateralized by a pool of cash and short-dated U.S. Treasury securities to ensure that it maintains its price stability—for every USDC in circulation,

$1 is held as collateral.  However, stablecoins like USDC occasionally "de-peg" due to dynamic market conditions and trade at below (or, rarely, slightly above) their pegged value.

## II.      The Debtors' History and Operations

### A.      Bittrex's Corporate History

36.      Bittrex was founded in 2014 as Bittrex LLC by three cybersecurity engineers, Richie Lai, Rami Kawach, and William Shihara, with the goal of operating a world-class cryptocurrency exchange with a focus on security and trust by putting a human face in front of a blockchain platform.  As part of a series of restructurings and expansions, in 2016 Bittrex LLC was converted to a corporation and in 2018 became a wholly owned subsidiary of its ultimate parent, Aquila Holdings.  Bittrex expanded its international reach in 2018 with the formation of the predecessor of the international arm of Bittrex, Bittrex International Inc., which in the same year it formed Malta Holdings, a Malta private limited company, as a wholly-owned subsidiary, which in turn formed its wholly-owned subsidiary Malta OpCo, as a Malta private limited company.  In 2019, Bittrex International Inc. changed its name to Bittrex Global, Inc.

37.      Malta OpCo served non-U.S. customers; however, in 2019, the Malta OpCo migrated its customers to BG and Malta OpCo discontinued its operations.  In spite of multiple requests by Malta OpCo, some Malta OpCo customers never completed the required paperwork to become customers of BG, nor did they withdraw their cryptocurrency; consequently, the accounts of such non-U.S. customers have remained dormant since 2019, although throughout this period users have been able to request customer support assistance with transferring their accounts to BG.

38.      Bittrex grew rapidly—in just nine years, it expanded the availability of its platform to 48 states and approximately 150 cryptocurrencies and stablecoins.  In 2016, Bittrex became the first crypto exchange to list all top twenty tokens measured by market cap.  In 2021, Bittrex's

revenue grew by 410 percent and Customer Crypto Assets Under Management amounted to $3.8 billion globally.  By early 2023, Bittrex's customer base reached over 2.1 million customers globally and 600,000 users on the U.S. platform alone.

**B.      The Debtors' Operations**

39.      Bittrex provides cryptocurrency exchange and trading platforms.  Customers can access Bittrex's services through a website and a mobile application available for both Android and iOS operating systems.  Bittrex also offers exchange-as-a-service, providing its technology and order book to certain local and regional exchanges.

 

40.      Bittrex employs the most reliable and effective security technologies on the market.  It leverages an elastic, multi-stage wallet strategy to ensure that the majority of funds are kept in cold storage for additional safety.  Bittrex also requires two-factor authentication for all users and provides a host of additional security features to provide multiple layers of protection.  Its custom-built trading engine was designed to be scalable while ensuring that orders are executed in real-time.  Bittrex also supports third-party trading platforms and algorithmic trading via its extensive APIs.  The highly efficient and automated monitoring platform allows Bittrex to provide users the fastest transactions available today.  This includes updates on balance, trade, and wallet information.

41.      Customers can execute trades both in a mobile application and on Bittrex's website.  Customers sign up for an account on the platform after digitally executing the customer agreement.

Customers can link their bank account or off-site cryptocurrency wallet to the platform to facilitate the purchase of cryptocurrency or the transfer of the customer's cryptocurrency on the platform. The platform also offers wallet services for its users: in line with industry standards, Bittrex does not maintain a separate cryptocurrency wallet for each customer; instead, cryptocurrency assets are commingled on an asset-by-asset basis.

42.    The trading experience on Bittrex is streamlined and users can quickly start making trades or purchase cryptocurrencies with a debit card, credit card, bank account, or Bittrex account balance.  Users benefit from a real-time view of the cryptocurrency markets available on Bittrex. The trading platform supports advanced order types, including stop, stop limit, trailing stop, and ladder limit orders.

### III.    The Debtors' Pre-Petition Corporate and Capital Structure.

#### A.    The Debtors' Corporate Structure.

43.    As set forth in the corporate structure chart attached as **Exhibit B**, non-debtor entity Aquila Holdings Inc. currently owns, directly or indirectly, each of the Debtor entities.

#### B.    The Debtors' Capital Structure.

##### a.    Loan Facilities

44.    The Debtors are not obligors on secured debt.  BUS is a borrower in an unsecured intercompany loan: on March 30, 2023, BUS entered into a 12-month delayed draw credit agreement for up to $15 million with its ultimate parent, non-debtor Aquila Holdings Inc. (the "Aquila Loan").  The Aquila Loan bears interest of 5.35% compounding and payable monthly, with the principal to be repaid at maturity.  As of this filing, $ 2,000,000 of the Aquila Loan is outstanding.

45.    BUS is also a borrower on a $15 million unsecured delayed draw intercompany loan facility with its non-debtor affiliate, BG (the "BG Loan"), dated September 9, 2022.  The BG

Loan provides for a variety of repayment options available for individual draws. As of this filing, $ 15,000,000 of the BG Loan is outstanding.

### b.      Equity Interests in the Debtors.

46.      As of the Petition Date, the Debtors' ultimate parent, Aquila Holdings Inc., has approximately (i) 630,000 shares of Class A Voting Common Stock issued, approximately 33.33 percent of which is held by each of the original founders, Richie Lai, Rami Kawach, and William Shihara, and (ii) 3,780,000 shares of Class B Non-Voting Common Stock issued, approximately 20.15 percent of which is held by Richie Lai, 33.33 percent of which is held by Rami Kawach, and 33.33 percent of which is held by William Shihara, with the balance held by a number of shareholders holding less than five percent of Class B Non-Voting Common Stock each.

## IV.   Circumstances Leading to These Chapter 11 Cases.

### A.      Volatile Markets

47.      Before the explosion of energy prices and concerns regarding the stability of digital currencies, the market for digital assets had been growing exponentially: Bitcoin's daily exchange volume rose from $92 million in January 2017 to more than $50 billion in May 2021.  The initial exchange rate recorded on October 5, 2009, was $0.000764 for every bitcoin; at its all-time high on November 10, 2021, one bitcoin was worth $68,789.  The price of bitcoin declined through most of 2022, reaching approximately $16,800 in December 2022.

48.      The beginning of the COVID-19 pandemic introduced instability to both traditional and cryptocurrency markets.  Between February 12, 2020 and March 23, 2020, the Dow Jones Industrial Average lost 37 percent of its value and the S&P 500 lost 34 percent of its value.  The price of Bitcoin fell over 50 percent over the same time period, and most other cryptocurrencies experienced similar declines.

49.    Fears of a devastating pandemic and its effect on the world economy drove many investors to exit the markets.  The Debtors, however, continued to operate their cryptocurrency exchange.  Customers were able to use the trading platform despite extreme volatility in the markets.

50.    After the pandemic-related markets crash, both traditional and cryptocurrency markets experienced a short recovery followed by a sustained growth period.  Central banks and governments, including the United States Federal Reserve, enacted relief programs and adopted quantitative easing monetary policies designed to support the world economies until the end of the COVID-19 pandemic.  Such policies contributed to growth in traditional and cryptocurrency markets; subsequently, investment into new projects in the cryptocurrency industry increased rapidly.  The price of Bitcoin grew by over 1,000 percent between its lowest point in 2020 and its highest point in 2021.  The S&P 500 increased by nearly 100 percent over the same period.

51.    In traditional markets, fears of new variants of the COVID-19 virus and a potential economic contraction chilled equity markets through the end of 2021.  In the cryptocurrency space, divestments from risky assets such as technology and early-stage equities led to divestments in the cryptocurrency sector as investors reduced exposure.  Increased regulatory scrutiny internationally also contributed to market pessimism, while strong spot trading by institutional investors drove most cryptocurrencies from all-time highs to double-digit losses.

52.    Traditional markets eventually closed 2021 with double-digit growth.  Although it seemed like markets were beginning to recover from the COVID-19 pandemic and that its lingering effects would be minimal, as inflation rose, in March 2022 the United States Federal Reserve embarked on a series of interest rate increases to the Federal Funds Rate and fears of a possible 2022 recession began to rise In part due to this quantitative monetary tightening,  The

S&P 500 declined by 20 percent of its value in the first half of 2022, while the technology-heavy NASDAQ declined by nearly 30 percent over the same period. Rising inflation and commodity prices contributed to investor pessimism and further divestments. In June 2022, market analysts officially labeled 2022 as a bear market. The net wealth of U.S. households declined by $4 trillion in 2022. After a small recovery, the S&P 500 fell by 396.19 (or 8.78%) in the twelve months ending in April 2023.

**B.    Increased Competition**

53.     As cryptocurrency gained popularity throughout the late 2010s, new exchanges were launched, and aggressively advertised to gain new customers. These efforts included Super Bowl commercials, sports stadium naming rights, and large budgets to spend on online advertising. In addition, Bittrex's competitors offered "yield" on crypto holdings to customers who deposited or purchased coins, where they would essentially receive interest payments in cryptocurrency, making them attractive to prospective customers who wanted to increase their financial upside. Like in the traditional banking world, these interest payments were often funded by loaning out the crypto assets to other third parties which is known as "rehypothetication" and was allowed per their terms of service. As exchanges competed to offer higher yield percentages to customers, the related crypto lending activity increased. BUS never offered yield-based products. This eventually led to the demise of several crypto exchanges in 2022.

54.     The emergence of these types of competitors resulted in Bittrex losing market share starting in 2018, as they did not participate in aggressive lending to fund customer yield, nor did they engage in aggressive advertising campaigns.

**C.    Crypto Winter and Regulatory Tightening**

55.     The widespread selloff in traditional markets was mirrored in the cryptocurrency industry. All major cryptocurrencies experienced significant declines in the first half of 2022;

Bitcoin declined 37.3 percent in June 2022 alone and was down 60 percent year-to-date. Companies in the cryptocurrency industry also experienced significant equity declines as declining cryptocurrency prices pressured margins and investor pessimism grew.  In June 2022, the aggregate value of the cryptocurrency market dropped below $1 trillion for the first time since January 2021.  The CoinDesk Currency Index (CCY), measuring the market capitalization weighted performance of digital currencies, fell by more than 65 percent in 2022.  Since May 2021 to date, the ROI on Bitcoin declined by 51 percent.

56.    Distressed industry participants—Terra and Three Arrows Capital—exacerbated this "cryptocurrency winter."  The eventual implosion of Terra and Three Arrows Capital, and the resulting fallout, started a downward spiral in the crypto industry.

57.    Terra issued TerraUSD ("UST"), an algorithmic stablecoin pegged to the U.S. dollar through an arbitrage mechanism with its cryptocurrency Luna and a reserve of Bitcoin.  Over the course of two weeks in May 2022, the UST/Luna ecosystem collapsed, which created a ripple effect through the cryptocurrency industry.

58.    Following the collapse of Luna, on June 12, 2022, Celsius Network, a cryptocurrency lender with over $11 billion of assets under management, announced that it was pausing all account withdrawals and transfers due to extreme market conditions.  Celsius's announcement triggered a further decline in the cryptocurrency markets; Bitcoin dropped over thirty percent in value  in the following days as investors on other platforms began to liquidate their positions.

59.    On June 27, 2022, the hedge fund Three Arrows Capital ("Three Arrows"), which had invested heavily in UST, defaulted on loan payments to the crypto lender Voyager.  Three

Arrows was ordered by a British Virgin Islands court to liquidate after its creditors sued the crypto

hedge fund for alleged failure to repay debts.

60.     On July 5, 2022, Voyager, a major creditor of Three Arrows and a customer-facing

crypto-broker, filed for chapter 11 bankruptcy protection, citing escalating customer withdrawal

requests that, if left unchecked, would result in insufficient assets to satisfy those transactions due

to approximately $650million of Voyager assets remaining frozen in the Three Arrows estate.

61.     On November 11, 2022, FTX, a leading centralized cryptocurrency exchange,

which specialized in derivatives and leveraged products, filed for chapter 11 bankruptcy protection

after reports of overvaluation of the company and its FTT token, followed by a run on FTX deposits

causing a liquidity crunch.

62.     On November 28, 2022, BlockFi, a crypto lending platform with significant

exposure to FTX, filed for bankruptcy after suspending customer withdrawals.

63.     On January 19, 2023, the crypto lender Genesis, which had exposure to Three

Arrows' and FTX's collapse, filed for chapter 11 bankruptcy protection, after the SEC sued it and

crypto firm Gemini over a lending product.  Gemini suspended withdrawals from the product in

question (Earn), in which Genesis is a lending partner.

64.     On March 8, 2023, Silvergate Capital, one of the crypto market's most frequently

used banks, announced that it was shutting down as a result of undercapitalization due to recent

events in the crypto industry.  Because many U.S. banks do not serve the crypto market due to

regulatory concerns, the loss of Silvergate Capital has become another industry headwind, as there

are now fewer options to onboard new customers into the crypto space, which usually starts with

a transfer of USD before cryptocurrency is purchased.

65.     Also in March, the SEC warned Coinbase, the largest U.S. crypto exchange, that it planned to take enforcement action against the company, while the Commodity Futures Trading Commission sued Binance, alleging that the crypto exchange operator violated U.S. rules that required futures and other derivatives to be traded on regulated platforms.

66.     The regulators' escalating crackdown on digital currency firms, coupled with cryptocurrency markets' instability and declines, made it very difficult for crypto firms such as the Debtors to operate in the current market and regulatory environment without constant threat of fines and enforcement actions for alleged violations of insufficiently defined standards and regulations.

67.     Though Bittrex rigorously pursued potential restructuring transactions, it became clear that a potential strategic transaction involving its U.S. operations would not materialize. Accordingly, Bittrex began to analyze a potential shut down of its U.S. operations and finalize its contingency preparations process.  The Debtors engaged BRG as restructuring advisor to assist the Debtors with their wind down efforts.

68.     As a result of these developments, on March 31, 2023, Bittrex released a statement announcing that BUS had made the difficult decision to wind down and close its U.S. operations, effective April 30, 2023.  BUS made customer assets available for withdrawal until April 30, 2023. Because Bittrex does not hypothecate or otherwise risk crypto deposited by its customers, BUS easily met all withdrawals and returns of both crypto and fiat deposits submitted prior to the communicated deadline, and plans to continue to do so subject to Court's approval.

### D.     Governance Initiatives

69.     On March 1, 2023, the Debtors appointed disinterested director, Timothy Pohl (the "Disinterested Director").  The Disinterested Director is vested with the authority to, among other things:

- investigate any historical transactions, including the January 2022 restructuring, or regulatory issues undertaken by the Debtors that the Disinterested Director deems necessary or appropriate, and the facts and circumstances surrounding such transactions;

- interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by the Debtors that the Disinterested Director deems necessary or appropriate;

- request documentation and information regarding the Debtors' business, assets, properties, liabilities, and business dealings with respect to any historical transactions undertaken by the Debtors that the Disinterested Director deems necessary and appropriate to review; and

- perform any other activities consistent with the matters described herein or as the Disinterested Director or the Debtors' boards of directors otherwise deems necessary or appropriate.

70.     The Disinterested Director will prosecute or settle any and all claims and causes of action arising from the historical transactions that are investigated by the Disinterested Director.

71.     In addition to the appointment of the disinterested director, on April 17, 2023, the Debtors also appointed two Co-Chief Restructuring Officers, myself and Robert Duffy.

**E.     The Debtors' Chapter 11 Plan, these Chapter 11 Cases, and Next Steps.**

72.     The Debtors filed their Plan concurrently with this Declaration.  The Plan provides for a wind down of the Debtors and payment in full of all (a) administrative, (b) priority tax, (c) super-priority post-petition financing, and (d) non-tax priority claims.  The Debtors' customers entitled to distributions will receive under the Plan a 100 percent like-kind cryptocurrency distribution, which with respect to customers means that the customer shall be entitled to access the Bittrex platform and withdraw cryptocurrencies consistent with the Plan and with its allowed claim.  The liquidating trust will then receive the remaining assets of the estate and liquidate them for the benefit of the three impaired classes, distributing the proceeds in the following order of priority: (i) general unsecured creditors, (ii) subordinated unsecured creditors, and (iii) equity

holders.  The liquidating trust will be managed by a liquidating trustee, subject to a three-member trust advisory board consisting of representatives of each of the three impaired classes receiving interests in the liquidating trust.

73.    These chapter 11 cases provide the Debtors with the best opportunity to stabilize their business and to orderly distribute their assets to customers and creditors.  The Debtors plan to engage with all constituencies, including the potential official committee of unsecured creditors (which would likely be composed of largely account holders), in a productive dialogue with the hope of building consensus around the Debtors' Plan and, ultimately, a distribution that will maximize recovery for its customers and creditors.

## V.    Evidentiary Support for First Day Motions.[7]

74.    Contemporaneously herewith, the Debtors filed a number of First Day Motions and are seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate an orderly wind down through these chapter 11 cases.  The First Day Motions seek authority to, among other things, ensure sufficient liquidity to preserve the Debtors' assets, ensure the continuation of the Debtors' cash management systems, and allow for other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to give the Debtors an opportunity to work towards an orderly wind down that will benefit the Debtors' stakeholders.

75.    The First Day Motions request authority to pay certain pre-petition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay pre-petition claims during the first 21 days

---

[7]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain pre-petition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

76.    I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their efficiently winding down the Debtors' U.S. and Malta operations.  A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit A**.

## VI.    Information Required by Local Bankruptcy Rules 1007-1 and -2.

77.    Local Bankruptcy Rules 1007-1 and 1007-2 require certain information related to the Debtors, which I have provided in the exhibit attached hereto as **Exhibit D**.  Specifically, this exhibit contains the following information with respect to the Debtors (on a consolidated basis, unless otherwise noted):[8]

- **Exhibit D**.  Pursuant to Local Bankruptcy Rule 1007-1(a), Exhibit D provides the following information with respect to each of the holders of the debtors' fifty largest unsecured claims, excluding claims of insiders: the creditors name; the address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the telephone number; the name(s) of the person(s) familiar with the debtors' account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

*[Remainder of page intentionally left blank]*

---

[8]    The information contained in **Exhibit D** attached to this Declaration does not constitute an admission of liability by, nor is it binding on, the Debtors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed this 8th day of May, 2023.

                                         */s/ Evan Hengel*
                                          Evan Hengel
                              Co-Chief Restructuring Officer

## <u>EXHIBIT A</u>

**Evidentiary Support for First Day Pleadings[1]**

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the applicable First Day Motion.

# I.    Procedural Motions

### A.    Joint Administration Motion.

1.    The Debtors filed several administrative or procedural First Day Motions, including a motion to jointly administer the Debtors' bankruptcy cases.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  Entry of the order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the United States Trustee for the District of Delaware ("U.S. Trustee") and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.  Moreover, joint administration will not adversely affect the Debtors' respective constituencies because the Joint Administration Motion seeks only administrative, not substantive, consolidation of the Debtors' estates.  Parties in interest will not be harmed by the relief requested; instead, parties in interest will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.

2.    I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption in order to implement an orderly wind down.

### B.    Claims Agent Application.

3.    The Debtors seek entry of an order (a) appointing Omni Agent Solutions, Inc. ("Omni") as the claims and noticing agent in the Debtors' chapter 11 cases effective as of the Petition Date, including assuming full responsibility for the distribution of notices and the

maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases
and (b) granting related relief.  Although the Debtors have not yet filed their schedules of assets
and liabilities, the Debtors anticipate that there will be hundreds of thousands of individuals and
entities to be noticed in these chapter 11 cases.

4.      Given the number of anticipated claimants and the complexity of the Debtors'
business, the Debtors submit that the appointment of Omni Agent Solutions as Claims and
Noticing Agent is in the best interest of the Debtors' estates and their creditors, because the
distribution of notices and the processing of claims will be expedited, and the Clerk's Office will
be relieved of the administrative burden of processing what may be an overwhelming number of
claims.

5.      I believe that the relief requested in the Claims Agent Application is in the best
interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate
the Debtors' ability to operate their businesses in chapter 11 without disruption in order to
implement an orderly wind down.[1]

**C.      Creditor Matrix Motion**

6.      The Debtors filed an administrative or procedural First Day Motion requesting that
the Court enter an order (a) authorizing the Debtors to (i) maintain a consolidated list of creditors,
(ii) file a consolidated list of the Debtors' fifty (50) largest unsecured creditors, and (iii) withhold
or omit certain confidential information; (b) establishing procedures for notifying the parties of the
commencement of these chapter 11 cases; and (c) granting related relief.

7.      Permitting the Debtors to file and maintain a single consolidated list of creditors

---

[1]     In accordance with the Claims Agent Protocol, Omni was selected following the Debtor's competitive solicitation
of at least three separate proposals for potential claims and noticing agents.

(the "Creditor Matrix"), in lieu of the filing and maintaining of separate lists of creditors for each Debtor, is warranted under the circumstances of these cases. The Debtors, in consultation with Omni, their proposed claims and noticing agent, have determined that time and resource efficiencies can be obtained by preparing and maintaining a consolidated Creditor Matrix. Requiring, instead, that the Debtors segregate and convert their computerized records to a debtor-specific creditor matrix format would be an unnecessarily burdensome task, and it would increase the risk of error in connection with the preparation of separate lists of creditors.

8.    Compiling separate top twenty (20) creditor lists for each individual Debtor would also consume a substantial amount of the Debtors' time and resources. Further, the Debtors believe a single, consolidated list of the Debtors' fifty (50) largest unsecured, non-insider creditors (the "Top 50 Creditors List") will aid the U.S. Trustee in its efforts to communicate with these creditors. Additionally, Debtors Desolation Holdings LLC and Bittrex Malta Holdings Ltd. have fewer than 20 unsecured creditors, so filing separate lists of the top 20 unsecured creditors for each Debtor would be of limited utility. Therefore, filing a single consolidated list of fifty (50) largest unsecured creditors in these chapter 11 cases is appropriate for the abovementioned reasons.

9.    The Debtors submit that cause exists, under section 107(b)(1) of the Bankruptcy Code, to authorize the Debtors to omit customers' names, physical addresses, email addresses, and any other customers' contact information in any paper filed or to be filed with the Court, or made publicly available in these Chapter 11 Cases, including, but not limited to, the Creditor Matrix, the Top 50 Creditors List, and schedules and statements (the "Filings"). In lieu of these data, in the Filings, the Debtors provided and will provide, for each customer, the related unique user ID (the "UUID[s]"), which (a) is not available to other third parties; (b) is visible to a customer only after the customer has completed the process to log in to a Bittrex account; and (c) is not needed for

customers in order to log in to their Bittrex accounts; and (d) is not used for the identity verification process related to the Bittrex accounts.  By including the UUIDs, Debtors' customers will be able to easily and quickly identify their inclusion in any relevant Filings of these chapter 11 cases.

10.     The Debtors have operated a trading platform for various forms of cryptocurrency. The Debtors' business is grounded on the number of customers trading on the platform.  As such, the Debtors have maintained their customer list in strict confidence.  The list is an important and valuable asset of the Debtors' estates.  Third parties have shown interest in a potential acquisition of the Debtors' customer list, but the related discussions have been paused and, at this juncture, it is unclear whether they will or not resume in the future.

11.     The Debtors further submit that cause exists, under sections 105(a) and 107(c) of the Bankruptcy Code, to authorize the Debtors to omit, in any Filings with the Court or made publicly available in these chapter 11 cases, (a) customers' names, physical addresses, email addresses, and any other customers' contact information; and (b) the names, physical addresses, email addresses, and any other contact information of other creditors and employees (i) who are natural persons and (ii) reside in the United States or are otherwise protected by the European General Data Protection Regulation ("EU GDPR") or the United Kingdom Data Protection Act of 2018 and the United Kingdom General Data Protection Regulation ("UK GDPR," and together with the EU GDPR, the "GDPR").  The proposed omission is a measure that prevents customers' (but also other creditors' and employees') exposure to bad actors aiming to steal from (or cause other injury).  Furthermore, the inclusion of the customer UUIDs in the Filings, compared to the disclosure of customers' names and other identifying information, sufficiently protects customers from the abovementioned risks because the UUIDs are not data that customers typically use on social media, or are normally included in records that are published online.  Absent the requested

relief, the disclosed information can be used to perpetrate identity theft and other scams aiming to injure the property of the targeted victims, or to locate and subject individuals to harassment, stalking or other violent acts.  Moreover, the Debtors risk violating the GDPR, exposing the Debtors to potential civil liability and significant financial penalties.

12.    In particular, the disclosure of customer personal data together with their cryptocurrency balances in Bittrex's wallets would make customers ripe targets of phishing, scamming, and even extortion.  Similar concerns reverberated through the media after customer information was disclosed in another prominent cryptoexchange bankruptcy case, Celsius.[2] Although the Bittrex exchange itself has not been hacked thanks to its state-of-the-art security features, BUS was concerned about its users becoming targets of phishing attacks, and provided ample guidance to its customers on how to protect themselves.[3]  BUS also received and tracked customer reports of being victims of phishing and scamming attacks.  With the users of cryptoexchanges already being widely targeted by scammers, exposure of BUS's users' data together with their cryptocurrency balances recorded by Bittrex would result in a substantial increase of such criminal attempts.

13.    In addition, the GDPR imposes significant constraints on the processing (which includes the transferring or disclosing) of information relating to individuals (including names, home and email addresses, and business contacts) (the "Personal Data").  The GDPR has an extraterritorial reach, and it applies to the processing of Personal Data in the context of an

---

[2]    *See*, *e.g.*, Andy Greenberg, *Celsius Exchange Data Dump Is a Gift to Crypto Sleuths—and Thieves*, WIRED (Oct. 13, 2022), https://www.wired.com/story/celsius-user-data-dump-crypto-tracing-scammers/.

[3]    *See*, *e.g.*, https://bittrex.com/discover/manage-your-online-security-like-a-pro; https://bittrex.com/discover/5-ways-to-stay-protected-online; https://medium.com/bittrex/top-7-tips-for-secure-trading-in-2020-7d94eec8da14; https://bittrex.zendesk.com/hc/en-us/articles/6226921856539-How-to-keep-your-account-safe; https://bittrex.zendesk.com/hc/en-us/articles/5873174805531-Two-Factor-Authentication-2FA-.

establishment of a controller[4] or processor[5] in the European Economic Area ("EEA") or the United

Kingdom ("UK"), regardless of whether the processing takes place in the EEA or the UK.  Further,

organizations outside the EEA/UK space can become subject to the GDPR when the Personal Data

processing relates to individuals located in the EEA or UK.  Violators of the GDPR risk severe

penalties.[6]  The GDPR may apply to the Debtors because (a) BUS has thousands of individual

customers who reside in an EEA member state or in the UK, or who are otherwise citizens of those

jurisdictions;[7] and (b) Malta OpCo is an EEA entity required, in principle, to protect the Personal

Data of its individual customers, independently of their nationality or residence.

14.    Furthermore, BUS's privacy policy for its users (the "Privacy Policy") specifically

assured them that BUS would protect their personal data, especially as the data relates to Know

Your Customer ("KYC") and Anti-Money Laundering ("AML") information that BUS was

required to collect by regulators.[8]  Although the Privacy Policy contained a customary carveout

---

[4]    According to the General Data Protection Regulation (EU) 2016/679, art. 4(7), and ), and United Kingdom Data Protection Act 2018, section 3(6), "controller" means "the natural or legal person . . . which, alone or jointly with others, determines the purposes and means of the processing of personal data . . . ."

[5]    According to the General Data Protection Regulation (EU) 2016/679, art. 4(8), and the United Kingdom Data Protection Act 2018, section 3(6), "processor" means "a natural or legal person . . . which processes personal data on behalf of the controller."

[6]    If an organization is found to have breached  the EU GDPR by unlawfully processing Personal Data, the organization may be fined up to the higher of €20,000,000 or 4% of worldwide annual turnover—i.e., total gross annual revenues—of the preceding financial year.  See General Data Protection Regulation (EU) 2016/679, art. 83(5).  Similarly, pursuant to the UK GDPR, an unlawful processing of Personal Data may entail a fine against the organization up to the higher of £17,300,000 or 4% of worldwide annual turnover—i.e., total gross annual revenues—of the preceding financial year.  See United Kingdom Data Protection Act 2018, section 157(5)(a) (as amended by Data Protection, Privacy and Electronic Communications (Amendments etc.) (EU Exit) Regulations 2019).

[7]    According to Bittrex's compliance and know-your-customer procedures, a customer is allocated to the U.S. business—and therefore is a creditor of the Debtors—if it has certain ties with the United States, including, but not  limited to, the U.S. nationality (irrespectively of the customer's country of residence) or a U.S. residence (irrespectively of the customer's nationality).

[8]    See Bittrex, Inc. Privacy Policy – Version 3.2 (Dec. 31, 2019), https://bittrex.zendesk.com/hc/en-us/articles/360038032572-Bittrex-Inc-Privacy-Policy-Version-3-2.  With respect to third parties, Bittrex Inc.'s privacy policy stated:

for disclosure of personal data "if [BUS is] under a duty to disclose or share [customer] personal data to comply with any legal obligation, judgment or under an order from a court, tribunal or authority,"[9] making such personal data public in a court filing would run counter to the letter and spirit of BUS's contractual obligations under its Privacy Policy.

15.    In connection with the relief sought under sections 105(a) and 107(b) and (c) of the Bankruptcy Code, the Debtors will instruct Omni to serve customers (both individuals and entities), as well as the other relevant creditors and employees who are natural persons, at their physical addresses or e-mail addresses to ensure, to the maximum extent possible, that they will receive relevant notices in these chapter 11 cases.  Also, the Debtors will make available versions of the Creditor Matrix, Top 50 Creditors List, and any other applicable Filings that contain the names and other omitted information of customers, other creditors, and employees to (a) the Court, the U.S. Trustee and counsel to any official committee appointed in these Chapter 11 Cases; and (b) upon Court order, to any other party.

16.    The Debtors believe that using Omni to undertake all mailings or e-mailing, as applicable, directed by the Court or the U.S. Trustee, or as required by section 342(a) of the Bankruptcy Code and Bankruptcy Rules 2002(a) and (f) to all applicable parties will maximize efficiency in administering these chapter 11 cases and will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee.  Additionally, Omni (a) is and will assist the Debtors in preparing creditor lists and (b) will assist mailing initial notices, and therefore there are

---

We require all third parties to respect the security of your personal data and to treat it in accordance with the law (including applicable data protection and privacy law). We do not allow our third party business partners or service providers to use your personal data for their own purposes and only permit them to process your personal data for specified purposes and in accordance with our documented instructions. Furthermore, these third parties access and process your data on the basis of strict confidentiality and subject to the appropriate security measures and safeguards.

[9]    Bittrex, Inc. Privacy Policy – Version 3.2 (Dec. 31, 2019), https://bittrex.zendesk.com/hc/en-us/articles/360038032572-Bittrex-Inc-Privacy-Policy-Version-3-2.

efficiencies in authorizing Omni to mail or e-mail the notice of commencement of these chapter 11 cases. Accordingly, the Debtors respectfully submit that Omni Agent Solutions should undertake such mailings or e-mailings.

17.     I believe that the relief requested in the Creditor Matrix Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption in order to implement an orderly wind down.

**D.     E-mail Service Motion**

18.     The Debtors filed an administrative or procedural First Day Motion requesting that the Court enter an order authorizing the Debtors to provide e-mail service to creditors in these Chapter 11 Cases. The Debtors have approximately 1.2 million customers in the United States, in addition to other creditors. The Debtors' numerous customers will require service of a voluminous number of notices, and service via e-mail would be consistent with the way the Debtors and their customers communicated prior to the Petition Date. Furthermore, the cost of postage alone to mail the Case Commencement Notice to 1.2 million customers would be staggering. Service via e-mail will substantially reduce administrative burdens and cost to the estate, preserving value for distribution to the stakeholders in these Chapter 11 Cases. In the event any creditor has filed a notice of appearance or a proof of claim in these Chapter 11 Cases, the Debtors will provide such party with notice as required under Bankruptcy Rule 2002.

19.     I believe that the relief requested in the E-mail Service Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption in order to implement an orderly wind down.

## II.    **Operational Motions**

**E.    Cash Management Motion**

20.    The Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to (i) continue to operate their Cash Management System; (ii) honor certain pre-petition obligations related thereto; (iii) pay any pre-petition or post-petition amounts outstanding on account of the Bank Fees; and (iv) continue to perform Intercompany Transactions; (b) granting super-priority administrative expense status to post-petition intercompany balances; and (c) granting related relief.

21.    In the ordinary course of business, the Debtors maintain a cash and cryptocurrency management system comparable to the systems used by similarly situated companies to manage the cash and digital assets on their platform in a cost-effective and efficient manner.  The Debtors' Cash Management System is critical to the Debtors' business, as it streamlines the Debtors' ability to collect, transfer, and disburse cash and cryptocurrency generated from their operations and to facilitate cash and digital asset monitoring, forecasting, and reporting.

22.    As of the Petition Date, the Debtors' Cash Management System is comprised of seven bank accounts and a cryptocurrency management system that allows the Debtors to facilitate the trading of various cryptocurrency and to store digital currencies on the Debtors' platform.

23.    BUS receives income in the form of exchange commissions, withdrawal fees, staking revenue, advising fees, dormant account fees, and blockchain recovery fees ("Commission Fees").  The Commission Fees are collected in the form of cryptocurrency to BUS corporate trading accounts that transact on the exchange, converted to USD, and then transferred to BUS's operating account at Customers Bank ("Bittrex Operating Account").  The Bittrex Operating Account funds BUS's disbursements, automated-clearing house ("ACH") transfers, and wires for

BUS's operating, capital, and general administrative expenses, and other cryptocurrency exchange related operating, capital, and general administrative expenses.

24.     BUS also maintains an operating account at Customers Bank designated as an OTC account ("OTC Account"). The OTC Account is used for settlements with third-party trading desks (e.g., Galaxy Digital). BUS liquidates larger blocks (over $50,000 USD) with cryptocurrency institutional market makers, and third-party trading desks wire those proceeds to the OTC Account, which is then swept to the Bittrex Operating Account.

25.     BUS maintains two FBO accounts for the purpose of handling customer Cash Deposits (defined below) and Withdrawals (defined below). One of the FBO accounts is at Customers Bank ("Customers FBO Account"), and the other is at Prime Trust ("Prime Trust FBO Account" and with the Customers FBO Account, the "FBO Accounts"). Customer Cash Deposits are wired into the Customers FBO Account, while customer Cash Deposits provided through ACH are deposited into the Prime Trust FBO Account. BUS also maintains a reserve account at Prime Trust ("Reserve Account") for the purpose of maintaining an ACH reserve.

26.     BUS further maintains two dormant accounts at United Texas Bank and Goldman Sachs (the "United Texas Dormant Account", the "Goldman Sachs Dormant Account", and together, the "Dormant Accounts"). The Dormant Accounts are not currently in use and contain de minimis amounts.

27.     As of the Petition Date, the Debtors have approximately $10,903,808.48 in the FBO Accounts, approximately $540,369.61 in the Bittrex Operating and OTC Accounts, and approximately $1,000,000 in the Reserve Account..

28.     In the ordinary course of business, the Debtors incur periodic service charges, payment processing fees, and other fees in connection with maintaining the Cash Management

System.  The Debtors incur between approximately $31,000 and $45,000 in Bank Fees each month under the Cash Management System in the aggregate.  The Debtors estimate that approximately $0 in pre-petition Bank Fees remains outstanding as of the Petition Date.  To ensure continued access to their Bank Accounts without disruption, the Debtors seek authority to pay any such due and owing Bank Fees, including pre-petition Bank Fees, in the ordinary course on a post-petition basis, consistent with historic practice.

29.    The Cash Management Banks are not designated as authorized depositories in the District of Delaware by the Office of the United States Trustee pursuant to the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees*.  However, the Cash Management Banks are well capitalized and financially stable financial institutions that are insured by the Federal Deposit Insurance Corporation, and therefore maintenance of the Bank Accounts will not jeopardize any party in interest.

30.    In addition, the Debtors hold cryptocurrency assets through a self-custody custodian, Fireblocks.  Requiring the Debtors to collateralize their digital asset holdings, including cryptocurrency, would be prohibitively expensive (if possible at all).  Further, requiring the Debtors to liquidate their digital assets and transfer the resulting cash to an authorized depository would be value-destructive to the debtors and their stakeholders.

28.    Requiring the Debtors to transfer the cash funds held in non-authorized depositories to authorized depositories or for the Debtors to post a bond for their crypto custodial accounts would similarly place a needless administrative and financial burden on the Debtors, imposing unnecessary and avoidable costs on the Debtors' estates to the detriment of their efforts to maximize value for stakeholders.  Many authorized depositories will not open accounts for cryptocurrency businesses.  The Debtors have attempted to open accounts with authorized

depositories, but have not yet been able to do so, and will continue reaching out to authorized depositories to find suitable banks. In the event that any of the Bank Accounts cease to comply with, or do not comply with, the requirements of section 345(b) of the Bankruptcy Code during these chapter 11 cases, the Debtors request that the Court either (a) provide the Debtors without prejudice with 45 days to seek an additional extension from the entry of the Interim Order to bring the Bank Accounts into compliance with section 345(b) of the Bankruptcy Code, or (b) grant the right to seek appropriate relief from the Court.

31.     I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption in order to implement an orderly wind down.

**F.      Post-Petition Financing Motion**

32.     The Debtor seeks approval of the DIP Loan on an interim basis. The DIP Loan is necessary to fund the costs associated with the Debtors' bankruptcy proceeding, confirmation of a chapter 11 plan of liquidation, distribution of cryptocurrency holdings to Debtors' customers, and an orderly wind-down of Debtors' business. The Debtors anticipate confirmation of a chapter 11 plan of liquidation prior to the maturity of the DIP Loan.

33.     The DIP Lender, is non-debtor Aquila Holdings, the ultimate parent company of the Debtors and is familiar with their operations. The DIP Lender is willing to provide funding on terms that are more favorable than the Debtors have available to them from any other source, including the DIP Loan being provided on an unsecured basis. The DIP Loan was negotiated in good faith and at arm's length. The Debtors were represented by separate, independent representatives and advisors in the negotiation of the DIP Loan. In particular, Tim Pohl, the

Disinterested Director, negotiated, on behalf of the Debtors, the business terms of the DIP Loan, with representatives of the DIP Lender.  Mr. Pohl was advised in these negotiations by the Debtors' separate legal counsel and assisted by myself, as the Debtors' CRO.

34.    The DIP Loan will be made in bitcoins ("BTC") and the principal amount will be repaid in BTC.  Although novel to those outside of the cryptocurrency industry, borrowing funds in BTC is not uncommon for participants in the cryptocurrency industry, as BTC is that industry's currency of choice.  Following the closure of the Debtors' U.S. dollar fiat banking services provider, Silvergate Bank, access to fiat currency for a cryptocurrency company in wind-down mode is unlikely.  While the Debtors discussed with the DIP Lender whether it would make the DIP Loan in U.S. dollars, the DIP Lender was unwilling to do so due to potential negative tax consequences to the DIP Lender, which would have greatly increased the expense of lending and for which the Debtors would have been charged.

35.    In order to prevent negative tax consequences, the DIP Lender also requires the principal amount of the DIP Loan to be repaid in BTC.  Importantly, the Debtors negotiated protection against the risk of currency rate fluctuations between the time the DIP Loan is borrowed and repaid.  It is expected that the DIP Loan will be made in two draws—250 BTC upon approval of the Interim Order, and an additional 450 BTC upon approval of the Final Order.  Following each of these draws, the Debtors intend to convert promptly the BTC into U.S. dollars in order to minimize any risks of currency rate fluctuation.  After converting BTC from the DIP Loan into U.S. dollars, the Debtors will use those proceeds to pay their administrative expenses in the chapter 11 cases in accordance with the Budget, including professional fees and employee costs, among other things.

36.    When the Debtors repay the DIP Loan at maturity, the Debtors will be required to

repay the principal amount in BTC. All other obligations under the DIP Loan will be repaid, at the Debtors' option, in BTC, U.S. dollars, or any combination thereof. If the Debtors do not have sufficient BTC on hand to repay at maturity the full principal amount of the DIP Loan in BTC and there is a shortfall, the Debtors will have to use the currencies it possesses at that time of repayment to acquire the additional BTC to pay that shortfall. Significantly, to protect against currency rate fluctuations between the time of borrowing the DIP Loan and repaying it, the Debtors negotiated a cap on the amount of additional BTC they may need acquire in order to pay the shortfall. Specifically, the amount of BTC the Debtors may need to acquire to pay the shortfall is capped at a number of BTC equal to 110% of the value of the shortfall on the Petition Date. Based on their books and records, the Debtors believe they will have sufficient unclaimed BTC, or other cryptocurrencies that remain unclaimed property of the estate that could be liquidated to acquire BTC, in order to satisfy all obligations under the DIP Loan at maturity.

37.     I believe, in the exercise of the my business judgment, that the terms of the DIP Loan are fair, equitable, and in the best interest of the Debtors' estates. The Debtors will suffer immediate and irreparable harm if they do not obtain financing. I do not believe that there are any parties willing to provide financing on terms more favorable than those contained in the proposed financing, including financing in the form of unsecured credit allowable under section 503(b)(1) or as an administrative expense under section 364(a) or (b). Approval of the DIP Loan on the terms set forth in the Superpriority Debtor-in-Possession Credit Agreement will provide the Debtors with immediate access to funds necessary to fund this Chapter 11 Case and fully wind down. Without access to sufficient funds to pay these costs, the Debtors cannot wind up their affairs.

**G.     Wages Motion**

38.    Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders to continue employee compensation and benefits programs in the ordinary course.

39.    Before the Petition Date, the Debtors employed approximately 96 individuals across the United States.  As a part of the orderly wind-down of the Debtors, many of those employees are now employed by Trexie Management, LLC ("Trexie") rather than the Debtors.  Thus, as of the Petition Date, the Debtors only employed 13 individuals (each,  an "Employee" and collectively, the "Employees") on a  full-time basis.  All of the Employees are salaried and exempt.  None of the employees are represented by a union or collective bargaining unit.  The Debtors also appointed Timothy Pohl as an independent non-employee director.

40.    As of the Petition Date, the Debtors estimate that there are no amounts outstanding on account of Employee Compensation and Benefits.

41.    Without the continued, uninterrupted services of the Debtors' workforce, the ability of the Debtors to maintain and administer their estates will be materially impaired, and the Debtors' ongoing business could be severely and adversely affected.  Thus, the Debtors seek to continue their Employee Compensation and Benefits as set forth in the Wages Motion.  Out of an abundance of caution, the Debtors further request confirmation of their right to modify, change, and/or discontinue any of their Employee Compensation and Benefits and/or to implement new programs, policies, and benefits in the ordinary course of business on a post-petition basis during these Chapter 11 Cases in the Debtors' sole discretion (subject in all respects to the terms of the Interim Order or Final Order, as applicable).

42.    To minimize the personal hardship that the Employees and Independent Director would suffer if Employee and Independent Director-related obligations remain unpaid during these chapter 11 cases, the Debtors seek authority to continue the Employee Compensation and Benefits

as set forth in the Wages Motion.

43.     I believe the relief requested in the Wages Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of the Bankruptcy Code, and Bankruptcy Rules 6003 and 6004.  I understand the Debtors believe that without the relief requested in the Wages Motion, Employees may seek alternative employment opportunities, which would deplete the Debtors' workforce and hinder the Debtors' ability to implement an orderly wind down.

44.     I believe that the relief requested in the Wages Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to implement an orderly wind down of the Debtors' business that maximizes value for all of the Debtors' stakeholders.

**H.     Stay Motion**

45.     Pursuant to the Stay Motion, the Debtor seeks an order (a) restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of the Bankruptcy Code; (b) approving the form and manner of notice related thereto (the "Notice"); and (c) granting related relief**.**

46.     The Debtors are part of Bittrex, a group of more than two dozen domestic and international companies operating two cryptocurrency exchanges and providing online platforms for access to the exchanges to customers in different jurisdictions.  As such, the Debtors have customers, other contractual counterparties, and business operations in and outside the United States.  Debtor BUS operated a cryptocurrency exchange with a focus on the U.S. market, which

included customers who are (a) individuals with U.S. citizenship or residence;[10] or (b) U.S. entities. Further, Debtor Malta Opco catered to foreign customers that (a) based on Bittrex's compliance system and procedures, did not have relevant ties (e.g., nationality, residence, or incorporation) with the United States;[11] and (b) whom Malta OpCo did not transfer to non-debtor BG in 2019. Within Bittrex, non-debtors BG and BGB operate a cryptocurrency exchange that focuses on the non-U.S. market and that has hundreds of thousands of international customers. Two of the three pillars of the Debtors' restructuring process are (a) leaving intact the non-U.S. business operated by BG and BGB for the benefit of their customers; and (b) separating Bittrex's non-U.S. operations in a fair and equitable manner.

47.    The Debtors' customers and contract counterparties in foreign jurisdictions may be unfamiliar with the chapter 11 process, including the scope of a debtor in possession's authority to operate its business and the application of the automatic stay to efforts to collect debts. In violation of the automatic stay, these creditors may attempt to take action against the Debtors or interfere with their restructuring, in and outside the United States, to the detriment of the Debtors, their estates, and other creditors. In addition, upon the commencement of these Chapter 11 Cases, non-U.S. counterparties to certain leases or executory contracts with the Debtors could attempt to terminate such agreements in contravention of sections 362 and 365 of the Bankruptcy Code. Similarly, in violation of section 525 of the Bankruptcy Code, governmental units outside of the United States may deny, suspend, terminate, or otherwise place conditions upon certain licenses, permits, charters, franchises, or other similar grants that Debtors Malta OpCo and its holding

---

[10]    In general, according to Bittrex's compliance and know-your-customer procedures, a customer is considered part of the U.S. market (and allocated to BUS) if it has certain ties with the United States. For example, the U.S. nationality of an individual customer is sufficient to make him or her a customer of BUS regardless of his or her country of residence.

[11]    Otherwise, these customers would have been allocated to the U.S. market and become BUS' customers.

company, Malta Holdings, maintain.

48.     The Debtors seek the relief requested herein out of an abundance of caution and to assist them in better informing non-U.S. creditors and other stakeholders of the broad protections offered by the Bankruptcy Code.  For the avoidance of doubt, the Debtors do not seek to expand or enlarge the rights afforded to them under the Bankruptcy Code with this Motion.  Instead, the Debtors seek to affirm those rights and believe that an order from this Court will help guard the Debtors against improper actions taken by, and provide clarity for, non-U.S. parties in interest.

49.     I believe that the relief requested in the Stay Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to implement an orderly wind down of the Debtors' business that maximizes value for all of the Debtors' stakeholders.

**EXHIBIT B**

**Corporate Organizational Structure**



# Organizational Structure Effective May 8, 2023

BITTREX

**Key:**

BLUE: Existing Direct Subsidiaries
WHITE: Existing Indirect Subsidiaries
GRAY: Debtor Entities

**<u>EXHIBIT C</u>**

**Chapter 11 Plan**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re:

Desolation Holdings LLC et al.[1]

        Debtors.

_____/

Case No. 23-10597 (BLS)

(Joint Administration Pending)

## JOINT CHAPTER 11 PLAN OF LIQUIDATION
## OF DESOLATION HOLDINGS LLC AND ITS AFFILIATED DEBTORS

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Susheel Kirpalani *(pending pro hac vice)*
Patricia B. Tomasco *(pending pro hac vice)*
Daniel Holzman (*pending pro hac vice*)
Razmig Izakelian *(pending pro hac vice)*
Alain Jaquet *(pending pro hac vice)*
Joanna Caytas *(pending pro hac vice)*
Valerie Ramos (*pending pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: 212-849-7000
Facsimile: 212-849-7100
Email: susheelkirpalani@quinnemanuel.com
Email: pattytomasco@quinnemanuel.com
Email: razmigizakelian@quinnemanuel.com
Email: alainjaquet@quinnemanuel.com
Email: joannacaytas@quinnemanuel.com
Email: danielholzman@quinnemanuel.com
Email: valerieramos@quinnemanuel.com

*Counsel to the Debtors and Debtors in Possession*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Robert S. Brady (Delaware Bar No. 2847)
Kenneth Enos (Delaware Bar No. 4544)
Joshua Brooks (Delaware Bar No. 6765)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: 302-571-6600
Facsimile: 302-571-1253
Email: rbrady@ycst.com
Email: kenos@ycst.com
Email: jbrooks@ycst.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: May 8, 2023

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Holdings Ltd. (2227); and Bittrex Malta Ltd. (1764). The mailing and service address of the Debtors is 701 5th Avenue, Suite 4200, Seattle, WA 98104.

## TABLE OF CONTENTS

**Page**

INTRODUCTION...................................................................................................... 5

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION,  COMPUTATION OF TIME, AND GOVERNING LAW**........................................................... 5

    A.     Defined Terms. ............................................................................................. 5

    B.     Rules of Interpretation. .............................................................................. 16

    C.     Computation of Time.................................................................................. 16

    D.     Governing Law. .......................................................................................... 17

    E.     Reference to Monetary Figures................................................................... 17

    F.     Conflicts...................................................................................................... 17

**ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND DIP LOAN CLAIMS** ................................................................................................. 17

    A.     Administrative Claims. ............................................................................... 17

    B.     Priority Tax Claims..................................................................................... 19

    C.     DIP Loan Claims. ....................................................................................... 19

    D.     Statutory Fees. ............................................................................................ 20

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ........... 20

    A.     Classification in General............................................................................. 20

    B.     Grouping of Debtors for Convenience Only............................................... 20

    C.     Classification of Claims and Interests........................................................ 21

    D.     Treatment of Claims and Interests. ............................................................ 21

    E.     Special Provision Governing Unimpaired Claims. .................................... 23

    F.     Elimination of Vacant Classes. .................................................................. 23

    G.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ........................................................................................................... 24

    H.     Voting Classes; Presumed Acceptance by Non-Voting Classes................. 24

    I.      Presumed Acceptance and Rejection of the Plan....................................... 24

    J.      Controversy Concerning Impairment. ....................................................... 24

    K.     Subordinated Claims and Interests............................................................. 24

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ................................................. 25

    A.     No Substantive Consolidation..................................................................... 25

    B.     Settlement and Compromise. ...................................................................... 25

    C.     Liquidation of the Debtors. ......................................................................... 25

    D.     Settlement of Claims After the Effective Date. .......................................... 31

|     | E. | Sources of Consideration for Plan Distributions | 31 |
|     | F. | Cancellation of Certain Existing Securities and the DIP Loan Agreement. | 31 |
|     | G. | Release of Liens. | 32 |
|     | H. | Corporate Action. | 32 |
|     | I. | Effectuating Documents; Further Transactions. | 32 |
|     | J. | Section 1146 Exemption. | 33 |
|     | K. | Preservation of Causes of Action. | 33 |
|     | L. | Payment of Certain Fees. | 34 |
|     | M. | Document Retention | 34 |
|     | N. | Closing of Chapter 11 Cases | 34 |
|     | O. | Notice of Effective Date | 34 |
|     | P. | Separability | 34 |

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ........................................................................................... **35**

|     | A. | Rejection of Executory Contracts and Unexpired Leases. | 35 |
|     | B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 35 |
|     | C. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. | 35 |
|     | D. | Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases. | 36 |
|     | E. | Indemnification Obligations. | 36 |
|     | F. | Insurance Policies. | 37 |
|     | G. | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 37 |
|     | H. | Reservation of Rights. | 38 |
|     | I. | Nonoccurrence of Effective Date. | 38 |

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** .................................... **38**

|     | A. | Timing and Calculation of Amounts to Be Distributed. | 38 |
|     | B. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 39 |
|     | C. | Special Rules for Distributions to Holders of Disputed Claims and Interests. | 40 |
|     | D. | Manner of Payment. | 40 |
|     | E. | Compliance with Tax Requirements. | 40 |
|     | F. | Setoffs and Recoupment. | 41 |
|     | G. | No Double Payment of Claims. | 41 |
|     | H. | Claims Paid or Payable by Third Parties. | 41 |
|     | I. | Allocation of Distributions Between Principal and Interest. | 42 |

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND DISPUTED CLAIMS** ...................................................................... **42**

| | | |
|---|---|---|
| A. | Allowance of Claims. | 42 |
| B. | Claims Administration Responsibilities. | 42 |
| C. | Adjustment to Claims Without Objection | 43 |
| D. | Time to File Objections to Claims or Interests. | 43 |
| E. | Estimation of Claims. | 43 |
| F. | Disputed and Contingent Claims Reserve. | 43 |
| G. | Disallowance of Claims. | 44 |
| H. | Amendments to Proofs of Claim | 44 |
| I. | Reimbursement or Contribution. | 44 |
| J. | No Distributions Pending Allowance. | 45 |
| K. | Distributions After Allowance. | 45 |

**ARTICLE VIII. RELEASES, INJUNCTION, EXCULPATION, AND RELATED PROVISIONS ... 45**

| | | |
|---|---|---|
| A. | **[Releases by the Debtors.** | 45 |
| B. | **[Releases by Holders of Claims and Interests.** | 46 |
| C. | [Waiver of Statutory Limitations on Releases | 46 |
| D. | **Exculpation.** | 47 |
| E. | **Injunction.** | 48 |
| F. | Recoupment. | 49 |
| G. | Binding Effect. | 49 |

**ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ... 50**

| | | |
|---|---|---|
| A. | Conditions Precedent to Confirmation | 50 |
| B. | Conditions Precedent to the Effective Date. | 51 |
| C. | Waiver of Conditions. | 51 |
| D. | Substantial Consummation. | 51 |
| E. | Effect of Failure of Conditions. | 51 |

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ... 51**

| | | |
|---|---|---|
| A. | Modification and Amendments | 51 |
| B. | Effect of Confirmation on Modifications. | 52 |
| C. | Revocation or Withdrawal of Plan | 52 |

**ARTICLE XI. RETENTION OF JURISDICTION ... 52**

**ARTICLE XII. MISCELLANEOUS PROVISIONS ... 54**

| | | |
|---|---|---|
| A. | Immediate Binding Effect. | 54 |
| B. | Additional Documents. | 55 |

C.     Payment of Statutory Fees. ................................................................................. 55

D.     Reservation of Rights. .......................................................................................... 55

E.     Successors and Assigns. ....................................................................................... 55

F.     Notices. ................................................................................................................. 55

G.     Term of Injunctions or Stays. ............................................................................... 56

H.     Entire Agreement. ................................................................................................. 56

I.     Exhibits. ................................................................................................................ 56

J.     Nonseverability of Plan Provisions. ..................................................................... 56

K.     Votes Solicited in Good Faith. .............................................................................. 57

L.     Waiver or Estoppel. .............................................................................................. 57

M.     Closing of Chapter 11 Cases. ............................................................................... 57

N.     Creditor Default. ................................................................................................... 57

## INTRODUCTION

Desolation Holdings LLC ("Desolation"), Bittrex, Inc. ("BUS"), Bittrex Malta Ltd. ("Malta OpCo"), and Bittrex Malta Holdings Ltd. ("Malta Holdings") as debtors and debtors in possession (collectively, the "Debtors"), propose this joint chapter 11 plan of liquidation (the "Plan") for the resolution of the outstanding Claims against, and Interests in, the Debtors. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in Article I.A of the Plan. Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, business, assets, results of operations, historical financial information, events during the Chapter 11 Cases, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

*A.    Defined Terms.*

As used in the Plan, capitalized terms have the meanings set forth in the Introduction above or in the definitions below.

1.    "341 Notice" means the notice of chapter 11 bankruptcy case filed in the Chapter 11 Cases at [•], which, inter alia, specified the Bar Date.

2.    "503(b)(9) Claim" means a Claim or any portion thereof entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

3.    "Administrative Claim" means a Claim for costs and expenses of administration of the Estates or the Chapter 11 Cases under sections 503(b) (including 503(b)(9) Claims), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date through the Effective Date of preserving the Estates and operating the business of the Debtors; (b) Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911–1930.

4.    "Administrative Claims Bar Date" means the final deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to General Administrative Claims other than those that were accrued in the ordinary course of business, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 60 days after the Effective Date.

5.    "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

6.      "Allowed" means, with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest in a liquidated amount as to which no objection has been Filed prior to the applicable Claims Objection Deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither Disputed, contingent, nor unliquidated, and for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount; (c) a Claim or Interest that is upheld or otherwise Allowed (i) pursuant to the Plan; (ii) in any stipulation that is approved by the Bankruptcy Court; (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had Disallowed prior to such Final Order); provided that with respect to a Claim or Interest described in clauses (a) through (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been or, in the Debtors' or Liquidating Trust's reasonable good faith judgment, may be interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest, as applicable, shall have been Allowed by a Final Order; provided, further, that no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Liquidating Trust, as applicable.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt a Proof of Claim or Interest Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow," "Allowing," and "Allowance" shall have correlative meanings.

7.      "Asset" means all of the rights, title, and interests of a Debtor in, and to property of whether type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property.

8.      "Assumption Schedule" means the list, compiled by the Debtors, as applicable, of executory contracts and unexpired leases (with proposed cure amounts) that will be assumed by the Debtors, which list shall be included in the Plan Supplement.

9.      "Avoidance Actions" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547, 548, 549, 550, 551, 552, and 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

10.      "Ballot" means the ballot applicable to the relevant Holder of a Claim, substantially in the form attached to the Disclosure Statement Order.

11.      "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

12.    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

13.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

14.    "Bar Date" means the applicable date established by which Proofs of Claims and Interests must be Filed in these Chapter 11 Cases pursuant to Local Bankruptcy Rule 3003-1 and the 341 Notice, which date is [●], except with respect to Proofs of Claims filed by governmental units and certain other exceptions set forth in the 341 Notice.

15.    "Malta OpCo" has the meaning set forth in the Introduction.

16.    "BUS" has the meaning set forth in the Introduction.

17.    "Business Day" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18.    "Cash" means the legal tender of the U.S. and equivalents thereof, including bank deposits, checks, and other similar items.

19.    "Causes of Action" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 551, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

20.    "Chapter 11 Cases" means, collectively: (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (b) when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

21.    "Claim" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

22.    "Claims Objection Deadline" means the later of: (a) the date that is 180 days after the Effective Date; and (b) such other date as may be fixed by the Bankruptcy Court, after notice and hearing, upon a motion Filed before the expiration of such deadline.

23.    "Claims Register" means the official register of Claims maintained by the Bankruptcy Court.

24.    "Class" means a category of Claims or Interests as set forth in Article III of the Plan.

25.    "Class A Interests" has the meaning given to the term in the Liquidating Trust Agreement.

26.    "Class B Interests" has the meaning given to the term in the Liquidating Trust Agreement.

27.    "Class C Interests" has the meaning given to the term in the Liquidating Trust Agreement.

28.    "CM/ECF" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

29.    "Confirmation" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

30.    "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

31.    "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

32.    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

33.    "Consummation" means the occurrence of the Effective Date.

34.    "Cryptocurrency" means any digital asset that is not backed by a government. The term "cryptocurrency" is to be interpreted broadly to include all forms of digital assets, virtual currency, cryptocurrency, tokens, security tokens, utility tokens and stablecoins. This includes bitcoin, ether, Peercoin, Vertcoin, any ERC-20 compliant token, any altcoin, and any other cryptocurrency.

35.    "Cryptocurrency Transaction" means a pre-petition transaction involving any transfer by any Entity of Cryptocurrency to the Debtors, whether directly or indirectly.

36.    "Cure Claim" means a Claim (unless waived or modified by the applicable counterparty) based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code, other than with respect to a default that is not required to be cured under section 365(b)(2) of the Bankruptcy Code.

8

37.    "Customer" means an Entity that engaged in a Cryptocurrency Transaction with one or more of the Debtors.

38.    "Customer Claim" means a Claim of a Customer arising from a Cryptocurrency Transaction.

39.    "Customer Distribution" means the Distribution of like kind Cryptocurrencies to be Distributed to Holders of Customer Claims by providing access to the Debtors' platform for withdrawal of 100% of the amount of Cryptocurrencies associated with such Customer's account as of the Petition Date.

40.    "D&O Policy" means any insurance policy that covers, among others, current or former directors, members, trustees, managers, and officers liability issued at any time to or providing coverage to the Debtors and all agreements, documents or instruments relating thereto, including any runoff policies or tail coverage.

41.    "Debtors" has the meaning set forth in the Introduction.

42.    "DIP Lender" means Aquila Holdings, Inc. (or its designee), in its capacity as lender under the DIP Loan Agreement.

43.    "DIP Loan Agreement" means the DIP Loan Agreement as defined in the DIP Order.

44.    "DIP Loans" means the post-petition financing provided by the DIP Lender on the terms and conditions set forth in the DIP Order.

45.    "DIP Loan Claims" means any Administrative Claims arising in connection with the DIP Loan.

46.    "DIP Order" means the [●] (ECF No. [●]), as may be amended, and all other Orders of the Bankruptcy Court authorizing the Debtors to obtain post-petition financing at any time prior to Confirmation.

47.    "Disallowed" means, with respect to any Claim, a Claim or any portion thereof that (a) has been disallowed by a Final Order, including a Final Order, (b) is scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or the Plan, (c) is not scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or the Plan, (d) has been waived or withdrawn by agreement of the applicable Debtor or Liquidating Trust, as applicable, and the Holder thereof, or (e) has been waived or withdrawn by the Holder thereof.

48.     "Disclosure Statement" means the [●], dated as of [●] (ECF No. [●]), as may be amended, including all exhibits and schedules thereto, as approved pursuant to the Disclosure Statement Order.

49.     "Disclosure Statement Order" means the [●] (ECF No. [●]).

50.     "Disputed" means with regard to any Claim or Interest, a Claim or Interest that is not yet Disallowed or Allowed.

51.     "Distribution" means, with respect to Customer Distributions, that a Customer entitled to a Customer Distribution shall access the Bittrex platform and withdraw Cryptocurrencies consistent with this Plan and its Allowed Claim.  With respect to distributions other than Customer Distributions, "Distribution" means payment in cash or check.

52.     "Distribution Date" means, with respect to any Claim or Interest that is Allowed as of the Effective Date, the date on which Distributions are made pursuant to the Plan, which shall be on or as soon as reasonably practicable following the Effective Date, provided that to the extent Claims or Interests will be paid from the proceeds of Cryptocurrencies, rather than in kind Distributions, such Distributions will occur at such time as the Liquidating Trustee determines in its sole discretion, based on factors the Liquidating Trustee determines are appropriate, including the quantity in any transaction.

53.     "Distribution Record Date" means the record date for purposes of making Distributions under the Plan on account of Allowed Claims and Allowed Interests, which date shall be the date that is [●] Business Days after the Confirmation Date or such other date as designated in a Final Order of the Bankruptcy Court.

54.     "Effective Date" means, with respect to the Plan and any such applicable Debtor(s), the date that is the first Business Day upon which:  (a) all conditions precedent specified in Article IX.A and Article IX.B have been satisfied or waived (in accordance with Article IX.C); and (b) the Plan is declared effective with respect to such applicable Debtor(s).

55.     ["Enjoined Party" has the meaning set forth in Article IX.E.]

56.     "Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

57.     "Estate" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

58.     ["Exculpated Parties" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Liquidating Trust; (c) the DIP Lender; and (d) with respect to each of the foregoing (a) through (c), such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former members, equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, predecessors, successors, assigns, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, restructuring advisors, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.]

59.	"Federal Judgment Rate" means the federal judgment rate in effect as of the Petition Date, compounded annually, as set forth in 28 U.S.C. § 1961.

60.	"File," "Filed," or "Filing" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

61.	"Final Order" means (a) an order or judgment of the Bankruptcy Court, as entered on the docket in any Chapter 11 Case (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction, or (b) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Bankruptcy Court (or any other court of competent jurisdiction, including in an appeal taken) in the Chapter 11 Case (or in any related adversary proceeding or contested matter), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; provided that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order.

62.	"General Administrative Claim" means any Administrative Claim, other than a Professional Fee Claim.

63.	"Government Regulation" shall mean all regulations applicable to a Cryptocurrency Transaction consisting of the withdrawal or liquidation of any Cryptocurrency by a Customer.

64.	"Governmental Unit" has the meaning set forth in section 101(27) of the Bankruptcy Code.

65.	"GUC Claim" means any unsecured Claim against any Debtor.

66.	"Holder" means an Entity holding a Claim or an Interest, as applicable. "Hold" and "Held" shall have the correlative meanings.

67.	"Impaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

68.	"Indemnification Obligations" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, for their current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals, advisors, and agents of the Debtors, as applicable.

11

69.     "Insurance Policies" means the policies of insurance listed in the Plan Supplement.

70.     "Insurers" means the insurance companies providing insurance coverage under the Insurance Policies.

71.     "Interest" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Entity.

72.     "Interim Compensation Order" means the [●], dated [●](ECF No. [●]).

73.     "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

74.     "IRS" means the Internal Revenue Service.

75.     "Judicial Code" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

76.     "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

77.     "Liquidating Trust" means the Liquidating Trust established by this Plan.

78.     "Liquidating Trust Agreement" means the agreement establishing and delineating the terms and conditions of the Liquidating Trust and filed as part of the Plan Supplement.

79.     "Liquidating Trust Assets" means all of the Debtors' Assets, as well as the rights and powers of the Estates with respect to the Debtors' Assets.

80.     "Liquidating Trust Beneficiaries" means the Holders of Allowed Claims that are entitled to receive Distributions pursuant to the terms of the Plan, whether or not such Claims are Allowed as of the Effective Date.

81.     "Liquidating Trust Exculpation Party" has the meaning set forth in Article IV.C.10.

82.     "Liquidating Trust Expenses" means all actual and necessary costs and expenses incurred by the Liquidating Trust in connection with carrying out the obligations of the Liquidating Trust pursuant to the terms of the Plan and the Liquidating Trust Agreement.

83.     "Liquidating Trustee" means the Person who will be appointed to act as trustee of the Liquidating Trust in accordance with the terms of the Plan, the Confirmation Order, and the Liquidating Trust Agreement, or any successor appointed in accordance with the terms of the Plan and the Liquidating Trust Agreement. The identity of the Liquidating Trustee, as well as the terms of the compensation paid to the Liquidating Trustee, will be disclosed in the Plan Supplement.

84.     "Local Bankruptcy Rules" means the local rules of bankruptcy procedure promulgated in this district in accordance with Bankruptcy Rule 9029 that are applicable to all

cases and proceedings arising in, under, or related to cases pending under the Bankruptcy Code in the Bankruptcy Court.

85.　["Opt Out Form" means a form, substantially in the form contained in the Plan Supplement, by which a creditor or other party in interest may indicate its intent to opt out of the releases contained in Article VIII of the Plan by submitting such form in advance of the deadline for voting on the Plan.]

86.　"Other Priority Claim" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

87.　"Petition Date" means May 8, 2023, which is the date on which the Debtors commenced the Chapter 11 Cases.

88.　"Plan" has the meaning set forth in the Introduction.

89.　"Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors.  The Plan Supplement shall be comprised of, among other documents, the following: (a) the Assumption Schedule; (b) the Schedule of Retained Causes of Action; and (c) the identity of the Liquidating Trustee.  Any reference to the Plan Supplement in the Plan shall include each of the documents identified above as (a) through (c).  Notwithstanding the foregoing, the Debtors may amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date or as otherwise provided herein.

90.　"Priority Claims" means, collectively, the (a) Administrative Claims, (b) Priority Tax Claims, and (c) Other Priority Claims.

91.　"Priority Tax Claim" means the Claims of Governmental Units of the type specified in section 507(a)(8) of the Bankruptcy Code.

92.　"Pro Rata" means the proportion that the amount of an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of the Allowed Claims or Allowed Interests, in that Class, or the proportion of the Allowed Claims or Allowed Interests in a particular Class and other Classes, respectively, entitled to share in the same recovery as such Claim or Interest under the Plan.

93.　"Professional" means an Entity: (a) retained pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

94.　"Professional Fee Claims" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court.  To the extent the

Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

95.    "Professional Fee Escrow Account" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount and funded by the Debtors on the Effective Date, pursuant to Article II.A.2(b) of the Plan.

96.    "Professional Fee Reserve Amount" means the total amount of Professional Fee Claims estimated in accordance with Article II.A.2(c) of the Plan.

97.    "Proof of Claim" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

98.    "Proof of Interest" means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

99.    "Protected Party" has the meaning set forth in Article IX.E.

100.    "Reinstate," "Reinstated," or "Reinstatement" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired for purposes of section 1124 of the Bankruptcy Code.

101.    ["Released Parties" means, collectively, and in each case only in its capacity as such: (a) the Debtors; (b) the DIP Lender; and (c) with respect to each of the foregoing (a) through (b), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.]

102.    ["Releasing Parties" means, collectively, and in each case only in its capacity as such: (a) each of the Debtors; (b) the DIP Lender; (c) each of the Debtors' current and former directors or officers; (d) all Holders of Claims or Interests who (1) vote in favor of the Plan or (2) abstain from voting, are not entitled to vote, or vote to reject the Plan and do not opt out of the Third Party Release on a timely submitted Ballot or Opt Out Form; and (e) with respect to each of the foregoing (a) through (e), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.]

103.    "Retained Causes of Action" means any Causes of Action that are set forth on the Schedule of Retained Causes of Action to be retained by the Debtors or the Liquidating Trust, as applicable, and prosecuted on behalf of the Debtors or the Liquidating Trust, as applicable.

104.    "Schedule of Retained Causes of Action" means the schedule of certain Causes of Action of the Debtors that are not released or waived pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors, which shall be included in the Plan Supplement, provided that such schedule shall not include any Causes of Action against any Released Party, and any such inclusion will be deemed void ab initio.

105.    "Schedules" means the schedules of assets and liabilities, schedules of executory contracts or unexpired leases, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

106.    "SEC" means the Securities and Exchange Commission.

107.    "SEC Complaint" means the complaint filed on April 17, 2023 in the Western District of Washington that initiated the action captioned *Securities and Exchange Commission v. Bittrex, Inc., et al.*, Case No. 2:23-cv-00580-RSM.

108.    "Secured Claim" means a Claim that is: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan or separate order of the Bankruptcy Court as a secured claim.

109.    "Subordinated Claim" means any claim that is subordinated pursuant to section 510 of the Bankruptcy Code, or as needed to satisfy the best interests of creditors test of 1129(a)(7). The Debtors or the Liquidating Trustee, as applicable, reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

110.    ["Third Party Release" means the release provided by the Releasing Parties in favor of the Released Parties as set forth in Article VIII.B of the Plan.]

111.    "U.S." or "United States" means the United States of America.

112.    "U.S. Trustee" means the Office of the U.S. Trustee Region 3 for the District of Delaware.

113.    "Unimpaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

114.    "Unsecured" means, when referring to a Claim, any Claim that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, or Secured Claim.

115.    "Voting Deadline" has the meaning given to that term in the Disclosure Statement Order.

B.    *Rules of Interpretation.*

For purposes of the Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neutral gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, or similar formation document or agreement, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (14) any immaterial effectuating provisions may be interpreted by the Debtors or Liquidating Trust, as applicable, in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C.    *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.    *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate governance matters relating to the Debtors or the Liquidation Trust, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Liquidating Trust.

E.    *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States, unless otherwise expressly provided.

F.    *Conflicts.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## <u>ARTICLE II.</u>
## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND DIP LOAN CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and DIP Loan Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests.

A.    *Administrative Claims.*

1.    General Administrative Claims.

Except as specified in this Article II, unless the Holder of an Allowed General Administrative Claim and the Debtors or the Liquidating Trust, as applicable, agree to less favorable treatment, each Holder of an Allowed General Administrative Claim will receive, in full satisfaction of its General Administrative Claim, Cash equal to the amount of such Allowed General Administrative Claim either:  (a) on the Effective Date; (b) if the General Administrative Claim is not Allowed as of the Effective Date, sixty (60) days after the date on which an order allowing such General Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (c) if the Allowed General Administrative Claim is based on a liability incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Administrative Claim, without any further action by the Holders of such Allowed General Administrative Claim, and without any further notice to or action, order, or approval of the Bankruptcy Court.

Except for Claims of Professionals, requests for payment of General Administrative Claims that were not accrued in the ordinary course of business must be Filed and served on the Debtors or the Liquidating Trust, as applicable, no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date. Holders of General Administrative Claims that are required to File and serve a request for payment of such General Administrative Claims by the Administrative Claims Bar Date and do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such General Administrative Claims against the Debtors or Liquidating Trust, as applicable, or their respective property, and such General Administrative Claims shall be deemed forever discharged and released as of the Effective Date. Any requests for payment of General Administrative Claims that are not properly Filed and served by the Administrative Claims Bar Date shall not appear on the Claims Register and shall be Disallowed automatically without the need for further action by the Debtors or the Liquidating Trust, as applicable, or further order of the Bankruptcy Court. To the extent this Article II.A.1 conflicts with Article XII.C of the Plan with respect to fees and expenses payable under section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, Article XII.C of the Plan shall govern. Notwithstanding the foregoing, no request for payment of a General Administrative Claim need be Filed with respect to a General Administrative Claim previously Allowed by Final Order.

The Debtors or the Liquidating Trust, as applicable, in their sole and absolute discretion, may settle General Administrative Claims without further Bankruptcy Court approval. The Liquidating Trust may also choose to object to any Administrative Claim no later than sixty (60) days from the Administrative Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors or Liquidating Trust (or other party with standing), as applicable, object to a timely filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtors or Liquidating Trust, as applicable, object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

    2.    Professional Compensation.

    (a)    <u>Final Fee Applications</u>.

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date, must be Filed and served on the Liquidating Trust no later than sixty (60) days after the Effective Date or such other time as may be directed by the Bankruptcy Court. All such final requests will be subject to approval by the Bankruptcy Court after notice to other parties on the regular service list and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, including the Interim Compensation Order, and once approved by the Bankruptcy Court, promptly paid from the Professional Fee Escrow Account up to the full Allowed amount.

    (b)    <u>Professional Fee Escrow Account</u>.

On the Effective Date, the Debtors or Liquidating Trust, as applicable, shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Liquidating Trust, as applicable. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Liquidating Trust from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Liquidating Trust without any further action or order of the Bankruptcy Court. If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, all remaining unpaid Allowed Professional Fee Claims will be paid by the Debtors or the Liquidating Trust, as applicable.

(c)    Professional Fee Reserve Amount.

Professionals shall estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date and shall deliver such estimate to the Debtors no later than five business days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The aggregate amount for all Professionals estimated pursuant to this section shall comprise the Professional Fee Reserve Amount.

(d)    Post-Confirmation Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Liquidating Trust may employ and pay any Professional pursuant to the Liquidating Trust Agreement.

B.    *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

C.    *DIP Loan Claims.*

Except to the extent that a Holder of an Allowed DIP Loan Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Loan Claim, each Holder of such Allowed DIP Loan Claim shall be paid in full in accordance with the terms of the DIP Loans. Upon the payment or satisfaction of the Allowed DIP Loan Claims in accordance with this Article II.C, all superpriority claims granted in connection with the Allowed DIP Loan Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

D.      *Statutory Fees.*

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Liquidating Trust shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. The Liquidating Trust shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the case of that particular Debtor being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

## <u>ARTICLE III.</u>
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification in General*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and Distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

B.      *Grouping of Debtors for Convenience Only*

This Plan groups the Debtors together solely for the purpose of describing treatment under this Plan, confirmation of this Plan, and Plan Distributions to be made in respect of Claims against and Interests in the Debtors under this Plan. Each Class of Claims will be deemed to contain sub-classes for each of the Debtors, to the extent applicable for voting and Distribution purposes. To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor. Except as otherwise provided herein, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim. Such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets.

C.      *Classification of Claims and Interests*

Claims and Interests, except for Administrative Claims, Priority Tax Claims, Professional Fee Claims, and DIP Loan Claims, are classified as required by the Bankruptcy Code in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.F.

The following chart represents the classification of Claims and Interests for each Debtor pursuant to the Plan.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2A | BUS Customer Claims | Impaired | Entitled to Vote |
| Class 2B | Malta OpCo Customer Claims | Impaired | Entitled to Vote |
| Class 3 | GUC Claims | Impaired | Entitled to Vote |
| Class 4 | Subordinated Claims | Impaired | Entitled to Vote |
| Class 5 | Interests | Impaired | Entitled to Vote |

D.      *Treatment of Claims and Interests.*

To the extent that a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the treatment of Allowed Claims and Allowed Interests in such Class is specified below.

1.      Class 1 – Other Priority Claims.

(a)     *Classification*:  Class 1 consists of Other Priority Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c)     *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Claims in Class 1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2.    Class 2A – BUS Customer Claims.

(a)    *Classification*:  Class 2A consists of BUS Customers Claims.

(b)    *Treatment*:  The BUS Customer Claims are Allowed in the full amount due and owing to each Customer of BUS.  Except to the extent that a Holder of an Allowed BUS Customer Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed BUS Customer Claim, each such Holder, who provides all information that the Debtors believe, in consultation with regulatory counsel, is required by the Debtors, shall receive its Customer Distribution, provided that all Government Regulations applicable to such Customer are satisfied prior to making such Customer Distribution.

(c)    *Voting:*  Class 2A is Impaired under the Plan.  Holders of Claims in Class 2A are entitled to vote to accept or reject the Plan.

3.    Class 2B – Malta OpCo Customer Claims.

(a)    *Classification*:  Class 2B consists of Malta OpCo Customers Claims.

(b)    *Treatment*:  The Malta OpCo Customer Claims are Allowed in the full amount due and owing to each Customer of Malta OpCo.  Except to the extent that a Holder of an Allowed Malta OpCo Customer Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Malta OpCo Customer Claim, each such Holder, who provides all information that the Debtors believe, in consultation with regulatory counsel, is required by the Debtors, shall receive its Customer Distribution, provided that all Government Regulations applicable to such Customer are satisfied prior to making such Customer Distribution.

(c)    *Voting:*  Class 2B is Impaired under the Plan.  Holders of Claims in Class 2B are entitled to vote to accept or reject the Plan.

4.    Class 3 – GUC Claims.

(a)    *Classification*:  Class 3 consists of GUC Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed GUC Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed GUC Claim, each such Holder of a Claim in Class 3 shall receive its Pro Rata share of the Class A Interests, which entitles it to payment priority from the Liquidating Trust over Holders of Class B Interests and Class C Interests.

22

(c)     *Voting:*  Class 3 is Impaired under the Plan.  Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

5.     Class 4 – Subordinated Claims.

(a)     *Classification*:  Class 4 consists of Subordinated Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Subordinated Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Subordinated Claim, each such Holder of a Claim in Class 4 shall receive its Pro Rata share of the Class B Interests, which entitles it to payment priority from the Liquidating Trust over Holders Class C Interests.

(c)     *Voting:*  Class 4 is Impaired under the Plan.  Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

6.     Class 5 – Interests.

(a)     *Classification*:  Class 5 consists of Interests.

(b)     *Treatment*:  On the Effective Date, existing Interests shall be deemed canceled, discharged, released, and extinguished, and except to the extent that a Holder of an Allowed Class 5 Interest agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Class 5 Interest, each such Holder of an Interest in Class 5 shall receive its Pro Rata Share of the Class C Interests, which entitles it to payment of any remaining Liquidating Trust Assets (if any) after all Allowed Claims have been paid in full.

(c)     *Voting:*  Class 5 is Impaired under the Plan.  Holders of Interests in Class 5 are entitled to vote to accept or reject the Plan.

E.     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

F.     *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes pursuant to the Disclosure Statement Order shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the

Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

G.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.D of the Plan.   The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

H.     *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Holders of Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

I.     *Presumed Acceptance and Rejection of the Plan.*

To the extent that Claims or Interests of any Class receive no Distribution under the Plan, each Holder of a Claim or Interest in such Class is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.   To the extent that Claims or Interests of any Class are Reinstated, each Holder of a Claim or Interest in such Class is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

J.     *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

K.     *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable or contractual subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.   Pursuant to section 510 of the Bankruptcy Code, or as needed to satisfy the best interests of creditors, the Debtors or the Liquidating Trustee, as applicable, reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.   For the avoidance of doubt, this Plan classifies any Claims held by Governmental Units for penalties or that are punitive in nature as Subordinated Claims, including, specifically,

any Claims asserted by the SEC in connection with or related to the facts alleged in the SEC Complaint

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

*A.      No Substantive Consolidation.*

This Plan is being proposed as a joint chapter 11 plan of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor.  This Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims of Interests set forth in the Plan.

*B.      Settlement and Compromise.*

The Plan shall be deemed a motion to approve the good-faith compromise and settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 of disputes between Customers and the Debtors with respect to ownership of Cryptocurrencies.  In consideration for the benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement.  The compromises and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan.  The Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise, settlement, and releases set forth in the Plan, as well as a finding by the Bankruptcy Court that such settlement and compromise, and the releases and indemnities provided to effectuate such settlement, are in the best interests of the Debtors, their Estates, and the Holders of Claims and Interests, and is fair, equitable, and reasonable.

*C.      Liquidation of the Debtors.*

In accordance with section 1141 of the Bankruptcy Code, the Liquidating Trust Assets shall automatically be assigned, transferred, and vest in the Liquidating Trust upon the occurrence of the Effective Date, free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Class 5 Interests, as set forth herein, and the expenses of the Liquidating Trust, as set forth herein and in the Liquidating Trust Agreement, for Distribution in accordance herewith.  The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.  The Debtors' attorney-client privilege shall not be transferred to the Liquidating Trust.

1.      *Appointment of Liquidating Trustee*

The Liquidating Trustee shall be selected by the Debtors and shall be identified in the Liquidating Trust Agreement to be filed with the Bankruptcy Court with the Plan Supplement. The appointment of the Liquidating Trustee shall be approved in the Confirmation Order, and the Liquidating Trustee's duties shall commence as of the Effective Date.  The Liquidating Trustee shall administer the Plan and the Liquidating Trust and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Causes of Action belonging to the Estates.

In accordance with the Liquidating Trust Agreement, the Liquidating Trustee shall serve in such capacity through the earlier of (i) the date on which the Liquidating Trust is dissolved in accordance with Section IV.C.9 hereof and (ii) the date on which such Liquidating Trustee resigns, is terminated, or is otherwise unable to serve; provided, however, that, in the event that the Liquidating Trustee resigns, is terminated, or is otherwise unable to serve, the beneficiaries of the Trust shall appoint a successor to serve as the Liquidating Trustee in accordance with the Liquidating Trust Agreement.  If a successor Liquidating Trustee is not appointed within the time periods specified in the Liquidating Trust Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Liquidating Trust, shall approve a successor to serve as the Liquidating Trustee.  Any such successor Liquidating Trustee shall serve in such capacity until the Liquidating Trust is dissolved.

2.    *Responsibilities of Liquidating Trustee*

Responsibilities of the Liquidating Trustee shall include, but are not limited to:

(i)    Administering the implementation of the Plan, including the making of the Distributions contemplated herein;

(ii)    Marshalling, marketing for sale, and liquidating the Liquidating Trust Assets;

(iii)    Conducting an analysis of any and all Claims and Interests and prosecuting objections thereto or settling or otherwise compromising such Claims and Interests, if necessary and appropriate;

(iv)    Maintaining and administering the reserves in accordance with the terms hereof;

(v)    Commencing, prosecuting, or settling claims and Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges in accordance herewith and paying all associated costs;

(vi)    Recovering and compelling turnover of the Debtors' property;

(vii)    Paying Liquidating Trust Expenses;

(viii)    Abandoning any property constituting the Liquidating Trust Assets that cannot be sold or otherwise disposed of for value and whose Distribution to Holders of Allowed Claims would not be feasible or cost-effective in the Liquidating Trustee's reasonable judgment;

(ix)    Preparing and filing post-Effective Date operating reports;

(x)    Filing appropriate tax returns in the exercise of the Liquidating Trustee's fiduciary obligations;

(xi)     Retaining such Professionals as are necessary and appropriate in furtherance of the Liquidating Trustee's fiduciary obligations; and

(xii)    Taking such actions as are necessary and reasonable to carry out the purposes of the Liquidating Trust, including winding down the Debtors' business affairs.

3.    *Establishment of a Liquidating Trust*

Pursuant to the Confirmation Order, the Debtors will be dissolved and the Liquidating Trust will be established. The Liquidating Trust will be intended to qualify as a "liquidating trust" as described in Treasury Regulations Section 301.7701-4(d) and Revenue Procedure 94-45, 1994-2 C.B. 684, and will be treated for federal income tax purposes as a "grantor trust" under Internal Revenue Code sections 671-677. The Liquidating Trust shall be managed by the Liquidating Trustee, who shall be selected by the Debtors. The Liquidating Trust shall be administered in accordance with the terms of the Liquidating Trust Agreement.

Prior to the Effective Date, any and all of the Liquidating Trust Assets shall remain Assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date shall, subject to the Liquidating Trust Agreement, be transferred to and vest in the Liquidating Trust.  For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, assigned or sold pursuant to a prior Order or the Plan, the Liquidating Trust specifically retains and reserves the right to assert, after the Effective Date, any and all of the claims, Causes of Action (including but not limited to those Causes of Action listed on the Causes of Action List) and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Liquidating Trust and the Liquidating Trustee shall have the right to pursue or not to pursue, or, subject to the terms hereof and the Liquidating Trust Agreement, compromise or settle any Liquidating Trust Assets. From and after the Effective Date, the Liquidating Trust and the Liquidating Trustee may commence, litigate, and settle any Causes of Action or Claims relating to the Liquidating Trust Assets or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Liquidating Trust and Liquidating Trustee on or after the Effective Date, except as otherwise expressly provided herein and in the Liquidating Trust Agreement.  The Liquidating Trust shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

Other than as set forth herein, no other Entity may pursue such Liquidating Trust Assets on or after the Effective Date.  The Liquidating Trustee shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Liquidating Trust Asset without the need for filing any motion for such relief.  On the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall have established the Liquidating Trust pursuant hereto.  In the event of any conflict between the terms of this [●] and the terms of the Liquidating Trust Agreement, the terms of the Liquidating Trust Agreement shall control.

4.      *Liquidating Trust Assets*

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Liquidating Trust Assets become available, the Debtors shall be deemed, subject to the Liquidating Trust Agreement, to have automatically transferred to the Liquidating Trust all of their right, title, and interest in and to all of the Liquidating Trust Assets, in accordance with section 1141 of the Bankruptcy Code, excluding the Debtors' attorney-client privilege.  All such Assets shall automatically vest in the Liquidating Trust free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and the Class 5 Interests, as set forth herein, and the expenses of the Liquidating Trust, as set forth herein and in the Liquidating Trust Agreement.  Thereupon, the Debtors shall have no interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.

5.      *Treatment of Liquidating Trust for Federal Tax Income Purposes; No Successor-in-Interest*

The Liquidating Trust shall be established for the primary purpose of liquidating and distributing the Assets transferred to it, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Accordingly, the Liquidating Trustee may, in an expeditious but orderly manner, liquidate the Liquidating Trust Assets, make timely Distributions to the Liquidating Trust Beneficiaries and not unduly prolong its duration.  The Liquidating Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Liquidating Trustee expressly for such purpose.

The Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidating Trust Beneficiaries treated as grantors and owners of the Liquidating Trust.  For all federal income tax purposes, all parties (including the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets by the Debtors to the Liquidating Trust, as set forth in the Liquidating Trust Agreement, as a transfer of such Assets by the Debtors to the Holders of Allowed GUC Claims entitled to Distributions from the Liquidating Trust Assets, followed by a transfer by such Holders to the Liquidating Trust.  Thus, the Liquidating Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

As soon as practicable after the Effective Date, the Liquidating Trustee shall make a good faith determination of the fair market value of the Liquidating Trust Assets as of the Effective Date; provided, however, that the Liquidating Trustee shall not be required to hire an expert to make such a valuation.  This valuation shall be used consistently by all parties (including the Debtors, the Liquidating Trustee, and the Holders of GUC Claims) for all federal income tax purposes.  The Bankruptcy Court shall resolve any dispute regarding the valuation of the Liquidating Trust Assets.

The right and power of the Liquidating Trustee to invest the Liquidating Trust Assets, the proceeds thereof, or any income earned by the Liquidating Trust, shall be limited to the right and power that a liquidating trust, within the meaning of Section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings or other IRS pronouncements.  The Liquidating Trustee may expend the Cash of the Liquidating Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective Assets of the Liquidating Trust during liquidation, (ii) to pay the respective reasonable administrative expenses (including any taxes imposed on the Liquidating Trust), and (iii) to satisfy other respective liabilities incurred by the Liquidating Trust in accordance herewith and with the Liquidating Trust Agreement (including the payment of any taxes).

6.      *Expenses of Liquidating Trustee*

The Liquidating Trust Expenses shall be paid from the Liquidating Trust Assets.

7.      *Insurance; Bond*

The Liquidating Trustee, in his or her sole discretion, may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Liquidating Trustee under the Liquidating Trust Agreement.  Liquidating Trustee shall serve with a bond, the cost and expense of which shall be paid by the Liquidating Trust.

8.      *Fiduciary Duties of the Liquidating Trustee*

Pursuant hereto and the Liquidating Trust Agreement, the Liquidating Trustee shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims that will receive Distributions pursuant to the terms hereof.

9.      *Termination of the Liquidating Trust*

The Liquidating Trust will terminate on the earlier of: (a) final liquidation, administration and Distribution of the Liquidating Trust Assets in accordance with the terms of the Liquidating Trust Agreement and the Plan, and its full performance of all other duties and functions as set forth herein or in the Liquidating Trust Agreement; and (b) the fifth (5th) anniversary of the Effective Date.  Notwithstanding the foregoing, multiple fixed term extensions can be obtained so long as Bankruptcy Court approval is obtained within six (6) months before the expiration of the term of the Liquidating Trust and each extended term provided that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust within the meaning of Section 301.7701-4(d) of the Treasury Regulations for federal income tax purposes.  After (a) the final Distributions pursuant hereto, (b) the Filing by or on behalf of the Liquidating Trust of a certification of dissolution with the Bankruptcy Court, and (c) any other action deemed appropriate by the Liquidating Trustee, the Liquidating Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

10.     *Liability of the Liquidating Trustee; Indemnification*

Neither the Liquidating Trustee, its respective members, employees, employers, designees or professionals, or any of its duly designated agents or representatives (each, an "Liquidating Trust Exculpation Party" and collectively, the "Liquidating Trust Exculpation Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Liquidating Trust or for the act or omission of any other Liquidating Trust Exculpation Party, nor shall the Liquidating Trust Exculpation Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Liquidating Trust Agreement or the Plan other than for specific acts or omissions resulting from such Liquidating Trust Exculpation Party's willful misconduct or actual fraud.  The Liquidating Trustee shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee.  The Liquidating Trustee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, the Liquidating Trustee shall not be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and its determination not to do so shall not result in the imposition of liability on the Liquidating Trustee or its respective designees, unless such determination is based on willful misconduct or actual fraud.  The Liquidating Trust shall indemnify and hold harmless the Liquidating Trust Exculpation Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidating Trust or the Plan or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct or actual fraud.  Persons dealing or having any relationship with the Liquidating Trustee shall have recourse only to the Liquidating Trust Assets and shall look only to the Liquidating Trust Assets to satisfy any liability or other obligations incurred by the Liquidating Trustee to such Person in carrying out the terms of the Liquidating Trust Agreement, and the Liquidating Trustee shall not have any personal obligation to satisfy any such liability.  The Liquidating Trustee shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Liquidating Trust Agreement against any of them. The Liquidating Trust shall promptly pay expenses reasonably incurred by any Liquidating Trust Exculpation Party in defending, participating in, or settling any action, proceeding or investigation in which such Liquidating Trust Exculpation Party is a party or is threatened to be made a party or otherwise is participating in connection with the Liquidating Trust Agreement or the duties, acts or omissions of the Liquidating Trustee or otherwise in connection with the affairs of the Liquidating Trust, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise.  Each Liquidating Trust Exculpation Party hereby undertakes, and the Liquidating Trust hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Exculpated Party is not entitled to be indemnified therefor under the Liquidating Trust Agreement.  The foregoing indemnity in respect of any Liquidating Trust Exculpation Party shall

survive the termination of such Liquidating Trust Exculpation Party from the capacity for which they are indemnified.

11.    *Full and Final Satisfaction Against Liquidation Trust*

On and after the Effective Date, the Liquidating Trust shall have no liability on account of any Claims or Equity Interests except as set forth herein and in the Liquidating Trust Agreement. All payments and all Distributions made by the Liquidating Trustee hereunder shall be in full and final satisfaction, settlement, and release of and in exchange for all Claims or Equity Interests against the Debtors.

12.    *Securities Law Exemption*

The issuance of any beneficial interests in the Liquidating Trusts is in reliance on section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act of 1933, as amended, and any state or local law requiring registration.

D.    *Settlement of Claims After the Effective Date.*

In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trust, as the case may be, may compromise and settle Claims against, and Interests in, the Debtors and their Estates, and Causes of Action against other Entities.

E.    *Sources of Consideration for Plan Distributions.*

The Debtors and the Liquidating Trustee, as applicable, shall fund Distributions under this Plan with the Assets of the Debtors that may become Cash or Cryptocurrencies, including proceeds from the Estate Causes of Action. Each Distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth herein applicable to such Distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such Distribution or issuance, which terms and conditions shall bind each Entity receiving such Distribution or issuance. The issuance, Distribution, or authorization, of any securities in connection with the Plan will be exempt from SEC registration to the fullest extent permitted by law, as described more fully in Article VI.E below.

F.    *Cancellation of Certain Existing Securities and the DIP Loan Agreement.*

Except as otherwise provided in the Plan, on and after the Effective Date, all notes, instruments, certificates, agreements, indentures, mortgages, security documents, and other documents evidencing any Claims against any of the Debtors, and any Interests in the Debtors, shall be deemed canceled, surrendered, and discharged without any need for further action or approval of the Bankruptcy Court or any Holder or other person and the obligations of the Debtors or Liquidating Trust, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full and discharged, and the counterparties to any such documents or agreements shall be released from all duties thereunder, *provided* that notwithstanding Confirmation or Consummation, any such document or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of: (1) allowing Holders to receive Distributions under

the Plan; (2) allowing creditors to enforce their rights, claims, and interests vis-à-vis any parties other than the Debtors; and (3) preserving any rights of any creditors to enforce any obligations owed to each of them under the Plan, and to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including, but not limited, to enforce the respective obligations owed to such parties under the Plan.

G.    *Release of Liens.*

Except as otherwise expressly provided herein, on the Effective Date, all Liens on any property of any Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors shall be automatically discharged and released.

H.    *Corporate Action.*

On the Effective Date, all actions contemplated under the Plan with respect to the Debtors and the Liquidating Trust, as applicable, shall be deemed authorized and approved in all respects, including, as applicable:  (1) formation by the Debtors or such other party as contemplated in the Plan, Plan Supplement, or Confirmation Order, of the Liquidating Trust, and the any transactions related thereto; (2) selection of, and the election or appointment (as applicable) of, the Liquidating Trustee; (3) adoption of and entry into any employment agreements; (4) approval and adoption of (and, as applicable, the execution, delivery, and filing of) the Liquidating Trust Agreement; (5) all transfers of Assets that are to occur pursuant to the Plan; (6) the dissolution and wind-down of the Debtors; and (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).

All matters provided for herein involving the corporate structure of the Debtors or the Liquidating Trust, as applicable, and any corporate action, authorization, or approval that would otherwise be required by the Debtors or the Liquidating Trust, as applicable, in connection with the Plan shall be deemed to have occurred or to have been obtained and shall be in effect as of the Effective Date, without any requirement of further action, authorization, or approval by the Bankruptcy Court, security holders, directors, managers, or officers of the Debtors, the Liquidating Trust, or any other person.

On or before the Effective Date, the appropriate officers of the Debtors or the Liquidating Trust, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments, and take such actions, contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Liquidating Trust, and all such documents shall be deemed ratified.   The authorizations and approvals contemplated by this Section shall be effective notwithstanding any requirements under non-bankruptcy law.

I.    *Effectuating Documents; Further Transactions.*

On or after the Effective Date, the Debtors or the Liquidating Trust, as applicable, and the officers, directors, agents and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further

evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

J.      *Section 1146 Exemption.*

Pursuant to, and to the fullest extent permitted by, section 1146 of the Bankruptcy Code, any transfers of property pursuant to, in contemplation of, or in connection with, the Plan, including: (1) the transfer, if any, of the Liquidating Trust Assets to the Liquidating Trust; (2) the issuance of any beneficial interests in the Liquidating Trusts; and (3) the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets in connection with, arising out of, contemplated by, or in any way related to the Plan, shall, in each case, not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer, mortgage recording tax, or other similar tax, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers or property without the payment of any such tax, recordation fee, or governmental assessment.

K.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, the Debtors shall assign to the Liquidating Trust and the Liquidating Trust shall retain and may enforce all rights to commence and pursue any and all Causes of Action belonging to the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Liquidating Trust's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations set forth in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Liquidating Trust as of the Effective Date.

The Liquidating Trust may pursue such Causes of Action, as appropriate, in accordance with the Liquidating Trust Agreement.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Liquidating Trust will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Liquidating Trust expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.  Unless any Cause of Action of the Debtors against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Debtors and the Liquidating Trust expressly reserve all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Liquidating Trust shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall be transferred to and vest in the Liquidating Trust, except as otherwise provided in the Plan, including Article VIII of the Plan. The Liquidating Trust shall retain, and through their authorized agents or representatives shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment, any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

L.      *Payment of Certain Fees.*

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtors, or the Liquidating Trust, as applicable, shall pay on the Effective Date any reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by all of the attorneys, accountants, and other professionals, advisors, and consultants payable under the DIP Order (which fees and expenses shall be paid pursuant to the terms of the DIP Order).

M.      *Document Retention*

On and after the Effective Date, the Liquidating Trust may maintain or dispose of documents in accordance with the Liquidating Trust Agreement.

N.      *Closing of Chapter 11 Cases*

After an Estate has been fully administered, the Liquidating Trust shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

O.      *Notice of Effective Date*

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

P.      *Separability*

Notwithstanding the combination of the separate plans of liquidation for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still, subject to the consent of the applicable Debtors, confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Rejection of Executory Contracts and Unexpired Leases.*

As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, unless such contract or lease: (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; or (iv) is identified for assumption on the Assumption Schedule included in the Plan Supplement.

Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Liquidating Trust has provided adequate assurance of future performance under such assumed executory contracts and unexpired leases. Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Liquidating Trust, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of executory contracts or unexpired leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed within thirty (30) days after the later of: (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; and (2) the effective date of such rejection. Any Claims arising from the rejection of an executory contract or unexpired lease not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, Liquidating Trust, the Estates, or their property without the need for any objection by the Debtors or the Liquidating Trust or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' executory contracts or unexpired leases shall be classified as GUC Claims and shall be treated in accordance with the Plan, unless a different security or priority is otherwise asserted in such Proof of Claim and Allowed in accordance with Article VII of the Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under each assumed executory contract or unexpired lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitation described below, or on such other terms as the parties to such executory contracts or

35

unexpired leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Liquidating Trust or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the executory contract or unexpired lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

Any objection by a contract or lease counterparty to a proposed assumption (including, for purposes of the Plan, assumption and assignment) of an executory contract or unexpired lease or the related cure cost (including as set forth on the Assumption Schedule) must be Filed, served, and actually received by the Debtors in accordance with the Disclosure Statement Order or other applicable Final Order of the Bankruptcy Court.  Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such assumption and the proposed cure amount.  For the avoidance of doubt, to the extent an executory contract or unexpired lease proposed to be assumed is not listed as having a related cure cost, any counterparty to such executory contract or unexpired lease that fails to object timely to the proposed assumption will be deemed to have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults, including any cure payment, under such executory contract or unexpired lease.

Assumption of any executory contract or unexpired lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption.  Any Proofs of Claim Filed with respect to an assumed executory contract or unexpired lease shall be deemed Disallowed, without further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed by the executory contract or unexpired lease counterparty or counterparties to the Debtors or the Liquidating Trust, as applicable, under such executory contracts or unexpired leases.

E.      *Indemnification Obligations.*

Any obligations of the Debtors pursuant to a contract, instrument, agreement, certificate of incorporation, by-law, comparable organizational document or any other document or applicable law, to indemnify, reimburse, or limit the liability of any director, officer, or employee of the Debtors, pursuant to the foregoing in respect of any claims, demands, suits, causes of action, or proceedings against such director, officer, or employee based upon any act or omission related to such director or officer's service with, for, or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits, and proceedings relating to the Debtors shall survive Confirmation of the Plan and except as set forth herein, remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement, or

limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date; provided, however, that all monetary obligations under this provision shall be (a) limited solely to available insurance coverage, and (b) to the extent such Claims are not covered by any applicable insurance, including deductibles, shall be treated as Allowed GUC Claims. Any Claim based on the Debtors' indemnification obligations shall not be a Disputed Claim or subject to any objection under Bankruptcy Code section 502(e)(1)(B). For the avoidance of doubt, the scope of the Debtors' indemnification obligations in this Section shall be conterminous with applicable non-bankruptcy law and to the extent provided by such law.

F.     *Insurance Policies.*

Notwithstanding anything to the contrary in the Plan, the Plan Supplement, any bar date notice, or claim objection, and any other document related to any of the foregoing, and any other order of the Bankruptcy Court, on the Effective Date: (a) all insurance policies issued or providing coverage to the Debtors shall (subject to the applicable insurer's right to object to such a designation) be assumed in their entirety by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code, and coverage for defense costs and indemnification under the D&O Policies shall remain available to all individuals within the definition of "Insured" in the D&O Policies, and the Liquidating Trust shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such insurance policies, without the need or requirement for an insurer to file a Proof of Claim, Administrative Expense Claim or objection to any cure amount; (b) nothing shall alter or modify the terms and conditions of and/or any rights, obligations, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; and (c) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (i) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (ii) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; (iii) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies; and (iv) holders of Allowed Claims to pursue insurance recovery to the extent allowed or required by this Plan.

G.     *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all executory contracts and unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated under the Plan.

Unless otherwise provided herein or in the applicable executory contract or unexpired lease (as may have been amended, modified, supplemented, or restated), modifications, amendments, supplements, and restatements to pre-petition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the pre-petition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any executory contract or unexpired lease on the Assumption Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an executory contract or unexpired lease or that any of the Debtors or the Liquidating Trust has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Liquidating Trust, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

I.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur with respect to a Debtor, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases with respect to such Debtor pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Distribution Date (or if a Claim is not an Allowed Claim on the Distribution Date, on the date that such Claim or Interest becomes an Allowed Claim), each Holder of an Allowed Claim shall receive the full amount of the Distributions that the Plan provides for such Allowed Claim in accordance with its priority and Allowed amount.

If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.

To the extent any Distributions made in accordance with the Plan are subject to disgorgement to the Liquidating Trust, the Liquidating Trust shall effectuate the Distribution of such disgorged Distribution to the Holders of Allowed Claims entitled to such Distributions in accordance with the Plan as soon as reasonably practicable.  For the avoidance of doubt, to the extent disgorgement of a Distribution made to a Holder of a Claim pursuant to the Plan is required, such Holder shall be required to disgorge any Distribution but shall not be required to remit interest on such Distribution.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

B.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.    Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making Distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on such Distribution Record Date.

2.    Delivery of Distributions.

Except as otherwise provided herein, the Liquidating Trust shall be authorized to make Distributions to Holders of Allowed Claims and Allowed Interests as of the Distribution Record Date at the Address for each such Holder as indicated on the Debtors' records as of the date of any such Distribution.  Customer Distributions shall be initiated by the Customer using the Bittrex platform.  The manner of such Distributions shall be determined at the discretion of the Liquidating Trust, and the address for each Holder of an Allowed Claim or Allowed Interest shall be deemed to be the address set forth in any Proof of Claim or Interest Filed by that Holder.

3.    Delivery of Distributions to Holders of GUC Claims.

The Debtors and the Liquidating Trust, will, in their reasonable discretion, determine the method for a timely Distribution of all Distributions to Holders of Allowed GUC Claims pursuant to the Plan.

4.    Minimum Distribution.

No Cash payment of less than $100 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim; provided however, that there will be no minimum amount with respect to Customer Distributions.

5.    Undeliverable Distributions and Unclaimed Property.

In the event that any Distribution to any Holder is returned as undeliverable or in the event that a Customer fails to initiate a Customer Distribution or comply with any Government Regulation or provide any information that the Debtors believe, in consultation with regulatory counsel, is required by the Debtors, no Distribution to such Holder shall be made unless and until the Liquidating Trust has determined the then-current address of such Holder and has received all other required information, at which time such Distribution shall be made to such Holder without interest; *provided* that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date such Distribution is returned as undeliverable or such Customer fails to complete a Customer Distribution or comply with any Government Regulation or other information required by the Debtors.  After such date, all

unclaimed property or interests in property shall revert to the Liquidating Trust automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) for Distribution consistent with the Plan and the Liquidating Trust Agreement, and any claim of any Holder to such property shall be fully discharged, released, and forever barred.

For the avoidance of doubt, the Liquidating Trust and its respective agents and attorneys are under no duty to take any action to attempt to locate any Claim Holder.

C.      *Special Rules for Distributions to Holders of Disputed Claims and Interests.*

Except as otherwise provided in the Plan, agreed to by the Debtors or the Liquidating Trust, or set forth in an order of the Bankruptcy Court:  (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim or Interest until all such disputes in connection with such Disputed Claim or Interest have been resolved by settlement or Final Order; *provided* that if a portion of a Claim is not Disputed, the Debtors or the Liquidating Trust may make a partial Distribution based on such portion of such Claim that is not Disputed; and (b) any Entity that holds both an Allowed Claim or Interest and a Disputed Claim or Interest shall not receive any Distribution on the Allowed Claim or Interest unless and until all objections to the Disputed Claim or Interest have been resolved by settlement or Final Order or the Claims or Interests have been Allowed or Disallowed.  Any dividends or other Distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other Distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

D.      *Manner of Payment.*

Unless otherwise set forth herein, all Distributions under the Plan to the Holders of Allowed Claims shall be made by the Debtors or the Liquidating Trust.  At the option of the Debtors and the Liquidating Trust, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

E.      *Compliance with Tax Requirements.*

In connection with the Plan, as applicable, the Debtors and the Liquidating Trust, as applicable, shall comply with all tax withholding and tax reporting requirements imposed on them by any Governmental Unit with respect to Distributions pursuant to the Plan.  Notwithstanding any provision herein to the contrary, the Debtors and the Liquidating Trust, as applicable, shall be authorized to take all actions necessary to comply with such tax withholding and tax reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions, and establishing any other mechanisms they believe are reasonable and appropriate to comply with such requirements.  The Debtors and the Liquidating Trust, as applicable, reserve the right to allocate all Distributions made

under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

F.      *Setoffs and Recoupment.*

The Debtors or the Liquidating Trust, as applicable, may, but shall not be required to, setoff against or recoup any payments or Distributions to be made pursuant to the Plan in respect of any Claims of any nature whatsoever that the Debtors or the Liquidating Trust, as applicable may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Liquidating Trust, as applicable, of any such right it may have against the Holder of such Claim.

G.      *No Double Payment of Claims.*

To the extent that a Claim is Allowed against more than one Debtor's Estate, there shall be only a single recovery on account of that Allowed Claim, but the Holder of an Allowed Claim against more than one Debtor may recover Distributions from all co-obligor Debtors' Estates until the Holder has received payment in full on the Allowed Claims. No Holder of an Allowed Claim shall be entitled to receive more than payment in full of its Allowed Claim, and each Claim shall be administered and treated in the manner provided by the Plan only until payment in full on that Allowed Claim.

H.      *Claims Paid or Payable by Third Parties.*

1.      Claims Paid by Third Parties.

The Debtors and the Liquidating Trust shall reduce a Claim, and such Claim shall be deemed Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor or the Liquidating Trust. Subject to the penultimate sentence of this paragraph, to the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor or the Liquidating Trust on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Distribution to the Liquidating Trust, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan. The failure of such Holder to timely repay or return such Distribution shall result in the Holder owing the Liquidating Trust annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day period specified above until the amount is repaid.

2.      Claims Payable by Third Parties.

Except as otherwise provided for in the Plan, no Distributions under the Plan shall be made on account of a Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such a Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' agreement, the applicable portion of such Claim may be

41

Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

       3.     Applicability of Insurance Policies.

Except as otherwise provided in the Plan, any Distributions of insurance proceeds to Holders of Allowed Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy.  Except as otherwise provided in the Plan, the Plan shall not otherwise constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Policies, nor shall anything contained herein (a) constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers, or (b) establish, determine, or otherwise imply any liability or obligation, including any coverage obligation, of any Insurer.

*I.*     *Allocation of Distributions Between Principal and Interest.*

For Distributions in respect of Allowed Claims, to the extent that any such Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

<div align="center">

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

</div>

*A.*     *Allowance of Claims.*

Except as otherwise set forth in the Plan, after the Effective Date, the Liquidating Trust shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date.  Except as specifically provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed in accordance with the Plan.

*B.*     *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, and subject to the rights and duties of the Liquidating Trust as set forth herein, after the Effective Date, (a) the Liquidating Trust shall have the sole authority to File, withdraw, or litigate to judgment, objections to all Claims; and (b) the Liquidating Trust shall have the authority to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c)  the Liquidating Trust shall have the authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.      *Adjustment to Claims Without Objection.*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted on the Claims Register by the Liquidating Trust without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Time to File Objections to Claims or Interests.*

Any objections or challenges to Claims or Interests shall be Filed on or before the applicable Claims Objection Deadline.

E.      *Estimation of Claims.*

Before or after the Effective Date, the Debtors or the Liquidating Trust may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent, unliquidated, or arises from a right to an equitable remedy for breach of performance f pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. § 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been Disallowed or expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distributions), and the Liquidating Trust may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated and the Bankruptcy Court grants such reconsideration.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

F.      *Disputed and Contingent Claims Reserve.*

On or after the Effective Date, the Debtors and the Liquidating Trust shall establish one or more reserves for Claims that are contingent or have not yet been Allowed, in an amount or amounts as reasonably determined by the applicable Debtors and Liquidating Trust, consistent with the Proof of Claim Filed by the applicable Holder of such Disputed Claim.

Any assets held in any such reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9.  As such, such assets will be subject to entity-level taxation, and the Debtors and Liquidating Trust shall be required to comply with the relevant rules.

G.      *Disallowance of Claims.*

Any Claims held by Entities from which the Bankruptcy Court has determined that property is recoverable under section 542, 543, 547, 548, 549, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer that the Bankruptcy Court has determined is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and the full amount of such obligation to the Debtors has been paid or turned over in full.

All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and Disallowed as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.  All Proofs of Claim Filed on account of an employee benefit shall be deemed satisfied and Disallowed as of the Effective Date to the extent the Liquidating Trust elects to honor such employee benefit, without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as provided herein or otherwise agreed to by the Liquidating Trust in its sole discretion, any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

H.      *Amendments to Proofs of Claim.*

On or after the Effective Date, a Proof of Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Liquidating Trust, and any such new or amended Proof of Claim or Interest Filed that is not so authorized before it is Filed shall be deemed Disallowed in full without any further action.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has

Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

J.      *No Distributions Pending Allowance.*

Except as otherwise set forth herein, if an objection to a Claim or portion thereof is Filed as set forth in Article VII.C of the Plan, no payment or Distribution provided under the Plan shall be made on account of such Disputed Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

K.      *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date a Disputed Claim becomes Allowed, the Liquidating Trust shall provide to the Holder of such Claim the Distribution (if any) to which such Holder is entitled under the Plan, as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under such order or judgment of the Bankruptcy Court.

<u>**ARTICLE VIII.**</u>
**RELEASES, INJUNCTION, EXCULPATION, AND RELATED PROVISIONS**

A.      *[**Releases by the Debtors.**

**As of the Effective Date, the Debtors, and each of their respective Affiliates, on behalf of themselves and their respective Estates, including any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, including the Liquidating Trust, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, and waived each Released Party from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims asserted or that may be asserted on behalf of any of the Debtors or their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan (including the Plan Supplement), the Disclosure Statement, the restructuring of Claims or Interests in the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, the pursuit of consummation of the Effective Date, the administration and implementation of the Plan, including the issuance or Distribution of securities pursuant to the Plan, the subject matter of or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, or the Distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing, except for Causes of Action arising from an act or omission of a Released Party that is judicially determined in a Final Order to**

**have constituted actual fraud, gross negligence, criminal misconduct or willful misconduct. Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth above shall not be construed as releasing any post-Effective Date obligations of any party or entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and (ii) the releases by the Debtors set forth above shall not impair any Estate Causes of Action against a non-Released Party.]**

B.      *[Releases by Holders of Claims and Interests.*

**As of the Effective Date, except (a) for the right to enforce the Plan or (b) as otherwise expressly provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the date upon which the Bankruptcy Court enters the Confirmation Order, on or after the Effective Date, each Released Party shall be deemed expressly, conclusively, absolutely, unconditionally, irrevocably and forever, released, and waived by each of the Releasing Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims asserted or that may be asserted on behalf of any of the Debtors or their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan (including the Plan Supplement), the Disclosure Statement, the restructuring of Claims or Interests in the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, the pursuit of consummation of the Effective Date, the administration and implementation of the Plan, including the issuance or Distribution of securities pursuant to the Plan, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, or the Distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing, except for Causes of Action arising from an act or omission of a Released Party that is judicially determined in a Final Order to have constituted actual fraud, gross negligence, criminal misconduct or willful misconduct. Notwithstanding anything to the contrary in the foregoing, the releases set forth above shall not be construed as releasing any post-Effective Date obligations of any party or entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.]**

C.      *[Waiver of Statutory Limitations on Releases*

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH

UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN SECTION 10 OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.]

D.    ***Exculpation.***

**To the maximum extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from any liability in respect of any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, arising between the Petition Date and the Effective Date, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan (including the Plan Supplement), the Disclosure Statement, the restructuring of Claims or Interests in the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, the pursuit of consummation of the Effective Date, the administration and implementation of the Plan, including the issuance or Distribution of securities (if any) pursuant to the Plan, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, or the Distribution of property under the Plan or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, gross negligence, criminal misconduct or willful misconduct , but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon any Order of the Bankruptcy Court or the advice of counsel with respect to their duties and responsibilities.**

**To the extent section 1125(e) of the Bankruptcy Code applies, the Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and Distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such Distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above shall not be construed as exculpating any party or entity from its post-Effective Date obligations under**

the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

E.    *Injunction.*

Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates ("<u>Enjoined Parties</u>"), shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are treated by the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors or the Liquidating Trust ("<u>Protected Parties</u>"), as applicable, or the property of the Protected Parties, as applicable; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Protected Parties; or the property of the Protected Parties, as applicable; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Protected Parties, or the property of the Protected Parties, as applicable; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Protected Parties, as applicable, or against property or interests in property of the Protected Parties, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have

affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this Section.

The injunctions in this Section shall extend to any successors of the Protected Parties, as applicable, and their respective property and interests in property.

Notwithstanding the foregoing, nothing in this Section shall enjoin the assertion of a defensive right of recoupment.

Nothing in the Plan or Confirmation Order shall (1) enjoin, release, impair or otherwise preclude the United States (i) from pursuing any criminal action or any police or regulatory action, (ii) from pursuing any liability to the United States that is not a Claim, (iii) from exercising any rights of setoff or recoupment subsequent to confirmation of the Plan or any order granting substantive consolidation, and such rights are preserved, and (iv) from pursuing any claim of the United States arising on or after the Confirmation Date; and (2) grant the Debtors a discharge pursuant to section 1141(d) of the Bankruptcy Code.

No Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Cases, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor, the administration of the Liquidating Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court: (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party; and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

F.    *Recoupment.*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Liquidating Trust, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

G.    *Binding Effect.*

On the Effective Date, except as otherwise provided herein to the contrary, and effective as of the Effective Date, the Plan will bind, and will be deemed binding upon, all Holders of Claims against and Interests in the Debtors, and such Holder's respective successors and assigns, to the maximum extent permissible by law, notwithstanding whether or not such Holder (1) will receive any property or interest in property under the Plan, or (2) has filed a Proof of Claim or Interest in

the Chapter 11 Cases, or (3) failed to vote to accept or reject the Plan or affirmatively voted to reject the Plan.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

*A.    Conditions Precedent to Confirmation*

It shall be a condition to Confirmation that the following shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1.    the Bankruptcy Court shall have entered the Disclosure Statement Order and the Confirmation Order in a manner consistent in all material respects with the Plan; and

2.    the Confirmation Order shall, among other things:

(a)    decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(b)    authorize the Debtors and the Liquidating Trust, as applicable, to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(c)    authorize the Debtors and the Liquidating Trust, as applicable/necessary, to enter into any agreements, transactions, and sales of property, as set forth in the Plan Supplement with respect to the Debtors or the Liquidating Trust, as applicable;

(d)    provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order in furtherance of, or in connection with, any transfers of property pursuant to the Plan, including any deeds, mortgages, security interest filings, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan shall not be subject to transfer or recording taxes or fees to the extent permissible under section 1146 of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment;

(e)    authorize and approve the compromise and settlement set forth in the Plan; and

(f)    contain the release, injunction, and exculpation provisions contained in Article VIII herein.

*B.*    *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1.    the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred, and no stay of the Confirmation Order shall be in effect;

2.    all agreements necessary to implement the Plan, shall have (i) been tendered for delivery and (ii) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements;

3.    the documents contained in the Plan Supplement will contain terms and conditions consistent in all material respects with this Plan;

4.    The Liquidating Trust Agreement shall have been executed and all the transactions contemplated in the Liquidating Trust Agreement shall have occurred.

*C.*    *Waiver of Conditions.*

The conditions to Confirmation and Consummation set forth in this Article IX may be waived by the Debtors and/or the Liquidating Trust without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

*D.*    *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

*E.*    *Effect of Failure of Conditions.*

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (2) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

## <u>ARTICLE X.</u>
## <u>MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN</u>

*A.*    *Modification and Amendments.*

Subject to the limitations contained in the Plan, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit

votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.     *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.     *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code to the extent provided under applicable law, including jurisdiction to:

1.     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or Unsecured status, priority, amount, or Allowance of Claims or Interests;

2.     decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor is party or with respect

to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any executory contract or unexpired lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

5.    adjudicate, decide, or resolve any and all matters related to the Causes of Action enumerated in the Schedule of Retained Causes of Action;

6.    adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.    enter and implement such orders as may be necessary to execute, implement, or consummate the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement, including injunctions or other actions as may be necessary to restrain interference by an Entity with Consummation or enforcement of the Plan;

8.    enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.    adjudicate, decide, or resolve any and all matters related to the Plan;

10.    resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

11.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary to implement such releases, injunctions, and other provisions;

12.    resolve any cases, controversies, suits, disputes, or Causes of Action relating to the Distribution or the repayment or return of Distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.H.1 of the Plan;

13.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by or assess damages against any Entity with regard to Consummation or enforcement of the Plan;

14.    enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.    enter an order or decree concluding or closing the Chapter 11 Cases;

16.    adjudicate any and all disputes arising from or relating to Distributions under the Plan or any of the transactions contemplated therein;

17.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.    determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code, including any request made under section 505 of the Bankruptcy Code for the expedited determination of any unpaid liability of a Debtor for any tax incurred during the administration of the Chapter 11 Cases, including any tax liability arising from or relating to the Restructuring Transactions, for tax periods ending after the Petition Date and through the closing of the Chapter 11 Cases;

20.    hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee benefit program, regardless of whether such termination occurred before or after the Effective Date;

21.    except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

22.    enforce all orders previously entered by the Bankruptcy Court and resolve any issues not enumerated above related to any matters adjudicated in the Chapter 11 Cases; and

23.    hear any other matter not inconsistent with the Bankruptcy Code.

Notwithstanding the foregoing, the Bankruptcy Court shall retain non-exclusive jurisdiction to adjudicate, decide, or resolve any and all matters related to objections to Claims.

## <u>ARTICLE XII.</u>
## MISCELLANEOUS PROVISIONS

*A.    Immediate Binding Effect.*

Subject to Article I.B of the Plan, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon, as applicable, the Debtors, the Liquidating Trust, any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or

compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Liquidating Trust, and all Holders of Claims and Interests receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, will be paid by the Liquidating Trust for each quarter (including any fraction thereof) until the applicable Chapter 11 Case is converted, dismissed, or closed, whichever occurs first.  All such fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Liquidating Trust shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee, until the earliest of the date on which the applicable Chapter 11 Case is converted, dismissed, or closed.

D.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any other Entity with respect to the Holders of Claims or Interests prior to the Effective Date.

E.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.    if to the Debtors, to:

Bittrex, Inc.
701 5th Avenue, Suite 4200
Seattle, WA 98104

After the Effective Date, the Liquidating Trust shall have the authority to send a notice to Entities that request to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Liquidating Trust is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

G.    *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.    *Entire Agreement.*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.    *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website or the Bankruptcy Court's website.

J.    *Nonseverability of Plan Provisions.*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as

applicable, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors and/or the Liquidating Trust; and (3) nonseverable and mutually dependent.

K.    *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Liquidating Trust shall have any liability for the violation of any applicable law (including the Securities Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

L.    *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

M.    *Closing of Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Liquidating Trust shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of Desolation, and all contested matters and adversary proceedings relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Desolation; *provided* that for purposes of sections 546 and 550 of the Bankruptcy Code, the Chapter 11 Cases shall be deemed to remain open until the Chapter 11 Case of Desolation has been closed.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan and Liquidating Trust Agreement, the Liquidating Trust shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Desolation in accordance with the Bankruptcy Code and the Bankruptcy Rules.

N.    *Creditor Default.*

On and after the Effective Date, any act or omission by a holder of a Claim or an Interest in contravention of the provisions of the Plan shall be deemed an event of default under the Plan. Upon an event of default, the Liquidating Trust may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs in remedying such default. Upon the finding of such a default by a creditor, the Bankruptcy Court may: (a) designate a party to appear, sign and/or accept the documents required under the Plan on

behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Liquidating Trust in an amount, including interest, to compensate the Liquidating Trust for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

## **EXHIBIT D**

### **Consolidated List of the Holders of the Debtors' 50 Largest Unsecured Claims**

Pursuant to Local Rule 1007-2(a)(4), the following is a consolidated list of the Debtors' creditors holding the 50 largest unsecured claims (the "Consolidated Creditor List") based on the Debtors' unaudited books and records as of the Petition Date.  The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who fall within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 50 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code<br><br>UUID | Name, telephone number, and email address of creditor | Nature of the claim (for example, trade debts, bank loans, services, and | Indicate if claim is or disputed | Amount of unsecured claim<br><br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Office of Foreign Asset Control U.S. Department of the Treasury Treasury Annex/Freedman's Bank Bldg. 1500 Pennsylvania Avenue, NW Washington, DC 20220 | Alison Cooper, Chief, Financial Sector Investigations 1-202-622-2490 | Settlement | | | | $24,280,829.20 |
| 2 | c09b87dc-64d8-440d-b71f-b2efcfe2aff6 | On file | Customer | Contingent | | | $14,586,302.21 |
| 3 | 83393306-9343-4855-8987-868266cb144e | On file | Customer | Contingent | | | $10,655,025.38 |
| 4 | 5cfb7e9b-08dc-4691-a7a0-91789961f52c | On file | Customer | Contingent | | | $6,937,360.13 |

| Debtor | Desolation Holdings LLC, et al., | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

| | Name of creditor and complete mailing address, including zip code UUID | Name, telephone number, and email address of creditor | Nature of the claim (for example, trade debts, bank loans, services, and | Indicate if claim is or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 5 | 6a24bb04-4799-4da8-b799-98e9887b5d43 | On file | Customer | Contingent | | | $6,191,788.91 |
| 6 | 0aaa95f4-0b64-41a0-8212-2f4468de8d5e | On file | Customer | Contingent | | | $4,815,983.80 |
| 7 | a1472e35-7879-403d-b912-33b369f974bc | On file | Customer | Contingent | | | $4,617,061.03 |
| 8 | a577b1ff-00ed-4872-a9ce-647cabbd4921 | On file | Customer | Contingent | | | $3,912,558.40 |
| 9 | Financial Crimes Enforcement Network PO Box 39 Vienna, Virginia 22183 | FRC@fincen.gov | Settlement | Contingent | | | $3,500,000.00 |
| 10 | dcb22222-657a-400a-b98b-495711848302 | On file | Customer | Contingent | | | $3,230,276.80 |
| 11 | 4f7f1b08-a58c-4bed-b0b5-16e246c52880 | On file | Customer | Contingent | | | $2,323,295.89 |
| 12 | f536e49d-aa7a-4a54-a9ea-fcba81492b5c | On file | Customer | | | | $1,987,086.42 |

| Debtor | Desolation Holdings LLC, et al., | | Case number (if known) | |
|---|---|---|---|---|
| | Name | | | |

| Name of creditor and complete mailing address, including zip code<br><br>UUID | Name, telephone number, and email address of creditor | Nature of the claim (for example, trade debts, bank loans, services, and | Indicate if claim is or disputed | Amount of unsecured claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 13 fb923c5c-30ca-4100-9f55-beeac5ba6ea8 | On file | Customer | Contingent | | | $1,904,259.12 |
| 14 fadf45ef-bc0f-4353-9850-fd1e77b29697 | On file | Customer | Contingent | | | $1,647,784.03 |
| 15 f9999a5f-fa69-46ab-aff4-bca7e8ddeb56 | On file | Customer | Contingent | | | $1,384,238.22 |
| 16 3f28305a-7f4a-41ff-a707-e1d25ac111f9 | On file | Customer | Contingent | | | $1,378,934.37 |
| 17 dd2f7fdc-2163-42af-a90e-2d76007a16f0 | On file | Customer | Contingent | | | $1,269,454.51 |
| 18 dbe0b606-15c8-43f3-8517-14ac18907906 | On file | Customer | Contingent | | | $1,184,652.66 |
| 19 008beac3-c9e4-4760-9a4c-b67977d15981 | On file | Customer | | | | $874,805.53 |
| 20 cd16ebb3-96f5-4864-8a02-fc8d2463734f | On file | Customer | Contingent | | | $868,307.01 |

Debtor    Desolation Holdings LLC, et al.,                     Case number *(if known)* _____
            Name

| Name of creditor and complete mailing address, including zip code<br><br>UUID | Name, telephone number, and email address of creditor | Nature of the claim (for example, trade debts, bank loans, services, and | Indicate if claim is or disputed | Amount of unsecured claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 21 925d0c0b-c584-4005-9e48-025493db1f09 | On file | Customer | Contingent | | | $844,317.21 |
| 22 4ede2655-0b05-4b45-9f04-de15d8c4f521 | On file | Customer | Contingent | | | $816,538.40 |
| 23 6ce22b6a-eaab-4150-860a-87d822ce49e6 | On file | Customer | Contingent | | | $735,431.51 |
| 24 d375ee9b-ef35-45fe-81ae-7eb0a643781b | On file | Customer | Contingent | | | $704,094.33 |
| 25 27f81091-66c7-458a-a4f9-31f636c9b5c7 | On file | Customer | Contingent | | | $701,261.67 |
| 26 12dba393-1a79-4ffe-a58d-782d80c140ba | On file | Customer | Contingent | | | $685,601.64 |
| 27 518eeb1b-dfb2-4be7-acee-7d3ccd74e5d5 | On file | Customer | Contingent | | | $623,338.94 |
| 28 1e09e8ec-8b17-422d-b3f3-cb96ee71fbaa | On file | Customer | Contingent | | | $599,605.40 |

Debtor    <u>Desolation Holdings LLC, et al.,</u>
          Name

Case number (if known) _____

| Name of creditor and complete mailing address, including zip code<br><br>UUID | Name, telephone number, and email address of creditor | Nature of the claim (for example, trade debts, bank loans, services, and | Indicate if claim is or disputed | Amount of unsecured claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 29 f25c6a91-1afa-48fd-abd9-e511999da04c | On file | Customer | Contingent | | | $599,437.12 |
| 30 ae2ee974-3f89-4cb1-bcb4-64361b44486a | On file | Customer | Contingent | | | $585,301.25 |
| 31 e78e6f3a-5be9-49b8-be09-0c619928b44f | On file | Customer | Contingent | | | $563,069.08 |
| 32 2a54b310-c531-49eb-a704-f5933e925168 | On file | Customer | Contingent | | | $560,338.73 |
| 33 01014189-63a3-43c0-b6fc-651ddccaa276 | On file | Customer | Contingent | | | $523,733.24 |
| 34 58611824-5bc6-442d-b239-b548b4a4eec3 | On file | Customer | Contingent | | | $510,941.43 |
| 35 210de341-83a8-474c-a37e-61d2c10c8734 | On file | Customer | | | | $480,647.44 |
| 36 6341b91e-7b9f-4f56-a6a9-c66069ad945d | On file | Customer | Contingent | | | $479,813.02 |

Debtor    Desolation Holdings LLC, et al.,                                    Case number *(if known)*
                Name

| Name of creditor and complete mailing address, including zip code<br><br>UUID | Name, telephone number, and email address of creditor | Nature of the claim (for example, trade debts, bank loans, services, and | Indicate if claim is or disputed | Amount of unsecured claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 37 13e5eb91-0087-4936-9f9b-fb73052b5f1a | On file | Customer | Contingent | | | $476,340.88 |
| 38 c62b2459-1676-4e4e-9caa-99a0b420a404 | On file | Customer | | | | $471,531.46 |
| 39 f9c46d34-51fa-4e10-aa95-93137c2de7e8 | On file | Customer | Contingent | | | $470,951.81 |
| 40 dd88f140-297b-4811-88c0-f18afd1b8752 | On file | Customer | Contingent | | | $444,358.84 |
| 41 3264a54a-1218-46b6-ac7d-1d7773995563 | On file | Customer | Contingent | | | $436,365.03 |
| 42 db61b2ac-da20-4304-9c5e-9285060cc799 | On file | Customer | | | | $433,506.21 |
| 43 2482db41-3e56-4a7b-b3a1-c332df465fa9 | On file | Customer | Contingent | | | $424,769.05 |
| 44 b59cdaee-c5c7-4914-8741-335a0bd25e41 | On file | Customer | Contingent | | | $421,533.64 |

Debtor    Desolation Holdings LLC, et al.,              Case number (if known)
           Name

| Name of creditor and complete mailing address, including zip code UUID | Name, telephone number, and email address of creditor | Nature of the claim (for example, trade debts, bank loans, services, and | Indicate if claim is or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 45 7e8620c2-7ff2-4802-9979-6bc46d6b8fb7 | On file | Customer | Contingent | | | $416,699.31 |
| 46 0d372cc9-9c01-40ab-996a-28f0032b2a26 | On file | Customer | Contingent | | | $395,877.60 |
| 47 93ec913d-a376-4c3a-8844-93daf932b7d6 | On file | Customer | | | | $387,569.35 |
| 48 1fc8d534-be33-4884-bc54-edbab65f5b13 | On file | Customer | Contingent | | | $385,442.01 |
| 49 2ede9c2c-3f1c-4c1f-913c-7fe64dd5af6f | On file | Customer | Contingent | | | $384,286.59 |
| 50 Securities and Exchange Commission 100 Pearl Street, Suite 20-100 New York, New York 10004 | 212-336-1100 | Litigation | Contingent, unliquidated, and disputed | | | Undetermined |