# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Desolation Holdings LLC, *et al.*,[1] | Case No. 23-10597 (BLS) |
| Debtors. | (Jointly Administered) |
| | Hrg. Date: June 14, 2023 at 10:00 a.m. (ET) <br> Obj. Deadline: May 26, 2023 at 4:00 p.m. (ET) |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO HONOR WITHDRAWALS OF CRYPTOCURRENCY ASSETS BY CUSTOMERS

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion ("Motion"):

### RELIEF REQUESTED

1. The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** ("Order"), authorizing the Debtors to honor the withdrawals of cryptocurrency assets and fiat currency by customers.

### JURISDICTION AND VENUE

2. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware. Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware ("Local Rule[s]"), the Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Holdings Ltd. (2227); and Bittrex Malta Ltd. (1764). The mailing and service address of the Debtors is 701 5th Avenue, Suite 4200, Seattle, WA 98104.

orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 362(d), and 363(b) of title 11 of the United States Code ("Bankruptcy Code"), Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 4001, and Local Rules 4001-1, 9006-1, and 9013-1.

## BACKGROUND

5. The Debtors, together with their non-debtor affiliates (collectively, "Bittrex") operate cryptocurrency exchanges for both retail and institutional customers in several jurisdictions. Bittrex, Inc. ("BUS"), a Georgia corporation, operates Bittrex's cryptocurrency exchange for U.S. customers, whereas two foreign non-debtor affiliates operate Bittrex's cryptocurrency exchange for non-U.S. customers. The global Bittrex platform has approximately 1.5 million active customers, including over 600,000 in the United States, and over 5.4 million customers overall.

6. On May 8, 2023, (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Evan Hengel, Co-Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* ("Hengel Declaration" or "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.[2]

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Hengel Declaration.

7.     As described in more detail in the First Day Declaration, the Debtors commenced these Chapter 11 Cases for the purpose of allowing customer withdrawals, consistent with Bittrex's terms of service and applicable law, within an orderly wind down of Bittrex's U.S. and Malta operations. Through these Chapter 11 Cases, the Debtors seek to complete the previously announced wind down of its U.S. business and implement the wind down of its Malta business, and accomplish, as soon as practicable, a comprehensive process that will (a) maximize value for the Debtors' creditors and stakeholders; (b) maintain intact Bittrex's non-U.S. business operations (other than its Malta business) for the benefit of non-U.S. customers; and (c) fairly separate the non-U.S. operations. On the Petition Date, the Debtors have filed their proposed chapter 11 plan, which provides, among other things, that the Debtors' customers entitled to distributions will receive under the plan a 100 percent like-kind cryptocurrency and fiat currency distribution. This means that with respect to customers, they will be entitled to access the Bittrex platform and withdraw cryptocurrencies and fiat consistent with the plan and with their allowed claims. The Debtors do not intend to monetize cryptocurrencies reserved for like-kind distributions to holders of allowed customer claims, and any change in the value of such assets following the Petition Date would be borne by the Debtors' customers.

8.     The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No official committees have been appointed or designated.

9.     By this Motion, the Debtors seek authority to continue their orderly wind-down process by permitting and encouraging customers to withdraw their deposits of cryptocurrencies and fiat currency and seek Court authorization to honor such withdrawals as soon as practicable.

I. **The Debtors' Business**

10. The Debtors are part of a group of over two dozen companies located around the world that operate cryptocurrency exchanges for customers in different jurisdictions. Bittrex's platform operates through a website and mobile web application. Customers can execute trades on both the mobile web application and Bittrex's website. Bittrex also offers its technology and order book to local and regional exchanges.

11. Bittrex's security technologies are among the most reliable and effective in the market. Those technologies include, among other things, two-factor authentication for all users as well as additional layers of security. As a result of, among other things, Bittrex's security technologies, customers deposits of cryptocurrencies remain safe.

12. Customers sign up for an account on the Bittrex platform. They are required to digitally execute the customer agreement, and after doing so, can link their bank account or off-site cryptocurrency wallet to the platform for the purposes of transferring cryptocurrencies or entering into cryptocurrency transactions. Bittrex does not maintain a separate cryptocurrency wallet for each customer. Instead, cryptocurrency assets are commingled into single Bittrex wallets on an coin-by-coin basis (e.g., all Bitcoin is held in a single wallet).

13. BUS operates a cryptocurrency exchange to U.S. customers. As of March 27, 2023, BUS provided access to over 600,000 customers in 46 states.

14. Debtor Malta Holdings is a fully-owned subsidiary of RBR Holdings, Inc. and Malta OpCo is a fully-owned subsidiary of Malta Holdings. Bittrex created Malta OpCo to provide access to a Bittrex cryptocurrency exchange to non-U.S. customers; however, in 2019, all active Malta OpCo customers were migrated to BG, and Malta OpCo discontinued its operations. Despite multiple requests, some Malta OpCo customers never completed the required paperwork

4

and onboarding to become customers of BG, nor did they withdraw their cryptocurrency, although throughout this period such users have been able to request customer support assistance with transferring their accounts to BG.

**II.    The Stresses on the Debtors' Business and the Decision to Wind Down**

15.    Cryptocurrency markets are notoriously volatile.  Until 2021, the market for digital assets had been growing exponentially.  For example, Bitcoin's daily exchange volume rose from $92 million in January 2017 to over $50 billion in May 2021, and the exchange rate for Bitcoin rose from $0.000764 on October 5, 2009 to $68,789 on November 10, 2021.  However, cryptocurrency prices declined through most of 2022; for example, Bitcoin's price declined to $16,800 by December 2022.

16.    The losses throughout 2022 resulted from several factors.  By the end of 2021, fears of new variants of COVID-19 and a potential economic contraction chilled equity markets.  The chill in equity markets, particularly risky technology and early-stage equities, led to divestments in the cryptocurrency sector as part of strategies to reduce risk exposure.  Additionally, increased regulatory scrutiny contributed to market pessimism.

17.    The declines in 2022 were indeed significant.  For example, Bitcoin declined 37.3 percent in June 2022 alone and was down 60 percent year-to-date.  In turn, companies in the cryptocurrency industry experienced equity declines.  These declines were exacerbated by the collapse of several industry participants, including Terra, Three Arrows Capital, Celsius Network, Voyager, and FTX.

18.    Bittrex was not immune to these trends, and it experienced a dramatic decrease in revenues: from $663 million in 2017 to $52 million in 2022.

19. While prices were declining and industry participants were struggling, regulatory agencies, whose authorizing statutes nad regulations largely have not been modified to address the cryptocurrency sector, began investigating cryptocurrency businesses. Indeed, the United States has not clarified which agency is the primary regulator for cryptocurrency or whether cryptocurrencies will be considered a commodity, currency, security, or novel asset under the law. To date, existing agencies have provided little other guidance.

20. Despite the lack of guidance, the SEC began to ramp up investigations and enforcement actions. For several years, BUS has received and responded to subpoenas from the SEC, even though the SEC never indicated which digital assets it viewed as securities. On March 9, 2023, the SEC staff served BUS with a "Wells Notice" indicating that the staff intended to recommend the SEC charge BUS with operating an unregistered securities exchange, an unregistered broker dealer, and an unregistered clearing agency. Following extensive efforts to resolve these allegations consensually, on April 17, 2023, the SEC brought an enforcement action in the Western District of Washington (Seattle) against BUS, its former CEO, and its international sister company, BG, seeking injunctive relief, fines, and disgorgement. It was then for the first time in nearly six years of investigation that the SEC disclosed the six digital assets listed by BUS (DASH, ALGO, OMG, TKN, NGC, and IHT) it asserted to be securities.

21. Other agencies had previously asserted that BUS had not complied with applicable regulations, but they were consensually resolved via settlement. After years of investigations by the Financial Crimes Enforcement Network ("FinCEN") and the Office of Foreign Assets Control ("OFAC"), in October 2022, BUS settled with both FinCEN and OFAC, agreeing to pay fines of more than $24 million and $29 million, respectively. As part of the settlement, FinCEN credited to BUS the OFAC fine, such that BUS would owe only an additional $5 million to FinCEN after

paying the OFAC fine.  Neither settlement required any remediation by, or ongoing oversight of, B US.

22.     State agencies also responded to the downturn in the digital assets industry.  BUS, as a national platform, held money transmitter licenses in the majority of U.S. states where it operated.  Following the collapse of FTX in November 2022, BUS received significantly increased audit requests from state regulators, further diverting substantial resources away from daily operations.  Then, several states alleged that BUS was undercapitalized and demanded that BUS immediately surrender its money transmitter licenses.

23.     Increased regulatory scrutiny, coupled with the decline in revenues, made it very difficult for crypto firms to operate in the United States. As a result, Bittrex's team began to explore strategic solutions.

**III.     The Wind Down, the Bankruptcy, and the Plan**

24.     Bittrex retained Lazard Ltd. and engaged in discussions with third parties to possibly sell Bittrex's assets or obtain sources of liquidity.  The Debtors then retained Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") as its restructuring counsel (having previously retained Quinn Emanuel on other matters) for the Debtors, but not the non-Debtor Bittrex affiliates.  On March 1, 2023, the BUS retained Timothy Pohl with TRP Advisors, LLC to serve as the independent director to act for the sole benefit of BUS in any transactions involving the rest of the corporate group. The Debtors subsequently retained Berkeley Research Group ("BRG") as their financial advisor on March 20, 2023 and appointed Evan Hengel and Robert Duffy to act as Co-Chief Restructuring Officers on April 17, 2023.

25.     However, there was little to no interest in BUS or its assets, likely due to market conditions and the inhospitable regulatory environment.  Thus, with the assistance of their

advisors, the Debtors ultimately determined that an orderly wind-down and customer withdrawal process was the best path forward to protect the Debtors' creditors (including their customers) and other stakeholders.

26. On March 31, 2023, BUS initiated a campaign urging customers to withdraw their cryptocurrency deposits from BUS by April 30, 2023. All cryptocurrencies transferred to BUS by customers are held by BUS, and customers were at all times free to withdraw cryptocurrencies prepetition, as long as the customers comply with all applicable governmental rules and regulations. Unlike other recent cryptocurrency bankruptcies, BUS never loaned customer cryptocurrency to third parties. Because BUS does not hypothecate or otherwise risk crypto deposited by its customers, BUS easily met all pre-petition withdrawals and return of both crypto and fiat deposits, and it remains able to do so. Upon the announcement to wind down, BUS ceased accepting new customers and deposits.

27. As the final phase of this wind-down effort, the Debtors have filed these Chapter 11 Cases to complete the orderly liquidation of their U.S. and Malta operations.

28. The Debtors filed the Plan concurrently with their bankruptcy petitions and this Motion. The Plan provides for a wind down of the Debtors and payment in full of all (a) administrative, (b) priority tax, (c) super-priority post-petition financing, and (d) non-tax priority claims.

29. Pursuant to the Plan, BUS customers who have provided information required by the Debtors' terms of service to comply with governmental regulations will receive under the Plan a 100 percent like-kind cryptocurrency distribution from BUS, and Malta OpCo customers can migrate their accounts to BG to facilitate withdrawal using the BG platform. The distribution will take the form of permitting customers to withdraw cryptocurrencies from the exchange platform,

consistent with the ordinary practice of withdrawing cryptocurrencies. The Plan's treatment of BUS and Malta OpCo customers is a proposed compromise between the customers and the Debtors with respect to the ownership of cryptocurrencies. Plan, Art. IV.B. As will be described in further detail in the Debtors' disclosure statement, there may be a dispute between the Debtors and their customers as to who owns the cryptocurrencies deposited by customers and stored in the Debtors' wallets. The Debtors believe that they own the cryptocurrency assets. But, the proposed treatment, where customers will be permitted to withdraw cryptocurrencies equivalent to 100% of the cryptocurrencies they deposited as a distribution (subject to complying with information requests to ensure that all governmental rules and regulations are satisfied) avoids the expense and delay of litigation concerning ownership of those assets, while still providing customers, the vast majority of which are individuals, the ability to receive a 100% distribution by withdrawing the cryptocurrencies.

30. The Plan also proposes to create a liquidating trust, which will then receive the remaining assets of the estate and liquidate them for the benefit of three stakeholder classes, distributing the proceeds in the following order of priority: (i) general unsecured creditors, (ii) subordinated unsecured creditors, including specifically, the Securities and Exchange Commission and other regulatory agencies to the extent that their claims consist of disgorgement, fines, and/or other penalties and (iii) equity holders. The Debtors believe that there are sufficient assets to pay general unsecured creditors in full, and potentially to pay subordinated unsecured creditors in full as well, depending on the resolution of their claims.

31. This classification structure, where customers are classified separately and ahead of general unsecured claims and subordinated claims, is consistent with plans that have been proposed in other cryptocurrency bankruptcies. For example, in the case of *In re Voyager Digital*

*Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y.), the court confirmed a plan, *id.* D.I. 1166, that classified account holders claims separately and ahead of other general unsecured claims and subordinated claims, *id.* D.I. 853 at 22. Similarly, in *In re Celsius Network LLC*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y), the debtors have proposed a plan that classifies customers under their various programs separately and head of other general unsecured claims. *Id.* D.I. 2358 at 29-30. And in the case of *In re BlockFi Inc.*, the debtors have proposed a plan that classifies account holders separately and ahead of other general unsecured claims and subordinated claims. *In re BlockFi Inc.*, Case No. 22-19361, ECF 22 at 27 (Bankr. D. N.J. Nov. 28, 2022). The Debtors' customers deserve no lesser treatment.

**BASIS FOR RELIEF**

32. Courts recognize that it is appropriate to authorize payment (or treatment) of pre-petition obligations in appropriate circumstances. *In re Windstream Holdings, Inc.*, 614 B.R. 441, 456 (S.D.N.Y. 2020) (citing *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989)); *see generally*, *In re Kmart Corp.*, 359 F.3d 866, 872-74 (7th Cir. 2004) (granting request to pay general unsecured claims of "critical vendors" under section 363(b)(1)); *In re Ionosphere Clubs, Inc.*, 98 B.R. 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay pre-petition wages); *see also In re James A. Phillips, Inc.*, 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay pre-petition claims of suppliers who were potential lien claimants). In authorizing payments of certain pre-petition obligations, courts have relied on several legal theories, rooted in sections 1107(a), 1108, 363(b), and 105(a) of the Bankruptcy Code.

33. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273

B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that satisfaction of pre-petition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

34. Courts have also authorized payment of pre-petition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g., In re Ionosphere Clubs*, 98 B.R. at 175 (discussing prior order authorizing payment of pre-petition wage claims pursuant to section 363(b) and noting that relief is appropriate where payment is needed to "preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale"); *see also In re James A. Phillips, Inc.*, 29 B.R. at 397 (considering section 363 in affirming decision allowing the debtor to pay pre-petition claims of suppliers who were potential lien claimants). Specifically, the business judgment standard requires that a debtor "articulate some business justification, other than mere appeasement of major creditors . . . ." *In re Ionosphere Clubs*, 98 B.R. at 175. Moreover, section 105(a) of the Bankruptcy Code provides the Court authority to issue any order "necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

35. Indeed, courts have repeatedly authorized debtors to pay prepetition claims ahead of plan confirmation, such as paying employees' pre-petition wages, the invoices of "critical vendors," and have even permitted "roll ups" for lenders who continue financing the debtor to receive payment on prepetition claims. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 467–

30366555.1

68 (2017). In doing so, courts have only required that the proposed payments further a Bankruptcy Code related objective, such as enabling a successful reorganization, benefitting other creditors, promoting the possibility of a confirmable plan, or protecting reliance interests. *Id.*; *Kmart*, 359 F.3d at 874 (stating that pre-confirmation payments to "critical vendors" would require a showing of the "prospect of benefit to the other creditors").

36. Here, authorizing the Debtors to honor withdrawals of cryptocurrencies by customers would further the purpose of these bankruptcy cases, which is to minimize harm to their customers while completing the orderly wind-down of operations. The Debtors commenced the Chapter 11 Cases for the purposes of protecting their client base and maximizing recoveries. That process specifically contemplates distributing the Debtors' customers the cryptocurrencies associated with their accounts by allowing them to withdraw cryptocurrency equal to the cryptocurrencies they had deposited as soon as practicable. That is the process that BUS began on March 31, 2023, as part of an arrangement with state-level regulators, to offer BUS's customers a uniform and orderly withdrawal process. The Debtors propose that any continued withdrawals be performed consistently with the applicable terms of service, where customers can withdraw cryptocurrencies and fiat by transferring them to an external wallet or depository account. Upon approval of this Motion, the Debtors will post detailed instructions on their website at www.bittrex.com to assist customers with the withdrawal process.

37. The Debtors have not put at risk any of the cryptocurrencies transferred to them by customers. Those cryptocurrencies reside in the omnibus wallets owned by BUS and Malta OpCo for each type of cryptocurrency asset. To the extent that the Debtors have already received from the customers all of information required by the terms of service in order to comply with governmental regulations, such as "know your customer" identity verification and the like, the

Debtors intend to schedule such customers as creditors holding undisputed, noncontingent, and liquidated claims.[3]  The Debtors' proposed Plan provides for payment in kind of all claims by customers against BUS and Malta OpCo.  As discussed above, the Plan's treatment of BUS and Malta OpCo customers is a proposed compromise with respect to the ownership of cryptocurrencies.  Plan, Art. IV.B.  Despite the fact that there may be a dispute with respect to ownership of the cryptocurrency assets, the Debtors have not put at risk any of the cryptocurrencies transferred to them by customers, and their primary goal has always been to protect their customers.  The Plan treatment promotes this goal, while avoiding the delay and expense of litigation, by permitting customers to withdraw cryptocurrency corresponding to the amounts they are owed.  Continuing to honor customer withdrawals would also comply with prior agreements between BUS and the states that requested, as part of the surrender of money-transmitter licenses, an effective wind-down plan that offers BUS's customers a uniform and orderly withdrawal process.

38.    Further, the Debtors have no third-party funded debt obligations, and anticipate being able to pay all general unsecured claims related to the operation of the Debtors' business in full under the Plan.  The only claims that the Debtors are not able to estimate at this time are those that may be asserted by regulatory agencies including the Securities and Exchange Commission.[4]

---

[3]  In these cases, the Debtors intend to seek authority to send a bar date notice to all of their customers so that those who have not provided the information required under the terms of service to comply with governmental regulations can do so by a date certain so that their claims are allowed and so that they may withdraw cryptocurrencies even under a confirmed Plan.

[4]  To the extent that such claims are in the nature of disgorgement, fines, or other penalties that do not compensate for actual loss, the Debtors believe that there are strong grounds to subordinate such claims to the claims of other general unsecured creditors, given, among other things, the years-long lack of guidance by the Securities and Exchange Commission with respect to whether cryptocurrencies constitute securities. *United States v. Noland*, 517 U.S. 535, 542-43 (1996)

However, the Debtors do not believe that the assertion of a claim by regulatory agencies such as the Securities and Exchange Commission will undermine any Bankruptcy Code related objectives served by permitting customers to withdraw cryptocurrencies consistent with the Bittrex terms of service which include compliance with applicable government regulations, for several reasons.

39.     *First*, it is likely that the claims of regulatory agencies are in the nature of penalties that do not compensate for actual loss.  For example the SEC's complaint seeks only injunctive relief, fines, and disgorgement and does not allege, or seek recovery of, any actual losses by customers. Pursuant to section 726(a)(4) of the Bankruptcy Code, such claims are lower in priority than the claims of general unsecured creditors.  While it is true that claims representing fines or penalties cannot be categorically subordinated in chapter 11 cases, *United States v. Noland*, 517 U.S. 535, 542-43 (1996) (holding that bankruptcy courts may subordinate the penalty claims of governmental units so long as the subordination is not "categorical in nature"), the facts of this case supports subordinating the claims of regulatory agencies, given the glaring lack of guidance (as contrasted to voluminous guidance applicable to other businesses) issued by those agencies regarding cryptocurrency businesses since the Debtors were formed.  Moreover, even if section 726(a)(4) of the Bankruptcy Code does not strictly apply in chapter 11 cases, if the Debtors did not prioritize the treatment of customer claims over non-compensatory claims of those of regulatory agencies, a single non-accepting customer could cause Plan confirmation to fail under the best interests of creditors test found in section 1129(a)(7) of the Bankruptcy Code.  That is because, in a hypothetical chapter 7 liquidation, claims representing fines and/or penalties are subordinated to general unsecured claims pursuant to section 726(a)(4).  *In re Friedman's Inc.*,

---

(holding that bankruptcy courts may subordinate the penalty claims of governmental units so long as the subordination is not "categorical in nature").

356 B.R. 766, 778 (Bankr. S.D. Ga. 2006) (subordinating penalty claims and explaining that if the claims had not been subordinated, the plan may have failed the best interests of creditors test).

40. *Second*, as discussed above, customer claims can be separately classified from the claims of other general unsecured creditors and regulatory agencies in this case because the Plan proposes to pay customers in kind in the amount (but not necessarily the dollar value) of cryptocurrency as of the Petition Date. This represents a compromise between the Debtors and their customers concerning the ownership of the cryptocurrencies. Although the Debtors believe that cryptocurrency assets maintained in BUS omnibus wallets constitute property of the bankruptcy estate, the proposed compromise renders the debate academic because customers can withdraw 100% of the cryptocurrencies deposited onto the platform, while avoiding the cost and delay of litigation, including potential dilution from regulatory or other unknown disputed, contingent, and unliquidated creditors. At the same time, the withdrawal of cryptocurrency assets by customers will eliminate potential risk to the estate if the customers prevail in demonstrating that they own the cryptocurrency assets associated with their accounts. As importantly, continued withdrawal of cryptocurrency assets will mitigate the risk of injury to customers that can be caused by the notorious price volatility in cryptocurrency markets.

41. *Third*, given the relative novelty of cryptocurrency bankruptcies in late-2022 and early-2023, Congress has not yet put in place any specific provisions governing cryptocurrency firms that file bankruptcy. However, the Bankruptcy Code contains provisions governing the liquidation of stockbrokers and commodities brokers that provide useful equitable analogs. Section 752(a) of the Bankruptcy Code, which applies to liquidations of stockbrokers, requires

distribution of "customer property"[5] to customers first, and pursuant to section 752(b), "customer property" may only be distributed to non-customers if there is an excess. Similarly, section 766(h)(2) of the Bankruptcy Code, which applies to liquidations of commodities brokers, requires that "customer property"[6] be distributed to customers first, and pursuant to section 766(j)(1), "customer property" may only be distributed to non-customers if there is an excess. Similar to these provisions, the Plan proposes to return cryptocurrencies to customers first, with any excess to be liquidated and distributed for general unsecured claimants and subordinated claimants, in that order of priority.

## RESERVATION OF RIGHTS

42. Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise)

---

[5] For the purposes of stockbroker liquidations, section 741(4) of the Bankruptcy Code defines "customer property" as cash, securities, or other property "received, acquired, or held by or for the account of the debtor, from or for the securities account of a customer." 11 U.S.C. § 741(f).

[6] For the purposes of commodity broker liquidations, section 761(10) defines "customer property" as cash, securities, or other property "received, acquired, or held by or for the account of the debtor, from or for the account of a customer."

30366555.1

satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any withdrawal made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NOTICE

43. The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the lender under the Debtors' post-petition financing facility; (d) counsel to Debtors' non-debtor affiliate Bittrex Global GmbH; (e) counsel to Debtors' non-debtor affiliates RBR Holdings, Inc., and Aquila Holdings Inc.; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the attorneys general in the states where the Debtors conduct their business operations; (i) the Securities and Exchange Commission, FinCEN, and OFAC; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank]*

30366555.1

WHEREFORE, the Debtors respectfully request that the Court enter the Order substantially in the form attached hereto as **Exhibit A** and grant such other and further relief as is just and proper.

| | |
|---|---|
| Date: May 12, 2023<br>Wilmington, DE | **YOUNG CONAWAY STARGATT &<br>TAYLOR, LLP**<br><br>/s/ Kenneth J. Enos<br>Robert S. Brady (Delaware Bar No. 2847)<br>Kenneth Enos (Delaware Bar No. 4544)<br>Joshua Brooks (Delaware Bar No. 6765)<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Telephone: 302-571-6600<br>Email: rbrady@ycst.com<br>Email: kenos@ycst.com<br>Email: jbrooks@ycst.com<br><br>-and-<br><br>**QUINN EMANUEL URQUHART &<br>SULLIVAN, LLP**<br><br>Susheel Kirpalani *(admitted pro hac vice)*<br>Patricia B. Tomasco *(admitted pro hac vice)*<br>Daniel Holzman *(admitted pro hac vice)*<br>Alain Jaquet *(admitted pro hac vice)*<br>Razmig Izakelian *(admitted pro hac vice)*<br>Valerie Ramos *(admitted pro hac vice)*<br>Joanna D. Caytas *(admitted pro hac vice)*<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>Telephone: 212-849-7000<br>Facsimile: 212-849-7100<br>Email: susheelkirpalani@quinnemanuel.com<br>Email: pattytomasco@quinnemanuel.com<br>Email: danielholzman@quinnemanuel.com<br>Email: alainjaquet@quinnemanuel.com<br>Email: razmigizakelian@quinnemanuel.com<br>Email: valerieramos@quinnemanuel.com<br>Email: joannacaytas@quinnemanuel.com<br><br>**PROPOSED COUNSEL FOR THE DEBTORS** |