```
1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3   IN RE:                       .  Chapter 11
                                 .  Case No. 23-10597 (BLS)
4   DESOLATION HOLDINGS LLC,     .
    et al.,                      .  (Joint Administration Pending)
5                                .
                                 .  Courtroom No. 1
6                                .  824 Market Street
                     Debtors.    .  Wilmington, Delaware 19801
7                                .
                                 .  Wednesday, May 10, 2023
8   . . . . . . . . . . . . . . . 10:38 a.m.

9

10                    TRANSCRIPT OF ZOOM HEARING
             BEFORE THE HONORABLE BRENDAN L. SHANNON
11                UNITED STATES BANKRUPTCY JUDGE

12

13  APPEARANCES:

14  For the Debtors:        Robert S. Brady, Esquire
                            YOUNG CONAWAY STARGATT & TAYLOR, LLP
15                          Rodney Square
                            1000 North King Street
16                          Wilmington, Delaware 19801

17

18

19  (APPEARANCES CONTINUED)

20  Audio Operator:         Dana L. Moore, ECRO

21  Transcription Company:  Reliable
                            The Nemours Building
22                          1007 N. Orange Street, Suite 110
                            Wilmington, Delaware 19801
23                          Telephone: (302)654-8080
                            Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.
```

1 | APPEARANCES (CONTINUED):

2 | For the Debtors:         Susheel Kirpalani, Esquire
Patricia B. Tomasco, Esquire
3 |                     QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
4 |                     51 Madison Avenue
22nd Floor
5 |                     New York, New York 10010

6 |                     Alain Jaquet, Esquire
1300 I Street, NW
7 |                     Suite 900
Washington, DC 20005
8 |

9 |                     Razmig Izakelian, Esquire
865 South Figueroa Street
10th Floor
10 |                     Los Angeles, California 90017

11 |                     Joanna D. Caytas, Esquire
Pennzoil Place
12 |                     711 Louisiana Street
Suite 500
13 |                     Houston, Texas 77002

14 |

15 | For the U.S. Trustee:   Richard L. Schepacarter, Esquire
OFFICE OF THE UNITED STATES TRUSTEE
16 |                     UNITED STATES DEPARTMENT OF JUSTICE
J. Caleb Boggs Federal Building
17 |                     844 King Street
Suite 2207, Lockbox 35
18 |                     Wilmington, Delaware 19801

19 | ALSO PRESENT:

20 | For the Debtors:         Evan Hengel, Managing Director
BERKELEY RESEARCH GROUP, LLC
21 |                     2029 Century Park East
Suite 1250
22 |                     Los Angeles, California 90067

23 | For the Debtors:         Timothy R. Pohl, Senior Advisor
TRP ADVISORS, LLC
24 |                     2045 North Fremont Street
Chicago, Illinois 60614
25 |

<pre>
 1                              INDEX

 2   MOTIONS:                                             PAGE

 3   Agenda
     Item 3:    Debtors' Motion for Entry of an Order (I)    47
 4              Authorizing Joint Administration of the
                Chapter 11 Cases and (II) Granting Related
 5              Relief [Docket No. 2; 5/8/23]

 6              Court's Ruling:                              48

 7   Agenda
     Item 4:    Debtors' Application for Entry of an Order   49
 8              Appointing Omni Agent Solutions as Claims
                and Noticing Agent, Effective as of the
 9              Petition Date [Docket No. 3; 5/8/23]

10              Court's Ruling:                              51

11   Agenda
     Item 5:    Debtors' Motion Seeking Entry of Interim and 52
12              Final Orders (I) Authorizing the Debtors to
                Serve Certain Parties by Email, and (11)
13              Granting Related Relief [Docket No. 4; 5/8/23]

14              Court's Ruling:                              63

15   Agenda
     Item 6:    Debtors' Motion Seeking Entry of Interim and 64
16              Final Orders (I) Authorizing the Debtors to
                (A) Maintain a Consolidated List of Creditors,
17              (B) File a Consolidated List of the Debtors'
                Fifty Largest Unsecured Creditors, and (C)
18              Withhold or Omit Certain Confidential
                Information, (11) Establishing Procedures for
19              Notifying the Parties of Commencement, and
                (111) Granting Related Relief
20              [Docket No. 5; 5/8/23]

21              Court's Ruling:                              70

22

23

24

25
</pre>

1                          INDEX

2    MOTIONS:                                              PAGE

3    Agenda
     Item 7:    Debtors' Motion for Entry of an Order (I)      73
4               Restating and Enforcing the Worldwide
                Automatic Stay, Anti-Discrimination
5               Provisions, and Ipso Facto Protections of the
                Bankruptcy Code, (II) Approving the Form and
6               Manner of Notice, and (III) Granting Related
                Relief [Docket No. 6; 5/8/23]
7

8               Court's Ruling:                               79

9    Agenda
     Item 8:    Debtors' Motion for Entry of Interim and Final  80
10              Orders to (I) Continue Employee Benefits
                Programs and (II) Grant Related Relief
11              [Docket No. 7; 5/8/23]

12              Court's Ruling:                               82

13   Agenda
     Item 9:    Debtors' Motion Seeking Entry of Interim and   84
14              Final Orders (I) Authorizing the Debtors to
                (A) Continue to Operate Their Cash Management
15              System, (B) Honor Certain Pre-Petition
                Obligations Related Thereto, and (C) Continue
16              to Perform Intercompany Transactions, (II)
                Granting Superpriority Administrative Expense
17              Status to Post-Petition Intercompany Balances,
                and (III) Granting Related Relief
18              [Docket No. 8; 5/8/23]

19              Court's Ruling:                               91

20   Agenda
     Item 10:   Debtors' Motion for Entry of Interim and Final  93
21              Orders: (A) Authorizing the Debtors to Incur
                Post-Petition Debt, (B) Granting Super-
22              Priority Administrative Expense Claims, (C)
                Scheduling a Final Hearing, and (D) Granting
23              Related Relief [Docket No. 9; 5/8/23]

24              Court's Ruling:                              101

25

1                              EXHIBITS

2  DECLARATIONS:                                          PAGE

3  1) Declaration of Evan Hengel                           19

4  Transcriptionists' Certificate                         107

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Proceedings commence at 10:38 a.m.)

2               THE COURT:  Good morning, all.  This is Judge

3   Shannon.  I understand from the court reporter that necessary

4   parties have joined.

5               This is the first-day hearing in a new case in the

6   matter of Desolation Holdings, LLC, which is Case Number 23-

7   10597.

8               Before we get going, can I get a thumbs-up from

9   parties that you're able to see and hear me clearly?  All

10  right.  Great.

11              The Court would note for the record that today's

12  hearing is being conducted virtually.

13              And before we get rolling, I would make at least

14  two observations:

15              First, I will hear from any and all parties that

16  wish to be heard.  I'm certainly not going to stand on

17  ceremony, as is my practice at a first-day hearing with

18  respect to issues of admission pro hac vice or any of those

19  issues.  So any party that wishes to address the Court is

20  welcome to and any issue of affiliation with Delaware counsel

21  is a matter for another day.

22              Second, I would extend my appreciation to all of

23  the parties for accommodating my schedule.  I think the

24  debtor had originally requested a first-day hearing on

25  Thursday, which I certainly would have been happy to

1   accommodate, but I have a commitment at the Third Circuit

2   conference and, since I like my job, I decided to accommodate

3   that conflict and asked that we conduct this hearing today.

4   I do know or I believe it may have been a burden particularly

5   on the Office of the United States Trustee, and I apologize

6   for any inconvenience associated with that, but I wanted to

7   make sure that we got the hearing in, in a timely manner and

8   in a way that accommodated my schedule and as many schedules

9   as possible.

10          So, with that, I would be happy to hear from

11  counsel for the debtor.

12          Good morning, all.  Mr. Brady, good morning, it's

13  good to see you.

14          MR. BRADY:  Good morning, Your Honor.  Same here.

15  Robert Brady for the debtors.  And I'm joined today by some

16  of my colleagues at Young Conaway and by lead restructuring

17  counsel at Quinn Emanuel.

18          As always, Your Honor, we'd like to start by

19  thanking the Court and your staff for scheduling this hearing

20  and for allowing us to proceed by Zoom.

21          Also, we have been working very hard with Mr.

22  Schepacarter and his office over the last couple of days to

23  address any concerns raised by the United States Trustee.  We

24  thank them for a very constructive dialogue.  And I think,

25  Your Honor, we were able to resolve virtually all of the

1 concerns.  But I think there's at least one point that's open

2 that will need to be presented to the Court.

3             THE COURT:  Okay.

4             MR. BRADY:  We also received comments from the

5 United States to the proposed order, and we were able to

6 incorporate those revisions.

7             So, as a result, there are a number of revised

8 orders that we transmitted to Your Honor's chambers this

9 morning and the Quinn team will walk Your Honor through those

10 during the course of the hearing.  And if you're inclined to

11 grant the relief, we will upload clean copies of the order --

12 of the orders at the conclusion of the hearing, so --

13             THE COURT:  I think that sounds fine.

14             MR. BRADY:  Great, Your Honor.

15             And one last housekeeping point.  In order to fill

16 in the blanks in some of the orders, we will need a second-

17 day hearing and will request sometime between June 6th and

18 June 8th, to the extent the Court can accommodate.

19             THE COURT:  Well, we might as well deal with that

20 right out of the gate.  This would be, Mr. Brady, I just want

21 to confirm, for a routine second-day hearing?  That would

22 deal --

23             MR. BRADY:  A routine --

24             THE COURT:  It will --

25             MR. BRADY:  -- second-day hearing --

1          THE COURT:  -- deal with --

2          MR. BRADY:  -- and one new --

3          THE COURT:  -- retentions, the final DIP.  I

4   realize -- I do note that the debtors have filed a plan and I

5   would expect that the debtor might want to talk about some of

6   the scheduling issues, but that doesn't seem to be a June 6th

7   issue, unless I'm mistaken.  So is that what we're talking

8   about?

9          MR. BRADY:  Yes, Your Honor.  I think one new

10   motion will be filed and with the ability for customers to

11   withdraw from the platform, so we would ask to put that on

12   the second-day hearing, as well.

13          THE COURT:  Again, without prejudice to anybody's

14   rights to weigh in on these issues, but I think, given the

15   number of parties that we have here, I would like to at least

16   propose that we would conduct a hearing at 11 a.m. on June 7.

17   I'm hopeful that that's workable for parties.

18          If it turns out that there is an intractable issue

19   with somebody's schedule, we can change that.  But at least

20   for our purposes right now, as we go forward, you should be

21   confident that you'll get scheduling in the bracket that

22   you're looking for.

23          Separately, I think we have -- we do have a plan,

24   and obviously, that's not an issue for today.  But if the

25   debtor is also discussing scheduling for that, we can address

1 | that at the appropriate time.

2 | But is that responsive to your concern, Mr. Brady?

3 | MR. BRADY:  Yes, Your Honor.  Thank you very much.

4 | And with that, unless you have any more questions

5 | of me, I yield the podium, the virtual podium, over to

6 | Susheel Kirpalani and Patty Tomasco from Quinn Emanuel.

7 | THE COURT:  That sounds great.

8 | Mr. Kirpalani, good morning.  It's good to see you

9 | again.  Welcome.

10 | MR. KIRPALANI:  And good morning.  Thank you, Your

11 | Honor.  Nice to see you.  Thank you, Mr. Brady, and thank you

12 | to your team, Mr. Brady, for helping us through the last

13 | several days.

14 | For the record, Susheel Kirpalani of Quinn,

15 | Emanuel, Urquhart & Sullivan on behalf of -- proposed counsel

16 | for the debtors Desolation Holdings and its affiliates,

17 | including Bittrex, Inc., which we call "Bittrex U.S." or

18 | "BUS," just in case I use those phrases.

19 | THE COURT:  Okay.

20 | MR. KIRPALANI:  It's often how we refer to it.

21 | Your Honor, I would also like to thank the Court's

22 | personnel.  I saw Ms. O'Boyle's name pop up on the Zoom, and

23 | that was a blast from the past, from New York, so very happy

24 | to see her.

25 | I also want to thank Mr. Schepacarter.  He's a law

1  firm of one person and did an enormous job for us, reviewing

2  everything and getting back to us timely.  I do think that

3  we've resolved most of the issues and I think, as Mr. Brady

4  said, there's just one open point.

5          Your Honor, with me and who will  be addressing

6  the Court is my partner from Houston Patricia Tomasco and my

7  colleagues Razmig Izakelian, Joanna Caytas, and Alain Jaquet,

8  it's J-a-q-u-e-t

9          THE COURT:  Very good.

10          MR. KIRPALANI:  I also have on the Zoom my

11  regulatory litigation partner Stacylyn Doore, in case Your

12  Honor has some questions about the regulatory environment in

13  which Bittrex operates that I don't have the expertise to

14  answer.

15          THE COURT:  Okay.

16          MR. KIRPALANI:  Your Honor, our -- we have, from

17  the client, from the company, the General Counsel David Maria

18  and the Associate General Counsel Caleb Barker.  And our

19  first-day witness is the Co-Chief Restructuring Officer of

20  Bittrex, Inc., Evan Hengel of Berkeley Research Group, or

21  BRG.  And we also have here in the court our independent

22  director, former Skadden partner and Lazard partner Timothy

23  Pohl, who I think the Court is familiar with.

24          THE COURT:  I am.  Mr. Pohl, it is good to see

25  you.  It has been a long time.  I -- it may go as far back --

1  was it the VeraSun case?  Back in 2008, I think.

2           MR. POHL:  Good morning, Your Honor.  It's good to

3  see you.

4           THE COURT:  Good to see you.

5           MR. POHL:  That was the last -- that was the last

6  time I appeared in front of you, but not the first time.

7           THE COURT:  True that.  I recall, when I saw you

8  referenced as the independent director in the declaration, I

9  did recall the colloquy that we had about how we both thought

10  that all of that ethanol was being wasted, where it could

11  have been supplied to a distillery and put to better use in

12  the VeraSun case.

13           MR. POHL:  I remember it well.  Good to see you.

14           THE COURT:  Good to see you.

15           Mr. Kirpalani, before we go any further, I think

16  I'd like to -- there's been a couple of references to the

17  United States Trustee, and I would like to hear from the

18  United States Trustee just on the status of the case and

19  issues relating to timing for purposes of the committee

20  formation or otherwise.

21           Mr. Schepacarter, good morning, it's good to see

22  you, as always.  And again, I appreciate you accommodating

23  the scheduling issues I -- and I hope it wasn't too

24  burdensome.  Good morning.

25           MR. SCHEPACARTER:  Good morning, Your Honor.  For

1   the -- can you hear me clearly?

2          THE COURT:  I sure can.

3          MR. SCHEPACARTER:  Okay.  Thank you.  For the

4   record, Richard Schepacarter for the United States Trustee.

5          Apology accepted, but I was able to get somebody

6   to cover that other hearing for me, so it kind of worked

7   out --

8          THE COURT:  Okay.

9          MR. SCHEPACARTER:  -- at any rate.  But I do

10  appreciate the Court's consideration.

11          Just a couple of things, Your Honor.  And we

12  don't -- today we come here and we don't really have anything

13  that's really contested from a standpoint of, you know, sort

14  of where the case goes.

15          I do note that there's a couple of issues, I guess

16  a couple of overriding issues with respect to these type of

17  cases.  The one will be -- and you'll hear something from me

18  on this -- on the Section 345(b) waiver for 30 days.  The

19  banks that the debtors currently use now, none of them

20  uniform depository agreements with our office, which we call

21  the "UDAs."  So that means that they need to come into

22  compliance very, very soon.  Immediacy would be great, but I

23  understand that some of these things take time.  But we've

24  put provisions in the order that they hopefully will be able

25  to maneuver into complying with 345.

1          The other issue is -- and this is probably one

2  of -- probably the first time this has happened, that

3  somebody -- someone -- a debtor is coming into the case

4  looking for a DIP and they're using bitcoin.  I don't know

5  that any of the other cases have done that.

6          THE COURT:  You know, Mr. Schepacarter, I get to

7  this point in my life and I wonder whether there's anything

8  new under the sun, and then Mr. Kirpalani arrives with a DIP

9  that says, well, our initial draw will be 250 bitcoin.

10          MR. SCHEPACARTER:  Right.

11          THE COURT:  So, yeah.  Well, we'll deal with that

12  as we get to it.

13          MR. SCHEPACARTER:  Yeah.  When I first looked at

14  it, I saw that it was seven -- a total of 700 bitcoin, and I

15  didn't see the bitcoin part.  I'm like $700 to run the case,

16  wow, that's really economical, so ... but then I came to the

17  realization otherwise.

18          The other issue -- and again, you'll hear from me

19  on the (indiscernible) issue.  There's two parts to that:

20          One is the sealing part of the creditor matrix.

21  So they have the creditor matrix going, you'll hear that,

22  something from me on the sealing of the names.

23          The other part of it is -- and again, we're going

24  to keep our powder dry probably on all of these things

25  because they're all interim.  But the email service, Rule

1  9036 basically mandates the Clerk's Office or the Court's

2  standpoint that service has to be by mail unless somebody

3  consents to it, so you'll hear from me on that.

4         Now you did ask about the creditor committee

5  formation meeting.

6         THE COURT:  Uh-huh.

7         MR. SCHEPACARTER:  We will send that notice out

8  today, right after this hearing, probably give the parties --

9  today is what, the 10th?  Probably give the parties a week to

10 respond to us, so that will be sometime during the 17th.  If

11 the next hearing is June 6th -- and I don't know if there's

12 going to be any interim hearings like on the DIP or not with

13 respect to that.  But if we do this on a week basis -- which

14 has kind of become common in this -- in Delaware, at least

15 for my cases -- hopefully, by the end of that week -- so by

16 Wednesday, Thursday, Friday, by the 19th, hopefully, we'll

17 have some semblance of a committee involved.  Although my

18 last two cases have not -- have resulted in no committee,

19 which is unusual, so ...

20        THE COURT:  Okay.  Well, I -- as always, I

21 certainly would echo the comments from counsel, appreciating

22 your, and your colleagues efforts to respond and engage.

23        And again, while I was being a little bit flip,

24 these cases raise novel issues.  And what we found is that

25 the Bankruptcy Code and the Bankruptcy Courts are pretty

1   nimble, as well as your office.

2            MR. SCHEPACARTER:  Thank you.

3            THE COURT:  I appreciate the issues that you've

4   raised with respect to service.  I'm familiar with Rule 9036

5   and the sealing issues, I think, have arisen in other cases

6   in this jurisdiction and in others and so I'm happy to have

7   that discussion.  It sounds like the parties have figured out

8   a way or are discussing how to keep powder dry on those

9   issues for further proceedings, and I certainly am prepared

10  to work with parties on that.

11           MR. SCHEPACARTER:  Thank you, Your Honor.

12           THE COURT:  And I think it's particularly helpful

13  that your office is moving forward and engaging.  Presuming

14  that we'll have a committee, it's simply helpful that the

15  sooner they're on board, the sooner we're moving.

16           My colloquy with Mr. Brady indicated that we --

17  our next meeting, absent some emergency, would be on

18  June 7th.  Obviously, if there's an emergency or relief

19  that's needed, we'll deal with scheduling.  But you know,

20  presuming that the next major hearing is a second-day hearing

21  with all that that entails on June 7th, on the schedule that

22  you've laid out, it sounds like we should be in good shape to

23  have a committee that would be onboard and up to speed.

24           MR. SCHEPACARTER:  Thank you, Your Honor.

25           THE COURT:  All right.  Thank you again,

1   Mr. Schepacarter.

2              Back to you, Mr. Kirpalani.

3              MR. KIRPALANI:  Thank you, Your Honor.

4              THE COURT:  And ready to proceed?

5              MR. KIRPALANI:  Yes.  Thank you, Your Honor.

6              I think the first order of business, Your Honor,

7   we do have the voluntary petitions that are filed:

8              Desolation Holdings is Case Number 23-10597.

9   Bittrex, Inc. -- which is the lead case, by the way.

10             Bittrex, Inc., which is a Georgia corporation but

11  an affiliate, is Case Number 23-10598.

12             Bittrex malting -- Bittrex Malta Holdings Limited

13  is Case Number 23-10599.

14             And Bittrex Malta Limited is Case Number 23-10600.

15             Those are the four debtors-in-possession, Your

16  Honor.

17             And we do have the declaration of Evan Hengel, the

18  Co-Chief Restructuring Officer of the debtors that's in

19  support of the petitions and various relief from the first-

20  day motions.  And that was filed on the docket at Docket

21  Number 11, on May 8th.  And so I guess the first order of

22  business, if we could, is move to have the declaration of

23  Mr. Hengel admitted as evidence.

24             THE COURT:  Very good.  Considering the debtors'

25  request for admission of the declaration, I would ask if

1   there are any objections.  But I would make my -- what is, I

2   think, my standard admonition with respect to a first-day

3   declaration:

4            The Court, to the extent the declaration is

5   admitted today, it's admitted exclusively for purposes of the

6   limited relief sought at the interim hearing that we are

7   attending today.  I have, on many occasions, observed and

8   heard from counsel that there are concerns about admission of

9   issues and purported facts or testimony that lays out a story

10  or an explanation of how a company arrived or how a debtor

11  arrived in court.  And there are concerns sometimes expressed

12  that admission today makes them somehow the law of the case

13  or adjudicate facts for purposes of further proceedings, and

14  I want to be clear that I don't hold that view at all.

15           Debtors often describe the circumstances that led

16  to their need to file for bankruptcy relief.  Often, those

17  descriptions describe the actions of third parties that may

18  be the subject of further proceedings.  So, to be clear, to

19  the extent that the declaration is admitted, it's only for

20  those purposes and wouldn't necessarily -- and would not be

21  admitted or otherwise affirmative testimony for further

22  proceedings, particularly given the limited time line that we

23  have to get to today's hearing.

24           With that, I would ask if there are any objections

25  to the admission of Mr. Hengel's declaration as part of the

1    debtors' case for purposes of the relief sought today.

2           (No verbal response)

3                THE COURT:  All right.  Mr. Hengel's declaration

4    is admitted.

5           (Hengel Declaration received in evidence)

6                THE COURT:  Just so that I know what my dance card

7    looks like, can I ask if there is any party that intends to

8    or expects to cross-examine Mr. Hengel regarding the contents

9    of his declaration today?

10          (No verbal response)

11               THE COURT:  Very well.  Mr. Hengel's declaration

12   is admitted.

13               Mr. Kirpalani, you may proceed.

14               MR. KIRPALANI:  Thank you, Your Honor.

15               Would I have the ability to share my screen --

16               THE COURT:  Sure.

17               MR. KIRPALANI:  -- with the --

18               THE ECRO:  He has it.

19               MR. KIRPALANI:  -- participants?

20               THE COURT:  I understand from the court reporter

21   that you have been granted those sharing privileges.

22               Dana, he's all set?

23               MR. KIRPALANI:  Great.

24               THE ECRO:  Yes.

25               THE COURT:  Yes.

1              THE ECRO:  Yes, Your Honor.

2              MR. KIRPALANI:  Thank you, Your Honor.  Just give

3    me one moment.

4              THE COURT:  Before we get much further, though,

5    Mr. Kirpalani, at some point, someone --

6              MR. KIRPALANI:  Yes.

7              THE COURT:  -- will need to tell me where the name

8    "Desolation Holdings" came from.

9         (Laughter)

10             MR. KIRPALANI:  Yeah, and I --

11             THE COURT:  It may not be a today issue.  That may

12   be -- that may be a sidebar question, but it's quite a name.

13             MR. KIRPALANI:  I promise you, prior to

14   confirmation, we will get you an answer to that.

15             THE COURT:  Fair enough.

16             MR. KIRPALANI:  And it absolutely (indiscernible)

17   for now, until we make some more progress in this case.

18        (Laughter)

19             MR. KIRPALANI:  So can Your Honor see the

20   presentation that I have up on the screen?

21             THE COURT:  I can.  And as is my wont, I've also

22   printed it.

23             MR. KIRPALANI:  Perfect.  Thank you, Your Honor.

24             And if any of the participants can't see or can't

25   follow along, please do speak up and I'll do a better job.

1          So, Your Honor, I'm not going to go through this

2   entire deck laboriously, but there are some features that I'd

3   like to talk to the Court about when it comes to Bittrex.

4   I'd like to give you a summary of our situation.

5          I would like to give you an overview of the

6   company and its history, as well as a slight -- or a small

7   primer on the crypto industry overall.  It's something I have

8   learned the hard way, if you will, over the last year as

9   counsel to Voyager, and Mr. Pohl was the independent director

10  there, so he and I learned together.

11         Let me just put this back up.  I don't know what

12  happened there.  Okay.  Great.

13         And then we'd like to talk a bit about how we --

14  as you mentioned, the declaration is not, you know, binding

15  on third parties, but it is our view of how we got to where

16  we are, including the regulatory environment in which the

17  debtors operate in the United States.

18         And then the agenda for the first-day hearing,

19  which I hope will be relatively smooth.  I will be the one

20  handling what Your Honor referred to as the "novel" DIP

21  financing.  I didn't want to make it boring, so I had to keep

22  something interesting.

23         Oh, first, Your Honor, Bittrex was the industry-

24  leading cryptocurrency exchange, operating exchanges both for

25  retail and institutional customers here and abroad.

1           As I mentioned, we have four debtors.  There are

2   some important affiliates that are nondebtors:  The first is

3   Bittrex Global GmbH, which we refer to as "BG," and the

4   Bittrex Global Bermuda, which is BGB.  Again, those are not

5   debtors in Chapter 11 or debtors in any jurisdiction.  They

6   are operating businesses in their respective places, but

7   they're affiliates of the U.S. companies.

8           Bittrex itself was founded by three cybersecurity

9   engineers and -- in 2014, and the company was an early

10  pioneer in operating cryptocurrency exchanges with a

11  particular focus on building security and trust.

12          The cryptocurrency exchanges run by Bittrex

13  allowed customers to buy, sell, and store cryptocurrency on

14  an easy-to-use and secure platform.

15          Until April 1st of this year, Bittrex U.S., which

16  we refer to as "BUS," operated a U.S. exchange that served

17  only U.S. customers, and BG and BGB operated the exchanges

18  outside of the United States that serve non U.S. customers.

19          In all -- we're going to hear a lot about things

20  like bitcoin -- but in all, there were 150 digital assets or

21  tokens that were available to trade on Bittrex's exchanges.

22  And Bittrex has over 1.5 million active users globally

23  through these various companies, through BUS, BG, and BGB.

24          THE COURT:  So --

25          MR. KIRPALANI:  In the U.S. --

1          THE COURT:  -- I just want to make sure,

2    Mr. Kirpalani --

3          MR. KIRPALANI:  Uh-huh.

4          THE COURT:  -- Mr. Kirpalani, I understood

5    Mr. Hengel's declaration accurately.  I think he described

6    the company as a "true exchange," that it was not offering,

7    effectively, interest or yield on people's investments, and

8    it wasn't using the investments to backstop or collateralize

9    or fund its own investments.

10          MR. KIRPALANI:  Yes.

11          THE COURT:  I saw that in there and I want to make

12    sure that I understand because, obviously, that's a hot point

13    in a number of other pending cases, but presumably not this

14    one.

15          MR. KIRPALANI:  Absolutely, Your Honor.  And

16    you're a bit ahead of me, but absolutely right.  We're going

17    to talk a bit this morning about how Bittrex's, I would say

18    more conservative profile also resulted in an inability to

19    compete effectively for customers because it wasn't offering

20    those types of rewards or yields which other companies, like

21    for example Voyager, did offer.  And Bittrex did not

22    hypothecate or loan out or put at risk any of its customers'

23    deposits.

24          But as a result, it also has difficulty generating

25    revenues, particularly if the regulatory environment that it

1  operates in restricts or starts questioning the ability to

2  permit trading.

3          THE COURT:  Okay.

4          MR. KIRPALANI:  And that's how they made money.

5          THE COURT:  Sure.  All right.  Thank you.

6          MR. KIRPALANI:  Okay.  Uh-huh.

7          And as I was just mentioning, we believe there are

8  approximately 600,000 active U.S. users who are our customers

9  or customer creditors.

10          Since 2022, Bittrex's U.S. business has suffered

11  losses that impaired BUS's ability to operate as a going

12  concern.  I'm going to talk about some of those steps or what

13  happened.

14          But in the first quarter of this year, as I'm sure

15  Your Honor has read in the newspapers, the U.S. regulatory

16  environment has become untenable for Bittrex and probably for

17  other companies like it.  That compelled the debtors to

18  initiate a restructuring and wind-down process of their U.S.

19  and Malta operations.

20          On March 31st of this year, BUS urged its

21  customers to access the platform and withdraw their

22  cryptocurrency deposits in the ordinary course of business,

23  come in and take your deposits out.

24          At the same time, BUS ceased accepting new

25  customers and worked with its advisors to responsibly repay

1  customers 100 percent of their respective cryptocurrency and

2  U.S. dollars that were on deposit with BUS.

3        As the final phase of the wind-down effort, the

4  debtors have decided to file Chapter 11 to complete an

5  orderly wind-down of their U.S. and Malta operations and

6  provide some finality to these companies.

7        The proposed Chapter 11 plan that Your Honor noted

8  we filed, we did not include a disclosure statement yet

9  because we're not seeking any hearing on anything yet.  But

10 the reason we filed it was to show our intentions with

11 respect to how we're getting out of Chapter 11.

12       Our plan contemplates full payment in kind of the

13 claims of the debtors' customers.  So whatever tokens

14 customers had on the platform as of the petition date, we

15 would propose under our plan to pay them back the same amount

16 of -- the same types of tokens as of the effective date.  So,

17 even though -- and we can talk about, I'm sure, down the

18 road, we may.  Even though the Bankruptcy Code recognizes

19 claims as rights to payment, we are not technically paying in

20 cash any allowed claims of customers.  Instead, we would be

21 paying customers or distributing to customers or allowing

22 their withdrawal of cryptocurrency assets in kind, in the

23 amounts that they had on the petition date.  And we have no

24 guarantee what the value of the tokens that we distribute on

25 the effective date will be relative to the value on the

1  petition date.

2          And so we take the position, Your Honor, that

3  these customers are impaired and they would have the right to

4  vote.  But that's, you know, not for today, but I wanted to

5  give you a preview, Your Honor, of what our plan --

6          THE COURT:  Okay.

7          MR. KIRPALANI:  -- entails.  But our expectation

8  is we would have enough tokens to pay everyone back their

9  entire investment.

10          THE COURT:  I understand.

11          MR. KIRPALANI:  Okay.  Thank you, Your Honor.

12  Moving on -- did Your Honor have a question?  I'm sorry.

13          THE COURT:  No, I don't.  But I would ask if

14  anybody that's not speaking to the Court, please be kind

15  enough to put your microphones on mute.  I think we are both

16  -- Mr. Kirpalani and I were both getting a little bit of

17  feedback there.

18          You may proceed, sir.

19          MR. KIRPALANI:  Thank you, Your Honor.

20          So, in terms of Bittrex's profile -- and this is

21  as of April 27th, we had 101 employees.  We had -- it says

22  "AUM" on the slide, Your Honor, but let's call it "assets on

23  the platform," in 2021, of $2.7 billion worth of tokens.  And

24  as of 2023, the median number had dropped to 566 million of

25  assets on the platform.  That's a change from our peak, a

1   drop of 79 percent of how many customers were using the

2   Bittrex platform.

3              We made the decision to shut down the U.S.

4   businesses as of April 1st, 2023.  And withdrawals have been

5   processing.  And the withdrawals, we're pleased to report

6   that we've been able to process since the shutdown has been a

7   total of $425 million worth of assets from BUS and Malta

8   operating company.

9              Your Honor did note that we have DIP commitment

10  from a nondebtor affiliate, it's the ultimate parent company

11  of the debtor.  And that's -- the name of that entity is

12  Aquila Holdings.

13             THE COURT:  Right.

14             MR. KIRPALANI:  And the loan will be in bitcoin,

15  and I'll explain that when we get to the DIP motion, as to

16  why and how it was negotiated by Mr. Pohl, our independent

17  director.  But it's 700 bitcoin at 4 percent interest, and

18  that loan would be repayable in bitcoin.  What we're asking

19  for today as the interim relief is 250 bitcoin, to be

20  available upon entry of the interim order.

21             The -- as I mentioned, the goal is -- of the

22  restructuring is to return all crypto assets in kind to

23  KYC -- which is "know your customer" -- compliant BUS

24  customers in an expedited fashion.  We want to leave intact

25  Bittrex's non U.S. businesses overseas.

1          THE COURT:  Right.

2          MR. KIRPALANI:  We want to resolve the remaining

3   claims that we have from U.S. regulators against BUS.

4          BG will be reimbursing BUS for any shared services

5   via a transition services agreement.

6          And we want to maintain an open dialogue with key

7   regulators throughout the process, to ensure that customers

8   remain protected and treated fairly.  That's our number one

9   goal.

10          THE COURT:  Mr. Kirpalani, has the transition

11   services agreement between BG and BUS been memorialized at

12   this point or is that something that's still being worked on?

13          MR. KIRPALANI:  I -- Mr. Hengel I know is here on

14   the Zoom.

15          THE COURT:  He's welcome --

16          MR. KIRPALANI:  I believe --

17          THE COURT:  -- to weigh in.

18          MR. KIRPALANI:  Yeah.  Could you let us know, Mr.

19   Hengel?

20          MR. HENGEL:  Yeah, I believe it was finalized over

21   the last 48 hours.

22          THE COURT:  Very good.  Thank you, Mr. Hengel.  I

23   appreciate it.

24          MR. KIRPALANI:  So an overview, the leadership

25   team of Bittrex is the co-founder and CEO is Richie Lai, the

1   COO is Jim Waschak.  The general counsel, who is here in the

2   courtroom -- court Zoom is David Maria.  The Co-Chief

3   Restructuring Officers are Even Hengel and Bob Duffy.  Our

4   advisors, as Your Honor knows, is my firm, Quinn Emanuel.

5   Proposed Delaware counsel is Young Conaway.  And our proposed

6   financial advisor is BRG and our proposed noticing and claims

7   agent is Omni.

8           Skipping ahead, this is the -- on Slide 12 -- and

9   to the extent it's helpful or Your Honor's practice, we're

10  happy to file this deck after we finish going through it on

11  the docket for people to have a reference, if they want to

12  review the transcript later.

13          THE COURT:  Actually, that might actually be

14  helpful.  Again, these PowerPoint decks have become certainly

15  kind of a standard.  And occasionally, especially in a live

16  hearing, there was often a debate about whether there's

17  affirmative evidence being put in.  I typically regard them

18  as a demonstrative.

19          But there's enough information here, much of which

20  is already contained in Mr. Hengel's declaration, but it's

21  here in a somewhat different format.  I think it would be

22  helpful just to file this under a notice of filing.  Okay?

23          MR. KIRPALANI:  Thank you.  Thank you, Your Honor.

24          THE COURT:  Sure.

25          MR. KIRPALANI:  We will.

1          So here we've got, on Slide 12, the overall

2    organizational chart of the debtors and their nondebtor

3    affiliates.

4          As I mentioned, Aquila Holdings is on top, that is

5    our DIP lender and ultimate holding company.

6          And you can see the red boxes that are shaded

7    gray --

8          THE COURT:  They're our debtors.

9          MR. KIRPALANI:  -- so the red outline, those are

10   the debtors --

11         THE COURT:  Yep.

12         MR. KIRPALANI:  -- Bittrex, Inc., Desolation

13   Holdings, Bittrex Malta Holdings, and Bittrex Malta OpCo.

14         The assets of BUS are approximately, today,

15   $50 million of customers' cash, $250 million equivalent of

16   customers' crypto, about $3 million of cash and proprietary

17   owned crypto assets, and we also have assets in prepaid

18   expenses and office supplies.

19         For Malta OpCo, the assets are approximately $120

20   million of customer cash and crypto assets that's offset by a

21   similar liability.

22         Malta Holdings basically owns the equity in its

23   sub.

24         And Desolation has minimal cash, a security

25   deposit for an office lease, and various lease obligations.

1              In terms of the time line, I'm going to probably

2    jump through most of this.  As I mentioned, the company

3    started in February of 2014.

4              If we skip ahead to February 2019, Bittrex

5    launched its mobile application.  It adopted, in September

6    2019, a block chain compliance firm Chain Analysis, real time

7    monitoring software.  That's when Richie Lai became CEO of

8    BUS.

9              Later in 2022, following what we'll talk about,

10   it's commonly referred to as "crypto winter," Bittrex settled

11   with OFAC and FinCEN for $53 million of fines, although one

12   of the fines offsets the others, so it's a total out-of-

13   pocket payment required of $29 million total, a portion of

14   which has been paid and a portion of which remains to be paid

15   and will become a claim in the bankruptcy.

16             By the first quarter of 2023, as I mentioned, the

17   regulatory environment had really become untenable, and

18   Bittrex has been compelled to wind down the U.S. businesses.

19             As mentioned in Mr. Hengel's declaration, we have

20   been in discussions with the SEC for quite some time.  The

21   SEC served the company with a Wells notice, indicating an

22   intention to commence an enforcement action.  We had

23   explained to the SEC that we're going to be filing for

24   Chapter 11.  We have stopped operating completely.  And

25   nevertheless, the SEC filed in April a complaint against BUS,

1  against BGB, and against our former CEO for a failure to

2  register as a securities exchange.

3          In some sense, the complaint is helpful because

4  it's the first time we have been told exactly what the SEC's

5  position is with respect to what we've been doing wrong,

6  allegedly.

7          THE COURT:  Right.

8          MR. KIRPALANI:  And we'll talk more about that as

9  the case progresses.

10          In terms of the industry overview, Bittrex

11  certainly benefitted from the industry tail winds in the

12  early days of crypto.  But it has been damaged by the

13  significant headwinds that's impacting their ability to

14  generate revenue.

15          And just to give Your Honor a little bit of

16  perspective on this industry, the increase in bitcoin price

17  was over 14,000 percent from 2016 to 2021.  That helped

18  increase the value of assets on the platform and drive

19  revenue for Bittrex.  Bitcoin prices have since been reduced

20  by half to around $30,000, as the crypto winter continues.

21          Other crypto exchanges, as Your Honor noted, began

22  offering yield products on crypto deposits, which has upset

23  some regulators.  But they did it in order to recruit new

24  customers to their platform away from some of the old line

25  exchanges like Bittrex.  This yield was often funded by

1  aggressive lending activity of customer assets, something

2  that the debtors never did.  And competitors used the yield

3  offerings and aggressive advertising spend to gain Bittrex's

4  market share, which they did.

5          When the lending crypto exchanges imploded, such

6  as Voyager --

7          THE COURT:  Can I ask you --

8          MR. KIRPALANI:  -- and Celsius --

9          THE COURT:  -- a question, Mr. Kirpalani?

10          MR. KIRPALANI:  Sure.

11          THE COURT:  Among other things, this was in

12  Mr. Hengel's declaration.  But you guys didn't have a Super

13  Bowl commercial.

14          MR. KIRPALANI:  That's true, we did not.

15          THE COURT:  So you are -- so you are the one

16  because I watched that Super Bowl.

17      (Laughter)

18          THE COURT:  Can I ask a question?  As the -- I

19  think you're describing a bunch of different market forces

20  impacting the company over a period of years and regulatory

21  forces, as well.  But one of them --

22          MR. KIRPALANI:  Uh-huh.

23          THE COURT:  -- is obviously, I think, described by

24  you and by Mr. Hengel as a -- as, functionally, a competitive

25  disadvantage because you weren't offering yield or in -- or,

1  functionally, interest, and you weren't necessarily

2  advertising.

3          How did Bittrex generate new clients or

4  relationships in the absence of the kind of marketing blitz

5  that featured, you know, "fortune favors the brave" and all

6  of that, and Tom Brady and all of those people?

7          MR. KIRPALANI:  Right.  I mean, my

8  understanding -- and like I said, we have Mr. Hengel here, to

9  the extent he can address the Court's question.  But my

10 understanding was it was, you know, designed to be best in

11 class security and resistance to hacking.

12         THE COURT:  Sure.

13         MR. KIRPALANI:  Bittrex has never been hacked.

14 And I think people who were looking for a safe place to put

15 their investments chose Bittrex for that reason.

16         But Mr. Hengel, could you respond to the Judge's

17 question, if you know?

18         MR. HENGEL:  Yeah, I think your answer was perfect

19 Susheel.

20         I think, you know, look, the -- it -- the founders

21 of the business had a background in data security, and so I

22 think it naturally attracted those -- particularly in the

23 infancy of bitcoin and other crypto back in 2015, 2016, and

24 2017, that were growing, I think there was, you know, a

25 little bit of nervousness in terms of, you know, going out

1 and, you know, putting a significant amount of funds, you

2 know, out there in a nascent industry.  And so, you know,

3 that was kind of before the advertising blitz.  And I think

4 people -- as that nervousness subsided as the industry aged,

5 I think people, you know, ended up flocking to other product

6 features that maybe Bittrex wasn't willing to offer.

7           THE COURT:  Right.  Thank you, Mr. Hengel.  I

8 appreciate it.

9           Mr. Kirpalani, you may proceed.  Sorry for the

10 interruption.

11          MR. KIRPALANI:  No.  Thank you.  It's helpful,

12 really it is.  I hate to just drone on.

13       (Laughter)

14          MR. KIRPALANI:  The -- you know, I already

15 mentioned the regulatory environment.  But just to state the

16 obvious, when those other lending crypto exchanges imploded,

17 it froze out customer funds.  And that, of course, invited a

18 lot of public outcry, political outcry in D.C., within the

19 states.  It seems like every single regulatory agency was

20 looking for what they could do to help customers ensure that

21 this wouldn't happen to them, and so there's been increased

22 scrutiny and Bittrex has certainly not been exempt from that.

23          There's just a chart on Page 17 to show you the

24 volatility of key coin prices.

25          THE COURT:  Okay.

1     MR. KIRPALANI:  And as Your Honor was just

2  alluding to, on Slide 18 we can show you that, in 2017,

3  Bittrex was the number two behind Binance, number two crypto

4  exchange by volume.  And now we've fallen all the way down to

5  33.

6     THE COURT:  Okay.

7     MR. KIRPALANI:  Okay.  2022 has been, you know, a

8  story unto itself.  It's a turbulent year for the crypto

9  industry.  It's resulted in a sharp decline and various

10  bankruptcies, one of the most surprising of which was filed

11  in this district, of course, FTX, in November.

12     And then, more recently, in the Voyager case, in

13  March, Voyager confirmed its plan.  That's before Judge

14  Michael Wiles in the Southern District of New York.  And then

15  the District Court granted a stay, preventing implementation

16  and consummation of the plan, pending the Government -- it

17  was the Department of Justice's -- appeal from confirmation.

18     And then, following that, the buyer of Voyager's

19  assets backed out of its 1.3-billion-dollar deal to acquire

20  those assets, and that was Binance.

21     So, in the U.S. alone, Your Honor, there are at

22  least eight different regulatory bodies working on rules and

23  regulations around the classification of tokens, tax

24  reporting, KYC, anti-money laundering.  And following the

25  ongoing collapses, what we've been seeing is what we would

1  refer to on the company side as "regulation by enforcement,"

2  without clear guidelines.

3          So, speaking specifically about Bittrex -- on

4  Slide 22 for reference -- during the first quarter -- I'm

5  sorry -- during the third quarter of 2022, Bittrex U.S.

6  settled with FinCEN and OFAC.  And as I mentioned, we agreed

7  to pay more than $24 million and $29 million respectively.

8  Although, as noted, there is a credit, so that the total

9  amount is only 29 million.

10          And between November '22 and the first quarter,

11  following FTX's collapse, BUS received several audit requests

12  from state regulators in connection with money transmitter

13  licenses, or MTLs, that we need to operate according to the

14  states in their jurisdictions.

15          The SEC, as I mentioned, served us with a Wells

16  notice and then commenced litigation.

17          Prior to the litigation being commenced, we did

18  appoint a disinterested director, Timothy Pohl.

19          And at the end of March, as I mentioned, we

20  announced the decision, difficult decision to wind down U.S.

21  operations and begin to make customer assets available for

22  withdrawal.  We put in the notification that it would be

23  available until April 30th.

24          The -- we are going to attempt to ask the Court

25  for approval to allow them to continue withdrawing.  It

1   will -- the motion has not yet been filed, but that's the one

2   additional motion that Mr. Brady was referring to.

3             THE COURT:  Okay.

4             MR. KIRPALANI:  The concept -- I'm not arguing it

5   today at all.  I just wanted to preview it for everybody.

6   The concept is simple.  It's pretty common in bankruptcy

7   cases that, when someone has a priority claim and it would

8   serve an injustice or unfairness or an onus on those third

9   parties to await confirmation of a plan to get those

10  payments, those payments are routinely granted.  This is

11  different.  I'm not going to say it's not.  It's clearly pre-

12  petition claims.

13            Customers, however, may take the position that

14  they actually own the assets and they're not a creditor of

15  the debtor.  We think otherwise, Your Honor.  But we do note

16  that we have sufficient assets in our matched book to make

17  sure everybody gets back the tokens that they invested on our

18  platform.  And we would ask the Court for approval to

19  continue allowing customers to make their withdrawals even

20  post-bankruptcy.

21            But the notice that we sent out on April 1st or

22  March 31st told people to try and hurry and get their

23  deposits back prior to April 30th, so that, to the extent

24  they were able to do so, they wouldn't be potentially

25  impacted by a delay of the bankruptcy.  And we're going to,

1 obviously, continue to try to push our plan forward as soon

2 as possible to minimize that disruption, as well.

3          THE COURT:  Obviously -- I appreciate the

4 description.  Obviously, Mr. Brady touched on this and you've

5 expanded a bit, and I think I understand the context in which

6 the debtor is proposing to file and seek that relief.  As you

7 noted, it is not a today issue.  And so, you know, I will

8 deal with that motion and any concerns or objections when

9 that motion is filed.  But I appreciate getting a little bit

10 of context.

11          If I could ask you a question at this point.

12          MR. KIRPALANI:  Sure.

13          THE COURT:  Mr. Hengel's declaration describes a

14 category of customer that has, for lack of a better phrase,

15 gone dark on the company.  What -- you know, again, it --

16 those are people that have assets at the exchange or with the

17 company --

18          MR. KIRPALANI:  Yes.

19          THE COURT:  -- and are not being responsive.  Is

20 there a game plan for them?  Hopefully, you know, when they

21 see something with a heading that says, "bankruptcy

22 proceeding," they will wake up and act.  But we -- you know,

23 sometimes this creates a challenge in a variety of different

24 circumstances.

25          And obviously here, I think, from Mr. Hengel's

1  declaration, the company is holding and acknowledges that

2  it's holding these assets or that there are claims there.  Is

3  that something that we need to -- or I think I'd like to know

4  if there's anything further I need to know about that.

5          MR. KIRPALANI:  Well, Your Honor, I'm glad you

6  asked that question.  So the -- there is, we believe, going

7  to be a substantial amount of what we would call "unclaimed

8  property" in the estate.  And we are hopeful -- and we will

9  do everything within our power -- that we can reach customers

10 who, for whatever reason, have gone dark.

11         We have attempted, outside of bankruptcy, using

12 whatever identification and means to track people down are

13 available to us, to find them, to encourage them to move

14 their assets to a different wallet on a different platform or

15 back to their own personal wallets, and it's been

16 unsuccessful.

17         The Malta entities, you know, just as an example,

18 they have been dormant for years.

19         THE COURT:  Right.

20         MR. KIRPALANI:  And we still have tens of millions

21 of dollars of assets.

22         So there will be, obviously, a bar date that will

23 be approved by the Court, notification that would be approved

24 by the Court and by the Office of the U.S. Trustee.  We're

25 going to do whatever we can and we're going to give them as

1  much time as the Court believes is appropriate to try to

2  claim that property.

3          To the extent it's not claimed, you know, our view

4  is it will be property of the estate.  There will be other

5  creditors we've got to satisfy, including regulators.  And

6  you know, we may contest some of the regulators' claims, and

7  likely will be contesting, I'm pretty sure, the SEC's claim.

8          But you know, that is what our overall plan is for

9  dealing with and trying to reconcile parties' entitlement.

10         THE COURT:  Okay.  Well, I was busting your chops

11 a little bit earlier on the DIP about, you know, something

12 completely new under the sun.  But actually, we have

13 addressed many, many times debtors that are holding assets or

14 have identified claimants that are simply unresponsive.  And

15 there are certainly tools and mechanisms that exist to deal

16 with that challenge, and I'm making no comment on any of

17 that.

18         And you're right, you had touched on the debtors,

19 obviously will think through it.  I expect the U.S. Trustee

20 will be deeply involved, other stakeholders, and certainly a

21 committee, to the extent that it's appointed.  So, again,

22 that's not a today issue, but I could certainly anticipate

23 that that would be a meaningful feature for the proceedings

24 later in this case.

25         MR. KIRPALANI:  Yes, Your Honor.

1           THE COURT:  Okay.

2           MR. KIRPALANI:  So you asked a bit about our

3   overall time line for the plan.  So we have filed it.  Again,

4   the purpose of filing it now was really to try to give

5   assurance to our customers as to what our intentions are.

6   That's May 8th.

7           By May 28th, we will file our schedule of assets

8   and liabilities and statement of financial affairs.

9           By July 7th, we plan to file our disclosure

10  statement.  And to the extent we have to amend the plan --

11  most likely we will in some sense have to do so -- we'll do

12  it by then.

13          We're going to be seeking an August 6th bar date

14  for all creditors, other than governmental entities.

15          And we'll be seeking an August 16th disclosure

16  statement hearing, or thereabouts, Your Honor.  We're not,

17  you know --

18          THE COURT:  Sure.

19          MR. KIRPALANI:  -- wedded to --

20          THE COURT:  I understand.

21          MR. KIRPALANI:  -- any dates.  Whatever works for

22  the Court's schedule.

23          The voting deadline will be sometime in the middle

24  of September.

25          End of September confirmation hearing.

1          Hoping to get out bankruptcy by October 5th or

2   thereabouts.

3          We do note, however, that, under the rules, we

4   have to provide until November 4th for the governmental bar

5   date.  This could be an issue for us.  We do note that, like

6   I said, it was helpful, frankly, that the SEC filed their

7   complaint in Seattle because it finally gives us some insight

8   as to what unliquidated claims they're seeking to assert

9   against the debtors, and including some nondebtors.

10          And you know, depending -- we had engaged --

11   without going into any detail, of course, we had engaged in

12   some negotiations with the SEC to try to resolve consensually

13   that potential claim.  It didn't conclude pre-bankruptcy.  We

14   hope to continue that dialogue.  If we can't reach a

15   consensual resolution, you know, we'll have to see what it

16   does with respect to delaying the administration of the case

17   and what our rights are under the Bankruptcy Code with

18   respect to dealing with those types of claims.

19          But certainly, we're not seeking to impede,

20   without seeking any court approval at least, their ability to

21   regulate or do what it needs to do, which they're exempted

22   from the automatic stay, the right to do.

23          THE COURT:  Okay.

24          MR. KIRPALANI:  Okay.

25          THE COURT:  I -- and just to be clear because I

 1  know that we've got many, many parties that are

 2  participating, and I assume others are getting up to speed

 3  and will see this transcript, I appreciate getting the

 4  debtors' vision of a roadmap and a game plan.  But you know,

 5  I think, Mr. Kirpalani, as you said just a moment ago, this

 6  is the debtors' plan.  It's helpful for me to see both the

 7  plan and the debtors' expectation of where it would like to

 8  go, but all of this is entirely subject to further

 9  proceedings and to the rights of all parties.  So I want to

10  be clear parties don't need to feel that they need to reserve

11  their rights about timing of a disclosure statement, et

12  cetera.  But again, I appreciate getting a -- getting the

13  debtors' view of where it would like to see the case go, and

14  we'll go from there.

15          MR. KIRPALANI:  Thank you, Your Honor.

16          I don't have to spend much time on the plan.  I

17  think I've already talked to you a bit about the overall

18  structure of it, and I think we can get on with the agenda

19  for the hearing.  I appreciate the Court giving me the

20  opportunity to give you our perspective, as you said

21  correctly.  It's certainly not, you know, necessarily the

22  only perspective, but it is ours.

23          I would like to -- I'm going to come back at the

24  end to do the post-petition financing motion.

25          THE COURT:  Sure.

1        MR. KIRPALANI:  But until then, I would like to

2    defer to my partner Patty Tomasco, who can let us know who's

3    going to be handling the various items.

4        THE COURT:  That sounds fine.

5        MR. KIRPALANI:  Thank you.

6        THE COURT:  Before we turn to the motions

7    themselves, again, we've covered a lot of ground.  And I

8    think I've given my admonition that, again, it's helpful to

9    me to hear the debtors' view and vision.  And the declaration

10   has been admitted, again, for the limited purposes of today.

11   But I would ask if there's anybody else that wishes to be

12   heard or to address the Court generally before we turn to the

13   various motions that are before the Court.

14       (No verbal response)

15       THE COURT:  Well, I'll call that a good sign.

16       Ms. Tomasco, good afternoon.  Good to see you.

17   Welcome -- or good morning.  I'm sorry.

18       MS. TOMASCO:  Thank you, Your Honor.  Can you hear

19   me okay?

20       THE COURT:  I sure can.  Thank you.

21       MS. TOMASCO:  All right.  Your Honor, this is

22   Patty Tomasco, also with Quinn Emanuel, proposed counsel for

23   the debtors and debtors-in-possession.  And thank you again

24   for accommodating these first-day motions.

25       We're going to move through the agenda.  And I'm

1   happy to say that the people who are going to be presenting

2   are largely the people who wrote the motions, and so they get

3   the additional work of presenting them to you today.  And I'm

4   in the same -- I know, it's sort of like winning the pie-

5   eating contest and we get more pie.

6               THE COURT:  There's more pie.

7               MS. TOMASCO:  More pie.

8               THE COURT:  There's always more pie in this

9   business.

10              MS. TOMASCO:  Correct.

11              So I'm handing off the actual podium, not a

12  virtual one, with -- to Ms. Joanna Caytas, who is in our

13  Houston office, followed by Alain Jaquet and Razmig

14  Izakelian, and then I have a couple of motions myself, and so

15  I'll be back, Your Honor.  And I'm going to turn it over to

16  Joanna Caytas.

17              THE COURT:  That's fine.  I'm happy to go in any

18  order that the parties wish.

19              Good morning.

20              MS. CAYTAS:  Good morning, Your Honor.

21              MS. TOMASCO:  Oh, she's too tall.  Sorry.

22              THE COURT:  No worries.

23         (Participants confer)

24              THE COURT:  You may proceed.

25              MS. CAYTAS:  Good morning, Your Honor.  This is

 1  Joanna Caytas of Quinn Emanuel, proposed counsel to debtors

 2  and debtors-in-possession.

 3         Your Honor, with the Court's indulgence, we will

 4  address today's motions in the order as they appear on the

 5  agenda.

 6         The first motions that we have on the agenda is

 7  Item 4, which was filed at Docket Item 2, and that's the

 8  debtors' motion for joint administration.

 9         By this motion, the debtors request that the four

10  cases be jointly administered under the caption of Desolation

11  Holdings, LLC, to allow for efficient administration pursuant

12  to Rule 1015(b).

13         The debtors are affiliates here.  The four

14  entities have common direct or indirect ownership.  And the

15  debtors believe that the joint administration of these cases

16  will permit the efficient and convenient administration of

17  these matters.

18         Most of the notices, applications, hearings in

19  these cases will affect each and every debtor in these cases.

20  Absent joint administration, it would result in numerous

21  duplicative filings.

22         The motion, Your Honor, of course only requests

23  administrative and non-substantive consolidation of these

24  cases; thus, joint administration does not adversely affect

25  the debtors, creditors, or other stakeholders.  Rather,

1  constituents stand only to benefit from joint administration

2  through cost reduction and efficiency gains.

3          Support for this declaration [sic] was provided in

4  the declaration of Evan Hengel in support of Chapter 11

5  petitions, filed at Docket Item 11, at Page A-1, Paragraphs 1

6  and 2.

7          Your Honor, the U.S. Trustee reviewed the motion

8  and did provide specific comments, but he did provide global

9  comments to proposed orders, for which we thank the U.S.

10 Trustee.  And the debtors incorporated such comments and the

11 conforming form of order was filed at Docket Item 2 at

12 Exhibit A.

13         Unless Your Honor has other questions, we are

14 request entry of the joint administration order.

15         THE COURT:  I do not have any questions.

16         I would ask if anyone wishes to be heard with

17 respect to the debtors' request for an order authorizing

18 joint administration.

19     (No verbal response)

20         THE COURT:  Very well.

21     I'm going to grant the motion.  I agree with counsel

22 that this relief is standard in cases in this jurisdiction

23 with multiple debtors filing.

24         I also note that the relief provided will ease the

25 burden, both on stakeholders, as well as the Court, in

1  providing a single documentary under which to -- or a single

2  case number under which to look for activity in these

3  proceedings.

4          So, based upon the record before me, I'm satisfied

5  the motion is well founded.  The motion is granted, the order

6  will issue.

7          MS. CAYTAS:  Thank you, Your Honor.

8          Your Honor, the next motion on the agenda is Item

9  5, which was filed at Docket Item 3, and this is the debtors'

10  application to retain Omni Agent Solutions.

11          The debtors by this motion seek to employ and

12  retain Omni as a claims and noticing agent effective nunc pro

13  tunc to the petition date pursuant to 28 U.S.C., Section

14  156(c).

15          Attached to the motion as Exhibit B is the

16  declaration of Paul Deutch, Executive Vice President of Omni.

17  Mr. Deutch is on the Zoom hearing today and is available to

18  answer any questions.

19          THE COURT:  All right.

20          MS. CAYTAS:  Your Honor --

21          THE COURT:  You may --

22          MS. CAYTAS:  Your Honor --

23          THE COURT:  -- proceed.  Go ahead.

24          MS. CAYTAS:  Your Honor, the debtors anticipate

25  that there will be hundreds of thousands of creditors in

1   these Chapter 11 cases.  In light of the number of

2   anticipated claimants and the complexity of the debtors'

3   businesses, the debtors submit that appointment of a claims

4   and noticing agent, required by Local Rule 2002.1(f), is in

5   the best interests of both the creditors' estates -- of the

6   debtors' estates and the creditors.

7           By appointing Omni, the distribution of notices

8   and processing of claims would be expedited and the Office of

9   the Clerk and the Bankruptcy Court will be relieved of an

10  administrative burden of what would otherwise could be an

11  overwhelming number of claims and contacts.

12          In selecting Omni, Your Honor, the debtors

13  obtained and reviewed proposals from two other court-approved

14  claims agents (indiscernible) selection was for a competitive

15  process and in accordance with the claims agent protocol.

16  The debtors believe that Omni is qualified due to its

17  significant experience in both legal and administrative

18  aspects of large and complex Chapter 11 cases.

19          The debtors further submit, Your Honor, that nunc

20  pro tunc relief is appropriate because Omni has provided and

21  continues to provide valuable services to the debtors'

22  estates in this interim period.

23          Further support for this motion was provided in

24  the declaration of Evan Hengel in support of Chapter 11

25  petitions filed at Docket Item 11, at Pages A-1 through A-2,

1  Paragraphs 3 through 5.

2         The debtors did receive informal comments on

3  Omni's retention application from the United States Trustee,

4  for which the debtors thank the United States Trustee.  The

5  debtors addressed these comments in the form of order that

6  was filed at Docket Item 3 at Exhibit A.

7         Unless Your Honor has any questions, we would

8  respectfully request that the order be entered.

9         THE COURT:  I do not have any questions.

10         I would ask if anyone wishes to be heard with

11  respect to the debtors' request to retain Omni as the

12  debtors' claims and noticing agent.

13     (No verbal response)

14         THE COURT:  Very well.

15         I see Mr. Deutch in the Zoom room.  Good morning,

16  sir.  It's good to see you.  It's been a while.

17         Very well.  Hearing no response, I'm going to

18  grant the motion.

19         I do find, as counsel observed, that this case in

20  particular certainly requires the services of an able claims

21  and noticing agent, given the scope and range of the

22  potential stakeholders and claimants in these proceedings.

23         I also note that this case certainly meets the

24  requirement under our local rules that a case of this size is

25  obliged to obtain a claims and noticing agent within the

1   first 30 days of the case.

2           The Court is certainly familiar with Omni Agent

3   Solutions and has no concerns with respect to its ability to

4   perform the services that have been described.  I have had an

5   opportunity to review Mr. Deutch's declaration, as well as

6   the engagement agreement.  I find both are consistent with

7   established practice in this jurisdiction and compliant with

8   our local rules.

9           This motion is granted and the order will issue.

10          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

11          MS. CAYTAS:  Thank you very much, Your Honor.

12          I will now turn the virtual podium to my colleague

13  Alain Jaquet, who will address the next item on the agenda,

14  Item 6.

15          THE COURT:  Very well.

16          MR. JAQUET:  Good morning, Your Honor.

17          THE COURT:  Good morning, Mr. Jaquet.

18          MR. JAQUET:  I'm Alain Jaquet with Quinn Emanuel,

19  proposed counsel for the debtors and debtors-in-possession.

20          As my colleague said, I'll be presenting Item 6 on

21  today's agenda, which is the service via email motion.  The

22  original proposed order is under Docket 4, which has been

23  revised and shared with the Court this morning.

24          Regarding this motion, we received three comments

25  from the U.S. Trustee:

1            The first comment was to delete certain language

2    regarding the relief being in the best interests of the

3    debtors, their estates, and the creditors.  We have

4    implemented that in the proposed order.

5            The second comment relate to the U.S. Trustee

6    requesting that the order is an interim order.  This is also

7    reflected in the proposed order.

8            And the third and last comment was on whether the

9    debtors have agreement for the customer to serve via email,

10   instead of regular mail.  In that regard, yesterday we shared

11   the term of services relating to Bittrex and Bittrex Malta

12   with the U.S. Trustee.  These agreements, under the relevant

13   articles, provide the customer consent to receive

14   electronically, including via email, all communications.

15   Then, following the transmission of this agreement, we

16   didn't -- we did not receive other comment from the U.S.

17   Trustee in writing.

18           Regarding the requested relief, this motion seeks

19   to modify the service requirements under Bankruptcy

20   Rule 2002(g), to permit email service to customer and other

21   creditors.  The statutory basis for the relief is

22   Section 105(a) of the Bankruptcy Code.

23           Here, as has been said, there are hundreds of

24   thousands of creditors, and almost all of them are customers.

25   Service via email is consistent with the way the debtors and

1  the customer communicated prior to the petition date, which

2  is via electronic means.  Also, email communications are the

3  most effective means to communicate with the debtor customer

4  who are technologically savvy and based in the United States

5  and abroad.  Service via email would be also really cost-

6  efficient compared to use of regular mail.  As we said, the

7  volume of creditors is really, really high, substantial.

8          Finally, under the term of service, the customers

9  agreed to the electronic transmission of any type of

10 communications.  And the Courts in this District have granted

11 similar relief to the one sought.  For example, recently, In

12 Re FTX Trading Ltd., Case Number 22-110678, January 9, 2023,

13 Docket 425, which authorize on final basis debtor to serve

14 over 100,000 creditors via email under the same conditions

15 that we propose.

16         The evidentiary support to this motion is Exhibit

17 A to the first-day declaration, Page 8, Paragraphs 18 and 19,

18 Docket 11.

19         And based on all of the above, unless the Court

20 has any question, we respectfully request entry of the

21 interim order under Docket 4, as revised.

22         THE COURT:  Thank you.

23         MR. JAQUET:  Thank you, Your Honor.

24         THE COURT:  Thank you, Mr. Jaquet.  I would

25 like -- or Jaquet.

1          I would like to hear from Mr. Schepacarter on this

2   motion, if I can.  I think we touched on this briefly a

3   moment ago.  Mr. Schepacarter, good afternoon -- or still

4   morning.  Sorry.

5          MR. SCHEPACARTER:  It's still morning.

6       (Laughter)

7          THE COURT:  It's still morning.

8          MR. SCHEPACARTER:  You got another 19 minutes or

9   so.  Again, Richard Schepacarter for the United States

10  Trustee.

11         I don't want to take up too much time.  Again,

12  this is an interim order, so, as Your Honor likes to say, and

13  I borrow the phrase, I'm keeping my powder dry.  I will do

14  that on this motion.

15         But I do note that the rule -- and Your Honor is

16  familiar with the rule -- 9036 indicates that -- or states

17  that the Clerk can send out notices by electronic means, but

18  if it's another entity -- which is basically, I guess,

19  anybody but the Clerk or the Court's -- the Court, they have

20  to use by -- they have to send it by papers, unless the party

21  has consented --

22         THE COURT:  Can I --

23         MR. SCHEPACARTER:  -- in writing --

24         THE COURT:  Can I --

25         MR. SCHEPACARTER:  -- consented in writing.

1          THE COURT:  Can I ask you --

2          MR. SCHEPACARTER:  So --

3          THE COURT:  -- a question --

4          MR. SCHEPACARTER:  Okay.

5          THE COURT:  -- Mr. Schepacarter?

6          MR. SCHEPACARTER:  Sure.

7          THE COURT:  And this is more an academic

8  discussion, I want to be clear.

9          MR. SCHEPACARTER:  Uh-huh.

10          THE COURT:  I appreciate the practical and

11  cooperative approach that you've taken with the debtor.  I

12  certainly understand the issue and I think everybody is

13  trying to do the right thing and the most practical thing

14  here.  Let me ask you a question, though.

15          MR. SCHEPACARTER:  Sure.

16          THE COURT:  And it's -- it relates to Rule 9036.

17  I have actually worked in a capacity for the Judicial

18  Conference on Rule 9036 and some of the mechanics and issues

19  with respect to service by mail, versus service by email or

20  otherwise.

21          MR. SCHEPACARTER:  Right.

22          THE COURT:  How does -- is there an interplay or

23  has anybody dealt with the question -- and I'm just curious,

24  so it does not really relate --

25          MR. SCHEPACARTER:  Sure.

1          THE COURT:  -- to this.

2          MR. SCHEPACARTER:  Yeah.

3          THE COURT:  But I've had -- you and I have had

4   this discussion before in other cases.

5          As I understand 28 U.S.C., Section 156 --

6          MR. SCHEPACARTER:  Right.

7          THE COURT:  -- Omni will stand, effectively, in

8   the shoes of or as the agent for the Clerk of Court, which is

9   different from somebody filing a motion and deciding I want

10  to serve people -- some third party filing a motion --

11          MR. SCHEPACARTER:  Uh-huh.

12          THE COURT:  -- and saying I want to serve people

13  by email.  Does the agent, the claims and noticing agent, in

14  its agency capacity for the Clerk of Court, stand in the

15  shoes of the Clerk of Court for purposes of whatever rights

16  or powers are accorded under the rules from your office's

17  point of view?

18          MR. SCHEPACARTER:  We haven't -- I have not posed

19  that question internally --

20          THE COURT:  Yeah --

21          MR. SCHEPACARTER:  -- at all.

22          THE COURT:  -- I haven't, and that's why I've been

23  careful to say that --

24          MR. SCHEPACARTER:  And it's --

25          THE COURT:  -- that this is kind of an academic

1  discussion and doesn't drive --

2          MR. SCHEPACARTER:  Sure.

3          THE COURT:  -- our issues today, but I'm curious.

4          MR. SCHEPACARTER:  I mean, it's a good point.  I

5  mean, if they are standing in the shoes of the Clerk and, by

6  doing that, they do -- even I think in cases where there's

7  some, either negligence, or some type of liability, they get

8  to use that qualified immunity that the Clerk's Office would

9  have, they would enjoy.

10          But with respect to whether the clerk somehow,

11  working for the debtor, but also being sort of the quasi-

12  court -- quasi-Clerk's Office, whether they fall under here

13  where it says the clerk may send notice, is, I think,

14  probably a discussion or something for probably a later date.

15          THE COURT:  Well, I'm not trying to put you on the

16  spot, so --

17          MR. SCHEPACARTER:  Yeah.  No, I understand.  And

18  that's actually a good question.  I will --

19          THE COURT:  Okay.

20          MR. SCHEPACARTER:  -- ponder that.  I will --

21          THE COURT:  So, I just want to make sure I

22  understand your position.  With respect to the relief that's

23  being requested, am I correct that you're okay with the

24  debtors' approach for purposes of this interim, but we may

25  have to revisit questions of the mechanics of notice and the

1  sufficiency at a further hearing, especially as we get,

2  perhaps, toward a plan process or a bar date, et cetera; is

3  that correct?

4          MR. SCHEPACARTER:  That is correct, Your Honor.

5          THE COURT:  Okay.

6          MR. SCHEPACARTER:  That is correct.

7          THE COURT:  Yeah, I --

8          MR. SCHEPACARTER:  Some of these items are, you

9  know, big-ticket items like a plan or a disclosure

10 statement --

11         THE COURT:  Sure.

12         MR. SCHEPACARTER:  -- or things of that nature.

13         THE COURT:  You know, it's interesting, and,

14 again, kind of editorializing, you know, one of the

15 challenges that we face is that the rules presume that the

16 gold standard of notices is mailing something hard to

17 somebody.  And I've had -- I don't believe Mr. Deutch has

18 testified, but I've actually had claims agents testifying

19 that are in this business and have reported, you know, people

20 don't open their mail.  They open their email.  And they

21 assume that any and all of the mail that they get is junk.

22         And I've had a different case where the proposed

23 strategy, which just seemed to me to be genius, was rather

24 than mailing the disclosure statement and the plan, it would

25 be this kind of unattributed, anonymous thumbdrive that would

1   arrive in the mail with an encouragement that you stick it in

2   your computer.  And there was a lengthy discussion about

3   whether there was a lot of wisdom there, but all kidding

4   aside, the challenge is providing effective notice to

5   stakeholders in a way that, frankly, won't break the budget

6   of the case.

7            And I would observe that, you know, I appreciate,

8   again, the practicality of your office in certainly

9   vindicating the expectations and requirements of the rules.

10  And I've also observed that, you know, the Court ascribes

11  significance to the position of an Official Committee of

12  Unsecured Creditors on this topic because they have resources

13  and visibility that I don't necessarily have to say with

14  confidence, you know, we need to be mailing to people

15  because, you know, these are an elderly collection of

16  claimants or these are people that don't open their mail --

17  we don't even have hard addresses for them -- and the only

18  way that they expect to be communicated with on this kind of

19  a topic is via electronic communications.

20           So, I mean, I view that as an ongoing dialogue,

21  but understanding your position before I move on any other

22  parties, did you have any other observation or position with

23  respect to the claims and noticing motion?

24           MR. SCHEPACARTER:  Yes, Your Honor, just briefly.

25           Your Honor brought up something about the

1  customers have gone dark that you raised and I think that

2  would be a little bit of a concern.  If the debtor can't get

3  them now, how is it going to get them later on if we're

4  using -- and I'm assuming that they probably use email for

5  almost all of the communications, I would assume sometimes

6  maybe paper, depending on how they operate -- but if they're

7  using that email system to try to contact customers who have

8  assets, arguably, assets with respect to the debtor, like

9  these unclaimed funds, how much are the unclaimed funds and

10  are they going to take any steps to try to contact these

11  persons or entities.  So, I mean, that's, again, probably

12  maybe for the second day, but it's something to think about,

13  especially in the context of these parties being impaired and

14  getting something else other than, I guess, a different type

15  of token of some sort.

16             THE COURT:  Yeah, I agree --

17             MS. TOMASCO:  Your Honor?

18             THE COURT:  I agree with you, and that's why I

19  touched on it with Mr. Kirpalani, because we've all dealt

20  with this issue in different cases.  I certainly, I recall

21  having the issue in Takata with the airbags and we sent

22  out -- that's where we had live testimony about the cost of

23  mailing out 83 million postcards.

24             But I see Ms. Tomasco is perhaps going to educate

25  us a little bit, but, again, my instincts are with you,

1  Mr. Schepacarter.  This is an issue, but I don't think it's a

2  today issue.

3          Ms. Tomasco?

4          MR. SCHEPACARTER:  All right.  Thank you.

5          THE COURT:  Sorry for the interrupt.

6          Ms. Tomasco?

7          MS. TOMASCO:  Your Honor, it's not -- this is

8  obviously something that we've been thinking about for weeks

9  now, working with Mr. Deutch and talking about how many

10 bounce-backs are we going to get through the emails.  It is

11 our current plan that if we get bounce-backs, you know, for

12 our email service, we're going to mail at the last-known

13 address for those parties.

14         At some point in the case, along with the bar date

15 notice, which I think is, you know, for this case, will be

16 the big thing --

17         THE COURT:  Yeah --

18         MS. TOMASCO:  -- is going to be the bar date

19 notice, noticed by publication --

20         THE COURT:  -- to publish.

21         MS. TOMASCO:  -- and all of that kind of thing, to

22 do everything that the Code contemplates or that we can

23 creatively think of to make sure that people know that they

24 need to file a claim or, you know, if the Court grants the

25 motion, get on the platform and withdraw their

1  cryptocurrency.

2         THE COURT:  No, thank you very much for that.

3  And, again, I don't want parties to attribute too much

4  significance to my comments or to my colloquy with

5  Mr. Schepacarter.  This is an issue that we've seen.  I have

6  abundant confidence in the ability of the professionals to

7  navigate through this and to come up with an effective plan,

8  because there are laws of diminishing returns and there are

9  some people that you just can't get ahold of, and then we

10  have discussions about where do we publish and sometimes we

11  publish in very creative places.  But again, I will leave

12  that to the parties and I'll be guided by the parties at the

13  appropriate time.

14         But I think I would ask if anyone else wishes to

15  be heard with respect to the motion requesting an interim

16  order authorizing service of certain parties by email?

17      (No verbal response)

18         THE COURT:  Okay.  I'm going to grant this motion.

19  And, again, consistent with Mr. Jaquet's comments, I find

20  that cause exists for purposes of the interim relief.  The

21  United States has, I think, carefully and wisely observed

22  that there are competing considerations here that will be the

23  subject of further communications and negotiations and

24  dialogue both, with the Court, as well as, likely, a

25  Committee, and the Office of the United States Trustee to

1  address the principles that we've now just been chatting

2  about.

3          But for purposes of today, I'm satisfied that,

4  one, the debtor has demonstrated that it has a contractual

5  relationship with parties that contemplates communication

6  with these parties by email.  That is consistent with the

7  Court's understanding of how this industry would operate as a

8  practical matter.  And I'm prepared to grant this motion,

9  without prejudice, to the raising of any objections or

10 competing considerations, either at a second day hearing on

11 this relief or in the context as, I think Ms. Tomasco said,

12 in the context of a bar date notice or, certainly, the steps

13 related to circulating a plan and a disclosure statement.

14         So, this is not necessarily -- this is certainly

15 not the end of the discussion on this topic, but for purposes

16 of today, I'm satisfied that the debtors have carried their

17 burden.  This motion is granted and the order will issue.

18         MS. TOMASCO:  Thank you, Your Honor.

19         So I'm going to take the virtual podium back from

20 Mr. Jaquet.  The next item on the agenda is Item 7 [sic],

21 which pertains to ECF or Docket Item 5.  This is the motion

22 for an order seeking to allow the debtors to maintain a

23 consolidated list of creditors, to file a consolidated list

24 of the 50 largest creditors, and to withhold or omit certain

25 confidential information, and to establish notice procedures.

1         Your Honor, we did work with the U.S. Trustee.  We

2   understand that their objection to this is the redaction or

3   the omission of personally identifiable information, as

4   contemplated by Section 107(c).  The rest of the relief that

5   we're seeking here is fairly routine.  We filed the top-50

6   list.  As you'll see, many of the customers are listed as

7   "contingent" because they have not filled out their KYC

8   information or they haven't provided us with the information

9   that we need to verify their identity and for the debtors to

10  comply with the various regulations.

11        So, if Your Honor agrees with me that most of the

12  relief that we seek is routine and that the only thing that

13  we're arguing about is the omission of personally identifying

14  information, I can go to that argument.

15        THE COURT:  I think that that would be

16  appropriate.  It does seem to me that most of this is routine

17  and the focus on sealing or protecting the creditor

18  information is the nub of the discussion.  And I know that

19  Dorsey dealt with this, I think, and you've quoted him in

20  your papers at paragraph 17.

21        You may proceed.

22        MS. TOMASCO:  Thank you, Your Honor.

23        And the reason why, you will hear throughout the

24  case that this is not the lawyers; this is the client.  The

25  client wants to pay back its customers and the client wants

1    to protect the customers from the effects of this Chapter 11,

2    to the greatest extent possible.  That is their mission and

3    it is our mission, as well.

4           Now, imagine, and if you'd look at the top-50 list

5    that's attached to Mr. Hengel's declaration, you will see

6    that the largest individual creditor holds about $14 million

7    worth of crypto, okay.  Imagine if we published his name, his

8    email address, and the fact that he's holding $14 million

9    worth of crypto, what do you think that would happen?

10          What would happen is he would get a slew of

11   phishing emails, hacking attempts, that sort of thing,

12   because that's a pretty hefty prize for, you know, some

13   pretty low-tech, you know, skullduggery.  And for that

14   reason, I think it's highly appropriate in this case to

15   follow what Congress has set out for us under Section 107,

16   and that is that we redact that information.

17          Now, obviously, we're going to give it to the U.S.

18   Trustee and we hope the U.S. Trustee, you know, contacts this

19   gentleman with $14 million worth of crypto on the platform

20   and gets him on the Committee and we can figure out who he

21   is.  But the problem that I have is, I don't understand the

22   objection.  I really don't.  And so, you know, that example,

23   alone, shows why we should not be publishing this

24   information, particularly in this case that's so acute.

25          Now we've cited cases in our papers, the <u>Charming</u>

1  Charlie case, where, you know, a stalker found the address of

2  his victim by looking at the information that the U.S.

3  Trustee and the Court agreed should be made public.  We have

4  the case, In re Celsius that we cite in our papers that had,

5  specifically, an entire docket entry devoted to the phishing

6  attempts that were visited on those customers because their

7  names were published because of the orders of the Court and

8  the U.S. Trustee.  We do not want that to happen here.

9          Now, in addition, Your Honor, as you may note, we

10  also have the Malta entities whose customers are primarily

11  outside of the U.S. and primarily in the EU or in Great

12  Britain or in other countries that have adopted the

13  equivalent of the GDPR, which I'm sure the Court is familiar.

14  Those regulations are also designed to protect people from

15  hacking and phishing and all of the other things that happen

16  when their information gets out there in the public domain.

17          So against this legitimate, very legitimate

18  concern for the protection of its customers, the U.S. Trustee

19  proposes that 107(c)(1) cannot be applied to the debtors'

20  customers and I would say I disagree for the reasons that I

21  stated.

22          In addition, even under 107(b), while the debtors

23  are winding down, their customers lists still have value, and

24  for that reason, they're also protected under 107(b) as

25  proprietary information.

1          Unless Your Honor has any questions, we

2   respectfully request that the order be entered.  I will note

3   that the modified order does take out the sentence in the

4   order that says that it's in the best interests of the

5   debtors, their estates, and their creditors.  We believe it

6   is, but we're happy to take it out of the order.

7          THE COURT:  All right.

8          Mr. Schepacarter?

9          MR. SCHEPACARTER:  I'm not as quick on the buttons

10  as I used to be.

11          THE COURT:  No, that's all right.

12      (Laughter)

13          MR. SCHEPACARTER:  Again, Richard Schepacarter for

14  the United States Trustee.

15          We don't take issue with respect to sealing the,

16  or redacting, I guess you want to call it, the addresses and

17  the email and the like.  Our issue is with respect to the

18  names and our position is that that doesn't fall under the

19  PII aspect.  Like, you can have a name, for example, if they

20  were going to -- well, take the Charming Charlie, for

21  example, somebody was stalking somebody.  So you see the

22  name, that doesn't necessarily mean that you're going to know

23  where that person is; it just means that name is listed

24  somewhere on the list of creditors.

25          It's not -- and just listing the creditors or the

1  names on the creditor matrix isn't the -- doesn't fall under

2  the aspect of being some type of customer list that could

3  fall under commercial information under that portion of

4  Section 107.

5          The GDPR, I mean, I understand that it may affect

6  people, but I think in the Celsius case -- I think it's the

7  Celsius case if I have it right -- is the Court there

8  basically said the GDPR doesn't cover, doesn't trump

9  bankruptcy law.  It's just not applicable.

10          THE COURT:  Can I ask you a question?

11          MR. SCHEPACARTER:  Sure.

12          THE COURT:  I certainly understand the bid and the

13  ask, and I squarely understand the issue that's being raised,

14  and, again, the interests that you're attempting to protect,

15  Mr. Schepacarter.

16          If I'm not mistaken -- I guess I have a procedure

17  question.  If I'm looking at Dorsey's order from FTX, and I

18  believe Judge Glenn -- Chief Judge Glenn's order from

19  Celsius, neither of those orders directing disclosure were

20  entered on day one.  I think they were the subject of further

21  proceedings and briefing --

22          MR. SCHEPACARTER:  Correct.

23          THE COURT:  -- by the parties, because I believe,

24  especially in the Celsius case, and all I know is what I read

25  in the reports, there was briefing, particularly on issues of

1  European privacy laws and others.

2          MR. SCHEPACARTER:  Uh-huh.

3          THE COURT:  So my guess is that those were not

4  today issues or were not day-one issues.

5          MR. SCHEPACARTER:  That's correct.

6          And we would -- not to interrupt you -- but we

7  would -- this is an interim order --

8          THE COURT:  Okay.

9          MR. SCHEPACARTER:  -- so, again, we would want to

10  be able to brief it later, at a later time.  I think that in

11  FTX there was what I'll call "substantial briefing" with

12  respect to that issue.  So, we would reserve that right.

13          But today, at least for the interim, we just

14  wanted to bring up these issues with respect to, basically,

15  the name of the customer or the client or creditor should not

16  be redacted.  And that also holds true or mostly holds

17  true -- even truer, if I could say -- make up a word, that

18  for entities, corporations, businesses, why are those

19  names -- where's the privacy issue there?  That's what I

20  don't see, so --

21          THE COURT:  So, here's what I think -- here's the

22  way that I think I'd like to proceed.  As you might tell from

23  all of at discussions that we've had on this and the prior

24  motion, I've dealt with these issues many, many times and

25  there are legitimate, competing interests.  And, again,

1  Mr. Schepacarter, your office, I think, has been careful and

2  assiduous to try to be both, practical, but faithful to the

3  Code.

4          Ms. Tomasco's concerns, you know, she's certainly

5  pushing an open door.  And this is a little bit different in

6  some ways because it's one thing to say in a typical case

7  that you've got a $10 million claim against the company.  Who

8  knows how that might be paid.

9          In this instance, and, again, not to oversimplify

10 what is an exceedingly complicated industry and asset, but

11 the argument, and Ms. Tomasco, I think, touched on this, is

12 that this would be a public filing and somebody has an asset

13 that's worth $14 million and her concern is that party did

14 not necessarily sign up to tell the world that they had it.

15          And, again, we are cognizant of the change where

16 there was a day, from my lights, not that long ago, where if

17 you wanted to find out who the creditors were, you went into

18 the Clerk's Office and you looked through three telephone

19 book stacks of lists.  Right now, it's -- experience teaches

20 that these are easily searchable and scannable.

21          That doesn't answer the question that we have for

22 purposes of rules that may not necessarily be responsive to

23 these issues.  But for purposes of today, I am not prepared

24 to require that the debtor put in names of the individuals.

25 I appreciate that the United States Trustee is attempting to

1  try to meet the debtor halfway, but there are bad actors out

2  there and I'm not certainly judging the question when it's

3  ultimately presented to me on briefing, but if we put

4  someone's name out there where it's indicated that that

5  person has an asset that's worth millions of dollars and,

6  arguably, easily transferable or reachable, somebody is going

7  to put the effort into finding out who that person is whether

8  you have their address or not.

9       And, again, I want to be clear in overruling the

10 trustee's request to include the names today, that this is,

11 as Mr. Schepacarter, again, carefully noted, an interim

12 order, and I'm an open book on these issues.  Judge Glenn

13 dealt with the issues.  Judge Dorsey dealt with the issues.

14 Other courts are dealing with this and have landed in

15 different spots.

16       I will be guided by capable counsel.  And, again,

17 this is, as I mentioned a moment ago, the sort of thing where

18 the Court also looks and ascribes significance to the

19 position of an Official Committee if we have one.  They are

20 the fiduciary for those stakeholders, and so the concerns are

21 not necessarily hypothetical.

22       And, again, I appreciate Ms. Tomasco's observation

23 that this is not the lawyers' argument.  This is a principal

24 and a business position from the debtors that this is

25 consistent with how they run their business and the

1  expectations of the parties.

2         Mr. Schepacarter is not wrong to say that those

3  expectations are potentially impacted by a bankruptcy filing,

4  but not today.  So the debtor has asked to seal these issues

5  on an interim -- this information on an interim basis.  I'm

6  prepared to grant that and I would be prepared to entertain

7  the issue at a further hearing if need be, and if it can't be

8  resolved between and among the parties, okay.

9         MR. SCHEPACARTER:  Thank you, Your Honor.

10        THE COURT:  Sure.  Thank you.

11        Ms. Tomasco?

12        MS. TOMASCO:  Thank you, Your Honor.

13        Next on the agenda, we're going to address Docket

14  Item 6, which is the Agenda Item 8 [sic].  This is the motion

15  for the imposition of the worldwide stay, which is sometimes

16  called a "comfort order."

17        We are not trying to expand the scope of the

18  automatic stay.  We are grateful that the U.S. Trustee

19  reached out and made some changes to the proposed order.  I

20  don't know that we have any disagreement on those changes.

21  We've incorporated them and they are before the Court.  If

22  you would want me to read through them, I can explain what

23  they are.

24        THE COURT:  Actually, given that it's a first day,

25  I have reviewed them.  If you want to briefly do a turn on

1  it, that would be fine.  I have reviewed them and I had no

2  issue with them, but there are parties that are participating

3  that may have not seen them, so -- and, again, as always, I

4  certainly see Mr. Schepacarter's comments as being helpful

5  and practical.

6          You may proceed.

7          MS. TOMASCO:  Thank you, Your Honor.

8          On page 2 of the order in the preamble, we are

9  omitting the part where the Court finds that the motion is in

10 the best interests of the debtors, their estates, and

11 creditors.

12         THE COURT:  You know, can I ask a question,

13 actually, Mr. Schepacarter?  I've not seen this issue or this

14 language raise concerns with your office.  If this is

15 something new, then fine, if there's something peculiar about

16 this case.  But Ms. Tomasco has accommodated the request to

17 take it out, but arguably, I'm considering a debtors' motion.

18         Around I obliged to find that the relief is

19 actually in the interests of the debtors' estate or is there

20 an interest that we're -- is there a consideration that we're

21 trying to protect against that I don't necessarily perceive?

22         MR. SCHEPACARTER:  Good question, Your Honor.

23     (Laughter)

24         MR. SCHEPACARTER:  I know we've taken it out in a

25 number of cases.  I think part of the problem is that on a

1  limited record, that finding just can't -- just, the findings

2  can't go that far to say that it's in the best interests of

3  the estate, unless the Court probably makes a number of

4  different additional factual findings that aren't part of

5  this record, so --

6          THE COURT:  Okay.  Well, I appreciate the concern.

7  I guess my observation -- we're not going to belabor the

8  point here --

9          MR. SCHEPACARTER:  Right.

10         THE COURT:  -- Ms. Tomasco has been kind enough to

11 agree to take the language out.  And if it's something that

12 is an institutional consideration for your office, I'd be

13 happy to address it in the next case.

14         MR. SCHEPACARTER:  Uh-huh.

15         THE COURT:  I would observe that, to me, I

16 understand the point that you're raising, but I'm struggling

17 to perceive a debtor that comes before me, you know, a month

18 into a case and says, You've got to answer -- you've got to

19 grant the final order.  You've already found that this is the

20 debtors' best interests.  I mean, that's not going to fly.

21         So, I understand the point.  To me, as a practical

22 matter, it seems a little bit academic.  Obviously, to grant

23 relief to a debtor that's requesting it, I need to find that

24 it's in their interests.  Whether it's in their best

25 interests, I don't know --

1          MR. SCHEPACARTER:  Right.

2          THE COURT:  -- but we'll deal -- we'll cross that

3  bridge when we come to it.

4          MR. SCHEPACARTER:  Another question for another

5  day.

6          THE COURT:  We got a --

7          MR. SCHEPACARTER:  Thank you, Your Honor.

8          THE COURT:  Are you keeping a list, because I

9  mean, at some point --

10         MR. SCHEPACARTER:  I am keeping a list.  I've got

11  it going.

12         THE COURT:  All right.

13         MR. SCHEPACARTER:  I have it here.  So, thank you,

14  Your Honor.

15         THE COURT:  Ms. Tomasco?

16         MS. TOMASCO:  Thank you, Your Honor.

17         The next change in the redline is in paragraph 3

18  of the ordered paragraphs and that is with respect to

19  contract counterparties continuing to perform under their

20  contracts, notwithstanding the imposition of the stay or

21  refusing to perform.  Obviously, we believe that refusing to

22  perform under an executory contract when a stay is in place

23  would be a violation of the stay as, you know, in NLRB v

24  Bildisco and Dewey Freight System have found, specifically.

25         But if the U.S. Trustee believes that there's not

1   authority for that sentence, I believe that the stay speaks

2   for itself, as does the U.S. Trustee, and so we took that

3   sentence out.

4         The next redline is my favorite section of the

5   Bankruptcy Code, Section 525, which prohibits governmental

6   units from using their regulation to discriminate against

7   debtors and debtors-in-possession.

8         We took out the language that purported to enjoin

9   those entities, but simply stated that the combination of

10  Section 362 and Section 525 of the Bankruptcy Code prevented

11  them from denying, revoking, or suspending any license,

12  permit, charter, franchise, or other similar grant.  And so,

13  that change is also included in the redline before the Court.

14        The next redline is in paragraph 7, which is

15  restating that this order is not attempting to expand the

16  debtors' rights.  That language has been changed to stating

17  that this order does not expand or enlarge the debtors'

18  rights, nor does it affect or impair the protections afforded

19  or preserved for governmental units under the Bankruptcy

20  Code, which we also agree with.  And that would conclude the

21  redline markup of this order.

22        THE COURT:  Very good.  Thank you.

23        I would ask if anyone wishes to be heard with

24  respect to the debtors' request for, as Ms. Tomasco said,

25  essentially a comfort order, providing that the provisions of

1  the automatic stay apply beyond the borders of the United

2  States?

3         MR. SCHEPACARTER:  Just briefly, Your Honor.

4  Again, it's Richard Schepacarter for the United States

5  Trustee.

6         THE COURT:  Sure.

7         MR. SCHEPACARTER:  And this may be more of

8  anecdote than anything else, but with respect to the order,

9  we really tried to keep it cabined in just for the Code.  And

10  the order part, as to Section 525, it was like already an

11  injunction against governmental entities.

12         And early on in my career, I think I was probably

13  about, I think I was still in my 20s, and I filed a TRO.  I

14  got a temporary restraining order from a bankruptcy judge in

15  Trenton, New Jersey, to prohibit a municipality from fining

16  and basically arresting -- they wanted to arrest my client to

17  make him clean up a property that was within the confines of

18  the city.  I actually had to go to court and enjoin, not only

19  the City, but also the city commissioners or committee

20  members, the mayor, the police department.

21         And I went to the municipal court and the judge

22  there looked at the order and was like, What is this?  And

23  after I explained it to him, he goes, I guess he's right.

24  Here's an order.  You better lay off this guy.

25         So, the bottom line is -- the point of that story

 1  is that you need to go to court and get a restraining order

 2  or some type of thing.

 3          THE COURT:  I think the bottom line of that story

 4  is, as we learned from Hamilton, is that everything is legal

 5  in Jersey.

 6      (Laughter)

 7          MR. SCHEPACARTER:  I can't deny it.

 8          THE COURT:  All right.

 9          MR. SCHEPACARTER:  Thank you, Your Honor.

10          THE COURT:  I'll ask if anyone else wishes to be

11  heard?

12      (No verbal response)

13          THE COURT:  All right.  I'm going to grant this

14  motion.  The Court has seen this relief on many, many prior

15  occasions.  It is -- I think experience teaches that it is

16  valuable for a debtor to have an order of this sort to

17  communicate the provisions of the Bankruptcy Code and,

18  particularly, the protections of the automatic stay to

19  parties that may not be familiar with the U.S. legal system.

20          This motion is granted.  The order will issue.

21          MS. TOMASCO:  Thank you, Your Honor.

22          And I'm pleased to turn over the virtual podium to

23  my colleague Mr. Razmig Izakelian.

24          THE COURT:  Very good.

25          Good afternoon, sir.  It is afternoon.

1          MR. IZAKELIAN:  It is afternoon.  Good afternoon,

2   Your Honor.  Razmig Izakelian of Quinn Emanuel, as proposed

3   counsel to the debtors and the debtors-in-possession.

4          The next motion we had is Agenda Item 8, which was

5   filed at Docket 7.  It is the debtors' motion to continue

6   employee benefit programs.  Before I get into the specifics,

7   the debtors have worked with Mr. Schepacarter and

8   incorporated his comments into the proposed interim order

9   that was filed with the motion.

10         And so, by this motion, the debtors are requesting

11  that the Court authorize them to continue their employee

12  compensation and benefits programs on a post-petition basis,

13  pursuant to Sections 363 and 105(a).  This motion is actually

14  a bit more simple than most of these kinds of motions in the

15  sense that the debtors had signed the petition to avoid the

16  disruption to their employees' livelihoods, so as of the

17  petition date, there were no prepetition amounts owing.

18         So, the motion is limited to seeking authorization

19  to continue the programs on a post-petition basis.  The only

20  slight complication with this motion is that pursuant to the

21  transition services agreement, the counterparty to that

22  agreement, which is Trexie Management, has not yet opened a

23  bank account.  So until a time that it does, the debtors are

24  proposing that they make payments on account of all the

25  employees, separately account for all the payments made on

1  behalf of Trexie employees, and then submit those payments to

2  Trexie for reimbursement.

3        The debtors believe that continuation of the wages

4  and benefits programs are necessary to continue -- to ensure

5  the continued and uninterrupted services of the debtors'

6  employees.  The employees rely on these programs, and if they

7  are not continued, they may seek other employment and that

8  would substantially impair the debtors' ability to conclude

9  the orderly wind-down of their business and to maximize value

10  for all stakeholders.

11        Unless Your Honor has any questions, we would

12  request entry of the interim order.

13        THE COURT:  I think I'd just like a little bit of

14  clarity, Mr. Izakelian.  And I've read the application and

15  Mr. Hengel's declaration, but the application represents that

16  the debtors don't believe that they have any wage or benefit

17  obligations that are coming due.

18        I'm certainly fine with giving authority to

19  maintain, without interruption, any payment obligations, but

20  it is -- is it because the obligations have been shifted over

21  in a TSA or have they all been front-loaded or paid?  Even,

22  you know, I can understand front-paying salaries, but it

23  would seem to me that there's always the prospect of

24  benefits, medical claims, something else that might be in the

25  float that would show up later.

1          Is there something I'm missing or, again, I don't

2    have an issue with the relief.  I've said many, many times,

3    There no constituency I'm more concerned for at the first day

4    of a case than the employees that look to the company for

5    payment of their wages and benefits.

6          But this motion seems to indicate that you don't

7    think you have any obligations.  Can I get a little clarity

8    on that?

9          MR. IZAKELIAN:  Of course.  So, as far as we know,

10   there's not anything -- there aren't any upcoming payments,

11   however, as I think Your Honor noted, there are healthcare

12   obligations here and to the extent the healthcare claim pops

13   up and a payment needs to be made, we are --

14          THE COURT:  Okay.

15          MR. IZAKELIAN:  -- requesting authority to

16   continue the programs so that we can make those payments.

17          THE COURT:  Very good.  Okay.

18          I would ask if anyone wishes to be heard?

19       (No verbal response)

20          THE COURT:  Okay.  I'm going to grant the motion.

21   I do note that the relief, as it -- it is pretty limited, at

22   least in terms of the debtors' ask, but nevertheless, I think

23   as I made clear just a moment ago, and as Mr. Izakelian

24   observed, the debtor has employees.  Those employees look to

25   the company for payment for their wages and benefits, and it

1 is important to me to ensure that there's no interruption to

2 those.

3         There is limited relief that's being sought, and

4 in many ways, I could regarding this as largely protective,

5 giving the debtor authority to make certain payments that are

6 in the ordinary course, but nevertheless, would be captured

7 by the bankruptcy.  And as I've said in many prior first day

8 hearings, I certainly appreciate the relief that's being

9 sought in order to avoid the need for emergency motion

10 practice to pay something $1500 or something like that.  You

11 can't file a motion for that modest amount.  And so I think

12 this makes good sense from my point of view, and it does

13 seem, at least from at the debtors' understanding, that what

14 we're likely talking about are *de minimis* obligations, that,

15 again, I would be personally inclined to ensure are not

16 interrupted.

17         I do note that the relief may potentially, if

18 there are obligations, it would implicate Bankruptcy

19 Rule 6003 and that it contemplates a payment of certain

20 obligations in the first few weeks of the case; nevertheless,

21 for the reasons stated in Mr. Hengel's declaration, and well

22 as the Court's long experience, I am satisfied the debtors'

23 reorganization effort would suffer the risk of immediate and

24 irreparable harm in the absence of the relief requested.

25         This motion is granted and the order will issue.

1          MR. IZAKELIAN:  Thank you, Your Honor.

2          THE COURT:  Thank you, Mr. Izakelian.

3          MR. IZAKELIAN:  So our next motion -- it's Razmig

4   Izakelian, again, from Quinn Emanuel, as proposed counsel to

5   the debtors and the debtors-in-possession -- the next motion

6   we have is Agenda Item 9, which is filed at Docket 8, and

7   this is the motion to continue the cash management program

8   and to continue to perform intercompany transactions.

9          Again, before I get into the specifics, we have

10  worked with Mr. Schepacarter on this and we have incorporated

11  his requested language into a revised interim order, which I

12  believe was uploaded with the Court this morning.

13         As Mr. Schepacarter indicated earlier this

14  morning, I think the primary, if not the only issue here, is

15  the Section 345(b) issue.  It is true that the current banks

16  are not approved depositories, but at the same time, we do

17  not want to make an issue if there isn't one.  We will try to

18  comply, as best we can, with the provisions set forth in the

19  revised interim order; specifically, those are at

20  paragraph 23 and paragraph 31.

21         We will attempt to come into compliance within 30

22  days, pursuant to paragraph 23.  We will also attempt, in

23  good faith, to cause the current banks to enter into a

24  uniform depository agreement.  If we can't, we will seek

25  relief from the requirements of Section 345.

1          THE COURT:  Very good.

2          MR. IZAKELIAN:  And --

3          THE COURT:  I'm sorry, I didn't mean to interrupt.

4          You may proceed.

5          MR. IZAKELIAN:  Oh, yes.  You didn't interrupt,

6  Your Honor.

7          Unless Your Honor has any further questions, we

8  would request entry of the proposed interim order.

9          THE COURT:  All right.  Mr. Schepacarter, I think

10  you kind of previewed this one at the outset.

11          MR. SCHEPACARTER:  That's correct, Your Honor.

12          Again, good afternoon, Richard Schepacarter for

13  the United States Trustee.

14          Before I read my statement, I just want to

15  highlight something that I know counsel has indicated that

16  they want to come into compliance.  It would be comforting to

17  hear how they're going to do that, whether that comes from

18  somebody from a principal of the debtor or counsel who may be

19  more involved with the Section 345 and the banks and the

20  like.  But I think they need to establish what I'll call

21  "concrete steps" to come into compliance.

22          What is their game plan?  What is the debtors'

23  intentions?  Are they not only going to reach out to banks,

24  but are they going to contact surety companies and look for

25  bonds or do something else other than maybe move the accounts

1  or something of some substance so that the Court can say,

2  basically, that we can be comforted that where you're not

3  going to have an issue like we've had in other cases, given

4  the banking -- the realm of the banking world today.  So,

5  that's kind of my first issue.

6            Perhaps they can respond, maybe?

7            THE COURT:  Sure.

8            MR. IZAKELIAN:  As I think Mr. Schepacarter

9  alluded to, it is a challenging environment to find an

10 approved depository, which is willing to do business with a

11 cryptocurrency company.

12           In terms of the concrete steps, we first will

13 attempt to -- we will, in accordance with paragraph 31 of the

14 revised order, attempt to get the current banks to enter into

15 a uniform depository agreement.  Absent that, we will try to

16 reach out to other banks on the approved depository list and,

17 perhaps, move the accounts, if possible.  If that is not

18 possible, we intend to seek relief under Section 345(b).

19           MR. HENGEL:  And, Raz, if you want me to expand a

20 little bit on some of the efforts that are ongoing?

21           You know, Mr. Schepacarter, just so you're aware,

22 we've introduced a handful of different banks to the debtors.

23 The debtors already had some of those conversations ongoing,

24 and so there are probably no fewer than four or five, kind

25 of, onboarding conversations going on from a banking

1  perspective.  Some of them have kind of washed by the

2  wayside.

3         You know, many banks don't want to see crypto,

4  which is something seen in Voyager and BlockFi and a whole

5  bunch of other crypto cases, so it wasn't terribly

6  surprising.  We do know that there are a couple that will

7  still do it, and so we will continue to push forward with

8  those conversations, just we can't guarantee any level of

9  success there.

10         THE COURT:  I think I can touch on the issues that

11  the U.S. Trustee is concerned about, and, again, his office's

12  concern is to try to ensure compliance with the statutory

13  mandate.  It seems like there is activity going on that

14  certainly is not concluded.

15         I am aware of issues with, obviously issues in the

16  banking sector, generally, and then at the interplay of

17  crypto companies and traditional banking institutions.  I

18  think one way to square the circle, because I don't think

19  we're going to answer the question this afternoon, one way to

20  square the circle would be for the Court to advise that it

21  expects that the parties will continue to communicate clearly

22  and transparently with the Office of the United States

23  Trustee regarding their efforts and any results.

24         And the Court would also extend an invitation

25  that's probably not a secret to most of the folks on the

1  phone, but if there are -- or on the call today -- if there

2  are issues, I would be happy to get on the phone or on a

3  status conference with parties in the near term.  This is not

4  something that I would insist wait until sometime in June.

5          The U.S. Trustee's concerns regarding the issues

6  that he's identified are real and legitimate, but again, they

7  require, frankly, businesspeople to address them.  This is

8  not something that the lawyers fix.  And so, if I can provide

9  a measure of comfort to all parties that the process will

10 continue, that there'll be engagement and communication, and

11 then there'll be prompt recourse to the Court, if necessary,

12 my hope would be that that might ease some of the legitimate

13 concerns expressed by the United States Trustee.

14         Mr. Schepacarter, on this, do you have any

15 thoughts?

16         MR. SCHEPACARTER:  Yeah.  I understand that's sort

17 of the way that it's going to work and I think that it has to

18 work that way.  I mean, I understand that they're going to --

19 they have to -- and I'm about to read a statement that's

20 going to sort of mandate what they are going to need to do,

21 so let me do that, and that may answer some of the questions

22 or at least set out what -- kind of what we expect.

23         And the statement is:

24         Section 345 obligated the debtors-in-possession to

25 require from an entity, which estate monies are invested,

1  either a bond having features defined in Code Section 345(b),

2  or alternatively, the deposit of securities, consistent

3  with 31 U.S.C. Section 9303, unless the Court orders

4  otherwise.

5          In connection with the cash management motion

6  today, we make five observations.  The first one is

7  Section 345 places an obligation on the debtor-in-possession

8  to require a protection for its monies from institutions

9  which hold such monies.

10         Second, while Section 345 does not mention the

11 United States Trustee's Office, our office in its supervisory

12 role, pursuant to 28 U.S.C. Section 586, assists with

13 protection of debtor-in-possession funds by its entry into

14 Uniform Depository Agreements, or as I call them "UDAs."  The

15 UDAs obligate depositories to maintain collateral for

16 bankruptcy funds on deposit in an amount no less than 115

17 percent of the debtor-in-possession and trustee deposits,

18 which exceed FDIC insurance limits.

19         The United States Trustee maintains information on

20 the banks who have executed Uniform Depository Agreements,

21 regularly provides this list to debtors' advisors, and it's

22 working to post a current list to the website, our website.

23         Third, in order for a debtor-in-possession to

24 comply with Section 345 where a UDA bank is involved, the

25 debtor-in-possession must, first, identify and disclose all

1  of its depository accounts where the monies are held.

2  Second, contact those banks to ensure that the relevant

3  accounts are designated as "debtor-in-possession accounts."

4  If the debtor-in-possession does not identify all of its

5  accounts and take steps to ensure that its accounts are

6  properly designated, then the bank will not treat such

7  accounts as debtor-in-possession accounts.  Fourth, the

8  monthly operating report filed with the Court requires that

9  bank statements and bank reconciliations for the reporting

10 period be attached.  Periodic reporting assists the United

11 States Trustee's Office with ensuring that operation of the

12 debtors' cash management system is consistent with this

13 Court's authorization, and, as well, deposits remain in

14 authorized depositories where estate funds are appropriately

15 collateralized or maintained in accordance with Section 345.

16 And, fifth, last but not least -- fifth, recent bank failures

17 highlight the importance of the debtor-in-possession's

18 compliance with Section 345 for the benefit of its

19 stakeholders.  The United States Trustee seeks specific

20 language in any interim cash management order that identifies

21 concrete steps and a definite time frame to achieve

22 compliance with Section 345.  The United States Trustee

23 encourages the debtor to act promptly to ensure full

24 compliance with Section 345 and, of course, reserves the

25 right to be heard on cash management at the final hearing.

1  Thank you.

2          THE COURT:  Thank you, Mr. Schepacarter.

3          I appreciate, and I certainly understand, that the

4  statement that has been read into the record by your office

5  in this case and in all the other cases in the past couple of

6  months and I appreciate the comments.

7          MR. SCHEPACARTER:  Thank you.

8          THE COURT:  Any other issues with the cash

9  management request?

10         MR. SCHEPACARTER:  No.  They're made the changes

11 in the order that we've requested --

12         THE COURT:  Great.

13         MR. SCHEPACARTER:  -- so we have no objection to

14 its entry.  Thank you.

15         THE COURT:  Very good.

16         Does anyone else wish to be heard with respect to

17 the debtors' request for an order authorizing continuation of

18 cash management?

19     (No verbal response)

20         THE COURT:  All right.  I am going to grant the

21 motion.  I am satisfied that the relief requested is

22 appropriate and warranted.  I also find that the relief is

23 consistent with that which I have approved and authorized in

24 many, many prior cases.

25         Our discussion with the United States Trustee and

1  with Mr. Izakelian identifies -- and Mr. Hengel weighed in

2  on, as well, helpfully -- identifies a number of issues and

3  challenges that are, perhaps, not typical at a first day

4  hearing.  The Court has had, I think, a productive

5  discussion.

6           I'm informed on the issues.  The debtor is working

7  through these, but again, from my lights, it's largely, as a

8  practical matter, a business issue with financial

9  institutions and we'll let that process play itself out.

10          The Court has, as noted, offered to make itself

11  available on an expedited basis if there's need to deal with

12  this issue.

13          I would make an observation, and, again, I think

14  everybody has heard me say this before, on some of these

15  issues that we've described, talking about mechanics or this

16  issue, particularly, if it seems to be going off the rails

17  and you feel that you need access to the Court, I would

18  prefer not to get letters or motion practice on this issue.

19  You get on the phone with me promptly and we'll figure out

20  the issue.

21          If we have -- you know, if the U.S. Trustee or

22  other parties need to commence motion practice, I think I'd

23  like to have a discussion before we head down that path.

24          But otherwise, as to the motion itself, again, I

25  find that the relief requested is appropriate and warranted

1  and I will grant the motion.  The order will issue.

2            MR. IZAKELIAN:  Thank you, Your Honor.

3            THE COURT:  Thank you, Mr. Izakelian.

4            MR. IZAKELIAN:  I will now pass the virtual podium

5  to Mr. Kirpalani.

6            THE COURT:  Very good.

7            Back to you, Mr. Kirpalani.

8            MR. KIRPALANI:  Thank you, Your Honor.

9            And last, but not least on the agenda is Docket 9.

10  That's the debtors' motion for approval of DIP financing on

11  an interim basis.

12            Your Honor, the debtors seek authorization under

13  Section 364(c) of the Bankruptcy Code to obtain post-petition

14  financing from its parent company, known as Aquila

15  Holdings, Inc.  As I mentioned at the outset, in light of the

16  company's inability to generate revenues that exceed

17  expenses, without this financing, the debtors would suffer

18  immediate and irreparable harm because they have no other way

19  to pay the costs of an orderly wind-down of operations.

20            Upon approval of the motion, the DIP lender will

21  provide financing in accordance with the DIP loan agreement,

22  which is attached as Exhibit B to the motion, in a multi-draw

23  term loan of up to 700 Bitcoin, or "BTC," of which 250 BTC

24  would be available upon entry of the interim order with

25  the 450 remaining being available to the debtors after the

1  final hearing, if approved.

2          And the funds would be used for the purposes of --

3      (Bells ringing)

4          Sorry.

5          The funds would be used for the purposes of

6  general corporate means and any other amounts set forth in

7  the proposed budget that's attached as Exhibit 1 to the

8  proposed order.

9          In exchange, the DIP lender will be given a

10  superpriority administrative expense claim in the Chapter 11

11  cases, pursuant to Section 364(c)(1).  As we noted, and

12  somewhat novel, the DIP loan will be made in Bitcoin and the

13  principal amount -- the principal amount, not the interest

14  and the expenses -- but the principal amount must be repaid

15  in Bitcoin.

16          Although it's novel to those outside of the

17  cryptocurrency industry, borrowing funds in BTC is not

18  uncommon for participants in the cryptocurrency industry.

19  Bitcoin is the industry's currency of choice.

20          Following the closure of the debtors' U.S. dollar

21  fiat banking services provider Silvergate Bank, access to

22  fiat currency for cryptocurrency companies in wind-down mode

23  is highly unlikely.  As my colleague noted, we are even still

24  waiting for confirmation that our human resources affiliate

25  Trexie has been able to find and set up a suitable banking

1  relationship.

2           While the debtors initially asked the DIP lender

3  whether it would make the DIP loan in U.S. dollars to the

4  estate, the DIP lender was unwilling to do so, due to

5  potential negative tax consequences to the DIP lender, which

6  would have greatly increased the expense of lending for which

7  the debtors would have been charged.  Working through these

8  challenges, the debtors, led by its independent director

9  Timothy Pohl and Quinn Emanuel, sized the DIP loan based on

10 the budget developed by chief restructuring officer Evan

11 Hengel and his team at BRG in dollars.  So the DIP loan was

12 sized in U.S. dollars.

13          Then, Mr. Hengel built in a small amount of

14 cushion for near-term currency exchange fluctuation and

15 Mr. Pohl negotiated for the loan to be made and repaid in

16 Bitcoin, provided that the estate is not going to bear

17 extreme currency risks, given the value of Bitcoin does

18 change every day.  Frankly, the result, Your Honor, is a DIP

19 loan on more favorable terms than I think I've ever seen in

20 Chapter 11.

21          THE COURT:  Yeah.

22          MR. KIRPALANI:  The DIP loan is entirely

23 unsecured.  The debtors are not pledging any property that

24 customers may contend is their property.

25          THE COURT:  Mr. Kirpalani, can I --

1          MR. KIRPALANI:  There is no prime --

2          THE COURT:  Mr. Kirpalani, can I just ask to

3  confirm a point raised in Mr. Hengel's declaration?

4          MR. KIRPALANI:  Uh-huh.

5          THE COURT:  And I just wanted to confirm it, but

6  this debtor and this estate, there are no secured

7  obligations; is that correct?

8          MR. KIRPALANI:  That is correct.

9          THE COURT:  Okay.  I understand.

10          You may proceed.  Sorry for the interruption.

11          MR. KIRPALANI:  Uh-huh.

12          They are not pledging any property that customers

13  may claim is their own property.  There is no priming.  There

14  is no rollup of prior amounts that were funded by Aquila

15  during the preceding months.  And the maturity on this DIP

16  loan is nine months -- get this -- without any hair-trigger

17  milestones that we've all become accustomed to, and Your

18  Honor knows how I feel about those from other cases.

19      (Laughter)

20          THE COURT:  Did you real just say, "get this"?

21      (Laughter)

22          MR. KIRPALANI:  We missed the Super Bowl

23  commercial, so I'm trying here, Your Honor.

24          We believe that the funds that we're getting from

25  the DIP lender are going to be sufficient for the debtors to

1  get to an effective date in these cases.  The interest rate

2  on the loan is 4 percent and the debtors are protected

3  against extreme adverse swings in the price of Bitcoin,

4  should that happen.

5        By this, I mean that even in the event that the

6  price of Bitcoin skyrockets between now and the effective

7  date, the maximum amount of dollars that the estate will have

8  to spend to acquire Bitcoin so it can repay the DIP loan, if

9  it does not have sufficient Bitcoin on hand is 110 percent of

10  the price of Bitcoin as of the last close before the

11  bankruptcy filing, which was May 8th, 2023.

12        We, frankly, do anticipate that we will have

13  sufficient Bitcoin in the debtors' estates, due to the

14  dormant accounts issue that we discussed that have not been

15  claimed for years, but we don't want to touch that, until and

16  unless, it is clear after the bar date and whatever other

17  procedures are approved by the Court, that there are no

18  valid, allowed customers claiming such funds.

19        So help translate the amount of the DIP loan into

20  terms that the Court more used to seeing, the interim amount

21  that we seek will be about $7 million and the balance will be

22  approximately 12 and a half to $13 million, depending on the

23  price of the Bitcoin after the final hearing.  The total

24  projected loan in dollars is $19.6 million or so, which

25  is 700 Bitcoin at the May 8th closing price of $27,567 per

1  Bitcoin.

2          THE COURT:  And, again, the debtors' maximum

3  exposure, if I do my math, is just about $2 million over

4  that, so a $21 million figure for the debtors' maximum

5  exposure, irrespective of the movement of the crypto market

6  or the Bitcoin value, correct?

7          MR. KIRPALANI:  That's correct, Your Honor, yes.

8          THE COURT:  I understand.

9          MR. KIRPALANI:  As we've noted, Mr. Hengel's

10  testimony to support the factual basis for the DIP motion is

11  contained in his declaration; specifically, it's

12  paragraphs 32 to 37 on pages A12 to A14 of his declaration.

13          And for the reasons we have outlined, we

14  respectfully request approval on an interim basis and the

15  authorization to borrow the first tranche of 250 BTC

16  immediately.

17          I will note that we had some questions from the

18  U.S. Trustee yesterday late afternoon.  We did work with

19  Mr. Hengel to provide written responses to those questions.

20  I think we have answered the questions that Mr. Schepacarter

21  raised, but, of course, he'll speak for himself and we're

22  happy to address them publicly if that's a good use of the

23  Court's time.

24          And with respect to any other issues, yes, counsel

25  for the Department of Justice -- counsel for the United

1   States Department of Justice, Civil Division, reached out and

2   asked if we could clarify that the DIP order should contain a

3   reservation of rights.  We did include that redline.  I

4   believe Mr. Brady's team submitted that to the Court.

5              THE COURT:  I did receive the redline.

6              MR. KIRPALANI:  And just for the record, for those

7   who were not privy to it, it's new paragraph 27.  I'll just

8   read it -- it's one sentence:

9              "Reservation:  Notwithstanding anything in this

10  order, the DIP loan documents or any related documents,

11  nothing in this order or the DIP loan documents, or any

12  related documents, modifies, affects, or impairs the United

13  States of America's rights, claims, or defenses of recoupment

14  or setoffs."

15             And that was fine with us, Your Honor.  We didn't

16  have any other parties contacting us about the relief that we

17  are seeking.  And with that, subject to the U.S. Trustee's

18  comments, we would ask the Court, respectfully, to enter the

19  interim order.

20             THE COURT:  Sure.

21             Mr. Schepacarter, again, good afternoon.  Any

22  thoughts on the DIP order?

23             MR. SCHEPACARTER:  Yeah, just a couple, Your

24  Honor.

25             And to quote Larry Davis, since we're going to do

1  commercials, I'd just have to say:  uh-uh.

2        (Laughter)

3              MR. SCHEPACARTER:  I really only have like five or

4  six points that I want to raise.  Again, this is an unusual

5  situation.  I assume -- we assume that a Committee will be

6  working with the debtors and the DIP lender, which is the

7  parent, to assess the costs and risks associated with the

8  Bitcoin lending.  They're kind of focused on the costs to the

9  estate and the risks posed.

10             The language for evaluating the DIP financing,

11 which is not only the debtors' business judgment, but the

12 debtors' exercise of their fiduciary obligations to all

13 creditors and the estate, we would expect -- the U.S. Trustee

14 would not expect, I should say, e-currency lending to become

15 the norm for any more traditional Chapter 11 cases.  The U.S.

16 Trustee is aware that regulatory oversight of e-currency

17 trading, investing and lending, is developing and evolving,

18 and lastly, it would be presumptuous if this case established

19 any precedent or accepted practices for future Chapter 11

20 cases on this type of lending.

21             THE COURT:  So noted.

22             MR. SCHEPACARTER:  So, those are my comments.

23             THE COURT:  Okay.

24             MR. SCHEPACARTER:  Thank you, Your Honor.

25             THE COURT:  Sure.

1            I would ask if anyone else wishes to be heard with

2   respect to the debtors' request for an order authorizing

3   post-petition financing and granting superpriority

4   administrative expense claims?

5        (No verbal response)

6            THE COURT:  Okay.  I'm going to grant the motion

7   and I will give you my reasons.  First, I note that the Court

8   takes a measure of comfort from the agreement between and

9   among the parties to insert new paragraph, decretal

10  paragraph 27 to the order that preserves and reserves the

11  rights of the United States.  And, again, I appreciate the

12  parties' engagement on these issues both, with the United

13  States, as well as with Mr. Schepacarter's office, to work

14  through open concerns and considerations.

15            As I said at the outset, there's always something

16  new, but as a practical matter, again, I studied this pretty

17  hard last night and Mr. Kirpalani's walk-through was

18  certainly helpful and I appreciate getting the blacklined

19  order in advance of this morning's hearings.  But what I'm

20  being asked to do, at bottom, is consider a debtors' request

21  for the necessary funding and financing to ensure the case

22  can move forward.  This debtor simply uses a different

23  currency.

24            The U.S. Trustee's concerns with respect to this

25  case establishing a precedent or otherwise are well-founded.

1   Each case stands on its own.  But I would note, and perhaps

2   echo Mr. Kirpalani's comments that, frankly, if more debtors

3   show up with economic terms for post-petition financing along

4   the lines of what I have here, that would be, frankly, a

5   welcomed development.  The economic terms of this are at

6   least, by my lights and on the record before me, manifestly

7   favorable to the debtor.  The interest rate is very modest

8   at 4 percent.

9         And the debtor is also not granting what would be,

10  otherwise, customary liens and security interests in assets

11  on a superior or priming basis to existing obligations;

12  instead, the lender, which is noted to be an insider and an

13  affiliate, is making the loan subject only to rights

14  identified in the order and particularly protected by

15  superpriority administrative expense claims.

16        So it is certainly immediately apparent to the

17  Court that this financing, which is necessary, based upon

18  Mr. Hengel's declaration and the record before me, but it is

19  abundantly clear that this financing is being provided on,

20  frankly, favorable terms.

21        And I appreciate the walk-through that

22  Mr. Kirpalani provided regarding Mr. Pohl's negotiations in

23  order to address currency fluctuation.  That was my first

24  reaction and that was what actually caused me to spend a good

25  deal of time reading through this and understanding,

1  effectively, the collar or cap that's been placed upon the

2  debtors' exposure, because that was my first reaction is,

3  what is this thing going to be like when you have to repay

4  it.

5        So in the review of the papers, again, I took a

6  measure of comfort from the fact that the debtor anticipated

7  these issues and capped its overall exposure in an amount

8  that certainly makes sense as a business matter to me, at

9  least on the record before me, and avoids the perceptible,

10  and maybe remote, but real risk that, you know, there's a

11  surge in value that we've seen reflected in some of the

12  papers that were included in the first day declaration, as

13  well as in Mr. Kirpalani's PowerPoint that shows that this --

14  these currencies can be volatile.

15        And so it's probably no secret, my immediate

16  reaction to seeing a DIP facility funded in Bitcoin was,

17  what's the exposure to that volatility, and, again, I think

18  the debtors have appropriately and responsibly addressed

19  those considerations.

20        In the absence of objections, I'm not going to

21  burden the record with extensive findings, but again, I note,

22  as the U.S. Trustee did, that this is a novel currency, but

23  otherwise, the relief provided is, frankly, functionally

24  modest, compared to other cases using more traditional

25  currency.  That is what it is.

1         But I'm being asked to approve and authorize

2 borrowing and that is occurring under Bankruptcy Code

3 Section 361, potentially 363, and certainly 364 for purposes

4 of funding a debtor's post-petition operations.

5         I am satisfied that the debtors have carried their

6 burden under those Bankruptcy Code Sections for purposes of

7 the relief that's being requested and I'm satisfied that the

8 lender is entitled to the protections that have been

9 identified and laid out in the form of order.

10         In addition, I find that the relief implicates

11 Bankruptcy Rule 4001 because the debtor is seeking on an

12 interim basis, emergency funding, and I am satisfied that the

13 record and the budget before me reflect that the funding,

14 which is in the amount of 250 Bitcoin, pending entry of a

15 final order, is, in fact, necessary to avoid immediate and

16 irreparable harm to the debtors' reorganization effort.

17         And, again, I appreciate the parties' engagement

18 on the form of order.  As noted, I find that the economic

19 terms are favorable to the debtor and I would be prepared to

20 enter that order once it's uploaded.

21         The motion is granted and the order will issue.

22         MR. KIRPALANI:  Thank you very much, Your Honor.

23         I think that's all we have on behalf of the

24 debtors, unless the Court or any parties in interest have

25 questions for us.

1     THE COURT:  I don't think that I have any

2  questions.

3        I would certainly invite parties that wish to be

4  heard at this point before we break, to weigh in.  But I

5  would also note that we have the hearing scheduled for

6  June 7.  If we need hearings rolling out from there,

7  Ms. Bello will be happy to provide you dates and we'll get a

8  scheduling order going out so that there's clarity on

9  people's schedules.

10       I would also further observe that, again, I

11  appreciate everyone accommodating my schedule to have this

12  hearing today, but the parties should expect that hearings in

13  the future, consistent with our practice, and I think all of

14  the Court's practice, you should assume that those hearings

15  will be live and in the courtroom.  We do have policies with

16  respect to a hybrid feature, which I think is going to be a

17  feature of all cases until either the Supreme Court or

18  somebody tells us we can't do this anymore, but again, I

19  think we've got policies with respect to principal players

20  being in the courtroom for purposes of hearings going

21  forward.  But I appreciate the people making themselves

22  available for this morning.

23       I would ask if anyone else wishes to be heard

24  before we adjourn.  I will look for the orders to be uploaded

25  and you should expect them to be entered promptly.

1            Does anyone else wish to be heard?

2        (No verbal response)

3            THE COURT:  Very well.  With that, again, I would

4    thank all parties for their presentations.

5            And we are adjourned.  Be well, counsel.

6            COUNSEL:  Thank you, Your Honor.

7        (Proceedings concluded at 12:48 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2              We certify that the foregoing is a correct

3     transcript from the electronic sound recording of the

4     proceedings in the above-entitled matter to the best of our

5     knowledge and ability.

6

7     /s/ William J. Garling                    May 11, 2023

8     William J. Garling, CET-543

9     Certified Court Transcriptionist

10    For Reliable

11

12    /s/ Coleen Rand                           May 11, 2023

13    Coleen Rand, CET-341

14    Certified Court Transcriptionist

15    For Reliable

16

17

18

19

20

21

22

23

24

25