## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Desolation Holdings LLC, *et al.*,[1] | Case No. 23-10597 (BLS) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket Nos. 5, 60, and 70 |

## DEBTORS' REPLY IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO WITHHOLD OR OMIT CERTAIN CONFIDENTIAL INFORMATION

Desolation Holdings LLC and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby file this reply (the "Reply") in further support of the filed *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain a Consolidated List of Creditors, (B) File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, and (C) Withhold or Omit Certain Confidential Information, (II) Establishing Procedures for Notifying the Parties of Commencement, and (III) Granting Related Relief* [D.I. 5] (the "Confidential Information Motion" or the "Motion"). In support of this Reply, the Debtors submit the concurrently filed *Supplemental Declaration of Evan Hengel in Support of Motion for Entry of an Order Authorizing Debtors to Withhold or Omit Certain Confidential Information* (the "Hengel Supplemental Declaration").[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Holdings Ltd. (2227); and Bittrex Malta Ltd. (1764). The mailing and service address of the Debtors is 701 5th Avenue, Suite 4200, Seattle, WA 98104.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Confidential Information Motion and the Hengel Supplemental Declaration.

## PRELIMINARY STATEMENT

1.      Customers' protection has always been a core value for the Debtors.  Debtors have protected customers' property by carrying on their business in such a way that, on the Petition Date, they had enough assets to pay back customers all their crypto and fiat currency.  The Debtors have also protected customers' privacy by adopting related policies and entering into contracts with their employees prohibiting the disclosure of customer data to third parties.  Now that the Debtors are winding down their operations, Debtors' loyalty and sense of responsibility towards their customers remains unchanged.  As such, in these Chapter 11 Cases, the Debtors aim to continue protecting their customers by respectfully seeking that this Court grant the Relief.

2.      The Debtors are committed to conducting a transparent chapter 11 process for the Debtors' creditors and other parties-in-interest.  However, the Debtors also have an obligation to balance transparency with both (a) maximizing the value of their assets for the benefits of the estates and their creditors; and (b) needing to protect their customers and other Protected Parties from the inherent risks of that a public disclosure of their Confidential Information entails.

3.      The U.S. Trustee downplays the detrimental effects that disclosing customers' Confidential Information (even if limited to their names) would have on the value of Debtors' customer lists.  Although in these Chapter 11 Cases the Debtors focus on winding down their U.S. and Malta operations and returning assets to customers, a potential monetization of the Customer Base remains a viable source of value for creditors.  If customers' names and other Confidential Information were made public, the value of Debtors' customer lists would be substantially diminished or dissipated.  Now, in these early-stage Chapter 11 Cases, there is no need to destroy the asset value of customers' Confidential Information through its disclosure in Debtors' Filings.

4.       Based on abstract considerations, the U.S. Trustee also minimizes the obvious and concrete risks that a publication of Confidential Information would create to Debtors' customers and other Protected Parties.  The Celsius Case is the quintessential example.  In the absence of the Relief, attempted fraud and theft, harassment, and potential violent actions loom over the Protected Parties.

5.       This risk would even be more exacerbated if the Court granted the Withdrawals Order, by which customers who provide all the required know-your-customer ("KYC") information are entitled to receive the assets deposited on their Bittrex accounts.  The vast majority of the Debtors' customers have not yet provided all the KYC information that is needed for the withdrawals.  Therefore, if the Withdrawals Order were granted and customers' Confidential Information were available to the public, it is hard to believe that bad actors would miss the chance to target customers and jackpot the assets that should be returned to them.  Phishing attacks, relentless uncertainty and suspicion regarding the true identity of both Debtors and customers in the withdrawal process, an increase of the costs related to the Debtors' execution of the withdrawal requests, and, in essence, chaos in these Chapter 11 Cases are dangerously behind the corner.  If criminals were able to compromise multiple customers' accounts, the risk of administrative and additional customer claims for breach of the Privacy Policy would also exponentially increase.  Needless to say, processing post-petition claims for compromised customer accounts would create unnecessary administrative burdens on this Court as well as the Debtors and their professionals.

6.       In their Filings, the Debtors provide Account IDs in lieu of names and other contact information.  The Debtors maintain that this is a measure that properly balances the transparency required in the chapter 11 process with the Debtors' interest in maximizing the value of their estates and protecting customers' privacy.  A proper administration of these Chapter 11 Cases is not only

guaranteed by the use of Account IDs, but also by the fact that the Debtors are ready to make available unredacted Filings to the Court, the U.S. Trustee, and any official committee merely upon request.

7.     In addition, the Debtors maintain that the GDPR may apply to a large number of parties in these Chapter 11 Proceedings (e.g., all the Malta OpCo individual customers).  The U.S. Trustee asks this Court to deviate from longstanding precedent in this district of redacting information (including names and addresses) protected by the GDPR, and that despite the risk that Debtors may incur in significant penalties.  The Court should not approve this newfound position.

8.     Accordingly, the Debtors request that the Court overrule the Objections and grant the Relief requested.

**RELEVANT BACKGROUND**

9.     On the Petition Date, the Debtors filed the Confidential Information Motion.  An interim order approving the relief requested in the Confidential Information Motion was entered on May 10, 2023 [D.I. 37].

10.    On May 25, 2023, the Securities and Exchange Commission ("SEC") asked the Debtors to amend paragraph 7 of the proposed Final Order to include the SEC among the parties entitled to receive unredacted information upon request.  The Debtors have agreed that this change will be included in any revised Final Order granting the Relief requested in the Motion.

11.    On June 2, 2023, the U.S. Trustee objected to the Relief, except to allow for the redaction of the addresses and email addresses of natural persons who are Debtors' customers and other creditors [D.I. 70] (the "UST Objection").[3]

---

[3]    Also, on May 19, 2023, Mr. Ghader filed the Ghader Objection [D.I. 60].  Based on the Debtors' investigation, Mr. Ghader is not a customer of the Debtors, but an international customer of BGB.

**REPLY**

I.      **Cause Exists to Protect Confidential Information of Customers Pursuant to Section 107(b)(1) of the Bankruptcy Code**

12.      Pursuant to section 107(b)(1) of the Bankruptcy Code and Bankruptcy Rule 9018, the Debtors maintain that cause exists to authorize the Debtors to withhold or omit their customers' names, physical addresses, email addresses and any other contact information from the Filings.

13.      The Debtors are not seeking section 107(b)(1) protection to "do business behind a shield of secrecy." UST Obj. ¶ 64.  The Debtors are respectfully requesting this Court to grant the requested Relief because the Debtors and their estates would otherwise be harmed by the disclosure of customers' names and other Confidential Information.  Hengel Suppl. Decl. ¶¶ 13–14, 21, 30.

14.      Debtors' business is grounded on the number of customers trading on Bittrex's platform.  Mot. ¶ 17.  As the Privacy Policy shows, customers shared their personal data with the Debtors expecting that the latter would protect the confidentiality of customer information to the maximum extent possible.  Hengel Suppl. Decl. ¶ 16, Ex. A.  Under the Privacy Policy, the Debtors' customers never consented to an unrestricted public disclosure of their personally identifiable information.  In alignment with the privacy obligations owed to their customers, but also to protect the value of Bittrex's business, the Debtors took extensive measures to preserve the confidentiality of customers' data and avoid their disclosure to competitors and other third parties. *Id*. ¶ 17.  For example, based on mutually agreed non-disclosure agreements, BUS required all its employees to keep customer information confidential.  *Id*., Ex. B.

15.      Additionally, certain third parties have shown interest in purchasing customers' information from the Debtors.  Hengel Suppl. Decl. ¶ 18.  And while in these Chapter 11 Cases, the Debtors' focus is the wind down of their U.S. and Malta's operations, a monetization of the

Customer Base remains a viable source of value for the creditors. *Id*. Further, under both accounting and valuation perspectives, it is well established that customer lists are valuable assets. *Id*. ¶¶ 19–20.

16.     Therefore, in contrast with what the U.S. Trustee asserts (UST Obj. ¶ 60), the Debtors respectfully submit that they have satisfied their burden in establishing that their customers' Confidential Information is information entitled to protection under section 107(b)(1) of the Bankruptcy Code. That in view of (a) the promise made to customers to protect their privacy to the maximum extent possible; (b) the extensive measures taken to protect the Confidential Information from improper disclosures; (c) third parties' interest in buying the Debtors' customer lists and the fact that the monetization of these lists in the Chapter 11 Cases remains an option; and (d) widely-recognized accounting and valuation principles.

17.     Other courts in this jurisdiction have acknowledged that customer lists belonging to cryptocurrency exchanges are valuable information entitled to protection under section 107(b)(1) of the Bankruptcy Code. As mentioned in the Motion (¶ 17), in a recent case relating to the bankruptcy of a cryptocurrency exchange, Judge John T. Dorsey stated: "*[I]t goes without saying that a customer list in any bankruptcy case is something that is protected by 107(b) as a trade secret.* Companies hold those things very closely and don't want them disclosed." (Emphasis added.) *In re FTX Trading, Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Jan. 13, 2023), D.I. 489 (Jan. 11, 2023 Hr'g Tr. at 103:1-5). *See also In re FTX Trading, Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Jan. 20, 2023), D.I. 545 (extending, based on section 107(b)(1) of the Bankruptcy Code, Debtors' authority to redact names, addresses and email address of all customers). Similarly, in *In re Cred Inc.*, Judge Dorsey overruled an objection from the U.S. Trustee and concluded that those debtors' customer list "*has some intrinsic value*, and that

disclosure of that list could affect the ability of the debtors to market and sell that list as part of their going toward a plan of reorganization." No 20-12836 (JTD) (Dec. 18, 2020) [D.I. 277] (Dec. 22, 2020 Hr'g Tr. at 113:23-25, 114:1-3) (emphasis added). *See also In re Cred, Inc.*, No. 20-12836 (JTD) (Bankr. D. Del. Dec. 21, 2020), D.I. 264 (authorizing redactions of names, addresses and e-mail addresses of customers pursuant to section 107(1)(b)).

18.    The requested Relief is a balance between Debtors' interest in protecting the value of the estate assets and the transparency required in chapter 11 proceedings. Through Account IDs—which customers can use to easily and quickly identify their inclusion in any relevant Filings (see, e.g., BUS's schedules [D.I. 87])—the Debtors sufficiently guarantee the transparency of the chapter 11 process. In line with the U.S. Trustee's quote from *In re Celsius Network LLC*, by providing the Account IDs, Debtors' customers "can look at the schedule[s] and see whether their claim has been listed, and whether it is an undisputed claim, in which case, they don't have to file a proof of claim." 644 B.R. 276, 297 (Bankr. S.D.N.Y. 2022) (quoting the court's statements at the hearing). *See also* UST Obj. ¶ 63.

19.    When citing *In re Celsius* to support its objection to the Relief pursuant to section 107(b)(1) (UST Obj. ¶¶ 63, 68–70), the U.S. Trustee fails to mention the detrimental consequences that the disclosure of Celsius customers' confidential information had on them. Specifically, following such disclosure, scammers repeatedly contacted and harassed Celsius customers to steal from them. Mot. ¶ 20; *see also* Hengel Suppl. Decl. ¶ 25, Ex. D.

20.    The U.S. Trustee's reliance on the Debtor's Privacy Policy is misplaced. The U.S. Trustee asserts that Debtors' customer lists are "not secret or confidential" because the Privacy Policy provides that BUS may disclose the information to others. UST Obj. ¶¶ 65–66. This is incorrect. Plainly, the Privacy Policy does not contemplate *publication* of customers' information

to the general public.[4]  The Privacy Policy's provision that permits customer personal data's disclosure if required by a "legal obligation, judgment or . . . an order from a court, tribunal or authority" contemplates allowing regulatory access to the data (such as by law enforcement) while maintaining confidentiality where possible; the Privacy Policy does not contemplate filing customer personal data on a publicly-available docket.  Hengel Suppl. Decl. Ex. A, at 17.  In sum, nothing in the Privacy Policy countermands the Debtors efforts to maintain the confidentiality of the customer lists as assets of the estates.

## II.    Cause Exists to Protect Confidential Information Pursuant to Sections 105(a) and 107(c) of the Bankruptcy Code

21.    Pursuant to sections 105(a) and 107(c)(1) of the Bankruptcy Code, the Debtors maintain that cause exists to authorize the Debtors to withhold or omit from their Filings (a) customers' names, physical addresses, email addresses and any other contact information; and (b) the names, physical addresses, email addresses, and any other contact information of other creditors and employees (i) who are natural persons and (ii) reside in the United States or are otherwise protected by the GDPR.

22.    The legislative history of section 107(c) of the Bankruptcy Code supports protecting the Confidential Information in these Chapter 11 Cases, including the names of the Protected Parties.  During the debates that led to the adoption of the Bankruptcy Abuse Prevention

---

[4]    *See also* Hengel Suppl. Decl., Ex. A, at 17, stating, in particular, that: "**We require all third parties to respect the security of your personal data** and to treat it in accordance with the law (including applicable data protection and privacy law).  We do not allow our third party business partners or service providers to use your personal data for their own purposes and only permit them to process your personal data for specified purposes and in accordance with our documented instructions.  Furthermore, these third parties access and process your data on the basis of strict confidentiality and subject to the appropriate security measures and safeguards."  (Emphasis added.).

and Consumer Act of 2005 ("BAPCA"), one of the co-sponsors of an amendment that included

section 107(c), former U.S. Senator Olympia J. Snowe stated:

> "Bankruptcy court filings, like most other court proceedings, are public record, and most papers filed in these cases are publicly available record. This is a good thing, because the administration of justice in our country should not be a secret affair. It is the public's right to know how its courts are meting out justice. The Bankruptcy Code affirmatively adopts this policy. At the same time, bankruptcy proceedings are unique in that the explicit financial information of the debtor and its creditors are filed with the court, and likewise available for public review. Such information includes . . . _a person's name_ and address . . . . This information has long been available for public review at our Nation's courthouses. However, _in today's information age, more and more Federal courts are making all of their public documents available on-line as well. While this is an advancement in efficiency in most regards, it opens up a great potential for abuse for identity thieves and others who access the Internet with the intent to commit fraud, physical harm, or other crimes_. . . . Currently the Bankruptcy Code allows courts to issue protective orders to prevent public disclosure of trade secrets and confidential research and commercial information. _Our amendment would expand the court's authority to provide for similar protection of the personally identifiable information that I just described_, as well as give the court the ability to shield other information if its release would create an undue risk of either identity theft or of injury to an individual's person or property." (Emphasis added.)

151 Cong. Rec. S2111-04, S2140 (Mar. 7, 2005).

23.    Through the requested Relief, the Debtors seek to shield their customers and other

Protected Parties from the concrete and serious risks that a disclosure of their Confidential

Information poses to their property, their physical integrity and their mental wellbeing. Hengel

Suppl. Decl. ¶¶ 13–14, 24–26, 30.

24.    In the Debtors' regular course of business—i.e., while maintaining the privacy of

customers' names and other information—the Debtors received more than 730 separate reports of

identity theft caused by customers' revealing or being tricked into revealing their login credentials.

Hengel Suppl. Decl. ¶ 23. To dupe the Debtors' customers, scammers deployed an array of

techniques that would only multiply if even partial personally identifying information were

publicized in these Chapter 11 Cases.  For example, bad actors have regularly used social media presenting themselves to customers as Bittrex representatives, or they have created phishing websites to trick customers into providing their Bittrex credentials and steal from the accounts.  *Id.* Through a public disclosure of hundreds of thousands of names and other Confidential Information, the Debtors reasonably expect that criminals will successfully defraud customers on a scale that exponentially exceeds the Debtors' prior experience.  This already serious and concrete risk would be amplified if the Debtors were authorized to reopen the platform for customer withdrawals through the Withdrawals Order.  *Id.* ¶¶ 24, 27–28.  Disclosing customers' Confidential Information, coupled with the possibility to withdraw from the accounts, would become a bad actor free-for-all that would exhaust the Debtors' limited resources and exponentially increase the costs to the estates.  *Id*. ¶ 28.

25.     While citing *In re Celsius* (UST Obj. ¶ 72), the U.S. Trustee again fails to mention the well documented series of phishing attacks that have targeted Celsius customers following the disclosure of their names.  Hengel Suppl. Decl., Ex. D.  Moreover, in a following decision in the Southern District of New York, the court permitted those debtors to maintain confidential the names of certain creditors because, by "publishing the names of those [creditors], the [d]ebtors will heighten the risk to them of identity theft. . . . As the [d]ebtors noted, publishing a list of [creditors]' names in a searchable format would further compound the risk of identity theft, since that format would render the claimants' information more susceptible to data mining." *In re Endo International plc*, No. 22-22549 (JLG), 2022 WL 16640880, at *12 (Bankr. S.D.N.Y. Nov. 2, 2022).

26.     In the present case, the protection afforded to individuals by section 107(c) of the Bankruptcy Code should be extended to entity customers, given that they are subject to a high risk

of injury to their property.  If provided with entity customers' Confidential Information, bad actors could easily find online information relating to employees or directors of these customers (e.g., through LinkedIn and other social media), making them an appealing target for theft, similar to the individual customers.  Hengel Suppl. Decl. ¶ 24; Mot. ¶ 22.

27.     Moreover, publicizing the Confidential Information entails concrete and serious risks of injury to the physical integrity and mental wellbeing of the Debtors' individual customers, the employees and directors of the Debtors' entity customers, as well as the Debtors' other individual creditors and employees.  Hengel Suppl. Decl. ¶ 26.  In 2017, a group of criminals murdered a Bittrex customer to reportedly obtain his password for Bitcoin transactions.  *Id*., Ex. P.  Such crypto-related violence is not an isolated case.  The press has repeatedly reported episodes of kidnapping and brutal violence affecting cryptocurrency holders or, if these are entities, their directors and employees.  *Id*., Ex. E to J, M.

28.     "Section 107(c) references 'risk,' and assessment of risk is forward looking.  While a specific potential harm must be identified, the standard does not require evidence of injury having occurred in the past or under similar circumstances."  *In re Motions Seeking Access to 2019 Statements*, 585 B.R. 733, 751 (D. Del. 2018) (affirming on appeal bankruptcy court order sealing personally identifiable information of creditors).  Contrary to the U.S. Trustee's allegations (UST Obj. ¶ 75–76), the Debtors submit that they amply met their burden in establishing that by disclosing names and other Confidential Information, the Debtors' customers and the other Protected Parties are subject to an undue risk of identity theft or other unlawful injury.  As such, they should be protected pursuant to sections 105(a) and 107(b)(1) of the Bankruptcy Code.

29.     Other courts in this district have recognized that those who may be adversely affected by a disclosure of Confidential Information (including by solely publicizing the names)

need the Court's protection.  Mot. ¶¶ 21–22.  As mentioned in the Motion, Judge Dorsey recently

referred to the definition of "means of identification" under 18 U.S.C. 1028(d), which is identical

to section 107(c), and noted: "[I]f you look at 128(d) [sic], it says that the information includes

names, numbers, or any combination of those two that would allow the identification of an

individual. So, certainly, the Criminal Code recognizes that disclosure of a name could result in

the identification of an individual and if that individual needs protecting, we need to make sure

that that is happening."  *In re FTX Trading, Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Jan. 13,

2023), D.I. 489 (Jan. 11, 2023 Hr'g Tr. at 103:24-104:5); *see also* Mot. ¶ 21.

30.     The Debtors further submit that cause exists to authorize the Debtors to withhold

or omit from the Filings the Confidential Information of the Protected Parties who are protected

by the GDPR.  Compliance with the GDPR should not be underestimated because the Debtors face

the risk of substantial fines and penalties to the detriment of the estates and the Debtors' creditors.

Hengel Suppl. Decl. ¶ 29.  A recent example is the approximately 1.3 billion fine that, in May

2023, the Irish Data Protection Commission ("DPC") imposed on Meta Platforms Ireland Limited

("Meta") for transferring EU Facebook users' data to the United States (the "Meta Decision").  *Id*.

In particular, in the Meta Decision, The DPC fined Meta despite the latter arguing that the transfer

of data was allowed based on derogations provided by Article 49(1) of the GDPR.  *Id*., Ex. O ¶¶

1.14(2), 8.6.

31.     The GDPR, which contemplates substantial fines in case of its violation, may apply

to the Debtors.  Mot. ¶¶ 24–25.  Pursuant to the GDPR, "processing" personal data includes their

"disclosure by transmission."  GDPR Art. 4(2).  Under Article 6 of the GDPR, the Debtors must

have a legal basis to process the personal data of EU or UK data subjects.  While the U.S. Trustee

notes that processing of personal data is lawful if the processing is "necessary for compliance with

a legal obligation to which the controller is subject" (UST Obj. ¶ 49), it ignores that the legal obligation justifying such processing "should have a basis in Union or Member State law"—and not in U.S. law.  GDPR Art. 6(1), Recital 45.  None of the other legal bases for processing data contained in Article 6 of the GDPR would apply under the present circumstances.

32.    The U.S. Trustee argues that the GDPR "facially appears to permit the disclosure" of the personal data of the covered individuals based on the "Legal Claim Exception," according to which the "transfer" is valid because "necessary for the establishment, exercise or defen[s]e of legal claims."  UST Obj. ¶ 82 (citing GDPR Art. 49(1)(e)).  The U.S. Trustee's argument should not be followed, given that it erroneously mixes the concepts of "processing" under Article 4(2) of the GDPR and "transferring" under Article 49(1) of the same law.  The latter limitedly applies to transfers of personal data that (a) start from an EU member state or the UK; and (b) end in a third country.  GDPR Art. 49(1).  *See also* European Data Protection Board, *Guidelines 2/2018 on Derogations of Article 49 Under Regulation 2016/679*, at 3 (May 25, 2018).  That said, Article 49(1) of the GDPR and, specifically, the "Legal Claim Exception" are not applicable to a disclosure of Confidential Information originating from the United States.  Moreover, even assuming that the aforesaid did not exclude the application of Article 49(1) of the GDPR to these Chapter 11 Cases, a disclosure of Confidential Information based on the "Legal Claim Exception" would still be illicit under the GPDR because in violation of the principle of proportionality derived from Article 52(1) of the Charter of Fundamental Rights of the European Union (the "Charter"),[5] protecting natural persons in relation to their personal data's processing.  *See*, *e.g.*, Hengel Suppl. Decl., Ex. O ¶¶ 8.7–8, 8.17–18.  *See also* GDPR Recitals 1 and 4 ("The protection of natural persons in relation to the processing of personal data is a fundamental right.  Article 8(1) of the [Charter] . . . provide[s] that everyone has

---

[5]    Charter of Fundamental Rights of the European Union, 2012 O.J. C 326/391.

the right to the protection of personal data concerning him or her" and "[the GDPR] respects all fundamental rights and observes the freedoms and principles recogni[z]ed in the Charter"). A disclosure of Confidential Information is, in particular, not proportional when balancing (a) the high and severe risks that data subjects run because of a worldwide publicization of their information; and (b) the little to no benefit that such disclosure entails in these Chapter 11 Cases. *See* European Data Protection Supervisor, *Assessing the necessity of measures that limit the fundamental right to the protection of personal data: A Toolkit*, at 4 (Apr. 11, 2017) ("[F]or a measure to meet the principle of proportionality as enshrined in Article 52(1) of the Charter, the advantages resulting from the measure should not be outweighed by the disadvantages the measure causes with respect to the exercise of the fundamental rights.").

33.    The U.S. Trustee states that the Court should disregard the GDPR based on "this Court's interest in enforcing the Bankruptcy Code," which is "superior" to the EU's and UK's "legitimate interest in enforcing their own law." UST Obj. ¶ 81. However, courts in this districts have routinely authorized redactions of names and other Confidential Information protected by the GDPR. *See*, *e.g.*, *In re Alex and Ani, LLC*, No. 21-10918 (CTG) (June 11, 2021), D.I. 62 (authorizing debtors to redact names and addresses of any natural person whose personally identifiable information has been provided to an organization with an establishment in the United Kingdom or a European Economic Area member state); *In re Highpoint Res. Corp.*, No. 21-10565 (CSS) (Mar. 16, 2021), D.I. 78 (same); *In re Mallinckrodt Plc*, No. 20-12522 (JTD) (Nov. 10, 2020), D.I. 464 (authorizing the redaction of names and addresses of individuals protected by the GDPR); *In re Clover Techs. Grp., LLC*, No. 19-12680 (KBO) (Feb. 4, 2020), D.I. 155 (same). In particular, in *In re Clover*, Judge Karen B. Owens granted relief after having overruled the same objection raised by the U.S. Trustee. *In re Clover Techs. Grp., LLC*, No. 19-12680 (KBO) (Jan. 24, 2020), D.I. 146 (Jan. 22, 2020 Hr'g Tr. at 22:1–4).

## **RESERVATION OF RIGHTS**

34.     The Debtors reserve the rights to file additional requests for redaction pursuant to the applicable sections of the Bankruptcy Code and in accordance with the Bankruptcy Rules and Local Rules in these Chapter 11 Cases.

## CONCLUSION

35.     For the reasons stated above, the Court should overrule the Objections, and grant

the Relief requested.

Dated: June 6, 2023
Wilmington, DE

**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**

*/s/ Kenneth J. Enos*
Robert S. Brady (Delaware Bar No. 2847)
Kenneth Enos (Delaware Bar No. 4544)
Joshua Brooks (Delaware Bar No. 6765)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: 302-571-6600
Facsimile: 302-571-1253
Email: rbrady@ycst.com
Email: kenos@ycst.com
Email: jbrooks@ycst.com

-and-

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
Susheel Kirpalani *(admitted pro hac vice)*
Patricia B. Tomasco *(admitted pro hac vice)*
Daniel Holzman *(admitted pro hac vice)*
Alain Jaquet *(admitted pro hac vice)*
Razmig Izakelian *(admitted pro hac vice)*
Valerie Ramos (*admitted pro hac vice)*
Joanna D. Caytas *(admitted pro hac vice)*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: 212-849-7000
Facsimile: 212-849-7100
Email: susheelkirpalani@quinnemanuel.com
Email: pattytomasco@quinnemanuel.com
Email: danielholzman@quinnemanuel.com
Email: alainjaquet@quinnemanuel.com
Email: razmigizakelian@quinnemanuel.com
Email: valerieramos@quinnemanuel.com
Email: joannacaytas@quinnemanuel.com

**PROPOSED COUNSEL FOR THE DEBTORS**