**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Desolation Holdings LLC, *et al.*,[1] | Case No. 23-10597 (BLS) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket Nos. 5 & 11 |

**SUPPLEMENTAL DECLARATION OF EVAN HENGEL IN SUPPORT OF
MOTION FOR ENTRY OF AN ORDER AUTHORIZING
DEBTORS TO WITHHOLD OR OMIT CERTAIN
<u>CONFIDENTIAL INFORMATION</u>**

I, Evan Hengel, Co-Chief Restructuring Officer of Bittrex Inc. ("BUS"), Desolation Holdings LLC ("Desolation"), Bittrex Malta Holdings Ltd. ("Malta Holdings") and Bittrex Malta Ltd. ("Malta OpCo") (collectively, the "Debtors"), hereby declare under penalty of perjury:

1. I am a Managing Director at Berkeley Research Group, LLC ("BRG") with over 16 years of experience working in distressed situations and transactions, including several involving crypto firms such as Voyager Digital Holdings, Inc., BlockFi, Inc., SALT Lending, and Genesis Global Holdco, LLC. I serve as the CRO of the Debtors. Accordingly, I am in all respect competent to make this declaration (the "Declaration").

2. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the professionals in this case and/or employees working under my supervision, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations. I am

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Holdings Ltd. (2227); and Bittrex Malta Ltd. (1764). The mailing and service address of the Debtors is 701 5th Avenue, Suite 4200, Seattle, WA 98104.

1

authorized to submit this Declaration on the Debtors' behalf. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## THE CONFIDENTIAL INFORMATION MOTION

3. On the Petition Date,[2] the Debtors filed *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain a Consolidated List of Creditors, (B) File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, and (C) Withhold or Omit Certain Confidential Information, (II) Establishing Procedures for Notifying the Parties of Commencement, and (III) Granting Related Relief* [D.I. 5] (the "Confidential Information Motion" or the "Motion"), and the *Declaration of Evan Hengel, Co-Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [D.I. 11] (the "Hengel Declaration" or the "First Day Declaration").

4. Through the Confidential Information Motion, the Debtors sought the following "Relief." Pursuant to sections 105(a) and 107(b)(1) and (c)(1) of title 11 of the United States Code (the "Bankruptcy Code"), the Debtors requested authority to withhold or omit, in any Filings with the Court or made publicly available in these Chapter 11 Cases, (a) customers' names, physical addresses, email addresses and any other contact information; and (b) the names, physical addresses, email addresses, and any other contact information of other creditors and employees (i) who are natural persons and (ii) reside in the United States or are otherwise protected by the GDPR (the "Confidential Information"). Moreover, the Debtors asked the Court to authorize the Claims and Noticing Agent to (a) suppress from the claim register the Confidential Information of Debtors' customers and individual creditors residing in the United States or otherwise protected

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Confidential Information Motion.

by the GDPR; and (b) file affidavits of service omitting the Confidential Information of the Protected Parties, provided that the Claims and Noticing Agent serves them at their physical addresses and email addresses, as necessary.

5. Further, in the Motion, the Debtors stated their intention to provide, for each customer, the related Account ID (referred in the Motion as UUID) in lieu of the Confidential Information in any relevant Filings. In the Debtors' view, the insertion of the Account IDs is the most appropriate means to (a) protect customers' financial and physical safety, on one hand; and (b) allow customers to easily and quickly identify their inclusion in any relevant Filings of the Chapter 11 Cases, on the other hand.

6. At the hearing on the first day motions, held on May 10, 2023, the United States Trustee for the District of Delaware ("U.S. Trustee") objected to the Relief with respect to the disclosure of names. Over the U.S. Trustee's objection, the Court granted the Relief through an interim order [D.I. 37] (the "Interim Order"). Pursuant to the Interim Order, the Debtors shall provide versions of any Filings containing the names and other omitted information of customers, other creditors, and employees to (a) upon request, the U.S. Trustee and any official committee appointed in the Chapter 11 Cases, and (b) upon further order of the Court, any other party. Moreover, the Interim Order provides that, upon request of a party in interest, the Court may, upon a showing of good cause, release some or all of the information that is being withheld or omitted.

7. On May 12, 2023, the Debtors filed *Debtors' Motion for Entry of an Order Authoring the Debtors to Honor Withdrawals of Cryptocurrency Assets by Customers* [D.I. 43] (the "Withdrawals Motion"). Specifically, through the Withdrawals Motion, the Debtors seek an order from the Court permitting customers to withdraw their deposits of cryptocurrencies and fiat

currency (the "Withdrawals Order"). The hearing to consider approval of the Withdrawals Order is scheduled for June 14, 2023.

8. On May 19, 2023, Azim Ghader ("Mr. Ghader"), an Iranian and Dominican Republic citizen residing in Turkey, asked the court to deny the Motion to help "customers from OFAC-sanctioned countries and jurisdictions" to "recover their [allegedly] unfairly lost assets" [D.I. 60] (the "Ghader Objection"). Based on the Debtors' investigation, Mr. Ghader is not one of the Debtors' customers; he is a customer of non-debtor Bittrex (Global) Bermuda Ltd. ("BGB").

9. On May 25, 2023, the Securities and Exchange Commission ("SEC"), asked the Debtors to amend paragraph 7 of the proposed Final Order to include the SEC among the parties entitled to receive unredacted information upon request (the "SEC Request"). The Debtors have agreed to include the SEC Request in any amended proposed Final Order.

10. On June 2, 2023, the U.S. Trustee filed the *United States Trustee's Objection to the Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain a Consolidated List of Creditors, (B) File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, and (C) Withhold or Omit Certain Confidential Information, (II) Establishing Procedures for Notifying the Parties of Commencement, and (III) Granting Related Relief* [D.I. 70] (the "UST Objection," and together with the Ghader Objection, the "Objections").

11. On June 5, 2023, BUS and Malta OpCo filed their schedules [D.I. 87 and 91], which include thousands of pages providing Account IDs in lieu of customers' names, addresses and other contact information.

12. I submit this Declaration in support of the *Reply in Support of filed Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain a Consolidated List of Creditors, (B) File a Consolidated List of the Debtors' Fifty Largest*

4

*Unsecured Creditors, and (C) Withhold or Omit Certain Confidential Information, (II) Establishing Procedures for Notifying the Parties of Commencement, and (III) Granting Related Relief.*

## THE NEED TO REDACT THE CONFIDENTIAL INFORMATION

13. In these Chapter 11 Cases, including through the Confidential Information Motion, the Debtors are taking steps to maximize value for the benefit of creditors and, at the same time, minimize the deleterious effects that the cases could have on the their customers, and other individual creditors and employees (collectively, the "Protected Parties").

14. Continuing to prevent the disclosure of the Confidential Information is critical for (a) preserving the value of the Debtors' assets; (b) safeguarding the property, safety and privacy of the Protected Parties; and (c) avoiding the administrative and financial burden that phishing and other malicious conduct against the Protected Parties would cause to the Debtors, especially if the Withdrawals Order is granted. The Debtors understand and fully appreciate the public policy of transparency in the bankruptcy process. However, the circumstances of cryptocurrency bankruptcy cases, such as the Debtors' Chapter 11 Cases, present concrete and serious risks to the Debtors' estates, customers, and the other Protected Parties. To the extent that the there is any benefit in a publication of the Confidential Information, such benefit is vastly outweighed by the harm that may bring upon the Debtors' estates and the Protected Parties. Thus, I believe the Relief that the Debtors requested in the Confidential Information Motion, coupled with the Account IDs' disclosure, strike an appropriate balance between transparency and an increased need for protection.

**I.     Confidential Information relating to Customers Is a Valuable Asset Requiring Protection under Section 107(b) of the Bankruptcy Code**

15.     Debtor BUS has over 1.2 million customers overall (i.e., with and without a balance in the respective accounts), including approximately 2,000 individual customers who, based on the Debtors' records, are EU or UK nationals reside in the EEA. Debtor Malta OpCo, in turn, has more than 400,000 individual customers overall (i.e., with and without a balance in the respective accounts).

16.     All these customers (collectively, the "Customer Base") shared with the Debtors valuable and sensitive Confidential Information with an expectation that the Debtors would protect the confidentiality of the data provided to the maximum extent possible. For example, the collected customer information is subject to a privacy policy (the "Privacy Policy"), which is attached hereto as **Exhibit A**. While the Privacy Policy details circumstances in which certain client information may be disclosed, the Privacy Policy does not provide, and the Debtors' customers have never consented to an unrestricted public disclosure of their personally identifiable information that would occur if their names and account balances were published via CM/ECF.

17.     The Debtors took extensive measures to protect customers' Confidential Information, including through non-disclosure and non-compete agreements with their employees, preventing the latter from disclosing customer's Confidential Information to third parties. For example, a recent version of BUS' Non-Disclosure, Non-Compete, and Invention Agreement, attached hereto as **Exhibit B**, explicitly protects customer information requiring employees to maintain the confidentiality of such information. It is common knowledge that, in general, businesses take thorough measures to protect the identity of their customers. That said, I believe that the widespread implementation of measures to keep customers' information confidential is

evidence that their identity is a very important value component to the Debtors and most businesses.

18.     In the recent past, certain third parties have shown interest in the acquisition of the Debtors' customer list, which is further demonstration that customers' Confidential Information is a valuable asset of the Debtors. While the Debtors' focus centers on winding down its U.S. operations, monetizing the Customer Base remains a viable source of value for creditors.

19.     In addition, from an accounting perspective, it is well established that customer information such as names and contact information, commonly referred as customer lists, are separately valued intangible assets of an entity. The Financial Accounting Standards Board ("FASB")—an independent organization that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow Generally Accepted Accounting Principles ("GAAP")—provides guidance regarding the recognition of different categories of customer-related intangible assets acquired in a business combination in Accounting Standard Codification ("ASC") 805. The guidance in ASC 805-20-25-31 states: "Customer-related intangible assets that would meet that criterion for recognition under this accounting alternative are those that are capable of being sold or licensed independently from the other assets of a business. . . . Customer-related intangible assets that may meet that criterion for recognition include but are not limited to: . . . Customer information (for example, names and contact information)."[3]

20.     Financial valuation literature supports the concept that customer lists constitute assets on a company's balance sheet with an inherent and potentially significant value as long as its confidentiality is preserved. For example, in *Intangible Assets: Valuation and Economic*

---

[3]     FASB ASC 805-20-25-31, https://asc.fasb.org/1943274/2147480013 (last visited on June 5, 2023).

*Benefit*, valuation expert Jeffrey A. Cohen observed that "[a] customer list . . . might qualify as trade secrets, provided that there is value in the fact [it] remain[s] unknown to the competition—that is, that [it] provide[s] independent economic value, and that there is some evidence that their owners actually try to keep [it] secret."[4] As shown in ¶ 18, the Debtors have indeed sought to keep their customer lists private.

21. The Debtors are committed to enhancing the value of their estates, a crucial aspect of which, in these early phases of the Chapter 11 Cases, involves preserving undisclosed customers' Confidential Information. I believe that exposing this information to the public in the course of these Chapter 11 proceedings would significantly devalue or erode its substantial worth.

II. **Disclosure of the Confidential Information Creates an Extreme Risk of Harm that Section 107(c) of the Bankruptcy Code Was Designed to Protect**

22. Shielding, to the maximum extent possible, the Protected Parties from the concrete and serious risks stemming from these Chapter 11 Cases forms the core of the Debtors' goals for these Chapter 11 Cases. The disclosure of the names and other Confidential Information of the Protected Parties will result in "phishing" attempts, extortion or other personal threats, or other impermissible conduct, while providing no apparent benefit to the general public.

23. Cryptocurrencies facilitate instantaneous transfer of value and, as such, bad actors often target cryptocurrency holders for scams. Although the Bittrex exchange itself has not been hacked thanks to its state-of-the-art security features, in the past there have been more than 730 separate events where customers reported that their login credentials were compromised and used to remove funds from customers' accounts. Imposters have regularly used accounts on social media presenting themselves as Bittrex representatives in order to deceive customers. Also, I am

---

[4] JEFFREY A. COHEN, INTANGIBLE ASSETS: VALUATION AND ECONOMIC BENEFIT 17 (2005).

aware of phishing websites that appeared on Google and other search engines when searching for "Bittrex" (*see* picture in the following page). When customers clicked on links to these phishing websites, they were tricked into providing their login credentials, which the phishing site owners immediately used to log into the Bittrex platform and conduct trades or withdraw funds from the Bittrex accounts.



24.     Now, if customers' names and other Confidential Information is disclosed in these Chapter 11 Cases to the general public, scammers will attempt to defraud and steal from customers, including in the circumstance where the Withdrawal Motion is granted and customers are authorized to withdraw cryptocurrency and fiat from their Bittrex accounts. To be clear, not only individual customers but also entity customers run an equal risk of injury if their Confidential Information is disclosed in these Chapter 11 Cases. As for individual customers, scammers can easily find online information relating to employees or directors of entity customers (e.g., through

LinkedIn and other social media), making entity customers an equally appealing target for malefactors.

25. One need look no further than the pending cryptocurrency case in the Southern District of New York, *In re Celsius Network, LLC* ("Celsius") (the "Celsius Case"). In the Celsius Case, the court ordered the disclosure of (a) the names of individual customers (but also those of other creditors and employees); and (b) the names, physical addresses, and email addresses of customer entities (as well as, more in general, of any business entity). Since then, scammers have been able to repeatedly contact and harass Celsius customers in order to steal,[5] and for individual customers, they were able to do so based solely on the disclosure of names. In certain cases, bad actors tried to connect with Celsius customers over messaging applications, but, in other cases, they also used more sophisticated means, including impersonating Celsius legal counsel or claims agent, and using a fake court order. Celsius Case's filings related to these phishing scams are attached hereto as **Exhibit D**.

26. Through a disclosure of the names and other Confidential Information, individual customers, and employees and directors of entity customers may not only risk a financial injury, but also be exposed to threats to their physical integrity, including kidnapping, torture, and other types of violent aggressions.[6] For example, in 2017, a group of criminals reportedly murdered a

---

[5] Vince Sullivan, *Celsius Ch. 11 Creditors Hit with Crypto Phishing Attacks*, LAW360 (Dec. 1, 2022), https://www.law360.com/articles/1554186/celsius-ch-11-creditors-hit-with-crypto-phishing-attacks (reporting that Celsius customers were subject to phishing attacks by scammer pretending to be Celsius' bankruptcy counsel), attached hereto as **Exhibit C**.

[6] Afkar Ali Ahmed, *Dubai: Dh4 million stolen from Bitcoin trader; 9 people jailed*, KHALEEJ TIMES (Oct. 3, 2022), https://www.khaleejtimes.com/crime/dubai-dh4-million-stolen-from-bitcoin-trader-9-people-jailed (reporting that a gang of 9 people stole over $1 million of assets from the owner of a Bitcoin trading company who was assaulted while he was at work), attached hereto as **Exhibit E**; Samantha Dunn, *Crypto Investor Kidnapped And Forced To Hand Over Keys To Wallet*, CRYPTODAILY (Nov. 15, 2021), https://cryptodaily.co.uk/2021/11/crypto-investr-kidnapped-forced-to-hand-over-keys-to-wallet (reporting the kidnapping and torturing of a cryptocurrency trader who was forced to give up his cryptocurrency keys to criminals), attached hereto as **Exhibit F**; Ed Browne, *Bitcoin Millionaire Zaryl Dentzel Says He Was Beaten, Had Fortune Stolen in Masked Robbery*,

Bittrex client, who was "beaten and suffocated" to "obtain the victim's password for Bitcoin transactions."[7] Moreover, as a consequence of disclosure of their names and other Confidential Information, these individuals could be the targets of unwanted doxing attacks, as well as suffer emotional distress as a consequence of a malicious use of their data.[8] The Debtors' employees and other individual creditors are not spared from these same risks if their Confidential Information is disclosed in these Chapter 11 Cases.[9]

---

NEWSWEEK (Nov. 3, 2021), https://www.newsweek.com/bitcoin-millionaire-zaryn-dentzel-beaten-fortune-stolen-masked-robbery-cryptocurrency-1645550 (reporting of an investigation in the violent robbery of an entrepreneur who was forced to reveal to criminals breaking in his home the password to an online account that contained Bitcoins), attached hereto as **Exhibit G**; Jaime Redman, *London College Student Robbed at Knifepoint by 8 Thugs for $93K in Bitcoin*, BITCOIN.COM (Sept. 25, 2021), https://news.bitcoin.com/london-college-student-robbed-at-knifepoint-by-8-thugs-for-93k-in-bitcoin (reporting of a knifepoint robbery where a student was targeted because of his cryptocurrency holding and he was forced to reveal related credentials and passwords), attached hereto as **Exhibit H**; Anthony Cuthbertson, *Bitcoin trader brutally tortured with drill in cryptocurrency robbery*, INDEPENDENT (Mar. 5, 2019), https://www.independent.co.uk/tech/bitcoin-robbery-torture-cryptocurrency-netherlands-a8807986.html (reporting that a cryptocurrency trader was tortured by criminals who raided his home in an attempt to steal cryptocurrency from him), attached hereto as **Exhibit I**; *Suspect charged in bitcoin heist, police hunt 2 others*, CBC NEWS (Jan. 24, 2018), https://www.cbc.ca/news/canada/ottawa/robbery-ottawa-search-bitcoin-1.4501719 (reporting that three armed robbers held up the employees of a Bitcoin financial institution, bounding four employees and striking one on the head with a gun), attached hereto as **Exhibit J**.

[7] *Family seeks Bitcoin of man who was killed for virtual currency in Turkey's Antalya*, HURRIYET DAILY NEWS (Dec. 16, 2017), https://www.hurriyetdailynews.com/family-seeks-bitcoins-of-man-who-was-killed-for-virtual-currency-in-turkeys-antalya-124778 (reporting the murder of a young man in Turkey to steal his crypto assets), attached hereto as **Exhibit P**. Moreover, following the death of Bittrex's customer, several bad actors contacted Bittrex pretending to be the victim's heirs.

[8] Erika Harrell, *Victims of Identity Theft, 2018*, BUREAU OF JUSTICE STATISTICS (Apr., 2021), at 11, https://bjs.ojp.gov/library/publications/victims-identity-theft-2018 (providing statistics on the percentage of victims suffering forms of emotional distress following a misuse of their accounts and other misconduct related to identity theft), attached hereto as **Exhibit K**; *Doxing in 2022: An Unexpectedly Widespread Cybersecurity Threat*, SAFEHOME.ORG TEAM (Apr. 6, 2022), https://www.safehome.org/family-safety/doxxing-online-harassment-research/ (stating, among other things: "Publishing a name may not seem overtly threatening, but when attached to unsavory allegations and accompanied by additional info, the potential for dark results grows greater. [Doxing] attacks impacted personal lives 86% of the time, specifically involving online harassment, public shaming, lost friendships, family harassment, and online distribution of photos." ), attached hereto as **Exhibit L**.

[9] Olivia Capozzalo, *Director of UK-Based Crypto Exchange Kidnapped in Kiev*, COINTELEGRAPH (Dec. 27, 2017), https://cointelegraph.com/news/director-of-uk-based-crypto-exchange-kidnapped-in-kiev (reporting how the director of a cryptocurrency exchange was kidnapped while leaving his office), attached hereto as **Exhibit M**; *See In re Charming Charlie Holdings, Inc.*, 19-11534 (CSS) (Bankr. D. Del. Jul. 11, 2019), D.I. 4 (describing how, in the debtors' prior chapter 11 cases, the abusive former partner of an employee of the debtors misused the publicly accessible creditor and employee information filed in the cases to find the employee at her new address not publicly available until then, forcing the employee to change addresses again).

27. A disclosure of the Confidential Information, coupled with identity theft and related scams, would not only be detrimental to the Protected Parties, but also to the Debtors. In prior experience, compromised customer accounts resulted in a diversion of the Debtors' resources to interdiction, resolution and recovery of customer accounts, or, in some cases, controversies over relative fault over identity theft and customer account loss. At this delicate stage of these cases, Debtors intend to reopen their platform for customer withdrawals which will, in and of itself, create massive customer account resolution issues given that most of the remaining customers have one or more issues with KYC compliance or updated account information which will need to be resolved to facilitate the winding down of the U.S. platform and operations.

28. If the customers' account information were publicized now, processing customer withdrawals would become fraught with identity theft concerns that would increase the costs to the Debtors of processing customer withdrawal requests. What would be a moderately difficult situation would become a bad actor free-for-all that would exhaust the Debtors' limited resources and exponentially increase the costs to the estate. In the unfortunate event that identity theft bad actors succeeded in compromising multiple customers' accounts, the risk of administrative and additional customer claims for breach of the Debtors' privacy policy also increases exponentially. Suffice to say, processing post-petition claims for compromised customer accounts would create needless administrative burdens on this Court as well as the Debtors and their professionals.

29. Finally, the risk for the Debtors of violating the GDPR and incurring heavy fines should not be underestimated. Exemplative of this is the May 2023 decision by which Ireland's Data Protection Commission fined Meta Platform Ireland approximately $1.3 billion for infringing

the EU GDPR in connection with the transfer of data of EU Facebook users to the United States.[10]

30. All the above considered, I believe that a disclosure of the Confidential Information unnecessarily harms or, in any case, causes a concrete and serious risk of injury to the customers and the other Protected Parties as well as these chapter 11 estates. This risk can be minimized by granting the Relief respectfully requested by the Debtors, which is authority to withhold or omit, in any Filing with the Court or made publicly available in these Chapter 11 Cases, (a) customers' names, physical addresses, email addresses and any other contact information; and (b) the names, physical addresses, email addresses, and any other contact information of other creditors and employees (i) who are natural persons and (ii) reside in the United States or are otherwise protected by the GDPR.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed this 6th day of June, 2023.

                                                                                                                                                                                                 */s/ Evan Hengel*  
                                                                 Evan Hengel  
                                                                 Co-Chief Restructuring Officer

---

[10] Allison Grande, *Meta's €1.2B EU Fine Raises Stakes for US Data Transfer Deal*, LAW360 (May 22, 2023), https://www.law360.com/articles/1680244 (reporting of "European data protection authorities' record-setting privacy fine against Meta Platforms"), attached hereto as **Exhibit N**; Data Protection Commission, In the matter of Meta Platforms Ireland Limited (previously known as Facebook Ireland Limited), Decision of the Data Protection Commission made pursuant to Section 111 of the Data Protection Act, 2018 and Articles 60 and 65 of the General Data Protection Regulation, Case No. IN-20-8-1 (May 12, 2023), attached hereto as **Exhibit O**.