## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Desolation Holdings LLC, *et al.,*[1] | Case No. 23-10597 (BLS) |
| Debtors. | **(Jointly Administered)** |
| | **Hearing Date:  July 12, 2023 at 1:30 p.m. (ET)**<br>**Obj. Deadline: June 30, 2023 at 4:00 p.m (ET)** |

\*\*\*\*\*

**THIS MOTION SEEKS RELIEF RELATED TO THE FEDERAL
SECURITIES LAWS OF THE UNITED STATES REGARDING
WHETHER CRYPTO ASSETS ARE SECURITIES**

\*\*\*\*\*

**Motion Pursuant to Sections 105(A) and 502(C) of the Bankruptcy Code to Estimate
Contingent and Unliquidated Claims of the
<u>Securities and Exchange Commission and Grant Related Relief</u>**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion ("Motion"):

## I.    <u>INTRODUCTION</u>

1.    The Debtors seek entry of an order, substantially in the form attached hereto as

**<u>Exhibit A</u>** (the "Order"), to establish procedures estimating any and all contingent or unliquidated

claims (the "SEC Claims") asserted against any of them by the Securities and Exchange

Commission ("SEC").

2.    The Debtors are part of a group of companies (collectively, "Bittrex") located

around the world that operate cryptocurrency exchanges for customers inside and outside of the

United States.   Debtor Bittrex, Inc. ("BUS") operates the cryptocurrency exchange for U.S.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Holdings Ltd. (2227); and Bittrex Malta Ltd. (1764). The mailing and service address of the Debtors is 701 5th Avenue, Suite 4200, Seattle, WA 98104.

customers.  For years, the SEC conducted an investigation into Bittrex's commercial activities, demanding production of tens of thousands of documents and taking sworn testimony from several witnesses, but despite numerous requests by BUS, the SEC refused to identify the activities considered unlawful or why.  Specifically, despite being the principal regulator of securities in the United States, the SEC never identified which, if any, of the cryptocurrencies traded on Bittrex's U.S. exchange it considered to be securities.  Not until the SEC filed its recent complaint against BUS in federal district court did the SEC identify the six cryptocurrencies that it now alleges are securities.

3.    Whether any of the cryptocurrencies on the U.S. exchange constitute "securities" remains a threshold question for the SEC to have any allowed claim.  And that question must be addressed on a token-by-token basis and will depend on the facts and circumstances of each token during the time the Debtors hosted them on their exchanges.  The SEC concedes that some cryptocurrencies are not securities, while simultaneously asserting that other cryptocurrencies *might* be securities depending on various factors.  Courts historically use a test called the "investment contract" test, which was set forth by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), to analyze whether a particular cryptocurrency should be considered a security.  Under the *Howey* test, a cryptocurrency might be a security if it involves an investment of money in a common enterprise with a reasonable expectation of profits derived solely from the managerial efforts of others.  Under this test, the SEC appears to agree that two of the most highly traded cryptocurrencies in the world—Bitcoin and Ethereum—are not securities.

4.    Long before it filed its chapter 11 petition, BUS engaged in many discussions with the SEC to try and resolve the SEC 's concerns.  BUS even offered to be the first crypto exchange to register with the SEC, but the SEC did not offer BUS a practical path to permit the U.S. exchange

2

to remain in business.  Hengel Decl. ¶ 9.[2]  More recently, the SEC expressed to BUS that it would be asserting rights to disgorgement of profits allegedly earned from activity that violated the securities laws, plus additional civil monetary penalties.  BUS, continuing to provide additional data to the SEC, engaged in further negotiations.  Ultimately, BUS and the SEC could not reach an agreement on the amount of money necessary to appease the SEC.  At around the same time, BUS informed the SEC that it would cease operating the U.S. exchange and begin its orderly wind-down of operations, the last step of which would be the filing for chapter 11.  Thereafter, the Debtors filed for chapter 11 with the goal of repaying all of their customers and other legitimate creditors (including those government entities that settled with the Debtors) in full.  Mindful of the potential delays and distractions that have mired other crypto exchanges in litigious, protracted, and cost-prohibitive chapter 11 cases, the Debtors plan to expeditiously resolve any contingent or unliquidated claims either by agreement or through estimation under section 502(c)(1) of title 11 of the United States Code (the "Bankruptcy Code").  Given the failed attempt at negotiating a dollar amount, and the inordinate amount of time it will take to liquidate that amount (which may well be zero) in pending litigation elsewhere, this Motion seeks to estimate the SEC's contingent and unliquidated claims against the Debtors in connection with these chapter 11 cases.

5.       On March 9, 2023, the SEC served BUS with a "Wells Notice," a letter indicating that the SEC staff (the "Staff") would recommend that the SEC charge BUS with operating an unregistered securities exchange, an unregistered broker dealer, and an unregistered clearing agency.  BUS attempted to consensually resolve these allegations with the SEC, but when those attempts failed, the SEC filed an enforcement action in the U.S. District Court for the Western

---

[2]  "Hengel Decl." refers to the *Declaration of Evan Hengel, Co-Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions*.  D.I. 11.

30470697.2

District of Washington (the "WD Wash. Court"), seeking injunctive relief,[3] disgorgement, and additional penalties (the "WD Wash. Action").  The WD Wash. Action had a silver lining.  For the first time, the SEC informed BUS that the SEC deemed the following tokens to be securities: OMG, DASH, ALGO, TKN, NGC, and IHT (collectively, the "Six Tokens").  The Six Tokens were never heavily traded, and the SEC has already received numerous operational and financial documents concerning the Six Tokens, the volume of trades involving the Six Tokens, and BUS's associated revenues from commissions.

6.      As part of the Debtors' wind-down, commencing March 31, 2023, BUS ceased accepting new customers, and encouraged existing customers to withdraw cryptocurrencies and fiat associated with their accounts by April 30, 2023.  BUS, along with the other Debtors, filed bankruptcy shortly thereafter, and with their bankruptcy petitions, the Debtors filed the Plan (defined below) to complete their orderly wind-down.  Pursuant to the Plan, administrative and priority claims would be paid in full in cash, whereas customers would receive 100% of like-kind cryptocurrencies in amounts associated with their accounts.  The Debtors remaining assets, also in the form of  cryptocurrencies, would then be liquidated, but only to the extent necessary to pay allowed claims of general unsecured creditors in cash.  The remaining cryptocurrencies, if any, would then be distributed to owners of the Debtors' equity interests as the residual stakeholders. The Plan contemplates that the SEC Claims, to the extent allowed, will be subordinated below customers claims, but have priority over equity interests.

---

[3]   Although styled as an action seeking injunctive relief, the SEC was aware that BUS had already decided to wind down its business.  The principal relief sought in the WD Wash. Court litigation is for disgorgement and similar penalties (*i.e.*, money).

7.      The Debtors Plan and this Motion seek to address the fact that cryptocurrencies fluctuate in value every day, and any delays in distribution could result in unwelcome and unavoidable risks for the Debtors' stakeholders, including customers, the SEC, and equity holders.

8.      It follows that prompt liquidation of the SEC Claims are necessary so that the Debtors can complete their orderly wind-down in an expeditious manner that maximizes value and minimizes prejudice and delay to stakeholders.  Section 502(c) of the Bankruptcy Code is designed for exactly this situation.

9.      Section 502(c) requires the court to estimate contingent or unliquidated claims, where the fixing or liquidation of such claims would unduly delay administration of the case.  The SEC Claims are both contingent and unliquidated.  They are contingent on whether the Six Tokens are in fact securities and whether any other laws were violated.  And they are unliquidated because the disgorgement and other monetary penalties sought by the SEC is to be determined by the revenues associated with alleged securities law violations, minus expenses, and therefore is not readily observable.  Indeed, similar enforcement actions by the SEC have taken years to resolve.[4]

10.     Therefore, the Debtors propose procedures to require the SEC to file its proof of claim, including for the monetary amounts sought in the WD Wash. Action, by August 9, 2023. The Court would then use its core judicial power over the allowance, disallowance, and liquidation of claims to estimate the SEC Claims as a contested matter.  Whether or not the Six Tokens are securities depends upon facts that vary with each token, and will take many months, if not years, to fully litigate, including through likely appeals to the Ninth Circuit and the Supreme Court. Although the determination of whether the Six Tokens are securities under the law falls squarely

---

[4]  *See infra* ¶¶ 29-31.

within the Court's estimation authority under section 502(c), the Court also enjoys broad discretion in how to conduct estimation. Accordingly, the Debtors propose a simplified approach that obviates the need to delve into complex factual and legal issues under the securities laws.

11. First, the Court should estimate the amount of the potential disgorgement and other penalties by reviewing a limited factual record of revenues and expenses generated from the Six Tokens. Potential disgorgement would then calculated by determining the revenues generated from the Debtors' transactions with each subject token followed by a deduction of legitimate business expenses associated with that token.

12. The Debtors submit that the SEC Claims can be estimated through a process where the Court reviews competing spreadsheets submitted by BUS and the SEC, subject to the parties having an opportunity to review and verify the competing spreadsheets. Whether or not live testimony will be necessary will depend on the outcome of that review.

13. Second, BUS anticipates the SEC will voice significant objection over this Court delving into the untested waters of application of the securities laws to the cryptocurrency sector. While section 502(c) requires the Court to estimate contingent claims, it also provides the Court sufficient flexibility to set procedures for estimating claims based on the circumstances of the case. With respect to the Six Tokens identified by the SEC in the WD Wash Action, the Debtors propose that the Court apply a 50% discount (the "Token Toss") to the amount that the Court estimates is subject to potential disgorgement and penalties in step one, above. By doing so, the Court can estimate the SEC Claims without tipping the scales in favor of either party.[5]

---

[5]  If the SEC objects to the Token Toss method, or if the SEC adds more tokens to the SEC Claim beyond the Six Tokens that are the subject of the WD Wash Action, the Debtors reserve the right to seek an appropriate probability-based assessment and estimate. The Debtors would, in that circumstance, propose

14.     The Debtors submit that these procedures are in the best interests of all of the Debtors' stakeholders, and will result in no prejudice to the SEC, because the SEC already conducted years of extensive, unilateral discovery, received all of the documents it requested, and taken all requested depositions, to estimate the amount of the claim.  Additionally, the proposed estimation will not determine whether the Six Tokens are securities, nor will it interfere with the SEC's ongoing exercise of its regulatory power, including the continued prosecution of the WD Wash. Action (if the SEC still wishes to do so) for "injunctive" relief or for monetary and injunctive relief against the non-Debtor defendants in that action.[6]

## II.      JURISDICTION AND VENUE

15.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware.  Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware ("Local Rule[s]"), the Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

16.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

a discovery and briefing schedule to provide the Court with the facts and law from which to make a probabilistic estimation.

[6]  The Debtors reserve the right to seek full disallowance of any claims by the SEC in the event this Motion is denied in whole or in part, or with respect to any additional tokens added by the SEC to the WD Wash. Action or to any proof of claim against the Debtors.

17.     The bases for the relief requested herein are sections 105(a) and 502(c) of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 3003(c) and 9014, and Local Rule 9013-1.

## III.    BACKGROUND

### A.  The Debtors' Business

18.     The Debtors are part of the Bittrex group of companies, which are located around the world and operate cryptocurrency exchanges for customers in different jurisdictions.  Hengel Decl. ¶ 1.  BUS, a Georgia corporation, operates Bittrex's cryptocurrency exchange for U.S. customers, whereas two foreign non-debtor affiliates operate Bittrex's cryptocurrency exchange for non-U.S. customers.  *Id.*  As of March 27, 2023, BUS provided access to over 600,000 customers (i.e., with a balance in their respective accounts) in 46 states, and 1.2 million customers overall (i.e., with and without a balance in their respective accounts).  *Id.*

19.     Bittrex was founded in 2014 as Bittrex LLC.  *Id.* ¶ 36.  In 2016, Bittrex LLC was converted to a corporation and in 2018 it became a wholly owned subsidiary of Aquila Holdings.  *Id.*  Also in 2018, Bittrex formed its international arm, Bittrex International Inc., which was subsequently renamed Bittrex Global, Inc. ("BG").  *Id.*

### B.  The SEC Begins to Take Interest in U.S.-based Cryptocurrency Exchanges

20.     The cryptocurrency industry grew quickly in the late-2010s and early-2020s.  *Id.* ¶ 8.  Despite that growth, U.S. regulators did not clarify which agency would be the primary regulator for cryptocurrency businesses.  *Id.*  Nor did any agency clarify whether cryptocurrencies would be considered a commodity, currency, security, or novel asset under the law.  *Id.*

21.     In this regulatory vacuum, the SEC took it upon itself to investigate U.S.-based cryptocurrency exchanges.  *Id.* ¶ 9.  Its hook was that certain cryptocurrency assets may be

securities, which in turn, would require exchanges offering such cryptocurrency assets for trading to register with the SEC or otherwise comply with the Securities Exchange Act of 1934.  *See* SEC Complaint ¶ 2.  Failure to do so could result in operating as unregistered broker, clearing agency, and/or exchange.  *Id.* ¶ 3.  A threshold issue is whether any of the cryptocurrency assets offered by a U.S.-based exchange are securities.

22.    Courts generally use the "investment contract" analysis set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) to determine whether unique or novel arrangements are securities subject to federal securities laws.  *See, e.g., U.S. Securities and Exchange Comm'n v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020) (applying *Howey* "investment contract" analysis to a token issued by Kik Interactive Inc.).  Pursuant to *Howey*, an "investment contract" exists when there is an investment of money in a common enterprise with a reasonable expectation of profits derived solely from the efforts of others.  Under this construct, for example, Bitcoin and Ethereum are not considered securities, because they simply act as replacements for traditional fiat currency and do not involve an investment of money with a reasonable expectation of profits derived from the efforts of others.  *See* Baron, R.E, Mcnamara, C.J. & Ward, M.C., *Are cryptocurrencies securities? The SEC is answering the question*, Reuters (Mar. 21, 2022) *available at* www.reuters.com/legal/transactional/are-cryptocurrencies-securities-sec-is-answering-question-2022-03-21/ (discussing a 2018 interview with SEC Chair Jay Clayton where Mr. Clayton clarified that "true cryptocurrencies" such as Bitcoin and Ether are not securities).[7]

---

[7]  *See also* De, N., *Hinman Emails Reveal 2018 Speech on Ether Drew Input from Multiple SEC Officials*,  CoinDesk  (June  13,  2023)  *available  at* https://www.coindesk.com/policy/2023/06/13/hinman-emails-reveal-2018-speech-on-ether-drew-input-from-multiple-sec-officials/ (stating that an SEC official "wanted to say" in 2019 that the SEC did "not … see a need to regulate Ether").  Despite years of SEC commentary that Ethereum, the second most prominent token, is not a security, the SEC has now done an about face and has suggested that Ethereum may be a security.  Coghlan, J., *SEC's Gensler says BTC, ETH*

23.    The SEC, however, had provided no concrete guidance on whether and which cryptocurrency assets are securities.  For example, the SEC only issued limited, high-level guidance, such as the July 2017 "DAO Report" (the "July 2017 DAO Report")[8] and the April 2019 staff guidance "Framework for 'Investment Contract' Analysis of Digital Assets" (the "April 2019 Staff Guidance").[9]  *Id.*  These documents purported to provide information on the circumstances in which cryptocurrencies would be deemed securities, but did not specify any cryptocurrency assets (other than one token) the SEC viewed to be securities.  *Id.*  In the July 2017 DAO Report, the SEC determined that "DAO Tokens" (which had been created by Slock.it and its co-founders) were securities under the Securities Act of 1933 and the Securities Exchange Act of 1934, but did not say whether the SEC determined any other cryptocurrencies or tokens to be securities. Similarly, the April 2019 Staff Guidance did not say whether the Staff believes that any particular cryptocurrencies or tokens are securities.

### C.  The SEC's Investigation of BUS

24.    Despite this lack of guidance, the SEC started investigating numerous U.S.-based cryptocurrency exchanges, including BUS.  Hengel Decl. ¶ 9.  Beginning in 2017, the SEC began to serve, and BUS and its affiliated entities responded to, numerous subpoenas.  *Id.*

25.    From 2017 to date, BUS has provided over 24,000 documents to the SEC, including e-mail communications, Slack chats, and centrally-stored documents.  Those documents included

---

*'not securities in a newly surfaced video* (June 13, 2023) *available at* https://cointelegraph.com/news/sec-gary-gensler-in-2018-video-says-btc-eth-not-securities (providing a link to a video of Mr. Gensler in 2018 at a Bloomberg conference where he stated that the SEC believes Ethereum is "not" a security).

[8]  https://www.sec.gov/litigation/investreport/34-81207.pdf.

[9]  https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

30470697.2

internal and external communications concerning the listing and delisting of tokens, financial statements, and commissions earned by BUS.  In addition, the SEC took numerous depositions.

26.     At no time during its investigation did the SEC indicate which of the digital assets listed by BUS it believed to be securities.  Hengel Decl. ¶ 9.

**D.  The Wells Notice and the SEC Complaint**

27.     On March 9, 2023, the SEC staff served BUS (and attempted to serve BG) a "Wells Notice" indicating that the SEC staff intended to recommend the SEC charge BUS with operating an unregistered securities exchange, an unregistered broker dealer, and an unregistered clearing agency.  *Id.*  BUS, for its part, attempted in good-faith to cooperate with the SEC.  It tried to register with the SEC, but the SEC was unable to offer BUS a path to comply with registration requirements for a national securities exchange and still remain in business.  *Id.*  As discussions progressed, Bittrex informed the SEC that it would cease its U.S. operations and wind down the U.S. business.  The parties were unable to reach agreement on the entitlement to and amount of any disgorgement.

28.     Following failed efforts to resolve these allegations consensually, on April 17, 2023, the SEC filed an enforcement complaint ("SEC Complaint") in the WD Wash. Court against BUS, its former CEO, and BG, seeking injunctive relief and disgorgement.  *SEC v. Bittrex, Inc., Bittrex Global GmbH, and William Hiroaki Shihara*, No. 2:23-cv-00580 (W.D. Wash.) ("SEC Action").

29.     The SEC alleges that BUS did not register as a national securities, broker-dealer and clearing agency.  SEC Complaint ¶¶ 234-242.  For the first time in the *six years* it has investigated Bittrex, the SEC specified the Six Tokens that it considered securities: OMG, DASH, ALGO, TKN, NGC, and IHT.  As noted above, the SEC has already requested, and BUS has

already produced, documents concerning BUS's commissions, including commissions associated with all of the cryptocurrencies offered on its platform, including the Six Tokens.

30.    The Debtors believe that it will take several years, at a minimum, to liquidate the SEC Claim through the SEC Action.  From 2017 to 2022, the SEC brought over 80 enforcement actions related to either fraudulent or unregistered cryptocurrency asset offerings and platforms.[10] Yet, as of December 31, 2022, it appears that only 42 of those litigations were resolved.[11]  One study by Cornerstone Research indicates that the resolved enforcement actions took a median of 290 days,[12] but nearly half of the enforcement actions filed over the last six years have not yet resolved.

31.    In 2022, the SEC filed at least four cryptocurrency-related enforcement actions in the Western of District of Washington.  As set forth in the table below, only one of those actions has been resolved through entry of a consent judgment.  The remaining cases, despite having been filed between 6-10 months ago, are still in their infancy.  In one case, *SEC v. Douver Torres Braga et al.*, Case No. 2:22-cv-01563, the SEC still has not served the defendants.  In another case, *SEC v. Ihan Wahi et al.*, Case No. 2:22-cv-01009, the parties settled the matter before finishing briefing motions to dismiss.  And in the remaining case, *SEC v. Dragonchain Inc. et al.*, Case No. 2:22-cv-01145, the parties have agreed to a potential trial date that is over 8 months away (16 months after the enforcement action was filed).

---

[10]   https://www.sec.gov/news/press-release/2022-78.

[11]   SEC Cryptocurrency Enforcement at 12, Cornerstone Research (2022 Update) *available at* https://www.cornerstone.com/wp-content/uploads/2023/01/SEC-Cryptocurrency-Enforcement-2022-Update.pdf.

[12]   *Id.*

30470697.2

| Case | Date Filed | Claim(s) | Current Status |
|------|-----------|----------|----------------|
| *SEC v. Ihan Wahi et al.*, Case No. 2:22-cv-01009 | July 21, 2022 | Insider Trading | The case settled as to two of the defendants in late May 2023, and the third defendant was served the complaint and summons on May 26, 2023. |
| *SEC v. Dragonchain Inc. et al.*, Case No. 2:22-cv-01145 | August 16, 2022 | Unregistered offering | The parties engaged in a Rule 26(f) conference on January 6, 2023. D.I. 19. The parties have stated that they believe that discovery can be completed by September 29, 2023 and the case will be ready for trial by January 22, 2024. D.I. 19. |
| *SEC v. Douver Torres Braga et al.*, Case No. 2:22-cv-01563 | November 3, 2022 | Fraudulent offering | The SEC has not yet served the defendants. D.I. 5. The court has extended the deadline to serve the defendants to July 7, 2023 (for domestic defendants) and October 6, 2023 (for defendants that do not reside in the United States). |
| *SEC v. Jonathan Tetreault*, Case No. 2:22-cv-01567 | November 3, 2022 | Fraudulent offering | Consent judgment entered on November 18, 2022. |

32.     Enforcement actions in other districts also required substantial time to resolve.  For example, in *U.S. Securities and Exchange Commission v. LBRY, Inc.*, Case No. 1:21-cv-00260 (D. N.H.), the SEC filed an enforcement action alleging an unregistered securities offering on March 29, 2021.  Although the court granted the SEC's motion for summary judgment in November 2022, *id.*, D.I. 86, the parties, over two years after the enforcement action was filed, are *still briefing* the appropriate remedies, including the amount of the civil penalty.  *Id.*, D.I. 107 (SEC's supplemental brief on remedies, dates May 12, 2023).  Similarly, in *U.S. Securities and Exchange Commission v. Ripple Labs Inc. et al.*, Case No. 120-cv-10832 (S.D.N.Y.), the SEC filed an enforcement action alleging an unregistered securities offering.  The SEC filed that complaint in December 2020, and over two-and-a-half years later, the parties are still briefing summary judgment motions.

### E.  The Wind Down, the Bankruptcy, and the Plan

33.     As set forth in more detail in the Hengel Decl., increased regulatory scrutiny, coupled with a decline in revenues, made it very difficult for crypto firms to operate in the United States.  Hengel Decl. ¶ 16.  As a result, Bittrex's team began to explore strategic solutions.  *Id.* The Debtors ultimately determined that an orderly wind-down and customer withdrawal process was the best path forward to protect the Debtors' creditors (including their customers) and other stakeholders.  *Id.* ¶ 17.

34.     On March 31, 2023, BUS initiated a campaign urging customers to withdraw their cryptocurrency deposits from BUS by April 30, 2023.  *Id.* ¶ 68.  BUS never loaned cryptocurrency to third parties, and therefore easily met all pre-petition withdrawals and return of both crypto and fiat deposits.  *Id.*  Upon the announcement to wind down, BUS ceased accepting new customers. *Id.* ¶ 2.  The Debtors then filed bankruptcy to complete the orderly liquidation of their U.S. and Malta operations.

35.     The Debtors filed the *Joint Chapter 11 Plan of Liquidation of Desolation Holdings LLC and its Affiliated Debtors* [D.I. 10] (as may be amended from time to time, the "Plan") concurrently with their bankruptcy petitions.  The Plan provides for a wind down of the Debtors and payment in full of all (a) administrative, (b) priority tax, (c) super-priority post-petition financing, and (d) non-tax priority claims.  Pursuant to the Plan, BUS customers who have provided information required by governmental regulations will receive under the Plan a 100 percent like-kind cryptocurrency distribution from BUS, and Malta OpCo customers who had provided the required information will receive a 100 percent like-kind cryptocurrency distribution from Malta OpCo.  Plan Art. III.D.  The distribution will take the form of permitting customers to withdraw cryptocurrencies from the exchange platform, consistent with the ordinary practice of

14

withdrawing cryptocurrencies.  Plan ¶ 51.  The Plan further provides that the claims of the SEC and other regulatory agencies will be subordinated to customers claims the extent their claims consist of disgorgement, fines, and/or other penalties.

36.    The Debtors believe that there are sufficient assets to pay general unsecured creditors in full, depending on the amount of their claims.   Whether equity holders receive distributions is dependent on liquidation of the SEC Claims.

## IV.    BASIS FOR RELIEF

### A.  The SEC Claim Is Subject To Mandatory Estimation

37.    Bankruptcy Code section 502(c) provides that the Bankruptcy Court "shall" estimate a contingent or unliquidated claim when the "fixing or liquidation" of such claim would otherwise "unduly delay the administration of the case."  What constitutes "undue" delay was left undefined by Congress, meaning that it depends facts and circumstances of each case.

38.    Estimation "provides a means for a bankruptcy court to achieve reorganization, and/or distributions on claims, without awaiting the results of legal proceedings that could take a very long time to determine."  *In re Chemtura Corp.*, 448 B.R. 635, 649-50 (Bankr. S.D.N.Y. 2011) (internal quotations and citation omitted); *see In re Federal-Mogul Global, Inc.*, 330 B.R. 133, 154 (D. Del. 2005) (stating that estimation helps the court "'avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed'"); *In re Stone & Webster, Inc.*, 279 B.R. 748, 811 (Bankr. D. Del. 2002) (estimating contractual damages claim); *In re Adelphia Bus. Sols. In*c., 341 B.R. 415, 422 (Bankr. S.D.N.Y. 2003) (same as *Chemtura); In re Specialty Prods. Holding Corp.*, 2013 WL 2177694, at *25 (Bankr. D. Del. May 20, 2013) (estimating mesothelioma claims); *In re Enron Corp.*, 2006 WL 544463, at *2 (Bankr. S.D.N.Y. Jan. 17, 2006) (stating that estimation is "designed" to "avoid the need to await the resolution of

15

outside lawsuits to determine issues of liability or amount owed" and to "promote a fair distribution to creditors through a realistic assessment of uncertain claims").

39. The Bankruptcy Code requires estimation where the prerequisites have been met. *Federal-Mogul Global*, 330 B.R. at 154 ("[I]t is apparent that the Bankruptcy Code requires an estimation in order to prevent undue delay in the administration of the estate."); *In re G-I Holdings, Inc.*, 323 B.R. 583, 599 (Bankr. D.N.J. 2005) (noting that the duty to estimate contingent or unliquidated claims is a "mandatory" obligation of the court where otherwise the claim would cause undue delay); *In re Lane*, 68 B.R. 609, 611 (Bankr. D. Haw. 1986) (same).

40. Those prerequisites are: (i) the claim must be contingent or unliquidated; and (ii) fixing or liquidating the claim would unduly delay the administration of the case. *In re LightSquared Inc.*, 2014 WL 5488413, at *3 (Bankr. S.D.N.Y. Oct. 30, 2014); *see AL Tech Specialty Steel Corp. v. Allegheny Int'l Credit Corp.*, 104 F.3d 601, 606 (3d Cir. 1997) ("[Section] 502(c) of the Bankruptcy Code specifically provides for estimation, for purposes of allowance, of such unliquidated claims.").[13] Although only one prerequisite need be present, as set forth below, the SEC Claims are actually both contingent and unliquidated. And on the facts of these cases, including the unique risks imposed on all stakeholders from the volatility of cryptocurrency assets, a delay of many months or even years to await the outcome of novel litigation in another court before distributing assets is simply untenable.

---

[13]    *See also In re Lionel L.L.C.*, 2007 WL 2261539, at *4 (Bankr. S.D.N.Y. Aug. 3, 2007) (ordering estimation because, among other things, "[a] liquidation or further reorganization contingency cannot realistically be provided for in a plan, when neither the likelihood of an adverse judgment, nor the timing and amount of such a judgment, can be predicted with any certainty"); *Lane*, 68 B.R. at 611 (ordering estimation because, among other things, "[n]o plan of reorganization can be confirmed so long as this claim remains unliquidated and not estimated").

**B. The SEC Claim is Contingent and Unliquidated**

41.     A claim is contingent if it "has not yet accrued and … is dependent upon some future event that may never happen." *In re Energy Future Holdings Corp.*, 531 B.R. 499, 515 & n.71 (Bankr. D. Del. 2015) (citing *In re RNI Wind Down Corp.*, 369 B.R. 174, 182 (Bankr. D. Del. 2007)); *Saint Catherine Hosp. of Indiana, LLC v. Indiana Family and Soc. Servs. Admin.*, 800 F.3d 312, 317 (7th Cir. 2015) ("A 'contingent' claim is one conditioned upon some future event that is uncertain."); *Felton v. Noor Staffing Grp., LLC (In re Corporate Res. Servs. Inc.)*, 564 B.R. 196, 201 (Bankr. S.D.N.Y. 2017) (same).[14]   The SEC Claim is contingent on whether the Six Tokens are in fact securities, an issue that will take time to litigate before the Washington District Court and, likely, the Ninth Circuit Court of Appeals.

42.     A claim is unliquidated when it is not subject to ready determination and precision in computation of the amount due. *In re Vaughn*, 276 B.R. 323, 325 (Bankr. D. N.H. 2002) (same); *see In re Baroni*, 558 B.R. 916, 922 (Bankr. C.D. Cal. 2016) (same); *In re Kreisler*, 407 B.R. 321, 326 (Bankr. N.D. Ill. 2009) (stating that a claim is unliquidated when the discretion or judgment of the court is required to determine the amount of the claim); *In re Chavez*, 381 B.R. 582, 587 (Bankr. E.D.N.Y. 2008) (holding that litigation claims pending outside of bankruptcy court were subject to estimation).[15]   The calculation of the disgorgement sought in the SEC Claims depends

---

[14]   *See also In re Fostvedt*, 823 F.2d 305, 306 (9th Cir. 1987) (stating that a claim is contingent if "the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor" (citation omitted)); *SNTL Corp. v. Ctr. Ins. Co.* (*In re SNTL Corp.*), 571 F.3d 826, 843–44 (9th Cir. 2009) (holding that prepetition contractual right of payment that comes due postpetition is a prepetition, contingent claim that may be estimated under section 502(c) of the Bankruptcy Code); *Coldwell Banker & Co. v. Godwin Bevers Co., Inc.* (*In re Godwin Bevers Co., Inc.*), 575 F.2d 805, 807–08 (10th Cir. 1978) (same).

[15]   *See also Fostvedt*, 823 F.2d at 306 (holding that a claim is unliquidated if it is not subject to "ready determination and precision in computation of the amount due" (citation omitted)); *In re Loya*, 123 B.R. 338, 341 (B.A.P. 9th Cir. 1991) (stating that whether a claim is unliquidated "turns on the distinction between a simple hearing to determine the amount of a certain debt, and an extensive and contested evidentiary hearing in which substantial evidence may be necessary to establish amounts or liability"

on an "unjust enrichment theory," *see* 15 U.S.C. § 78u(d)(3), (7), and is measured by "wrongful gain." *See, e.g., SEC v. Sargent*, 329 F.3d 34, 40 (1st Cir. 2003) (stating that disgorgement is "intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws"). Disgorgement cannot exceed a purported wrongdoer's net gain, and therefore is measured by reasonably approximating profits causally connected to the violation, *SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004), and deducting legitimate expenses, *Liu v. SEC*, 140 S. Ct. 1936, 1950 (2020). It follows that liquidation of the SEC Claim will require consideration of commissions earned through the trading of the Six Tokens and deduction of legitimate corresponding expenses. The SEC Claim is thus unliquidated because the amount of the liability—even if the contingency is satisfied (which itself is uncertain)—is unknown today and cannot be easily calculated.

### C. Estimation Will Avoid Undue Delay in Administration of These Cases

43.     Whether delay is "undue" depends on the facts and circumstances of each case. *In re John Q. Hammons Fall 2006, LLC*, 2017 WL 4638439, at *4 (Bankr. D. Kan. Oct. 13, 2017). Courts consider "all the circumstances in the case and, in particular, how long the liquidation process would take compared with the uncertainty due to the contingency in question." *In re Teigen*, 228 B.R. 720, 723 (Bankr. D. S.D. 1998). Courts often estimate the contingent or unliquidated claims of governmental agencies to avoid undue delays in administration of bankruptcy cases. *See, e.g., In re Eagle Bus Mfg., Inc.*, 158 B.R. 421, 436 (S.D. Tex. 1993) (estimating National Labor Relations Board's claim for back pay because the bankruptcy proceedings "could not be effected" without the claim being addressed and "full adjudication of

---

(citation omitted)); *In re Interco, Inc.*, 137 B.R. 993, 997 (Bankr. E.D. Mo. 1992) (holding that a retirement fund's withdrawal liability claim against chapter 11 debtors was unliquidated under 502(c), where liquidation of amount of claim under Multiemployer Pension Plan Amendments Act of 1980 would require resolution of many substantial disputed issues).

the claims would require several years of litigation"); *In re Bicoastal Corp.*, 124 B.R. 598, 601 (Bankr. M.D. Fla. 1991) (estimating federal government's False Claims Act claims, which include treble damages and forfeiture); *In re Patrick Cudahy Inc.*, 97 B.R. 489, 491 (Bankr. E.D. Wisc. 1989) (estimating claim of National Labor Relations Board because it was necessary to value the claim to proceed with attempting to confirm a plan); *In re AMR Corp.*, 2021 WL 2954824, at *5 (Bankr. S.D.N.Y. July 14, 2021) (estimating claim of Equal Employment Opportunity Commission to avoid "awaiting the results of legal proceedings that could take a very long time to determine" and to save the estates a "significant amount in U.S. Trustee fees" by putting the debtors in a position to "close out their cases"); *In re Dana Corp.*, 2007 WL 2908221, at *1 (Bankr. S.D.N.Y. Oct. 3, 2007) (stating that the court ordered an estimation proceeding for the United States' claims under the Comprehensive Environmental Response, Compensation, and Liability Act to avoid a delay in the plan process).

44.     Estimation of the SEC Claim will avoid undue delay in the administration of the Debtors' jointly administered cases.  As described, *supra*, ¶¶ 35-36, the Plan provides for payment in full of all customer claims (by permitting customers to withdraw like-kind cryptocurrencies in the amounts associated with their accounts) and potentially payment in full in cash of other unsecured claims, with any residual remaining to be distributed to equity holders.

45.     However, even if the Plan hierarchy protecting customers and subordinating regulatory penalty claims is approved—which is unknown today—the Debtors still need to determine how much in cryptocurrency assets must be converted to cash to satisfy all non-customer claims against the Debtors.  This issue is particularly important because the Debtors anticipate having cryptocurrency assets that exceed the amount necessary to satisfy customer claims and general unsecured claims.  Liquidation of the SEC Claims allows the Debtors to

promptly convert sufficient cryptocurrencies to cash to satisfy the SEC Claims and make distributions to equity holders. The cryptocurrencies are highly volatile by nature, and any delay in distributing them risks a substantial decline in value. Delaying confirmation of the Plan by as much as several years so that the SEC Claim can be finally adjudicated in the WD Wash Court and Ninth Circuit will risk prejudice to all other stakeholders in these cases. *See, e.g.*, *Adelphia Bus. Solutions*, 341 B.R. at 423 (holding that estimation was appropriate because the Debtors were unable to establish a cash reserve for payment of administrative claims absent estimation of the claim).

46.     At the same time, the SEC will suffer little to no prejudice. The SEC already conducted an extensive, years'-long investigation regarding the Six Tokens, including commissions earned by BUS based on trading of the Six Tokens, and therefore, estimation can proceed efficiently.[16] Moreover, the SEC will be able to continue exercising its regulatory authority and prosecuting the WD Wash. Action at its own pace. In sum, "when the liquidation of a claim is premised on litigation pending in a non-bankruptcy court, and the final outcome of the matter is not forthcoming, the bankruptcy court should estimate the claim." *In re Lionel L.L.C.*, 2007 WL 2261539, at *2 (Bankr. S.D.N.Y. Aug. 3, 2007) (citation omitted).

### D.  The Court Has Broad Discretion to Set Procedure to Estimate Claims

47.     The Court has authority to approve the timeline proposed herein for the estimation of the SEC Claim, and it also holds wide discretion in determining how to estimate the SEC Claim. *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3rd Cir. 1982) (estimation can occur under § 502(c)

---

[16]  BUS has not yet had an opportunity to obtain discovery from the SEC and third parties regarding the Six Tokens. Though BUS plans to seek such discovery in the SEC Action, there is no prejudice to the SEC in estimating the SEC Claim before that discovery is complete because BUS already has produced documents sufficient to estimate the SEC Claim.

"using whatever method is best suited to the particular contingencies at issue"); *Addison v. Langston (In re Brints Cotton Mktg., Inc.)*, 737 F.2d 1338, 1341 (5th Cir. 1984) ("In estimating a claim, 'the bankruptcy court should use whatever method is best suited to the circumstances.'"); *Chemtura*, 448 B.R. at 648 ("neither the Code nor the Federal Rules of Bankruptcy Procedure provides any procedures or guidelines for estimation, and a bankruptcy court has wide discretion in accomplishing it" (internal citations omitted)).

48.    When determining the appropriate procedures, the Court should consider "the Congressional intent of assuring a speedy disposition of all matters relevant to bankruptcy proceedings." *In re T.D.M.A., Inc.*, 66 B.R. 992, 997 (Bankr. E.D. Pa. 1986); *see In re Amalgamated Foods, Inc*., 41 B.R. 616, 618 (Bankr. C.D. Cal. 1984) (stating that section 502(c) "clearly voices a policy of speedy disposition."). That is because "longer method[s], such as a full-blown trial on the merits, would 'eviscerate the purpose underlying Section 502(c).'" *Lionel L.L.C.*, 2007 WL 2261539, at *5 (quoting *In re Baldwin-United Corp*, 55 B.R. 885, 899 (Bankr. S.D. Ohio 1985)); *see also In re Adelphia Communs. Corp*., 368 B.R. 140, 278 (Bankr. S.D.N.Y. 2007) ("courts specifically have recognized that it is often 'inappropriate to hold time-consuming proceedings which would defeat the very purpose of 11 U.S.C. § 502(c)(1) to avoid undue delay.'") (quoting *In re Windsor Plumbing Supply Co., Inc*., 170 B.R. 503, 520 (Bankr. E.D.N.Y. 1994)). The procedures used by courts must only satisfy the basic requirements of due process. *Lionel L.L.C.*, 2007 WL 2261539, at *5 (stating that, "[i]n general, the truncated trial process that can be developed under [section] 502(c) has been found to be consistent with the dictates of due process of law").

49.    Courts have therefore approved a variety of estimation procedures, depending on the facts of each case, "'run[ning] the gamut from summary trials to full-blown evidentiary

hearings to a mere review of pleadings, briefs, and a one-day hearing involving oral argument of counsel.'" *See, e.g., In re Cantu*, 2009 WL 1374261, at *2 (Bankr. S.D.. Tex. May 15, 2009) (quoting *In re Windsor Plumbing Supply Co*., 170 B.R. 503, 520 (Bankr. E.D.N.Y. 1994)). Indeed, where discovery was not necessary, courts have estimated claims following a simple "review of [the] pleading and briefs followed by oral argument of counsel." *Chemtura*, 448 B.R. at 650; *see Matter of Fed. Press Co*., 116 B.R. 650 651 (Bankr. N.D. Ind. 1989) (estimating claim based on briefs and oral argument); *Lane*, 68 B.R. at 613 (same).

50.     Similarly, courts have adopted a variety of procedures to estimate the amount of the claim. Some courts use a "probabilistic methodology" in which "the amount of the claim [is] diminished by probability that it may be sustainable only in part or not at all." *Cantu*, 2009 WL 1374261, at *3; *see Windsor Plumbing*, 170 B.R. at 521 (estimating asserted claim of $3,502,860 at $145,000 based on the probabilities of whether the claimant would ultimately prevail on the merits). Other courts, however, have taken a "binary[,] all or nothing" approach. *Windsor Plumbing*, 170 B.R. at 521 (citing Bittner, 691 F.2d at 136). Under this approach, "[t]he party that carries its argument by a preponderance generally receives either a claim value of zero if the debtor prevails, or the full value of the claim if the claimant prevails." *Windsor Plumbing*, 170 B.R. at 521 (citing *Bittner*, 691 F.2d at 136). The Court's determination of the methodology used to estimate a claim is reviewed only for abuse of discretion. *Bittner*, 691 F.2d at 136 (holding that the bankruptcy court did not abuse its discretion by estimating claims "according to their ultimate merits rather than the present value of the probability that they would succeed in their state court action"). Here, both the Debtors and the SEC can posit their proposed methodology for estimation of the claim after reviewing the SEC's proof of claim.

30470697.2

**E. The Court Should Require The SEC To File A Proof Of Claim And Set Procedures For An Estimation Proceeding**

51.    The bankruptcy court possesses wide discretion to determine the method best suited to estimating the claim. *Bittner*, 691 F.3d at 135; *Chemtura Corp.*, 448 B.R. at 649; *In re Thomson McKinnon Secs., Inc.*, 191 B.R. 976, 989 (Bankr. S.D.N.Y. 1996).   Overly time consuming proceedings defeat the very purpose of 11 U.S.C. § 502(c)(1) to avoid undue delay.   *Windsor Plumbing*, 170 B.R. at 520.

52.    The estimation sought here can be done quickly and efficiently.   The SEC's complaint only identifies the Six Tokens as securities and seeks disgorgement of purported "ill-gotten gains" with respect to the Six Tokens.   And the SEC has already taken discovery regarding the Six Tokens, including the commissions earned by BUS based on trades of the Six Tokens. Therefore, the amount of disgorgement can be resolved with minimal (if any) additional discovery.

53.    The Court has authority as a part of the claims estimation procedure to require the SEC to file a proof of claim before the 180-day bar date set forth in section 502(b)(9)(A).   Section 502(b)(9) states that a claim of a governmental units are timely filed "if it is filed before 180 days after the date of the order for relief or such later time as the Federal Rules of Bankruptcy Procedure may provide."   However, both the Bankruptcy Code and the Bankruptcy Rules provide the Court ample authority to require a governmental unit to file a claim before the general 180-day bar date.

54.    Section 502(c) of the Bankruptcy Code requires estimation when the facts satisfy the statutory requirements. *Federal-Mogul Global*, 330 B.R. at 154; *G-I Holdings*, 323 B.R. at 599.   Section 502(c) does not exempt the claims of governmental units, and courts have repeatedly used section 502(c) to estimate such claims. *Supra* ¶ 43.   Courts have also repeatedly held that bankruptcy courts have broad discretion to set procedures to estimate claims, *supra* ¶¶ 47-50, and that discretion necessarily includes requiring the creditor to file a proof of claim.   It follows that

23

section 502(c)[17] gives the Court ample authority to require a governmental unit to file a claim before the 180-day bar date.

55.    The Bankruptcy Rules also provide authority to shorten the deadline for the SEC to file a proof of claim.  Bankruptcy Rule 3002(c)(1) discusses the deadline for proofs of claim by governmental units, but that rule only applies in chapter 7 and 13 cases.  Bankruptcy Rule 3003(c)(3) states that the court "shall fix" the deadline to file claims in chapter 11 cases.  That rule specifies that certain claims may be filed "to the extent and under the conditions stated in" Rule 3002, but carves out Bankruptcy Rule 3002(c)(1).  In other words, the Bankruptcy Rules are silent on when government claims must be filed in chapter 11 cases.  Moreover, Bankruptcy Rule 9006(c) does not prohibit the reduction of the time for taking actions under Bankruptcy Rule 3003(c).  In sum, Bankruptcy Rule 3003 provides that the Court "shall fix" the deadline to file claims (without exception for government claims), and Bankruptcy Rule 9006 recognizes that the 180-day bar date for governmental claims may be shortened "for cause" in chapter 11 cases.

56.    Additionally, requiring the SEC to file a claim as set forth below would not undermine the purpose of section 502(b)(9)(A).  Section 502(b)(9)(A) was designed to protect the public's interest in assuring governmental units can assert claims because it can take more time for a governmental unit than a private party to identify and quantify a claim.  *See In re Gardenhire*, 220 B.R. 376, 384 (B.A.P. 9th Cir. 1998) *rev'd on other grounds in In re Gardenhire*, 209 F.3d 1145, 1152 (9th Cir. 2000).  Here, the SEC has had more than ample time to prepare a claim given that it started investigating BUS in 2017, demanded and received voluminous documents and took

---

[17]    Additionally, section 105(a) of the Bankruptcy Code supplements section 502(c), permitting the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out" estimation of a claim under section 502(c).

numerous depositions. *Supra* ¶¶ 24-25. And, the SEC has already filed a complaint that identifies the specific tokens that it believes are securities. The SEC does not need any more time to prepare a proof of claim, particularly where giving it more time would risk the a devaluation of the cryptocurrencies that will be distributed to stakeholders in these cases.

57.    The Debtors therefore propose the following process: the SEC will be required to file its proof of claim, including for the Asserted Claims, on or before August 9, 2023 (which is three months after the Petition Date and approximately four months after asserting the SEC Claims in the W.D. Wash. Court), which must include a spreadsheet specifying the amount of disgorgement sought and the supporting calculations. The SEC, having conducted an investigation and filed its complaint, is fully aware of its claim, and thus a proof of claim will not require significant time to prepare. Formally submitting the proof of such claim will permit the Court and the Debtors the means of resolving it as part of BUS's chapter 11 case. After the SEC files its proof of claim, BUS will examine and verify the SEC's asserted disgorgement through document discovery and one deposition, and then file a brief setting forth its position on the amount of disgorgement. The SEC would similarly have an opportunity to verify BUS' asserted disgorgement. Under this proposed procedure, the Court would not determine whether any of the Six Tokens are securities. Instead, the Court would estimate the potential disgorgement associated with the Six Tokens, and then apply the 50% Token Toss. This procedure will ameliorate any of the SEC's concerns about this Court addressing securities laws (even though section 502(c) plainly provides that the Court may do so).

58.    This contested matter would be governed by the following schedule:

| Date | Event |
| --- | --- |
| August 9, 2023 | Deadline for SEC to File Proof of Claims |
| September 8, 2023 | Debtors' Opening Estimation Brief on How the Claims Should Be Estimated, Including any Expert Reports |

| September 29, 2023 | SEC's Opposition Brief on How the Claims Should Be Estimated, Including any Expert Reports |
| --- | --- |
| October 10, 2023 | Debtors' Reply Brief |
| Earliest date available to Court after October 10, 2023 | Hearing |

## **NOTICE**

59.     The Debtors will provide notice of this Motion to the SEC and the following parties and/or their respective counsel, as applicable: (a) the United States Trustee for the District of Delaware; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the lender under the Debtors' post-petition financing facility; (d) counsel to Debtors' non-debtor affiliate Bittrex Global GmbH; (e) counsel to Debtors' non-debtor affiliates RBR Holdings, Inc., and Aquila Holdings Inc.; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the attorneys general in the states where the Debtors conduct their business operations; (i) FinCEN and OFAC; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the Order substantially in the form attached hereto as **Exhibit A** and grant such other and further relief as is just and proper.

*[Signature Page to Follow]*

Date: June 16, 2023
Wilmington, DE

**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**

*/s/  Kenneth Enos*

Robert S. Brady (Delaware Bar No. 2847)
Kenneth Enos (Delaware Bar No. 4544)
Joshua Brooks (Delaware Bar No. 6765)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: 302-571-6600
Facsimile: 302-571-1253
Email: rbrady@ycst.com
Email: kenos@ycst.com
Email: jbrooks@ycst.com

-and-

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

Susheel Kirpalani *(admitted pro hac vice)*
Patricia B. Tomasco *(admitted pro hac vice)*
Daniel Holzman *(admitted pro hac vice)*
Alain Jaquet *(admitted pro hac vice)*
Razmig Izakelian *(admitted pro hac vice)*
Valerie Ramos *(admitted pro hac vice)*
Joanna D. Caytas *(admitted pro hac vice)*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: 212-849-7000
Facsimile: 212-849-7100
Email: susheelkirpalani@quinnemanuel.com
Email: pattytomasco@quinnemanuel.com
Email: danielholzman@quinnemanuel.com
Email: alainjaquet@quinnemanuel.com
Email: razmigizakelian@quinnemanuel.com
Email: valerieramos@quinnemanuel.com
Email: joannacaytas@quinnemanuel.com

**CO-COUNSEL FOR THE DEBTORS**

30470697.2