**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Desolation Holdings LLC, *et al.* | Case No. 23-10597 (BLS) |
| Debtors. | (Jointly Administered) |
| | Hrg. Date: July 12, 2023 at 1:30 p.m. (ET)<br>Obj. Deadline: July 5, 2023 at 4:00 p.m. (ET) |

### FLORIDA OFFICE OF FINANCIAL REGULATION'S OBJECTION TO DEBTORS' MOTION TO ENFORCE AUTOMATIC STAY AND NON-DISCRIMINATION PROVISIONS OF THE BANKRUPTCY CODE, AND FOR CIVIL CONTEMPT

The Florida Office of Financial Regulation ("OFR"), files this Objection to the Debtors' Motion to Enforce Automatic Stay and Non-Discrimination Provisions of the Bankruptcy Code, and For Civil Contempt ("Motion") filed by above-captioned debtors and debtors in possession ("Debtors"), and respectfully states as follows:

### JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware. Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware ("Local Rule[s]"), the OFR confirms its consent to the Court entering a final order in connection with Debtors' Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Introduction

1.      The Office of Financial Regulation ("OFR") is the Florida regulator of Bittrex Inc.'s money transmitter activities and is neither a creditor nor a claimant in Debtors' bankruptcy proceedings. Nor is the OFR party to an "adversarial proceeding" under Rule 7001. Rather, the OFR appears in this Court for the limited purpose of responding to Debtors' Motion.

2.      The OFR objects to the Debtors' Motion because the OFR's statutorily authorized enforcement action against Debtor Bittrex Inc. ("Bittrex Inc.") and its control persons is seeking only to impose a license revocation for valid public safety and policy reasons, and is a valid and nondiscriminatory use of police or regulatory powers that is exempt from the automatic stay.

3.      The OFR's action is solely intended to effectuate important public policies of protecting Florida consumers from potential harm, holding responsible parties accountable for their violations of Florida law, and deterring and preventing future violations. The OFR is therefore fulfilling its statutory obligation to enforce its regulatory or police powers.

4.      On the other hand, Debtors' motion is a thinly veiled attempt to weaponize and misuse federal bankruptcy protections as a sword against a state regulator in order to prioritize the future career opportunities of those legally responsible for Bittrex Inc.'s Florida violations. In doing so, Debtors' Motion seeks to thwart a statutorily authorized enforcement action, frustrate important Florida public policies, and seeks to gain an advantage in state administrative litigation.

5.      The matter has not yet been referred for administrative hearing, as the OFR has held it in abeyance since service of the Administrative Complaint ("Complaint")[1]; in the interim, the parties have made efforts to confer regarding possible settlement.

6.      Because the OFR enforcement action does not violate the U.S. Bankruptcy Code,

---

[1] See *Exhibit C to Declaration of Steven Merriman*, Case No. 23-10597-BLS.

the relief sought by Debtors' Motion is inappropriate and should be denied by this Court.

## FACTS

7.    On April 17, 2023,[2] the OFR issued its Complaint to Bittrex Inc. and five of its affiliated parties,[3] charging three counts which alleged violations of chapter 560, Florida Statutes, and seeking to revoke the company's license. The Complaint, including a Notice of Rights and a courtesy Election of Proceeding Form, was served on Bittrex Inc. on April 24.

8.    The OFR's Complaint (and Debtors' Motion) derive from the following events and circumstances.

9.    Unbeknownst to the OFR in late 2018 when it issued a Florida money transmitter license to Bittrex Inc., Bittrex Inc. had been engaging in ongoing conduct that state and federal regulators independently found to be noncompliant with federal Bank Secrecy Act/Anti-Money Laundering ("AML") regulations. Bittrex Inc.'s conduct concerning its AML program, among other things, resulted in final agency actions in 2019 by the New York Department of Financial Services ("NYDFS")[4] and later in 2022 by the Financial Crimes Enforcement Network, Department of the Treasury ("FinCEN").[5] Bittrex Inc.'s conduct, in turn, violated chapter 560, Florida Statutes, subjecting Bittrex Inc. to a license revocation in Florida. See §560.114(1)(l), Fla. Stat. (2022).

10.    Importantly, the federal AML regulations that Bittrex Inc. was noncompliant with

---

[2] Only by happenstance and not coordination, on April 17, the same day the OFR issued its Complaint, the Securities and Exchange Commission ("SEC") filed a civil complaint against Bittrex Inc. in the U.S. District Court for the Western District of Washington (Seattle) (Case No. 2:23-cv-00580-RSM). Significantly, Debtors do not appear to have claimed that the SEC's enforcement action violates the automatic stay.

[3] The five affiliated parties named in the OFR's Complaint were Bittrex Inc. officers and/or indirect owners Richie Lai, William Shihara, Rami Kawach, James Waschak, and Michael Joseph Carter.

[4] See *Exhibit G to Declaration of Steven Merriman*, Case No. 23-10597-BLS.

[5] See *Exhibit E to Declaration of Steven Merriman*, Case No. 23-10597-BLS.

according to NYDFS and FinCEN are also incorporated into chapter 560, Florida Statutes, for the legislative purpose of deterring the use of a money services business to conceal proceeds from criminal activity and to ensure the availability of such records for criminal, tax, or regulatory investigations or proceedings. § 560.123(2), Fla. Stat. (2022).

11.    In 2020, the Connecticut Department of Banking found that Bittrex Inc. engaged in unlicensed money transmission activity in Connecticut, resulting in a final action,[6] thereby violating chapter 560, Florida Statutes, and subjecting Bittrex Inc. to a license revocation. § 560.114(1)(m), Fla. Stat. (2022).

12.    In October 2022, around the same time the OFR finally learned about the FinCEN action and its findings that Bittrex Inc. repeatedly committed "willful" AML violations during previous years, the OFR participated in a multistate examination of Bittrex Inc. that resulted in several findings of recent and ongoing violations of chapter 560, Florida Statutes. These included: 1) a failure to segregate customer assets from company operating capital (i.e., commingling)[7]; 2) ███████████████████████████████████; and 3) a failure to continuously provide a surety bond in the correct amount.[9]

13.    On March 21, 2023, the OFR's examination findings were referred for a potential enforcement matter seeking to revoke Bittrex Inc.'s money transmitter license.

14.    Then, on March 31, 2023, the OFR received a letter from Bittrex Inc. advising that

---

[6] See *Exhibit F to Declaration of Steven Merriman*, Case No. 23-10597-BLS.

[7] § 560.208(4), Fla. Stat. (2022).

███████████████████

[9] § 560.209(5), Fla. Stat. (2022). Note that subsection (3)(b) of this provision states that the surety bond "*shall run to the state for the benefit of any claimants in this state against the applicant or its authorized vendors to secure the faithful performance of the obligations of the applicant.*" Thus, a money transmitter licensee's failure to continuously provide the OFR with a surety bond in the correct amount deprives potential Florida claimants of the chance to be made whole if the licensee defaults on its monetary obligations.

it planned to wind down its U.S. operations and surrender its Florida license "on or before April 30." [10] The letter did not indicate that Bittrex Inc. planned to file for bankruptcy. To the contrary, Bittrex Inc.'s letter asserted that "the consolidated group of entities that Bittrex is a part of remains well capitalized." [11]

15.    Given the OFR's awareness of Bittrex Inc.'s past and recent violations of minimum license requirements, the letter was concerning, especially as to whether Bittrex Inc.'s withdrawal from the state would adversely affect the financial interests of Florida consumers owed monies by Bittrex Inc.

16.    Accordingly, on April 17, 2023, the OFR issued its Complaint to Bittrex Inc., and five of its affiliated parties ("Respondents"), charging three counts alleging violations of chapter 560, Florida Statutes, and seeking a license revocation. On April 24, Bittrex Inc. received the Complaint.

17.    The OFR's purpose in seeking a license revocation against Respondents (as opposed to accepting a voluntary surrender), given Bittrex Inc.'s ongoing pattern of violations, is to affirmatively deter and prevent future violations of chapter 560, Florida Statutes, and protect Florida consumers. In the event that any or all Respondents return to Florida in the future to apply for a license (whether as Bittrex Inc. or as another entity), the revocation must be disclosed on such application, and could serve as a basis for the OFR's license denial.

18.    On April 30, 2023, Bittrex Inc., surrendered its license. However, Bittrex Inc.'s license surrender does not affect OFR's prosecution of the Complaint, because pursuant to section

---

[10] See *Exhibit A to Declaration of Steven Merriman*, Case No. 23-10597-BLS.

[11] No information was provided in the letter regarding the total amount of monetary obligations owed to Florida customers by Bittrex Inc.; it only shared generalized details about customer notifications to withdraw monies before the Bittrex online platform would be disabled on April 30. The letter stated that "[f]or a commercially reasonable time thereafter, Bittrex will remain available to process individual customer claims for withdrawal."

560.114(6), Florida Statutes, "[i]f a license granted under [chapter 560, Florida Statutes] expires or is surrendered by the licensee during the pendency of an administrative action, the proceeding may continue as if the license is still in effect."

19.    On May 8, 2023, Bittrex Inc. filed its bankruptcy petition in this Court.

20.    On May 9, 2023, counsel to Bittrex Inc. emailed the OFR to advise of the bankruptcy filing and stated that "[Bittrex Inc.] is considering its response to the Administrative Complaint, and whether [OFR's] continued prosecution of it violates the Bankruptcy Code."

21.    On May 10, 2023, the OFR responded by email, articulating its position that, under 11 U.S.C. § 362(b)(4), it was excepted from the automatic stay provision as a state regulator pursuing an administrative action in which no monetary penalties were being sought.

22.    On May 22, 2023, Bittrex Inc. and its affiliated parties filed a joint request for an administrative hearing and requested to engage in settlement negotiations with the OFR.

23.    Thus, the OFR has neither referred its Administrative Complaint for a hearing at the Florida Division of Administrative Hearings, nor taken any other enforcement action to advance the prosecution of its Complaint. Rather, the OFR has at Bittrex, Inc.'s request, engaged in good faith since May, conferring with Bittrex Inc.'s counsel as in an attempt to resolve the matter.

24.    On June 1, 2023, the OFR conferred with counsel to Bittrex Inc. Despite the fact the OFR possessed information that Bittrex Inc. has continued to violate Florida law on an ongoing basis, opposing counsel stridently asserted during the conference that Bittrex Inc. may have had regulatory issues in the past, but it had been compliant with Florida law since then. Such was not the case. The OFR made a limited disclosure to Bittrex Inc.'s counsel of confidential OFR

examination information [12] relating to uncharged violation findings. , in the course of articulating the point (that OFR was aware of an ongoing pattern of violations by Bittrex Inc.), the OFR explained that it chose to exercise its lawful discretion to issue its Complaint with the three violations mentioned above. The OFR is not required by law to charge every violation it may be aware of, and may use its discretion in making charging decisions.

25.    At no point during the June 1 meet-and-confer, nor at any other time, has the OFR ever stated, that Bittrex Inc.'s ████████████████████████ was the sole purpose of the OFR's enforcement action. In issuing its Complaint, the OFR was concerned only with its statutory responsibility as the financial regulator to enforce compliance with chapter 560, Florida Statutes, and to fulfill its duty to protect the interests of Florida consumers.

26.    On June 13, 2023, bankruptcy counsel to Bittrex Inc. sent the OFR a letter which demanded the immediate dismissal of the Complaint, alleging that its continued prosecution violated the automatic stay and nondiscrimination provisions of the Bankruptcy Code.

27.    Because the OFR's enforcement action falls within the regulatory exception to the automatic stay and is motivated only by the statutory duty to compel compliance with and prevent future violations of Florida consumer finance laws for the protection of Floridians, this Court should deny the Debtors' Motion.

## BACKGROUND

### A.    OFR's Statutory Authority to Enforce Florida Consumer Finance Laws

28.    The OFR was created by section 20.121, Florida Statutes, and is overseen by the

---

[12] § 560.129, Fla. Stat. (2022). (The OFR's examination or investigation-related information is "confidential and exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution until the investigation or examination ceases to be active. For purposes of this section, an investigation or examination is considered 'active' so long as the office or any other administrative, regulatory, or law enforcement agency of any jurisdiction is proceeding with reasonable dispatch and has a reasonable good faith belief that action may be initiated by the office or other administrative, regulatory, or law enforcement agency."). By Florida statutes, it is a third-degree felony to willfully disclose such confidential information. § 560.129(7), Fla. Stat. (2022).

Financial Services Commission, which is composed of the governor, attorney general, chief financial officer, and the commissioner of agriculture. The OFR is "responsible for all activities of the Financial Services Commission relating to the regulation of banks, credit unions, other financial institutions, finance companies, and the securities industry." *Id.*

29.     The OFR, pursuant to section 560.105, Florida Statutes, is tasked by the Florida Legislature to supervise all money services businesses (e.g., money transmitters) and their affiliated parties [13] (e.g., control persons), by administering and enforcing chapter 560, Florida Statutes, and its corresponding rules.

**B.     Florida's Administrative Procedure Act and Posture of OFR's Action**

30.     Chapter 120, Florida Statutes ("Florida Administrative Procedure Act" or "Florida APA") "provides uniform procedures for the exercise of specified authority" to state agencies such as the OFR. § 120.515, Fla. Stat. (2022). As such, when the OFR takes an administrative action to enforce statutes or rules that apply to the various types of businesses it regulates, it must do so according to the Florida APA and its corresponding rules.

31.     Specifically, section 120.569, Florida Statutes, applies to all administrative actions taken Florida administrative agencies to enforce statutory or administrative rule violations. After a licensee is served with an administrative complaint, the licensee has twenty-one (21) days to notify the OFR in writing as to whether it wants to preserve its right to a hearing.

32.     In the case before the Court, the Notice of Rights (on page 9 of the OFR's Complaint served on Respondents on April 24, 2023) explicitly and unambiguously informed Respondents when, where, and how to preserve their right to a hearing.

33.     The Election of Proceeding ("EOP") form, attached to the Complaint as a courtesy,

---

[13] See §§ 560.103(1) and (10), 560.127, and 560.114(1)(a), Fla. Stats. (2023).

presented Respondents with three options:

    i.      To consent to the allegations and conclusions of law;

    ii.     To consent to the allegations but to dispute the OFR's *conclusions of law*, which would allow Respondents to have a hearing before an OFR hearing officer, pursuant to section 120.57(2), Florida Statutes; or,

    iii.    To dispute the OFR's *factual allegations* which, assuming material facts were in dispute, would allow Respondents to have the matter referred to the Florida Division of Administrative Hearings for a hearing before an administrative law judge, pursuant to section 120.57(1), Florida Statutes.

34.     Under either option 2 or 3, the EOP form presented Respondents with an additional choice to request to engage in settlement negotiations with the OFR.

35.     Any licensee that fails to submit a completed EOP form or otherwise file a petition with the OFR is subject to default.

36.     On May 22, 2023, counsel to Bittrex Inc. submitted a completed EOP form with option 3 selected, as well as a statement of the allegations it and its principals disputed, and a request to engage in settlement negotiations with the OFR.

37.     Contrary to the insinuations and implications noted in Debtors' Motion, as of the April 24 date of service of the Complaint, the OFR has neither referred the matter for an administrative hearing, nor undertaken any enforcement action concerning the Complaint. Rather, the OFR has, at Bittrex Inc's request, engaged in settlement negotiations with Bittrex Inc.'s legal counsel.

    **C.**    **Bittrex Inc.'s Ongoing Pattern of Violations as a Florida Licensee**

    <u>2018-2020 period of licensure.</u>

38.     On August 17, 2018, Bittrex Inc., a money services business in the virtual currency industry, first submitted its application to the OFR for a money transmitter license ("license"), pursuant to Part II, chapter 560, Florida Statutes. The OFR approved Bittrex Inc.'s license on

October 4, 2018.

**Bittrex Inc.'s conduct results in a 2019 New York regulatory action.**

39. On April 10, 2019, the New York State Department of Financial Services ("NYDFS") issued Bittrex Inc. a Cease-and-Desist ("C&D") Order and two license denials (money transmitter license and virtual currency license). NYDFS's actions were based on its findings that, between January 2017 and December 31, 2018, Bittrex Inc.: 1) failed to maintain an adequate BSA/AML/OFAC[14] compliance program; 2) failed to agree to maintain the minimum capital requirement; and 3) failed to perform adequate due diligence in launching tokens or products.

40. Bittrex Inc.'s AML failures discovered by NYDFS consisted of inadequacies in many essential legal requirements imposed on a money services business: 1) customer due diligence, e.g., Know Your Customer and Customer Identification programs; 2) policies and procedures; 3) employee training; 4) independent review; and 5) an effective and/or qualified compliance officer.

41. Under Florida law, a money services business is subject to a disciplinary action if it engages in conduct that results in a licensing authority in another jurisdiction taking an action against it. [15] Accordingly, Count III of the OFR's Complaint alleged that Bittrex Inc.'s conduct resulting in the NYDFS action violated Florida law. *Id.* Because of the violation, the OFR is authorized to seek a license revocation,[16] which is what Count III seeks.

**Bittrex Inc.'s conduct results in a 2020 Connecticut regulatory action.**

42. On October 16, 2020, Bittrex Inc. and the Connecticut Department of Banking

---

[14] Bank Secrecy Act ("BSA"); Anti-Money Laundering ("AML"); and Office of Foreign Asset Control, U.S. Department of Treasury ("OFAC").

[15] § 560.114(1)(l)), Fla. Stat. (2022).

[16] Pursuant to the Disciplinary Guidelines for Money Services Businesses Form OFR-560-09, incorporated by reference in Rule 69V-560.1000, Florida Administrative Code, violation number 13.

("CDB") entered into a Consent Order as a result of investigative findings that Bittrex Inc. acted as an unlicensed money transmitter in Connecticut.

43.     Under Florida's consumer finance laws, a money services business is subject to disciplinary action if it is the subject of a regulator's final agency action for engaging in unlicensed activity in any jurisdiction. [17] Accordingly, Count II of the OFR's Complaint alleged that the CDB Consent Order involving Bittrex Inc.'s unlicensed money transmission activity violated Florida law. *Id.* Because of the violation, the OFR is authorized to seek a license revocation,[18] which is what Count II seeks.

### 2022-2023 period of licensure.

**OFR learns Bittrex Inc.'s prior conduct results in 2022 FinCEN regulatory action.**

44.     On October 5, 2022, Bittrex Inc. and Financial Crimes Enforcement Network, Department of the Treasury ("FinCEN") entered into a Consent Order Imposing a Civil Money Penalty subsequent to FinCEN's findings that Bittrex Inc. willfully violated federal BSA/AML regulations between February 13, 2014 and December 7, 2018.

45.     After NYDFS in 2019, FinCEN was now the second regulatory authority to take an action against Bittrex Inc. after finding that it failed to comply with federal AML regulations during a period that overlaps with that of Bittrex Inc.'s money transmitter licensure in Florida.

46.     Similar to Count III (i.e., pertaining to the 2019 NYDFS Cease-and-Desist Order and license denials), Count I of the OFR's Complaint alleged that Bittrex Inc.'s conduct resulting in the FinCEN Consent Order violated Florida law. § 560.114(1)(l), *supra*. Because of the

---

[17] § 560.114(1)(m), Fla. Stat. (2022).

[18] Pursuant to the Disciplinary Guidelines for Money Services Businesses Form OFR-560-09, incorporated by reference in Rule 69V-560.1000, Florida Administrative Code, violation number 14.

violation, the OFR is authorized to seek a license revocation,[19] which is what Count I seeks.

**2022 OFR exam of Bittrex Inc. finds violations and refers for enforcement.**

47.     Between October 2022 and March 2023, the OFR participated in a multistate examination of Bittrex Inc., along with financial regulators from Texas, Maryland, and Michigan. During the course of the examination, Bittrex Inc. produced records and information in response to OFR requests. The OFR examiner found that Bittrex Inc. had failed to comply with several provisions of chapter 560, Florida Statutes, and corresponding rules.

48.     On March 22, 2023, these examination findings were referred internally to the OFR's Office of General Counsel for a possible enforcement action against Bittrex Inc. which sought to impose a license revocation.

**Bittrex Inc. notifies OFR of imminent license surrender and wind-down.**

49.     On March 31, 2023, the OFR received a letter from Bittrex Inc. advising that it planned to wind down its U.S. operations and surrender its Florida license "on or before April 30."[20] The letter did not indicate that Bittrex Inc. planned to file for bankruptcy. To the contrary, Bittrex Inc.'s letter asserted that "the consolidated group of entities that Bittrex is a part of remains well capitalized."

50.     Additionally, no information was provided in the letter regarding the total amount of monetary obligations owed to Florida customers by Bittrex Inc.; it only shared generalized details about customer notifications to withdraw monies before the Bittrex online platform would be disabled on April 30. The letter stated that "[f]or a commercially reasonable time thereafter, Bittrex will remain available to process individual customer claims for withdrawal."

---

[19] FN 5, supra.

[20] See *Exhibit A to Declaration of Steven Merriman*, Case No. 23-10597-BLS.

51.     Given the OFR's awareness of Bittrex Inc.'s past and recent violations of Florida law, the letter was concerning, especially given the OFR's statutory obligation to enforce violations of and compel compliance with chapter 560, Florida Statutes, to protect the financial interests of Florida consumers. [21]

**OFR initiates enforcement action prior to Bittrex Inc.'s bankruptcy filing.**

52.     On April 17, 2023, the OFR's issued its Complaint to Bittrex Inc. and five of its affiliated parties, who received it on April 24. When issuing an administrative complaint to revoke an entity's license, it is generally the practice of the OFR to name one or more control persons in addition to the entity itself. This is intended to hold responsible those individuals in charge of operating a licensed entity when a violation occurred, especially when the entity is (or will be) dissolved. Under Florida law, a control person is one type of "affiliated party" of a money services business who is liable for a failure by the licensee to comply with chapter 560, Florida Statutes, and corresponding rules. §§ 560.103(1) and (10), 560.127, and 560.114(1)(a), Fla. Stats. (2023).

53.     On May 8, Bittrex Inc. filed its bankruptcy petition, notifying the OFR by email on May 9, and questioning whether the automatic stay prevented the OFR from continuing to prosecute its Complaint.

54.     On May 10, OFR counsel responded by email, articulating the agency's  legal position that it was exempt from the automatic stay pursuant to the regulatory exception of 11 U.S. Code §362(b)(4).

55.     On May 22, Bittrex Inc. filed its request for an administrative hearing as well as a request to engage in settlement negotiations. In response, the OFR held the case in abeyance rather

---

[21] The consumer protection components of chapter 560, Florida Statutes, provide the OFR with express authority to examine, investigate, and/or discipline "*any practice or conduct that ... materially prejudices the interests of [a money services business'] customers.*" §§ 560.109, 560.114(1)(z), Fla Stats. (2022). (Emphasis added).

than referring for hearing; the parties began efforts to confer and explore a possible settlement.

56.    On June 1, 2023, OFR counsel and Bittrex Inc. counsel conferred, discussing several topics. Opposing counsel argued that the Complaint only alleged "older" conduct by Bittrex Inc., while no recent violations had been alleged. In response, OFR counsel explained how the recent examination revealed more recent violations of Florida law which indicated an ongoing pattern throughout Bittrex Inc.'s licensure, and that it was within OFR's administrative discretion in deciding which legal violations to charge in its Complaint. OFR counsel's comments were carefully prefaced by stating clearly that such discussion required a limited disclosure of confidential information relating to an OFR examination,[22] but it would be shared with opposing counsel once they confirmed their understanding of Florida's confidentiality requirements, in the specific context of confidential settlement communications.

57.    Counsel for Bittrex Inc. verbally confirmed their understanding of the OFR counsel's statement lawfully invoking confidentiality, leading the OFR to believe that they agreed to protect the OFR's confidential exam information. Once confidentiality was established, OFR counsel referenced examination findings such as 1) failure to segregate customer assets from company operating capital; 2)                                                    and, 3) failure to maintain a surety bond in the correct amount at all times.

58.    Despite the fact that the OFR was in possession of evidence that Bittrex Inc. has continued to violate Florida law on an ongoing basis, opposing counsel stridently asserted that Bittrex Inc.'s regulatory issues were all in the past.

---

[22] § 560.129, Fla. Stat. (2022). (The OFR's examination or investigation-related information is "confidential and exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution until the investigation or examination ceases to be active. For purposes of this section, an investigation or examination is considered 'active' so long as the office or any other administrative, regulatory, or law enforcement agency of any jurisdiction is proceeding with reasonable dispatch and has a reasonable good faith belief that action may be initiated by the office or other administrative, regulatory, or law enforcement agency."). By Florida statutes, it is a third-degree felony to willfully disclose such confidential information. § 560.129(7), Fla. Stat. (2022).

59.     At no point during the June 1 conference, nor at any other time, did the OFR state that Bittrex Inc.'s financial condition (e.g., insolvency, or bankruptcy filing) was the sole reason for the OFR's enforcement action. Such was not the case. In issuing its Complaint, the OFR was concerned only with its statutory responsibility to protect the interests of Florida consumers, while deterring and preventing future violations of state consumer finance laws by holding accountable those who have violated them. At the time of filing its Administrative Complaint, and at all times thereafter, the OFR has had no pretextual motivation towards Bittrex Inc. or its control persons because of its financial condition. The reference to a ███████████████████████ was simply one of many different violations of minimum license requirements, not an act of discrimination.

**Bittrex Inc.'s Demand that OFR Immediately Dismiss Enforcement Action**

60.     Attempts at settlement failed. On June 13, 2023, the OFR received a demand letter from opposing counsel which stated in relevant part:

> [Bittrex Inc.] does not intend to resume the operation of its U.S. exchange and has already surrendered its License. Therefore, [Bittrex Inc.] demands that you dismiss the Florida Action in its entirety, with prejudice, immediately, but in no event later than Friday, June 16, 2023.

(*See Exhibit L to Declaration of Patricia B. Tomasco*, Case No. 23-10597-BLS.)

61.     The OFR rejects counsel's demand to dismiss the Complaint (with or without prejudice). Since Bittrex Inc., has surrendered its licensee, a dismissal of the OFR's pending Administrative Complaint seeking license revocation would prevent the OFR from refiling at a later time because the agency would no longer retain jurisdiction and authority to re-file and prosecute its enforcement action, pursuant to section 560.114(6), Florida Statutes.

62.     Opposing counsel's conduct and statements to the OFR on behalf of Bittrex Inc. and its control persons indicate that their primary motivation in avoiding a license revocation is to

protect the future career prospects of the individuals named in the Complaint who operated Bittrex Inc., as it violated numerous laws and regulations in Florida. The OFR seeks to hold these individuals responsible for such violations and deter and prevent future violations, in order to protect Florida consumers who may be harmed if such individuals return to the state in the future to apply for a license (whether as Bittrex Inc. or as another entity altogether).

63.    The OFR's important purpose for bringing its pending enforcement action is to protect Florida consumers from a significant and measurable harm, as well to deter and prevent future violations by those responsible for past violations. *Only by obtaining a license revocation in this particular enforcement action* can the OFR be assured that Bittrex Inc. and its control persons would, if they were to return to Florida to apply for another license in the future, be legally required to disclose such revocation on their new application. Such disclosure places future OFR staff on notice of the prior action, provides a possible legal basis for denial, and thereby seeks to deter and prevent future violations of chapter 560, Florida Statutes, for the protection of Florida consumers. Merely surrendering a license does not have the same legal effect.

## LEGAL ARGUMENT

**A.    THE OFR'S ENFORCEMENT ACTION FALLS WITHIN THE REGULATORY EXCEPTION TO AUTOMATIC STAY BECAUSE IT SEEKS TO PROTECT CONSUMERS AND PREVENT FUTURE VIOLATIONS OF FLORIDA LAW.**

64.    Once a bankruptcy petition is filed, the automatic stay provided by 11 U.S.C. § 362 operates to prohibit "all entities" from, among other things, engaging in "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

65.    The automatic stay in bankruptcy is an important shield, but is not to be used as a sword designed to afford a party with a litigation advantage. *In re Cracked Egg, LLC*, 624 B.R.

84, 89 (Bankr. W.D. Pa. 2021). Moreover, the extent or reach of the automatic stay is not absolute. *Id.* Congress recognized the stay provision to be especially vulnerable to abuse by debtors improperly seeking refuge under the stay in an effort to frustrate necessary governmental functions. *U.S. v. Nicolet, Inc.*, 857 F.2d 202 (1988)

66.     To combat the risk that the bankruptcy court would become a sanctuary for wrongdoers, Congress enacted the police and regulatory power exception to the automatic stay.

67.     One such policy-based statutory exception to the automatic stay provision applies to the commencement or continuation of any action by a governmental unit "to enforce [its] police and regulatory power." [23] Congress, by expressly creating a statutory exception for enforcement of regulatory actions under 11 U.S.C. §362(b)(4), has declared that the underlying policy of the automatic stay provision yields to state and federal governmental interests in securing compliance with certain aspects of those authorities' respective regulatory and police powers. *Chao v. Hospital Staffing Services, Inc.*, 270 F.3d 374 (6th Cir. 2001). Congress clearly intended for the "police power" exception to allow governmental agencies to remain unfettered by the bankruptcy code in the exercise of their regulatory powers. [24]

68.     Indeed, the Fourth Circuit has held that the regulatory exception to the automatic stay applies narrowly to situations where a governmental entity is using its police power to prevent or stop violations of consumer protection, safety, fraud, or similar police or regulatory laws. *In re*

---

[23] 11 U.S.C. §362(b)(4) reads: "The filing of a petition . . . . does not operate as a stay under [§362(1)(a)] of the commencement or continuation of an action or proceeding by a governmental unit . . . . to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.")

[24] House and Senate Reports cited by the Fourth Circuit in *Royal* noted: "[W]here a governmental unit is suing a debtor to *prevent or stop violation* of fraud, environmental protection, *consumer protection, safety or similar police or regulatory laws*, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay."). [Emphasis added.]

*Royal*, 137 Fed.Appx. 537 (4th Cir. 2005). In determining whether § 362(b)(4) applies, most courts apply one or both of two tests: 1) the pecuniary purpose test, which looks at whether the governmental proceeding at issue relates primarily to the protection of the government's pecuniary interest in the debtor's property, and not to matters of public safety, or 2) the public policy test, which distinguishes between proceedings that adjudicate private rights and those that effectuate public policy. *In re Leonard*, 644 Fed.Appx. 612, 615 (6th Cir. 2016) ("We have held that government action is exempt from the stay if designed to effectuate public-policy goals, rather than to protect a pecuniary interest in the debtor's property or adjudicate private rights."). [25] Actions that are primarily related to public safety or the effectuation of public policy are exempt from the automatic stay. *McAtee*, 162 B.R. at 578.

69.      In *City & County of San Francisco*, the Ninth Circuit adopted the Sixth Circuit's "pecuniary purpose" test to hold that a joint lawsuit brought by the California attorney general and the city and county of San Francisco against a debtor utility's parent was excepted from the automatic stay. The lawsuit alleged unlawful business conduct for which the plaintiffs sought injunctive relief, civil penalties, and restitution. Even the partial dissent conceded that the injunctive relief and civil penalties sought fell within the regulatory exception, if not the restitution. *Id.*, at 1128. However, the majority opinion reasoned that "restitution will benefit the public welfare by penalizing past unlawful conduct and deterring future wrongdoing." *Id.*, at 1124-25.

70.      In *McAtee,* the U.S. Bankruptcy Court for the Northern District of Florida applied the Sixth Circuit's approach to hold that the Florida Bar's action to enforce a license suspension

---

[25] See also *City & Cnty. of San Francisco v. PG & E Corp.*, 433 F.3d 1115, 1124–26 (9th Cir. 2006) (holding that governmental lawsuit seeking restitution from debtor excepted from automatic stay); *McAtee v. Fla. Bar (In re McAtee)*, 162 B.R. 574, 578 (Bankr. N.D. Fla. 1993) (holding Florida Bar action enforcing supreme court suspension fell within narrow regulatory exception to automatic stay because it was exercising its police powers and no money judgment was being sought).

order issued by the state supreme court was excepted from a debtor's automatic stay. Having first determined that the state bar was a governmental unit authorized to prosecute the debtor for violating state professional rules of conduct for attorneys, the *McAtee* court then found that the state bar "acted with concern for the public safety and in the interest of public policy by redressing the debtor's failure to conform to specified standards of conduct." [26]

71.     Likewise, under the "pecuniary purpose" and "public policy" two-part inquiry used by most federal courts, the OFR is exempt from the automatic stay. First, the OFR's action has no pecuniary purpose in that it does not seek a money judgment or any other pecuniary interest in Debtors' property; nor does it seek to adjudicate private rights. *Leonard*, 644 at 615. Instead, the OFR's action seeks only to impose a license revocation against Respondents to fulfill a statutory obligation "by penalizing past unlawful conduct and deterring future wrongdoing" and protecting the safety of Florida consumers, thereby effectuating an important "public policy." *City & Cnty. of San Francisco, Leonard, McAtee*, supra.

72.     Here, the OFR's Complaint charged Respondents with several violations of chapter 560, Florida Statutes. This chapter is part of Florida's consumer finance laws and authorizes the OFR to regulate money services businesses; it expressly includes consumer protection laws. The OFR was not only aware of the charged violations involving agency actions resulting from AML violations and unlicensed activity), but it was also aware from its examination that Respondents had recently violated other minimum license requirements, including the failure to segregate customer assets from operating capital, the failure to maintain an adequate surety bond, and ▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Such failures to comply with Florida law,

---

[26] *Id.*, at 578. ("The Court is not at liberty to invade the supreme court's province and restrict that court's ability to fashion remedies that protect the public and punish and deter wrongdoing by its licensees. All that is required by [the two-part inquiry established by] *In re Commerce Oil Co.*, 847 F.2d 291 (6th Cir.1988), is that the action of the governmental unit be primarily related to public safety or to effectuate public policy.").

especially in light of prior violations, established a pattern of ongoing noncompliance that legitimately raises concerns for the protection of consumers. The OFR, accordingly, took an enforcement action to revoke Bittrex Inc.'s license. Based on the circumstances, the OFR exercised administrative discretion in deciding which violations to charge and not charge in its Administrative Complaint.

73.     The OFR has been given no reason to believe that, absent this enforcement action, future conduct by any or all Respondents – whether licensed as Bittrex Inc. or as another entity – will be compliant with Florida laws. As such, the OFR seeks a license revocation to hold Respondents accountable for past violations and, should they return to Florida for a license in the future, require their disclosure of such revocation on a new license application. Disclosure will put future OFR staff on notice of prior violations and provide a possible legal basis for license denial, pursuant to section 560.114(1), Florida Statutes. Effectuating this important policy will enable the OFR to fulfill its statutory duty to prevent future violations and protect consumers.

74.     Conversely, a voluntary license surrender, such as that submitted by Bittrex Inc. after service of the OFR's Complaint, provides no legal basis for future license denial. Nonetheless, Florida law provides a legal basis for the OFR's action to proceed despite a surrender, "as if the license is still in effect." § 560.114(6), F.S., *supra*. As such, Bittrex Inc.'s license is still considered to be in effect during the pendency of the OFR's enforcement action.

75.     However, if the OFR's case is dismissed as Debtors' have requested in their Motion and proposed order, the OFR would be forever stripped of its ability to perform its duties and obligations to enforce Florida's regulatory laws concerning Bittrex's pending violations. If that were to happen, the OFR will have been deprived of its statutory authority to seek to revoke a license for violations of Florida law and prevent future legal violations, impeding its ability to

protect Florida consumers. Debtors' Motion seeks to thwart operation of Florida law and turns to this Court in seeking to use the automatic stay provisions of the U.S. Bankruptcy Code not as a shield, but as a sword.

76.     In taking an enforcement action against Bittrex, Inc., and its affiliated parties, the OFR has acted with concern for consumer protection (i.e., the public safety) and in the interest of public policy by redressing company's failures to conform to specified standards of conduct between 2018 through 2020. *McAtee*, supra. At the same time, the OFR is also aware of Respondents' ongoing noncompliance in 2022 and 2023 and seeks revocation for an important policy purpose to prevent future violations of consumer finance laws intended to protect consumers, which does not involve any pecuniary purpose. Therefore, the OFR's action falls squarely within the regulatory exception to the automatic stay. *Id.*, *Rice*, supra.

**B.     THE OFR'S ACTION IS NONDISCRIMINATORY BECAUSE IT IS LEGITIMATELY CONCERNED ONLY WITH PROTECTING FLORIDA CONSUMERS BY PREVENTING FUTURE VIOLATIONS OF FLORIDA LAWS BY THOSE RESPONSIBLE FOR REPEATED PRIOR VIOLATIONS.**

77.     11 U.S.C. § 525(a) states that "a governmental unit may not deny revoke, suspend, or refuse to renew a license … against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act [or] has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge…."

78.     Section 525 "means nothing more or less than that the failure to pay a dischargeable debt must alone be the proximate cause of the cancellation—the act or event that triggers the agency's decision to cancel, whatever the agency's ultimate motive in pulling the trigger may be."

*F.C.C. v. NextWave Personal Communications Inc.*, 537 U.S. 293, 301-02 (2003).

### Procedural Posture of *NextWave* Case Cited by Debtors' Motion

79.     It is worth a closer look at the *NextWave* case cited by Debtors' Motion as support for its Section 525 argument, in that its facts are largely distinguishable from those at issue here. In *NextWave*, the U.S. Supreme Court ("SCOTUS") heard an appeal with a complex backstory between the Federal Communications Commission ("FCC"), both a regulator and creditor of NextWave, a broadband communications company. NextWave had successfully bid for broadband licenses awarded by the FCC. *Id.*, at 297. Next, the parties entered into contracts that conditioned NextWave's rights and interest (which the FCC retained a first lien on, and security interest in) in the licenses upon the full and timely payment of all monies due the FCC, and that failure to comply with this condition would result in their automatic cancellation. *Id.*

80.     NextWave soon had financing issues and could not make its required installment payment on time; it then filed for chapter 11 bankruptcy protection and suspended all payments to creditors, including the FCC. *Id.* NextWave litigated to avoid $4.74 billion in debt for the FCC licenses, alleging them to be a fraudulent conveyance that had depleted in value to less than $1 billion. *Id.*, at 298. The bankruptcy court agreed to a discharge, but the Second Circuit reversed, holding that the lower court had no jurisdiction to change the licensing conditions, and that there was no fraudulent conveyance by the FCC as creditor. *Id.*

81.     NextWave then drafted a reorganization plan contemplating a lump sum payment to satisfy its outstanding $4.3 billion licensing debt to the FCC, including interest and late fees. *Id.* However, the FCC objected, asserting the licenses were cancelled automatically when the first payment deadline was missed, and publicly announced it was auctioning off NextWave's licenses. NextWave sought emergency relief from the bankruptcy court, which nullified the cancellation

under the bankruptcy code; the Second Circuit reversed since review of the FCC's licensing reauction decision was exclusively within the appellate court's jurisdiction. *Id.*, at 299.

82.    NextWave petitioned the FCC to reconsider the cancellation; once denied, it then appealed to the D.C. Circuit Court of Appeals, who agreed with NextWave that the FCC's revocation violated the nondiscrimination bar of 11 U.S.C. § 525. The FCC appealed to SCOTUS, who ultimately affirmed.

83.    In *NextWave*, the FCC was the debtor-licensee's creditor. The FCC conceded that nonpayment was the proximate cause of the cancellation (i.e., "revocation") of the licenses, but argued that it had a valid regulatory motive and thus 11 U.S.C. § 525 was inapplicable to protect the debtor, NextWave. A majority of the Court was unpersuaded by this argument.

> In our view, that factor is irrelevant. When the statute refers to failure to pay a debt as the sole cause of cancellation ("solely because"), it cannot reasonably be understood to include, among the other causes whose presence can preclude application of the prohibition, the governmental unit's motive in effecting the cancellation. Such a reading would deprive § 525 of all force. It is hard to imagine a situation in which a governmental unit would not have some further motive behind the cancellation—assuring the financial solvency of the licensed entity, e.g., *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); *In re The Bible Speaks*, 69 B.R. 368, 374 (Bkrtcy.D.Mass.1987), or punishing lawlessness, e.g., *In re Adams*, 106 B.R. 811, 827 (Bkrtcy.D.N.J.1989); *In re Colon*, 102 B.R. 421, 428 (Bkrtcy.E.D.Pa.1989), or even (quite simply) making itself financially whole. <u>Section 525 means nothing more or less than that the failure to pay a dischargeable debt must alone be the proximate cause of the cancellation—the act or event that triggers the agency's decision to cancel, whatever the agency's ultimate motive in pulling the trigger may be.</u>

*Id.*, at 301-02. (Emphasis added.)

84.    Thus, the debtor's nonpayment to its creditor, the FCC, per specific contract terms (i.e., "the failure to pay a dischargeable debt") was clearly the "proximate cause" of the license revocation in the *NextWave* case, regardless of the rejected pretext offered by the FCC. *Id.*

**Distinguishing *NextWave* from the OFR's action.**

85.     In the OFR's regulatory enforcement action however, the only relationship between the OFR and Bittrex Inc. and its control persons is one of regulator-licensee. The OFR is not a creditor of Bittrex Inc., nor is there any "failure to pay a dischargeable debt" that Debtors can point to as the "proximate cause" of the OFR's action. *Id.* In fact, the OFR took its enforcement action as the result of Bittrex Inc.'s continued noncompliance with minimum license requirements of Florida money services business laws designed to protect consumers. Moreover, the OFR's action was first referred for enforcement in March 2023 and issued in April 2023, well before Bittrex Inc.'s May 8 bankruptcy petition. In fact, on March 31, Bittrex Inc. represented to the OFR that "the consolidated group of entities that Bittrex is a part of remains well capitalized." This is rather unlike the FCC revocation of NextWave's licenses only after NextWave filed for bankruptcy protection and missed its license payments to the FCC, now its creditor as well as regulator. When comparing the facts in *NextWave* to the facts concerning the OFR's enforcement action the *NextWave* case cited by the Debtors is clearly distinguishable.

86.     Further, an allegation of debtor discrimination is rebuttable. Once a debtor has first shown an adverse governmental action, courts then require that "the governmental unit taking the adverse action to articulate a legitimate, nondiscriminating reason for its adverse actions in order to prevail." *In re Metro Trans. Co.*, 64 B.R. 968, 975-76 (Bankr. E.D. Pa. 1986).

87.     An action based upon proper nonbankruptcy considerations, such as a lack of present or future financial ability, financial irresponsibility, or moral turpitude will be considered a legitimate and nondiscriminatory exercise of a governmental unit's police or regulatory powers to deny or revoke a license or permit, since its purpose is to protect the public from unqualified licensees, and therefore will neither be stayed under § 362 nor actionable under § 525. See, e.g., *In re Christmas*, 102 Bankr. Rep. 447 (Bankr. Ct. D. Md 1989)(denial of horse trainer's license on

grounds of financial irresponsibility was proper exercise of police and regulatory power where there was no intent to coerce repayment of prepetition debts); *In re Leopard*, 272 B.R. 507, 509 (Bankr. M.D. Fla. 2002).

88.     In *Leopard*, the court found that a county construction licensing board's action to revoke a debtor's contracting license was supported on numerous nonbankruptcy-related grounds, including charges of professional incompetence, customer complaints, and several ordinance violations which included "mismanagement and misconduct in the practice of contracting causing financial loss to customers." *Id.* Because there was no evidence that revocation resulted because of the debtor's status as a debtor, the court found that the board's actions did not violate the nondiscrimination provision of 11 U.S.C. § 525(a). *Id.*

89.     Just as in *Leopard*, the OFR's action to revoke the money transmitter license of Bittrex Inc. is supported on numerous nonbankruptcy-related grounds that support this Court finding a legitimate and nondiscriminatory reason for the Complaint. *Id.* As set forth in section A., *supra*, the OFR, having learned of an ongoing pattern of noncompliance-related violations of Florida money services business laws, took an enforcement action against Bittrex Inc. and its control persons out of a statutory concern for consumer protection and to deter and prevent future violations.

## C.     DEBTORS' REQUEST TO HAVE THE COURT FIND OFR IN CIVIL CONTEMPT SHOULD BE DENIED.

90.     It is generally accepted that bankruptcy judges have the power to enforce their orders by finding violators in civil contempt of court. [27]

---

[27] A bankruptcy court's authority to hold a party in contempt derives from several sources, including the inherent authority of a federal court to regulate the conduct of those appearing before it, 11 U.S.C. §105 (the power to issue orders necessary or appropriate to carry out the Bankruptcy Code), 28 U.S.C. § 157(b) (jurisdiction of bankruptcy courts to hear "core" matters), and Fed. R. Bankr. P. 9020.

91.     Civil contempt is a measure imposed to compel compliance with a court order and provide compensation to a party damaged by violation of that order. See *In re Grand Jury Investigation*, 600 F.2d 420, 423 (3rd Cir.1978); *New York State National Organization for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir.1989).

92.     To establish proof of contempt, a movant is required to demonstrate (1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order. *In re AGR Premier Consulting, Inc.*, 550 Fed.Appx. 115, 122-23 (3rd Cir. 2014). Each element must be proven by clear and convincing evidence, with ambiguities resolved in favor of the party charged with contempt. *Id.* Although conduct need not be willful, and good faith is not a defense to civil contempt, courts should hesitate to adjudge a party in contempt *when there is ground to doubt the wrongfulness of the conduct*. *Id.* [Emphasis added.]

93.     The Third Circuit has held that a party should not be held in contempt unless a court first gives fair warning that certain acts are forbidden, and that any ambiguity in the law should be resolved in favor of the party charged with contempt. *U.S. on Behalf of I.R.S. v. Norton*, 717 F.2d 767, 774 (3rd Cir. 1983) (reversing contempt citation where, based on a "much litigated and controversial question" regarding retention of tax funds, the I.R.S. lacked fair warning that it was violating debtor's automatic stay).

94.     Here, the scope of the regulatory exception to the automatic stay is a "much litigated and controversial question" in which federal courts have taken multiple analytical approaches (see IV.A., supra). *Id.* The Fourth Circuit case cited by the Debtors' Motion, *In re Royal*, 137 Fed.Appx. 537 (2005), favors an "enforcement" analysis, whereas the Sixth Circuit and Ninth Circuit (and other courts) cases cited by the OFR favor the two-part "pecuniary purpose" and "public policy" analysis. Although the OFR emphatically maintains that its enforcement action satisfies both

approaches so as to be excepted from the automatic stay, it may be the case that the Court agrees with Debtors as to the Fourth Circuit analysis but agrees with the OFR as to the Sixth and Ninth Circuit analyses. In such case, any ambiguity in the law should be resolved in favor of the OFR, not Debtors. *Norton*, 717 F.2d at 774. This reasoning applies with even more force considering that neither this Court, nor any other court, has first given "fair warning" to the OFR to stand down from its action by declaring that its enforcement action, under the unique facts and circumstances of this matter, is *not* excepted from the automatic stay, or otherwise violates the nondiscrimination provision. *Id.*

95. Additionally, while it may be that "good faith is no defense to civil contempt," the OFR would nonetheless argue that it has taken its enforcement action to revoke Bittrex Inc.'s license not to willfully violate a court order, but in furtherance of important and non-discriminatory public policy and public safety reasons for seeking to impose a license revocation, i.e., consumer protection and the deterrence and prevention of future violations in Florida by Bittrex Inc. and its control persons.

96. Finally, counsel for Bittrex Inc. expressed a legal position which conflicts with the OFR's, then demanded immediate dismissal of the Complaint. When dismissal was not forthcoming, Debtors' filed their Motion, seeking to punish the OFR by having the Court hold it in civil contempt.

97. For the reasons articulated in sections A. and B., *supra*, Debtors' Motion fails to establish that the OFR's enforcement action violates either the automatic stay or nondiscrimination provisions of the Bankruptcy Code. However, the OFR would argue in the alternative that, should the Court ultimately agree with opposing counsel as to one or both arguments and decide to grant the Motion (in part or otherwise), a contempt citation would still be inappropriate under the facts

of this case. The OFR must first be given fair notice from a court – not from opposing counsel's conflicting legal position – that its action, under the circumstances, has been found to violate the automatic stay and/or nondiscrimination provisions. *Id.*

98.     Counsel to Bittrex Inc. attempted to "demand" that the OFR dismiss its case, but the OFR respectfully disagreed with their legal position and would not accede to the demand.  This Court has not provided fair notice in a specific order that the OFR is wrong, and Debtors are correct. Debtors' Motion now asks this Court to penalize the OFR for acting in (good faith) reliance on its reasonable legal position regarding a "much litigated and controversial question" as to the scope of the regulatory exception to the automatic stay. *Id.* Likewise, as to the nondiscrimination provision. In doing so, Debtors weaponize and abuse the Court's inherent contempt authority against a governmental entity attempting to fulfill its statutory duty.

99.     Therefore, the Court "should hesitate to adjudge [the OFR] in contempt when there is ground to doubt the wrongfulness of the conduct" alleged by Debtors. *AGR Premier*, 550 Fed.Appx., at 123.

## CONCLUSION

100.     Debtors' Motion effectively seeks to eviscerate Florida law and the OFR's regulatory authority to enforce its consumer finance laws and prevent violations for the protection of Floridians. Contrary to Debtors' assertions, the OFR's enforcement action falls within the regulatory exception to the automatic stay provision. Moreover, Debtors have attempted to mischaracterize the OFR's verbal reference to confidential exam findings regarding Bittrex Inc.'s ▮▮▮▮▮▮▮▮ during confidential settlement communications.

101.     The OFR has evidence that Bittrex Inc. committed multiple violations of Florida law as a licensee between 2018 and 2023, including AML violations and unlicensed money

transmission which both resulted in several state and federal regulatory actions; the failure to segregate customer funds from company operating capital; the ███████████████████████ ███████████████; and the failure to continuously provide a surety bond in the correct amount.

102.    At no time did the OFR claim or assert that Bittrex Inc.'s ███████████ or bankruptcy was the reason for its enforcement action. In fact, Bittrex Inc., told the OFR it was "well-capitalized" as recently as March 31, in its notification letter, which also made no mention of bankruptcy plans.

103.    The reason for the OFR's action was Bittrex Inc.'s continued and ongoing pattern of violations of Florida law between 2018 and 2023, with the purpose of revoking the license to prevent future violations of chapter 560, Florida Statutes, by the company and its control persons, who might decide to reapply for a Florida license in the future.

104.    Finally, the OFR has done nothing but serve its Complaint and hold the case in abeyance as it has been conferring with opposing counsel. Under the circumstances, no further enforcement action has been taken.

105.    Because the OFR has not acceded to opposing counsel's demand to dismiss the case outright, Debtors now seek to misuse the protections of the U.S. Bankruptcy Code as a sword by requesting the Court to dismiss a statutorily authorized enforcement action, hold a state regulator in civil contempt for doing its duty, and award Debtors attorney's fees and costs.

## NOTICE

106.    The OFR will provide notice of this Motion to the Debtors and the following parties and/or their respective counsel, as applicable: (a) the United States Trustee for the District of Delaware; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the lender under the Debtors' post-petition financing facility;

(d) counsel to Debtors' non-debtor affiliate Bittrex Global GmbH; (e) counsel to Debtors' non-debtor affiliates RBR Holdings, Inc., and Aquila Holdings Inc.; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the attorneys general in the states where the Debtors conduct their business operations; (i) the Securities and Exchange Commission, FinCEN, and the Office of Foreign Assets Control; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. The OFR submits that, in light of the nature of its response/objection to the Court, no other or further notice need be given.

**WHEREFORE**, for the above-stated reasons, the OFR respectfully requests that the Court deny the Debtors' Motion.

Date: July ___, 2023
Tallahassee, FL

**FLORIDA OFFICE OF FINANCIAL REGULATION**

Russell C. Weigel, III
Commissioner

George Bedell, Chief Counsel
Florida Office of Financial Regulation
Florida Bar No. 363685
101 E. Gaines Street
Tallahassee, FL 32399-0379
Phone: (813) 218-5308
Email: george.bedell@flofr.gov