## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Desolation Holdings LLC, *et al.,*[1] | Case No. 23-10597 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. 134 and 176** |

## REPLY TO OBJECTION OF THE U.S. SECURITIES AND EXCHANGE COMMISSION TO MOTION PURSUANT TO SECTIONS 105(A) AND 502(C)  OF THE BANKRUPTCY CODE TO ESTIMATE CONTINGENT AND UNLIQUIDATED CLAIMS OF THE SECURITIES AND EXCHANGE COMMISSION AND GRANT RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby file their reply to the objection (the "Objection") [D.I. 176] of the United States Securities and Exchange Commission (the "SEC") to the Debtors' motion to estimate the SEC's contingent and unliquidated claims (the "Motion") [D.I. 134].[2]

## I.    INTRODUCTION

1.    Although the SEC asserts that long, drawn-out bankruptcy cases should be the norm whenever it wishes to assert claims, the Debtors disagree.  Since even before commencing these cases, the Debtors have been working hard to satisfy the legitimate claims of creditors (including customers above all others) and complete their wind-down process.  In late March 2023, the Debtors notified their customers that they intended to shut down operations, and offered them until the end of April 2023 to withdraw cryptocurrency assets and fiat currencies associated with their accounts.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Holdings Ltd. (2227); and Bittrex Malta Ltd. (1764). The mailing and service address of the Debtors is 701 5th Avenue, Suite 4200, Seattle, WA 98104.

[2]   All terms not defined herein have the meaning ascribed to them in the Motion.

After filing for relief under chapter 11 of the Bankruptcy Code, the Debtors sought and obtained authorization to continue honoring withdrawals by customers.

2.       The Debtors are now in the process of finalizing their disclosure statement inclusive of projections of the number of allowed customer-claims and cryptocurrency assets available for distribution.  Based on withdrawal rates and proofs of claim filed to date, the Debtors continue to believe that there will be sufficient cryptocurrency assets to satisfy all allowed customer claims in full in kind.  With respect to allowed general unsecured claims, including any allowed claim of the SEC, the Debtors will have to monetize cryptocurrency assets and convert them to cash.  The Debtors anticipate that any cryptocurrency assets remaining after satisfying allowed claims will be distributed in kind to holders of the Debtors' equity interests in accordance with the absolute priority rule.  The longer that process takes, the greater the risk that cryptocurrency assets available for distribution will lose value given their volatility.  As such, what constitutes an undue delay in administering any given debtor's estate depends entirely on the facts and circumstances of that case. Section 502(c)(1) squarely applies here and mandates the estimation of contingent or unliquidated claims, such as the SEC Claims, because such claims unduly delay the administration of the Debtors' estates.

3.       The SEC does not dispute that its claims are contingent and unliquidated.  Instead, it makes four arguments for why it should be allowed to hold this case hostage for years while its preferred manner of litigating runs its course.  None of them is consistent with the Bankruptcy Code or the policies underlying it.

4.       *First*, the SEC argues that the Motion lacks merit because (1) the Court already authorized customer withdrawals (which is all *the SEC* cares about), (2) the Court should not care about delays to distributions to equity holders (because *the SEC* does not care about equity holders

in this case), and (3) because the SEC is unlikely to receive any distributions anyway (based on

rank speculation). These arguments all fail (but if the SEC really believes (3), it could simply agree

to set its claims at $0 and that would resolve the Motion).

5.    The SEC (along with the Department of Justice or "DOJ") negotiated and obtained

a provision in the customer withdrawal order (D.I. 123, 128) reserving rights to claw back customer

withdrawals to the extent that the SEC is not paid in full, meaning that customers will not actually

have any finality unless the amount of the SEC Claims is known and satisfied. With respect to

stakeholders other than customers, the Debtors are not willing to reserve potentially significant

amounts of cryptocurrency assets while the SEC figures out what monetary amounts it may wish to

seek from the Debtors. Adopting the SEC's wait-and-see approach threatens harm to general

unsecured creditors and equity holders, whose claims and interests are neither contingent nor

unliquidated—and who Congress determined are entitled to distributions without undue delay.

Finally, the SEC's argument that it is unlikely to receive any distributions anyway is based on a

misunderstanding of bankruptcy law; while the schedules may show that liabilities exceed assets,

many of those liabilities are contingent and are unlikely to become allowed claims. The Debtors

believe that there will be sufficient assets to pay all creditors in full, depending on the liquidation

of the SEC Claim.

6.    *Second*, the SEC argues that *despite six years of investigating the Debtors and*

*already suing Debtor BUS, its affiliate, and its founder,* it should not be forced to file claims before

180 days following the Petition Date because it may think of some other claims to bring.[3] Section

---

[3]   The SEC incorrectly asserts that the Debtors are seeking to shorten the governmental bar date
for all regulatory agencies. The Motion concerns the SEC Claims only. The SEC has uniquely
spent years investigating potential claims against the Debtors and ultimately made it impracticable
for the Debtors to continue operating, which precipitated this bankruptcy. The SEC also already
asserted its claims by commencing litigation against Debtor BUS and others, so this is hardly a

502(c) of the Bankruptcy Code contains no prohibition on estimating claims as soon as they are asserted and provides the Court abundant discretion to do so, without any exception for the SEC. The Debtors proposed shortening the bar date for the SEC because they believe this process should be done once for all the SEC Claims.  To the extent that the Court declines to shorten the SEC's bar date, but otherwise agrees estimation would be proper, the Debtors will adjust their overall case schedule and ask the Court to conduct the estimation shortly after that deadline.

7.    *Third*, the SEC argues that the Court should not estimate the claims because doing so will involve findings as to whether tokens are securities.  To the contrary, the Motion did not ask for the Court to make any findings regarding the securities laws in order to estimate the SEC Claims. Instead, the Debtors proposed the "Token Toss" procedure to estimate the SEC Claims as to the Six Tokens identified by the SEC to date, using a 50/50 probability—which is the furthest thing from a "finding."  Besides, this Court is well within its core jurisdiction to "determine" (including by estimation) the amount of allowed claims.  *See* 28 U.S.C. § 157(b)(2)(B) (containing exceptions *only* for personal injury tort and wrongful death claims, not the SEC).  To the extent the SEC decides to add more claims beyond what it has asserted to date, the Debtors reserve the right to advocate for a different probability, if appropriate, but estimating claims would not constitute a determination for any other purpose.

8.    *Last*, the SEC argues that if estimation is appropriate, the Court should build more time into the schedule to permit discovery.  The Debtors agree.  While the SEC does not identify what discovery *it* still needs to calculate asserted disgorgement or other penalties, it bears emphasizing that the SEC has been conducting *one-sided* discovery from Debtor BUS *for the past*

---

question of ensuring a regulatory creditor is not caught off guard and has sufficient notice of a bankruptcy.

*six years.* The Debtors should be permitted to propound expedited discovery against the SEC as relevant to the estimation process and will similarly comply with reasonable relevant requests (to the extent the SEC does not already have the information). The purpose of estimation is to quickly liquidate contingent or unliquidated claims that would take too long to liquidate through ordinary litigation; it would flout the purpose of the statute to permit the claimant—who openly prefers delay—to use discovery as a ruse to cause even more of it.

## II.    REPLY

### A.   Estimation Of The SEC Claims Is Necessary To Avoid Undue Delay In Administration Of These Cases

9.      These cases require estimation of the SEC Claims to avoid undue delay in administering these cases. Put simply, the Debtors need to determine how much of their cryptocurrency assets must be converted to cash to satisfy non-customer claims against the Debtors. An admittedly lengthy delay[4] in doing so risks an erosion of value to both non-customer creditors and equity holders due to the volatile nature of cryptocurrency assets. The SEC's arguments to the contrary lack substance or merit.

10.     *First*, the SEC's argues that estimation is not necessary because the Court already authorized the Debtors to honor customer withdrawals. Objection ¶ 7. As a threshold matter, this argument ignores a provision that the SEC insisted on adding to the Court's order. Both the SEC and the DOJ responded to the Debtors' motion to honor customer withdrawals. D.I. 64 (SEC's response), 109 (DOJ's response). While the SEC did not object to permitting continued customer withdrawals, D.I. 64 at 2, it reserved the right to oppose subordination of the SEC Claims, *id.* To

---

[4]   The SEC did not dispute that liquidation of the SEC Claims by final adjudication in the WD Wash Court and Ninth Circuit will take several years. Motion ¶¶ 30-32, 45.

resolve the SEC's and DOJ's responses, the Debtors agreed to a proposed form of order, D.I. 120 (certification of counsel), which both reserved the SEC's right to oppose subordination of its claims, and included a reservation requested by the SEC for "***any creditor, including the United States***, from recovering from any customer the value of any cryptocurrency assets or fiat currency such customer receives that exceeds the distributions provided by the plan, if such general unsecured creditor or subordinated creditor is not paid in full …." D.I. 120-1 at 3-4 (emphasis added); *see* D.I. 128 at 2-3.

11.     In other words, the SEC reserved the right to seek to claw back any customer withdrawals in the event that their disgorgement and penalty claims (if any) are not paid in full. Having reserved rights to claw back payments based on what its contingent and unliquidated claims may someday be determined to be, the SEC cannot credibly argue that estimation of its claim is unnecessary. If the SEC Claims are not timely estimated for purposes of allowance, as required by the Bankruptcy Code, customers may be subject to a claw back risk. Customers should be assured that their withdrawals will not be subject to some long-dated unquantified risk.

12.     *Second*, the SEC argues that facilitating a recovery to equity holders is "not a compelling reason" to estimate the SEC Claims. Objection ¶ 8. This is wrong for two reasons. The SEC ignores that a delay in estimating the SEC Claims will also delay distributions to other general unsecured creditors, depending on how much may need to be reserved for the SEC's and other contingent and unliquidated claims. More fundamentally, nothing in section 502(c) (or other relevant provision of the Bankruptcy Code) supports the SEC's position that equity holders do not have rights to a prompt distribution. The statute itself speaks to delays in administering the *estate*

30531002.1

(which includes the shareholders' participation)[5] and the SEC says nothing to explain how a multi-year litigation claim against BUS would not delay administering BUS' estate. As stated, cryptocurrency assets will need to be converted into cash to pay general unsecured creditors following satisfaction of customer claims in kind. Cryptocurrency is indisputably subject to changes in market prices, and the Debtors prudently seek to minimize the risk of long delays caused by parties asserting contingent or unliquidated claims. The risk of a decline in the value of the cryptocurrency assets applies equally to equity holders, who will receive any leftover amounts after payment of allowed customer and general unsecured claims.

13.    *Third*, the SEC argues that estimation is unnecessary because it appears based on the Debtors' schedules that there are insufficient assets to pay the SEC anyway. Objection ¶ 9. That argument betrays a misapprehension of bankruptcy law. The SEC points to the Debtors' schedules and argues that the SEC may not receive any distributions because scheduled liabilities exceed scheduled assets, but ignores the fact that a large number of the claims set out in the Debtors' schedules are "contingent," meaning that they will not be allowed until and unless allowed by this Court. In this regard, the proof of claim required to be filed must contain certain Know-Your-Customer ("KYC") and address information that is required by law. *See, e.g.,* Bankruptcy Rule 3003(c)(2) (stating that creditors in chapter 11 cases whose claims are scheduled as contingent must file a proof of claim). The Debtors have been urging customers for months to provide the required information and to withdraw the cryptocurrency assets associated with their accounts. The Debtors anticipate that the ultimate amount of total allowed claims will likely be

---

[5]  When Congress wished to craft rules that benefit creditors (but not shareholders) of the estate, it did so clearly. *See, e.g.,* 11 U.S.C. § 510(c)(1) (providing the power to subordinate claims of creditors only for the benefit of other creditors, not for the benefit of equity holders).

lower than the amounts scheduled as contingent. The Debtors will know the universe of allowed

customer claims by August 31, 2023. D.I. 107 at 2 (general bar date). After that point, provided

that contingent or unliquidated claims against the Debtors can be resolved expeditiously (either by

agreement or through the judicial process), the Debtors will be in a position to promptly move

forward with confirmation of their plan.

**B. The Court Can and Should Shorten The SEC's Deadline to File Claims**

14.    The Court has the authority to shorten the deadline for the SEC to file a proof of

claim.  As set forth in the Motion, section 502(c) provides the Court broad authority to set

procedures for estimating contingent or unliquidated claims, and provides no exceptions for the

SEC. Motion ¶¶ 52-56.[6]  The SEC's two arguments to the contrary fail.

15.    The SEC's first argument is that the Court does not have authority to shorten the

government bar date. Objection ¶ 10. The SEC concedes that section 502(c) provides the court

"discretion to determine the best methods for estimating claims under the circumstances," *id.*, but

without providing any explanation or analysis, it contends that this discretion does not include

shortening the 180-day time period. *Id.*  That argument is wrong. The bankruptcy court has wide

discretion in determining how to estimate claims, *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135

(3rd Cir. 1982), and that discretion specifically includes setting *procedures* for estimation, with a

baseline minimum of due process. Motion ¶ 48 (citing multiple authorities). Critically, section

502(c) contains no exemption for the SEC or other governmental entities, demonstrating

Congressional intent to permit estimation of governmental claims when the other requirements for

---

[6]  Contrary to the SEC's argument, Objection ¶ 12, the Debtors did not request in the Motion to shorten the deadline as to all government claims. The Debtors only seek to shorten the deadline for the SEC as part of the estimation request.

estimation have been satisfied.  *See In re T.D.M.A., Inc.*, 66 B.R. 992, 997 (Bankr. E.D. Pa. 1986) (stating that, with respect to estimation, courts should consider "the Congressional intent of assuring a speedy disposition of ***all matters*** relevant to bankruptcy proceedings" (emphasis added)).

16.     The SEC's second argument fares no better.  It argues that the Court should not shorten the bar date based on the Debtors' "self-imposed plan confirmation schedule."  Objection ¶ 11.  But it ignores that the Debtors are seeking to promptly wind down their affairs so that they can make distributions to customers, general unsecured creditors, and (if assets remain) to equity holders as quickly as possible.  The SEC's argument amounts to an assertion that the goal of prompt distributions should yield to the pace the SEC wishes to set for itself.  The SEC has had six years to quantify its claims—it started investigating BUS in 2017 and since that time has demanded and received voluminous documents, taken numerous depositions, and has even filed a complaint against Debtor BUS, identifying the tokens that it asserts create liability for BUS and certain affiliates.  It strains credulity to suggest that the SEC, after six years of investigation, pre-litigation discovery, and a full-blown lawsuit, needs the full 180 days to assert its position as a creditor.[7]

## C.   The Debtors Have Not Asked The Court To Make Any Findings Under The Federal Securities Laws

17.     In the Motion, the Debtors proposed procedures to estimate the SEC Claims against Debtor BUS.  Motion ¶ 57.  The procedures did not contemplate the Court making any findings of whether any of the Six Tokens were securities as a matter of law (although the Debtors disagree

---

[7]   In the event that the Court declines, even under the unique circumstances of this case, to impose a shortened deadline on the SEC, the Debtors request that the Court schedule estimation of the SEC Claims to commence 30 days after the governmental bar date.

that the Court would not have the power to do so); instead, the Debtors asked the Court to estimate the potential disgorgement (net profits) associated with those tokens (which will require consideration of the parties' competing positions), and then to apply a 50/50 probability to the estimated disgorgement amount so as not to tip the scales on the underlying securities issues in favor of either party. *Id.* The Debtors also reserved the right to seek an alternate probability-based assessment and estimate in the event that the SEC adds additional tokens (subject to discovery and a briefing schedule). *Id.* ¶ 13 n.5. At no time have the Debtors requested that the Court enter an order finding that particular tokens are or are not securities.

18.    In the Objection, the SEC distorts the Debtors' request, arguing that the Court "would potentially be required to determine issues under the federal securities laws that are being litigated in the District Court Action," including whether "crypto assets, are being offered and sold as securities and whether the defendants in the [WD Wash Action] operated as an unregistered securities exchange, broker and/or clearing agency by offering these crypto assets on a crypto asset trading platform." Objection ¶ 13. The Debtors never asked this Court to make any findings on the "crypto-as-securities" issue, and in fact proposed the exact opposite.[8]

19.    The SEC next argues that in a SEC enforcement action, the District Court must first establish liability, and then determine disgorgement. Objection ¶ 14. But reasons like these for delays associated with ordinary litigation are precisely the harm to be avoided through estimation. *In re Chemtura Corp.*, 448 B.R. 635, 649-50 (Bankr. S.D.N.Y. 2011) (stating that estimation

---

[8]   The SEC also suggests that other defendants in the WD Wash Action will use estimation of the SEC Claims against Debtor BUS to cap the SEC's claims against them. Objection ¶ 15. That issue is irrelevant to whether estimation is appropriate under section 502(c)(1). Moreover, the SEC has not offered any explanation of how a party other than Debtor BUS could use a section 502(c)(1) determination for any purpose other than allowance of claims against a debtor. The order estimating the SEC Claims can of course make that explicit.

"provides a means for a bankruptcy court to achieve reorganization, and/or distributions on claims, without awaiting the results of legal proceedings that could take a very long time to determine"); *In re Federal-Mogul Global, Inc.*, 330 B.R. 133, 154 (D. Del. 2005) (stating that estimation helps the court "avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed").  By estimating the SEC Claims pursuant to the procedures set forth in the Motion, the Court can liquidate the SEC Claims without making any findings under the securities laws.

20.     The SEC cites *In re Dana Corp.*, 379 B.R. 449, 453 (S.D.N.Y. 2007), arguing that the WD Wash Court should decide any federal securities law issues. Objection ¶ 13.  Setting aside the fact that the Debtors are not asking the Court to decide any federal securities law issues, it appears that what the SEC is really arguing is that estimation is unavailable when there is already a pending case.  *Dana Corp.* does not stand for that sweeping argument.  In *Dana Corp.*, the Debtors' moved to set procedures to estimate claims by the Environmental Protection Agency ("EPA").  379 B.R. at 451.  The court granted that motion, but the Debtors also filed objections to the EPA's claims.  *Id.*  The district court withdrew the reference with respect to both the claims objections and the already-ordered estimation proceeding because the debtors: (i) opposed imposition of joint and several liability, which required application of CERCLA; (ii) asked the Court to "equitably allocate" the clean-up of a contaminated site, which would again require application of "difficult" CERCLA issues; and (iii) sought to apply defenses based on a "National Contingency Plan" and "acts of God" which required the Court to take into account CERCLA policy.  *Id.* at 456-62.[9]

---

[9]   The SEC quotes *Dana Corp.* for the proposition that withdrawal of the reference is appropriate if the case requires the bankruptcy court to engage in the intricacies of a non-bankruptcy law, as opposed to a routine application of non-bankruptcy law.  Objection ¶ 13.  But the SEC's selective

30531002.1

21.    Unlike *Dana Corp.*, the Debtors have not asked the Court to determine any of the underlying questions involving securities law, *i.e.*, whether any of the Six Tokens are securities. The Debtors here only ask the Court to delve into the amount of any disgorgement, an equitable remedy routinely calculated by bankruptcy courts. *See, e.g.*, *In re New River Dry Dock, Inc.*, 497 F. App'x 882, 887-88 (11th Cir. 2012) (affirming bankruptcy court's order disgorging commissions paid to real estate broker); *In re de Jong*, 588 B.R. 879, 893-94 (B.A.P. 9th Cir. 2018) (calculating disgorgement against a debtor for trespass on a dairy farm, including that disgorgement should be calculated by subtracting operating costs from gross revenues); *U.S. v. Ginn*, 2005 WL 2493342, at *1 (N.D. Tex. Oct. 7, 2005) (affirming bankruptcy court's order disgorging post-confirmation fees of a liquidating plan agent). Calculating a disgorgement remedy does not require any unique application of securities laws, and certainly not "difficult" ones for this Court.[10] Indeed, where district courts withdraw the reference, they only do so to the extent of deciding narrow, novel issues under a federal statutory scheme, leaving calculation damages to the bankruptcy court. *See e.g., In re Nat'l Gypsum Co.*, 139 B.R. 397, 415 (N.D. Tex. 1992)

---

quotation does not accurately state the narrow test for mandatory withdrawal of the reference, which requires that a "substantial and material consideration of non-Bankruptcy Code federal [law] is necessary for the resolution of the proceeding." *Dana Corp.*, 379 B.R. at 453.

[10]    The Exchange Act contains no special formula for calculating the disgorgement remedy. As recently found by the Supreme Court, *Liu v. Sec. & Exch. Comm'n*, 207 L. Ed. 2d 401, 140 S. Ct. 1936, 1946-47 (2020), calculating disgorgement in SEC enforcement actions must follow generally applicable principles governing equitable relief: "At bottom, even if Congress employed 'disgorgement' as a shorthand to cross-reference the relief permitted by § 78u(d)(5), it did not silently rewrite the scope of what the SEC could recover in a way that would contravene limitations embedded in the statute. After all, such 'statutory reference[s]' to a remedy grounded in equity 'must, absent other indication, be deemed to contain the limitations upon its availability that equity typically imposes.'" *Id.* As bankruptcy courts frequently employ equitable remedies, including disgorgement, no special facility with securities law is required. To be clear, the Debtors are not conceding that disgorgement would be appropriate. Instead, they are simply asking the Court to calculate the extent of possible disgorgement.

30531002.1

(withdrawing the reference, addressing substantive CERCLA issues concerning the Debtors' liability, and referring the matter to the Bankruptcy to estimate the amount of the claims).  The Motion achieves the same result.  It leaves the application of securities laws to the tokens in the WD Wash Court, and expedites the routine calculation of damages to facilitate the conclusion of the chapter 11 case.  The Debtors will thereafter urge a 50/50 probability assessment as something that is well within the discretion of the Court in conducting estimation for bankruptcy claim allowance purposes.

**D. The SEC Has Already Had Six Years To Conduct Discovery And Should Not Be Afforded More Time To The Detriment Of Stakeholders In These Bankruptcy Cases**

22.     The SEC's final argument is that if the Court grants estimation, then it should be provided discovery and should not be limited to the Six Tokens that were listed in the Complaint. Objection ¶ 16.  The SEC even suggests in its Objection that it intends to continue adding tokens to the WD Wash Action after discovery closes (which could be years in the future, as there is not even a scheduling order in place).  *Id.* ¶ 13.  These arguments ignore the interests of the stakeholders in these cases and if accepted, will create unacceptable risks for the Debtors' estates.

23.     The SEC investigated BUS for six years, received voluminous documents and took numerous depositions.  Six years of discovery provides the SEC with more than enough information to calculate any potential claims for disgorgement.  Indeed, following its six-year investigation, the SEC filed the Complaint in WD Wash specifically identifying the Six Tokens it contends *are* securities.  Tellingly, although the SEC now says it needs more discovery, the SEC fails to identify a single category of documents it needs, nor does it identify a single person it still needs to depose.  The SEC should not be permitted to set out legal theories and claims *ad infinitum* in dribs and drabs and delay the Debtors' plan process for an unspecified time.

24.     The Debtors agree that discovery may be relevant to estimation, but it is the Debtors who should be entitled to some.  The Debtors are willing to discuss with the SEC a reasonable discovery schedule to help estimate its disgorgement claims, but the SEC's proposed approach of thinking of ways to create even more delay by feigning a need for discovery is untenable given the volatility of the assets and the fact that other stakeholders bear that risk.[11]

---

[11]   As noted above, if the Court declines to shorten the governmental bar date for the SEC, the Debtors request that the Court hold the SEC to the current government bar date and order a prompt estimation of the SEC Claims to commence 30 days thereafter.  The Debtors will then set forth a probabilities-based assessment because the SEC does not appear to believe that the "Token Toss" method is appropriate.

### III.    CONCLUSION

25.    For the reason stated in the Motion and above, the Debtors request that the Court overrule the Objection, grant the Motion, and set an estimation schedule consistent with the Court's decisions regarding (i) whether or not to require the SEC to file its claims sooner than 180 days after the Petition Date and (ii) the scope and breadth of discovery.

Date: July 10, 2023
Wilmington, DE

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/  Kenneth Enos*
Robert S. Brady (Delaware Bar No. 2847)
Kenneth Enos (Delaware Bar No. 4544)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: 302-571-6600
Email: rbrady@ycst.com
Email: kenos@ycst.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani (admitted pro hac vice)
Patricia B. Tomasco (admitted pro hac vice)
Daniel Holzman (admitted pro hac vice)
Alain Jaquet (admitted pro hac vice)
Razmig Izakelian (admitted pro hac vice)
Valerie Ramos (admitted pro hac vice)
Joanna D. Caytas (admitted pro hac vice)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: 212-849-7000
Facsimile: 212-849-7100
Email: susheelkirpalani@quinnemanuel.com
Email: pattytomasco@quinnemanuel.com
Email: danielholzman@quinnemanuel.com
Email: alainjaquet@quinnemanuel.com
Email: razmigizakelian@quinnemanuel.com
Email: valerieramos@quinnemanuel.com
Email: joannacaytas@quinnemanuel.com

**CO-COUNSEL FOR THE DEBTORS**

30531002.1