UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 11 |
|  | . |  |
|  | . | Case No. 23-10597(BLS) |
| DESOLATION HOLDINGS, LLC, | . |  |
| et al, | . |  |
|  | . | 824 Market Street |
|  | . | Wilmington, Delaware 19801 |
| Debtors. | . |  |
| . . . . . . . . . . . . . . . . | . | Wednesday, July 12, 2023 |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:              Kenneth Enos, Esq.
                              YOUNG, CONAWAY, STARGATT
                               & TAYLOR, LLP
                              Rodney Square
                              1000 North King Street
                              Wilmington, Delaware 19801

                              Patricia B. Tomasco, Esq.
                              Razmig Izakelian, Esq.
                              QUINN, EMANUEL, URQUHART
                               & SULLIVAN, LLP
                              51 Madison Avenue, 22nd Floor
                              New York, New York 10010

For the U.S. Trustee:         Richard L. Schepacarter, Esq.
                              OFFICE OF THE U.S. TRUSTEE
                              844 King Street, Suite 2207
                              Wilmington, Delaware 19801

(Appearances Continued)

Audio Operator:               Electronically Recorded
                              by Dana L. Moore, ECRO

Transcription Company:        Reliable
                              1007 N. Orange Street
                              Wilmington, Delaware 19801
                              (302)654-8080
                              Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA ZOOM:

| | |
|---|---|
| For the Debtors: | Alain Jaquet, Esq.<br>Barbara Howell, Esq.<br>QUINN, EMANUEL, URQUHART<br> & SULLIVAN, LLP |
| For the Securities and<br>Exchange Commission: | Therese Scheuer, Esq.<br>Patricia Schrage, Esq.<br>U.S. SECURITIES AND EXCHANGE<br> COMMISSION |
| For the United States: | Leah Lerman, Esq.<br>U.S. DEPARTMENT OF JUSTICE<br> - CIVIL DIVISION |
| For Aquila Holdings,<br>Inc.: | Laura Davis Jones, Esq.<br>PACHULSKI, STANG, ZIEHL<br> & JONES, LLP |
| For Lexon Insurance<br>Company: | Brian Roy, Esq.<br>HARRIS BEACH, PLLC |
| For the Florida Office of<br>Financial Regulation: | George Bedell, Esq.<br>OFFICE OF THE ATTORNEY GENERAL |
| For the Texas Department<br>of Banking: | Roma Desai, Esq.<br>OFFICE OF THE ATTORNEY GENERAL |
| Also Appearing: | Craig Rasile, Esq.<br>WINSTON & STRAWN, LLP |
| | John Penn, Esq.<br>PERKINS COIE, LLP |
| | Clayton Kolls<br>Harry Foard<br>Dominic Collins<br>BERKELEY RESEARCH GROUP |
| | Mia Cooper, Interested Party |
| | Tim Pohl, Interested Party on<br> behalf of Bittrex |

(Appearances Continued)

APPEARANCES VIA ZOOM:   (Continued)

Also Appearing:                Sedona Claypoole, Interested
                                Party on behalf of BRG

                               Mason Palissery
                               REORG

                               Jack Schickler
                               Sandali Handagama
                               COIN DESK

                               Becky Yerak
                               WALL STREET JOURNAL

                               Elizabeth Napolitano
                               "MEDIA"

                               Dietrich Knauth
                               REUTERS

INDEX

|  | Page |
|---|---|
| STATUS BY MS. TOMASCO | 6 |
| DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PRE-PETITION OBLIGATIONS RELATED THERETO, AND (C) CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS; (II) GRANTING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS TO POST-PETITION INTERCOMPANY BALANCES; AND (III) GRANTING RELATED RELIEF | 20 |

| EXHIBIT | EVID. |
|---|---|
| Hengel Declaration | 21 |

1    (Proceedings commence at 1:34 p.m.)

2    (Call to order of the Court)

3         THE COURT:  Please be seated.

4         Ms. Tomasco, good afternoon.  Good to see you.

5         MS. TOMASCO:  Good to see you, too, Judge Shannon.

6    This -- good afternoon, Your Honor.  Patty Tomasco with Quinn

7    Emanuel, I'm counsel for the debtors.  I'm here with Ken Enos

8    and Razmig Izakelian --

9         THE COURT:  Great.

10        MS. TOMASCO:  -- who are going to help with the

11   presentation today.

12        We wanted to -- it was going to be a much more

13   exciting hearing than it's going to be.  So I thought I'd

14   present you with some filler and only five minutes worth of

15   filler.  And if I go over, you're going to have to say stop.

16   Okay?

17        THE COURT:  That's not really my thing, but go

18   ahead.

19    (Laughter)

20        MS. TOMASCO:  All right.  Just we wanted -- we

21   thought it was time, two months into the case, approximately,

22   that we update the Court what we've been doing while we're --

23   we haven't been in front of you.

24        THE COURT:  Sure.

25        MS. TOMASCO:  And so we have a short status

1    presentations --

2                THE COURT:  That would --

3                MS. TOMASCO:  -- that we --

4                THE COURT:  -- be great.

5                MS. TOMASCO:  -- wanted to go through just to let

6    you know kind of how things are going.

7                I won't belabor the point, but there are four

8    debtors, two of which are participants in a cryptocurrency

9    platform.

10                THE COURT:  Uh-huh.

11                MS. TOMASCO:  They have approximately -- if you --

12                UNIDENTIFIED:  Your Honor, do you have a copy?

13                THE COURT:  Sure.  I do not have a copy.  I saw

14    that you had sent it and I did look at it, but --

15                MS. TOMASCO:  I apologize, Your Honor.  May I

16    approach?

17                THE COURT:  Of course.

18                MS. TOMASCO:  Thank you.

19                THE COURT:  Thanks.

20                MS. TOMASCO:  This way, you can write on it with

21    all your questions.

22                There are four debtors, two of which are

23    participants in an online cryptocurrency platform.  All

24    tolled, the individuals and entities that have interacted

25    with these debtors total approximately 2 million.

1          When we filed, we listed that we have active

2    creditor customers of somewhere around 500,000.  And so --

3    but in order to define the universe of notice, we've gone to

4    the end of the earth, like you would any case.

5          THE COURT:  Sure.

6          MS. TOMASCO:  Anybody that you've ever written a

7    text to, we've sent notice to everybody that we've ever had

8    an account with --

9          THE COURT:  Okay.

10          MS. TOMASCO:  -- or who tried to set up an account

11    with us.

12          And so what I wanted to do was to go through what

13    our goals are, how we're going to get there, and where we're

14    going.

15          THE COURT:  Okay.

16          MS. TOMASCO:  Okay.  So we started with Your

17    Honor's order that you entered on June 14th to allow

18    customers to begin again withdrawing their crypto.  So far,

19    5,692 customers have withdrawn approximately $23 million

20    worth of cryptocurrency, still not enough.  We need more

21    customers to withdraw their crypto.

22          We are trying to resolve the claims of various

23    regulatory entities.  Florida and SEC are prominent in our

24    efforts.

25          THE COURT:  I've seen.

1          MS. TOMASCO:  And that hearing has been continued

2    until next Wednesday.

3          THE COURT:  Right.

4          MS. TOMASCO:  We're still having the dialogue with

5    each of those regulators.

6          And then we have Bittrex's non U.S. business, which

7    is Bittrex Global, which you may hear some about off and on.

8          On Slide 6, you'll see just a basic time line of

9    where we've gotten to today.

10          THE COURT:  Let me ask you a question.

11          MS. TOMASCO:  Sure.

12          THE COURT:  And again, I do recall the first-day

13    hearing and subsequent hearings, when we talked about the

14    debtors' intention to essentially make available for return

15    to the customers their crypto.  And again, I think that the

16    debtor went to lengths to ensure that -- or to explain to the

17    Court that this case was different from a number of the other

18    crypto cases that were there.  This was exclusively an

19    exchange and Bittrex was not offering yield and was not using

20    people's crypto for its own purposes, so I get that.

21          And again, I do recall, I believe on a consensual

22    basis, the Court entered the order authorizing the --

23          MS. TOMASCO:  Withdrawal.

24          THE COURT:  -- process of return.  I was certainly

25    happy to do that.

1          I guess, instinctively to me, and when you report

2    that some 5,000 customers have managed to withdraw or regain

3    control of twenty-three-some-odd million dollars,

4    intuitively, that number seems low to me.

5          MS. TOMASCO:  It does to us, as well, Your Honor.

6          THE COURT:  What am I missing or what's going on?

7          MS. TOMASCO:  Well, I mean, we are -- the trouble

8    tickets are to a minimum.  The company is doing everything

9    when customers have trouble getting the crypto off.

10         As you'll see in the next couple of slides, we've -

11   - the company has sent two series of emails to the customers,

12   saying that, you know, please withdraw.

13         They've put their third-party assistance, customer

14   assistance vendor on overtime to help with the trouble

15   tickets.  So it's not the trouble tickets.

16         It's just a lack of engagement by the customers to

17   come and get their crypto off.  And so, you know, when I look

18   at these numbers --

19         THE COURT:  That's non-intuitive to me.

20         MS. TOMASCO:  I -- it's not intuitive to me,

21   either.  But one thing that -- one thing in the back of my

22   mind is, you know, Bittrex is one of the oldest

23   cryptocurrency exchanges to ever exist, and so some of the

24   customers have been on the platform for a very long time.

25   And the value of certain cryptocurrency types, like Bitcoin,

1    have gone up in value appreciably.  So it's sort of like

2    maybe a stock certificate that you have in a safety deposit

3    box that you kind of forgot about it, but it's a --

4                THE COURT:  But it turns out it's Tesla.

5                MS. TOMASCO:  Correct, exactly.  And that's the

6    closest analogy for why there's so much value on this

7    platform that's not being extracted.

8                There are also issues with some customers don't

9    want to come in and do the KYC process, and that's something

10   that, you know --

11               THE COURT:  Right.

12               MS. TOMASCO:  -- at the --

13               THE COURT:  Anonymity --

14               MS. TOMASCO:  -- end of the day --

15               THE COURT:  Anonymity is one of the charms of this

16   --

17               MS. TOMASCO:  Correct.

18               THE COURT:  -- industry.

19               MS. TOMASCO:  At the end of the day, though, even

20   if they don't do that KYC process, we are allowing them to

21   file a proof of claim.

22               THE COURT:  Uh-huh.

23               MS. TOMASCO:  And then, if there is a tension

24   between the customer and the regulators, then we'll let the

25   Court decide what to do about that.  And so that's the

1  process we've set up.

2         THE COURT:  Fascinating.

3         MS. TOMASCO:  It is --

4         THE COURT:  Okay.

5         MS. TOMASCO:  Well, the -- it's been -- if you're

6  sort of like a -- you know, an engineering brain like mine

7  trying to set up this whole process of how to get the claims

8  forms, the notice out, how you're going to deal with the

9  tension between the regulators and the customers, setting

10  this up has been a really fun exercise.  I think we've done a

11  really good job.

12         THE COURT:  Okay.

13         MS. TOMASCO:  But just -- and you'll see more

14  details of that as we get -- go along in the case.

15         But just to let you know, right now, the customers

16  can log onto the platform, they can provide the regulatory

17  compliance elements, KYC, all of those things -- we can't

18  send money to certain jurisdictions -- and they can accept

19  the terms of service and then they can withdraw their crypto.

20         We haven't seen, necessarily, that it's -- we don't

21  -- except in isolated cases, that this process of complying

22  with the terms of service have been an issue with getting

23  crypto off.  It's just a lack of engagement.

24         THE COURT:  Okay.  You may be getting to this, but

25  I guess it's -- and again, I don't want to overly complicate

1    this issue, but we're talking about how we got here and where

2    you're going.  Is there an escheat feature to this at the --

3    to this exercise at the back end?

4            I mean, I imagine -- and again, it's not an apt

5    analogy.  Your idea of holding a stock certificate, I think,

6    might actually be more apt.  But when we think about,

7    sometimes, things like gift cards --

8            MS. TOMASCO:  Uh-huh.

9            THE COURT:  -- stuff like that --

10            MS. TOMASCO:  Uh-huh.

11            THE COURT:  -- that are in somebody's sock drawer

12    from ten years ago.  In the absence of customers engaging,

13    presumably you will not get a hundred percent engagement or

14    compliance.  What happens then?  And if I'm getting ahead of

15    myself or I'm poking a -- you know, some kind of a thicket --

16    and I imagine I might be, you know, feel free to tell me that

17    I can tune in later, and we'll figure out how to cross that

18    bridge.  It's not a today issue.

19            But again, I've had many cases -- I mean,

20    bankruptcy cases commonly feature unclaimed funds, unclaimed

21    distributions, et cetera, and there are mechanisms for that.

22    This one is a little different --

23            MS. TOMASCO:  Correct.

24            THE COURT:  -- because of the nature of your

25    business.

1          MS. TOMASCO:  Correct.

2          So this is similar to cases that we have down in

3    Texas for unclaimed royalties.  An unclaimed --

4          THE COURT:  Sure.

5          MS. TOMASCO:  Yeah.  So an unclaimed royalty is --

6    you know, you're a royalty owner is because you're -- you own

7    land on which somebody has drilled a well.  And they send you

8    a royalty check and you don't cash it, and so it sits in

9    something that oil and gas companies call a "suspense

10   account."

11         THE COURT:  Suspense accounts, right.  I've had --

12         MS. TOMASCO:  Yeah.

13         THE COURT:  Yeah, I've had dealings with these.

14         MS. TOMASCO:  Right.

15         And so the way that those are typically processed

16   is, you know, we have Section 347 of the Bankruptcy Code,

17   which says what we do with unclaimed distributions.  We also

18   have a feature in the plan that says what we do with the

19   unclaimed distributions.

20         THE COURT:  Okay.

21         MS. TOMASCO:  And so those are going to -- you

22   know, customers go first, priority claims, unsecured claims,

23   equity.  So that's --

24         THE COURT:  Okay.

25         MS. TOMASCO:  -- strict waterfall.

1      There will be unclaimed property claims consistent

2  with, you know, Thomson McKinnon Securities, Drexel Burnham,

3  those cases -- largely stockbroker cases --

4          THE COURT:  Sure.

5          MS. TOMASCO:  -- have dealt with this previously --

6  that create a claim for state escheats if the payment date

7  for the unclaimed property occurred pre-petition.

8          THE COURT:  Got it.

9          MS. TOMASCO:  There will be claims, we've been

10  tracking those claims, as well.

11          THE COURT:  Okay.

12          MS. TOMASCO:  So there's going to be a -- you know,

13  a bright line of demarcation, one goes to 347; the other, the

14  states will have a claim for.

15          THE COURT:  Okay.  No.  Thank you.  I appreciate

16  the guidance.  And predictably, you're way ahead of me.

17  Okay.

18          MS. TOMASCO:  Yeah, it's the nerd in me, I can't

19  help it.

20          All right.  So, on Slide 10, we have the totals

21  here of how many customers are left, how much has been

22  withdrawn broken between the Malta OpCo and the BUS

23  customers.

24          So what have we done in terms of notice?  As I

25  mentioned, we have given notice to upwards of 2 million

1    different individuals.

2           Notice of commencement went to 1.6 million

3    customers by email --

4           THE COURT:  Uh-huh.

5           MS. TOMASCO:  -- per the Court's order.  There were

6    hard bounces in working with Omni.  We anticipated that there

7    would be hard bounces and that we would need to do mail

8    service of those.  So those mail services went out to 32,000

9    customers.

10          THE COURT:  Okay.

11          MS. TOMASCO:  Soft bounces, spam filter, things

12   like that, those were also worked through with Omni.  You can

13   see those numbers there.  There's been sort of a triage and

14   constant updating of the email addresses, so that we can get

15   notice to customers.

16          So turning to the bar date notice, which is on

17   Slide 15.  Omni sent the bar date notice to 1.9 million

18   current and former customers, that's anybody that's ever

19   touched the platform.

20          THE COURT:  Uh-huh.

21          MS. TOMASCO:  They sent 57,000 pieces of mail, just

22   regular mail, for the bar date.

23          The total of those numbers is 2,040,444 people.

24   Again, going through the hard bounces, soft bounces, making

25   sure that everybody got notice.  And so that's -- those are

1    the specifics that we have there.

2              THE COURT:  I have to just comment that, consistent

3    with my observation a few minutes ago, in a lot of ways, I

4    actually am surprises that the hard bounces number is as low

5    as it is --

6              MS. TOMASCO:  Well --

7              THE COURT:  -- given the age of the platform and

8    the number of people that may have engaged in 2017 and then

9    moved on with their lives and are no longer on Gmail or

10   Hotmail or whatever they may have been on previously.

11             MS. TOMASCO:  Correct.  Yes, the company had been

12   culling the email addresses repeatedly over time --

13             THE COURT:  Okay.

14             MS. TOMASCO:  -- so that's one of their -- the

15   company is extremely well run, in terms from the data

16   reliability standpoint, and so that was just another one of

17   those features.

18             Also, we did publication notice in CoinDesk, which

19   is the primary cryptocurrency publication, three notices;

20   Wall Street Journal, Financial Times, and the Times of Malta.

21             And again, low engagement on proofs of claim.  We

22   have 193 proofs of claim from customers and 14 from other

23   creditors.

24             THE COURT:  Okay.

25             MS. TOMASCO:  As you know, the bar date is set for

1    August 31st, and so we still expect a -- you know, a certain

2    number for July and August, so those numbers should go way

3    up.

4                    THE COURT:  Sure.

5                    MS. TOMASCO:  Okay.  So for the future -- I hope

6    I'm not past five minutes here, but maybe I am.  Of course,

7    the plan that's on file, we plan to pay the customers their

8    cryptocurrency in kind, in full, if they make a claim.  And

9    again, we may have some that need to be resolved *vis-a-vis*

10   regulatory compliance versus the customer claim.

11                   THE COURT:  Okay.

12                   MS. TOMASCO:  And so that's the system we set up.

13                   We expect to file notice -- file the disclosure

14   statement and amended plan before the end of the exclusivity

15   period, which is September 5th.

16                   Again, the priority is not complicated in this

17   case, there's very little funded debt, nothing really sexy

18   about the plan on -- in that regard.

19                   And so the anticipated time line is that:

20                   We have another omnibus hearing on August 16th.

21                   The general bar date is August 31st.

22                   Exclusivity ends on September 5th.

23                   The solicitation deadline and the general

24   government bar date is November 4th.

25                   THE COURT:  Okay.

| | |
|---|---|
| 1 | MS. TOMASCO:  And if the Court has any questions |
| 2 | ... |
| 3 | THE COURT:  No, I don't think I do.  I appreciate |
| 4 | getting the heads-up. |
| 5 | And obviously I have, you know, some visibility |
| 6 | into the process by the resolution of matters that were |
| 7 | otherwise teed up.  For example, again, the withdrawal motion |
| 8 | was sort of, you know, pre-discussed with the Court, but |
| 9 | ended up being consensual and resolved. |
| 10 | And obviously, there were matters that were |
| 11 | scheduled for today.  My understanding from counsel is that |
| 12 | negotiations are ongoing.  I'm happy to adjourn the hearing |
| 13 | to allow for those discussions to continue. |
| 14 | And you know, I know that -- and certainly Mr. Enos |
| 15 | knows this -- but I -- you know, I get a sense that there's a |
| 16 | concern about that there is a burden by the Court by asking |
| 17 | whether there are dates before -- I understand how the |
| 18 | process works.  If our calendar can assist that dialogue, I'm |
| 19 | happy to have that discussion and make time available, and |
| 20 | the best thing that happens is you don't use my time. |
| 21 | MS. TOMASCO:  I -- |
| 22 | THE COURT:  But again, I'm -- it's not lost on me |
| 23 | that having dates out there keep people focused.  It's the, |
| 24 | you know, facing the gallows at dawn focuses the mind |
| 25 | wonderfully. |

1    So I don't have any issue with adjourning.  I'm

2    happy to have the hearing that's coming up scheduled for next

3    week.  And if there is anything that -- further that the

4    Court can do in assisting with that process, I'd be happy to

5    oblige.

6            MS. TOMASCO:  Thank you, Your Honor.  And we do

7    appreciate the Court's indulgence.  We knew we were going to

8    the well perhaps one too many times.  But it really does help

9    the process to keep --

10           THE COURT:  I had a --

11           MS. TOMASCO:  -- everybody focused.

12           THE COURT:  I had a sale hearing -- I don't think

13   Mr. Schepacarter was in this one -- but I conducted nine

14   hearings and never entered a single order, and it was perhaps

15   the most valuable use of my time.  But they were trying to

16   get to a sale and they came in pretty much about every two or

17   three days, and they said we'll be right back, and I'm happy

18   to oblige with that.  That's part of the process, from my

19   point of view.

20           And I know, on your side, it can seem like you're

21   pestering, but that is at least not how I see it.  Generally,

22   having those deadlines, focus -- and particularly, it's not

23   counsel.  Counsel doesn't need assistance focusing; it's

24   clients.  And clients are advised by counsel we need to have

25   an answer because we're going to have to -- we're going to be

1    in court and the other side will be there --

2              MS. TOMASCO:  Uh-huh.

3              THE COURT:  -- on Thursday.

4              MS. TOMASCO:  Yes.  The bankruptcy time line is

5    faster than the rest of the world.

6              So I'm going to turn the podium over to Mr.

7    Izakelian who's going to present the 345 motion --

8              THE COURT:  Great.

9              MS. TOMASCO:  -- in conjunction with Mr.

10   Schepacarter.

11             THE COURT:  Okay.  Welcome.

12             MR. IZAKELIAN:  Good afternoon, Your Honor.  Razmig

13   Izakelian, Quinn Emanuel, for the debtors and debtors-in-

14   possession.

15             Your Honor, we're here today requesting an

16   extension of the deadline to come into compliance with

17   Section 345(b) until August 16, which is the next omnibus

18   hearing date, without prejudice to seeking further extensions

19   if we have to.

20             So, as an initial matter, we've submitted a

21   declaration of Evan Hengel in support of the -- of the

22   request, it's ECF 182.  We'd like to move Mr. Hengel's

23   declaration into evidence.

24             THE COURT:  Sure.  Is there any objection to the

25   admission of Mr. Hengel's declaration as part of the debtors'

1     case-in-chief for purposes of the cash management order.

2               MR. SCHEPACARTER:  No objection.

3               THE COURT:  Very well.  Thank you.

4               The declaration is admitted.

5        (Hengel Declaration received in evidence)

6               THE COURT:  Is there any party that intends or

7     expects to cross-examine Mr. Hengel regarding the contents of

8     his declaration

9        (No verbal response)

10               THE COURT:  Very well.  The declaration is admitted

11     without contradiction.

12               You may proceed, Mr. Izakelian.

13               MR. IZAKELIAN:  I appreciate that, Your Honor.

14     Thank you.

15               So, Your Honor, as we stated in the supplement and

16     as set forth in Mr. Hengel's declaration, the debtors have

17     been doing everything they can to come into compliance here:

18               We've asked the current banks to sign UDAs.

19               We've reached out to approved banks; we've reached

20     out to unapproved banks and asked them to sign a UDA.

21               And ultimately, we have been able to open an

22     operating account with an approved bank and we are in

23     discussions to open an FBO account with that bank, as well.

24     We're hopeful that bank, as well.  We're hopeful that will be

25     approved soon.

1                I do want to say we do appreciate the U.S.

2    Trustee's concerns here.  We do want to come into compliance

3    with 345(b), we don't want to argue this issue if we don't

4    have to.  Unfortunately, it's just hard for cryptocurrency

5    companies to find banking partners in this climate.  It's

6    even harder for us, given the SEC complaint that's been

7    filed.

8                THE COURT:  Sure.

9                MR. IZAKELIAN:  But we have been trying and we're

10   hopeful we won't have to seek a permanent 345(b) waiver.

11               As a logistical matter, we thought it would be

12   helpful to have two separate orders here, to kind of separate

13   345 from --

14               THE COURT:  From the --

15               MR. IZAKELIAN:  Everything --

16               THE COURT:  -- rest of --

17               MR. IZAKELIAN:  -- else cash --

18               THE COURT:  -- cash management.

19               MR. IZAKELIAN:  -- management related.

20               THE COURT:  Okay.

21               MR. IZAKELIAN:  So we have drafted a final cash

22   management order and a separate extension of 345.

23               I understand the U.S. Trustee has signed off on the

24   form of the orders, but Mr. Schepacarter can correct me if

25   I'm wrong.

1          I have copies of them, if Your Honor would --

2          THE COURT:  That would --

3          MR. IZAKELIAN:  -- like to see.

4          THE COURT:  -- be great.

5      (Pause in proceedings)

6          MR. IZAKELIAN:  Is it okay if I approach, Your

7  Honor?

8          THE COURT:  Sure.  Thank you, Mr. Izakelian.

9          MR. IZAKELIAN:  Of course.

10         So, Your Honor, I just handed you a copy of the 345

11  extension order, a final cash management order, and a

12  blackline of the final cash management order against the

13  previous interim order.  If these are acceptable to the

14  Court, we can upload them after the hearing.

15         If Your Honor has any other questions, I'd be happy

16  to answer them; otherwise, we would ask that you grant the

17  request.

18         THE COURT:  No.  If you would just give me 30

19  seconds to --

20         MR. IZAKELIAN:  Of course.

21         THE COURT:  -- review the blackline.  I've looked

22  at the proposed 345 order, I understand it, and I'll hear

23  from Mr. Schepacarter in a moment.

24     (Pause in proceedings)

25         THE COURT:  Okay.  I think I understand the relief

1    sought.  I don't have any questions, Mr. Izakelian.

2              Mr. Schepacarter, did you wish to be heard?

3              MR. SCHEPACARTER:  Yes, Your Honor.  Thank you.

4              THE COURT:  Good afternoon.  It's good to see you.

5              MR. SCHEPACARTER:  Good afternoon.

6              THE COURT:  Very sharp tie today.

7              MR. SCHEPACARTER:  Thank you.  I picked it out

8    special for this occasion.

9              THE COURT:  You know, it just makes my day.

10             MR. SCHEPACARTER:  I almost forgot, when I came

11   over here, I was like where do I have to go.  I'm like,, wait

12   a minute, I know, it's Judge Shannon.

13             THE COURT:  There you go.

14             MR. SCHEPACARTER:  So I knew that right away.

15             For the record, Richard Schepacarter for the United

16   States Trustee.

17             We don't necessarily sign off on orders, but we

18   just don't object to their entry --

19             THE COURT:  Right.

20             MR. SCHEPACARTER:  -- and that's what we're doing

21   here.

22             I think the debtors appreciate the give-and-take

23   that we've had over the last month or so over this Section

24   345 waiver issue.  I think they appreciate the severity or

25   the seriousness of this issue.

1          I think, a lot of times in the past, the 345 issue

2     kind of got glossed over, and a number of cases probably had

3     situations where there was never even a final order entered,

4     that we just kept extending it, extending it, and the case

5     got confirmed, and then everybody sort of forgot about it.

6          But in the brave new world of the 21st Century and

7     2003 [sic], things are a little different.  So I think they

8     understand the severity of it.

9          I think we're -- it seems like they're making

10    progress --

11         THE COURT:  Uh-huh.

12         MR. SCHEPACARTER:  -- from the standpoint of the

13    fact that they're trying to open accounts.  They understand

14    that there's still an ongoing process.

15         I think the bank that they have those accounts in

16    now and they're seeking to have those for benefit accounts,

17    FBO accounts, is a bank that has signed a UDA, I believe.

18    I'm -- correct me if I'm wrong, but I think they've signed a

19    UDA.  But I don't think the collateralization process has

20    taken place yet because of the nature of these for benefit

21    accounts.

22         So I guess we're going to kick the can down the

23    road, but it's not forever.  So I think that --

24         THE COURT:  Well, and it seems from Mr. Izakelian's

25    comments that the debtor actually is making --

1        MR. SCHEPACARTER:  Yes.

2        THE COURT:  -- real progress.  A lot of times, this

3   issue -- I agree with you.  And in years past, this issue

4   might have been just back-burnered.  And again, prior to all

5   the issues, both in the crypto market, as well as in the

6   banking industry, these issues are front and center.  And you

7   don't need to explain or apologize to the Court for the

8   seriousness with which your office takes this issue.  And you

9   know, so I -- you know, I think I get it.

10       But I also am sensitive to the debtors' description

11  of the challenges that they're facing, given the nature of

12  the industry and where they fit in that, in the context of

13  the bankruptcy proceedings.  So, you know, I think your point

14  is also to ensure that the debtor remains focused on closing

15  the loop on this process, and keeping those deadlines and

16  time lines certainly works.

17       MR. SCHEPACARTER:  Right.

18       THE COURT:  If there are issues or if there are

19  complications to it, the parties are welcome to get on the

20  phone with me because, again, we are in some fairly new

21  ground here.  And I would imagine that some of the interests

22  that you're vindicating or protecting are relatively new

23  considerations for your office, but generally articulated on

24  a national basis.

25       MR. SCHEPACARTER:  Uh-huh.  That --

1           THE COURT:  I think that's probably fair.

2           MR. SCHEPACARTER:  Yeah, I think that's very fair.

3           THE COURT:  Okay.

4           MR. SCHEPACARTER:  So my -- every day, there's

5    something new that crops up, so we'll see what happens.

6           THE COURT:  That's why I like coming into work.

7           MR. SCHEPACARTER:  Exactly, at least for the short

8    term.  Thank you, Your Honor.

9           THE COURT:  All right.  Thank you, Mr.

10   Schepacarter.

11          All right.  Does anyone else wish to be heard with

12   respect cash management and a 345 motion?

13        (No verbal response)

14          THE COURT:  All right.  I note that they are one

15   motion.  I think that it does make good sense to hive off the

16   345 issue and allow particular attention to be focused on

17   that, while getting a final order as to the cash management.

18          Mr. Izakelian has walked through the procedural

19   history, as well as the substantive posture of the motion

20   right now.  I have previously entered orders on this motion

21   and I'm being asked, as a threshold matter, to enter a final

22   order regarding the cash management system independent of the

23   Section 345 provisions and I am prepared to grant that

24   motion.

25          I'm not going to burden the record.  I note that

1  Mr. Hengel has provided a declaration upon which I rely and

2  the debtor has carried its burden as to the relief requested.

3  The motion is granted and the cash management order will

4  issue.

5        Likewise, the debtor is seeking a further interim

6  order that extends the deadline to come into compliance with

7  Section 345(b).  Mr. Hengel's declaration likewise speaks to

8  this issue.  I'm satisfied that cause exists for a further

9  interim order.

10        And again, I very much appreciate the colloquy with

11  Mr. Schepacarter and with Mr. Izakelian regarding the process

12  here because it -- again, it's not typical or it wasn't a

13  year ago, but it is becoming typical, and I appreciate the

14  challenges the debtor is facing and working through.  I'm

15  happy to grant the further extension and, hopefully, we can

16  close the loop on this.

17        So both orders will be entered.  If you want to

18  upload them at the conclusion of the hearing, we'll get them

19  right on.  Okay?

20        Ms. Tomasco, do we have anything further?

21        MS. TOMASCO:  As always, Your Honor, we thank you

22  for your time and the patience of your staff.  And that's all

23  we have for today.

24        THE COURT:  Very good.  All right.  Well, thanks

25  very much.  We stand in recess.  Be well, Counsel.  We're

1    adjourned.

2            MR. SCHEPACARTER:  Thank you, Your Honor.

3            UNIDENTIFIED:  Thank you, Judge.

4        (Proceedings concluded at 2:01 p.m.)

5                        *****

6                    CERTIFICATION

7            I certify that the foregoing is a correct

8    transcript from the electronic sound recording of the

9    proceedings in the above-entitled matter to the best of my

10   knowledge and ability.

11

12

13

14

15   _____        July 14, 2023

16   Coleen Rand, AAERT Cert. No. 341

17   Certified Court Transcriptionist

18   For Reliable

19

20

21

22

23

24

25