## EXHIBIT B

## LEASE ASSIGNMENT

ASSIGNMENT, ASSUMPTION AND AMENDMENT OF LEASE

THIS ASSIGNMENT, ASSUMPTION AND AMENDMENT OF LEASE (this "**Agreement**") is made this ___ day of _____, 2023 by and among BELLEVUE PLACE OFFICE, LLC, a Washington limited liability company ("**Landlord**"); DESOLATION HOLDINGS LLC, a Delaware limited liability company ("**Tenant**"); and PNC BANK, National Association, a national banking association ("**Assignee**").

<u>RECITALS</u>

A.    Landlord and Tenant entered into that certain Bank of America Building Office Lease, dated November 14, 2018 (the "**Original Lease**"), as amended by that certain First Lease Addendum, dated December 19, 2018, by and between Landlord and Tenant (the "**First Amendment**") and that certain Second Lease Addendum, dated July 29, 2019, by and between Landlord and Tenant (the "**Second Amendment**"), and as further amended and assigned pursuant to that certain Partial Assignment, Assumption and Amendment of Lease, dated February 6, 2020, by and among Landlord, Tenant, The Pokémon Company International, Inc., a Delaware corporation, and Aquila Holdings Inc., a Delaware corporation (the "**Partial Assignment**" and, together with the Original Lease, the First Amendment and the Second Amendment, the "**Lease**"), related to certain premises consisting of approximately 17,647 rentable square feet located on the 20th Floor of the Building and commonly known as Suite 2000 as further described therein (the "**Leased Premises**") and located at 10500 NE 8th Street, Bellevue, WA 98004 (the "**Building**").

B.    Tenant desires to assign all of its interest as Tenant under the Lease to Assignee and Assignee is willing to accept the assignment and assume all of the obligations of Tenant under the Lease upon certain terms and conditions, which are set forth herein.

C.    The assignment of the Lease to Assignee requires the prior written consent of Landlord and Landlord is willing to consent to the assignment upon certain terms and conditions, which are set forth herein.

D.    Unless otherwise noted, all capitalized terms herein have the same meanings as set forth in the Lease.

E.    On May 8, 2023, Tenant filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") (such proceeding being administered under Case No. 23-10597 (BLS) hereinafter referred to as the "**Bankruptcy Case**").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is hereby agreed as follows:

1.    <u>Assignment</u>.  Tenant shall and does hereby transfer and assign to Assignee, without reservation, all of Tenant's interest under the Lease, effective as of the Effective Date specified below.

2.      <u>Assumption</u>.  Assignee accepts the foregoing assignment and assumes each and every obligation as Tenant under the Lease, including but not limited to the payment of Rent and Other Charges, which are and will become due and payable under the Lease on and after October 1, 2023 (the "**Effective Date**").  Tenant shall pay Rent and all other sums due under the Lease prior to the Effective Date.

3.      <u>Termination of Sublease</u>.  Assignee is currently subleasing the Leased Premises pursuant to that certain sublease by and between Tenant and Assignee dated March 16, 2021 ("**Sublease**").  The parties hereto acknowledge and agree that, upon the Effective Date, simultaneously with this Agreement becoming effective, the Sublease shall terminate and be of no further force or effect, <u>provided</u> that, no later than one business day prior to the Effective Date, Assignee shall pay to Tenant all Rent and all other sums due under the Lease prior to the Effective Date which are the obligation of Assignee under the Sublease and which remain unpaid by Assignee.

4.      <u>Lease Amendments</u>.  The Lease is hereby amended, as of the Effective Date, as follows:

1.3 and 1.4      **Name and Address of Tenant** is changed to:

PNC Bank, National Association
c/o PNC Realty Services
The Tower at PNC Plaza – 22nd Floor
300 Fifth Avenue
Mail Stop: PT-PTWR-22-1
Pittsburgh, PA 15222-2401
Attn: Transaction Manager
E-Mail: thomas.byrd@pnc.com

with a copy to:

PNC Bank, National Association
Legal Division
1600 Market Street – 8th Floor
Philadelphia, PA 19103
Attn: Michael G. Balent, Esq., Chief Counsel
E-Mail: michael.balent@pnc.com

Section 3.1 of the Lease (regarding Term) is hereby amended by adding the following at the end of such Section: "Notwithstanding the foregoing, Tenant shall have the one-time option to terminate this Lease by providing Landlord written notice of its intent to terminate no later than September 30, 2027, which termination shall be effective September 30, 2028 ("**Tenant's Termination Option**").  As a condition to Tenant's exercise of Tenant's Termination Option and as consideration for the opportunity to terminate this Lease early, Tenant shall pay to Landlord a termination fee of $340,234.16, which fee shall be due upon Tenant's delivery of the notice described in the foregoing sentence."

37.7      **Broker's Commission**.
Each party hereto represents and warrants to the other party that it has incurred no liabilities or claims for brokerage commissions or finder's fees in connection with the execution of this Agreement and it has not dealt with or has any knowledge of any real estate broker, agent, or salesperson in connection with this Agreement. Each party agrees to indemnify and hold the other parties harmless from all such liabilities or claims (including, without limitation, reasonable attorneys' fees).

A new Section 37.27 is added to the Lease which reads as follows: "Landlord and Tenant hereby waive the right to a trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected to this Lease, the relationship of Landlord and Tenant, or Tenant's use or occupancy of the Leased Premises."

The following sections of the Lease are hereby deleted in their entirety:

1.14      **Security Deposit**
1.15      **Guarantor**
3.4      **Pre-Commencement License**
3.5      **Option to Extend Lease Term**
3.6      **Right of First Opportunity**
8      **Security Deposit**
11.2      **Premises Improvements**
37.21      **Current Tenant**
37.22      **Letter of Credit**
37.23      **Audited Financial Statement**
37.24      **Guaranty**

The Lease is amended by incorporating therein the following provisions of the Consent to Sublease dated March 16, 2021, by and between Landlord, Tenant, and Assignee ("**Consent to Sublease**"), a copy of which Consent to Sublease is attached hereto as Exhibit A:

Section 4 of the Consent to Sublease, which Section amends the following provisions of the Lease: Section 6.6 (regarding disputes relating to Additional Rent); Section 11.3 (regarding alterations by Tenant); Section 19.1-19.5 (regarding Insurance); and Section 22 (regarding Liens);

Section 16 of the Consent to Sublease (regarding Parking);

Section 17 of the Consent to Sublease (regarding Signage); and

Section 19/20 of the Consent to Sublease (regarding the Patriot Act).

5.        Memorandum of Insurance.  Assignee shall make available to Landlord a memorandum of insurance on or before the Effective Date in compliance with the insurance requirements set forth in Section 19 of the Lease, as amended herein.

6.        Further Assignments and Subleases.  Subject to Permitted Transfers by Assignee, as permitted pursuant to Section 20.7 of the Lease, neither Assignee nor Tenant shall further assign this Lease or any interest therein nor sublet the Leased Premises or any portion thereof without the prior written consent of Landlord.  Any attempted assignment or subletting without the requisite consent of Landlord shall be null and void and shall constitute a breach of the Lease.  The assignment of the Lease from Tenant to Assignee shall be deemed to be an absolute assignment and Tenant is hereby divested of its entire estate under the Lease.  Notwithstanding any agreement or arrangement between Tenant and Assignee to the contrary, Tenant is not entitled to reenter or repossess the Leased Premises, and any subsequent proposed or actual reentry or repossession by Tenant shall be deemed an additional assignment by Assignee and Landlord's written consent thereto shall be required at the time of such assignment.

7.        Release; Consent to Future Assignments and Subleases.  Other than the obligations of Tenant set forth in Section 2 of this Agreement and for any obligations of Tenant occurring or deemed to have occurred prior to the Effective Date that survive expiration or earlier termination of the Lease pursuant to this Agreement (collectively the "**Surviving Obligation**"), each of Landlord and Tenant hereby releases and relieves the other party, its respective agents, officers, directors, employees, and its respective successors from and against any and all actions, causes of action, suits, controversies, damages, judgments, claims and demands whatsoever, at law or in equity of every kind and nature whatsoever arising out of, or in connection with, the Lease, provided that nothing herein shall relieve the Landlord or the Tenant of its obligations under this Agreement.  Tenant and Guarantor hereby consents to any and all future assignments subleases or modifications of the Lease by Assignee and Assignee's successors in interest and Tenant's and Guarantor's written consent thereto shall not be required to effect a legally-enforceable assignment, sublease or modification by Assignee.  Any such future assignment, sublease or modification without Tenant's or Guarantor's consent shall not release or relieve Tenant or Guarantor from the Surviving Obligation.

8.        Indemnification.

(a)        Tenant shall protect, defend, indemnify and hold Assignee, and its officers, employees, agents, contractors and representatives, harmless from and against any and all liability, loss, cost, damage or expense (including reasonable attorneys' fees, charges and expenses) that arise by reason of (i) any failure of Tenant to perform or discharge any of the terms, covenants, agreements or its obligations under this Agreement, and (ii) any failure of Tenant to perform or discharge any of the terms, covenants, agreements or obligations of tenant under the Lease arising prior to the Effective Date and which remained the obligation of Tenant pursuant to the terms and conditions of the Sublease and for which Tenant is required to indemnify Assignee under the Sublease.

(b)        Assignee shall protect, defend, indemnify and hold Tenant, and its officers, employees, agents, contractors and representatives, harmless from and against any and all liability, loss, cost, damage or expense (including reasonable attorneys' fees, charges and expenses) that

arise by reason of any failure of Assignee to perform or discharge any of the terms, covenants, agreements or its obligations under this Agreement.

9.    Attorneys' Fees and Costs. Each party hereto shall be responsible for its own fees and costs incurred in connection with its review and consent to this Assignment of the Lease.

10.    Landlord Representations and Warranties.    Landlord represents and warrants that (i) subject to Section 3 above, all amounts due as Base Rent and Additional Rent with respect to the Leased Premises have been received by Landlord for the period through the Effective Date; and, as of the Effective Date, Landlord has no actual knowledge, without the duty to investigate, of any claims, counterclaims, set offs, or defenses against Tenant relating, in any way, to the Leased Premises; (ii) other than Tenant's Bankruptcy Case, the Lease is, as of the Effective Date, in full force and effect, Landlord has received no written notice of, nor otherwise has actual knowledge of, without the duty to investigate, any existing event of default under the Lease and, to the best of Landlord's actual knowledge, without the duty to investigate, no event has occurred and is continuing that would constitute an event of default under the Lease, but for the requirement to give notice and provide the applicable time to cure; (iii) Landlord is the fee simple owner of the Bank of America Building and Bellevue Place, including the Leased Premises, and is the landlord under the Lease, Tenant is the tenant thereunder with regard to the Leased Premises, and, to Landlord's actual knowledge, there are no other leases or occupancy agreements encumbering the Leased Premises; (iv) Exhibit A attached to the Sublease is a complete copy of the Lease and all other agreements between Landlord and Tenant relating to the leasing, use or occupancy of the Leased Premises; and, as of the Effective Date, the Leased Premises constitutes the entire premises let to Tenant pursuant to the Lease; (v) subject to the terms and conditions of the Lease as modified hereby, as of the Effective Date, the current term of the Lease will expire on October 31, 2030, unless earlier terminated pursuant to the terms of the Lease, including without limitation, pursuant to Tenant's Termination Option set forth herein; (vi) there are no actions, voluntary or otherwise, pending against Landlord under the bankruptcy, reorganization, arrangement, moratorium or similar laws of the United States, any state thereof or any other jurisdiction; and (vii) pursuant to the terms and conditions of Section 11.3 of the Lease, none of the alterations, additions or improvements previously made to the Leased Premises prior to the date hereof are required to be removed upon the expiration or earlier termination of the Lease; provided, however, in its sole discretion, upon the expiration or earlier termination of the Lease, Landlord shall have the right to require that the low voltage cabling and associated telecommunication equipment exclusively serving the Leased Premises be removed.

11.    Tenant Representations and Warranties. Tenant represents and warrants that: (i) Tenant is the tenant under the Lease; (ii) Exhibit A attached to the Sublease is a complete copy of the Lease and all other agreements between Landlord and Tenant relating to the leasing, use or occupancy of the Leased Premises; and, as of the Effective Date, the Leased Premises constitutes the entire premises let to Tenant pursuant to the Lease; (iii) the Lease is, as of the Effective Date, in full force and effect, (iv) other than in connection with Tenant filing its Bankruptcy Case, Tenant has received no written notice of, nor otherwise has actual knowledge, without the duty to investigate, of, any existing event of default under the Lease and, to Tenant's actual knowledge, without the duty to investigate, no event has occurred and is continuing that would constitute an event of default under the Lease, but for the requirement to give notice and

provide the applicable time to cure; and (v) there are no mortgages or other liens encumbering Tenant's interest in the Leased Premises.

12.  <u>Leasehold Improvements</u>.  Assignee hereby acknowledges that the leasehold improvements in the Leased Premises are the property of Landlord. Assignee accepts the Leased Premises and the existing leasehold improvements "As Is" and without warranties of any kind, express or implied.

13.  <u>Tenant's FF&E</u>. Pursuant to the Sublease, Assignee had (i) the right, during the term of the Sublease, to use the furniture, fixtures and equipment of Tenant listed on Schedule I to the Bill of Sale attached hereto as <u>Exhibit B</u> ("**Tenant's FF&E**"); and (ii) the right to purchase certain portions of Tenant's FF&E upon the expiration of the Sublease. In furtherance of the foregoing, notwithstanding anything in the Sublease to the contrary, pursuant to the Bill of Sale set forth on <u>Exhibit B</u> attached hereto and made a part hereof, on or prior to the Effective Date, Tenant shall sell to Assignee Tenant's FF&E for the sum of Ten Dollars ($10.00).

14.  <u>Landlord's Consent</u>.  In consideration of the foregoing terms and conditions, and subject to Tenant's payment of all sums due pursuant to the terms of the Lease prior to the Effective Date and Landlord's lender's consent to this Agreement, Landlord hereby consents to Tenant's assignment of its leasehold interest under the Lease to Assignee and the amendments to the Lease, all as more particularly set forth herein.

15.  <u>Authority and Bankruptcy Court Approval</u>.  Except for the approval of this Agreement by the Bankruptcy Court, each party hereto represents and warrants that the person executing this Agreement on its behalf is duly authorized to do so and that all required consents and approvals necessary for such party's due execution and delivery of this Agreement have been obtained.  This Agreement shall not be effective unless and until approved by the Bankruptcy Court.

16.  <u>Further Assurances</u>.  Each of the parties hereto, without additional consideration, shall execute and deliver all such further documents and do such other things as any other party may reasonably request to give full effect to this Agreement.

17.  <u>No Partnership</u>.  Nothing in this Agreement shall be deemed in any way to create between the parties hereto any relationship of partnership, joint venture, or association, and the parties hereto hereby disclaim the existence of any such relationship.

18.  <u>Counterpart Execution</u>.  This Agreement may be executed in counterparts, each of which when executed and delivered to the other parties (or to the other parties' legal counsel) will be deemed to be an original and all of which, taken together, will be deemed to be one and the same instrument. Execution and delivery of a counterpart of this Agreement by portable document format ("**PDF**") copy bearing the PDF signature of a duly authorized officer of any party hereto, whether delivered by either facsimile or email, shall be deemed to have the same legal effect as delivery of an original signed copy of this agreement. Each party hereto agrees that: (x) each PDF signature of such party will be enforceable to the same extent as a manual signature, whether in court or otherwise; and (y) such party will not raise any defenses or regulatory or statutory claims attempting to invalidate the enforceability of its PDF signature.

19.    <u>Remaining Lease Provisions; Conflict</u>.  All other provisions of the Lease remain in full force and effect; provided, however, in the event of a conflict between the terms of the Lease and this Agreement, this Agreement shall control.

*[signatures on following page]*

## CONSENT OF LENDER

The undersigned Lender consents to the foregoing Assignment, Assumption and Amendment of Lease (the "**Agreement**") and confirms and agrees that (i) the Subordination, Nondisturbance and Attornment Agreement between Landlord, Tenant and Lender, dated December 12, 2018 (the "**SNDA**"), shall inure to the benefit of Assignee, as the assignee of Tenant under the Lease, and (ii) in accordance with the terms and conditions of the SNDA, Lender shall be bound by the Lease as modified by the Agreement.

**IN WITNESS WHEREOF,** the undersigned has caused this Consent of Lender to be executed as of this _____ day of _____, 2023.

**LENDER:**

**METROPOLITAN LIFE INSURANCE COMPANY**, a New York corporation

By:_____
Name:_____
Title:_____

STATE OF _____    )
                              ) ss.
COUNTY OF _____    )

This record was acknowledged before me on _____, 2023, by _____ as the _____ of METROPOLITAN LIFE INSURANCE COMPANY, a New York corporation.

_____
(Signature of notary public)

_____
(Title of office)

My commission expires: _____

(Use this space for notarial stamp/seal)

IN WITNESS WHEREOF, this instrument has been signed on the date first above written.

"LANDLORD": **BELLEVUE PLACE OFFICE, LLC,** a Washington limited liability company

By:  Kemper Development Company, a Washington corporation, its Manager

By:_____
     James E. Melby
     President

"TENANT": **DESOLATION HOLDINGS LLC,** a Delaware limited liability company

By:_____
Its:_____

"ASSIGNEE": **PNC BANK, NATIONAL ASSOCIATION,** a national banking association

By:_____
Its:_____

## **LANDLORD**

STATE OF WASHINGTON            )
                               ) ss.
COUNTY OF KING                 )

    This record was acknowledged before me on _____, 2023, by JAMES E. MELBY as President of KEMPER DEVELOPMENT COMPANY, a Washington corporation, the Manager of BELLEVUE PLACE OFFICE, LLC, a Washington limited liability company.

<br>

_____
(Signature of notary public)

_____
(Title of office)

My commission expires: _____

(Use this space for notarial stamp/seal)

## **TENANT**

STATE OF _____       )
                               ) ss.
COUNTY OF _____      )

    This record was acknowledged before me on _____, 2023, by _____ as _____ of DESOLATION HOLDINGS LLC, a Delaware limited liability company.

<br>

_____
(Signature of notary public)

_____
(Title of office)

My commission expires: _____

(Use this space for notarial stamp/seal)

**ASSIGNEE**

COMMONWEALTH OF PENNSYLVANIA         )

                                                                      ) ss.

COUNTY OF ALLEGHENY                              )

This record was acknowledged before me on _____, 2023, by _____ as _____ of PNC BANK, NATIONAL ASSOCIATION, a national banking association.

<br>

_____
(Signature of notary public)

_____
(Title of office)

My commission expires: _____

(Use this space for notarial stamp/seal)

## EXHIBIT A

## <u>CONSENT TO SUBLEASE</u>

[See Attached]

## CONSENT TO SUBLEASE

THIS CONSENT TO SUBLEASE ("Consent") is made as of March __16__, 2021, by and among Bellevue Place Office, LLC, a Washington limited liability company (the "Landlord"); Desolation Holdings LLC, a Delaware limited liability company (the "Tenant"); and PNC Bank, National Association, a national banking association (the "Subtenant").

## RECITALS

A.      Landlord and Tenant entered into that certain Bank of America Building Office Lease, dated November 14, 2018 (the "Original Lease"), as amended by that certain First Lease Addendum, dated December 19, 2018, by and between Landlord and Tenant (the "First Amendment") and that certain Second Lease Addendum, dated July 29, 2019, by and between Landlord and Tenant (the "Second Amendment"), and as further amended and assigned pursuant to that certain Partial Assignment, Assumption and Amendment of Lease, dated February 6, 2020, by and among Landlord, Tenant, The Pokémon Company International, Inc., a Delaware corporation, and Aquila Holdings Inc., a Delaware corporation (the "Partial Assignment" and, together with the Original Lease, the First Amendment and the Second Amendment, the "Lease"), related to certain premises described therein (the "Premises") and located at 10500 NE 8th Street, Bellevue, WA 98004 (the "Building").

B.      Tenant desires to sublease a portion of the Premises consisting of approximately 17,647 rentable square feet located on the 20th floor of the Building and commonly known as Suite 2000 (the "Subleased Premises") to Subtenant pursuant to the provisions of that certain Sublease, dated March __16__, 2021, by and between Tenant and Subtenant, which is attached to this Consent as Exhibit A (the "Sublease").

C.      Tenant and Subtenant desire to obtain Landlord's consent to the Sublease.

NOW, therefore, in consideration of the foregoing and the agreements contained in this Consent, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord hereby consents to the Sublease, such consent being subject to and upon the following terms and conditions to which the parties hereby agree:

1.      Consent. Landlord hereby acknowledges and consents to the Sublease; provided, however, Landlord is not a party to the Sublease and, except to the extent otherwise expressly provided herein, shall not be bound by the provisions thereof.

2.      Notices; Audit Rights. Landlord shall simultaneously deliver to Subtenant any notice sent to Tenant by Landlord with regard to the Subleased Premises, including without limitation, any notice of default thereunder, any notice relating to Additional Rent or Other Charges due or to be reconciled with respect to the Subleased Premises, and any notice of Landlord obtaining a new lender for the financing thereof. In furtherance of the foregoing, Landlord and Tenant acknowledge and agree that Subtenant shall have any right of Tenant under the Lease to contest any calculation of Additional Rent or Other Charges relating to any period during which Subtenant is responsible for all or any portion of such costs or expenses pursuant to the Sublease, provided that (i) the right to contest any calculation of Additional Rent or Other Charges shall be in accordance with Section 6.6 of the Lease, and (ii) only one party (whether Tenant or Subtenant)

{00701099.12}

may contest calculations of Additional Rent or Other Charges for a particular Lease Year. Any such notices shall be delivered in accordance with the Lease and shall be sent to Tenant at the following address:

> Desolation Holdings LLC
> 1100 Bellevue Way NE, Ste. 8A-986
> Bellevue, WA 98004
> Attn: Ellie Havens
> Email: ehavens@bittrex.com

> with a copy to:

> O'Melveny & Myers LLP
> 400 S. Hope Street, 18th Floor
> Los Angeles, CA 90071
> Attn: Kathryn E. Turner, Esq.
> E-Mail: kturner@omm.com

> And to Subtenant at the following addresses:

> PNC Bank, National Association
> c/o PNC Realty Services
> The Tower at PNC Plaza – 22nd Floor
> 300 Fifth Avenue
> Mail Stop: PT-PTWR-22-1
> Pittsburgh, PA 15222-2401
> Attn: Transaction Manager
> E-Mail: nicole.nasca@pnc.com

> with a copy to:

> PNC Bank, National Association
> Legal Division
> 1600 Market Street – 8th Floor
> Philadelphia, PA 19103
> Attn: Michael G. Balent, Esq., Chief Counsel
> E-Mail: michael.balent@pnc.com

3.      Sublease is Subordinate. The Sublease shall be subordinate and at all times subject to: (a) all of the covenants, agreements, terms, provisions and conditions contained in the Lease, (b) the terms and conditions of superior mortgages, deeds of trust, or any other hypothecation or security now existing or hereafter placed upon the real property of which the Subleased Premises are a part and to any and all advances secured thereby and to all renewals, modifications, consolidations, replacements and extensions thereof, and (c) all matters of record affecting the Subleased Premises as of the date hereof. Subtenant shall not do or permit anything to be done in

{00701099.12}                                    2

connection with Subtenant's occupancy of the Subleased Premises, which would violate any covenants, agreements, terms, provisions and conditions contained in the Lease.

4.      Effect of Sublease. Except as otherwise expressly provided in this Consent, nothing contained in this Consent or in the Sublease shall be construed to modify, waive, impair, or affect any of the terms, covenants or conditions contained in the Lease, or to waive any breach thereof, or any rights or remedies of Landlord under the Lease against any person liable for the performance thereof, or to enlarge or increase Landlord's obligations or liabilities under the Lease. Notwithstanding the foregoing, or anything else contained herein to the contrary, the parties hereto hereby acknowledge and agree that, during the Term of the Sublease, as between Landlord and Subtenant, the terms of the Lease shall be deemed to be amended and modified as follows:

(a)      **Section 19.1 Through 19.5 Relating to Insurance**. Section 19.1 through Section 19.5 of the Lease, regarding insurance, shall be deemed to be amended and restated in their respective entirety, as set forth on Exhibit B attached hereto and incorporated herein;

(b)      **Section 6.6 Disputes Relating to Additional Rent**. The second sentence of Section 6.6 of the Lease is amended in its entirety to read as follows:

The Objection Notice must be received by Landlord within thirty (30) days after the date of receipt by Tenant of Landlord's statement summarizing the actual amount of Tenant's Share of Operating Expenses for the prior Lease Year, as set forth in Section 6.3 of the Lease and must set forth with particularity the reason why Tenant disputes Landlord's calculation or the amount.

(c)      **Section 11.3 Alterations by Tenant**. Landlord acknowledges that Subtenant desires to alter the Subleased Premises as generally shown on Exhibit C attached hereto (the "Proposed Alterations"). Any such alterations shall require Landlord's approval in accordance with the terms and conditions of Section 11.3 of the Lease, which shall include, without limitation, the requirement that Subtenant submit final plans and specifications for such alterations to Landlord for its review and approval. Notwithstanding the foregoing, Landlord acknowledges that, in concept, it is not opposed to the Proposed Alterations as generally shown on Exhibit C; and provided the final plans and specifications submitted to Landlord in connection with a request for Landlord's approval of the Proposed Alterations do not materially differ from the Proposed Alterations as shown on Exhibit C, Landlord shall not unreasonably withhold, condition or delay its approval thereof, in concept.

(d)      **Section 22 Liens.** The third (3rd) and fourth (4th) sentences of Section 22 of the Lease (requiring tenant improvements, alterations or other work to be bonded) are hereby deleted. For the avoidance of doubt, neither Subtenant nor Tenant shall be obligated to obtain any payment or performance bonds for any improvements, alterations or other work performed or to be performed by or on behalf of Subtenant.

5.      Tenant and Subtenant Obligations. Tenant shall remain fully liable and responsible for the due keeping, performance and observance of all the terms, covenants and conditions set forth in the Lease on the part of Tenant to be kept, performed and observed with regard to the Subleased Premises and for the payment of the Base Rent, Additional Rent and all other sums now

and hereafter becoming payable thereunder for the Subleased Premises. No guarantor of the Lease shall be relieved in any way from the terms and conditions of the guaranty of the Lease. Any act or omission of Subtenant or anyone claiming under or through Subtenant that violates any of the provisions of the Lease (as modified hereby) shall be deemed a violation of the Lease by Tenant, provided that Landlord has given Tenant notice of such violation to the extent required under the terms of the Lease and allowed Tenant to cure such violation to the extent allowed under the terms of the Lease. Subject to the Lease modifications set forth in Section 4 above, Subtenant agrees to assume all existing and future obligations of Tenant under the Lease in respect of the Subleased Premises during the term of the Sublease and shall be jointly and severally responsible with Tenant for the payment of Base Rent, Additional Rent, and the performance of all terms, covenants and conditions of the Lease, except as such terms, covenants and conditions of the Lease relate to any portion of the Premises which is not the Subleased Premises. With respect to the foregoing, Landlord represents and warrants that (i) all amounts due as Base Rent and Additional Rent with respect to the Subleased Premises have been received by Landlord for the period through March 31, 2021 (provided that the foregoing shall not apply to the annual reconciliation of any Additional Rent required under Section 6.3 of the Lease); and, as of the date hereof, Landlord has no actual knowledge of any claims, counterclaims, set offs, or defenses against Tenant relating, in any way, to the Subleased Premises; (ii) the Lease is, as of the date hereof, in full force and effect, Landlord has received no written notice of, nor otherwise has knowledge of, any existing event of default under the Lease and, to the best of Landlord's actual knowledge, no event has occurred and is continuing that would constitute an event of default under the Lease, but for the requirement to give notice and provide the applicable time to cure; (iii) Landlord is the fee simple owner of the Bank of America Building and Bellevue Place, including the Premises, and is the landlord under the Lease, Tenant is the tenant thereunder with regard to the Subleased Premises, and, to Landlord's actual knowledge, there are no other leases or occupancy agreements encumbering the Subleased Premises; (iv) Exhibit A attached to the Sublease is a complete copy of the Lease and all other agreements between Landlord and Tenant relating to the leasing, use or occupancy of the Subleased Premises; and, as of the date hereof, Suite 700 no longer constitutes a portion of the premises let under the Lease; (v) as of the date of this Agreement, the current term of the Lease will expire on October 31, 2030, unless modified by Landlord and Tenant or earlier terminated pursuant to the terms of the Lease; (vi) there are no actions, voluntary or otherwise, pending against Landlord under the bankruptcy, reorganization, arrangement, moratorium or similar laws of the United States, any state thereof or any other jurisdiction; and (vii) pursuant to the terms and conditions of Section 11.3 of the Lease, none of the alterations, additions or improvements made by Tenant to the Subleased Premises prior to the date hereof are required to be removed upon the expiration or earlier termination of the Lease; provided, however, in its sole discretion, upon the expiration or earlier termination of the Lease, Landlord shall have the right to require that the low voltage cabling and associated telecommunication equipment exclusively serving the Subleased Premises be removed.

      6.    Expiration or Termination of Lease. Except as otherwise provided in this Consent, upon the expiration or earlier termination of the Lease, the Sublease and the term and estate thereby granted shall automatically expire and come to an end as of the effective date of such expiration, and Subtenant shall vacate the Subleased Premises on or before such date. In case of the failure of Subtenant so to vacate, Landlord shall be entitled to all the rights and remedies which are available to a landlord against a tenant holding over after the expiration of a term, in addition to

the rights and remedies which are available to Landlord pursuant to the Lease in the event that Tenant holds over after the expiration of the Lease.

7.    Default by Tenant.  In the event of Tenant's default under the provisions of the Lease beyond any applicable cure period, Landlord may pursue any and all remedies available to Landlord under the Lease as a result of such default. Notwithstanding the foregoing, if Tenant is in monetary default of the Lease, from and thereafter, Subtenant shall be permitted to direct all Base Rent and Additional Rent due under the Sublease directly to Landlord and, provided Subtenant does so from and after its receipt of any such notice of default from Landlord, then, as between Landlord and Subtenant, Landlord shall accept such payment as a cure of any such default relating to the Subleased Premises; provided, however, in the event any such direct payment by Subtenant to Landlord of Base Rent and Additional Rent due under the Sublease will be insufficient to fully compensate Landlord for the outstanding amounts due by Tenant under the Lease with regard to the Subleased Premises, then, in order for such direct payment of Base Rent and Additional Rent to constitute a cure of any such default relating to the Subleased Premises, Landlord shall require Subtenant to also pay directly to Landlord such amount as is required to fully compensate Landlord for such prior outstanding amounts due by Tenant under the Lease with regard to the Subleased Premises.

Tenant hereby consents to Subtenant paying Rent directly to Landlord in such event, it being acknowledged and agreed that Subtenant may rely solely upon notice from Landlord in determining where to direct any such payment.

8.    Assignment; Subletting.  Neither the Sublease nor this Consent shall be construed as a consent by Landlord to any further subletting either by Tenant or by Subtenant or to any assignment by Tenant of the Lease or assignment by the Subtenant of the Sublease.  There shall be no further subletting or assignment of all or any portion of the Subleased Premises, except in accordance with the terms and conditions of the Lease.

9.    Amendment of Sublease and Lease. Tenant and Subtenant agree that if the Sublease is modified or amended in any way without the prior written consent of Landlord, such modification or amendment shall in no way (i) be binding upon Landlord, or (ii) modify or amend the terms of the Lease or this Consent.  Tenant shall promptly deliver a copy of any and all modifications or amendments to the Sublease to Landlord, including Subtenant's exercise of any early termination of the Sublease. Landlord's receipt of any such modification or amendment shall in no way be deemed to be an acceptance by Landlord of terms of such modification or amendment or a waiver of any of Landlord's rights under the Lease or this Consent.  Any modification or amendment of the Sublease without Landlord's prior written consent, which modifies or amends the terms of the Lease or this Consent, shall be void and of no force or effect.

10.    Conflict.  In the event of any conflict between the provisions of (a) the Lease and this Consent and (b) the Sublease, as between Landlord and Tenant and Landlord and Subtenant only, the provisions of the Lease and this Consent shall prevail unaffected by the provisions of the Sublease.  In the event of any conflict between the provisions of this Consent and the provisions of the Lease, the provisions of this Consent shall prevail.

11.     Condition to Effect. This Consent shall not be effective and the Sublease shall not be valid unless and until Landlord has received: (a) a fully executed copy of the Sublease, and (b) a fully executed counterpart of this Consent; provided, however, Landlord's execution hereof shall be conclusive evidence that the foregoing conditions have been satisfied.

12.     Amendment. This Consent may be changed only by an agreement in writing signed by the parties hereto.

13.     Execution. Each party has the full right, power and authority to enter into this Consent, and has obtained all necessary consents and resolutions required under the documents governing such party's affairs in order to consummate the transaction contemplated herein. Further, Landlord has obtained all necessary consents and approvals from Landlord's lender with respect hereto. The persons executing this Consent have been duly authorized to do so and this Consent is the binding obligation of each party hereto, enforceable in accordance with its terms. This Consent may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute but one and the same instrument. Execution and delivery of a counterpart of this Consent by portable document format ("PDF") copy bearing the PDF signature of a duly authorized officer of any party hereto, whether delivered by either facsimile or email, shall be deemed to have the same legal effect as delivery of an original signed copy hereof. Each of party hereto agrees that: (x) each PDF signature of such party will be enforceable to the same extent as a manual signature, whether in court or otherwise; and (y) such party will not raise any defenses or regulatory or statutory claims attempting to invalidate the enforceability of its PDF signature.

14.     Governing Law. This Consent and the legal relations between the parties hereto shall be governed by and construed and enforced in accordance with the laws of the state of Washington.

15.     Direct Lease. Notwithstanding anything to the contrary contained herein, Landlord, Tenant and Subtenant acknowledge and agree that if at any time during the term of the Sublease, Landlord and Subtenant should execute a lease whereby Subtenant leases the Subleased Premises commencing upon the expiration or early termination of the Lease (a "Direct Lease") then (a) the Direct Lease and Subtenant's occupancy thereunder shall in no way be deemed to extend the term of the Lease; (b) any occupancy by Subtenant of the Subleased Premises after the expiration of the term or early termination of the Lease shall be governed by the terms of the Direct Lease and Tenant shall have no liability to Subtenant or Landlord relating thereto; and (c) Tenant shall not be deemed a holdover tenant or a tenant at sufferance upon expiration of the Lease.

16.     Parking. Subtenant shall be entitled to Tenant's parking rights pursuant to the terms of the Sublease and, in accordance with the terms and conditions of the Lease, Subtenant may elect to use up to three (3) parking permits for each one thousand (1,000) square feet of Useable Area included in the Subleased Premises.

17.     Subtenant Signage. Subtenant shall be permitted: (i) for no additional cost or charge, to add its signage/listing to the Building directory and (ii) at its sole cost and expense, subject to Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, to install an identification sign on the 20th floor at the entrance to the

Subleased Premises, provided Subtenant obtains all governmental permits and approvals required therefor. Thereafter, without the prior written consent of Landlord, Subtenant shall be permitted to update such premises signage in a manner consistent with its then current prototypical signage.

18.    <u>Costs and Fees; Legal Expenses</u>. Tenant shall reimburse Landlord for Landlord's reasonable attorneys' fees and costs incurred in conjunction with the processing and documentation of the Sublease, up to a maximum aggregate amount of $20,000.00. Any such fees and costs incurred by Landlord and paid by Tenant shall thereafter be allocated among Tenant and Subtenant pursuant to the terms of the Sublease.

19.    <u>Patriot Act</u>. Landlord and Subtenant acknowledge and agree that, as between Landlord and Subtenant, the following provision shall apply in lieu of the OFAC provision set forth in Section 37.20 of the Lease.

20.    Landlord represents, warrants and covenants to Subtenant that (a) no Landlord Covered Entity (as hereinafter defined) (i) is a Sanctioned Person (as hereinafter defined) or (ii) is directly or indirectly controlled by a Sanctioned Person; and (b) Landlord is not acting hereunder and will not act hereunder for or on behalf of a Sanctioned Person. Subtenant represents, warrants and covenants to Landlord that (a) no Subtenant Covered Entity (as hereinafter defined) (i) is a Sanctioned Person or (ii) is directly or indirectly controlled by a Sanctioned Person; and (b) Subtenant is not acting hereunder and will not act hereunder for or on behalf of a Sanctioned Person. As used in this Section, the following terms shall have the meanings set forth below:

"Anti-Terrorism Laws" shall mean any Laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering or bribery, and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, all as amended, supplemented or replaced from time to time.

"Landlord Covered Entity" means (a) Landlord and each direct or indirect subsidiary of Landlord and (b) each Person that, directly or indirectly, is in control of a Person described in clause (a) above. For purposes of this definition, control of a Person means the direct or indirect (x) ownership of, or power to vote, 25% or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise.

"Law" shall mean any law(s) (including common law), constitution, statute, treaty, regulation, rule, ordinance, opinion, issued guidance, release, ruling, order, executive order, injunction, writ, decree, bond, judgment, authorization or approval, lien or award of or any settlement arrangement, by agreement, consent or otherwise, with any governmental authority, foreign or domestic.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"Sanctioned Person" means any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person, group,

regime, entity or thing, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any Anti-Terrorism Law.

"Subtenant Covered Entity" means (a) Subtenant and each direct or indirect subsidiary of Subtenant, and (b) each Person that, directly or indirectly, is in control of Subtenant or any direct or indirect subsidiary of Subtenant. For purposes of this definition, control of a Person means the direct or indirect (x) ownership of, or power to vote, 25% or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise.

21.    <u>Building Investment Trust Representation.</u> Landlord is not the AFL-CIO Building Investment Trust or an affiliate or subsidiary thereof (collectively, the "BIT"). The BIT is not involved with the transactions contemplated by the Lease, and the BIT is not receiving any portion of the rents or other amounts payable to Landlord thereunder.

*[SIGNATURES ON FOLLOWING PAGE]*

IN WITNESS WHEREOF, the parties have executed this Consent as of the date first written above.

"LANDLORD":

**BELLEVUE PLACE OFFICE, LLC,** a
Washington limited liability company

By:  Kemper Development Company, a
Washington corporation, its Manager

By: _____
Name: _____
Its: _____

"TENANT":

**DESOLATION HOLDINGS LLC,**
a Delaware limited liability company

By: _____
Name: _____
Its: _____

"SUBTENANT":

**PNC BANK, NATIONAL ASSOCIATION,**
a national banking association

By: _____
Name: _____
Its: _____

IN WITNESS WHEREOF, the parties have executed this Consent as of the date first written above.

"LANDLORD": 

**BELLEVUE PLACE OFFICE, LLC,** a
Washington limited liability company

By: Kemper Development Company, a
Washington corporation, its Manager

By:_____
Name:_____
Its:_____

"TENANT": 

**DESOLATION HOLDINGS LLC,**
a Delaware limited liability company

By: _____
Name: James Waschak
Its: COO

"SUBTENANT": 

**PNC BANK, NATIONAL ASSOCIATION,**
a national banking association

By:_____
Name:_____
Its:_____

## ACKNOWLEDGMENTS

### *LANDLORD:*

STATE OF WASHINGTON    )
                             ) ss.

COUNTY OF KING             )

    This record was acknowledged before me on March 16 , 2021, by James Melby as President of KEMPER DEVELOPMENT COMPANY, a Washington corporation, as the Manager of BELLEVUE PLACE OFFICE, LLC, a Washington limited liability company.



_____
(Signature of notary public)

*Notary*
_____
(Title of office)

My commission expires: 9·20·21

(Use this space for notarial stamp/seal)

{00701099.12}

*TENANT:*

STATE OF ___WA___ )
                          ) ss.
COUNTY OF ___KING___ )

This record was acknowledged before me on ___March   16___ , 2021, by
___James Wardak___ as ___COO___ of ___Desolation Holdings___ .

```
┌──────────────────────────────┐
│   DEBORAH MADIGAN             │
│   Notary Public              │
│   State of Washington        │
│   Commission # 197294        │
│   My Comm. Expires Jan 28, 2022 │
└──────────────────────────────┘
```

(Use this space for notarial stamp/seal)

___Demadurger___
(Signature of notary public)

___Notary Public___
(Title of office)

My commission expires: ___Jan 28 2022___

***SUBTENANT:***

STATE OF ___Pennsylvania___ )
                         ) ss.
COUNTY OF ___Allegheny___ )

        This record was acknowledged before me on ___March 16th___, 2021, by ___Dana Armstrong___ as ___V.P.___ of ___PNC BANK N.A___.

___(signature)___
(Signature of notary public)

___NOTARY PUBLIC___
(Title of office)

My commission expires: ___May 3rd 2024___

> Commonwealth of Pennsylvania - Notary Seal
> Helen Kundman, Notary Public
> Allegheny County
> My commission expires May 3, 2024
> Commission number 1269280
> Member, Pennsylvania Association of Notaries

(Use this space for notarial stamp/seal)

**EXHIBIT A**

**SUBLEASE**

**[To be attached]**

*[Execution Version]*

**SUBLEASE**

by and between

**Desolation Holdings LLC**,
a Delaware limited liability company

**(Sublandlord)**

and

**PNC Bank, National Association**,
a national banking association

**(Subtenant)**

for

Premises located at:

Bellevue Place
10500 NE 8th Street, 20th Floor
Bellevue, WA 98004

March 16, 2021

## SUBLEASE

This Sublease ("**Sublease**") is made this 16th day of March, 2021 (the "**Execution Date**"), by and between **Desolation Holdings LLC**, a Delaware limited liability company ("**Sublandlord**"), and **PNC Bank, National Association**, a national banking association ("**Subtenant**").

## RECITALS

A.      **WHEREAS**, Bellevue Place Office, LLC, a Washington limited liability company, as landlord ("**Landlord**"), and Sublandlord, as tenant, entered into that certain Bank of America Building Office Lease, dated November 14, 2018 (the "**Original Lease**"), as amended by that certain First Lease Addendum, dated December 19, 2018, by and between Landlord and Sublandlord (the "**First Amendment**") and that certain Second Lease Addendum, dated July 29, 2019, by and between Landlord and Sublandlord (the "**Second Amendment**"), and as further amended and assigned pursuant to that certain Partial Assignment, Assumption and Amendment of Lease, dated February 6, 2020, by and among Landlord, Sublandlord, The Pokémon Company International, Inc., a Delaware corporation, and Aquila Holdings Inc., a Delaware corporation (the "**Partial Assignment**" and, together with the Original Lease, the First Amendment and the Second Amendment, the "**Lease**"), related to certain premises described therein (the "**Premises**") and located at 10500 NE 8th Street, Bellevue, WA 98004 (the "**Building**").  A copy of the Lease is attached hereto as <u>Exhibit A</u> and made a part hereof.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth for them in the Lease.

B.      **WHEREAS**, Subtenant desires to sublet from Sublandlord, and Sublandlord desires to sublet to Subtenant, a portion of the Premises consisting of approximately 17,647 rentable square feet located on the 20th floor of the Building and commonly known as Suite 2000 (the "**Subleased Premises**"), as shown on Exhibit "C" to the Original Lease, in accordance with the terms and conditions of this Sublease.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements of the parties hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sublandlord and Subtenant hereby agree as follows:

1.      **SUBLEASE**

Upon and subject to the terms, covenants and conditions hereinafter set forth, Sublandlord hereby subleases to Subtenant and Subtenant hereby subleases from Sublandlord the Subleased Premises.

2.      **AS-IS CONDITION; FF&E**

2.1      Subtenant hereby acknowledges and agrees that Subtenant has inspected the Subleased Premises and that Subtenant accepts the Subleased Premises in their current, "AS-IS, WHERE-IS, WITH ALL FAULTS" condition, and, except as otherwise expressly set forth herein,

without any representations or warranties of any kind by Sublandlord or anyone acting on Sublandlord's behalf.  Except as otherwise expressly set forth herein, Sublandlord shall have no obligation to furnish or supply any work, services, furniture, fixtures, equipment, or decorations, except Sublandlord shall deliver the Subleased Premises in "broom clean" condition. Notwithstanding the foregoing or anything contained herein to the contrary, (a) Sublandlord represents and warrants to Subtenant that, to Sublandlord's actual knowledge, the Subleased Premises will be delivered to Subtenant free of Hazardous Material; and (b) nothing herein shall be constructed to impose any liability on Subtenant for any contamination of the Subleased Premises which (i) occurred prior to the Early Access Date or (ii) was caused by the actions of Landlord, Sublandlord or any other prior owner or occupant.

        2.2     Notwithstanding anything to the contrary contained in this Sublease, during the Term (as hereinafter defined), Sublandlord shall permit Subtenant to use the furniture, fixtures and equipment listed on <u>Exhibit B</u> attached hereto and incorporated by reference herein (the "**FF&E**").  Subtenant shall accept the FF&E in its presently existing, "AS-IS, WHERE-IS, WITH ALL FAULTS" condition, and, during the Term, Subtenant shall be responsible, at its sole cost and expense, for all maintenance and repair of the FF&E, normal wear and tear and casualty excepted.  Prior to the Commencement Date (as hereinafter defined), Sublandlord shall remove from the Subleased Premises any IT network equipment, server equipment, printers, computers, iPads, desktop monitors, mobile AV units, select couches and chairs, and any other furniture, fixtures or equipment not listed on <u>Exhibit B</u>; and, such items removed by Sublandlord shall not be part of the FF&E. If Subtenant does not exercise Subtenant's Termination Option (as hereinafter defined), upon expiration of the Term, Subtenant shall purchase the FF&E, other than the FF&E identified on <u>Exhibit B</u> as not subject to purchase by Subtenant, from Sublandlord for the sum of Ten Dollars ($10.00) and pursuant to a bill of sale in substantially the form set forth on <u>Exhibit C</u> attached hereto and incorporated by reference herein. If Subtenant exercises Subtenant's Termination Option or the Term terminates prior to the Expiration Date (as hereinafter defined), the FF&E shall remain in the Subleased Premises and Sublandlord shall retain ownership of the FF&E; provided, however, Subtenant shall have the right at any time, without the consent of Sublandlord, to remove from the Subleased Premises any furniture, equipment, fixtures or other personal property owned by Subtenant (which owned property does not constitute a part of the FF&E).  Additionally, from time to time throughout the Term, upon the prior written consent of Sublandlord, Subtenant shall have the right to remove furniture, equipment, fixtures or other personal property from the Subleased Premises, which personal property does constitute FF&E hereunder, and Sublandlord may elect to store or use the same for its own use; provided that Subtenant may not remove the FF&E marked on <u>Exhibit B</u> as not being subject to removal by Subtenant. Any modifications by Subtenant to the FF&E shall be subject to the prior written consent of Sublandlord.  Sublandlord shall have no liability to Subtenant of any kind under any circumstances arising out of or in connection with the FF&E or Subtenant's use thereof.  Subtenant hereby releases Sublandlord from and against any and all claims, damages, costs, expenses and liabilities arising out of or in connection with the FF&E, and/or Subtenant's use thereof, including, without limitation, any taxes accruing on or after the Commencement Date with respect to the FF&E and/or Subtenant's use thereof, and any related interest and penalties resulting from late payment by Subtenant thereof (collectively, "**FF&E Claims**"), and Subtenant shall indemnify, defend and hold Sublandlord harmless from and against any and all FF&E Claims accruing on and after the Commencement Date. To the extent Sublandlord may have a lien on, security interest in

or right to distrain with regard to the fixtures, equipment, inventory or other property of Subtenant (including, without limitation, the FF&E once the FF&E has become property of Subtenant as provided in this Section, but not before) by law or otherwise, Sublandlord hereby waives and agrees not to assert the same.

3. **TERM**

3.1    The term of this Sublease (the "**Term**") shall commence on August 1, 2021 (the "**Commencement Date**"), and shall expire at midnight on October 31, 2030 (the "**Expiration Date**"), unless sooner terminated or cancelled in accordance with the terms and conditions of this Sublease.  Throughout the Term, Subtenant shall have all of the rights and obligations of the Tenant under the Lease with regard to the Subleased Premises, except as expressly modified or excluded herein or in Landlord's Consent (as such term is hereinafter defined). Notwithstanding the foregoing, Subtenant shall have no right to exercise any rights of extension, termination or expansion under the Lease or the right to grant any waiver or consent thereunder. Nothing contained in this Sublease shall be deemed or construed to give Subtenant the right to amend, modify or terminate the Lease or to agree to amend, modify or terminate the Lease during the Term.  Notwithstanding the foregoing or anything else contained herein to the contrary, if any event or condition occurs which gives rise to a right or obligation of Sublandlord to grant any waiver or consent which may affect Subtenant's use or enjoyment of the Subleased Premises or its rights hereunder, Sublandlord shall not grant any such waiver or consent without the prior written consent of Subtenant, which consent shall not be unreasonably withheld, conditioned or delayed. If for any reason the term of the Lease is terminated prior to the Expiration Date, as between Sublandlord and Subtenant, this Sublease shall automatically terminate on the date of such termination and, except as otherwise set forth herein to the contrary, Sublandlord shall have no liability or obligation to Subtenant as a result thereof.

3.2    Notwithstanding the foregoing, Subtenant shall have the one-time option to terminate this Sublease by providing Sublandlord written notice of its intent to terminate no later than July 31, 2025, which termination shall be effective July 31, 2026 ("**Subtenant's Termination Option**").  As a condition to Subtenant's exercise of Subtenant's Termination Option and as consideration for the opportunity to terminate this Sublease early, Subtenant shall pay to Sublandlord a termination fee of $133,719.00 (the "**Termination Fee**") which shall be due upon Subtenant's delivery of the notice described in the foregoing sentence.

3.3    Unless already provided pursuant to Sections 4.1 or 4.2 below, on or prior to the Commencement Date, Subtenant shall deliver to Sublandlord its Memorandum of Insurance indicating that Subtenant has obtained all required insurance in conformity with the modified insurance requirements set forth in Landlord's Consent, which memorandum shall include both Landlord and Sublandlord as additional insureds.  Subtenant shall not enter the Subleased Premises prior to delivery to Sublandlord and Landlord of such evidence of insurance.

4. **EARLY ACCESS**

4.1    Beginning the later of (i) the day after the Execution Date and (ii) the day after Subtenant has made available to Sublandlord its Memorandum of Insurance indicating that Subtenant has obtained all required insurance in conformity with the modified insurance

requirements set forth in Landlord's Consent, which memorandum shall include both Landlord and Sublandlord as additional insureds (the "**Early Access Date**") and ending on May 31, 2021 (such period, the "**First Early Access Period**"), Subtenant shall have non-exclusive access to the Subleased Premises, other than the secure/safe room (to which Subtenant shall not have access), during normal business hours solely for planning purposes.  Without limiting the generality of the foregoing, Subtenant shall not be permitted to make any installations or construct any alterations during the First Early Access Period, including but not limited to installing any network equipment or altering any security equipment or devices.  Prior to entering the Subleased Premises during the First Early Access Period, Subtenant shall give Sublandlord not less than twenty-four (24) hours' advance notice of its desire to access the Subleased Premises and the date and time of such access, which notice may be given by electronic mail to protectiveops@bittrex.com; and, Sublandlord shall have the right, but not the obligation, to accompany Subtenant. Notwithstanding the foregoing, during the First Early Access Period, Subtenant shall not access the server room or the IT storage room without being accompanied by a representative of Sublandlord.  Subtenant shall not enter the Subleased Premises prior to delivery to Sublandlord and Landlord of the evidence of insurance required in this Section.

4.2    Subject to Sublandlord's receipt of the items in clause (ii) of Section 4.1, if not already received, beginning on June 1, 2021 and ending on July 31, 2021 (such period, the "**Second Early Access Period**"), Subtenant shall have non-exclusive, unaccompanied access to the Subleased Premises, including the server room, IT storage room and secure/safe room, at any time, for the purpose of planning and installing Subtenant's furniture, fixtures and equipment in the Subleased Premises, which may include installation of any network equipment or security equipment or devices, and constructing any alterations which have been approved by Sublandlord and Landlord in accordance with Section 15.3 of this Sublease and Section 11.3 of the Lease. During the Second Early Access Period, Subtenant shall not be required to notify Sublandlord prior to accessing the Subleased Premises, but shall be required to abide by all terms of this Sublease and the Lease, as incorporated herein.  If Subtenant is not provided access to the Subleased Premises in accordance with the terms and conditions of this Section 4.2 on or before June 1, 2021, Subtenant shall be entitled to one (1) day of free Rent for each day of delay accruing from June 1, 2021 to the date upon which Subtenant is provided access to the Subleased Premises in accordance with the terms and conditions of this Section 4.2, which abatement shall be applied to the first Rent payments due hereunder.  Sublandlord and Subtenant agree that the amount set forth above is a reasonable estimate of the damages Subtenant would sustain if such access to the Subleased Premises is delayed, and that it is not and shall not be construed as a penalty.

4.3    Subtenant hereby agrees to indemnify, defend and hold Sublandlord and the Sublandlord Indemnified Parties (as defined below) harmless from and against all losses, costs, expenses, damages, liabilities, actions, liens, claims and suits, including, without limitation, reasonable attorney's fees, for bodily injury (including death resulting therefrom) and property damage and any and all liability, loss, cost, expense or damage (excluding consequential damages) incurred or suffered by Sublandlord or the Sublandlord Indemnified Parties in connection with the access to the Subleased Premises (and the performance of any activity therein, including, but not limited to, any installation of furniture, fixtures and equipment and any construction of alterations or improvements) pursuant to this Section 4 by Subtenant and its employees, representatives, consultants, contractors, and suppliers, except to the extent caused by the gross negligence or

willful misconduct of Sublandlord or its agents, employees, contractors, interest holders, officers or directors.  This <u>Section 4.3</u> shall survive the expiration or earlier termination of this Sublease.

5.      **LANDLORD'S CONSENT**

5.1      This Sublease is expressly conditioned on obtaining the written consent of Landlord ("**Landlord's Consent**") in accordance with the provisions of the Lease and in substantially the form attached hereto as <u>Exhibit D</u>.  Receipt by each of Subtenant and Sublandlord of the fully executed Landlord's Consent is hereby made an express condition precedent to each party's obligations hereunder.

5.2      Any fees and expenses incurred by Sublandlord in connection with requesting and obtaining Landlord's Consent up to but not exceeding Fifteen Thousand Dollars ($15,000.00) shall be paid by Sublandlord at its sole cost and expense.  Any fees and expenses incurred by Sublandlord in connection with requesting and obtaining Landlord's Consent exceeding Fifteen Thousand Dollars ($15,000.00) shall be paid by Sublandlord and shall be reimbursed by Subtenant to Sublandlord as Additional Rent not later than thirty (30) days after written demand therefor by Sublandlord. Subtenant agrees to cooperate with Landlord and supply directly to Landlord all information and documentation reasonably requested by Landlord in connection with obtaining Landlord's Consent.  Except for the above referenced fees and expenses, Sublandlord shall not be required to perform any acts, expend any funds, or bring any legal proceedings to obtain Landlord's Consent and Subtenant shall have no right to any claim against Sublandlord if Landlord's Consent is not obtained.

5.3      This <u>Section 5</u> shall survive the expiration or earlier termination of this Sublease.

6.      **BASE RENT; ADDITIONAL RENT; SERVICES AND UTILITIES**

6.1      Throughout the Term of this Sublease, Subtenant shall pay to Sublandlord base rent ("**Base Rent**") in monthly installments as provided in the following table, each installment of which shall be paid to Sublandlord in advance on or before the first day of each calendar month during the Term, in lawful money of the United States, at the address of Sublandlord set forth in <u>Section 12</u> below or to such other person or at such other place as Sublandlord may from time to time designate in writing.  Subtenant's covenant to pay Base Rent shall be independent of every other covenant in this Sublease.

| Months | Annual Base Rent per square foot of the Subleased Premises | Monthly Base Rent |
|---|---|---|
| August 1, 2021 – July 31, 2022 | $47.47 | $69,808.59 |
| August 1, 2022 – July 31, 2023 | $48.89 | $71,896.82 |
| August 1, 2023 – July 31, 2024 | $50.36 | $74,058.58 |
| August 1, 2024 – July 31, 2025 | $51.87 | $76,279.16 |
| August 1, 2025 – July 31, 2026 | $53.43 | $78,573.27 |
| August 1, 2026 – July 31, 2027 | $55.03 | $80,926.20 |

OMM_US:79329696.14

| August 1, 2027 – July 31, 2028 | $56.68 | $83,352.66 |
| August 1, 2028 – July 31, 2029 | $58.38 | $85,852.66 |
| August 1, 2029 – July 31, 2030 | $60.13 | $88,426.18 |
| August 1, 2030 – October 31, 2030 | $61.93 | $91,073.23 |

6.2     So long as Subtenant is not then in default of its obligations under this Sublease beyond applicable notice and cure periods, the monthly Base Rent and Additional Rent shall be abated for the period beginning August 1, 2021 and ending September 30, 2021. Such abatement period, as the same may be extended pursuant to Section 4.2 hereof, is collectively referred to herein as the "**Abatement Period**".

6.3     Upon the expiration of the Abatement Period, in addition to Base Rent, Subtenant shall pay to Sublandlord those amounts payable by Sublandlord as "Additional Rent" under Section 6 of the Lease in respect of the Subleased Premises (the "**Additional Rent**") and any Other Charges payable by Tenant under the Lease in respect of the Subleased Premises. Within ten (10) business days of Sublandlord's receipt of the same, Sublandlord shall provide to Subtenant all invoices and back up documentation which Landlord delivers to Sublandlord with regard to Additional Rent or Other Charges due under the Lease in respect of the Subleased Premises and which relate in whole or in part to any period during which Subtenant is responsible for all or any portion of such costs or expenses hereunder (collectively, "**Reconciliation Documentation**"). Sublandlord shall be entitled to receive directly from Landlord any credits or refunds due in connection with any Reconciliation Documentation, and shall be obligated to pay directly to Landlord any amounts due in connection with any Reconciliation Documentation. Notwithstanding the foregoing, as between Sublandlord and Subtenant, within thirty (30) days following receipt of the Reconciliation Documentation, Subtenant shall pay to Sublandlord Subtenant's pro rata share of any amounts due to Landlord in connection with the Reconciliation Documentation. Sublandlord shall pay to Subtenant Subtenant's pro rata share of any credit or refund received by Sublandlord in connection with the Reconciliation Documentation within thirty (30) days following Sublandlord's receipt of such credit or refund. "Subtenant's pro rata share" shall be determined by multiplying the total amount due under the Reconciliation Documentation or credit or refund provided for therein, as applicable, by a fraction, the denominator of which shall be the total number of days covered by such Reconciliation Documentation and the numerator of which shall be the number of such days falling within the Term and occurring after the expiration of the Abatement Period.

Subject to Landlord's approval, Subtenant is hereby expressly granted all rights, if any, which Sublandlord has under the Lease to contest any calculation of Additional Rent or Other Charges relating to any period during which Subtenant is responsible for all or any portion of such costs or expenses hereunder; and, to the extent Landlord refuses to communicate directly with Subtenant regarding any such contest, Sublandlord agrees to reasonably cooperate with Subtenant in order to effectuate Subtenant's exercise of such rights. Subtenant shall be solely responsible for all costs and expenses incurred by Subtenant in contesting any Additional Rent or Other Charges as provided in this Section and for the payment to Landlord of any amounts due to Landlord in connection with Subtenant's exercise of such rights. Subtenant shall reimburse Sublandlord for any costs or expenses incurred by Sublandlord and any amounts paid by Sublandlord in connection

with Subtenant's exercise of the right described in this paragraph within thirty (30) days after receipt of written notice thereof.

6.4     Base Rent, Additional Rent, Other Charges and any other amounts payable by Subtenant to Sublandlord under this Sublease (including without limitation, late fees) shall hereinafter be collectively referred to as "**Rent**." Notwithstanding anything herein to the contrary, Subtenant shall be obligated to pay Rent hereunder only to the extent Sublandlord is obligated to pay the same with regard to the Subleased Premises under the Lease; and, if at any time after the expiration of the Abatement Period, Sublandlord receives an abatement, reduction or other similar benefit with regard to rent due under the Lease with regard to the Subleased Premises, Subtenant shall have the same abatement, reduction or benefit hereunder.

6.5     Subtenant shall be responsible pursuant to Section 10 of the Lease, as incorporated herein by <u>Section 10</u> of this Sublease, for the payment of any utilities or services charged or attributable to the Subleased Premises and accruing from and after the expiration of the Abatement Period.  In the event Sublandlord is charged for any such utilities or services, Subtenant shall reimburse Sublandlord for such amounts within thirty (30) days after written notice thereof by Sublandlord to Subtenant.

6.6     All Base Rent and Additional Rent shall be due and payable without demand therefor and, except as otherwise expressly set forth herein, without any deduction, offset, abatement, counterclaim, or defense.  The monthly installments of Base Rent and Additional Rent payable on account of any partial calendar month during the Term of this Sublease, if any, shall be prorated.

7.     **OCCUPANCY OF PREMISES**

7.1     Subtenant shall use and occupy the Subleased Premises solely in accordance with, and as permitted under, the terms of the Lease and for no other purpose and shall strictly adhere to the restrictions on use set forth in the Lease.

7.2     Subtenant agrees to conduct its business in a manner consistent with a professional office environment.  Subtenant agrees to reasonably cooperate with Landlord and Sublandlord with respect to the investigation and resolution of any safety or security issues that arise with regard to the Subleased Premises.

8.     **PARKING**

Subtenant shall have the right (but not the obligation) to exercise Sublandlord's parking rights under the Lease in respect of the Subleased Premises during the Term of this Sublease as set forth in Section 34.1 of the Lease, and in accordance with the terms and conditions of the Lease, Subtenant may elect to use up to three (3) parking permits for each one thousand (1,000) square feet of Useable Area included in the Subleased Premises.  If Landlord requires the parking permits be sold and assigned only to Sublandlord and not to Subtenant, Sublandlord agrees to purchase as many of the parking permits as Subtenant indicates, from time to time during the Term, that are needed by Subtenant, and Subtenant shall pay in advance to Sublandlord the amount due therefor under the Lease.

9.    **BROKERS**

Each party hereto represents and warrants to the other party that it has incurred no liabilities or claims for brokerage commissions or finder's fees in connection with the execution of this Sublease and it has not dealt with or has any knowledge of any real estate broker, agent or salesperson in connection with this Sublease except for Andy Strand and Rob Nielsen of Jones Lang LaSalle, who represent Subtenant ("**Subtenant's Broker**"), and Jeff Jochums of CBRE, Inc., who represents Sublandlord ("**Sublandlord's Broker**").  Provided a sublease is executed between Sublandlord and Subtenant, Sublandlord agrees to pay a broker's commission to Subtenant's Broker pursuant to a separate agreement.  Sublandlord shall be responsible for paying the full amount of any broker's commission due to Sublandlord's Broker in connection with this Sublease. Each party agrees that should any claim be made against the other party for any broker's commissions, fees or compensation for this transaction (by anyone other than Subtenant's Broker or Sublandlord's Broker) by reason of the acts of such party, the party upon whose acts such claim is predicated shall indemnify, defend and hold the other party harmless from all liabilities or claims (including, without limitation, reasonable attorneys' fees) arising therefrom.

10.    **INCORPORATION OF LEASE BY REFERENCE**

10.1    <u>Effect of Sublease.</u> This Sublease is subject and subordinate to the Lease. Subject to the modifications set forth in this Sublease and Landlord's Consent, the terms of the Lease are incorporated herein by reference, and shall, as between Sublandlord and Subtenant (as if they were Landlord and Tenant, respectively, under the Lease) constitute the terms of this Sublease except to the extent that they are inapplicable to, inconsistent with, or modified by, the terms of this Sublease or Landlord's Consent.  In the event of any inconsistencies between the terms and provisions of the Lease and the terms and provisions of this Sublease, the terms and provisions of this Sublease shall govern.  Subtenant acknowledges that it has reviewed the Lease and is familiar with the terms and conditions thereof.

10.2    <u>Incorporation of Lease</u>. For the purposes of incorporation herein, the terms of the Lease are subject to the following additional modifications:

10.2.1  In all provisions of the Lease (under the terms thereof and without regard to modifications thereof for purposes of incorporation into this Sublease) requiring the approval or consent of Landlord, Subtenant shall be required to obtain the approval or consent of both Sublandlord and Landlord.

10.2.2  Subject to <u>Section 10.2.4</u> below regarding excluded provisions, in all provisions of the Lease requiring Tenant to submit, exhibit to, supply or provide Landlord with evidence, certificates, or any other matter or thing, Subtenant shall be required to submit, exhibit to, supply or provide, as the case may be, the same to both Landlord and Sublandlord.  In any such instance, Sublandlord shall determine, in its reasonable discretion, if such evidence, certificate or other matter or thing shall be satisfactory.

10.2.3  Sublandlord shall have no obligation to restore or rebuild any portion of the Subleased Premises after any destruction or taking by eminent domain.

10.2.4 The following provisions of the Lease are specifically excluded from the terms of the Lease which are incorporated herein by reference: Section 1.14 (Security Deposit), Section 3.4 (Pre-Commencement License), Section 3.5 (Option to Extend Lease Term), Section 3.6 (Right of First Opportunity), Section 8 (Security Deposit), Section 11.2 (regarding Sublandlord's initial work), Section 18.6 (Indemnification by Landlord), the third and fourth sentences of Section 22 (requiring tenant improvements, alterations or other work to be bonded), Section 37.21 (governing Sublandlord's initial occupancy), Section 37.22 (Letter of Credit), Section 37.23 (Audited Financial Statement), Section 37.24 (Guaranty) and any other provision of the Lease which expressly applies only to any portion of the Premises not part of the Subleased Premises.

10.2.5 Sections 19.1 through 19.5 of the Lease, regarding insurance, shall be deemed to be amended and restated in its entirety as more fully described in Landlord's Consent.

10.3 <u>Performance under Lease by Sublandlord and Subtenant</u>. Subtenant covenants and agrees that all obligations of Sublandlord with respect to the Subleased Premises under the Lease shall be done or performed by Subtenant, except as otherwise provided by this Sublease, and Subtenant's obligations shall run to Sublandlord and Landlord as Sublandlord may determine to be appropriate or be required by the respective interests of Sublandlord and Landlord. Sublandlord covenants and agrees with Subtenant that Sublandlord will pay all fixed rent and additional rent payable by Sublandlord pursuant to the Lease when due and shall, except for those obligations assumed by Subtenant hereunder, otherwise perform or cause to be performed all duties, obligations and covenants of tenant under the Lease. Subtenant agrees to indemnify and defend Sublandlord, and hold it harmless, from and against any and all claims, damages, losses, expenses and liabilities (including reasonable attorneys' fees) incurred as a result of the non-performance, non-observance or non-payment of any of Sublandlord's obligations under the Lease which, as a result of this Sublease, became an obligation of Subtenant; and Sublandlord agrees to indemnify and defend Subtenant, and hold it harmless, from and against any and all claims, damages, losses, expenses and liabilities (including reasonable attorneys' fees) incurred as a result of the non-performance, non-observance or non-payment of any of Sublandlord's obligations under the Lease which have not become an obligation of Subtenant hereunder. If Subtenant makes any payment to Sublandlord pursuant to this indemnity, Subtenant shall be subrogated to the rights of Sublandlord concerning said payment; and if Sublandlord makes any payment to Subtenant pursuant to this indemnity, Sublandlord shall be subrogated to the rights of Subtenant concerning said payment. Subtenant and Sublandlord each covenant and agree that, during the Term, they shall not do or cause to be done or suffer or permit any act to be done which would or might cause the Lease, or the rights of Sublandlord as tenant under the Lease, to be endangered, canceled, terminated, forfeited or surrendered, or which would or might cause Sublandlord to be in default thereunder, or which would constitute a default under this Sublease. The indemnifications set forth in this <u>Section 10.3</u> shall survive the expiration or earlier termination of this Sublease.

10.4 <u>Performance by Landlord under Lease</u>. Sublandlord agrees that Subtenant shall be entitled to receive all services and repairs to be provided by Landlord to Sublandlord under the Lease in respect of the Subleased Premises and that Subtenant shall have the benefit of all Landlord obligations and releases provided for in the Lease, except to the extent the same relate to

any portion of the Premises not part of the Subleased Premises. In furtherance of, but without limiting the foregoing, Subtenant shall have the benefit of all indemnification obligations of Landlord set forth in the Lease and the benefit of the release set forth in Section 17 of the Lease. Subtenant shall look solely to Landlord for all such services and for the enforcement of all such obligations and releases, and shall not, under any circumstances, seek nor require Sublandlord to perform any of such services or obligations, nor shall Subtenant make any claim upon Sublandlord for any damages which may arise by reason of Landlord's default under the Lease.  Any condition resulting from a default by Landlord shall not constitute as between Sublandlord and Subtenant an eviction, actual or constructive, of Subtenant and no such default shall excuse Subtenant from the performance or observance of any of its obligations to be performed or observed under this Sublease, or entitle Subtenant to receive any reduction in or abatement of the Rent provided for in this Sublease.  In furtherance of the foregoing, Subtenant does hereby waive any cause of action and any right to bring any action against Sublandlord by reason of any act or omission of Landlord under the Lease. Notwithstanding anything to the contrary contained in this Sublease, Sublandlord does not assume any of the obligations of Landlord under the Lease and Sublandlord shall not be deemed to have made any representation made by Landlord in the Lease.  In the event Subtenant determines, in its reasonable discretion, that a default or failure of performance by Landlord under the Lease has an adverse effect on (i) Subtenant's use or occupancy of the Subleased Premises or (ii) Subtenant's other rights or benefits under this Sublease (such default or failure, a "**Landlord Default**"), and Subtenant has provided notice of such Landlord Default to Sublandlord, then (a) Sublandlord shall make demand upon Landlord to perform its obligations under the Lease and otherwise cooperate with Subtenant as Subtenant may reasonably request in enforcing the Lease and exercising the remedies of tenant thereunder, which may include Sublandlord assigning to Subtenant its right to pursue any reasonable and appropriate legal action to enforce the Lease against Landlord; and (b) in the event of a Landlord Default which remains uncured for sixty (60) days after Sublandlord's receipt of written notice from Subtenant thereof and which (1) prohibits or materially curtails Subtenant's use of the Subleased Premises or (2) threatens the health or safety of Subtenant's workers, then Subtenant shall have the right to terminate this Sublease upon written notice; provided that Sublandlord may, but shall not be obligated to, cure any Landlord Default, and if Sublandlord, in good faith, promptly begins any such cure and, thereafter, causes the same to be accomplished within such sixty (60) day period, Subtenant shall have no right to terminate this Sublease under this Section.

   10.5 <u>Sublandlord Representations</u>. Sublandlord represents and warrants that: (i) Sublandlord is the tenant under the Lease with Landlord; (ii) <u>Exhibit A</u> attached hereto is a complete copy of the Lease and all other agreements between Landlord and Sublandlord relating to the leasing, use or occupancy of the Subleased Premises, (iii) the Lease is, as of the date of this Sublease, in full force and effect, (iv) Sublandlord has received no written notice of, nor otherwise has actual knowledge of, any existing event of default under the Lease and, to Sublandlord's actual knowledge, no event has occurred and is continuing that would constitute an event of default under the Lease, but for the requirement to give notice and provide the applicable time to cure; (v) there are no actions, voluntary or otherwise, pending against it under the bankruptcy, reorganization, arrangement, moratorium or similar laws of the United States, any state thereof or any other jurisdiction; and (vi) there are no mortgages or other liens encumbering Sublandlord's interest in the Subleased Premises.

10.6    <u>Modification of Lease by Sublandlord</u>. Sublandlord shall not agree to any modification, amendment, waiver, release or other agreement with respect to the Lease, nor exercise any right of Sublandlord thereunder, that would reasonably be expected to have an adverse effect on Subtenant's use or occupancy of the Subleased Premises or on Subtenant's other rights and benefits hereunder.

11.    **CONSENTS**

Whenever the consent or approval of Sublandlord is required, Subtenant shall also be obligated to obtain the written consent or approval of Landlord, if required under the terms of the Lease.  If Landlord's consent is required under the Lease or Subtenant otherwise desires to seek Landlord's consent, Subtenant shall notify Sublandlord in writing of Subtenant's desire to obtain Landlord's consent and, in such notice, Subtenant shall request that, before conveying the consent request to Landlord, Sublandlord obtain from Landlord an estimate of Landlord's charges or fees to be incurred in considering or approving such consent.  Sublandlord shall endeavor to obtain Landlord's estimate of its charges or fees and provide the same to Subtenant.  Subtenant shall have no right to seek Landlord's consent and Sublandlord shall not be obligated to seek Landlord's consent on behalf of Subtenant, unless and until Subtenant has agreed in writing to cover any and all charges or fees owed to Landlord in connection with such consent request.

Subtenant shall promptly provide any information or documentation that Landlord may request in determining whether to grant any consent requested by Subtenant.  Subtenant shall reimburse Sublandlord, not later than thirty (30) days after written demand by Sublandlord, for any fees and disbursements of attorneys, architects, engineers, or others or any other amounts charged assessed by Landlord against Sublandlord in connection with any consent or approval requested by Subtenant.  Sublandlord shall have no liability of any kind to Subtenant for Landlord's failure to give its consent or approval.

12.    **NOTICE**

All notices and other communications required or permitted under this Sublease shall be given in writing by the party or its attorneys and shall either be personally delivered or sent by United States certified mail, return receipt requested, or by an overnight delivery service that provides for receipted delivery, such as FedEx, or by electronic mail, in each case, addressed to the addresses set out below. All notices shall be effective upon receipt or refusal, but no later than five (5) days following deposit with a physical carrier. Notwithstanding the foregoing, in the event the sender of any such notice which is sent by electronic mail receives a failure to deliver notice or any similar automatic response indicating that such notice may not have been received by the intended recipient, such notice shall not constitute a valid notice hereunder unless and until such notice is sent by another means permitted hereunder and such subsequent notice shall be deemed effective in accordance with the terms of this provision. Notwithstanding the foregoing, Subtenant shall pay all Rent by wire transfer to Sublandlord in accordance with such wire instructions that Sublandlord shall deliver to Subtenant from time to time.

OMM_US:79329696.14

If to Sublandlord:

        Desolation Holdings LLC
        1100 Bellevue Way NE, Ste. 8A-986
        Bellevue, WA 98004
        Attn: Ellie Havens
        Email: ehavens@bittrex.com

        with a copy to:

        O'Melveny & Myers LLP
        400 S. Hope Street, 18th Floor
        Los Angeles, CA 90071
        Attn: Kathryn E. Turner, Esq.
        E-Mail: kturner@omm.com

If to Subtenant:

        PNC Bank, National Association
        c/o PNC Realty Services
        The Tower at PNC Plaza – 22nd Floor
        300 Fifth Avenue
        Mail Stop: PT-PTWR-22-1
        Pittsburgh, PA 15222-2401
        Attn: Transaction Manager
        E-Mail: nicole.nasca@pnc.com

        with a copy to:

        PNC Bank, National Association
        Legal Division
        1600 Market Street – 8th Floor
        Philadelphia, PA 19103
        Attn: Michael G. Balent, Esq., Chief Counsel
        E-Mail: michael.balent@pnc.com

Either party, by not less than fifteen (15) days' written notice to the other party, may designate a different address or addresses for notices, requests or demands to it.

Except to the extent the same does not relate to the Subleased Premises, Sublandlord shall promptly deliver to Subtenant any notice initiated or received by Sublandlord, whether to or from Landlord or a third party, with regard to the Subleased Premises, including, without limitation, any notice of default thereunder and any notice of Landlord obtaining a new lender for the financing thereof.

13.    **DEFAULTS AND REMEDIES**

13.1    <u>Subtenant Default</u>. Each of the following shall constitute a "**Default**" hereunder by Subtenant:

(a)    Subtenant shall fail to make any payment of Base Rent, Additional Rent, Other Charges or any other payment required to be made by Subtenant hereunder, which failure shall continue for more than five (5) days after written notice thereof by Sublandlord to Subtenant.

(b)    Subtenant shall fail to observe or perform any other covenants, conditions or provisions of this Sublease to be observed or performed by Subtenant (other than as described in <u>Section 13.1(a)</u> above) either directly or derivatively pursuant to obligations arising under the Lease, and such failure shall continue for a period of ten (10) days after written notice thereof by Sublandlord to Subtenant; provided, however, if the nature of Subtenant's failure is such that more than ten (10) days are required for its cure, Subtenant shall not be deemed to be in default hereunder if Subtenant commences such sure within such ten (10) day period and thereafter diligently prosecutes such cure to completion.

(c)    A default by Subtenant under Section 23.1(d) and (e) of the Lease if but only if the word "Subtenant" is substituted for "Tenant" under those Sections; *provided*, for avoidance of doubt, a default by Sublandlord under any of the Default provisions of Section 23.1 of the Lease shall not constitute a default by Subtenant under this Sublease.

13.2    <u>Sublandlord Remedies</u>. Upon default by Subtenant hereunder or under the Lease, in each case, beyond all applicable notice and cure periods, Sublandlord shall have all rights and remedies available to it at law or in equity, including, but not limited to, all of the rights and remedies of Landlord set forth in the Lease.

13.3    <u>Notice of Default</u>. Sublandlord promptly shall notify Subtenant in writing of any default that continues beyond any applicable notice and cure period under the Lease by either Sublandlord or Landlord relating to the Subleased Premises.

14.    **INDEMNITY**

14.1    <u>Indemnification by Subtenant</u>. Subtenant hereby acknowledges and agrees that Subtenant shall indemnify, defend, protect and hold harmless Sublandlord, Landlord and all of their respective partners, shareholders, directors, officers, employees, and agents (collectively, the "**Sublandlord Indemnified Parties**"), as and when provided in the Lease in the same manner as Tenant indemnifies Landlord thereunder, including, without limitation, from and against all liabilities, obligations, losses, damages, penalties, claims, liens, costs, charges and expenses (including, without limitation, reasonable attorney's fees and other professional fees) arising as a result of, or otherwise paid, suffered, or incurred by any of the Sublandlord Indemnified Parties as a result of (i) any breach of this Sublease by Subtenant (including any holdover by Subtenant after the Term or failure to remove its property and restore the Subleased Premises in accordance with the terms hereof), or (ii) the acts, negligence, or omissions of Subtenant or any of its employees,

OMM_US:79329696.14

contractors, invitees or agents ("**Subtenant Related Parties**") attributable to any access to or use of any portion of the Subleased Premises by Subtenant or any Subtenant Related Parties.

14.2    Indemnification by Sublandlord. Sublandlord hereby acknowledges and agrees that Sublandlord shall indemnify, defend, protect and hold harmless Subtenant and all of its shareholders, directors, officers, employees, and agents from and against all liabilities, obligations, losses, damages, penalties, claims, liens, costs, charges and expenses (including, without limitation, reasonable attorney's fees and other professional fees) to the extent the same arise from any breach of this Sublease by Sublandlord.

14.3    Indemnification, Generally. If any action or proceeding is brought against a party entitled to be indemnified hereunder, the indemnifying party, upon notice from the indemnified party, shall defend the same at the expense of the indemnifying party by legal counsel reasonably satisfactory to the indemnified party. The indemnification obligations hereunder shall survive the expiration or earlier termination hereof with respect to any event occurring prior to such expiration or termination.

15.    **MISCELLANEOUS**

15.1    Signage.  Subject to the terms and conditions of the Lease (including any requirement to obtain Landlord's consent), Subtenant shall be permitted: (a) for no additional cost or charge, to add its signage/listing to the Building directory and (b) at its sole cost and expense, to install an identification sign on the 20th floor at the entrance to the Subleased Premises, provided Subtenant obtains all governmental permits and approvals required therefor.  Thereafter, without the prior written consent of Sublandlord (but with any consent required from Landlord), Subtenant shall be permitted to update such premises signage in a manner consistent with its then current prototypical signage.  Sublandlord shall reasonably cooperate with Subtenant to obtain Landlord's consent to such signs.  Subtenant shall remove any Subtenant signage at the expiration or earlier termination of this Sublease.

15.2    Assignment and Subletting.  Subtenant hereby covenants and agrees that it will not assign, sublease, transfer or encumber any interest in this Sublease (by operation of law or otherwise), or allow any third party to use any portion of the Subleased Premises (including the granting of concessions, licenses and the like), without the prior written consent of: (a) Sublandlord, which consent shall not be unreasonably withheld, conditioned or delayed; and (b) Landlord.  If Subtenant fails to observe the obligations and limitations imposed by this Section 15.2, such failure shall be deemed to be an immediate and incurable default hereunder. Notwithstanding the foregoing, Subtenant shall have the same rights to assign its rights hereunder and to sub-sublet the Subleased Premises as Sublandlord has under Section 20 of the Lease; provided that anytime Subtenant is required to obtain consent from Landlord, Subtenant shall also be required to obtain consent from Sublandlord.

15.3    Subtenant Alterations.  Subtenant acknowledges and agrees that, except for those alterations, additions or improvements which Sublandlord (as tenant under the Lease) has the right to make without the prior written consent of Landlord, Subtenant shall not be permitted to construct alterations, additions or improvements to the Subleased Premises without the prior written consent of Sublandlord, as well as the consent of Landlord as provided in Section 11.3 of

the Lease. Subtenant shall comply with all requirements set forth in Section 11 of the Lease in constructing any alterations, additions or improvements.  Sublandlord shall reasonably cooperate with Subtenant in obtaining any licenses, permits or approvals which may be required from Landlord or applicable governmental authorities in connection with any alterations, additions or improvements Subtenant desires to make to the Subleased Premises.  If Landlord's consent is required under the Lease or Subtenant otherwise desires to seek Landlord's consent, Subtenant shall notify Sublandlord in writing of Subtenant's desire to obtain Landlord's consent and, in such notice, Subtenant shall request that, before conveying the consent request to Landlord, Sublandlord obtain from Landlord an estimate of Landlord's charges or fees to be incurred in considering or approving such consent.  Sublandlord shall endeavor to obtain Landlord's estimate of its charges or fees and provide the same to Subtenant.  Subtenant shall have no right to seek Landlord's consent and Sublandlord shall not be obligated to seek Landlord's consent on behalf of Subtenant, unless and until Subtenant has agreed in writing to cover any and all charges or fees owed to Landlord in connection with such consent request.  Subtenant shall reimburse Sublandlord for any amounts charged by Landlord to Sublandlord or any expenses incurred by Sublandlord in so cooperating within thirty (30) days following receipt of written notice of such amounts.

Notwithstanding the foregoing, with regard to Office A, Office B and Office C (as each such office is shown on Exhibit E attached hereto), Subtenant shall be permitted to construct the alterations depicted on Exhibit E attached hereto, subject to Landlord's consent and subject to the terms and conditions of the Lease in respect of tenant alterations, including Section 11 of the Lease. Notwithstanding anything herein to the contrary, including without limitation Section 2.2 above, without the prior written consent of Sublandlord, Tenant shall have the right to remove any FF&E located in any such office which is so altered and Sublandlord may elect to store or use the same for its own use, but in no event shall Subtenant be required to store or contribute to the cost of storing any such FF&E which it desires to remove from any such office.

15.4    Holdover.  Subtenant hereby acknowledges and agrees that it has reviewed the Lease and is aware that (i) the Expiration Date is on or around the expiration date of the Lease, (ii) in the event the Term of this Sublease is not terminated prior to the Expiration Date, Subtenant is required to vacate and surrender possession of the Subleased Premises in accordance with the terms of the Lease, and (iii) Subtenant's failure to so vacate and surrender possession of the Subleased Premises on the Expiration Date and in the condition required under the Lease shall constitute a holdover tenancy under the Lease.  In the event of such holdover tenancy by Subtenant, Subtenant shall be liable for all costs, expenses and damages incurred by Sublandlord arising from or related to same, including, but not limited to, Sublandlord's attorneys' fees and expenses and any increase in Rent (as defined in the Lease) owed by Sublandlord to Landlord.

15.5    Restoration.  If the Term hereof expires upon the Expiration Date or if the Sublease is terminated prior to the Expiration Date due to a breach of the Sublease by Subtenant, to the extent required under the Lease, Subtenant shall be responsible for the removal and restoration of all improvements or alterations required to be removed or restored under the Lease and for complying with all other conditions under the Lease related to the surrender condition of the Subleased Premises, including, at Sublandlord's election, the removal and restoration of any alterations or improvements constructed by Subtenant; provided, however, Sublandlord hereby represents and warrants to Subtenant that, to Subtenant's actual knowledge as of the date hereof,

none of the alterations, additions or improvements made by Sublandlord prior to the date hereof are required to be removed upon the expiration or earlier termination of the Lease; provided, further, however, the parties hereto acknowledge and agree that upon the expiration or earlier termination of the Lease, Landlord, in its sole discretion, shall have the right to require that the low voltage cabling exclusively serving the Subleased Premises be removed. Notwithstanding the foregoing, if Subtenant exercises Subtenant's Termination Option or if for any other reason (excepting only a default hereunder by Subtenant) the Term of this Sublease expires or is terminated prior to the Expiration Date, Subtenant shall surrender the Subleased Premises in "broom clean" condition, without the obligation to remove any cabling (including, without limitation, Subtenant's voice and data cabling) or any alterations, additions or improvements made by Sublandlord; provided, however, in such event, Sublandlord shall have the option to require Subtenant to remove and restore any other alterations or improvements constructed by Subtenant. Notwithstanding anything to the contrary contained in this Section, in the event Subtenant shall elect to alter Office B as shown on Exhibit E attached hereto, regardless of whether the term hereof expires upon or prior to the Expiration Date, Subtenant shall not be required to remove or restore any such alterations to Office B unless required to by Landlord in accordance with the Lease.

15.6    Limitation of Liability.  IN NO EVENT SHALL SUBLANDLORD OR LANDLORD BE LIABLE TO SUBTENANT, NOR SHALL SUBTENANT BE LIABLE TO EITHER OR BOTH OF SUBLANDLORD OR LANDLORD, FOR ANY LOST PROFIT, DAMAGE TO OR LOSS OF BUSINESS OR ANY FORM OF SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES.  BEFORE FILING SUIT FOR AN ALLEGED DEFAULT BY SUBLANDLORD HEREUNDER, SUBTENANT SHALL GIVE SUBLANDLORD WRITTEN NOTICE OF SAME AND SUCH PERIOD OF TIME AS REASONABLY MAY BE NECESSARY TO CURE SAME.  If, at any time during the Term, Sublandlord's or Landlord's interest hereunder shall be held by anyone acting in a fiduciary capacity, then, notwithstanding any other provision hereof, Sublandlord's and/or Landlord's obligations hereunder shall not be binding upon such fiduciary individually or upon any beneficiary, officer, employee, affiliate or shareholder for whom such fiduciary acts, but only upon such fiduciary in that capacity.

15.7    Quiet Enjoyment.  Sublandlord covenants that, so long as Subtenant is not in default hereunder beyond applicable notice and cure periods, Subtenant shall have quiet enjoyment of and may peaceably enjoy the Subleased Premises and all appurtenances belonging thereto, without disturbance by Sublandlord or anyone properly claiming by, through or under Sublandlord.

15.8    Authority.  Each party hereto and the persons signing below warrant that the person signing below on such party's behalf is authorized to do so and to bind such party to the terms hereof; and that such party has obtained all necessary consent and resolutions governing such party's affairs in order to consummate the transaction contemplated herein.

15.9    Access.  Sublandlord shall have all of the rights afforded to Landlord to access and enter the Subleased Premises pursuant to Section 15 of the Lease.

15.10    Counterparts.    This Sublease may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original for all purposes, and all such counterparts shall together constitute but one and the same instrument.

Execution and delivery of a counterpart of this Sublease by portable document format ("**PDF**") copy bearing the PDF signature of a duly authorized officer of any party hereto, whether delivered by either facsimile or email, shall be deemed to have the same legal effect as delivery of an original signed copy of this Sublease. Each of Sublandlord and Subtenant agrees that: (x) each PDF signature of such party will be enforceable to the same extent as a manual signature, whether in court or otherwise; and (y) such party will not raise any defenses or regulatory or statutory claims attempting to invalidate the enforceability of its PDF signature.

15.11    <u>Waiver of Jury Trial</u>. Sublandlord and Subtenant hereby waive the right to a trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected to this Sublease, the relationship of Sublandlord and Subtenant, or Subtenant's use or occupancy of the Subleased Premises.

15.12    <u>Legal Fees</u>. In the event Sublandlord or Subtenant shall institute any action or proceeding against the other relating to the provisions of this Sublease, or any default hereunder, the unsuccessful party in such action or proceeding agrees to reimburse the successful party for the reasonable expenses of attorneys' fees and disbursements incurred therein by the successful party.

15.13    <u>Patriot Act</u>.  Sublandlord and Subtenant acknowledge and agree that, as between Sublandlord and Subtenant, the following provision shall apply in lieu of the OFAC provision set forth in Section 37.20 of the Lease.

Sublandlord represents, warrants and covenants to Subtenant that (a) no Sublandlord Covered Entity (as hereinafter defined) (i) is a Sanctioned Person (as hereinafter defined) or (ii) is directly or indirectly controlled by a Sanctioned Person; and (b) Sublandlord is not acting hereunder and will not act hereunder for or on behalf of a Sanctioned Person. Subtenant represents, warrants and covenants to Sublandlord that (a) no Subtenant Covered Entity (as hereinafter defined) (i) is a Sanctioned Person or (ii) is directly or indirectly controlled by a Sanctioned Person; and (b) Subtenant is not acting hereunder and will not act hereunder for or on behalf of a Sanctioned Person. As used in this Section, the following terms shall have the meanings set forth below:

"**Anti-Terrorism Laws**" shall mean any Laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering or bribery, and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, all as amended, supplemented or replaced from time to time.

"**Sublandlord Covered Entity**" means (a) Sublandlord and each direct or indirect subsidiary of Sublandlord and (b) each Person that, directly or indirectly, is in control of a Person described in clause (a) above.  For purposes of this definition, control of a Person means the direct or indirect (x) ownership of, or power to vote, 25% or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise.

{00699948.9}                    17

"**Law**" shall mean any law(s) (including common law), constitution, statute, treaty, regulation, rule, ordinance, opinion, issued guidance, release, ruling, order, executive order, injunction, writ, decree, bond, judgment, authorization or approval, lien or award of or any settlement arrangement, by agreement, consent or otherwise, with any governmental authority, foreign or domestic.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"**Sanctioned Person**" means any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person, group, regime, entity or thing, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any Anti-Terrorism Law.

"**Subtenant Covered Entity**" means (a) Subtenant and each direct or indirect subsidiary of Subtenant, and (b) each Person that, directly or indirectly, is in control of Subtenant or any direct or indirect subsidiary of Subtenant.  For purposes of this definition, control of a Person means the direct or indirect (x) ownership of, or power to vote, 25% or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise.

     15.14   <u>Building Investment Trust Representation</u>.  Sublandlord is not the AFL-CIO Building Investment Trust or an affiliate or subsidiary thereof (collectively, the "**BIT**").  The BIT is not involved with the transactions contemplated by this Sublease, and the BIT is not receiving any portion of the rents or other amounts payable to Sublandlord in connection with this Sublease.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

OMM_US:79329696.14

IN WITNESS WHEREOF, Sublandlord and Subtenant have executed this Sublease as of the day and year first above written.

**SUBLANDLORD:**

**Desolation Holdings LLC**, a Delaware limited liability company

By: _____
Name: James Waschak
Title: COO

**SUBTENANT:**

**PNC Bank, National Association**, a national banking association

By: _____
Name:
Title:

[Signature Page to Sublease]

IN WITNESS WHEREOF, Sublandlord and Subtenant have executed this Sublease as of the day and year first above written.

**SUBLANDLORD:**

**Desolation Holdings LLC**, a Delaware limited liability company

By:   _____
        Name:
        Title:

**SUBTENANT:**

**PNC Bank, National Association**, a national banking association

By:   _____
        Name: Ana Armstrong
        Title: Vice President

[Signature Page to Sublease]

**_SUBLANDLORD:_**

STATE OF ___WA___ )
                        ) ss.
COUNTY OF ___KING___ )

This record was acknowledged before me on _March 16_, 2021, by _James Waschak_ as ___CCO___ of _Resolation Holdings_

_____
(Signature of notary public)

_Notary Public_
(Title of office)

My commission expires: _Jan 28 2022_

DEBORAH MADIGAN
Notary Public
State of Washington
Commission # 197294
My Comm. Expires Jan 28, 2022

(Use this space for notarial stamp/seal)

**SUBTENANT:**

STATE OF _Pennsylvania_ )
                               ) ss.
COUNTY OF _Allegheny_ )

    This record was acknowledged before me on _March 16th_, 2021, by _Dana Armstrong_ as _V.P._ of _PNC BANK N.A_

_Helen Kundman_
(Signature of notary public)

_NOTARY PUBLIC_
(Title of office)

My commission expires: _May 3rd 2024_

| |
|---|
| Commonwealth of Pennsylvania - Notary Seal<br>Helen Kundman, Notary Public<br>Allegheny County<br>My commission expires May 3, 2024<br>Commission number 1269280 |
| Member, Pennsylvania Association of Notaries |

(Use this space for notarial stamp/seal)

# **EXHIBIT A**

## **COPY OF LEASE**

[Attached.]

**BANK OF AMERICA BUILDING OFFICE LEASE**

**BETWEEN**

**BELLEVUE PLACE OFFICE, LLC,**
a Washington limited liability company
(Landlord)

**AND**

**DESOLATION HOLDINGS LLC,**
a Delaware limited liability company
(Tenant)

**SUITE 2000**

33128-0230/141416834.5

# CONTENTS

1.   BASIC LEASE DATA, TERMS AND EXHIBITS. ...............................................1

2.   PREMISES. .........................................................................................5
     2.1    Generally. ................................................................................5
     2.2    Reserved to Landlord. ................................................................5

3.   LEASE TERM. .....................................................................................6
     3.1    Generally. ................................................................................6
     3.2    Termination. .............................................................................6
     3.3    Holding Over. ...........................................................................6
     3.4    Pre-Commencement License. ........................................................6
     3.5.   Option to Extend Lease Term. .......................................................7
     3.6    Right of First Opportunity. ..........................................................9

4.   COMMENCEMENT AND EXPIRATION DATES; LEASE YEAR. ..................10
     4.1    Commencement Date. ................................................................10
     4.2    Expiration Date. ......................................................................10
     4.3    Confirmation of Commencement and Expiration Dates. .......................10
     4.4    Lease Year. ............................................................................10

5.   RENT. .............................................................................................10

6.   ADDITIONAL RENT. ...........................................................................11
     6.1    Generally. ..............................................................................11
     6.2    Definitions. ............................................................................11
     6.3    Payment. ...............................................................................13
     6.4    Nonpayment. ..........................................................................14
     6.5    Future Development of Bellevue Place. ..........................................14
     6.6    Disputes Relating to Additional Rent. ............................................14

7.   LATE CHARGES. ...............................................................................15

8.   SECURITY DEPOSIT. .........................................................................16

9.   USES. .............................................................................................16
     9.1    Permitted Uses. .......................................................................16
     9.2    Prohibited Uses. ......................................................................16
     9.3    Compliance with Laws, Rules and Regulations. ................................17
     9.4    Hazardous Material. .................................................................17

| 10. | SERVICES AND UTILITIES. | 18 |
|---|---|---|
| | 10.1 Standard Services. | 18 |
| | 10.2 Interruption of Services. | 19 |
| | 10.3 Additional Services. | 19 |
| 11. | IMPROVEMENTS, ALTERATIONS AND ADDITIONS. | 20 |
| | 11.1 Acceptance of the Leased Premises. | 20 |
| | 11.2 Premises Improvements. | 20 |
| | 11.3 Alterations by Tenant. | 22 |
| | 11.4 Disability Laws. | 23 |
| 12. | MAINTENANCE OF THE PREMISES. | 24 |
| | 12.1 Maintenance and Repair by Tenant. | 24 |
| | 12.2 Failure to Maintain. | 24 |
| | 12.3 Repair by Landlord. | 24 |
| | 12.4 Surrender of Leased Premises. | 25 |
| 13. | INTENTIONALLY OMITTED. | 25 |
| 14. | DEFAULT BY LANDLORD. | 25 |
| 15. | ACCESS. | 25 |
| | 15.1 Right of Entry. | 25 |
| | 15.2 Excavation. | 26 |
| 16. | DAMAGE OR DESTRUCTION. | 26 |
| | 16.1 Insured Loss. | 26 |
| | 16.2 Uninsured Loss. | 27 |
| | 16.3 No Obligation. | 27 |
| | 16.4 Partial Destruction of the Bank of America Building. | 27 |
| | 16.5 Business Interruption. | 27 |
| 17. | MUTUAL RELEASE AND WAIVER OF SUBROGATION. | 28 |
| 18. | INDEMNITY. | 28 |
| | 18.1 Indemnification by Tenant. | 28 |
| | 18.2 Concurrent Negligence of Landlord and Tenant Relating to Construction, Repair and Maintenance Activities. | 29 |
| | 18.3 Waiver of Workers' Compensation Immunity. | 29 |
| | 18.4 Acts of Others. | 29 |
| | 18.5 Provisions Specifically Negotiated. | 30 |
| | 18.6 Indemnification by Landlord. | 30 |
| 19. | INSURANCE. | 30 |
| | 19.1 Liability Insurance. | 30 |

|  | 19.2 | Property Insurance. | 31 |
|  | 19.3 | Other Insurance. | 32 |
|  | 19.4 | Failure to Maintain. | 32 |
|  | 19.5 | Increase in Insurance Premium. | 32 |
|  | 19.6 | Tenant Contractor. | 33 |
| 20. | ASSIGNMENT AND SUBLEASING. | | 34 |
|  | 20.1 | Assignment or Sublease. | 34 |
|  | 20.2 | Assignee Obligations. | 35 |
|  | 20.3 | Sublessee Obligations. | 36 |
|  | 20.4 | Conditional Consents. | 36 |
|  | 20.5 | Attorneys' Fees and Costs. | 36 |
|  | 20.6 | Excess Rent. | 36 |
|  | 20.7 | Permitted Transfers. | 36 |
| 21. | ADVERTISING. | | 37 |
| 22. | LIENS. | | 38 |
| 23. | TENANT'S DEFAULT. | | 39 |
|  | 23.1 | Default. | 39 |
|  | 23.2 | Remedies in Default. | 39 |
|  | 23.3 | Legal Expenses. | 40 |
|  | 23.4 | Bankruptcy. | 40 |
|  | 23.5 | Remedies Cumulative - Waiver. | 42 |
| 24. | SUBORDINATION AND ATTORNMENT; MORTGAGEE PROTECTION. | | 42 |
|  | 24.1 | Subordination - Notice to Mortgagee. | 42 |
|  | 24.2 | Mortgagee Protection Clause. | 42 |
| 25. | INTENTIONALLY OMITTED. | | 43 |
| 26. | REMOVAL OF PROPERTY. | | 43 |
| 27. | VOLUNTARY SURRENDER. | | 43 |
| 28. | EMINENT DOMAIN. | | 43 |
|  | 28.1 | Total Taking. | 43 |
|  | 28.2 | Constructive Taking of Entire Premises. | 44 |
|  | 28.3 | Partial Taking. | 44 |
|  | 28.4 | Damages. | 44 |
| 29. | NOTICES. | | 45 |

30.    LANDLORD'S LIABILITY. .................................................................45

31.    TENANT'S CERTIFICATES. ...............................................................46

32.    RIGHT TO PERFORM. ........................................................................46

33.    AUTHORITY. ......................................................................................47

34.    PARKING AND COMMON AREAS. ..................................................47
       34.1   Parking. ......................................................................................47
       34.2   Common Areas. .........................................................................48

35.    TRANSPORTATION MANAGEMENT PROGRAM. ...........................48

36.    QUIET ENJOYMENT. ........................................................................49

37.    GENERAL. .........................................................................................49
       37.1   Captions. ....................................................................................49
       37.2   Bellevue Place Rent and Income. .............................................49
       37.3   Successors or Assigns. ..............................................................49
       37.4   Tenant Defined. ..........................................................................49
       37.5   Lost Security or Access Key Card. ............................................49
       37.6   Landlord's Consent. ....................................................................50
       37.7   Broker's Commission. .................................................................50
       37.8   Partial Invalidity. ........................................................................50
       37.9   Recording. ..................................................................................50
       37.10  Joint Obligation. .........................................................................50
       37.11  Time. ...........................................................................................51
       37.12  Prior Agreements. ......................................................................51
       37.13  Inability to Perform. ...................................................................51
       37.14  Transfer of Landlord's Interest. .................................................51
       37.15  No Light, Air or View Easement. ...............................................52
       37.16  Reciprocal Easement Agreements. ............................................52
       37.17  Waiver. ........................................................................................52
       37.18  Name. ..........................................................................................52
       37.19  Choice of Law - Venue. ..............................................................52
       37.20  OFAC Certification. ....................................................................52
       37.21  Current Tenant. ..........................................................................53
       37.22  Letter of Credit. ..........................................................................53
       37.23  Audited Financial Statement. .....................................................55
       37.24  Guaranty. .....................................................................................55
       37.25  Signage. ......................................................................................55
       37.26  Fitness Center. ............................................................................55

## BANK OF AMERICA BUILDING OFFICE LEASE

THIS LEASE is made this 14 day of November, 2018, by and between BELLEVUE PLACE OFFICE, LLC, a Washington limited liability company ("Landlord"), and DESOLATION HOLDINGS LLC, a Delaware limited liability company ("Tenant").

### RECITALS

A.    Landlord owns certain rights and interests in and to certain real property and improvements thereon in the City of Bellevue, King County, Washington, which real property is described in Exhibit "A," attached hereto, and shown on the site plan attached hereto as Exhibit "B." Said property and the improvements thereon are part of a first-class multi-use development commonly known and referred to herein as "Bellevue Place." Bellevue Place currently consists of the Bank of America Building, Hotel Building, Corner Building, and Wintergarden Retail Center, as shown on Exhibit "B," as well as a Parking Garage currently located beneath the foregoing.

B.    Tenant desires to lease from Landlord a portion of the Bank of America Building and Landlord is willing to do so on certain terms and conditions, which are set forth herein.

NOW THEREFORE, for and in consideration of the promises, covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

1.    **BASIC LEASE DATA, TERMS AND EXHIBITS.**

1.1    Landlord:  Bellevue Place Office, LLC, a Washington limited liability company.

1.2    Address of Landlord:  P. O. Box 4186, Bellevue, Washington 98009.

1.3    Tenant:  Desolation Holdings LLC, a Delaware limited liability company.

1.4    Principal Business Address of Tenant:  610 Bellevue Way NE, Suite 200, Bellevue, WA 98004

1.5    Tenant's Permitted Trade Name:  N/A

1.6    Leased Premises:  That portion of the twentieth (20th) floor of the Bank of America Building; as and where shown on Exhibit "C" attached hereto.

1.7    Rentable Area of the Leased Premises:  Seventeen Thousand Six Hundred Forty-seven (17,647) square feet.

1.8     Breakdown of Rentable Area at Bellevue Place:

(a)     The total Rentable Area of the Bank of America Building and the Corner Building is Four Hundred Sixty-three Thousand Five Hundred Ninety-nine (463,599) square feet.

(b)     The total Rentable Area of Bellevue Place is Five Hundred Nineteen Thousand Five Hundred Forty-nine (519,549) square feet.

1.9     Tenant's Share:

(a)     Because Bellevue Place is a multi-use development containing a variety of different office, retail, and common area facilities within its various elements, Tenant's Share appropriately comprises two components:  (i) Operating, Repair and Maintenance Expenses specific to the Bank of America Building and the Corner Building, as set forth in Section 1.9(b); and (ii) Operating, Repair and Maintenance Expenses for Bellevue Place generally, as set forth in Section 1.9(c).

(b)     Operating, Repair and Maintenance Expenses for the Bank of America Building and the Corner Building:  three point eight zero seven percent (3.807%) based on 463,599 rentable square feet pursuant to Section 1.8(a).

(c)     Operating, Repair and Maintenance Expenses for Bellevue Place:  three point three nine seven percent (3.397%) based on 519,549 rentable square feet pursuant to Section 1.8(b).

1.10    Rent: **[based on 17,647 square feet]**

From and including the Commencement Date through and including the last day of the twelfth (12th) month of the Lease Term, the Rent shall be Forty-four and 75/100 Dollars ($44.75) per square foot of the Rentable Area of the Leased Premises per annum or Sixty-five thousand Eight Hundred Eight and 60/100 Dollars ($65,808.60) per month.

From and including the first day of the thirteenth (13th) month of the Lease Term to and including the last day of the twenty-fourth (24th) month of the Lease Term, the Rent shall be Forty-six and 09/100 Dollars ($46.09) per square foot of the Rentable Area of the Leased Premises per annum or Sixty-seven Thousand Seven Hundred Seventy-nine and 19/100 Dollars ($67,779.19) per month.

From and including the first day of the twenty-fifth (25th) month of the Lease Term to and including the last day of the thirty-sixth (36th) month of the Lease Term, the Rent shall be Forty-seven and 47/100 Dollars ($47.47) per square foot of the Rentable Area of the Leased Premises per annum or Sixty-nine Thousand Eight Hundred Eight and 59/100 Dollars ($69,808.59) per month.

From and including the first day of the thirty-seventh (37th) month of the Lease Term to and including the last day of the forty-eighth (48th) month of the Lease Term, the Rent shall be Forty-eight and 89/100 Dollars ($48.89) per square foot of Rentable Area of the Leased Premises per annum or Seventy-one Thousand Eight Hundred Ninety-six and 82/100 Dollars ($71,896.82) per month.

From and including the first day of the forty-ninth (49th) month of the Lease Term to and including the last day of the sixtieth (60th) calendar month of the Lease Term, the Rent shall be Fifty and 36/100 Dollars ($50.36) per square foot of Rentable Area of the Leased Premises per annum or Seventy-four Thousand Fifty-eight and 58/100 Dollars ($74,058.58) per month.

From and including the first day of the sixty-first (61st) month of the Lease Term to and including the last day of the seventy-second (72nd) month of the Lease Term, the Rent shall be Fifty-one and 87/100 Dollars ($51.87) per square foot of Rentable Area of the Leased Premises per annum or Seventy-six Thousand Two Hundred Seventy-nine and 16/100 Dollars ($76,279.16) per month.

From and including the first day of the seventy-third (73rd) month of the Lease Term to and including the last day of the eighty-fourth (84th) month of the Lease Term, the Rent shall be Fifty-three and 43/100 Dollars ($53.43) per square foot of Rentable Area of the Leased Premises per annum or Seventy-eight Thousand Five Hundred Seventy-three and 27/100 Dollars ($78,573.27) per month.

From and including the first day of the eighty-fifth (85th) month of the Lease Term to and including the last day of the ninety-sixth (96th) month of the Lease Term, the Rent shall be Fifty-five and 03/100 Dollars ($55.03) per square foot of Rentable Area of the Leased Premises per annum or Eighty Thousand Nine Hundred Twenty-six and 20/100 Dollars ($80,926.20) per month.

From and including the first day of the ninety-seventh (97th) month of the Lease Term to and including the last day of the one hundred eighth (108th) month of the Lease Term, the Rent shall be Fifty-six and 68/100 Dollars ($56.68) per square foot of Rentable Area of the Leased Premises per annum or Eighty-three Thousand Three Hundred Fifty-two and 66/100 Dollars ($83,352.66) per month.

From and including the first day of the one hundred ninth (109th) month of the Lease Term to and including the last day of the one hundred twentieth (120th) month of the Lease Term, the Rent shall be Fifty-eight and 38/100 Dollars ($58.38) per square foot of Rentable Area of the Leased Premises per annum or Eighty-five Thousand Eight Hundred Fifty-two and 66/100 Dollars ($85,852.66) per month.

From and including the first day of the one hundred twenty-first (121st) month of the Lease Term to and including the last day of the one hundred thirty-second

(132nd) month of the Lease Term, the Rent shall be Sixty and 13/100 Dollars ($60.13) per square foot of Rentable Area of the Leased Premises per annum or Eighty-eight Thousand Four Hundred Twenty-six and 18/100 Dollars ($88,426.18) per month.

From and including the first day of the one hundred thirty-third (133rd) month of the Lease Term to and including the Expiration Date, the Rent shall be Sixty-one and 93/100 Dollars ($61.93) per square foot of Rentable Area of the Leased Premises per annum or Ninety-one Thousand Seventy-three and 23/100 Dollars ($91,073.23) per month.

1.11    Lease Term:  One hundred thirty-five (135) calendar months, plus that portion of a calendar month necessary, if at all, for the Expiration Date to occur on the last day of such calendar month.

1.12    Possession Date:  The date on which possession of the Leased Premises is delivered to Tenant in accordance with the terms of this Lease, which is anticipated to be April 1, 2019.

Commencement Date:  The earlier of (i) one hundred five (105) days following the Possession Date; or (ii) Tenant's occupancy of the Leased Premises for business purposes.

1.13    Expiration Date:  October 31, 2030.

1.14    Security Deposit:  Tenant shall pay Landlord One Million Three Hundred Eighty-nine Thousand Seven Hundred Seventy-nine and 47/100 Dollars ($1,389,779.47) of which Eighty-seven Thousand Four Hundred Eleven and 47/100 Dollars ($87,411.47) shall be applied to Rent and Additional Rent due for the first (1st) month of the Lease Term (and for the avoidance of doubt, if the Lease Term commences on a day other than the first day of a calendar month such that Rent and Additional Rent are prorated, then the balance of such amount shall be applied to Rent and Additional Rent due for the following calendar month), and the remaining One Million Three Hundred Two Thousand Three Hundred Sixty-eight and 00/100 Dollars ($1,302,368.00) shall be held as a security deposit, in the form of a letter of credit, subject to and as further described in Sections 8 and 37.22 below.

1.15    Guarantor:  The party identified as Guarantor in that certain Guarantee of Lease, attached hereto and incorporated herein as Exhibit "J".

1.16    Contingency:  THIS LEASE IS CONTINGENT UPON ITS ACCEPTANCE AND APPROVAL BY LANDLORD'S LENDERS.  If this Lease is acceptable to Landlord's lenders, this contingency will be waived by Landlord. Landlord shall use commercially reasonable efforts to obtain such Lender acceptance in writing

not later than ninety (90) days following the date of this Lease. In the event Landlord has not provided Tenant a copy of such written acceptance within said ninety (90) day period, Tenant shall have the right to terminate this Lease upon written notice to Landlord, and upon such termination, any sums paid to Landlord, including, without limitation, any prepaid Rent, Additional Rent and the Security Deposit shall promptly be returned to Tenant, and the parties hereto shall be released from any further obligations hereunder.

1.17    Project Architect: JPC Architects, or as otherwise designated by Landlord.

1.18    Exhibits Incorporated by Reference:

Exhibit "A" - Legal Description of Bellevue Place.
Exhibit "B" - Site Plan of Bellevue Place.
Exhibit "C" - Floor Plan of the Leased Premises.
Exhibit "D" - Tenant Design & Construction Manual
Exhibit "E" - Rules and Regulations.
Exhibit "F" - Bellevue Place Transportation Management Agreement.
Exhibit "G" - Form of Tenant Estoppel Certificate.
Exhibit "H" - Form of Subordination Agreement to Reciprocal Easement
             Agreement.
Exhibit "I" - Form of Subordination, Nondisturbance and Attornment Agreement
Exhibit "J" - Form of Guarantee of Lease
Exhibit "K" - Tenant's Draw Request

## 2.    PREMISES.

### 2.1    Generally.

Landlord does hereby lease and demise to Tenant, and Tenant hereby accepts from Landlord, upon the terms and conditions herein set forth, the Leased Premises described in Section 1.6 above and depicted in Exhibit "C," together with rights of ingress and egress over and across the Common Areas and Facilities of the Bank of America Building and Bellevue Place.

### 2.2    Reserved to Landlord.

Landlord reserves the right, from time to time, to change the size and dimensions of Bellevue Place; add additional buildings and improvements to Bellevue Place; relocate, alter, and change the number of buildings and other improvements in, on and under Bellevue Place; change any building dimensions and the number of floors in any of the buildings and parking areas in Bellevue Place; change the identity and type of stores and tenancies in Bellevue Place; change the name and address of the buildings and other improvements in Bellevue Place; and change the Common Areas and Facilities in Bellevue Place. Landlord further reserves the use of, and all rights in and to, the exterior walls and roof, and the right to install, maintain, use, repair and

replace pipes, ducts, conduits and wires leading through the Leased Premises in locations which will not materially interfere with Tenant's use thereof and serving other parts of Bellevue Place. Landlord shall reasonably attempt to locate such items under the floor, above the ceiling, and/or adjacent to an interior wall. Such use shall not exceed one percent (1%) of the Useable Area of the Leased Premises unless otherwise agreed. If Landlord's use hereunder exceeds one percent (1%) of the Useable Area of the Leased Premises, Tenant shall be entitled, as its sole and exclusive remedy, to a reduction in the stated Rentable Area for the Leased Premises, as set forth in Section 1.7 above, and a proportional reduction in Rent and Additional Rent (as defined in Sections 5 and 6 below) due hereunder. The Leased Premises shall not include the space above the suspended ceiling. Landlord shall retain the right to use the area immediately below the floor surface and the space above the suspended ceiling in any manner which does not permanently and materially interfere with Tenant's use of the Leased Premises.

## 3. LEASE TERM.

### 3.1    Generally.

The term of this Lease (the "Term" or "Lease Term") shall be the period of time set forth in Section 1.11 above and shall commence on the Commencement Date as provided in Section 4.1 below and shall end at 11:59 p.m. on the Expiration Date, as provided in Section 4.2 below.

### 3.2    Termination.

The Lease shall terminate on the Expiration Date, unless sooner terminated hereunder or by operation of law, without the necessity for any notice from either Landlord or Tenant. If Tenant fails to surrender the Leased Premises at the end of the Lease Term, or any renewal or extension hereof, Tenant shall be liable for, and shall indemnify Landlord against, all claims and demands made by any succeeding tenants against Landlord founded upon delay by Landlord in delivering possession of the Leased Premises to such succeeding tenant.

### 3.3    Holding Over.

Any holding over by Tenant after the expiration of the Lease Term shall be construed to be a tenancy from month-to-month. During such tenancy, Tenant shall pay to Landlord a monthly rental of twice the Rent payable during the last month of the Lease Term in addition to the Additional Rent and Other Charges set forth herein. Except as set forth herein, such month-to-month tenancy also shall be subject to all of the terms, covenants, and conditions of this Lease.

### 3.4    Pre-Commencement License.

Tenant and Tenant's employees, agents and approved contractors and licensees may enter the Leased Premises and the Bank of America Building pursuant to the license granted under this Section 3.4 (the "Pre-Commencement License") for the limited purpose of constructing and

installing the Premises Improvements. The Pre-Commencement License shall be subject to such reasonable restrictions and conditions as may be imposed by Landlord from time to time. Tenant's right to enter onto the Leased Premises and the Bank of America Building pursuant to the Pre-Commencement License shall not trigger the Commencement Date under Section 1.1 above; and Tenant's rights under this Section 3.4 shall not be revoked as long as Tenant complies with the reasonable restrictions and conditions required by Landlord; provided, however, the terms and provisions of Articles 1, 2, 3, 4, 6.2, 6.4-6.6, and 7 through 37 of this Lease, and the provisions and requirements of Exhibit "D" shall automatically become effective and apply to all activities of Tenant and Tenant's employees, agents, contractors and licensees in, about, or relating to the Leased Premises or the Bank of America Building. Notwithstanding anything herein to the contrary and without limiting the generality of the foregoing, Landlord may require Tenant and any of its agents, contractors or licensees to sign a separate commercially reasonable indemnification and hold harmless instrument and provide appropriate evidence of insurance coverage as a condition to entering onto the Leased Premises and the Bank of America Building. Tenant shall coordinate all activities on and about the Leased Premises relating to the Premises Improvements with Landlord's Tenant coordinator and Tenant shall not interfere with or hinder Landlord or Landlord's other tenants with respect to their work or the use and enjoyment of other space within the Bank of America Building.

   **3.5.    Option to Extend Lease Term.**

   (a)    Tenant is granted an option (the "Extension Option") to extend the Lease Term for five (5) years, to and including the last day of the month that is sixty (60) months following the Expiration Date. The period of time shall be referred to herein as the "Option Period". To exercise the Extension Option, Tenant must give Landlord unequivocal written notice of Tenant's election to exercise the Extension Option at least fifteen (15) calendar months prior to the Expiration Date.

   (b)    If Tenant elects to exercise the Extension Option, the Rent for the Option Period ("New Rent") shall be the Fair Market Rent (as defined below) for comparable space in the office component of Lincoln Square South, Lincoln Square North, and the Bank of America Building ("Comparable Space"), but in no event shall the New Rent be less than the Rent payable during the last month of the Lease Term. If there is no Comparable Space in Lincoln Square South, Lincoln Square North, and the Bank of America Building at the time, Tenant shall pay, as New Rent, whatever the fair market rent in Lincoln Square South, Lincoln Square North, and Bank of America Building would be if there was such Comparable Space in Lincoln Square South, Lincoln Square North, and the Bank of America Building. The term "Fair Market Rent" shall mean the rent that would be paid by a willing tenant renewing its lease for Comparable Space for a term of five (5) years. Tenant concessions shall be included in the determination of fair market rent with respect to tenants who are renewing their leases in Lincoln Square North, Lincoln Square South, and the Bank of America Building. The term "tenant concessions" shall include, without limitation, such inducements as tenant improvements and free rent.

   (c)    In the event Landlord and Tenant cannot agree on the New Rent, the matter shall be submitted for decision to a panel of three (3) arbitrators. Landlord and Tenant

shall each appoint one (1) arbitrator, who shall by profession be a licensed commercial real estate broker or an MAI real estate appraiser and who shall be familiar with Lincoln Square South, Lincoln Square North, and the Bank of America Building and have been active (over the three (3) year period ending on the date of such appointment) in the brokering or appraisal of Comparable Space. The determination of the arbitrators shall be limited solely to the issue of whether Landlord's or Tenant's proposed New Rent is the closest to the Fair Market Rent. Each such arbitrator shall be appointed within fifteen (15) days after Tenant's or Landlord's notice to the other of its election to have the New Rent be determined by this arbitration procedure. The two arbitrators so appointed shall, within fifteen (15) days of the date of the appointment of the last appointed arbitrator, agree upon and appoint a third arbitrator, who shall be qualified under the same criteria set forth above for qualification of the initial two arbitrators. Failing such agreement, either Landlord or Tenant shall have the right to petition for the appointment of the third arbitrator by the Presiding Judge of the Superior Court of the County of King. The three (3) arbitrators shall, within thirty (30) days of the appointment of the third arbitrator, reach a decision as to whether the parties shall use Landlord's or Tenant's proposed New Rent and shall notify Landlord and Tenant thereof. The decision of the majority of the three (3) arbitrators shall be binding upon both Landlord and Tenant. The cost of the arbitration shall be paid by Landlord and Tenant equally. The arbitration procedure shall not take more than thirty (30) days. However, if the arbitrators have not determined the New Rent prior to the beginning of the Option Period, Tenant shall pay the Rent previously in effect under the Lease plus a ten percent (10%) increase until such time as the arbitrators determine the New Rent. If the arbitration procedure results in a higher Rent, Tenant shall pay the difference with the next monthly rental payment due under the Lease. If the arbitration procedure results in a lower Rent, Tenant shall receive a credit against its next monthly Rent payments under the Lease, and any succeeding monthly rental payments, if necessary, in an amount equal to the overpayment.

      (d)    Notwithstanding anything in the foregoing to the contrary, the Extension Option may not be exercised during any period in which Tenant is in default under any provision of the Lease until said default has been fully cured. Time is of the essence. If Tenant fails to exercise the Extension Option in any instance when such right is in effect, prior to the expiration of the applicable time period for the exercise of such right, the Extension Option shall thereafter be deemed null and void and of no further force or effect. The period of time within which the Extension Option may be exercised shall not be extended or enlarged by reason of Tenant's inability to exercise such rights because of the foregoing provisions. All rights of Tenant to the Extension Option shall terminate and be of no further force or effect, even after Tenant's due and timely exercise thereof, if, after such exercise, but prior to the commencement date of the Option Period, Tenant defaults under the terms of the Lease which default is not cured within any applicable cure period.

      (e)    The Extension Option shall be personal to Tenant and may not be exercised or be assigned, voluntarily or involuntarily, by or to any person or entity other than Tenant, nor shall the Extension Option be assignable separate and apart from this Lease.

### 3.6    Right of First Opportunity.

(a)    Landlord and Tenant acknowledge that Tri-Marine International, Inc. or an affiliate (to whom Tri-Marine International, Inc. transfers its current lease) is the existing tenant occupying approximately 19,666 rentable square feet on floor 18 of the Bank of America Building (the "First Opportunity Space") as the date of this Lease (such existing tenant or affiliate referred to as "Existing Tenant" for purposes of this subsection).  If the Existing Tenant elects not to extend its existing lease term, then Landlord will notify Tenant in writing ("Landlord's First Opportunity Notice") and, except as otherwise set forth herein, Tenant shall have the right ("Right of First Opportunity") to lease such First Opportunity Space on the terms and conditions as outlined in Landlord's First Opportunity Notice, by notifying Landlord of its exercise of such right in accordance with subsection (b) below.  Tenant's lease of the First Opportunity Space shall commence upon the earlier of: (i) one hundred five (105) days following Landlord's delivery of the First Opportunity Space broom clean with all furniture, fixtures, and low voltage cabling removed; or (ii) Tenant's occupancy of the First Opportunity Space for business purposes.  Notwithstanding anything herein to the contrary, Tenant's Right of First Opportunity is expressly contingent upon the Existing Tenant electing not to extend or renew its existing lease for the First Opportunity Space.  If the Existing Tenant elects to extend or renew its existing lease for the First Opportunity Space, then Landlord shall deliver Landlord's First Opportunity Notice following the expiration or termination of such extension or renewal (and any subsequent extension or renewal thereafter, as applicable) and this Right of First Opportunity shall become exercisable at such time in accordance with the terms of this Section 3.6.

(b)    If Tenant desires to exercise its right to lease the First Opportunity Space, Tenant shall give Landlord unequivocal written notice thereof ("Tenant's First Opportunity Notice") within ten (10) days after receipt of Landlord's First Opportunity Notice.  Time is of the essence.  If, for any reason, Tenant declines or does not so notify Landlord, then Tenant's rights with respect to the First Opportunity Space which is the subject of Landlord's First Opportunity Notice shall be deemed to be waived, and thereafter, after expiration of such ten (10) day period, Landlord may lease such space to any other party.

(c)    Notwithstanding anything in the foregoing to the contrary, the Right of First Opportunity may not be exercised during any period in which Tenant is in default under any provision of the Lease until said default has been fully cured.  Time is of the essence.  If Tenant fails to exercise the Right of First Opportunity in any instance when such right is in effect, prior to the expiration of the applicable time period for the exercise of such right, the Right of First Opportunity shall thereafter be deemed null and void and of no further force or effect.  The period of time within which the Right of First Opportunity may be exercised shall not be extended or enlarged by reason of Tenant's inability to exercise such rights because of the foregoing provisions.  At Landlord's sole option, all rights of Tenant to the First Opportunity Space shall terminate and be of no further force or effect, even after Tenant's due and timely exercise thereof, if, after such exercise, but prior to the commencement date of the First Opportunity Space Tenant defaults under the terms of the Lease which default is not cured within any applicable cure period.

(d)    The Right of First Opportunity shall be personal to Tenant and may not be exercised or be assigned, voluntarily or involuntarily, by or to any person or entity other than Tenant and any successor, assignee or transferee of a Permitted Transfer, nor shall the Right of First Opportunity be assignable separate and apart from this Lease.

## 4.    COMMENCEMENT AND EXPIRATION DATES; LEASE YEAR.

### 4.1    Commencement Date.

The Commencement Date shall be the date set forth in Section 1.12 above.

### 4.2    Expiration Date.

This Lease shall expire at 11:59 p.m. on the date set forth in Section 1.13 above.

### 4.3    Confirmation of Commencement and Expiration Dates.

Within the later of: (i) five (5) business days after Tenant's occupancy of the Leased Premises, and (ii) Landlord's request following such occupancy; in each instance, Landlord and Tenant shall confirm the specific Commencement Date and Expiration Date in writing, as well as the "as built" Rentable Area of the Leased Premises, as defined in Section 6.2(f), and the Rent payable hereunder, which shall be appended to and incorporated into this Lease.

### 4.4    Lease Year.

A "Lease Year" shall mean a calendar year commencing on January 1 and ending the following December 31. If the Commencement Date is a date other than January 1, the initial Lease Year shall be from and including the Commencement Date to and including December 31 of that calendar year. If the Expiration Date is a date other than December 31, the final Lease Year shall be from and including January 1 of the calendar year of the Final Lease Year to and including the Expiration Date.

## 5.    RENT.

Tenant shall pay to Landlord, without notice or demand and without setoff or deduction whatsoever, the sums stated in Section 1.10 above (the "Rent"), which shall be paid to Landlord in advance in lawful money of the United States, on or before the first day of each calendar month at Landlord's Address as set forth in Section 1.2 above, or to such other party or at such other place as Landlord may hereafter from time to time designate in writing. Rent and Additional Rent (as defined in Section 6.1 below) for any partial month at the beginning or end of the Lease Term shall be prorated, based upon a thirty (30) day month. All amounts payable hereunder, other than Rent and Additional Rent, may be sometimes referred to as "Other Charges." Notwithstanding anything to the contrary in this Lease, Landlord hereby acknowledges and agrees that Tenant shall make all payments of Rent, Other Charges or additional rent hereunder via Automated Clearing House payments (also known as "ACH

Payments"). Landlord agrees to cooperate with Tenant, at no cost to Landlord, to complete all necessary forms in order to accomplish such method of payment within thirty (30) days of Tenant's written request. Tenant shall have the right from time to time during the Lease Term and any extensions or renewals thereof to change its method of payment of Rent, Other Charges or additional rent hereunder upon not less than thirty (30) days' prior written notice to Landlord.

## 6.    ADDITIONAL RENT.

### 6.1    Generally.

In addition to the Rent provided for in Section 5 above, Tenant shall pay to Landlord, without notice (other than notice advising Tenant of its share of the Additional Rent) or demand and without setoff or deduction, Tenant's Share (as defined in Section 6.2(a) below) of the Operating Expenses (as defined in Section 6.2(b) below), which expenses include, but are not limited to, (i) Operating, Repair, and Maintenance Expenses for the Bank of America Building and the Corner Building; and (ii) Operating, Repair, and Maintenance Expenses for Bellevue Place during the Lease Term (the "Additional Rent").

### 6.2    Definitions.

The following terms shall have the meanings hereinafter specified, unless the context otherwise specifies or clearly requires:

(a)    Tenant's Share. Tenant's Share shall be equal to the percentages set forth in Section 1.9 above.

(b)    Operating Expenses Generally. The Operating Expenses shall include (i) all Operating, Repair and Maintenance Expenses (defined in Section 6.2(c) below), and (ii) all Taxes (defined in Section 6.2(d) below).

(c)    Operating, Repair and Maintenance Expenses. Operating, Repair and Maintenance Expenses shall include the actual costs and expenses that are paid or payable by Landlord in connection with the operation, repair and maintenance of Bellevue Place and its constituent parts, which include without limitation, the Bank of America Building, the Corner Building and the Wintergarden Retail Center, less all contributions for such costs received from the owner of the Hotel Tract as defined in and pursuant to the terms of that certain Construction, Operation and Reciprocal Easement Agreement recorded under King County Recorder's File No. 8709160449, as amended from time to time (the "REA"), and shall include, but not be limited to, those costs and expenses that are paid or payable to the Transportation Management Association. Without limiting the generality of the foregoing and by way of illustration, Operating, Repair and Maintenance Expenses shall include costs and expenses of all utility, heating, air conditioning and ventilation costs and expenses; license, permit and inspection fees; planting and landscaping costs and expenses; janitorial services; direct physical damage insurance (including but not limited to loss of income insurance), liability and excess liability insurance, and other appropriate insurance policies, as determined solely by Landlord or

Landlord's lender, including but not limited to garage keeper's legal liability, boiler and machinery and auto insurance; taxes and assessments on equipment; the cost and expense of repairs including, but not limited to, those of a capital nature necessary or appropriate to fulfill Landlord's obligations to its tenants; the cost and expense of removing trash and other refuse; the cost and expense of supplies, tools and equipment; the cost and expense of cleaning, maintaining, repairing and replacing machinery and equipment, including but not limited to automatic door openers, lights and lighting fixtures, heating, air conditioning and ventilation equipment, fire and sprinkler systems and security systems; depreciation allowance on machinery and equipment (depreciation to be over the useful life of any such machinery and equipment in accordance with the guidelines and regulations established by the Internal Revenue Service, if any); the cost and expense of personnel to implement such services, including but not limited to security and traffic control; legal and accounting costs and expenses; customary management fees; the cost of any capital improvements necessary or appropriate to fulfill Landlord's repair or maintenance obligations, required by any applicable governmental law or regulation not in effect at the time Tenant is required to take occupancy of the Leased Premises or made for the purpose of reducing operating, repair or maintenance costs (the cost of any such capital improvements shall be amortized over the useful life of such item (in accordance with the guidelines and regulations established by the Internal Revenue Service, if any, from time to time) as Landlord shall determine with a return on capital at the current market rate per annum on the unamortized balance or at such higher rate as may have been paid by Landlord on funds borrowed for the purpose of purchasing or constructing such improvements). Notwithstanding the foregoing, Operating, Repair and Maintenance Expenses shall not include (a) costs of any special services rendered to individual tenants (including Tenant) for which a special charge is made; (b) ground lease rental payments and debt service on mortgages or deeds of trust; (c) leasing commissions and attorneys' and other fees and costs incurred in leasing space in Bellevue Place or in connection with disputes with tenants of Bellevue Place; and (d) costs and expenses for services or other benefits that are not offered to Tenant but that are provided to another tenant or occupant.

      (d)    Taxes. Taxes shall include all real estate taxes, personal property taxes and all other taxes, surcharges and assessments that are or may be levied upon, assessed against or attributable to Bellevue Place and all improvements, fixtures, equipment and other property of Landlord, real and personal, located on, in or under Bellevue Place and used in connection with the operation thereof, including the Bank of America Building, the Corner Building and land underlying the Bank of America Building and the Corner Building and including, although not limited to, the land, improvements, equipment, fixtures and other property used in connection with the operation of and comprising the Parking Garage and Wintergarden Retail Center and any rental, excise, sales, transaction or other privilege tax or levy, however denominated (excepting federal, state and local net income taxes) paid or payable during the Lease Term and taxes on all tenant improvements in the Wintergarden Retail Center owned by Landlord but excluding the Hotel Building and the land underlying the Hotel Building. Taxes also shall include any amounts paid or payable to any third party or incurred by Landlord for the purpose of obtaining a reduction in the Taxes as above defined.

(e)     Rentable Area of the Leased Premises. For purposes of this Lease, the Rentable Area of the Leased Premises shall mean the Useable Area of the Leased Premises, as that term is defined and computed according to the *Standard Method for Measuring Floor Area in Office Buildings, ANSI/BOMA Z65.1-2010*, otherwise known as the "BOMA Standard," multiplied by a load factor of seventeen point four nine (17.49%) full floor percentage. The Rentable Area of the Leased Premises comprises 17,647 square feet.

(f)     Rentable Area of Bellevue Place. For purposes of this Section 6, the Rentable Area of Bellevue Place shall include the total of all areas and spaces in (i) the Bank of America Building, (ii) the Corner Building, and (iii) all areas and spaces in and opening into the Wintergarden Retail Center (whether or not such areas or spaces in the Bank of America Building, the Corner Building, and the Wintergarden Retail Center are actually leased by Landlord) that are available for the exclusive use and occupancy of tenants of Landlord and their employees, licensees, invitees and guests and shall include, but not be limited to, all rest rooms, mezzanines, warehousing and storage areas, clerical and office areas, and employee areas within the leased premises of any tenant of Landlord in the Wintergarden Retail Center, Bank of America Building and Corner Building, but shall exclude all areas and spaces in the Hotel Building (other than those areas and spaces in or opening into the Wintergarden Retail Center and available for the exclusive use and occupancy of tenants of Landlord and their employees, licensees, invitees and guests) and the Common Areas and Facilities of Bellevue Place. If at any time, Landlord believes the Rentable Area of Bellevue Place is materially different than the Rentable Area of Bellevue Place set forth in Section 1.8 above because of an error in calculation or additions, modifications or alterations to Bellevue Place, Landlord may so notify Tenant in writing, and Tenant shall reasonably cooperate with Landlord in Landlord's re-measurement, at Landlord's sole cost and expense, of Bellevue Place, or a portion thereof; provided, that, notwithstanding anything to the contrary in this Section 6.2, no such re-measurement will modify or otherwise affect Section 1.8 or the other terms of this Lease for purposes of calculating the amount of Rent or Operating Expenses hereunder or otherwise.

**6.3     Payment.**

Landlord shall provide to Tenant, at or before the Commencement Date, an estimate of the annual Operating Expenses for the Lease Year in which the Commencement Date occurs. Within ninety (90) days after the expiration of each succeeding Lease Year of the Lease Term, or as soon thereafter as such information becomes available, Landlord shall give Tenant a written estimate of Tenant's Share of the Operating Expenses for the then current Lease Year ("Tenant's Estimated Share"). Tenant shall pay Tenant's Estimated Share, in advance, in equal monthly installments on or before the first (1st) day of each calendar month of such Lease Year at Landlord's Address as set forth in Section 1.2 above, or to such other party or at such other place as Landlord may hereafter from time to time designate in writing. During the period of time following the expiration of a Lease Year and Tenant's receipt of Landlord's estimate of Tenant's Estimated Share, Tenant shall continue to pay Landlord Tenant's Estimated Share from the prior Lease Year. Within ninety (90) days after the expiration of each Lease Year of the Lease Term (or as soon thereafter as such information becomes available), Landlord shall furnish to Tenant a

statement summarizing the actual amount of Tenant's Share of the Operating Expenses for the prior Lease Year. If Tenant's Share of the Operating Expenses exceeds the amount paid by Tenant, Tenant shall pay the deficiency to Landlord promptly upon receipt of a written notice of the amount thereof. If such statement shows Tenant's Share of the Operating Expenses to be less than the amount paid by Tenant, the amount of overpayment by Tenant shall be credited by Landlord to the next payment or payments of Additional Rent due hereunder. If the Lease Term has expired and Tenant has vacated the Leased Premises and no amounts are or may become payable by Tenant, then any overpayment shall be returned to Tenant, or at Landlord's option, to the last assignee of Tenant's interest in the Leased Premises. If this Lease commences at a time other than the beginning of a calendar year, Tenant shall pay the Tenant's Estimated Share for the remaining portion of the initial Lease Year based upon the number of days from the Commencement Date. If this Lease expires at a time other than the last day of a calendar year, Tenant shall be obligated to pay immediately any deficiencies which shall be computed at the expiration of that Lease Year. If at any time during a Lease Year it appears to Landlord that any of the Operating Expenses payable for that Lease Year will vary from Landlord's estimate by more than five percent (5%) on an individual or aggregate basis, Landlord may, at its election, adjust Tenant's Estimated Share for the balance of that Lease Year to compensate for such increase. Any increased payments required to be made pursuant to this Section shall be made within thirty (30) days after Landlord has notified Tenant thereof. Tenant's obligations under this Section shall survive the expiration or termination of this Lease.

### 6.4    Nonpayment.

In the event of nonpayment of any item of Additional Rent or any Other Charge due hereunder, Landlord shall have the same rights and remedies as for failure to pay Rent.

### 6.5    Future Development of Bellevue Place.

Tenant is aware that Landlord, by itself or in combination with other persons, intends to further expand and develop Bellevue Place in one or more additional phases. In the event one or more such phases of the Bellevue Place project are completed during the Lease Term, any additional operating, repair or maintenance expenses and real estate and other taxes attributable to such other phases may be included in the Operating Expenses at Landlord's discretion; provided that the denominator used to calculate Tenant's proportionate share of such expenses is adjusted with respect to such phases.

### 6.6    Disputes Relating to Additional Rent.

If Tenant desires to contest any calculation by Landlord of Tenant's Share or the amount of any Bellevue Place Operating Expense payable by Tenant, Tenant must give Landlord a written notice (an "Objection Notice") stating that Tenant disputes the calculation or amount. The Objection Notice must be received by Landlord within ninety (90) days after the last day of the Lease Year to which the disputed item pertains and set forth with particularity the reason why Tenant disputes Landlord's calculation or the amount. If Tenant fails to give Landlord such an Objection Notice within such time, Tenant shall be deemed to have waived and released any and

all rights it may have to contest the calculation and amount. Promptly after receiving any such Objection Notice from Tenant, Landlord shall meet with Tenant and both Tenant and Landlord shall attempt in good faith to reconcile the matters described in the Objection Notice; provided, however, if Tenant refuses to meet with Landlord within thirty (30) days after the date Landlord received the Objection Notice from Tenant, Tenant shall be deemed to have waived and released any and all rights it may have to contest Landlord's calculation and the inclusion and amount of any Bellevue Place Operating Expense. If Landlord and Tenant are unable to resolve the dispute within a reasonable time, Landlord shall cause its accounting firm to undertake an investigation and analysis of the matter and prepare a written report, a copy of which shall be provided to Tenant. The cost of the investigation, analysis and report shall be paid for by Tenant unless the investigation and analysis discloses a material (i.e. three percent (3%) or more) error favoring Landlord, in which event Landlord shall bear the cost of the investigation, analysis and report. If the report discloses that the amount or calculation used by Landlord was incorrect, Landlord shall provide a credit to Tenant for future Additional Rent payable by Tenant equal to the amount of any overpayment paid by Tenant during the Lease Year to which Tenant's Objection Notice relates. Notwithstanding the pendency of any dispute hereunder, Tenant shall continue to pay all amounts owed hereunder based upon Landlord's determination and calculation or until such calculation or amount has been established hereunder to be incorrect.

## 7.    LATE CHARGES.

If Tenant fails to pay, when the same is due and payable, any Rent, Additional Rent or Other Charges, such unpaid amounts shall bear interest at the rate of two percent (2%) per month from the date due to the date of payment, unless such amount would violate any applicable usury or other law, in which event such unpaid amounts shall bear interest at the highest rate then allowed by law. In addition to such interest, Tenant acknowledges that the late payment by Tenant of any installment of Rent, Additional Rent or Other Charges will cause Landlord to incur certain costs and expenses not contemplated under this Lease, the exact amount of such costs being extremely difficult or impractical to fix. Such costs and expenses will include, without limitation, administrative and collection costs, and processing and accounting expenses. Therefore, if any Rent, Additional Rent or Other Charge installment is not received by Landlord from Tenant by the fifth (5th) day after such installment is due, Tenant shall immediately pay to Landlord, in addition to the installment due, a late charge equal to twelve percent (12%) of such installment. Landlord and Tenant agree that this late charge represents a reasonable estimate of such costs and expenses and is fair compensation to Landlord for its loss and expense suffered by such nonpayment by Tenant. Acceptance of this late charge shall not constitute a waiver of Tenant's default with respect to such nonpayment by Tenant nor prevent Landlord from exercising all other rights and remedies available to Landlord under this Lease. Landlord shall apply payments made by Tenant first to accrued charges, interest and rent in the following order: (a) Late Charges; (b) interest; (c) Rent; Other Charges and Additional Rent; and (d) any balance remaining to current Rent, Other Charges, and Additional Rent.

## 8.    SECURITY DEPOSIT.

As additional consideration for this Lease, Tenant has delivered to Landlord as a security deposit the sum shown in Section 1.14 above in the form of a letter of credit in accordance with Section 37.22 below.  Such sum shall be held by Landlord as security for the faithful performance by Tenant of all the terms, covenants and conditions of this Lease to be kept and performed by Tenant during the entire Lease Term.  If Tenant is in breach under any provision of this Lease, Landlord may (but shall not be required to) use, apply or retain all or any part of this security deposit for the payment of any rent or any unpaid obligation or sum in default, or for the payment of any amount which Landlord may spend or become obligated to spend by reason of Tenant's breach, or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's breach.  In the event Landlord elects to so use, apply or retain all or any part of the security deposit, Tenant shall within ten (10) days of demand therefor cause the Letter of Credit to be restored in accordance with Section 37.22 below for the amount so used, applied or retained.  Landlord shall not be required to keep the security deposit separate from its general funds and Tenant shall not be entitled to interest on such deposit. If Tenant is not in default, the security deposit or any balance thereof after deductions hereunder by Landlord shall be returned to Tenant (or at Landlord's option, to the last assignee, if any, of Tenant's interest hereunder) within thirty (30) days following expiration of the Lease Term or Tenant's return of the Leased Premises to Landlord in the condition required hereunder, whichever shall last occur. No trust relationship is created hereby between Landlord and Tenant with respect to the security deposit.

## 9.    USES.

### 9.1    Permitted Uses.

Tenant shall use and occupy the Premises only for general office purposes, and uses incidental thereto, consistent with a first class office building (the "Permitted Use"), and for no other business or purpose without the prior written consent of Landlord, which consent may be withheld if Landlord, in its sole discretion, determines that any proposed use is inconsistent with or detrimental to the maintenance and operation of the Building as a first-class office building.

### 9.2    Prohibited Uses.

Tenant shall not do or permit or suffer anything to be done in or about the Leased Premises, Bank of America Building or Bellevue Place which will in any way obstruct or interfere with the rights of other tenants or occupants of the Bank of America Building or Bellevue Place or injure or annoy them, their customers or clients, nor shall Tenant use or allow the Leased Premises to be used for any purpose which is objectionable or offensive in Landlord's reasonable judgment or which is unlawful, nor shall Tenant do or permit or suffer anything to be done in or about the Leased Premises, the Bank of America Building or Bellevue Place which would cause Landlord to be in violation of any recorded restriction applicable to the Leased Premises, Bank of America Building or Bellevue Place.  If Tenant permits or engages in any activity which, in Landlord's reasonable judgment, is objectionable, offensive or otherwise

constitutes a nuisance to Landlord, the other tenants of the Bank of America Building or Bellevue Place, or their employees, customers, guests or invitees, Tenant shall discontinue such activity within twenty-four (24) hours after notice from Landlord, which notice may be provided by email to: operations@freestonemgmt.com, as such email addresses may be change from time to time upon written notice from Tenant to Landlord, or take action to cause the activity to be discontinued with all due diligence if it cannot be immediately discontinued. Tenant's failure to comply with this Section and failure to cure such noncompliance within any applicable cure period shall constitute a material default of this Lease and entitle Landlord to pursue its remedies for such a default or, in the alternative, undertake such work as may be appropriate to prevent such activity and recover, as additional rent, the cost thereof plus interest thereon at four percent (4%) over the prime rate of interest charged or published by Bank of America on the first day of each month, commencing on the date due through the date of payment. Such additional rent shall become due and payable to Landlord ten (10) days following delivery of an invoice for same to Tenant.

### 9.3   **Compliance with Laws, Rules and Regulations.**

Tenant shall, at its sole cost and expense, promptly comply with all local, state and federal laws, statutes, ordinances and governmental rules, regulations or requirements now in force or which may hereafter be in force relating to Tenant's use and occupancy of the Leased Premises and Tenant's business conducted therein.

### 9.4   **Hazardous Material.**

Tenant shall not cause or permit any Hazardous Material, as defined below, to be brought upon, kept or used in or about the Leased Premises by Tenant, its agents, employees, contractors or invitees. If Tenant breaches the obligations stated in the preceding sentence, or if the presence of Hazardous Material on the Leased Premises caused or permitted by Tenant results in contamination of the Leased Premises or any part of Bellevue Place or any other property, or if contamination of the Leased Premises or any part of Bellevue Place or any other property by Hazardous Material otherwise occurs for which Tenant may be legally liable to Landlord for damage resulting therefrom, then Tenant shall indemnify, defend and hold Landlord harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, diminution in value of the property, damages for the loss or restriction on use of rentable or useable space or of any amenity of Bellevue Place or the Leased Premises or elsewhere, damages arising from any adverse impact on marketing of space at Bellevue Place, and sums paid in settlement of claims, attorneys' fees, consultant fees and expert fees) which arise during or after the Lease Term as a result of such contamination. This indemnification of Landlord by Tenant includes, without limitation, costs incurred in connection with any investigation of site conditions or any clean-up, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of Hazardous Material present in the soil or ground water on or under Bellevue Place. Without limiting the foregoing, if the presence of any Hazardous Material brought upon, kept or used in or about the Leased Premises or Bellevue Place by Tenant, its agents, employees, contractors or invitees, results in any contamination of the Leased Premises or any part of Bellevue Place or

any other property, Tenant shall promptly take all actions, at its sole expense, as are necessary to return the Leased Premises, Bellevue Place or any other property to the condition existing prior to the introduction of any such Hazardous Material; provided that Landlord's approval of such actions shall first be obtained, which approval shall not be unreasonably withheld so long as such actions would not potentially have any material adverse long-term or short-term effect on the Leased Premises, Bellevue Place or other property.  As used herein, the term "Hazardous Material" means any hazardous, dangerous, toxic or harmful substance, material or waste which is or becomes regulated by any local governmental authority, the State of Washington or the United States Government.

Notwithstanding the foregoing, without limiting the indemnities set forth above, routine and ordinary restaurant cleaning products, office supply products (such as toner for copiers), and ordinary substances that otherwise would be "Hazardous Materials," as defined herein) may be brought within the Leased Premises without Landlord's consent so long as such products are used in the reasonable and prudent conduct of Tenant's business in the Leased Premises, and are used with due care and in accordance with the instructions of the manufacturer of such products.

Landlord represents and warrants to Tenant that, to Landlord's actual knowledge, the Leased Premises will be delivered to Tenant free of Hazardous Material.  Nothing herein shall be construed to impose liability on Tenant for any contamination of the Leased Premises that occurred prior to the Possession Date or was caused by Landlord's actions or the actions of any previous owner or occupant.  In no event shall Tenant be liable for, and Landlord shall indemnify Tenant from and against, any and all claims, judgments, damages, penalties, fines, costs, liabilities that arise during or after the Lease Term as a result of the presence of Hazardous Materials now existing or hereafter discovered in the Building, provided the presence of said Hazardous Materials is not the result of Tenant's actions or the actions of its agents, employees, contractors, invitees, or other occupants of the Leased Premises.  If Hazardous Materials are discovered in the Leased Premises and are not the result of Tenant's actions or the actions of its agents, employees, contractors, invitees, or other occupants of the Leased Premises, Landlord shall remediate the same and Landlord will, at its sole cost and expense, repair any and all damage to the Leased Premises and to the Premises Improvements resulting from such remediation or contamination.

## 10.    SERVICES AND UTILITIES.

### 10.1    Standard Services.

As long as Tenant is not in default under any of the provisions of this Lease, Landlord shall cause the Leased Premises (in accordance with Section 12.3) and the public and common areas of Bellevue Place, including the lobbies, elevators, stairs, corridors and rest rooms, to be maintained in good order and condition consistent with the operation and maintenance of the Bank of America Building as a first-class office and retail building in downtown Bellevue, except for damage occasioned by any act or omission of Tenant or Tenant's officers, contractors, agents, invitees, licensees or employees, the repair of which shall be paid for by Tenant.  From 7:00 a.m. to 6:00 p.m. on weekdays, excluding legal holidays ("Regular Business Hours"),

Landlord shall furnish the Leased Premises with electricity for lighting and operation of low power usage office machines, water, heat, air conditioning and elevator service (the "Standard Services"). During all other hours, Landlord shall furnish the Standard Services, including elevator service as reasonably required to provide access to the Leased Premises, except for heat and air conditioning and lighting. If requested by Tenant, Landlord shall furnish heat and air conditioning and lighting at times other than Regular Business Hours and the cost of such services, as established by Landlord, shall be paid by Tenant in the same manner as provided in Section 5 above. Landlord also shall provide lamp replacement service for Building Standard fluorescent light fixtures, toilet room supplies, window washing at reasonable intervals and customary building janitorial service as part of the Standard Services, although no janitorial service shall be provided for Saturdays, Sundays or legal holidays. The cost and expense of any janitorial or other services provided or caused to be provided by Landlord to Tenant in addition to the services ordinarily provided Bank of America Building tenants shall be paid by Tenant in the same manner as provided for payment in Section 5 above.

### 10.2    Interruption of Services.

Landlord shall not be liable for any loss, injury or damage to person or property caused by or resulting from any variation, interruption or failure to provide the Standard Services due to any cause whatsoever. No temporary interruption or failure to provide the Standard Services incidental to the making of repairs, alterations, or improvements, or due to accident, strike or conditions or events beyond Landlord's reasonable control shall be deemed an eviction of Tenant or relieve Tenant from any of Tenant's obligations hereunder. Notwithstanding anything in this Section 10.2 to the contrary, but subject to the requirements of any federal, state or local authorities, in the event that any utility service to the Leased Premises is interrupted for three (3) consecutive days or more and provided further that Landlord was the sole cause of said interruption and the remedy for such interruption is exclusively within Landlord's direct control, then in such an event, Tenant shall be entitled to an equitable abatement of Rent during the period of time such utility service is interrupted, reflecting the extent to which the Leased Premises are unusable. Landlord shall exercise all diligent efforts to promptly remedy any utility interruption which remedy is within Landlord's direct or reasonable control, or within the direct or reasonable control of Landlord's employees, agents, or contractors.

### 10.3    Additional Services.

Tenant shall not install lights and equipment in the Leased Premises with heating loads which in the aggregate exceed the Bank of America Building standard mechanical system. Landlord shall not unreasonably withhold consent to Tenant's installation of lights and equipment exceeding such amount but may condition its consent on Tenant's payment of the costs incurred by Landlord for the installation, operation, repair and maintenance of supplementary air conditioning capacity or electrical systems as necessitated by such equipment or lights. In addition, Tenant shall pay to Landlord, in advance, on the first day of each month during the Lease Term, such amount estimated by Landlord to be the cost of furnishing electricity to Tenant for the operation of such equipment or lights and such amount estimated by Landlord to be the cost of operating and maintaining the supplementary air conditioning units as

necessitated by Tenant's use of such equipment or lights. Such costs shall be paid by Tenant and adjusted for any under or overpayment in the same manner as provided in Section 5 above. In the event of nonpayment of amounts due for any of the above-described additional services, Landlord shall have the same rights and remedies as it has with respect to the nonpayment of rent hereunder. Landlord shall be entitled to install and operate, at Tenant's sole cost and expense, a monitoring or metering system in the Leased Premises to measure the added demands on electricity, heating, ventilation, and air conditioning systems resulting from such equipment and lights and from Tenant's after-hours heating, ventilation and air conditioning service requirements. Tenant shall comply with Landlord's instructions for the use of drapes, blinds and thermostats in the Bank of America Building.

## 11.    IMPROVEMENTS, ALTERATIONS AND ADDITIONS.

### 11.1    Acceptance of the Leased Premises.

Tenant has inspected the Leased Premises and accepts the same in their current condition, provided that the Leased Premises shall be delivered broom clean with furniture, equipment, and data cabling removed, and waives the right to make any claim against Landlord for any matter directly or indirectly arising out of the condition of the Leased Premises, appurtenances thereto, the improvements thereon and the equipment thereof. **LANDLORD MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE OR HABITABILITY**

### 11.2    Premises Improvements.

(a)    Commencing on the Possession Date, Tenant will, at Tenant's sole cost and expense (subject to Landlord's Improvement Contribution set forth below), alter and refurbish the Leased Premises with such alterations, additions and improvements that may be approved by Landlord in its reasonable discretion ("Premises Improvements"), which Premises Improvements shall be in compliance with applicable law and in accordance with mutually agreed upon plans and specifications for such improvements (the "Premises Plans"). Tenant shall use commercially reasonably efforts to complete the Premises Improvements on or before the date that is one hundred five (105) days following the Possession Date. The Premises Improvements shall be constructed, installed and performed by design professionals and contractors mutually agreed upon by Landlord and Tenant and no other contractor(s), in accordance with the requirements set forth herein, in Exhibit "D", and such other reasonable rules and regulations applicable to such construction and improvements as may be promulgated by Landlord from time to time. Prior to the commencement of the Premises Improvements, Landlord shall cause JPC Architects' to prepare the initial space plan for the Leased Premises. In addition to Landlord's Improvement Contribution, Landlord agrees to contribute the amount of $0.15 per rentable square foot of the Leased Premises for the initial space plan and revisions prepared by JPC Architects, or a total of Two Thousand Six Hundred Forty-seven and 05/100 Dollars ($2,647.05). Landlord and Tenant shall reasonably cooperate with one another to review and, if necessary, mutually agree to any revisions to the space plan. Unless specifically

acknowledged by Landlord in writing, Landlord's approval of any plans or specifications shall not be deemed or considered to be an express or implied waiver of any requirement or restriction set forth in the Lease, including without limitation Exhibit "D". Landlord shall not impose any supervisory, review, management, or other fees or chargebacks as part of the Premises Improvements, except as may be provided in Exhibit "D".

(b)      Landlord shall pay Forty-eight and 00/100 Dollars ($48.00) per rentable square foot of the Leased Premises, or a total amount not to exceed Eight Hundred Forty-seven Thousand Fifty-six and 00/100 Dollars ($847,056.00) ("Landlord's Improvement Contribution") to be used, except as otherwise provided herein, exclusively for the Premises Improvements (including all sales and other applicable taxes but *not* including furniture, trade fixtures, equipment, inventory, or personal property, which shall be Tenant's sole cost and responsibility). The construction of the Premises Improvements shall be subject to the terms of the Lease and such Premises Improvements shall be finished to the Leased Premises Standard Specifications described in Exhibit "D" to the Lease.

(i)      Landlord shall pay (A) 25% of Landlord's Improvement Contribution after the initial forty-five (45) days from commencement of the Premises Improvements and within thirty (30) days following the receipt by Landlord of a complete payment request ("Tenant's Draw Request"), provided no liens have actually been filed relating to the Premises Improvements that Tenant has not caused to be released through payment or posting of a bond, in accordance with Section 22 of this Lease; (B) 25% of Landlord's Improvement Contribution after ninety (90) days after commencement of construction of Premises Improvements and within thirty (30) days following the receipt by Landlord of Tenant's Draw Request, provided no liens have actually been filed relating to the Premises Improvements that Tenant has not caused to be released through payment or posting of a bond, in accordance with Section 22 of this Lease; and (C) the balance of any unpaid portion of Landlord's Improvement Contribution, as necessary and up to the Landlord's Improvement Contribution amount, upon Landlord's receipt of the final Tenant's Draw Request and all unconditional lien releases from all of the contractors and subcontractors who performed or supplied any labor, materials or equipment relating to the Premises Improvements and any other documents or evidence reasonably requested by Landlord substantiating the amount of expenditures by Tenant for such improvements. Tenant's Draw Request shall be made using the form attached hereto as Exhibit "K" and shall include a copy of all supporting invoices, conditional progress payment lien waivers (in compliance with applicable laws) for labor and materials incorporated in such payment request, and pertinent back-up that is attached to a standard general contractor AIA G702 and G703 payment application. Landlord shall have the right to offset any amount due to Tenant hereunder against any amount due and owing by Tenant under the Lease at the time Landlord's Improvement Contribution is to be paid to Tenant. Should any liens be filed against the Leased Premises or the Bank of America Building or Bellevue Place and said liens are not removed or bonded around according to applicable State law within fifteen (15) days after receipt of written notice from Landlord, Landlord, shall be entitled to pay whatever reasonable costs Landlord may incur to remove said liens and to offset

said costs, including without limitation any reasonable attorney's fees and costs related thereto, against Landlord's Improvement Contribution.

      (ii)    Any and all costs for the construction and installation of the Premises Improvements (including but not limited to the cost of all working drawings, space plans, and engineering, architectural, design and consulting fees) in excess of Landlord's Improvement Contribution shall be Tenant's sole responsibility and shall be paid by Tenant.

      (iii)    The foregoing shall be deemed to be a financial accommodation of the type referenced in 11 USC §365(c)(2) and a material and substantial part of this Lease transaction, as amended.

      (c)    All improvements and fixtures made or installed in or to the Leased Premises are the property of Landlord. The Premises Improvements shall _not_ include, and Tenant shall be solely responsible for, all costs associated with (i) the interior design of the Leased Premises, (ii) security and access control to the Leased Premises, (iii) data, telephone, and similar communications cabling, and (iv) furniture, fixtures and equipment.

### 11.3    Alterations by Tenant

After completion of the Premises Improvements, except for No Consent Alterations (as hereafter defined), Tenant shall not make any subsequent alterations, additions or improvements in, on, or to the Leased Premises without the prior written consent of Landlord, which consent may be subject to such reasonable conditions as Landlord may deem appropriate. Tenant shall submit complete sets of final plans and specifications for all such alterations, additions or improvements to Landlord for approval. Any such alterations, additions or improvements consented to by Landlord shall be made at Tenant's sole cost and expense. Prior to the commencement of any such work, Tenant shall notify Landlord of the contractors that will be retained by Tenant to perform the work. Landlord shall have the right to approve or disapprove in advance any or all contractors to be retained by Tenant for such work. Upon completion of such work, Landlord shall promptly be provided with complete "as built" drawings and specifications for all alterations, additions and improvements made by Tenant. Tenant shall secure all governmental permits, approvals or authorizations required for such work. All alterations, additions and improvements (including but not limited to all attached light fixtures and floor coverings but excluding any inventory, furniture and other personal property which does not become a part of the Leased Premises) shall immediately become the property of Landlord, without any obligation on the part of Landlord to pay therefor, upon installation in the Leased Premises. Upon the expiration or sooner termination of the Lease Term, Tenant shall (i) forthwith remove (at Tenant's sole cost and expense) all alterations, additions or improvements made by Tenant designated by Landlord to be removed at the time of Landlord's written approval of the making of such alterations; and (ii) repair (at its sole cost and expense) any damage to the Leased Premises caused by such removal. Notwithstanding anything herein or elsewhere in this Lease to the contrary, Tenant shall remove all voice and data cabling and other telecommunications equipment installed by Tenant, and shall restore the portions of the Leased Premises housing such telecommunications equipment to the condition they were in prior

to the installation of such items. Tenant's obligations hereunder shall survive the expiration or termination of this Lease.

Notwithstanding anything herein to the contrary, after fifteen (15) days' prior written notice to Landlord, Tenant may, without Landlord's prior written consent, make any decorative, nonstructural, non-mechanical alteration, addition or improvement in, on or to the Leased Premises that (a) does not affect the structural components, exterior, or common areas of the Bank of America Building or Bellevue Place; (b) does not affect any mechanical, sprinkler, electrical or other utility system; (c) is otherwise appropriate for a first class office building; (d) Tenant agrees to remove at the end of the Lease Term if so requested by Landlord; and (e) does not exceed One Hundred Thousand and 00/100 Dollars ($100,000.00) in cost in any twelve (12) month period ("No Consent Alterations").

**11.4    Disability Laws.**

Notwithstanding anything in this Lease to the contrary, if Tenant constructs, makes or installs or causes to be constructed, made or installed any improvement or alteration in or to the Leased Premises, Tenant shall be solely responsible for ensuring that such improvements and/or alterations do not violate any provision in any local, state or federal law or regulation relating to accessibility for handicapped persons or the removal of architectural or communication barriers to accessibility ("Disability Law"), including but not limited to RCW Chapter 70.92 and The Americans with Disabilities Act. Any approval by Landlord of Tenant's plans or specifications for any such improvements or alterations shall not be a representation or warranty, express or implied, by Landlord that such plans will comply with any Disability Law. If any claim is asserted against Landlord under any Disability Law which claim relates directly or indirectly to any alterations or improvements installed, made or constructed, directly or indirect, by or for Tenant in or to the Leased Premises or any trade fixture or personal property item used by Tenant in the Leased Premises, Tenant shall defend, indemnify and hold Landlord harmless from and against the claim and any and all charges, liabilities, obligations, penalties, damages, judgments, costs and expenses (including reasonable attorneys' fees) arising or incurred against or suffered, directly or indirectly, by Landlord relating thereto. If it should be determined that any improvement or alteration constructed, made or installed in or to the Leased Premises, directly or indirectly, by or for Tenant or any trade fixture or personal property item used by Tenant in the Leased Premises is an illegal architectural or communication barrier under any Disability Law, Tenant shall immediately, at its sole cost and expense, remove the barrier or, to the extent allowed by the Disability Law, provide alternatives to the barrier so as to make the Leased Premises accessible to handicapped persons. No alteration or improvement in the Leased Premises will be approved by Landlord if it will require that barriers outside the Leased Premises be removed under any Disability Law. Tenant shall not have any basis for objecting to Landlord's judgment regarding the probable application of any Disability Law provided Landlord acts reasonable.

Notwithstanding anything herein to the contrary, Landlord shall be responsible for compliance with all Disability Laws to the extent they pertain to the Leased Premises as originally delivered to Tenant by Landlord, and/or to the Common Areas and Facilities and Bank

of America Building, unless the need to comply arises out of an improvement or alteration to the Leased Premises or Bank of America Building made by Tenant, in which event Tenant shall be responsible for such compliance. This provision shall not give rise to any right on the part of Tenant to specific performance or to otherwise require compliance by Landlord with any Disability Law except to the extent said right otherwise exists under any relevant Disability Law.

## 12.    MAINTENANCE OF THE PREMISES.

### 12.1    Maintenance and Repair by Tenant.

Other than those repairs required to be made by Landlord pursuant to this Lease, Tenant shall at all times throughout the Lease Term, at its sole cost and expense, keep the Leased Premises (including all exterior doors and entrances, windows and moldings and trim on all doors and windows located in the Leased Premises) and all partitions, door surfaces, fixtures, equipment and appurtenances located in the Leased Premises in good order, condition and repair consistent with a first-class office building, damage by unavoidable casualty and normal wear and tear excepted (but not excluding any damage caused by burglary, attempted burglary or vandalism of the Leased Premises).

### 12.2    Failure to Maintain.

If, after five (5) business days' prior written notice (except in emergencies) from Landlord, Tenant fails to keep, preserve and maintain the Leased Premises as set forth in Section 12.1 above, Landlord may, at its option, put or cause the same to be put in the required condition and state of repair, and in such case, upon receipt of written statements from Landlord, Tenant shall promptly pay the entire cost thereof as additional rent. Subject to Section 15.1 below, Landlord shall have the right to enter the Leased Premises for the purpose of undertaking such work upon the failure of Tenant to do so.

### 12.3    Repair by Landlord.

Landlord shall keep the roof, exterior walls, exterior building windows, public corridors, equipment used in common with other tenants (such as elevators, plumbing, heating, air-conditioning and similar equipment), foundation, and building structure of the Leased Premises in a good state of repair, and shall accomplish such repairs as may be needed promptly after receipt of written notice from Tenant. If repairs are required by reason of Tenant's negligent acts or failure to act, Tenant shall promptly pay Landlord, as additional rent, for the cost thereof. Except as otherwise specifically provided in this Lease, there shall be no abatement of rent and no liability of Landlord by reason of any injury to or interference with Tenant's business arising from the making of any repairs, alterations or improvements in or to any portion of the Leased Premises or building of which the Leased Premises are a part, or in or to fixtures, appurtenances and equipment therein. In no event shall Landlord be liable to Tenant for any damage to the Leased Premises or for any loss, damage or injury to any property therein or thereon resulting from acts by other third parties or occasioned by fire; explosion; falling plaster; the breaking, bursting, stoppage or leaking of water, gas, sewer, electrical cables, wires or steam pipes; or from

water, rain, or other substances leaking or coming from the roof, street, subsurface or from any other place or from dampness or from any similar risks or causes. Landlord shall not be liable for any loss or damage to any person or property sustained by Tenant or any other persons, which may be caused by theft, or by any act or neglect of any tenant or occupant of Bellevue Place, or of any other third parties.

### 12.4   Surrender of Leased Premises.

At the expiration or sooner termination of this Lease, Tenant shall return the Leased Premises to Landlord in the same condition in which it was initially received (or, if altered by Landlord or by Tenant with Landlord's consent, then the Leased Premises shall be returned in such altered condition), reasonable wear and tear and damage by fire or other unavoidable casualty excepted (excluding burglary, attempted burglary and vandalism). Tenant shall remove all inventory, furniture and other personal property which does not become a part of the Leased Premises and all alterations and improvements which Landlord designates to be removed pursuant to Section 11.3 above, and shall restore the Leased Premises to the condition it was in prior to the installation of such items. Tenant's obligations under this Section 12.4 shall survive the expiration or termination of this Lease.

### 13.   INTENTIONALLY OMITTED.

### 14.   DEFAULT BY LANDLORD.

Landlord shall not be in default under this Lease unless Landlord fails to perform the obligations required of Landlord as soon as reasonably practicable, and in any event within thirty (30) days after written notice by Tenant to Landlord and to the holder of all mortgages and deeds of trust covering the Leased Premises whose names and addresses shall have been furnished to Tenant in writing. The notice shall specify wherein Landlord has failed to perform such obligation; provided, however, if the nature of Landlord's obligation is such that more than thirty (30) days are required for performance then Landlord shall not be in default if Landlord commences performance within such thirty (30) day period and thereafter diligently prosecutes the same to completion. Tenant further agrees not to invoke any of its remedies under this Lease until such thirty (30) days have elapsed. In no event shall Tenant have the right to terminate this Lease as a result of Landlord's default and, subject to Section 30, Tenant's remedies shall be limited to damages.

### 15.   ACCESS.

### 15.1   Right of Entry.

Landlord or Landlord's employees, agents, and contractors shall have the right, upon at least twenty-four (24) hours' prior notice (except in the event of an emergency, in which case only such notice as is reasonable under the circumstances (including no notice) shall be required), which notice may be provided by email to: operations@freestonemgmt.com, as such email address may be changed from time to time upon written notice from Tenant to Landlord, to

enter the Leased Premises, to examine the same, and to show the Leased Premises to prospective purchasers or, during the last twelve (12) months of the Lease Term, prospective tenants of the Bank of America Building, and to make such repairs, alterations, improvements or additions to the Leased Premises and/or the Bank of America Building as Landlord may deem necessary or desirable. Landlord shall reasonably coordinate any entry (other than entry in the event of an emergency or other urgent necessity) with Tenant such that Tenant, at Tenant's option, can provide a representative of Tenant to accompany Landlord during its entry; provided, however, that nothing herein shall obligate Landlord to delay entry beyond the applicable notice period provided in this Section 15.1. This provision shall not have the effect of requiring notice prior to Landlord's or Landlord's agent's entry for the performance of routine and customary janitorial services within the Leased Premises. In the event Landlord requires access to the Leased Premises for the purposes set forth in this Section 15.1, Landlord shall take reasonable steps to minimize any interference with Tenant's use of the Leased Premises.

### 15.2   Excavation.

If an excavation is made of property adjacent to the Leased Premises, Tenant shall and does hereby afford to the person causing or authorized to cause such excavation, an irrevocable license to enter upon the Leased Premises for the purpose of doing such work as Landlord shall deem necessary to preserve the wall of the building of which the Leased Premises are a part from injury or damage and to support the same by proper foundations or other means, without any claim for damages against Landlord or diminution or abatement of rent.

## 16.   DAMAGE OR DESTRUCTION.

### 16.1   Insured Loss.

Subject to Section 16.2, if the Leased Premises are damaged by perils covered by Landlord's insurance coverage and the proceeds therefrom are sufficient to cover the cost of repairs and are made available to Landlord for the purpose of repairing such damage, Landlord agrees to forthwith repair the same, and this Lease shall remain in full force and effect; provided, however, Landlord shall not be required to repair or replace any of Tenant's supplies, inventory, furniture, furnishings, fixtures, or equipment, or any improvements, additions, or modifications to or in the Leased Premises, and Landlord's obligations shall be subject to any governmental requirements or requirements of Landlord's lender and such lender's right to control, apply or withhold such insurance proceeds; provided further, however, Tenant shall be entitled to a proportionate reduction of Rent and Other Charges from the date of damage until the earlier of (i) the end of the Restoration Period, or (ii) Tenant's recommencement of ordinary business operations in the Leased Premises after such repairs. Such proportionate reduction shall be based upon the rentable square footage of the untenantable portion of the Leased Premises. The "Restoration Period" shall mean that period of time, not to exceed four (4) months, reasonably required (considering all relevant circumstances, including the scope of the damage and the extent of the reconstruction required) to allow Tenant to reconstruct or repair any alterations, additions or improvements that are damaged or destroyed, commencing upon delivery of the Leased Premises by Landlord following Landlord's repair work pursuant to this Section 16.1.

### 16.2    Uninsured Loss.

If the Leased Premises are damaged as a result of any cause other than the perils covered by Landlord's insurance coverage or if the insurance proceeds are not sufficient to cover the cost of repairs, Landlord shall forthwith repair the same provided the cost of repair is less than ten percent (10%) of the then replacement cost of the Leased Premises, and the Rent and Other Charges shall be proportionately reduced as provided in Section 16.1 above.  If the Leased Premises are damaged as a result of a cause other than a peril covered by Landlord's insurance coverage, or if the insurance proceeds from Landlord's insurance are not made available to Landlord for the purpose of repairing the Leased Premises, or, if the cost of repair is equal to or greater than ten percent (10%) or more of the replacement cost of the Leased Premises, then Landlord shall have the option to (i) repair or restore such damage, in which event this Lease shall continue in full force and effect but the Rent and Additional Rent shall be proportionately reduced as provided in Section 16.1 above; or (ii) at any time within one hundred twenty (120) days after such damage give notice to Tenant of the termination of this Lease as of the date specified in such notice, which date shall not be less than thirty (30) days after the date of such notice.  If such notice is given, this Lease shall terminate and all interest of Tenant in and to the Leased Premises shall end on the date so specified in such notice and the Rent and Additional Rent, reduced by a proportionate reduction, based upon the extent, if any, to which such damage materially interfered with the business carried on by Tenant in the Leased Premises, shall be paid up to date of such termination.

### 16.3    No Obligation.

Notwithstanding anything to the contrary contained in this Section 16, Landlord shall not have any obligation whatsoever to repair, reconstruct or restore the Leased Premises when the damage resulting from any casualty occurs during the last eighteen (18) calendar months of the Lease Term.

### 16.4    Partial Destruction of the Bank of America Building.

If thirty percent (30%) or more of the Rentable Area of the Bank of America Building is damaged, notwithstanding that the Leased Premises may be unaffected, Landlord may terminate this Lease and the tenancy hereby created by giving Tenant not less than thirty (30) days' prior written notice of Landlord's election to terminate the tenancy; provided, however, that such notice shall be given, if at all, within one hundred twenty (120) days following the date of occurrence of such damage or destruction.  Rent and Additional Rent shall be prorated as of the date of such termination.

### 16.5    Business Interruption.

Except to the extent otherwise expressly provided in this Lease, no damages, compensation or claims shall be payable by Landlord for inconvenience, loss of business, or annoyance arising from any repair or restoration of any portion of the Leased Premises or of the Bank of America Building.  Landlord shall use reasonable efforts to effect such repairs promptly.

## 17.    MUTUAL RELEASE AND WAIVER OF SUBROGATION.

Landlord and Tenant hereby mutually release each other from liability, and waive all right of recovery against each other, for any injury, loss or damage to any building, structure, inventory or other tangible property and any revenues, profit and rents to be generated therefrom, whether due to negligence or any other insured cause, if such injury, loss or damage is caused by any of the perils which are covered by a first-party insurance policy benefiting the party suffering such injury, loss or damage, or if such injury, loss or damage was required to be covered by insurance pursuant to this Lease; provided that this Section shall be inapplicable if it would have the effect, but only to the extent it would have the effect, of invalidating any insurance coverage of Landlord or Tenant. This Waiver only applies to insured property losses and does not limit the ability to recover for deductibles or other uninsured losses. Landlord and Tenant acknowledge that their current insurance policies, as of the date of this Lease, will not be invalidated. In the future, if avoiding any invalidation can be effected by the payment of money to such insurer, the other party may elect to pay such amount to obtain such waiver of subrogation for its benefit. Landlord and Tenant, respectively, shall promptly notify the other if its insurance will be invalidated by the foregoing release and waiver or if any payment is required to avoid such invalidation. Notwithstanding anything to the contrary, this Section shall not apply to any claim by Landlord for any Rent, Additional Rent or Other Charges payable under this Lease. Landlord and Tenant specifically intend, however, that this Section shall apply to any potential claim that could otherwise be made by Landlord for any rents to be paid by other occupants of Bellevue Place or any claim that could potentially be made by Tenant for any lost sales, profits or revenues that could have been generated from or operating expenses related to the Leased Premises or elsewhere.

## 18.    INDEMNITY.

### 18.1    Indemnification by Tenant.

Subject to Section 17 above, Landlord shall not be liable for the loss of or damage to any property (including property of Tenant and others) occurring in or about the Leased Premises from any cause whatsoever. Landlord shall not be liable for injury to any person occurring in or about the Leased Premises except and to the extent that such injury is caused by the negligence or willful misconduct of Landlord or its employees, agents, or contractors (collectively, "Landlord Parties"). Subject to Section 17 above, except to the extent an injury to any person is caused by the negligence of the Landlord Parties, Tenant shall defend, indemnify and hold Landlord harmless from and against any and all claims, charges, liabilities, obligations, penalties, damages, costs and expenses (including reasonable attorneys' fees) arising, claimed, charged or incurred against or by Landlord from any matter or thing arising from Tenant's use of the Leased Premises, the conduct of its business or from any activity, work or other things done, permitted or suffered by the Tenant in or about the Leased Premises, and Tenant shall further indemnify and hold Landlord harmless from and against any and all claims arising from any breach or default in the performance of any obligation on Tenant's part or to be performed under the terms of this Lease, or arising from any act or negligence of Tenant, or any officer, agent, employee, guest, or invitee of Tenant, and from all costs, reasonable attorneys' fees, and liabilities incurred

in or about the defense of any such claim or any action or proceeding brought thereon. If any action or proceeding is brought against Landlord by reason of such a claim, Tenant, upon notice from Landlord, shall defend the same at Tenant's expense by legal counsel reasonably satisfactory to Landlord.

### 18.2    Concurrent Negligence of Landlord and Tenant Relating to Construction, Repair and Maintenance Activities.

Notwithstanding Section 18.1 above, in the event of concurrent negligence of Tenant, its agents, employees, sublessees, invitees, licensees or contractors on the one hand, and that of Landlord, its partners, agents, employees or contractors on the other hand, which concurrent negligence results in injury or damage to persons or property and relates to the construction, alteration, repair, addition to, subtraction from, improvement to or maintenance of the Leased Premises or Bellevue Place, Tenant's obligation to indemnify Landlord as set forth in this Section 18 shall be limited to the extent of Tenant's negligence, and that of its agents, employees, sublessees, invitees, licensees or contractors, including Tenant's proportional share of costs, and attorneys' fees and expenses incurred in connection with any claim, action or proceeding brought with respect to such injury or damage.

### 18.3    Waiver of Workers' Compensation Immunity.

The indemnification obligations contained in this Lease shall not be limited by any workers' compensation, benefit or disability laws, and each indemnitor hereby waives any immunity that said indemnitor may have under the Industrial Insurance Act, Title 51 RCW and similar workers' compensation, benefit or disability laws.

### 18.4    Acts of Others.

Landlord shall not be responsible or liable to Tenant, or to those claiming by, through or under Tenant, for any loss or damage which may be occasioned by or through the acts or omissions of third parties or persons occupying space adjoining the Leased Premises or any part of the Leased Premises or any other part of the Bank of America Building and Bellevue Place. In addition, Landlord shall not be responsible or liable to Tenant for any loss or damage resulting to Tenant, or those claiming by, through or under Tenant, or any of its property, from fire; explosion; falling plaster; the breaking, bursting, stoppage or leaking of water, gas, sewer, electrical cables, wires or steam pipes; or from water, rain or other substances leaking or coming from the roof, street, subsurface or from any other place or from dampness or from any similar risks or causes (in each case unless caused by Landlord's negligence or willful misconduct, subject to the waiver of subrogation set forth in Section 17 above). Landlord shall not be liable for any loss or damage to any person or property sustained by Tenant or any other persons, which may be caused by theft, or by any act or neglect of any tenant or occupant of the Bank of America Building, Bellevue Place, or of any other third parties.

**18.5    Provisions Specifically Negotiated.**

LANDLORD AND TENANT ACKNOWLEDGE BY THEIR EXECUTION OF THIS LEASE THAT EACH OF THE INDEMNIFICATION, RELEASE AND WAIVER PROVISIONS OF THIS LEASE (SPECIFICALLY INCLUDING BUT NOT LIMITED TO THOSE RELATING TO WORKERS' COMPENSATION BENEFITS AND LAWS) WERE SPECIFICALLY NEGOTIATED AND AGREED TO BY LANDLORD AND TENANT.

**18.6    Indemnification by Landlord.**

Subject to Section 17 above, Landlord shall defend, indemnify and hold Tenant harmless from and against all claims, charges, suits, actions, obligations, penalties, damages, costs and expenses (including reasonable attorneys' fees), or liabilities for personal injury or death which arises in or about the Leased Premises or Bellevue Place, but only to the extent the injury results from the negligent acts or omissions of Landlord Parties. This indemnity does not apply to claims, suits, actions or liabilities (i) to the extent they are attributable to the negligent acts or omissions or willful misconduct of Tenant, its agents, employees, contractors or invitees, or (ii) to damage, claims, suits, actions or liabilities waived under Section 17 of the Lease. Tenant shall, in good faith, notify Landlord in writing within a reasonable period of time of circumstances wherein a claim may be made against Tenant and Landlord would be required to indemnify Tenant with respect to such claim, if Tenant has reason to believe that Landlord is not aware of the circumstances surrounding such potential claim.

**19.    INSURANCE.**

**19.1    Liability Insurance.**

(a)    <u>Liability Insurance</u>.  Tenant shall, at its own cost and expense, keep and maintain in full force and effect during the Lease Term, a policy of comprehensive/commercial general liability insurance on an occurrence form, including but not limited to premises and operations; blanket contractual; products/completed operations; owner's and contractor's protective; employer's contingent liability or stop gap; personal injury insuring Tenant's activities with respect to the Leased Premises, Bank of America Building and Bellevue Place against claims of loss, damage or liability for personal injury or death or loss or damage to property with a limit of not less than Two Million Dollars ($2,000,000) combined single limit for policies without a general aggregate limit. For policies with a general aggregate limit, such aggregate limit shall be not less than Two Million Dollars ($2,000,000) and include an endorsement providing that the foregoing limit shall apply per location, including the Leased Premises, and have an occurrence limit not less than Two Million Dollars ($2,000,000). In the event Tenant obtains a policy with a general aggregate limit, Tenant shall immediately notify Landlord if claims covered by such policy or policies at any time are made against Tenant which claims exceed fifty percent (50%) or more of the aggregate limit. Notwithstanding the foregoing, if during the Lease Term, in Landlord's reasonable judgment, the policy limits required hereunder are no longer adequate to provide reasonable protection to Landlord, Landlord may notify Tenant of such inadequacy and an appropriate level of coverage and Tenant, within thirty (30) days of

receiving such a notice, shall obtain such additional amounts of insurance and provide Landlord with satisfactory evidence thereof. Reference may be made to policy amounts required by other landlords for similar space and operations in the vicinity of Bellevue Place in determining what is reasonable protection hereunder. The insurance required under this Section shall be with companies rated A-VII or better in A.M. Best's Insurance Guide. The insurance policy shall contain a provision that such policy and the coverage evidenced thereby shall be primary and noncontributing with respect to any policies carried by Landlord, and that any coverage carried by Landlord shall be excess insurance. Landlord, Kemper Development Company, and any other parties in interest designated by Landlord, shall be named as additional insureds. The insurance policy shall bear an endorsement that the policy shall not be cancelled, materially changed, or fail to be renew the coverage provided by such policy without first giving Landlord forty-five (45) days' prior written notice to Landlord and only after ten (10) days' prior written notice for non-payment of premiums. Tenant shall deliver to Landlord upon the Commencement Date and from time to time thereafter as requested by Landlord copies of all certificates of insurance thereof, including applicable endorsements, evidencing the coverage required by this Section 19 and showing Landlord as an additional insured and the applicable policy limits thereof. In no event shall the limits of such policies be considered as limiting the liability of Tenant under this Lease. Additional insureds shall be for all limits carried, not just the minimums contained herein.

(b)    Service of Alcoholic Beverages. If Tenant serves, distributes or sells any alcoholic beverages, the insurance to be carried by Tenant pursuant to Section 19.1(a) above shall not exclude liability for violation of any governmental statute, ordinance, regulation or rule pertaining to the sale, gift, distribution or use of any alcoholic beverages, or liability by reason of the selling, serving or giving of any alcoholic beverage to a minor or to a person under the influence of alcohol or any other person, or which causes or contributes to the intoxication of any persons. Accordingly, the indemnification obligations in Section 18 of this Lease shall extend, as well, to damages occurring at locations other than the Leased Premises and resulting from risks insurable by any of the following (i) so-called dram shop liability insurance, (ii) host liquor liability insurance or (iii) liquor legal liability insurance; or (iv) insurance otherwise related to the sale, gift, distribution or use of alcoholic beverages, with limits in the amount of not less than Three Million Dollars ($3,000,000) per occurrence.

**19.2    Property Insurance.**

In addition to the insurance required by Sections 19.1 and 19.2, Tenant shall, at its own cost and expense, keep and maintain in full force and effect during the Lease Term, property insurance covering Tenant's supplies, inventory and other personal property as well as all improvements, additions and modifications to or in the Leased Premises, in an amount equal to full replacement cost without co-insurance penalty, insuring special form perils. The insurance policy shall bear an endorsement that the policy shall not be canceled or the policy limits reduced below the coverage required by this Lease for any reason other than non-payment of premiums, except upon forty-five (45) days' prior written notice to Landlord and only after ten (10) days' prior written notice to Landlord for non-payment of premiums. Tenant shall deliver to Landlord

upon the Commencement Date and from time to time thereafter as requested by Landlord copies of all policies of such insurance or certificates thereof showing Landlord as a loss payee.

### 19.3    Other Insurance.

(a)    <u>Workers Compensation Insurance</u>. Tenant shall maintain all required coverages including employer's liability at a limit of not less than Two Million Dollars ($2,000,000).

(b)    <u>Automobile Liability</u>. Tenant shall maintain automobile liability for all owned, non-owned and hired autos at a limit of not less than Two Million Dollars ($2,000,000) per accident, showing Landlord and Kemper Development Company as additional insureds and the applicable policy limits thereof.

### 19.4    Failure to Maintain.

If Tenant fails or refuses to maintain any insurance required by this Section 19, Landlord, at its discretion, may obtain and maintain such insurance in such amounts as required under this Lease and any and all premiums paid or payable by Landlord therefor shall be deemed to be additional rent and shall be due on the payment date of the next installment of Rent hereunder. The failure to obtain or maintain any insurance required by this Section 19 or Tenant's failure to reimburse Landlord for obtaining or maintaining any insurance required of Tenant under this Section 19 that continues for three (3) days after notice from Landlord shall constitute a material breach of this Lease.

### 19.5    Increase in Insurance Premium.

Notwithstanding anything in this Lease to the contrary, Tenant shall not keep, use, sell or offer for sale in or upon the Leased Premises any article, nor conduct any activities or operations, which are or may be prohibited by Landlord's insurance carriers. Tenant shall pay any increase in premiums for property or liability insurance maintained by Landlord resulting from Tenant's use or occupancy of the Leased Premises, whether or not Landlord has consented thereto. In the event of such increased insurance premiums to Landlord, Tenant also shall pay immediately to Landlord an amount equal to any additional premium on the insurance policy or policies that Landlord may carry for its protection against loss resulting from any insured event. In determining whether increased premiums are the result of Tenant's use or occupancy of the Leased Premises, the rates and premiums determined by the organization setting the insurance premiums shall be conclusive evidence of the several items and charges which make up the insurance premiums. Landlord shall deliver bills for such additional amounts to Tenant at such times as Landlord may elect, and Tenant shall immediately pay Landlord therefor. Notwithstanding the foregoing, Landlord agrees that Tenant's use of the Leased Premises (i) in accordance with the Permitted Use and Section 9 above, and (ii) in a commercially reasonable and good-faith manner, shall not be prohibited by Landlord's insurance carriers or require Tenant to make payment under this subsection.

### 19.6   Tenant Contractor.

Tenant's contractor shall, at its own cost and expense, keep and maintain in full force and effect, a policy of comprehensive/commercial general liability insurance on an occurrence form, including but not limited to premises and operations; blanket contractual; products/completed operations; owner's and contractor's protective; employer's contingent liability or stop gap; personal injury insuring contractor's activities with respect to the Leased Premises, the Bank of America Building, or Bellevue Place against claims of bodily injury or death or property damage or loss, with a limit of not less than Three Million Dollars ($3,000,000) per occurrence and in the general aggregate and include an endorsement providing that the foregoing limit shall apply per project, including the Tenant's Leased Premises. Any and all self-insured retentions or liability deductibles require prior written approval by Landlord. In the event contractor obtains a policy with a general aggregate limit, contractor shall immediately notify Landlord if claims covered by such policy or policies at any time are made against contractor which claims exceed fifty percent (50%) or more of the aggregate limit.

Notwithstanding the foregoing, if during the Lease Term, in Landlord's reasonable judgment, the policy limits required hereunder are no longer adequate to provide reasonable protection to Landlord, Landlord may notify contractor of such inadequacy and an appropriate level of coverage and contractor, within thirty (30) days of receiving such a notice, shall obtain such additional amounts of insurance and provide Landlord with satisfactory evidence thereof. Reference may be made to policy amounts required by other landlords for similar space and operations in the vicinity of Bellevue Place in determining what is reasonable protection hereunder. Contractor shall maintain all required Workers Compensation coverages including employer's liability at a limit of not less than Three Million Dollars ($3,000,000). Contractor shall maintain automobile liability for all owned, non-owned and hired autos at a limit of not less than Three Million Dollars ($3,000,000) per accident. The insurance required under this Section shall be with companies rated A-VII or better in A.M. Best's Insurance Guide. This insurance shall be primary and non-contributing in nature to Landlord's insurance. Landlord, Kemper Development Company, and any other parties in interest designated by Landlord, shall be named as additional insureds. Subcontractor agrees to waive all rights of subrogation against all parties required to be named as additional insureds and such policies shall contain a waiver of subrogation in favor of all parties required to be named as additional insureds. The insurance policy shall bear an endorsement that the policy shall not be cancelled or the policy limits reduced by endorsement below the coverage required by this Lease for any reason other than nonpayment of premiums except upon forty-five (45) days' prior written notice to Landlord and only after ten (10) days' prior written notice for non-payment of premiums. Contractor shall deliver to Landlord upon the Commencement Date and from time to time thereafter as requested by Landlord, copies of all policies of such insurance or certificates thereof showing Landlord and Kemper Development Company as additional insureds and the applicable policy limits thereof. In no event shall the limits of such policies be considered as limiting the liability of contractor under this Lease.

Coverage as required by this Section 19 may be provided by supplementing contractor's commercial general liability, liquor liability, auto liability, employer's liability insurance policy(ies) with an umbrella or excess liability policy (provided that (i) such umbrella or excess liability policy of insurance includes Landlord and Kemper Development Company as additional insureds thereunder, (ii) the coverage afforded Landlord will not be reduced or diminished by reason of the use of such umbrella or excess liability policy and (iii) coverage is at least as broad as the underlying coverage.

## 20.    ASSIGNMENT AND SUBLEASING.

### 20.1    Assignment or Sublease.

Tenant shall not assign, transfer, mortgage, pledge, hypothecate, encumber or otherwise transfer this Lease or any interest therein, nor sublease the whole or any part of the Leased Premises, nor shall this Lease or any interest hereunder be assignable or transferable by any process or proceeding of any court, or otherwise, without in each case first obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed. Except for a Permitted Transfer as provided in Section 20.7 below, any such transaction undertaken without Landlord's prior written consent shall be null and void.

Landlord shall approve or disapprove any requested transfer within ten (10) business days after receipt of a written request from Tenant that includes all information required in connection with such requested Transfer by this Section 20.1 and states in **BOLD** and **ALL CAPITAL** letters, in a minimum 14-point font, the following:

> **PURSUANT TO THE TERMS OF THE LEASE, IF LANDLORD FAILS TO RESPOND TO THIS REQUEST WITHIN TEN (10) BUSINESS DAYS AFTER LANDLORD'S RECEIPT HEREOF, LANDLORD SHALL BE DEEMED TO HAVE CONSENTED TO THIS REQUEST.**

In determining whether to grant consent to Tenant's sublease, assignment, or transfer request, Landlord may consider any factor, including but not limited to the experience and business reputation of the proposed assignee, sublessee, or transferee in operating a business for the uses set forth in the Lease; notwithstanding that Tenant and/or others remain liable under the Lease, whether the proposed assignee, sublessee, or transferee has a net worth, and financial strength and credit record, reasonably satisfactory to Landlord; that the use of the Leased Premises by the proposed assignee, sublessee, or transferee must be identical to the use permitted by the Lease; that the use of the Leased Premises by the proposed assignee, sublessee, or transferee will not violate any laws; and whether Landlord's consent might result in a breach of any other lease or agreement to which Landlord is a party.

No assignment, sublease or other transfer shall relieve Tenant of any liability under this Lease. The prohibition set forth in this Section 20 includes, without limitation (and the following shall be deemed to be "assignments"): (i) a consolidation or merger of Tenant; (ii) a change in the ownership or voting rights of more than forty-nine percent (49%) of the issued and outstanding stock of any corporate tenant; (iii) any sublease, assignment or transfer which would otherwise occur by operation of law, merger, consolidation, reorganization, transfer or other significant change in corporate or proprietary structure; (iv) the sale, assignment or transfer of all or substantially all of the assets of Tenant, with or without the specific assignment of this Lease; and (v) a change in control in any partnership tenant. The acceptance by Landlord of any amounts following any transaction prohibited hereunder shall not be deemed to be a consent by Landlord nor shall the same be deemed to be a waiver of any right or remedy of Landlord hereunder. Consent to any such assignment, sublease or other transfer shall not operate as a waiver of the necessity for consent to any subsequent assignment, sublease or transfer. If Landlord's consent is requested for an assignment, sublease or transfer of all or a portion of the Leased Premises, Landlord shall have the right to terminate this Lease with respect to that portion of the Leased Premises for which such consent is requested, at the proposed effective date of such assignment, sublease or transfer, and enter into the relationship of Landlord and Tenant with the proposed assignee, subtenant, or transferee based on the rent (and/or other compensation) and term agreed to by such assignee, subtenant or transferee and otherwise upon the terms and conditions of this Lease, unless Tenant agrees not to enter into the proposed assignment, sublease or transfer upon being advised by Landlord of Landlord's intention to terminate this Lease hereunder and so notifies Landlord in writing within ten (10) business days of being advised by Landlord that Landlord intends to terminate this Lease hereunder. In connection with any sublease, assignment or transfer, Tenant shall promptly provide Landlord with fully executed copies of all assignment, sublease and assumption instruments.

Notwithstanding anything herein to the contrary, the prior written consent of Landlord shall not be required for (i) any public offering of stock in Tenant or public sale of stock of Tenant traded through a national or international stock exchange, such as AMEX, NYSE, or NASDAQ, (ii) a private offering of Tenant's stock, so long as any such private offering is made for the primary purpose of raising additional capital and does not result in any material change in the management and operations of Tenant (and for the avoidance of doubt, change of individual managers or officers in the ordinary course of business shall not constitute such a material change), or (iii) the direct transfer of a controlling interest of Tenant to or between institutional investors where such investor is a major banking institution, insurance company, venture arm of a Fortune 100 company, pension fund, money management firm, private equity fund, venture capital fund, or an asset management fund, provided any such institutional investor has a net worth in excess of $100,000,000.00.

**20.2    Assignee Obligations.**

As a condition to Landlord's consent, any potential assignee otherwise approved by Landlord shall expressly assume all existing and future obligations of Tenant under this Lease

and shall be jointly and severally liable with Tenant for the payment of Rent, Additional Rent, Other Charges and the performance of all terms, covenants and conditions of this Lease.

### 20.3    Sublessee Obligations.

As a condition to Landlord's consent, any potential sublessee otherwise approved by Landlord shall expressly assume all existing and future obligations of Tenant under the Lease during the term of the sublease and shall be jointly and severally liable with Tenant for the payment of Rent, Additional Rent, and Other Charges, and the performance of all terms, covenants, and conditions of this Lease.

### 20.4    Conditional Consents.

Any consent by Landlord to any assignment or subleasing may be subject to any reasonable terms or conditions as Landlord shall determine appropriate (including but not limited to requiring that any and all guarantors of the Lease agree to continue to guarantee the Lease obligations after the assignment) and all such terms and conditions shall be binding upon any person holding by, under or through Tenant.

### 20.5    Attorneys' Fees and Costs.

Tenant shall reimburse Landlord for Landlord's reasonable attorneys' fees and costs incurred in conjunction with the processing and documentation of any such requested transfer, assignment, subleasing or encumbrance, up to a maximum aggregate amount of $5,000 per proposed transfer.

### 20.6    Excess Rent.

Tenant shall pay Landlord one hundred percent (100%) of all rent and other consideration that Tenant receives as a result of an assignment, sublease, or transfer that is in excess of the Rent payable to Landlord for the portion of the Leased Premises and Lease Term covered by the assignment, sublease, or transfer. Tenant shall pay Landlord for Landlord's share of any excess within thirty (30) days after Tenant's receipt of such excess consideration. Tenant may deduct from the excess all reasonable and customary expenses directly incurred by Tenant attributable to the assignment, sublease, or transfer (other than Landlord's processing and documentation fee provided in Section 20.5 above), including without limitation, brokerage fees, legal fees and construction costs. If Tenant is in default beyond applicable cure periods (defined in Section 23.1 below), Landlord may require that all such payments be made directly to Landlord, in which case Tenant shall receive a credit against Rent in the amount of any payments received (less Landlord's share of any excess).

### 20.7    Permitted Transfers.

Notwithstanding anything herein to the contrary, without Landlord's consent, Tenant may assign its entire interest under this Lease (in each case a "Permitted Transfer") to:

(a)     A successor to Tenant by purchase, merger, consolidation, hypothecation of any ownership interest in Tenant or reorganization without the consent of Landlord ("Merger"), provided that all of the following conditions are satisfied : (1) Tenant is not in default under this Lease beyond the applicable notice and cure period; (2) Tenant's successor shall own all or substantially all of the assets of Tenant; (3) Tenant's successor shall have a tangible net worth (as determined by generally accepted accounting principles) of $30,000,000.00 or more; (4) the use by the successor to Tenant is consistent with the Permitted Use; and (5) Tenant shall give Landlord written notice at least thirty (30) days after the effective date of the proposed purchase, merger, consolidation or reorganization.

(b)     An Affiliate of Tenant (defined below), subject to the requirements of this Lease, provided that all of the following conditions are satisfied: (1) the provisions of this Section shall be applicable only during such time as the entity to whom the Lease has been assigned remains an Affiliate of Tenant; (2) such Affiliate does not intend to, and will not, use the Leased Premises other than for the Permitted Use; and (3) Tenant shall give Landlord at least thirty (30) days' written notice before the effective date of the assignment. As used herein, "Affiliate" means any corporation, partnership, limited liability company, limited liability partnership or person (collectively, for the limited purpose of this subsection (b), referred to as "Person") that directly or indirectly controls or is directly or indirectly controlled by Tenant and any Person that is controlled by the same Person that controls Tenant. The terms "controls" and "controlled by" shall mean the ownership of and the right to vote more than 50% of the voting interest in the controlled Person. Tenant shall give Landlord thirty (30) days' prior written notice if the Affiliate to whom this Lease is assigned will no longer be the Affiliate of Tenant. In the event the Affiliate at the time of an assignment permitted by this Subsection 20.7(b) no longer qualifies as an Affiliate as the result of a subsequent transaction without Landlord's prior written consent, then such subsequent transaction shall become, at Landlord's sole option, an assignment subject to the terms of this Section 20. In the event a former Affiliate continues to operate or control any portion of the business in the Leased Premises after such Person is no longer the Affiliate of Tenant, then such event shall constitute a material and substantial default under the Lease, except to the extent that Tenant has complied with the provisions of this Section 20 governing transfers that are not Permitted Transfers.

Tenant's notice to Landlord shall include information and documentation showing that each of the above conditions, to the extent applicable, has been satisfied. If requested by Landlord, Tenant and Tenant's successor shall provide a commercially reasonable form of assignment and assumption agreement to Landlord. The provisions of Section 20.1 above shall apply and Tenant or any guarantor shall not be released from primary liability to Landlord under the Lease by virtue of any actions taken pursuant to this Section 20.7 but shall remain continually and directly liable to Landlord for the full and complete, prompt payment and performance of all obligations under this Lease.

## 21.    ADVERTISING.

Tenant shall not inscribe any inscription, or post, place, or in any manner display any sign, awning, canopy, marquee, decoration, graphics, notice, picture, placard or poster, or any

advertising matter whatsoever, anywhere in or about the Leased Premises or the Bank of America Building at places visible (either directly or indirectly as an outline or shadow on a glass pane) from anywhere outside the Leased Premises without first obtaining Landlord's written consent thereto, such consent to be at Landlord's sole discretion. Any such consent by Landlord shall be upon the understanding and condition that Tenant shall remove the same at the expiration or sooner termination of this Lease and Tenant shall repair any damage to the Leased Premises or the Bank of America Building caused thereby. All such signs and advertising matter shall comply with all applicable laws, governmental regulations, ordinances and orders.

## 22.    LIENS.

No work performed by Tenant pursuant to this Lease shall be deemed to be for the immediate use and benefit of Landlord so that no mechanic's, materialmen's or other liens shall be allowed against the estate of Landlord by reason of any consent given by Landlord to Tenant to improve, alter or repair the Leased Premises. Tenant shall keep the Leased Premises, the Bank of America Building and Bellevue Place free and clear of all liens and encumbrances arising out of any work performed for, materials furnished to and obligations incurred by or on behalf of Tenant and Tenant shall indemnify and hold Landlord harmless from any liability from any and all costs, liabilities and expenses (including but not limited to reasonable attorneys' fees and Landlord's reasonable administrative costs and expenses) arising therefrom. Prior to commencing any improvement, alteration or repair work to the Leased Premises, Tenant shall provide to Landlord, at Tenant's sole cost and expense, separate payment and performance bonds for such work and materials in an amount equal to either (i) the actual contract price if the contract price is fixed, or (ii) one and one-half (1-1/2) times the estimated cost of the improvements, alterations or repairs which Tenant desires to make within the Leased Premises if the contract price is not fixed. Such bonds shall cover the faithful performance of the contract and payment of all obligations arising therefrom and insure Landlord against any and all liability for mechanics' and materialmen's liens and other similar liens and insure the completion of such work. If any lien is filed against the Bank of America Building, Bellevue Place or the Leased Premises by any person claiming by, through or under Tenant, Tenant shall, at Tenant's sole cost and expense, within fifteen (15) days after receipt of written notice from Landlord, discharge the same or furnish to Landlord a bond in form and amount and issued by a surety satisfactory to Landlord, indemnifying Landlord against all liability, costs and expenses, including but not limited to reasonable attorneys' fees, which Landlord may incur, directly or indirectly, as a result thereof and Landlord's reasonable administrative costs and expenses. If Tenant shall fail to cause such lien to be discharged of record or bonded, then, in addition to any other right or remedy of Landlord, Landlord may bond or discharge the same by paying the amount claimed to be due, and the amount so paid by Landlord, including any reasonable attorney's fees incurred by Landlord in defending against such lien or in procuring its discharge of record, shall be due and payable by Tenant as additional rent.

23.    **TENANT'S DEFAULT.**

23.1    **Default.**

The following shall constitute defaults of this Lease by Tenant:

(a)    <u>Intentionally omitted</u>.

(b)    <u>Failure to Pay Rent</u>. Tenant's failure to make any payment of Rent, Additional Rent or Other Charges, or any other payment required to be made by Tenant hereunder, as and when due, where such failure shall continue for a period of five (5) days after written notice thereof by Landlord to Tenant.

(c)    <u>Failure to Perform</u>. Tenant's failure to observe or perform any of the covenants, conditions or provisions of this Lease to be observed or performed by Tenant where such failure continues for a period of fifteen (15) days (except as otherwise provided in this Lease) after written notice thereof by Landlord to Tenant; provided, however, that if the nature of Tenant's failure is such that more than fifteen (15) days are required for its cure, Tenant shall not be deemed to be in default under this Section 23.1(c) if Tenant commences such cure within such fifteen (15) day period and thereafter diligently prosecutes such cure to completion.

(d)    <u>Bankruptcy</u>. The making by Tenant of any general assignment or general arrangement for the benefit of creditors; or the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt, or a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within sixty (60) days of filing); or the appointment of a trustee or a receiver to take possession of substantially all of Tenant's assets located at the Leased Premises or of Tenant's interest in this Lease, where such seizure is not discharged in thirty (30) days after appointment of such trustee or receiver, or the filing of the petition for the appointment of the same, whichever shall first occur.

(e)    <u>Repeated Defaults</u>. Tenant's failure to perform or observe any of Tenant's obligations under the Lease after Tenant has neglected or failed to perform or observe any of Tenant's obligations under the Lease at least twice previously (although Tenant shall have cured any such previous failure after notice from Landlord, and within the notice period).

23.2    **Remedies in Default.**

In the event of any default or breach of this Lease by Tenant, Landlord may at any time after any applicable cure period, with or without notice or demand and without limiting Landlord in the exercise of a right or remedy which Landlord may have by reason of such default or breach:

(a)    <u>Terminate the Lease</u>. Terminate Tenant's right to possession of the Leased Premises by any lawful means, in which case this Lease shall terminate and Tenant shall

immediately surrender possession of the Leased Premises to Landlord.  In such event, Landlord shall be entitled to recover from the Tenant all past due Rent, Additional Rent and Other Charges and all other amounts owed under the terms of this Lease; the expense of re-leasing the Leased Premises, including but not limited to the expense of necessary renovating and alterations to the Leased Premises and reasonable leasing commissions; reasonable attorneys' fees and costs; the worth at the time of award by the court having jurisdiction thereof of the amount by which the unpaid Rent and Additional Rent called for herein for the balance of the Lease Term after the time of such award exceeds the amount of such loss for the same period that Tenant proves could be reasonably avoided (the "worth at the time of award" shall be determined by discounting such excess amount by the discount rate of the Federal Reserve Bank of San Francisco plus one percent (1%)); and any and all other damages arising from Tenant's default or breach; or,

(b)    Continue the Lease.  Maintain Tenant's right to possession, in which case this Lease shall continue in effect whether or not Tenant has abandoned the Leased Premises.  In such event, Landlord shall be entitled to enforce all Landlord's rights and remedies under this Lease, including the right to recover damages, Rent, Additional Rent, Other Charges, and any other payments as may become due hereunder; or,

(c)    Other Remedies.  Pursue any other remedy or remedies now or hereafter available to Landlord under the laws or judicial decisions of the State of Washington.

### 23.3    Legal Expenses.

If either party is required to bring or maintain any action (including assertion of any counterclaim or cross-claim, or claim in a proceeding in bankruptcy, receivership or any other proceeding instituted by a party hereto or by others), or otherwise refers this Lease to an attorney for the enforcement of any of the covenants, agreements, terms or conditions of this Lease, the prevailing party, in addition to all other remedies provided herein, shall receive from the other party all costs (including reasonable attorneys' fees) incurred in the enforcement of the covenants, agreements, terms and conditions of this Lease (whether or not an action is instituted) and including any such costs and fees incurred by the prevailing party on any appeal.

### 23.4    Bankruptcy.

(a)    Assumption of Lease.  In the event Tenant becomes a Debtor under Chapter 7 of the Bankruptcy Code ("Code") or a petition for reorganization or adjustment of debts is filed concerning Tenant under Chapters 11 or 13 of the Code, or a proceeding is filed under Chapter 7 of the Code and is transferred to Chapters 11 or 13 of the Code, the Trustee or Tenant, as Debtor and as Debtor-In-Possession, may not elect to assume this Lease unless, at the time of such assumption, the Trustee or Tenant has:

(1)    Cured all defaults under the Lease and paid all sums due and owing under the Lease or provided Landlord with "Adequate Assurance" (as defined below) that: (A) within ten (10) days from the date of such assumption, the Trustee or Tenant will completely pay all sums due and owing under this Lease and compensate Landlord for any actual pecuniary

loss resulting from any existing default or breach of this Lease, including without limitation, Landlord's reasonable costs, expenses, accrued interest, and attorneys' fees incurred as a result of the default or breach; (B) within twenty (20) days from the date of such assumption, the Trustee or Tenant will cure all non-monetary defaults and breaches under this Lease; and (C) the assumption will be subject to all of the provisions of this Lease.

(2)     For purposes of this Section, Landlord and Tenant acknowledge that, in the context of a bankruptcy proceeding involving Tenant, at a minimum, "Adequate Assurance" shall mean: (A) the Trustee or Tenant has and will continue to have sufficient unencumbered assets after the payment of all secured obligations and administrative expenses to assure Landlord that the Trustee or Tenant will have sufficient funds to fulfill the obligations of Tenant under this Lease; (B) the Bankruptcy Court shall have entered an Order segregating sufficient cash payable to Landlord and/or the Trustee or Tenant shall have granted a valid and perfected first lien and security interest and/or mortgage in property of Trustee or Tenant acceptable as to value and kind to Landlord, to secure to Landlord the obligation of the Trustee or Tenant to cure the monetary and/or non-monetary defaults and breaches under this Lease within the time periods set forth above; and (C) the Trustee or Tenant, at the very minimum, shall deposit a sum equal to two (2) months' Rent to be held by Landlord (without any allowance for interest thereon) to secure Tenant's future performance under the Lease.

(b)     <u>Assignment of Lease</u>. If the Trustee or Tenant has assumed the Lease pursuant to the provisions of this Section for the purpose of assigning Tenant's interest hereunder to any other person or entity, such interest may be assigned only after the Trustee, Tenant or the proposed assignee have complied with all of the terms, covenants and conditions of this Lease, including, without limitation, those with respect to Additional Rent; Landlord and Tenant acknowledging that such terms, covenants and conditions are commercially reasonable in the context of a bankruptcy proceeding of Tenant. Any person or entity to which this Lease is assigned pursuant to the provisions of the Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such assignee shall upon request execute and deliver to Landlord an instrument confirming such assignment.

(c)     <u>Adequate Protection</u>. Upon the filing of a petition by or against Tenant under the Code, Tenant, as Debtor and as Debtor-In-Possession, and any Trustee who may be appointed agree to adequately protect Landlord as follows: (1) to perform each and every obligation of Tenant under this Lease until such time as this Lease is either rejected or assumed by Order of the Bankruptcy Court; (2) to pay all monetary obligations required under this Lease, including without limitation, the payment of Rent and Additional Rent payable hereunder which is considered reasonable compensation for the use and occupancy of the Leased Premises; (3) provide Landlord a minimum of thirty (30) days' prior written notice, unless a shorter period is agreed to in writing by the parties, of any proceeding relating to any assumption of this Lease or any intent to abandon the Leased Premises, which abandonment shall be deemed a rejection of this Lease; and (4) to perform to the benefit of Landlord as otherwise required under the Code.

The failure of Tenant to comply with the above shall result in an automatic rejection of this Lease.

### 23.5    Remedies Cumulative - Waiver.

Landlord's remedies hereunder are cumulative and the Landlord's exercise of or failure to exercise any right or remedy due to a default or breach by Tenant shall not be deemed a waiver of, or to alter, affect or prejudice any right or remedy which Landlord may have under this Lease or by law. Neither the acceptance of rent, nor any other act or omission of Landlord at any time or times after the happening of any breach, default or other event authorizing the cancellation or forfeiture of this Lease, shall operate as a waiver of any past or future violation, breach or failure to keep or perform any covenant, agreement, term or condition hereof or to deprive Landlord of its right to cancel or forfeit this Lease, upon the written notice provided for herein, at any time that cause for cancellation or forfeiture may exist, or be construed so as at any time to stop Landlord from promptly exercising any other option, right or remedy that it may have under any term or provision of this Lease, at law or in equity.

### 24.    SUBORDINATION AND ATTORNMENT; MORTGAGEE PROTECTION.

### 24.1    Subordination - Notice to Mortgagee.

At the request of Landlord, Tenant shall promptly execute, acknowledge and deliver all instruments which may be reasonably required by Landlord or Landlord's lender, including, but not limited to, the Subordination, Nondisturbance and Attornment Agreement in the form attached hereto as Exhibit "I" to subordinate this Lease to any existing or future mortgages or deeds of trust on Bellevue Place, the Bank of America Building or the Leased Premises, and to any extensions, renewals or replacements thereof; provided, that the mortgagee or beneficiary, as the case may be, shall agree, in exchange for the agreement of Tenant to attorn to such mortgagee or beneficiary, to recognize this Lease in the event of foreclosure if Tenant is not in default at such time beyond the applicable cure periods. Notwithstanding anything to the contrary in this Lease, Landlord shall not be in breach or default under any provision of this Lease unless written notice specifying such breach or default is given to Landlord and to all persons who have an interest in all or part of Bellevue Place as mortgagees and/or deed of trust beneficiaries whose names and addresses have been given to Tenant in writing, and the provisions of Section 14 have been fully complied with.

### 24.2    Mortgagee Protection Clause.

Tenant shall give all mortgagees and deed of trust holders with an interest in the Bank of America Building, by registered, certified, or express mail, copies of all notices of default served upon the Landlord, provided that prior to such notice Tenant has been notified in writing (by way of Notice of Assignment of Rents and Leases, or otherwise) of the addresses of such mortgagees or deed of trust holders. If Landlord fails to cure such default within the time provided in this Lease, then the mortgagees or deed of trust holders shall have an additional thirty (30) days within which to cure such default or if such default cannot be cured within that time, then such

additional time as may be necessary, provided that within such thirty (30) days any mortgagee or deed of trust holder commences and diligently pursues the remedies necessary to cure such default (including but not limited to commencement of judicial or nonjudicial foreclosure proceedings, if necessary, to effect such cure).

**25.    INTENTIONALLY OMITTED.**

**26.    REMOVAL OF PROPERTY.**

Tenant shall remove all of its personal property and improvements designated to be removed pursuant to Sections 11.2 and 11.3 at the termination of this Lease either by expiration of the term or other cause, and shall pay Landlord for any damages for injury to the Leased Premises or Bank of America Building resulting from such removal. If Tenant shall fail to remove any of its property of any nature whatsoever from the Leased Premises or the Bank of America Building at the termination of this Lease or when Landlord has the right of re-entry, Landlord may remove and store such property without liability for loss thereof or damage thereto, such storage to be for the account and at the expense of Tenant. If Tenant shall not pay the cost of storing any such property after it has been stored for a period of thirty (30) days or more, Landlord may, at its option, sell, or permit to be sold, any or all such property at public or private sale, in such manner and at such times and places as Landlord in its sole discretion may deem proper, without notice to Tenant, unless notice is required under applicable statutes, and shall apply the proceeds of such sale: first, to the cost and expense of such sale, including reasonable attorneys' fees actually incurred; second, to the payment of the costs or charges for storing any such property; third, to the payment of any other sums of money which may then be or thereafter become due to Landlord from Tenant under any of the terms hereof; and, fourth, the balance, if any, to Tenant.

**27.    VOLUNTARY SURRENDER.**

The voluntary or other surrender of this Lease by Tenant, or a mutual cancellation thereof, shall not work a merger, but, at the option of Landlord, shall terminate all or any existing subleases and subtenancies or operate as an assignment to Landlord of any or all such subleases or subtenancies.

**28.    EMINENT DOMAIN.**

**28.1    Total Taking.**

If all the Leased Premises are taken by the power of eminent domain exercised by any governmental or quasi-governmental authority, this Lease shall terminate as of the date Tenant is required to vacate the Leased Premises and all Rent, Additional Rent and Other Charges due hereunder shall be paid to that date. As used in this Section 28, the term "eminent domain" shall include the taking or damaging of property by, through or under any governmental or quasi-governmental authority, and any purchase or acquisition in lieu thereof, whether or not the

damaging or taking is by the government or any other person authorized to exercise the power of eminent domain.

### 28.2    Constructive Taking of Entire Premises.

In the event of a taking of a material part, but less than all, of the Bank of America Building, where Landlord shall reasonably determine that the remaining portions of the Bank of America Building cannot be economically or effectively used as desired by Landlord (whether on account of physical, economic, aesthetic or other reasons), Landlord shall forward a written notice to Tenant of such determination not more than sixty (60) days after the date of taking. The term of this Lease shall expire upon such date as Landlord shall specify in such notice but not earlier than sixty (60) days after the date of such notice.

### 28.3    Partial Taking.

If more than fifteen percent (15%) of the Rentable Area of the Leased Premises is taken or appropriated by the power of eminent domain, this Lease, at the option of either party, may be terminated by written notice given to the other party not more than thirty (30) days after Landlord and Tenant receive written notice of the taking or appropriation, and such termination shall be effective as of the date Tenant is required to vacate the portion of the Leased Premises so taken. If more than ten percent (10%) of the Common Area of the Bank of America Building is taken by the power of eminent domain, then Landlord, at its option, may terminate this Lease by written notice given to Tenant within sixty (60) days of the date of such taking. If this Lease is so terminated, all Rent, Additional Rent and Other Charges due hereunder shall be paid to the date of termination. Whenever any portion of the Leased Premises or Common Area is taken by the power of eminent domain and this Lease is not terminated, Landlord, at its expense, shall proceed with reasonable dispatch to restore, to the extent that it is reasonably prudent, the remainder of the Leased Premises and Common Area to their condition immediately prior to such taking, and Tenant, at its sole expense, shall proceed with reasonable dispatch to restore the fixtures and improvements installed by Tenant and Tenant's furniture, furnishings, and equipment to the same condition they were in immediately prior to such taking. From the date Tenant is required to vacate that portion of the Leased Premises so taken, the Rent and Additional Rent payable hereunder shall be reduced in the same proportion that the area taken bears to the Rentable Area of the Leased Premises prior to the taking.

### 28.4    Damages.

Landlord reserves all rights to the entire damages award or payment for taking by the power of eminent domain, and Tenant shall make no claim whatsoever against Landlord for damages for termination of its leasehold interest in the Leased Premises or for interference with its business. Tenant hereby grants or and assigns to Landlord any right Tenant may now have or hereafter acquire to such awards and payments and agrees to execute and deliver such further instruments of assignment thereof as Landlord may from time to time request. Notwithstanding the foregoing, Tenant shall have the right to claim from the condemning authority all compensation that may be recoverable by Tenant on account of any loss incurred by Tenant in

removing Tenant's merchandise, furniture and other personal property that Tenant is entitled to remove at the termination of this Lease or for damage to Tenant's business; provided, however, that Tenant may claim such damages only if they are awarded separately in the eminent domain proceeding and not as part of Landlord's damages.

## 29.    NOTICES.

Any notices required in accordance with any of the provisions herein, if to Landlord, shall be delivered in person or mailed by an express mail service, such as Federal Express or UPS, to the address of Landlord as set forth in Section 1.2 above or at such other place as Landlord may in writing from time to time direct to Tenant, and if to Tenant, shall be delivered in person or sent by an express mail service, such as Federal Express or UPS, to Tenant at the Leased Premises. If Tenant is more than one person or entity, any notice required or permitted hereunder may be given by or to any one thereof, and shall have the same force and effect as if given by or to all thereof. Any notices mailed to Tenant bearing the proper address and adequate postage for delivery shall be deemed effective upon deposit in the U.S. mail.

## 30.    LANDLORD'S LIABILITY.

Anything in this Lease to the contrary notwithstanding, the covenants, undertakings and agreements herein made on the part of Landlord are made and intended not as personal covenants, undertakings and agreements for the purpose of binding Landlord personally or the assets of Landlord, but are made and intended for the purpose of binding only the Landlord's interest in the Leased Premises and Bank of America Building, as the same may from time to time be encumbered. No personal liability or personal responsibility is assumed by, nor shall at any time be asserted or enforceable against Landlord or its partners or their respective heirs, legal representatives, successors, and assigns on account of the Lease or on account of any covenant, undertaking or agreement of Landlord in this Lease contained. Therefore, in consideration of the benefits accruing hereunder, Tenant and all successors and assigns covenant and agree that, in the event of any actual or alleged failure, breach or default hereunder by Landlord:

(a)    The sole and exclusive remedy of Tenant shall be against the Landlord's interest in the Leased Premises and the Bank of America Building, and the rents, issues, profits, income and proceeds thereof and therein;

(b)    No general or limited partner of Landlord, or any director, officer, agent or employee of any corporation if Landlord, or any general or limited partner of Landlord, is a corporation (collectively, for the purpose of this Section 30, referred to as "general or limited partner of Landlord") shall be sued or named as a party in any suit or action, and Landlord shall not assert therein the defense or lack of personal jurisdiction arising out of Tenant's compliance with this Section 30;

(c)    No general or limited partner of Landlord shall be required to answer or otherwise plead to any service or process;

(d)     No judgment will be taken against any general or limited partner of Landlord;

(e)     Any judgment taken against any general or limited partner of Landlord may be vacated and set aside at any time nunc pro tunc;

(f)     No writ of execution will ever be levied against the asset of Landlord or any general or limited partner of Landlord, other than Landlord's interest in the Leased Premises or the Bank of America Building;

(g)     These covenants and agreements are enforceable both by Landlord and also by any general or limited partner of Landlord.

## 31.    TENANT'S CERTIFICATES.

Tenant shall at any time and from time to time, within ten (10) business days after written notice from Landlord, execute, acknowledge and deliver to Landlord or its designee a written statement substantially in the form of Exhibit "G" certifying, to the extent true, that (i) this Lease is in full force and effect and has not been assigned, modified, supplemented or amended in any way (or specifying the date and terms of all agreements so affecting this Lease); (ii) to Tenant's knowledge, all conditions under this Lease to be performed by the Landlord have been satisfied, if any; (iii) to Tenant's knowledge, all required contributions by Landlord, if any, to Tenant on account of the Premises Improvements or additional improvements have been received; (iv) to Tenant's knowledge, as of the date of such certification there are no existing claims, defenses or offsets that the Tenant has against the enforcement of this Lease by the Landlord; (v) no Rent or other rent obligation has been paid more than one month in advance; (vi) no security has been deposited with Landlord (or, if so, the amount thereof) and (vii) setting forth any other information reasonably required by Landlord's lenders.  It is intended that all statements delivered pursuant to this paragraph may be relied upon by prospective purchasers of Landlord's interest, Landlord's lenders, and other designees of Landlord and Landlord's lenders.  If Tenant fails to respond within ten (10) business days of Tenant's receipt of a written request by Landlord as herein provided, and such failure is not cured within five (5) days following receipt of a written reminder notice from Landlord, such failure shall be a material default under the terms and conditions of this Lease.

## 32.    RIGHT TO PERFORM.

If Tenant shall fail to pay any sum of money, other than Rent and Additional Rent, required to be paid by it hereunder or shall fail to perform any other act on its part to be performed hereunder, and such failure shall continue for ten (10) days after notice thereof by Landlord, Landlord may, but shall not be obligated so to do, and without waiving or releasing Tenant from any obligations of Tenant, make any such payment or perform any such other act on Tenant's part to be made or performed as provided in this Lease.  Landlord shall have (in addition to any other right or remedy of Landlord) the same rights and remedies in the event of

the nonpayment of sums due under this Section as in the case of default by Tenant in the payment of Rent.

## 33.    AUTHORITY.

Landlord and Tenant each represents and warrants to the other party to this Lease that the person signing this Lease on its behalf is duly authorized to execute and deliver this Lease, and that this Lease is binding upon the party to this Lease making such representation in accordance with its terms. Landlord and Tenant each represents and warrants to the other party to this Lease that it has full right, power, and authority to enter into this Lease.

## 34.    PARKING AND COMMON AREAS.

### 34.1    Parking.*

Landlord shall provide Tenant with three (3) parking permits for each one thousand (1,000) square feet in the Useable Area of the Leased Premises, at the current rate of Two Hundred Fifteen and 00/100 Dollars ($215.00) per parking permit per month (excluding tax), which rate may increase from time to time, for the Lease Term. In addition, day time bike storage facilities will be provided in areas within the Bellevue Collection (Lincoln Square North, Lincoln Square South, Bellevue Square and Bellevue Place) designated by Landlord from time to time in its sole discretion. Tenant's employees shall not park their vehicles in the automobile parking areas of the Common Areas and Facilities which may from time to time be designated for patrons of Bellevue Place. Landlord at all times shall have the right to designate the particular parking areas to be used by Tenant's employees and any such designation may be changed from time to time (notice of which shall be provided to Tenant). Tenant and its employees shall park their vehicles only in those portions of the Common Areas and Facilities, if any, designated for that purpose by Landlord. Tenant shall furnish Landlord with Tenant's and Tenant's employees' state vehicle license numbers within fifteen (15) days after Tenant opens for business in the Leased Premises and Tenant shall thereafter notify Landlord of any changes within five (5) business days after such change occurs. If Tenant or its employees fail to park their vehicles in designated parking areas, then Landlord, without limiting any other remedy Landlord may have, may charge Tenant a minimum of Ten Dollars ($10.00) per day for each day or partial day for each vehicle improperly parked; provided, however, Landlord shall give Tenant written notice of the first violation of this provision and Tenant shall have two (2) days thereafter within which to cause the violation to be discontinued; and if not discontinued within such two-day period, then the vehicle fines shall commence. After notice of the first such violation, no notice of any subsequent violation shall be required prior to the imposition of any parking fine. All amounts due under the provisions of this Section shall be additional rent and due and payable by Tenant within ten (10) days after demand therefor. Tenant shall notify its employees in writing of the provisions of this Section. Notwithstanding anything in the Lease to the contrary, Landlord shall have the absolute right to implement a valet assist, or similar program, within the Common Areas and Facilities in the manner and time as determined by Landlord in its sole discretion, and Tenant shall cooperate in good faith with such valet assist or similar program.

### 34.2    Common Areas.

Landlord shall at all times have exclusive control and management of the Common Areas and Facilities of Bellevue Place.  Tenant shall have the nonexclusive right in common with others to use the public areas of the Bank of America Building and the Common Areas and Facilities of Bellevue Place, subject to such nondiscriminatory and reasonable rules and regulations as Landlord may adopt from time to time governing the use thereof including, but not limited to, the right to close the same from time to time to such an extent as may be legally sufficient, in Landlord's opinion, to prevent a dedication thereof or the accrual of right to any person or to the public therein.  Tenant shall comply with the rules and regulations that Landlord and the owner or ground lessee of Bellevue Place may from time to time promulgate and/or modify regarding use and operation of the Common Areas of the Bank of America Building and Common Areas and Facilities of Bellevue Place.  The rules and regulations shall be binding upon Tenant upon delivery of a copy thereof to Tenant.  Landlord shall not be responsible to Tenant for the nonperformance of such rules and regulations by any other tenants or occupants of space in either Bellevue Place or the Bank of America Building.  The term "Common Areas and Facilities of Bellevue Place" refers to all on and off-site areas and/or related facilities which are made available or are used from time to time for the general use, convenience and benefit of Landlord and other persons entitled to occupy space in Bellevue Place, including their employees, invitees, licensees and guests, which areas shall include, but not be limited to, all parking structures and parking areas (including off-site parking), driveways, sidewalks, landscaped or planted areas, pedestrian areas, lobbies, walkways, the Wintergarden Retail Center and Parking Garage.  The term "Common Areas and Facilities of Bellevue Place" also refers to all on-site and off-site areas and/or related facilities which may not be accessible to Tenant and other persons entitled to occupy space in Bellevue Place, but which are used in conjunction with the operation, management, repair or maintenance of Bellevue Place, including, but not limited to janitorial closets, on and/or off-site management offices and maintenance areas.  The term "Common Areas and Facilities of the Bank of America Building" refers to the Common Areas and Facilities of Bellevue Place located within the Bank of America Building.

### 35.    TRANSPORTATION MANAGEMENT PROGRAM.

Tenant shall cooperate with Landlord and the designated Transportation Management Association in complying with the terms and conditions of the Bellevue Place Transportation Management Program, as set forth in the Bellevue Place Transportation Management Agreement, a copy of which is attached hereto as Exhibit "F" and incorporated herein, and shall become a member participant in the designated Transportation Management Association.  Tenant shall designate one of its employees or agents as Tenant Transportation Coordinator, who shall represent Tenant in all matters pertaining to transportation management.  Landlord shall be immediately notified of any change in the Transportation Coordinator. Upon Tenant's request, Landlord shall cause its transportation management representative to be available to meet with Tenant's employees to discuss transportation options to and from the Building.

36.    **QUIET ENJOYMENT.**

Tenant, upon fully complying with and promptly performing all of the terms, covenants and conditions of this Lease to be performed on its part and upon the prompt and timely payment of all sums due hereunder, shall have and possess the Leased Premises for the Lease Term set forth herein.

37.    **GENERAL.**

37.1    **Captions.**

Any section or paragraph titles or captions are for convenience only and shall not be deemed to define, limit or otherwise modify the scope and intent of this Lease or any provision thereof.

37.2    **Bellevue Place Rent and Income.**

All amounts to be paid hereunder, specifically including all Rent, Additional Rent and Other Charges, shall be paid as and when due, and without any setoff or deduction whatsoever. Landlord shall be entitled to all rent and other payments on all leases and tenancies at Bellevue Place on all property owned or leased by Landlord and any other payments made to Landlord or its agents for any other activities, uses or operations at Bellevue Place.

37.3    **Successors or Assigns.**

All the terms, conditions, covenants and agreements of this Lease shall extend to and be binding upon Landlord, Tenant, their respective heirs, administrators, executors, successors and assigns, and upon any person or persons coming into ownership or possession of any interest in the Leased Premises by operation of law or otherwise, and shall be construed as covenants running with the land.

37.4    **Tenant Defined.**

The word "Tenant" as used herein shall mean each and every person, partnership, limited liability company or corporation who is mentioned as a Tenant herein or who executes this Lease as Tenant.

37.5    **Lost Security or Access Key Card.**

Tenant shall reimburse Landlord for any and all losses and expenses incurred or suffered by Landlord as a result of Tenant or any of Tenant's agents, employees, licensees or contractors losing any security or access key card or similar device issued to Tenant, which losses or expenses are incurred or suffered by Landlord prior to Tenant notifying Landlord of the loss of such card or similar device.

**37.6    Landlord's Consent.**

Unless otherwise specifically stated herein, whenever Landlord's consent or approval is required, Landlord's consent or approval may be withheld in Landlord's sole subjective discretion.

**37.7    Broker's Commission.**

Each party hereto represents and warrants to the other party that it has incurred no liabilities or claims for brokerage commissions or finder's fees in connection with the execution of this Lease and it has not dealt with or has any knowledge of any real estate broker, agent or salesperson in connection with this Lease except Jeff Jochums of CBRE, which represents Tenant and Broderick Group, Inc., which represents Landlord. Provided a lease is executed between Landlord and Tenant, Landlord agrees to pay a broker's commission to: (a) CBRE, in the amount of One and 00/100 Dollar ($1.00) per Rentable Area of the Leased Premises per year, prorated for any partial year, for the Lease Term; one-half (1/2) of which shall be paid upon mutual execution of the Lease and the remaining one-half (1/2) of which shall be paid upon the Commencement Date, and (b) to Broderick Group, Inc., the full amount of any broker's commissions due in connection with this Lease. Each party agrees to indemnify and hold the other parties harmless from all such liabilities or claims (including, without limitation, reasonable attorneys' fees) by anyone other than CBRE and/or Broderick Group, Inc.

**37.8    Partial Invalidity.**

If any term, covenant, or condition of this Lease or the application thereof to any person or circumstance is, to any extent, invalid or unenforceable, the remainder of this Lease, and the application of the terms, covenants or conditions to persons or circumstances other than those which are held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**37.9    Recording.**

Tenant shall not record this Lease. Tenant also shall not record any memorandum of lease. However, upon the request of Landlord, Tenant shall execute and deliver to Landlord a memorandum in the form provided by Landlord. The memorandum shall describe the parties, the Leased Premises, the Lease Term and Tenant's obligation to comply with the Transportation Management Agreement and City of Bellevue Land Use Code Paragraph 20.25A.030.C.1, or any similar or successor law, regulation, code or rule, if applicable.

**37.10    Joint Obligation.**

If there is more than one Tenant, the obligations hereunder imposed shall be joint and several.

### 37.11  Time.

Time is of the essence of this Lease and each and all of its provisions in which performance is a factor.

### 37.12  Prior Agreements.

It is understood that there are no oral or written agreements or representations between Landlord and Tenant affecting this Lease and that this Lease supersedes and cancels any and all previous negotiations, arrangements, representations, brochures, displays, projections, estimates, agreements and understandings, if any, made by or between Landlord and Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret, construe, supplement, or contradict this Lease.  This Lease, and all mutually-executed written amendments thereto, is and shall be considered to be the only agreement between Landlord and Tenant and their representatives and agents.  All negotiations and oral agreements acceptable to Landlord and Tenant have been merged into and are included in this Lease.  There are no other representations, covenants or warranties between Landlord and Tenant and all reliance with respect to representations is solely upon the express representations, covenants and warranties contained in this Lease.  Although the printed provisions of this Lease were drawn by Landlord, Landlord and Tenant agree that this circumstance shall not create any presumption, canon of construction, or implication favoring the position of either Landlord or Tenant.  Landlord and Tenant agree that the interlineation, obliteration, or deletion of language from this Lease prior to its mutual execution by Landlord and Tenant shall not be construed to have any particular meaning or to raise any presumption, canon of construction, or implication, including, without limitation, any implication that Landlord or Tenant intended thereby to state the converse, obverse or opposite of the deleted language.  This Lease shall be read as if the obliterated or deleted language had never existed and the interlineated language had always existed.

### 37.13  Inability to Perform.

The obligations of Landlord or Tenant hereunder shall be excused for a period equal to the time by which such performance is prevented or delayed due to acts of God or any other causes beyond the reasonable control of such party, financial inability or negligence excepted. The provisions of this Section 37.13 shall not apply to any payment of Rent, Additional Rent or Other Charges.

### 37.14  Transfer of Landlord's Interest.

In the event of any transfer or transfers of Landlord's interest in the Leased Premises or Bellevue Place, other than a transfer for security purposes only, the transferor shall be automatically relieved of any and all obligations and liabilities on the part of Landlord accruing from and after the date of such transfer and Tenant agrees to attorn to such transferee.

**37.15  No Light, Air or View Easement.**

Any diminution or shutting off of light, air or view by any structure which may be erected on land on or adjacent to Bellevue Place shall in no way affect this Lease or the obligation of Tenant hereunder nor impose any liability on Landlord.

**37.16  Reciprocal Easement Agreements.**

This Lease shall be subordinate to any and all operating, maintenance and reciprocal easement agreements ("REAs") entered into by and among Landlord and any other parties, including any amendments or modifications thereto. Tenant shall execute and return to Landlord within ten (10) days after written request therefor by Landlord, agreements in recordable form, substantially in the form of Exhibit "H", subordinating this Lease to any such REAs.

**37.17  Waiver.**

The waiver by either party of any term, covenant or condition herein contained shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant or condition herein contained. The subsequent acceptance by a party of any sum due hereunder shall not be deemed to be a waiver of any preceding default by the paying party of any term, covenant or condition of this Lease, other than the failure of the paying party to pay the particular sum so accepted, regardless of the accepting party's knowledge of such preceding default at the time of the acceptance of such sum. In addition, no endorsement or statement on any check or any letter accompanying any payment shall be deemed an accord and satisfaction, and such part's right to recover the balance of such sum or pursue any other remedy provided herein or otherwise shall not be affected by such endorsement or statement or by the acceptance of such payment.

**37.18  Name.**

Tenant shall not, without the prior written consent of Landlord, use the name of the building or project for any purpose other than as the address of the Leased Premises, and in any event, Tenant shall not acquire any rights in or to such names.

**37.19  Choice of Law - Venue.**

This Lease shall be governed by the laws of the State of Washington. The venue for any action to enforce the terms of this Lease or collect any amounts owing by Tenant to Landlord shall be in the Superior Court for King County, Washington.

**37.20  OFAC Certification.**

(a)    <u>Certification</u>. Tenant certifies that:

(i)    It is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury

Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control; and

(ii)    It is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation.

(b)    Indemnification.  Tenant hereby agrees to defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities, and expenses (including attorney's fees and costs) arising from or related to any breach of the foregoing certification.

### 37.21  Current Tenant.

Tenant is aware that the Leased Premises is currently occupied by another tenant or tenants (the "Current Tenant") and the Current Tenant may fail or refuse to vacate the Leased Premises and relinquish all claims to the Leased Premises prior to the Possession Date.  Landlord shall have no responsibility under this Lease to take any action to remove the Current Tenant and shall not be liable for any damages, injuries or claims that may be suffered by Tenant relating to or arising out of, directly or indirectly, the Current Tenant's failure or refusal to vacate and release all interest in the Leased Premises. Notwithstanding anything to the contrary contained in this Lease, (a) in the event Landlord has not delivered possession of the Leased Premises to Tenant in accordance with the terms of this Lease on or before June 15, 2019, Landlord shall abate one (1) day of Rent for every one (1) day that the Possession Date is delayed after June 15, 2019, and (b) in the event Landlord has not delivered possession of the Leased Premises to Tenant in accordance with the terms of this Lease on or before August 15, 2019, Tenant or Landlord shall have the right to terminate this Lease upon written notice to the other party, and upon such termination, any sums paid to Landlord, including, without limitation, any prepaid Rent, Additional Rent and the Security Deposit shall promptly be returned to Tenant, and the parties hereto shall be released from any further obligations hereunder.

### 37.22  Letter of Credit.

(a)    Landlord and Tenant acknowledge that Tenant will occupy space in the Bank of America Building pursuant to this Lease and, as consideration for Landlord's willingness to enter into this Lease, Tenant shall deliver or cause to be delivered to Landlord, and shall cause to be maintained at all times in effect without expiration or termination, one or more irrevocable standby letters of credit complying with the terms of this Section 37.22.  Any failure by Tenant to perform or observe any term, covenant or agreement set forth in this Section 37.22 shall constitute a material default under this Lease.

(b)    Tenant shall deliver or cause to be delivered to Landlord an irrevocable standby letter of credit in a form reasonably acceptable to or provided by Landlord (the "Letter of Credit"), issued by a United States national banking association or other FDIC insured

institution reasonably acceptable to Landlord, for the account of Tenant in favor of Landlord in the initial amount of One Million Three Hundred Two Thousand Three Hundred Sixty-eight and 00/100 Dollars ($1,302,368.00), having an expiry date not earlier than the Expiration Date, and stating by its terms that it shall be automatically extended annually, without written amendment or modification, to the date that is one (1) year after the then current expiry date unless the issuer of the Letter of Credit gives Landlord, at least sixty (60) days prior to the then current expiry date, written notice that the issuer elects not to extend the Letter of Credit.  If the issuer of the Letter of Credit at any times gives to Landlord notice that the issuer elects not to extend the Letter of Credit, then, not less than thirty (30) days prior to the then current expiry date of the Letter of Credit, Tenant shall deliver or cause to be delivered to Landlord a substitute irrevocable standby letter of credit issued in favor of Landlord by a national banking association reasonably acceptable to Landlord in an amount required by this Section 37.22.  Not less than thirty (30) days prior to the expiry date of any substitute letter of credit delivered pursuant to this Section, Tenant shall deliver or cause to be delivered to Landlord a further substitute irrevocable standby letter of credit issued in favor of Landlord by a national banking association reasonably acceptable to Landlord in an amount required by this Section 37.22.  Each substitute letter of credit delivered pursuant to this Section shall have a term of not less than one (1) year and shall be in a form acceptable to or provided by Landlord.

(c)    Notwithstanding the foregoing, following the fourth (4th) full Lease Year, provided Tenant (i) has not had any late payments or defaulted under this Lease; and (ii) delivers to Landlord information reasonably satisfactory to Landlord showing that Tenant has had net income of over $50,000,000 in each of the three (3) prior years, then the amount of the Letter of Credit shall be reduced to Six Hundred Seventy-six Thousand One Hundred Eighty-four ($676,184.00).

(d)    Upon the occurrence of any breach or default under this Lease beyond the applicable cure period including, but not limited to, any failure by Tenant timely to deliver or cause to be delivered to Landlord any substitute letter of credit required pursuant to this Section 37.22, Landlord, at its option, may draw against the Letter of Credit and any substitute letter of credit delivered pursuant to this Section 37.22 in an amount reasonably necessary to cure such breach or default and/or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's breach or default.  The Letter of Credit and each substitute letter of credit (also referred to as a "Letter of Credit") delivered pursuant to this Section 37.22 shall provide for payment against Landlord's (or any transferee's) draft at sight accompanied by a certificate stating substantially as follows: "Drawn under _____ Bank, N.A.'s Irrevocable Standby Letter of Credit No. _____, dated _____, 2018, as a result of the occurrence of a default under the Lease dated _____, 2018, between Bellevue Place Office, LLC, a Washington limited liability company, and Desolation Holdings LLC, a Delaware limited liability company.  If Landlord draws against the Letter of Credit, Tenant shall, within ten (10) days of the date of such draw, restore the Letter of Credit or provide additional irrevocable standby letters of credit so that, at all times, there shall be an amount required by this Section 37.22 available for Landlord to draw against in the event of any further breach or default under this Lease.

(e)    If the Letter of Credit is not renewed or Tenant does not provide a substitute irrevocable standby letter of credit on or before the date that is thirty (30) days prior to the expiry date of the then current Letter of Credit, or in the event Landlord draws against the Letter of Credit, if Tenant does not restore the Letter of Credit or provide additional letters of credit so that an amount required by this Section 37.22 is available to Landlord to draw upon in the event of any further breach or default under this Lease, then in such event the amount of the draw against the Letter of Credit may be equal to the entire amount of the Letter of Credit. The proceeds of any draw against the Letter of Credit pursuant to the immediately preceding sentence shall be held by Landlord as an additional security deposit pursuant to the provisions of Section 8 of this Lease.

### 37.23  Audited Financial Statement.

Tenant shall, upon Landlord's written request at any time following the first (1st) anniversary of the Commencement Date, deliver to Landlord Tenant's audited financial statement for its immediately preceding fiscal year. Such audited financial statement shall be delivered to Landlord within ten (10) business days of Landlord's request therefore, but in no event do Tenant's audited financial statements have to be delivered earlier than ninety (90) days after the end of Tenant's fiscal year. The statements provided pursuant to this Section 37.23 may be, at Tenant's option, audited financial statements for Tenant alone, or in the alternative, audited consolidated financial statements of Tenant's direct or indirect parent company and Tenant, so long as Tenant's financial information is readily discernible.

### 37.24  Guaranty.

Landlord's obligations hereunder are made expressly contingent upon its receipt of the duly executed Guarantee of Lease from Guarantor, substantially in the form attached hereto as Exhibit "J", concurrently with Tenant's delivery of this Lease when executed by it.

### 37.25  Signage.

Landlord shall provide standard building suite entrance and directory signage. There shall be no charge for use of the signage during the Lease Term or any extensions thereof.

### 37.26  Fitness Center.

So long as the Hyatt Stay Fit Fitness Center located on floor 3 of the Corner Building remains in operation and is made available to tenants' employees, but without imposing any obligation or liability upon Landlord, Tenant's employees shall have the right to elect to use the

Hyatt Stay Fit Fitness Center on the same terms and at the same rates offered to other tenants of Bellevue Place.

IN WITNESS WHEREOF this Lease has been executed the day and year first above set forth.

LANDLORD

TENANT

BELLEVUE PLACE OFFICE, LLC,
a Washington limited liability company

DESOLATION HOLDINGS LLC,
a Delaware limited liability company

By KEMPER DEVELOPMENT COMPANY,
    a Washington corporation, Its Manager

By _____
    James Waschak
Its COO

By _____
    James E. Melby, President

STATE OF WASHINGTON )

)  ss:

COUNTY OF KING           )

     On this **14** day of November, 2018, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared JAMES E. MELBY, to me known to be the President of KEMPER DEVELOPMENT COMPANY, a Washington corporation, as the Manager of BELLEVUE PLACE OFFICE, LLC, a Washington limited liability company, the limited liability company that executed the within and foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said limited liability company, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute said instrument.

     WITNESS my hand and official seal hereto affixed the day and year first written above.



(SEAL)

Type Notary Name *Katherine Kirkness*
Notary Public in and for the State of
Washington, residing at *Shoreline*
My commission expires *9-20-71*

STATE OF WASHINGTON )

)  ss:

COUNTY OF KING           )

     On this **2nd** day of November, 2018, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared JAMES WASCHAK, to me known to be the COO, of DESOLATION HOLDINGS LLC, a Delaware limited liability company, the limited liability company that executed the within and foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said limited liability company, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute said instrument.

     WITNESS my hand and official seal hereto affixed the day and year first written above.

(SEAL)

Type Notary Name *Barbara J Catt*
Notary Public in and for the State of
Washington, residing at *Newcastle*
My commission expires *4/10/22*

# OFFICE LEASE EXHIBITS

Exhibit A -    Legal Description of Bellevue Place

Exhibit B -    Site Plan of Bellevue Place

Exhibit C -    Floor Plan of the Leased Premises

Exhibit D -    Tenant Design & Construction Manual

Exhibit E -    Rules and Regulations

Exhibit F -    Bellevue Place Transportation Management Agreement

Exhibit G -    Form of Tenant Estoppel Certificate

Exhibit H -    Form of Subordination Agreement to Reciprocal Easement
Agreement

Exhibit I -    Form of Subordination, Nondisturbance and Attornment Agreement

Exhibit J -    Form of Guarantee of Lease

Exhibit K -    Tenant's Draw Request

EXHIBIT A

<u>LEGAL DESCRIPTION OF BELLEVUE PLACE</u>

New Lots 3, 4, 5 and 6 of Boundary Line Adjustment No. 07-117859, recorded in King County, Washington on November 29, 2007, under recording number 20071129900004;

TOGETHER WITH:

Lots 11, 12, 13, and 14, Bellevue Realty Redwood Addition, according to the Plat recorded in Volume 54 of Plats, Page 28, in King County, WA;

EXCEPT:

The north 0.70 feet of said Lot 14 lying westerly of the easterly 74 feet of said Lot 14 and easterly of the westerly 19 feet of said Lot 14.

EXHIBIT B

SITE PLAN OF BELLEVUE PLACE

(see attached)



EXHIBIT C

FLOOR PLAN OF THE LEASED PREMISES

(see attached)



EXHIBIT D

<u>TENANT DESIGN & CONSTRUCTION MANUAL</u>

(see attached)





# Tenant Design & Construction Manual 2014

Bellevue Place Building
Bank of America Building
Bellevue, Washington

Exhibit "D" to the Lease

Office Criteria



**BELLEVUE PLACE**

We wish to welcome you as a new Tenant to the Bellevue Place Office Building/Bank of America Building. This Tenant Design & Construction Manual has been prepared to assist you and your staff during the design and construction phases of your new office. The information in this manual is intended to help expedite your efforts to obtain the necessary approvals and subsequent completion of your space. Particular attention should be paid to the Design Process, Submittal Procedure and Construction Phase Information set forth in the Tenant Design & Construction Manual.

Thank you for choosing to locate your firm at Bellevue Place and we look forward to working with you during the design and construction of your Leased Premises.

*Nothing in this manual is or shall be an express or implied warranty or representation by Bellevue Place Office, LLC or Kemper Development Company, or any of their agents, contractors, or employees. All warranties and representations, if any, are set forth in the Lease pertaining to the Leased Premises.*

33128-0230/141407605.1



BELLEVUE
PLACE

# Introduction

## Contents

ARTICLE I  Building Description                                                    5
    Section 1.01  Design Concept                                     5
    Section 1.02  Construction Type                                  6
    Section 1.03  Vicinity Map, Site Plan                            7
Article II  Directory Of Landlords Representatives, Consultants, And Government Agencies    8
    A. Landlord's Representatives                                    8
    B. Government Agencies                                           9
    C. Utility Services                                              9
Article III  Design And Landlord Approval Process                                 10
    Section 3.01  Description of Tenant's Additional Improvements and Design Criteria    10
        Method of Measuring Tenant Spaces                       10
    Section 3.02  Design Criteria                                   11
    Section 3.03  Submittal Requirements                            12
        Shell Perimeter Walls, Demising Partitions and Ceiling    12
            Perimeter Walls                               12
            Corridor Walls                                12
            Demising Partitions                           12
            Standard Partitions                           12
            Column /finish Treatment                      12
            Ceiling                                       13
        Doors, Frames and Hardware                             13
        Paint                                                  13
        Flooring                                               13
        Penetrations, Welding and Hot Work                     14
        Waterproofing                                          14
        Plumbing                                               14
        Mechanical                                             15
        Electrical                                             18
        Structural and Roof                                    20
        Fire/Life Safety, Fire Sprinklers and Testing          20
        Communication System                                   21
        Satellite Dish                                         21
    Section 3.04  Existing Building Conditions                      21
    Section 3.05  Design Submittal Requirements                     22
        A. Preliminary Submittal                               22
        B. Final Submittal                                     22
        Permits                                                23
        Mechanical/Electrical Schedule                         24
        Start-Up and Air Balance Request                       25
Article IV  CONSTRUCTION PHASE                                                    26
    Section 4.01  Construction Agreement                            26
    Section 4.02  Preconstruction Meeting                           26
        Construction Contract and Schedule of Values           26
        Bonds                                                  26
        Certificate of Insurance                               27
        Acceptance of Leased Premises                          27
        Construction Schedule                                  27
        Building Permit                                        27
        Subcontractor List                                     27
        Construction Deposit                                   27
        Signed Lease And Delivery of Security Deposit          27
    Section 4.03  Tenant Contractor Rules and Regulations          27
        General Contractor Responsibility                      27

33128-0230/141407605.1

BELLEVUE
PLACE

Superintendent                                             28
Subcontractors                                             28
Excessive Noise and Odors                                  28
Smoking                                                    28
Damage                                                     28
Storage                                                    28
Trash and Dumpsters                                        28
Dust and dirt                                              28
Delivery and Parking                                       28
Working Hours                                              28
Contractor Signage                                         29
Construction Barricade                                     29
**Section 4.04  Demolition**                               29
**Section 4.05  Penetrations, Welding and Hot Work**       29
**Section 4.06  Fire Pre-Test/Final Test Procedures**      29
**Section 4.07  Stopping the Work**                        29
**Section 4.08  Construction Completion and Closeout**     30
**Section 4.09  Tenant Improvement Checklist**             30
**Article V  MISCELLANEOUS FORMS**                         31
Contractor Rules                                           32
Sample Certificate of Insurance                            34
Pre/Post Demo MEP Inspection Form                          35
Emergency Fire Sprinkler Containment Kit Instructions      36
Fire System Sprinkler Drain and Re-Fill Procedure          37
Hot Work Permit Sample                                     38
**Article VI  Typical Details (11/22/2010)**               39

33128-0230/141407605.1



BELLEVUE
PLACE

## ARTICLE I: BUILDING DESCRIPTION

### Section 1.01: Design Concept

### Building Description

Bellevue Place is located on one of the region's busiest intersections, situated on the corner of Bellevue Way NE and NE 8th Street, across from Bellevue Square and Lincoln Square.  Together these projects are known as The Bellevue Collection.

Bellevue Place was the first mixed-use development in downtown Bellevue.  Built in 1989, it features the 733 room Hyatt Regency Bellevue, the 21-story Bank of America Building, the 6-story Bellevue Place Building, boutique retail and restaurants, a 5-level below grade parking structure, and a grand atrium space known as the Wintergarden.

The Bank of America Building is a distinctive brick-clad, 458,000 square foot office tower that is adjoined to the Hyatt Regency through the Wintergarden on the first two floors.  Floors 3 through 20 house class "A" office space and floors 1, 2 and 21 feature unique restaurants and retail.

The Bellevue Place Building is a distinctive brick-clad low-rise 127,000 square foot office building that sits on the corner of Bellevue Way and NE 8th Street.  It is connected to the Hyatt Regency, the Wintergarden, and the Bank of America Building via the arrival plaza on the first floor.  The Bellevue Place Building has distinctive retail and restaurants on the first level and the Hyatt Stay-Fit Fitness Center located on the second level.  Floors 2-6 house class "A" office space.

Bellevue Place is connected to Lincoln Square by both a sky bridge and a tunnel for easy access to additional merchants of The Bellevue Collection.



**Section 1.02: Construction Type**

All designs must be consistent with the International Building Code and the City of Bellevue Amendments.  The following general code information may assist in the design of the Leased Premises.

The design of the office building Leased Premises must comply with all requirements of a **Type I - A** fully sprinkled building as required by code.  The occupancy group for an office space shall be **"Group B"** as defined in the International Building Code.

**Bellevue Place Corner Building:**
All levels are reinforced concrete slabs with concrete beams and joists.

**Bank of America Building:**
All levels are reinforced concrete slabs with concrete beams and joists.

**Wintergarden:**
Reinforced concrete slabs with concrete beams and joists or steel beams with concrete over steel deck floors.



**Section 1.03: Vicinity Map, Site Plan**

Bellevue Place is located in the superblock in downtown Bellevue.  It is bordered by NE 10th Street to the north, Bellevue Way NE to the west, NE 8th Street to the south, and 106th Avenue NE to the east.



33128-0230/141407605.1



## ARTICLE II: DIRECTORY OF LANDLORDS REPRESENTITIVES, CONSULTANTS, AND GOVERNMENT AGENCIES

Landlord is represented by Landlord's Tenant Coordinator.  Any questions regarding the Leased Premises, this Manual or the design and construction process should be directed to Landlord's Tenant Coordinator.

Tenants are encouraged to utilize Landlord's Representatives for their tenant improvements; however, if Tenant chooses to use their consultants/contractors, they must be approved by Landlord prior to commencing work.

### A. Landlord's Representatives:

**Landlord**    Bellevue Place Office, LLC
Kemper Development Company
575 Bellevue Square
Bellevue, Washington 98004
Sr. VP of Design & Construction — Daniel P. Meyers, AIA
**Tenant Coordinator/Project Manager — Tony Cook**
**(425) 646-3660 or tony.cook@kemperdc.com**

**Management Office**   Bellevue Place Office Building
10500 NE 8th Street, Suite 215
Bellevue, Washington 98004
VP of Property Management — Phillip Scott
(425) 460-5840 or (206) 861-5770 or Phillip.scott@kemperdc.com
**Security — (425) 460-5730**

**Landlord's Legal Representative**   Perkins Coie LLP
10885 NE 4th Street, Suite 700
Bellevue, Washington 98004
Attn: Craig Gilbert
(425) 635-1400   Fax  (425) 635-2400

**Project Architect**   Sclater Partners Architects, P.C.
414 Olive Way, Suite 300 '
Seattle, Washington 98101
Attn:  Craig Kasman
(206) 624-8682    Fax  (206) 621-8445

**Space Planner**   JPC Architects
909 112th Ave. NE, Suite 206
Bellevue, WA 98004
Attn:  Amy Nichols
(425) 641-9200

**Structural Engineer**   Cary Kopczynski & Co.
10500 NE 8th Street, Suite 800
Bellevue, Washington 98004
(425) 455-2144   Fax (425) 455-2091

**Electrical Contractor**   Nelson Electric
9620 Stone Avenue N, Suite 201
Seattle, Washington 98103
(206) 523-4525    Fax (206) 527-9539

**Fire Protection Contractor**   Patriot Fire Protection Inc.
2707 70th Avenue E
Tacoma, Washington 98424
(253) 922-4200   Fax (253) 922-6150



**Fire Alarm Contractor**   SimplexGrinnell
  9520 10th Avenue S, Suite 100
  Seattle, WA 98108
  (206) 291-1400   Fax (206) 291-1500

**Mechanical Engineer & Contractor**   MacDonald Miller Facility Solutions
  7717 Detroit Avenue SW
  Seattle, Washington 98106
  Attn:  Jon Sigmund
  (206) 768-4222   Fax (206) 768-4223

**Roofing Contractor**   Snyder Roofing
  20203 Broadway Avenue
  Snohomish, Washington 98296
  (425) 402-1848

## B.  Government Agencies:

**Building Department**   City of Bellevue - Design and Development
  P.O. Box 90012
  Bellevue, Washington 98009
  (425) 452-6864

**Fire Department**   Bellevue Fire Prevention Bureau
  766 Bellevue Way S.E.
  Bellevue, Washington 98004
  (425) 452-6872

## C.  Utility Services:

**Water**   Water and Sewer Utilities
  City of Bellevue
  P.O. Box 90012
  Bellevue, Washington 98009
  (425) 455-6864

**Electricity**   Puget Sound Energy
  10608 NE Fourth Street
  Bellevue, Washington 98004
  New Services
  (425) 455-5120

**Telephone**   CenturyLink
  Business Services
  (800) 603-6000



**BELLEVUE PLACE**

# ARTICLE III: TENANT IMPROVEMENT DESIGN AND LANDLORD APPROVAL PROCESS

### Section 3.01: Description of Tenant's Additional Improvements and Design Criteria

This section describes the Tenant's Additional Improvements and outlines the design phase of the tenant improvement process, including design criteria to meet both building requirements and those of the appropriate government agencies. Landlord reserves the right to change the design criteria from time to time.

Tenant shall inspect the Leased Premises and verify the existing conditions within the space prior to starting design work. Regardless of existing conditions, any work not specifically described as Landlord's Work shall be a part of Tenant's Additional Improvements.

To begin the design phase, Landlord shall send Tenant the "Tenant Information Package". This package shall include this document (Tenant Design and Construction Manual) along with a plan of the Leased Premises and the previous "Tenant Improvement" drawings of the space, as available. This information will assist Tenant's architect in the design phase. **It is the Tenant's responsibility to verify the existing conditions of their space.**

All design work shall be done by an architect licensed in the State of Washington. It is Tenant's sole responsibility to conform the design of the space to all applicable government rules, regulations and codes and to obtain all necessary permits and authorizations required for the construction of any and all improvements and alterations to the Leased Premises. Without limiting the generality of the foregoing, Tenant shall be solely responsible for ensuring that its design will not violate any local, state, or federal law pertaining to barriers to the disabled such as the federal Americans with Disabilities Act (the "ADA") and the Americans With Disabilities Act Accessibility Guidelines ("ADAAG").

### Method of Measuring Tenant Spaces

Standard Building Owners and Managers Association International (BOMA) calculations are used to measure tenant spaces.

33128-0230/141407605.1



BELLEVUE
PLACE

**Section 3.02: Design Criteria**

**Design Process**
Planning and construction for the Leased Premises in both the Bank of America Building and Bellevue Place Corner Building are broken into two phases:

- Schematic Phase (Space plan)
- Construction Document Phase (Working drawings)

Depending on the Lease, there are two different ways the design and construction process will proceed:

<u>Turn-Key by Landlord:</u>  If the Lease is a turn-key lease, Landlord will coordinate, oversee and manage the entire design and construction process of the space improvements.  During lease negotiations, Tenant's representative will meet with Landlord and Landlord's space planner to come up with an agreed upon scope of work for the space. Landlord will be responsible for all bidding, contracting, coordination, and management of the project to achieve the agreed upon scope within the timeline set forth.  Tenant will be responsible for all costs and delays due to Tenant changes to the scope after the scope is agreed upon.  All changes must first be approved by Landlord.

<u>Tenant Managed Tenant Improvements:</u>  Tenant will hire Landlord's space planner (or another space planner approved by Landlord) to prepare design drawings and determine the scope of work for the build-out of the space. Tenant will follow the process outlined in the Tenant Design and Construction Manual for the design, planning, permitting, Landlord review, and construction of the space.  Tenant will be responsible for all bidding, contracting, coordination, and management of the project.

The schematic plan shall be prepared and submitted to Landlord within 30 days of Lease execution, or as otherwise stated in the Lease, and shall define the layout of the Leased Premises showing the location of all physical features such as:  walls, doors, rooms, etc.  A finish board indicating colors and materials shall also be submitted.

**Schematic Phase**

The space planner, licensed as an architect in the State of Washington, shall prepare a schematic plan of the Leased Premises based on the information listed below.  The space planner shall confirm the plan meets all current state, City of Bellevue, local fire, energy, ADA, and building code requirements.  That Schematic Plan shall address the following:

- Dimensions of all walls, openings and other space planning features
- Reflected ceiling plan; locating the ceiling grid and light fixtures
- Power and telephone plan; including specific requirements for computers and other dedicated circuits
- Location and dimensions of all slab penetrations
- HVAC modifications/requirements
- Plumbing modifications/requirements
- Number of personnel to occupy the space
- Number, size and relationship of private offices
- Conference room requirements
- Reception area requirements
- Storage and office support requirements
- Equipment needs

Tenant shall submit load calculations for mechanical and electrical review (see Mechanical/Electrical schedule, page 23), and should work with structural, mechanical, and electrical engineers when appropriate.

Landlord shall review the Schematic Plan with Tenant and make necessary changes until requirements are met. Upon approval from Landlord, Tenant shall prepare construction documents based on the Schematic Phase.

33128-0230/141407605.1



BELLEVUE
PLACE

### Section 3.03:  Standard Specifications

The Standard Specifications and Details referenced below outline Tenant's Improvements to be installed in and to the Leased Premises.  Unless otherwise approved by Landlord, Tenant's Improvements shall be designed and installed in accordance with the following Standard Specifications and Details.  (Tenant's Improvements, however, may not necessarily include all of the following items.)  Compliance with the following information will help to minimize construction costs and avoid delays.

**Shell Perimeter Walls, Corridor Walls, Demising Partitions, and Ceilings**

**Perimeter Walls**

Tenant is responsible for replacing the batt insulation with rigid insulation if improvements affect shell perimeter walls.

**Standard specification:**

Sill height shall be 2'5" with 2" aluminum frame at windows with GWB installed below sill.

**Corridor Walls**

Corridor walls are as-is.  However, after a full-floor tenant vacates, Landlord will install corridor walls throughout the space to a finish condition on the common area side, and open-stud condition on Tenant's side.

**Standard specification:**

Corridor partitions must be built with one-hour construction rating with a demising wall on one side of the corridor, core shaft wall opposite side, with one-hour rated ceiling above.

**Demising Partitions**

Tenant shall finish demising walls to maintain integrity of sound insulation and fire ratings.  Demising walls shall be 6" metal studs.  No GWB provided by Landlord at interior demising walls.  All shell and core fire ratings must be maintained throughout the project.

**Standard specification:**

2 1/2" 25-gauge galvanized steel studs at 24" on center.
Partition height shall be 8'6".
Continuous acoustical sealant at base of GWB on both sides.
Wall terminated at underside of acoustic ceiling.
1/2" reveal to be painted black.
2 - 1/2" USG Thermafiber Sound attenuation batts floor to ceiling in stud cavity.
2 - 1/2" Thermafiber Sound attenuation blanket 2'0" each side of partition in ceiling plenum.

**Standard Partitions**

**Standard specification:**

2 1/2" 25-gauge galvanized steel studs at 24" on center.
Partition height shall be 8'6".
5/8" gypsum wallboard each side, smooth finishes.
Wall terminated at underside of acoustic ceiling.
1/2" reveal to be painted black.

**Column Finish Treatment**

5/8" GWB wrapped all exposed sides.

33128-0230/141407605.1



## Ceiling

Tenants must maintain a ceiling system.  If open ceiling structures are essential to Tenant's design, Landlord approval must be obtained to ensure a high level of finish is achieved.  Tenant shall not suspend anything from the structural deck other than ceiling light fixtures, ceiling diffusers, and grilles, to a maximum load of 5 lbs. per square foot, without the prior written consent of Landlord.  Any system to be suspended from the deck must be submitted to Landlord's engineer for acceptance of the system design, at Tenant's cost.  Tenant and Tenant's engineer shall certify that the system installed is in conformance to local, state, and federal building codes relating to structural loading and seismic restraint under the authorities having jurisdiction.

All mechanical equipment suspended within the Leased Premises shall be designed and installed with vibration isolators.

### Standard specification for Acoustic Ceiling:

Typical finished ceiling heights are 8'6" with an exposed thin grid system, 2'x4'.
Mineral fiber lay-in panels, 2'x4', regular 2'x2' edge detail, fissured pattern.

## Doors, Frames, Hardware

### Standard specification:

Suite entry doors - 3'0" x 7'10" x 1-3/4".
Cherry, plain sliced, center book matched.
20-Minute labeled door assembly, smoke tight.
Frame - cherry.
Hardware - US26 D satin chrome.
One lockset with lever handles, two pair butts, one closer, and wall bumper.  All proximity card readers must be black, surface mounted and approved by Landlord.

Standard interior door - 3'0" x 7'10" x 1-3/4".
Door opening size - 3'0" x 7'0".
Cherry, plain sliced, center book matched.
Frame - cherry.
Hardware - US26 D satin chrome.
One lockset with lever handles, two pair butts, and wall bumper.

## Paint

One coat latex primer-sealer, two coats latex eggshell emulsion.  Color to be selected by Tenant from the Leased Premises Standard Finish Selection or otherwise approved by Landlord.

## Flooring

Tenant shall be responsible for provisions of ADA compliant transitions.  Tenant shall be required to provide drawings for Landlord's review and approval for all work that requires penetrations through structural slab floors to include, but not limited to:  slab openings for elevators, associated pits, atria, mechanical shafts, venting shaft pathways, and risers.  All such work will be performed by Landlord at Tenant's cost.  Any work required to provide for depression and/or raised areas, slots in floor slab for door tracks, door closures, door supports, and special floor finishes, is to be performed and completed by Tenant.  No cutting into, coring, jack hammering, or loading of the floor will be permitted if such work impairs the structural capacity of the floor.  Tenant shall install expansion joints where required.  Any modifications (core drills, etc.) to the floor system shall be reviewed and approved by Landlord's engineer, prior to commencing.

Such work will be required to be x-rayed by Tenant with written confirmation provided to Landlord prior to work commencing.  All x-raying of the floor slabs are to be executed during non-working hours so as to not disrupt any ongoing work or tenant operations.



BELLEVUE
PLACE

Any penetrations through a fire-rated assembly are to be minimally fire-rated to the equivalent of the original assembly.

**Standard specification:**
Carpets must be 30 ounce cut pile, chosen from the Leased Premises Standard Finish Selection or approved by Landlord.

Base must be resilient, 4" rubber base at carpeted floor.  Color selected by Tenant from the Leased Premises Standard Finish Selection or approved by Landlord.

## Penetrations, Welding, Hot Work
All core drilling and cutting of the concrete slab will be done after "normal" business hours, and approved by Landlord before work is started.  The general contractor is responsible for notifying Landlord so Landlord can coordinate with all adjoining tenants affected.  All security required for entrance into another tenants leased space during "off" hours is the responsibility of the general contractor.

Any welding requires the prior authorization of Landlord and Hot Work Permits are required, which can be obtained through Bellevue Place Security (425) 460-5730.  See page 38 to view a sample.

In addition, Tenant's contractor must ensure that all appropriate safety requirements are met and the following items provided:

- Protection screens to isolate the area from slashes and sparks
- Flashback arrestor fitted to the inlet connection of the welding and cutting blowpipes
- Fire extinguishers
- Fire Watch by outside vendor or Bellevue Place Security

## Waterproofing
All waterproofing shall be provided by Tenant.  All tenants must install a waterproof membrane within the kitchen areas, toilet rooms, and mop sink areas within any office, retail or restaurant space.  The membrane must extend up the wall and all plumbing, piping or electrical conduit, and any other floor penetration a minimum of six inches (6").  Landlord reserves the right to perform a waterproof membrane inspection at Tenant's expense.  Tenant is to provide an accurate installation schedule and coordinate the inspection with Landlord's Tenant Coordinator prior to installing the final flooring finishes.  Waterproof membranes may be required in areas other than stated above, if determined by Landlord that those areas require such protection.

Acceptable waterproofing products are manufactured by:
   Siplast -- http://www.siplast-international.com
      Local Representative -- Brad Viles  (425) 391-6893
   Kemper -- http://www.kempersystem.co.uk/p_fasttrack.html
      Local Representative -- Roland Wieth  (253) 606-6936
   Installation shall comply with all written installation guidelines and published details.
   Installing contractors shall be approved by the manufacturer.

Wetherholt and Associates shall be retained by Tenant to provide:
·    Pre-installation meeting of all parties associated with waterproofing.
·    Periodic part time inspection with a minimum of three site visits a week.
·    Review the start and end of all required water tests.
Contact Jeorge Hopkins,  Wetherholt & Associates Inc. (425) 822-8397

## Plumbing
All plumbing work, including but not limited to, the provision of plumbing fixtures, electric water heaters, etc., shall be designed and provided by Tenant.  Domestic water piping should be Type K or Type L copper, depending on specifications and insulated per the City of Bellevue Energy Code.  All scope must be reviewed and approved by Landlord.

Tenant shall provide shut-off valves in the supply piping to every fixture. Toilet rooms with flush valves shall have a



dedicated shut off valve to isolate the toilet room from the larger system.

All heating of domestic water shall be accomplished using electric water heaters.  Tenant shall contract with Landlord's contractor at Tenant's expense for all work outside of the Leased Premises. The water heater temperature and pressure relief drain shall be piped to a floor drain or other approved receptacle provided by Tenant. Trap primers are required for all floor drains per City of Bellevue requirements.  If a drain is existing, it is the Tenant's responsibility to verify the trap primers exist and are functioning properly.

All plumbing equipment and material required by Tenant shall become the property of Landlord upon installation.

Where plumbing lines are not being reused, they must be demoed, capped, sealed, and/or in-filled. This work inside the Leased Premises shall be verified by Landlord's plumbing contractor at Tenant's expense. During construction, removable plugs or caps shall be used on all plumbing services to keep debris from entering the system. Tenant's general contractor shall bear all costs associated with improper protection of waste, drain, and vent systems. If Tenant use requirements dictate upsizing of services, all associated costs shall be borne by Tenant.

Tenant shall install air chambers or shock absorbers in piping system to prevent noise and damage due to water hammer.

Waste and vent piping, shall be service weight cast iron, with no-hub fittings. Alternate materials are not accepted.

Tenant shall provide and install an approved grease trap or traps, complying with the City of Bellevue's requirements, in the waste line leading from sinks, drains and other fixtures or equipment where grease may be introduced into the sewage system. Tenant shall be required to provide an automatic chemical treatment system that injects grease dissolving chemicals into the piping system between the fixture and its P-trap. Where possible, above slab grease traps are recommended. Tenant shall contact the City of Bellevue for a list of approved chemical feed systems.

All plumbing equipment and material required by Tenant shall become the property of Landlord upon installation.

## Mechanical
Landlord shall approve all schematic mechanical system designs as part of the acceptance of Tenant's preliminary plans.  Any additional work associated with new equipment, such as added electrical capacity or structural support systems, shall be by Landlord at Tenant's cost.  All work outside the Leased Premises, shall be contracted directly with Landlord's mechanical contractor.

The mechanical contractor is responsible for the following:

- Verify design criteria based on original design, ventilation ratios, and load calculations.
- Inspect the existing space and compare the as-built records to the current conditions and notify Landlord of discrepancies.  Landlord will make a determination of further work based on observations.
- Removal of all existing fan coil units where there aren't 24 hour cooling requirements, including all ductwork and piping.  All removed equipment must be returned to Landlord.
- When removing CWFC (fan coil units), the chilled water and condensate pipes must be removed back to the closest "T".  Valves with caps should be provided for future use if not already existing.
- Re-balance all VAV zones in the remodeled space, regardless if diffuser modifications where made.
- Verify all VAV bottom service access panels are accessible for future use.
- Should for any reason the chilled water systems need to be drained down, the contractor shall provide Landlord's mechanical contractor ethylene glycol for replenishment of the system to the current 15% by solution values.  All costs to refill will be at Tenant's sole expense.

Any existing HVAC equipment that is in poor operating condition, or is deemed by Landlord to be beyond it's useful life, shall be replaced with new equipment upon prior approval by Landlord's mechanical contractor at Tenant's expense.

All existing PVC condensation drain piping inside Tenant's space shall be replaced with copper piping and must have a clean out in the line.  An auxiliary drain pan shall be installed below the fan/coil units, and a drain from the pan shall drain to a conspicuous location per City of Bellevue requirements.

33128-0230/141407605.1



Tenant shall provide all distribution supply and return air ductwork, diffusers, grilles, and registers.

Tenant shall provide low voltage control wiring and thermostats for proper operation of their HVAC equipment within the space. Thermostats specifications are required to be submitted for approval by Landlord's mechanical contractor.

Tenant shall furnish and install all power wiring, disconnects, fuses, circuit breakers, electrical outlets, and safety devices necessary to comply with local mechanical, electrical and fire codes. (See Electrical section for further details). NEC electrical clearances must be maintained at all times, including for existing equipment. The Tenant's mechanical engineer is responsible for verifying as-built conditions, comparing them to the new Tenant layouts and relocating equipment as needed. Tenant shall contract with Landlord's contractor at Tenant's expense for any work on the roof and any work associated with the building fire/smoke control system.

Tenant shall provide and install return air smoke detectors in all air conditioning units providing air in excess of two thousand (2,000) CFM to automatically shut off unit if smoke is detected. The smoke detector shall be installed in the return duct. Smoke detectors shall be Simplex model #4098-9756. The detectors shall be furnished, wired and programmed by Landlord's electrical contractor and installed by Landlord's mechanical contractor at Tenant's expense. Tenant shall bear all associated costs for programming and testing of duct mounted smoke detectors as required by the City of Bellevue prior to occupancy. If mechanical equipment is being reused, and the detectors are in the supply duct, they shall be replaced at Tenant's expense.

Any additional Tenant required HVAC equipment and material to be installed outside the Leased Premises shall be installed by Landlord's contractor at Tenant's expense. These costs would include, without limitation, all aspects of the mechanical equipment change, upgrade, or addition and related roofing, electrical, structural, or general construction work. Tenant shall contract directly with Landlord's contractors for the aforementioned work.

All HVAC equipment and material required by Tenant shall become the property of Landlord upon installation.

Tenant shall provide access panels in GWB ceilings, and walk platforms above, as required for servicing all HVAC equipment, including balancing dampers, fire dampers and smoke control dampers. Minimum access opening size shall be 24x24.

Access panels and walk platforms shall be shown on architectural plans and referenced on mechanical plans. Tenant must ensure that the ceiling structure or the work of any other trade does not block access to dampers and equipment above the ceiling so that periodic maintenance and testing can be performed.

Tenant shall contract with Landlord's contractor at Tenant's expense for all start-up, testing, and air balance work of HVAC equipment. Tenant shall complete the Start-up and Air Balance Request (referenced page 25), to ensure that each item on the request is completely finished, ensure the equipment is ready to run and contact the Building Engineer when ready for start-up and air balance of the HVAC system.

All HVAC and lighting work must comply with the Washington State Energy Code and Landlord's HVAC Design Criteria as outlined in this manual. Energy conservation is of the utmost importance and shall be reflected as such in Tenant's designs. **Tenant shall submit mechanical designs for review and approval prior to beginning any work.**

#### Smoke Control System:

Bellevue Place utilizes a floor by floor smoke control system. This system must be evaluated by Tenant's mechanical engineer and a letter, stamped by a Professional Engineer licensed in the State of Washington, must be written for each tenant improvement and addressed to the building official. The letter must explain how the integrity of the smoke control system is being maintained for the project. This must be available and submitted, along with the mechanical permit documents, to the City of Bellevue by Tenant's mechanical contractor.

All HVAC calculations shall be in accordance with the latest edition of the ASHRAE Fundamentals Guide and Data book, applicable codes, and good engineering practice. All calculations shall be submitted on the forms at the back of this manual for approval by Landlord's mechanical engineer. All calculations and drawings shall be certified by a currently registered Professional Engineer in the State of Washington. The units were originally designed in accordance with the following HVAC design criteria:

33128-0230/141407605.1



BELLEVUE
PLACE

Equipment replacement is recommended for any units that are oversized so as to promote energy conservation.

**Environmental Design Conditions:**
The cooling system will be based on the ASHRAE 2% design condition temperatures for Bellevue of 83/67°F DB/ WB. The indoor design temperature set-point will be 78° +/- 2°F. Air conditioning will be provided in all occupied areas.

The heating system will be based on the ASHRAE 99.6% design temperature of 24°F. The design will incorporate heating season indoor temperatures of 70° +/- 2°F in occupied areas.

**Ventilation Rates:**
Ventilation, pressurization, and air change rates will be provided in accordance with ASHRAE Standard 62-2010 (Ventilation for Acceptable Indoor Air Quality), and the current Washington State Energy Code.

**Humidity Control:**
Humidity control is not provided in the system. Tenant may need to provide humidity control as part of their system.

**Building Internal Loads:**
Building internal loads are based on ASHRAE recommendations. Factors impacting the building's internal loads are:

- Occupant Density - Densities will be based on 1 person for every 265 square feet.
- Lighting Loads - Loads will be coordinated with the electrical engineer. Lighting loads will be in the approximate range of 0.5 to 2.0 watts per square foot depending on the space usage.
- Miscellaneous Equipment Loads - Loads will be in the approximate range of 0.5 to 5.0 watts per square foot depending on use.

**Heating System:**
Shell and core and tenant system consist of electric heating at the VAV boxes.

It is Tenant's responsibility to ensure that heating and cooling equipment serving the Leased Premises is capable of automatically maintaining a winter inside dry bulb temperature of seventy degrees (70°) Fahrenheit and a summer inside dry bulb temperature of seventy-eight degrees (78°) Fahrenheit as stated above. The supply and return air systems shall be ducted. The ceiling plenum can be used for return air.

Landlord shall select the manufacturer of any building materials or equipment in which all or part is to be installed outside of the Leased Premises, or affects Landlord or other tenants. All new mechanical equipment shall be submitted for approval by Landlord's mechanical contractor.

All new and replacement equipment must exceed the current energy codes.

**Variable Air Volume Boxes (VAV's), for both the Bank of America Building & Bellevue Place Corner Building:**
The building standard VAV box is a Trane series fan powered box with ECM motor (no substitutions). Perimeter units have electric heat. Interior units may not have heat depending on use. Building supply air is delivered at 44°F but is reset seasonally up to 65°F based on outside air temperature and demand. Select VAV fan to be 120% of design maximum VAV valve airflow, in order to raise the air temperature delivered to the space.

Typical electrical must be 277/1. If providing a heater equal to or larger than 5KW, then specify 4-wire 460/3 power. ECM motor is 277/1 and requires a neutral wire. Tenant's mechanical contractor must provide controls per building control standard. They must also provide one stage of heat for every 5KW of heat per box and no cross zoning between tenants is allowed.

The following rooms must have a dedicated VAV zone:
- Conference rooms with 6 or more people
- Training rooms
- Corner offices

All new and replacement VAV's are required to be submitted to Landlord's mechanical contractor with associated
33128-0230/141407605.1



load calculations for approval, prior to installation.

**Chilled Water Fan Coil Units (CHW FCU's), for both the Bank of America Building & Bellevue Place Corner Building:**

The building utilizes a low temperature chilled water system with ice storage capabilities. The chilled water system is the primary source of 24/7 cooking and pot cooling in the building. All new chilled water loads must be submitted to Landlord's mechanical contractor with associated load calculations for approval. Building standard chilled water fan coil is Trane or equivalent with ECM motor (if available). The supply temperature is 38° with a 25° delta T and contains 15% glycol, and can be reset up to 55°F.

All chilled water system piping, equipment and accessories installed at or below the 7th floor must be considered "high pressure" and be rated for greater than 150 psi working pressure.

Typical electrical must be 277/1.

Tenant's mechanical contractor must provide controls per building standard with 2-way chilled water control valve.

Tenant's mechanical contractor must also provide a line sized hose kit that includes braided stainless steel flex hoses, strainer, shut off valves and balancing valve. FDI VersaFlow kit B or equivalent.

Condensate must be sloped to an appropriate drain location per local codes and add a plenum rated condensate pump if required. Pan overflow alarm and connection to BMS should also be included.

Mechanical contractor must dispose of glycol/water mixture per EPA guidelines when draining and replace with equivalent mixture when re-filling the system. Mixture may be stored and re-used with building approval.

Existing CHW FCU's that are not being re-used must be demolished including chilled water mains back to the main branch shut-off valves and lines must be capped. All new and replacement CHW FCU's are required to be submitted to Landlord's mechanical contractor with associated load calculations for approval prior to installation.

**Condenser Water System for both the Bank of America Building & Bellevue Place Corner Building:**

Both buildings utilize a condenser water system that is common to the main chillers and air handlers. It provides cooling for the chillers and/or waterside economizer or pre-heat to each floor by floor AHU as needed. As such, this stems should not be used for auxiliary cooking needs. The cooling tower is an open cooling tower and does not contain glycol.

The condenser water supply temperature is 79° with a 10° delta T with no glycol. At times, the temperature can reach 100° for AHU preheat. All condenser water system piping, equipment and accessories installed at or below the 5th floor must be considered "high pressure" and re-rated for greater than 150 psi working pressure.

Water source heat pumps shall not be connected to the condenser water system.

Thermostats shall be fully compatible with existing building DDC system. **Battery back-up programmable thermostats are not permitted.** All thermostats are required to be submitted to Landlord's mechanical contractor for approval.

Grilles, registers, and diffusers shall be manufactured by Krueger, Titus, Shoemaker, or Price. Tenant's mechanical engineer or contractor shall submit type and manufacturer of GRD's to permit proper balance of equipment by Landlord's contractor.

**Electrical**

Tenant is responsible for having a complete electrical power and lighting distribution system within the Leased Premises. This includes, but is not limited to: temporary power during construction, transformers, panels, lighting panels, breakers, branch circuits, outlets, battery back-up, emergency egress/exit lighting, and electrical circuits to signage, including wiring and connections. Tenant shall provide electrical equipment rooms if required to house Tenant's systems (no space will be provided in building electrical equipment rooms to house Tenant's electrical equipment). Provision and/or installation of telephone/communications cabling and wiring from the telecom



BELLEVUE
PLACE

equipment rooms to and within the Leased Premises are to be done and completed by Tenant.

Each tenant floor is furnished with a 480/277 volt panel board for high-volt usage that is typically used for "house" lighting. Tenants shall use Landlord's electrical contractor to connect 277V lighting circuits to the common panels located in the electrical equipment rooms, which are located on every floor. Tenant will also install all supplemental lighting control relay panels and other lighting controls as required to meet Washington State Energy Code within the Leased Premises. Space will not be provided to Tenant in building electrical rooms.

Any supplemental HVAC units that must be installed outside the Leased Premises must be approved by Landlord for installation location and electrical capacity. Conduit routing outside of Tenant's space must be approved prior to installation. Tenant shall provide all power wiring for HVAC equipment including conduit, conductors, safety disconnect switches, lights, and receptacles required for servicing HVAC equipment. Tenant's contractor shall extend the conduit to the electrical panel and provide the branch circuit conductors from the panel to the disconnect switch and connections from the disconnect switch to the HVAC unit, including motor rated fuses to match the HVAC unit amperage rating.

The main electrical switch shall be sized for the following capacity: four (4) watts/square foot, safe for miscellaneous equipment (receptacles, etc.) and power sufficient for the installed lighting, water heater, and HVAC units. Lighting capacity may be limited by the HVAC cooling capacity available in the Leased Premises. Please refer to the mechanical section of this manual.

Installed lighting fixtures and control systems must comply with the Washington State Nonresidential Energy Code, and calculations showing compliance with code need to be specified on the drawings.

All construction power supplies used by Tenant's contractor must be fitted with ground fault interrupters. Electrical leads must be placed on stands or suspended and should not be run along the ground where they may be damaged or create a trip hazard. By no means will extension cords be permitted outside the Leased Premises.

If you require information relating to the purpose or source of cables in your space, contact Landlord. Under no circumstances should any cables be cut.

Landlord's electrical contractor is to perform all work outside of the Leased Premises, including tie-in to main electrical panels.

Panel schedules must be updated at the closeout of each project. Circuits in multi-tenant panels must be identified by Tenant name and description of area served.

Tenants with high energy usage (server rooms, multiple computers per desk, etc.) may be required to install an electrical sub meter at Landlord's discretion at Tenant's cost.

## Lighting
Tenant shall be responsible for upgrading all lighting within the Leased Premises to the following specifications, if not already completed:

**Fixture:** LIGHTOLIER, Coffaire II Recessed Fluorescent Direct/Indirect - 2'x4' with Perforated Basket, Air Return, 2 Lamp T8

**Bulb:** T8, 32 WATT, 3500K

Single-floor Tenant's elevator lobby and corridor lighting to be reviewed and approved by Landlord and provided by Tenant.

**Standard specification:**
Outlets - Wall-mounted 12" above finished floor unless otherwise specified.
Telephone/CRT Outlets - Wall-mounted 12" above finished floor unless otherwise specified.
Exit signs - Universal standard exit sign with stencil face and arrows as required.

33128-0230/141407605.1



## Structural and Roofing

### Structural
Any alterations, additions or reinforcements to the building to accommodate Tenant's work shall be at Tenant's sole cost and expense and require Landlord's prior approval.

### Roof
All roof penetrations or roof work shall be approved by Landlord.  Tenant shall contract with Landlord's contractor for engineering and installation at Tenant's expense.  (See mechanical section of this manual for further information regarding roof penetrations)

## Fire and Life Safety, Fire Sprinklers, Fire Extinguishers

Tenant shall modify the sprinkler system within the Leased Premises to conform to all code and/or regulatory requirements.  A minimum one hour fire resistance rating is to be maintained as per the City of Bellevue requirements. Any modification to the sprinkler system by Tenant is to be performed by Landlord's contractor at Tenant's expense, so as not to void any warranties, certificates and/or insurance underwriting requirements currently in place.  Tenant shall be responsible to repair and/or replace any fireproofing already in place that is disturbed, damaged and/or related to Tenant work.  Any firefighting, fire prevention, safety and emergency equipment or lighting in and about the Leased Premises, such as fire extinguishers, additional to that included in the base system provided by Landlord, and required by any authority having jurisdiction, shall be installed by the Tenant at Tenant's expense.

### Fire/Life Safety – Mechanical
The building is equipped with a smoke control system, that consists of dampers on each floor.  The system must remain unaltered unless Landlord has permitted otherwise.

### Fire/Life Safety – Electrical
Landlord provides a central Simplex alarm system for the space.  Tenant shall be provided with Fire Alarm Voice and Alarm Circuits in a J-Box located within the Leased Premises for a single point connection to Landlord's monitoring service as required by code and Landlord's central system.  Design and connection to Landlord's fire protection system shall be made by Landlord's contractor at Tenant's expense.  All fire alarm components used within the Leased Premises shall be U.L. approved and fully compatible with the base building Simplex system.  The system shall be fully programmed, with graphics, for annunciation of the base building system.  Tenant shall be responsible for any troubleshooting, investigation and/or repairs required to place the system in full working order. Fire system wiring is *not* allowed to be directly attached to all thread hangers, and must be attached using a secondary attachment method.  Connection to the NAC panel and smoke detector circuits connected to the house panel, are to be completed by Nelson Electric at Tenant's sole expense.

### Standard specification:
Smoke detectors must be surface-mounted.
Emergency speakers should be flush-mounted, 6 1/2" square frame.

## Automatic Sprinkler System
Tenant is responsible for upgrading all sprinklers to quick response heads, per current code, if not already installed. Tenant shall contract with Landlord's contractor at Tenant's expense for all automatic fire sprinkler system engineering, materials, and installation. Tenant is responsible for the cost of obtaining approvals from the City of Bellevue, Landlord and Landlord's designated representative(s).

Where existing, in previously improved spaces, the automatic sprinkler system in the Leased Premises may be reused at Tenant's discretion subject to adequate capacity, condition, acceptable location and code requirements.

The Leased Premises must remain fully sprinkled at all times.  All sprinkler system modifications shall be made in accordance with the current International Building Code (IBC) and all applicable state and local codes.

Tenant is required to submit system design for review and approval prior to beginning work.  Tenant shall not proceed with any ceiling work until notified of sprinkler rough-in and inspection.

A vertical clearance of eighteen inches (18") must be maintained from sprinkler heads to any shelf storage or
33128-0230/141407605.1



materials that could impair water distribution.

Tenant must take note if sprinkler protection is required above the ceilings of the Leased Premises.  If it is required, care must be taken in positioning equipment, ducts, and demising walls, so as not to impair the sprinkler distribution. When impairment is unavoidable, sprinkler coverage above the ceiling must be modified to maintain proper coverage, at Tenant's expense.  To assist with sprinkler layout, Tenant's architect shall dimension all ceiling grid and elements such as lights, speakers, and other ceiling mounted items from building column lines.

Slab penetrations shall be core drilled, sleeved, fire-safe, and waterproofed.  Tenant shall have all core drill locations approved by Landlord.

All materials shall be listed by Underwriter's Laboratories.  All sprinkler heads shall be quick response and manufactured by Reliable Automatic Sprinkler Co., Inc.  Building standard sprinkler heads are as follows:

> Finished Ceilings - Reliable "G4A" concealed, 165 degree, 1/2" orifice, white paint finish or equivalent, SIN: R5415.

> Any other sprinkler finish must be specified by Tenant's architect.

Impairment of the sprinkler systems requires drain and re-fill procedures to be followed.  Please refer to the Fire System Sprinkler Drain and Re-Fill Procedure Form on page 35.

**Fire Extinguishers**
Tenant shall provide fire extinguishers as required by the City of Bellevue.

Fire Extinguishers shall be 2A10BC type.  Fire extinguishers shall be mounted in semi-recessed 1/2" stainless steel flat trim type cabinets.

**Communication System**
Tenant shall provide all telephone wiring and equipment, including:  all distribution and extensions of telephone conduit within the Leased Premises and all data, intercom, computer, communication, fire and burglar/security alarms, and signal systems required by Tenant.  All Tenant equipment must be confined to Tenant's Leased Premises.

**Satellite Dish**
Satellite dishes and certain forms of data and/or telecommunications equipment may be permitted or allowed to be provided and/or installed on the roof or other portions of the building exterior only after review and approval by Landlord.  All work to be performed on the roof or other portions of the building exterior shall be performed by Landlord's contractor at Tenant's expense.

A Satellite Dish License Agreement must be executed prior to equipment being installed.

**Section 3.04:  Existing Building Conditions**

· Concrete floor slab is generally smooth-finished concrete without depressed or raised areas.
· Structural framing is reinforced concrete.
· Floor load capacity is ninety-five (95) pounds per square foot.
· Typical structural bay size:
  · Bank of America Building:  30' x 33'
  · Bellevue Place Building:  Varies

· Typical floor-to-floor heights:
  · Bank of America Building 2nd floor: 14'0"
  · Bank of America Building 3rd floor and above:  12'2"
  · Bellevue Place Corner Building 2nd floor: 14'0"
  · Bellevue Place Corner Building 3rd floor and above:  12'6"

33128-0230/141407605.1



**Doors, Frames, Hardware**
Wood finish on cherry:  medium stain with multiple coats of hand-rubbed lacquer.

**Paint**
One coat latex primer-sealer, two coats latex eggshell emulsion.

**Section 3.05: Design Submittal Requirements**

Landlord's review and approval process of the complete Tenant Design Package must be completed prior to Tenant commencing any work.

Landlord's approval of Tenant's plans shall only acknowledge conformity to the aesthetic design objectives and criteria of Bellevue Place/Bank of America Building, and in no way signifies that Tenant's plans comply with any ordinances, codes, laws, rules or regulations applicable to Tenant's permitted uses, nor does such approval connote any professional assessment of the quality, durability or safety of Tenant's design or the materials to be used in construction of Tenant's leasehold improvements.  Should a discrepancy occur between the Tenant Design & Construction Manual and the approved drawings, the Tenant Design & Construction Manual shall take precedence.

Any changes, modifications or alterations requested by Tenant must be reviewed and approved by Landlord, and any additional charges, expenses or costs, including architect's or other consultant's fees incurred by Landlord as a result of any such request shall be paid by Tenant.  Landlord shall have the right to demand payment for such changes, modifications, or alterations prior to Landlord consenting to any work in the Leased Premises.

If the Leased Premises has not been constructed in accordance with the approved drawings, Tenant shall not be permitted to occupy the Leased Premises until the Leased Premises complies in all respects with the approved drawings.  However, if Tenant is allowed to occupy the Leased Premises and notwithstanding any lapse of time, Tenant shall bring the Leased Premises into compliance with the approved drawings.

Note that in each place in this manual where Landlord's consent or approval is required, unless otherwise specifically agreed to in writing, Landlord reserves the right to withhold its consent or approval for any reason, or no reason, in its sole subjective discretion.

A.  **Preliminary Submittal**
Tenant shall submit to Landlord an electronic **Preliminary Submittal (PDF format)**:

Floor Plan, at 1/4" = 1'-0" scale
Reflected Ceiling Plan, at 1/4" = 1'-0" scale
Entry Elevation, at 1/4" = 1'-0" scale
Mechanical Plan, at 1/4" = 1'0" scale
Finish Schedule with Color Samples

The purpose of the Preliminary Submittal is to determine general conformity with the design criteria.

An electronic set of drawings, with Landlord's preliminary notes, shall be returned to Tenant.  In the event of any changes, additional preliminary drawings may be required. Should the drawing not meet Landlord's minimum requirements or industry standards, new drawings shall be required.

B.  **Final Submittal**
Within thirty (30) days of receiving the floor plan for the Leased Premises from Landlord, Tenant must electronically submit to Landlord final drawings prepared by Tenant's licensed architect. All mechanical and electrical drawings and calculations shall be certified by currently registered State of Washington Professional Engineers.

Tenant shall submit a **Final Submittal**, in PDF format, to Landlord.  It shall include the following:

**Architectural Drawings**:
Floor Plan, at 1/4" = 1'-0" scale
Longitudinal Section, at 1/4" = 1'-0" scale
Interior Elevations, at 1/4" = 1'-0" scale



Reflected Ceiling Plan, at 1/4" = 1'-0" scale
Partition Wall Sections, at 1/2" = 1'-0" scale
Door, Finish and Color Schedules and Samples
Specifications

**Mechanical Drawings:**
HVAC Distribution Plan, at 1/4" = 1'- 0" scale
Controls Plan
Reflected Ceiling Plan, at 1/4" = 1'- 0" scale
Mechanical/Electrical Schedule
Plumbing Plan, at 1/4" = 1'- 0" scale
Plumbing Fixture Units Schedule
Specifications
Plumbing and Mechanical plans must be stamped by a professional engineer currently licensed in the State of Washington.
Complete Mechanical/Electrical Schedule and Plumbing Fixture Units Schedule, located in this manual.

**Electrical Drawings:**
Floor Plan showing light fixtures, switches, receptacles and equipment
Branch circuit wiring and circuiting
Riser diagram and load summary
Panel Schedules
Specifications
Light Fixture Schedule
Fire Alarm Plan
Fire Sprinkler Layout/Plan
Calculations showing compliance with the Washington State Energy Code

**Permits**
Tenant shall provide all required permits, plan check fees, and all other required government approvals.  It is the Tenant's responsibility to contact the local governing agencies to obtain current permit requirements.  Below is a list of contact information for local agencies having jurisdiction over the property:

**Building Department**   City of Bellevue - Design and Development
    P.O. Box 90012
    Bellevue, Washington  98009
    (425) 452-6864

**Fire Department**   Bellevue Fire Prevention Bureau
    766 Bellevue Way S.E.
    Bellevue, Washington  98004
    (425) 452-6872

After the construction documents have been approved and signed by both parties, any revisions or changes will require Landlord's approval.  Tenant shall be responsible for all costs associated with said changes.



BELLEVUE
PLACE

## MECHANICAL/ELECTRICAL SCHEDULE

Submit only one completed form.

Prepared by: _____

Mechanical_____Phone_____Date_____

Electrical_____Phone_____Date_____

1. Tenant Name_____Space#_____
2. Tenant Drawing #'s:Mechanical_____Electrical_____
3. Floor Area_____Square Feet
4. Electrical Load Breakdown
    A. Interior Lighting _____ Watts
    B. Signage _____ Watts
    C. Appliances _____ Watts
    D. Receptacles _____ Watts
    E. HVAC Equipment _____ Watts
    F. Electric Water Heater _____ Watts
    G. Miscellaneous Elect. Equipment _____ Watts
    H. Total Connected Electrical Load _____ Watts, _____ Watts per Square Foot
5. Cooling Load Breakdown
    A. Lighting In Space _____ BTUH
    B. People _____ BTUH
    C. Infiltration _____ BTUH
    D. Ventilation _____ BTUH
    E. Solar and Transmission Gains _____ BTUH
    F. Electrical Transformer _____ BTUH
    G. Misc. Heat Generating Equipment _____ Watts or BTUH
    H. Space Sensible Cooling Load _____ BTUH
    I. Space Latent Cooling Load _____ BTUH
    J. Total Space Cooling Load _____ BTUH
6. Toilet Exhaust _____ CFM

Note:   Please attach to this sheet any special exhaust or make-up air system(s) data.  Use CFM, H.P., method of operation, etc.  Miscellaneous heat generating equipment must be also be attached to this sheet, complete with heat output generated and applicable diversity factor.

## PLUMBING FIXTURE UNITS SCHEDULE

Prepared by:_____

Engineer_____Phone_____Date_____
1. Tenant Name_____Space#_____
2. Tenant Drawing #'s: Plumbing _____
3. Fixture units

Water closets _____Total fixture units        Grease waste fixture units _____
Lavatories _____ Total fixture units          Sanitary waste fixture units _____
Sinks _____ Total fixture units                Vent Fixture Units _____
Water fountains _____ Total fixture units
Other
_____Total fixture units
_____Total fixture units
_____Total fixture units

33128-0230/141407605.1



**START-UP AND AIR BALANCE REQUEST**

In order to save time during start-up, inspection, and balance of your Tenant space HVAC units, the following checklist is to be completed and returned to Landlord when requesting start-up:

1. Tenant Name _____ Space # _____

2. Contractor Contact _____ Phone _____

3. Mech. Contractor Contact _____ Phone _____

4. Elec. Contractor Contact _____ Phone _____

5. Electrical    Yes  No  Remarks
   AC or FCU/CU Unit numbers        _____
   Disconnects mounted? _____
   Power to the disconnects?  _____
   Voltage to the disconnects correct? _____
   Correct size wire to the unit ? _____
   Proper size fuses installed? _____
   Thermostat mounted and wired? _____
   Duct heaters disconnects/fuses installed? _____

6. Sheet Metal    Yes No  Remarks
   Mech. design review passed? _____
   Duct work complete? _____
   Diffusers in?      _____
   Damper installed for each supply grill? _____
   Return air system installed? _____
   Restroom exhaust installed? _____

Date _____ Signed _____
                                               Contractor

Start-up Remarks (for Landlord's use)

_____

_____

_____

_____



BELLEVUE
PLACE

## Article IV: CONSTRUCTION PHASE

### Section 4.01: Construction Agreement

During the construction process, ultimately the Tenant is responsible for the contractor's activities as it relates to the building, unless Landlord is carrying the construction contract. It is strongly suggested that the tenant improvements agreement include the requirement that the contractor comply with all of the conditions contained in Tenant's Lease Agreement.

Tenant must use only general contractors who are bondable, reputable and have an understanding of local codes and subcontractors. All contractors must be approved by Landlord.

**Tenant shall contract with Landlord's specified contractor at Tenant's expense for the following work:**

**Snyder Roofing:**
  • Roofing, flashing, counter-flashing, roof penetrations, roof repairs and curbs

**Patriot Fire Protection Inc.:**
  • Automatic Fire Sprinkler System including engineering

**MacDonald Miller Facility Solutions:**
  • Low voltage control wiring between the energy management system and Tenant's HVAC equipment
  • Installation of HVAC equipment and mechanical work outside of the Leased Premises
  • Start-up, testing, and air balance of HVAC equipment

**Nelson Electric:**
  • Connection to building fire alarm system and building house panels
  • Electrical rooftop work

### Section 4.02: Preconstruction Meeting

Tenant's contractor is required to contact Landlord's Tenant Coordinator to setup a preconstruction meeting. Prior to the meeting, all submittal requirements must be submitted and approved by Landlord and a signed Lease between Landlord and Tenant must be in place. Certificate of Insurance, bonds, construction deposit, copy of the owner's contract, Schedule of Values, sub-contractor list, and construction schedule as required from the contractor will be given to Landlord at this time. All items must be submitted prior to the start of construction, *without* exception.

**Construction Contract and Schedule of Values**
Tenant shall provide Landlord with a copy of the contract between Tenant and contractor, including the Schedule of Values.

**Payment and Performance Bonds**
Tenant shall obtain or cause its contractor to obtain, at Tenant's expense, separate labor and material payment and performance bonds. The amount of each of the bonds must be equal to the actual contract price. In lieu of the bonds either a certified check or a line of credit accessible solely by Landlord may be obtained in the amount of one and one-half times (1 1/2) the estimated cost of construction, alteration, or improvement work. The bonds shall require Landlord's signature for cancellation. Each bond shall remain in force for no less than three hundred sixty-five (365) days following completion of the work. Such bonds shall cover the faithful performance of the contract for the construction of Tenant's work and the payment of all obligations arising there from and insure Landlord against any liability for mechanic's and material man's liens arising from Tenant's work.

If, at any time prior to completion of Tenant's work, Tenant or Tenant's contractor requests a change order or orders, which in the aggregate exceed ten percent (10%) of the separate payment and performance bonds, Landlord's approval may be conditioned upon Tenant causing the amount of the bonds to be increased to cover the cost of the additional work.

Contractor shall notify Landlord immediately in writing if Tenant fails to pay such contractor in accordance with the terms of the contract.

33128-0230/141407605.1



BELLEVUE
PLACE

**Certificate of Insurance**
Prior to starting work, Tenant's contractor shall submit to Landlord evidence of liability insurance with a reputable insurance company or companies with a combined single limit of three million dollars ($3,000,000) for personal injuries or property damage to indemnify both Landlord and Tenant against any such claims, demands, losses, damages, liabilities, and expenses. Tenant's contractor shall also have Automobile Liability, Workers Compensation, and Employers' Liability coverage. All subcontractors must have insurance coverage as well. Both Landlord **(Kemper Development Company, Kemper Holdings LLC, Bellevue Place Office, LLC)** and Tenant shall be listed as " additional insured". See page 34 for an example.

**Acceptance of Leased Premises**
Tenant and Tenant's contractor shall accept the Leased Premises prior to starting any demolition or construction.

**Construction Schedule**
Tenant's contractor shall provide Landlord with a standard construction schedule on paper and in an electronic format (MS project or similar) in "bar graph" form indicating the completion date of all phases of Tenant's work. Schedule should also include major deliveries and any shutdowns.

**Building Permit**
A building permit must be issued by the City of Bellevue prior to commencing work. The permit must be prominently displayed in the Leased Premises throughout the construction period.

**Subcontractor List**
Contractors shall supply Landlord's Tenant Coordinator with a list of all subcontractors to be used with both contact names and phone numbers.

**Construction Deposit**
A check in the amount of $5,000 written to *Bellevue Place Office, LLC* for a construction deposit is required unless otherwise stated in the Lease, and must be given to Landlord prior to any work commencing. Construction deposits cover costs associated with maintenance or construction incurred by Landlord during the course of the job. This includes, but is not limited to: fire watch, cleanup, repairs, unattended punch list items, and any costs associated with rectifying non-compliance issues with Bellevue Place standards and practices.

If there are no costs or charges, the deposit will be returned in full upon completion of the project.

There will be no interest paid on the deposit. If charges are incurred, that amount will be deducted from the deposit with an explanation of expenses, and the remaining deposit will be mailed back to the contractor. If charges exceed the amount of the deposit, Tenant's contractor will be billed for the outstanding amount.

**Signed Lease and Delivery of Security Deposit**
The Lease shall be fully signed, delivered and Tenant's security deposit tendered to Bellevue Place Office, LLC before Tenant will be allowed to take possession of any space in the building or begin any construction, alteration, or improvement work.

**Section 4.03: Tenant Contractor Rules and Regulations**

**Tenant's contractors shall comply with the following regulations established by Bellevue Place:**

**General Contractor Responsibility**
The general contractor is responsible for the supervision and quality control of all onsite contractors, subcontractors, suppliers, venders, etc., doing work on the project, as well as confirming that all subcontractors, suppliers and venders are properly licensed and insured. The general contractor must enforce Bellevue Place's policies and procedures, as well as all governmental laws including, but not limited to, properly documented workers for all trades on-site. Landlord assumes no responsibility for any subcontractor, vendor, or suppliers hired by the general contractor and Tenant further agrees to save and hold Landlord harmless with respect to such work as provided in the Lease. Tenant's contractor(s) shall diligently perform the work of constructing Tenant's improvements in the Leased Premises. The Leased Premises must be constructed in accordance with the drawings approved by Landlord, and Tenant agrees to comply with all city, county and state ordinances, rules and regulations relating thereto. Any delays in the completion of the improvements shall be at Tenant's expense and shall not delay the commencement of the monthly rent.

33128-0230/141407606.1



## Superintendent

The superintendent must be on the job site at all times when work is taking place. If the superintendent is not on the job site while work is taking place, the job will be shut down. The subcontractor's foreman will not be acceptable as the on-site superintendent. Contractor is responsible for all scheduling, managing, and quality control on the job. Superintendent is also responsible for ensuring all of its employees, agents, subcontractors, and other hired parties adhere to the rules and regulations of the building.

## Subcontractors

The contractor's employees and/or subcontractors must not curse, expectorate, or otherwise act unprofessionally. Proper construction attire is required while working in the building. The superintendent is responsible for the actions and supervision of their subcontractors.

## Excessive Noise and Odors

Tenant's contractor(s) shall perform the work in a manner and at times that do not interfere with the normal operations of other tenants. Any construction work that will produce high levels of noise, odors, or is the source of complaints from visitors, tenants, or as determined by Landlord's sole judgment, will be stopped and may not continue at any time during hours of operation.

## Smoking

Bellevue Place is a non-smoking facility. Smoking inside tenant spaces is PROHIBITED! Anyone repeatedly told about smoking will be banned from working at the building. Smoking is permitted in designated areas only.

## Damage

Protection of Tenant's Leased Premises and materials is the responsibility of Tenant and Tenant's contractor. Tenant's contractor shall be responsible for the repair or replacement and clean up of any damage and other consequences caused by the contractor, which shall include, without limitation; access ways to the Leased Premises even if they are used concurrently by Tenant's contractor and others. If service corridors are modified all finishes must be brought back to the original condition.

## Storage

Tenant's contractor shall contain its operation and shall store its materials within the Leased Premises.

## Trash and Dumpsters

Tenant's contractor shall promptly remove all trash and provide a dumpster for storing trash outside the Leased Premises. Trash must be separated in accordance with city and county regulations. The location of the dumpster shall be approved by Landlord. There is to be no dumping of debris in building receptacles.

## Dust and Dirt

Tracking dirt and dust into the common area is prohibited. Contractor's employees should remove as much dirt and dust as possible before entering the common area.

## Delivery and Parking

Delivery of construction materials to the Leased Premises or removal of trash from the Leased Premises shall be done at a time other than normal business hours. The parking garage loading area on level P-2, has been provided for Tenant's non-exclusive use. All loading and unloading is to be confined to loading stalls within the designated loading area during hours specified by Landlord or Landlord's agent. The loading area is only accessible from 106th Avenue NE. There is to be no parking of vehicles that are not actively loading or unloading. Vehicles parked for extended periods of time are subject to towing at the owner's expense.

Contractors shall _only_ utilize the freight elevator for access, not passenger elevators.

No on-site parking will be made available for contractors or their subcontractors, employees, agents, or invitees. Landlord has provided "construction" parking in the southwest corner of the west parking garage of Bellevue Square.

## Working Hours and Access

Tenant's contractor shall notify Landlord of any work to be done on weekends or at any time other than normal working hours. All after-hours work coordination should be scheduled through Landlord at least (3) days in advance. Any work that requires contractors to be in another tenant's space, regardless of time frame, may require additional security at contractor's expense, and must be scheduled with Landlord (3) days prior to work taking place.



Contractor keys are not issued to contractors unless previously approved by Landlord.

Under no circumstances are any doors, locks, or latches to be tampered with, taped, or disabled outside of the construction space.

## Contractor Signage
Tenant's contractor or subcontractor shall not post signs on any part of the building or Leased Premises.

## Construction Barricade

A construction barricade is required for all new/remodel tenant improvement projects that alter the Tenant's entry. The barricade will be installed by the contractor, as directed by Landlord at Tenant's expense, prior to the start of any work, after it is approved by Landlord.

### Metal Stud & Drywall Structure
The barricade will be constructed of metal studs and drywall. It is to be taped, sanded, and painted.

## Section 4.04: Demolition

Tenant is responsible for any demolition of existing improvements required by Tenant's design. Any demolition that would alter the structure or property outside Tenant's lease line requires authorization from Landlord's representative. Tenant's contractor is responsible for protection of all fire sprinkler heads within the space. **Tenant is responsible for contacting Patriot Fire for sprinkler shutdown and fire watch in the space during the duration of the demolition.** Landlord's Fire, Life, Safety representative will deliver an Emergency Sprinkler Containment Kit to the site at the pre-construction meeting. The Pre/Post Demo Form must be filled out and signed off by each respective party before and after demolition. See pages 35 and 36 for examples.

## Section 4.05: Penetrations, Welding and Hot Work

All core drilling and cutting of the concrete slab will be done during "off" hours and the area must be x-rayed or scanned prior to drilling. Landlord's Tenant Coordinator is responsible for coordinating all work with all effected surrounding tenants. All security required for entrance into another tenants leased space at off hours is the responsibility of the general contractor and their agreement with the adjoining tenant. All piping and conduit that penetrates the second floor shall be sleeved. Sleeves shall be sealed to the second floor and shall project a minimum of six inches (6") above the floor. Any welding requires the prior authorization of Landlord and requires a Hot Work Permit from Bellevue Place Security (425) 460-5730. The permit is to be completely filled out and submitted to the Security Dispatch/Control Center prior to work commencing. Appropriate fire watch needs to be conducted while the work is being done, and then the permit needs to be returned to the Security Control Office to confirm the work is completed. See page 36 to view a sample.

## Section 4.06: Fire Pre-Test/Final Test Procedures

Tenant's general contractor is to contact Landlord's Technical Service Manager, or another assigned Fire, Life, Safety representative, to schedule fire system pre-testing prior to scheduling fire final with the City of Bellevue. Pre-test must be scheduled at least 48 hours prior to requested appointment time. **Pre-test appointment hours are Monday through Friday, 6:00am-7:30am.** The following items must be installed and functioning prior to the pre-test appointment: horns, strobes, smoke detectors, HVAC on-line, music cut-off relay, Simplex programming, and any other fire system devices.

## Section 4.07: Stopping the Work

Landlord and any of its employees have the authority to stop work for any reason. If any of these conditions are being violated, or if in their estimation the work is not being executed to the standards and/or quality set by the building management, they will stop the work. It is the responsibility of Tenant's construction manager and contractor to rectify any adverse impact to the schedule caused by any such stoppage of work.

33128-0230/141407605.1



**Section 4.08: Construction Completion and Closeout**

Upon construction completion, Tenant shall obtain final signatures on the permit inspection record from the City of Bellevue Building Department promptly following completion of Tenant's Work, and provide a copy of the permit inspection record to Landlord.

Upon completion of construction, the general contractor shall contact Landlord's Tenant Improvement Coordinator to do a final punch list of the construction. A copy of the Landlord approved plans must be on the construction site.

Tenant shall provide Landlord with a complete set (1 CD in AutoCAD and PDF format) of as-built drawings including architectural, mechanical, plumbing, electrical, and fire protection drawings upon construction completion. Marked-up drawings will not be accepted and all changes (ASI's, RFI's, etc.) must be re-drawn in both CAD and PDF formats by the architect/MEP engineers of record. The Start-Up and Air Balance Report is also required upon closeout. All drawings are to be updated at Tenant's sole expense.

**Section 4.09: Tenant Improvement Checklist**

**Prior to construction, the following list must be satisfied and/or submitted to the Landlord:**
· Lease signed
· Security Deposit received
· Preliminary Submittal
· Landlord Approval
· Final Submittal
· Mechanical Approval
· Electrical Approval

**Tenant or Tenant's contractor delivers to Landlord:**
· Copy of Building Permit
· Construction Contract, including Schedule of Values
· Certificate of Insurance
· Payment Bond
· Performance Bond
· Construction Schedule
· Construction Deposit
· Subcontractor List

**Prior to occupancy, the following must be submitted to Landlord:**
· Copy of signed Permit Inspection Record from the City of Bellevue
· Certificate of Substantial Completion
· Completed Punch List signed off by Landlord
· As-Built drawings (AutoCAD and PDF format) to Landlord
· Waterproofing Certificate/Warranty



**Article V: MISCELLANEOUS FORMS**

33128-0230/141407605.1



## Contractor Rules

The following are the rules for contractors working in tenant spaces at Bellevue Place:

1. **Barricade.** Unless installed by Landlord, the contractor shall be responsible for erecting a safe and neat barricade before construction begins. Tenant shall use a modular enclosure system from the Boston Barricade Company or construction drywall structure. No door access through either type of barricade is allowed unless Tenant's space is not serviced with a rear service door. All graphics are to be installed within 48 hours of the construction of the barricade.

2. **Parking.** All loading, unloading, and parking for vehicles of the contractor and its employees shall be done only in areas designated by Landlord.

3. **Trash.** No trash may be placed in the building compactors or dumpsters. No trash may be put in the common area receptacles. All trash must be stored in the tenant space being worked on, and must be removed daily, after business hours.

4. **Dust and dirt.** Tracking dirt and dust into the common area is prohibited. Contractors' employees should remove as much dirt and dust as possible before entering the common area.

5. **Damage.** Any damage to the building walls, floors, or ceiling must be repaired by the contractor before construction is completed.

6. **Storage of equipment.** Storage of all the contractors' tools, equipment, and supplies is limited to Tenant's space.

7. **Entry to Tenant space.** Deliveries and all entries by contractor shall be made through the rear entrance of the Tenant space, if possible, by using the freight elevators. *Passenger elevators are not to be used to bring construction materials to the space.* If items are too large to fit, contractor shall request and get the Landlord's prior permission to deliver through the main entrance.

8. **Outside work.** All work is to be completed in Tenant's space. No work is to be performed in the common area or other tenant spaces without Landlord's approval.

9. **Loaning of equipment.** No building equipment will be loaned to the contractor.

10. **Quality of work.** Contractor work shall be performed in a thorough, first-class, and workmanlike manner and shall be in good and usable condition at the date of completion thereof. If, in Landlord's judgment, the work fails to comply with this standard, Tenant will not be allowed to open until all discrepancies are fixed.

11. **Smells.** Proper care must be taken when working with glues, paints, and any other material requiring special ventilation. Such smells must not waft into the common area and other tenant spaces.

12. **Welding and penetrations.** All welding and slab penetrations require Landlord's prior approval. Hot Work Permits are required before any hot work is done. Hot Works Permits and Impairment Forms must be obtained through Security Control.

13. **Sprinklers.** At no time shall the sprinkler system be shut down without Landlord's approval. Any impairment of

33128-0230/141407605.1



the system requires a fire watch to be present at a rate of $40/hour. Bellevue Place sprinkler drain and re-fill procedures must be followed. Please reference page 37 for further information and instructions. Also, please review the Emergency Sprinkler Containment Kit direction on page 36.

14. **Irregular hours.** Contractor cannot perform any work before and/or after regular business hours without prior approval of Landlord.

15. **Noise.** Loud noises, particularly those created by the use of jackhammers, rivet guns, and grinding equipment shall not be used during business hours. No radios and/or music are allowed during normal business hours. Any and all noise must be kept at a low volume that cannot be heard outside Tenant's space.

16. **Roof.** Contractor shall not go on the roof without the prior approval of Landlord.

17. **Asbestos.** All materials incorporated in Tenant's space shall be 100 percent (100%) free of asbestos-containing material.

18. **Electrical room.** The contractor shall not enter the electrical room without Landlord's permission.

19. **Fire extinguisher.** The contractor shall keep a fire extinguisher in Tenant's space at all times.

20. **Professional behavior.** The general contractor, their employees, and all subcontractors must not curse, expectorate, or otherwise act unprofessionally and must wear shirts at all times.

21. **Maintenance.** Anytime maintenance personnel must do work to maintain Bellevue Place standards, the charges will be paid by Tenant's general contractor at the rate of $80/hour.

22. **Security Guard Service.** Security guard service may be required at Landlord's discretion at a rate of $40/hour. When requesting security, 24 hour notice is required, and we have a 4-hour minimum for security service. If contractor cancels service, they are required to give 24 hours notice of such cancellation in order to avoid the 4-hour minimum charge.

*Landlord may fine the contractor whatever amount is needed to repair any property damages that the contractor does not fix on their own. Landlord reserves the right to stop work if any of the above rules or regulations are violated by said contractor or any of their subcontractors.*

I have read and understand all of the above conditions and regulations and agree to abide by the same.

Tenant Space No: _____ Tenant: _____

General Contractor: _____

Signature: _____

Print Name: _____

Email Address: _____

Cell Phone Number: _____

33128-0230/141407605.1



**BELLEVUE PLACE**

# CERTIFICATE OF LIABILITY INSURANCE

**ACORD**

DATE (MM/DD/YYYY)
4/5/11

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| PARKER, SMITH & FEEK, INC. | PHONE (A/C, No, Ext): | | FAX (A/C, No): |
| 2233 112th Avenue N.E. | EMAIL ADDRESS: | | |
| Bellevue, Washington 98004 | PRODUCER CUSTOMER ID #: | | |
| Phone: 425-709-3600    Fax: 425-709-7460 | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| INSURED | INSURER A: INSURANCE COMPANY | A-VII | |
| «Entity» | INSURER B: INSURANCE COMPANY | A-VII | |
| INSURED NAME | INSURER C: INSURANCE COMPANY | A-VII | |
| ADDRESS | INSURER D: INSURANCE COMPANY | A-VII | |
| CITY, STATE 00000-0000 | INSURER E: | | |
| | INSURER F: | | |

**COVERAGES**   **CERTIFICATE NUMBER:**   **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY** | X | X | POLICY NUMBER | 00/00/0000 | 00/00/0000 | EACH OCCURRENCE | $ 1,000,000 |
| | X COMMERCIAL GENERAL LIABILITY | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | CLAIMS-MADE X OCCUR | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | PRODUCTS – COMP/OP AGG | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | | $ |
| B | **AUTOMOBILE LIABILITY** | | | POLICY NUMBER | 00/00/0000 | 00/00/0000 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | X ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | SCHEDULED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | HIRED AUTOS | | | | | | | $ |
| | NON-OWNED AUTOS | | | | | | | $ |
| | | | | | | | | $ |
| C | X **UMBRELLA LIAB** X OCCUR | X | X | POLICY NUMBER | 00/00/0000 | 00/00/0000 | EACH OCCURRENCE | $ 2,000,000 |
| | **EXCESS LIAB** CLAIMS-MADE | | | | | | AGGREGATE | $ 2,000,000 |
| | DEDUCTIBLE | | | | | | | $ |
| | X RETENTION $ | | | | | | | $ |
| A | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y/N | | N/A | POLICY NUMBER WASHINGTON STOP GAP | 00/00/0000 | 00/00/0000 | WC STATU-TORY LIMITS X OTHER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under SPECIAL PROVISIONS below | | | | | | E.L. DISEASE – EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE – POLICY LIMIT | $ 1,000,000 |
| D | PROPERTY – Special Form, Replacement Cost, Tenant Improvements & Betterments | | | POLICY NUMBER | 00/00/0000 | 00/00/0000 | Business Personal Property – 100% of Replacement Cost | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)
Leased Premises at: (specify location)
Landlord (put actual Landlord name) and Kemper Development Company are included as Additional Insureds and coverage is primary and non-contributory per Endorsement(s) attached. Waiver of Subrogation in favor of all Additional Insureds per Endorsement(s) attached.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Kemper Development Company 575 Bellevue Square Bellevue, WA 98004 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE |

© 1988–2009 ACORD CORPORATION. All rights reserved.

ACORD 25 (2009/09)        The ACORD name and logo are registered marks of ACORD

33128-0230/141407605.1



## Pre/Post Demo MEP Inspection Form

**Bellevue Place Pre/Post Demo MEP Inspection Form**

<u>Project Name</u>                                                    <u>Space #</u>

**Pre-Demo  Post-Demo**

| | | Fire, Life, Safety (Todd Yeager) |
Notes:

| | | MacDonald Miller Facility Solutions (Mechanical & Plumbing) |
Notes:

| | | Nelson Electric (Electrical) |
Notes:

> *Bring completed form to Tony Cook or Jennifer Milligan at Kemper Development office for final sign-off and approval to continue.*

_____                    _____
Landlord Representative Signature                          Date

Notes:

33128-0230/141407605.1



**Emergency Fire Sprinkler Containment Kit Instructions**

# EMERGENCY USE ONLY

**Purpose**

**This kit is to be utilized as needed in the event of a fire sprinkler line break during tenant construction activity.** The items can be used to control the water flow into the 55 gal. can or any other water tight item such as a gondola on site. In the event of a fire sprinkler line break, all contractors and subcontractors are to utilize the containment kit to minimize water escape from the work site. This is particularly critical in second level spaces, or any space that is not slab on grade. The object is to contain the water and in doing so to allow enough time to shut off the fire sprinkler main valve, controlling water flow to the work zone. The fire sprinkler water containment kit includes the following items:

- One (1) red, 55 gal. Rubbermaid can
- One (1) 100 foot roll of a poly-tube
- One (1) roll of Gorilla Tape
- One (1) roll of galvanized wire
- One (1) carpenters knife

**Procedure**

The site superintendent and all subcontractors shall be aware of this Emergency Fire Sprinkler Containment Kit and know its use, to prevent excessive water spillage into the TI space, adjacent spaces and common areas. This kit is to minimize water damage by controlling the water into the 55 gal. bucket and/or other water tight containers such as a gondola. KDC Security staff will be trained in the use of this kit and may be available to assist in case of a fire sprinkler break emergency. The use of this kit is primarily for the TI team and subcontractors that are onsite in the event of a fire sprinkler line break or damage.

1. Utilize the poly-tube, cut to needed length and place one end over the broken sprinkler pipe and the other end were you want the water to drain to (55 gal. rubber maid can or gondola, outside building, etc.)

2. Use the gorilla tape or galvanized wire to seal the poly-tube to the sprinkler break, making sure the poly-tube stays in place until draining of system is completed.

3. Continue to drain poly-tube /broken sprinkler pipe until water stops flowing from pipe. A fire sprinkler vendor will be contacted to make immediate repairs.

The Emergency Sprinkler Containment Kit is supplied to the TI space/Tenant's general contractor, and shall remain in place with all delivered contents for the duration of the project. Tenant's general contractor is responsible to maintain the kit in its original operable condition.



# Fire System Sprinkler Drain and Re-fill Procedure

Any tenant improvement or construction activity that requires draining of the fire sprinkler system within Kemper Development Properties must follow the guidelines/procedure below:

**Sprinkler System Draining Procedure**

Follow established impairment guidelines as follows:

(a.) Go to the Security Control Office, located in the Bank of America Building, and fill out an "Impairment Form".
(b.) Arrange appropriate fire watch if applicable.
(c.) Disable specific fire alarm devices.
(d.) Go on test hold with our off-site monitoring company.

Prior to any sprinkler systems being turned off, the appropriate **"RED TAG*"** will be attached to the control valve or device effected by work being done. Sprinkler fitter-vendor will communicate with Security Control via Fire Watch Officer assigned to their work area prior to closing the sprinkler valve. If a Fire Watch Officer is unavailable, sprinkler fitter-vendor will call Security Control at: (425) 460-5730 prior to closing any fire system sprinkler valve(s). Drain the system as needed and perform necessary work indicated on the Impairment Form.

**Sprinkler System Re-filling Procedure**

Contact Security Control via Fire Watch Officer that a refill is requested. (If Fire Watch Officer is unavailable, Security Control will be called at: (425) 460-5730.) KDC Fire, Life, Safety representative will turn pumps off prior to refill.

Security Control will relay the approval to refill the impaired system to the sprinkler fitter-vendor performing the work. *(The control valve must be opened slowly to minimize water-hammers to the system.)* Once the impaired system is up to normal pressure and impaired system piping has been checked for water leaks, the Fire Watch Officer will advise the sprinkler fitter-vendor and Security Control. The system is now online and the sprinkler fitter-vendor must return to Security Control, sign the Impairment Form for completion of work and return the "**RED TAG**". After the system is back online, a Fire, Life, Safety representative will turn the pumps back on.

\* = RED TAG impairment tagging system (FM Global)







BELLEVUE PLACE

## Hot Work Permit Sample



*(The hot work permit sample document, marked "SAMPLE ONLY" and "NOT FOR RE-ISSUE," is too faded to transcribe in detail.)*

33128-0230/141407605.1



BELLEVUE
PLACE

## Article VI:  TYPICAL DETAILS (11/22/2010)

| | |
|---|---|
| A-0 | REFERENCE FLOOR PLAN |
| A-1 | STANDARD PARTITION |
| A-2 | SOUND/DEMISING PARTITION |
| A-3 | TYPICAL WINDOW SILL |
| A-4 | LOW WALL SUPPORT |
| A-5 | LOW WALL END BRACING |
| A-6 | PARTITION HEAD BRACING |
| A-7 | PARTITION TO CORE WALL |
| A-8 | PARTITION 'T' INTERSECTION & FINISHED END |
| A-9 | PARTITION TO MULLION |
| A-10 | PARTITION TO CHEVRON |
| A-11 | CONCRETE COLUMN FURRING AND PARTITION |
| A-12 | PARTITION BASE |
| A-13 | PARTITION BASE-ALTERNATIVE |
| A-14 | LOW WALL TOP CAP |
| | |
| B-0 | TYPICAL DOOR-RELITE ELEVATION |
| B-1 | RELITE HEAD, JAMB & SILL |
| B-2 | RELITE HEAD, JAMB & SILL-ALTERNATIVE |
| B-3 | RELITE HEAD CONNECTION |
| B-4 | RELITE JAMB-GWB PARTITION |
| B-5 | RELITE SILL DETAIL |
| B-6 | RELITE VERTICAL MULLION |
| B-7 | RELITE VERTICAL MULLION-ALTERNATIVE |
| B-8 | RELITE VERTICAL CORNER |
| B-9 | TYPICAL BUTT GLAZING JOINT |
| B-10 | DOOR/RELITE JAMB |
| B-11 | DOOR/RELITE JAMB-ALTERNATIVE |
| B-12 | DOOR JAMB & HEAD |
| B-13 | DOOR JAMB TO PARTITION CONNECTION |
| B-14 | DOOR HEAD |
| B-15 | DOOR HINGE-SIDE JAMB |
| B-16 | DOOR THRESHOLD |
| B-17 | FOLDING DOOR JAMB |
| | |
| C-0 | TYPICAL CASEWORK ELEVATION |
| C-1 | UPPER CASEWORK |
| C-2 | LOWER CASEWORK |
| C-3 | ADA SINK & CASEWORK |
| C-4 | WORK COUNTER |
| C-5 | ADA CLOSET ROD & SHELF |
| | |
| D-1 | SUSPENDED CEILING SUPPORT |
| D-2 | CEILING PARIMETER DETAIL |
| | |
| E-1 | CARPET/VCT TRANSITION DETAIL |
| E-2 | CARPET/WOOD TRANSITION DETAIL |
| E-3 | CARPET/VINYL TRANSITION DETAIL |
| E-4 | CARPET/STONE TRANSITION DETAIL |

33128-0230/141407605.1

EXHIBIT E

RULES AND REGULATIONS

      1.    If Landlord objects in writing to any curtains, blinds, screens or hanging plants or other similar objects attached to or used in connection with any window or door of the Leased Premises, Tenant shall immediately discontinue such use. Tenant shall not place anything against or near glass partitions or doors or windows which may appear unsightly from outside the Leased Premises.

      2.    The sidewalks, halls, passages, exits, entrances, elevators and stairways shall not be obstructed by Tenant or used for any purpose other than for ingress to and egress from the Leased Premises. The halls, passages, exits, entrances, elevators, stairways, balconies and roof are not for the use of the general public and Landlord shall in all cases retain the right to control and prevent access thereto by all persons whose presence, in the judgment of Landlord, may be prejudicial to the safety, character, reputation or best interests of the Building and its Tenants; provided that nothing herein contained shall be construed to prevent such access to persons with whom Tenant normally deals in the ordinary course of Tenant's business, unless such persons are engaged in illegal activities. No Tenant and no employees or invitees of any Tenant shall go upon the roof of the Building or any other restricted areas which are so posted.

      3.    The directory of the Building will be provided exclusively for the display of the name and location of Tenants only, and Landlord reserves the right to exclude any other names therefrom.

      4.    Tenant shall not employ any person or persons other than the janitor of Landlord for purposes of cleaning the Leased Premises unless otherwise agreed to by Landlord. Except with the written consent of Landlord, no person or persons other than those approved by Landlord shall be permitted to enter the Building for the purpose of cleaning the same. Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness. Landlord shall not be responsible to any Tenant for any loss of property on the Leased Premises, however occurring, or for any damage done to the effects of any Tenant by the janitor or any other employee or any other person. Janitorial service shall include ordinary using and cleaning by the janitor assigned to such work and shall not include cleaning of carpets or rugs, except normal vacuuming, or moving of furniture or other special services.

      5.    Landlord will furnish office tenants, free of charge, with two keys to each door lock in the Leased Premises. Landlord may make a reasonable charge for any additional keys. Tenant shall not make or have made additional keys, and Tenant shall not alter any lock or install a new additional lock or bolt on the Leased Premises. Tenant, upon the termination of

its tenancy, shall deliver to Landlord the keys to all doors which have been furnished, or shall pay Landlord therefor.

6.    If Tenant requires telegraphic, telephonic, burglar alarm, music or similar services, it shall first obtain, and comply with, Landlord's instructions in their installation.

7.    Any freight elevator shall be available for use by all Tenants in the Building, subject to such reasonable scheduling as Landlord in its discretion shall deem appropriate. No equipment, materials, furniture, packages, supplies, merchandise or other property will be received in the Building or carried in the elevators except between such hours and in such elevators as may be designated by Landlord. All such deliveries shall enter the building through the loading dock on Garage Level P2.

8.    Tenant shall not place a load upon any floor of the Leased Premises which exceeds the load per square foot which such floor was designed to carry and which is allowed by law. Landlord shall have the right to prescribe the weight, size and position of all equipment, materials, furniture or other property brought in to the Building. Heavy objects shall, if considered necessary by Landlord, stand on such platforms as determined by Landlord to be necessary to properly distribute the weight. Business machines and mechanical equipment belonging to Tenant, which cause noise or vibration that maybe transmitted to the structure of the Building or to any space therein to such a degree as to be objectionable to Landlord or to any tenants in the Building, shall be placed and maintained by Tenant, at Tenant's expense, on vibration eliminators or other devices sufficient to eliminate noise or vibration. The person employed to move such equipment in or out of the Building must be acceptable to Landlord. Landlord will not be responsible for loss of, or damage to, any such equipment or other property from any cause, and all damage done to the Building by maintaining or moving such equipment or other property shall be repaired at the expense of the Tenant.

9.    Tenant shall not use or keep in the Leased Premises any kerosene, gasoline or other flammable or combustible fluid or material other than those limited quantities necessary for the operation and maintenance of office equipment and cash registers. Tenant shall not use or permit to be used in the Leased Premises any foul, toxic or noxious gas or substance, or permit or allow the Leased Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Building by reason of noise, odors or vibrations, nor shall Tenant bring into or keep in or about the Leased Premises any birds or animals.

10.    Tenant shall not use any method of heating or air-conditioning other than that supplied or approved by Landlord.

11.    Tenant shall not waste electricity, water or air-conditioning and agrees to cooperate fully with Landlord to assure the most effective operation of the Building's heating and air-conditioning and to comply with any governmental energy-saving rules, laws or regulations of which Tenant has actual notice, and shall refrain from adjusting controls. Tenant shall close window coverings and turn off lights at the end of each business day.

12.     Landlord reserves the right, exercisable with thirty (30) days' notice and without liability to Tenant, to change the name and street address of the Building.

13.     Between the hours of 6 p.m. and 7 a.m. the following day, or such other hours as may be established from time to time by Landlord, and on Sundays and legal holidays, Landlord reserves the right to exclude from the Building any person unless that person is known to the person or employee in charge of the Building and has a pass or is properly identified. Tenant shall be responsible for all persons for whom it requests passes and shall be liable to Landlord for all acts of such persons. Landlord shall not be liable for damages for any error with regard to the admission to or exclusion from the Building of any person. Landlord reserves the right to prevent access to the Building in case of invasion, mob, riot, public excitement or other commotion by closing the doors or by other appropriate action.

14.     Tenant shall close and lock the doors of the Leased Premises and entirely shut off all water faucets or other water apparatus, and electricity, gas or air outlets before Tenant and its employees leave the Leased Premises. Tenant shall be responsible for any damage or injuries sustained by other tenants or occupants of the Building or by Landlord for noncompliance with this rule.

15.     Tenant shall not accept barbering or bootblacking service upon the Leased Premises.

16.     The toilet rooms, toilets, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed and no foreign substance of any kind whatsoever shall be thrown therein. The expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the Tenant who, or whose employees or invitees, shall have caused it.

17.     Tenant shall not use the Leased Premises for any business or activity other than that specifically provided for in Tenant's Lease.

18.     Tenant shall not install any radio or television antenna, loudspeaker or other device on the roof or exterior walls of the Building. Tenant shall not interfere with radio or television broadcasting or reception from or in the Building or elsewhere.

19.     Tenant shall not mark, drive nails, screw or drill into the partitions, woodwork or plaster or in any way deface the Leased Premises or any part thereof. Landlord reserves the right to direct electricians as to where and how telephone and telegraph wires are to be introduced to the Leased Premises. Tenant shall not cut or bore holes for wires. Tenant shall not affix any floor covering to the floor of the Leased Premises in any manner except as approved by Landlord. Tenant shall repair any damage resulting from noncompliance with this rule.

20.    Canvassing, soliciting and distribution of handbills or any other written material, and peddling in the Building are prohibited, and Tenant shall cooperate to prevent same.

21.    Landlord reserves the right to exclude or expel from the Building any person who, in Landlord's judgment, is intoxicated or under the influence of liquor or drugs or who is in violation of any of the Rules and Regulations of the Building.

22.    Tenant shall store all its trash and garbage within the Leased Premises. Tenant shall not place in any trash box or receptacle any material which cannot be disposed of in the ordinary and customary manner of trash and garbage disposal. All garbage and refuse disposal shall be made in accordance with directions issued from time to time by Landlord.

23.    The Leased Premises shall not be used for any improper, immoral or objectionable purpose. No cooking shall be done or permitted by Tenant on the Leased Premises, except that use by Tenant of Underwriters' Laboratory-approved equipment such as equipment used for brewing coffee or dispensing hot water, and standard household refrigerators and microwave ovens shall be permitted, provided that such equipment and use is in accordance with all applicable federal, state, county and city laws, codes, ordinances, rules and regulations and in accordance with the use clause in Tenant's Lease.

24.    Tenant shall not use in any space or in the public halls of the Building any hand trucks except those equipped with rubber tires and side guards or such other material-handling equipment as Landlord may approve. Tenant shall not bring any other vehicles of any kind into the Building.

25.    Without the written consent of Landlord, Tenant shall not use the name of the Building in connection with or in promoting or advertising the business of Tenant except as Tenant's address.

26.    Tenant shall comply with all safety, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency.

27.    Tenant assumes any and all responsibility for protecting the Leased Premises from theft, robbery and pilferage, which includes keeping doors locked and other means of entry to the Leased Premises closed.

28.    The requirements of Tenant will be attended to only upon appropriate application to the office of the Building by an authorized individual. Employees of Landlord shall not perform any work or do anything outside of their regular duties, unless under special instructions from Landlord, and no employee of Landlord will admit any person (Tenant or otherwise) to any office without specific instructions from Landlord.

29.    Tenant shall not park its vehicles in any parking areas designated by Landlord as areas for parking by visitors to the Building.  Tenant shall not leave vehicles in the Building parking areas overnight nor park any vehicles in the Building parking areas other than automobiles, motorcycles, motor driven or non-motor driven bicycles or four-wheeled trucks.

30.    Landlord may, as Landlord in its sole discretion may deem appropriate, temporarily waive any one or more of these Rules and Regulations in favor of Tenant or any other tenant, but no such waiver of such Rules and Regulations in favor of Tenant or any other tenant, shall prevent Landlord from thereafter enforcing any such Rules and Regulations against Tenant or any or all of the tenants in the Building.

31.    These Rules and Regulations are in addition to, and shall not be construed to in any way modify or amend, in whole or in part, the terms, covenants, agreements and conditions of any lease of premises in the Building.

32.    Landlord reserves the right to charge and/or make such other reasonable Rules and Regulations as, in its judgment, may from time to time be appropriate, desired or needed for safety and security, for care and cleanliness of the Building, and for the preservation of good order therein.  Tenant agrees to abide by all such Rules and Regulations hereinabove stated and any additional rules and regulations which are adopted.

33.    Landlord shall have the right to prohibit any advertising by Tenant which, in Landlord's opinion, tends to impair the reputation of Bellevue Place or its desirability as a first-class office and retail complex and upon written notice from Landlord, Tenant shall refrain from or discontinue such advertising.

34.    The word "Building" as used herein means the entire Bellevue Place development of which the Leased Premises are a part.

35.    Tenant shall be responsible for the observance of all the foregoing rules by Tenant's employees, agents, clients, customers, invitees and guests.

EXHIBIT F

BELLEVUE PLACE TRANSPORTATION MANAGEMENT AGREEMENT

I.        OBJECTIVES

This Agreement describes the transportation management program for Bellevue Place. The objectives of this program are to:

A.        Make best use of the available parking supply;

B.        Control peak hour employee traffic generated by the project;

C.        Support the City's transportation goals for downtown Bellevue; and

D.        Provide a flexible program that allows adjustment to changing circumstances and patterns of success.

E.        To prevent a parking shortfall and spillover when the Building is 95% occupied.

II.        DEFINITIONS

A.        Carpool. An employee vehicle, registered with the TMA, carrying two or more persons (of which at least two must be full-time Bellevue Place employees) to and from work on a regular basis.

B.        Employee. A full-time employee whose place of work is Bellevue Place.

C.        Employee Vehicle. A motor vehicle driven by a Bellevue Place employee.

D.        Employer. A tenant of Bellevue Place with one or more employees.

E.        Percent Occupancy. The percent of net rentable floor area actually occupied by tenants at any given time.

F.        PM Peak Hour. The hour of highest traffic volume on streets adjacent to Bellevue Place in the p.m. peak period; this is currently defined as 4:30 to 5:30 p.m.

G.        Net Rentable Floor Area. As defined in BCC 20.50.020.

H.    Vanpool.  An employee vehicle, registered with the TMA, carrying 5 or more persons (of which at least 4 must be full-time Bellevue Place employees) to and from work on a regular basis.

III.    CONDITIONS

A.    The property owner shall seek to achieve "target maximums" for p.m. peak hour outbound employee vehicle trips and peak employee parking demand.  These target maximums are related to building occupancy and will recognize the greater effectiveness of a Transportation Management Program (TMP) when building occupancies are higher.  The target maximums are shown in Table 1.  Achievement toward target maximums will be evaluated every year beginning with the first October after reaching 50% occupancy and continuing until:

1.    4 years after 50% occupancy is reached, or

2.    6 years after the temporary certificate of occupancy is issued, whichever is later.

### Table 1.  Target Maximums

Target Maximums

| Project Occupancy | Employee Vehicles Parked | Peak Hour Outbound Employee Vehicle Trips (PM) |
|---|---|---|
| 0 to 49% Occupancy | (no targets) | (no targets) |
| 50.0 to 54.9% | 783 | 597 |
| 55.0 to 59.9% | 829 | 632 |
| 60.0 to 64.9% | 873 | 666 |
| 65.0 to 69.9% | 918 | 700 |
| 70.0 to 74.9% | 962 | 734 |
| 75.0 to 79.9% | 1003 | 765 |
| 80.0 to 84.9% | 1044 | 797 |
| 85.0 to 89.9% | 1083 | 826 |
| 90.0 to 94.9% | 1117 | 852 |
| 95.0 to 100% (full Occupancy) | 1117 | 852 |

B.    The property owner shall measure peak hour outbound employee vehicle trips and peak employee parking demand every year, beginning with project occupancy and continuing until no longer required by the City of Bellevue and TMA.  Measurements will be made by the TMA or other party approved by the City of Bellevue. The measurements shall be repeated annually during the month of October.

Peak hour employee traffic exit volumes will be counted manually or with the use of the mechanical exit control devices if possible. Employee parking demand will be counted during the peak period of accumulation or with the use of the mechanical garage control gate, if possible. These employee exit volumes and employee parking demands will be counted on 5 October weekdays, Tuesday through Thursday, selected by the TMA or other party jointly approved by the City and property owner. These selected days will exclude days of unusual events and may be modified by mutual agreement. (An example would be a day on which a large banquet meeting was expected to end during the p.m. peak hour). The mean of the five counts will be used for average employee vehicles parked and for average p.m. peak hour outbound employee vehicle trips.

Project occupancy will be recorded at the time of the parking and traffic surveys for use in evaluating the achievement toward target maximums. Project occupancy will be based on the percent of net rentable floor area occupied.

      C.     The property owner shall implement the Transportation Management program described herein to meet the objectives. This Transportation Management Program shall consist of a Base Level of activity and Activity Levels 1, 2 and 3.

      D.     The Transportation Management program shall provide a base level of activity. The base level of activity will begin with project occupancy and continue until no longer required by the City of Bellevue. In the base level of activity, the property owner shall agree that:

      1.     The property owner shall assign overall management responsibilities for transportation management services to a Transportation Management Association. Preferably, this would be the existing Bellevue TMA. However, if the Bellevue TMA should not be willing or able to perform, an on-site TMA would be established. The transportation services are subject to agreement by the TMA and will be based on operating costs for the TMA. The TMA's responsibilities would include:

      a.     Serve as the Bellevue Place Transportation Coordinator. The coordinator will take the lead in initiating and maintaining Bellevue Place Transportation Management program and will work in collaboration with the designated representatives of owners, tenants and Metro.

      b.     Establish and maintain the Commuter Information Center.

      c.     Provide for certification of carpools and vanpools.

      d.     Administer the transit, carpool, and vanpool incentive payments, if any.

      e.     Provide periodic distribution of information materials (desk-top, door-to-door) such as, but not limited to, transit, carpool/vanpool, and flex-time promotional

materials as well as information concerning parking rates, vanpool rates, or seasonal commuting information.

      f.    Provide semi-annual, building-wide promotions of High Occupancy Vehicle (HOV) travel and alternative work scheduling, such as flex-time, in collaboration with Metro. This may include underwriting and implementing special events related to Transportation Fairs or promotion.

      g.    Coordinate the employee travel/parking survey, previously described in paragraph III B of this agreement.

      h.    Provide new employees in the building with an orientation to the transportation incentives offered by Bellevue Place.

      i.    Coordinate with Metro for support services that could include Transportation Coordinator training sessions, program promotion services, and on-site displays and presentations.

      j.    Report on a periodic basis the results of the program to both the Owner/Developer and the City of Bellevue.

      2.    Both owners and tenants shall be member participants in the TMA. Membership will require a pledge of good faith efforts and payment of dues on the following basis:

      a.    The building owner will pay annual dues based on an average weekday p.m. peak hour outbound employee vehicle trips as defined and measured in paragraph III.B. Dues payment will begin at project occupancy. The peak hour outbound employee vehicle trips will be measured each October and will be made using the same methods as for measuring target maximums. Dues will become effective on the January 1st following the October survey defined in paragraph III.B, based on the results of such study. During the first year, or portion thereof, prior to the first January following the first October survey defined in paragraph III.B, the number of peak hour outbound employee vehicle trips will be estimated based on average projected occupancy for the year. Annual dues will be by year starting with initial occupancy, as shown below, in Table 2:

**Table 2.**
**Annual TMA Dues Schedule for Peak Hour**
**Outbound Employee Vehicle Trips**

| | |
|---|---|
| 1st Year (or portion of) | $42/p.m. peak hour outbound trip |
| 2nd Year | $37 |
| 3rd Year | $32 |
| 4th Year | $28 |
| 5th Year & Beyond | $24 |

In the event the Bellevue TMA provides these services, then in recognition of lower occupancies during the first years, these dues may be prepaid advances to the Bellevue TMA of up to $8,000 per quarter year up to an aggregate total not to exceed $60,000. These advances may be provided for any quarter year up to the end of 1990, and will be used only for direct expenses and allocated overhead related to the Bellevue Place Transportation Management program. Any such advance will be credited toward future dues payments.

      b.     Employer tenants, except the hotel, shall pay TMA dues at the rate of $10.00 per month for each additional employee parking space leased from the property owner in excess of 2 spaces per 1,000 net rentable floor area. This fee will be in addition to the normal parking rate charges. Should the Owner not wish to pass this responsibility on to his employer tenants, then he shall assume this responsibility to the TMA.

      c.     The purpose of these dues is to support the services and overhead related to the Bellevue Place Transportation Management program. In the event these services are provided by the existing Bellevue TMA, the Bellevue TMA shall reduce these dues if they are in excess of need. The dues may be raised only by the mutual consent of the Bellevue TMA and the property owner.

      d.     In the event the TMA services described are provided by the existing Bellevue TMA, Bellevue Place will have a continuing option to withdraw from the Bellevue TMA. For example, if Bellevue Place can, in its judgment, provide its own TMA that is equivalent or better at comparable lower costs, it may withdraw and firm its own TMA.

Continuing participation will also be contingent upon the Bellevue TMA also receiving by early 1989 significant funds on an ongoing basis from other sources in downtown Bellevue. If, by then, this other funding is not at least equal to twice the Bellevue Place share, then Bellevue Place may choose, at its option, to drop out of the Bellevue TMA and create its own project TMA. This project TMA would perform similar functions, and would not change the other aspects of the program. Withdrawal would take effect six months after giving such notice.

      3.     The property owner shall maintain a number of set-aside carpool and vanpool spaces sufficient to serve demand but not to exceed 224 spaces. Carpool or vanpool spaces not used by 9:30 a.m. may be released for other uses. Spaces will be reserved for carpools and vanpools that are registered with the building transportation coordinator of TMA.

      4.     The property owner shall charge for employee parking at current downtown Bellevue market rates, but in no case at a rate less than the then current Metro two-zone pass.

      E.     The property owner shall implement levels of activity 1, 2 and 3 for calendar year beginning January 1st if target maximums measured in the previous October counts (defined in paragraph III.B) were not achieved.

1.      Level 1 shall be implemented by the property owner the first calendar year following each October count (defined in paragraph III.B) in which maximums were not met. For example, if the project occupancy is between 60 and 65% and either the peak parking or outbound peak hour employee vehicles is greater than specified in the target maximum, level 1 activity would be triggered. Level 1 activity will be a continuation of base level activities plus:

a.      The property owner, through the TMA, will make available discounted transit passes to full-time Bellevue Place employees. The amount of the discount will be 14% of the then current cost of a Metro two-zone pass, rounded to the nearest dollar. The number of discounted transit passes will not exceed the minimum number of transit riders needed to meet the targets (at project full-occupancy, this would be a maximum of 450 persons including up to 150 for hotel employees; at intermediate stages, the maximum would be as shown in Table 3).

**Table 3.**
**Maximum Transit Pass, Subsidies and Parking Discount**

| Project Occupancy | Maximum Number of Parking Discounts | Maximum Number of Transit Pass Subsidies |
|---|---|---|
| 0 to 49.9% | 0 | 0 |
| 50 to 54.9% | 72 | 144 |
| 55 to 59.9% | 87 | 176 |
| 60 to 64.9% | 103 | 207 |
| 65 to 69.9% | 119 | 238 |
| 70 to 74.9% | 137 | 274 |
| 75 to 79.9% | 157 | 315 |
| 80 to 84.0% | 175 | 351 |
| 85 to 89.9% | 199 | 400 |
| 90 to 94.9% | 224 | 450 |
| 95 to 100% (full) | 224 | 450 |

2.      The property owner, through the TMA, will make available discounted parking permits for full-time Bellevue Place employees. The amounts of the discount for carpools will be 16.7% of the then current Bellevue Place monthly parking rates, rounded to the nearest dollar. For vanpools, the discount will be 33.3% of the then current Bellevue Place monthly parking rates, rounded to the nearest dollar. The number of discounted permits will not exceed the minimum number of rideshare vehicles needed to meet the targets (at project full-occupancy, this would be a maximum of 224 vehicles; at intermediate stages, this would be as shown in Table 3).

Level 2 activity shall be implemented by the property owner in the calendar year following the second consecutive October measurement in which target maximums were not achieved. Level 2 activity will be a continuation of the base activity level plus:

a.      The property owner, through the TMA, will make available discounted transit passes to full-time Bellevue Place employees.  The amount of the discount will be 28% of the then current cost of a Metro two-zone pass, rounded to the nearest dollar.  The number of discounted transit passes will not exceed the minimum number of transit riders needed to meet the targets (at project full-occupancy, this would be a maximum of 450 persons including up to 150 for hotel employee; at intermediate stages, the maximum would be as shown in Table 3).

b.      The property owner through the TMA, will make available discounted parking permits for full-time Bellevue Place employees.  The amount of the discount for carpools will be 33.3% of the then current Bellevue Place monthly parking rates, rounded to the nearest dollar.  For vanpools, the discount will be 66.7% of the then current Bellevue Place monthly parking rates, rounded to the nearest dollar.  The number of discounted permits will not exceed the minimum number of rideshare vehicles needed to meet the targets (at project full-occupancy, this would be a maximum of 224 vehicles; at intermediate stages, this would be as shown in Table 3).

3.      Level 3 activity shall be implemented by the property owner in the calendar year following a third consecutive October measurement (defined in paragraph III.B) in which target maximums were not achieved.  Level 3 activity will be a continuation of the base level of activity plus:

a.      The property owner, through the TMA, will make available discounted transit passes to full-time Bellevue Place employees.  The amount of the discount will be 42% of the then current cost of a Metro two-zone pass, rounded to the nearest dollar.  The number of discounted transit passes will not exceed the minimum number of transit riders needed to meet the targets (at project full-occupancy, this would be a maximum of 450 persons including up to 150 for hotel employees; at intermediate stages, the maximum would be as shown in Table 3).

b.      The property owner through the TMA, will make available discounted parking permits for full-time Bellevue Place employees.  The amount of the discount for carpools will be 50% of the then current Bellevue Place monthly parking rates, rounded to the nearest dollar.  For vanpools, the discount will be 100.0% of the then current Bellevue Place monthly parking rates, rounded to the nearest dollar.  The number of discounted permits will not exceed the minimum number of rideshare vehicles needed to meet the targets (at project full-occupancy, this would be a maximum of 224 vehicles; at intermediate stages, this would be as shown in Table 3).

4.      In the calendar year following an October count (defined in paragraphs III.B) in which both targets were achieved, the level of activity may drop by one level (from Level 2 to Level 1, for example) but not lower than the Base Level.  The activity levels cannot drop or rise by more than one level per year except at the termination of the target maximum program.  The end of the target maximum program will occur 4 years after the project reaches 50% occupancy or 6 years after the temporary certificate of occupancy is issued, whichever is later (as described in Section A).  At the termination of the target maximum program, the activity levels will return to the base level.

5.      If the experience shows that the relative use among transit, carpool and vanpool are different than expected, the number of transit passes subsidized or parking discounts offered can be modified so long as the maximum applicable expenditure would not exceed that required by paragraphs III.B(1), (2) and (3).

F.      The property owner or applicant shall annually provide an assurance bond as a guarantee that the required financial incentives described in activity levels 1, 2, and 3 will be provided. This assurance bond will equal the cost of the maximum incentive levels and property owner dues that could be required for the following year.

The amount included in the assurance bond will be determined in October when the level of activity required is determined. The bond would be issued by the following January 1st.

A claim may be made on the bond only if and to the extent that the property owner fails to provide the required level of subsidies and dues.

# DEFINITION OF TERMS

**Outbound Vehicle Trip-ends.** A vehicle that exits at any parking area at Bellevue Place and enters an adjacent street.

**On-site Employee Parking.** Parking for part- or full-time employees of the project located within the project.

**On-site Short-term Parking.** Parking within the project that is restricted for use by visitors, clients, shoppers and hotel use.

**P.M. Peak Hour of Traffic.** The hour with the highest two-way traffic volumes on streets adjacent to the project during the p.m. peak period.

**Peak Hour of Parking Accumulation.** The hour with the highest number of vehicles parked.

**Project Occupancy.** The percent of the project space that is leased and occupied based on the percent of net square feet and excludes hotel occupancy.

**Parking Limits.** The maximum number of parking spaces that can be allocated for employee parking.

**P.M. Peak Hour Outbound Employee Vehicle Trip Limits.** The maximum number of employee vehicle trips that are allowed to exit the project during the p.m. peak hour of traffic.

**Target Maximum.** A limit on the number of p.m. peak hour outbound employee vehicle trips and the number of parking spaces used for employee parking that is applied prior to full project occupancy but only after the occupancy of the project reaches 50% (excluding the hotel).

**Achievement of Target Maximum.** A target maximum is achieved when both intermediate employee parking and p.m. peak hour employee vehicle trip limits that were established for a percent of project occupancy are not exceeded.

**Transportation Management Program.** An assortment of policies and activities designed to discourage single occupancy vehicle (SOV) use by employees and peak hour vehicle trips generated by the project.

**Transportation Management Association.** An organization devoted to promoting transportation management programs as well as other transportation issues.

**Base Level of Activity.** The elements of the ongoing transportation management program which will be required of project owners and tenants and provided for employees.

**Level 1 Activity.** A specific financial contribution required by the building owner for transit pass subsidies and parking discounts that are offered to employees if target maximums are not achieved the first time.

**Level 2 Activity.** A specific financial contribution required by the building owner for transit pass subsidies and parking discounts that are offered to employees if target maximums are not achieved the second consecutive time.

**Level 3 Activity.** A specific financial contribution required by the building owner for transit pass subsidies and parking discounts that are offered to employees if target maximums are not achieved the third consecutive time.

**TMA Membership Dues.** Fees required to be paid by the building owners and tenants to the TMA in return for the TMA providing transportation management program services.

**Assurance Bond.** A financial commitment made by the property owner or applicant to the City of Bellevue that will be forfeited if property owner or applicant fails to make financial contributions required in Level 1, 2, or 3 Activities.

**Transit Pass Subsidies.** A financial contribution to employees through a discount for monthly Metro, Community Transit or other transit passes.

**Carpool and Vanpool Parking Discounts.** Lower prices relative to SOV employee parking rates offered by the building owner or applicant to employees who commute in a registered vanpool of 5 or more persons.

EXHIBIT G

FORM OF TENANT ESTOPPEL CERTIFICATE

_____, 20___


Metropolitan Life Insurance Company
425 Market Street, Suite 1050
San Francisco, California  94105

Ladies and Gentlemen:

The undersigned, Desolation Holdings LLC, a Delaware limited liability company ("Tenant"), as tenant under a lease (the "Lease") of certain premises dated _____ executed by Tenant and Bellevue Place Office, LLC ("Landlord"), does hereby state, declare, and certify as of the date hereof to Metropolitan Life Insurance Company and its subsidiaries and/or affiliates, as applicable, successors and assigns (collectively, "Lender"), as follows:

1.    The copy of the Lease attached hereto as Exhibit A is a true and correct copy of the Lease and the Lease is in full force and effect, subject to the effect of bankruptcy and other generally applicable debtor protection laws, and has not been amended, supplemented or changed, except as follows [if none, so state]:

2.    Tenant has accepted possession of the premises demised under the Lease, and all items of an executory nature have been completed under the terms of the Lease, including, but not limited to, completion of construction of the demised premises (and all other improvements required under the Lease) in accordance with  the terms of the Lease, and payment of any improvement allowance or other funds owing by Landlord to Tenant [except that the remaining improvement allowance owing by Landlord to Tenant is $_____, and except as follows: _____]. Tenant further acknowledges that the term commenced on _____ and shall expire on _____, 20___, unless sooner terminated or extended in accordance with the terms of the Lease.

3.    No default or, to Tenant's knowledge, event that with the passing of time or the giving of notice, or both, would constitute a default (referred to herein collectively as a "default") on the part of Tenant exists under the Lease in the performance of the terms, covenants and conditions of the Lease required to be performed on the part of Tenant.

4.    No default on the part of Landlord exists under the Lease in the performance of the terms, covenants and conditions of the Lease required to be performed on the part of Landlord.

5.      Tenant has no option or right to purchase the property of which the premises are a part, or any part thereof.

6.      Subject to Section 23.4(a)(2) of the Lease, no rentals are accrued and unpaid under the Lease.

7.      Subject to Section 23.4(a)(2) of the Lease, no prepayments of rentals due under the Lease have been made and no security or deposits as security have been made thereunder, except as set forth in the Lease.

8.      To Tenant's knowledge, Tenant has no defense as to its obligations under the Lease and claims no setoff or counterclaim against Landlord.

9.      Tenant has not received written notice of any assignment, hypothecation, mortgage, or pledge of Landlord's interest in the Lease or the rents or other amounts payable thereunder.


DESOLATION HOLDINGS LLC, a Delaware
limited liability company

By _____ [ EXHIBIT ONLY—DO NOT SIGN ] _____
Name: _____
Its: _____

## EXHIBIT A

### TO TENANT ESTOPPEL CERTIFICATE

### Copy of Lease and Amendments to Lease

EXHIBIT H

FORM OF SUBORDINATION AGREEMENT TO RECIPROCAL EASEMENT
AGREEMENT

WHEN RECORDED RETURN TO:

PERKINS COIE LLP
Attention: Craig S. Gilbert
10885 NE Fourth Street, Suite 700
Bellevue WA 98004-5579

## SUBORDINATION AGREEMENT

DESOLATION HOLDINGS LLC, a Delaware limited liability company, as Tenant under that certain Lease dated _____, 2018, wherein Tenant leases from Bellevue Place Office, LLC, as Landlord, certain premises which are part of Bellevue Place, which is more particularly described in Exhibit "A" attached hereto and made a part hereof, hereby subordinates the Lease and all of its rights and interests in and to the Leased Premises to that certain Reciprocal Easement Agreement dated September 11, 1987 and recorded on September 16, 1987, under King County Recorder's No. 8709160449, records of King County, Washington as amended from time to time.

DATED this _____ day of _____, 2018.

TENANT:

_____

By   [EXHIBIT ONLY—DO NOT SIGN ]
_____

Its _____

STATE OF WASHINGTON )
                    ) ss.
COUNTY OF KING      )

     On this _____ day of _____, 20__; before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared _____ to me known to be the _____ of _____, a _____ [corporation/limited liability company], the [corporation/limited liability company] that executed the within and foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said [corporation/limited liability company], for the uses and purposes therein mentioned, and on oath stated that ___ was authorized to execute said instrument.

     WITNESS my hand and official seal hereto affixed the day and year first written above.


                       __[ EXHIBIT ONLY—DO NOT SIGN ]__
                       (Signature)

                       (Name legibly printed or stamped)
(Seal or stamp)           Notary Public in and for the State of Washington, residing at _____.
                       My commission expires _____

## EXHIBIT A

## LEGAL DESCRIPTION OF BELLEVUE PLACE

New Lots 3, 4, 5 and 6 of Boundary Line Adjustment No. 07-117859, recorded in King County, Washington on November 29, 2007, under recording number 20071129900004;

TOGETHER WITH:

Lots 11, 12, 13, and 14, Bellevue Realty Redwood Addition, according to the Plat recorded in Volume 54 of Plats, Page 28, in King County, WA;

EXCEPT:

The north 0.70 feet of said Lot 14 lying westerly of the easterly 74 feet of said Lot 14 and easterly of the westerly 19 feet of said Lot 14.

EXHIBIT I

FORM OF SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

RECORDING REQUESTED
BY AND WHEN
RECORDED RETURN TO:

Real Estate Investments
Metropolitan Life Insurance Company
Law Department
425 Market Street, Suite 1050
San Francisco, California 94105

SUBORDINATION
NONDISTURBANCE
AND ATTORNMENT AGREEMENT

**NOTICE:**    **THIS SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT RESULTS IN YOUR LEASEHOLD ESTATE IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.**

DEFINED TERMS

**Execution Date: As of _____, 20____**

**Beneficiary & Address:**
Metropolitan Life Insurance Company, a New York corporation, and its affiliates, as applicable
One MetLife Way
Whippany, New Jersey 07981-1449
Attn:  Senior Vice President
        Real Estate Investments

with a copy to:

Metropolitan Life Insurance Company
425 Market Street, Suite 1050
San Francisco, California 94105
Attn:  Vice President

**Tenant & Address:**
Desolation Holdings LLC, a Delaware limited liability company
610 Bellevue Way NE, Suite 200
Bellevue, Washington 98004

**Landlord & Address:**
Bellevue Place Office, LLC, a Washington limited liability company
575 Bellevue Square
Bellevue, Washington 98004

**Loan:** A first mortgage loan in the original principal amount of $134,000,000.00 from Beneficiary to Landlord.

**Note:** A Promissory Note executed by Landlord in favor of Beneficiary in the amount of the Loan dated as of January 21, 2014.

**Deed of Trust:** A Deed of Trust, Security Agreement and Fixture Filing dated as of January 21, 2014 executed by Landlord, to Chicago Title Insurance Company, as Trustee, for the benefit of Beneficiary securing repayment of the Note recorded in the records of the County in which the Property is located, as amended by that certain First Amendment to Deed of Trust, Security Agreement and Fixture Filing dated as of July 27, 2015 (collectively, the "Deed of Trust").

**Lease and Lease Date:** The Bank of America Building Office Lease entered into by Landlord and Tenant dated as of _____, 2018 covering the Premises.

[

**Property:** Bellevue Place
Bellevue, Washington 98004

The Property is more particularly described on Exhibit A.

**THIS SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT** (the "Agreement") is made by and among Tenant, Landlord, and Beneficiary and affects the Property described in Exhibit A. Certain terms used in this Agreement are defined in the Defined Terms. This Agreement is entered into as of the Execution Date with reference to the following facts:

A. Landlord and Tenant have entered into the Lease covering certain space in the improvements located in and upon the Property (the "Premises").

B. Beneficiary has made or is making the Loan to Landlord evidenced by the Note. The Note is secured, among other documents, by the Deed of Trust.

C. Landlord, Tenant and Beneficiary all wish to subordinate the Lease to the lien of the Deed of Trust.

D. Tenant has requested that Beneficiary agree not to disturb Tenant's rights in the Premises pursuant to the Lease in the event Beneficiary forecloses the Deed of Trust, or acquires the Property pursuant to the trustee's power of sale contained in the Deed of Trust or receives a transfer of the Property by a conveyance in lieu of foreclosure of the Property (collectively, a "Foreclosure Sale") but only if Tenant is not then in default under the Lease and Tenant attorns to Beneficiary or a third party purchaser at the Foreclosure Sale (a "Foreclosure Purchaser") in accordance with the terms hereof.

NOW THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties agree as follows:

1.    <u>Subordination</u>. The Lease and the leasehold estate created by the Lease and all of Tenant's rights under the Lease are and shall remain subordinate to the Deed of Trust and the lien of the Deed of Trust, to all rights of Beneficiary under the Deed of Trust and to all renewals, amendments, modifications and extensions of the Deed of Trust.

2.    <u>Acknowledgments by Tenant</u>. Tenant agrees that: (a) Tenant has notice that the Lease and the rent and all other sums due under the Lease have been or are to be assigned to Beneficiary as security for the Loan; (b) in the event that Beneficiary notifies Tenant of a default under the Deed of Trust and requests Tenant to pay its rent and all other sums due under the Lease to Beneficiary, Tenant shall pay such sums directly to Beneficiary or as Beneficiary may otherwise request; (c) Tenant shall send a copy of any notice or statement under the Lease to Beneficiary at the address for Beneficiary set forth in the Defined Terms above (as the same may change from time pursuant to Paragraph 7 below) which pertains to (i) a change to Tenant's notice address(es), (ii) an exercise of any of Tenant's option rights under the Lease, and/or (iii) a default on the part of Landlord under the Lease, at the same time Tenant sends such notice or statement to Landlord; and (d) this Agreement satisfies any condition or requirement in the Lease relating to the granting of a nondisturbance agreement.

3.    <u>Foreclosure and Sale</u>. In the event of a Foreclosure Sale,

(a)    So long as Tenant complies with this Agreement and is not in default under any of the provisions of the Lease, the Lease shall continue in full force and effect as a direct lease between Beneficiary and Tenant, and Beneficiary will not disturb the possession of Tenant, subject to this Agreement. To the extent that the Lease is extinguished as a result of a Foreclosure Sale, a new lease shall automatically go into effect upon the same provisions as contained in the Lease between Landlord and Tenant, except as set forth in this Agreement, for the unexpired term of the Lease. Tenant agrees to attorn to and accept Beneficiary as landlord under the Lease and to be bound by and perform all of the obligations imposed by the Lease, or, as the case may be, under the new lease, in the event that the Lease is extinguished by a Foreclosure Sale. Upon Beneficiary's acquisition of title to the Property, Beneficiary will perform all of the obligations imposed on the Landlord by the Lease except as set forth in this Agreement; provided, however, that Beneficiary shall not be: (i) liable for any act or omission of a prior landlord (including Landlord); or (ii) subject to any offsets or defenses that Tenant might have against any prior landlord (including Landlord); or (iii) bound by any rent or additional rent which Tenant might have paid in advance to any prior landlord (including Landlord) for a period in excess of one month or by any security deposit, cleaning deposit or other sum that Tenant may have paid in advance to any prior landlord (including Landlord) unless such sum or deposit was transferred to and actually received by Beneficiary; or (iv) bound by any amendment, modification, assignment or termination of the Lease made without the written consent of Beneficiary (except for any termination right of Tenant that is expressly set forth in the Lease and the expiration of the term of the Lease); (v) obligated or liable with respect to any representations, warranties or indemnities contained in the Lease; provided, however, that Beneficiary shall be obligated to indemnify Tenant solely as set forth in Paragraph 3(c)(iii) below; or (vi) liable to Tenant or any other party for any conflict between the provisions of the Lease and the provisions of any other lease affecting the Property which is not entered into by Beneficiary.

(b)    Upon the written request of Beneficiary after a Foreclosure Sale, the parties shall execute a lease of the Premises upon the same provisions as contained in the Lease between Landlord and Tenant, except as set forth in this Agreement, for the unexpired term of the Lease.

(c)      Notwithstanding any provisions of the Lease to the contrary, from and after the date that Beneficiary acquires title to the Property as a result of a Foreclosure Sale, (i) Beneficiary will not be obligated to expend any monies to restore casualty damage in excess of available insurance proceeds; (ii) Tenant shall not have the right to make repairs and deduct the cost of such repairs from the rent without a judicial determination that Beneficiary is in default of its obligations under the Lease; (iii) in no event will Beneficiary be obligated to indemnify Tenant, except where Beneficiary is in breach of its obligations under the Lease or where Beneficiary has been actively negligent in the performance of its obligations as landlord; and (iv) other than determination of fair market value, no disputes under the Lease shall be subject to arbitration unless Beneficiary and Tenant agree to submit a particular dispute to arbitration.

4.      Subordination and Release of Purchase Options.  Tenant represents that it has no right or option of any nature to purchase the Property or any portion of the Property or any interest in the Landlord.  To the extent Tenant has or acquires any such right or option, these rights or options are acknowledged to be subject and subordinate to the Mortgage and are waived and released as to Beneficiary and any Foreclosure Purchaser.

5.      Acknowledgment by Landlord.  In the event of a default under the Deed of Trust, at the election of Beneficiary upon written notice to Tenant, Tenant shall and is directed to pay all rent and all other sums due under the Lease to Beneficiary.

6.      Construction of Improvements.  Beneficiary shall not have any obligation or incur any liability with respect to the completion of tenant improvements for the Premises.

7.      Notice.  All notices under this Agreement shall be deemed to have been properly given if delivered by overnight courier service or mailed by United States certified mail, with return receipt requested, postage prepaid to the party receiving the notice at its address set forth in the Defined Terms (or at such other address as shall be given in writing by such party to the other parties) and shall be deemed complete upon receipt or refusal of delivery.

8.      Miscellaneous.  Beneficiary shall not be subject to any provision of the Lease that is inconsistent with this Agreement.  Nothing contained in this Agreement shall be construed to derogate from or in any way impair or affect the lien or the provisions of the Deed of Trust.  This Agreement shall be governed by and construed in accordance with the laws of the State of in which the Property is located.

9.      Liability and Successors and Assigns.  In the event that Beneficiary acquires title to the Premises or the Property, Beneficiary shall have no obligation nor incur any liability in an amount in excess of $5,000,000 and Tenant's recourse against Beneficiary shall in no extent exceed the amount of $5,000,000. This Agreement shall run with the land and shall inure to the benefit of the parties and, their respective successors and permitted assigns including a Foreclosure Purchaser. If a Foreclosure Purchaser acquires the Property or if Beneficiary assigns or transfers its interest in the Note and Deed of Trust or the Property, all obligations and liabilities of Beneficiary under this Agreement shall terminate and be the responsibility of the Foreclosure Purchaser or other party to whom Beneficiary's interest is assigned or transferred.  The interest of Tenant under this Agreement may not be assigned or transferred except in connection with an assignment of its interest in the Lease which has been consented to by Beneficiary.

10.      OFAC Provisions  Tenant and Beneficiary hereby represent, warrant and covenant to each other, either  that (i) it is regulated by the SEC, FINRA or the Federal Reserve (a "Regulated Entity"), or is a wholly-owned subsidiary or wholly-owned affiliate of a Regulated Entity or (ii) neither it

nor any person or entity that directly or indirectly (a) controls it or (b) has an ownership interest in it of twenty-five percent (25%) or more, appears on the list of Specially Designated Nationals and Blocked Persons ("OFAC List") published by the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury.

With respect to each Guarantor of Tenant's obligations under this Lease, Tenant further represents, warrants and covenants either that  (i) any such Guarantor is  a Regulated Entity or a wholly-owned subsidiary or affiliate of a Regulated Entity or (ii) neither Guarantor nor any person or entity that directly or indirectly (a) controls such Guarantor or (b) has an ownership interest in such Guarantor of twenty-five percent (25%) or more, appears on the OFAC List.

*[SIGNATURE PAGES FOLLOW]*

**IN WITNESS WHEREOF**, the parties have executed this Subordination, Nondisturbance and Attornment Agreement as of the Execution Date.

**IT IS RECOMMENDED THAT THE PARTIES CONSULT WITH THEIR ATTORNEYS PRIOR TO THE EXECUTION OF THIS SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT.**

**BENEFICIARY:**          METROPOLITAN LIFE INSURANCE COMPANY,
a New York corporation

By: MetLife Investment Advisors, LLC,
its investment manager

By: _____
Name: _____
Its: _____

## ACKNOWLEDGEMENT

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document, to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF _____    )

On _____ before me, _____, a Notary Public, personally appeared _____ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____          (Seal)

**TENANT:**                       DESOLATION HOLDINGS LLC,
                                  a Delaware limited liability company


                                  By ___[ EXHIBIT ONLY—DO NOT SIGN ]___

                                  Its _____


State of _____

County of _____


On _____, 20___ before me, _____, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.


WITNESS my hand and official seal.


Signature _____          (Seal)

**LANDLORD:**          BELLEVUE PLACE OFFICE, LLC,
                       a Washington limited liability company

                       By: Kemper Development Company,
                           a Washington corporation,
                           its Manager

State of _____

County of _____

On _____, 20___ before me, _____, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____          (Seal)

# EXHIBIT A

## PROPERTY DESCRIPTION

TO DEED OF TRUST, SECURITY AGREEMENT AND FIXTURE FILING

PROPERTY DESCRIPTION

The property herein is situated in the County of King, State of Washington and more particularly described as follows:

THAT PORTION OF LOT 1, CITY OF BELLEVUE BOUNDARY LINE ADJUSTMENT NUMBER BLA 87-3815, RECORDED UNDER RECORDING NO. 8707219005 AND THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 29, TOWNSHIP 25 NORTH, RANGE 5 EAST, WILLAMETTE MERIDIAN, IN KING COUNTY, WASHINGTON, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT MEASURED AT RIGHT ANGLES 40 FEET NORTH OF THE SOUTH LINE OF SAID SUBDIVISION, ALSO BEING THE CENTERLINE OF NORTHEAST 8TH STREET AND 40 FEET EAST OF THE WEST LINE OF SAID SUBDIVISION, ALSO BEING THE CENTERLINE OF 104TH AVENUE NORTHEAST;
THENCE NORTH 01°23'20" EAST, A DISTANCE OF 179.48 FEET ALONG THE EAST MARGIN OF 104TH AVENUE NORTHEAST;
THENCE SOUTH 88°42'11" EAST, A DISTANCE OF 71.16 FEET;
THENCE NORTH 01°17'49" EAST, A DISTANCE OF 31.00 FEET;
THENCE SOUTH 88°42'11" EAST, A DISTANCE OF 183.00 FEET;
THENCE NORTH 01°17'49" EAST, A DISTANCE OF 11.00 FEET;
THENCE SOUTH 88°42'11" EAST, A DISTANCE OF 8.50 FEET;
THENCE NORTH 01°17'49" EAST, A DISTANCE OF 108.21 FEET;
THENCE SOUTH 88°41'40" EAST, A DISTANCE OF 12.88 FEET;
THENCE NORTH 01°18'20" EAST, A DISTANCE OF 5.95 FEET;
THENCE SOUTH 88°41'40" EAST, A DISTANCE OF 71.12 FEET;
THENCE NORTH 01°18'20" EAST, A DISTANCE OF 12.22 FEET;
THENCE SOUTH 88°41'40" EAST, A DISTANCE OF 76.81 FEET TO THE WEST LINE OF THE EAST 3 ACRES OF THE SOUTH 10 ACRES OF THE WEST HALF OF THE EAST HALF OF THE SOUTHWEST QUARTER OF SAID SECTION 29, SAID WEST LINE ALSO BEING THE WEST LINE OF THE PLAT OF BELLEVUE REALTY REDWOOD ADDITION, ACCORDING TO THE PLAT THEREOF, RECORDED IN VOLUME 54 OF PLATS, PAGE 28, RECORDS OF SAID COUNTY;
THENCE SOUTH 01°21'28" WEST, A DISTANCE OF 347.83 FEET ALONG SAID WEST LINE TO THE NORTH MARGIN OF NORTHEAST 8TH STREET;

THENCE NORTH 88°42'11" WEST, A DISTANCE OF 423.39 FEET ALONG SAID NORTH MARGIN TO THE POINT OF BEGINNING;

(ALSO KNOWN AS NEW LOT 5 OF CITY OF BELLEVUE BOUNDARY LINE ADJUSTMENT NO. 07-117859-LW, RECORDED UNDER RECORDING NO. 20071129900004.)

PARCEL B:

THOSE CERTAIN RECIPROCAL AND NON-EXCLUSIVE RIGHTS, EASEMENTS AND PRIVILEGES OF USE, INGRESS, EGRESS, PARKING AND FOR UTILITY AND OTHER PURPOSES CREATED AND GRANTED AS AN APPURTENANCE TO PARCEL A ABOVE, IN AND BY THAT CERTAIN CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT DATED THE 11TH DAY OF SEPTEMBER, 1987, BY AND AMONG KEMPER DEVELOPMENT COMPANY ("KEMPER"), GRANTOR, AND BELLEVUE PROPERTIES ("BELLEVUE"), RECORDED ON SEPTEMBER 16, 1987 UNDER RECORDING NUMBER 8709160449, DIVISION OF RECORDS AND ELECTIONS, KING COUNTY, WASHINGTON, AS MODIFIED BY AMENDMENT NO. 1 TO CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT DATED THE 16TH DAY OF FEBRUARY, 1988 BY AND AMONG BELLEVUE, BELLEVUE PLACE HOTEL LIMITED PARTNERSHIP, KEMPER AND BELLEVUE PLACE OFFICE BUILDING 1 LIMITED PARTNERSHIP, RECORDED ON AUGUST 12, 1988 UNDER RECORDING NUMBER 8808120346, AND AS FURTHER MODIFIED BY SECOND AMENDMENT TO CONSTRUCTION AND RECIPROCAL EASEMENT AGREEMENT DATED DECEMBER 7, 2007 BY AND AMONG BELLEVUE PLACE OFFICE BUILDING 1 LIMITED PARTNERSHIP, A WASHINGTON LIMITED PARTNERSHIP, AND BELLEVUE PLACE HOTEL LIMITED PARTNERSHIP, A WASHINGTON LIMITED PARTNERSHIP, RECORDED ON DECEMBER 7, 2007 UNDER RECORDING NUMBER 20071207001336, SAID DIVISION OF RECORDS AND ELECTIONS (COLLECTIVELY THE "REA"), IN, ON, OVER, UPON AND UNDER CERTAIN ADJOINING REAL PROPERTY THEREIN MORE PARTICULARLY DESCRIBED, TOGETHER WITH ALL OF THE RIGHTS, POWERS, PRIVILEGES AND BENEFITS UNDER SAID REA ACCRUING TO THE OWNER OF SAID PARCEL A, ITS SUCCESSORS, LEGAL REPRESENTATIVES AND ASSIGNS;

PARCEL C:

THOSE CERTAIN EASEMENT RIGHTS FOR THE PASSAGE AND PARKING OF VEHICLES OF ALL KINDS AND THE PASSAGE AND ACCOMMODATION OF PEDESTRIANS APPURTENANT TO PARCEL A ABOVE, AS ESTABLISHED BY THAT CERTAIN INGRESS AND EGRESS EASEMENT AGREEMENT BY AND BETWEEN BELLEVUE AND BELLEVUE PLACE OFFICE BUILDING 1 LIMITED PARTNERSHIP,

RECORDED JULY 21, 1987 UNDER RECORDING NUMBER 8707211889 AND RE-RECORDED AUGUST 31, 1987 UNDER RECORDING NUMBER 870831 0222, AS MODIFIED BY THAT CERTAIN ADDENDUM TO INGRESS AND EGRESS AGREEMENT DATED NOVEMBER 1, 1997 BY AND BETWEEN BELLEVUE AND BELLEVUE PLACE OFFICE BUILDING I LIMITED PARTNERSHIP, RECORDED NOVEMBER 4, 1997 UNDER RECORDING NUMBER 9711041232;

PARCEL D;

THOSE CERTAIN EASEMENT RIGHTS FOR THE PASSAGE AND PARKING OF VEHICLES OF ALL KINDS AND THE PASSAGE AND ACCOMMODATION OF PEDESTRIANS APPURTENANT TO PARCEL A ABOVE, AS ESTABLISHED BY THAT CERTAIN INGRESS AND EGRESS EASEMENT AGREEMENT BY AND BETWEEN BELLEVUE AND BELLEVUE PLACE OFFICE BUILDING I LIMITED PARTNERSHIP, RECORDED JULY 21, 1987 UNDER RECORDING NUMBER 8707211888 AND RE-RECORDED AUGUST 31, 1987 UNDER RECORDING NUMBER 870831 0223, AS MODIFIED BY THAT CERTAIN ADDENDUM TO INGRESS AND EGRESS AGREEMENT DATED NOVEMBER 1, 1997 BY AND BETWEEN BELLEVUE AND BELLEVUE PLACE OFFICE BUILDING I LIMITED PARTNERSHIP, RECORDED AUGUST 31, 1987, UNDER RECORDING NUMBER 8708310223, AS MODIFIED BY THAT CERTAIN ADDENDUM TO INGRESS AND EGRESS AGREEMENT DATED NOVEMBER 1, 1997 BY AND BETWEEN BELLEVUE AND BELLEVUE PLACE OFFICE BUILDING I LIMITED PARTNERSHIP, RECORDED NOVEMBER 4, 1997 UNDER RECORDING NUMBER 9711041233, AND AS MODIFIED BY THAT CERTAIN ADDENDUM TO INGRESS AND EGRESS AGREEMENT BY AND BETWEEN BELLEVUE AND BELLEVUE PLACE OFFICE BUILDING I LIMITED PARTNERSHIP, RECORDED NOVEMBER 29, 2007 UNDER RECORDING NO. 20071129001843.

APN: 292505-9056-07

The undersigned Guarantor to the Lease hereby consents to the foregoing Subordination, Nondisturbance and Attornment Agreement and reaffirms that the Guaranty of Lease dated _____ remains in full force and effect as of the date of the foregoing Subordination, Nondisturbance and Attornment Agreement.

**GUARANTOR:**                            BITTREX, INC.,
                                          a Delaware corporation


                                          By ___[ EXHIBIT ONLY—DO NOT SIGN ]___

                                          Its _____

EXHIBIT J

<u>FORM OF GUARANTEE OF LEASE</u>

This Guarantee is made as of _____, 20___, by _____ (if one person or entity **"Guarantor"**, and if more than one person or entity **"Guarantors"**), for the benefit of **BELLEVUE PLACE OFFICE, LLC**, a Washington limited liability company (**"Landlord"**).

## RECITALS:

A.      Landlord has agreed to enter into a Lease dated _____, 20___ (the **"Lease"**), with _____, a _____ (**"Tenant"**), for certain space located in Bellevue Place in the City of Bellevue, County of King, State of Washington.

B.      Guarantor(s) has a financial interest in Tenant, and will receive a material benefit from the Lease.  Guarantor(s) acknowledges Landlord would not enter into the Lease without this Guarantee.

## AGREEMENT:

In consideration of and to induce Landlord to enter into the Lease, Guarantor(s) agrees as follows:

1.      Guarantor(s) hereby guarantees to Landlord the full and prompt payment of all sums, including, but not limited to, the rent, taxes, insurance, utility charges and any and all other sums and charges payable by Tenant under the Lease as the same may be amended from time to time, and the full performance and observance of all the covenants, terms conditions and agreements therein provided to be performed and observed by Tenant.  Guarantor(s) hereby covenants and agrees to and with Landlord if Tenant or its sublessees, successors or assigns at any time defaults in the payment of any such sum or in the performance of any of the terms, covenants, provisions or conditions contained in the Lease and such default is not cured within the applicable cure period, Guarantor(s) will promptly pay such sum or will forthwith perform and fulfill such terms, covenants and conditions and agreements, and will promptly pay to Landlord, its successors and assigns all damages that may arise as a consequence of any default by Tenant under the Lease for which Tenant is liable, including without limitation, all reasonable attorneys' fees incurred by Landlord to the extent Tenant is required to reimburse such fees under the terms of the Lease.

2.      This is an absolute and unconditional guaranty of payment and performance.  The obligations of Guarantor(s) hereunder are independent of the obligations of Tenant, and a separate action or actions may be brought and prosecuted against each Guarantor, regardless of whether an

-1-

action is brought against Tenant or any other Guarantor and regardless of whether Tenant or any other Guarantor is joined in such action or actions, and each Guarantor waives the benefit of any statute of limitations affecting his, her or its liability hereunder or the enforcement thereof. The liability of Guarantor(s) hereunder is primary and shall not be affected or diminished by any transfer (by sublease, assignment or otherwise) of Tenant's interest in the Lease.

3.    Guarantor(s) authorizes Landlord, without notice or demand and without affecting any Guarantor's liability hereunder, from time to time to (a) renew, extend, accelerate or otherwise change the time for payments under or otherwise change the terms of, the Lease or any part thereof; (b) take and hold security for the payment of this Guarantee or the indebtedness guaranteed and exchange, enforce, waive and release any such security; (c) apply any security for the Lease or direct the order or manner of sale thereof as Landlord in its sole discretion may determine; (d) release or substitute any one or more Guarantor(s); (e) modify or alter the liability of Tenant under the Lease; or (f) settle or compromise any claim of Landlord against Tenant. Landlord may assign the Lease to the extent permitted under the terms of the Lease and this Guarantee in whole or in part, without notice and without in any manner affecting Guarantor's obligations hereunder.

4.    Guarantor(s) waives any right to require Landlord to (a) proceed against Tenant; (b) proceed against or exhaust any security held from Tenant; or (c) pursue any other remedy in Landlord's power whatsoever. Guarantor(s) waives any defense arising by reason of any disability or other defense of Tenant or by reason of the cessation from any cause whatsoever of the liability of Tenant. Until all obligations of Tenant to Landlord under the Lease shall have been fully paid and performed, Guarantor(s) shall have no right of subrogation, and waive any right to enforce any remedy which Landlord now has or may hereafter have against Tenant, and waive any benefit of, and any right to participate in any security now or hereafter held by Landlord. Guarantor(s) waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance of this Guarantee and of the existence, creation or incurring of new or additional indebtedness and all other notices of every kind and nature to which Guarantor(s) might otherwise be entitled as a matter of law.

5.    Any indebtedness of Tenant now or hereafter held by each or both of the Guarantor(s) is hereby subordinated to the indebtedness of Tenant to Landlord and such indebtedness of Tenant to Guarantors, if Landlord so requests after a default by Tenant under the Lease, shall be collected, enforced and received by Guarantor(s) as a trustee for Landlord and be paid over to Landlord on account of the indebtedness of Tenant to it, but without reduction or affecting in any manner the liability of Guarantor(s) under the other provisions of this Guarantee. Until such time as the Lease has been paid and performed in full, Guarantor(s) agrees not to exercise any rights any of them may now or hereafter acquire against Tenant (whether by subrogation, reimbursement, or otherwise) arising out of payments to Landlord hereunder. Guarantor(s) hereby waives and relinquishes in favor of Landlord and Tenant any claim or right to payment either or both of the Guarantor(s) may now have or hereafter have or acquire against Tenant, by subrogation or otherwise.

-2-

6.    Guarantor(s) agrees it is not necessary for Landlord to inquire into the powers of Tenant or any officers, directors, partners or agents acting or purporting to act on its behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.  Guarantor(s) warrants that no consent of any persons or entities or any governmental authority is necessary for Guarantor(s) to execute, deliver and perform this Guarantee.

7.    If Landlord retains the services of an attorney in connection with enforcing the terms of this Guarantee, or if suit is brought to enforce or interpret this Guarantee, the substantially prevailing party therein will be entitled to recover from the other party the substantially prevailing party's reasonable attorneys' fees, witness fees and other court costs incurred in connection therewith (including attorneys' fees and costs for any appeal, bankruptcy proceeding, arbitration or any other proceeding).

8.    This Guarantee shall continue in full force and effect and shall be unaffected by any bankruptcy, reorganization or insolvency of Tenant or any successor or assign of Tenant or any disaffirmance or rejection of the Lease by a trustee of Tenant or any trustee of any successor or assign of Tenant.  This Guarantee may not be changed, modified, discharged or terminated orally or in any other manner other than by an agreement in writing signed by Guarantor(s) and Landlord.  For purposes of this Guarantee, the term "Tenant" shall include any successor, sublessee or assignee of Tenant; the term "Landlord" shall include any successor or assignee of Landlord; and the term "Lease" shall include any amendment, extension or renewal of the Lease, whether made with or without the consent of Guarantor(s).  This Guarantee shall be the joint and several obligation of each of the undersigned if there be more than one, and shall bind the individual and community property of each of them.

9.    This Guarantee shall be governed by and construed and enforced under the laws of the State of Washington, United States of America.  Guarantor(s) irrevocably submits to the jurisdiction of any state or federal court sitting in King County, Washington, in any action or proceeding brought to enforce or otherwise arising out of or relating to this Guarantee.  Guarantor(s) waives any objection to venue in such court and waive any claim that such form is an inconvenient form.

10.    Within twenty (20) days after Landlord's written request, each Guarantor shall provide Landlord with a copy of his, her or its financial statement for its immediately preceding fiscal year, prepared in accordance with generally accepted accounting principles, consistently applied, or such other accounting practices as may be reasonably acceptable to Landlord, and certified as true and correct by the applicable Guarantor.  The statements provided pursuant to this Section 10 may be, at Grantor's option, financial statements for Guarantor alone, or in the alternative, consolidated financial statements of Guarantor's direct or indirect parent company and Guarantor, provided that Guarantor's financial information is readily discernible.

-3-

IN WITNESS WHEREOF, each Guarantor has executed this Guarantee as of the day of and year first written above.

**GUARANTOR(S):**

_____

By _[ EXHIBIT ONLY—DO NOT SIGN ]_

Its _____

By _[ EXHIBIT ONLY—DO NOT SIGN ]_

Its _____


_____

Address: _____
_____

-4-

STATE OF _____ )
                        ) ss.
COUNTY OF _____ )

      On this _____ day of _____, 20__, before me, the undersigned, a Notary Public in and for the State of _____, duly commissioned and sworn, personally appeared _____ and _____, to me known to be the _____ and _____, respectively, of _____, a _____ [corporation/limited liability company], the [corporation/limited liability company] that executed the within and foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said [corporation/limited liability company], for the uses and purposes therein mentioned, and on oath stated that [_____was/they were] authorized to execute said instrument.

      WITNESS my hand and official seal hereto affixed the day and year first written above.

_____
(Signature)

_____
(Name legibly printed or stamped)
(Seal or stamp)           Notary Public in and for the State of
                   _____, residing at _____.
                   My commission expires _____

STATE OF _____ )
                             ) ss.
COUNTY OF _____ )

      On this _____ day of _____, 20__, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared _____ known to me to be the individual named in and who executed the foregoing document, and acknowledged to me that [he/she] signed the same as [his/her] free and voluntary act and deed for the uses and purposes therein mentioned.

      WITNESS my hand and official seal hereto affixed the day and year first written above.

_____
(Signature)

_____
(Name legibly printed or stamped)
(Seal or stamp)           Notary Public in and for the State of
                   _____, residing at _____.
                   My commission expires _____

Desolation Holdings BP Office Lease Exhibits
33128-0230/141407213.4

EXHIBIT K

TENANT'S DRAW REQUEST

**To:**     Bellevue Place Office, LLC, a Washington limited liability company

**Leased Premises:**  Space _____ at Bank of America Building in Bellevue Place

**Tenant:**    _____, a _____ limited liability company / corporation

Tenant hereby requests a disbursement of Landlord's Improvement Contribution for costs incurred in constructing Premises Improvements in the amount of $_____. Tenant hereby certifies that such request (a) is made in accordance with Section ___ of that certain Lease dated _____, and (b) is based on the payment applied for in the attached AIA G702 and G703 Application and Certificate for Payment and Continuation Sheet, which is a true and correct copy of the Application and Certificate for Payment and Continuation Sheet executed by Tenant's Approved Contractor and Tenant's architect for such payment. Tenant hereby further certifies that it has delivered with this Draw Request all supporting invoices, conditional progress payment lien waivers (in compliance with applicable laws) for labor and materials incorporated in such payment request, and pertinent back-up that is attached to a standard general contractor AIA G702 and G703 payment application, and full conditional lien releases from Tenant's Approved Contractor and each subcontractor and supplier that has completed its work as of the date of this Draw Request.

| |
|---|
| **Requested Disbursement Amount:** |
| **Disbursement Released:** |

Dated this ___ day of _____, 20__.

          TENANT:

          _____

          By: [ EXHIBIT ONLY—DO NOT SIGN ]
           Authorized Representative

**Disbursement Date:** _____
*(For Landlord Use Only)*

-1-

Desolation Holdings BP Office Lease Exhibits
33128-0230/141407213.4

# FIRST LEASE ADDENDUM

THIS FIRST LEASE ADDENDUM (the "Addendum") is made this _19th_ day of _December_, 2018 ("Effective Date"), by and between BELLEVUE PLACE OFFICE, LLC, a Washington limited liability company ("Landlord"), and DESOLATION HOLDINGS LLC, a Delaware limited liability company ("Tenant").

## RECITALS

A.    Landlord and Tenant entered into a nonresidential Lease dated November 14, 2018 (the "Lease"), for Suite 2000 in the Bank of America Building at Bellevue Place, Bellevue, Washington, which leased space is more specifically described in the Lease.

B.    Landlord and Tenant intend, by the execution and delivery of this Addendum, to amend and supplement the Lease in certain material respects, which includes (i) adding Suite 720 to the Leased Premises; and (ii) providing Rent for such suite.

C.    Unless otherwise noted, all capitalized terms herein have the same meanings as set forth in the Lease.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby amend and supplement the Lease as follows:

1.    <u>Section 1 - Basic Lease Data, Terms and Exhibits</u>.  The following provisions of Section 1 of the Lease are hereby amended as follows:

1.6    <u>Leased Premises</u>.  The following paragraph is hereby added to the end of Section 1.6 of the Lease:

<u>Suite 720</u>:  Upon the Commencement Date For Suite 720 through and including the Expiration Date For Suite 720, that portion of the seventh (7th) floor of the Bank of America Building, as and where shown on <u>Exhibit A</u>, attached hereto and incorporated herein by this reference, shall be added to <u>Exhibit C</u> in the Lease.

1.7    <u>Rentable Area of the Leased Premises</u>.  Upon the Commencement Date For Suite 720, the following is added to the end of Section 1.7 of the Lease:

<u>Suite 720</u>: A total of Two Thousand Seven Hundred Twenty-nine (2,729) square feet, from the Commencement Date For Suite 720, through and including the Expiration Date For Suite 720.

1.9    <u>Tenant's Share For Suite 720</u>. The following is hereby added to the end of Section 1.9:

33128-0230/142441773.1

Suite 720: From the Commencement Date For Suite 720, through and including the Expiration Date For Suite 720, Tenant's Share For Suite 720 shall be as follows:

(b)     Operating, Repair and Maintenance Expenses for the Bank of America Building and the Corner Building: Zero point five eight nine percent (0.589%) based on 463,599 rentable square feet pursuant to Section 1.8(a) of the Lease.

(c)     Operating, Repair and Maintenance Expenses for Bellevue Place: Zero point five two five percent (0.525%) based on 519,549 rentable square feet pursuant to Section 1.8(b) of the Lease.

1.10     Rent:

The following paragraph is hereby added to the end of Section 1.10 of the Lease:

**Suite 720: [Based on 2,729 rentable square feet]**

From and including the Commencement Date For Suite 720, through and including the Expiration Date For Suite 720, Rent shall be Forty-three and 00/100 Dollars ($43.00) per rentable square foot for Suite 720 per annum or Nine Thousand Seven Hundred Seventy-eight and 92/100 Dollars ($9,778.92) per month.

1.14     Security Deposit:

The following paragraph is hereby added to the end of Section 1.14 of the Lease:

Suite 720:

Tenant shall pay to Landlord Thirteen Thousand Four Hundred Sixty-five and 34/100 Dollars ($13,465.34) which shall be applied to Rent and Additional Rent due for the first (1st) month of the Lease Term for Suite 720 (and for the avoidance of doubt, if the Lease Term for Suite 720 commences on a day other than the first day of a calendar month such that Rent and Additional Rent are prorated, then the balance of such amount shall be applied to Rent and Additional Rent due for the following calendar month).

1.19     Commencement Date For Suite 720.  Upon the earlier of (i) February 1, 2019 or (ii) the date Tenant occupies Suite 720 for business purposes.

1.20     Expiration Date For Suite 720: July 31, 2019.  The Lease shall continue thereafter with respect to the remaining Leased Premises under the Lease.

2.    <u>Section 3.3 Holding Over</u>. Section 3.3 of the Lease shall be amended in its entirety to read as follows:

(a)    Any holding over by Tenant after the expiration of the Lease Term shall be construed to be a tenancy from month-to-month. Except as provided in 3.3(b) below, during such tenancy, Tenant shall pay to Landlord a monthly rental of one and one-half the Rent payable during the last month of the Lease Term in addition to the Additional Rent and Other Charges set forth in the Lease. Except as set forth herein, such month-to-month tenancy also shall be subject to all of the terms, covenants, and conditions of this Lease.

(b)    With Landlord's prior written consent Tenant shall be allowed to holdover in Suite 720 until October 31, 2019. Tenant shall pay to Landlord for any holdover past the Expiration Date For Suite 720 until October 31, 2019 a monthly rental of the Minimum Rent payable as set forth in Section 1.10 above in addition to the Additional Rent and Other Charges as set forth in the Lease.

3.    <u>Rentable Area of the Leased Premises</u>. Section 6.2(e) is hereby amended to add the following at the end of the Section:

<u>Suite 720</u>:

For purposes of this Lease, the Rentable Area of the Leased Premises shall mean the Useable Area of the Leased Premises, as that term is defined and computed according to the Standard Method for Measuring Floor Area in Office Buildings, ANSI/BOMA Z65.1-2010, otherwise known as the "BOMA Standard," multiplied by a load factor of twenty-four point seventy-one percent (24.71%). The Rentable Area of the Leased Premises comprises 2,729 square feet.

4.    <u>Tenant's Acceptance of Suite 720</u>. Tenant has inspected Suite 720 and accepts the same in their current "as-is" condition, provided Landlord delivers Suite 720 vacant and broom-clean and waives the right to make any claim against Landlord for any matter directly or indirectly arising out of the condition of Suite 720, appurtenances thereto, the improvements thereon and the equipment thereof. **LANDLORD MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE OR HABITABILITY.**

5.    <u>Return of Suite 720</u>. At the expiration or sooner termination of this Lease, solely with respect to Suite 720, Tenant shall return Suite 720 to Landlord in the same condition in which it was initially received (or, if altered by Landlord or by Tenant with Landlord's consent, then the Leased Premises shall be returned in such altered condition), reasonable wear and tear and damage by fire or other casualty excepted. Tenant shall remove all inventory, furniture, and other personal property which does not become a part of the Leased Premises but will not be required to remove

the existing data cabling.

6.     <u>Brokerage</u>. Each party hereto represents and warrants to the other party that it has incurred no liabilities or claims for brokerage commissions or finder's fees in connection with the execution of this Lease and it has not dealt with or has any knowledge of any real estate broker, agent or salesperson in connection with this Lease except Jeff Jochums of CBRE, which represents Tenant and Broderick Group, Inc., which represents Landlord. Landlord and Tenant shall each be responsible for payment to its respective brokers. Each party agrees to indemnify and hold the other parties harmless from all such liabilities or claims (including, without limitation, reasonable attorneys' fees) by anyone other than CBRE and/or Broderick Group, Inc.

7.     <u>Current Tenant</u>.  The following is hereby added to the end of Section 37.21 of the Lease:

<u>Suite 720</u>:

Tenant is aware that the Leased Premises is currently occupied by another tenant or tenants (the "Current Tenant") and the Current Tenant may fail or refuse to vacate the Leased Premises and relinquish all claims to the Leased Premises prior to the Commencement Date For Suite 720. Landlord shall have no responsibility under the Lease to take any action to remove the Current Tenant and shall not be liable for any damages, injuries or claims that may be suffered by Tenant relating to or arising out of, directly or indirectly, the Current Tenant's failure or refusal to vacate and release all interest in the Leased Premises.

8.     <u>Remaining Lease Provisions Unchanged</u>.  All other terms, conditions, provisions and covenants of the Lease shall remain unchanged.

DATED as of the day and year first above written.

LANDLORD                                              TENANT

BELLEVUE PLACE OFFICE, LLC,            DESOLATION HOLDINGS LLC,
a Washington limited liability company       a Delaware limited liability company

By KEMPER DEVELOPMENT COMPANY,     By _____
    a Washington corporation, Its Manager        James Waschak
By _____              Its COO
    James E. Melby, President

33128-0230/142441773.1

STATE OF WASHINGTON )
                  ) ss:
COUNTY OF KING     )

On this 18th day of December, 2018, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared JAMES E. MELBY, to me known to be the President of KEMPER DEVELOPMENT COMPANY, a Washington corporation, as the Manager of BELLEVUE PLACE OFFICE, LLC, a Washington limited liability company, the limited liability company that executed the within and foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said limited liability company, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year first written above.

(SEAL)

> DEBORAH MADIGAN
> Notary Public
> State of Washington
> Commission # 197294
> My Comm. Expires Jan 28, 2022

Type Notary Name: _Deborah Madigan_
Notary Public in and for the State of
Washington, residing at _Bellevue_.
My commission expires _1-28-22_

STATE OF WASHINGTON )
                  ) ss:
COUNTY OF KING     )

On this _____ day of October 2018, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared JAMES WASCHAK, to me known to be the COO, of DESOLATION HOLDINGS LLC, a Delaware limited liability company, the limited liability company that executed the within and foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said limited liability company, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year first written above.

(SEAL)

Type Notary Name: _____
Notary Public in and for the State of
Washington, residing at _____.
My commission expires _____.

33128-0230/142441773.1

STATE OF WASHINGTON )
                     ) ss:
COUNTY OF KING       )      *December*

On this __19__ day of ~~October,~~ 2018, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared JAMES E. MELBY, to me known to be the President of KEMPER DEVELOPMENT COMPANY, a Washington corporation, as the Manager of BELLEVUE PLACE OFFICE, LLC, a Washington limited liability company, the limited liability company that executed the within and foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said limited liability company, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year first written above.

(SEAL)

Type Notary Name: *Katherine Kirkness*
Notary Public in and for the State of
Washington, residing at *Kirkland* .
My commission expires *9.20.11*

STATE OF WASHINGTON )
                     ) ss:
COUNTY OF KING       )

On this _____ day of October 2018, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared JAMES WASCHAK, to me known to be the COO, of DESOLATION HOLDINGS LLC, a Delaware limited liability company, the limited liability company that executed the within and foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said limited liability company, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year first written above.

(SEAL)

Type Notary Name: _____
Notary Public in and for the State of
Washington, residing at _____.
My commission expires _____.

33128-0230/142441773.1

EXHIBIT A

Suite 720



SECOND LEASE ADDENDUM

THIS SECOND LEASE ADDENDUM (this "Addendum") is made and entered into this _29_ day of _July_____, 2019, between BELLEVUE PLACE OFFICE, LLC, a Washington limited liability company ("Landlord"), and DESOLATION HOLDINGS LLC, a Delaware limited liability company ("Tenant").

RECITALS

A.    Landlord and Tenant entered into a nonresidential Lease dated November 14, 2018 and a First Lease Addendum dated December 19, 2018 (collectively the "Lease"), for certain space in the Bank of America Building at Bellevue Place, Bellevue, Washington, which leased space is more specifically described in the Lease.

B.    Landlord and Tenant intend, by the execution and delivery of this Addendum, to amend and supplement the Lease in certain material respects, which includes (i) adding additional space consisting of 19,666 rentable square feet on the eighteenth (18th) floor of the Bank of America Building, commonly known as Suite 1800; (ii) setting forth the terms and conditions for Lease Term, Rent and other matters related to Suite 1800; and (iii) providing for Suite 1800 Improvements (as defined below).

C.    Unless otherwise noted, all capitalized terms herein have the same meanings as set forth in the Lease.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby amend and supplement the Lease as follows:

1.    Section 1 - Basic Lease Data, Terms and Exhibits.  The following provisions of Section 1 of the Lease are hereby amended or added as follows:

1.6    Leased Premises.  The definition of "Leased Premises" in the Lease is hereby amended by adding the following paragraph at the end of Section 1.6 of the Lease and incorporating the attached Exhibit A into Exhibit C of the Lease:

Suite 1800:  Upon the Commencement Date For Suite 1800 through and including the Expiration Date For Suite 1800, that portion of the eighteenth (18th) floor of the Bank of America Building, commonly known as Suite 1800 ("Suite 1800"), as and where shown on Exhibit C, attached hereto.

1.7    Rentable Area of the Leased Premises.  Section 1.7 of the Lease is hereby amended by adding the following at the end of such section:

Suite 1800: A total of Nineteen Thousand Six Hundred Sixty-six (19,666) square feet, from the Commencement Date For Suite 1800, through and including the Expiration Date For Suite 1800.

1.9    Tenant's Share For Suite 1800. Section 1.9 of the Lease is hereby amended by adding the following as subsection (d) to the end of such section:

(d) Suite 1800: From the Commencement Date For Suite 1800, through and including the Expiration Date For Suite 1800, Tenant's Share For Suite 1800 shall be as follows:

(i)    Operating, Repair and Maintenance Expenses for the Bank of America Building and the Corner Building: four point two four two (4.242%) based on 463,599 rentable square feet pursuant to Section 1.8(a) of this Lease.

(ii)    Operating, Repair and Maintenance Expenses for Bellevue Place: three point seven eight five percent (3.785%) based on 519,549 rentable square feet pursuant to Section 1.8(b) of this Lease.

1.10    Rent:

The following paragraphs are hereby added to the end of Section 1.10 of the Lease:

**Suite 1800: [Based on 19,666 rentable square feet]**

From and including the Commencement Date For Suite 1800 through and including the last day of the twelfth (12th) month of the Lease Term For Suite 1800, the Rent shall be Forty-nine and 00/100 Dollars ($49.00), per square foot of the Rentable Area of the Leased Premises for Suite 1800 per annum or Eighty Thousand Three Hundred Two and 83/100 Dollars ($80,302.83) per month.

From and including the first day of the thirteenth (13th) month of the Lease Term For Suite 1800 to and including the last day of the twenty-fourth (24th) month of the Lease Term For Suite 1800, the Rent shall be Fifty and 47/100 Dollars ($50.47), per square foot of the Rentable Area of the Leased Premises for Suite 1800 per annum or Eighty-two Thousand Seven Hundred Eleven and 92/100 Dollars ($82,711.92) per month.

From and including the first day of the twenty-fifth (25th) month of the Lease Term For Suite 1800 to and including the last day of the thirty-sixth (36th) month of the Lease Term For Suite 1800, the Rent shall be Fifty-one and 98/100 Dollars ($51.98) per square foot of the Rentable Area of the Leased Premises for Suite 1800 per annum or Eighty-five Thousand One Hundred Eighty-six and 56/100 Dollars ($85,186.56) per month.

From and including the first day of the thirty-seventh (37th) month of the Lease Term For Suite 1800 to and including the last day of the forty-eighth (48th) month of the Lease Term For Suite 1800, the Rent shall be Fifty-three and 54/100 Dollars ($53.54) per square foot of Rentable Area of the Leased Premises for Suite 1800 per annum or Eighty-seven Thousand Seven Hundred Forty-three and 14/100 Dollars ($87,743.14) per month.

From and including the first day of the forty-ninth (49th) month of the Lease Term For Suite 1800 to and including the last day of the sixtieth (60th) calendar month of the Lease Term For Suite 1800, the Rent shall be Fifty-five and 15/100 Dollars ($55.15) per square foot of Rentable Area of the Leased Premises for Suite 1800 per annum or Ninety Thousand Three Hundred Eighty-one and 66/100 Dollars ($90,381.66) per month.

From and including the first day of the sixty-first (61st) month of the Lease Term For Suite 1800 to and including the last day of the seventy-second (72nd) month of the Lease Term For Suite 1800, the Rent shall be Fifty-six and 80/100 Dollars ($56.80) per square foot of Rentable Area of the Leased Premises for Suite 1800 per annum or Ninety-three Thousand Eight-five and 73/100 Dollars ($93,085.73) per month.

From and including the first day of the seventy-third (73rd) month of the Lease Term For Suite 1800 to and including the last day of the eighty-fourth (84th) month of the Lease Term For Suite 1800, the Rent shall be Fifty-eight and 50/100 Dollars ($58.50) per square foot of Rentable Area of the Leased Premises for Suite 1800 per annum or Ninety-five Thousand Eight Hundred Seventy-one and 75/100 Dollars ($95,871.75) per month.

From and including the first day of the eighty-fifth (85th) month of the Lease Term For Suite 1800 to and including the last day of the ninety-sixth (96th) month of the Lease Term For Suite 1800, the Rent shall be Sixty and 26/100 Dollars ($60.26) per square foot of Rentable Area of the Leased Premises for Suite 1800 per annum or Ninety-eight Thousand Seven Hundred Fifty-six and 10/100 Dollars ($98,756.10) per month.

From and including the first day of the ninety-seventh (97th) month of the Lease Term For Suite 1800 to and including the last day of the one hundred eighth (108th) month of the Lease Term For Suite 1800, the Rent shall be Sixty-two and 07/100 Dollars ($62.07) per square foot of Rentable Area of the Leased Premises for Suite 1800 per annum or One Hundred One Thousand Seven Hundred Twenty-two and 39/100 Dollars ($101,722.39) per month.

From and including the first day of the one hundred ninth (109th) month of the Lease Term For Suite 1800 to and including the last day of the one hundred twentieth (120th) month of the Lease Term For Suite 1800, the Rent

shall be Sixty-three and 93/100 Dollars ($63.93) per square foot of Rentable Area of the Leased Premises for Suite 1800 per annum or One Hundred Four Thousand Seven Hundred Seventy and 62/100 Dollars ($104,770.62) per month.

From and including the first day of the one hundred twenty-first (121st) month of the Lease Term For Suite 1800 to and including the last day of the one hundred thirty-second (132nd) month of the Lease Term For Suite 1800, the Rent shall be Sixty-five and 85/100 Dollars ($65.85) per square foot of Rentable Area of the Leased Premises for Suite 1800 per annum or One Hundred Seven Thousand Nine Hundred Seventeen and 18/100 Dollars ($107,917.18) per month.

From and including the first day of the one hundred thirty-third (133rd) month of the Lease Term For Suite 1800 to and including the Expiration Date For Suite 1800, the Rent shall be Sixty-seven and 83/100 Dollars ($67.83) per square foot of Rentable Area of the Leased Premises for Suite 1800 per annum or One Hundred Eleven Thousand One Hundred Sixty-two and 07/100 Dollars ($111,162.07) per month.

1.14    <u>Security Deposit:</u>

The following paragraph is hereby added to the end of Section 1.14 of the Lease:

<u>Suite 1800:</u>

Tenant shall pay Landlord, upon execution of this Addendum, One Million Eight Hundred Eighty-two Thousand Thirty-seven and 12/100 Dollars ($1,882,037.12) of which One Hundred Six Thousand Eight Hundred Sixty-eight and 32/100 Dollars ($106,868.32) shall be applied to Rent and Additional Rent due for the first (1st) month of the Lease Term For Suite 1800 (and for the avoidance of doubt, if the Lease Term For Suite 1800 commences on a day other than the first day of a calendar month such that Rent and Additional Rent are prorated, then the balance of such amount shall be applied to Rent and Additional Rent due for the following calendar month), and the remaining One Million Seven Hundred Seventy-five Thousand One Hundred Sixty-nine and 00/100 Dollars ($1,775,169.00) shall be held as a security deposit, in cash or in the form of a letter of credit, at Tenant's option, subject to and as further described in Sections 8 and 37.22 of this Lease, as applicable.

1.15    <u>Guarantor:</u> Effective as of the date of this Addendum, the Guarantee of Lease dated November 2, 2018 executed by Bittrex, Inc., a Delaware corporation shall be replaced by the Guarantee of Lease executed by Aquila Holdings Inc., a Delaware corporation, which shall be the new Guarantor.

1.18    Exhibits Incorporated by Reference.

Exhibit C – Floor Plan of Leased Premises. Upon the Commencement Date For Suite 1800, the Floor Plan of Suite 1800, a copy of which is attached hereto as ***Exhibit A***, shall be added to the existing Exhibit C to the Lease and be incorporated therein.

1.21    Possession Date For Suite 1800: The date on which possession of Suite 1800 is delivered to Tenant in accordance with the terms of this Lease, which is anticipated to be January 1, 2020.   Access to Suite 1800 upon delivery to Tenant shall be subject to the applicable terms and conditions of this Lease as further described in Section 3.4.

1.22    Commencement Date For Suite 1800:  Upon the earlier of (i) one hundred and five (105) days following the Possession Date For Suite 1800; or (ii) the date Tenant occupies Suite 1800 for business purposes.

1.23    Expiration Date For Suite 1800: The date one hundred forty-four (144) calendar months following the Commencement Date For Suite 1800, plus that portion of a calendar month necessary, if at all, for the Expiration Date for Suite 1800 to occur on the last day of such calendar month.

1.24    Lease Term For Suite 1800:  Approximately one hundred forty-four (144) calendar months, plus that portion of a calendar month necessary, if at all, for the Expiration Date For Suite 1800 to occur on the last day of such calendar month.

2.    Section 3.5 Option to Extend Lease Term.  Section 3.5(a) is amended in its entirety to read as follows:

(a)    Tenant is granted an option (the "Extension Option") to extend the relevant Lease Term for the applicable Suite for an additional five (5) year term, to and including the last day of the month that is sixty (60) months following the applicable Expiration Date. The Extension Option with respect to each Suite shall be exercisable separately from the Extension Option with respect to the other Suite. The period of time extending the Lease Term for the applicable Suite shall be referred to herein as the "Option Period". To exercise the Extension Option, Tenant must give Landlord unequivocal written notice of Tenant's election to exercise the applicable Extension Option at least fifteen (15) calendar months prior to the applicable Expiration Date.

3.    Section 6.2(e) Rentable Area of the Leased Premises.  Section 6.2(e) of the Lease is hereby amended to add the following at the end of the Section:

Suite 1800:

For purposes of this Lease in regards to Suite 1800 only, the Rentable Area of Suite 1800 shall mean the Useable Area of Suite 1800, as that term is defined and computed according to the Standard Method for Measuring Floor Area in Office Buildings, ANSI/BOMA Z65.1-2010, otherwise known as the "BOMA Standard," multiplied by a load factor of sixteen point nine eight percent (16.98%). The Rentable Area of Suite 1800 comprises 19,666 square feet.

4.      Section 37.22(b) Letter of Credit. The reference to "One Million Three Hundred Two Thousand Three Hundred Sixty-eight and 00/100 Dollars ($1,302,368.00)" in the first sentence of Section 37.22 of the Lease is hereby amended to read: ", with respect to Suite 2000, One Million Three Hundred Two Thousand Three Hundred Sixty-eight and 00/100 Dollars ($1,302,368.00) and with respect to Suite 1800, One Million Seven Hundred Seventy-five Thousand One Hundred Sixty-nine and 00/100 Dollars ($1,775,169.00)".

5.      Section 37.22(c) Letter of Credit. Section 37.22(c) is amended in its entirety to read as follows:

(c)      Suite 2000: Notwithstanding the foregoing, following the fourth (4th) full Lease Year, provided Tenant (i) has not had any late payments or defaulted under this Lease; and (ii) delivers to Landlord information reasonably satisfactory to Landlord showing that Tenant has had net income of over $50,000,000 in each of the three (3) prior years, then the amount of the Letter of Credit for Suite 2000 shall be reduced to Six Hundred Seventy-six Thousand One Hundred Eighty-four and 00/100 Dollars ($676,184.00).

Suite 1800: Notwithstanding the foregoing, following the fourth (4th) full Lease Year following the Commencement Date For Suite 1800, provided Tenant (i) has not had any late payments or defaulted under this Lease; and (ii) delivers to Landlord information reasonably satisfactory to Landlord showing that Tenant has had net income of over $50,000,000 in each of the three (3) prior years, then the amount of the Letter of Credit for Suite 1800 shall be reduced to Nine Hundred Twenty-three Thousand Eighty-seven and 88/100 Dollars ($923,087.88).

6.      Tenant's Acceptance of Suite 1800. Tenant has inspected Suite 1800 and accepts the same in its current condition, provided that Suite 1800 shall be delivered broom clean with furniture, equipment, and data cabling removed, and waives the right to make any claim against Landlord for any matter directly or indirectly arising out of the condition of Suite 1800, appurtenances thereto, the improvements thereon and the equipment thereof. **LANDLORD MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE OR HABITABILITY**

7.      Suite 1800 Improvements. Section 11.2 of the Lease is hereby amended to add the following at the end of such section:

(d)      Commencing on the Possession Date For Suite 1800, Tenant will, at Tenant's sole cost and expense (subject to Landlord's Contribution set forth below), alter and refurbish Suite 1800 with such alterations, additions and improvements that may be approved by

Landlord in its reasonable discretion ("Suite 1800 Improvements"), which Suite 1800 Improvements shall be in compliance with applicable law and in accordance with mutually agreed upon plans and specifications for such improvements (the "Premises Plans"), provided that Landlord shall refurbish the existing restrooms within the Common Areas and Facilities of Bellevue Place on the 18th floor pursuant to Landlord's standards, plans and specifications not later than December 31, 2020, however Landlord shall use good faith efforts to refurbish the restrooms prior to April 15, 2020. Tenant shall use commercially reasonably efforts to complete the Suite 1800 Improvements on or before the date that is one hundred five (105) days following the Possession Date For Suite 1800. The Suite 1800 Improvements shall be constructed, installed and performed by design professionals and contractors mutually agreed upon by Landlord and Tenant and no other contractor(s), in accordance with the requirements set forth herein, in Exhibit D, and such other reasonable rules and regulations applicable to such construction and improvements as may be promulgated by Landlord from time to time. Prior to the commencement of the Suite 1800 Improvements, Tenant shall cause JPC Architects' to prepare the initial space plan for Suite 1800. Landlord and Tenant shall reasonably cooperate with one another to review and, if necessary, mutually agree to any revisions to the space plan. Unless specifically acknowledged by Landlord in writing, Landlord's approval of any plans or specifications shall not be deemed or considered to be an express or implied waiver of any requirement or restriction set forth in the Lease, including without limitation Exhibit D. Landlord shall not impose any supervisory, review, management, or other fees or chargebacks as part of the Suite 1800 Improvements, except as may be provided in Exhibit D.

(e)    Landlord shall pay a total amount not to exceed Seventy and 00/100 Dollars ($70.00) per rentable square foot of Suite 1800, or One Million Three Hundred Seventy-six Thousand Six Hundred Twenty and 00/100 Dollars ($1,376,620.00) ("Landlord's Contribution") to be used, except as otherwise provided herein, exclusively for the Suite 1800 Improvements (including all sales and other applicable taxes but *not* including furniture, trade fixtures, equipment, inventory, or personal property, which shall be Tenant's sole cost and responsibility). The construction of the Suite 1800 Improvements shall be subject to the terms of the Lease and such Suite 1800 Improvements shall be finished to the Leased Premises Standard Specifications described in Exhibit D to the Lease.

(i)    Landlord shall pay (A) 25% of Landlord's Contribution after the initial forty-five (45) days from commencement of the Suite 1800 Improvements and within thirty (30) days following the receipt by Landlord of a complete payment request ("Tenant's Draw Request"), provided no liens have actually been filed relating to the Suite 1800 Improvements that Tenant has not caused to be released through payment or posting of a bond, in accordance with Section 22 of the Lease; (B) 25% of Landlord's Contribution after ninety (90) days from commencement of construction of Suite 1800 Improvements and within thirty (30) days following the receipt by Landlord of Tenant's Draw Request, provided no liens have actually been filed relating to the Suite 1800 Improvements that Tenant has not caused to be released through payment or posting of a bond, in accordance with Section 22 of the Lease; and (C) the balance of any unpaid portion of Landlord's Contribution, as necessary and up to the Landlord's Contribution amount, upon Landlord's receipt of the final Tenant's Draw Request and all unconditional lien releases from all of the contractors and subcontractors who performed or supplied any labor, materials or

equipment relating to the Suite 1800 Improvements and any other documents or evidence reasonably requested by Landlord substantiating the amount of expenditures by Tenant for such improvements. Tenant's Draw Request shall be made using the form attached as <u>Exhibit K</u> to the Lease and shall include a copy of all supporting invoices, conditional progress payment lien waivers (in compliance with applicable laws) for labor and materials incorporated in such payment request, and pertinent back-up that is attached to a standard general contractor AIA G702 and G703 payment application. Landlord shall have the right to offset any amount due to Tenant hereunder against any amount due and owing by Tenant under the Lease at the time Landlord's Contribution is to be paid to Tenant. Should any liens be filed against the Leased Premises or the Bank of America Building or Bellevue Place and said liens are not removed or bonded around according to applicable State law within fifteen (15) days after receipt of written notice from Landlord, Landlord, shall be entitled to pay whatever reasonable costs Landlord may incur to remove said liens and to offset said costs, including without limitation any reasonable attorney's fees and costs related thereto, against Landlord's Contribution.

(ii)     Any and all costs for the construction and installation of the Suite 1800 Improvements (including but not limited to the cost of all working drawings, space plans, and engineering, architectural, design and consulting fees) in excess of Landlord's Contribution shall be Tenant's sole responsibility and shall be paid by Tenant.

(iii)     The foregoing shall be deemed to be a financial accommodation of the type referenced in 11 USC §365(c)(2) and a material and substantial part of this Lease transaction, as amended.

(f)     All improvements and fixtures made or installed in or to Suite 1800 are the property of Landlord. The Suite 1800 Improvements shall <u>*not*</u> include, and Tenant shall be solely responsible for, all costs associated with (i) the interior design of Suite 1800, (ii) security and access control to Suite 1800, (iii) data, telephone, and similar communications cabling, and (iv) furniture, fixtures and equipment.

8.     <u>Brokerage</u>. Each party hereto represents and warrants to the other party that it has incurred no liabilities or claims for brokerage commissions or finder's fees in connection with the execution of this Addendum and it has not dealt with or has any knowledge of any real estate broker, agent or salesperson in connection with this Addendum except Jeff Jochums of CBRE, which represents Tenant and Broderick Group, Inc., which represents Landlord. Provided this Addendum is executed between Landlord and Tenant, Landlord agrees to pay a broker's commission to: (a) CBRE, in the amount of One Hundred Seventeen Thousand Nine Hundred Ninety-six and 00/100 Dollars ($117,996.00), one-half (1/2) of which shall be paid upon mutual execution of this Addendum and the remaining one-half (1/2) of which shall be paid upon the Commencement Date For Suite 1800; and (b) to Broderick Group, Inc., the full amount of any broker's commissions due in connection with this Addendum. Each party agrees to indemnify and hold the other parties harmless from all such liabilities or claims (including, without limitation, reasonable attorneys' fees) by anyone other than CBRE and/or Broderick Group, Inc.

9.     <u>Current Tenant</u>. The following is hereby added to the end of Section 37.21 of the

Lease:

       Suite 1800: Tenant is aware that Suite 1800 is currently occupied by another tenant or tenants (the "Current Tenant") and the Current Tenant may fail or refuse to vacate Suite 1800 and relinquish all claims to Suite 1800 prior to the Possession Date For Suite 1800. Landlord shall have no responsibility under the Lease to take any action to remove the Current Tenant and shall not be liable for any damages, injuries or claims that may be suffered by Tenant relating to or arising out of, directly or indirectly, the Current Tenant's failure or refusal to vacate and release all interest in Suite 1800. Notwithstanding anything to the contrary herein, in the event Landlord has not delivered possession of Suite 1800 to Tenant on or before May 1, 2020, Tenant shall have the right to terminate this Lease solely with respect to Suite 1800, upon written notice to Landlord, and upon such termination, any sums paid by Tenant with respect to Suite 1800, including, without limitation, any prepaid Rent, Additional Rent, and Security Deposit shall be promptly returned to Tenant, and the parties shall be released from any further obligations under this Lease with respect to Suite 1800.

       10.    Guaranty. Landlord's obligations hereunder are made expressly contingent upon its receipt of the duly executed Guarantee of Lease from Guarantor, concurrently with Tenant's delivery of this Addendum when executed by it.

       11.    Entire Agreement. Each party acknowledges that such party has not relied on or received any promise, representation or warranty of any kind not otherwise contained or referred herein to induce said party to enter this Addendum.

       12.    Remaining Lease Provisions Unchanged. Except as modified by this Addendum, all other terms, conditions, provisions and covenants of the Lease shall remain unchanged.

       13.    Counterparts. This Addendum may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same addendum. The counterparts of this Addendum may be executed and delivered by facsimile or other electronic signature (including portable document format) by either of the parties and the receiving party may rely on the receipt of such document so executed and delivered electronically or by facsimile as if the original had been received.

[Signatures on Next Page]

IN WITNESS WHEREOF, the parties hereto have executed this instrument the day and year first above set forth.

LANDLORD                                          TENANT

BELLEVUE PLACE OFFICE, LLC,                      DESOLATION HOLDINGS LLC,
a Washington limited liability company           a Delaware limited liability company

By KEMPER DEVELOPMENT COMPANY,                   By _____
   a Washington corporation, Its Manager            James Waschak
                                                 Its COO

        By _____
           James E. Melby
           President

STATE OF WASHINGTON　　　)
　　　　　　　　　　　　　　) ss.
COUNTY OF KING　　　　　　)

    This record was acknowledged before me on ___July 29___, 2019, by JAMES E. MELBY as President of KEMPER DEVELOPMENT COMPANY, a Washington corporation, as the Manager of BELLEVUE PLACE OFFICE, LLC, a Washington limited liability company.

_____
(Signature of notary public)

_____
(Title of office)

My commission expires: ___9·20·21___

(Use this space for notarial stamp/seal)

STATE OF ___WA___　　　　　)
　　　　　　　　　　　　　　) ss.
COUNTY OF ___King___　　　　)

    This record was acknowledged before me on ___July 29___, 2019, by ___James Warshak___ as ___CEO___ of DESOLATION HOLDINGS LLC, a Delaware limited liability company.

_____
(Signature of notary public)

_____
(Title of office)

My commission expires: ___Jan 28, 2022___

DEBORAH MADIGAN
Notary Public
State of Washington
Commission # 197294
My Comm. Expires Jan 28, 2022

(Use this space for notarial stamp/seal)

EXHIBIT A

FLOOR PLAN OF LEASED PREMISES

Exhibit A
Floor Plan of the Leased Premises



Floor - 18

## PARTIAL ASSIGNMENT, ASSUMPTION AND AMENDMENT OF LEASE

THIS PARTIAL ASSIGNMENT, ASSUMPTION AND AMENDMENT TO LEASE ("**Agreement**") is made this **6** day of **February** , 2020 (the "**Effective Date**") by and among BELLEVUE PLACE OFFICE, LLC, a Washington limited liability company ("**Landlord**"); DESOLATION HOLDINGS LLC, a Delaware limited liability company ("**Tenant**"); and THE POKÉMON COMPANY INTERNATIONAL, INC., a Delaware corporation ("**Partial Assignee**"); and AQUILA HOLDINGS INC., a Delaware corporation ("**Guarantor**"). Landlord, Tenant and Partial Assignee is each referred to in this Agreement as a "**Party**" and, collectively, as the "**Parties**."

### RECITALS

A.      Landlord and Tenant entered into that certain Bank of America Building Office Lease dated November 14, 2018, as amended by First Lease Addendum dated December 18, 2018 and Second Lease Addendum dated July 29, 2019 (collectively, the "**Lease**") for certain Leased Premises consisting of Suite 2000 and Suite 1800 at Landlord's project known as Bellevue Place located in Bellevue, King County, Washington, as further defined in the Lease.

B.      Tenant desires to assign all of its interest in Suite 1800 as tenant under the Lease to Partial Assignee and Partial Assignee is willing to accept the partial assignment and assume all of the obligations of Tenant under the Lease with respect to Suite 1800.

C.      The assignment of the Lease with respect to Suite 1800 to Partial Assignee requires the prior written consent of Landlord and Landlord is willing to consent to the partial assignment upon certain terms and conditions, which are set forth herein.

D.      Capitalized terms used in this Agreement and not otherwise defined shall have the same meanings ascribed to such terms in the Lease.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is hereby agreed as follows:

1.      **Partial Assignment.**  Tenant shall and does hereby transfer and assign to Partial Assignee, without reservation (except as otherwise provided herein), all of Tenant's right, title and interest in, to and under the Lease with respect to Suite 1800, including all rights and obligations with respect to the Suite 1800 Improvements as further described in the Second Lease Addendum, effective as of the Effective Date. Tenant hereby reserves to itself all of its right, title and interest in, to and under the Lease with respect to Suite 2000.

2.      **Assumption of Partial Assignment.**  Partial Assignee accepts the foregoing partial assignment and assumes all of Tenant's right, title and interest in, to and under the Lease with respect to Suite 1800 and agrees to pay, perform, fulfill and comply with each and every covenant and obligation to be paid, performed, fulfilled or complied with as tenant under the Lease with respect to Suite 1800 to the extent arising on and after the Effective Date, including but not limited to the payment of Rent, Additional Rent and Other Charges for Suite 1800, which are and will become due and payable under the Lease, and all covenants and obligations with respect to the

Desolation Partial Assignment, Assumption and Amendment of Lease
33128-0230/146836484 7

Suite 1800 Improvements, all with the full force and effect as if Partial Assignee had signed the Lease originally as the named tenant therein for Suite 1800. Partial Assignee shall make all payments of Rent, Additional Rent, Other Charges and any other amounts owed under the Lease with respect to Suite 1800 arising on and after the Effective Date directly to Landlord. Tenant shall pay all sums and perform all of its other obligations due under the Lease for Suite 1800 to the extent arising prior to the Effective Date.

      3.     Rent Through and Including May 31, 2020. Notwithstanding the assignment and assumption described in Section 2 of this Agreement, Tenant shall pay, and Landlord agrees to look solely to Tenant, for the payment of Rent, Additional Rent, and any other additional rent for Suite 1800 through and including May 31, 2020, which is currently estimated to be ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (collectively, "**Initial Suite 1800 Rent**"). Landlord and Tenant agree that Landlord shall withhold from Landlord's return of Tenant's Suite 1800 Security Deposit pursuant to Section 4(a) of this Agreement an amount of money equal to the Initial Suite 1800 Rent and such withholding shall be applied towards the Initial Suite 1800 Rent.

      4.     Security Deposits.

          a.     Tenant's Security Deposit for Suite 1800. Within thirty (30) days of the Effective Date, Landlord shall return Tenant's Suite 1800 Security Deposit, less the Initial Suite 1800 Rent and related attorneys' fees and costs pursuant to Section 15 below. Following such return of Tenant's Suite 1800 Security Deposit, Tenant shall have no further obligations with respect to any security deposit related or applicable to Suite 1800.

          b.     Partial Assignee's Security Deposit for Suite 1800. On the Effective Date, Partial Assignee shall deliver to Landlord a cash security deposit in the amount of ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to be held by Landlord as security for Partial Assignee's obligations under the Lease with respect to Suite 1800.

      5.     Separate Leaseholds. Subject to Section 17 below, Tenant and Partial Assignee acknowledge that, as of the Effective Date, each of Tenant and Partial Assignee shall be individually, separately and solely responsible for the payment of all Rent, Additional Rent and Other Costs related to their respective portions of the Leased Premises which may become due during the respective terms of the Lease, and for any obligations under the Lease with respect to their separate portions of the Leased Premises as provided hereunder, including, without limitation, Rent, Additional Rent, Other Charges, Operating, Repair and Maintenance Expenses, Taxes, the cost of utilities, capital expenditures for any improvements on the Leased Premises, maintenance of shared parking areas, common area charges, and personal or real property taxes or assessments, all as provided for in the Lease, as assigned and amended pursuant to this Agreement. If applicable, Tenant and Partial Assignee shall use commercially reasonable efforts to cause all water, gas, heat, lighting, power, trash removal, sewer, and other utilities that may be used or needed by Tenant or Partial Assignee in connection with the use of their respective portions of the Leased Premises to be separately metered.

Subject to Section 17 below, Tenant shall remain the tenant under the Lease with respect to Suite 2000, and all of Tenant's right, title and interest and obligations in connection therewith shall be treated by Landlord as separate and distinct from Partial Assignee's right, title, interest and obligations under the Lease as provided for under this Agreement.

Partial Assignee is the tenant under the Lease with respect to Suite 1800, and all of Partial Assignee's right, title and interest and obligations in connection therewith shall be treated by Landlord as separate and distinct from Tenant's right, title, interest and obligations under the Lease as provided for under this Agreement.

Subject to Section 17 below, no breach or default by Tenant under the Lease with respect to Suite 2000 shall constitute or result in a default by Partial Assignee under the Lease with respect to Suite 1800, and no breach or default by Partial Assignee under the Lease with respect to Suite 1800 shall constitute or result in a default by Tenant under the Lease with respect to Suite 2000. Notwithstanding the foregoing, Landlord has the right to declare a default as to either Suite 1800 or Suite 2000, as the case may be, in accordance with the Lease terms, as modified hereby.

6.     Guarantor. Guarantor hereby confirms that the Guarantee of Lease dated July 26, 2019 (the "**Guarantee of Lease**"), remains in full force and effect with respect to the Lease Term, including the Lease Term For Suite 1800, and by its signature below, Guarantor, guarantees the full performance of the obligations of Tenant and Partial Assignee under the Lease on the terms and conditions set forth in the Guarantee of Lease which are applicable to Suite 2000 and Suite 1800.

7.     Lease Amendments. Without limiting the other provisions of this Agreement, the Lease is further amended, as of the Effective Date, as follows:

(a)     Section 1 - Basic Lease Provisions. Section 1 of the Lease is hereby amended to include the following definitions:

PARTIAL ASSIGNEE:

The Pokémon Company International, Inc., a Delaware corporation

ADDRESS OF PARTIAL ASSIGNEE:

The Pokémon Company International, Inc.



Desolation Partial Assignment, Assumption and Amendment of Lease
33128-0230/146836484.7

SUITE 1800 SECURITY DEPOSIT:

Suite 1800 Security Deposit means the cash sum of [ ] which was paid by Tenant to Landlord substantially contemporaneously with the execution of the Second Lease Addendum and is presently in Landlord's possession, pursuant to Section 1.14 of the Lease (as modified by the Second Lease Addendum).

SUITE 2000:

"Suite 2000" means that portion of the twentieth (20th) floor of the Bank of America Building; as and where shown on Exhibit C attached to the Lease.

8.     Amended Definitions.  The following defined terms in the Lease are hereby amended and restated in their entirety as follows:

i.    *"Commencement Date For Suite 1800"* means the earlier of (i) April 15, 2020; or (ii) the date Partial Assignee occupies Suite 1800 for business purposes.

ii.   *"Expiration Date For Suite 1800"* means the last day of the one hundred forty-fourth (144th) calendar month following the Commencement Date For Suite 1800.

iii.  *"Guarantor"* means Aquila Holdings, Inc., a Delaware corporation.

iv.   *"Lease Term For Suite 1800"* means the period commencing on the Commencement Date For Suite 1800 and ending on the Expiration Date For Suite 1800.

v.    *"Leased Premises"* means the premises comprising Suite 2000 and Suite 1800.

vi.   *"Possession Date For Suite 1800"* means January 1, 2020.

9.     Certificate of Insurance and Financial Statements.  Partial Assignee shall deliver a certificate of insurance to Landlord on or before the Effective Date in compliance with the insurance requirements set forth in Section 19 of the Lease. Partial Assignee represents and warrants to Landlord and Tenant that all financial statements and related information previously provided to Landlord was true and correct in all material respects as of the date provided to Landlord and that, as of the date of mutual execution hereof, there has been no material adverse change in the financial condition of Partial Assignee.

10.    Further Assignments and Subleases.  Neither Partial Assignee nor Tenant shall further assign the Lease or any interest therein nor sublet the Leased Premises or any portion thereof without the prior written consent of Landlord if and to the extent required by the Lease.

4

Any attempted assignment or subletting without the requisite consent of Landlord in violation of the Lease shall be null and void and shall constitute a breach of the Lease. The assignment of the Lease with respect to Suite 1800 from Tenant to Partial Assignee shall be deemed to be an absolute assignment and Tenant is hereby divested of its right and interest in Suite 1800 under the Lease. Notwithstanding any agreement or arrangement between Tenant and Partial Assignee to the contrary, Tenant is not entitled to reenter or repossess Suite 1800, and any subsequent proposed or actual reentry or repossession by Tenant shall be deemed an additional assignment by Partial Assignee and Landlord's written consent thereto shall be required at the time of such assignment. The Parties acknowledge and agree that hereafter: (a) Landlord and Tenant may from time to time amend, assign, or terminate the Lease as to Suite 2000 (all in accordance with the terms of the Lease) without notice to or the consent of Partial Assignee; and (b) Landlord and Partial Assignee may from time to time amend, assign, or terminate the Lease as to Suite 1800 (all in accordance with the terms of the Lease) without notice to or the consent of Tenant or Guarantor (except to the extent that such notice or consent is required under this Agreement). Partial Assignee hereby covenants and agrees (i) not to amend or modify the Lease with respect to Suite 1800 in any respect that would materially increase either of their obligations without the prior written consent of Tenant and Guarantor, which consent may be withheld in Tenant's or Guarantor's sole discretion, (ii) not to encumber Tenant's interest in Suite 2000, (iii) not to assign, sublet, license, transfer or encumber Partial Assignee's interest in the Lease or Suite 1800 without the prior written consent of Tenant and Guarantor, not to be unreasonably withheld, (iv) not to take any action or omit to take any action that could cause a default under the Lease, or allow others to take or omit to take any such action, and (v) to promptly give to Tenant any notices or communications received by Partial Assignee from Landlord under the Lease or from any governmental agency, which notice or communication relates to an actual or alleged breach or default under the Lease or violation of applicable law with respect to Suite 1800. Any and all consent or approval rights of Tenant and/or Guarantor in this Section 10 are subordinate and subject to Landlord's consent and approval and Landlord shall not be bound by any Tenant or Guarantor requirements or approval rights herein.

11. No Release. Notwithstanding anything to the contrary herein, this Agreement shall in no way be construed to release or relieve Tenant from any of Tenant's obligations under the Lease, including Tenant's obligations with respect to Suite 1800, or Guarantor from any of Guarantor's obligations under the Guarantee of Lease with respect to Suite 1800, except that each of them shall be deemed released from their respective obligations related to Suite 1800 upon the earlier of (i) the expiration of the initial Lease Term For Suite 1800, or (ii) the date, if any, upon which Partial Assignee and Landlord mutually agree to terminate the Lease with respect to Suite 1800, but each of them shall remain liable for their respective obligations and liabilities to the extent arising or deemed to have arisen prior to the earlier of such dates.

12. Indemnification.

i. Partial Assignee shall protect, defend, indemnify and save and hold harmless Tenant and Guarantor, and their respective officers, employees, agents, contractors and representatives from and against any and all liability, loss, cost, damage or expense (including reasonable attorneys' fees, charges and expenses) that Tenant or Guarantor may incur by reason of (i) any failure of Partial Assignee to perform or discharge any of the terms, covenants, agreements or its obligations under this Agreement, (ii) any failure of Partial Assignee to perform

or discharge any of the terms, covenants, agreements or its obligations under the Lease with respect to Suite 1800 on or after the Effective Date, and (iii) any act or omission of Partial Assignee, its employees, agents, contractors, invitees, assignees and sublessees with respect to Suite 1800 on or after the Effective Date.

ii. Tenant shall protect, defend, indemnify and save and hold harmless Partial Assignee, and its officers, employees, agents, contractors and representatives from and against any and all liability, loss, cost, damage or expense (including reasonable attorneys' fees, charges and expenses) that any of them may incur by reason of (i) any failure of Tenant to perform or discharge any of the terms, covenants, agreements or its obligations under this Agreement, (ii) any failure of Tenant to perform or discharge any of the terms, covenants, agreements or its obligations under the Lease with respect to Suite 1800 prior to the Effective Date, and (iii) any act or omission of Tenant, its employees, agents, contractors, invitees, assignees and sublessees with respect to Suite 1800 prior to the Effective Date.

13.    Attorneys' Fees and Costs.  Tenant shall pay Landlord's reasonable attorneys' fees and costs incurred in connection with its review of, and consent to, this Agreement up to ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The amount for Landlord's reasonable attorneys' fees and costs owed by Tenant shall be withheld from Landlord's return of Tenant's Suite 1800 Security Deposit pursuant to Section 4(a) of this Agreement.

14.    Tenant's Suite 1800 Security Deposit.  Partial Assignee acknowledges and agrees that this Agreement confers upon it no right, title or interest in Tenant's Suite 1800 Security Deposit.

15.    Privity of Contract and Estate Between Landlord and Partial Assignee.  Landlord and Partial Assignee acknowledge and agree that this Agreement is intended to create privity of estate and contract between Landlord and Partial Assignee, such that either of them shall be entitled to enforce the terms and conditions of the Lease, insofar as they relate to Suite 1800, and the rights and obligations established by the Lease, insofar as they relate to Suite 1800, shall inure to their respective benefits and be binding upon them and their respective successors and assigns (subject to the terms of the Lease governing assignment and sublease).

16.    Improvements.

i. Acceptance of Suite 1800.  Partial Assignee hereby acknowledges that the leasehold improvements existing in Suite 1800 as of the Effective Date are the property of Landlord. Partial Assignee accepts Suite 1800 and the existing leasehold improvements "As Is" and without warranties of any kind, express or implied.

ii. Suite 1800 Improvements.  The first sentence of Section 11.2(d) of the Lease (as originally added to the Lease by Paragraph 7 of the Second Addendum) is hereby deleted in its entirety and replaced with the following:

Commencing on the Possession Date For Suite 1800, Tenant will, at Tenant's sole cost and expense (subject to Landlord's Contribution set forth below), alter and

6

refurbish Suite 1800 with such alterations, additions and improvements that may be approved by Landlord in its reasonable discretion ("Suite 1800 Improvements"), which Suite 1800 Improvements shall be in compliance with applicable law and in accordance with mutually agreed upon plans and specifications for such improvements (the "Premises Plans"), provided that Tenant, at its sole cost and expense, shall also refurbish the existing restrooms within the Common Areas and Facilities of Bellevue Place on the 18th floor pursuant to Tenant's standards, plans and specifications, as approved by Landlord, by December 31, 2020, provided further Tenant shall not be obligated to restore the refurbished restrooms upon termination or earlier expiration of the Lease Term For Suite 1800.

For clarification purposes, Partial Assignee hereby assumes and agrees to perform in full all of Tenant's obligations with respect to the Suite 1800 Improvements, Premises Plans, and refurbishment of existing restrooms.

17.    Landlord's Remedies.

       i.    Remedies as to Suite 2000 Premises.  In the event of any breach or default in the performance of Tenant's obligations under the Lease with respect to that portion of the Leased Premises comprised of Suite 2000, Landlord shall be entitled to pursue all of the remedies available to Landlord under the Lease against Tenant and Guarantor as and to the extent set forth in the Lease and this Agreement.

      ii.    Remedies as to Suite 1800 Premises.  In the event of any breach or default in the performance of Partial Assignee's obligations under the Lease with respect to that portion of the Leased Premises comprised of Suite 1800, Landlord shall be entitled to pursue all of the remedies available to Landlord under the Lease against Partial Assignee and/or Tenant and Guarantor as and to the extent set forth in the Lease and this Agreement.

18.    Landlord's Consent.  In consideration of the foregoing terms and conditions Landlord hereby consents and agrees to Tenant's partial assignment of its leasehold interest under the Lease with respect to Suite 1800 to Partial Assignee, Tenant's reservation of its right, title and interest to Suite 2000, and the amendments to the Lease described herein, all as more particularly set forth in this Agreement.

19.    Authority.  Each Party represents and warrants to all other Parties that the person or entity executing this Agreement on its behalf is duly authorized to do so and that all required consents and approvals necessary for such Party's due execution and delivery of this Agreement have been obtained.

20.    Brokerage Agreements.  Partial Assignee represents and warrants to Landlord and Tenant that it has incurred no liabilities or claims for brokerage commissions or finder's fees in connection with the execution of this Agreement and that it has not dealt with and has no knowledge of any real estate broker, agent or salesperson in connection with this Agreement,

7

Desolation Partial Assignment, Assumption and Amendment of Lease
33128-0230/146836484.7

except Grant Yerke of Broderick Group, Inc. ("**Partial Assignee's Broker**"). Partial Assignee agrees to indemnify and hold Landlord and Tenant harmless from all such liabilities or claims (including, without limitation, attorneys' fees). Tenant represents and warrants to Landlord and Partial Assignee that it has incurred no liabilities or claims for brokerage commissions or finder's fees in connection with the execution of this Agreement and that it has not dealt with and has no knowledge of any real estate broker, agent or salesperson in connection with this Agreement, except Jeff Jochums of CBRE ("**Tenant's Broker**"). Tenant agrees to indemnify and hold Landlord and Partial Assignee harmless from all such liabilities or claims (including, without limitation, attorneys' fees). Tenant shall be solely responsible for payment of all brokerage fees and/or commissions owed to Partial Assignee's Broker and Tenant's Broker, pursuant to one or more separate commission agreements.

21.    Ratification and Confirmation of Lease and Exhibits. The Parties hereby ratify and confirm all of the Exhibits to the Lease as further described in the Lease. A true and correct copy of the Lease, including all exhibits thereto, is attached hereto as Exhibit A.

22.    Counterpart Execution. This Agreement may be executed in two counterparts, each of which when executed and delivered to the other party (or to the other party's legal counsel) will be deemed to be an original and all of which, taken together, will be deemed to be one and the same instrument.

23.    Remaining Lease Provisions. All other provisions of the Lease remain in full force and effect, but in all instances subject to the partial assignment and assumption set forth herein.

*[signatures on following page]*

8

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date set forth above.

**LANDLORD:**

BELLEVUE PLACE OFFICE, LLC,
a Washington limited liability company

By: KEMPER DEVELOPMENT COMPANY,
a Washington corporation, its Manager

By: _____
James E. Melby, President

**TENANT:**

DESOLATION HOLDINGS, LLC,
a Delaware limited liability company

By: _____
James Waschak, Chief Operating Officer

**PARTIAL ASSIGNEE:**

THE POKÉMON COMPANY INTERNATIONAL, INC.,
a Delaware corporation

By: _____
Name: _____
Its: _____

**GUARANTOR:**

AQUILA HOLDINGS INC.,
a Delaware corporation

By: _____
Name: _____
Its: _____

9

## **LANDLORD**

STATE OF WASHINGTON          )
                             ) ss.
COUNTY OF KING               )

This record was acknowledged before me on **February 6**, 2020, by JAMES E. MELBY as President of KEMPER DEVELOPMENT COMPANY, a Washington corporation, as the Manager of BELLEVUE PLACE OFFICE, LLC, a Washington limited liability company.



(Use this space for notarial stamp/seal)

_____
(Signature of notary/public)

_____
(Title of office)

My commission expires: _____

Desolation Partial Assignment, Assumption and Amendment of Lease
33128-0230/146836484.7

## **TENANT**

STATE OF WASHINGTON      )
                                ) ss.
COUNTY OF KING              )

This record was acknowledged before me on Fe bruary 4, 2020, by JAMES WASCHAK as Chief Operating Officer of DESOLATION HOLDINGS, LLC, a Delaware limited liability company.

DEBORAH MADIGAN
Notary Public
State of Washington
Commission # 197294
My Comm. Expires Jan 28, 2022

(Use this space for notarial stamp/seal)

_____
(Signature of notary public)

Notary Public
(Title of office)

My commission expires: Jan 28, 2022

11

**PARTIAL ASSIGNEE**

STATE OF WASHINGTON )
) ss.
COUNTY OF KING )

This record was acknowledged before me on _February 8_ , 2020, by _Kevir Okubo_ as _President_ of THE POKEMON COMPANY INTERNATIONAL, INC., a Delaware corporation.

_Charles L. King_
(Signature of notary public)

_Notary Public_
(Title of office)

My commission expires: _November 8, 2022_

CHARLES L. KING
Notary Public
State of Washington
License Number 175170
My Commission Expires
November 08, 2022

(Use this space for notarial stamp/seal)

Desolation Partial Assignment, Assumption and Amendment of Lease
33128-0230/146836484.7

### **GUARANTOR**

STATE OF WASHINGTON )
) ss.
COUNTY OF KING )

This record was acknowledged before me on ~~February~~ 4 , 2020, by ~~James Waschak~~ as ~~officer~~ of AQUILA HOLDINGS INC., a Delaware corporation.

DEBORAH MADIGAN
Notary Public
State of Washington
Commission # 197294
My Comm. Expires Jan 28, 2022

_____
(Signature of notary public)

_Notary Public_
(Title of office)

My commission expires: Jan 28, 2022

(Use this space for notarial stamp/seal)

**EXHIBIT B**

**LIST OF FF&E**

| *Items* | *#* | *Notes* |
|---|---|---|
| Desks | 122 | 61 on both North and South sides of the floor |
| Desk chairs | 111 | |
| Spines | 59 | |
| End cap trash/recycle units | 5 | |
| Rolling peds | 106 | |
| Phone booths | 3 | |
| Conference rooms: | | |
|     Tables | 21 | |
|     Black chairs | 46 | |
|     Gray side chairs (rolling) | 53 | |
|     Floor lamps | 3 | |
|     Small wooden occasional tables | 3 | |
| Break room/kitchen: | | |
|     Square tables | 3 | |
|     Regular chairs | 12 | |
|     Tall silver chairs | 11 | |
|     Tall cocktail table (in game room) | 1 | |
|     Counter stools | 5 | |
|     Gray couch | 1 | |
|     Ping pong table/dining table | 1 | |
|     Large TV on wall | 1 | |
| Wall mounted whiteboards | 29 | |
| Server racks | 4 | 2x 2-post racks and 2x 4-post racks |
| Garbage/recycle bins | 36 | plus 4 larger bins in conference rooms |
| Coatracks | 2 | |
| Reception: | | |
|     Lounge chairs | 2 | |
|     Small table | 1 | |
|     Rug | 1 | |
|     Paintings on South wall | 2 | |

| | | |
|---|---|---|
| Olympics conf room round table | 1 | |
| Blue benches | 2 | |
| Office 2015: | | |
|     Round table | 1 | |
|     Chairs | 4 | |
|     Low bookcase | 1 | |
| Small square tables | 4 | |
| Blue green barrel chairs | 5 | |
| Green ottomans | 4 | |
| Gray armchairs | 2 | |
| Office 2021: | | |
|     Round table | 1 | |
| Office 2026: | | |
|     Small wooden table | 1 | |
|     Gray lounge chair | 1 | |
| Office 2027: | | |
|     Round table | 1 | |
|     White chairs | 2 | |
| Office 2037: | | |
|     Round table | 1 | |
|     White chairs | 2 | |
| Wellness room: | | |
|     Lounge chairs | 3 | |
|     Round table | 1 | |
| Office 2063: | | |
|     Round glass table | 1 | |
|     Low gray lounge chairs | 3 | |
| Large coffee maker | 1 | |
| Mini-fridge in Cascades conf room | 1 | |
| Mini-fridge office 2015 | 1 | |

| Refrigerators* | All | |
|---|---|---|
| Beverage Coolers* | All | |
| Dishwashers* | All | |

*These fixtures shall be left in the Subleased Premises by Sublandlord and may be used by Subtenant during the Term; provided that these fixtures may not be removed or altered at any time by Subtenant and shall not be part of the FF&E purchased by Subtenant in accordance with the Sublease and the bill of sale attached to the Sublease as Exhibit C.

## EXHIBIT C

## FORM OF BILL OF SALE

## BILL OF SALE

For the sum of Ten Dollars ($10.00) in hand paid and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Desolation Holdings LLC, a Delaware limited liability company ("**Seller**"), does hereby sell, grant, assign, transfer, set over and convey to PNC Bank, National Association, a national banking association ("**Buyer**"), its successors and assigns, the personal property and furniture, fixtures and equipment owned by Seller and located within that certain premises located on the 20th floor of the building commonly known as 10500 NE 8th Street, Bellevue, WA 98004 ("**Furniture**").  For the avoidance of doubt, the Furniture shall not include those fixtures which are the property of the Landlord (as defined in and pursuant to that certain Bank of America Building Office Lease, dated November 14, 2018, as the same may have been amended or supplemented prior to the date hereof).

TO HAVE AND TO HOLD the Furniture unto the Buyer, its successors and assigns forever.

Buyer acknowledges that Seller is selling and Buyer is buying the Furniture on an "as is, where is, with all faults" basis, and that, except as set forth in the immediately succeeding sentence, Buyer is not relying on any representations or warranties of any kind whatsoever, express or implied, including, without limitation, any implied warranties as to merchantability or fitness for a particular purpose. Seller represents and warrants to the Buyer that (i) Seller is the lawful owner of the Furniture; (ii) the Furniture is free from all liens, restrictions, leases, security interests, claims, charges or encumbrances whatsoever; and (iii) Seller has the legal right to sell the Furniture.

Buyer shall take delivery of the Furniture in its "as-is, where-is, with all faults" condition. Seller shall have no obligation to repair or replace any item of Furniture.

This Bill of Sale shall be governed by and construed in accordance with the laws of the State of Washington.  Any waiver by either party of any breach of any term or condition of this Bill of Sale shall not operate as a waiver of any other breach of such term or condition or of any other term or condition, nor shall any failure to enforce such provision hereof operate as a waiver of such provision or of any other provision hereof, nor constitute nor be deemed as a waiver or release of any other party for anything arising out of, connected with or based upon this Bill of Sale.  In the event of any litigation involving the parties arising out of this Bill of Sale, the prevailing party shall be entitled to recover from the other party such reasonable attorneys' fees and costs as may reasonably be incurred, as awarded by the court hearing the matter.

This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument.

C-1

This Bill of Sale shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

[Signatures on following page]

Dated this _____day of _____, 20__.

SELLER:                              DESOLATION HOLDINGS LLC,
                                     a Delaware limited liability company


                                     By:_____

                                     Title:_____


BUYER:                               PNC BANK, NATIONAL ASSOCIATION,
                                     a national banking association


                                     By:_____

                                     Title:_____

## **<u>EXHIBIT D</u>**

## **FORM OF LANDLORD'S CONSENT**

[Attached.]

**CONSENT TO SUBLEASE**

THIS CONSENT TO SUBLEASE ("Consent") is made as of March _____, 2021, by and among Bellevue Place Office, LLC, a Washington limited liability company (the "Landlord"); Desolation Holdings LLC, a Delaware limited liability company (the "Tenant"); and PNC Bank, National Association, a national banking association (the "Subtenant").

<u>RECITALS</u>

A.      Landlord and Tenant entered into that certain Bank of America Building Office Lease, dated November 14, 2018 (the "Original Lease"), as amended by that certain First Lease Addendum, dated December 19, 2018, by and between Landlord and Tenant (the "First Amendment") and that certain Second Lease Addendum, dated July 29, 2019, by and between Landlord and Tenant (the "Second Amendment"), and as further amended and assigned pursuant to that certain Partial Assignment, Assumption and Amendment of Lease, dated February 6, 2020, by and among Landlord, Tenant, The Pokémon Company International, Inc., a Delaware corporation, and Aquila Holdings Inc., a Delaware corporation (the "Partial Assignment" and, together with the Original Lease, the First Amendment and the Second Amendment, the "Lease"), related to certain premises described therein (the "Premises") and located at 10500 NE 8th Street, Bellevue, WA 98004 (the "Building").

B.      Tenant desires to sublease a portion of the Premises consisting of approximately 17,647 rentable square feet located on the 20th floor of the Building and commonly known as Suite 2000 (the "Subleased Premises") to Subtenant pursuant to the provisions of that certain Sublease, dated March \_\_\_, 2021, by and between Tenant and Subtenant, which is attached to this Consent as <u>Exhibit A</u> (the "Sublease").

C.      Tenant and Subtenant desire to obtain Landlord's consent to the Sublease.

NOW, therefore, in consideration of the foregoing and the agreements contained in this Consent, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord hereby consents to the Sublease, such consent being subject to and upon the following terms and conditions to which the parties hereby agree:

C.      <u>Consent</u>.  Landlord hereby acknowledges and consents to the Sublease; provided, however, Landlord is not a party to the Sublease and, except to the extent otherwise expressly provided herein, shall not be bound by the provisions thereof.

D.      <u>Notices; Audit Rights</u>. Landlord shall simultaneously deliver to Subtenant any notice sent to Tenant by Landlord with regard to the Subleased Premises, including without limitation, any notice of default thereunder, any notice relating to Additional Rent or Other Charges due or to be reconciled with respect to the Subleased Premises, and any notice of Landlord obtaining a new lender for the financing thereof. In furtherance of the foregoing, Landlord and Tenant acknowledge and agree that Subtenant shall have any right of Tenant under the Lease to contest any calculation of Additional Rent or Other Charges relating to any period during which Subtenant is responsible for all or any portion of such costs or expenses pursuant to the Sublease, provided that (i) the right to contest any calculation of Additional Rent or Other Charges shall be in accordance with Section 6.6 of the Lease, and (ii) only one party (whether Tenant or Subtenant)

may contest calculations of Additional Rent or Other Charges for a particular Lease Year. Any such notices shall be delivered in accordance with the Lease and shall be sent to Tenant at the following address:

> Desolation Holdings LLC
> 1100 Bellevue Way NE, Ste. 8A-986
> Bellevue, WA 98004
> Attn: Ellie Havens
> Email: ehavens@bittrex.com
>
> with a copy to:
>
> O'Melveny & Myers LLP
> 400 S. Hope Street, 18th Floor
> Los Angeles, CA 90071
> Attn: Kathryn E. Turner, Esq.
> E-Mail: kturner@omm.com
>
>
> And to Subtenant at the following addresses:
>
> PNC Bank, National Association
> c/o PNC Realty Services
> The Tower at PNC Plaza – 22nd Floor
> 300 Fifth Avenue
> Mail Stop: PT-PTWR-22-1
> Pittsburgh, PA 15222-2401
> Attn: Transaction Manager
> E-Mail: nicole.nasca@pnc.com
>
> with a copy to:
>
> PNC Bank, National Association
> Legal Division
> 1600 Market Street – 8th Floor
> Philadelphia, PA 19103
> Attn: Michael G. Balent, Esq., Chief Counsel
> E-Mail: michael.balent@pnc.com

E.      Sublease is Subordinate.  The Sublease shall be subordinate and at all times subject to: (a) all of the covenants, agreements, terms, provisions and conditions contained in the Lease, (b) the terms and conditions of superior mortgages, deeds of trust, or any other hypothecation or security now existing or hereafter placed upon the real property of which the Subleased Premises are a part and to any and all advances secured thereby and to all renewals, modifications, consolidations, replacements and extensions thereof, and (c) all matters of record affecting the Subleased Premises as of the date hereof.  Subtenant shall not do or permit anything to be done in

connection with Subtenant's occupancy of the Subleased Premises, which would violate any covenants, agreements, terms, provisions and conditions contained in the Lease.

F.     Effect of Sublease.  Except as otherwise expressly provided in this Consent, nothing contained in this Consent or in the Sublease shall be construed to modify, waive, impair, or affect any of the terms, covenants or conditions contained in the Lease, or to waive any breach thereof, or any rights or remedies of Landlord under the Lease against any person liable for the performance thereof, or to enlarge or increase Landlord's obligations or liabilities under the Lease. Notwithstanding the foregoing, or anything else contained herein to the contrary, the parties hereto hereby acknowledge and agree that, during the Term of the Sublease, as between Landlord and Subtenant, the terms of the Lease shall be deemed to be amended and modified as follows:

1.     **Section 19.1 Through 19.5 Relating to Insurance**. Section 19.1 through Section 19.5 of the Lease, regarding insurance, shall be deemed to be amended and restated in their respective entirety, as set forth on Exhibit B attached hereto and incorporated herein;

2.     **Section 6.6 Disputes Relating to Additional Rent**. The second sentence of Section 6.6 of the Lease is amended in its entirety to read as follows:

The Objection Notice must be received by Landlord within thirty (30) days after the date of receipt by Tenant of Landlord's statement summarizing the actual amount of Tenant's Share of Operating Expenses for the prior Lease Year, as set forth in Section 6.3 of the Lease and must set forth with particularity the reason why Tenant disputes Landlord's calculation or the amount.

3.     **Section 11.3 Alterations by Tenant**. Landlord acknowledges that Subtenant desires to alter the Subleased Premises as generally shown on Exhibit C attached hereto (the "Proposed Alterations"). Any such alterations shall require Landlord's approval in accordance with the terms and conditions of Section 11.3 of the Lease, which shall include, without limitation, the requirement that Subtenant submit final plans and specifications for such alterations to Landlord for its review and approval. Notwithstanding the foregoing, Landlord acknowledges that, in concept, it is not opposed to the Proposed Alterations as generally shown on Exhibit C; and provided the final plans and specifications submitted to Landlord in connection with a request for Landlord's approval of the Proposed Alterations do not materially differ from the Proposed Alterations as shown on Exhibit C, Landlord shall not unreasonably withhold, condition or delay its approval thereof, in concept.

4.     **Section 22 Liens.** The third (3rd) and fourth (4th) sentences of Section 22 of the Lease (requiring tenant improvements, alterations or other work to be bonded) are hereby deleted. For the avoidance of doubt, neither Subtenant nor Tenant shall be obligated to obtain any payment or performance bonds for any improvements, alterations or other work performed or to be performed by or on behalf of Subtenant.

G.     Tenant and Subtenant Obligations.  Tenant shall remain fully liable and responsible for the due keeping, performance and observance of all the terms, covenants and conditions set forth in the Lease on the part of Tenant to be kept, performed and observed with regard to the Subleased Premises and for the payment of the Base Rent, Additional Rent and all other sums now

and hereafter becoming payable thereunder for the Subleased Premises.  No guarantor of the Lease shall be relieved in any way from the terms and conditions of the guaranty of the Lease.  Any act or omission of Subtenant or anyone claiming under or through Subtenant that violates any of the provisions of the Lease (as modified hereby) shall be deemed a violation of the Lease by Tenant, provided that Landlord has given Tenant notice of such violation to the extent required under the terms of the Lease and allowed Tenant to cure such violation to the extent allowed under the terms of the Lease.  Subject to the Lease modifications set forth in Section 4 above, Subtenant agrees to assume all existing and future obligations of Tenant under the Lease  in respect of the Subleased Premises during the term of the Sublease and shall be jointly and severally responsible with Tenant for the payment of Base Rent, Additional Rent, and the performance of all terms, covenants and conditions of the Lease, except as such terms, covenants and conditions of the Lease relate to any portion of the Premises which is not the Subleased Premises.  With respect to the foregoing, Landlord represents and warrants that (i) all amounts due as Base Rent and Additional Rent with respect to the Subleased Premises have been received by Landlord for the period through March 31, 2021 (provided that the foregoing shall not apply to the annual reconciliation of any Additional Rent required under Section 6.3 of the Lease); and, as of the date hereof, Landlord has no actual knowledge of any claims, counterclaims, set offs, or defenses against Tenant relating, in any way, to the Subleased Premises; (ii) the Lease is, as of the date hereof, in full force and effect, Landlord has received no written notice of, nor otherwise has knowledge of, any existing event of default under the Lease and, to the best of Landlord's actual knowledge, no event has occurred and is continuing that would constitute an event of default under the Lease, but for the requirement to give notice and provide the applicable time to cure; (iii) Landlord is the fee simple owner of the Bank of America Building and Bellevue Place, including the Premises, and is the landlord under the Lease, Tenant is the tenant thereunder with regard to the Subleased Premises, and, to Landlord's actual knowledge, there are no other leases or occupancy agreements encumbering the Subleased Premises; (iv) Exhibit A attached to the Sublease is a complete copy of the Lease and all other agreements between Landlord and Tenant relating to the leasing, use or occupancy of the Subleased Premises; and, as of the date hereof, Suite 700 no longer constitutes a portion of the premises let under the Lease; (v) as of the date of this Agreement, the current term of the Lease will expire on October 31, 2030, unless modified by Landlord and Tenant or earlier terminated pursuant to the terms of the Lease; (vi) there are no actions, voluntary or otherwise, pending against Landlord under the bankruptcy, reorganization, arrangement, moratorium or similar laws of the United States, any state thereof or any other jurisdiction; and (vii) pursuant to the terms and conditions of Section 11.3 of the Lease, none of the alterations, additions or improvements made by Tenant to the Subleased Premises prior to the date hereof are required to be removed upon the expiration or earlier termination of the Lease; provided, however, in its sole discretion, upon the expiration or earlier termination of the Lease, Landlord shall have the right to require that the low voltage cabling and associated telecommunication equipment exclusively serving the Subleased Premises be removed.

H.    Expiration or Termination of Lease. Except as otherwise provided in this Consent, upon the expiration or earlier termination of the Lease, the Sublease and the term and estate thereby granted shall automatically expire and come to an end as of the effective date of such expiration, and Subtenant shall vacate the Subleased Premises on or before such date.  In case of the failure of Subtenant so to vacate, Landlord shall be entitled to all the rights and remedies which are available to a landlord against a tenant holding over after the expiration of a term, in addition to

the rights and remedies which are available to Landlord pursuant to the Lease in the event that Tenant holds over after the expiration of the Lease.

I.    Default by Tenant.  In the event of Tenant's default under the provisions of the Lease beyond any applicable cure period, Landlord may pursue any and all remedies available to Landlord under the Lease as a result of such default. Notwithstanding the foregoing, if Tenant is in monetary default of the Lease, from and thereafter, Subtenant shall be permitted to direct all Base Rent and Additional Rent due under the Sublease directly to Landlord and, provided Subtenant does so from and after its receipt of any such notice of default from Landlord, then, as between Landlord and Subtenant, Landlord shall accept such payment as a cure of any such default relating to the Subleased Premises; provided, however, in the event any such direct payment by Subtenant to Landlord of Base Rent and Additional Rent due under the Sublease will be insufficient to fully compensate Landlord for the outstanding amounts due by Tenant under the Lease with regard to the Subleased Premises, then, in order for such direct payment of Base Rent and Additional Rent to constitute a cure of any such default relating to the Subleased Premises, Landlord shall require Subtenant to also pay directly to Landlord such amount as is required to fully compensate Landlord for such prior outstanding amounts due by Tenant under the Lease with regard to the Subleased Premises.

Tenant hereby consents to Subtenant paying Rent directly to Landlord in such event, it being acknowledged and agreed that Subtenant may rely solely upon notice from Landlord in determining where to direct any such payment.

J.    Assignment; Subletting.  Neither the Sublease nor this Consent shall be construed as a consent by Landlord to any further subletting either by Tenant or by Subtenant or to any assignment by Tenant of the Lease or assignment by the Subtenant of the Sublease.  There shall be no further subletting or assignment of all or any portion of the Subleased Premises, except in accordance with the terms and conditions of the Lease.

K.    Amendment of Sublease and Lease. Tenant and Subtenant agree that if the Sublease is modified or amended in any way without the prior written consent of Landlord, such modification or amendment shall in no way (i) be binding upon Landlord, or (ii) modify or amend the terms of the Lease or this Consent.  Tenant shall promptly deliver a copy of any and all modifications or amendments to the Sublease to Landlord, including Subtenant's exercise of any early termination of the Sublease.  Landlord's receipt of any such modification or amendment shall in no way be deemed to be an acceptance by Landlord of terms of such modification or amendment or a waiver of any of Landlord's rights under the Lease or this Consent.  Any modification or amendment of the Sublease without Landlord's prior written consent, which modifies or amends the terms of the Lease or this Consent, shall be void and of no force or effect.

L.    Conflict.  In the event of any conflict between the provisions of (a) the Lease and this Consent and (b) the Sublease, as between Landlord and Tenant and Landlord and Subtenant only, the provisions of the Lease and this Consent shall prevail unaffected by the provisions of the Sublease.  In the event of any conflict between the provisions of this Consent and the provisions of the Lease, the provisions of this Consent shall prevail.

M.  Condition to Effect.  This Consent shall not be effective and the Sublease shall not be valid unless and until Landlord has received: (a) a fully executed copy of the Sublease, and (b) a fully executed counterpart of this Consent; provided, however, Landlord's execution hereof shall be conclusive evidence that the foregoing conditions have been satisfied.

N.  Amendment.  This Consent may be changed only by an agreement in writing signed by the parties hereto.

O.  Execution.  Each party has the full right, power and authority to enter into this Consent, and has obtained all necessary consents and resolutions required under the documents governing such party's affairs in order to consummate the transaction contemplated herein. Further, Landlord has obtained all necessary consents and approvals from Landlord's lender with respect hereto. The persons executing this Consent have been duly authorized to do so and this Consent is the binding obligation of each party hereto, enforceable in accordance with its terms. This Consent may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute but one and the same instrument. Execution and delivery of a counterpart of this Consent by portable document format ("PDF") copy bearing the PDF signature of a duly authorized officer of any party hereto, whether delivered by either facsimile or email, shall be deemed to have the same legal effect as delivery of an original signed copy hereof. Each of party hereto agrees that: (x) each PDF signature of such party will be enforceable to the same extent as a manual signature, whether in court or otherwise; and (y) such party will not raise any defenses or regulatory or statutory claims attempting to invalidate the enforceability of its PDF signature.

P.  Governing Law.  This Consent and the legal relations between the parties hereto shall be governed by and construed and enforced in accordance with the laws of the state of Washington.

Q.  Direct Lease. Notwithstanding anything to the contrary contained herein, Landlord, Tenant and Subtenant acknowledge and agree that if at any time during the term of the Sublease, Landlord and Subtenant should execute a lease whereby Subtenant leases the Subleased Premises commencing upon the expiration or early termination of the Lease (a "Direct Lease") then (a) the Direct Lease and Subtenant's occupancy thereunder shall in no way be deemed to extend the term of the Lease; (b) any occupancy by Subtenant of the Subleased Premises after the expiration of the term or early termination of the Lease shall be governed by the terms of the Direct Lease and Tenant shall have no liability to Subtenant or Landlord relating thereto; and (c) Tenant shall not be deemed a holdover tenant or a tenant at sufferance upon expiration of the Lease.

R.  Parking. Subtenant shall be entitled to Tenant's parking rights pursuant to the terms of the Sublease and, in accordance with the terms and conditions of the Lease, Subtenant may elect to use up to three (3) parking permits for each one thousand (1,000) square feet of Useable Area included in the Subleased Premises.

S.  Subtenant Signage. Subtenant shall be permitted: (i) for no additional cost or charge, to add its signage/listing to the Building directory and (ii) at its sole cost and expense, subject to Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, to install an identification sign on the 20th floor at the entrance to the

Subleased Premises, provided Subtenant obtains all governmental permits and approvals required therefor. Thereafter, without the prior written consent of Landlord, Subtenant shall be permitted to update such premises signage in a manner consistent with its then current prototypical signage.

      T.    <u>Costs and Fees; Legal Expenses</u>. Tenant shall reimburse Landlord for Landlord's reasonable attorneys' fees and costs incurred in conjunction with the processing and documentation of the Sublease, up to a maximum aggregate amount of $20,000.00. Any such fees and costs incurred by Landlord and paid by Tenant shall thereafter be allocated among Tenant and Subtenant pursuant to the terms of the Sublease.

      U.    <u>Patriot Act</u>. Landlord and Subtenant acknowledge and agree that, as between Landlord and Subtenant, the following provision shall apply in lieu of the OFAC provision set forth in Section 37.20 of the Lease.

      V.    Landlord represents, warrants and covenants to Subtenant that (a) no Landlord Covered Entity (as hereinafter defined) (i) is a Sanctioned Person (as hereinafter defined) or (ii) is directly or indirectly controlled by a Sanctioned Person; and (b) Landlord is not acting hereunder and will not act hereunder for or on behalf of a Sanctioned Person. Subtenant represents, warrants and covenants to Landlord that (a) no Subtenant Covered Entity (as hereinafter defined) (i) is a Sanctioned Person or (ii) is directly or indirectly controlled by a Sanctioned Person; and (b) Subtenant is not acting hereunder and will not act hereunder for or on behalf of a Sanctioned Person. As used in this Section, the following terms shall have the meanings set forth below:

      "Anti-Terrorism Laws" shall mean any Laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering or bribery, and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, all as amended, supplemented or replaced from time to time.

      "Landlord Covered Entity" means (a) Landlord and each direct or indirect subsidiary of Landlord and (b) each Person that, directly or indirectly, is in control of a Person described in clause (a) above.  For purposes of this definition, control of a Person means the direct or indirect (x) ownership of, or power to vote, 25% or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise.

      "Law" shall mean any law(s) (including common law), constitution, statute, treaty, regulation, rule, ordinance, opinion, issued guidance, release, ruling, order, executive order, injunction, writ, decree, bond, judgment, authorization or approval, lien or award of or any settlement arrangement, by agreement, consent or otherwise, with any governmental authority, foreign or domestic.

      "Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

      "Sanctioned Person" means any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person, group,

regime, entity or thing, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any Anti-Terrorism Law.

"Subtenant Covered Entity" means (a) Subtenant and each direct or indirect subsidiary of Subtenant, and (b) each Person that, directly or indirectly, is in control of Subtenant or any direct or indirect subsidiary of Subtenant.  For purposes of this definition, control of a Person means the direct or indirect (x) ownership of, or power to vote, 25% or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise.

W.    <u>Building Investment Trust Representation.</u> Landlord is not the AFL-CIO Building Investment Trust or an affiliate or subsidiary thereof (collectively, the "BIT").  The BIT is not involved with the transactions contemplated by the Lease, and the BIT is not receiving any portion of the rents or other amounts payable to Landlord thereunder.

*[SIGNATURES ON FOLLOWING PAGE]*

IN WITNESS WHEREOF, the parties have executed this Consent as of the date first written above.

"LANDLORD":                **BELLEVUE PLACE OFFICE, LLC,** a Washington limited liability company

By:  Kemper Development Company, a Washington corporation, its Manager

By:_____

Name:_____

Its:_____


"TENANT":                  **DESOLATION HOLDINGS LLC,** a Delaware limited liability company

By:_____

Name:_____

Its:_____


"SUBTENANT":               **PNC BANK, NATIONAL ASSOCIATION,** a national banking association

By:_____

Name:_____

Its:_____

# ACKNOWLEDGMENTS

### *LANDLORD*:

STATE OF WASHINGTON      )

                                    ) ss.

COUNTY OF KING              )

       This record was acknowledged before me on _____, 2021, by _____ as _____ of KEMPER DEVELOPMENT COMPANY, a Washington corporation, as the Manager of BELLEVUE PLACE OFFICE, LLC, a Washington limited liability company.

<br>

|  |
|---|
|  |

(Use this space for notarial stamp/seal)

_____
(Signature of notary public)

_____
(Title of office)

My commission expires: _____

***TENANT:***

STATE OF _____  )

                                  ) ss.

COUNTY OF _____  )

       This record was acknowledged before me on _____, 2021, by _____ as _____ of _____.

| | |
|---|---|
| | _____ |
| | (Signature of notary public) |
| | |
| | _____ |
| | (Title of office) |
| | |
| | My commission expires: _____ |

(Use this space for notarial stamp/seal)

***SUBTENANT****:*

STATE OF _____ )

                                ) ss.

COUNTY OF _____ )

       This record was acknowledged before me on _____, 2021, by _____ as _____ of _____.

 

 

                                                        _____

                                                        (Signature of notary public)

                                                        _____

                                                        (Title of office)

                                                        My commission expires: _____

(Use this space for notarial stamp/seal)

**EXHIBIT A**

**SUBLEASE**

**[To be attached]**

**EXHIBIT B**

**INSURANCE**

## 19.   <u>INSURANCE</u>.

19.1   <u>Liability Insurance</u>.

(a)   <u>General Liability Insurance</u>.  Tenant shall, at its own cost and expense, keep and maintain in full force and effect during the Lease Term, a policy of commercial general liability insurance on an occurrence form, including but not limited to premises and operations; blanket contractual; products/completed operations; operations of Tenant's independent contractors acting on Tenant's behalf; and personal and advertising injury insuring Tenant's activities with respect to the Leased Premises, Bank of America Building and Bellevue Place against claims of loss, damage or liability for personal injury or death or loss or damage to property with a limit of not less than Five Million Dollars ($5,000,000.00) per occurrence and Ten Million Dollars ($10,000,000.00) general aggregate. The insurance required under this Section shall be with companies rated A-VII or better in A.M. Best's Insurance Guide.  The insurance policy shall contain a provision that such policy and the coverage evidenced thereby shall be primary and noncontributing with respect to any policies carried by Landlord, and that any coverage carried by Landlord shall be excess insurance.  Landlord, Kemper Holdings, LLC, and Kemper Development Company shall be included as additional insureds with respect to liability arising out of the Tenant's operations and the Leased Premises. In the event that the policy will be cancelled, not renewed, or coverages or policy limits will be reduced below those required by this Lease, Tenant shall provide to Landlord at least forty-five (45) days' prior written notice of such event and ten (10) days' prior written notice to Landlord for non-payment of premiums. Tenant shall deliver to Landlord upon the Commencement Date and from time to time thereafter as requested by Landlord a memorandum of insurance evidencing the coverage required by this Section 19, showing that the above additional insured are included as additional insureds and coverage is provided on a primary and non-contributory basis as required by this Lease, and showing the applicable policy limits thereof.  In no event shall the limits of such policies be considered as limiting the liability of Tenant under this Lease. Additional insureds shall be for all limits carried, not just the minimums contained herein.

(b)   <u>Service of Alcoholic Beverages</u>.  If Tenant serves, distributes or sells any alcoholic beverages, the insurance to be carried by Tenant pursuant to Section 19.1(a) above shall not exclude liability for violation of any governmental statute, ordinance, regulation or rule pertaining to the sale, gift, distribution or use of any alcoholic beverages, or liability by reason of the selling, serving or giving of any alcoholic beverage to a minor or to a person under the influence of alcohol or any other person, or which causes or contributes to the intoxication of any persons. Accordingly, the indemnification obligations in Section 18 of this Lease shall extend, as well, to damages occurring at locations other than the Leased Premises and resulting from risks insurable by any of the following (i) so-called dram shop liability insurance, (ii) host liquor liability insurance or (iii) liquor legal liability insurance; or (iv) insurance otherwise related to the sale, gift, distribution or use of alcoholic beverages, with limits in the amount of not less than Three Million Dollars ($3,000,000) per occurrence.

19.2    Property Insurance.

In addition to the insurance required by Sections 19.1 and 19.2, Tenant shall, at its own cost and expense, keep and maintain in full force and effect during the Lease Term, "All-Risk" property insurance covering Tenant's supplies, inventory and other personal property as well as all improvements, additions and modifications to or in the Leased Premises, in an amount equal to full replacement cost without co-insurance penalty. In the event that the policy will be cancelled, not renewed, or coverages or policy limits will be reduced below those required by this Lease, Tenant shall provide to Landlord at least forty-five (45) days' prior written notice of such event and ten (10) days' prior written notice to Landlord for non-payment of premiums. Tenant shall deliver to Landlord upon the Commencement Date and from time to time thereafter as requested by Landlord a memorandum of insurance thereof, including Landlord as loss payee, as applicable.

19.3    Other Insurance.

(a)    Workers Compensation Insurance.  Tenant shall maintain all required coverages including employer's liability at a limit of not less than Two Million Dollars ($2,000,000).

(b)    Automobile Liability.  Tenant shall maintain automobile liability for all owned, non-owned and hired autos at a limit of not less than Two Million Dollars ($2,000,000) per accident, including Landlord, Kemper Holdings LLC, and Kemper Development Company as additional insureds.

19.4    Failure to Maintain.

If Tenant fails or refuses to maintain any insurance required by this Section 19 and such failure continues for more than seven (7) days after written notice from Landlord, at its discretion, Landlord may obtain and maintain such insurance in such amounts as required under this Lease and any and all premiums paid or payable by Landlord therefor shall be deemed to be additional rent and shall be due on the payment date of the next installment of Rent hereunder.  The failure to obtain or maintain any insurance required by this Section 19 or Tenant's failure to reimburse Landlord for obtaining or maintaining any insurance required of Tenant under this Section 19 that continues for seven (7) days after notice from Landlord shall constitute a material breach of this Lease.

19.5    Increase in Insurance Premium.

Notwithstanding anything in this Lease to the contrary, Tenant shall not keep, use, sell or offer for sale in or upon the Leased Premises any article, nor conduct any activities or operations, which are or may be prohibited by Landlord's insurance carriers.  Tenant shall pay any increase in premiums for property or liability insurance maintained by Landlord resulting from Tenant's use or occupancy of the Leased Premises, whether or not Landlord has consented thereto, provided that Landlord acknowledges that Tenant's Permitted Use will not cause an increase in such insurance premiums.  In the event of such increased insurance premiums to Landlord for which Tenant is responsible hereunder, Tenant also shall pay to Landlord, within thirty (30) days of receipt of invoice therefor, an amount equal to any additional premium on the insurance policy or policies that Landlord may carry for its protection against loss resulting from such use or

occupancy which has resulted in the increased premiums for which Tenant is responsible hereunder. In determining whether increased premiums are the result of Tenant's use or occupancy of the Leased Premises, the rates and premiums determined by the organization setting the insurance premiums shall be conclusive evidence of the several items and charges which make up the insurance premiums.  Landlord shall deliver bills for such additional amounts to Tenant at such times as Landlord may elect, and Tenant shall pay the same within thirty (30) days of receipt thereof. Notwithstanding the foregoing, Landlord agrees that Tenant's use of the Leased Premises (i) in accordance with the Permitted Use and Section 9 above, and (ii) in a commercially reasonable and good-faith manner, shall not be prohibited by Landlord's insurance carriers or require Tenant to make payment under this subsection.

**EXHIBIT C**

**PROPOSED ALTERATIONS**





{00699948.9}

OMM_US:79329696.14

**<u>EXHIBIT E</u>**

**SUBTENANT ALTERATIONS**

[See attached]



E-2

**EXHIBIT B**

**INSURANCE**

**19.**    **INSURANCE.**

19.1    Liability Insurance.

(a)    General Liability Insurance. Tenant shall, at its own cost and expense, keep and maintain in full force and effect during the Lease Term, a policy of commercial general liability insurance on an occurrence form, including but not limited to premises and operations; blanket contractual; products/completed operations; operations of Tenant's independent contractors acting on Tenant's behalf; and personal and advertising injury insuring Tenant's activities with respect to the Leased Premises, Bank of America Building and Bellevue Place against claims of loss, damage or liability for personal injury or death or loss or damage to property with a limit of not less than Five Million Dollars ($5,000,000.00) per occurrence and Ten Million Dollars ($10,000,000.00) general aggregate. The insurance required under this Section shall be with companies rated A-VII or better in A.M. Best's Insurance Guide. The insurance policy shall contain a provision that such policy and the coverage evidenced thereby shall be primary and noncontributing with respect to any policies carried by Landlord, and that any coverage carried by Landlord shall be excess insurance. Landlord, Kemper Holdings, LLC, and Kemper Development Company shall be included as additional insureds with respect to liability arising out of the Tenant's operations and the Leased Premises. In the event that the policy will be cancelled, not renewed, or coverages or policy limits will be reduced below those required by this Lease, Tenant shall provide to Landlord at least forty-five (45) days' prior written notice of such event and ten (10) days' prior written notice to Landlord for non-payment of premiums. Tenant shall deliver to Landlord upon the Commencement Date and from time to time thereafter as requested by Landlord a memorandum of insurance evidencing the coverage required by this Section 19, showing that the above additional insured are included as additional insureds and coverage is provided on a primary and non-contributory basis as required by this Lease, and showing the applicable policy limits thereof. In no event shall the limits of such policies be considered as limiting the liability of Tenant under this Lease. Additional insureds shall be for all limits carried, not just the minimums contained herein.

(b)    Service of Alcoholic Beverages. If Tenant serves, distributes or sells any alcoholic beverages, the insurance to be carried by Tenant pursuant to Section 19.1(a) above shall not exclude liability for violation of any governmental statute, ordinance, regulation or rule pertaining to the sale, gift, distribution or use of any alcoholic beverages, or liability by reason of the selling, serving or giving of any alcoholic beverage to a minor or to a person under the influence of alcohol or any other person, or which causes or contributes to the intoxication of any persons. Accordingly, the indemnification obligations in Section 18 of this Lease shall extend, as well, to damages occurring at locations other than the Leased Premises and resulting from risks insurable by any of the following (i) so-called dram shop liability insurance, (ii) host liquor liability insurance or (iii) liquor legal liability insurance; or (iv) insurance otherwise related to the sale, gift, distribution or use of alcoholic beverages, with limits in the amount of not less than Three Million Dollars ($3,000,000) per occurrence.

19.2    Property Insurance.

In addition to the insurance required by Sections 19.1 and 19.2, Tenant shall, at its own cost and expense, keep and maintain in full force and effect during the Lease Term, "All-Risk" property insurance covering Tenant's supplies, inventory and other personal property as well as all improvements, additions and modifications to or in the Leased Premises, in an amount equal to full replacement cost without co-insurance penalty. In the event that the policy will be cancelled, not renewed, or coverages or policy limits will be reduced below those required by this Lease, Tenant shall provide to Landlord at least forty-five (45) days' prior written notice of such event and ten (10) days' prior written notice to Landlord for non-payment of premiums. Tenant shall deliver to Landlord upon the Commencement Date and from time to time thereafter as requested by Landlord a memorandum of insurance thereof, including Landlord as loss payee, as applicable.

19.3    Other Insurance.

(a)    Workers Compensation Insurance.    Tenant shall maintain all required coverages including employer's liability at a limit of not less than Two Million Dollars ($2,000,000).

(b)    Automobile Liability.    Tenant shall maintain automobile liability for all owned, non-owned and hired autos at a limit of not less than Two Million Dollars ($2,000,000) per accident, including Landlord, Kemper Holdings LLC, and Kemper Development Company as additional insureds.

19.4    Failure to Maintain.

If Tenant fails or refuses to maintain any insurance required by this Section 19 and such failure continues for more than seven (7) days after written notice from Landlord, at its discretion, Landlord may obtain and maintain such insurance in such amounts as required under this Lease and any and all premiums paid or payable by Landlord therefor shall be deemed to be additional rent and shall be due on the payment date of the next installment of Rent hereunder. The failure to obtain or maintain any insurance required by this Section 19 or Tenant's failure to reimburse Landlord for obtaining or maintaining any insurance required of Tenant under this Section 19 that continues for seven (7) days after notice from Landlord shall constitute a material breach of this Lease.

19.5    Increase in Insurance Premium.

Notwithstanding anything in this Lease to the contrary, Tenant shall not keep, use, sell or offer for sale in or upon the Leased Premises any article, nor conduct any activities or operations, which are or may be prohibited by Landlord's insurance carriers. Tenant shall pay any increase in premiums for property or liability insurance maintained by Landlord resulting from Tenant's use or occupancy of the Leased Premises, whether or not Landlord has consented thereto, provided that Landlord acknowledges that Tenant's Permitted Use will not cause an increase in such insurance premiums. In the event of such increased insurance premiums to Landlord for which Tenant is responsible hereunder, Tenant also shall pay to Landlord, within thirty (30) days of receipt of invoice therefor, an amount equal to any additional premium on the insurance policy or policies that Landlord may carry for its protection against loss resulting from such use or

occupancy which has resulted in the increased premiums for which Tenant is responsible hereunder. In determining whether increased premiums are the result of Tenant's use or occupancy of the Leased Premises, the rates and premiums determined by the organization setting the insurance premiums shall be conclusive evidence of the several items and charges which make up the insurance premiums. Landlord shall deliver bills for such additional amounts to Tenant at such times as Landlord may elect, and Tenant shall pay the same within thirty (30) days of receipt thereof. Notwithstanding the foregoing, Landlord agrees that Tenant's use of the Leased Premises (i) in accordance with the Permitted Use and Section 9 above, and (ii) in a commercially reasonable and good-faith manner, shall not be prohibited by Landlord's insurance carriers or require Tenant to make payment under this subsection.

# EXHIBIT C

## PROPOSED ALTERATIONS





**EXHIBIT B**

**BILL OF SALE**

For the sum of Ten Dollars ($10.00) in hand paid and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Desolation Holdings LLC, a Delaware limited liability company ("**Seller**"), does hereby sell, grant, assign, transfer, set over and convey to PNC Bank, National Association, a national banking association ("**Buyer**"), its successors and assigns, the personal property and furniture, fixtures and equipment owned by Seller and located within that certain premises located on the 20th floor of the building commonly known as 10500 NE 8th Street, Bellevue, WA 98004 ("**FF&E**"). For the avoidance of doubt, (i) the FF&E shall include that certain property set forth on Schedule I attached hereto; and (ii) the FF&E shall not include those fixtures which are the property of the Landlord (as defined in and pursuant to that certain Bank of America Building Office Lease, dated November 14, 2018, as the same may have been amended or supplemented prior to the date hereof).

TO HAVE AND TO HOLD the FF&E unto the Buyer, its successors and assigns forever.

Buyer acknowledges that Seller is selling and Buyer is buying the FF&E on an "as is, where is, with all faults" basis, and that, except as set forth in the immediately succeeding sentence, Buyer is not relying on any representations or warranties of any kind whatsoever, express or implied, including, without limitation, any implied warranties as to merchantability or fitness for a particular purpose. Seller represents and warrants to the Buyer that (i) Seller is the lawful owner of the FF&E; (ii) the FF&E is free from all liens, restrictions, leases, security interests, claims, charges or encumbrances whatsoever; and (iii) Seller has the legal right to sell the FF&E.

Buyer shall take delivery of the FF&E in its "as-is, where-is, with all faults" condition. Seller shall have no obligation to repair or replace any item of FF&E.

This Bill of Sale shall be governed by and construed in accordance with the laws of the State of Washington. Any waiver by either party of any breach of any term or condition of this Bill of Sale shall not operate as a waiver of any other breach of such term or condition or of any other term or condition, nor shall any failure to enforce such provision hereof operate as a waiver of such provision or of any other provision hereof, nor constitute nor be deemed as a waiver or release of any other party for anything arising out of, connected with or based upon this Bill of Sale.

This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument.

This Bill of Sale shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

[Signatures on following page]

Dated this _____day of _____, 2023.

SELLER:                         DESOLATION HOLDINGS LLC,
a Delaware limited liability company

By:_____

Title:_____

BUYER:                        PNC BANK, NATIONAL ASSOCIATION,
a national banking association

By:_____

Title:_____

**EXHIBIT I TO BILL OF SALE**

| *Items* | *#* | *Notes* |
|---|---|---|
| Desks | 122 | 61 on both North and South sides of the floor |
| Desk chairs | 111 | |
| Spines | 59 | |
| End cap trash/recycle units | 5 | |
| Rolling peds | 106 | |
| Phone booths | 3 | |
| Conference rooms: | | |
|    Tables | 21 | |
|    Black chairs | 46 | |
|    Gray side chairs (rolling) | 53 | |
|    Floor lamps | 3 | |
| Break room/kitchen: | | |
|    Square tables | 3 | |
|    Regular chairs | 12 | |
|    Tall silver chairs | 11 | |
|    Tall cocktail table (in game room) | 1 | |
|    Counter stools | 5 | |
|    Gray couch | 1 | |
|    Ping pong table/dining table | 1 | |
|    Large TV on wall | 1 | |
| Server racks | 4 | 2x 2-post racks and 2x 4-post racks |
| Garbage/recycle bins | 36 | plus 4 larger bins in conference rooms |
| Coatracks | 2 | |
| Reception: | | |
|    Lounge chairs | 2 | |
|    Small table | 1 | |
|    Rug | 1 | |
| Olympics conf room round table | 1 | |
| Blue benches | 2 | |
| Office 2015: | | |

| | | |
|---|---|---|
| Round table | 1 | |
| Chairs | 4 | |
| Low bookcase | 1 | |
| Small square tables | 4 | |
| Blue green barrel chairs | 5 | |
| Green ottomans | 4 | |
| Gray armchairs | 2 | |
| Office 2021: | | |
| Round table | 1 | |
| Office 2026: | | |
| Small wooden table | 1 | |
| Gray lounge chair | 1 | |
| Office 2027: | | |
| Round table | 1 | |
| White chairs | 2 | |
| Office 2037: | | |
| Round table | 1 | |
| White chairs | 2 | |
| Wellness room: | | |
| Lounge chairs | 3 | |
| Round table | 1 | |
| Office 2063: | | |
| Round glass table | 1 | |
| Low gray lounge chairs | 3 | |
| Large coffee maker | 1 | |
| Mini-fridge in Cascades conf room | 1 | |
| Mini-fridge office 2015 | 1 | |
| Refrigerators | All | |
| Beverage Coolers | All | |
| Dishwashers | All | |