IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Desolation Holdings LLC, *et al.*,[1] | Case No. 23-10597 (BLS) |
| Debtors. | (Jointly Administered) |

**DEBTORS' REPLY TO FLORIDA OFFICE OF FINANCIAL REGULATION'S OPPOSITION TO MOTION TO ENFORCE AUTOMATIC STAY AND NON-DISCRIMINATION PROVISIONS OF THE BANKRUPTCY CODE, AND FOR CIVIL CONTEMPT**

The above-captioned debtors in possession (the "Debtors") respectfully state the following in support of this reply ("Reply") to the opposition ("Opposition") filed by the Florida Office of Financial Regulation ("OFR") to the Debtors' *Motion to Enforce Automatic Stay and Non-Discrimination Provisions of the Bankruptcy Code, and for Civil Contempt* ("Motion").[2]

**INTRODUCTION**

1. Florida's legislature designated the OFR to enforce statutes and related regulations applicable to money transmitters in its state.[3] The primary purpose of the MTL Statute is to ensure that money transmitters have sufficient net worth so that consumers' funds are not lost in insolvency-related deficiencies.[4] One purpose of the automatic stay and one limitation on the regulatory exception of section 362(a)(4) concerns protecting the exclusive jurisdiction of the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Holdings Ltd. (2227); and Bittrex Malta Ltd. (1764). The mailing and service address of the Debtors is 701 5th Avenue, Suite 4200, Seattle, WA 98104.

[2] All terms not defined herein have the meaning given to them in the Motion.

[3] Fla. Stat. § 560.103; Fla. Stat. § 560.105 (the "MTL Statute").

[4] *See, e.g.*, Fla. Stat. Ann. § 560.209 ("A licensee must have a net worth of at least $100,000. A licensee operating in more than one location must have an additional net worth of $10,000 per location in this state, up to a maximum of $2 million. The required net worth must be maintained at all times.").

1

Bankruptcy Court over similarly-positioned claims.[5]  Plainly, the MTL Statute's financial responsibility purpose in insuring payment in full of all Florida creditors evinces a pecuniary protection of Florida consumers, not a public policy one.

2.  Against this backdrop, it is clear that the OFR knowingly violated the automatic stay and discriminated against BUS and its officers in violation of the Bankruptcy Code.  In late March 2023, BUS notified the OFR that it intended to wind down its affairs and surrender its License.  BUS provided similar notice to numerous other states.  Many states either accepted the surrender or negotiated complementary conditions with BUS.  Rather than accept the surrender and work with BUS to ensure that Florida residents would be able to withdraw all the assets associated with their accounts, the OFR filed the Complaint to revoke[6] the License, and continued to prosecute the Complaint even after BUS filed bankruptcy.

3.  Immediately before filing the Complaint, the OFR had just finished ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[7]  A few days before it filed the Complaint, the OFR ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  But rather than allege ▮▮▮▮▮▮▮, the OFR opted instead to refer to the "low hanging fruit" of years-old license denials and consent orders, even though the OFR knew about these denials and orders for ages, without doing anything.  The OFR then concocted more pretext, referring to ▮▮▮▮▮▮▮▮▮▮



---

[5]  *E.g.*, *Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d 374, 390 (6th Cir. 2001) (staying "hot goods" labor regulation enforcement, because "a successful suit would result in a pecuniary advantage to certain private parties (employees) vis-a-vis other creditors of the estate, contrary to the Bankruptcy Code's priorities.").

[6]  Revocation carries long-term negative effects for money transfer licensees and their control persons and can prohibit them from obtaining a money transfer license in the future.  Surrender lacks this scarlet letter effect.

[7]  Tellingly, the State of Texas ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, but unlike Florida, entered into a consent order with BUS where it accepted the surrender of BUS' license and negotiated conditions for Texas residents to withdraw assets associated with their accounts.

██████████████████████, without providing any facts or documents supporting those allegations.

4. The Opposition offers no evidence to support its position that it has not violated the Bankruptcy Code. Its various arguments should be rejected for the following reasons.

5. *First*, the OFR argues that the Complaint is exempt from the automatic stay based on section 362(b)(4), because it is trying to protect the interests of Florida consumers, punish past violations, and deter future violations. However, the OFR has not shown any harm to Florida residents, let alone ongoing harm.[8] Had the OFR bothered to look at any documents filed in this bankruptcy, it would have seen that the Debtors have not loaned any crypto deposited by its customers, can easily met all withdrawals and returns of crypto and fiat deposits, and through this bankruptcy, propose to pay all customers in full. Moreover, while the OFR alleges ███████ ████████████████████████████████████████████████████████████████ ████████████████, it has refused to provide any evidence substantiating these allegations. Whether BUS can satisfy the claims of consumers in Florida falls squarely in this Court's purview, not the OFR's. In short, the OFR, through the Complaint, is not enforcing any ongoing police or regulatory power, let alone preventing any further violations.

6. *Second*, the OFR asserts that it should not be held in contempt because it has not violated the automatic stay. The evidence flatly contradicts this representation because the OFR openly threatened to default BUS if BUS did not defend against the Complaint.

7. *Third*, the OFR contends that it should not be held in contempt because there is

---

[8] Any financial harm to Florida residents now falls in this Court's exclusive jurisdiction. *See In re Commonwealth Companies, Inc.*, 913 F.2d 518, 524 (8th Cir. 1990) ("[O]ur holding in *Missouri v. Bankruptcy Court*, 647 F.2d at 775–76, resolved this problem by classifying an action to protect a 'pecuniary interest' in property of the debtor or of the estate as one which directly conflicts with the bankruptcy court's control of that property, perhaps the clearest example of an action resulting in a pecuniary advantage over other creditors.").

conflicting law concerning the scope of section 362(b)(4). Under these facts—where a governmental agency seeks to punish a liquidating Debtor that is winding down its operations for issues that it has either known about for years or has refused to produce evidence to substantiate—there is no conflicting caselaw. The OFR could have sought relief from stay or confirmation that the stay did not apply, but did not do so, and must now bear the consequences for that decision.

8.  *Fourth*, the OFR argues that it did not violate section 525, asserting that it did not file the Complaint based on BUS' insolvency. The evidence shows otherwise. The OFR filed the Complaint shortly after ████████████████████████. In contrast, the OFR has known about the NYDFS License Denial, Connecticut Consent Order, and FinCEN Consent Order for months or years and did nothing. Even in its Opposition, the OFR admits that the reason for revocation is to allow future discrimination against BUS and its control persons. Opposition ¶ 73.

9.  The Court should reject the OFR's arguments, and hold it accountable for its violations of some of the most essential protections of the Bankruptcy Code.

## RESPONSE TO THE OFR'S FACTUAL BACKGROUND[9]

I.  **The OFR's Justifications For Filing The Complaint Are Pretext And The Facts Demonstrate That It Issued The Complaint Based on ████████████████████ ████████**

10. The OFR spends pages discussing the NYDFS License Denial, the Connecticut Consent Order, and the FinCEN Consent Order, arguing that its decision to issue the Complaint was based on the contents of those documents, rather than BUS's ████████████. But, it neglects to mention that it knew about the NYDFS License Denial, the Connecticut Consent Order, and the

---

[9] The relevant facts are set out in the Motion. This section addresses the factual misstatements and new facts asserted in the Opposition.

FinCEN Consent Order for years and months before it filed the Complaint. This section outlines BUS' detailed disclosures each step of the way.

### A. BUS Disclosed the NYDFS License Denial In April 2019 And Amended Its Application For A Florida Money Transmitter License in July 2019

11. On April 10, 2019, the NYDFS issued its NYDFS License Denial in a public letter, referring to a review period of transactions dated between January 1, 2017 and December 31, 2018. Merriman Decl., Ex. G.

12. BUS mailed the NYDFS License Denial to the OFR on April 11, 2019, and it was received by the OFR on April 18, 2019. Maria Reply Decl. ¶ 3 & Ex. M. Additionally, on July 1, 2019, BUS filed an amended *Application for Licensure as Money Services Business* with the OFR, disclosing the NYDFS License Denial. *Id.* ¶ 4 & Ex. N. BUS filed a further amended *Application for Licensure as Money Services Business* with the OFR on July 8, 2019, again disclosing the NYDFS License Denial. *Id.* ¶ 5 & Ex. O.

### B. BUS Notified The OFR Of The Connecticut Consent Order And Amended Its Application for A Florida Money Transmitter License In October 2020

13. On October 16, 2020, BUS and the Connecticut Department of Banking entered into the Connecticut Consent Order, which provides that the Connecticut Banking Commissioner alleged that BUS engaged in unlicensed money transmission. Merriman Decl., Ex. F.

14. On October 20, 2020, BUS e-mailed a letter to the Florida Division of Consumer Finance, notifying it of the Connecticut Consent Order. Maria Reply Decl. ¶ 6 & Ex. P. On October 21, 2020, BUS filed an amended *Application for Licensure as Money Services Business* with the OFR, disclosing the Connecticut Consent Order. *Id.* ¶ 7 & Ex. Q.

### C. BUS Notified The OFR Of The FinCEN Consent Order in October 2022

15.     On October 11, 2022, the FinCEN Consent Order became public. Merriman Decl., Ex. E. The FinCEN Consent Order related to conduct that took place from February 13, 2014 through December 7, 2018. FinCEN Consent Order at 2. That same day, BUS notified the OFR of the FinCEN Consent Order by uploading it to the Regulatory Enforcement and Licensing Portal ("Real Portal"). Maria Reply Decl. ¶ 8.

### II.    The OFR Issues The Complaint Immediately After Learning Of BUS's Alleged ████

16.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Id.* ¶ 9 & Ex. R.

17.     On March 17, 2023, BUS notified Texas and several other states that it intended to surrender its money-transmitter license and wind-down its operations. *Id.* ¶ 10 & Ex. S.

18.     On March 21, 2023, according to the OFR, the multi-state examination findings were referred for a potential enforcement matter to revoke the License. Opposition ¶ 13.[10]

19.     On March 31, 2023, BUS mailed and e-mailed the OFR the Surrender Letter, stating that it intended to surrender its License by April 30, 2023. Merriman Decl. ¶ 2 & Ex. A.

20.     On April 17, 2023, the OFR issued its Complaint. Three days later, ████████████████████████████████████████████.[11] Maria Decl., Ex. K.

---

[10] The Opposition has inconsistent dates. It states that the multi-state examination findings were referred to the OFR on March 21, 2023, Opposition ¶ 13, and later, it says the referral was made on March 22, 2023, *id.* ¶ 48.

[11] On April 5, 2023, BUS entered into a *Consent Order* with the Texas Department of Banking ("Texas Consent Order"), Merriman Decl., Ex. B, which had led the multi-state examination. As set forth in the Texas Consent Order,

21. █████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

22. According to the OFR, in addition to the NYDFS License Denial, the Connecticut Consent Order, and the FinCEN Consent Order, it issued the Complaint based on allegations in ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████. Opposition ¶ 72. ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████.

23. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████ Moreover, the OFR has not produced any documents to substantiate with this allegation.

24. ████████████████████████████████████████████
████████████████████████████████████████████████

---

BUS voluntarily surrendered its Texas money transmitter license by April 7, 2023, and the Banking Commissioner of Texas accepted the surrender. Texas Consent Order ¶ 15.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████ As is the case with the preceding allegation, the OFR refused to produce any documents.[12]

## REPLY

### I. The Court Should Hold The OFR In Contempt For Violating The Automatic Stay

25. The OFR does not dispute that continued prosecution of the Complaint is stayed by section 362(a)(1) of the Bankruptcy Code. Instead, it argues that section 362(b)(4) exempts the Complaint from the automatic stay, that it has not prosecuted the Complaint post-petition, and that the Court should not hold it in contempt because section 362(b)(4) is "much litigated and controversial." For the reasons set forth below, each of these arguments fail.

#### A. Section 362(b)(4) Does Not Apply Because The OFR Is Not "Enforcing" Any Police Or Regulatory Power

26. As set forth in the Motion at ¶¶ 32-37, section 362(b)(4) does not apply because the OFR is not "enforc[ing]" any police or regulatory power. The Complaint alleges no public harm or ongoing violations of Florida law, and only seeks the revocation of the License, which has already been surrendered, by an entity that is winding down its affairs in bankruptcy.

27. The Opposition does nothing to change this analysis. The OFR argues that it is prosecuting the Complaint to "effectuate important public policies of protecting Florida consumers from *potential* harm, holding responsible parties accountable for their violations of Florida law,

---

[12] Tellingly, the OFR asserts that it "has evidence" that BUS ████████████████████████████ ████████████████████████████████████████████████████████ Opposition ¶ 101, but has not produced any such evidence to the Debtors.

and deterring and preventing *future* violations." Opposition ¶ 3 (emphases added). It then argues that section 362(b)(4) applies because it is not seeking any monetary penalty. *Id.* ¶ 76. The OFR's newfound excuses are undermined by the evidence, and it is legally wrong.

28. The fundamental problem with the OFR's argument lies in its confusion of economic regulations such as the MTL Statute and public health and safety concerns that section 362(b)(4) envisions. Moreover, its invocation of "potential harm" to Florida consumers lacks evidence—Florida provides none. The Debtors never loaned any crypto deposited by its customers, Hengel Decl. ¶ 68, and can meet all withdrawals and returns of crypto and fiat deposits, *id.* Moreover, the Plan proposes to pay all customers in full. *Id.* ¶ 72.[13] Simply put, the historical matters that led to the NYDFS License Denial, Connecticut Consent Order, and FinCEN Consent Order have not caused any harm to Florida consumers.

29. Without any evidence of any tangible harm to Florida consumers, the OFR refers to a grab-bag of excuses concerning Bittrex's financial wherewithal, and argues that the Complaint can penalize past conduct and deter future wrongdoing. Opposition ¶¶ 72-73. That grab-bag includes: (1) the NYDFS License Denial; (2) the Connecticut Consent Order; (3) the FinCEN Consent Order; ███████████████████████████████████████████████████████████████████

*Id.* ¶ 72. However, even a cursory review of the evidence demonstrates that the OFR is not

---

[13] Enforcement of financial responsibility laws cannot form a basis for ongoing regulatory exception from the automatic stay—the "pecuniary interests" test applies to both claims by the government and claims made by the government to protect third-parties' pecuniary interests. As numerous cases hold, "if the focus of the police power is directed at the debtor's financial obligations rather than the state's health and safety concerns, the automatic stay is applicable." *Matter of Penn Terra Ltd.*, 24 B.R. 427, 432 (Bankr. W.D. Pa. 1982); *In re Sampson*, 17 B.R. 528, 530 (Bankr. D. Conn. 1982).

"enforc[ing]" any police or regulatory power because in many cases, it sat on its hands for years, and in other cases, because it has provided no evidence of ongoing violations of Florida law.

30. With respect to the NYDFS License Denial, Connecticut Consent Order, and FinCEN Consent Order, as set forth above, the OFR has known about each of those documents for lengthy periods of time, yet did nothing to "enforce" the powers it is now purporting to "enforce." It strains credulity to suggest that a government agency would do nothing for several years, yet now claim that it is "enforc[ing]" a regulatory power.

31. The OFR's remaining excuses reveal the insolvency motivations behind the MTL Statute and the Complaint. In reality, and as discussed in detail below, the OFR only filed the Complaint (and prosecuted the Complaint) because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and to stamp individuals associated with BUS with an insolvency scarlet letter, in violation of section 525 of the Bankruptcy Code. Moreover, although the Florida OFR argues that "noncompliance [] legitimately raises concerns for the protection of consumers," Opposition ¶ 72, it has not identified a single consumer that has been unable to withdraw cryptocurrency assets or fiat, or how the Complaint benefits a broader segment of the public other than BUS' Florida creditors.

32. The OFR cites three cases, each of which are far-afield of the facts here,[14] and posits that the Complaint is exempt from the automatic stay because the OFR has not requested a monetary penalty. Opposition ¶¶ 68-71. Although the Complaint does not seek a monetary penalty

---

[14] In *In re Leonard*, 644 F. App'x 612, 615 (6th Cir. 2016), the Sixth Circuit held that a sanction by a federal judge was exempted from the automatic stay under section 362(b)(4) because it vindicated the integrity of the federal courts, *i.e.* a penalty. In *City & County of San Francisco v. PG&E Corp.*, 433 F.3d 1115, 1118 (9th Cir. 2006), the Ninth Circuit held that the debtor could not remove actions filed by governmental entities seeking restitution from third parties to the bankruptcy court, reasoning that the restitution actions benefitted the public at large, "not discrete and identifiable individuals or entities" such as BUS's Florida customers here. And in *In re McAtee*, 162 B.R. 574, 575 (Bankr. N.D. Fla. 1993), the court held that the Florida State Bar could assess a suspended attorney's fitness to practice law based on violation of numerous ethical rules without violating the automatic stay. None of these cases address these facts – where a government agency is asserting stale violations of law, that is has known about for years, against a liquidating debtor who will no longer be in business after the conclusion of the bankruptcy.

*per se*, that is not the legal test. Even the cases cited by the OFR state that where there are no monetary damages sought, the action must seek to protect the *public* safety and welfare from *ongoing* violations. *McAtee*, 162 B.R. at 575 (holding that section 362(b)(4) applied because the debtor sought reinstatement to practice law despite multiple ethical lapses).

33. In short, there are no ongoing violations of law, and therefore, the OFR cannot be "enforc[ing]" a police or regulatory power. *In re Royal*, 137 F. App'x 537, 540 (4th Cir. 2005) (stating that a governmental unit can only "enforce" its police or regulatory powers if it is "compel[ling] compliance" with a law or regulation that is being violated); *In re The Fairchild Corp.*, 2009 WL 4546581, at *4 (Bankr. D. Del. Dec. 1, 2009) (stating that section 362(b)(4) only applies where a governmental unit is "enforc[ing]" a police or regulatory power, i.e., "suing a debtor to ***prevent or stop*** violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws." (emphasis added)).

**B. The OFR Violated The Automatic Stay When It Threatened To Obtain A Default Against BUS**

34. The OFR argues that it has not violated the automatic stay because the Complaint "has not yet been referred" for administrative hearing, and asserts that the Debtors voluntarily requested an administrative hearing on May 22, 2023, so that the OFR could "attempt to resolve the matter." Opposition ¶¶ 5, 22, 23, 36, 37, 104. These allegations are flat out false.

35. The evidence demonstrates that on May 9, 2023, BUS notified the OFR of the bankruptcy. Merriman Decl., Ex. I. The OFR's response was to demand that BUS serve a request for a hearing or otherwise face a default. *Id.*, Ex. J. The OFR could have sought relief from stay or confirmation that the automatic stay did not apply – but it did neither of those. *See, e.g.*, *In re Allentown Ambassadors, Inc.*, 361 B.R. 422, 459 (Bankr. E.D. Pa. 2007) (stating that parties that does not seek relief from the automatic stay acts "at their own peril"); *In re Gagliardi*, 290 B.R.

808, 818 (Bankr. D. Colo. 2003) (similar). Instead, the OFR resorted to self-help, threatening BUS with a default. Because section 362(b)(4) does not apply, the OFR violated the automatic stay.

### C. The OFR Should Be Held In Contempt

36. The OFR's last gasp argument is that it should not be held in contempt because section 362(b)(4) is "much litigated and controversial," and that courts have taken different analytical approaches (an "enforcement" analysis vs. the "pecuniary purpose" and "public policy" tests). Opposition ¶ 94. This argument should be rejected.

37. It is well-established that section 362(b)(4) "is intended to be given a **narrow** construction." *Fairchild*, 2009 WL 4546581, at *4 (citing 124 Cong. Rec. H 11089, reprinted in 1978 U.S. Code Cong. & Admin. News 6436, 6444-445) (emphasis in original). The reason it is given a narrow construction is that the Bankruptcy Code gives governmental units a "safety valve"—they can request relief from the automatic stay. *Fairchild*, 2009 WL 4546581, at *4. Rather than take that safety valve, the OFR opted to exercise self-help and shift the burden to the Debtors' to enforce the automatic stay. The OFR made that decision at its own peril.

38. Moreover, there is no difference in "analytical approaches" under section 362(b)(4). The "pecuniary purpose" and "public policy" tests simply embody the principle that a governmental entity must be acting to prevent or stop *ongoing* violations of public health and safety laws, rather than to advance its own *or its citizens'* monetary interests. *See, e.g.*, *Chao*, 270 F.3d at 390; *Fairchild*, 2009 WL 4546581, at *4. Therefore, the Court should reject the OFR's argument, and hold it in contempt for violating the automatic stay.

## II. The Complaint Violates Section 525 Of The Bankruptcy Code

39. The Motion explains that the OFR's actions violate section 525(a). Motion ¶¶ 38-42. That is because the Complaint does not allege any public harm or recent conduct that violates

Florida law. Instead, the OFR referred only to the FinCEN Consent Order, the Connecticut Consent Order, and the NYDFS License Denial that concern operational periods ending, at their latest, in late 2018 and mid-2019, and the OFR did nothing for years. The evidence demonstrates that the reason the OFR filed the Complaint was BUS' insolvency. Maria Decl. ¶ 2.

40. The OFR's Opposition only further exposes that the claims in the Complaint are mere pretext, and that the real reason it filed the Complaint was to punish BUS and individuals associated with BUS for purported insolvency. The OFR sets out six "violations" for which it filed the Complaint (half of which it apparently decided not to include in the Complaint): (1) the NYDFS License Denial; (2) the Connecticut Consent Order; (3) the FinCEN Consent Order; ▌

▌ *Id.* ¶¶ 9, 10, 11, 12, 72. But a review of the evidence demonstrates that the OFR's proximate reason for filing the Complaint was its belief that BUS is insolvent.

41. **NYDFS License Denial** – BUS disclosed the NYDFS License Denial to the Florida OFR in April 2019 and in July 2019. It follows that the Florida OFR knew about the NYDFS License Denial for nearly four years before it filed the Complaint. During that four year period, the Florida OFR did nothing.

42. **Connecticut Consent Order** – BUS disclosed the Connecticut Consent Order to the Florida OFR in October 2020. Thus, the Florida OFR knew about the Connecticut Consent Order for two-and-half years before it filed the Complaint, yet during that period, it did nothing.

43. **FinCEN Consent Order** – BUS disclosed the FinCEN Consent Order to the Florida OFR in October 2022. The Florida OFR knew about the FinCEN Consent Order for six months before it filed the Complaint, yet during that period, it did nothing.

44. █████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ The Florida OFR did not include any of these details in the Opposition, and it refused to produce any documents in connection with this allegation.

45. █████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████ Moreover, the OFR refused to produce any documents in connection with this allegation.

46. █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

47. Section 525 specifically prevents governmental entities from revoking license against persons that are debtors *or that are associated with debtors* because the debtor "has been insolvent before the commencement of the case under this title," and the Supreme Court has made clear that section 525(a) applies where the "proximate cause of the cancellation" is that the debtor is a debtor or was insolvent. *F.C.C. v. NextWave Personal Comm's Inc.*, 537 U.S. 293, 301-02

(2003).[15]  The OFR has provided no evidence to meet its burden of articulating "a legitimate, nondiscriminating reason for its adverse actions in order to prevail." *In re Metro Trans. Co.*, 64 B.R. 968, 975-76 (Bankr. E.D. Pa. 1986).[16]  Unlike the government actor *In re Leopard*, 272 B.R. 507, 509 (Bankr. M.D. Fla. 2002) that presented numerous non-financial reasons for the license revocation, Florida OFR sought license revocation primarily on *recent* financial condition findings, and incidentally on alleged wrongdoing from remote time periods.

48.  Financial responsibility statutes such as the Florida's MTL Statute punish insolvency and usurp this Court's role in administering property of the estate equally and ratably for all creditors.  Section 525 of the Bankruptcy Code prevents governmental units such as the OFR from supplanting this Court's role by claiming to be acting on behalf of its residents who happen to be creditors of these bankruptcy estates (whose claims will be paid in full).

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court grant the Motion.

---

[15] *See, e.g.*, *Matter of Son-Shine Grading, Inc.*, 27 B.R. 693, 694-95 (Bankr. E.D. N.C. 1983) (holding that defendant violated section 525 where it disqualified debtor as a bidder due to the debtor's insolvency and bankruptcy); *Matter of Lambillotte*, 25 B.R. 392, 393-94 (Bankr. M.D. Fla. 1982) (denial of building contractor's license violated section 525 because notwithstanding the agency's arguments about why it denied the license, the evidence as a whole showed the agency was primarily concerned with the debtor's previous insolvency); *In re Coleman Am. Moving Servs., Inc.*, 8 B.R. 379, 384 (Bankr. D. Kan. 1980) (holding that defendant violated section 525 when it refused to consider debtor's bid based on the debtor's insolvency); 4 Collier on Bankruptcy ¶ 525.02[2][a] (2023) ("[I]t is clear that, at a minimum, if the government's action would not have occurred but for [insolvency], the action is prohibited.").

[16] The OFR argues that lack of future financial ability is a valid non-bankruptcy consideration. Opposition ¶ 87. But the OFR does not provide evidence that it filed the Complaint due to BUS' *future* financial ability.  Nor could it, because BUS notified the OFR that it was going to wind down its affairs before the Complaint.  Florida OFR's reliance on *In re Christmas*, 102 B.R. 447 (Bankr. D. Md. 1989), therefore lacks relevance because the debtor in *Christmas* could not meet the *prospective* financial requirements of licensure.  The OFR, in stark contrast, seeks to *revoke* BUS's License based on *past* insolvency to *prevent* future licensure by anyone associated with BUS.  Opposition ¶ 89.

| | |
|---|---|
| Date: September 15, 2023<br>Wilmington, DE | **YOUNG CONAWAY STARGATT & TAYLOR, LLP**<br><br>*/s/  Kenneth Enos*<br>Robert S. Brady (Delaware Bar No. 2847)<br>Kenneth Enos (Delaware Bar No. 4544)<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Telephone: 302-571-6600<br>Facsimile: 302-571-1253<br>Email: rbrady@ycst.com<br>Email: kenos@ycst.com<br><br>**QUINN EMANUEL URQUHART & SULLIVAN, LLP**<br>Susheel Kirpalani *(admitted pro hac vice)*<br>Patricia B. Tomasco *(admitted pro hac vice)*<br>Daniel Holzman *(admitted pro hac vice)*<br>Alain Jaquet *(admitted pro hac vice)*<br>Razmig Izakelian *(admitted pro hac vice)*<br>Valerie Ramos *(admitted pro hac vice)*<br>Joanna D. Caytas *(admitted pro hac vice)* 51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>Telephone: 212-849-7000<br>Facsimile: 212-849-7100<br>Email: susheelkirpalani@quinnemanuel.com<br>Email: pattytomasco@quinnemanuel.com<br>Email: danielholzman@quinnemanuel.com<br>Email: alainjaquet@quinnemanuel.com<br>Email: razmigizakelian@quinnemanuel.com<br>Email: valerieramos@quinnemanuel.com<br>Email: joannacaytas@quinnemanuel.com<br><br>**COUNSEL FOR THE DEBTORS** |