### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Desolation Holdings, LLC, *et al.*, | Case No. 23-10597 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 294** |

### OBJECTION OF THE UNITED STATES OF AMERICA TO THE DEBTORS' DISCLOSURE STATEMENT

The United States of America (the "United States") objects to the Debtors' Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation of Desolation Holdings, LLC and its Affiliated Debtors (Dk No. 294) and in support thereof, states the following:

### Factual Background

1.      On May 8, 2023 (the "Petition Date"), Desolation Holdings, LLC, Bittrex, Inc., Bittrex Malta Holdings, Ltd and Bittrex Malta Ltd (collectively, the "Debtors") filed voluntary petitions for bankruptcy under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2.      Prior to the Petition Date, the Debtor Bittrex, Inc. ("Bittrex") entered into settlement agreements with the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") and the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") for its apparent violations of federal laws by engaging

in business with foreign nationals from restricted, blocked or otherwise sanctioned nations.[1]

3.    Specifically, Bittrex admitted to violating the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311-5314, 5316-5336 and 12 U.S.C. §§ 1829b, 1951-1960, and its implementing regulations, 31 C.F.R. Chapter X (collectively, "Bank Secrecy Law").  From February 2014 through December 2018, Bittrex willfully violated the BSA's Anti-Money Laundering ("AML") Program and suspicious activity reporting requirement.    Bittrex's inadequate AML compliance program and transaction monitoring left its platform open to abuse by bad actors, including money launderers, terrorist financiers, ransomware attackers, and sanctions evaders.  Bittrex's failure to implement adequate procedures or controls led to its failure to identify and report suspicious transactions to FinCEN, including transactions involving sanctioned jurisdictions.

4.    Also, OFAC and Bittrex agreed that Bittrex apparently violated  the following sanctions programs administered by OFAC: (a) the Cuban Assets Control Regulations, 31 C.F.R. part 515 ("CACR"); (b) the Iranian Transactions and Sanctions Regulations, 31 C.F.R. part 560 ("ITSR"); (c) the Syrian Sanctions Regulations, 31 C.F.R. part 542 ("SySR"); (d) Executive Order 13685 of December 19, 2014, Blocking Property of Certain Persons and Prohibiting Certain Transactions with Respect to the Crimea Region of Ukraine ("E.O. 13685"); and (e) the Sudanese Sanctions Regulations, 31 C.F.R. part 538 ("SSR," and, collectively,, "Sanction Programs").  By permitting an account to be opened on behalf of a

---

[1] "Blocked" generally refers to a situation where severe action is required, like freezing the account or transaction; "restricted" generally refers to a situation where something less severe than blocking is required; "sanctioned" is a general term that indicates a situation where OFAC or FinCEN regulation may be involved.

person located in a jurisdiction subject to the Sanction Programs, Bittrex apparently violated Bank Secrecy Law and the Sanction Programs.

5.      To resolve the investigations, Bittrex entered into a settlement and consent order: (1) a settlement agreement with OFAC signed on December 22, 2022 (the "OFAC Settlement"); and (2) a consent order imposing civil money penalties with FinCEN entered into on October 5, 2022 (the "FinCEN Settlement").   Pursuant to the OFAC Settlement, Bittrex agreed to pay OFAC $24,280,829.20 over two installments by December 31, 2024; pursuant to the FinCEN Settlement, Bittrex agreed to pay FinCEN $5,000,000.00 by December 31, 2024.[2]  Bittrex made an installment payment of $1,500,000.00 towards the total due in December 2022.  Bittrex currently collectively owes $27,780,829.20 to OFAC and FinCEN (the "Treasury Claim").  Additionally, the OFAC and FinCEN Settlements require Bittrex to establish a sanctions compliance program.

6.      On August 25, 2023, the Debtors filed their Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation of Desolation Holdings, LLC and its Affiliated Debtors (the "Disclosure Statement") (Dk No. 294) and their Amended Joint Chapter 11 Plan of Liquidation of Desolation Holdings, LLC and its Affiliated Debtors (the "Plan") (Dk No. 293).  In the Plan, the Debtors separately classify their customers and the general unsecured creditors ("GUCs").  The Plan also provides that customers will receive 100% of their cryptocurrency assets before any GUC receives any recovery.  See Plan, Art. III.D.

---

[2] Bittrex owed FinCEN $29,280,829.20 for its violations, but in light of the OFAC Settlement, FinCEN agreed to provide Bittrex with a credit of $24,280,829.20, such that, subject to certain conditions, Bittrex was only required to pay FinCEN $5 million and, in light of its payment since entering the FinCEN consent order, currently owes FinCEN $3.5 million.

7.    Currently, the Debtors hold accounts for their customers, which contain cryptocurrency assets and potentially fiat currencies.  The Plan classifies these customers as holders of Class 2A or 2B claims.  See Plan, Art.III.D.2-3.  The Plan classifies all general unsecured claims separately in class 3.  Plan, Art.III.D.4.  Although the Debtors concede that whether their customers actually own the cryptocurrency assets/fiat currencies deposited in the accounts or are creditors is unresolved, the Debtors have indicated a desire to treat their customers, at least partially, as owners of the cryptocurrency assets/fiat currencies, and allow them to withdraw their cryptocurrency assets as their treatment under the Plan.  Debtors claim that certain of these accounts are "dark," and have been dormant for some amount of time, although only the Debtors likely know the dormancy period.

8.    A certain number of foreign nationals from sanctioned nations are customers of the Debtors.  Unless they apply for a license with OFAC, the Debtors may not be able to utilize these foreign nationals' cryptocurrency assets as part of the Plan's distribution scheme, or otherwise permit the withdrawal of those assets.  *See* 31 C.F.R. § 501.801.

9.    Since the Petition Date, various state governments have filed claims against the Debtors for unclaimed property or for escheatment.  *See, e.g.*, Proofs of Claim Nos. 370, 371, 372, 457 and 611 filed in case 23-10598.  Most of these claims are for unknown amounts and are fully redacted or contain no supporting documentation.  With a governmental bar date of November 4, 2023, the universe of potential unclaimed property claims is currently unclear.

10.    The Disclosure Statement fails to explain the Debtors' regulatory requirements regarding foreign nationals' accounts subject to the Sanction Programs, fails

4

to explain whether state unclaimed property claims are treated as GUCs or as customers/account holders, and is bereft of many other details which are necessary to help parties-in-interest understand how distributions will be made under the Plan, as well as how the Plan will function and whether it is feasible as proposed.

**<u>Relevant Statutes and Regulations</u>**

11.     Generally, OFAC regulations prohibit United States persons from engaging in business or financial transactions with persons in blocked, restricted or otherwise sanctioned nations, or that would otherwise implicate any Sanction Program. *See* 31 C.F.R. part 501; *see also Sanctions Compliance Guidance for the Virtual Currency Industry*, United States Department of the Treasury, Office of Foreign Assets Control, October 2021, https://ofac.treasury.gov/media/913571/download?inline.  OFAC statutes and regulations govern how the Debtors may transfer sanctioned persons' accounts or potentially make disbursements to such persons.

12.     Under 31 C.F.R. § 501.801, OFAC may authorize otherwise prohibited transactions or activities through general or specific licenses.  Applications for licenses to engage in any prohibited transactions or to unblock funds must be signed, either manually or electronically, and submitted through OFAC's Reporting and License Application Forms system (https://ofac.treasury.gov/ofac-license-application-page).  *Id.*  § 501.801(b)(2).

13.     License applicants must supply all information specified by the OFAC application, forms and relevant instructions (available on OFAC's Reporting and License Application Forms page at https://licensing.ofac.treas.gov), and must fully disclose the names of all parties who are concerned with or interested in any proposed transaction.  *Id.*

§ 501.801(b)(2)(ii).  Applicants may also be required to furnish further information as OFAC deems necessary. *Id.*

14.    OFAC reviews each request for a license on a case-by-case basis. *Sanctions Compliance Guidance for the Virtual Currency Industry*, United States Department of the Treasury,    Office    of    Foreign    Assets    Control,    October    2021, https://ofac.treasury.gov/media/913571/download?inline. The license process often requires coordination with other federal agencies before OFAC can reach a determination. *Id*.

## Legal Standard

15.    A disclosure statement must contain "adequate information" about the debtor and must be provided to "each holder of a claim or interest of a particular class." 11 U.S.C. § 1125(c).  Section 1125 broadly defines adequate information to mean:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan . . .

11 U.S.C. § 1125(a)(1); *see In re Zenith Elecs. Corp.*, 241 B.R. 92, 99 (Bankr. D. Del. 1999). "Adequate information" is "information sufficient for parties" to make an informed voting decision. 11 U.S.C. § 1125(a); *Zenith*, 241 B.R. at 99; *see, e.g., In re Monroe Well Serv., Inc.*, 80 B.R. 324, 332 (Bankr. E.D. Pa. 1987); *In re Nw. Recreational Activities, Inc.*, 8 B.R. 10, 11 (Bankr. N.D. Ga. 1980) (disclosure statement must "furnish . . . sufficient financial and operating information to enable each [party] to make an informed

judgment whether to approve or reject the proposed plan."). Among other things, debtors must disclose information relevant to plan funding, *see In re Fierman*, 21 B.R. 314, 316 (Bankr. E.D. Pa. 1982) (disclosure statement should detail matters affecting plan funding), including any contingencies impacting a debtor's capacity to pay its claims. *See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003). Failing to identify restrictions on funds' use or to describe disputes against debtors and their assets justifies denying disclosure statement approval. *See Hall v. Vance*, 887 F.2d 1041, 1043 (10th Cir 1989) (affirming denial of approval of disclosure statement which failed, *inter alia*, to identify funds held in escrow for tenants and status of any litigation against the debtors and their assets).

<u>**Argument**</u>

16.     The Disclosure Statement lacks adequate information for creditors to make an informed voting decision. First, the Disclosure Statement fails to describe the Debtors' obligations to submit a license application with OFAC; second, the Disclosure Statement fails to adequately describe potential escheatment and unclaimed property claims and how they may impact distributions under the Plan; and third, the Disclosure Statement fails to explain under what circumstances the Debtors and/or the Wind Down Entity may choose to reclassify GUC claims as Subordinated Claims. This missing information is necessary for creditors to make an informed voting decision on the Plan, and the Disclosure Statement should not be approved.

**A.   <u>The Disclosure Statement Fails to Adequately Describe the Debtors' Obligations Under Federal Law</u>**

17.     While the Disclosure Statement discusses the Debtors' customers' required regulatory obligations to potentially withdraw their cryptocurrency assets, the Disclosure

Statement is silent on the Debtors' regulatory obligations. Because the Debtors' Plan depends on their customers' withdrawal of their cryptocurrency assets, to make an informed voting decision, creditors need to know whether this can occur, under what conditions, and the risks involved, including any regulatory compliance issues and the consequences of non-compliance.[3]

18.     As described in the regulatory section above, the Debtors must comply with the Sanction Programs, including obtaining a license, to potentially distribute cryptocurrency assets to persons in blocked, restricted or otherwise sanctioned nations, or that would otherwise implicate any Sanction Program, or to transfer such accounts to a non-debtor entity that will assume responsibility for these accounts. In submitting a license application and providing OFAC with the names, addresses and account details of the foreign nationals connected to the Sanction Programs, OFAC will be able to determine whether certain foreign nationals can receive distributions directly from the Debtors. This would allow such customers to withdraw their cryptocurrency assets according to the Plan.

19.     Furthermore, should a government shutdown occur on October 1, 2023, OFAC's ability to process a license application may be impacted, possibly impacting the Debtors' implementation of the Plan. Such an event is beyond the control of the United States' executory branch.

20.     The Disclosure Statement fails to discuss any of these requirements, and as such, lacks adequate information.

---

[3] Absent authorization from OFAC, such withdrawals may violate Sanctions Programs if they involve prohibited transactions with sanctioned persons or jurisdictions.

**B.  The Disclosure Statement Fails to Adequately Describe the Risks the Escheatment and Unclaimed Property Claims Pose to General Unsecured Creditor Distributions Under the Plan**

21.    At least ten state governments have filed proofs of claim for unclaimed property or escheatment claims.  Most of these claims are fully redacted or missing necessary documents, and the total dollar amounts of the claims are not visible from the claims docket.[4]  Further, as the government bar date is November 4, 2023, more state governments may file proofs of claims for unclaimed property or escheatment.  Thus, the total amount of escheatment/unclaimed property claims is unclear.[5]

22.    Although the Disclosure Statement (§ VII.E.ii.5) states that such unclaimed property or escheatment claims shall be disallowed if creditors in classes 2A or 2B fail to withdraw their cryptocurrency assets or if a distribution is returned as undeliverable, this is insufficient for creditors to make an informed voting decision on the Plan.  While section 347(b) may deal with unclaimed distributions after confirmation and a plan's effective date, it does not address prepetition claims for escheatment or unclaimed property where the dormancy period ended before the Petition Date.

23.    Section 347 only preempts state unclaimed property laws for unclaimed bankruptcy estate distributions or escheatment and unclaimed property claims that arise after the Petition Date.  *See In re Continental Airlines, Inc., et al.,* 161 B.R. 101, 106 (Bankr. D. Del. 1993); *In re Drexel Burnham Lambert Group*, 151 B.R. 684, 691-96 (Bankr. S.D.N.Y. 1993) (state comptroller could file a claim for property that should have been turned over under abandoned property laws prior to commencement of the bankruptcy

---

[4] The United States received from the Debtors and/or Omni copies of these claims including the supporting documentation, but the documentation does not sum the hundreds of entries.

[5] It appears that a multi-state audit of unclaimed property was being conducted prior to the Petition Date, but it is not clear if it was completed.

case, but not property that was due to be turned over after the petition); *see also Arkansas v. Federated Dep't Stores*, 175 B.R. 924, 932 (S.D. Ohio 1992) (a state could file a claim for unclaimed credit card balances if the debtor should have turned over that property under the state's abandoned property laws prior to the petition, because section 347(b) deals with property that is first distributable under a chapter 11 plan and the state's claim was for property that was due and owing prior to the bankruptcy case). *But see In re Thomson McKinnon Secs., Inc.*, 125 B.R. 88, 93 (Bankr. S.D.N.Y. 1991) (state comptroller could not file claim under abandoned property law for unclaimed funds held by debtor prior to commencement of bankruptcy case).

24.    Only the Debtors (and potentially the multi-state auditor) know when certain accounts became dormant; thus, only the Debtors know whether they face any real prepetition escheatment or unclaimed property claims.   Whether the Debtors classify prepetition escheatment or unclaimed property claims in classes 2A/2B, as being derivative of the claims of customers, or in class 3 with other GUCs is also unclear.  If the prepetition escheatment or unclaimed property claims are derivative of customer claims, those claims will receive a property distribution before GUCs.  If these claims are significant, they may impact the proposed distributions to, at least, class 3 (GUC) creditors.  Although the Debtors have indicated to the United States that they believe these claims will not upset the proposed waterfall of distributions, the Disclosure Statement fails to make that claim and fails to provide an analysis supporting this belief.

25.    Further details about the unclaimed property and escheatment claims and their impact on claim distribution must be added to the Disclosure Statement for creditors to make an informed voting decision.

C. __The Disclosure Statement Fails to Adequately Explain How and When GUC Claims Could Be Reclassified as Subordinated Claims__

26.     Generally, the Plan classifies holders of Subordinated Claims into class 4; however, neither the Liquidation Analysis nor the Disclosure Statement describes the particular claims in this class.

27.     Moreover, the Plan permits the Debtors and/or the Wind Down Entity to reclassify any GUC claim as a Subordinated Claim in their sole discretion.  *See* Disclosure Statement, § VII.C.viii; Plan, Art. III.K.  The Disclosure Statement and Plan provide no explanation of why, how or when the Debtors or the Wind Down Entity would reclassify a GUC claim, creating a situation where no GUC can be sure of its treatment.

28.     Subordination under section 510(c) of the Bankruptcy Code likely requires an adversary proceeding under Fed. R. Bankr. P. 7001(8), and the United States reserves all rights to address this further at confirmation.

29.     Without an explanation as to how the subordination reclassification will function, the Disclosure Statement cannot be approved as containing adequate information.

### Reservation of Rights

30.     The Plan raises several concerns which the United States will address in a separate objection to confirmation.  The United States reserves all rights to amend this objection and otherwise protect its claims and interests in this case.

### Conclusion

For the foregoing reasons, the Court should not approve the Disclosure Statement unless modifications are made to provide adequate information and to protect the rights of the United States consistent with the foregoing objections.

Dated:  September 21, 2023.

Respectfully submitted,


BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General


/s/ *Leah V. Lerman*
KIRK MANHARDT
RODNEY MORRIS
LEAH V. LERMAN (Fed. Bar No. 28669)
CORTNEY ROBINSON
Civil Division
U. S. Department of Justice
P. O. Box 875
Ben Franklin Station
Washington, D.C.  20044-0875
(202) 307-0452 (telephone)
(202) 514-9163 (facsimile)
Email: Leah.V.Lerman@usdoj.gov


*ATTORNEYS FOR THE UNITED STATES*

## Certificate of Service

The undersigned certifies that she served a true and correct copy of the foregoing Objection on the parties receiving ECF notice in this case by ECF notification on September 21, 2023.

*s/ Leah V. Lerman*
Leah V. Lerman
Trial Attorney