# Exhibit 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Desolation Holdings LLC, *et al.*,[1] | Case No. 23-10597 (BLS) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR THE AMENDED JOINT CHAPTER 11 PLAN
## OF LIQUIDATION OF DESOLATION HOLDINGS LLC
## AND ITS AFFILIATED DEBTORS

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Susheel Kirpalani *(admitted pro hac vice)*
Patricia B. Tomasco *(admitted pro hac vice)*
Daniel Holzman *(admitted pro hac vice)*
Alain Jaquet *(admitted pro hac vice)*
Razmig Izakelian *(admitted pro hac vice)*
Valerie Ramos *(admitted pro hac vice)*
Joanna Caytas *(admitted pro hac vice)*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: 212-849-7000
Facsimile: 212-849-7100
Email: susheelkirpalani@quinnemanuel.com
Email: pattytomasco@quinnemanuel.com
Email: razmigizakelian@quinnemanuel.com
Email: danielholzman@quinnemanuel.com
Email: alainjaquet@quinnemanuel.com
Email: valerieramos@quinnemanuel.com
Email: joannacaytas@quinnemanuel.com

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Robert S. Brady (Delaware Bar No. 2847)
Kenneth Enos (Delaware Bar No. 4544)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: 302-571-6600
Facsimile: 302-571-1253
Email: rbrady@ycst.com
Email: kenos@ycst.comkenos@ycst.com
*Co-Counsel to the Debtors and Debtors in Possession*

*Co-Counsel to the Debtors and Debtors in Possession*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Ltd. (1764); and Bittrex Malta Holdings Ltd. (2227). The Debtors' mailing and service address is 701 5th Ave, Suite 4200, Seattle, WA 98104.

30699387.1

*Counsel to the Debtors and Debtors in Possession*

Dated: ~~August 25~~September 22, 2023

## DISCLAIMER

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT ("DISCLOSURE STATEMENT") TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF DESOLATION HOLDINGS LLC AND ITS AFFILIATED DEBTORS ("PLAN"). NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

ALL HOLDERS OF CLAIMS OR INTERESTS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. IN PARTICULAR, ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER THE RISK FACTORS SET FORTH IN SECTION VIII OF THIS DISCLOSURE STATEMENT—"CERTAIN RISK FACTORS TO BE CONSIDERED"—BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE. FURTHERMORE, BANKRUPTCY COURT APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS

DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL ACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENT, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

FURTHER, CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT," AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN SECTION VIII OF THIS DISCLOSURE STATEMENT, "CERTAIN RISK FACTORS TO BE CONSIDERED." IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. THE DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FURTHER EVENTS, OR OTHERWISE.

THE DEBTORS' MANAGEMENT, WITH THE ASSISTANCE OF THE DEBTORS' FINANCIAL ADVISORS, PREPARED THE LIQUIDATION ANALYSIS APPENDED TO THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE PRESENTED THESE PROJECTIONS WITH NUMERICAL SPECIFICITY, THEY HAVE NECESSARILY BASED THE LIQUIDATION ANALYSIS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE AT THE TIME OF PREPARATION, ARE INHERENTLY SUBJECT TO UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE DEBTORS' OR THE WIND DOWN ENTITY'S CONTROL. THE DEBTORS CAUTION THAT THEY CANNOT MAKE ANY REPRESENTATIONS AS

TO THE ACCURACY OF THE LIQUIDATION ANALYSIS OR TO THE ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.  FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES.

ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.   HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, THOSE HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF

CLAIMS AND INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.  THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THE DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY STATE AUTHORITY.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS DISCLOSURE STATEMENT, NOTHING IN THIS DISCLOSURE STATEMENT CONSTITUTES A FINDING UNDER U.S. FEDERAL SECURITIES LAWS, FOREIGN SECURITIES LAWS OR ANY STATE SECURITIES LAWS AS TO WHETHER CRYPTOCURRENCY OR TRANSACTIONS INVOLVING CRYPTOCURRENCY ARE SECURITIES.  THE SEC AND ITS STAFF HAVE TAKEN THE POSITION THAT CERTAIN CRYPTOCURRENCY ASSETS FALL WITHIN THE DEFINITION OF A "SECURITY" UNDER THE U.S. FEDERAL SECURITIES LAWS.  THE LEGAL TEST FOR DETERMINING WHETHER ANY GIVEN CRYPTOCURRENCY ASSET OR TRANSACTION INVOLVING CRYPTOCURRENCY IS A SECURITY IS A HIGHLY COMPLEX, FACT-DRIVEN ANALYSIS THAT EVOLVES OVER TIME, AND THE DETERMINATION AS TO WHETHER A CRYPTOCURRENCY ASSET OR A TRANSACTION INVOLVING CRYPTOCURRENCY MAY CONSTITUTE A "SECURITY" UNDER APPLICABLE LAWS IS A DETERMINATION FOR THE SEC, APPLICABLE STATE AND FOREIGN REGULATORY AUTHORITIES AND COURTS WITH PROPER JURISDICTION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B).  THE SECURITIES TO BE ISSUED ON OR AFTER THE EFFECTIVE

DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER ("SECURITIES ACT"), OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER APPLICABLE STATE SECURITIES LAW (COLLECTIVELY, THE "BLUE SKY LAWS").  THE SOLICITATION OF VOTES ON THE PLAN IS BEING MADE IN RELIANCE ON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE ("SOLICITATION").  NEITHER THE SOLICITATION NOR THIS DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:

- THE DEBTORS' REGULATORY LICENSES;
- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS;
- THE DEBTORS' LEVELS OF INDEBTEDNESS;
- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;
- THE DEBTORS' FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;
- GENERAL ECONOMIC AND BUSINESS CONDITIONS;
- THE OUTCOME OF PENDING AND FUTURE LITIGATION;
- EXCHANGE RATE FLUCTUATIONS AND CRYPTOCURRENCY PRICE FLUCTUATIONS;
- PLANS, OBJECTIVES, AND EXPECTATIONS;
- RISKS IN CONNECTION WITH DISPOSITIONS; AND
- RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE WIND DOWN ENTITY'S FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE WIND DOWN ENTITY'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE IT MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW.  THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:

- **THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES;**
- **THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS' BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;**
- **CHANGES TO A PARTICULAR CRYPTOCURRENCY ASSET'S OR PRODUCT OFFERING'S STATUS AS A "SECURITY" IN ANY RELEVANT JURISDICTION UNDER RELEVANT LAWS AND REGULATIONS OR REGULATORY INTERPRETATION THEREOF;**
- **LOSS OF CRITICAL BANKING OR INSURANCE RELATIONSHIPS;**
- **CUSTOMER RESPONSES TO THE CHAPTER 11 CASES;**
- **THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE PLAN;**
- **VOLATILITY OF THE DEBTORS' FINANCIAL RESULTS AS A RESULT OF THE CHAPTER 11 CASES;**
- **THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS AND FUND THE WIND DOWN ENTITY;**
- **RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC CONDITIONS AND THEIR IMPACT ON DEMAND FOR DIGITAL ASSETS;**
- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;**
- **SHIFTS IN POPULATION AND OTHER DEMOGRAPHICS;**
- **LEGISLATIVE OR REGULATORY REQUIREMENTS; AND**
- **FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES, AND CURRENCY VALUES.**

**YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, FINANCIAL PROJECTIONS, AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

## TABLE OF CONTENTS

**I. INTRODUCTION** — **9**

A.      Overview of the Debtors and the Causes Leading to the Chapter 11 Cases — 9

B.      Voting Procedures — 12

C.      Brief Overview of the Plan — 13

D.      Summary of Distributions and Voting Eligibility — ~~13~~14

E.      Confirmation — ~~16~~18

**II. ~~QUESTIONS AND ANSWERS~~QUESTIONS AND ANSWERS ABOUT THIS DISCLOSURE STATEMENT  AND THE PLAN** — ~~17~~**18**

A.      What Is Chapter 11? — ~~17~~18

B.      Why Are The Debtors Sending Me This Disclosure Statement? — ~~17~~18

C.      Am I Entitled To Vote On The Plan? — ~~17~~19

D.      What Will I Receive From The Debtors If The Plan Is Consummated? — ~~18~~19

E.      What Will I Receive From The Debtors If I Hold An Allowed Claim? — ~~18~~19

F.      Why Do The Debtors Believe That The Plan Provides The Greatest Distribution Possible To Holders Of Claims? — ~~18~~20

G.      Can I Vote If I Transferred My Claim To Someone Else? — ~~19~~20

H.      Can I Vote If I Am The Holder Of A Transferred Claim And If So, How? — ~~19~~20

I.      When Will I Receive My Distribution Under The Plan? What Is ~~meant~~Meant By "Confirmation," "Effective Date," And "Consummation?" — ~~19~~20

J.      What Happens To My Recovery If The Plan Is Not Confirmed Or Does Not Go Effective? — ~~20~~21

K.      If The Plan Provides That I Get A Distribution, How Will I Receive My Distribution? — ~~20~~22

L.      How Will Undeliverable Distributions And Unclaimed Property To Be Treated Under The Plan? — ~~21~~22

M.      What Is The Wind Down Entity? — ~~21~~22

N.  Who Is The Plan Administrator And What Are Its Responsibilities? ............... 2123

O.  Is There Potential Litigation Relating To The Plan? ............... 2223

P.  Will There Be Releases And Exculpations Granted To The Parties In Interest As Part Of The Plan? ............... 2324

    i.    Releases By The Debtors ............... 2324

    ii.   Releases By Holders Of Claims And Interests ............... 2325

    iii.  Exculpation ............... 2425

Q.  Do I Have To Grant The Release Under The Plan?  Can I Opt Out? ............... 2526

R.  What Is An Injunction, And Does The Plan Contain Any Injunction? ............... 2526

S.  What Is An Executory Contract Or Unexpired Lease, And What Does It Mean For The Debtors To "Assume," "Reject," Or "Assume And Assign" Such Contracts, And Why Is This Important? ............... 2728

T.  Can And Will The Debtors Assume Or Reject Any Executory Contracts? ............... 2729

U.  What Is The Deadline To Vote On The Plan? ............... 2829

V.  What Is The Deadline To Object To The Confirmation Of The Plan? ............... 2829

W.  How Do I Vote For Or Against The Plan? ............... 2829

X.  When Is The Confirmation Hearing Set To Occur? ............... 2830

Y.  What Is The Purpose Of The Confirmation Hearing? ............... 2830

Z.  Who Do I Contact If I Have Additional Questions Regarding This Disclosure Statement Or The Plan? ............... 2830

**III. DEBTORS' BUSINESS** ............... 2930

**IV. CORPORATE AND CAPITAL STRUCTURE** ............... 3032

A.  Corporate Structure ............... 3032

B.  Directors and Officers ............... 3132

C.  Debtors' Capital Structure ............... 3233

    i.    Equity Ownership ............... 3234

ii.  Loan Facilities ............................................................ 3234

iii.  Trade Payables and Ordinary Course Obligations ............... 3334

iv.  Legal Proceedings ...................................................... 3334

**V. KEY EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES** 3436

A. Causes Leading to These Chapter 11 Cases ........................... 3436

  i.  Volatile Markets ......................................................... 3436

  ii.  Increased Competition .................................................. 3537

  iii.  Crypto Winter and Regulatory Tightening ......................... 3637

B. Pre-Petition Restructuring & Marketing Efforts ...................... 3738

**VI. KEY EVENTS DURING CHAPTER 11 CASES** 3840

A. First And Second Day Relief And Other Case Matters ............... 3840

  i.  First Day Motions ....................................................... 3840

  ii.  Further Motions ......................................................... 4344

B. Bar Date Motion ............................................................ 4546

C. Schedules and Statements ................................................ 4547

D. Estimation Motion .......................................................... 4647

E. The SEC Consent Judgment .............................................. 4648

F. 341 Creditors' Meetings ................................................... 4749

G. Stay Enforcement Motion against the State of Florida, Office of Financial Regulation ....................................................... 4849

H. OFAC Restrictions on Distributions ..................................... 50

I. Unclaimed Property Claims ............................................... 51

J. The Sureties .................................................................. 51

**VII. SUMMARY OF PLAN** 4852

A. General ....................................................................... 4852

B.    Classification of Claims and Interests ................................................................ ~~49~~52

    i.    Classification in General ................................................................ ~~49~~52

    ii.    Grouping of Debtors for Convenience Only ................................ ~~49~~52

    iii.    Classification of Claims and Interests ........................................ ~~49~~53

C.    Treatment of Claims and Interests ................................................................ ~~50~~53

    i.    Classes' Classification, Treatment, and Voting ........................ ~~50~~53

    ii.    Special Provision Governing Unimpaired Claims ...................... ~~52~~55

    iii.    Elimination of Vacant Classes .................................................... ~~52~~56

    iv.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ...................................................................... ~~52~~56

    v.    Voting Classes; Presumed Acceptance by Non-Voting Classes ...... ~~53~~56

    vi.    Presumed Acceptance and Rejection of the Plan ........................ ~~53~~56

    vii.    Controversy Concerning Impairment .......................................... ~~53~~56

    viii.    Subordinated Claims and Interests .............................................. ~~53~~56

D.    Means for Implementation of the Plan ............................................................ ~~53~~57

    i.    No Substantive Consolidation .................................................... ~~53~~57

    ii.    Settlement and Compromise ........................................................ ~~53~~57

    iii.    Liquidation of the Debtors .......................................................... ~~54~~57

    iv.    Settlement of Claims After The Effective Date .......................... ~~58~~62

    v.    Sources Of Consideration For Plan Distributions ...................... ~~59~~63

    vi.    Cancellation Of Certain Existing Securities And The DIP Loan Agreement ...... ~~59~~63

    vii.    Release of Liens .......................................................................... ~~59~~63

    viii.    Corporate Action ........................................................................ ~~59~~63

    ix.    Effectuating Documents; Further Transactions .......................... ~~60~~64

    x.    Section 1146 Exemption .............................................................. ~~60~~64

~~30699387.1~~

| | | | |
|---|---|---|---|
| xi. | Preservation of Causes of Action | | ~~61~~65 |
| xii. | Payment of Certain Fees | | ~~61~~65 |
| xiii. | Document Retention | | ~~62~~66 |
| xiv. | Closing of Chapter 11 Cases | | ~~62~~66 |
| xv. | Notice of Effective Date | | ~~62~~66 |
| xvi. | Separability | | ~~62~~66 |
| ~~xvii.~~ | ~~Limitation on Debtors' Obligations in Connection with Resolved Actions.~~ | | ~~62~~ |
| E. | Distributions | | ~~62~~66 |
| i. | Timing and Calculation of Amounts to Be Distributed | | ~~62~~66 |
| ii. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | | ~~63~~67 |
| iii. | Special Rules For Distributions To Holders Of Disputed Claims And Interests | | ~~64~~68 |
| iv. | Manner Of Payment | | ~~64~~68 |
| v. | Compliance With Tax Requirements | | ~~64~~68 |
| vi. | Setoffs and Recoupment | | ~~65~~69 |
| vii. | No Double Payment of Claims | | ~~65~~69 |
| viii. | Claims Paid or Payable by Third Parties | | ~~65~~69 |
| F. | Procedures for Resolving Claims | | ~~66~~70 |
| i. | Allowance of Claims | | ~~66~~70 |
| ii. | Claims Administration Responsibilities | | ~~66~~70 |
| iii. | Adjustment to Claims Without Objection | | ~~67~~71 |
| iv. | Time to File Objections to Claims or Interests | | ~~67~~71 |
| v. | Estimation of Claims | | ~~67~~71 |
| vi. | Disputed and Contingent Claims Reserve | | ~~67~~71 |
| vii. | Disallowance of Claims | | ~~68~~72 |

~~30699387.1~~

| | | | |
|---|---|---|---|
| viii. | Amendments to Proofs of Claim | | 68 72 |
| ix. | Reimbursement or Contribution | | 68 72 |
| x. | No Distributions Pending Allowance | | 69 73 |
| xi. | Distributions After Allowance | | 69 73 |
| G. | Executory Contracts and Unexpired Leases | | 69 73 |
| i. | Rejection of Executory Contracts and Unexpired Leases | | 69 73 |
| ii. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | | 69 73 |
| iii. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | | 70 74 |
| iv. | Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases | | 71 75 |
| v. | Indemnification Obligations | | 71 75 |
| vi. | Insurance Policies | | 71 75 |
| vii. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | | 72 76 |
| viii. | Reservation of Rights | | 72 76 |
| ix. | Nonoccurrence of Effective Date | | 72 76 |
| H. | Conditions Precedent to the Occurrence of the Effective Date | | 72 77 |
| i. | Conditions Precedent to Confirmation | | 73 77 |
| ii. | Conditions Precedent to the Effective Date | | 73 78 |
| iii. | Waiver of Conditions | | 74 78 |
| iv. | Substantial Consummation | | 74 78 |
| v. | Effect of Failure of Conditions | | 74 78 |
| **VIII. TAX CONSEQUENCES** | | | 74 78 |
| A. | Introduction | | 74 78 |
| B. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors | | 76 80 |

30699387.1

11606-00001C/14200336.11

C.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of
      Allowed Claims Entitled to Vote ................................................ 77 81

      i.    The Liquidation .......................................................... 77 81

      ii.   Certain U.S. Federal Income Tax Consequences to U.S. Holders of
            Owning and Disposing of Cryptocurrency Received Under the Plan ........ 81 85

      iii.  The Wind Down Entity ................................................... 81

D.    Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders
      of Allowed Claims ........................................................... 81 85

      i.    Gain Recognition ....................................................... 81 85

      ii.   U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning
            and Disposing of Cryptocurrency Received Under the Plan ............... 82 86

E.    FATCA ....................................................................... 82 86

F.    U.S. Information Reporting and Withholding ................................... 82 87

**IX. CERTAIN RISK FACTORS TO BE CONSIDERED** ...................................... 83 **87**

A.    Certain Bankruptcy Law Considerations ....................................... 83 88

      i.    Risk of Non-Confirmation of the Plan ................................... 83 88

B.    Additional Risk Factors to be Considered .................................... 84 88

      i.    Nonconsensual Confirmation ............................................. 84 88

      ii.   Claim Objections ....................................................... 84 88

      iii.  Distributions .......................................................... 84 88

      iv.   Administrative Insolvency .............................................. 84 89

      v.    The Debtors Have No Duty to Update ..................................... 85 89

      vi.   No Representations Outside This Disclosure Statement Are Authorized .... 85 89

      vii.  No Legal or Tax Advice Is Provided to You by This Disclosure Statement . 85 90

      viii. No Admission Made ...................................................... 85 90

      ix.   Failure to Identify Litigation Claims or Projected Objections .......... 85 90

30699387.1

11606-00001C/14200336.11

x.      No Waiver of Right to Object or Right to Recover Transfers and Assets ........ 8590

xi.     Information Was Provided by Debtors and Was Relied Upon by Debtors'
        Advisors .................................................................................................... 8690

xii.    Amendment, Waiver, Modification, or Withdrawal of Plan ........................ 8690

xiii.   Non-Occurrence or Delayed Occurrence of the Effective Date ................... 8691

xiv.    Conversion to Chapter 7 ............................................................................. 8691

xv.     Dismissal of the Chapter 11 Cases ............................................................. 8791

xvi.    Cost of Administering the Debtors' Estates ................................................ 8791

**X. CONFIRMATION OF PLAN** .......................................................................... 8791

A.      Confirmation Hearing ................................................................................. 8791

B.      Objections to Confirmation ........................................................................ 8792

C.      Requirements for Confirmation of Plan ...................................................... 8893

i.      Requirements of Section 1129(a) of the Bankruptcy Code ......................... 8893

ii.     Alternative to Confirmation and Consummation of the Plan ...................... 9196

**XI. CONCLUSION AND RECOMMENDATION** .................................................. 9296

**EXHIBITS**

**EXHIBIT A**          Plan

**EXHIBIT B**          Organizational Chart

**EXHIBIT C**          Liquidation Analysis

# I.
# INTRODUCTION

Debtors Desolation Holdings LLC ("Desolation"), Bittrex, Inc. ("BUS"), Bittrex Malta Holdings Ltd. ("Malta Holdings"), and Bittrex Malta Ltd. ("Malta OpCo") (collectively, the "Debtors") submit this Disclosure Statement in connection with the solicitation of votes on their Plan.  A copy of the Plan is attached hereto as **Exhibit A** and is incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.[2]

**THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS.  THE DEBTORS BELIEVE THAT THE PLAN IS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.    THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## A.    Overview of the Debtors and the Causes Leading to the Chapter 11 Cases

The Debtors filed voluntary petitions (the "Petitions") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on May 8, 2023 (the "Petition Date").  On the Petition Date, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases (the "Chapter 11 Cases") pursuant to Bankruptcy rule 1015(b) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rule[s]").

The Debtors are part of a group of over two dozen domestic and international companies (collectively, "Bittrex"), which has operated two cryptocurrency exchanges and provided online platforms for access to the exchanges to customers in different jurisdictions.  Debtor BUS, a Georgia corporation, operated a cryptocurrency exchange in the United States, serving U.S. customers.  As such, BUS fell under U.S. regulatory oversight and was affected by U.S. macroeconomic trends.  Non-debtors Bittrex Global GmbH ("BG") and Bittrex Global (Bermuda) Ltd. ("BGB") operate Bittrex's cryptocurrency exchange outside of the United States.  Malta Holdings and Malta OpCo served non-U.S. customers, but it ceased operating in 2019 after notifying their customers to transfer their accounts to BG.

In 2022, Bittrex's business was negatively impacted by events in the world economy causing a downturn in traditional markets that, in turn, exacerbated challenges in cryptocurrency markets.  In the wake of the COVID-19 pandemic, rampant inflation spread worldwide, causing the U.S. Federal Reserve to raise interest rates in response.  This led to a re-valuation of risk and technology assets worldwide, including cryptocurrencies.  The cryptocurrency industry (the "Crypto Industry" or "Industry") experienced a decline in cryptocurrency market prices, their sell-off, and bankruptcy of major companies in the Industry.

---

[2]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan.  Additionally, this Disclosure Statements incorporates the rules of interpretation located in Article I of the Plan.

30699387.1

As a cryptocurrency exchange generating revenue from trading commissions, BUS experienced lower trading volumes and reduced platform account balances, which resulted in a revenue decrease.  In addition, competitors gained market shares through advertising and/or offering yield (*i.e.*, an interest rate on customer deposits), along with other incentives to attract new customers.  BUS did not offer yield-based products.

In addition to the Industry's 2022 market conditions, the Debtors' U.S. business was negatively affected by the lack of regulatory clarity regarding the Industry in the United States, as well as by U.S. federal and state regulatory actions directly targeting BUS.

At the federal level, in October 2022, after years of investigations, BUS settled with both the U.S. Department of the Treasury Financial Crimes Enforcement Network ("FinCEN") and the U.S. Department of the Treasury Office of Foreign Assets Control ("OFAC"), agreeing to pay fines of more than $29 million for BUS-related conduct from February 2014 through December 2018, and $24 million for BUS-related conduct between March 2014 and December 2017, respectively (the "Settlement[s]").[3]  Moreover, the Securities and Exchange Commission (the "SEC") served BUS with numerous subpoenas since 2017.  BUS responded to SEC's subpoenas, but the SEC never indicated during its investigation which of the digital assets listed by BUS fit the SEC's definition of securities.  On April 17, 2023, the SEC brought an enforcement action in federal court in the Western District of Washington (Seattle) against BUS, its former CEO, and BG, seeking injunctive relief, fines, and disgorgement.[4]  All parties to the SEC Action reached a global resolution, pursuant to which, among other things, BUS agreed to pay the SEC $24 million within 60 days after the Effective Date.

At the state level, following the November 2022 collapse of the cryptocurrency exchange FTX, BUS received significantly increased audit requests from state regulators in relation the state-issued money transmitter licenses (the "MTL[s]") that BUS, as a national platform, held.  After an increase in audits, certain of these regulators alleged that Bittrex was undercapitalized and demanded that BUS immediately surrender its MLTs in those states, impairing BUS's ability to operate.

As a result of these costly regulatory investigations and related penalties, coupled with lower revenue, Bittrex's management team explored potential strategic solutions.  Initially, BUS retained Lazard Ltd. and engaged in discussions with several third parties regarding the possible sale of all or part of Bittrex's assets, including customer lists, and potential sources of new liquidity through debt or equity investments.  While certain third parties were interested in a potential acquisition or partnership with BG, few expressed interest in BUS.

Also, BUS retained Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") as its restructuring counsel (having previously retained Quinn Emanuel as its SEC defense counsel),

---

[3]   As part of the Settlement, FinCEN credited to BUS the OFAC fine, such that BUS would owe an additional $5 million to FinCEN after paying the OFAC fine.  Neither Settlement required any remediation by, nor ongoing oversight of, BUS.

[4]   The SEC alleges that BUS did not register as national securities exchange, broker-dealer, and clearing agency.  The SEC also charged BG for failing to register as a national securities exchange in connection with its operation of a single shared order book along with BUS.

and this engagement grew to include all the Debtors, but no non-Debtor Bittrex affiliates.  On March 1, 2023, BUS retained Timothy Pohl ("Mr. Pohl") with TRP Advisors, LLC to serve as an independent non-employee director to act for the sole benefit of BUS in any transactions involving the rest of the non-debtor corporate group.  BUS subsequently retained Berkeley Research Group ("BRG") as its financial advisor on March 20, 2023, and appointed BRG's managing directors Evan Hengel ("Mr. Hengel") and Robert Duffy ("Mr. Duffy") to act as Co-Chief Restructuring Officers ("CRO[s]") on April 17, 2023.

With the assistance of their advisors, the Debtors ultimately decided to initiate a restructuring process and an orderly wind down of their U.S. operations.  First, on March 31, 2023, BUS urged its customers to withdraw their cryptocurrency deposits from BUS by April 30, 2023.  At the same time, BUS ceased accepting new customers and worked with its advisors to responsibly repay customers 100 percent of their respective cryptocurrency and U.S. dollars on deposit with BUS.  As the final phase of this winddown effort, the Debtors filed for chapter 11 relief for the purpose of protecting and maximizing the returns of their customers in the context of the orderly wind down of Bittrex's U.S. and Malta operations, a process that contemplates distributing to the Debtors' customers all the cryptocurrency associated with their accounts.  The Debtors seek to complete the previously announced wind down of its U.S. business and implement the wind down of its Malta business, and accomplish, as soon as practicable, a comprehensive process that will (a) maximize value for the Debtors' creditors (including its customers) and other stakeholders; (b) leave intact Bittrex's non-U.S. business operations for the benefit of their several hundred thousand customers; and (c) to the extent necessary, fairly separate the non-U.S. operations.

This Disclosure Statement provides holders of Claims entitled to vote to accept or reject the Plan with adequate information about (a) the Debtors' business and certain historical events; (b) the Debtors' Chapter 11 Cases; (c) the Plan; (d) the rights of holders of Claims and Interests under the Plan; and (e) other information necessary to enable each holder of a Claim entitled to vote on the Plan to make an informed judgment as to whether to vote to accept or reject the Plan. This Disclosure Statement also assists the Bankruptcy Court in determining whether the Plan complies with the provisions of the Bankruptcy Code and should be confirmed.

This Disclosure Statement is organized as follows:

| | |
|---|---|
| i. | Section I provides an introduction and general information about the Plan and confirmation of the Plan. |
| ii. | Section II contains certain questions and answers about the Disclosure Statement and the Plan. |
| iii. | Section III provides an overview of the Debtors' business. |
| iv. | Section IV discusses the Debtors' corporate and capital structure. |
| v. | Section V discusses events leading to these Chapter 11 Cases. |
| vi. | Section VI discusses events during these Chapter 11 Cases. |
| vii. | Section VII provides a summary of the Plan. |
| viii. | Section VIII provides a specific disclaimer regarding the tax consequences of the Plan. |
| ix. | Section IX addresses risk factors associated with the Plan. |
| x. | Section X discusses confirmation of the Plan. |

xi.    Section XI concludes this Disclosure Statement and recommends that eligible holders of Claims vote to accept the Plan.

**B.    Voting Procedures**

As set forth in more detail in Section VII of this Disclosure Statement, certain holders of Claims and Interests are entitled to vote to accept or reject the Plan. For each holder of a Claim or Interest entitled to vote, the Debtors have enclosed, along with a copy of this Disclosure Statement, among other things, a ballot and voting instructions regarding how to properly complete the ballot and submit a vote on the Plan. For detailed voting instructions, please refer to the specific voting instructions and the ballot enclosed with this Disclosure Statement. All completed ballots must be actually received by the Debtors' claims, noticing and solicitation agent Omni Agent Solutions, Inc. ("Noticing and Solicitation Agent") at the below address no later than 4:00 p.m. (Prevailing Eastern Time) on October 6̶24, 2023 (the "Voting Deadline").

Via Regular Mail, Overnight Courier, or Hand Delivery:

Bittrex Ballot Processing
c/o Omni Solutions, Inc.
1120 Avenue of Americas, 4th Floor
New York, NY 10036
United States of America

The Debtors will also be accepting ballots via electronic, online transmission through an e-ballot platform available on the Noticing and Solicitation Agent's website. Holders of Claims may cast an electronic ballot and electronically sign and submit such ballot via the platform. Instructions for casting an electronic ballot are available on the Noticing and Solicitation Agent's website at https://c̶a̶s̶e̶s̶.omniagentsolutions.com/h̶o̶m̶e̶?̶c̶l̶i̶e̶n̶t̶I̶d̶=̶3̶6̶6̶2̶Bittrex. The encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any electronic ballot submitted in this manner and the creditor's electronic signature will be deemed to be an original signature that is legally valid and effective. For the avoidance of doubt, electronic submissions of ballots may only be made via the e-ballot platform. Ballots submitted by electronic mail, facsimile, or any other means of electronic submission will not be counted.

The record date for purposes of determining (i) which eligible holders of Claims are entitled to vote on the Plan and (ii) which holders of Claims and Interests are entitled to receive other notices is September 1, 2023 (except as to governmental claims) (the "Voting Record Date").

If you are holder of a Claim that is entitled to vote on the Plan and you did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting with respect to the Plan, please contact the Noticing and Solicitation Agent at 888-481-3704 (domestic), 747-293-0010 (international), or email at B̶i̶t̶t̶r̶e̶x̶I̶n̶q̶u̶i̶r̶i̶e̶s̶@̶o̶m̶n̶i̶a̶g̶n̶t̶.̶c̶o̶m̶.̶BittrexInquiries@omniagnt.com.

A Class of Claims is deemed to accept the Plan if at least two-thirds in amount and more than one-half in number of the Allowed Claims in the Class that actually vote are cast in favor of

the Plan. Whether or not a holder of a Claim or Interest votes on the Plan, such holder will be bound by the terms and treatment as set forth in the Plan if the Plan is confirmed by the Bankruptcy Court. Pursuant to section 1126(e) of the Bankruptcy Code, the Bankruptcy Court may disallow any vote accepting or rejecting the Plan if such vote is not cast in good faith.

## C. **Brief Overview of the Plan**

The Plan provides for a wind down of the Debtors and a recovery equal to 100% for any: (a) Administrative Claims; (b) Priority Tax Claim; (c) DIP Loan Claim; (iv) Statutory Fees; and (v) Other Priority Claims.

Holders of Allowed BUS Customer Claims and Allowed Malta OpCo Customer Claims will receive their respective Customer Distribution by having access to the Debtors' platform for withdrawal of 100% of the amount of Cryptocurrencies or fiat currencies associated with such Customer's account as of the Petition Date, *provided that* (i) Customers will be required to pay any fees charged by third parties in connection with the withdrawal of Cryptocurrencies or fiat currencies; (ii) such Holders provide to the Debtors all required information in order to comply with Governmental Regulations; (iii) the Cryptocurrencies are not Defunct Crypto as of the date of Customer Distribution; (iv) to the extent the Cryptocurrencies are Non-Economic Crypto, such Cryptocurrencies will be aggregated and converted to fiat currency and distributed *pro rata* to customers in amounts associated with their accounts if their value in the aggregate exceeds the third-party costs associated with their withdrawal; and (v) such Holders accept the 2022 Updated Terms of Service of either BUS or BG, as applicable. With respect to customers of Malta OpCo, they will be asked to sign the BG Terms of Service in order to migrate to the BG platform.

Each Holder of an Allowed GUC Claims will receive payment in Cash in an amount equal to such Allowed GUC Claim. Each Holder of an Allowed Subordinated Claim (to the extent that there are any) will receive payment in Cash, after all Allowed GUC Claims have been paid in Cash in full, in an amount equal to such Allowed Subordinated Claim.

On the Effective Date, existing Interests in BUS will survive and continue to exist as Interests in the Wind Down Entity, which entitles each Holder of an Allowed Interest in BUS to a *pro rata* payment of any remaining Wind-Down Assets (if any) or the proceeds thereof after all Allowed Claims have been paid in full. On the Effective Date, existing Interests in all Debtors, other than BUS, will be deemed canceled, discharged, released, and extinguished, and there will be no distribution to Holders of Interests in the Debtors, other than BUS, on account of such Interests. The Wind Down Entity will be managed by the Plan Administrator. Section VII of this Disclosure Statement provides a more detailed description of the Plan.

## D. **Summary of Distributions and Voting Eligibility**

The summary table in the next page briefly outlines the classification and treatment of Claims and Interests in the Debtors under the Plan and the voting eligibility of the holders of such Claims and Interests. This table is qualified in its entirety by reference to the full text of the Plan.

| Class | Type of Claim or Interest | Treatment | Impairment | Approximate Percentage Recovery | Entitled to Vote |
|---|---|---|---|---|---|
| Class 1 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired | 100% | No (Deemed to accept) |

30699387.1

11606-00001C/14200336.11

| Class 2A | BUS Customer Claims | The BUS Customer Claims are Allowed in the full amount due and owing to each Customer of BUS.  Except to the extent that a Holder of an Allowed BUS Customer Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed BUS Customer Claim, each such Holder, who provides all information that the Debtors believe, in consultation with regulatory counsel, is required by the Debtors, shall receive its Customer Distribution, provided that all Government Regulations applicable to such Customer are satisfied prior to making such Customer Distribution. | Impaired | 100% | Yes |

| Class 2B | Malta OpCo Customer Claims | The Malta OpCo Customer Claims are Allowed in the full amount due and owing to each Customer of Malta OpCo.  Except to the extent that a Holder of an Allowed Malta OpCo Customer Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Malta OpCo Customer Claim, each such Holder, who provides all information that the Debtors believe, in consultation with regulatory counsel, is required by the Debtors, shall receive its Customer Distribution, provided that all Government Regulations applicable to such Customer are satisfied prior to making such Customer Distribution. | Impaired | 100% | Yes |

| | | | | | |
|---|---|---|---|---|---|
| Class 3 | GUC Claims | Except to the extent that a Holder of an Allowed GUC Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed GUC Claim, each such Holder of an Allowed Claim in Class 3 shall receive payment in Cash in an amount equal to such Allowed GUC Claim no later than six months after the Effective Date. | Impaired | 100% | Yes |
| Class 4 | Subordinated Claims | Except to the extent that a Holder of an Allowed Subordinated Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Subordinated Claim, each such Holder of an Allowed Claim in Class 4 shall receive payment in Cash, after all Allowed GUC Claims have been paid in Cash in full, in an amount equal to such Allowed Subordinated Claim no later than six months after the Effective Date. | Impaired | 100% | Yes |

| Class 5 | Interests | On the Effective Date, existing Interests in BUS shall survive and continue to exist as Interests in the Wind Down Entity, which entitles each Holder of an Allowed Class 5 Interest in BUS to a Pro Rata payment of any remaining Wind-Down Assets (if any) or the proceeds thereof after all Allowed Claims have been paid in full.  On the Effective Date, existing Interests in all Debtors, other than BUS, shall be deemed canceled, discharged, released, and extinguished, and there shall be no distribution to Holders of Interests in the Debtors, other than BUS, on account of such Interests. | Impaired | N/A | Yes |
|---|---|---|---|---|---|

**E.**    **Confirmation**

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on [October ]30, 2023 at [●] (**Eastern Time**) before the Honorable Brendan Linehan Shannon, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N Market St # 500, Wilmington, DE 19801(the "Confirmation Hearing").

Objections and responses to confirmation of the Plan, if any, must be served and filed so as to be received on or before the confirmation objection deadline, **October 624, 2023 at 4:00 p.m. (Eastern Time)**.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or the Debtors without further notice, except for adjournments announced in open court or as indicated in any notice of agenda of matters scheduled for hearing filed with the Bankruptcy Court.

**II.**
**~~QUESTIONS AND ANSWERS~~QUESTIONS AND ANSWERS ABOUT THIS**
**DISCLOSURE STATEMENT**
**AND THE PLAN**

**A.**     **What Is Chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and equity interest holders, subject to the priority of distributions and other provisions prescribed in the Bankruptcy Code. The commencement of a chapter 11 case creates an estate that comprises all the legal and equitable interests of the debtor as of the date that the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" until the chapter 11 plan is consummated.

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as the bankruptcy court may order. Subject to certain limited exceptions, a bankruptcy court order confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.**     **Why Are The Debtors Sending Me This Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind and in sufficient detail to enable a hypothetical reasonable investor typical of holders of claims or interests in the relevant class, such as Holders of Claims under the Plan, to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

**C.**     **Am I Entitled To Vote On The Plan?**

Whether you may vote on the Plan depends on the type of Claim or Interest you hold. For an overview of the Claims or Interests, *See* Section I.D above. The definitions in the Plan describe what Claims are included in each Class.

**D.**     **What Will I Receive From The Debtors If The Plan Is Consummated?**

For a summary of the currently anticipated recoveries to Holders of Claims and Interests under the Plan, *see* Section I.D above. Any estimates of the potential recoveries for the Claims and Interests in a particular Class in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to

consummate the Plan.  The amount of such distributions is also based on the total amount of Claims Allowed in the applicable Class, which is based on factors that are not within the Debtors' control.  The amount of approximate percentage recoveries in each of the scenarios are estimates that are based on analyses performed by the Debtors' financial advisors.

As detailed further herein and in the Liquidation Analysis, in a hypothetical liquidation under chapter 7 of the Bankruptcy Code, Holders of Claims and Interests would likely receive a reduced recovery relative to what such Holders would receive under the Plan.  In the event of a chapter 7 liquidation, the Bankruptcy Court would appoint a chapter 7 trustee (the "Chapter 7 Trustee") to oversee and effectuate the liquidation of the Debtors' assets.  The Chapter 7 Trustee's fees and expenses would be paid by the Debtors and would be paid prior to any BUS Customer Claims, Malta OpCo Customer Claims, and GUC Claims.  Given the novelty and complexity of the Debtors' business and the potential that any Chapter 7 Trustee appointed by the Bankruptcy Court may have minimal cryptocurrency experience, the Chapter 7 Trustee's fees and expenses and the anticipated reduction in value obtained through the monetization of cryptocurrency by the Chapter 7 Trustee would likely result in Holders of Claims and Interests receiving significantly reduced recoveries.  All distributions in a chapter 7 liquidation would be made in Cash.

### E.      What Will I Receive From The Debtors If I Hold An Allowed Claim?

Holders of Allowed BUS Customer and Malta OpCo Customer Claims will receive a Distribution of like kind Cryptocurrencies and fiat currencies by being provided access to the Debtors' platform for withdrawal of 100% of the amount of Cryptocurrencies and fiat currencies associated with such Customer's account as of the Petition Date.  To the extent that the Customer's account is associated with Defunct Crypto, such Customer may not be able to successfully withdraw such Defunct Crypto.  Moreover, to the extent that the Customer's account is associated with Non-Economic Crypto, such Customer will receive a Non-Economic Crypto Distribution.

Holders of GUC Claims and Subordinated Claims (if any) will receive cash equal to 100% of their Allowed Claim as of the Petition Date.  Any remaining Cryptocurrencies will be distributed to Holders of Interests in BUS.

For the avoidance of doubt, confirmation of the Plan by the Bankruptcy Court does not guarantee that you will receive the Distributions indicated above.

### F.      Why Do The Debtors Believe That The Plan Provides The Greatest Distribution Possible To Holders Of Claims?

The Debtors believe that the Plan is in the best interest of all Holders of Claims than any other alternatives (to the extent they exist).  The Plan provides for a larger distribution to all Holders of Claims than would otherwise result from any other available alternative, including a chapter 7 liquidation, as illustrated in the Liquidation Analysis set forth in **Exhibit C** attached hereto.  If the Plan is effectuated, the Debtors will be wound down through an orderly process

that is expected to yield higher sale prices on the Debtors' assets than a typical chapter 7 liquidation, as illustrated in the Liquidation Analysis set forth in **Exhibit C** attached hereto.

**G.**      **Can I Vote If I Transferred My Claim To Someone Else?**

If you transfer all your Claim to a third party by September 1, 2023 (except as to governmental claims) (the "Voting Record Date"),[5] you may not vote the portion of the Transferred Claim.  As explained in the question and answer immediately following this answer, any Holders of transferred Claims are entitled to vote, but each portion of the Claim (if more than one portion) must vote collectively to accept or reject the Plan.  If Ballots are received that do not vote each portion of the Claim identically, the Ballots will not be counted.

**H.**      **Can I Vote If I Am The Holder Of A Transferred Claim And If So, How?**

If you are the Holder of a transferred Claim and you have fulfilled the requirements of Bankruptcy Rule 3001(e) and the transfer is reflected on the Claims Register by the Voting Record Date), you may vote the transferred Claim.  The Claims Register can be accessed through the "Search Claims" button at https://cases.omniagentsolutions.com/claimdocket?clientid=3662.

If Ballots are received that do not vote each portion of the Claim identically, the Ballots will not be counted.  If you are entitled to vote a Transferred Claim or a portion of a Claim, you will receive a Ballot.

**I.**      **When Will I Receive My Distribution Under The Plan? What Is ~~meant~~Meant By "Confirmation," "Effective Date," And "Consummation?"**

"Confirmation" of the Plan refers to the Bankruptcy Court's approval of the Plan by entering the Confirmation Order.  Confirmation of the Plan does not guarantee that you will receive the Distribution indicated under the Plan.  After the Bankruptcy Court confirms the Plan, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Unless otherwise provided under the Plan, distributions to Holders of Allowed Claims and Interests will only be made starting at the "Consummation" or "Effective Date" of the Plan—*i.e.*, the first Business Day upon which:  (a) all conditions precedent specified in Article VII.H.i. and Article VII.H.ii. have been satisfied or waived (in accordance with Article VII.H.iii.); and (b) the Plan is declared effective with respect to such applicable Debtor(s)—or as soon as reasonably practicable thereafter, as specified in the Plan.  A "Notice of Effective Date" will be Filed on the Bankruptcy Court docket notifying all parties when the conditions precedent to the Effective Date have been satisfied.  *See* Article X of this Disclosure Statement entitled "Confirmation of the Plan" for a discussion of the conditions that need to be satisfied or waived before the Effective Date and Consummation of the Plan.  The following distributions will be made on or as soon as reasonably practicable following the Effective Date, provided that to the extent Claims or Interests will be paid from the proceeds of Cryptocurrencies, rather than in kind Distributions, such Distributions will occur at such time as the Plan Administrator determines in

---

[5]      The Debtors will update this date when the Voting Record Date is set by the Bankruptcy Court.

its sole discretion, based on factors the Plan Administrator determines are appropriate, including the quantity in any transaction.

In no event will Holders of Allowed Claims or Interests be entitled to interest, dividends, or accruals on the distributions provided for in the Plan regardless of whether such distribution is delivered on or after the Effective Date. Distributions will only be made to Persons or Entities who are Holders of Allowed Claims on the Distribution Record Date, or such other date used to determine which Holders of Allowed Claims will be eligible to receive distributions under the Plan. Holders of Allowed Claims on the Distribution Record Date will receive distributions on the Effective Date (or as soon as reasonably practicable thereafter), or in the time period otherwise described in the Plan. The Distribution Record Date shall be the date that is two (2) Business Days after the Confirmation Date or such other date as designated in a Final Order of the Bankruptcy Court.

If a Claim is transferred twenty or fewer days before the Distribution Record Date, distributions will be made to the transferee of such Claim (*i.e.*, the Person or Entity to whom the Claim is transferred) only to the extent practicable, and in any event, only if the relevant Claim transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. The Debtors will have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

In addition, to be eligible to receive a Customer Distribution, Holders of Customer Claims will have to provide all information that the Debtors, in consultation with regulatory counsel, believe are required. Further, all Government Regulations applicable to such Customer need to be satisfied prior to making such Customer Distribution.

Finally, a Distribution to certain parties may not be possible for legal or other reasons, including to Holders of Claims that live in prohibited jurisdictions as further explained in Section VIII of this Disclosure Statement, entitled "Risk Factors." In certain circumstances, these legal or other reasons may prevent the making of Distributions.

## J.    What Happens To My Recovery If The Plan Is Not Confirmed Or Does Not Go Effective?

There is no assurance that the Debtors will be able to reorganize their businesses if the Plan is not confirmed or does not go effective. It is likely that any alternative transaction may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan, including pursuant to a liquidation under chapter 7 of the Bankruptcy Code. A more detailed description of the consequences of an extended chapter 11 case or of a chapter 7 scenario is described in Section X.C.2. of this Disclosure Statement entitled "Best Interests Test," and the Liquidation Analysis attached hereto as **Exhibit C**.

## K.    If The Plan Provides That I Get A Distribution, How Will I Receive My Distribution?

Holders of Customer Claims shall access the Debtors' platform for withdrawal of 100% of the amount of Cryptocurrencies and/or fiat currencies associated with such Customer's

account as of the Petition Date, provided that Customers will be required to pay any fees charged by third parties in connection with the withdrawal of Cryptocurrencies and/or fiat currencies. Distributions to Holders of Allowed GUC Claims and Allowed Subordinated Claims (if any) are exclusively in Cash.

**L.** **How Will Undeliverable Distributions And Unclaimed Property To Be Treated Under The Plan?**

If any Distribution to any Holder is returned as undeliverable or a Customer fails to initiate a Customer Distribution or comply with any Government Regulation or provide any information that the Debtors believe, in consultation with regulatory counsel, is required by the Debtors, no Distribution to such Holder will be made, unless and until the Plan Administrator has determined the then-current address of such Holder and has received all other required information.

However, such Distributions are deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date such Distribution is returned as undeliverable or such Customer fails to complete a Customer Distribution or comply with any Government Regulation or other information required by the Debtors. After such date, all unclaimed property or interests in property will revert to the Wind Down Entity and be automatically transferred to the Wind Down Entity pursuant to the terms of the Plan automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) for Distribution consistent with the Plan, and any claim of any Holder to such property is fully discharged, released, and forever barred. For the avoidance of doubt, the Wind Down Entity and its respective agents and attorneys have no duty to take any action to attempt to locate any Claim Holder.

**M.** **What Is The Wind Down Entity?**

Pursuant to the Confirmation Order, the Debtors, other than BUS, will be dissolved. BUS, which is the Wind Down Entity, shall continue in existence after the Effective Date for purposes of (1) preserving the Causes of Action for the benefit of Holders of Claims entitled to Distributions under the Plan, (2) winding down the Debtors' remaining businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind Down Entity after the Effective Date, (3) resolving any Disputed Claims, (4) paying Allowed Claims, (5) filing appropriate tax returns, and (6) administering the Plan in an efficacious manner. On the Effective Date, all assets of the Debtors (which are referred to as the Wind-Down Assets) will automatically be transferred to the Wind Down Entity, which Wind-Down Assets will automatically vest in the Wind Down Entity free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and the Class 5 Interests, as set forth in the Plan, and the expenses of the Wind Down Entity. Thereupon, the Debtors will have no interest in or with respect to the Wind-Down Assets.

**N.** **Who Is The Plan Administrator And What Are Its Responsibilities?**

30699387.1

The Wind Down Entity will be managed by the Plan Administrator. The Debtors will select the Plan Administrator, which will be identified in the Plan Supplement to be filed with the Bankruptcy Court. The appointment of the Plan Administrator is to be approved in the Confirmation Order, and the Plan Administrator's duties will commence on the Effective Date.

The Plan Administrator will administer the Plan and the Wind Down Entity through the earlier of (i) the date on which the Wind Down Entity is dissolved in accordance with the Plan (Section IV.C.9) and (ii) the date on which such Plan Administrator resigns, is terminated, or is otherwise unable to serve. In the event that the Plan Administrator resigns, is terminated, or is otherwise unable to serve, the holders of a majority of the Interests in the Wind Down Entity will appoint a successor to serve as the Plan Administrator in accordance with, and within the periods specified in, the Wind Down Entity Agreement. If a successor Plan Administrator is not appointed within 60 days after such occurrence, any party-in-interest is entitled to ask via motion that the Bankruptcy Court approve a successor to serve as the Plan Administrator. Any such successor Wind-Down will serve in such capacity until the Wind Down Entity is dissolved.

The Plan Administrator's responsibilities include, without limitation: (a) administering the implementation of the Plan (including the making of the Distributions contemplated in the Plan); (b) marshalling, marketing for sale, and liquidating the Wind-Down Assets; (c) analyzing all Claims and Interests and prosecuting objections thereto or settling or otherwise compromising such Claims and Interests, if necessary and appropriate; (d) maintaining and administering the reserves in accordance with the terms of the Plan; (e) commencing, prosecuting, or settling claims and Causes of Action (other than the Avoidance Actions released pursuant to Article IV.K of the Plan), enforcing contracts, and asserting claims, defenses, offsets and privileges in accordance herewith and paying all associated costs; (f) recovering and compelling turnover of the Debtors' property; (g) paying Wind Down Entity Expenses; (h) abandoning any property constituting the Wind-Down Assets that cannot be sold or otherwise disposed of for value and whose Distribution to Holders of Allowed Claims would not be feasible or cost-effective in the Plan Administrator's reasonable judgment; (i) preparing and filing post-Effective Date operating reports; (j) filing appropriate tax returns in the exercise of the Plan Administrator's fiduciary obligations; (k) Retaining Professionals as necessary and appropriate in furtherance of the Plan Administrator's fiduciary obligations; and (l) taking such actions as are necessary and reasonable to carry out the purposes of the Wind Down Entity, including winding down the Debtors' business affairs.

## O.    Is There Potential Litigation Relating To The Plan?

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well. *See* Article X.B. of this Disclosure Statement entitled "Additional Risk Factors to be Considered" for further discussion on this issue.

If it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek Confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determinates that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article VII.C.vi. of this Disclosure Statement entitled "Confirmation Pursuant to

Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code" for further discussion on "cramdown" under the Bankruptcy Code.

**P.**    **Will There Be Releases And Exculpations Granted To The Parties In Interest As Part Of The Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' Wind Down. The release and exculpation provisions that are contained in the Plan are copied in pertinent part below.

*i.    Releases By The Debtors*

**As of the Effective Date, the Debtors, and each of their respective Affiliates, on behalf of themselves and their respective Estates, including any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, including the Wind Down Entity, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, and waived each Released Party from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims asserted or that may be asserted on behalf of any of the Debtors or their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan (including the Plan Supplement), the Disclosure Statement, the restructuring of Claims or Interests in the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, the pursuit of consummation of the Effective Date, the administration and implementation of the Plan, including the issuance or Distribution of securities pursuant to the Plan, the subject matter of or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, or the Distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing, except for Causes of Action arising from an act or omission of a Released Party that is judicially determined in a Final Order to have constituted actual fraud, gross negligence, criminal misconduct or willful misconduct. Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth above shall not be construed as releasing any post-Effective Date obligations of any party or entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and (ii) the releases by the Debtors set forth above shall not impair any Estate Causes of Action against a non-Released Party.**

### ii.      *Releases By Holders Of Claims And Interests*

As of the Effective Date, except (a) for the right to enforce the Plan or (b) as otherwise expressly provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the date upon which the Bankruptcy Court enters the Confirmation Order, on or after the Effective Date, each Released Party shall be deemed expressly, conclusively, absolutely, unconditionally, irrevocably and forever, released, and waived by each of the Releasing Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims asserted or that may be asserted on behalf of any of the Debtors or their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan (including the Plan Supplement), the Disclosure Statement, the restructuring of Claims or Interests in the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, the pursuit of consummation of the Effective Date, the administration and implementation of the Plan, including the issuance or Distribution of securities pursuant to the Plan, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, or the Distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing, except for Causes of Action arising from an act or omission of a Released Party that is judicially determined in a Final Order to have constituted actual fraud, gross negligence, criminal misconduct or willful misconduct. Notwithstanding anything to the contrary in the foregoing, the releases set forth above shall not be construed as releasing any post-Effective Date obligations of any party or entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### iii.      *Exculpation*

To the maximum extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from any liability in respect of any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, arising between the Petition Date and the Effective Date, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan (including the Plan Supplement), the Disclosure Statement, the restructuring of Claims or Interests in the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, the pursuit of consummation of the Effective Date, the administration and implementation of the Plan, including the issuance or

Distribution of securities (if any) pursuant to the Plan, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, or the Distribution of property under the Plan or any other related agreement including the Distribution of Cryptocurrencies to Customers, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, gross negligence, criminal misconduct or willful misconduct, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon any Order of the Bankruptcy Court or the advice of counsel with respect to their duties and responsibilities.

To the extent section 1125(e) of the Bankruptcy Code applies, the Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and Distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such Distributions made pursuant to the Plan.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above shall not be construed as exculpating any party or entity from its post-Effective Date obligations under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**Q.**     **Do I Have To Grant The Release Under The Plan?  Can I Opt Out?**

A creditor or other party in interest may indicate its intent to opt out of the releases contained in Article VIII of the Plan through an "Opt Out Form," substantially in the form contained in the ~~Plan Supplement~~Ballots, by submitting such form in advance of the deadline for voting on the Plan.

**R.**     **What Is An Injunction, And Does The Plan Contain Any Injunction?**

An injunction is typically a court order that requires a person to do or to stop doing something.  ~~The Plan contains an injunction provision.  *See* Article VIII.E of the Plan.~~ Article VIII.E of the Plan contains the injunction provision, as set forth below:

***Injunctions Relating to Releases***

~~Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates ("Enjoined Parties"), shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.~~

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been

~~filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest~~Effective as of the Effective Date, all Persons, along with their respective present or former employees, agents, officers, directors, principals, and affiliates ~~are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are treated by the Plan from~~, that hold, have held, or may hold a claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, or liability of any nature whatsoever, that is released or exculpated pursuant to this Plan (the "Enjoined Parties" and the "Released Claims"), shall be permanently, forever and completely stayed, restrained, prohibited, barred, and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such Released Claims: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding ~~of any kind~~ (including, without limitation, any ~~proceeding in a~~ judicial, arbitral, administrative, or other ~~forum) against or affecting the Debtors or the Wind Down Entity ("Protected Parties"), as applicable, or the property of the Protected Parties, as applicable;~~proceeding) on account of the Released Claims in any forum, (ii) enforcing,~~ levying,~~ attaching (including, without limitation, any prejudgment attachment), collecting, or ~~otherwise recovering by any manner or means, whether directly or indirectly,~~in any way seeking to recover any judgment, award, decree, or other order ~~against the Protected Parties; or the property of the Protected Parties, as applicable;~~on account of the Released Claims, (iii) creating, perfecting, or ~~otherwise~~in any way enforcing in any ~~manner~~matter, directly or indirectly, any ~~encumbrance of any kind against the Protected Parties, or the property of the Protected Parties, as applicable; (iv) asserting any right of setoff~~lien on account of the Released Claims, and (iv) setting off (except to the extent such setoff was exercised prior to the Petition Date), seeking reimbursement or contributions from, or subrogation against, directly or indirectly, any amount against any liability or obligation ~~due from the Protected Parties, as applicable, or against property or interests in property of the Protected Parties, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions~~ of the Plan. owed to any Person, along with their respective present or former employees, agents, officers, directors principals, and affiliates, on account of the Released Claims.

*Injunctions to Protect Plan Assets*

Except as expressly otherwise provided in this Plan, or to the extent necessary to enforce the terms and conditions of this Plan, the Confirmation Order or a separate Order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtors shall be permanently enjoined from taking any of the following actions against any of the assets to be distributed under this Plan on account of any such Claims or Equity Interests: (i) commencing or continuing, in any manner or in any place, any action, Cause of Action, or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or Order; (iii) creating, perfecting, or enforcing any Lien; (iv) asserting a setoff ( except to the extent such setoff was exercised prior to the Petition Date), or the right of subrogation of any kind

against any debt, liability, or obligation due to the Debtors; and (v) commencing or continuing, in any manner or in any place, any action, Cause of Action, or other proceeding against any of the assets to be distributed under this Plan that does not comply with or is inconsistent with the provisions of this Plan.

*Other Provisions Regarding Injunctions*

The injunctions in this Section shall extend to the Wind Down Entity and Plan Administrator (with the Debtors, "Protected Parties" and each, a "Protected Party"), as applicable, and their respective property and interests in property.

By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this Section. The injunctions in this Section shall extend to any successors of the Protected Parties, as applicable, and their respective property and interests in property. Notwithstanding the foregoing, nothing in this Section shall enjoin the assertion of a defensive right of recoupment.

Nothing in the Plan or Confirmation Order shall (1) enjoin, release, impair or otherwise preclude the United States (i) from pursuing any criminal action or any police or regulatory action, (ii) from pursuing any liability to the United States that is not a Claim, (iii) from exercising any rights of setoff or recoupment subsequent to confirmation of the Plan or any order granting substantive consolidation, and such rights are preserved, and (iv) from pursuing any claim of the United States arising on or after the Confirmation Date; and (2) grant the Debtors a discharge pursuant to section 1141(d) of the Bankruptcy Code.

No Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Cases, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor, the administration of the Wind Down EntityAssets, or the transactions in furtherance of the foregoing without the Bankruptcy Court: (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party; and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

Notwithstanding any language to the contrary in the Disclosure Statement, Plan and/or Plan Confirmation Order, no provision shall (i) preclude the United States Securities and Exchange Commission ("SEC") from enforcing its police or regulatory

30699387.1

**powers; or, (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceeding or investigations against any non-debtor person or non-debtor entity in any forum.**

**S.  What Is An Executory Contract Or Unexpired Lease, And What Does It Mean For The Debtors To "Assume," "Reject," Or "Assume And Assign" Such Contracts, And Why Is This Important?**

An "executory contract" is a contract that has not been fully completed.  In other words, the parties to the contract still owe obligations to one another.  One example of an executory contract is an "unexpired lease," or a residential or business lease that has not ended yet because the landlord and the tenant owe each other obligations until the end of the lease term (e.g., the tenant must pay the landlord rent every month, and the landlord must continue to provide for services such as heat, garbage pickup, etc.).

Companies in bankruptcy can "assume" executory contracts, meaning they have the ability to take on the contract and acknowledge that the contract is one to which it intends to remain party. By assuming a contract, companies in bankruptcy promise to continue fulfilling their obligations under the contract.

Companies can also "reject" executory contracts, meaning that companies can decide that they do not wish to perform under the contract any longer.  For example, if a company in bankruptcy determines that it has a burdensome office lease, the company could reject the lease and stop fulfilling its obligations under the contract.  The company's landlord, however, would have an unsecured claim for the damages it suffers as a result of the company's rejection of the contract.

Finally, companies can also "assume and assign" executory contracts, meaning that they can opt to remain party to the contract and can then assign both the benefits and the obligations of the contract to a third party.  For example, if a company in bankruptcy were to assume an office lease but did not want to remain a tenant of the office, they could assign that lease to another affiliate of the company, or to a third party seeking to move into that property.  Each of these three tools—assumption, rejection, and assumption and assignment—are beneficial for companies in bankruptcy.

**T.  Can And Will The Debtors Assume Or Reject Any Executory Contracts?**

The Debtors are party to numerous executory contracts and unexpired leases that may be assumed, rejected, or assumed and assigned.

On the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, unless such contract or lease: (a) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (b) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (c) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; or (d) is identified for assumption on the Assumption Schedule included in the Plan Supplement.

The entry of the Confirmation Order by the Bankruptcy Court will be considered an order approving the assumptions, assumptions and assignments, or rejections provided for in the Plan and a determination by the Bankruptcy Court that the Wind Down Entity has provided adequate assurance of future performance under such assumed executory contracts and unexpired leases. *See* Article V.A of the Plan.

**U.    What Is The Deadline To Vote On The Plan?**

The Debtors will request a Voting Deadline in their motion to approve the Disclosure Statement.  The Debtors currently anticipate that the Voting Deadline will be set for October 624, 2023 at 4:00 p.m. (ET).

**V.    What Is The Deadline To Object To The Confirmation Of The Plan?**

The Debtors will request that the Bankruptcy Court set the deadline by which objections to the Plan must be Filed with the Bankruptcy Court in the motion to approve the Disclosure Statement.  The Debtors currently anticipate that the deadline to file objections to the Plan will be set for October 624, 2023 at 4:00 p.m. (ET).

**W.    How Do I Vote For Or Against The Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims that are entitled to vote on the Plan.  To be counted as votes to accept or reject the Plan, each Ballot must be properly completed, executed, and delivered in accordance with the instructions provided such that the Ballot is actually received by the Debtors' Noticing and Solicitation Agent on or before the Voting Deadline, *i.e.* October 624, 2023 at 4:00 p.m., prevailing Eastern Time.  For further information, *See* Section I.B above.

**X.    When Is The Confirmation Hearing Set To Occur?**

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for a certain date in the Disclosure Statement motion.  The Bankruptcy Court must approve the Disclosure Statement motion for the date of the Confirmation Hearing to be set.  The Confirmation Hearing may be adjourned from time to time and all parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled.

**Y.    What Is The Purpose Of The Confirmation Hearing?**

The purpose of the Confirmation Hearing is for the Debtors to seek approval of the Plan from the Bankruptcy Court.  The confirmation of a plan of liquidation by a bankruptcy court binds the debtor, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

**Z.**     **Who Do I Contact If I Have Additional Questions Regarding This Disclosure Statement Or The Plan?**

If you have any questions regarding this Disclosure Statement of the Plan, please contact the Noticing and Solicitation Agent via one of the following methods:

By electronic mail at: BittrexInquiries@omniagnt.com

By telephone at: 888-481-3704 (Domestic) or 747-293-0010 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Noticing and Solicitation Agent at https://cases.omniagentsolutions.com/home?clientId=3662Bittrex (free of charge) or the Bankruptcy Court's website at https://www.deb.uscourts.gov/ (for a fee). PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

**III.**
**DEBTORS' BUSINESS**

In 2014, three cybersecurity engineers—Richie Lai, Rami Kawach, and William Shihara—founded Bittrex LLC, a Delaware limited liability company ("LLC"), with the goal of operating cryptocurrency exchanges.  In the following years, Bittrex underwent a series of restructurings and expansions.  In 2016, Bittrex LLC was converted to a Delaware corporation, becoming BUS.  In 2018, Bittrex formed Bittrex International Inc. ("Bittrex International"), a Delaware corporation that became the sole shareholder of Malta Holdings, a Malta private limited company, which, in turn, formed Malta OpCo, also a Malta private limited company.  In 2019, Bittrex International changed its name to Bittrex Global, Inc. ("Bittrex Global"), which is the sole shareholder of BG and BGB, the two foreign affiliates of Bittrex operating the cryptocurrency exchange for non-U.S. customers.  In 2022, BUS converted from a Delaware corporation to a Georgia corporation.  In 2023 and prior to the Petition Date, Bittrex Global transferred its ownership in Malta Holding to RBR Holdings, Inc. ("RBR"), a Delaware corporation and an intermediate holding company within Bittrex.

Bittrex has operated cryptocurrency exchanges for both retail and institutional customers in several jurisdictions.  In its nine years of operations, Bittrex grew rapidly, including by expanding the availability of the BUS-operated U.S. platform to 46 states and allowing the trade of approximately 150 cryptocurrencies and stablecoins.  BUS's cryptocurrency exchange was designed for U.S. customers, and by early 2023, it had over 600,000 active users (*i.e.*, with a balance in their respective accounts), and 1.2 million customers overall (*i.e.*, with and without a balance in their respective accounts).

Malta Holdings and Malta OpCo served non-U.S. customers.  As part of one of Bittrex's previous reorganizations and expansions, Malta Holdings and Malta OpCo ceased operating in 2019, after notifying their customers to transfer their accounts to BG.  Despite Malta OpCo's multiple requests, certain Malta OpCo customers never completed the required paperwork to become customers of BG, nor did they withdraw the cryptocurrency in their accounts.

Consequently, since 2019, the accounts of such non-U.S. customers have remained with Malta OpCo.  Throughout the period between 2019 and the Petition Date, Malta OpCo customers who are not located in a prohibited jurisdiction have, however, been able to request Bittrex's customer support assistance with transferring their accounts to BG.

While operating its U.S. and foreign exchanges, Bittrex has employed what it believes to be the most reliable and effective security technologies on the market. Bittrex has leveraged an elastic, multi-stage wallet strategy to ensure that the majority of funds were kept in cold storage for additional safety.  Also, Bittrex has required two-factor authentication for all users and provided a host of additional security features to provide multiple layers of protection.  Its custom-built trading engine was designed to be scalable while ensuring that orders were executed in real-time.  In addition, Bittrex has supported third-party trading platforms and algorithmic trading via its extensive application programming interfaces (APIs).  Further, Bittrex has offered exchange-as-a-service, providing its technology and order books to certain local and regional exchanges.

BUS's services have been accessible through a website and a mobile application available for both Android and iOS operating systems.  The BUS customers could execute trades both in a mobile application and on BUS's website.  The BUS customers could sign up for an account on the U.S. platform after digitally executing the customer agreement and link their bank accounts and off-site cryptocurrency wallets to the platform to facilitate the purchase of cryptocurrency and the transfer of the customer's cryptocurrency to the platform.  The BUS platform also offered wallet services for its users.  In line with industry standards, BUS did not maintain a separate cryptocurrency wallet for each customer; instead, cryptocurrency assets were commingled on an asset-by-asset basis.

BUS's customers could quickly start making trades or purchase cryptocurrencies with a debit card, credit card, bank account, or BUS account balance.  BUS customers benefitted from a real-time view of the cryptocurrency markets available on BUS.

## IV.
## CORPORATE AND CAPITAL STRUCTURE

### A.    Corporate Structure

Desolation is a Delaware LLC.  Non-debtor Freestone Management LLC ("Freestone"), a Delaware LLC, directly owns 100% of the membership interests in Desolation.  Non-debtor RBR, a Delaware corporation, owns 100% of the membership interests in Freestone.

Debtor BUS is a Georgia corporation.  As mentioned in Section II above, RBR owns 100% of the issued equity interests in BUS.

Debtor Malta OpCo is a Malta private limited company, and 100% of its share capital is owned by Debtor Malta Holdings, which is also a Malta private limited company.  RBR owns 100% the share capital in Malta Holdings.

Debtors' ultimate parent, Aquila Holdings, Inc. ("Aquila"), owns 100% of the issued equity interests in RBR.

A copy of the Debtors' organizational chart as of the Petition Date is annexed hereto as **Exhibit B**. Further, each of the Debtors, their direct and indirect equity holders, and their primary business purpose are summarized in the following chart:

| Entity | Equity Holder(s) | Business Purpose |
|---|---|---|
| Desolation | Freestone | Provided real estate services to other members of the corporate group |
| BUS | RBR | Operated cryptocurrency exchange for U.S. customers |
| Malta Holdings | RBR | Intermediate holding company of Malta OpCo |
| Malta OpCo | Malta Holdings | Operated cryptocurrency exchange for non-U.S. customers before migrating them to BG in 2019; remained dormant since then. |
| Freestone | RBR | Intermediate holding company of Desolation |
| RBR | Aquila | Intermediate holding company of BUS and Malta Holdings |
| Aquila | Lai (along with various family trusts), Kawach, and Shihara | Holding company |

## B.    Directors and Officers

The chart in the following page lists individuals who at the Petition Date were directors and high-level officers of the Debtors, Freestone, RBR and/or Aquila.

| Name | Position in Desolation | Position in BUS | Position in Malta Holdings | Position in Malta OpCo | Position in Freestone | Position in RBR | Position in Aquila |
|---|---|---|---|---|---|---|---|
| Richie Lai | CEO | Director; President and CEO | Director | Director | CEO | Director, President and CEO | Director; President and CEO |
| Rami Kawach | N/A | Director | Director | Director | N/A | Director | Director |
| William Shihara | | Director (Chairman) | Director | Director | N/A | Director | Director |
| Timothy Pohl | N/A | Director (Disinterested) | N/A | N/A | N/A | N/A | N/A |
| James | COO | COO, Secretary, | N/A | COO | COO | COO | COO, Secretary, |

| Name | Position in Desolation | Position in BUS | Position in Malta Holdings | Position in Malta OpCo | Position in Freestone | Position in RBR | Position in Aquila |
|---|---|---|---|---|---|---|---|
| Waschak | | Chief Information Security Officer | | | | | Chief Information Security Officer |
| Evan Hengel | Co-CRO | Co-CRO | Co-CRO | Co-CRO | N/A | N/A | N/A |
| Robert Duffy | Co-CRO | Co-CRO | Co-CRO | Co-CRO | N/A | N/A | N/A |
| David Maria | N/A | General Counsel | N/A | N/A | N/A | N/A | N/A |
| Paul Midgen | N/A | CTO | N/A | N/A | N/A | N/A | N/A |
| Michael Fritz | N/A | AML/BSA Officer | N/A | N/A | N/A | N/A | N/A |

Pursuant to resolutions adopted by BUS's Shareholders on March 1, 2023, disinterested director Mr. Pohl is vested with the authority to, among other things, (i) investigate any historical transactions or regulatory issues undertaken by the Debtors; (ii) interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by the Debtors; (iii) request documentation and information regarding the Debtors' business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by the Debtors.

## C.    Debtors' Capital Structure

The following description of the Debtors' capital structure is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

### i.    Equity Ownership

As detailed in Section VI.A above, (i) Freestone owns 100% of the membership interests of Desolation; (ii) RBR owns 100% of the equity interests of BUS and Malta Holdings; and (iii) Malta Holdings owns 100% of the share capital of Malta OpCo.

### ii.    Loan Facilities

The Debtors are not obligors on secured debt.  BUS is a borrower in an unsecured intercompany loan: on March 30, 2023, BUS entered into a 12-month delayed draw credit agreement for up to $15 million with its ultimate parent, non-debtor Aquila Holdings Inc. (the "Aquila Loan").  The Aquila Loan bears interest of 5.35% compounding and payable monthly,

with the principal to be repaid at maturity.  As of Petition Date, $2,000,000 of the Aquila Loan was outstanding.

BUS is also a borrower on a $15 million unsecured delayed draw intercompany loan facility with its non-debtor affiliate, BG (the "BG Loan"), dated September 9, 2022.  The BG Loan provides for a variety of repayment options available for individual draws. As of Petition Date, $15,000,000 of the BG Loan was outstanding.

On May 10, 2023, the Court issued an interim order (D.I. 41) authorizing the Debtors to obtain post-petition financing from Aquila (or its designee) (the "DIP Lender"), consisting of a super-priority delayed draw credit facility in the principal amount of up to 700 BTC (the "DIP Loan") to be used for general wind down and  liquidity purposes, including the payment of Administrative Expenses, of which amount 250 BTC was available upon the entry of the interim order, and an additional 450 BTC upon the entry of the final order.  The Bankruptcy Court entered the *Final Order (A) Authorizing the Debtors to Incur Post-Petition Debt, (B) Granting Super-Priority Administrative Expense Claims, and Granting Related Relief* (D.I. 101) on June 7, 2023.  The DIP Loan accrues interest at an annual rate of 4.00% compounding monthly, payable at maturity, which is the date nine months from May 11, 2023. Repayment of the principal amount of the DIP Loan will be in BTC.

### iii.    Trade Payables and Ordinary Course Obligations

As of the Petition Date, the Debtors owed an estimated $295,489.99 in outstanding unsecured obligations to certain third-party suppliers, vendors, and other ordinary course unsecured creditors, including $218,811.23 owed to the law firm Perkins Coie LLP.

### iv.    Legal Proceedings

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.  With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  The filing of the Chapter 11 Cases likewise generally stays any legal proceedings commenced to obtain possession of, or to exercise control over, the property of the Debtors' bankruptcy estate.

The following is a summary of the Legal Proceedings in which the Debtors are parties:

***In re Tether and Bitfinex Crypto Asset Litigation*, Case No. 1:19-cv-09236-KPF (S.D.N.Y.).**  This is a class action lawsuit filed in the United States District Court for the Southern District of New York in October 2019.  Plaintiffs raise various claims arising from their core allegation that Tether, a stablecoin marketed as being equivalent to the U.S. dollar, was not supported by sufficient assets in terms of their U.S. dollar value.  According to plaintiffs, various entities using accounts held at BUS and Poloniex, another cryptocurrency exchange, conspired to make large, carefully timed purchases of cryptocurrencies using Tether in order to artificially inflate their prices.  Plaintiffs' claims against BUS are based on the faulty premise

that BUS permitted various Tether-related entities to open accounts on the BUS cryptocurrency exchange and trade in a manner that manipulated the market. BUS believes that the plaintiffs' claims are without merit, and it has contended that the trading activity identified by the plaintiffs was conducted by an institutional client employing a perfectly legal high-volume, high-frequency arbitrage strategy. BUS obtained a declaration to that effect. Moreover, the Tether-related entities never had BUS accounts. In September 2021, the court granted in part and denied in part BUS's and Poloniex's motion to dismiss the claims against them. Since then, discovery has been ongoing.

*United States of America v. Bittrex, Inc., et al.*, **Case No. 4:22-cv-00626-ALM (E.D. Tex.)**. The proceeding relates to BUS's funds that were wrongfully seized from a BUS bank account. BUS was initially a claimant in a civil asset forfeiture action in the United States District Court for the Eastern District of Texas (*United States of America v. $448,840.92 in United States Currency*, Case No. 4:21-CV-00202-ALM (E.D. Tex)). In September 2021, the court rejected the government's motion to dismiss in the proceeding. The court also ordered the government to file an interpleader action, pursuant to which the court could determine the rightful owner of the seized funds. The interpleader action is pending, and BUS expects that these funds will be awarded and returned to BUS at the conclusion of the matter.

*D'Narial Brown-Pressley v. Bittrex, Inc.* **22CIV17610KCX (King County, WA West Division Courthouse)**. In March 2023, BUS was served with a civil complaint of Mr. Pressley, who alleged that BUS has stolen $500 from him. The proceeding is ongoing. BUS believes that Mr. Brown-Pressley's claim is meritless.

*Securities and Exchange Commission v. Bittrex, Inc., et al.*, **Case No. 2:23-cv-00580-RSM (W. D. WA)**. On April 17, 2023, the SEC filed a complaint against BUS, BG, and Mr. Shihara (the "SEC Action"). In the complaint, the SEC alleged, among others, that the defendants violated the Securities Exchange Act of 1934 (the "Exchange Act"). The SEC Action has been settled and is pending approval of the Bankruptcy Court (*see* section VI.E below).

**V.**
**KEY EVENTS LEADING TO COMMENCEMENT**
**OF THE CHAPTER 11 CASES**

**A.     Causes Leading to These Chapter 11 Cases**

     *i.     Volatile Markets*

Before the explosion of energy prices and concerns regarding the stability of digital currencies, the market for digital assets had been growing exponentially: Bitcoin's daily exchange volume rose from $92 million in January 2017 to more than $50 billion in May 2021. The initial exchange rate recorded on October 5, 2009, was $0.000764 for every bitcoin; at its all-time high on November 10, 2021, one bitcoin was worth $68,789. The price of bitcoin declined through most of 2022, reaching approximately $16,800 in December 2022.

The beginning of the COVID-19 pandemic introduced instability to both traditional and cryptocurrency markets. Between February 12, 2020 and March 23, 2020, the Dow Jones Industrial Average lost 37 percent of its value and the S&P 500 lost 34 percent of its value. The price of Bitcoin fell over 50 percent over the same time period, and most other cryptocurrencies experienced similar declines.

Fears of a devastating pandemic and its effect on the world economy drove many investors to exit the markets. The Debtors, however, continued to operate their cryptocurrency exchange. Customers were able to use the trading platform despite extreme volatility in the markets.

After the pandemic-related markets crash, both traditional and cryptocurrency markets experienced a short recovery. Central banks and governments, including the United States Federal Reserve, enacted relief programs and adopted quantitative easing monetary policies designed to support the world economies until the end of the COVID-19 pandemic. Such policies contributed to growth in traditional and cryptocurrency markets; subsequently, investment into new projects in the cryptocurrency industry increased rapidly. The price of Bitcoin grew by over 1,000 percent between its lowest point in 2020 and its highest point in 2021. The S&P 500 increased by nearly 100 percent over the same period.

In traditional markets, fears of new variants of the COVID-19 virus and a potential economic contraction chilled equity markets through the end of 2021. In the cryptocurrency space, divestments from risky assets such as technology and early-stage equities led to divestments in the cryptocurrency sector as investors reduced exposure. Increased regulatory scrutiny internationally also contributed to market pessimism, while strong spot trading by institutional investors drove most cryptocurrencies from all-time highs to double-digit losses.

Traditional markets eventually closed 2021 with double-digit growth. Although it seemed like markets were beginning to recover from the COVID-19 pandemic and that its lingering effects would be minimal, as inflation rose, in March 2022 the United States Federal Reserve embarked on a series of interest rate increases to the Federal Funds Rate and fears of a possible 2022 recession began to rise. In part due to this quantitative monetary tightening, the S&P 500 declined by 20 percent of its value in the first half of 2022, while the technology-heavy NASDAQ declined by nearly 30 percent over the same period. Rising inflation and commodity prices contributed to investor pessimism and further divestments. In June 2022, market analysts officially labeled 2022 as a bear market. The net wealth of U.S. households declined by $4 trillion in 2022. After a small recovery, the S&P 500 fell by 396.19 (or 8.78%) in the twelve months ending in April 2023.

### ii.    *Increased Competition*

As cryptocurrency gained popularity throughout the late 2010s, new exchanges were launched, and aggressively advertised to gain new customers. These efforts included Super Bowl commercials, sports stadium naming rights, and large budgets to spend on online advertising. In addition, BUS's competitors offered "yield" on crypto holdings to customers who deposited or purchased coins, where customers would essentially receive interest payments in cryptocurrency, making such offerings attractive to prospective customers who wanted to

increase their financial upside.  Like in the traditional banking world, these interest payments were often funded by loaning out the crypto assets to other third parties, which is known as "rehypothecation," and which was allowed per their terms of service.  As exchanges competed to offer higher yield percentages to customers, the related crypto lending activity increased and eventually led to the demise of several crypto exchanges in 2022.

The emergence of these types of competitors resulted in BUS losing market share starting in 2018, as BUS did not offer yield-based products, did not participate in aggressive lending to fund customer yield, nor did it engage in aggressive advertising campaigns.

### iii.    Crypto Winter and Regulatory Tightening

The widespread selloff in traditional markets was mirrored in the cryptocurrency industry.  All major cryptocurrencies experienced significant declines in the first half of 2022; Bitcoin declined 37.3 percent in June 2022 alone and was down 60 percent year-to-date. Companies in the cryptocurrency industry also experienced significant equity declines as declining cryptocurrency prices pressured margins and investor pessimism grew.  In June 2022, the aggregate value of the cryptocurrency market dropped below $1 trillion for the first time since January 2021.  The CoinDesk Currency Index (CCY), measuring the market capitalization weighted performance of digital currencies, fell by more than 65 percent in 2022.  Since May 2021 to date, the ROI on Bitcoin declined by 51 percent.

Distressed industry participants—Terra and Three Arrows Capital—exacerbated this "cryptocurrency winter."  The eventual implosion of Terra and Three Arrows Capital, and the resulting fallout, started a downward spiral in the crypto industry.

Terra issued TerraUSD ("UST"), an algorithmic stablecoin pegged to the U.S. dollar through an arbitrage mechanism with its cryptocurrency Luna and a reserve of Bitcoin.  Over the course of two weeks in May 2022, the UST/Luna ecosystem collapsed, which created a ripple effect through the cryptocurrency industry.

Following the collapse of Luna, on June 12, 2022, Celsius Network, a cryptocurrency lender with over $11 billion of assets under management, announced that it was pausing all account withdrawals and transfers due to extreme market conditions.  Celsius's announcement triggered a further decline in the cryptocurrency markets; Bitcoin dropped over thirty percent in value in the following days as investors on other platforms began to liquidate their positions.

On June 27, 2022, the hedge fund Three Arrows Capital ("Three Arrows"), which had invested heavily in UST, defaulted on loan payments to the crypto lender Voyager.  Three Arrows was ordered by a British Virgin Islands court to liquidate after its creditors sued the crypto hedge fund for alleged failure to repay debts.

On July 5, 2022, Voyager, a major creditor of Three Arrows and a customer-facing crypto-broker, filed for chapter 11 bankruptcy protection, citing escalating customer withdrawal requests that, if left unchecked, would result in insufficient assets to satisfy those transactions due to approximately $650 million of Voyager assets remaining frozen in the Three Arrows estate.

On November 11, 2022, FTX, a leading centralized cryptocurrency exchange, which specialized in derivatives and leveraged products, filed for chapter 11 bankruptcy protection after reports of overvaluation of the company and its FTT token, followed by a run on FTX deposits causing a liquidity crunch.

On November 28, 2022, BlockFi, a crypto lending platform with significant exposure to FTX, filed for bankruptcy after suspending customer withdrawals.

On January 19, 2023, the crypto lender Genesis, which had exposure to Three Arrows' and FTX's collapse, filed for chapter 11 bankruptcy protection, after the SEC sued it and crypto firm Gemini over a lending product.  Gemini suspended withdrawals from the product in question (Earn), in which Genesis is a lending partner.

On March 8, 2023, Silvergate Capital, one of the crypto market's most frequently used banks, announced that it was shutting down as a result of undercapitalization due to recent events in the crypto industry.  Because many U.S. banks do not serve the crypto market due to regulatory concerns, the loss of Silvergate Capital has become another industry headwind, as there are now fewer options to onboard new customers into the crypto space, which usually starts with a transfer of USD before cryptocurrency is purchased.

Also in March, the SEC warned Coinbase, the largest U.S. crypto exchange, that it planned to take enforcement action against the company, while the Commodity Futures Trading Commission sued Binance, alleging that the crypto exchange operator violated U.S. rules that required futures and other derivatives to be traded on regulated platforms.

The regulators' escalating crackdown on digital currency firms, coupled with cryptocurrency markets' instability and declines, made it very difficult for crypto firms such as the Debtors to operate in the current market.

**B.    Pre-Petition Restructuring & Marketing Efforts**

Facing lower revenues and increased costs associated with federal and state regulatory investigations and related penalties (*see* Section I.A above), Bittrex retained Lazard Ltd. and engaged in numerous discussions with a number of third parties regarding the possible sale of all or part of Bittrex's assets, including customer lists, and potential sources of new liquidity through debt or equity investments.

While some third parties expressed interest in a potential acquisition or partnership with Bittrex's primary international company, BG, few expressed interest in Bittrex's domestic entity, BUS, likely as a result of the current market conditions and inhospitable regulatory environment in the U.S., and consistent with minimal interest in asset sales of other leading distressed crypto exchanges.

Though Bittrex rigorously pursued potential restructuring transactions, it became clear that a potential strategic transaction involving its U.S. operations would not materialize. Accordingly, Bittrex began to analyze a potential shut down of its U.S. operations and finalize its contingency preparations process.  On March 1, 2023, BUS retained Mr. Pohl as an independent non-employee director to act for the sole benefit of BUS in any transactions involving the rest of

the non-debtor corporate group.  The Debtors engaged Quinn Emanuel as their restructuring counsel and BRG as restructuring advisor to assist the Debtors with their wind down efforts.

As a result of these developments, on March 31, 2023, Bittrex released a statement announcing that BUS had made the difficult decision to wind down and close its U.S. operations, effective April 30, 2023.  BUS made customer assets available for withdrawal until April 30, 2023.  Because Bittrex does not hypothecate crypto deposited by its customers, BUS easily met all withdrawals and returns of both crypto and fiat deposits submitted prior to the communicated deadline, and plans to continue to do so subject to Court's approval.

In connection with the wind down, Bittrex created a new Delaware entity—Trexie Management, LLC—to which BUS migrated employees as well as other contractual relationships prior to the Petition Date.  On April 17, 2023, BUS appointed Mr. Hengel and Mr. Duffy to act as Co-CROs. Subsequently, Messrs. Hengel and Duffy became Co-CROs of the remaining Debtors.

With the assistance of their advisors, the Debtors ultimately determined that an in-court process would be necessary to yield the swiftest, predictable and most value-maximizing path forward available to creditors of the Debtors, particularly the Debtors' customers, while giving the Debtors a centralized forum and process to address claims and potential disruptions in operations caused by third parties and related financial pressures.  To that end, the Debtors filed their chapter 11 petitions to facilitate an orderly wind down of their U.S. and Malta operations and effectuate the Debtors' consummate goal—to pay their customers' claims in full as soon as possible.

Through these Chapter 11 Cases, the Debtors seek to orderly complete the previously announced wind down of its U.S. business and implement the wind down of its Malta business, and accomplish, as soon as practicable, a comprehensive process that will (a) ensure maximizing value for the Debtors' creditors and stakeholders; (b) leave intact the non-U.S. business operated by BG and BGB for the benefit of their customers; and (c) separate Bittrex's non-U.S. operations in a fair and equitable manner.

## VI.
## KEY EVENTS DURING CHAPTER 11 CASES

### A.    First And Second Day Relief And Other Case Matters

#### i.    First Day Motions

On the Petition Date, the Debtors filed several motions (the "First Day Motions") seeking certain immediate relief from the Bankruptcy Court to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations due to the commencement of the Chapter 11 Cases.  A brief description of the First Day Motions is set forth below. As of the filing of the Plan on the Petition Date, the Bankruptcy Court has not ruled on the relief requested by the Debtors in the First Day Pleadings.  But following the hearing on First Day Motions on May 10, 2023 ("First Day Hearing") and on June 7, 2023 (the "Second Day Hearing"), the

Bankruptcy Court entered orders granting certain of the First Day Motions and applications on interim and final bases:

### 1. **Joint Administration Motion**

On the Petition Date, the Debtors filed the Debtors' Motion for Entry of an Order (I) Authorizing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion") (D.I. 2), requesting the entry of an order directing joint administration of the Chapter 11 Cases of the Debtors for procedural purposes only (D.I. 2). The Court granted the Joint Administration Motion on May 10, 2023 (D.I. 34).

### 2. **Claims And Noticing Agent Motion**

On the Petition Date, the Debtors filed the Debtors' Application for Entry of an Order Appointing Omni Agent Solutions as Claims and Noticing Agent, Effective as of the Petition Date (the "Claims and Noticing Agent Motion") (D.I. 3), requesting the entry of an order authorizing the retention of Omni Agent Solutions ("Omni") as a third-party claims and noticing agent in these Chapter 11 Cases to assume full responsibility for the distribution of notices and maintenance, processing and docketing of proofs of claim filed in the Debtors' cases, effective as of the Petition Date. The Court granted the Claims and Noticing Agent Motion on May 10, 2023 (D.I. 35).

### 3. **Service Via Email Motion**

On the Petition Date, the Debtors filed the Debtors' Motion Seeking the Entry of Interim and Final Orders (I) Authorizing the Debtors to Serve Certain Parties by Email, and (II) Granting Related Relief (the "Service via Email Motion") (D.I. 4), requesting the entry of an order authorizing the Debtors to serve certain of their customers and other creditors by email. The Court granted the motion on an interim basis on May 10, 2023 (D.I. 36).

On May 25, 2023, the Debtors received informal comments to the proposed form of the final order from the SEC, which asked to modify it to include language preventing any findings under U.S. federal securities laws as to whether crypto assets or transactions involving crypto assets are securities (the "SEC Crypto Comment").

To resolve the SEC Crypto Comment, the Debtors agreed on revising the proposed final order, which the Debtors filed on June 4, 2023 (D.I. 74). No formal objection had been filed against the Service via Email Motion.

On June 7, 2023, the Court entered the revised final order including the SEC Crypto Comment (D.I. 99).

### 4. **The Creditor Matrix Motion**

On the Petition Date, the Debtors filed the Debtors' Motion Seeking the Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain a Consolidated List of Creditors, (B) File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, and (C) Withhold or Omit Certain Confidential Information, (II) Establishing Procedures for Notifying the Parties

of the Commencement, and (III) Granting Related Relief (the "Creditor Matrix Motion") (D.I. 5). In the Creditor Matrix Motion, the Debtors, among other things, requested the entry of orders authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (b) file a consolidated list of the Debtors' fifty largest unsecured creditors in lieu of filing lists for each Debtor; and (c) withhold or omit certain confidential information relating to the Debtors' customers, as well as certain other creditors and employees. The Court granted the Creditor Matrix Motion on an interim basis on May 10, 2023. (D.I. 37).

On May 25, 2023, the SEC asked the Debtors to amend the proposed form of the final order to (a) include the SEC Crypto Comment; and (b) include the SEC among the parties entitled to receive unredacted information upon request (collectively, the "SEC Comments"). The Debtors agreed with the SEC that this change would be included in any revised order granting the Creditor Matrix Motion on a final basis.

On May 19, 2023, Mr. Azim Ghader asked the court to deny the Creditor Matrix Motion (the "Ghader Objection") (D.I. 60).  On June 2, 2023, the U.S. Trustee for the District of Delaware (the "U.S. Trustee") objected to the Creditor Matrix Motion with respect to the Debtors' request to withhold or omit certain confidential information (the "UST Objection," and together with the Ghader Objection, the "Objections") (D.I. 70).  Specifically, the U.S. Trustee objected to the related relief that the Debtors sought, except to allow for the redaction of the addresses and email addresses of natural persons who are Debtors' customers and other creditors.  Id.

On June 6, 2023, the Debtors filed a reply asking the Court to overrule the Objections (the "Reply") (D.I. 94).

On June 7, 2023, the Court held a hearing in which it granted the Creditor Matrix Motion, overruling the Objections.  On June 8, 2023, the Court entered a final order relating to this motion, which included the SEC Comments (D.I. 116).

### 5.  **The Automatic Stay Motion**

On the Petition Date, the Debtors filed the Debtors' Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, (II) Approving the Form and Manner of Notice, and (III) Granting Related Relief (the "Automatic Stay Motion") (D.I. 6).

The Court granted the Automatic Stay Motion on May 10, 2023. (D.I. 38).

### 6.  **Employee Benefits Motion**

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders to (I) Continue Employee Benefits Programs, and (II) Grant Related Relief* (the "Employee Benefits Motion") (D.I. 7).  In the Employee Benefits Motion, the Debtors requested the entry of orders authorizing the Debtors to continue paying prepetition wages and certain related administrative costs and to continue employee benefits programs.  The Court granted the motion on an interim basis on May 10, 2023. (D.I. 40).

On May 25, 2023, the Debtors received informal comments to the proposed form of the final order from the SEC, which asked to modify it to include the SEC Crypto Comment. To resolve the SEC Crypto Comment, the Debtors agreed on revising the proposed final order, which the Debtors filed on June 4, 2023 (D.I. 73). No formal objection had been filed against the Employee Benefits Motion.

On June 7, 2023, the Court entered the revised final order, which included the SEC Crypto Comment (D.I. 100).

7.    **Cash Management Motion**

On the Petition Date, the Debtors filed the Debtors' Motion Seeking the Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Pre-Petition Obligations Related Thereto, and (C) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Post-Petition Intercompany Balances, and (III) Granting Related Relief (the "Cash Management Motion") (D.I. 8), requesting, among other things, the entry of orders authorizing the Debtors to continue utilizing the Debtors' prepetition cash management system.

The Court granted the motion on an interim basis on May 10, 2023. (D.I. 39). Pursuant to this first interim order, the Debtors were required to either come into compliance with section 345(b) of the Bankruptcy Code ("Section 345(b)"), or to seek a further waiver from the Court by June 9, 2023.

On May 25, 2023, the Debtors received informal comments to the proposed form of the final order from the SEC, which asked to modify it to include the SEC Crypto Comment. The Debtors agreed on the inclusion of the SEC Crypto Comment in any further order relating to the Cash Management Motion.

Further, in the intervening period between the entry of the first interim order and June 9, 2023, the Debtors worked with their current banking partners to come into compliance with Section 345(b). None of these banking partners are Region 3 authorized depositories and, as of June 9, 2023, no banks had signed a Uniform Depository Agreement ("UDA[s]") despite the negotiations between the parties were ongoing. The Debtors' efforts to search for a new banking partner were further complicated by reluctance from many institutions to associate with the Crypto Industry or specifically with Bittrex due to their ongoing issues with the SEC. The Debtors conveyed their efforts to come into compliance with Section 345(b) to the U.S. Trustee, and the Debtors informed it that they would not be compliant by June 9, 2023. Following discussions, the U.S. Trustee agreed not to object to a further extension of the Debtors' deadline to come to compliance with Section 345(b) to June 30, 2023. On June 6, 2023, the Debtors filed a proposed second interim order that (a) included the SEC Crypto Comment; and (b) reflected that the Debtors had until June 30, 2023 to come in compliance with Section 345(b) or to obtain a further extension from the Court (D.I. 97). No formal objection had been filed against the Cash Management Motion.

On June 7, 2023, the Court granted the second interim order relating to this motion (D.I. 108).

30699387.1

Following the entry of the second interim order, the Debtors continued their efforts to become compliant with Section 345(b).  With the consent of the US Trustee, the Debtors revised the second interim order into a third interim order, which the Debtors filed with the Court on June 30, 2023 (D.I. 158).  Pursuant to the third interim order, the Debtors had until July 12, 2023—coinciding with the date of an omnibus hearing in these Chapter 11 Cases—to either come into compliance with Section 345(b) or seek a further extension.

On June 30, 2023, the Court entered the third interim order relating to the Cash Management Motion (D.I. 160), which provided for the Debtors' sought extension until July 12, 2023.

On July 6, 2023, the Debtors filed a Supplement to the Cash Management Motion (D.I. 181), requesting a further extension of their deadline to come into compliance with Section 345(b).

Following a July 12, 2023 hearing, on the same date, the Bankruptcy Court entered the final order relating to the Cash Management Motion (the "Final Cash Management Order") (D.I. 205).  Simultaneously, the Court entered the fourth interim order, waiving the requirements of Section 345(b) with respect to the UDAs on a further interim basis through and including August 16, 2023 (D.I. 206), which was the date of an omnibus hearing in these Chapter 11 Cases.

Since entry of the fourth interim order, the Debtors were able to successfully open operating and FBO accounts with an authorized depository (Citizens Bank) and are ready to transfer funds currently held at Customers Bank and Prime Trust to Citizens Bank.  However, the Debtors believe that they need additional time to set up payments for vendors and payroll out of their Citizens Bank Operating Accounts.  The Debtors also believe that they need additional time to resolve issues with Prime Trust, which recently entered receivership.

Accordingly, on August 2, 2023, the Debtors filed a motion (D.I. 242), seeking to revise the Final Cash Management Order to ensure that Customers Bank would comply with the Debtors' requests to make payments to third parties (e.g., vendors and payroll).  That same day, the Debtors also filed a motion (D.I. ~~160~~240), requesting further extension of their deadline to come into compliance with Section 345(b) until September 13, 2023.

On August 14, 2023, the Bankruptcy Court entered an order granting the Debtors request to amend the Final Cash Management Order (D.I. 269).  That same day, the Bankruptcy Court entered the fifth interim order (D.I. ~~168~~268), which provided for the Debtors' sought extension to September 13, 2023.

On August 30, 2023, the Debtors filed a motion to further extend their deadline to come into compliance with Section 345(b) until October 15, 2023 (D.I. 307). The Court entered an order granting the motion on September 12, 2023 (D.I. 338), extending the deadline until October 15, 2023.

8. **DIP Motion**

On the Petition Date, the Debtors filed *Debtors' Motion to Approve Debtor In Possession Financing* (D.I. 9) (the "DIP Motion") requesting entry of an order authorizing the Debtors to (a)

obtain post-petition financing from Aquila (the "DIP Lender"), consisting of a super-priority delayed draw credit facility in the principal amount of up to 700 BTC (the "DIP Loan") to be used for general wind down and liquidity purposes, including the payment of Administrative Expenses, of which amount 250 BTC was made available under the DIP Loan on an interim basis during an interim period before the entry of a final order and an additional 450 BTC was made available upon the entry of the final order; (b) execute and enter into the DIP Loan Documents; (c) use proceeds of the DIP Loan solely as expressly permitted in the DIP Loan Documents and in accordance with the interim order granting the DIP Lender an allowed super-priority administrative expense claim against the Debtors for the amounts advanced under the DIP Loan; (d) pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Loan Documents as such amounts become due and payable.  The DIP Loan accrues interest at an annual rate of 4.00% compounding monthly, payable at maturity, which is the date nine months from May 11, 2023. The DIP Loan requires repayment of the principal amount in BTC.

The Court granted the DIP Motion on an interim basis on May 10, 2023. (D.I. 41).  On May 25, 2023, the Debtors received informal comments to the proposed form of the final order from the SEC, which asked to modify it to include the SEC Crypto Comment.  The Debtors agreed on revising the proposed final order, which the Debtors filed on June 4, 2023 (D.I. 75). No formal objection had been filed against the DIP Motion.

On June 7, 2023, the Court entered the revised final order including the SEC Crypto Comment (D.I. 101).

The First Day Motions, and all orders for relief granted in these Chapter 11 Cases, can be viewed free of charge at https://cases.omniagentsolutions.com/home?clientId=3662 https://omniagentsolutions.com/Bittrex.

### *ii.    Further Motions*

Following the Petition Date, the Debtors filed several other motions to facilitate the Debtors' restructuring efforts and ease administrative burdens (the "Further Motions"), as further described below:

### 1.    **Customer Withdrawals Motion**

On May 12, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Honor Withdrawals of Cryptocurrency Assets by Customers* (the "Customer Withdrawals Motion") (D.I. 43), requesting the entry of an order authorizing customers to withdraw their deposits of cryptocurrencies and fiat currencies as a continuation of the Debtors' orderly wind down process.

On May 24, 2023, the SEC filed a response to the Customer Withdrawals Motion (the "SEC Response"), in which the SEC (a) did not object to the motion with respect to the authorization of customer withdrawals; (b) reserved its right to respond to any request to subordinate SEC claims; and (c) asked to include in the order language preventing any findings

under U.S. federal securities laws as to whether crypto assets or transactions involving crypto assets are securities, and reserving the right of the SEC to challenge transactions involving crypto assets (D.I. 64).

On June 7, 2023, the United States filed an objection against the Customer Withdrawals Motion (the "U.S. Response," and together with the SEC Response, the "Responses"), arguing that (a) contrary to what the Debtors had asserted in the motion, it was not appropriate to authorize customer withdrawals by making an analogy with the treatment reserved to critical vendors and the payment of related prepetition claims ahead of plan confirmation; (b) the relief sought was premature; and (c) Debtors' motion improperly attempted to subordinate certain regulatory claims outside of the plan (D.I. 109). Following discussions with the SEC and the United States, the Debtors agreed to a revised form of the order approving the motion, which the Debtors filed on June 12, 2023 (D.I. 123). The revised proposed order (a) included the language that the SEC asked to include in the SEC Response; and (b) provided that nothing in the order (i) determines or settles any dispute between the Debtors and its customers over the customers' ownership of or entitlement to possession of the cryptocurrency assets held by the Debtors, or the relative priority between the customers and other creditors, including the United States and its agencies (the "U.S. Agencies"); (ii) prohibits the US Agencies from objecting to the Debtors' disclosure statement, plan of liquidation or other pleading on any basis, including, but not limited to, subordination or claims classification; (iii) has precedential effect on the U.S. Agencies in any other bankruptcy case with respect to whether the critical vendor standard is appropriate for the relief sought in the Debtors' motion; or (iv) prohibits the Debtors, any Plan Administrator, plan administrator or any creditor, including the U.S. Agencies, from recovering from any customer the value of any cryptocurrency assets or fiat currency such customer receives that exceeds the distributions provided by the plan, if such general unsecured creditor or subordinated creditor is not paid in full.

The Court entered the revised order on the Customer Withdrawals Motion on June 13, 2023 (D.I. 128).

### 2.    **The Interim Compensation Motion**

On May 17, 2023, the Debtors filed the Debtors' Motion Seeking Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (the "Interim Compensation Order') (D.I. 53). No objection was filed against the Interim Compensation Motion, and the Court entered the related order on June 7, 2023 (D.I. 102).

### 3.    **The Ordinary Course Professionals Motion**

On May 17, 2023, the Debtors filed the Debtors' Motion for Authority to Employ Professionals Used in Ordinary Course of Business (the "Ordinary Course Professionals Motion") (D.I. 54), requesting the entry of an order approving procedures for the retention and compensation of certain professionals used by the Debtors in the ordinary course businesses (D.I. 54).

Prior to the objection deadline (*i.e.*, May 31, 2023), the Debtors received informal comments to the proposed order from the US Trustee.  Following discussions with the U.S. Trustee, the Debtors filed a revised proposed order and amended list of ordinary course professionals on June 4, 2023 (D.I. 77).

The Court granted the Ordinary Course Professionals Motion on June 7, 2023. (D.I. 103).

### 4.    **Applications to Retain Professionals**

On May 17, 2023 and May 23, 2023, the Debtors requested the entry of orders approving applications to retain professionals postpetition pursuant to sections 327 of the Bankruptcy Code, including: (a) Quinn Emanuel Urquhart & Sullivan, LLP as Co-Counsel for the Debtors and the Debtors in Possession ("QE Application") (D.I. 55); (b) Young Conaway Stargatt & Taylor, LLP as Co-Counsel for the Debtors ("YCST Application") (D.I. 56); (c) Berkeley Research Group, LLC as to Provide Co-Chief Restructuring Officers and Additional Personnel for the Debtors ("BRG Application") (D.I. 57); and Omni as Administrative Agent ("Omni Application") (collectively, "Applications") (D.I. 61).  The above professionals, among others, are integral to the Debtors' orderly administration of these Chapter 11 Cases and ultimate wind down.  The postpetition compensation of all of the Debtors' professionals retained pursuant to section 327 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

Prior to the objection deadlines (*i.e.*, May 31, 2023 for the QE, YCST, and BRG Applications, and June 6, 2023 for the Omni Application) the Debtors received informal comments to the proposed orders from the U.S. Trustee.  Following discussions with U.S. Trustee, the Debtors filed revised proposed orders with respect to the QE, YCST, and BRG Applications (D.I. 79, 80, and 82).  No forma objection was filed against any of the Applications.

On June 7 and 8, 2023, the Court entered orders relating to the Applications (D.I. 104, 105, 106, and 114).

The Further Motions, and all orders for relief granted in these Chapter 11 Cases, can be viewed free of charge at ~~https://cases.omniagentsolutions.com/home?clientId=3662~~ https://omniagentsolutions.com/Bittrex.

### B.    **Bar Date Motion**

On May 24, 2023, the Debtors filed Motion of Debtors for Authority to (I) Establish Deadlines for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, and (III) Approving Procedures for Providing Notice of Bar Date (the "Bar Date Motion") (D.I. 65).

Prior to the objection date (i.e., May 31, 2023) the Debtors received certain informal comments to the proposed order from the US Trustee and the SEC.  Following discussions with U.S. Trustee, the Debtors filed a revised proposed order on June 4, 2023 (D.I. 83).

On June 7, 2023, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion (D.I. 107) (the "Bar Date Order"), which established procedures and set

deadlines for filing Proofs of Claim against the Debtors, approved the Customer Proof of Claim Form and the General Proof of Claim Form, and approved the form and manner of the bar date notice (the "Bar Date Notice").  Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities, including customers, to file Proofs of Claim in these Chapter 11 Cases is August 31, 2023 at midnight Prevailing Eastern Time (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is November 4, 2023 at midnight Prevailing Eastern Time (the "Governmental Bar Date").

The Bar Motion and the related order for relief can be viewed free of charge at ~~https://cases.omniagentsolutions.com/home?clientId=3662~~https://omniagentsolutions.com/Bittrex.

## C.    Schedules and Statements

On June 5, 2023, the Debtors filed their respective schedules of assets and liabilities, and statements of financial affairs (D.I. 85, 86, 87, 88, 89, 90, 91, and 92).

On June 23, 2023, with respect to BUS, the Debtors filed supplemental schedules of assets and liabilities, and statements of financial affairs (D.I. 142 and 143), which are in addition to, and do not replace, those filed on June 5, 2023.

Interested parties may review the Schedules and Statements and any amendments free of charge at ~~https://cases.omniagentsolutions.com/home?clientId=3662~~https://omniagentsolutions.com/Bittrex.

## D.    Estimation Motion

On June 16, 2023, the Debtors filed the Motion Pursuant to Sections 105(a) and 502(c) of the Bankruptcy Code to Estimate Contingent and Unliquidated Claims of the Securities and Exchange Commission and Grant Related Relief (the "Estimation Motion") (D.I. 134), seeking the entry of an order establishing procedures for estimating any and all contingent or unliquidated claims asserted against by the SEC ("SEC Claims"), including those arising from the SEC Action and the SEC's allegation that six tokens traded on Bittrex platform were securities ("Six Tokens") (D.I. 134).

On July 6, 2023, the SEC filed its objection to the Estimation Motion (D.I. 176), alleging, among other things, that (a) the Estimation Motion was an improper attempt to shorten the time set by the Bankruptcy Code for governmental units to file claims (i.e., the Governmental Bar Date set on November 4, 2023), and it would result in an unnecessary drain on the estate resources; and (b) the Estimation Motion would require the Court to determine, under federal laws, certain issues in a way that it might interfere with ongoing litigation related to the SEC Action.  Further, in its objection the SEC asked the Court to grant certain discovery to the SEC if the Court granted the Estimation Motion.

On July 10, 2023, the Debtors filed their reply to the SEC's objection to the Estimation Motion (D.I. 189), in which the Debtors, among other things, argued that (a) the estimation of

~~30699387.1~~

the SEC Claim was necessary to avoid an undue delay in the administration of these Chapter 11 Cases; (b) the Court could and should shorten the SEC's deadline to file its claims; (c) the Debtors did not ask the Court to make any findings under federal securities laws, and, by estimating the SEC Claims pursuant to the procedures set forth in the motion, the Court could liquidate the SEC Claims without making any of such findings; and (d) the SEC had already had six years to conduct discovery related to the SEC Action, so that the SEC should not be afforded more time to the stakeholders' detriment in these Chapter 11 Cases.

The Court held an initial hearing on the Estimation Motion on July 16, 2023 but adjourned that hearing so that the parties could continue settlement discussions.

The Estimation Motion can be viewed free of charge at ~~https://cases.omniagentsolutions.com/home?clientId=3662~~https://omniagentsolutions.com/Bittrex.

## E.    The SEC Consent Judgment

After months of hard-fought negotiations, all parties to the SEC Action reached a global resolution of the SEC Claims, the terms of which are reflected in the *Consent of Defendants* (the "Consent Judgment") filed in the SEC Action (D.I. 53-1 in the SEC Action).  More specifically, the Consent Judgment:  (i) permanently enjoins BUS and Mr. Shihara from directly or indirectly making use of mails or any means or instrumentality of interstate commerce for the purpose of using any facility to exchange, within or subject to the jurisdiction of the United States, to effect any transaction in a security, unless registered as an exchange in accordance with Section 5 of the Exchange Act or exempt from such registration; (ii) permanently enjoins BUS and Mr. Shihara from directly or indirectly operating as a broker or dealer in violation of Section 15(a) of the Exchange Act; (iii) permanently enjoins BUS and Mr. Shihara from directly or indirectly operating as a clearing agency in violation of Section 17A of the Exchange Act; and (iv) permanently enjoins BG from directly or indirectly making use of mails or any means or instrumentality of interstate commerce for the purpose of using any facility to exchange, within or subject to the jurisdiction of the United States, to effect any transaction in a security, unless registered as an exchange in accordance with Section 5 of the Exchange Act or exempt from such registration.

The Consent Judgment also holds BUS and BG jointly and severally liable for disgorgement in the amount of $14.4 million, with $4 million in prejudgment interest, and a civil penalty of $5.6 million, for a total of $24 million, due to the SEC within 60 days after the Effective Date.  The SEC will have a general unsecured claim against BUS.  The SEC will not enforce the Consent Judgment until 90 days after the effective date of the Plan (and only if the Consent Judgment is not paid under the Plan), but if the Plan has not gone effective by March 1, 2024, the SEC may enforce the Consent Judgment against BG anytime thereafter.  Notwithstanding any other provision of the Disclosure Statement, Plan or Bankruptcy Court's order confirming the Plan, The SEC's general unsecured claim against BUS will not be subject to reclassification as a Subordinated Claim  by the Debtors, or the Wind Down Entity, as applicable.

The Washington District Court entered an order approving the Consent Judgment on August 15, 2023 (D.I. 54 in the SEC Action).

On August 21, 2023, the Debtors, with the consent of the SEC, filed the *Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 to Approve Settlement with the Securities Exchange Commission* (the "SEC 9019 Motion") (D.I. 273), seeking an order from the Bankruptcy Court approving the Consent Judgment. The Debtors initially envisioned certain claims, including those of the SEC, would be subordinated, because it was unclear, due to uncertainty about the size of the SEC Claims, whether there would be sufficient assets to pay the allowed claims of customers and general unsecured creditors before claims that could potentially be penalties. However, based on the liquidation of the SEC Claims as reflected in the Consent Judgment, the Debtors believe that there are sufficient assets to pay customers and general unsecured creditors in full without the subordination of any claims. Accordingly, the Debtors believe that the Consent Judgment represents a fair, reasonable compromise of the SEC Claims, and is in the best interests of the Debtors, their creditors, and the estates.

The Court has entered an order approving the SEC 9019 Motion (D.I. 325). Payments to the SEC contemplated in the SEC Motion shall be treated as Allowed GUC Claims. Notwithstanding any other provision of the Disclosure Statement, Plan or Confirmation Order, such SEC's Allowed GUC Claims will not be subject to reclassification as a Subordinated Claim by the Debtors, or the Wind Down Entity, as applicable. Payments to the SEC contemplated in the SEC 9019 Motion will not be made from insurance proceeds. Nothing in the Plan shall modify the terms of the settlement in the SEC 9019 Motion that was approved by order of the Bankruptcy Court on September 7, 2023. The SEC Rule 9019 Motion and related order can be viewed free of charge at https://omniagentsolutions.com/Bittrex.

~~If any objections are filed with respect to the SEC 9019 Motion, the Bankruptcy Court shall, after notice and a hearing, determine such objections on or before the Confirmation Date. The SEC Rule 9019 Motion and~~ any related orders for relief ~~can be viewed free of charge at https://cases.omniagentsolutions.com/home?clientId=3662.~~

## F.    341 Creditors' Meetings

On May 16, 2023, the U.S. Trustee Filed a notice setting the first meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code for June 15, 2023, at 10:30 a.m., prevailing Eastern Time (D.I. 48). The first 341 Meeting was held on June 15, 2023 at the scheduled time, and continued on June 23, 2023, at 3:15 p.m., prevailing Eastern Time.

## G.    Stay Enforcement Motion against the State of Florida, Office of Financial Regulation

In April 2023, the Florida Office of Financial Regulation ("Florida OFR") issued an *Administrative Complaint* ("Administrative Complaint") against BUS and certain individuals associated with BUS, seeking to revoke BUS' Florida money transmitter license. On June 28, 2023, the Debtors filed under seal a motion to enforce the automatic stay and non-discrimination provisions of the Bankruptcy Code against the State of Florida, Office of Financial Regulation ("Florida OFR") (D.I. 149). According to the Debtors, after the filing of these Chapter 11 Cases, the Florida OFR violated the automatic stay and discriminated against BUS and individuals

30699387.1

associated with BUS in violation of section 525(a) of the Bankruptcy Code, by continuing to prosecute a pre-Petition Date administrative complaint that seeks the revocation of a money transmitter license despite BUS having already told the Florida OFR it had surrendered it.

On July 5, 2023, the Florida OFR filed a sealed objection against this motion arguing, among other things, that its enforcement action only seek to impose a license revocation for valid public safety and policy concerns, and it is a valid and nondiscriminatory use of police or regulation powers that is exempt from the automatic stay (D.I. 168).

On August 9, 2023, the Debtors submitted a letter to the Bankruptcy Court *Regarding Debtors' Requests for Production in Connection with Debtors' Motion to Enforce Automatic Stay and Non-Discrimination Provisions of the Bankruptcy Code, and for Civil Contempt* (the "Debtors' Letter") (D.I. 256), seeking a status conference with respect to certain discovery issued by the Debtors to the Florida OFR. The Florida OFR filed a response to the Debtors' Letter on August 10, 2023 (D.I. 258). The Bankruptcy Court held a status conference with respect to the Debtors' Letter on August 16, 2023 at 10:00 a.m.

At a hearing on September 20, 2023 before the Bankruptcy Court, the Debtors and the Florida OFR announced a resolution of the Administrative Complaint and Enforcement Motion, pursuant to which the Florida OFR would accept the surrender of BUS' money transmitter license and dismiss all non-BUS defendants from the Administrative Complaint with additional conditions, and in exchange, the Debtors and the Florida OFR would dismiss the Enforcement Motion. The terms of the resolution are set forth in the record of the September 20, 2023 hearing.

The stay enforcement motion against the Florida OFR, and ~~the~~ related ~~order for relief~~pleadings can be viewed free of charge at ~~https://cases.omniagentsolutions.com/home?clientId=3662~~https://omniagentsolutions.com/Bittrex.

### H.   OFAC Restrictions on Distributions

Certain Holders of Claims are customers who are residents or nationals of countries subject to OFAC sanctions. BUS previously entered with OFAC into Settlement in relation to such customers who established their accounts with the Debtors prior to 2017, see Section I.A above. Furthermore, consistently with OFAC regulations, the Debtors have issued "blocked property reports" to OFAC and have frozen the accounts of multiple customers who have become subject to various sanctions after becoming BUS's customers. These funds remain on the Bittrex platform.

Permitting withdrawals or distribution of assets to customers who reside, or cannot conclusively establish that they no longer reside, in OFAC-sanctioned jurisdictions without the authorization of OFAC would constitute a violation of federal laws. OFAC may authorize otherwise prohibited transactions or activities through general or specific licenses. However, that process is lengthy—often well over a year—which would not permit such licenses to be issued during the time period set forth to resolve the Chapter 11 Cases.

Bittrex previously applied to OFAC for licenses to release funds to customers in multiple sanctioned jurisdictions in April 2018.  Eighteen months later, in October 2019, OFAC issued licenses to release funds to customers in Iran, Cuba, and Crimea, which was announced to those customers in November 2019.  Those licenses expired on March 31, 2020, and many affected customers took advantage of the licenses and withdrew funds during that period.  However, despite receiving public notice and direct communications, many did not, including any impacted customers now filing claims in the Chapter 11 Cases.

Aware that funds related to customers in sanctioned jurisdictions and blocked property could not be distributed to such customers without violating federal law absent OFAC authorization, but also aware that a typical license process would take too long in the Chapter 11 Cases, the Debtors sought guidance from OFAC and the Department of Justice.  The parties have agreed that, once the full universe of relevant claims has been determined through the claims review process, the Debtors would provide that list (including all available information pertaining to such affected customers) to OFAC, so that OFAC can advise whether licenses can be granted for some or all of those individuals, allowing Debtors to distribute such funds lawfully.  Similarly, the Debtors are in the process of providing to OFAC the details of customers subject to blocked property reports, so that OFAC can advise the Debtors as to where those funds should be directed.

**I.    Unclaimed Property Claims**

The Debtors received from state governmental entities ten proofs of claims for customer unclaimed property amounting to approximately $1.3 million.  The governmental bar date is November 4, 2023.  The Debtors have performed analysis of these and other potential unclaimed property claims and estimated such claims at less than $25 million. This approximation of up to $25 million in potential state unclaimed property claims has already been accounted for in the Liquidation Analysis and estimated in the Plan as reserves built in Classes 2A and 2B.

The Debtors do not anticipate unclaimed property claim amounts to materially affect distributions under the Plan.

**J.    The Sureties**

Before the Petition Date, BUS maintained surety bond(s), including with Endurance Assurance Corporation ("Endurance").  On August 25, 2023, Endurance filed proofs of claims against each of the Debtors in the amount of $13,536,122: Claim No. 43 against Malta OpCo, Claim No. 228 against Desolation, Claim No. 639 against BUS and Claim No. 14 against Malta Holdings (collectively, the "Endurance Claims").  To resolve the Endurance Claims, the Debtors agreed to release the surety bonds through the Plan, and in exchange, Endurance agreed to withdraw the Endurance Claims.  The terms of the release of the surety bonds are as follows:

*Surety Bond Obligations*

As discussed in the *Declaration of Evan Hengel, Co-Chief Restructuring Officer of the Debtors, In Support of Chapter 11 Petitions and First Day Motions* (the "First Day Affidavit"), BUS was required to obtain and held money

30699387.1

transmitter licenses in the majority of U.S. states where it operated (the "Licenses"). In order to obtain the Licenses, BUS obtained thirty-nine (39) surety bonds (the "Bonds") from Endurance Assurance Corporation and Endurance American Insurance Company (collectively, "Endurance") listing certain governmental and/or regulatory entities and agencies as the obligees (the "Obligees") under the Bonds. Many of the Bonds have cancellation provisions that permit Endurance to cancel the Bonds once certain conditions are met (the "Bond Cancellation Provisions").

The Debtors acknowledge that to effectuate the goal of the Plan, which is to pay the Customer Claims, it is essential the Bonds stay in place in order to provide, among other things, the Customer Distribution to their Customers.

In light of the foregoing, Endurance permitted the Bonds to stay in place, and did not utilize the Bond Cancellation Provisions.

Upon the Effective Date, all of the Bonds shall be released (the "Bond Releases"). The Bond Releases shall be binding and effective on all of the Obligees under the Bonds, and the Bonds shall then be terminated by Endurance. Furthermore, Endurance shall be included as part of the: (a) Exculpated Parties as defined in Article I(A)(58) of the Plan; and (b) Released Parties as defined in Article I(A)(101) under the Plan, such that upon the Effective Date of the Plan, the Bonds may be unliterally terminated by Endurance.

## VII.
## SUMMARY OF PLAN

### A.    General

This section of this Disclosure Statement summarizes the Plan, a copy of which is attached hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the Plan. **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

In general, a chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the consideration that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan. Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class. Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (i) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (ii) provides, among other things, for the cure of certain existing defaults and reinstatement of the maturity of claims in such class.

## B. Classification of Claims and Interests

### i. Classification in General

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### ii. Grouping of Debtors for Convenience Only

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and Plan Distributions to be made in respect of Claims against and Interests in the Debtors under the Plan. Each Class of Claims will be deemed to contain sub-classes for each of the Debtors, to the extent applicable for voting and distribution purposes. To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor. Except as otherwise provided in the Plan, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim. Such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets.

### iii. Classification of Claims and Interests

Claims and Interests, except for Administrative Claims, Priority Tax Claims, Professional Fee Claims, and DIP Loan Claims, are classified as required by the Bankruptcy Code in the Classes set forth in Article III of the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.D of the Plan.

The following chart represents the classification of Claims and Interests for each Debtor pursuant to the Plan.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2A | BUS Customer Claims | Impaired | Entitled to Vote |
| Class 2B | Malta OpCo Customer Claims | Impaired | Entitled to Vote |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 3 | GUC Claims | Impaired | Entitled to Vote |
| Class 4 | Subordinated Claims | Impaired | Entitled to Vote |
| Class 5 | Interests | Impaired | Entitled to Vote |

## C.    **Treatment of Claims and Interests**

To the extent that a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the treatment of Allowed Claims and Allowed Interests in such Class is specified below.

### i.    *Classes' Classification, Treatment, and Voting*

1. Class 1 – Other Priority Claims:.

   (a) *Classification*: Class 1 consists of Other Priority Claims, as defined in the Plan.

   (b) *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

   (c) *Voting*: Class 1 is Unimpaired under the Plan. Holders of Claims in Class 1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2. Class 2A – BUS Customer Claims.

   (a) *Classification*: Class 2A consists of Bittrex US Customers Claims, as defined in the Plan.

   (b) *Treatment*: The BUS Customer Claims are Allowed in the full amount due and owing to each Customer of BUS. Except to the extent that a Holder of an Allowed BUS Customer Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed BUS Customer Claim, each such Holder, who provides all information that the Debtors believe, in consultation with regulatory counsel, is required by the Debtors, shall receive its Customer Distribution, provided that all Government

Regulations applicable to such Customer are satisfied prior to making such Customer Distribution.

(c)     *Voting:* Class 2A is Impaired under the Plan.  Holders of Claims in Class 2A are entitled to vote to accept or reject the Plan.

3.     Class 2B – Malta OpCo Customer Claims.

(a)     *Classification*: Class 2B consists of Malta OpCo Customers Claims, as defined in the Plan.

(b)     *Treatment*: The Malta OpCo Customer Claims are Allowed in the full amount due and owing to each Customer of Malta OpCo.  Except to the extent that a Holder of an Allowed Malta OpCo Customer Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Malta OpCo Customer Claim, each such Holder, who provides all information that the Debtors believe, in consultation with regulatory counsel, is required by the Debtors, shall receive its Customer Distribution, provided that all Government Regulations applicable to such Customer are satisfied prior to making such Customer Distribution.

(a)     *Voting:* Class 2B is Impaired under the Plan.  Holders of Claims in Class 2B are entitled to vote to accept or reject the Plan.

4.     Class 3 – GUC Claims.

(a)     *Classification*: Class 3 consists of GUC Claims, as defined in the Plan.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed GUC Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed GUC Claim, each such Holder of an Allowed Claim in Class 3 shall receive payment in Cash in an amount equal to such Allowed GUC Claim no later than six months after the Effective Date.

(c)     *Voting:* Class 3 is Impaired under the Plan.  Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

5.     Class 4 – Subordinated Claims.

(a)     *Classification*:  Class 4 consists of Subordinated Claims.

(b)     *Treatment:* Except to the extent that a Holder of an Allowed Subordinated Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Subordinated Claim, each such Holder of an Allowed Claim in Class 4 shall receive payment in Cash, after all Allowed GUC Claims

have been paid in Cash in full, in an amount equal to such Allowed Subordinated Claim no later than six months after the Effective Date.

(c)     *Voting:*  Class 4 is Impaired under the Plan.  Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

6.     Class 5 – Interests.

(a)     *Classification*: Class 5 consists of Interests, as defined in the Plan.

(b)     *Treatment*: On the Effective Date, existing Interests in BUS shall survive and continue to exist as Interests in the Wind Down Entity, which entitles each Holder of an Allowed Class 5 Interest in BUS to a Pro Rata payment of any remaining Wind-Down Assets (if any) or the proceeds thereof after all Allowed Claims have been paid in full.  On the Effective Date, existing Interests in all Debtors, other than BUS, shall be deemed canceled, discharged, released, and extinguished, and there shall be no distribution to Holders of Interests in the Debtors, other than BUS, on account of such Interests.

(c)     *Voting:* Class 5 is Impaired under the Plan.  Holders of Interests in Class 5 are entitled to vote to accept or reject the Plan.

### ii.     *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

### iii.     *Elimination of Vacant Classes*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes pursuant to the Disclosure Statement Order shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

### iv.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.D of the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to

render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

### v.    Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class contains Holders of Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

### vi.    Presumed Acceptance and Rejection of the Plan

To the extent that Claims or Interests of any Class receive no Distribution under the Plan, each Holder of a Claim or Interest in such Class is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan. To the extent that Claims or Interests of any Class are Reinstated, each Holder of a Claim or Interest in such Class is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

### vii.    Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### viii.    Subordinated Claims and Interests

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable or contractual subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, or as needed to satisfy the best interests of creditors, the Debtors or the Plan Administrator, as applicable, reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto – via claim objection or motion.  Such reservation of right does not apply to the payments to the SEC contemplated in the SEC Motion, which are Allowed GUC Claims that not subject to a reclassification as a Subordinated Claim by the Debtors, or the Wind Down Entity, as applicable.

## D.    Means for Implementation of the Plan

### i.    No Substantive Consolidation

This Plan is being proposed as a joint chapter 11 plan of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor.  This Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims of Interests set forth in the Plan.

### ii.    Settlement and Compromise

The Plan shall be deemed a motion to approve the good-faith compromise and settlement pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 of disputes between Customers and the Debtors with respect to ownership of Cryptocurrencies.  As set forth in the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Honor Withdrawals of Cryptocurrency Assets by Customers* (D.I. 43), although the Debtors believe that Cryptocurrencies maintained in BUS omnibus wallets constitute property of the bankruptcy estate, Customers may assert that the Cryptocurrencies maintained in BUS omnibus wallets do not constitute property of the bankruptcy estate.  This proposed compromise renders the debate academic because Customers can withdraw 100% of the Cryptocurrencies deposited onto the platform, while avoiding the cost and delay of litigation. At the same time, this proposed compromise will eliminate potential risk to the estate if the Customers prevail in demonstrating that they own the Cryptocurrencies associated with their accounts.  In consideration for the benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement.  The compromises and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan.  The Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise, settlement, and releases set forth in the Plan, as well as a finding by the Bankruptcy Court that such settlement and compromise, and the releases and indemnities provided to effectuate such settlement, are in the best interests of the Debtors, their Estates, and the Holders of Claims and Interests, and is fair, equitable, and reasonable.

### iii.    Liquidation of the Debtors

In accordance with section 1141 of the Bankruptcy Code, the Wind-Down Assets shall automatically be assigned, transferred, and vest in the Wind Down Entity upon the occurrence of the Effective Date, free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and Class 5 Interests, as set forth in the Plan, and the expenses of the Wind Down Entity, as set forth in the Plan, for Distribution in accordance with the Plan.   The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.  The Debtors' attorney-client privilege shall be transferred to the Wind Down Entity.

#### 1.    *Appointment of the Plan Administrator*

The Plan Administrator shall be selected by the Debtors and shall be identified in the Plan Supplement filed with the Bankruptcy Court.  The appointment of the Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date.  The Plan Administrator shall administer the Plan and the Wind Down Entity and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Causes of Action belonging to the Estates, other than the Avoidance Actions released pursuant to Article VIII of the Plan.

In accordance with the Plan, the Plan Administrator shall serve in such capacity through the earlier of (i) the date on which the Wind Down Entity is dissolved in accordance with

30699387.1

Article IV.C.9 of the Plan and (ii) the date on which such Plan Administrator resigns, is terminated, or is otherwise unable to serve; provided, however, that, in the event that the Plan Administrator resigns, is terminated, or is otherwise unable to serve, the holders of a majority of the Interests in the Wind Down Entity shall appoint a successor to serve as the Plan Administrator in accordance with the Plan.  If a successor Plan Administrator is not appointed within 60 days after such occurrence, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind Down Entity, shall approve a successor to serve as the Plan Administrator.  Any such successor Plan Administrator shall serve in such capacity until the Wind Down Entity is dissolved.

2.    *Responsibilities of the Plan Administrator*

Responsibilities of the Plan Administrator shall include, but are not limited to:

a.    a) Administering the implementation of the Plan, including the making of the Distributions contemplated in the Plan;

b.    b) Marshalling, marketing for sale, and liquidating the Wind-Down Assets;

c.    c) Conducting an analysis of any and all Claims and Interests and prosecuting objections thereto or settling or otherwise compromising such Claims and Interests, if necessary and appropriate;

d.    d) Maintaining and administering the reserves in accordance with the terms hereof;

e.    e) Commencing, prosecuting, or settling claims and Causes of Action (other than the Avoidance Actions released pursuant to Article VIII of the Plan), enforcing contracts, and asserting claims, defenses, offsets and privileges in accordance herewith and paying all associated costs;

f.    f) Recovering and compelling turnover of the Debtors' property;

g.    g) Paying Wind Down Entity Expenses;

h.    h) Abandoning any property constituting the Wind-Down Assets that cannot be sold or otherwise disposed of for value and whose Distribution to Holders of Allowed Claims would not be feasible or cost-effective in the Plan Administrator's reasonable judgment;

i.    i) Preparing and filing post-Effective Date operating reports;

j.    j) Filing appropriate tax returns in the exercise of the Plan Administrator's fiduciary obligations;

k.    k) Retaining such Professionals as are necessary and appropriate in furtherance of the Plan Administrator's fiduciary obligations; and

l.    l) Taking such actions as are necessary and reasonable to carry out the purposes of the Wind Down Entity, including winding down the Debtors' business affairs.

3.    *Wind Down Entity*

Pursuant to the Confirmation Order, the Debtors, other than BUS, will be dissolved.  The Wind Down Entity shall continue in existence after the Effective Date for purposes of (1) preserving the Causes of Action for the benefit of Holders of Claims entitled to Distributions under the Plan, (2) winding down the Debtors' remaining businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind Down Entity after the Effective Date, (3) resolving any Disputed Claims, (4) paying Allowed Claims, (5) filing appropriate tax returns, and (6) administering the Plan in an efficacious manner.  The Wind Down Entity shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.  Except as otherwise provided in the Plan, the Wind Down Entity shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Wind Down Entity to file motions or substitutions of parties or counsel in each such matter.  Interests in the Wind Down Entity will be uncertificated and non-transferable.

Except as otherwise provided in the Plan or the Plan Supplement, or any agreement, instrument, or other document incorporated therein, the Wind Down Entity shall continue to exist after the Effective Date as a separate corporate entity, with all the powers of a corporation, pursuant to the applicable law in the jurisdiction in which it is incorporated pursuant to its certificate of incorporation and bylaws in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind Down Entity and the Plan Administrator shall have the right to pursue or not to pursue, or, subject to the terms of the Plan, compromise or settle any Wind-Down Assets.  From and after the Effective Date, the Wind Down Entity and the Plan Administrator may commence, litigate, and settle any Causes of Action (other than the Avoidance Actions released pursuant to Article VIII of the Plan) or Claims relating to the Wind-Down Assets or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind Down Entity and the Plan Administrator on or after the Effective Date, except as otherwise expressly provided in the Plan.  Notwithstanding the release of Avoidance Actions, the Wind Down Entity shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their

30699387.1

Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.

Other than as set forth in the Plan, no other Entity may pursue such Wind-Down Assets on or after the Effective Date. The Wind Down Entity shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors in any Causes of Action pending before the Bankruptcy Court or any other court that relates to any Wind-Down Asset without the need for filing any motion for such relief.

After the Effective Date, and upon completion of all of the transactions described in this Plan and entry of a final decree, the Wind Down Entity and any Debtor mayshall be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 4. *The Wind-Down Assets*

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Wind-Down Assets become available, the Debtors shall be deemed to have automatically transferred to the Wind Down Entity all of their right, title, and interest in and to all of the Wind-Down Assets, in accordance with section 1141 of the Bankruptcy Code. All such Assets shall automatically vest in the Wind Down Entity free and clear of all Claims, Liens, and other interests, subject only to the Allowed Claims and the Class 5 Interests, as set forth in the Plan, and the expenses of the Wind Down Entity, as set forth in the Plan. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Assets or the Wind Down Entity.

### 5. *Expenses of the Plan Administrator*

The Wind Down Entity Expenses shall be paid from the Wind-Down Assets.

### 6. *Insurance; Bond*

The Plan Administrator, in his or her sole discretion, may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the Plan Administrator in accordance with the Plan. The Plan Administrator shall serve with a bond, the cost and expense of which shall be paid by the Wind Down Entity.

### 7. *Fiduciary Duties of the Plan Administrator*

Pursuant to the Plan, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive Distributions pursuant to the terms hereof.

### 8. *Dissolution Of The Wind Down Entity*

Upon a certification to be filed with the Bankruptcy Court by the Plan Administrator of the occurrence of the Effective Date, all distributions having been made, completion of all its duties under the Plan, and entry of a final decree closing the Wind Down Entity's Chapter 11

Case, in compliance with section 350 of the Bankruptcy Code and after a motion and hearing, and the conclusion of all litigation being pursued by the Plan Administrator, the Wind Down Entity shall be deemed to be dissolved without any further action by the Wind Down Entity, the Plan Administrator, or the Bankruptcy Court, including the filing of any documents with the secretary of state for the state in which the Wind Down Entity is formed or any other jurisdiction. The Plan shall constitute a plan of distribution as contemplated in the Georgia Business Corporation Code. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Wind Down Entity in and withdraw the Wind Down Entity from applicable state(s).

9.      *Liability Of The Plan Administrator; Indemnification*

Neither the Plan Administrator, its respective members, employees, employers, designees or professionals, or any of its duly designated agents or representatives (each, a "Wind Down Entity Exculpation Party" and collectively, the "Wind Down Entity Exculpation Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind Down Entity or for the act or omission of any other Wind Down Entity Exculpation Party, nor shall the Wind Down Entity Exculpation Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Plan other than for specific acts or omissions resulting from such Wind Down Entity Exculpation Party's willful misconduct or actual fraud. The Plan Administrator shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee. The Plan Administrator may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, the Plan Administrator shall not be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and its determination not to do so shall not result in the imposition of liability on the Plan Administrator or its respective designees, unless such determination is based on willful misconduct or actual fraud. The Wind Down Entity shall indemnify and hold harmless the Wind Down Entity Exculpation Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Wind Down Entity or the Plan or the discharge of their duties under the Plan; provided, however, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct or actual fraud. Persons dealing or having any relationship with the Plan Administrator shall have recourse only to the Wind-Down Assets and shall look only to the Wind-Down Assets to satisfy any liability or other obligations incurred by the Plan Administrator to such Person in carrying out the terms of the Plan, and the Plan Administrator shall not have any personal obligation to satisfy any such liability. The Plan Administrator shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth in the Plan. The Wind Down Entity shall promptly pay expenses reasonably incurred by any Wind Down Entity Exculpation Party in

defending, participating in, or settling any action, proceeding or investigation in which such Wind Down Entity Exculpation Party is a party or is threatened to be made a party or otherwise is participating in connection with the duties, acts or omissions of the Plan Administrator or otherwise in connection with the affairs of the Wind Down Entity, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Wind Down Entity Exculpation Party hereby undertakes, and the Wind Down Entity hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Exculpated Party is not entitled to be indemnified therefor under the Plan. The foregoing indemnity in respect of any Wind Down Entity Exculpation Party shall survive the termination of such Wind Down Entity Exculpation Party from the capacity for which they are indemnified.

10.    *Full and Final Satisfaction Against The Wind Down Entity*

On and after the Effective Date, the Wind Down Entity shall have no liability on account of any Claims or Equity Interests except as set forth in the Plan. All payments and all Distributions made by the Plan Administrator under the Plan shall be in full and final satisfaction, settlement, and release of and in exchange for all Claims against, or Interests in, the Debtors or the Wind Down Entity.

11.    *Securities Law Exemption*

The issuance of any beneficial interests in the Wind Down Entity is in reliance on section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act of 1933, as amended, and any state or local law requiring registration.

### iv.    *Settlement of Claims After The Effective Date*

In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Wind Down Entity may compromise and settle Claims against, and Interests in, the Debtors and their Estates, and Causes of Action against other Entities.

### v.    *Sources Of Consideration For Plan Distributions*

The Debtors and the Plan Administrator, as applicable, shall fund Distributions under this Plan with the Assets of the Debtors that may become Cash or Cryptocurrencies, including proceeds from the Estate Causes of Action other than the Avoidance Actions released pursuant to Article VIII of the Plan. Each Distribution and issuance referred to in Article VI the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such Distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such Distribution or issuance, which terms and conditions shall bind each Entity receiving such Distribution or issuance. The issuance, Distribution, or authorization, of any securities in connection with the Plan will be exempt from SEC registration to the fullest extent permitted by law.

### vi. Cancellation Of Certain Existing Securities And The DIP Loan Agreement

Except as otherwise provided in the Plan, on and after the Effective Date, all notes, instruments, certificates, agreements, indentures, mortgages, security documents, and other documents evidencing any Claims against any of the Debtors, and any Interests in the Debtors, shall be deemed canceled, surrendered, and discharged without any need for further action or approval of the Bankruptcy Court or any Holder or other person and the obligations of the Debtors or Wind Down Entity, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full and discharged, and the counterparties to any such documents or agreements shall be released from all duties thereunder, provided that notwithstanding Confirmation or Consummation, any such document or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of: (1) allowing Holders to receive Distributions under the Plan; (2) allowing creditors to enforce their rights, claims, and interests vis-à-vis any parties other than the Debtors; and (3) preserving any rights of any creditors to enforce any obligations owed to each of them under the Plan, and to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including, but not limited, to enforce the respective obligations owed to such parties under the Plan.

### vii. Release of Liens

Except as otherwise expressly provided in the Plan, on the Effective Date, all Liens on any property of any Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors shall be automatically discharged and released.

### viii. Corporate Action

On the Effective Date, all actions contemplated under the Plan with respect to the Debtors and the Wind Down Entity, as applicable, shall be deemed authorized and approved in all respects, including, as applicable: (1) formation by the Debtors or such other party as contemplated in the Plan, Plan Supplement, or Confirmation Order, of the Wind Down Entity, and the any transactions related thereto; (1) selection of, and the election or appointment (as applicable) of, the Plan Administrator; (2) adoption of and entry into any employment agreements; (4) all transfers of Assets that are to occur pursuant to the Plan; (5) the dissolution and wind down of the Debtors and the Wind Down Entity; and (6) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).

All matters provided for in the Plan involving the corporate structure of the Debtors or the Wind Down Entity, as applicable, and any corporate action, authorization, or approval that would otherwise be required by the Debtors or the Wind Down Entity, as applicable, in connection with the Plan shall be deemed to have occurred or to have been obtained and shall be in effect as of the Effective Date, without any requirement of further action, authorization, or approval by the Bankruptcy Court, security holders, directors, managers, or officers of the Debtors, the Wind Down Entity, or any other person.

On or before the Effective Date, the appropriate officers of the Debtors or the Wind Down Entity, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments, and take such actions, contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind Down Entity, and all such documents shall be deemed ratified. The authorizations and approvals contemplated by this Section shall be effective notwithstanding any requirements under non-bankruptcy law.

### ix.     *Effectuating Documents; Further Transactions*

On or after the Effective Date, the Debtors or the Wind Down Entity, as applicable, and the officers, directors, agents and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

### x.     *Section 1146 Exemption*

Pursuant to, and to the fullest extent permitted by, section 1146 of the Bankruptcy Code, any transfers of property pursuant to, in contemplation of, or in connection with, the Plan, including: (1) the transfer, if any, of the Wind-Down Assets to the Wind Down Entity; (2) the issuance of any beneficial interests in the Wind Down Entity; and (3) the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets in connection with, arising out of, contemplated by, or in any way related to the Plan, shall, in each case, not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer, mortgage recording tax, or other similar tax, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers or property without the payment of any such tax, recordation fee, or governmental assessment.

### xi.     *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, the Debtors shall assign to the Wind Down Entity and the Wind Down Entity shall retain and may enforce all rights to commence and pursue any and all Causes of Action belonging to the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Wind Down Entity's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations set forth in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Wind Down Entity as of the Effective Date.

The Wind Down Entity may pursue such Causes of Action, as appropriate. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Wind Down Entity will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Wind Down Entity expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan. Unless any Cause of Action of the Debtors against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Debtors and the Wind Down Entity expressly reserve all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Wind Down Entity shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall be transferred to and vest in the Wind Down Entity, except as otherwise provided in the Plan, including Article VIII of the Plan. The Wind Down Entity shall retain, and through their authorized agents or representatives shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment, any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding anything to the contrary in the Plan, on the Effective Date, the Debtors, on behalf of themselves and their Estates, shall release and waive any and all Avoidance Actions.

### xii.    Payment of Certain Fees

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtors, or the Wind Down Entity, as applicable, shall pay on the Effective Date any reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by all of the attorneys, accountants, and other professionals, advisors, and consultants payable under the DIP Order (which fees and expenses shall be paid pursuant to the terms of the DIP Order).

### xiii.    Document Retention

On and after the Effective Date, the Wind Down Entity may maintain or dispose of documents in accordance with the Plan.

### xiv.    Closing of Chapter 11 Cases

After an Estate has been fully administered, the Wind Down Entity shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

### xv.    Notice of Effective Date

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### xvi.    Separability

Notwithstanding the combination of the separate plans of liquidation for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still, subject to the consent of the applicable Debtors, confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

## E.    Distributions

### i.    Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Distribution Date (or if a Claim is not an Allowed Claim on the Distribution Date, on the date that such Claim or Interest becomes an Allowed Claim), each Holder of an Allowed Claim shall receive the full amount of the Distributions that the Plan provides for such Allowed Claim in accordance with its priority and Allowed amount.

If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.

To the extent any Distributions made in accordance with the Plan are subject to disgorgement to the Wind Down Entity, the Wind Down Entity shall effectuate the Distribution of such disgorged Distribution to the Holders of Allowed Claims entitled to such Distributions in accordance with the Plan as soon as reasonably practicable. For the avoidance of doubt, to the extent disgorgement of a Distribution made to a Holder of a Claim pursuant to the Plan is required, such Holder shall be required to disgorge any Distribution but shall not be required to remit interest on such Distribution.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### ii.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### 1.    Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making Distributions shall instead be authorized and entitled to recognize only

those record Holders listed on the Claims Register as of the close of business on such Distribution Record Date.

2. *Delivery of Distributions*

Except as otherwise provided in the Plan, the Wind Down Entity shall be authorized to make Distributions to Holders of Allowed Claims and Allowed Interests as of the Distribution Record Date at the Address for each such Holder as indicated on the Debtors' records as of the date of any such Distribution. Customer Distributions shall be initiated by the Customer using the Bittrex platform. The manner of such Distributions shall be determined at the discretion of the Wind Down Entity, and the address for each Holder of an Allowed Claim or Allowed Interest shall be deemed to be the address set forth in any Proof of Claim or Interest Filed by that Holder.

3. *Delivery of Distributions to Holders of GUC Claims*

The Debtors and the Wind Down Entity, will, in their reasonable discretion, determine the method for a timely Distribution of all Distributions to Holders of Allowed GUC Claims pursuant to the Plan.

4. *Minimum Distribution*

No Cash payment of less than $100 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim; provided however, that there will be no minimum amount with respect to Customer Distributions, provided further, however, that Customers will be required to pay any fees charged by third parties in connection with the withdrawal of Cryptocurrencies, provided further that with respect to the Defunct Crypto there will be no Customer Distributions, and provided further and the Debtors or the Plan Administrator will determine whether there is sufficient Non-Economic Crypto to warrant distribution

5. *Undeliverable Distributions and Unclaimed Property*

In the event that any Distribution to any Holder is returned as undeliverable or in the event that a Customer fails to initiate a Customer Distribution or comply with any Government Regulation or provide any information that the Debtors believe, in consultation with regulatory counsel, is required by the Debtors, no Distribution to such Holder shall be made unless and until the Wind Down Entity has determined the then-current address of such Holder and has received all other required information, at which time such Distribution shall be made to such Holder without interest; provided that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date such Distribution is returned as undeliverable or such Customer fails to complete a Customer Distribution or comply with any Government Regulation or other information required by the Debtors. After such date, all unclaimed property or interests in property shall revert to the Wind Down Entity automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) for Distribution consistent with the Plan, and any claim of any Holder to such property shall be fully discharged, released, and forever barred.

For the avoidance of doubt, the Wind Down Entity and its respective agents and attorneys are under no duty to take any action to attempt to locate any Claim Holder.

### iii. Special Rules For Distributions To Holders Of Disputed Claims And Interests

Except as otherwise provided in the Plan, agreed to by the Debtors or the Wind Down Entity, or set forth in an order of the Bankruptcy Court: (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim or Interest until all such disputes in connection with such Disputed Claim or Interest have been resolved by settlement or Final Order; provided that if a portion of a Claim is not Disputed, the Debtors or the Wind Down Entity may make a partial Distribution based on such portion of such Claim that is not Disputed; and (b) any Entity that holds both an Allowed Claim or Interest and a Disputed Claim or Interest shall not receive any Distribution on the Allowed Claim or Interest unless and until all objections to the Disputed Claim or Interest have been resolved by settlement or Final Order or the Claims or Interests have been Allowed or Disallowed. Any dividends or other Distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other Distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

### iv. Manner Of Payment

Unless otherwise set forth in the Plan, all Distributions under the Plan to the Holders of Allowed Claims shall be made by the Debtors or the Wind Down Entity. At the option of the Debtors and the Wind Down Entity, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

### v. Compliance With Tax Requirements

In connection with the Plan, as applicable, the Debtors and the Wind Down Entity, as applicable, shall comply with all tax withholding and tax reporting requirements imposed on them by any Governmental Unit with respect to Distributions pursuant to the Plan. Notwithstanding any provision in the Plan to the contrary, the Debtors and the Wind Down Entity, as applicable, shall be authorized to take all actions necessary to comply with such tax withholding and tax reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions, and establishing any other mechanisms they believe are reasonable and appropriate to comply with such requirements. The Debtors and the Wind Down Entity, as applicable, reserve the right to allocate all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

### vi. Setoffs and Recoupment

The Debtors or the Wind Down Entity, as applicable, may, but shall not be required to, setoff against or recoup any payments or Distributions to be made pursuant to the Plan in respect of any Claims of any nature whatsoever that the Debtors or the Wind Down Entity, as applicable may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Wind Down Entity, as applicable, of any such right it may have against the Holder of such Claim.

### vii. No Double Payment of Claims

To the extent that a Claim is Allowed against more than one Debtor's Estate, there shall be only a single recovery on account of that Allowed Claim, but the Holder of an Allowed Claim against more than one Debtor may recover Distributions from all co-obligor Debtors' Estates until the Holder has received payment in full on the Allowed Claims. No Holder of an Allowed Claim shall be entitled to receive more than payment in full of its Allowed Claim, and each Claim shall be administered and treated in the manner provided by the Plan only until payment in full on that Allowed Claim.

### viii. Claims Paid or Payable by Third Parties

#### 1. Claims Paid by Third Parties

The Debtors and the Wind Down Entity shall reduce a Claim, and such Claim shall be deemed Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor or the Wind Down Entity. Subject to the penultimate sentence of this paragraph, to the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor or the Wind Down Entity on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Distribution to the Wind Down Entity, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan. The failure of such Holder to timely repay or return such Distribution shall result in the Holder owing the Wind Down Entity annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day period specified above until the amount is repaid.

#### 2. Claims Payable by Third Parties

Except as otherwise provided for in the Plan, no Distributions under the Plan shall be made on account of a Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such a Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' agreement, the applicable portion of such Claim may be Disallowed without a Claims objection having to be Filed and without any further notice

to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, the Debtors do not intend to make any payments to the SEC with insurance proceeds.

### 3. *Applicability of Insurance Policies*

Except as otherwise provided in the Plan, any Distributions of insurance proceeds to Holders of Allowed Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy. Except as otherwise provided in the Plan, the Plan shall not otherwise constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Policies, nor shall anything contained in the Plan (a) constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers, or (b) establish, determine, or otherwise imply any liability or obligation, including any coverage obligation, of any Insurer.

### 4. *Allocation of Distributions Between Principal and Interest*

For Distributions in respect of Allowed Claims, to the extent that any such Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

### F.    **Procedures for Resolving Claims**

#### i.    ***Allowance of Claims***

Except as otherwise set forth in the Plan, after the Effective Date, the Wind Down Entity shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as specifically provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed in accordance with the Plan.

#### ii.    ***Claims Administration Responsibilities***

Except as otherwise specifically provided in the Plan, and subject to the rights and duties of the Wind Down Entity as set forth in the Plan, after the Effective Date, (a) the Wind Down Entity shall have the sole authority to File, withdraw, or litigate to judgment, objections to all Claims; and (b) the Wind Down Entity shall have the authority to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) the Wind Down Entity shall have the authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

### iii. Adjustment to Claims Without Objection

Any Claim that has been paid or satisfied, ~~or~~ any Claim that has been amended or superseded, or any Claim that has been asserted against multiple Debtors may be adjusted on the Claims Register by the Wind Down Entity without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### iv. Time to File Objections to Claims or Interests

Any objections or challenges to Claims or Interests shall be Filed on or before the applicable Claims Objection Deadline.

### v. Estimation of Claims

Before or after the Effective Date, the Debtors or the Wind Down Entity may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent, unliquidated, or arises from a right to an equitable remedy for breach of performance pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. § 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been Disallowed or expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distributions), and the Wind Down Entity may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated and the Bankruptcy Court grants such reconsideration. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### vi. Disputed and Contingent Claims Reserve

On or after the Effective Date, the Debtors and the Wind Down Entity shall establish one or more reserves for Claims that are contingent or have not yet been Allowed, in an amount or amounts as reasonably determined by the applicable Debtors and Wind Down Entity, consistent with the Proof of Claim Filed by the applicable Holder of such Disputed Claim.

Any assets held in any such reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. As such, such assets will be subject to

entity-level taxation, and the Debtors and Wind Down Entity shall be required to comply with the relevant rules.

### vii.    Disallowance of Claims

Any Claims held by Entities from which the Bankruptcy Court has determined that property is recoverable under section 542, 543, 547, 548, 549, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer that the Bankruptcy Court has determined is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and the full amount of such obligation to the Debtors has been paid or turned over in full.

All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and Disallowed as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.  All Proofs of Claim Filed on account of an employee benefit shall be deemed satisfied and Disallowed as of the Effective Date to the extent the Wind Down Entity elects to honor such employee benefit, without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as provided in the Plan or otherwise agreed to by the Wind Down Entity in its sole discretion, any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

### viii.    Amendments to Proofs of Claim

On or after the Effective Date, a Proof of Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Wind Down Entity, and any such new or amended Proof of Claim or Interest Filed that is not so authorized before it is Filed shall be deemed Disallowed in full without any further action.

### ix.    Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

### x.      *No Distributions Pending Allowance*

Except as otherwise set forth in the Plan, if an objection to a Claim or portion thereof is Filed as set forth in Article VII.C of the Plan, no payment or Distribution provided under the Plan shall be made on account of such Disputed Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

### xi.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date a Disputed Claim becomes Allowed, the Wind Down Entity shall provide to the Holder of such Claim the Distribution (if any) to which such Holder is entitled under the Plan, as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under such order or judgment of the Bankruptcy Court.

## G.     Executory Contracts and Unexpired Leases

### i.      *Rejection of Executory Contracts and Unexpired Leases*

As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, unless such contract or lease: (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; or (iv) is identified for assumption on the Assumption Schedule included in the Plan Supplement.

Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Wind Down Entity has provided adequate assurance of future performance under such assumed executory contracts and unexpired leases. Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Wind Down Entity, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

### ii.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of executory contracts or unexpired leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed within thirty (30) days after the later of:   (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; and (2) the effective date of such rejection.  Any

Claims arising from the rejection of an executory contract or unexpired lease not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, Wind Down Entity, the Estates, or their property without the need for any objection by the Debtors or the Wind Down Entity or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' executory contracts or unexpired leases shall be classified as GUC Claims and shall be treated in accordance with the Plan, unless a different security or priority is otherwise asserted in such Proof of Claim and Allowed in accordance with Article VII of the Plan.

### iii.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each assumed executory contract or unexpired lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitation described below, or on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Wind Down Entity or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the executory contract or unexpired lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

Any objection by a contract or lease counterparty to a proposed assumption (including, for purposes of the Plan, assumption and assignment) of an executory contract or unexpired lease or the related cure cost (including as set forth on the Assumption Schedule) must be Filed, served, and actually received by the Debtors in accordance with the Disclosure Statement Order or other applicable Final Order of the Bankruptcy Court.  Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such assumption and the proposed cure amount.  For the avoidance of doubt, to the extent an executory contract or unexpired lease proposed to be assumed is not listed as having a related cure cost, any counterparty to such executory contract or unexpired lease that fails to object timely to the proposed assumption will be deemed to have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults, including any cure payment, under such executory contract or unexpired lease.

Assumption of any executory contract or unexpired lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption.  Any Proofs of Claim Filed with respect to an

assumed executory contract or unexpired lease shall be deemed Disallowed, without further notice to or action, order, or approval of the Bankruptcy Court.

### iv.    Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases

Rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed by the executory contract or unexpired lease counterparty or counterparties to the Debtors or the Wind Down Entity, as applicable, under such executory contracts or unexpired leases.

### v.    Indemnification Obligations

Any obligations of the Debtors pursuant to a contract, instrument, agreement, certificate of incorporation, by-law, comparable organizational document or any other document or applicable law, to indemnify, reimburse, or limit the liability of any director, officer, or employee of the Debtors, pursuant to the foregoing in respect of any claims, demands, suits, causes of action, or proceedings against such director, officer, or employee based upon any act or omission related to such director or officer's service with, for, or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits, and proceedings relating to the Debtors shall survive Confirmation of the Plan and except as set forth in the Plan, remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement, or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date; provided, however, that all monetary obligations under this provision shall be (a) limited solely to available insurance coverage, and (b) to the extent such Claims are not covered by any applicable insurance, including deductibles, shall be treated as Allowed GUC Claims.  Any Claim based on the Debtors' indemnification obligations shall not be a Disputed Claim or subject to any objection under Bankruptcy Code section 502(e)(1)(B).  For the avoidance of doubt, the scope of the Debtors' indemnification obligations in this Section shall be conterminous with applicable non-bankruptcy law and to the extent provided by such law.

### vi.    Insurance Policies

Notwithstanding anything to the contrary in the Plan, the Plan Supplement, any bar date notice, or claim objection, and any other document related to any of the foregoing, and any other order of the Bankruptcy Court, on the Effective Date: (a) all insurance policies issued or providing coverage to the Debtors shall (subject to the applicable insurer's right to object to such a designation) be assumed in their entirety by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code, and coverage for defense costs and indemnification under the D&O Policies shall remain available to all individuals within the definition of "Insured" in the D&O Policies, and the Wind Down Entity shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such insurance policies, without the need or requirement for an insurer to file a Proof of Claim, Administrative Expense Claim or objection to any cure amount; (b) nothing shall alter or modify the terms and conditions of and/or any rights, obligations, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the

applicable insurer; and (c) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (i) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (ii) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim, and (III) all costs in relation to each of the foregoing; (iii) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies; and (iv) holders of Allowed Claims to pursue insurance recovery to the extent allowed or required by this Plan.

### vii.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all executory contracts and unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated under the Plan.

Unless otherwise provided in the Plan or in the applicable executory contract or unexpired lease (as may have been amended, modified, supplemented, or restated), modifications, amendments, supplements, and restatements to pre-petition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the pre-petition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### viii.    *Reservation of Rights*

Neither the exclusion nor inclusion of any executory contract or unexpired lease on the Assumption Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an executory contract or unexpired lease or that any of the Debtors or the Wind Down Entity has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind Down Entity, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

### ix.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur with respect to a Debtor, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for

assuming or rejecting unexpired leases with respect to such Debtor pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

**H.     Conditions Precedent to the Occurrence of the Effective Date**

   *i.     Conditions Precedent to Confirmation*

   It shall be a condition to Confirmation that the following shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

   1.     The Bankruptcy Court shall have entered the Disclosure Statement Order and the Confirmation Order in a manner consistent in all material respects with the Plan; and

   2.     The Confirmation Order shall, among other things:

    (a)     Decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

    (b)     Authorize the Debtors and the Wind Down Entity, as applicable, to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

    (c)     Authorize the Debtors and the Wind Down Entity, as applicable/necessary, to enter into any agreements, transactions, and sales of property, as set forth in the Plan Supplement with respect to the Debtors or the Wind Down Entity, as applicable;

    (d)     Provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order in furtherance of, or in connection with, any transfers of property pursuant to the Plan, including any deeds, mortgages, security interest filings, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan shall not be subject to transfer or recording taxes or fees to the extent permissible under section 1146 of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment;

    (e)     Authorize and approve the compromise and settlement set forth in the Plan; and

    (f)     Contain the release, injunction, and exculpation provisions contained in Article VIII of the Plan.

### ii.    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1.    The Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred, and no stay of the Confirmation Order shall be in effect;

2.    All agreements necessary to implement the Plan, shall have (i) been tendered for delivery and (ii) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements; and

3.    The documents contained in the Plan Supplement will contain terms and conditions consistent in all material respects with this Plan.

### iii.    Waiver of Conditions

The conditions to Confirmation and Consummation set forth in this Article IX may be waived by the Debtors and/or the Wind Down Entity without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

### iv.    Substantial Consummation

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

### v.    Effect of Failure of Conditions

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (2) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

## VIII.
## TAX CONSEQUENCES

## A.    Introduction

The following discussion is an overview of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and Holders entitled to vote to accept or reject the Plan.  This overview is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the

"IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

The application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Plan, and to Cryptocurrency in general, is subject to an unusually high level of uncertainty.  No opinion of counsel has been or will be obtained and the Debtors have not requested, and do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan.  No portion of this discussion is binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors take.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.  THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders of Claims and Interests in light of their individual circumstances.  This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Purchaser, Persons liable for alternative minimum tax, Persons (other than, if applicable, the Debtors) using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction).  No aspect of state, local, non-income, or non-U.S. taxation is addressed (including, for the avoidance of doubt, the application of Malta tax law to Holders or to the Debtors, which issues are under further review).  Furthermore, this preliminary overview assumes that a Holder holds only Claims or Interests in a single Class and, except as set forth below, holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC).  This preliminary overview also assumes that the various debt and other arrangements to which the Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC.  This preliminary overview does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.  The U.S. federal income tax consequences of the implementation of the Plan to the Debtors and Holders

of Claims and Interests described below also may vary depending on the ultimate nature of any Restructuring Transactions that the Debtors engage in. This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is: (a) an individual who is a citizen or resident of the United States; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust, or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The below discussion assumes that the Debtors obtained tax ownership of cryptocurrency deposits when customers made such deposits. The Debtors believe that position is the right one based on, among other things, the fact that the Debtors had the right to transfer and otherwise deal in deposited cryptocurrency. If the Debtors were determined to not have tax ownership of the cryptocurrency, the consequences of the Plan to Holders of Claims and the Debtors would vary significantly from the discussion below.

**ACCORDINGLY, THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

## B. <u>Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors</u>

The Plan contemplates a liquidation of the Debtors. Generally, the Debtors would distribute Cryptocurrency and/or Cash in satisfaction of Claims. The Debtors would realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in

such assets.  Gain would be reduced by the amount of tax attributes (if any) available for use by the Debtors, and any remaining gain would be recognized by the Debtors and result in a cash tax obligation.

With respect to the Debtors' Distribution of Cryptocurrency and/or Cash to Holders of Claims, the Debtors would recognize income or cancellation of indebtedness income related to any difference between the value of what a Holder receives in exchange for its Claim and the amount of such Claim (determined without regard to "dollarization" of such Claims) in case the payment is not like kind.

Following a liquidation, the Debtors' tax attributes (if any) will not survive the implementation of the Plan.  Accordingly, the rules regarding cancellation of indebtedness income are generally inapplicable and the rules regarding section 382 of the IRC are inapplicable and, in each case, not discussed further.

The Debtors continue to evaluate how "dollarization" of Claims as of the Effective Date may modify the above analysis, either with respect to the implementation of the Plan itself or with respect to any administrative tax period more generally.  The Debtors currently cannot say with certainty that there will not be material administrative income tax liabilities that must be satisfied under the Plan.

## C.     Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders[6] of Allowed Claims Entitled to Vote

### i.     *The Liquidation*

#### 1.     U.S. Federal Income Tax Consequences to Certain U.S. Holders of Customer Claims

Each Holder of an Allowed Customer Claim will receive, in exchange for such Allowed BUS Customer Claim, its Customer Distribution, which corresponds to the Distribution of like kind Cryptocurrencies to be Distributed to Holders of Customer Claims by providing access to the Debtors' platform for withdrawal of 100% of the amount of Cryptocurrencies associated with such Customer's account as of the Petition Date, provided that Customers will be required to pay any fees charged by third parties in connection with the withdrawal of Cryptocurrencies

There is a material risk that U.S. Holders of Customer Claims will have a taxable event in connection with the consummation of the Plan or the "dollarization" of Claims (or separate taxable events for one or both events).  For the avoidance of doubt, this is the case even though the liquidation contemplates that Holders of Customer Claims can withdraw cryptocurrency from the Debtors' platform.  To the extent any taxable event occurs, tax liability would be based on the difference between the Holder's tax basis in its Claim compared to the value it receives in respect of such Claim, with such gain or loss generally being capital in nature.

---

[6]    Based on the Debtors' understanding of the residence of Holders, the Debtors do not discuss any U.S. federal income tax consequences of the consummation of the Plan to Non-U.S.-Holders.

The tax treatment of Holders under the Plan depends significantly on the tax treatment of customer deposits in the first instance. There is uncertainty with respect to whether deposits are taxable when they occur, but the Debtors generally expect that most customers have taken the position that the act of depositing cryptocurrency with the Debtors is not a taxable event. While there is substantial theoretical debate regarding that position, it is a position that has some level of support in the idea that the exchange of cryptocurrency for a contractual right to the return of such cryptocurrency is not a transaction that results in a realization event under section 1001 of the IRC because it does not involve an exchange of property "differing materially either in kind or in extent." Such position relies, among other things, on caselaw that pre-dates the enactment of section 1058 of the IRC and analogies to the treatment afforded to securities lending under section 1058. On the other hand, there is also support for the position that the initial deposit of cryptocurrency is a taxable event because of various provisions in the Terms of Use that narrow a customer's rights with respect to the deposited cryptocurrency.

To the extent an initial deposit of cryptocurrency was not taxable, there is an argument that the same position could be taken with respect to the return by the Debtors of such cryptocurrency to customers, because the exchange of the contractual right to the return of such cryptocurrency for the underlying cryptocurrency would itself not be an exchange of property "differing materially either in kind or in extent." The Debtors emphasize that, like other aspects of Cryptocurrency taxation, this position is subject to significant uncertainty, including because of the existence of Proposed Treasury Regulation Section 1.1058-1(e)(2), which causes a securities lending transaction to become taxable where a borrower fails to return to the lender securities identical to the securities transferred, or otherwise defaults under the agreement. While this Proposed Treasury Regulation is inapplicable by its terms to Cryptocurrency, it would very likely cause such a transaction to be taxable to a customer (or other Person that transferred Cryptocurrency to the Debtors in a transaction (such as a "loan" (for commercial purposes but not tax purposes) of Cryptocurrency) intended to be treated as non-taxable in the first instance) if it applied to Cryptocurrency. If the Customer Distribution in the form of Cryptocurrency were a different type of Cryptocurrency than the Cryptocurrency that the Holder of Customer Claim originally deposited on the Bittrex platform (because of, for example, rebalancing), then the ability to rely on such argument would be greatly impaired because the property withdrawn would differ "materially either in kind or in extent," likely leading to a taxable event (and in any event, for the avoidance of doubt, in a liquidation, the receipt of Cash or property other than cryptocurrency in exchange for deposited cryptocurrency should generally result in a taxable event). (TBD whether to include this paragraph, given that customers should only receive the same type of cryptocurrencies). The Debtors continue to study whether the above arguments, when combined with a general "bifurcation" approach that separates the recovery Holders receive into multiple components (*i.e.*, the type of Cryptocurrency the customer had deposited on the platform, other Cryptocurrencies, Cash), may permit Holders to take the position that Holders retain the portion of their recovery taking the form of the type of Cryptocurrency that the Holder had deposited on the Debtors' platform even if the receipt of other consideration constitutes a taxable exchange as to such other Cash and/or property. The Debtors emphasize that these positions are unclear.

The ability to take the position that a Customer Distribution is not taxable to Holders of Customer Claims is subject to increased risk as a result of the "dollarization" of Customer Claims. It may be the case that "dollarization" resulted, or will result, in a taxable event to

Customers, either as of the Petition Date or as of the Confirmation Date.  If such a taxable event were determined to have occurred, it would be because the contract to receive particular Cryptocurrency was modified, as a result of dollarization, to have an economic "cap."  In light of this, it is unclear whether the arguments described above that support tax-free treatment with respect to the receipt of Cryptocurrency under the Plan could still apply.  Such a "capped" contract arguably "differ[s] materially either in kind or in extent" from the underlying Cryptocurrency.  However, the Debtors also believe it would be reasonable to assert that this is not a material enough change to Customers' underlying entitlements.

**The Debtors emphasize in the strongest possible terms that the law applicable to deposits and withdrawals of Cryptocurrency from the Debtors, "dollarization," and the consummation of the Plan is subject to extreme uncertainty.  There is effectively no "controlling" authority on any of these issues.  Accordingly, there is a material risk that the positions described above may not be sustained.  The concepts of a non-taxable in kind distribution of Cryptocurrency referred to above rest in large part on the theory that the property that the Debtors would distribute in kind through a Customer Distribution to a Holder of a Customer Claim would be in respect of an obligation that does not differ "materially either in kind or in extent" from the obligation that arose when the Holder of a Customer Claim deposited property with the Debtors.  There is a significant risk that the Claim that a Holder of a Customer Claim has against the Debtors as of the Petition Date is with respect to property that differs "materially either in kind or in extent" from the property that the Holder previously deposited with the Debtors, such that the Debtors would be distributing property in respect of an obligation that differs "materially either in kind or in extent" from the one that existed when the Holder deposited property with the Debtors (and thus tax-free in kind treatment would likely be unavailable).**

Very generally, to the extent any form of transaction is taxable to a Holder of a Customer Claim (which, for the avoidance of doubt, would include any Holder who receives only Cash), each such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (be it Cash, and/or Cryptocurrency)[7] received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor.  The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim.  If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  Such Holder's tax basis in any Cryptocurrency received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

---

[7]   The Debtors generally do not expect that the right to become a Transferred Creditor would be ascribed independent value for U.S. federal income tax purposes.

A U.S. Holder should not recognize gain or loss in connection with any Distribution from a Debtor until such Debtor makes such Distribution.

As noted repeatedly herein, nothing in this disclosure constitutes tax or legal advice to Holders. However, the Debtors wish to highlight one area of tax consideration that has been the subject of significant speculation in online resources and similar. The above language indicates that customers may be able to take a loss in connection with the consummation of the Plan. The Debtors generally expect such loss would arise *when the Plan is consummated*, and not before. There has been significant speculation in various sources with respect to whether a customer can take a loss, potentially under section 166 of the Tax Code (related to bad debts, including non-business bad debts). There are significant timing limitations on the ability to claim a loss under section 166 of the Tax Code. In particular, other than with respect to certain types of taxpayers that can take partial bad debt deductions in connection with a "charge-off" under section 166(a)(2) of the Tax Code, most taxpayers can only take a deduction under 166 when a debt has become entirely worthless. Certain Customer Claims may have become entirely worthless because the related Cryptocurrency no longer trades ("Defunct Cryptocurrency"). Accordingly, the Debtors are of the view that certain Customers may be able to take a section 166 loss with respect to Customer Claims that, prior to the consummation of the Plan, became entirely worthless because of their association to Defunct Cryptocurrency. Moreover, in the event "dollarization" of Claims results in a taxable event to customers, customers likely can claim a loss in connection with such "dollarization."

2.    **U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed GUC Claims**

If the Plan is consummated, each Holder of an Allowed GUC Claim will receive, in exchange for such GUC Claim, payment in Cash in an amount equal to such Allowed GUC Claim no later than six months after the Effective Date.

Each such U.S. Holder should recognize gain or loss in an amount equal to the difference between the fair market value of the consideration (in Cash) received under the Plan and such U.S. Holder's adjusted tax basis in the Claim exchanged therefor. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.

The foregoing assumes that no Allowed Class 3 Claim is in respect of Cryptocurrency deposited with the Debtors. If any such Allowed Class 3 Claim were in respect of Cryptocurrency deposited with the Debtors, the considerations described in "U.S. Federal Income Tax Consequences to Certain U.S. Holders of Customer Claims" would apply.

3.      **Net Investment Income Tax**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets.   U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

4.      **Limitations on Use of Capital Losses.**

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

ii.      *Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Cryptocurrency Received Under the Plan*

The U.S. federal income tax consequences to a U.S. Holder of owning and disposing of Cryptocurrency received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including the activities that such Holder pursues with respect to such Cryptocurrency.  U.S. Holders are urged to consult their own tax advisors with respect to the above.

**D.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  This discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan and the Restructuring Transactions to such Non-U.S. Holder.

i.      *Gain Recognition*

Gain, if any, recognized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain

30699387.1

is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).   If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply).  In order to claim an exemption from or reduction of withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).   In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments. **The taxation of Cryptocurrency is extremely uncertain, and each Non-U.S. Holder should consult its own tax advisor regarding the possibility of being deemed to be engaged in a trade or business in the United States as a result of its Cryptocurrency-related activities (including activities on exchanges such as the Debtors').**

### ii.    *U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Cryptocurrency Received Under the Plan*

The U.S. federal income tax consequences to a Non-U.S. Holder of owning and disposing of Cryptocurrency received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including (a) the U.S. federal income tax characterization of the relationship between such Holder and a third-party Cryptocurrency exchange (if any) to which such Holder transfers any such Cryptocurrency, and (b) the activities that such Holder and/or such third-party Cryptocurrency exchange (if applicable) pursue with respect to such Cryptocurrency.  Non-U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of holding and disposing of Cryptocurrency.

### E.    FATCA

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."   For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends.

FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding. FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends.  However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective.

30699387.1

Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**F.**    **U.S. Information Reporting and Withholding**

The Debtors and the Wind Down Entity, as applicable, intend to withhold all amounts required under the IRC with respect to distributions made under the Plan and to comply with all applicable reporting requirements of the IRC.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest under the Plan, as well as future payments made with respect to consideration received under the Plan.

Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

> **THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.  THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

## IX.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Parties in interest should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered

together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

A.    **Certain Bankruptcy Law Considerations**

i.    ***Risk of Non-Confirmation of the Plan***

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

The Bankruptcy Code requires that a chapter 11 plan comply with certain requirements (including the requirements of section 1129 of the Bankruptcy Code) to be confirmed.  The Bankruptcy Court may determine that one or more of those requirements is not satisfied with respect to the Plan. If the Bankruptcy Court makes such a determination, the Debtors could be required to restart the solicitation process and (i) seek the approval of a new disclosure statement, (ii) solicit or re-solicit votes from the holders of Claims or Interests, and (iii) seek the confirmation of a newly proposed plan.  Alternatively, if the confirmation requirements are not satisfied with respect to the plan of one of the Debtors, the other Debtor(s) may choose to sever such plan and proceed with confirmation of the Plan.

B.    **Additional Risk Factors to be Considered**

i.    ***Nonconsensual Confirmation***

In the event that any impaired class of claims or interests entitled to vote on a plan of reorganization or liquidation does not accept such plan of reorganization or liquidation, respectively, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

ii.    ***Claim Objections***

The Debtors may object to a proof of claim filed by or on behalf of a holder of a Claim. The distribution estimates set forth in this Disclosure Statement are not applicable to any holder of any Claim whose Claim is or may be subject to an objection.  Any such holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

iii.    ***Distributions***

While the Debtors have endeavored to project what they believe are likely distributions, if any, to be made to parties holding Allowed Claims, there can be no certainty that the projections will be accurate and that holders will receive the distributions described in the Plan. The projections will necessarily be affected by, among other things: (i) recoveries generated in connection with the liquidation of all the Debtors' remaining assets; (ii) the outcome of

30699387.1

objections to Claims; and (iii) the cost and expenses of such actions and generally administering and winding down the Debtors' Estates.

### iv.    Administrative Insolvency

Section 1129(a)(9)(A) of the Bankruptcy Code states that, for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim brought under section 507(a)(2) or 507(a)(3) of the Bankruptcy Code (*i.e.*, allowed administrative expense claims) receive cash equal to the full allowed amount of such claim, unless such holder agrees to different treatment. Additionally, section 1129(a)(9)(C) of the Bankruptcy Code states that, for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim entitled to priority under section 507(a) of the Bankruptcy Code (*i.e.*, allowed priority tax claims) receive regular installment payments in cash of a total value equal to the allowed amount of such claim over a period ending not later than five (5) years after the petition date, and in a manner that is not less favorable than the most favored nonpriority unsecured claim under such plan. Finally, other priority claims may similarly be required to receive a certain treatment under section 1129(a)(9) of the Bankruptcy Code (such as cash equal to the full allowed amount of such claim).

The Debtors presently believe that they have sufficient cash or assets to pay all Allowed Administrative Claims, Priority Tax Claims, Professional Fee Claims, and DIP Loan Claims, and/or that they will be able to reach agreements with the holders of such Claims as to any different treatment of such Claims, as necessary. However, if the Debtors are administratively insolvent, then the Bankruptcy Court may not confirm the Plan and the Bankruptcy Court may convert the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, either or both of which possible outcomes would likely entail significantly greater risk of delay, expense, and uncertainty to the Debtors and their Estates.

### v.    The Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the Petition Date, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### vi.    No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

### vii.    No Legal or Tax Advice Is Provided to You by This Disclosure Statement

The contents of this Disclosure Statement should **not** be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### viii.    No Admission Made

Nothing contained in the Plan will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

### ix.    Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Causes of Action and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Causes of Action.

### x.    No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a holder of a Claim for or against the Plan does not constitute a waiver or release of any claims, Causes of Action, or rights of the Debtors (or any entity, as the case may be) to object to that holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

### xi.    Information Was Provided by Debtors and Was Relied Upon by Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

### xii.    Amendment, Waiver, Modification, or Withdrawal of Plan

Under certain circumstances, the Debtors may, prior to the Confirmation or the substantial consummation of the Plan, and subject to the provisions of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and the Plan, amend the terms of the Plan or waive

any conditions thereto, if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the holders of Claims cannot presently be foreseen, but may include a change in the economic impact of the Plan on some or all of the Classes or a change in the relative rights of such Classes.

### *xiii.    Non-Occurrence or Delayed Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date will occur shortly after the Confirmation Date following the satisfaction of any applicable conditions precedent, there can be no assurance as to the precise timing of the Effective Date.  If the conditions precedent to the Effective Date, as described in Article IX of the Plan, have not occurred or otherwise been waived by the date that is sixty (60) days after the entry of the Confirmation Order or by such later date as set forth by the Debtor in a notice filed with the Bankruptcy Court prior to the expiration of such period, then, upon filing a notice with the Bankruptcy Court, the Debtors may deem the Plan null and void in all respects.  Under such circumstances, no distributions would be made under the Plan, the Debtors and all holders of Claims and Interests would be restored to the status quo as of the day immediately preceding the date of confirmation, and the Debtors' obligations with respect to all Claims and Interests would remain unchanged.

### *xiv.    Conversion to Chapter 7*

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtors, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to the Debtors' creditors than as provided for in the Plan, as further detailed in Section VIII of this Disclosure Statement.

### *xv.    Dismissal of the Chapter 11 Cases*

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtors, one or more of the Chapter 11 Cases may be dismissed by order of the Bankruptcy Court.

### *xvi.    Cost of Administering the Debtors' Estates*

Liquidation of the Debtors' remaining assets and the disbursement of the proceeds of such liquidation, as well as the wind down of the Debtor entities and the Wind Down Entity, will require certain administrative costs that may vary based on a variety of factors, including many out of the Debtors' control.  Such administrative costs cannot be predicted with certainty and may affect recoveries under the Plan.

## X.
## CONFIRMATION OF PLAN

## A.    Confirmation Hearing

30699387.1

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. The Confirmation Hearing has not yet been scheduled with the Bankruptcy Court.  Notice of the Confirmation Hearing will be provided to all known holders of Claims or Interests (or their representatives) and other persons and entities required by the Bankruptcy Code and the Bankruptcy Rules.   The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

## B.    Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of the Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the Honorable Brendan L. Shannon, United States Bankruptcy Judge, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order.

a)    **Debtors** at
Bittrex, Inc.
701 5th Ave, Suite 4200
Seattle, WA 98104
Attn: David Maria, Caleb Barker
Email: dmaria@bittrex.com
    cbarker@bittrex.com

b)    **Counsel to Debtors** at
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Ave 22nd floor
New York, NY 10010
Attn: ~~Susheel Kirpalani, Esq.,~~ Patricia B. Tomasco, Esq.
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: pattytomasco@quinnemanuel.com

c)    **Office of the U.S. Trustee** at
Office of the United States Trustee for the District of Delaware
844 King Street, Suite 2207
Wilmington, DE 19801
Attn: Richard L. Schepacarter
Telephone: (302) 573-6540
Facsimile: (302) 573-6497
Email: Richard.Schepacarter@usdoj.gov

**IF AN OBJECTION TO CONFIRMATION IS NOT TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**C.**      **Requirements for Confirmation of Plan**

   *i.* ***Requirements of Section 1129(a) of the Bankruptcy Code***

   1. **General Requirements**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

   a. The Plan complies with the applicable provisions of the Bankruptcy Code.

   b. The Debtors have complied with the applicable provisions of the Bankruptcy Code.

   c. The Plan has been proposed in good faith and not by any means proscribed by law.

   d. Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 cases, or in connection with the Plan and incident to the chapter 11 cases, has been approved or is subject to the approval of the Bankruptcy Court as reasonable.

   e. The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in a joint plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy.

   f. With respect to each Class of Claims or Interests, each holder of an Impaired Claim or Impaired Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. *See* discussion of "Best Interests Test" below.

   g. Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan.

   h. Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Allowed Claims will be paid in full on the Effective Date.

i.      At least one class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

j.      Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. *See* "Feasibility Analysis" below.

k.      All fees payable under section 1930 of title 28 have been paid or the Plan provides for the payment of all such fees on, or reasonably practicable thereafter, the Effective Date of the Plan.

2.      **Best Interests Test**

As noted above, the Bankruptcy Code requires that each holder of an Impaired Claim or Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  This requirement is referred to as the "best interests test."

The best interests test requires the Bankruptcy Court to determine what the holders of Allowed Claims and Allowed Interests in each impaired Class would receive from a liquidation of the Debtors' assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a hypothetical liquidation of the Debtors' assets and properties (after subtracting the amounts attributable to the aforesaid Claims) is then compared with the value offered to such Classes of Claims and Interests under the Plan.

Under the Plan, all holders of Impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  This conclusion is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of Impaired Claims and Interests and (ii) the Liquidation Analysis prepared by the Debtors' financial advisor that is annexed as **Exhibit C** hereto.

The Liquidation Analysis is based on a number of significant assumptions which are described therein.  The Liquidation Analysis is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that the Bankruptcy Court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

3.      **Feasibility Analysis**

The Plan provides for the liquidation of the Debtors and their Estates.  The Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet their post-Confirmation Date obligations to pay for the costs of administering and

fully consummating the Plan.  Accordingly, the Debtors believe the Plan satisfies the feasibility requirement imposed by section 1129(a)(11) of the Bankruptcy Code.

### 4.    **No Unfair Discrimination**

The "no unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan.  A plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its claims or equity interests.  This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

Under the Plan, all Impaired Classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other Classes of Claims and Interests having the same priority.  Accordingly, the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

### 5.    **Fair and Equitable Test**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirements that no class of claims receive more than 100% of the allowed amount of the claims in such class and that if a class is not paid in full, no class junior in priority receives a distribution.  The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class.  In order to demonstrate that a plan is "fair and equitable," the plan proponent must demonstrate the following:

(a)    *Secured Creditors*. With respect to a class of impaired secured claims, a proposed plan must provide the following: (a) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estates' interest in such property, or (b) for the sale, subject to section 363 of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) or (c) of this paragraph, or (c) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim.

(b)    *Unsecured Creditors*. With respect to a class of impaired unsecured claims, a proposed plan must provide the following: either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c)    *Equity Interests*. With respect to a class of equity interests, a proposed plan must provide the following: (i) that each holder of an equity interest receive or retain on account of

such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest or (ii) that the holder of any interest that is junior to the interests of the class of equity interests will not receive or retain under the Plan on account of such junior interest any property.

As to any Class that may reject the Plan, the Plan satisfies the "fair and equitable" requirement because, as to any such dissenting Class, no Class that is junior to such a dissenting Class will receive or retain any property on account of the Claims or Interests in such Class.

### ii.    *Alternative to Confirmation and Consummation of the Plan*

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best option for the Debtors and their Estates and will maximize recoveries to parties-in-interest—assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan include a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### 1.    **Liquidation Under Chapter 7**

In a chapter 7 case, a trustee is appointed to liquidate a debtor's assets and make distributions to creditors in accordance with the priorities established in the Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid.  Unsecured creditors are paid from any remaining Sale Proceeds, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

The liquidation analysis further describing the financial recovery in a liquidation is annexed hereto as **Exhibit C**.

### 2.    **Alternative Plans**

The Debtors do not believe that there are any alternative plans for the reorganization or liquidation of the Debtors' Estates. The Plan, as described herein, enables holders of Claims and Interests to realize the greatest possible value under the circumstances and, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

### XI.
### CONCLUSION AND RECOMMENDATION

Confirmation and implementation of the Plan is in the best interests of all creditors. The Debtors urge holders of Impaired Claims to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than the Voting Deadline, October 624, 2023 at 4:00 p.m. (ET).

Dated: ~~August 25~~September 22, 2023

Respectfully submitted,

Desolation Holdings LLC and its affiliated Debtors

~~By:~~          ~~/s/ Evan Hengel~~

~~Name:~~    ~~Evan Hengel~~

~~Title:~~     ~~Co-Chief Restructuring Officer~~

_____/s/ Evan Hengel_____
Evan Hengel
Co-Chief Restructuring Officer