# EXHIBIT A

```
 1                  UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11
                                   .
 4   DESOLATION HOLDINGS LLC,      .  Case No. 23-10597 (BLS)
     et al.,                       .
 5                                 .  (Jointly Administered)
                                   .
 6                                 .  Courtroom No. 1
                                   .  824 Market Street
 7            Debtors.             .  Wilmington, Delaware 19801
                                   .
 8                                 .  Wednesday, June 7, 2023
     . . . . . . . . . . . . . .   .  11:00 a.m.
 9
                      TRANSCRIPT OF HEARING
10        BEFORE THE HONORABLE BRENDAN L. SHANNON
                UNITED STATES BANKRUPTCY JUDGE
11

12   APPEARANCES:

13   For the Debtors:         Kenneth Enos, Esquire
                              YOUNG CONAWAY STARGATT & TAYLOR LLP
14                            Rodney Square
                              1000 North King Street
15                            Wilmington, Delaware 19801

16                            Patricia Tomasco, Esquire
                              QUINN EMANUEL URQUHART &
17                                SULLIVAN, LLP
                              51 Madison Avenue
18                            22nd Floor
                              New York, New York 100100
19
     (APPEARANCES CONTINUED)
20
     Audio Operator:          Dana L. Moore, ECRO
21
     Transcription Company:   Reliable
22                            The Nemours Building
                              1007 N. Orange Street, Suite 110
23                            Wilmington, Delaware 19801
                              Telephone: (302)654-8080
24                            Email: gmatthews@reliable-co.com

25   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
```

1    APPEARANCES (CONTINUED):

2    For the U.S. Trustee:        Richard Schepacarter, Esquire
                                  OFFICE OF THE UNITED STATES TRUSTEE
3                                 844 King Street, Suite 2207
                                  Lockbox 35
4                                 Wilmington, Delaware 19801

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            INDEX

2  MOTION:                                                  PAGE

3  Agenda
4  Item 11:  Debtors' Motion Seeking Entry of Interim        6
              And Final Orders (I) Authorizing Debtors
5              to (A) Maintain a Consolidated List of
              Creditors, (B) File a Consolidated List
6              Of the Debtors' Fifty Largest Unsecured
              Creditors, and (C) Withhold or Omit
7              Certain Confidential Information, (II)
              Establishing Procedures for Notifying
8              The Parties of Commencement, and (III)
              Granting Related Relief [D.I. 5, 5/8/23]
9
10             Court's Ruling:                              74

11

12 WITNESSES CALLED
   BY THE DEBTORS:                                          PAGE

13     EVAN HENGEL
       Direct examination by Ms. Tomasco                    16
14     Cross-examination by Mr. Schepacarter                37

15

16 DECLARATIONS:                                            PAGE

17 1) Evan Hengel                                           13

18

19

20

21

22

23

24

25

1              (Proceedings commenced at 11:09 a.m.)

2              (Call to order of the Court)

3                    THE COURT:  Please be seated.

4                    Mr. Enos, good morning.  Good to see you.

5                    MR. ENOS:  Good to see you as well, Your Honor.

6     Ken Enos, Young Conaway Stargatt & Taylor, on behalf of the

7     debtors.  Your Honor, with me today is Patty Tomasco and

8     Alain Jaquet from Quinn Emanuel.

9                    THE COURT:  Welcome.

10                    MR. ENOS:  Evan Hengel, our CRO, from BRG.

11                    THE COURT:  Our affiant today, right?

12                    MR. ENOS:  Yes, sir.  And my colleague, Rebecca

13    Lamb.

14                    THE COURT:  Welcome.

15                    MR. ENOS:  Your Honor, we had a very lengthy

16    agenda, but thanks to the hard work of Mr. Schepacarter, as

17    well as some discussions with the SEC, we were able to

18    resolve all but one matter.  I believe orders hit the docket

19    this morning, so very much thank Your Honor and staff for

20    getting through all those.

21                    THE COURT:  Sure.

22                    MR. ENOS:  Your Honor, that leaves us to the one

23    contested matter which is the debtors' request to seal their

24    customer information and certain related relief.  Ms. Tomasco

25    will be handling that for us, so I would cede the podium to

1  her at this time.

2         THE COURT:  Can you just remind me of procedurally

3  where we are.  The Court entered an interim order at the

4  first day hearing granting the relief and sealing it subject

5  to entry of a final order.  So, everybody's powder remains

6  dry on the issues.  I think Mr. Schepacarter observed that he

7  was reserving his rights, but the idea was that to the extent

8  we were going to deal with this on a final basis that we

9  would have the opportunity for the supplemental briefing that

10 the Court received and, otherwise, but that is procedurally

11 how we got here and where we are, right?

12        MR. ENOS:  Yes, Your Honor.  That matches my

13 recollection as well.

14        THE COURT:  Okay.  Very good.

15        Ms. Tomasco, welcome.

16        MS. TOMASCO:  Thank you, Your Honor.  Pattie

17 Tomasco, Alain Jaquet, with Quinn Emanuel on behalf of the

18 debtors.  I think now that our order is entered, we don't

19 have to say proposed.

20        THE COURT:  Very good.  Welcome aboard.

21        MS. TOMASCO:  That instantaneously changed my

22 status.  Thank you very much.

23        THE COURT:  Its like Facebook, you've updated.

24        MS. TOMASCO:  Correct.  Your Honor, we are seeking

25 today to redact customer information. In particular, I think

1  this case is very different then the cases that the U.S.

2  Trustee cited.   First order of business, we filed a

3  supplemental declaration of Evan Hengel, who is our CRO, at

4  Docket Item 95.   Mr. Hengel is in the courtroom and available

5  for cross-examination.

6          In terms of how you would like to handle this, I

7  move to admit the declaration of Mr. Hengel. I understand

8  that Mr. Schepacarter has some objections to certain of the

9  exhibits to the declaration, but perhaps not the declaration

10  itself.

11          THE COURT:   Sure.   Mr. Schepacarter.

12          MR. SCHEPACARTER:   Thank you.

13          THE COURT:   Good morning.

14          MR. SCHEPACARTER:   Good morning.   Richard

15  Schepacarter for the United States Trustee.

16          THE COURT:   That's a good tie.

17          MR. SCHEPACARTER:   Thank you.   I picked it out

18  specially for today.

19          THE COURT:   You know, I appreciate the effort.

20          MR. SCHEPACARTER:   I was in front of Judge

21  Silverstein, but she didn't yell at me.

22          With respect to this case, we did receive the

23  declaration later in the afternoon, which was fine, but we

24  did have some concerns with respect to the declaration itself

25  to the extent that when it ties into certain of the exhibits,

1   and I will point the exhibits out to Your Honor.  It's

2   Exhibit C, and then it would be E through J, then I think its

3   M, N, and then P.

4           These are mainly news reports and articles that

5   contain hearsay.  They're probably --

6           THE COURT:  Yeah, they sure do.

7           MR. SCHEPACARTER:  -- hearsay themselves and the

8   contain hearsay inside of hearsay.  But we would object to

9   the entry of those articles. Frankly, I don't know that they

10  prove the point that counsel wants -- or that debtors want to

11  prove with respect to why the information should be redacted

12  or omitted because it deals with -- basically, we're talking

13  about the disclosure of names for individuals and then names,

14  addresses, and the other information for non-entities.  I

15  think that is the way -- under the statute I don't know that

16  that is permitted, but I don't want to get into argument.

17          I just want to say that I don't know that these

18  items actually even really help their case to a certain

19  extent.

20          THE COURT:  Well, let me figure out if there is a

21  way that we can square this circle on the evidentiary

22  question that will allow us to proceed with the declaration.

23  Your points are well taken.  I mean, when I read the

24  declaration and I looked at the exhibits in advance of the

25  hearing, obviously, there is a concern of hearsay.  The

1  witness is testifying, but he's testifying regarding articles

2  that I read.

3          MR. SCHEPACARTER:  Right.

4          THE COURT:  They are, obviously, not being

5  introduced for the truth of the matter asserted.  And I would

6  not introduce them or permit them to be admitted into

7  evidence in that respect.  These are reports that Mr. Hengel

8  is familiar with that he has read, but, obviously, it's not

9  his own perception and its not his own percipient

10 observation.

11         MR. SCHEPACARTER:  That is correct.  And not to

12 interrupt, Your Honor, but if we're going with just a

13 declaration itself, we would object to those portions of the

14 declaration that talk about those items.

15         THE COURT:  Is there -- let me ask a question --

16         MR. SCHEPACARTER:  So, what I would want to cross

17 on would be the things that I don't think -- like if we

18 objected to it, it wouldn't be admitted, we wouldn't cross on

19 something that wouldn't be in evidence.  Do you know what I'm

20 saying?

21         THE COURT:  I do.  Let me make a suggestion about,

22 at least, the way that I would view this, perhaps, sitting as

23 the trier of fact and that may resolve some of your concerns.

24         First, I will give you as broad latitude on cross-

25 examination as you would wish particularly given that the

1  deck was filed just on the eve of the hearing. I mean no

2  criticism at all.

3          In terms of the various exhibits, it would seem to

4  me that a legitimate question on direct or on cross to Mr.

5  Hengel is the debtors represented and your declaration has

6  represented that bad things may happen if this information is

7  disclosed.  Why do you think that?  The answer is I am aware

8  of, you know, circumstances that have been reported in the

9  news where bad things happened based upon, you know,

10 disclosure of crypto information, etc.

11         I would not permit him to testify regarding the

12 events described, for example, in Turkey, or in England,

13 etc., because, again, he's got not percipient fact.  I think

14 that the theme of the debtor, the primary theme of the

15 debtor's motion and the reply is that the debtor perceives a

16 risk to their customers and I would be happy to give you as

17 much leave to examine that and I would not permit him to

18 testify regarding those issues unless you wanted to ask him

19 about it.

20         MR. SCHEPACARTER:  That, but, frankly, that almost

21 slides like into a legal issue because we're talking about

22 what the statute says and what their perception is as to

23 risk.  The statute talks about undo risk and I think that is

24 probably going to be the hook in this case, the hook in the

25 arguments.

1          THE COURT:  Sure, for the statute, for Section

2  107.

3          MR. SCHEPACARTER:  That, those two words.

4          THE COURT:  How would you like to proceed?  Ms.

5  Tomasco.

6          MS. TOMASCO: It's up to Your Honor.  We can have

7  opening argument, we can have closing argument, we can have

8  both. Mr. Hengel is here and available to testify.  We can --

9  you know, his declaration, if the Court admits it, can stand

10 as his direct testimony.  Mr. Schepacarter can cross-examine

11 him, whichever the Court would like.

12         THE COURT:  What do you think?

13         MR. SCHEPACARTER:  I would say that we put the

14 evidence on first.  I don't know that we need openings.

15         THE COURT:  Yeah, I don't need openings and

16 closings. I understand the issues that we have and they have

17 certainly been well presented.

18         MR. SCHEPACARTER:  I think we can argue post-

19 evidence once the record is closed.  We can argue at that

20 point.

21         THE COURT:  So, I would like your thoughts then,

22 the debtor has the declaration. I have shared with you that

23 to me the exhibits that you have identified that relate to,

24 essentially, news reports of circumstances that Mr. Hengel

25 has learned about certainly would not be admitted as

1  affirmative evidence in the context of the case, but --

2            MR. SCHEPACARTER:  I mean, I can cross-examine

3  based on the declaration.

4            THE COURT:  Okay.

5            MR. SCHEPACARTER:  Then if counsel wants to

6  redirect after that, that's fine and then if I have recross.

7  I think that is probably the most efficient way.

8            THE COURT:  At the Trustee's suggestion what I

9  would propose to do is admit Mr. Hengel's declaration.  I

10 don't believe that it would be appropriate to admit the

11 various exhibits that have been described.  If you wish to

12 cross-examine him with respect to them you may do so and that

13 may open a door a little bit.

14            I want to be clear to you and to Ms. Tomasco, this

15 is not going to -- this motion and this ruling is not going

16 to be dependent upon a story from California or a story from

17 Turkey or something else.  Those are all --

18            MR. SCHEPACARTER:  Understood.

19            THE COURT:  -- to me, arguably, part of the

20 witness's understanding or perception.  Again, he is here as

21 the representative of the debtor. It is the debtors' motion

22 and it is the debtors' burden. He needs to demonstrate that

23 cause exists for the relief requested and, again, I will give

24 you broad latitude.  But I think if we admit the declaration,

25 we don't admit the exhibits that have been described, and

1  then we will navigate. If we have issues or if you think that

2  you are being unfairly treated in the context of the

3  examination or otherwise, sing out, and we will make sure

4  that there is a full and fair opportunity to develop the

5  record.

6          MR. SCHEPACARTER:  Understood. Thank you, Your

7  Honor.

8          THE COURT:  Ms. Tomasco, let me ask a question --

9  with that I would ask, are there any other parties that wish

10  to be heard with respect to the request to admit Mr. Hengel's

11  declaration as part of the debtor's case in chief for

12  purposes of the relief sought today?

13          MS. TOMASCO:  I am not aware of anyone here, Your

14  Honor, other then Mr. Schepacarter.

15          THE COURT:  All right.

16          MS. TOMASCO:  I would say that --

17          THE COURT:  Hang on just a second. I should have

18  done this at the outset.  The Court notes that there are a

19  number of parties, obviously, in the courtroom and a number

20  of parties participating via Zoom.  Those parties that are on

21  Zoom would you be kind enough to either sing out or turn on

22  your camera and give me a thumbs up just to confirm that

23  parties that are participating remotely are able to see and

24  hear me.

25          (Pause)

1      THE COURT:  Great.  I see thumbs.  That is a good

2  start.  Thanks everybody.

3      Ms. Tomasco, again, I would ask are there any

4  objections to the admission of Mr. Hengel's declaration for

5  purposes of the relief sought today?

6      (No verbal response)

7      THE COURT:  Very well.  That declaration is

8  admitted subject to the colloquy between the Court and Mr.

9  Schepacarter.  And I note further that the exhibits attached

10  to that declaration that have been identified by the United

11  States Trustee are not admitted as part of the evidentiary

12  record before us today.

13      (Hengel declaration received into evidence)

14      THE COURT:  I would just confirm, Mr.

15  Schepacarter, you intend to cross-examine Mr. Hengel

16  regarding the contents of his declaration.

17      MR. SCHEPACARTER:  That is correct.

18      THE COURT:  Very good.  Ms. Tomasco, the papers

19  also reference the first day declaration of Mr. Hengel, which

20  speaks to the motion itself and it would seem to me that that

21  is also part of the record for purpose of our proceeding

22  today.  It would seem to make sense that we address that

23  first day declaration because I think the Court -- I haven't

24  gone back and looked at the transcript, but I try to be

25  pretty scrupulous at a first day hearing to note that the

1  first day deck is admitted exclusively and solely for

2  purposes of a first day hearing.

3          My guess would be that you would intend to include

4  some of Mr. Hengel's statements and representations in the

5  first day declaration where he is describing the company and

6  its business, etc.  And, obviously, the more focused and

7  refined supplemental declaration that I have just admitted.

8  Does the debtor wish to admit Mr. Hengel's first day

9  declaration as well?

10         MS. TOMASCO:  Yes, Your Honor.  It seems like a

11 good idea to admit it for the background so that we don't

12 have to go through that testimony.

13         THE COURT:  All right.  Any objection to the

14 admission, again, of the first day declaration for purposes

15 of the relief sought today?

16         MR. SCHEPACARTER:  For the record, Richard

17 Schepacarter for the United States Trustee.

18         No objection based on that purpose. There is

19 testimony in that declaration at the back end of that

20 declaration where there were evidentiary foundations laid for

21 different first day motions. One of which was the first day

22 motion that this relates to which is now we're seeking a

23 final order.  So, I may ask -- I am hoping the witness has

24 one, a copy of the first day declaration, I may go back and

25 cross-examine on that one as well.

1          So, what I will do is I will start with the
2   supplemental and then I may go back to the other one to the
3   extent that things in the supplemental are not already
4   covered in the first one.
5          THE COURT:  I will tell you what, we will go ahead
6   and get you -- we will get counsel -- we will get Ms. Tomasco
7   and you a copy of the first day declaration.
8          MR. SCHEPACARTER:  I actually have one.
9          THE COURT:  Oh, you have one?
10         MR. SCHEPACARTER:  Yeah.
11         THE COURT:  So, you're good.  Ms. Tomasco, we will
12  go ahead and get you a copy unless you have one.
13         I don't think it's a big deal and, again, we're
14  admitting it largely for the background and overview of the
15  company.  So, we will take care of that, but that declaration
16  is, likewise, admitted for purposes of the record that we are
17  developing today.
18         Ms. Tomasco, I would ask you a question.  Given
19  that we've admitted Mr. Hengel's declaration as well as his
20  first day declaration I would afford you the opportunity, if
21  you wished, to adduce any testimony on direct. His testimony
22  in the declarations is, effectively, of record now and I have
23  reviewed both.  Given the context, if you wish to ask him any
24  questions or take any direct testimony from him in advance of
25  the cross-examination you are welcome to do so. If you wanted

1  a short break I would be happy to accommodate.

2          MS. TOMASCO:  Your Honor, I will take you up on

3  that opportunity.  On behalf of the debtors, we call Mr.

4  Hengel to the stand.

5          THE COURT:  Okay.  You want five minutes?

6          MS. TOMASCO:  No, we're ready.

7          THE COURT:  Okay.  Mr. Hengel, you all set.

8          MR. HENGEL:  Yeah.

9          THE COURT:  All right.  Come on up to the stand

10 please.  Please remain standing and we will swear the

11 witness.

12          EVAN HENGEL, DEBTOR WITNESS, SWORN

13          THE CLERK:  Please state your full name for the

14 record.

15          THE WITNESS:  Evan Hengel, E-V-A-N, H-E-N-G-E-L.

16          THE COURT:  Welcome.

17          THE WITNESS:  Thank you.

18          THE COURT:  You may proceed.

19                  DIRECT EXAMINATION

20 BY MS. TOMASCO:

21 Q    Good morning, Mr. Hengel.

22      Having stated your name for the record, what is your

23 professional background?

24 A    It's been in restructuring for 16 years, 10 years at

25 FTI Consulting and six at BRG.

1   Q      And what is BRG?

2            THE COURT:  Mr. Hengel, can I just ask you to make

3   sure that you -- the mics are kind of sensitive, but they are

4   directional. If you are not looking at the mic it's not going

5   to pick you up.

6            THE WITNESS:  Got it.

7            THE COURT:  You may proceed.

8   BY MS. TOMASCO:

9   Q      What does BRG Stand for?

10  A      Berkely Research Group.

11  Q      And what does Berkely Research Group do?

12  A      Among other things, we do restructuring advice on both

13  debtor and creditor side.

14  Q      And what is your position at BRG?

15  A      Managing director.

16  Q      What areas do you specialize in, if any?

17  A      I do a lot of work in financial institutions, inclusive

18  of crypto, and also a decent amount of work in retail apparel

19  and media and entertainment.

20  Q      And what crypto cases have you worked on?

21  A      Voyager Digital, BlockFi, Genesis on the creditor side,

22  and Salt Lending on the debtor side.

23  Q      So, as financial advisors go would you say you have an

24  inordinate amount of experience in the crypto area?

25  A      Yes.  In the last 11 months for sure.

1  Q      And when did you become CRO of the debtors?

2  A      I believe it was mid to late April.

3  Q      And how did you come to understand how the debtors

4  operate?

5  A      I met with them at their headquarters in Seattle early

6  on in the case before we filed for bankruptcy, learned a lot

7  then and have been in constant contact with them throughout

8  via Zoom, phone call, text, etc.

9  Q      Did they let you into their slack account?

10 A      Yes, they did.

11 Q      Has that been a boon of your existence?

12 A      I enjoy it.

13 Q      All right.  Thank you.

14         So, with whom did you speak within the debtors to

15 understand their operations?

16 A      I spoke with, I would say, probably starting with the

17 finance team early on to, again, give me a background of how

18 the business operates inclusive of Steven Lassiter, Chris

19 Chenoweth. Going onto the operations Jim Washek and Dave

20 Morea (phonetic).  Background on some of the legal stuff,

21 Paul Arthur another big resource and operations.  So, I have,

22 kind of, had unfettered access for the last couple of months

23 now.

24 Q      All right.  Now looking at your declaration that is at

25 Docket Item 95, which has been admitted into evidence, did

1  you participate in the preparation of that declaration?

2  A    Yes, I did.

3  Q    And did you provide many of the items that are

4  contained in that declaration?

5  A    Yes, I did.

6  Q    Now let's talk about -- when I say 107(b) do you know

7  what I'm talking about?

8  A    No.

9  Q    Okay.  With respect to the proprietary value of the

10  debtors' customer list have you thought about whether or not

11  the debtors have a proprietary interest in their customer

12  list?

13  A    Yes.

14  Q    And what is your conclusion about that?

15  A    I think that there is value in the customer list.  I

16  think you could probably demonstrate that by, you know,

17  looking at other transactions in the marketplace.  You know,

18  there's the customer lists, the part of M&A deals where one

19  may purchase the platform of another.  A key asset of that is

20  the customer list which was procured through marketing costs,

21  you know, millions of dollars over plenty of years.  Then,

22  you know, you could potentially unlock that by selling that

23  customer list along with the broader platform as you saw in

24  other crypto cases as well.

25  Q    Have you thought about how the debtors' customer list

1   is capable of being monetized in light of the debtors'

2   privacy policy that it publishes on its website?

3   A     Yes.

4   Q     And what are your conclusions about that?

5   A     My conclusions about that are that to the extent that

6   we were to market these assets in some type of M&A effort we

7   would not publicize that list until a transaction closed

8   making sure that we don't compromise those names during a

9   diligence process that might not yield an ultimate

10  transaction.

11  Q     Now have the debtors undertaken efforts to maintain the

12  confidentiality of their customer list?

13  A     Yes.

14  Q     And what does that consist of?

15  A     They have got a customer service team that, you know,

16  yields inquiries, you know, does two factor authentication

17  and a whole bunch of other measures to ensure that when

18  somebody reaches out and claims to be somebody with an

19  account that has a balance that they are, in fact, that

20  person.  There is a whole team of people dedicated to

21  ensuring that that process maintains its integrity.

22  Q     Now what about the debtor's employees, are the debtors'

23  employees free to distribute the names of customers as they

24  wish?

25  A     They are not?

1  Q     Okay.  Why not?

2  A     Because there is a non-disclosure agreement attached to

3  most of their employment agreements.

4  Q     Now with respect to the value of the debtors' customer

5  list have you come to any conclusions about whether or not it

6  has value?

7  A     I would say it probably does. I think you could argue

8  about how much value could be unlocked, but, I think given

9  the fact that there has been millions of dollars procuring it

10  you would probably think that there is some value to it to

11  the extent that it still exists, you know, after the initial

12  wave of withdrawals hit.

13  Q     Are you aware of any inbound inquiries to the debtors

14  with respect to offboarding customers or acquiring the

15  debtors' customer base?

16  A     I am aware that there was, you know, some M&A

17  discussions prior to my involvement in the case that did

18  indicate there would have been some value.

19          MR. SCHEPACARTER:  Your Honor, I would object.

20  It's hearsay.

21          THE COURT:  Sustained.  You may proceed.

22  BY MS. TOMASCO:

23  Q     Mr. Hengel, as part of your position as chief

24  restructuring officer have you been evaluating the debtors'

25  options and what the debtor may do to resolve the issues in

1   these cases?

2   A     Yes.

3   Q     What does that involve?

4   A     It involves talking to the company a lot, trying to

5   understand, you know, exactly how the customer list was

6   constructed; in particular, whose on it, what the account

7   balances are, what the last activity was, how many of them

8   have gone through KYC processes.  A lot of factors like that

9   would likely affect the value of this list.

10  Q     And as the CRO, is one of your tasks evaluating whether

11  or not there is residual value in the debtors' customer list?

12  A     Yes.

13  Q     And what have you learned with respect to evaluating

14  that option?

15  A     I have learned that I believe there could be a buyer

16  that would want to procure this customer list, but I can't

17  speak to necessarily what dollar amount that might be.

18  Q     Thank you.

19        Have customer lists been an issue in transactions that

20  you or your BRG team have been involved?

21  A     Yes.

22  Q     Can you give me some examples?

23  A     Yes.  We have, you know, went through an M&A process in

24  Voyager and BlockFi which included customer lists.  You know,

25  even outside of the crypto space often times when any

1 | consumer facing business, whether its apparel or otherwise,
2 | you know, there are customer lists that would be procured by,
3 | maybe a strategic competitor which is, obviously, subject to
4 | confidentiality processes during the diligence process as
5 | well.
6 | Q    If a debtors' customer list were made public would that
7 | -- what effect would that have on the value of the customer
8 | list in an M&A transaction?
9 | A    Negative.
10 | Q    How negative?
11 | A    Probably significantly so.  To the extent that the
12 | customers are made public then any other competitor would be
13 | free to go and then reach out to those customers and onboard
14 | them onto their own platform to the detriment of the debtors'
15 | platform.
16 | Q    Thank you.
17 |      Now turning to the debtors' particular way of
18 | identifying customers have you come to learn what is an
19 | account ID within the Bittrex family of companies?
20 | A    Yes.
21 | Q    And what is it?
22 | A    It is a unique long text of numeric string that is
23 | unique to one particular account.  You know, not similar to
24 | an anonymized username, but there is no PII contained within
25 | that customer ID that would allow a third party who sees it t

1   be able to draw that to an individual customer.

2   Q     Now is the account ID used in the logon process?  In

3   order for a customer to log on is the account ID one of the

4   authenticating factors?

5   A     It is an authenticating factor.

6   Q     It is or is not?

7   A     It is an authenticating factor, but is not necessarily

8   used to login with like an email and a password, but it is

9   contained upon login.  You can see the number and it is

10  unique to that particular customer.

11  Q     Okay. I just wanted to make that clear.

12        When a customer logs on the customer can then see their

13  unique customer ID?

14  A     Correct.

15  Q     Okay.  Now is that feature unique to Bittrex as far as

16  cryptocurrency exchanges go?

17  A     Some do have that feature, some do not.

18  Q     All right.  Now let me ask you another question.  When

19  you got hired did you start creating the top 50 creditor

20  list?

21  A     Yes.

22  Q     And in that list were you or your team able to look at

23  a customer name and figure out who they were in the real

24  world?

25  A     Yes.

1   Q      And can you explain to me that process.  What did you

2   do and what were your conclusions?

3   A      So, we ran two different tests to try to figure out if

4   it was easy to map a customer name to an actual individual.

5   The first test we did with two unique individuals at our firm

6   who were, basically, given the list of submitted customer

7   information which is mainly name, email, and a location.

8   They were able to identify about 30 to 40 of the top 50.

9         Subsequently, we wanted to see could you obtain the

10  same information if you had nothing other than a customer

11  name.  While that is a little bit more opaque, we have reason

12  to believe we identified somewhere between 15 to 25 of the

13  top 50 using nothing other then a name.  Mainly driven by

14  some of the names on our top 50 list happen to be fairly

15  unique and it's not John Smith.

16  Q      Now would it be able to -- how many customers are on

17  the customer list, Mr. Hengel?

18  A      On the list that we looked at was 50, but overall its,

19  I don't know, 600,000 something like that?

20         THE COURT:  I'm sorry, could you repeat that.  Its

21  -- overall its --

22         THE WITNESS:  I would need to look back, but I

23  think it was 600,000.

24  BY MS. TOMASCO:

25  Q      With balances, correct?

1  A       Correct.

2  Q       So, to take your methodology and determine whether or

3  not a name was unique enough to be traceable or common enough

4  to not be traceable how difficult would that process be?

5  A       Pretty difficult.

6  Q       All right.  Now in your declaration you come to the

7  conclusion that publicizing the names of Bittrex's customers

8  would put their identity at risk?

9  A       Yes.

10  Q       And how did you come to that conclusion?

11  A       Mainly the exercise that we conducted in trying to test

12  how easily it was to find their names, I think, was helping

13  in coming to that conclusion along with, you know, what I

14  have read about in other cases, understandably.

15          MR. SCHEPACARTER:  Again, Your Honor, objection as

16  to hearsay.

17          MS. TOMASCO:  Your Honor, I would say that Mr.

18  Hengel is testifying either as a lay expert or as an expert

19  and is basing his conclusions, which is in the form of

20  opinion testimony about what would happen if we disclosed

21  customer names.

22          MR. SCHEPACARTER:  He's an expert. I don't --

23          THE COURT:  No. I am going to sustain the

24  objection and I will share with you my reasons.  The Court is

25  certainly familiar with Mr. Hengel and, frankly, a lot of his

1 colleagues at BRG and similarly situated folks in his

2 profession.  I am aware and presume, frankly, a measure not

3 only of competence but, frankly, as a practical matter

4 expertise in these areas.

5       I am concerned about the issues expressed by the

6 Office of the United States Trustee and particularly

7 permitting a witness to testify where, again, Mr. Hengel, I

8 think, is emphatically a fact witness here.  He is

9 testifying, certainly, from his experience in similar cases

10 in terms of selling an asset like a customer list.  He is

11 also testifying to his experience in this particular case

12 about testing the vulnerability of names on the list.

13       I don't think in terms that it would be entirely

14 fair to permit him to testify regarding things that he has

15 read.  So, I would sustain the objection. I think the witness

16 can still testify regarding his concerns about disclosure of

17 information. I mean he is both an experienced individual and

18 a person living on planet earth today.  He can testify with

19 respect to that, but I think it probably is a step too far to

20 permit him to testify regarding the sorts of things that he

21 has read.  Okay.

22       MS. TOMASCO:  Thank you, Your Honor.

23 BY MS. TOMASCO:

24 Q    Mr. Hengel, are you -- have you become aware of

25 incidents in Bittrex's history?

1   A      Yes.

2   Q      Involving the physical harm to Bittrex's customers as a

3   result of their Bittrex Holdings being made public?

4   A      Yes.

5   Q      And can you tell me what those incidents are?

6   A      The incident in 2017 which --

7           MR. SCHEPACARTER:  Again, Your Honor, I'm going to

8   object as to -- he can testify to things as he's been the CRO

9   and something has happened.

10          THE COURT:  No, I'm going to allow him to testify

11  to this.  I'm not going to permit the introduction of any

12  documentary evidence relating to it.  But, again, looking at

13  the capacity in which Mr. Hengel was both testifying and

14  serving in this case, the nature of his role is as an officer

15  of the company, but, by definition, someone that comes to the

16  company not in a career capacity.  So, by definition, a

17  person serving in his role is advised and informed by

18  engagement with company personnel.

19          It raises a legitimate hearsay consideration, but

20  as a practical matter, I think it goes to weight, and I think

21  our practice in this Court would be to permit a chief

22  restructuring officer to testify regarding the information

23  that he has learned and understood.

24          And, again, to be clear, Mr. Schepacarter, I'm

25  happy to give you broad leave to examine, but if Mr. Hengel

1   has been advised of incidents that have occurred at Bittrex,

2   not simply that he read about on the internet or came to him,

3   I'll allow that examination and we'll go from there.

4              MR. SCHEPACARTER:  Thank you, Your Honor.

5              THE COURT:  All right?  So that objection is

6   overruled.

7              MR. SCHEPACARTER:  Thank you.

8   BY MS. TOMASCO:

9   Q    Do you remember the question, Mr. Hengel?

10  A    I do, yeah.

11  Q    Thank you.

12  A    So this was pertaining to an incident in 2017 where an

13  individual accountholder of Bittrex, Inc. was, I believe,

14  kidnapped and tortured for his password and information

15  pertaining to his cryptocurrency holdings.

16  Q    And do you recall what happened after that individual

17  was murdered -- at Bittrex, what happened at Bittrex after

18  that individual was murdered?

19  A    After the individual was tortured and murdered, there

20  was various parties that came forward trying to lay some

21  claim to what was taken from the deceased individual.

22  Q    Approximately how many trouble tickets, do you recall?

23  A    I don't recall the exact number, but it was numerous,

24  you know, many of which were not believed to be true.

25  Q    Now, if we replicated that experience of what happens

1  after --

2         THE COURT:  Hang on, Ms. Tomasco.  I just want to

3  make sure that I follow the witness' testimony.

4         You were asked what happened at Bittrex afterwards,

5  you testified that there were several requests related to the

6  assets of the now-deceased accountholder.  I just want to

7  make sure that I understood, is your point that scammers or

8  people came pretending to be entitled to or pretending to

9  have a right to those monies and were found out by the

10  company?

11         THE WITNESS:  Yes, that's my understanding.

12         THE COURT:  Okay, I understand.

13         You may proceed.  Sorry for the interruption.

14         MS. TOMASCO:  No problem, Your Honor.  Thank you.

15  I just asked the wrong question is all.

16  BY MS. TOMASCO:

17  Q    If the experience -- let's see if I wrote down his name

18  -- if the experience with this 2017 individual were

19  replicated, let's just say, even over half of the remaining

20  customers with balances, would that cause a backlog of

21  trouble tickets at Bittrex?

22         MR. SCHEPACARTER:  Your Honor --

23         THE COURT:  I'm not sure I understand the question.

24         MR. SCHEPACARTER:  -- I'm going to -- oh, can I

25  state my objection?

1          THE COURT:  Yeah, sure.

2          MR. SCHEPACARTER:  Thanks.  I object because it's

3    asking for speculation as to not only an event that hasn't

4    happened, but what would happen as to following exactly what

5    happened in the 2017 that somebody else might come in and try

6    to steal and --

7          THE COURT:  Yeah, I think --

8          MR. SCHEPACARTER:  -- we're getting way far afield

9    of --

10          THE COURT:  I think I'd ask that you rephrase the

11    question.

12          MS. TOMASCO:  Thank you, Your Honor.

13    BY MS. TOMASCO:

14    Q    Have you thought about what would happen at Bittrex if

15    customer names were publicized alongside their account

16    holdings?

17    A    Yes.

18    Q    And what have you concluded?

19    A    I've concluded that I think there are concerns that, to

20    the extent that there was excessive outreach to the debtors

21    from individuals claiming, you know, fraudulently, to be an

22    accountholder that they are actually not, it would

23    potentially delay the processing of legitimate requests and

24    could create a backlog that could impede our ability to

25    return assets to customers.

1  Q    Are you aware of the debtors' motion to allow customers

2  to withdraw their cryptocurrency?

3  A    Yes.

4  Q    And are you aware that that is set for hearing next

5  Wednesday?

6  A    Yes.

7  Q    What is involved in --

8        THE COURT:  Hang on.  I want to make sure I

9  understood the witness' testimony because, if I missed it in

10 the declaration, then I'm sure Ms. Tomasco can direct me to

11 it.  But much of the thrust of your motion and your

12 declaration go to concerns that if the customers' names are

13 disclosed, even simply the names, that people will use the

14 tools that you described that you did -- or your folks did in

15 a trial run to see whether this would happen -- and that the

16 customers would be pinged, chased, scammed, fished, whatever.

17 Your testimony right now is a different consideration and I

18 want to make sure that I understand it.

19        Your point would be that, irrespective of what may

20 happen at the customer level, if the customer names are

21 disclosed, there is a prospect that the company will be --

22        THE WITNESS:  Yes.

23        THE COURT:  -- the recipient of getting scammed,

24 pinged, fished --

25        THE WITNESS:  Yes.

1          THE COURT:  Okay, I understand.

2          THE WITNESS:  And just to clarify on that too, I

3  think, you know, the customer has KYC processes that would

4  reject those, you know, dubious requests, but it would just

5  bog them down and potentially delay the process if you have a

6  legitimate request that would come in.  So it's not --

7          MR. SCHEPACARTER:  Your Honor --

8          THE WITNESS:  -- that I think the company is then

9  going to --

10          THE COURT:  Hang on.

11          THE WITNESS:  -- is that good?

12          MR. SCHEPACARTER:  I'm sorry.

13          THE COURT:  He's answering my question, so I don't

14  know that you get to object --

15      (Laughter)

16          MR. SCHEPACARTER:  I know.  Yeah, it's something --

17          THE COURT:  -- but I'll hear you.

18          MR. SCHEPACARTER:  -- unique, it's something

19  unique.  The objection goes to the relevance because we're

20  talking about Section 107 here and it's as to an individual.

21  The statute is entity with respect to commercial information

22  --

23          THE COURT:  Individual --

24          MR. SCHEPACARTER:  -- then it drops down to

25  individual with respect to scandalous, whatever, and then it

1  drops down to -- or, I'm sorry, it's person, then it drops

2  down -- I shouldn't say drop down, but it goes off until

3  individual with respect to sealing this type of information

4  and they're not an individual.  And I think we're getting far

5  afield of what the harm is because you've got to look at the

6  undue risk of harm to the individual, his person, his

7  property, that's not them.

8          THE COURT:  I'm going to allow the testimony.  I

9  think that your point goes more to argument about whether --

10  I think that this is part of the witness' factual predicate

11  and I think your argument is that that testimony, even if

12  true and accepted, doesn't afford -- doesn't fall within the

13  statutory scheme that you've described.  I think we would

14  reserve that issue to argument, but I'm not going to strike

15  the witness' testimony.

16          MR. SCHEPACARTER:  Thank you, Your Honor.

17          THE COURT:  All right, you may proceed.

18  BY MS. TOMASCO:

19  Q    Mr. Hengel, would disclosing the names of Bittrex's

20  customers expose them to undue risk of identity theft or

21  unlawful injury?

22  A    Yes, possibly.

23  Q    And why do you come to that conclusion?

24  A    Because I think that there's a lot of money at stake,

25  you know.  When you look at the assets that we have in the

1   platform, you know, it's in excess of $300 million, I

2   believe.  I think a lot of the people that comprise that $300

3   million, you know, aren't necessarily wealthy individuals who

4   have their own private security or anything like that.

5        And so I think that, to the extent that somebody has

6   bitcoin that they currently cannot access, you know, they

7   can't necessarily use the value that sits in the platform to

8   enhance their own personal security features, and so I just

9   worry that, to the extent that the names were released, there

10  would be at least some subset of the customers that are in

11  question here that could be subject to, you know, some

12  unpleasant outreach.

13  Q    Does Bittrex U.S. have customers that are subject to the

14  EU regulatory scheme known as GDPR?

15  A    Yes, a small amount.

16  Q    Okay.  And how many?

17  A    I believe it's 2,000.

18  Q    All right.  And what about Bittrex Malta, is Bittrex

19  Malta itself part of the EU?

20  A    Yes.

21  Q    And so Bittrex Malta's customers, no matter where

22  they're located, are they also subject to the GDPR?

23  A    Yes.

24  Q    Is it your intention to try to comply with those

25  regulations while you're acting as CRO?

1  A      Yes.

2  Q      Now, finally, I just want to for the record talk about

3  another objection that we received from Mr. Azim Ghader?

4  A      Yes.

5  Q      Are you familiar with that objection?

6  A      I am.

7  Q      Have you researched Mr. Ghader's relationship with the

8  debtors?

9  A      Yes.

10  Q      And what is it?

11  A      He has none.

12  Q      Is Mr. Ghader in fact a customer of Bittrex Global?

13  A      That is correct, which is a non-debtor entity.

14  Q      Thank you.

15          MS. TOMASCO:  That's all I have, Your Honor.

16          THE COURT:  Okay.  Mr. Schepacarter, do you want

17  five minutes?

18          MR. SCHEPACARTER:  Yeah, that's fine, Your Honor.

19          THE COURT:  Okay.

20          MR. SCHEPACARTER:  Thank you, I appreciate that.

21          THE COURT:  All right, we'll go ahead, we'll take a

22  five-minute break.

23          Mr. Hengel, you're not to discuss your testimony

24  with anyone during the break.

25          THE WITNESS:  Yes.

1    THE COURT:  Five minutes, we'll stand in recess.

2  Thank you.

3    MR. SCHEPACARTER:  Thank you, Your Honor.

4    (Recess taken at 11:50 a.m.)

5    (Proceedings resumed at 12:09 p.m.)

6    THE COURT:  My apologies for the delay.  Mr.

7  Schepacarter, are you ready to proceed?

8    MR. SCHEPACARTER:  No apologies needed, Your Honor.

9  Thank you very much.

10    For the record, Richard Schepacarter for the United

11  States Trustee.

12                        CROSS-EXAMINATION

13  BY MR. SCHEPACARTER:

14  Q    Good eve -- good evening, I'm all right -- good

15  afternoon, Mr. Hengel.

16  A    Good afternoon.

17  Q    I want to go over some of the questions that you were

18  asked on direct and some of the testimony that you have in

19  your declarations.

20    One thing I wanted to cover and, hopefully, I can be

21  comprehensive enough is -- one thing I wanted to cover is you

22  mentioned, there was some discussion, some testimony

23  regarding the customer list.

24  A    Yes.

25  Q    In your declaration, you talk about something called a

1  customer base.  Are they the same thing?

2  A    Generally, yes.

3  Q    Okay.  And what is that?  What is the customer list or

4  base or whatever?

5  A    The customer list is the list of all open accounts with

6  the debtors.  So, you know, inclusive of those that have

7  money in them and those that do not.

8  Q    Okay.  And what's on there, is it the name of the

9  depositor or their address, other information?

10  A    Yeah.  I mean, ultimately, like what other people would

11  want is the funds contained in the account, but, you know, to

12  do that you do need information about the customer itself.

13  Q    Okay.  And, specifically, if you know, what is that

14  information?  Is it the customer's name?

15  A    That's part of it, yes.

16  Q    Okay.  Is it the customer's address?

17  A    Yes.

18  Q    Is it a mailing address?

19  A    Yes.

20  Q    Okay.  And does it also include like an email address?

21  A    Generally, yes.

22  Q    Okay.  When you say generally, that's not a requirement?

23  A    Well, I think it's worth noting just because Bittrex's

24  platform is fairly old that, you know, the information that

25  is contained in a brand new account that would have been

1  opened prior to -- just prior to bankruptcy may have

2  different information than an account that was opened back

3  in, you know, 2016, 2017 --

4  Q    Okay.

5  A    -- back when there was different procedures for

6  gathering customer information and KYC.

7  Q    Right.  Have you reviewed those 2016 account customer

8  lists?

9  A    Not exhaustively, but I have seen a good amount of them.

10 Q    Okay.  And how do they differ from the ones that are

11 opened, say, in 2023?

12 A    Some of them, you know, might not have an up-to-date

13 address or some might not have an address at all.  You know,

14 I think there was -- it differs by individual and, you know,

15 the older the account is, probably the less value it might

16 have and the less likely we are to be able to get in contact

17 with that person to withdraw their funds.

18 Q    Okay, all right.  And you also said that it has the

19 account balance?

20 A    Yes.

21 Q    Okay.  And that's on the customer list, the account

22 balance?

23 A    Yeah, in the list that we have, it is inclusive of the

24 balances for each customer.

25 Q    Okay.  Does it have multiple accounts or does it just

1  have one account, or does it just have like --

2  A    Most only have one account.  I think we did find a

3  select few where there may have been one person who

4  controlled multiple accounts.

5  Q    Okay.  And is this list the same as -- this customer

6  list the same as what you would call a depositors list or a

7  list of all the people who have bitcoin accounts at Bittrex

8  or one of the other subsidiaries?

9  A    Yeah.

10  Q    Okay.  All right.  And there was some talk of some

11  value, residual value of these lists.  Has BRG done a

12  valuation of the customer list?

13  A    No.

14  Q    Okay.  And has any other professional that is working

15  for the debtors done a valuation of the customer list?

16  A    Professional -- no professionals that are with the

17  company currently, there may have been some in the past.

18  Q    Okay.  And have there been any offers that you know of

19  for the customer list?  Has any third party come forward to

20  say we want your customer list and we'll pay X dollars for

21  it?

22  A    My understanding is that there were some of those

23  discussions that happened prior to my retention.

24  Q    Okay.  But nothing since then, right?

25  A    No formal offers that I'm aware of.

1  Q    All right.  And is this -- the customer list, is this an

2  asset that's valued on the debtors' books and records?

3  A    Generally speaking, no.

4  Q    Okay.  All right.  And, without looking, I'm assuming

5  that it's not on the schedules or the statement of financial

6  affairs any kind of valuation for the customer list?

7  A    I believe it's listed as undetermined.

8  Q    Okay.

9  A    I think a customer list is generally only valued when

10 you acquire it from a third party.  To the extent that you

11 grow it organically, it generally has an undetermined value.

12 Q    Okay.  And there's nothing to prevent a customer or

13 depositors from just deciding that they don't want to do

14 business with Bittrex any longer, they want to go to another

15 exchange, whatever one might be out there; correct?

16 A    That is correct.

17 Q    So it's not unlike a bank account, if I have a bank

18 account at Citizens Bank and I decide I want to open one up

19 at Wells Fargo, I can just do that?

20 A    Yeah.  I mean, I guess it's a little different because

21 there's no mechanism to withdraw yet.  Hopefully, that's

22 changing in the coming weeks --

23 Q    Right.

24 A    -- but, as of now, they wouldn't have the ability to

25 pull their funds off.

1  Q    Okay.  But they would have done that prior to the filing

2  of the bankruptcy?

3  A    Correct and many did.

4  Q    All right.  In your declaration, the supplemental

5  declaration, you talk about customer lists.  You talk about

6  the GAAP accounting and the like.  You're not an accountant;

7  correct?

8  A    Correct.

9  Q    Okay.

10      (Pause)

11  Q    All right, there was some testimony about Mr. -- if I

12  could say his name correctly -- Mr. -- and he's not a

13  customer, correct, Mr. Ghader -- am I saying that right,

14  Ghader?  Ghader?

15  A    Yeah, I don't know how to pronounce him --

16  Q    Okay.

17  A    -- but I assume this is the Bittrex Global customer that

18  we were talking about earlier.

19  Q    That's right, it's the one on paragraph 8, Mr. Azim

20  Ghader.

21  A    Yes.

22  Q    And you said he's not a customer of the debtors, but

23  he's a customer of the non-debtors?

24  A    That is correct.

25  Q    Okay.  And do you know if --

1       THE COURT:  Actually -- I apologize for

2  interrupting, but I would note that the Court does have

3  appearing at Docket Number 60 the letter submission from Mr.

4  Ghader; it's spelled G-h-a-d-e-r.  I would ask if Mr. Ghader

5  or anyone on his behalf is present in the courtroom.

6       (No verbal response)

7       THE COURT:  Hearing no response, I would ask if Mr.

8  Ghader or anyone representing him is participating virtually

9  via Zoom today?

10       (No verbal response)

11       THE COURT:  Very well.  You may proceed, Mr.

12  Schepacarter.

13       MR. SCHEPACARTER:  Okay, thank you.

14  BY MR. SCHEPACARTER:

15  Q    And do you know if Mr. Ghader, since he has filed

16  something with the Court, do you know if he's been -- there's

17  been any phishing attempt with respect to Mr. Ghader or any

18  kind of other outreach of some sort?

19  A    I haven't been in contact with Mr. Ghader, so I couldn't

20  say either way.

21  Q    All right, but your testimony is you're not aware of

22  any?

23  A    I'm not aware of any.

24  Q    Okay.  All right.

25       Now, with respect to your declaration -- and I don't

1  know if you have a copy of it in front of you or not --

2  A    I've got the supplemental one, but --

3  Q    Oh, you do have the supplemental.  Okay.

4  A    Yeah, but I don't have the original one in front of me,

5  the first day.

6  Q    All right.  Let's just do it with the supplemental one

7  right now.

8  A    Sure.

9  Q    If you could turn to page 9.

10  A    Yep.

11  Q    Just let me know when you're there and I'll --

12  A    I'm there.

13  Q    Okay.  Take a look at that insert of -- it's like a

14  Google insert of a page, it's a Google page.

15  A    Yes.

16  Q    Did you create that page?

17  A    I did not.

18  Q    Okay.  Have you ever seen that page before?

19  A    Yes, I have.

20  Q    Okay.  And, to the extent of your knowledge, what does

21  that page represent?

22  A    It appears to be pages that bear the likeness to

23  Bittrex, potentially trying to procure information from

24  Bittrex customers.

25  Q    Okay.  And this is from a Google -- I guess somebody did

1   a Google search.  It looks like Bittrex at the top?

2   A    Yeah, that is correct, but there's two ads placed ahead

3   of it --

4   Q    All right.

5   A    -- to potentially distract a customer looking for the

6   right website to access.

7   Q    Right, okay.  And that could happen to anybody.  So, if

8   I looked up Bittrex and I did the same thing, I would get

9   those two fake websites; correct?

10  A    I'm not exactly sure how Google's algorithms work and

11  how they're tailored to individuals, but it's possible you

12  would see the same thing.

13  Q    Right, but I don't need to actually be a customer to

14  have looked on this page and developed it?

15  A    Probably not.

16  Q    Okay.  So it wouldn't really matter if somebody knew

17  somebody was a customer or not, this is anybody could search

18  the internet would find this page -- or this --

19  A    Correct, although I think --

20  Q    -- these pages on Google, I should say?

21  A    That is correct.  I think that they were probably

22  targeted at those that do have an account in order to access

23  that information, but yes, I think non-accountholders could

24  probably see the same thing.

25  Q    Right, okay.  Okay, that's fine.

1      All right, you talked about -- you testified regarding

2  the one Bittrex customer that you knew of who had been, I

3  guess, assaulted and was murdered; correct, is that what --

4  A    That is correct.

5  Q    -- happened?  Okay.

6      And you weren't aware of that when it happened; correct?

7  A    That is correct.

8  Q    So this is based on your discussions, I am assuming,

9  with Bittrex personnel?

10  A    That is correct.

11  Q    Okay.  And with respect to this person -- and I'm not

12  going to mention a name, but with respect to this person,

13  this Bittrex customer, do you know how the -- I guess maybe

14  we'd say -- I don't know the status of the case -- the

15  alleged perpetrators, how they found -- came to find him?

16  A    I do not.

17  Q    Okay.  So you wouldn't know if it was because they found

18  out he was a Bittrex customer or some other avenue of --

19  A    Yeah, I don't know if he was targeted because he was a

20  specific Bittrex customer or if it was just disclosed that he

21  had enough crypto to be worth targeting.

22  Q    All right, okay.  Or he may have discussed it in a bar

23  or something like that?

24  A    You never know.

25  Q    What was the old saying?  Slip of a lip will sink a

1  ship.  That's even before my time.

2      Now, you talked about the GDPR.  Would you consider

3  yourself knowledgeable with respect to the GDPR?

4  A    I wouldn't consider myself an expert on that, no.

5  Q    Okay, all right.  And you said there was 2,000

6  customers, correct, that are covered by that?

7  A    At Bittrex U.S.  I think there's another, roughly

8  400,000 at Bittrex Malta, which is also a debtor entity.

9  Q    And with respect to the 2,000 in the U.S., what makes

10  you believe that they are -- let me back up a little bit.

11      Are they U.S. citizens, do you know, or no?

12  A    I don't know if they're all U.S. citizens, but they were

13  all onboarded to Bittrex U.S., potentially before the

14  creation of Bittrex Global, or they moved overseas at some

15  point in the future.

16  Q    Okay.

17  A    There could be multiple avenues as to how a U.S.

18  customer -- I'm sorry, how a customer in Europe could end up

19  as a BUS customer, they either started in Europe and moved or

20  vice versa.

21  Q    All right.  And what makes you -- what would make you

22  believe that they were covered by the GDPR?

23  A    Based on the address that we have on file.

24  Q    Okay, based simply on the address?

25  A    Correct.

1  Q    Okay.  Are you aware of -- there was talk in your

2  declaration, I think it -- let me see if I can point you

3  right to it.  It's the penultimate paragraph, number 29, and

4  you talk about -- you say, "Finally, the risk of debtors

5  violating the GDPR and incurring heavy fines should not be

6  underestimated."

7       Are you aware of a heavy fine that could be levied

8  against Bittrex or any of its subsidiaries?

9  A    Currently?

10 Q    Yeah.

11 A    Not that I know of currently, just given that, I think,

12 the information has remained confidential.  So, it would be

13 contingent upon disclosure of that information that may

14 trigger additional liability.

15 Q    Do you -- what disclosure do you think might trigger

16 that penalty?

17 A    Could be, you know, as part of the customer list if we

18 were to publicize it in a non-redacted fashion.  I am not an

19 expert to know what level of risk that has in terms of

20 triggering that.

21 Q    And you said could be, so it could not be also?

22 A    I am not an expert in GDPR.  So, I couldn't say one way

23 or the other.

24 Q    All right.  On direct you testified that with respet to

25 the -- counsel asked you about the undue risk that could be

1  inflicted with respect to, I guess disclosure of the names or

2  other information.  And you said that the concerns -- that

3  there were possible concerns.  Are you aware of anything that

4  could actually happen if somebody if just an individuals name

5  were to be posted on the docket?

6  A    Yes.

7  Q    Okay.  What might that be?

8  A    Fishing attacks.  We have seen in other cases, you

9  know, where -- Celsius being one of them that the disclosure

10 of names can trigger fishing attacks where there will be

11 outreach of somebody pretending to be somebody trying to

12 solicit other personally identifiable information to

13 potentially go and hack into the account.

14 Q    And just because your name is posted as a Bittrex

15 customer doesn't mean that that is the only that you could be

16 subject to a fishing attack, correct?

17 A    I mean, technically, anybody could be subject to a

18 fishing attack. I think if you have got a dollar amount

19 attached to your name it may make you a higher value target.

20 If they know you have got a claim for $500,000 you have more

21 value as a fishing target then somebody that has an

22 undetermined amount.

23 Q    And have you, yourself, ever been subject of a fishing

24 attack?

25

1  A      Probably. I get text messages from the same ones that

2  probably everybody gets, you know, trying to say that you

3  have got an IRS refund due.  That is a fishing attack.  You

4  know, getting emails saying that you have won a prize.  You

5  know, there's different fishing attacks that are a very

6  little likelihood of success.

7  Q      Right.  Your Amazon account has been locked?

8  A      Exactly.

9          THE COURT:  Has that happened to you?

10         MR. SCHEPACARTER:  It happened to me.

11         THE COURT:  Okay.

12         MR. SCHEPACARTER:  Actually, me and my wife and

13 she doesn't even have an Amazon account.

14 BY MR. SCHEPACARTER:

15 Q      So when you testified you were worried about the

16 disclosure and it could subject somebody to what you call an

17 unpleasant outreach.  Is that what you are talking about?

18 A      A fishing attack would probably be the least onerous of

19 that type of outreach.  Obviously, on the other end of the

20 spectrum you would see what happened to the Bittrex customer

21 in 2017.

22 Q      Okay.  But you don't know that that was a result of a

23 fishing attack?

24 A      I don't.

25

1  Q      You actually don't know what that was the result of,

2  how he was ascertained to be a holder of bitcoin, not even

3  the Bittrex customer.

4  A      I can't speak to how he was necessarily identified as a

5  target.

6  Q      Okay.  All right.  Let me see if I have anything else.

7             THE COURT:  Take your time.

8             MR. SCHEPACARTER:  This is actually going quicker

9  than I thought it would.  Your Honor, I don't think I have

10  anything else.  I will reserve for recross if I need it.

11             THE COURT:  Okay.

12             MR. SCHEPACARTER:  I appreciate it.

13             THE COURT:  Ms. Tomasco, any redirect?

14             MS. TOMASCO:  No redirect, Your Honor.

15             THE COURT:  Thank you, Mr. Hengel. You may step

16  down.

17             THE WITNESS:  Thank you.

18        (Witness excused)

19             THE COURT:  Ms. Tomasco, any other witnesses or

20  evidence?

21             MS. TOMASCO:  No, Your Honor.  With the admission

22  of Mr. Hengel's declarations, two of them, along with his

23  direct testimony the debtors rest.

24             THE COURT:  Okay.  Mr. Schepacarter, does the U.S.

25  Trustee have any affirmative evidence or exhibits?

1           MR. SCHEPACARTER:  No.  We rely on the cross-

2    examination of Mr. Hengel.

3           THE COURT:  Very good.  I would be happy to

4    entertain closings.

5           MS. TOMASCO:  Thank you, Your Honor.  Patty

6    Tomasco with Quinn Emanuel, again, on behalf of the debtors.

7           Two statutory bases for the relief that the

8    debtors are seeking today supplemented by 105(a) which is

9    always an ever present helper in these situations.  107(b),

10   one of the older sections of 107, allows for the protection

11   of commercial information including the value of a customer's

12   list.

13          I am reminded that when 107(c) was enacted as part

14   of, I call it BAPCPA, you know, Congress also enacted 332

15   consumer privacy ombudsman at the same time which is kind of

16   interesting here because as a practical matter I think to

17   myself, well, if we go ahead and publish all of the customers

18   names then what would a consumer privacy ombudsman do once we

19   go to sell it under 332.

20          Clearly what Congress intended was to protect the

21   consumers and protect them from identity theft which has

22   become so rampant.  As Your Honor mentioned, just being alive

23   makes you aware of how rampant the attempts at identity

24   theft, and fishing, and spoofing, and spear fishing, and all

25   of the lovely names that we have learned mostly because my

1  firm makes me watch three hours of how to prevent identity

2  theft every year.

3          So, we know all of these things and we know them

4  to be true, but with respect to 107(b) I am reminded that

5  once we go to sell this customer list to a potential M&A

6  counterparty what would the privacy ombudsman protect if we

7  have gone ahead and published the names of our customers.  It

8  makes it almost nullity which can't be what Congress

9  intended.

10          So, unlike the Cred Inc. case and FTX cases that

11 Your Honor is familiar with where the Courts did protect the

12 customer lists under 107(b) it's not the main focus here. The

13 main focus here is 107(c) and in this case it's because we

14 are trying to do a couple of things.  We are trying to get

15 the customers to get their crypto off.  In doing that we have

16 to comply with KYC information.

17          Well the KYC information is pretty much like

18 filling out forms when you first go to see a new doctor.  I

19 mean it is your social security number, it is what was your

20 mother's name and did she have cancer, what was your father's

21 name and, you know, did you have relatives that died of X, Y,

22 Z.  It's just that extensive.

23          So, we are not talking about insignificant things

24 that are available from the customers that are in Bittrex's

25 possession.  So, we are trying to walk this narrow path and

1  that is we want to get the customers back their crypto.  We

2  have to comply with the KYC laws which are designed to

3  prevent money laundering and, you know, things that the

4  Government is going to make us do to make sure that we are

5  not dealing with bad actors from overseas, or from countries

6  that are on a blacklist, and that sort of thing.

7          So, this is a very delicate situation.  I want you

8  to know, Your Honor, that we have thought very long and hard

9  about every single process that we are doing in this case,

10 how we design the proof of claim, working with Omni Agent

11 Solutions so that the proof of claim is not going to be made

12 public.  It is going to be uploaded the way the claims rep

13 loaded in the Boy Scouts case or in a diocese case for sexual

14 abuse victims.  It's not going to be publicly available.

15          We have thought about this process from soup to

16 nuts about how to both comply with the regulations and do

17 right by the customers.

18          THE COURT:  Well, the proof of claim and bar date

19 questions aren't in front of me today, are they?

20          MS. TOMASCO:  No, but it goes to we're not doing

21 this for fun.  We're not asking to keep these -- we're not

22 doing this for fun.  One, I do think the customer list has

23 some value.

24          THE COURT:  Yeah, I think I'd like to go to your

25 opening point.  The debtor offers two -- again, if I were to

1  encapsulate your argument, the debtor believes it's offering

2  two completely independent prevailing arguments.

3          MS. TOMASCO:  Correct.

4          THE COURT:  One is that we can't publish this

5  stuff because we will lose, the estate will lose valuable

6  commercial information otherwise presented under 107(b) and,

7  alternatively, or additionally, depending on how you want to

8  think about it, the debtor is concerned, and you're saying

9  the Court should be likewise concerned about the impact on

10  individuals identified or contemplated under 107(c), that

11  they would be the subject of harassing or wrongful conduct

12  that we've discussed.

13          MS. TOMASCO:  Correct.

14          THE COURT:  But they're independent.

15          MS. TOMASCO:  They are independent.  They are

16  independent, except when you get to the patient -- not the

17  patient-care ombudsman -- but the privacy ombudsman kind of

18  gives you that link between 107(b) and 107(c), and that is

19  when we go to sell the customer list and the patient -- and

20  the privacy ombudsman gets appointed, what is there to

21  protect?

22          THE COURT:  Well, I think you may be trying to

23  prove too much with the consumer ombudsman.

24          MS. TOMASCO:  Uh-huh.

25          THE COURT:  And I can look at Section 332, I

1  hadn't thought of this argument and I don't think it's in

2  your papers, but the ombudsman and the considerations

3  identified by Congress in connection Section 332 in the

4  creation of the privacy ombudsman that I dealt with many,

5  many times in many, many cases --

6           MS. TOMASCO:  Right.

7           THE COURT:  -- goes more toward protecting the

8  transfer of that information.  And, again, experience teaches

9  that the consumer privacy ombudsman comes in and does, often,

10 a very, very "under the gun" report and advises that the

11 transfer can occur --

12          MS. TOMASCO:  Uh-huh.

13          THE COURT:  -- because the privacy policy that

14 we've reviewed that the debtor entered into with his

15 customers, permits the transfer or sale.

16          But that doesn't necessarily, while that, perhaps,

17 identifies or allows us to see a congressional consideration

18 that we're to be cognizant of, you know, expectations of

19 privacy, et cetera, articulated in a policy, I think the

20 issue that we have before us is a slightly different animal.

21 Because I think, often, the United States Trustee's argument,

22 which is not really made here, but the United States Trustee

23 will often come in and say, You need to disclose this stuff.

24          And sometimes the argument will be, Well, there's

25 an expectation of privacy.  I mean, you were doing

1  business -- and imagine a different kind of business that,

2  perhaps, people don't necessarily want widely known that they

3  were a participant in.  There's an expectation of privacy.

4          And the trustee's point of view is, that doesn't

5  change the bankruptcy laws --

6          MS. TOMASCO:  Uh-huh.

7          THE COURT:  -- and they're not wrong.

8          But -- so, I don't know that that's going to drive

9  the analysis at all.  And I guess I would say that it's not

10  necessarily -- it is preserving the value, consistent with

11  Mr. Hengel's testimony, that if this is known, if the

12  universe of claimants is known, even only by name, the value

13  to this is, is that this is a universe of people that are

14  interested in making a certain type of investment and that's

15  a limited universe of people.  And people that remain in this

16  business -- there's a lot of carnage going on in this

17  industry right now --

18          MS. TOMASCO:  Right.

19          THE COURT:  -- but people that remain and emerge,

20  crypto is still going to be around.  Somebody is going to

21  want to know 600,000 people that might be interested in

22  investing.

23          And so, I think Mr. Hengel's point is that the

24  value is going to be compromised.  Somebody will still pay

25  for it, but, you know, arguably, those customers will be

1  annoyed, perhaps, that they've been disclosed and say, I

2  don't want to be in this business at all or they will have

3  been onboarded by somebody else that, leave aside phishing,

4  somebody else that legitimately came to them and said, We

5  understand that you were a customer here.  We offer an equal

6  or superior product.  Come join us.  And do that, maybe, even

7  just from their name.

8              Isn't that right?

9              MS. TOMASCO:  Correct.  And I think -- let's just

10  say what has gone on here, uncontroverted testimony that in

11  the top-50 list, 30 can be identified just by using their

12  name.  That if that's available to a criminal, it's equally

13  available to a competitor who might want to, you know,

14  contact those individuals and decimate the value of the

15  customer list; that's number one.

16              Number two.  The U.S. Trustee sort of ignores what

17  the Court's job here is, to balance the harms.  Yes, we want

18  transparency, but we've done our level best to create a

19  system within this case to have jut most transparency by

20  using the artifact of the unique account ID, which is a

21  unique identifier, which anonymizes each of the customers,

22  but which we are able to -- and if Your Honor has had a

23  chance to look at the statements and schedules, you will see

24  that every customer is listed, not just for the fact that

25  they have a claim, but for the fact that they got a transfer

1  within 90 days.  And so every single customer is uniquely

2  identified; it's not as if you have a blank or a black mark

3  there.  We have a unique customer account ID, that is, the

4  customer can access.

5         And to address Judge Glenn's concern in Celsius,

6  he said, you know, how is a customer going to know if they're

7  scheduled at all?

8         Well, we've solved for that.  You know, we have

9  the benefit of these cases that came before us.  We read the

10  transcripts, read the U.S. Trustee objection, took all that

11  into account and came up with the way that we're doing it

12  here.  And we appreciate all the cases that went before us.

13         So what we did is we located this account ID,

14  which is unique to each customer, which the customer can

15  access by logging into the Bittrex platform.  They can, on

16  website, get that number and then go check it against the

17  statements and schedules and see if they are schedules, and

18  if they are schedules, in what amount, and whether or not

19  they're scheduled as contingent or disputed.

20         We don't yet have a committee in this case, but if

21  somebody wanted to look at whether those customers received a

22  preference, they could use that same unique account ID and

23  they could see if the customer got a preference.

24         Now, when the customer files a claim, they can use

25  the same -- they're going to fill in the same unique customer

1   ID.  We show them on our FAQs on our website how to get that

2   customer ID.  They can file a proof of claim and somebody can

3   see -- can tie them in to the schedules to see whether or not

4   the claim matches the schedules or not.

5          So all of the things you can do with a customer

6   name, you can do with the account ID.  So the transparency

7   issue that was identified by Judge Glenn in Celsius has been

8   solved.

9          So where is the balance of the harms, then?  If we

10  can identify specific instances in which cryptocurrency

11  customers have been targeted for violence in order to obtain

12  their sign-in credentials by revealing their name, we are

13  necessarily making them the target of violence.  And if we

14  are providing their name, plus the value of their

15  cryptocurrency holdings, we are exacerbating that by a factor

16  of 10.

17         So we have solved the transparency issue, but the

18  U.S. Trustee continues to want to disclose the customer

19  names.  We have demonstrated through the uncontroverted

20  testimony of Mr. Hengel that disclosing names is as good as

21  disclosing who the customer is.

22         Now, let's look at what 107(c) says.  107(c) uses

23  the term "any means of identification."  It says the Court

24  may protect an individual from risk of identity theft or

25  other unlawful injury by redacting any means of

1  identification.  It does not distinguish between the

2  customer's name --

3            THE COURT:  Name or address --

4            MS. TOMASCO:  -- and everything else.

5            And in this case, any means of identification

6  includes the name, because of the testimony that we've had

7  here today.  These are fairly unique names, not that we have

8  attracted at Bittrex, a bunch of uniquely named individuals;

9  they just simply are unique names.

10            And if we put a unique name next to one of our top

11  creditors who has $14 million worth of crypto, and what is

12  that going to do to that individual?

13            So we look at the legislative history.  We look at

14  the concerns of Judge Glenn in the Celsius case.  We've

15  solved for the transparency problem.  And the balance of the

16  harms simply is so great in favor of the debtors' position

17  it's really hard for me to understand what benefit there's

18  going to be to the estate from revealing these names in

19  comparison to the examples of physical violence and financial

20  violence that is replete throughout the newspaper articles

21  that the Court doesn't need to consider, but in Bittrex's own

22  experience.

23            In addition, the Hengel supplemental declaration

24  goes through about 740 instances of customers, you know,

25  without having their names published.  Customers have had

1   instances in which their accounts have been hacked.  It

2   happens, you know, with your bank account when you try to log

3   in.  It just happens.  So over Bittrex's history, they've had

4   about 740 of these.  That number is going to go up, not down,

5   if the names of the customers are released out there.

6         Next week, Your Honor will hear our customer

7   withdrawal motion.  We didn't draw any objections.  We have

8   one still that we've given extension, a deadline extension to

9   and I'm hopeful that that's going to get worked out.

10        But what we're going to be trying to do is get

11  customers to move their crypto off the platform.  If, on top

12  of that, we're also dealing with an exponentially larger

13  number of phishing and account hacks, that's just going to

14  make that problem very, very difficult to maneuver.

15        And so, we're trying to do the right thing here.

16  We're not trying to make more money or, you know, do bad by

17  the little guy; we're trying to do right by the little guy.

18  And so I understand the need for transparency.  We worked

19  really hard to solve that.

20        And so, for that reason, the debtors' motion

21  should be granted.

22        THE COURT:  Very good.  All right.

23        Mr. Schepacarter?

24        MR. SCHEPACARTER:  Thank you, Your Honor.

25        THE COURT:  Sure.

1      MR. SCHEPACARTER:  Your Honor, Richard

2   Schepacarter for the United States Trustee.

3      A couple of things.  One is, and I guess we can

4   sort tick them off one at a time, the customer list.  The

5   testimony was, basically, that the customer list really has

6   no value.  It has some --

7      THE COURT:  No, the customer -- the debtor does

8   not maintain a value on its books and records.

9      MR. SCHEPACARTER:  Right.  So it doesn't have any

10  known value, too.

11     And we're talking about a customer list versus

12  what the disclosure would be if it was just the name.  So the

13  customer list is addresses, email --

14     THE COURT:  Contact information.

15     MR. SCHEPACARTER:  -- contact information,

16  account, and all this other stuff.

17     What we're talking about is just with individuals

18  is the name.  And with the entities, it's a little different,

19  because that would be -- they're not covered.  Our argument

20  is they're not covered by 107(c).  They're -- and arguably,

21  covered by 107(b)(1), which would be, sometimes commercial

22  information.  And I don't know that it is commercial

23  information.  I don't think it, just because it has a value,

24  I don't think it comes under -- and I don't know what the

25  value is.  Nobody's told -- said what the value is, so we

1  don't really know the value.

2             And I don't think it comes under, like Judge Glenn

3  found in Celsius.  It's just not commercial information.

4  It's just not that type of information.

5             THE COURT:  Let me ask you a question.  So I've

6  got a business that has -- that's in a competitive

7  environment, a landscaping business here in Wilmington and

8  I've got 500 customers --

9             MR. SCHEPACARTER:  Okay.

10            THE COURT:  -- and a healthy business.  Isn't that

11 list of customers valuable?

12            MR. SCHEPACARTER:  Well, it might have some value,

13 but it doesn't mean it doesn't -- it's not -- it would still

14 be subject to disclosure.  We still have to put all your

15 customers --

16            THE COURT:  But it doesn't fall -- disclosure

17 includes commercial information.

18            MR. SCHEPACARTER:  Right.  But you could say

19 anything is commercial information.  That would mean that

20 every customer list for every business would be what they

21 call "commercial information" and you would have every --

22 every case would be sealed.  Every case would have the

23 pleadings sealed, would have the customer lists sealed --

24            THE COURT:  Well --

25            MR. SCHEPACARTER:  -- would have the creditor --

1  the Schedule F would be sealed.  Everybody would be redacted.

2  That's what would happen parent.

3          THE COURT:  Well, not necessarily, because

4  customers aren't always creditors.  Schedule F is unsecured

5  creditors.

6          MR. SCHEPACARTER:  Uh-huh.

7          THE COURT:  So if I sold you a service or a good,

8  I don't necessarily list you as a creditor if I were to file

9  for bankruptcy.

10          MR. SCHEPACARTER:  Right.  But if you didn't come

11  cut my grass, you would, right?

12          THE COURT:  Not necessarily.  As long as --

13          MR. SCHEPACARTER:  You owe me -- I paid you and

14  now you owe me --

15          THE COURT:  You paid me to cut your grass.

16          MR. SCHEPACARTER:  I paid you and you didn't come

17  cut my grass and now you -- I might be a customer or also a

18  creditor --

19          THE COURT:  Possibly.

20          MR. SCHEPACARTER:  -- you know, and most of the

21  customers are creditors.  I mean, I have a case, it's a feed

22  case and all the people who they sell to and the like are all

23  the creditors of that case, in that case.

24          THE COURT:  Uh-huh.

25          MR. SCHEPACARTER:  So, again, I don't think that

1   this information -- I don't think they've been able to

2   establish that it's commercial information.  It's not

3   something that's not even been marketed yet.  So they're

4   contemplating, maybe potentially selling it.

5           And even their own policy, their privacy policy

6   wouldn't necessitate an ombudsman, because it says that when

7   you make a disclosure, that, or to sell, transfer, and merge

8   parts of our business or assets or acquire other businesses.

9   So, that consumer privacy ombudsman would not occur in this

10  case.  If that issue comes up, we've already dealt with it.

11  So, I don't think it's commercial information.

12          And then we get down to the argument as to -- and,

13  again, what the debtors want to do here is -- and, again,

14  this is on the backdrop of, and we set it forth in our

15  objection that everything is public unless it hits the

16  exceptions.  So what the debtors want is basically to have,

17  like, a choice.  Like, there's the chance -- unless you want

18  to change the statute -- there's the chance, not the undue

19  risk, but the chance of the information causing harm, not the

20  undue risk.

21          They haven't proven -- they've said, Well, there

22  could be some phishing attacks.  And even the Bittrex attack,

23  which happened to that poor gentleman overseas, that --

24  there's no evidence that the disclosure of his name or

25  something that was gotten from Bittrex itself led to his

1    demise.  It could have been any number of things that led to
2    it and we can only speculate to what it is, because we don't
3    know.  There's no evidence as to what happened.  It's a
4    terrible thing that happened and we wouldn't want to see it
5    happen to anyone --

6            THE COURT:  Sure.

7            MR. SCHEPACARTER:  -- period, but there's no nexus
8    as to what we're doing here today, to what led to something
9    along those lines.

10           THE COURT:  How do I deal with the point, perhaps,
11   raised by the Court, but certainly by Ms. Tomasco, that
12   phishing -- spear phishing, scamming, everything is a basic
13   feature of how the world operates and part of the concern is
14   that we're articulating a, or we're putting out --

15           MR. SCHEPACARTER:  Uh-huh.

16           THE COURT:  -- a list of people that own assets
17   that are, you know, potentially quite valuable.

18           MR. SCHEPACARTER:  Right.  Well, here's the thing,
19   as somebody from my office would say, the thing is that we
20   get -- they even put in their declaration, there's a phishing
21   attack everywhere; as a matter of fact, you can go and
22   apparent just put in "Bittrex" -- I didn't try it -- but you
23   can put in "Bittrex" and you'll get these fake Bittrex
24   websites.

25           THE COURT:  Uh-huh.

1          MR. SCHEPACARTER:  And I've seen them in other

2    cases.  You can go on for Bank of America and you get a funky

3    one, then you have to find the right one to make sure that

4    you're logging into your account or whatever it might be.

5          There's phishing attacks, here, the testimony

6    is 740 hacks, I guess you want to call it, but it had nothing

7    to do with the disclosure of names; people were able to

8    figure it out.  So just because the name is published, which

9    is supposed to be under the laws here, that's the --

10          THE COURT:  If we start with the presumption that

11    this has to be published --

12          MR. SCHEPACARTER:  -- overview.

13          Presumption is -- and you've got to hit, you've

14    got to go to 107 --

15          THE COURT:  -- the burden is on the debtor to seek

16    relief from that standard.

17          MR. SCHEPACARTER:  -- you've got to go down that

18    lane.  It's almost like a golf course, right; you've got to

19    hit the ball, you've got to make sure it stays on the

20    fairway, you've got to keep hitting that ball until it

21    eventually lands in the hole.

22          What the debtors would like is, and I would like

23    this for myself when I'm playing golf, you hit the ball on

24    the fairway, it's a par.

25          THE COURT:  It's a gimme.

1          MR. SCHEPACARTER:  It's a gimme.  Everything is a

2 gimme and then I'm done.  I just have to do it.

3          THE COURT:  Let me ask you a question.

4          MR. SCHEPACARTER:  Okay.  Go ahead.

5          THE COURT:  On your threshold proposition, you're

6 pushing an open door.  There is a presumption that

7 proceedings are open.  I don't believe that I've sealed my

8 courtroom in more than a decade.

9          And I think you raised a concern about, what are

10 we going to do with these proceedings?  And I'm telling the

11 debtor now something that is probably not a surprise:  I'm

12 not sealing the courtroom for further proceedings in this

13 case.  I don't do that.  And you'd have to make a heck of a

14 showing to me and I'll deal with it, but it is something that

15 I have usually found able counsel can protect against those

16 concerns without sealing a courtroom.

17          That's -- sealing a courtroom is probably as

18 significant a concern as we get.

19          MR. SCHEPACARTER:  Uh-huh.

20          THE COURT:  So the flipside is, do we have a

21 different consideration, given the asset or the nature of

22 this company's business?  For example, let's take a typical

23 company that has public debt, okay.  We're going to list it

24 and we're going to say that John Smith owns 500,000 shares of

25 the debtor's senior convertible notes, okay, or $500,000

1    worth of that.

2              Now, obviously, that person might not want the

3    world to know that they own $500,000 worth of a debtor's

4    senior convertible notes.  As a general proposition, that's a

5    creditor and that gets published.

6              MR. SCHEPACARTER:  Uh-huh.

7              THE COURT:  One of the reasons -- and, again, I'm

8    trying to intuit it and I'd like your thoughts -- is this

9    industry, maybe not unique, but different from typical

10   considerations?  For example, again, here, the ability to get

11   a little bit of information by subterfuge or otherwise, might

12   open the door to getting all of this value and having it

13   disappear, right.

14             Where, if I knew the name of somebody who owns

15   $500,000 worth of a debtor's senior convertible notes that

16   are publicly traded securities, I'm not sure how you would

17   somehow try to siphon off that value, but if you inserted

18   yourself, you'd be committing a federal crime and you'd have

19   to have some sort of paper trail that showed, somehow, the

20   fictitious transfer of those securities, et cetera.

21             That's different.  That's different.

22             And, you know, the idea that the bedrock basis of

23   this business is the instantaneous and untraceable transfer

24   of value around the world, gives rise to, you know, concerns

25   about know your client and money laundering, but also, just

1  the ability of people to seize value is, it seems to me much

2  more evident than it would be if all we're talking about are

3  claims or shareholdings.

4           MR. SCHEPACARTER:  Uh-huh.

5           THE COURT:  Again, we list who the shareholders

6  are.

7           MR. SCHEPACARTER:  Exactly.

8           THE COURT:  It's hard to share somebody's shares.

9  I don't know how you'd do it.  You could ask them for them,

10 but you can't get an account number or a password and all of

11 a sudden get everything out of it.

12          MR. SCHEPACARTER:  Uh-huh.

13          THE COURT:  I'd like your thoughts about whether

14 or not the nature of this business or this industry, which is

15 now, you know, impending in a host of bankruptcy courts --

16          MR. SCHEPACARTER:  Right.

17          THE COURT:  -- is different.

18          MR. SCHEPACARTER:  And I don't know that we've

19 ever had any real testimony on that point.  We've had

20 testimony that potentially putting the names out there could

21 lead to other crypto or whatever competitors of some sort,

22 somehow contacting these people.  But we don't know if

23 they've already done that, like, we don't know that some

24 other -- and I don't -- I'm not a crypto person, so I don't

25 know the different exchanges and whatever -- but some other

1  ABC exchange has already reached out to some of these

2  customers agree they've already been the subject of phishing

3  scams.

4          THE COURT:  Uh-huh.

5          MR. SCHEPACARTER:  You put these -- you know, it

6  seems like some of these people are somewhat sophisticated

7  and somewhat not sophisticated.  You know, one of the things

8  they tell you to look for is misspellings.  So they can't

9  even spell sometimes the right name.  I think the Celsius

10 one, they spelled it -- misspelled it.

11         THE COURT:  Well, it's also that you have to --

12         MR. SCHEPACARTER:  You know automatically it's a

13 scam.

14         THE COURT:  Right.  But often the misspelling is

15 deliberate because you can't have a "dot com" with the same

16 name, so you add two Ss or something like that.

17         MR. SCHEPACARTER:  That's true.  That's true.

18         THE COURT:  But, again, some of them are facially

19 defective, et cetera, but I understand the point.

20         MR. SCHEPACARTER:  Or they have "dot net" or

21 something like that.  Yeah, they have all kinds of different

22 things.

23         But, I think the issue is here, when we're talking

24 about -- and, again, I said it before, you start with

25 entities.  Scandalous, we're not talking about that, but

1  that's for a person.

2          THE COURT:  Uh-huh.

3          MR. SCHEPACARTER:  Which, arguably, a person is a

4  corporation, right?  I mean, that could be, so it's not an

5  entity, but it's a person.

6          But then you get down to the specific statute that

7  talks about undue risk to an individual person or property.

8  Like, an undue risk has to be, like, substantial.  It has to

9  be, like, exasperating.  It has to be -- all the men, and

10 like, well, it's like people say, you know, it's on steroids.

11 It has to be that kind of risk.

12         What we're talking about here is like, eh, there's

13 a chance of that.  It could happen.  It probably will happen.

14 Maybe it'll happen.  Potentially it'll happen.  You know, we

15 don't want to expose them to some potential -- you know, I'm

16 at risk when I walk out of this courtroom and I go across the

17 street.  That doesn't mean that I have to call, you know, the

18 Wilmington Police Department and have everything corded off

19 so that I can make sure I walk across the street and there'll

20 be definitely no cars that come near me.

21         So, you know, there's, like I said, we don't even

22 know if these people have been contacted, these lists, I

23 mean, this customer list.  And we're only talking about just

24 the name; we're not talking about all the information, at

25 least as to the individuals.

1          And as to the GDPR, I don't think there's been any

2    testimony on that, whether it's applicable or not.  They

3    believe it to be applicable.  We don't know that to be a

4    fact.  And we don't know of any potential penalty.

5          They attached that tome of an order, I guess it

6    was, from the Meta case, and the Meta case is a totally

7    separate case because that wasn't in bankruptcy.  As Judge

8    Glenn found that bankruptcy laws supercede, I guess you want

9    to call it, the GDPR when you're in bankruptcy.  If they were

10   in bankruptcy -- if Meta was in bankruptcy, maybe it would

11   have been a different story, but it's not, so --

12          THE COURT:  Yeah.

13          MR. SCHEPACARTER:  -- other than that, Your Honor,

14   I don't have anything else.

15          If Your Honor has no questions, I will sit.

16          THE COURT:  No, I don't have any questions.

17          MR. SCHEPACARTER:  Thank you, Your Honor.

18          THE COURT:  All right.  Here's what we're going to

19   do.  I'm going to overrule the objection and I'm going to

20   grant the debtors' motion and I will give you my reasons.

21          First, I want to commend the United States Trustee

22   for, frankly, putting the debtor to its burden.  We

23   administrator with the proposition that proceedings in a

24   bankruptcy court, both the proceedings in the court and the

25   filings with the Court, are public.  Section 107 recognizes

1  that there are limits to that proposition, but that is our

2  opening proposition.  Cause must be established to waiver

3  from that proposition.

4          And I'm satisfied here, based upon Mr. Hengel's

5  testimony, as well as the record developed in the court, that

6  the debtor has, in fact, carried its burden.  And I find that

7  it was carried its burden as to the request to seal the

8  customer list and the information contained therein on two

9  independent counts.  First, I am satisfied that the debtor

10 has demonstrated that the customer list constitutes

11 commercial information under Section 107(b)(1) and is

12 entitled to be protected.

13         The fact that Mr. Hengel could not identify a

14 pending offer is, frankly, of no moment at this point.  The

15 debtors' obligation at this stage of its proceeding is to

16 husband and preserve the value of the estate as we move

17 through a reorganization process.  He has identified a list

18 of 600,000 individuals and has testified credibly and

19 plausibly that he believes that it may, in fact, have value.

20         Mr. Schepacarter is correct that, at this point,

21 it doesn't necessarily demonstrate any concrete value.  And

22 I'm not troubled by the fact that the debtor does not ascribe

23 an economic or a particular price point value to its own

24 organically developed customer list.  I have not seen a

25 customer list valued that way on a company's typical books

1  and records, but I have on many, many occasions, considered

2  and approved the sales of customer lists for real and

3  significant consideration in a sale.

4          And I am satisfied that Mr. Hengel has

5  demonstrated that the disclosure of this information could

6  materially compromise the value that could be obtained, and

7  that is a situation and where I think the trustee has

8  correctly identified, there are two ways of looking at

9  Section 107.  One is from the point of view of the company,

10  and this is a preservation of an asset of the company, and,

11  again, under Section (b), I'm satisfied that the customer

12  list that's at issue here is commercial information.

13          I digressed a moment and I want to return.  I want

14  to commend the United States Trustee, though, for putting the

15  debtor to its burden.  This is a significant ask and an

16  important one.  And the trustee's objection and request and

17  demand for an evidentiary predicate is precisely the role, I

18  think, that Congress anticipated for the trustee to play.

19          There are not a lot of other stakeholders other

20  participants that might show an interest in or engage deeply

21  on this issue, and it is, I think, squarely within the

22  mandate of the United States Trustee to protect and preserve

23  the public nature of these proceedings.

24          So, with that observation, the debtor has, again,

25  presented affirmative and competent testimony with respect to

1    the relief requested and, as noted, I would be prepared to

2    grant the motion under the predicate of Bankruptcy Code

3    Section 107(b)(1).

4            Independently, I would, likewise, be prepared to

5    grant the motion for relief under Bankruptcy Code

6    Section 107(c)(1)(A).

7            Mr. Schepacarter has, again, challenged the

8    debtors' concern that the disclosure of this information will

9    subject their customers to undue risk of identity theft or

10   other unlawful injury.  And, again, he has tested those

11   propositions in argument and in cross-examination of

12   Mr. Hengel.

13           But I believe that Mr. Hengel's testimony,

14   coupled, frankly, with the Court's own experience, which I

15   believe I'm entitled to consider as the trier of fact,

16   reflects that there is an undue risk of identity theft or

17   other harm if the information is disclosed.

18           Mr. Hengel testified that they did a test run and

19   without a great deal of effort, out of simply knowing the

20   names of the top 50 customers, they were able to identify

21   over half of them in, I assume, a relatively short period of

22   time.

23           The risk is manifest and the attractiveness of

24   that list, even only names, of people that have invested and

25   are holding crypto in a particular amount to be disclosed on

1  the schedules in a format easily searchable gives rise to,

2  again, a manifest risk of identity theft, scams, and

3  phishing.

4         The trustee expresses, again, I think, a

5  legitimate concern about what the limiting principle is.  And

6  it was an interesting colloquy and I don't know that we

7  finished the discussion, and maybe we don't have to finish it

8  today; there will be further cases, I expect.  But I think

9  I'm obliged to consider the nature of the business that's in

10 front of me and the context in which the information is

11 procured and attempted to be protected or preserved.

12        Crypto is different from many other businesses,

13 and as I said during argument, one of its primary purposes is

14 the immediate, instantaneous, and effectively untraceable

15 transfer of value.  That aspect does not necessarily drive

16 through every business that we own, whether it's gift cards

17 in a retail case, shares of a company, debt securities being

18 held, or, frankly, claims against a company.  So I think that

19 there is a more material risk of loss here and of injury here

20 to stakeholders than perhaps would exist in a more typical or

21 traditional business environment.

22        So based upon the record before me, I am satisfied

23 that the debtors have carried their burden under Bankruptcy

24 Code Section 107(b) and 107(c) for the relief requested.

25        The parties have briefed, but the record, I think,

1  is limited with respect to the effect of the GDPR and I don't

2  believe that I have to reach that question for purposes of

3  today.  I have read the Celsius opinion.  I certainly know

4  and respect Chief Judge Glenn and, again, I've carefully read

5  his opinion.

6        I don't think I have to reach the question of

7  whether or not the provisions of the GDPR govern proceedings

8  in a Bankruptcy Court.  I don't think that that's a today

9  issue.  I think the debtor has demonstrated, instead, that

10  under applicable provisions of the Bankruptcy Code, which

11  govern here without dispute, the debtor is entitled to secure

12  and protect the information and to seal it.

13        I make no comment about, obviously, further cases.

14  The trustee has expressed, I think, a legitimate concern

15  about what the end point of this is or the limiting

16  principle.  I get it, but I'm asked to consider relief in a

17  particular case and I'm satisfied that that burden has been

18  carried, and I will consider any further case on its own

19  merits and facts.

20        I note further, that in a colloquy with

21  Ms. Tomasco, we discussed -- and with Mr. Hengel -- where

22  this case might be headed for further steps, right.  There

23  may be a sale process.  There will be, presumably, a claims

24  bar date and a claims administration process.

25        I'm being asked to approve a motion that was filed

1    on the first day and to grant that motion on a final basis.

2    I'm doing that today.  My ruling does not answer or dispose

3    of issues and questions relating to the claim-objection

4    process, a pending or possible bar date issue, or the

5    mechanics of that process.  We'll deal with them when they

6    come.

7              So, I want to be clear that while we did discuss

8    it, and I think it was helpful, frankly, for the debtor to

9    demonstrate the extent to which -- or the debtors to

10   demonstrate the extent to which they have anticipated and

11   thought through some of these issues, today my ruling is

12   limited to the relief that's requested and the motion is

13   granted.

14             Are there any questions?

15        (No verbal response)

16             THE COURT:  All right.  I appreciate everyone's

17   time.

18             We will stand in recess.  Thank you.

19             COUNSEL:  Thank you, Your Honor.

20        (Proceedings concluded at 1:11 p.m.)

21

22

23

24

25

1                              CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    June 8, 2023

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    June 8, 2023

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                     June 8, 2022

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25