**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Desolation Holdings LLC, *et al.,*[1] | Case No. 23-10597 (BLS) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION
OF THE AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
DESOLATION HOLDINGS LLC AND ITS AFFILIATED DEBTORS**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Holdings Ltd. (2227); and Bittrex Malta Ltd. (1764). The mailing and service address of the Debtors is 701 5th Avenue, Suite 4200, Seattle, WA 98104.

# Table of Contents

Preliminary Statement........................................................................................................1

Argument ...........................................................................................................................2

I.  Case Background. ......................................................................................................3

    A.  Procedural History. ........................................................................................3

         2.  The Wind Down........................................................................................6

    B.  The Plan Solicitation and Notification Process. ............................................7

    C.  The Objections. ..............................................................................................9

II.  The Debtors Complied with the Applicable Notice Requirements. ....................10

    A.  The Debtors Complied with the Applicable Notice and Solicitation
        Requirements. ...............................................................................................10

    B.  Solicitation of the Plan Complied with the Bankruptcy Code and was in
        Good Faith. ...................................................................................................10

III.  The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code. ...............11

    A.  The Plan Complies with the Applicable Provisions of the Bankruptcy Code
        (§ 1129(a)(1)). ..............................................................................................11

         1.  The Plan Satisfies the Classification Requirements of Section 1122
             of the Bankruptcy Code. ......................................................................11

         2.  The Plan Satisfies the Mandatory Plan Requirements of Section
             1123(a) of the Bankruptcy Code...........................................................14

         3.  The Plan Complies with the Discretionary Provisions of Section
             1123(b) of the Bankruptcy Code...........................................................17

         4.  The Plan Complies with Section 1123(d) of the Bankruptcy Code...........28

    B.  The Debtors Complied with the Applicable Provisions of the Bankruptcy
        Code (§ 1129(a)(2)). .....................................................................................29

         1.  The Debtors Complied with Section 1125 of the Bankruptcy Code. ........29

         2.  The Debtors Complied with Section 1126 of the Bankruptcy Code. ........31

    C.  The Plan Was Proposed in Good Faith (§ 1129(a)(3)). .............................32

    D.  The Plan Provides that the Debtors' Payment of Professional Fees and
        Expenses Is Subject to Court Approval (§ 1129(a)(4)). .........................34

    E.  The Plan Does Not Require Additional Disclosures Regarding Directors,
        Officers, and Insiders (§ 1129(a)(5)). ......................................................35

    F.  The Plan Does Not Require Governmental Regulatory Approval (§
        1129(a)(6)). ..................................................................................................36

G.    The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)). .................................................................................................36

H.    The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code. ...........................................................38

I.    The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)). .............................................................................................39

J.    At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)). .......................................................................................40

K.    The Plan Is Feasible (§ 1129(a)(11)). .......................................................41

L.    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ............42

M.    No Remaining Retiree Benefits Obligations (§ 1129(a)(13)). ................43

N.    Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan. .................43

O.    The Plan Satisfies the Requirements of Section 1129(b) of the Bankruptcy Code. .........................................................................................44

1.    The Plan Is Fair and Equitable (§ 1129(b)(2)(B)). .....................44

2.    The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1)). ................................................................................45

P.    The Debtors Complied with Section 1129(d) of the Bankruptcy Code.................46

Q.    Modifications to the Plan. .........................................................................46

R.    Good Cause Exists to Waive the Stay of the Confirmation Order. .......47

Conclusion .................................................................................................................49

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*In re AAI Pharma*,
    No. 05-11341 (PJW) (Bankr. D. Del. Feb. 22, 2006) .................................................22

*In re Adelphia Bus. Sols., Inc.*,
    341 B.R. 415 (Bankr. S.D.N.Y. 2003) ......................................................................41

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................................................21, 37

*In re Aleris Int'l, Inc.*,
    Case No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) .........22, 23, 42

*In re Am. Apparel, Inc.*,
    No. 15-12055 (BLS), 2016 Bankr. LEXIS 3331 (Bankr. D. Del. Jan. 27, 2016) ...................28

*In re Ambanc La Mesa L.P.*,
    115 F.3d 650 (9th Cir. 1997) .....................................................................................44

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006) ......................................................................................11

*In re Armstrong World Indus., Inc.*,
    348 B.R. 136 (D. Del. 2006) ......................................................................................12

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999) .............................................................................................37, 44

*Berkeley Fed. Bank & Trust v. Sea Garden Motel and Apartments (In re Sea Garden Motel and Apartments)*,
    195 B.R. 294 (D.N.J. 1996) .......................................................................................42

*In re Blitz U.S.A., Inc.*,
    No. 11-13603, 2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014) ...........................24

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. 2018) ......................................................................15

*In re Broadway 401 LLC*,
    No. 10-10070(KJC), 2010 WL 2902755 (Bankr. D. Del. Mar. 16, 2010) ...............48

*In re Brotby*,
    303 B.R. 177 (B.A.P. 9th Cir. 2003) .........................................................................42

*In re Burns & Roe Enters., Inc.*,
No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) ...............................................47

*In re Calpine Corp.*,
No. 05-60200 (BRL), 2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 19, 2007).........................24

*In re Charter Commc'ns, Inc.*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009).......................................................................................21

*In re Chassix Holdings, Inc.*,
533 B.R. 64 (Bankr. S.D.N.Y. 2015).........................................................................................24

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010)..................................................................................24, 27

*In re Chemtura Corp.*,
No. 09-11233 (REG) (Bankr. S.D.N.Y. Nov. 23, 2010) ..........................................................48

*In re Coram Healthcare Corp.*,
271 B.R. 228 (Bankr. D. Del. 2001) ..........................................................................................32

*In re Dana Corp*,
412 B.R. 53 (S.D.N.Y. 2018).....................................................................................................15

*In re Drexel Burnham Lambert Grp.*,
960 F.2d 285 (2d Cir. 1992).......................................................................................................27

*In re Drexel Burnham Lambert Grp., Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992)..................................................................................11, 12

*In re Drug Fair Grp., Inc.*,
No. 09-10897, 2010 WL 3492994, 2010 Bankr. LEXIS 2984
(Bankr. D. Del. June 7, 2010) ..............................................................................................28, 48

*In re Eddington Thread Mfg. Co.*,
181 B.R. 826 (Bankr. E.D. Pa. 1995) ........................................................................................42

*In re Exide Holdings, Inc.*,
20-11157-CSS, 2021 WL 3145612 (D. Del. July 26, 2021) .....................................................21

*In re Extended Stay Inc.*,
No. 09-13764 (JMP) (Bankr. S.D.N.Y. July 20, 2010) ............................................................48

*In re Frascella Enters., Inc.*,
360 B.R. 435 (Bankr. E.D. Pa. 2017) ........................................................................................33

*In re Genco Shipping & Trading Ltd.*,
513 B.R. 233 (Bankr. S.D.N.Y. 2014).......................................................................................24

*In re Genesis Health Ventures, Inc.*,
  266 B.R. 591 (Bankr. D. Del. 2001) ....................................................................33

*Gillman v. Continental Airlines (In re Continental Airlines)*,
  203 F.3d 203 (3d Cir. 2000)..............................................................................27

*In re Glob. Safety Textiles Holdings LLC*,
  No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009)..............................47

*In re Global Indus. Techs., Inc.*,
  No. 02-21626, 2013 WL 587366 (Bankr. W.D. Pa. Feb. 13, 2013) ......................................24

*In re Greate Bay Hotel & Casino, Inc.*,
  251 B.R. 213 (Bankr. D.N.J. 2000) ...................................................................11

*In re HRI Holding Corp.*,
  No. 19-12415 (MFW) (Bankr. D. Del. Nov. 5, 2020) .................................................28

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013) ...................................................................24

*In re Jersey City Med. Ctr.*,
  817 F.2d 1055 (3d Cir. 1987)...........................................................................12

*In re Jewish Memorial Hosp.*,
  13 B.R. 417 (Bankr. S.D.N.Y. 1981) ..................................................................46

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
  987 F.2d 154 (3d Cir. 1993)........................................................................12, 44

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986)..................................................................29

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988)........................................................................41, 42

*Koelbl v. Glessing (In re Koelbl)*,
  751 F.2d 137 (2d Cir. 1984)...........................................................................32

*In re Lapworth*,
  No. 97-34529, 1998 WL 767456 (Bankr. E.D. Pa. Nov. 3, 1998) ........................................29

*In re Latam Airlines Group SA*,
  2022 WL 2206829 (Bankr. S.D.N.Y June 18, 2022)....................................................15

*Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*,
  329 B.R. 491 (D.N.J. 2005) ...........................................................................34

*In re Mallinckrodt,*
No. 20-12522 (JTD) (Bankr. D. Del. Feb. 3, 2022)...............................................24

*In re Maremont Corp.,*
601 B.R. 1 (Bankr. D. Del. 2019) ........................................................................34

*In re Marvel Entm't Group, Inc.,*
222 B.R. 243 (D. Del. 1998) ................................................................................21

*In re Masonite Corp.,*
No. 09-10844 (PJW), 2009 Bankr. LEXIS 4698 (Bankr. D. Del. May 29,
2009) ....................................................................................................................28

*In re Master Mortg. Inv. Fund, Inc.,*
168 B.R. 930 (Bankr. W.D. Mo. 1994)................................................................21

*Mercury Capital Corp. v. Milford Conn. Assocs., L.P.,*
354 B.R. 1 (D. Conn. 2006) .................................................................................42

*In re Metromedia Fiber Network, Inc.,*
416 F.3d 136 (2d Cir. 2005)................................................................................24

*Meyers v. Martin (In re Martin),*
91 F.3d 389 (3d Cir. 1996)..................................................................................21

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.),*
25 F.3d 1132 (2d Cir. 1994)................................................................................30

*In re MPM Silicones,*
2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014)...........................................24

*In re NII Holdings, Inc.,*
536 B.R. 61 (Bankr. S.D.N.Y. 2015) ...................................................................21

*In re Oldco M. Corp.,*
No. 09-13412 (MG) (Bankr. S.D.N.Y. Feb. 23, 2010).........................................48

*Olympia & York Fla. Equity Corp. v. Bank of N.Y. (In re Holywell Corp.),*
913 F.2d 873 (11th Cir. 1990) .............................................................................12

*In re Oneida Ltd.,*
351 B.R. 79 (Bankr. S.D.N.Y. 2006)...................................................................21

*In re Penton Bus. Media Holdings, Inc.,*
No. 10-10689 (AJG) (Bankr. S.D.N.Y. Mar. 5, 2010) .........................................48

*In re Premier Int'l Holdings, Inc.,*
2010 WL 2745964 (CSS) (Bankr. D. Del. Apr. 29, 2010) ...................................26

*In re Prudential Energy Co.*,
    58 B.R. 857 (Bankr. S.D.N.Y. 1986) .................................................................41

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000) ....................................................................26, 32

*In re Regent Commc'ns, Inc.*,
    No. 10-10632 (KG), 2010 Bankr. LEXIS 5793 (Bankr. D. Del. Apr. 12, 2010) ...................27

*In re Roman Catholic Bishop of Stockton*,
    No. 14-20371, 2017 WL 118013 (Bankr. E.D. Cal. Jan. 10, 2017) ........................................21

*In re Sabine Oil & Gas Corp.*,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016) .................................................................12

*In re SGL Carbon Corp.*,
    200 F.3d 154 (3d Cir. 1999) .................................................................32

*In re Spansion Inc.*
    2010 WL 2905001 (Bankr. D. Del. April 16, 2010) .................................................................26

*In re Spansion, Inc.*,
    426 B.R. 114 (Bankr. D. Del. 2010). .................................................................21, 22

*In re Stallion Oilfield Servs.*,
    No. 09-13562 (BLS), 2010 Bankr. LEXIS 4500 (Bankr. D. Del. Jan. 20, 2010) ...................28

*In re TCI 2 Holdings, LLC*,
    428 B.R. 117 (Bankr. D.N.J. 2010) .................................................................11, 34

*In re Teton Energy Corp.*,
    No. 09-13946 (PJW), 2010 WL 2822056 (Bankr. D. Del. Jan. 20, 2010) ...........................48

*In re Texaco Inc.*,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988) .................................................................29, 41

*In re TK Holdings, Inc.*,
    No. 17-11375 (BLS), 2018 Bankr. LEXIS 756 (Bankr. D. Del. Feb. 21, 2018) ...................27

*In re Trib. Co.*,
    972 F.3d 228 (3d Cir. 2020) .................................................................46

*In re Tribune Co.*,
    476 B.R. 843 (Bankr. D. Del. 2012) .................................................................12

*In re W.R. Grace & Co.*,
    729 F.3d 311 (3d Cir. 2013) .................................................................15, 32, 34

*In re Washington Mut., Inc.*,
   461 B.R. 200 (Bankr. D. Del. 2011) .......................................................................33

*Will v. Nw. Univ. (In re Nutraquest, Inc.)*,
   434 F.3d 639 (3d Cir. 2006) ..................................................................................21

*In re Wool Growers Cent. Storage Co.*,
   371 B.R. 768 (Bankr. N.D. Tex. 2007) .................................................................24

*In re Worldcom, Inc.*,
   2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ...................................29, 46

*In re Zenith Elec. Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999). ......................................................................21

## Statutes

11 U.S.C. § 101(31) ...................................................................................................36

11 U.S.C. § 105(a) .......................................................................................................3

11 U.S.C. § 365 ..............................................................................................18, 28, 48

11 U.S.C. § 502(b)(9) ...................................................................................................3

11 U.S.C. § 503(b) .....................................................................................................40

11 U.S.C. § 507(a)(2) ............................................................................................40, 43

11 U.S.C. § 507(a)(8) .................................................................................................40

11 U.S.C. § 1114 ........................................................................................................43

11 U.S.C. § 1122 ..............................................................................11, 12, 14, 28, 47

11 U.S.C. § 1123 ..................................................................................11, 18, 28, 47

11 U.S.C. § 1123(a) ..........................................................................14, 15, 16, 17

11 U.S.C. § 1123(b) .......................................................17, 18, 19, 20, 22, 28

11 U.S.C. § 1123(d) .............................................................................................28, 29

11 U.S.C. § 1125 ..............................................................................10, 11, 29, 30, 31

11 U.S.C. § 1126 ......................................................................................7, 29, 31, 32

11 U.S.C. § 1127 ..................................................................................................46, 47

11 U.S.C. § 1129 ..................................................................................................... *passim*

28 U.S.C. § 1930 ..................................................................................................... 42, 43

**Other Authorities**

Fed. R. Bankr. P. 3017 ............................................................................................. 29

Fed. R. Bankr. P. 3018 ............................................................................................. 29

Fed. R. Bankr. P. 3019 ............................................................................................. 47

Fed. R. Bankr. P. 3020 ............................................................................................. 48

Fed. R. Bankr. P. 6004 ............................................................................................. 48

Fed. R. Bankr. P. 6006 ............................................................................................. 48

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977) ....................................... 11, 29

S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978) ............................................ 29

The above-captioned debtors (collectively, the "Debtors") submit this memorandum of law (this "Memorandum") in support of confirmation of the *Amended Joint Chapter 11 Plan of Liquidation of Desolation Holdings LLC and Its Affiliated Debtors* [D.I. 391-1] (as modified, amended, or supplemented from time to time, the "Plan"),[2] pursuant to section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").   In support of confirmation of the Plan, the Debtors respectfully state as follows:

## **Preliminary Statement**

1.       The Debtors' chapter 11 cases featured several novel and unprecedented challenges and solutions, including a DIP loan in cryptocurrency, litigation with multiple governmental units, and interim withdrawals by customers of cryptocurrencies associated with their accounts.

2.       The Debtors navigated these challenges, in an uncertain regulatory landscape, and proposed a Plan that will provide a 100% distribution to customers and general unsecured creditors.  Given the proposed distributions, it is unsurprising but nevertheless requires emphasis that the Plan is almost entirely consensual.  No parties have objected to the Plan and it enjoys the support of the vast majority of the Debtors' stakeholders.  Indeed, of the creditors that voted, over 92% of BUS' customers, holding over 98.5% of customer claims against BUS, accepted the Plan. The general unsecured creditors that voted unanimously accepted the Plan.  The only stakeholders that voted against the Plan were a group of Iranian nationals to whom the Debtors cannot make distributions absent compliance with federal regulations.  Yet, the Plan still provides an avenue to make distributions to those intransigent customers, so long as the Debtors can do so in compliance with all applicable statutes and regulations.

---

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or the Proposed Confirmation Order  (as defined herein), as applicable.

3.      The Debtors engaged with the U.S. Trustee, the Department of Justice (the "DOJ"), the Securities and Exchange Commission (the "SEC"), the Texas Attorney General's office (the "Texas AG"), and a number of other parties who submitted objections and comments to the Disclosure Statement and comments to the Plan, in an effort to consensually resolve all of their concerns.  The Debtors believe that all such issues have been resolved.[3]

4.      The Plan maximizes the value of the Debtors' assets, enables the expeditious distribution of cryptocurrency to customers, provides for payment in full to general unsecured creditors, effectuates the orderly wind down of the Debtors, and most importantly, complies with all of the requirements of section 1129 of the Bankruptcy Code.  For these reasons, and as set forth more fully in this Memorandum, the Plan should be confirmed.

## Argument

5.      This Memorandum is divided into two parts.  Part I provides the procedural history of the Plan and Disclosure Statement, the Debtors' solicitation efforts and voting results, and a summary of the various Objections filed with respect to the Plan.  Part II establishes the Plan's compliance with each of the applicable requirements for Confirmation, including that certain of the discretionary contents of the Plan, including the Releases, are appropriate and should be approved.    In further support of Confirmation of the Plan, the Debtors have filed contemporaneously herewith:

- the *Declaration of Kim Steverson in Support of Plan Confirmation* [D.I. 500] (the "Steverson Declaration" or "Voting Report");

- the *Declaration of David Maria in Support of Plan Confirmation* [D.I. 501] (the "Maria Declaration"); and

---

[3]   The reservations of rights filed with respect to the Plan do not object to confirmation.  [D.I. 482, 484].

- the *Declaration of Evan Hengel in Support of Plan Confirmation* [D.I. 502] (the "Hengel Declaration" and, together with the Voting Report and the Maria Declaration, the "Declarations").

6.      For the reasons stated herein, the Debtors respectfully request that the Court find that the Debtors have satisfied all relevant burdens and approve the Plan.

## I.    Case Background.

### A.    Procedural History.

7.      On the first day of these chapter 11 cases, the Debtors filed the *Joint Chapter 11 Plan of Liquidation of Desolation Holdings, LLC and Its Affiliated Debtors* [D.I. 10].

8.      On June 7, 2023, the Court entered the *Order Pursuant to 11 U.S.C. §§ 502(b)(9) and 105(a), Fed. R.* Bankr. *P. 2002, 3003(c)(3), 5005, and 9007, and Local Rules 2002-1(e), 3001-1, and 3003-1 for Authority To (I) Establish Deadlines for Filing Proofs of Claim, (II) Establish the Form and Manner of Notice Thereof and (III) Approve Procedures for Providing Notice of Bar Date* [D.I. 107] (the "Bar Date Order") establishing, among other things, August 31, 2023 at midnight (Prevailing Eastern Time) as the deadline to file general proofs of claims and customer proofs of claims (the "General Bar Date") and November 4, 2023 at midnight (Prevailing Eastern Time) as the deadline by which governmental units must file proofs of claim (the "Governmental Bar Date").

9.      On August 25, 2023, the Debtors filed the revised *Joint Chapter 11 Plan of Liquidation of Desolation Holdings LLC and Its Affiliated Debtors* [D.I. 293] and the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Desolation Holdings LLC and Its Affiliated Debtors* [D.I. 294].

10.     Also on August 25, 2023, the Debtors filed the *Debtors' Motion for an Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures, Including (A) Fixing the Record Date, (B) Approving the Solicitation Packages and Procedures for*

*Distribution, (C) Approving the Form of the Ballots and Establishing Procedures for Voting, and (D) Approving Procedures for Vote Tabulation; (III) Scheduling a Confirmation Hearing and Establishing Notice and Objection Procedures; (IV) Shortening the Notice Period for the Hearing to Consider Confirmation of the Plan; and (V) Granting Related Relief* [D.I. 295].

11.     On September 25, 2023, the Debtors filed the *Omnibus Reply to Objections to (I) Disclosure Statement, and (II) Disclosure Statement Motion* [D.I. 376].

12.     On September 28, 2023*, the Court entered the *Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures, Including (A) Fixing the Record Date, (B) Approving the Solicitation Packages and Procedures for Distribution, (C) Approving the Form of the Ballots and Establishing Procedures for Voting, and (D) Approving Procedures for Vote Tabulation; (III) Scheduling a Confirmation Hearing and Establishing Notice and Objection Procedures; (IV) Shortening the Notice Period for the Hearing to Consider Confirmation of the Plan; and (V) Granting Related Relief* [D.I. 389], approving the Disclosure Statement, solicitation procedures, and related notices, forms, and ballots, and shortening the notice period for confirmation hearing (the "Disclosure Statement Order");

13.     On September 28, 2023, the Debtors filed the *Notice of Filing of Solicitation Version of Disclosure Statement for Amended Joint Chapter 11 Plan of Liquidation of Desolation Holdings LLC and Its Affiliated Debtors* [D.I. 391] (the "Disclosure Statement" and its Exhibit A, the "Plan" [D.I. 391-1]).

14.     Beginning on or about October 2, 2023 (the "Solicitation Date"), the Debtors caused the Solicitation Packages (as defined in the Disclosure Statement Order), notice of the Confirmation Hearing, and the deadline for objecting to confirmation of the Plan to be distributed in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), the Disclosure Statement Order, and the Solicitation Procedures, as evidenced by, among other things, the *Certificate of Service* [D.I. 417] (the "Solicitation Affidavit").

15.     On October 17, 2023, the Debtors filed the *Notice of Filing of Plan Supplement* [D.I. 449] (the "Plan Supplement"), which included (a) Schedule of Assumed Executory Contracts and Unexpired Leases; (b) Insurance Policies; (c) the identity of the Plan Administrator; and (d) Schedule of Retained Causes of Action, and served notices of assumption on each of the counterparties to Executory Contracts and Unexpired Leases whose Executory Contracts or Unexpired Leases are being assumed pursuant to the Plan.

16.     The Plan, among other things:

- contemplates payment in full of Administrative Claims, Secured Tax Claims, Priority Tax Claims, and Other Priority Claims;

- provides for the distribution of Cryptocurrency, Cash, and any remaining assets to Holders of Claims;

- provides for any residual value after payment in full of General Unsecured Claims to be distributed to Holders of Interests; and

- designates a Plan Administrator to wind down the Debtors' affairs in accordance with the Plan.

17.     The deadline (a) to file objections to the Plan, and (b) for all Holders of Claims and Interests entitled to vote on the Plan to cast their ballots was October 24, 2023, at 4:00 p.m., prevailing Eastern Time.  The Confirmation Hearing is scheduled for October 30, 2023, at 10:00 a.m., prevailing Eastern Time.  The Debtors have submitted the *Proposed Order Confirming the Amended Joint Chapter 11 Plan of Liquidation of Desolation Holdings LLC and Its Affiliated Debtor* [D.I. 494] (the "Proposed Confirmation Order").

### 2.    The Wind Down.

18.    The Debtors will pursue the orderly wind down in accordance with the Plan.  Under the liquidation procedures described in Article IV.C. of the Plan, the Plan Administrator will distribute certain Cryptocurrency in-kind to Holders of Allowed Customer Claims in accordance with Article VI of the Plan.  The Debtors, except for Bittrex, Inc., will be dissolved pursuant to the Proposed Confirmation Order, and their assets will vest in the Wind Down Entity, after which the Wind Down Assets[4] will be distributed to Holders of Allowed Claims and Interests and liquidated.

19.    As set forth in greater detail in Article IV.C. of the Plan, on the Effective Date of the Plan, the Wind Down Assets shall be transferred to and vest in the Wind Down Entity.  The Wind Down Entity will conduct no business operations and will be charged with winding down the Debtors' Estates.  The Wind Down Entity will continue in existence after the Effective Date for purposes of (1) preserving the Causes of Action for the benefit of Holders of Claims entitled to Distributions, (2) winding down the Debtors' remaining businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind Down Entity after the Effective Date, (3) resolving any Disputed Claims, (4) paying Allowed Claims, (5) filing appropriate tax returns, and (6) administering the Plan promptly and efficiently.  The Wind Down Entity shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

20.    The Wind Down Entity will be managed by the Plan Administrator.  Among other things, the Plan Administrator will be charged with: (a) administering the implementation of the Plan, including the making of the Distributions contemplated herein; (b) marshalling, marketing for sale, and liquidating the Wind Down Assets; (c) conducting an analysis of any and all Claims

---

[4]  Pursuant to the Plan, "Wind Down Assets" means all of the Debtors' assets, all of which shall vest in the Wind Down Entity pursuant to the Plan, including the Retained Causes of Action.  Plan, Art.I.A.117.

and Interests and prosecuting objections thereto or settling or otherwise compromising such Claims and Interests, if necessary and appropriate; (d) maintaining and administering the reserves in accordance with the terms hereof; (e) commencing, prosecuting, or settling claims and Causes of Action (other than the Avoidance Actions released pursuant to Article IV.K. of the Plan), enforcing contracts, and asserting claims, defenses, offsets and privileges in accordance herewith and paying all associated costs; (f) recovering and compelling turnover of the Debtors' property; (g) paying Wind Down Expenses; (h) abandoning any property constituting the Wind Down Assets that cannot be sold or otherwise disposed of for value and whose Distribution to Holders of Allowed Claims would not be feasible or cost-effective in the Plan Administrator's reasonable judgment; (i) preparing and filing post-Effective Date operating reports; (j) filing appropriate tax returns in the exercise of the Plan Administrator's fiduciary obligations; (k) retaining such Professionals as are necessary and appropriate in furtherance of the Plan Administrator's fiduciary obligations; and (l) taking such actions as are necessary and reasonable to carry out the provisions of the Plan, including winding down the Wind Down Entity's business affairs.

21.    Following completion of the Plan Administrator's duties, the Plan Administrator will dissolve the Wind Down Entity in accordance with the Plan.

**B.    The Plan Solicitation and Notification Process.**

22.    In compliance with the Bankruptcy Code, only Holders of Claims and Interests in Impaired Classes receiving or retaining property on account of such Claims or Interests were entitled to vote on the Plan.[5]  Holders of Claims and Interests were not entitled to vote if their rights are Unimpaired or if they are not receiving or retaining any property under the Plan. The

---

[5]  *See* 11 U.S.C. § 1126.

following Class of Claims was ***not*** entitled to vote on the Plan, and the Debtors did not solicit votes from Holders of such Claims: Class 1, Other Priority Claims.

23.     The Debtors solicited votes on the Plan from Holders of Claims and Interests in Classes 2A, 2B, 3, 4, and 5, which were entitled to vote to accept or reject the Plan (collectively, the "Voting Classes").

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2A | BUS Customer Claims | Impaired | Entitled to Vote |
| Class 2B | Malta OpCo Customer Claims | Impaired | Entitled to Vote |
| Class 3 | GUC Claims | Impaired | Entitled to Vote |
| Class 4 | Subordinated Claims | Impaired | Entitled to Vote |
| Class 5 | Interests | Impaired | Entitled to Vote |

24.     The voting results, as reflected in the Voting Report, are summarized as follows:

| Class 2A (BUS Customers Claims) | | Result |
|---|---|---|
| Tabulated Ballots Received | 122 | ACCEPTED |
| Accept | 92.62% in number of votes accepting the Plan 98.53% in dollar amount accepting the Plan ($251,744.74) | |
| Reject | 7.38% in number of votes rejecting the Plan 1.47% in dollar amount rejecting the Plan ($3,750.29) | |
| Class 2B (Malta OpCo Customer Claims) | | Result |
| Tabulated Ballots Received | 16 | REJECTED |
| Accept | 75.00% in number of votes accepting the Plan 15.79% in dollar amount accepting the Plan ($113,068.95) | |
| Reject | 25.00% in number of votes rejecting the Plan 84.21% in dollar amount rejecting the Plan ($603,806.71) | |

8

| Class 3 (GUC Claims) | | Result |
|---|---|---|
| Tabulated Ballots Received | 3 | |
| Accept | 100% in number of votes accepting the Plan<br><br>100% in dollar amount accepting the Plan ($78,763.37) | ACCEPTED |
| Reject | 0% in number of votes rejecting the Plan<br><br>0% in dollar amount rejecting the Plan ($0.00) | |

25.      The Debtors strongly believe that the Plan promotes best interests of the Debtors, their estates, and other parties in interest.  And as shown above, Holders of Claims agree: 92.62 percent of BUS Customers and 98.5 percent in amount of BUS Customer Claims actually voting voted in favor of the Plan.  Further, 100 percent of General Unsecured Claims and 100 percent in amount of General Unsecured Claims actually voting voted to accept the Plan.  The Debtors did not receive any votes from Holders of Subordinated Claims and Holders of Interests.

26.      Each of the Debtors strongly believes that the Plan complies with the best interests of its estate and represents the best available alternative for all of its stakeholders.  The voting results demonstrate that the vast majority of stakeholders agree.  The transactions embodied in the Plan will maximize the value of the Estates and maximize recoveries to Holders of Claims and Interests.

**C.      The Objections.**

27.      There were no objections to the confirmation of the Plan.  There were two reservations of rights filed by (a) Endurance Assurance Corporation and Endurance American Insurance Company [D.I. 482] ("Endurance" and "Endurance ROR"); and (b) Department of

Justice [D.I. 484] (the "DOJ" and "DOJ ROR").  The Debtors incorporated all informal comments in the Proposed Confirmation Order filed at [D.I. 494].[6]

## II.    The Debtors Complied with the Applicable Notice Requirements.

### A.    The Debtors Complied with the Applicable Notice and Solicitation Requirements.

28.    Aside from approving the Disclosure Statement, the Disclosure Statement Order granted relief regarding solicitation and noticing procedures and materials including, among other things: (a) approving solicitation and voting procedures with respect to the Plan, including (i) fixing the Record Date, (ii) approving the Solicitation Packages and procedures for distribution, (iii) approving the form of the Ballots and establishing procedures for voting, and (iv) approving procedures for vote tabulation; and (b) approving certain dates and deadlines with respect to the Plan and its confirmation.  The Debtors have complied with the procedures and timeline approved by the Disclosure Statement Order.

### B.    Solicitation of the Plan Complied with the Bankruptcy Code and was in Good Faith.

29.    Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.

30.    As set forth in the Disclosure Statement and Disclosure Statement Motion, and as demonstrated by the Debtors' compliance with the Disclosure Statement Order,[7] the Debtors at all times took appropriate actions in connection with the solicitation of the Plan in compliance with

---

[6]   The informal comments and reservations of rights are summarized in **Exhibit A** attached hereto.

[7]   *See generally*, Voting Report.

section 1125 of the Bankruptcy Code. Therefore, the Debtors request that the Court grant the

parties the protections provided under section 1125(e) of the Bankruptcy Code.

**III.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code.**

**A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).**

31.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the

applicable provisions of [the Bankruptcy Code]." A chapter 11 plan can be confirmed if it satisfies

section 1129 of the Bankruptcy Code by a preponderance of the evidence.[8]  The legislative history

of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses and

incorporates the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern

the classification of claims and the contents of a plan of reorganization, respectively.[9]   As

explained below, the Plan complies with the requirements of sections 1122 and 1123 in all respects.

**1.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

32.    The classification requirement of section 1122(a) of the Bankruptcy Code provides,

in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place
> a claim or an interest in a particular class only if such claim or

---

[8]  *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 119–20 (D. Del. 2006) (hereinafter cited as "*Armstrong I*") (stating that a court must determine whether a plan meets the requirements of section 1129 in order to confirm such plan); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 148 (Bankr. D.N.J. 2010) ("The plan proponent bears the burden to show by a preponderance of the evidence that the proposed Chapter 11 plan has a reasonable probability of success, and is more than a visionary scheme." (internal quotations omitted)).

[9]  *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992); H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 223 (Bankr. D.N.J. 2000) ("The legislative history reflects that the applicable provisions of chapter 11 includes sections such as section 1122 and 1123, governing classification and contents of plan." (internal quotation marks omitted)).

interest is substantially similar to the other claims or interests of such class.[10]

33.    A plan proponent has significant flexibility under section 1122(a) in classifying claims if there is reasonable basis to do so.[11]  Moreover, the requirement of substantial similarity[12] does not mean that claims or interests within a particular class must be identical or that all similarly situated claims must receive the same treatment under a plan.[13]

34.    The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into five separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class in a legal or factual way or based on other relevant criteria.[14] Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

a.    Class 1: Other Priority Claims;

b.    Class 2A: BUS Customer Claims;

---

[10]   11 U.S.C. § 1122(a).

[11]   *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (explaining that a classification is proper as long as each class represents a voting interest "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed"); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) ("It remains clear that Congress intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case."); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992); *Olympia & York Fla. Equity Corp. v. Bank of N.Y.* (*In re Holywell Corp.*), 913 F.2d 873, 880 (11th Cir. 1990) (plan proponent allowed considerable discretion to classify claims and interests according to facts and circumstances of case so long as classification scheme does not violate basic priority rights or manipulate voting).

[12]   *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (D. Del. 2006).

[13]   *In re Tribune Co.*, 476 B.R. 843, 854–55 (Bankr. D. Del. 2012), *aff'd as modified*, No. 08–13141 (KJC), 2014 WL 2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part*, 799 F.3d 272 (3d Cir. 2015); *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 310 (Bankr. S.D.N.Y. 2016); *Drexel*, 138 B.R. at 757 ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims. It does not require that similar classes be grouped together, but merely that any groups be homogenous or share some attributes.") (citations omitted).

[14]   *See* Plan Art. III.

      c.      Class 2B: Malta OpCo Customer Claims;

      d.      Class 3: GUC Claims;

      e.      Class 4: Subordinated Claims; and

      f.      Class 5: Interests.

35.      Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.[15]  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.[16]  Namely, the Plan separately classifies the Claims and Interests because each Holder of such Claims or Interests may hold (or may have held) rights in the estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience results from such classification.

36.      Dissimilar Claims and Interests are not classified together under the Plan.  For example, debt and equity are classified separately and secured claims are classified separately from unsecured claims.  Holders of Customer Claims are classified separately from Holders of General Unsecured Claims due to the unique nature and basis for the Customer Claims, which consist of claims held by customers on the Bittrex platform.  Other aspects of the classification scheme recognize the different legal or factual nature of Claims or Interests.

37.      Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class and the distinctions among Classes are based on valid business, factual, and legal distinctions. The Debtors

---

[15]  *See* Maria Decl. ¶ 15.

[16]  *See id.* ¶¶ 10-12, 54.

submit that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code, and no party has asserted otherwise.

> ### 2. The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

38. Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy. The Plan satisfies each of these requirements.[17]

> #### (1) Designation of Classes of Claims and Equity Interests (§ 1123(a)(1))

39. For the reasons set forth above, Article III of the Plan properly designates classes of Claims and Interests and thus satisfies the requirement of section 1122 of the Bankruptcy Code.[18]

> #### (2) Specification of Unimpaired Class (§ 1123(a)(2))

40. Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan." The Plan meets this requirement by identifying in Article III the Class that is Unimpaired: Class 1, Other Priority Claims.[19]

> #### (3) Treatment of Impaired Classes (§ 1123(a)(3))

41. Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan." The Plan meets this requirement by setting forth in Article III the treatment of each Class that is Impaired:[20] Class 2A (BUS Customer Claims); Class 2B (Malta OpCo Customer Claims); Class 3 (GUC Claims); Class

---

[17]   *See* 11 U.S.C. § 1123(a)(1)-(8). Section 1123(a)(8) of the Bankruptcy Code is only applicable to individual debtors.

[18]   *See* Maria Decl. ¶¶ 10-12.

[19]   *See* Plan Art. III; Maria Decl. ¶¶ 13-14, 21.

[20]   *See id.*

4 (Subordinated Claims); and Class 5 (Interests).  Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### (4)    Equal Treatment within Classes (§ 1123(a)(4))

42.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  The Plan meets this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such holders' respective Class.[21]

43.    Section 1129(b) of the Bankruptcy Code requires only equality of treatment, not equality of result,[22] and the Plan treats Holders of Customer Claims the same regardless of jurisdiction.  In practice, the "key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity" to recover.[23] Accordingly, the Plan provides the same treatment to the Holders of Customer Claims, and the Plan complies with section 1123(a)(4) of the Bankruptcy Code.

### (5)    Means for Implementation (§ 1123(a)(5))

44.    Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.  The Plan satisfies this requirement because Article IV of the Plan,

---

[21]    *See* Maria Decl. ¶ 15.

[22]    *See In re Latam Airlines Group SA,* 2022 WL 2206829, at *35, (Bankr. S.D.N.Y June 18, 2022) (citing *In re Dana Corp*, 412 B.R. 53, 62 (S.D.N.Y. 2018)); *see also In re Breitburn Energy Partners LP*, 582 B.R. 321, 358 (Bankr. S.D.N.Y. 2018).

[23]    *In re Dana Corp.*, 412 B.R. at 62; *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) ("What matters, then, is not that claimants recover the same amount but that they have equal opportunity to recover on their claims.").

as well as other provisions thereof, provide for the means by which the Plan will be implemented.[24]
Among other things, Article IV of the Plan provides for:

a.   the general settlement of Claims and Interests;

b.   liquidation of the Debtors;

c.   transfer of assets to the Wind Down Entity;

d.   appointment of the Plan Administrator;

e.   sources of consideration for Plan distributions;

f.   release of Liens;

g.   the cancellation of certain notes, instruments, certificates, licenses, and other documents; and

h.   preservation of Causes of Action.

45.   The precise terms governing the execution of these transactions are set forth in the applicable definitive documents or forms of agreements included in the Plan Supplement.  The Debtors submit that the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

*(6)   Issuance of Non-Voting Securities (§ 1123(a)(6))*

46.   Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities. No nonvoting securities will be issued under the Plan, and on or prior to the Effective Date, three of the Debtors will be dissolved; with respect to the Wind Down Entity, no nonvoting stock will be issued. Accordingly, section 1123(a)(6) of the Bankruptcy Code is inapplicable to the Plan, and no parties have asserted otherwise.

---

[24]   *See* Maria Decl. ¶¶ 16-17.

*(7)    Directors and Officers (§ 1123(a)(7))*

47.    Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy." The Plan satisfies this requirement by providing that, on the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole director and the sole officer of the Wind Down Entity and shall succeed to the powers of the Wind Down Entity's managers, directors, and officers.   The Debtors also filed the Plan Supplement, which provides the identity of the Plan Administrator.   Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

**3.    The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.**

48.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.   Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may: (a) modify, impair, or leave unimpaired any class of claims or interests; (b) provide for the settlement or adjustment of claims against or interests in a debtor or its estate or the retention and enforcement by a debtor, trustee, or other representative of claims or interests; (c) provide for the assumption or rejection of executory contracts and unexpired leases; (d) provide for the sale of all or substantially all of the property of the Debtors' estates, and the distribution of the proceeds of such sale among holders of claims or interests; or (e) "include

any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[25]

49.     The Plan satisfies section 1123(b) of the Bankruptcy Code.  Specifically, under Article III of the Plan, Class 1 is Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims within such Class.[26]  On the other hand, Classes 2A, 2B, 3, 4, and 5 are Impaired because the Plan modifies the rights of the Holders of Claims and Interests within such Classes as contemplated in section 1123(b)(1) of the Bankruptcy Code.[27]

50.     In addition, and under section 1123(b)(2) of the Bankruptcy Code, Article V.A of the Plan provides that, on the Effective Date, all Executory Contracts and Unexpired Leases that, as of the Effective Date, were not previously rejected, assumed, expired, terminated, subject of a motion to assume filed by the Debtors on or before the Confirmation Date, or identified for assumption on the Assumption Schedule included in the Plan Supplement, shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except to the extent set forth in the Plan.[28]  The Plan also contains provisions implementing certain releases and exculpations, compromising claims and interests, and enjoining certain causes of action.

51.     Finally, as discussed above, the Plan implements certain releases and exculpations, compromising claims and interests, and enjoining certain causes of action.  Each of these provisions conforms with prevailing case law because they (a) result from arm's-length negotiations, (b) emanated from the need to obtain the support of the various constituencies for the Plan, (c) are given for valuable consideration, (d) are fair and equitable and in the best interests of

---

[25]   *See* 11 U.S.C. § 1123(b)(1)-(6).

[26]   *See* Plan Art. III.

[27]   *See id.*

[28]   *See* Plan Art. V.A.

the Debtors, their estates, and these chapter 11 cases, and (e) are consistent with the relevant provisions of the Bankruptcy Code and Third Circuit law.  Such provisions are discussed in turn below, but, in summary, satisfy the requirements of section 1123(b).

> (1) *The Settlement of Claims and Controversies Is Fair and Equitable and Should be Approved.*

52.     The Plan provides for the general settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.

53.     The compromises set forth in the Plan bring necessary closure to these and other matters addressed in the Plan and permitting the Debtors to avoid waste and maximize the value of the Estate for the benefit of all parties in interest and maximize recoveries for all Holders of Claims and Interests.[29]

54.     Article IV.B.1 of the Plan provides for a compromise between the Debtors and their customers concerning the ownership of the cryptocurrencies.  Although the Debtors believe that cryptocurrency assets maintained in BUS omnibus wallets constitute property of the bankruptcy estate, the proposed compromise renders the debate academic because customers can withdraw 100% of the cryptocurrencies deposited onto the platform, while avoiding the cost and delay of litigation, including potential dilution from regulatory or other unknown disputed, contingent, and unliquidated creditors. At the same time, the withdrawal of cryptocurrency assets by customers eliminates the potential risk to the estate if the customers prevail in demonstrating that they own the cryptocurrency assets associated with their accounts.

---

[29]  *See* Maria Decl. ¶ 23.

55.     Article IV.B.2 of the Plan discusses a settlement of the SEC Action, which the Court previously approved with the *Order Granting Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 to Approve Settlement with the Securities and Exchange Commission* [D.I. 325].

> (2)     *The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.*

56.     The Plan includes certain releases, an exculpation provision, and an injunction provision. These discretionary provisions achieve the value maximizing conclusion to these chapter 11 cases and garner the necessary support for the terms of the Plan, are supported by the Debtors and their key constituents, and comply with applicable precedent.[30]

(i)     The Debtor Release Is Appropriate.

57.     Article VIII.A of the Plan provides for releases by the Debtors of Claims and Causes of Action against the Released Parties[31] (the "Debtor Release"). The Debtor Release forms a vital component of the Plan, and as described above results from a sound exercise of the Debtors' business judgment and should be approved.

---

[30]  *See* Maria Decl. ¶¶ 25-35.

[31]   Pursuant to the Plan, "Released Parties" means, collectively, and in each case only in its capacity as such: (a) the Debtors; (b) the DIP Lender; and (c) with respect to each of the foregoing (a) through (b), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; provided, additionally, that Endurance shall be a Released Party as set forth in Article IV.B.4 of the Plan.

58.    Axiomatically, a debtor may settle or release its claims in a chapter 11 plan.[32] Courts grant releases consistent with the "best interests of the estate."[33] In determining whether releases meet the best interests of the estate test, the court need not conduct a "'mini-trial' of the facts or the merits underlying [each] dispute[,]" and "the settlement need not be the best that the debtor could have obtained."[34]  Under this standard, the "court should instead 'canvass [*sic*] the [settled] issues [to] see whether the settlement falls below the lowest point in the range of reasonableness.'"[35]  As set forth herein and as further demonstrated at the Confirmation Hearing, the Debtor Release should be approved because the Debtors reasonably exercised their business judgment, the Debtor Release meets the best interests of the estates test, and the Debtor Release satisfies the standards set forth in *Martin*.[36] Additionally, if applicable, the Debtor Release satisfies the standard set forth in *Master Mortgage*.[37]  Moreover, no party objected to the Debtor Releases.

---

[32]   *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263 n.289 (Bankr. S.D.N.Y. 2007) (holding the debtor may release its own claims); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims is permissible).

[33]   *See In re Charter Commc'ns, Inc.*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate.") (citation omitted).

[34]   *In re NII Holdings, Inc.*, 536 B.R. 61, 99 (Bankr. S.D.N.Y. 2015) (*quoting Adelphia*, 368 B.R. at 225).

[35]   *Id.* at 100 (*quoting Adelphia*, 368 B.R. at 225 (citation omitted)).

[36]   *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

[37]   *In re Exide Holdings, Inc.*, 20-11157-CSS, 2021 WL 3145612, at *14 (D. Del. July 26, 2021) (affirming debtor release because it was "a valid exercise of the debtor's business judgment, [and was] fair, reasonable, and in the best interests of the estate"); *In re Roman Catholic Bishop of Stockton*, No. 14-20371, 2017 WL 118013, at *8-9 (Bankr. E.D. Cal. Jan. 10, 2017) (confirming debtor releases in connection with insurers' buyback of policies because the debtor "exercised appropriate business judgment" in agreeing to the releases, which were "reasonable"); *In re Zenith Elec. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (*citing In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *In re Spansion, Inc.*, 426 B.R. 114, 143 n.47 (Bankr. D. Del. 2010) (citing the *Master Mortgage* factors); *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *accord Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (finding that the *Martin* factors are useful when analyzing a settlement of a claim against the debtor as well as a claim belonging to the debtor); *see also TMT Trailer Ferry, Inc.*, 390 U.S. at 424 (1968); *In re Marvel Entm't Group, Inc.*, 222 B.R. 243 (D. Del. 1998) (proposed settlement held in best interest of the estate).

59.    The Court should approve the Debtor Release.  During the Disclosure Statement objection negotiations, it became apparent that the Debtor Release would be a necessary condition of implementing the Plan.  Without the Debtor Release, the Debtors and their stakeholders would have been unable to secure the substantial benefits provided by the Plan in the expedited timeframe in which the Debtors propose to exit bankruptcy.[38]  Additionally, the Released Parties include Endurance as part of a settlement to resolve Endurance Claims in the Plan in Art.  IV.B.4.  The Debtors, in their business judgment, determined that the Debtor Release represents a fair and reasonable compromise and meets the best interests test for both the Debtors and their Estates.[39]  The inclusion of the Debtor Release avoids waste and benefits all of the Debtors' stakeholders.  The Debtors' creditors agree: Holders of Claims in a majority of the Voting Classes voted overwhelmingly in support of the Plan.  Only seven parties with valid votes opted out of the Releases.

60.    Release of the Released Parties also conforms with applicable law and precedent.  The Released Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through, among other things, their efforts to negotiate and implement the Plan and fund

---

[38]  Maria Decl. ¶¶ 25-28.

[39]  *Id*.  *See also U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. at 143 ("[A] debtor may release claims in a plan pursuant to Bankruptcy Code § 1123(b)(3)(A), if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."); *see also In re Aleris Int'l, Inc.*, Case No. 09-10478 (BLS), 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) (stating that where a debtor release is "an active part of the plan negotiation and formulation process, it is a valid exercise of the debtor's business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of a plan"); *In re AAI Pharma*, No. 05-11341 (PJW) (Bankr. D. Del. Feb. 22, 2006), [D.I. 893] (A debtor "can elect to release claims as part of the plan and as part of the fresh start, concentrating on the business affairs and forgetting about litigation that may have questionable value or no value at all, just to settle past scores of charges and expressions of discontent" and "the debtor should be given considerable latitude in addressing" whether to release claims as part of its plan.); *In re Aleris Intern., Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) ("it is a valid exercise of the debtor's business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of the plan as part of the plan negotiation process").

the Plan's implementation, which will maximize value for the benefit of all parties in interest.[40]

In addition, the active participation of the Debtors' released directors, officers, employees and

professionals, both in prepetition negotiations and during the course of these chapter 11 cases—

and for many through their anticipated assistance in implementing the Plan and getting recoveries

to customers as soon as possible—merit their inclusion as Released Parties for purposes of the

Debtor Release.[41]

61.     For the foregoing reasons, the Debtors' agreement to provide the Debtor Release

constitutes a sound exercise of the Debtors' business judgment and should be approved.

(ii)     <u>The Third-Party Release Represents a Consensual Release.</u>

62.     Article VIII.B of the Plan provides that each Releasing Party[42] shall release any and

all Causes of Action such parties could assert against the Debtors and other Released Parties (the

"Third-Party Release," and together with the Debtor Release, the "Releases").   The Releasing

Parties include : (a) the DIP Lender; (b) the Debtors' current and former directors or officers; (c)

---

[40]   *See id.*

[41]   *See* Maria Decl. ¶¶ 25-28.

[42]   Pursuant to the Plan, "Releasing Parties" means, collectively, and in each case only in its capacity as such: (a) the DIP Lender; (b) each of the Debtors' current and former directors or officers, solely to the extent such current and former directors or officers may assert claims or causes of action on behalf of or in a derivative capacity through the Debtors; (c) all Holders of Claims or Interests who are in voting classes that (1) vote to accept the Plan, (2) vote to reject the Plan or (3) abstain from voting on the Plan, and in each instance  do not opt out of the Third Party Release on a timely submitted Ballot or file an objection to the Third Party Releases; (d) all creditors in Unimpaired Classes who do not timely return an Opt Out Form or file an objection to the Third Party Releases; and (e) with respect to each of the foregoing (a) through (d)*,* such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (each, a "Related Party"), each in their capacity as such, and each solely to the extent such Related Party may assert claims or causes of action on behalf of or in a derivative capacity by or through an Entity in clause (a) through (d); provided, however, that the term "Releasing Parties" shall not include any Entity without actual or constructive knowledge of the Chapter 11 Cases. *See* Plan, Art. I.A.102.

Holders of Claims or Interests in voting classes who do not opt out of the Third Party Release or file an objection to the Third Party Releases; (d) Unimpaired Classes creditors who do not opt out or file an objection to the Third Party Releases; and (e) the affiliates and Professionals of the foregoing.  The Third-Party Release thus meets the criteria for a consensual release, consistent with established law, is integral to the Plan and therefore should be approved.

63.    "Most courts allow consensual [third-party] releases to be included in a plan."[43] Courts regularly approve third party releases such as those contained in the Plan on the grounds that such releases are consensual,[44] and even approve non-consensual releases in specific circumstances.[45]  Here, the Third-Party Releases provided under the Plan are entirely consensual in that the Plan offers all Holders of Claims and Interests—whether such Holders vote to accept, vote to reject, or abstain from voting or are otherwise not entitled to vote on the Plan because they are in an Unimpaired Class—an opportunity to opt out of such Third-Party Release provided by

---

[43]    *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007); *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013) ("Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected.").

[44]    *See In re Chassix Holdings, Inc.,* 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015) ("'Consenting Creditors' should include creditors who voted in favor of the Plan . . . [s]imilarly, creditors who rejected the Plan, but who nevertheless 'opted in' to the releases, have consented to those releases."); *In re MPM Silicones*, Case No. 14-22503-RDD, 2014 WL 4436335, at *32 (Bankr. S.D.N.Y. Sept. 9, 2014) (citing *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005)), aff'd, 531 B.R. 321 (S.D.N.Y. 2015), *aff'd in part, rev'd in part and remanded sub nom. Matter of MPM Silicones, L.L.C.*, 874 F.3d 787 (2d Cir. 2017*); see also In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014)*; In re Chemtura Corp.,* 439 B.R. 561, 611 (Bankr. S.D.N.Y. 2010); *In re Calpine Corp.*, No. 05-60200 (BRL), 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007).

[45]    *See, e.g.*, *In re Mallinckrodt*, No. 20-12522 (JTD) at 25 (Bankr. D. Del. Feb. 3, 2022) [D.I. 6347] (confirming a plan with a nonconsensual third-party release of and channeling injunction for trust personal injury claims related to debtor's opioid products); *In re Blitz U.S.A., Inc.*, No. 11-13603, 2014 WL 2582976, at *19-21 (Bankr. D. Del. Jan. 30, 2014) (confirming a plan with a nonconsensual third-party release of and channeling injunction for personal injury and wrongful death claims related to explosions involving debtor-manufacturer's defective gasoline cans); *In re Global Indus. Techs., Inc.*, No. 02-21626, 2013 WL 587366, at *39 (Bankr. W.D. Pa. Feb. 13, 2013) (confirming a plan with a nonconsensual third-party release of and channeling injunction for silica personal injury claims related to debtor's refractory products and materials).

the Plan.  Accordingly, the Third-Party Release represents a fully consensual release.  In addition, as set forth in the Voting Report, only seven Holders of Claims or Interests with valid votes affirmatively opted out of the Third-Party Releases.

64.     In addition to being consensual, the Third-Party Release is substantively warranted for the Released Parties. As discussed above, for months prior to the commencement of these chapter 11 cases and throughout the pendency of these chapter 11 cases, the Released Parties made substantial and valuable contributions to the Debtors' chapter 11 process through, among other things, efforts to market and sell the Debtors' assets and negotiate and implement the Plan, which will maximize value for the benefit of all parties in interest.[46]

65.     Finally, throughout these chapter 11 cases and the related negotiations, the released Professionals and the released Debtors' directors, officers and employees steadfastly maintained their duties to maximize value for the benefit of all stakeholders, investing thousands of hours both pre- and post-petition in addition to performing their ordinary course responsibilities.[47]  Without the contributions of the Debtors' board of directors, the  Debtors' employees, and Professionals, the Debtors would not have been able to pursue confirmation of the Plan.

(iii)     The Court Should Approve the Exculpation Provision.

66.     Article VIII.D of the Plan provides that each Exculpated Party[48] shall have no liability for and be exculpated from any liability in respect of Claims, Interests, and Causes of Action arising between the Petition Date and the Effective Date out of acts or omissions in

---

[46]  *See* Maria Decl. ¶¶ 25-33.

[47]  *See* Maria Decl. ¶ 34.

[48]  Pursuant to the Plan, "Exculpated Parties" means, collectively, and in each case in its capacity as such: (a) the Debtors; and (b) with respect to each of the Debtors, its current and former officers and directors who served during any portion of these cases and the Debtors' retained financial advisors, attorneys, accountants, restructuring advisors, investment bankers, consultants, and other retained professionals, each in their capacity as such.  *See* Plan, Art. I.A.58.

connection with these Chapter 11 Cases and certain related transactions, except for acts or omissions that are found by a final court order to have been the product of actual fraud, gross negligence, criminal misconduct or willful misconduct (the "Exculpation").  The Exculpation will help prevent collateral attacks against estate fiduciaries or parties that have acted in good faith to help facilitate the Debtors' reorganization.  The Exculpation forms an integral part of the Plan and otherwise satisfies the standards in this district.  This provision provides necessary and customary protections to those parties in interest (whether estate fiduciaries or otherwise) whose efforts were and continue to be vital to implementing the Plan.

67.    Exculpation provisions are "commonplace" and do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation between a releasing party against an Exculpated Party for acts arising out of the Debtors' restructuring.[49]

68.    The Debtors also believe that the exculpation is necessary to protect parties who have made substantial contributions to the Debtors' reorganization from collateral attacks related to their good faith acts or omissions in effecting the Debtors' successful restructuring during the Chapter 11 Cases.[50]  Put simply, the Debtors could not have developed the Plan without the support and contributions of the Exculpated Parties, which will be proven to the Court at the confirmation

---

[49]  *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision is "a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *10 (CSS) (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion Inc.*, Case No. 09-10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. April 16, 2010) (same).

[50]  *See In re Chemtura Corp.*, 439 B.R. 561, 610 (Bankr. S.D.N.Y. 2010) (recognizing that "exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decision makers in the chapter 11 case").

hearing.  Further, the scope of the exculpation is limited in time and subject matter and has no effect on liability resulting from actual fraud, gross negligence, criminal misconduct or willful misconduct, as a court may determine pursuant to a final order.[51]  Thus, the exculpation provision is consistent with applicable law and should be approved in connection with the Confirmation of the Plan.

(iv)   <u>The Injunction Provision Is Appropriate.</u>

69.     Article VIII.E of the Plan contains an injunction necessary to preserve and enforce the releases and exculpation provisions in the Plan and are narrowly tailored to achieve that purpose.   The Third Circuit in *Continental* indicated that fairness and necessity principles, including the *Master Mortgage* factors, apply to both releases and the injunctions that effectuate such releases.[52]  As explained above, the releases conform with applicable law, and, accordingly, the Court should approve the injunction provision.[53]

70.     The Debtors submit that the discretionary provisions of the Plan conform to section 1123(b) of the Bankruptcy Code.  In light of the foregoing, because the Plan fully complies with

---

[51]   *See* Plan Art. VIII.D.

[52]    *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 217 & n.17 (3d Cir. 2000).

[53]    *See In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 293 (2d Cir. 1992); *see also In re TK Holdings, Inc.*, No. 17-11375 (BLS), 2018 Bankr. LEXIS 756, at *61 (Bankr. D. Del. Feb. 21, 2018) ("The injunctions are necessary to preserve and enforce the releases and are narrowly tailored to achieve that purpose."); *In re Regent Commc'ns, Inc.*, No. 10-10632 (KG), 2010 Bankr. LEXIS 5793, at *18-19 (Bankr. D. Del. Apr. 12, 2010) ("The injunction provisions set forth in Article X.F of the Plan are necessary to preserve and enforce the release, exculpation, non-debtor release and injunction provisions . . . of the Plan and are narrowly tailored to achieve that purpose."); *In re Drug Fair Grp., Inc.*, No. 09-10897 (BLS), 2010 Bankr. LEXIS 2984, at *16 (Bankr. D. Del. June 7, 2010) ("The injunction provision set forth in Section 9.2 of the Plan . . . is necessary to preserve and enforce the Release and the Exculpation, and the Injunction is narrowly tailored to achieve this purpose."). Courts in this district routinely approve similar injunctions. *See, e.g.*, *In re Am. Apparel, Inc.*, No. 15-12055 (BLS), 2016 Bankr. LEXIS 3331, at *250 (Bankr. D. Del. Jan. 27, 2016); *In re HRI Holding Corp.*, No. 19-12415 (MFW) (Bankr. D. Del. Nov. 5, 2020) [D.I. 816]; *In re Stallion Oilfield Servs.*, No. 09-13562 (BLS), 2010 Bankr. LEXIS 4500, at *70 (Bankr. D. Del. Jan. 20, 2010); *In re Masonite Corp.*, No. 09-10844 (PJW), 2009 Bankr. LEXIS 4698, at *66 (Bankr. D. Del. May 29, 2009).

section 1122 and 1123 of the Bankruptcy Code, the Debtors submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

### 4.      The Plan Complies with Section 1123(d) of the Bankruptcy Code.

71.      Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."[54]

72.      The Plan complies with section 1123(d) of the Bankruptcy Code.   The Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Leases to be assumed under the Plan by payment of the default amount, if any, on the Effective Date, subject to the limitations described in Article V.C of the Plan or in the Proposed Confirmation Order .[55]   In accordance with Article V.D of the Plan and section 365 of the Bankruptcy Code, the Debtors provided notice of the amount and timing of payment of any cure payments to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement.   The Plan also sets forth procedures for counterparties to assumed Executory Contracts or Unexpired Leases to follow in the event they submit a request for payment that differs from ordinary course amounts paid or proposed to be paid by the Debtors.   Accordingly, the Plan satisfies the requirements of section 1123(d) of the Bankruptcy Code, and no party has asserted otherwise.

---

[54]   11 U.S.C. § 1123(d).

[55]   *See* Plan Art. V.C.

**B.     The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).**

73.     Section 1129(a)(2) ensures that a plan proponent has complied with the requirements of the Bankruptcy Code regarding solicitation of acceptances of a plan.[56]   The legislative history to section 1129(a)(2) provides that section 1129(a)(2) is intended to encompass the disclosure and solicitation requirements set forth in section 1125 and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.[57]   As set forth below, the Debtors have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their Claims, Noticing, and Solicitation Agent in accordance with the Disclosure Statement Order.

**1.     The Debtors Complied with Section 1125 of the Bankruptcy Code.**

74.     Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is

---

[56]   *See, e.g.*, *In re Texaco Inc.*, 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988) ("The principal purpose of Section 1129(a)(2) is to assure that the proponents have complied with the requirements of section 1125 in the solicitation of acceptances to the plan."); *In re Johns-Manville Corp.*, 68 B.R. 618, 629-30 (Bankr. S.D.N.Y. 1986) ("Objections to confirmation raised under § 1129(a)(2) generally involve the alleged failure of the plan proponent to comply with § 1125 and § 1126 of the Code . . . . These sections provide for the appropriate manner of disclosure and solicitation of plan votes."), *aff'd sub nom. In re Johns-Manville Corp.*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[57]   *See* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also, e.g.*, *In re Lapworth,* No. 97-34529, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 3, 1998) ("The adequacy of disclosure is an essential element for plan confirmation embodied in the § 1129(a)(2) confirmation requirement."); *In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Worldcom, Inc.*, 2003 WL 23861928 at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[58]  Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan.[59]

75.    Section 1125 is satisfied here.  Before the Debtors solicited votes on the Plan, the Court approved the Disclosure Statement in accordance with section 1125(a)(1).[60]  The Court also approved the Solicitation Packages provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan.[61]  As stated in the Voting Report, the Debtors, through the Claims Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.[62]  The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular Class.  Here, the Debtors caused the Disclosure Statement to be transmitted to all parties entitled to vote on the Plan.[63]

76.    Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order, and no party has asserted otherwise.

---

[58]   11 U.S.C. § 1125(b).

[59]   *See Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) (finding that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[60]   *See* D.I. 389.

[61]   *Id.*

[62]   *See* Voting Report ¶¶ 7-10; *see also* Affidavit of Service [D.I. 498] (the "Affidavit of Solicitation").

[63]   *See* Voting Report ¶¶ 8-9; *see also generally* Affidavit of Solicitation.

## 2.    The Debtors Complied with Section 1126 of the Bankruptcy Code.

77.    Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[64]  As noted above, the Debtors did not solicit votes on the Plan from Class 1 (Other Priority Claims), which is Unimpaired under the Plan (the "Unimpaired Class"),[65] because, pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in the Unimpaired Class are conclusively presumed to have accepted the Plan and, therefore, were not entitled to vote on the Plan.

78.    Accordingly, the Debtors solicited votes only from Holders of Allowed Claims and Interests in the Voting Classes—Classes 2A, 2B, 3, 4, and 5—because each of these Classes is Impaired and entitled to receive a distribution under the Plan.[66]  With respect to the Voting Classes of Claims and Interests, section 1126(c) of the Bankruptcy Code provides that:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan.[67]

79.    The Voting Report, summarized above, reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[68]  Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(2), and no party has asserted otherwise.

---

[64]   *See* 11 U.S.C. § 1126.

[65]   *See* Plan, Art. III.C.

[66]   *Id.  See generally* Affidavit of Solicitation.

[67]   11 U.S.C. § 1126(c).

[68]   *See generally* Voting Report, Exhibit A.

### C.      The Plan Was Proposed in Good Faith (§ 1129(a)(3)).

80.      Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[69]  The Third Circuit has held that for a plan to be proposed in good faith it must "fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[70]  Whether a plan has been proposed in good faith is a factual inquiry, assessed on a case-by-case basis in light of the totality of the circumstances surrounding the establishment of the chapter 11 plan.[71]  Courts have "considerable discretion in finding good faith."[72]  In this Circuit, to establish that a plan was proposed in good faith, a plan proponent must establish that the plan "[a] fosters a result consistent with the Bankruptcy Code's objectives; [b] has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and [c] exhibited a fundamental fairness in dealing with the creditors."[73]  Here, the Debtors have met these factors.  The Plan was proposed with integrity, good intentions, and with the goal of maximizing stakeholder recoveries.  Throughout these cases, the Debtors, the Debtors' board of directors, and their senior management team have upheld their fiduciary duties to stakeholders and protected the interests of all constituents.

---

[69]   11 U.S.C. § 1129(a)(3).

[70]   *PWS Holding*, 228 F.3d at 242 (internal quotations, citations, and modifications omitted); *see also In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999); *Koelbl v. Glessing* (*In re Koelbl*), 751 F.2d 137, 139 (2d Cir. 1984) (in other words, there must be "some relation" between the chapter 11 plan and the "reorganization-related purposes" of chapter 11).

[71]   *W.R. Grace*, 475 B.R. at 87.

[72]   *Id.* at 88 (citing *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001)).

[73]   *Id.* at 87–88 (*citing In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001)); *In re Washington Mut., Inc.*, 461 B.R. 200, 239 (Bankr. D. Del. 2011); *accord In re Frascella Enters., Inc.*, 360 B.R. 435, 446 (Bankr. E.D. Pa. 2017).

81.     First, the Plan fosters reorganization and value maximization, a result consistent with the Bankruptcy Code's key objectives.[74]    The Plan maximizes the value of potential recoveries available to Holders of Claims by implementing an orderly wind down to distribute to Holders of Customer Claims the fiat and cryptocurrency associated with their accounts, and to liquidate and distribute the remaining assets to other Holders of Claims and Interests.

82.     Second, the Debtors have proposed the Plan with honesty and good intentions. From the outset of these Chapter 11 Cases, the Debtors have been forthright about the reasons they sought bankruptcy protection and have been unwavering in declaring and pursuing their objective of maximizing recoveries for customers and other creditors.[75]    With these objectives in the forefront, the Plan is the product of negotiations with multiple Governmental Units, resulting in compromises that represent a good faith effort to maximize recoveries for creditors.

83.     In addition, "[i]n analyzing whether a plan has been proposed for honest and good reasons, courts routinely consider whether the debtor intended to abuse the judicial process, whether the plan was proposed for ulterior motives, or if no realistic probability for effective reorganization exists."[76]    As discussed herein, the Plan (including the settlements embodied therein) and Plan Documents were negotiated at arm's length among representatives of the Debtors and multiple Governmental Units, and there is no evidence to the contrary.

84.     Third, the majority of the core creditor constituencies in these Chapter 11 Cases support confirmation of the Plan.  That the Plan has garnered such significant support demonstrates

---

[74]   *Id.*

[75]   *See, e.g.*, First Day Declaration at ¶¶ 1-18, 73; Disclosure Statement Art. V.A.

[76]   *W.R. Grace*, 475 B.R. at 88.

that the Plan is fundamentally fair to creditors.[77]  Importantly, the Plan provides full recoveries to the Debtors' Holders of Allowed Claims and full in-kind distributions.

### D.     The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Is Subject to Court Approval (§ 1129(a)(4)).

85.     Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable.  Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Court as to their reasonableness.[78]

86.     The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.[79]  All payments made or to be made by the Debtors for services or for costs or expenses in connection with these chapter 11 cases prior to the Confirmation Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Court.[80]  Article II.A of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than 60 days after the Effective Date for determination by the Court, after notice and a hearing, in accordance with the procedures

---

[77]   *See In re Maremont Corp.*, 601 B.R. 1, 20 (Bankr. D. Del. 2019) ("The [d]ebtors' good faith is evidence from the facts and record of the [c]hapter 11 [c]cases," which demonstrate "that the [d]ebtors engaged in extensive good-faith arm's length negotiations with [major stakeholders], which led to the [p]lan's formulation.").

[78]   *See Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a Plan should not be confirmed unless fees and expenses related to the Plan have been approved, or are subject to the approval, of the Bankruptcy Court."), *aff'd*, 241 F. App'x 1 (3d Cir. 2007); *see also In re TCI 2 Holdings, LLC*, 428 B.R. 117, 145 (Bankr. D.N.J. 2010) ("Under its clear terms, 'any payment' made or to be made by the plan proponent or the debtor for services 'in or in connection with' the plan or the case must be approved by or 'subject to the approval of' the bankruptcy court as 'reasonable.'").

[79]   *See* Maria Decl. ¶ 42.

[80]   *See* Plan, Art. II.

established by the Court.[81]   Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.

E.     **The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).**

87.     The Bankruptcy Code requires the plan proponent to disclose the affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[82]   Section 1129(a)(5)(A)(ii) further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[83]

88.     The Plan satisfies section 1129(a)(5).   As set forth in Article IV.C of the Plan, on the Effective Date, the Wind Down Assets shall automatically be assigned, transferred, and vest in the Wind Down Entity.   Pursuant to the Proposed Confirmation Order, the Debtors, other than BUS, will be dissolved.   The Wind Down Entity shall continue in existence after the Effective Date as the successor-in-interest to the Debtors and the Debtors' rights, title, and interest in the Wind Down Assets.   The Wind Down Entity shall be managed by the Plan Administrator.   As such, section 1129(a)(5) of the Bankruptcy Code is inapplicable to the Plan.   To the extent section 1129(a)(5) applies to the Wind Down Entity, it will have satisfied the requirements of this provision by, among other things, disclosing the identity of the Plan Administrator in the Plan Supplement.[84]

---

[81]   *Id.*

[82]   11 U.S.C. § 1129(a)(5)(A)(i).

[83]   11 U.S.C. § 1129(a)(5)(A)(ii).

[84]   *See* Plan Supplement, Exhibit C.

89.    In addition, section 1129(a)(5)(B) also requires a plan proponent to disclose the identity of any "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.[85]  Here, on or after the Effective Date, the Wind Down Entity shall be deemed to have withdrawn its business operations from any state in which the Debtors were previously conducting business.[86]  After, among other things, effectuating final distributions pursuant to the Plan, the Wind Down Entity will dissolve. Because no individual person shall serve as a director, officer, or voting trustee of a reorganized Debtor and no insider will be employed by the Debtors following the Effective Date, section 1129(a)(5)(B) is inapplicable to the Plan, and no party has asserted otherwise.

**F.    The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).**

90.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan. Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these chapter 11 cases, and no party has asserted otherwise.

**G.    The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).**

91.    Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests-
>
> (A)    each holder of a claim or interest of such class-
>
> > (i)    has accepted the plan; or
> >
> > (ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that

---

[85]  11 U.S.C. § 1129(a)(5)(B).

[86]  Plan, Art. IV.C.

is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .[87]

92.     The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[88]  As section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to holders of non-accepting impaired claims or interests.  Here, all Holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of the confirmation of the Plan as they would in a hypothetical chapter 7 liquidation, because all Holders of Claims are anticipated to receive full recovery, and Holders of Interests are anticipated to receive at lease some recovery.[89]  Accordingly, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.

93.     To demonstrate compliance with section 1129(a)(7) of the Bankruptcy Code, the Debtors, with the assistance of Berkeley Research Group, the Debtors' restructuring advisors, prepared a liquidation analysis, which is attached to the Disclosure Statement as Exhibit C (the "Liquidation Analysis") and discussed at length in the Hengel Declaration.[90]  The Liquidation Analysis compares the projected range of recoveries that would result from the liquidation of the

---

[87]    11 U.S.C. § 1129(a)(7)(A).  *See also Adelphia*, 368 B.R. at 252 ("In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7.").

[88]    *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *Century Glove*, 1993 WL 239489, at *7; *Adelphia*, 368 B.R. at 251 (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[89]    *See* Hengel Decl. ¶¶ 5, 19.

[90]    *See* Hengel  Decl. ¶¶ 6-21.

Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan.[91]   The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.[92]   The illustrative recoveries provided in the Liquidation Analysis are subject to potentially material change, including due to macroeconomic business conditions and legal rulings.[93]

94.     Based on the unaudited Liquidation Analysis and the assumptions included therein, the value of any distributions in a chapter 7 liquidation would be no greater than the value of distributions under the Plan.[94]   As a result, Holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.[95]   Based on the recoveries set forth in the Liquidation Analysis, the Plan satisfies the best interests test as required by the Bankruptcy Code.

**H.     The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

95.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.  If any class of claims or interests rejects the plan, the plan must satisfy the requirements of section 1129(b) with respect to the claims or interests in that class.

---

[91]   *See id.*

[92]   *See id.*

[93]   *See id.* at ¶¶ 9, 12, 15.

[94]   *See id.* at ¶¶ 21-22.

[95]   *See id.*

96.     Here, the Plan satisfies either the voting requirements or the requirements of section 1129(b) with respect to each Class. Class 2A (BUS Customer Claims) and Class 3 (General Unsecured Claims), which are impaired under the Plan, voted overwhelmingly to accept the Plan. Class 2B (Malta OpCo Customer Claims) rejected the Plan.  The Debtors did not receive any votes from Holders of Claims in Class 4 (Subordinated Claims) nor from Holders of Interests in Class 5 (Interests).  Class 1 (Other Priority Claims) is Unimpaired is presumed to accept the Plan.  As discussed below, the Plan satisfies the requirements of section 1129(b) with respect to all Classes that are Impaired under but have not voted to accept the Plan.  Therefore, the Plan satisfies section 1129(a)(8) or otherwise satisfies the requirements of the Bankruptcy Code, and no party has asserted otherwise.

I.      **The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).**

97.     Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code— administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.[96]  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a

---

[96]   11 U.S.C. § 1129(a)(9)(A).

value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).  Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—i.e., priority tax claim—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.

98.     The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  *First*, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each holder of an Allowed Administrative Claim allowed on or prior to the Effective Date will receive payment in full in Cash no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter.  *Second*, Article III.C of the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because it provides that holders of the types of Claims specified by 1129(a)(9)(B) shall receive either payment in full in cash or such other treatment as to render such holders unimpaired.  *Third*, Article II.B of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that holders of Allowed Priority Tax Claims will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code, and no party has asserted otherwise.

**J.      At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).**

99.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.

100.     As set forth above, Holders of Claims in Classes 2A and 3, which are Impaired Classes under the Plan, overwhelmingly voted to accept the Plan independent of any insiders' votes.[97]  Thus, the Debtors respectfully submit that the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code, and no party has asserted otherwise.

### K.    The Plan Is Feasible (§ 1129(a)(11)).

101.     Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine, in relevant part, that confirmation is not likely to be followed by the liquidation or further financial reorganization of the Debtors (or any successor thereto), unless such liquidation or reorganization is proposed in the Plan.  This requirement has been interpreted by courts in this district as requiring a determination that the Plan "has a reasonable likelihood of success."[98]  Importantly, "the feasibility inquiry is peculiarly fact intensive and requires a case-by-case analysis, using as a backdrop the relatively low parameters articulated in the statute . . . . There is a relatively low threshold of proof necessary to satisfy the feasibility requirement."[99]  Section 1129(a)(11) does

---

[97]   *See* Voting Report, Exhibit A.

[98]   *See In re Adelphia Bus. Sols., Inc.*, 341 B.R. 415, 421-22 (Bankr. S.D.N.Y. 2003) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success." Success need not be guaranteed.) (citing *Kane v. Johns-Manville*, 843 F.2d at 649); *Texaco*, 84 B.R. at 910 (plan is feasible if there is a "reasonable assurance of commercial viability"); *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) ("Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11).").

[99]   *See Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D. Conn. 2006), *remanded*, No. 0430511, 2008 WL 687266 (Bankr. D. Conn. Mar. 10, 2008), ("[A] 'relatively low threshold of proof' will satisfy the feasibility requirement.") (*quoting In re Brotby*, 303 B.R. 177, 191-92 (B.A.P. 9th Cir. 2003)); *Berkeley Fed. Bank & Trust v. Sea Garden Motel and Apartments (In re Sea Garden Motel and Apartments)*, 195 B.R. 294, 304-05 (D.N.J. 1996); *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995) ("[T]he feasibility inquiry is peculiarly fact intensive and requires a case by case analysis, using as a backdrop the relatively broad parameters articulated in the statute.").

not require the Debtors to guarantee the Plan's complete success. Instead, and to satisfy the feasibility requirement, the Debtors must show that the Plan has a reasonable chance of success.[100]

102.    Here, the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code by providing for a clear path to emergence from these chapter 11 cases and the ability of the Debtors to satisfy all of their obligations under the Plan.  Article IV sets out the means for implementation of the Plan, and in particular, Article IV.C of the Plan specifies that the Debtors' assets shall vest in the Wind Down Entity, which shall, among other things, liquidate all assets of the Wind Down Entity and distribute them in accordance with the Plan.  The Debtors, in consultation with their advisors, have determined that there will be no need for a further liquidation of the Debtors.[101]  Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(11) of the Bankruptcy Code.

### L.    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).

103.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.

104.    The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article II.D of the Plan provides that all fees and applicable interest payable pursuant to 28 U.S.C. § 1930 shall

---

[100]    *See In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *27-29 (Bankr. D. Del. May 13, 2010); *accord Kane*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed.").

[101]    Maria Decl. ¶ 49.

be paid.   Accordingly, the Debtors submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code, and no party has asserted otherwise.

### M.      No Remaining Retiree Benefits Obligations (§ 1129(a)(13)).

105.    Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.  The Debtors do not have any remaining obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code).   Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these chapter 11 cases, and no party has asserted otherwise.

### N.      Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan.

106.    Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  Because the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.  Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.  Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.  Finally, each of the Debtors are a moneyed, business, or commercial corporation or trust, and therefore, section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with any applicable provisions of nonbankruptcy law, is not applicable to the chapter 11 cases.  Accordingly, the Debtors respectfully submit that the Plan is not subject to the requirements of section 1129(a)(14)-(16) of the Bankruptcy Code, and no party has asserted otherwise.

O.    **The Plan Satisfies the Requirements of Section 1129(b) of the Bankruptcy Code.**

107.    Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[102]

108.    As noted above, Class 2A and Class 3, which are Impaired Classes of Claims entitled to vote on the Plan, have voted in favor of the Plan.  Impaired Class 4 and Class 5 were entitled to vote but did not vote.  Class 2B voted to reject the Plan (the "Rejecting Class").  Nonetheless, as set forth below, the Plan satisfies the requirements under section 1129(b) of the Bankruptcy Code, and no party has asserted otherwise.

1.    **The Plan Is Fair and Equitable (§ 1129(b)(2)(B)).**

109.    A plan meets the "fair and equitable" standard with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[103]  This requires that an impaired rejecting class of unsecured claims either receive

---

[102]   *In re John Hancock Mut. Life Ins. Co.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993); *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

[103]   *Bank of Am.*, 526 U.S. at 441-42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").

or retain on account such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim, or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[104]  With respect to a rejecting class of interests, a plan is only fair and equitable if the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or, the holder of any interest junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

110.    Here, the Plan is fair and equitable within the meaning of section 1129(b) of the Bankruptcy Code.  Although Class 2B is an Impaired Rejecting Class, the Plan is fair and equitable as set forth in section 1129(b)(2)(B)(i) because Holders of Claims in Class 2B will receive 100% of the allowed amounts of their claims.  Moreover, Class 4 is a vacant class, and the Plan is fair and equitable with respect to Class 5 pursuant to section 1129(b)(2)(C)(ii) because there are no interests junior to Class 5.

### 2.    The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1)).

111.    Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[105]  In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially

---

[104]    11 U.S.C. § 1129(b)(2)(B).

[105]    *See In re Jewish Memorial Hosp.*, 13 B.R. 417, 420 (Bankr. S.D.N.Y. 1981) ("[T]he Bankruptcy Act does not establish inexorable rules for distribution that can never be deviated from in the interest of justice and equity.").

different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[106]  The Third Circuit has ruled that "when cramdown plans play with subordinated sums, the comparison of similarly situated creditors is tested through a more flexible unfair-discrimination standard."[107]

112.    Here, the Plan's treatment of the non-accepting Impaired Class (*i.e.*, the Rejecting Class) is proper because regardless of the differing legal rights of various stakeholders, all Classes of Claims in the Plan are receiving 100% of the allowed amounts of their Claims.  And Class 5 (Interests) will only receive distributions after other claims have been satisfied in full.

113.    For the reasons set forth above, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code.

**P.    The Debtors Complied with Section 1129(d) of the Bankruptcy Code.**

114.    The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act.[108]  No party has argued otherwise.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**Q.    Modifications to the Plan.**

115.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that

---

[106]  *See WorldCom*, 2003 WL 23861928 at *59 (requiring a reasonable basis to justify disparate treatment).

[107]  *In re Trib. Co.*, 972 F.3d 228, 232 (3d Cir. 2020).

[108]  *See* Maria Decl. ¶ 57.

the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.  Interpreting Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[109]

116.    Following solicitation, the Debtors made certain minor modifications to the Confirmation Order that specify superseding Plan language to resolve formal and informal comments to the Plan by parties in interest (the "Modifications").[110]  The Modifications are immaterial or otherwise do not affect the treatment of creditors and stakeholders and thus comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the Modifications, and that such Modifications should be deemed accepted by all creditors that previously accepted the Plan.

### R.    Good Cause Exists to Waive the Stay of the Confirmation Order.

117.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."[111] Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory

---

[109]    *See, e.g.*, *In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at \*4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at \*23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

[110]    *See Proposed Confirmation Order* filed at D.I. 494.

[111]    Fed. R. Bankr. P. 3020(e).

contract or unexpired lease under section 365(f) of the Bankruptcy Code.[112]  Each rule also permits

modification of the imposed stay upon court order.[113]

118.    The Debtors submit that good cause exists for waiving and eliminating any stay of

the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the

Confirmation Order will be effective immediately upon its entry.[114]  As noted above, these chapter

11 cases and the related transactions have been proposed and implemented in good faith and with

a high degree of transparency and public dissemination of information.   The Debtors have

undertaken great effort to exit chapter 11 as soon as possible.  Additionally, each day the Debtors

remain in chapter 11 they incur significant administrative and professional costs.

119.    In light of the requisite support by the Voting Classes, and the lack of any objections

to confirmation, no parties will be prejudiced by waiver of the stay to facilitate the Debtors' swift

emergence from chapter 11.   Accordingly, the Debtors request a waiver of any stay imposed by

the Bankruptcy Rules so that the Proposed Confirmation Order may be effective immediately upon

its entry.

---

[112]   Fed. R. Bankr. P. 6004(h), 6006(d).

[113]   *Id.*

[114]   *See, e.g.*, *In re Chemtura Corp.*, No. 09-11233 (REG) (Bankr. S.D.N.Y. Nov. 23, 2010) (shortening the Bankruptcy Rule 3020(e) period due to the significant expense to the debtors' estates in delaying the effectiveness of the plan); *In re Extended Stay Inc.*, No. 09-13764 (JMP) (Bankr. S.D.N.Y. July 20, 2010) (waiving stay under Bankruptcy Rule 3020(e)); *In re Penton Bus. Media Holdings, Inc.*, No. 10-10689 (AJG) (Bankr. S.D.N.Y. Mar. 5, 2010) (waiving the stay in Bankruptcy Rule 3020(e) in light of support for the plan by voting classes); *In re Oldco M. Corp.*, No. 09-13412 (MG) (Bankr. S.D.N.Y. Feb. 23, 2010) (waiving the stay imposed by Bankruptcy Rule 3020(e) to permit a distribution trustee to commence its duties as quickly as practicable); *In re Broadway 401 LLC*, No. 10-10070(KJC), 2010 WL 2902755, at *20 (Bankr. D. Del. Mar. 16, 2010); *In re Drug Fair Grp., Inc.*, No. 09-10897, 2010 WL 3492994, at *12 (Bankr. D. Del. June 7, 2010); In re Accuride Corp., No. 09-13449 BLS, 2010 WL 5093173, at *13 (Bankr. D. Del. Feb. 18, 2010); *In re Teton Energy Corp.*, No. 09-13946 (PJW), 2010 WL 2822056, at *23 (Bankr. D. Del. Jan. 20, 2010).

## <u>Conclusion</u>

120.    For all of the reasons set forth herein and in the Voting Report, the Maria Declaration, and the Hengel Declaration, and as will be further shown at the Confirmation Hearing, the Debtors respectfully request that the Court confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Proposed Confirmation Order, and granting such other and further relief as is just and proper.

*[Remainder of page intentionally left blank]*

Date: October 27, 2023
Wilmington, DE

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

/s/  *Kenneth J. Enos*
Robert S. Brady (Delaware Bar No. 2847)
Kenneth J. Enos (Delaware Bar No. 4544)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: 302-571-6600
Facsimile: 302-571-1253
Email: rbrady@ycst.com
Email: kenos@ycst.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Susheel Kirpalani *(admitted pro hac vice)*
Patricia B. Tomasco *(admitted pro hac vice)*
Daniel Holzman *(admitted pro hac vice)*
Alain Jaquet *(admitted pro hac vice)*
Razmig Izakelian *(admitted pro hac vice)*
Joanna D. Caytas *(admitted pro hac vice)*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: 212-849-7000
Facsimile: 212-849-7100
Email: susheelkirpalani@quinnemanuel.com
Email: pattytomasco@quinnemanuel.com
Email: danielholzman@quinnemanuel.com
Email: alainjaquet@quinnemanuel.com
Email: razmigizakelian@quinnemanuel.com
Email: joannacaytas@quinnemanuel.com

**COUNSEL FOR THE DEBTORS**