**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Desolation Holdings LLC, *et al.,*[1]<br><br>Wind Down Entity. | Chapter 11<br><br>Case No. 23-10597 (BLS)<br><br>(Jointly Administered)<br><br>Ref. Docket No. 641 |

**PLAN ADMINISTRATOR'S OBJECTION TO AZIM GHADER'S MOTION TO
CONTINUE HEARING ON DEBTORS' OBJECTION TO
MR. GHADER'S SURVIVING CLAIMS**

David Maria, as plan administrator (the "Plan Administrator") in the chapter 11 cases of the above-captioned debtors and each of their debtor affiliates (collectively, the "Debtors" or the "Wind Down Entity"), through undersigned counsel, objects to *Azim Ghader's Motion to Continue Hearing on Debtors' Objection to Mr. Ghader's Surviving Claims* [D.I. 641] (the "Motion"), and in support thereof states as follows:

**PRELIMINARY STATEMENT**

1. Mr. Ghader's motion for continuance is yet another strategic maneuver that attempts to delay the resolution of the Claim Objection, so that he can exhaust the Debtors with disproportionate discovery demands while he scrambles to find a viable theory of recovery supporting his attempts to pry millions of dollars of value from the Wind Down Entity.[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Holdings Ltd. (2227); and Bittrex Malta Ltd. (1764). The mailing and service address of the Debtors is 701 5th Avenue, Suite 4200, Seattle, WA 98104.

[2] Capitalized terms used in this Objection and not otherwise defined herein shall have the meanings set forth in the *Debtors' Objection to Proof of Claims 597-239, 597-296, 598-998, 598-998, 596-1021, 598-10408, 599-35, 599-38, 599-10018, 600-87, 600-96, and 600-0052 Filed by Azim Ghader Pursuant to Section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and Local Rule 3007-1* (the "Claim Objection") [D.I. 411].

1

2. Strikingly, all these efforts are based on a claim of less than $3,400, corresponding to the value of the assets associated with Mr. Ghader's account—assets that he was freely able to withdraw but chose not to, solely to retain his status as a creditor of the Debtors.

3. The pattern of harassment and prevarications in Mr. Ghader's pleadings and letters have purposefully complicated the judicial administration of these cases. In his efforts to derail the orderly administration of the Debtors' chapter 11 cases, Mr. Ghader did not hesitate to make false representations to this Court, including the absurd lie that the Debtors did not make the OFAC License public despite the fact that he attempted to withdraw his funds pursuant to the license. *See* [D.I. 60].

4. The hearing on the Claim Objection was initially scheduled for October 30, 2023. The parties agreed to continue the hearing, which resulted in its postponement to December 13, 2023 (the "December 13 Hearing" or "Hearing"). Throughout November 2023, the Debtors attempted to depose Mr. Ghader, but the latter insisted that he was not available until early December 2023. Two days before his December 5, 2023 deposition, Mr. Ghader, through his counsel, asked to postpone the deposition because he had a flu. The following day, the Debtors proposed December 12, 2023 as an alternative date for Mr. Ghader's deposition. In response, Mr. Ghader, through his counsel, suddenly claimed that he was in the hospital, but the documents in Turkish language that he provided to the Debtors show that on December 3 and/or 4, 2023, Mr. Ghader briefly received outpatient treatment for heart palpitations and was then released. Mr. Ghader has used these seemingly strategic delays to lob ever more irrelevant and burdensome discovery requests at the Debtors. This has resulted in the Debtors and counsel spending hundreds of hours and hundreds of thousands of dollars on a single claimant; all while they work diligently to process and resolve over 4,000 claims filed in these chapter 11 cases.

5. Mr. Ghader, having produced zero evidence in support of his Claims and facing mountains of contrary documents now seeks to amend his Claims and introduce new ones, in disregard of the Bar Date Order and the Confirmation Order, and contrary to established case law. Claims that, since the inception of these chapter 11 cases, have been based on ever-changing theories, including Mr. Ghader alleging, with a conspiratorial tone, that "Bittrex US [was] exploiting the credibility of the U.S. and OFAC to gain unfair profits." [D.I. 60.] His motion for continuance should therefore be disallowed.

## GENERAL BACKGROUND

6. On May 8, 2023 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). Prior to the Petition Date through the Effective Date of the Plan (defined below), the Debtors managed and operated their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. An official committee of unsecured creditors has not been appointed in these Chapter 11 Cases.

7. On May 24, 2023, the Debtors filed the Bar Date Motion,[3] which the Court granted on June 7, 2023, setting August 31, 2023 (the "Bar Date") as the general bar date for filing proofs of claim (the "Bar Date Order"). [D.I. 107.]

8. On October 31, 2023, the Court entered its order [D.I. 517] (the "Confirmation Order") confirming the *Amended Chapter 11 Plan of Liquidation of Desolation Holdings LLC and its Debtor Affiliates* (the "Plan") (the "Confirmation").[4]

---

[3] The term "Bar Date Motion" refers to the *Motion of Debtors for Authority to (I) Establish Deadlines for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, and (III) Approving Procedures for Providing Notice of Bar Date.* [D.I. 65.]

[4] Capitalized terms not otherwise defined in the paragraphs 9 and 10 below have the meanings ascribed to them in the Plan.

9. On November 15, 2023, the Debtors filed a *Notice of Effective Date* [D.I. 563], setting the effective date to the same day (the "Effective Date"). As set forth in the Confirmation Order, as of the Effective Date, all Wind Down Assets vested in the Wind Down Entity, and David Maria was appointed to serve as the Plan Administrator managing the Wind Down Entity. *See* Confirmation Order at ¶¶ 17.G, 52.

10. Now that the Effective Date has occurred, the Plan Administrator is continuing the claims reconciliation process, and the wind down of the business operations and affairs of the Wind Down Entity.

## SPECIFIC BACKGROUND

**I.    From the Account Opening in June 2017 to April 2023**

11. In June 2017, Mr. Ghader created an account with Bittrex, Inc. by providing (i) a copy of his Iranian passport; and (ii) an Iranian phone number. Hengel Decl. ¶ 5.[5]

12. In connection with his account opening, Mr. Ghader accepted BUS' 2015 Terms of Service (the "2015 Terms of Service"). *See*, *e.g.*, Response ¶ 88, Ex. B.[6] When agreeing to the 2015 Terms of Service, Mr. Ghader falsely "represent[ed] and warrant[ed] that … [he was] not located in, under the control of, or a national or resident of … any country to which the United States has embargoed goods or services." Response, Ex. B.

---

[5] "Hengel Decl." refers to the Declaration of Evan Hengel in Support of Debtors' Objection to Proof of Claims 597-239, 597-296, 598-998, 598-998, 596-1021, 598-10408, 599-35, 599-38, 599-10018, 600-87, 600-96, and 600-0052 Filed by Azim Ghader Pursuant to Section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and Local Rule 3007-1. [D.I. 412].

[6] "Response" refers to the *Response of Azim Ghader to Debtors' Objection to Proof of Claims 597-239, 597-296, 598-998, 598-998, 596-1021, 598-10408, 599-35, 599-38, 599-10018, 600-87, 600-96, and 600-0052 Filed by Azim Ghader Pursuant to Section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and Local Rule 3007-1*. [D.I. 470.]

4

13. In October 2017, Bittrex blocked Mr. Ghader's account to comply with the Iranian Sanctions.[7] Hengel Decl. ¶ 6.

14. In November 2018, Mr. Ghader accepted Bittrex's International Terms of Service (the "2018 Terms of Service") and became a customer of Bittrex Malta OpCo ("Malta OpCo"). Hengel Decl. ¶ 8, Ex. A. Bittrex International's Terms of Service, among other things, forbade Mr. Ghader to use Bittrex's services because of his Iranian citizenship and residency.[8]

15. In 2019, Mr. Ghader continued to ask to have his account unblocked, and Malta OpCo restated repeatedly that his account was blocked due to the Iranian Sanctions. Hengel Decl. ¶ 9. Mr. Ghader attempted to obtain access to the Bittrex platform by providing (i) a Dominica passport; and (ii) a statement indicating an address in Luxembourg that was a co-working space. Hengel Decl. ¶ 10. Using these documents, Mr. Ghader tried to persuade Bittrex that he was a Luxembourg resident. *Id*.

16. In late 2019, Bittrex obtained the OFAC License, which allowed a release of assets in Iran. Hengel Decl. ¶ 12. Starting from November 2019, the Debtors informed all relevant Iran

---

[7] On October 10, 2017, the Office of Foreign Assets Control ("OFAC") sent BUS an administrative subpoena (the "OFAC Subpoena") directing BUS to provide the agency with information regarding accounts held by Iranian persons. **Exhibit A**. Upon receiving the OFAC Subpoena, BUS found an unintentional gap in its OFAC compliance process, which, since 2016, had been outsourced to an OFAC sanctions compliance consultant (the "OFAC Sanctions Consultant"). *Id*. Specifically, contrary to Bittrex's belief, the OFAC Sanctions Consultant did not screen prospective customers from Iran (the "Compliance Gap"), who were able to open accounts. *Id*. Following the discovery of the Compliance Gap, BUS disabled all accounts of customers whom BUS identified as coming from Iran. *Id*. Mr. Ghader was among the customers targeted by BUS's corrective action.

[8] Specifically, section 2.2 of the 2018 Terms of Service provides: "You may not use the Services if you are located in, or a citizen or resident of the United States. **You may not use the Services if you are located in, or a citizen or resident of any state, country, territory or other jurisdiction that is embargoed by the United States**, …. **You represent and warrant that you are not a citizen or resident of any such jurisdiction** and that you will not use any Services while located in any such jurisdiction, and that you are not on any trade or economic sanctions list…. **Bittrex may implement controls to restrict access to the Services from any jurisdiction prohibited pursuant to this Section 2.2. You will comply with this Section 2.2, even if Bittrex's methods to prevent use of the Services are not effective or can be bypassed**." Hengel Decl., Ex. A (Emphasis added.)

5

customers—including Mr. Ghader—that they could withdraw cryptocurrency in their blocked accounts. *Id*. In 2019, Mr. Ghader did not attempt any activity in his account. *Id*.

17. In early February 2020, the Debtors again contacted Mr. Ghader regarding the OFAC License and the need to withdraw the assets associated with his account. Hengel Decl. ¶ 13. In March 2020, Mr. Ghader finally responded to Bittrex. *Id*. As part of the withdrawal process, Bittrex asked Mr. Ghader to provide three pictures necessary to verify his identity (the "Compliance Pictures"). *Id*. Mr. Ghader replied that he would send the Compliance Pictures in a matter of hours, but he failed to do so. *Id*. The OFAC License expired, and Mr. Ghader's assets remained blocked due to the Iranian Sanctions. *Id*. ¶ 14.

18. In January 2021, Mr. Ghader contacted Bittrex to resolve his Iranian Sanctions and KYC issues. Hengel Decl. ¶ 15. Mr. Ghader's account remained suspended because Mr. Ghader failed to provide Bittrex with the requested documentation (e.g., an utility bill) to verify that he no longer resided in Iran. *Id*.

19. Finally, in early April 2023, Mr. Ghader provided Bittrex with the KYC Information, which allowed Bittrex to unblock his account. Hengel Decl. ¶¶ 17–18.

## II. From the Debtors' Commencement of the Chapter 11 Cases to Present

### a. In May 2023, Mr. Ghader Alleges that Bittrex is Executing a Scheme that Exploits the Credibility of the U.S. and OFAC to Gain Unfair Profits

20. On May 16, 2023, Mr. Ghader filed an objection (the "May 2023 Objection") against Debtors' Creditor Matrix Motion.[9] In the May 2023 Objection, Mr. Ghader claimed that Bittrex did not release "digital assets worth millions of dollars" to Iranian customers pursuant to

---

9 "Creditor Matrix Motion" refers to the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain a Consolidated List of Creditors, (B) File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, and (C) Withhold or Omit Certain Confidential Information, (II) Establishing Procedures for Notifying the Parties of Commencement, and (III) Granting Related Relief*. [D.I. 5.]

alleged scheme where "Bittrex US [was] exploiting the credibility of the U.S. and OFAC to gain unfair profits" (the "Scheme"). [D.I. 60.] "[O]n behalf of the many victims" of this scheme, Mr. Ghader aimed to "recover their unfairly lost assets and find a relief for their financial and moral losses." *Id*.

21.    At that time, Mr. Ghader also stated that the OFAC License "was never made public," which is patently false, including because he attempted to withdraw the assets in his account pursuant to such License. *See supra* ¶ 16.

    **b.    In Late June And Mid-July 2023 Mr. Ghader Reiterates the Existence of the Scheme, Not Disclosing to the Court That He Withdrew 99% of the Assets Associated With His Account**

22.    In a June 30, 2023 letter to the Court, Mr. Ghader reiterated that, as "indicated in [his] objection, there are many others like [him] who stand to lose their hard-earned assets due the actions of Bittrex, and its operators" (the "June 30 Letter") [D.I. 198.].

23.    Through a July 14, 2023 letter (the "July 14 Letter"), Mr. Ghader again shared the June 30 Letter with the Court [D.I. 215]. In the July 14 Letter, Mr. Ghader failed to mention that, in early July 2023, he withdrew over 99% (i.e., roughly $273,319.80) of the assets associated with his account. Hengel Decl. ¶ 21. Following these withdrawals, the remaining assets associated with Mr. Ghader's account are worth approximately $3,200. *Id*. ¶ 26.

    **c.    In Late August 2023, Mr. Ghader Files Proofs of Claim against the Debtors**

24.    Between August 30 and 31, 2023, by using the Official Form 401, Mr. Ghader filed ten proofs of claims (the "Claims") against the Debtors for over $80 million, despite the fact that the assets remaining in his account were valued approximately $3,200.

7

25. In these ten Claims, Mr. Ghader abandoned the theory of the "Scheme." These Claims make no mention of OFAC, let alone of the Iranian Sanctions and Bittrex taking intentionally advantage of them to realize undue profits.

26. In the first set of Claims (e.g., Claims 598-998 and 600-87), Mr. Ghader listed a claim of over $20.8 million. According to his allegations:

- Between June 2017 and October 2017, Mr. Ghader "invest[ed]" over $1 million in BTC and ARK, which then he used to "invest" in other cryptocurrencies.

- The same year, Mr. Ghader began to establish his (phantomatic) cryptocurrency exchange that "would have offered a competitive alternative option to Bittrex exchange," and for which, in April 2019, he obtained two financial services licenses from Estonian regulators.

- In October 2017, Bittrex "barred" Mr. Ghader's account, which, in the following four months "soared to an [unproven] all-time high (over 750 Bitcoins)" and "Mr. Ghader was unable to sell his crypto coin at an advantageous time in the market, as he intended to."

- The suspension of the account made him "unable to provide adequate capital to fund his cryptocurrency exchange and wallet services business" and "his [Estonian] licenses … expired about one year thereafter," with the consequence, according to Mr. Ghader, that "Bittrex effectively boxed out a potential competitor."

- Because of the suspension of his account, Mr. Ghader could not "payoff [alleged] loans taken out to support his [alleged] business."

- Mr. Ghader's "fortune in crypto coins is now worth only a fraction of its prior value" and, accordingly, "[a]ll Debtors are jointly and severally liable for the full amount of Mr. Ghader's Claims — Exceed 750 Bitcoins."

*See* Hengel Declaration ¶¶ 27–28. Shooting in the dark, in this set of Claims, Mr. Ghader stated that damages "***may*** arise under a number of legal theories, including, but not limited to, fraud, breach of contract, breach of fiduciary duty, conversion, tort, civil conspiracy, emotional distress, personal injury, misrepresentation, breach of the implied duty of good faith and fair dealing, unjust enrichment, negligence and lost profits." (Emphasis added.)

8

31036513.2

27. In the second set of Claims (*see*, e.g., Claims 598-1021 and 600-96), Mr. Ghader listed a claim of $1 million because, according to his allegations:

- Between June 2017 and October 2017, Mr. Ghader "invest[ed]" over $1 million in BTC and ARK, which then he used to "invest" in other cryptocurrencies.

- As of August 31, 2023, Mr. Ghader's efforts to retrieve his coins from his account were "partially successful," but "Bittrex" still had custody of certain of his coins, and "strangely, several of Mr. Ghader's coins [did] not even appear" in his account balance.

- Mr. Ghader owned coins for which he was entitled to receive periodic rewards.

*See* Hengel Declaration ¶¶ 34–35. In this set of Claims, Mr. Ghader repeated that damages "may arise under a number of legal theories," and listed the same hypothetical causes of actions that he mentioned in the first set of Claims.

28. In response to the Claims, on September 29, 2023, the Debtors filed their Claim Objection.

### d. In October 2023, the Debtors and Mr. Ghader Execute a Stipulation Narrowing the Dispute between the Parties

29. On October 20, 2023, the Debtors and Mr. Ghader entered into a Stipulation for the purpose of "narrow[ing] the Parties' dispute relating to the Claims and Objection (the "Dispute")."[10] Pursuant to the Stipulation, the parties agreed that (i) the only Claims subject to the Dispute are Claim 598-998, Claim 598-1021, Claim 600-87, and Claim 600-96 (the "Surviving Claims"); and (iii) if any of Mr. Ghader's Claims is allowed, Mr. Ghader is not entitled to any double or multiple recoveries, and his recovery is capped at $21,835,750.

---

[10] "Stipulation" refers to the Stipulation regarding Withdrawal of Claims. [D.I. 468.]

### e. In late October 2023, Mr. Ghader Files His Response

30. On October 22, 2023, Mr. Ghader filed his Response. Mr. Ghader repeatet the panoply of other hypothetical causes of actions (¶¶ 66, 102), but none of these is substantiated in the Response.[11]

### f. In late November 2023, Mr. Ghader Files the Motion

31. On November 29, 2023, Mr. Ghader filed the Motion, asserting six reasons why a continuance of the December 13 Hearing would be justified:

- Mr. Ghader would like to participate to the December 13 Hearing but he does not have a visa to come to the United States;

- Upon information and belief, the Court has set only 30 minutes for the Hearing;

- Discovery is not yet completed;

- The pendency of alleged Freedom of Information Act ("FOIA") request he made to OFAC;

- This week, Mr. Ghader intends to file an adversary proceeding that (i) would be filed against BUS, Malta OpCo and other parties; (ii) would "assert claims, causes of action and damages for, among other things, breach of contract, conversion, misrepresentation, unjust enrichment, unfair and deceptive business practices, lack of good faith and fair dealing and reckless and wanton conduct; and (iii) "the facts underlying these causes of action [would be] interrelated to the bases for his Surviving Claims.

- A short continuance would not prejudice the Debtors.

Motion ¶ 4.

---

[11] At paragraphs 66, 97, 103–104 of the Response, Mr. Ghader makes certain unsubstantiated and speculative references to the tort of conversion, which could be a shift back to the Scheme's theory.

**OBJECTIONS**

I. **Mr. Ghader Attempts to Amend His Claims After the Bar Date and Introduce New Claims After Confirmation**

32. Mr. Ghader's attempts to delay the hearing to gather even more futile evidence is yet another attempt at a second bite at the apple of his claims. Mr. Ghader keeps changing his theories of recovery when discovery does not bring the results he was seeking to support his claims. However, "[a] party seeking to amend its proof of claim after the bar date must obtain the court's permission to do so." *In re Brown*, 159 B.R. 710, 714 (Bankr. D.N.J. 1993). Furthermore, "[t]he decision to allow amendments to a proof of claim is within the discretion of the Bankruptcy Court." *In re Ben Franklin Hotel Assocs.*, 186 F.3d 301, 309 (3d Cir. 1999).

33. Although Mr. Ghader asserts that no prejudice would result to the Debtors by allowing him to delay the hearing on his claim objection in order to gather more evidence to support and potentially expand his claims, as the *Brown* court explained, "[a]mendments after the bar date, however, must be scrutinized carefully to ensure that they are truly amending the timely filed claim and not asserting a new claim." *N.Y.C. Hous. Auth. v. G-I Holdings, Inc. (G-I Holdings, Inc.)*, 514 B.R. 720, 754–55 (Bankr. D.N.J. 2014) (quoting *In re Brown*, 159 B.R. 710 at 714). The amendment must relate back to the initial filing pursuant to Fed. R. Civ. P. 15(c) if it is filed after the bar date; "otherwise, it will be deemed a 'new' claim and will not be permitted." *In re MK Lombard Group I, Ltd.*, 301 B.R. 812, 816 (Bankr. E.D. Pa. 2003). But "[w]here the proposed amendment is more than just a correction of an error or involves something beyond the original claim, courts will generally apply an equitable test to determine whether to allow the amendment anyway." *Brown*, 159 B.R. at 715. The equitable test focuses on the issues of prejudice, delay, and bad faith. *Id.* at 716. "In reviewing these equitable concerns, this court places greatest weight on whether any prejudice would result to other parties from allowing the amendments." *Id.* Here,

the prejudice to the Debtors and other creditors is clear: new claims raised by Mr. Ghader after the Bar Date, especially given the astronomical claimed amount compared to his approximately $3,200 account balance, turns the claims allowance process into a never-ending gauntlet of expensive and wasteful delay and deception.

34. To the extent Mr. Ghader attempts to propound new late claims, these require meeting an even higher standard of excusable neglect of Bankruptcy Rule 9006(b)(1) under *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993). *Pioneer* enunciated the following factors to analyze whether the creditor met the burden of proving the existence of excusable neglect in submitting new claims after the bar date: "the danger of prejudice to the debtor, the length of delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Id*. at 395; *Jones v. Chemetron Corp.*, 212 F.3d 199, 205 (3d Cir. 2000). "These factors focus on three issues: the conduct of the claimant; prejudice to the other parties; and the interests of efficient judicial administration." *G-I Holdings, Inc.*, 514 B.R. at 756 (quoting *Brown*, 159 B.R. 710 at 718).

35. Considering the irregular conduct of Mr. Ghader in these chapter 11 cases since their inception, the prejudice to other claimants based on the extravagant recoveries sought by Mr. Ghader based on his account holdings of approximately $3,200 (which he was freely able to withdraw but chose not to), and Mr. Ghader's various instances of interference with and complications imposed on the judicial administration of these cases, Mr. Ghader's conduct is the opposite of excusable neglect and any assertion of his novel claims should not be allowed.

36. Furthermore, the Debtors crossed another threshold in these Chapter 11 Cases: the Confirmation Order. The attempts of Mr. Ghader to use delays to find reasons to amend or expand

his claims should be therefore disallowed. *In Holstein v. Brill*, the Seventh Circuit Court of Appeals addressed the issue of amendments of claims after confirmation of the plan. 987 F.2d 1268 (7th Cir. 1993). The court stated:

> We asked the parties whether any other court ever had allowed a claim to be increased, for any reasons, after confirmation of a plan of reorganization. Neither side could find such a decision under the 1978 Code, or for that matter under the 1898 Act during its final 50 years. Our search was equally fruitless.

987 F.2d at 1271. The Seventh Circuit further elaborated:

> Post-confirmation amendments make an end run around these provisions and may throw monkey wrenches into the proceedings, making the plan infeasible or altering the distributions to remaining creditors.... And whether or not late-breaking claims affect third parties' entitlements, they assuredly disrupt the orderly process of adjudication. To every thing there is a season, and the season for stating the amount of a debt is before the confirmation of a plan of reorganization.

*Id*. at 1270–71.

37. The Eleventh Circuit also considered the issue of post-confirmation amendment of claims and found that "only the most compelling circumstances justify it. In the absence of such compelling reasons, a confirmed reorganization plan should be accorded res judicata effect on a creditor's subsequent attempt to amend his claim." *In re Winn-Dixie Stores, Inc*., 639 F.3d 1053, 1056-57 (11th Cir. 2011). "The [*NextMedia*] court further noted that while the Third Circuit has not directly addressed the issue, 'the Eleventh Circuit has recently followed the Seventh Circuit in holding that res judicata precludes post-confirmation amendments absent some compelling reason.'" *G-I Holdings, Inc*., 514 B.R. at 756 (Bankr. D.N.J. 2014) (quoting *CBS Outdoor Inc. v. NextMedia Group Inc. (In re NextMedia Group Inc.)*, 2011 U.S. Dist. LEXIS 115541, 2011 WL 4711997, at *3 (D. Del. Oct. 6, 2011)). There are no such compelling reasons in the attempts of Mr. Ghader to find reasons to amend or expand his claims after confirmation. Mr. Ghader fully participated in these chapter 11 cases and his attempts to change the basis of his claims evidence

13

furthers his gameplan of trying to throw an ever changing set of theories of damages at the Debtors, hoping that something will stick.

## II. The Request to Continue the Hearing Is Based on Speculative Reasons and Mr. Ghader's Self-Created and Self-Serving Needs

### A. Mr. Ghader's Alleged Late Visa Processing Is Not A Reason to Delay the December 13 Hearing

38. In the Motion, Mr. Ghader seeks a continuance of the December 13 Hearing because he does not have a visa that would allow him to participate at the Hearing. Motion ¶¶ 4(i), 26.

39. The Debtors note that, in the Motion, is not clear whether Mr. Ghader has applied for a visa, and Mr. Ghader did not provide any evidence of it.

40. But, assuming that Mr. Ghader submitted a visa application, his argument fails because there is no guarantee that Mr. Ghader—an Iranian citizen—will *ever* obtain a visa to present live testimony regarding his Surviving Claims, let alone before March 2024 when the Debtors plan to complete their liquidation.

41. Mr. Ghader had plenty of time to apply for a visa in order to travel to the United States—in May 2023, he already claimed that he "was prepared to testify before this Court" [D.I. 60]. Further, the Debtors note that the hearing on the Claim Objection was originally scheduled for October 30, 2023, which was 44 days before the Hearing. Accordingly, if Mr. Ghader aimed to attend the Hearing in person, he should have promptly acted to obtain the required visa. Now, Mr. Ghader's procrastination and failure to take action in time should not unduly burden the Debtors.

### B. A Delayed FOIA Request with an Uncertain Outcome Is not A Reason to Delay the Hearing

42. According to Mr. Ghader, a continuance of the December 13 Hearing is justified because of an alleged Freedom of Information Act ("FOIA") request, which would be pending before OFAC. Motion ¶¶ 4(iv), 29.

43. The Debtors believe that the foregoing is not a reason to continue the Hearing. To date, it is a mere conjecture that Mr. Ghader will *ever* obtain from OFAC any of the information he sought pursuant to his expedited FOIA request. The filing of a FOIA request does not automatically entail that the relevant agency will provide the requested information, or that such information exists.

44. Also, it is no more than a speculation that OFAC will provide information to Mr. Ghader before March 2024, considering that "OFAC denied [Mr. Ghader's] expedited request and advised Mr. Ghader's counsel that *there are numerous requests in the queue ahead of Mr. Ghader's*." Motion ¶ 4(iv) (Emphasis added.)

45. Moreover, Mr. Ghader's lateness in filing the FOIA request—circumstance that is evidenced by the fact that he asked for an expedited treatment—should not be tolerated at the Debtors' expense. Mr. Ghader, in fact, had plenty of time to file his FOIA request for obtaining information from OFAC. For several years, Mr. Ghader knew that the suspension of his account related to the Iranian Sanctions. Moreover, in July 2023, Mr. Ghader was already considering to seek information from OFAC,[12] but he failed to timely take action until recently.

---

[12] See **Exhibit B** ("Should I reach out to OFAC directly for further information, …?").

15

### III. Debtors' Document Discovery to Mr. Ghader Is Completed; Mr. Ghader Had Several Occasions to Depose the Debtors' Witnesses But Failed to Do So

46. Mr. Ghader alleges that a continuance of the December 13 Hearing would be justified because "discovery is not yet complete." Motion ¶¶ 4(iii); 23, 28.

47. The Debtors, however, completed their document discovery to Mr. Ghader. The Debtors' document productions—totaling over 530 pages—include all of the identified communications between Mr. Ghader and the Debtors. Further, the Debtors produced several OFAC-related documents to Mr. Ghader's counsel.[13] These OFAC-related documents provide extensive information regarding, among other things, (i) the Compliance Gap; (ii) Bittrex's related decision to disable the accounts of Iranian citizens like Mr. Ghader; as well as (iii) OFAC Enforcement Division requesting Bittrex to submit an application for the OFAC License.[14] The Debtors are not required to produce any other OFAC-related document (if it exists), given that Bankruptcy Rule 7026(b)(1) limits discovery requests to "any nonprivileged matter that is *relevant* to any party's claim or defense *and proportional to the needs of the case*." *In re Anderson News, LLC*, 615 B.R. 45, 50 (Bankr. D. Del. 2020) (emphasis added). The appropriateness of discovery must be assessed by taking into consideration "the importance of [it] in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R.

---

[13] On attorneys' eyes only/confidential basis, the Debtors produced (i) Bittrex's license application; (ii) the OFAC license; (iii) the settlement with OFAC; (iv) the OFAC subpoenas dated October 10, 2017 and February 2, 2018; (v) a January 10, 2018 letter in response to the OFAC's 2017 subpoena; (vi) a March 14, 2018 letter in response to the OFAC's 2018 subpoenas. Also, the Debtors produced **Exhibit A**, which is OFAC's press release regarding the settlement.

[14] In his Motion, Mr. Ghader alleges that the Debtors would be in possession of documents showing "OFAC [giving] Bittrex [instructions] regarding whether it was necessary to disable and block Mr. Ghader's account." Response ¶ 28. To date, the Debtors have found no written instructions to disable and block the Iranian accounts. However, the fact that OFAC's Enforcement Division requested Bittrex to apply for the OFAC License implies that Bittrex was required to disable the identified Iranian accounts to comply with the OFAC regulatory framework.

31036513.2

Civ. P. 26(b)(1).[15] Here, if they exist, no other OFAC-related documents would meet the standard of production set forth in Bankruptcy Rule 7026(b)(1). The produced documents already show (i) why the Debtors disabled Mr. Ghader's account;[16] and (ii) why the Debtors maintained the suspension of Mr. Ghader's account—i.e., his negligent and fraudulent conduct over the years Moreover, any "additional discovery" regarding "the Debtors' outsourcing of their OFAC responsibilities to a third-party vendor" and "the Debtors' use of Jumio as the agent to sign up Iranian Account" bears no relation to the issues before the Court in connection with the Surviving Claims (which make no mention of OFAC, the Iranian Sanctions, the OFAC Sanctions Consultant, or Jumio). In that respect, "additional discovery" would be no more than a fishing expedition under the hope of finding evidence in support of Mr. Ghader's ever-shifting theories for claiming over $21.8 million from the Debtors (*see supra* ¶¶ 20–30).

48. With respect to fact witnesses, it has been since November 1, 2023 that the Debtors have tried to facilitate the depositions of Messrs. Maria (Plan Administrator and the Debtors' General Counsel) and Hengel (Debtors' Co-Chief Restructuring Officer) by providing Mr. Ghader with several dates when their depositions could take place. Mr. Ghader, however, dismissed all of

---

[15] The Debtors reserve the right to assert any and all applicable privileges or other protections.

[16] For example, the OFAC's press release relating to the 2022 settlement states: Bittrex had no internal controls in place until October 2017 to screen customers or transactions for a nexus to a sanctioned jurisdiction. ***Bittrex did not, for example, screen … physical address information provided by the customer, such as an Iranian passport***…. In February 2016, Bittrex … retained a third-party vendor for sanctions screening purposes, but the screening was incomplete. Until October 2017, the vendor screened transactions only for hits against OFAC's List of Specially Designed Nationals and Blocked Persons (the "SND List") and other lists but did not scrutinize customers or transactions for a nexus to sanctioned jurisdictions. ***Only after OFAC issued Bittrex a subpoena in October 2017*** to investigate potential sanctions violation ***did Bittrex realize that the vendor was not scrutinizing whether customers were in a sanctioned jurisdiction***…. OFAC determined the following to be ***mitigating factors***: … In response to the Apparent Violations, Bittrex swiftly took a series of subsequent remedial measures that significantly curtailed the Apparent Violations. In particular, ***Bittrex: … restricted the accounts of all account holders identified as being located in jurisdictions subject to OFAC sanctions***. Ex. A. (Emphasis added.)

the proposed dates. In that respect, Mr. Ghader's lack of cooperation does not justify a continuance of the December 13 Hearing.

### IV. A Continuance of the Hearing Causes Prejudice to the Debtors

49. The Debtors objected to the Ghader Claims, totaling over $80 million, on September 29, 2023. The hearing on the Claim Objection was originally set for October 30, 2023, and then continued to the December 13 Hearing.

50. Now that Mr. Ghader has been unable to produce evidence to support his Surviving Claims, Mr. Ghader seeks a second continuance to potentially file new claims after the Bar Date and after Confirmation. This is the definition of gamesmanship and harassment in service of meritless claims.

51. The Debtors are filing claim objections from the largest to the smallest. While Mr. Ghader may, when it suits him, act as though his Surviving Claims are routine and easily postponed with no prejudice to these bankruptcy estates, the Motion seeks to continue a pattern of behavior that (i) needlessly and vexatiously multiplies litigation over less than $3,400 left in Mr. Ghader's account; and (ii) unnecessarily depletes resources of the Wind Down Entity.

### CONCLUSION

WHEREFORE, the Plan Administrator respectfully requests that the Court deny the Motion.

| | |
|---|---|
| Date: December 7, 2023<br>Wilmington, DE | **YOUNG CONAWAY STARGATT &<br>TAYLOR, LLP**<br><br>*/s/  Kenneth J. Enos*<br>Robert S. Brady (Delaware Bar No. 2847)<br>Kenneth J. Enos (Delaware Bar No. 4544)<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Telephone: 302-571-6600<br>Facsimile: 302-571-1253<br>Email: rbrady@ycst.com<br>Email: kenos@ycst.com<br><br>-and-<br><br>**QUINN EMANUEL URQUHART &<br>SULLIVAN, LLP**<br>Susheel Kirpalani *(admitted pro hac vice)*<br>Patricia B. Tomasco *(admitted pro hac vice)*<br>Daniel Holzman *(admitted pro hac vice)*<br>Alain Jaquet *(admitted pro hac vice)*<br>Razmig Izakelian *(admitted pro hac vice)*<br>Joanna D. Caytas *(admitted pro hac vice)*<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>Telephone: 212-849-7000<br>Facsimile: 212-849-7100<br>Email: susheelkirpalani@quinnemanuel.com<br>Email: pattytomasco@quinnemanuel.com<br>Email: danielholzman@quinnemanuel.com<br>Email: alainjaquet@quinnemanuel.com<br>Email: razmigizakelian@quinnemanuel.com<br>Email: joannacaytas@quinnemanuel.com<br><br>**COUNSEL FOR THE PLAN<br>ADMINISTRATOR** |