```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2
    IN RE:                      .  Chapter 11
 3                              .  Case No. 23-10597 (BLS)
    DESOLATION HOLDINGS,        .
 4  LLC, et al.                 .  (Jointly Administered)
                                .
 5                              .  Courtroom No. 1
                                .  824 Market Street
 6              Debtors.        .  Wilmington, Delaware 19801
                                .
 7                              .  Wednesday, December 13, 2023
    . . . . . . . . . . . . . .  . 10:00 a.m.
 8
                         TRANSCRIPT OF HEARING
 9         BEFORE THE HONORABLE BRENDAN L. SHANNON
              CHIEF UNITED STATES BANKRUPTCY JUDGE
10
    APPEARANCES:
11
    For the Debtors:          Patricia Tomasco, Esquire
12                            Joanna Caytas, Esquire
                              QUINN EMANUEL URQUHART
13                               & SULLIVAN, LLP
                              Pennzoil Place
14                            711 Louisiana Street
                              Suite 500
15                            Houston, Texas 77002

16


17
    (APPEARANCES CONTINUED)
18
    Audio Operator:           Nikki Washington, ECRO
19
    Transcription Company:    Reliable
20                            The Nemours Building
                              1007 N. Orange Street, Suite 110
21                            Wilmington, Delaware 19801
                              Telephone: (302)654-8080
22                            Email:  gmatthews@reliable-co.com

23


24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.
```

1    APPEARANCES (CONTINUED):

2    Pro Se Litigants:          Adel Abbasi
                                 Amirali Momezadeh
3                                Shahriar Arabpour

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2  MOTIONS:                                              PAGE

3  Agenda
   Item 8:   Debtors' First Omnibus (Non-Substantive)      6
4            Objection to Certain Exact Duplicate
             Claims [(Sealed) D.I. 542, (Redacted)
5            D.I. 543, 11/8/23]

6  Agenda
   Item 9:   Debtors' Fourth Omnibus (Non-Substantive)
7            Objection to Certain Incorrect Debtor
             Claims [(Sealed) D.I. 548, (Redacted)
8            D.I. 549, 11/8/23]

9  Agenda
   Item 10:  Debtors' Fifth Omnibus (Substantive)
10           Objection to Certain Misclassified Claims
             [(Sealed) D.I. 550, (Redacted)
11           D.I. 551, 11/8/23]

12           Court's Ruling:                              69

13

14 DEBTORS' EXHIBITS:                                    PAGE

15   1 - Declaration of Evan Hengel                        7

16   2 - Declaration of Evan Hengel                       10

17   3 - Declaration of Evan Hengel                       16

18

19

20

21

22

23

24

25

1    (Proceedings commenced at 10:06 a.m.)

2         THE CLERK:  All rise.

3         THE COURT:  Please be seated.  Good morning.

4         This is a hearing in the matter of Desolation

5  Holdings, Case Number 23-10597.

6         I note that we have a number of parties that are

7  participating via Zoom.  I would ask that those parties give

8  me either a verbal or a visual thumbs up that they can see

9  and hear me.  I do have counsel for the debtor in the --

10 present in the courtroom.

11        I see Mr. Hengel.  Good morning.  All right.  I

12 see thumbs.  That's good.  I'm ready to proceed.

13        Ms. Tomasco, good morning and welcome.

14        MS. TOMASCO:  Good morning, Your Honor, and thank

15 you for giving us time today.

16        I am Patty Tomasco, with Quinn Emanuel, on behalf

17 of the debtors.  I am joined by my colleagues, Alain Jaquet,

18 who has been here before, and also Mr. Stephen House, from

19 our D.C. office --

20        THE COURT:  Welcome, sir.

21        MS. TOMASCO:  -- who's here with me today.

22        Obviously, David Maria, the Plan Administrator, is

23 here also in the courtroom and, of course, the esteem, Mr.

24 Ken Enos, from Young Conaway.

25        To get started, we're going to follow the agenda,

1   at least for the first part, and then I'm going to ask for a

2   little indulgence to switch the order of presentation to do

3   after we do the omnibus claim objections.

4                We think it makes sense to do the --

5                THE COURT:  The Protective Order.

6                MS. TOMASCO:  -- Protective Order beforehand.

7                THE COURT:  I was thinking precisely the same

8   thing.

9                MS. TOMASCO:  Correct, Your Honor, because it's a

10  little bit of a gating issue to the substance and --

11               THE COURT:  It is.

12               MS. TOMASCO:  -- so for that reason, we want to do

13  the omnibus claim objections to get as much wood chopped

14  today as we possibly can.

15               For that reason, I'm going to turn it over to my

16  colleague, Joanna Caytas, who has permission to appear via

17  Zoom because she has a serious leg injury and can't travel

18  and so she's going to handle the omnibus claim objections

19  because she wrote them and she knows them better than

20  everybody else.

21               THE COURT:  We'll --

22               MS. TOMASCO:  So, with that, I would like to turn

23  it over to Ms. Caytas.

24               THE COURT:  We will leave it to the pros.

25               Ms. Caytas, good morning and welcome.  I hope

1  you're well.

2         MS. CAYTAS:  Good morning, Your Honor.

3         Joanna Caytas, of Quinn Emanuel, on behalf of the

4  Plan Administrator.

5         Your Honor, the first omnibus objection on the

6  amended agenda is Item 8, which is filed at Dockets Number

7  542, which was sealed, and 543, redacted, and which is

8  Debtors' First Omnibus (Non-Substantive) Objection to Certain

9  Exact Duplicate Claims, and there's a householding matter.

10 With the Court's permission, I would be referring to the

11 docket numbers of the adopted versions available on the

12 updated docket, which is Docket Item 543.

13        First, I move into evidence the Declaration of

14 Evan Hengel, in support of Debtors' First Omnibus (Non-

15 Substantive) Objection to Certain Duplicate Claims, which was

16 filed at Exhibit B to the objection at Docket 543-3.

17        Mr. Hengel is available online for cross

18 examination.

19        THE COURT:  Very good.  I would ask if anyone

20 objects to the admission of Mr. Hengel's Declaration as part

21 of the debtors' case-in-chief for purposes of the claim

22 objection pending.

23     (No verbal response)

24        THE COURT:  Very well.  Mr. Hengel's declaration

25 is admitted.

1        (Debtors' Exhibit 1 received into evidence)

2            Ms. Caytas, you may proceed.

3            MS. CAYTAS: Thank you, Your Honor.

4            By this objection, the debtors request disallowing

5    an expansion date exact duplicate claims identified as

6    Schedule 1 of the motion -- of the objection.

7            Schedule 1 was filed at Docket 543-2 and it

8    contains 105 claims.

9            The debtors have reviewed and analyzed the 105

10   exact duplicate claims listed on Schedule 1 to the Proposed

11   Order and have determined that each exact duplicate claim was

12   filed by or on behalf of the same claimant in the same amount

13   and priority on account of the same alleged liability and it

14   is the same debtor more than once.

15           More specifically, on Schedule 1, the claims

16   listed under the column, Duplicate Claim to be Allowed, are

17   exact duplicates of the corresponding claims listed under the

18   column titled Remaining Claim.

19           Your Honor, the debtors are not required to pay

20   twice of the same application.  This allowance of these

21   redundant claims will enable the claims register to reflect

22   more accurately the claims asserted against the debtors and a

23   disallowance -- expungement of the exact duplicate claims

24   will not prejudice the claimant's interest or their

25   substantive rights against the debtors because each remaining

1   claim will remain on the claims register, subject to the

2   debtors' ongoing rights to object to the remaining claims on

3   these or other applicable grounds, including other grounds

4   set forth in the debtors' subsequent omnibus objections.

5          Support for this motion was provided in the

6   Declaration of Evan Hengel, which was admitted into evidence,

7   and it's filed on Docket 543-3 at paragraphs 5 through 7.

8          Your Honor, the debtors received two informal

9   objections to the motion from individual customers, Mr. Yuki

10  Kato and Mr. Richard Bell Rattey.

11         Mr. Yuki Kato's claim is listed in row 103 of the

12  schedule and Mr. Richard Bell Rattey's claims are listed in

13  row 77 of the schedule.  The debtors believe that they have

14  resolved these objections.

15         Additionally, the debtors will submit a revised

16  Proposed Order, excluding from the objection and notice

17  allowing the claim of Mr. Robert [indiscernible], which is

18  Claim C-597-10061 [indiscernible].

19         Mr. [indiscernible] did not submit an objection,

20  but the debtors determined that his claim, C-597-10061, was

21  inadvertently included also in the second omnibus objection

22  filed at Docket 544, which was sealed, and 545, redacted,

23  which the Court sustained at Docket 658 entered on December

24  1st.

25         The second omnibus objection claim of Mr.

1  [indiscernible], Number 10061 is designated as the surviving

2  claim and that, as a result, including Mr. [indiscernible]

3  claim, 10061, also in the first omnibus objection, will

4  result in complete disallowance of Mr. [indiscernible]

5  claims, which was not the debtors' intention.

6          We would, therefore, upload a revised Order,

7  excluding this particular claim from the first omnibus

8  objection.

9          And, unless Your Honor has any questions, we

10  request that the Court sustain the objection and enter a

11  revised Proposed Order to be uploaded after the hearing.

12          THE COURT:  Very good.  I do not have any

13  questions.  I would ask if anyone wishes to be heard with the

14  debtor -- with respect to the debtor's First Omnibus (Non-

15  Substantive) Objection to Certain Duplicate Claims.

16      (No verbal response)

17          THE COURT:  Very well.  Hearing no response, I'm

18  satisfied that the relief requested is appropriate and

19  warranted.  I will sustain or grant the Debtors' First

20  Omnibus Objection and I will look for that Order to be

21  uploaded.

22          Ms. Caytas, you may proceed.

23          MS. CAYTAS:  Thank you, Your Honor.  Your Honor,

24  the next objection on the amended agenda is Item 9, which was

25  filed on Dockets Number 548, sealed, and 549, redacted, and

1  which is Debtors' Fourth Omnibus (Non-Substantive) Objection

2  to Certain Incorrect Debtor Claims.  And, again, I would be

3  referring to the docket numbers, the redacted versions, in

4  this case, Docket Item 548.

5         First, I move into evidence the Declaration of

6  Evan Hengel in support of Debtors' Fourth Omnibus (Non-

7  Substantive) Objection to Certain Incorrect Debtor Claims,

8  which was filed as Exhibit B to the objection at Docket 549-

9  3.

10         Mr. Hengel is available online for cross

11  examination.

12         THE COURT:  Very good.  I would ask if there are

13  any objections to the admission of Mr. Hengel's Declaration

14  in connection with the Debtors' Fourth Omnibus Claim

15  Objection.

16     (No verbal response)

17         THE COURT:  Very well.  Mr. Hengel's Declaration

18  is admitted.

19     (Debtors' Exhibit 2 received into evidence)

20         THE COURT:  You may proceed.

21         MS. CAYTAS:  Thank you, Your Honor.  By this

22  objection, the debtor's request disallowing an expansion

23  being corrected for claims identified on Schedule 1 of the

24  motion, and Schedule 1 was filed at Docket 549-2 and it

25  contains 274 claims.

1          The debtors have reviewed and analyzed the 274

2   incorrect debtor claims listed on Schedule 1 in -- to the

3   Proposed Order and found no evidence indicating that these

4   claimants hold a claim against the asserted debtor,

5   Desolation Holdings, LLC, Bittrex, Inc., Bittrex Malta

6   Holdings, Ltd., or Bittrex Malta, as applicable.

7          As such, the incorrect debtor claims failed to

8   establish legal or factual basis asserting a claim against

9   the named debtor.

10          However, the debtors have determined that each

11   incorrect debtor claim is a customer claim appropriately

12   asserted against debtors, Bittrex, Inc. or Bittrex Malta,

13   Ltd.

14          Desolation Holdings, LLC did not operate a crypto

15   exchange.  It did not enroll customers, accept cryptocurrency

16   [indiscernible] associated with customer accounts where

17   [indiscernible] the debtors, Bittrex, Inc. or Bittrex Malta,

18   Ltd.

19          And furthermore, Desolation Holdings, LLC,

20   similarly like Bittrex Malta Holdings, Ltd., are not jointly

21   and severely liable with Bittrex, Inc. or Bittrex Malta, Ltd.

22   With respect to any liabilities.

23          These cases also have not been substantially

24   consolidated.

25          In assigning the incorrect debtor claim as the

1  claim against the debtor appearing in the correct debtor

2  column of Schedule 1 to the Proposed Order, filed at Docket

3  549-2, does not affect the claimant's substantive rights, as

4  the claimant will retain its incorrect debtor claim in the

5  as-filed amount but against a different debtor against whom

6  the claim should have been properly asserted.

7        Raising the incorrect debtor claim against the

8  correct debtor, Bittrex, Inc. or Bittrex Malta, Lt., will

9  enable the debtors to maintain a more accurate claims

10 register.

11       The claimants hold that incorrect debtor claims

12 would not be prejudiced by this relief, as the incorrect

13 debtor claim will remain on the claim register, as against

14 the correct debtor, subject to the debtors' ongoing rights to

15 object to the incorrect debtor claims on another applicable

16 grounds, including grounds set forth in debtors' subsequent

17 omnibus objections and support for this motion is provided in

18 the already admitted Declaration of Evan Hengel, filed at

19 Docket 543-549-547.

20       Your Honor, the debtors received two informal

21 responses of Yuki Kato and of Flavius Timothy Dinu and one

22 formal response filed at Docket Number 57 -- 617, which is

23 the response of Mr. Steven Crouch.

24       Mr. Kato's claims are listed in rows 240 and 241

25 of Schedule 1 and the debtors believe that they resolved the

1  response of Mr. Kato.

2          Mr. Crouch's claim is listed in row 215 of

3  Schedule 1.  That's claim C-597-209.  And Mr. Dinu's claim is

4  listed in row 61 of Schedule 1.  That's claim C-597-10232.

5          In spite of efforts, which include phone calls,

6  voice messages, and email, the debtors were unable to

7  establish contact with Mr. Crouch or Mr. Dinu.

8          Additionally, the debtors received a response of

9  -- from -- I can explain more about the substance of the

10  responses of Mr. Crouch and Mr. Dinu, or I can -- if the

11  Court wishes to hear about it.  Otherwise, I will proceed to

12  address another --

13          THE COURT:  No.  I've had an opportunity to review

14  Mr. Crouch's response and, obviously, the Court would afford

15  Mr. Crouch an opportunity to be heard if he's attending

16  today.

17          Is Mr. Crouch or anyone on his behalf present in

18  the courtroom or participating virtually via Zoom?

19      (No verbal response)

20          THE COURT:  Very well.  Ms. Caytas, you may

21  proceed.

22          MS. CAYTAS:  Thank you, Your Honor.

23          Additionally, the debtors received a response from

24  Mr. Michael Koff (phonetic), filed at Docket 660.

25          The debtors believe that this is a response to the

1    individual objection of Mr. Cox -- of Mr. Koff -- Mr. Koff

2    claims.  It was filed at Docket 613 and was also docketed as

3    a response to objection at Docket 613.  However, to clarify,

4    Mr. Koff's claim was also inadvertently included on the

5    Fourth Omnibus Objection to Incorrect Debtor Claims at row

6    153 at claim C-597-54.

7            The response of Mr. Koff does not address the

8    substance of the Fourth Omnibus Objection.  The response

9    alleges that Mr. Koff was simply hacked and the debtors

10   believe that it is proper to sustain the objection and

11   consider the merits of the claim of Mr. Koff at the hearing

12   -- the individual objections scheduled for December 20th.

13           THE COURT:  Okay.

14           MS. CAYTAS:  And, unless Your Honor has any

15   questions, we request that the Court sustain the Fourth

16   Omnibus Claim Objection and enter the Proposed Order filed at

17   Docket 549-2.

18           THE COURT:  I do not have any questions.  I would

19   ask if anyone wishes to be heard with respect to the Debtors'

20   Fourth Omnibus Objection to Incorrect Debtor Claims appearing

21   at Docket Number 548.

22      (No verbal response).

23           THE COURT:  Hearing no response, I'm satisfied the

24   debtors have carried their burden as to the relief requested.

25   I will sustain or grant the objection and I will look for

1  that Order to be uploaded.

2          You may proceed, Ms. Caytas.

3          MS. CAYTAS:  Thank you, Your Honor.

4          The next objection ono the amended agenda is Item

5  11, which was filed at Dockets Number 550, sealed, and 551,

6  the redacted version, which is the Debtors' Fifth Omnibus

7  Substantive Objection to Certain Misclassified Claims, and

8  again, I will be referring to the redacted versions on the

9  public docket, which is Docket Item 551.

10         First, I move into evidence the Declaration of Mr.

11 Evan Hengel, in support of Debtors' Five -- Fifth Omnibus

12 Substantive Objection to Certain Misclassified Claims, which

13 was filed as Exhibit B to the motion at Docket 551-3.

14         Mr. Hengel is available online for cross

15 examination.

16         THE COURT:  All right.  I would ask if there is

17 any objection to the admission of Mr. Hengel's Declaration in

18 connection with the Debtors' Fifth Omnibus Substantiative

19 Objection.

20     (No verbal response)

21         THE COURT:  Very well.  Mr. Hengel's Declaration

22 is admitted.

23     (Debtors' Exhibit 3 received into evidence)

24

25         THE COURT:  Ms. Caytas, you may proceed.

1          MS. CAYTAS:  Thank you, Your Honor.

2          By this motion -- by this objection, the debtors

3   request that the misclassified claims be reclassified to the

4   extent set forth on Schedule 1 of the objection.

5          Schedule 1 was filed at Docket 551-208 and

6   contains 97 claims.

7          Based upon the review and analysis of the

8   misclassified claims listed on Schedule 1 to the Proposed

9   Order, the debtors have determined that each such

10  misclassified claim was filed incorrectly as administrative

11  priority or secured claim where such claim cannot be properly

12  classified [indiscernible].

13         All of the misclassified claims were submitted by

14  customers where balances of cryptocurrency and

15  [indiscernible] associated with the Bittrex accounts of

16  status of general unsecured claims based on the nature of the

17  relationship between the debtors and their customers.

18         As such, asserting secured or priority claims has

19  no legal basis with respect to balances associated with

20  customer accounts.

21         Failure to reclassify the misclassified claims

22  will result in creditors receiving incorrect recoveries on

23  account of those misclassified claims to the detriment of

24  other similarly situated creditors.

25         Support for this motion was provided in the

1 Declaration of Evan Hengel, which was admitted into evidence,

2 as filed at Docket 551-3 at paragraphs 5 and 6.

3          Your Honor, the debtors received two letter

4 responses of Anita Broadway-Skillern, at Docket 621, and of

5 Dianeth Saavedra, Docket 637, as well as one informal

6 response of Mr. Troy Matthews.

7          Mr. Matthews' claim is listed in row 92 of

8 Schedule 1.  That's claim C-598-1239.  The debtors believe

9 that they have resolved Mr. Matthews' response.

10          Mr. [sic] Skillern's claim is listed in row 10 of

11 Schedule 1.  That's claim C-597-10144.  The debtors discussed

12 the letters first with Mr. Skillern at length but were unable

13 to reach an agreement to withdraw the response.

14          Mr. -- Ms. Saavedra's claim is listed in row 26 of

15 Schedule 1.  That's claim C-598-941.  She filed a priority

16 claim in the amount of $3,350 and unsecured amount of $3,569,

17 for a total amount of nearly $7,000.

18          In spirt of efforts, the debtors were unable to

19 establish an [indiscernible] with Ms. Saavedra.

20          I can go over the details of the responses or --

21          THE COURT:  No, I think we can proceed.

22          MS. CAYTAS:  Okay.

23          THE COURT:  I will afford the respondents or the

24 claimants an opportunity to be heard, if they wish, at the

25 appropriate time.

1          MS. CAYTAS:  So, unless Your Honor has any

2  questions, we request that the Court overrule any objections

3  and sustain the Fifth Omnibus Claim Objection and enter the

4  Proposed Order filed at Docket 551-2.

5          THE COURT:  Very good.  Thank you.  I have no

6  questions.  I would ask -- again, we've identified a number

7  of parties that have responded.  I would ask if anyone is

8  present in the courtroom or participating virtually via Zoom

9  for Ms. Broadway-Sillern, Ms. Saavedra, or Mr. Matthews?

10     (No verbal response)

11          THE COURT:  Hearing no response, I am satisfied

12  that the debtors have carried their burden as to the relief

13  requested and I would be prepared to enter an Order granting

14  and sustaining the Debtors' Fifth Omnibus Objection to

15  Claims.  I'll look for that Order to be uploaded.

16          MS. CAYTAS:  Thank you, Your Honor.  And I will

17  turn now the virtual podium to Ms. Tomasco.

18          THE COURT:  Very good.  Ms. Tomasco?

19          Thank you, Ms. Caytas.

20          MS. TOMASCO:  Thank you, Your Honor.

21          As predicted, we're going to ask to take up now

22  the Item Number 14 on the agenda, which is the Omnibus Motion

23  for Protective Order, found at Docket Item 631, that we filed

24  on November 27th of 2023.

25          THE COURT:  Okay.

1          MS. TOMASCO:  With respect to the Motion for

2   Protective Order, we propose taking this out of order

3   because, in certain unfiled motions to continue from the

4   three Iranian claimants, that's Mr. Momenzadeh, Arabpour, and

5   Abbassi.

6          They've argued that the reason why they -- in

7   their responses to the claim objection, their primary

8   objection to the claim objection is that they did not get

9   discovery from the debtors.

10          As detailed in the motion, that discovery was

11   served in -- you know, one week before the November 27th --

12          THE COURT:  Um-hum.

13          MS. TOMASCO:  -- deadline to respond to the claim

14   objection.

15          The discovery consists of various items that are

16   requiring voluminous production with respect to the claims of

17   every single individual that was subject to the interaction

18   between Bittrex and OFAC.  That would include all of the

19   other customers from Iran, customers from various other

20   sanctioned countries, such as Cuba, Crimea, and other

21   countries.  They are asking for all of that to be produced.

22          They are also asking to be produced the

23   correspondence and the interactions between OFAC and Bittrex.

24          But it has nothing to do with these claim

25   objections, so our primary objection to the discovery that

1  was posited by these claimants is that it was posited for an

2  improper purpose and it has nothing to do with what the Court

3  has to determine here.

4          I've invited Mr. Stephen House, from our D.C.

5  office, who regularly deals with OFAC regulations.  He's

6  going to describe how the claimants' various allegations

7  about Bittrex reaction to the OFAC subpoena that was issued

8  in November of 2017 -- I'm sorry, October of 2017 has nothing

9  to do with how the customers and Bittrex interact with each

10 other.  It has solely to do with a regulatory environment

11 here in the U.S.

12          In 2017, Bittrex engaged in the back and forth

13 with OFAC and determined to self-report, sought what's called

14 an OFAC license, published that OFAC license and sent emails

15 to all of the affected customers and, finally, that OFAC

16 license was granted in 2019 and it was for a period of six

17 months and it expired at the end of March of 2020.

18 Iranian customers were told that they could withdraw their

19 crypto.  Several of them -- I mean hundreds of them did and

20 some of them did not. So we had 440 Iranians withdrew $1.5

21 million worth of crypto.  Some Iranians did not.  And you'll

22 hear that Mr. Abbasi was one of the Iranians that did

23 withdraw all of the crypto in his account.

24          With respect to the Iranians who did not take

25 advantage of the OFAC license, that crypto is still there.

1 As the Court knows, none of the crypto has moved from this

2 debtor, it hasn't completely matched book.  And you know,

3 under the terms of the plan, the customers, if they comply

4 with regulatory requirements and KYC, so that we do not

5 violate U.S. law, they'll be allowed to get their crypto

6 back.  And that's the same for these three Iranian claimants.

7 And Mr. Hauss can explain how the OFAC regulations

8 don't give them a private right of action.  And in this

9 regulatory environment, Bittrex did what it was supposed to

10 do, given the circumstances that existed in 2017.

11 We have made three substantive claim objections to

12 the three Iranian claimants' claims.  If you reviewed the

13 claims, you know that they allege $300,000 worth of damages,

14 $200,000 worth of damages, $100,000 worth of damages, or 10

15 Bitcoins, 5 Bitcoins.  These are very round numbers that have

16 nothing to do with the exact cryptocurrency holdings in those

17 accounts.

18 So what does the claim objection say?  It says, for

19 Mr. Abbasi, you withdrew all of your cryptocurrency that

20 could be withdrawn in response to the OFAC license, you

21 withdrew it at the beginning of 2020.  You have a zero

22 balance in your account.  That's what it says.

23 Our report, he has 4 surviving claims.  He's

24 claiming $300,000 as a secured claim against BUS and Bittrex

25 Malta.  Debtors' record show a balance of 4 different coins,

1   BTC DOGE, SCBCH, worth 8,400 -- I'm using May 8th numbers,

2   just for --

3            THE COURT:  I understand.

4            MS. TOMASCO:  Okay.  And Mr. Momenzadeh, he has

5   five surviving claims that he has not withdrawn against

6   Bittrex U.S., Malta, and Malta Holdings, which, as you heard

7   Ms. Caytas say, Malta Holdings never did any contracts with

8   Iranian customers.

9            Our objections says you agreed to the terms of

10  service that says we can suspend a coin and we can suspend

11  services and you waive all consequential other damages, and

12  that is in the terms of service 2015 that all three claimants

13  admitted that they entered into.

14           So we're going to dispense with a lot of the noise

15  and try to keep this as streamlined as possible.  They agreed

16  to the 2015 terms of service.  The 2015 terms of service that

17  you will find at Exhibit 70, Part 19 contains the conspicuous

18  limitation of liability.

19           And Part 4.7 of Exhibit 70 permits Bittrex to limit

20  the availability of any currency and disclaims any losses for

21  removing currency from the site, such as defunct crypto.

22           You will also see, in the plan, that it also

23  disclaims liability for defunct crypto.  And none of the

24  claimants objected to the plan.

25           So what we are proposing to do is, if they make a

1  claim for defunct crypto, that is a piece of crypto that,

2  because of the nature of cryptocurrency, it has become

3  uneconomic or cannot be supported.  So some of them, it may

4  mean that the originator of the crypto no longer maintains

5  the blockchain, you couldn't move it from one blockchain to -

6  - from one customer to another, even if you tried.

7          Another type of defunct crypto is where the cost of

8  extracting or trading that particular currency is -- exceeds

9  the value of the currency.  So this is sort of like, you

10  know, if you were trading in Italian Lire in 1930, and all of

11  a sudden that currency went away, you may have a nice

12  souvenir, but it's not worth anything  So that's the --

13  that's what "defunct crypto" is.  But even if we allowed the

14  claims for defunct crypto in these cases, the testimony will

15  show that they're worth two dollars, four dollars, very, very

16  small amounts.

17          So what do we have here?  We have claims from

18  customers, $8,400 from Arabpour --

19          THE COURT:  For the --

20          MS. TOMASCO:  -- and Momenzadeh has somewhere

21  around $3,000 worth and Mr. Abbasi has --

22          THE COURT:  Zero.

23          MS. TOMASCO:  -- zero.  And so why are we having to

24  go back and look at our records and pull every single

25  customer that we self-reported to the -- to OFAC, why are we

1  having to go back and discuss all of the correspondence back

2  and forth with OFAC?  How does that help the Court resolve

3  these claims?

4         So we know that the rules changed.  And 26(b)(1)

5  states, as it was amended in, I believe, 2015:

6         "Parties may obtain discovery proportional to the

7  needs of the case, considering the importance of the issues

8  at stake in the action, the amount in controversy, and the

9  parties' relative access to relevant information, the

10  importance of discovery and resolving issues, and whether the

11  burden and expense of the proposed discovery outweighs the

12  likely benefit."

13         This standard can't be met with the discovery that

14  they've served.

15         Now keep in mind we, in response to discovery, gave

16  them every single record we had with respect to their

17  account:  Their Zendesk history, their account trading

18  history, and any correspondence that we could find in the

19  system between any of the Bittrex entities and them.  So they

20  got that.

21         We responded within a few days of receiving the

22  discovery, but we said to them, hey, we need to talk to you

23  about this other stuff because we don't think it's relevant

24  and we don't think it's proportional, and they refused to get

25  on the phone with us.  And so we were not able to resolve

1  this consensually.  But that being said, we did cooperate, to

2  the extent that it was appropriate for these claim

3  objections.

4         So what do we have here?  We know they agreed to

5  the 2015 terms of service, they've admitted that in their

6  answers to the claim objections.

7         They've admitted in their answers to the claim

8  objections that they don't want a double recovery.  Each of

9  them has between three and six surviving claims that they

10 have not withdrawn, including against Bittrex Malta Holdings.

11        But that's what we've asked, get one recovery of

12 the amount in your account, that's what you get.  That's what

13 we're asking the claims to be allowed at.

14        Obviously, we're going to have to deal with the

15 regulatory issues.  If they can prove that they live in

16 Turkey, as they've represented in their sworn proofs of

17 claim, and that they would, therefore, not be subject to the

18 Iranian sanctions that OFAC enforces, then that would be

19 fine.

20        We could allow -- that's what Mr. Goddard did.

21 Goddard successfully proved, in the Summer of 2023, that he

22 actually resided in Turkey, even though, when he opened his

23 account, he was an Iranian citizen and resided in Turkey.

24        So, if they can prove that they have moved to

25 Turkey and that the term -- the regulatory term is

1  "ordinarily resident" in Turkey or elsewhere that is not a

2  sanctioned country, then they can withdraw their crypto.

3       But the discovery that they're seeking puts

4  proportionality on its head.  We should be able to say to a

5  claimant this is what our records show we owe you.  And if

6  they disagree with it, they can say, well, this is what my

7  records show, I say I put in more Bitcoin than you're showing

8  and here's a record.  That's the kind of exchange we should

9  be having.

10       It should not be a fishing expedition in search of

11  an additional cause of action that they never put in their

12  claim in the first place, and that's what they're trying to

13  do.  We don't need to examine voluminous evidence in order to

14  resolve them.

15       So Mr. Hauss is here, so I'm going to turn over the

16  podium --

17            THE COURT:  Okay.

18            MS. TOMASCO:  -- to him, so he can explain the OFAC

19  issues in this case and how Bittrex responsibly handled these

20  issues and how they're not relevant to the individual claims

21  of these Iranian Citizens.

22            THE COURT:  Very good.

23            Mr. Hauss.  Good morning and welcome.

24            MR. HAUSS:  Good morning, Your Honor.  Thank you.

25  Stephen Hauss of Quinn Emanuel for the plan administrator.

1          I wanted to start with a clarification.  One of the

2    arguments that the claimants have made as to why they need

3    the discovery is to show that Bittrex illegally blocked their

4    accounts.  And I think that term "blocked" has been used

5    somewhat loosely.

6          So Bittrex disabled Iranian accounts and other

7    accounts at sanctioned jurisdictions and it prevented IP

8    addresses in those jurisdictions from accessing the platform.

9    So, in the colloquial sense, it is correct that individuals

10   were "blocked" from the platform, but --

11         THE COURT:  Is "blocked" a term of art?

12         MR. HAUSS:  It is a term of art in the sanctions

13   context.

14         THE COURT:  Okay.

15         MR. HAUSS:  So, when OFAC places specific

16   individuals or entities on what's known as the "specially

17   designated national" or "SDN" list, those individuals and

18   entities are subject to blocking sanctions.  And what that

19   means is, if property comes within the possession of a U.S.

20   person or U.S. entity, that U.S. person or entity is

21   obligated to, quote, "block" the property.  There are

22   specific procedures that need to be followed, a specific

23   account that needs to be set up, and a report that needs to

24   be filed with OFAC within a certain amount of time.

25         THE COURT:  Let me ask you a question.

1          MR. HAUSS:  Sure.

2          THE COURT:  I appreciate the imprimatur on the

3 term.

4          MR. HAUSS:  Yep.

5          THE COURT:  And I think you've acknowledged that,

6 at least from a layman's point of view, the concept is

7 blocked.  I can't get access because I am in a jurisdiction.

8 It -- the sanctions are not directed at me personally.  And

9 there's another suite of sanctions or flavor of sanctions

10 that are identifying particular individuals.  That's not what

11 we're talking about.

12          MR. HAUSS:  Correct.

13          THE COURT:  Is there a meaningful distinction for

14 purposes of the relief that the debtor is seeking today?

15          MR. HAUSS:  Yeah.  So the distinction is that, when

16 property is blocked, it is subject to -- it can only be

17 released by OFAC authorization of that release.

18          THE COURT:  Affirmative --

19          MR. HAUSS:  It's -- the --

20          THE COURT:  -- relief and particularized --

21          MR. HAUSS:  That --

22          THE COURT:  -- relief.

23          MR. HAUSS:  And that blocking is essentially the

24 property has been seized by the U.S. Government.  It's not

25 being held by the U.S. person anymore; it's effectively being

 1  held by the U.S. Government.

 2          THE COURT:  Okay.

 3          MR. HAUSS:  That's not what happened here.  So

 4  there was no blocking.  None of these individuals are SDNs,

 5  the property was not block, no reports were filed with OFAC.

 6  That's not what we're talking about.  We're talking about a

 7  different regulation.

 8          So what we're talking about is 31 C.F.R. 560.204

 9  and 31 C.F.R. 560.206.  And what those regulations say is

10  that U.S. persons are prohibited from exporting services to

11  Iran.  And the definition of "Iran" includes individuals who

12  are ordinarily resident in Iran.

13          Now, as a U.S. person, Bittrex is subject to that

14  very broad restriction of not providing any services to

15  individuals in Iran.  But that is especially true after

16  Bittrex received the subpoena from OFAC.  The reason for that

17  is that OFAC has civil administrative authority, and so a

18  strict liability basis.

19          THE COURT:  Uh-huh.

20          MR. HAUSS:  If you violate the sanctions even

21  inadvertently, OFAC can impose penalties and sanctions on

22  you.

23          But if you violate the sanctions wilfully -- and

24  the definition of "wilfully" for these purposes is knowing it

25  could be unlawful --

1           THE COURT:  Uh-huh.

2           MR. HAUSS:  -- then you're subject to potential

3   criminal penalty --

4           THE COURT:  Criminal liability.

5           MR. HAUSS:  -- by the Department of Justice.

6           So, once Bittrex received the subpoena and

7   discovered the compliance gap, if it had continued to violate

8   the sanctions; for example, by operating the accounts or

9   transferring the funds, it faced potential criminal

10  liability.

11          THE COURT:  I --

12          MR. HAUSS:  So --

13          THE COURT:  I understand.

14          MR. HAUSS:  So what the claimants point to is

15  Frequently Asked Question 37.  So this is guidance that is

16  put out by OFAC itself on its website.  And what that

17  frequently asked question asks is, if a bank account is being

18  operated for an individual living in Iran, is it blocked.

19  And the answer to that, provided by OFAC, consistent with

20  what I just explained, is no, it's not blocked, it's

21  restricted.  And it says:

22          "The Iranian sanctions prohibit the export of goods

23  or services to Iran.  By operating an account for an

24  individual or company in Iran, the bank would be exporting

25  services to that person or entity in violation of the Iranian

1  transactions regulations."

2        So that's -- as I just explained, that violation of

3  those prohibitions in the regulations.

4        What I think the claimants are focusing on is the

5  next part that says:

6        "The accounts, however, are not blocked.  The

7  account holder can close the account and have the funds

8  transferred to his or her account outside the United States."

9        So they are trying to show that Bittrex could have

10  simply, without a license, transferred their currency outside

11  of Bittrex, outside of the United States.

12        Now the reason that that reliance on that

13  frequently asked question is incorrect is because that's

14  focusing on a bank and the transfer of fiat currency.  So,

15  when a bank transfers an Iranian resident's funds outside of

16  the bank, it has three obligations:

17        Number one, it has to go to a bank outside the

18  United States.

19        Number two, it cannot go to a bank in a sanctioned

20  jurisdiction; they couldn't send it to a Cuban or North

21  Korean bank.

22        And number three, the bank to which it's

23  transferred can't be on the SDN list.

24        But we are not talking about a bank --

25        THE COURT:  Fiat --

1          MR. HAUSS:  -- with a --

2          THE COURT:  -- currency.

3          MR. HAUSS:  -- fiat currency.  Digital currency is

4  different.  And because of the fact that the addresses are on

5  a server, on a computer, and it's not obvious from the

6  address of where the digital currency would be sent, that it

7  is, in fact, outside the United States and not in a

8  sanctioned jurisdiction and not of a sanctioned platform,

9  Bittrex would be required to engage in --

10          THE COURT:  The thought process there, if I

11  understand, would be that financial institutions and banks

12  have been around for a long time.  Their structure and their

13  legal responsibilities to the host, to wherever they are

14  based and to whoever their host is, is well defined by both

15  statute and regulation.

16          Cryptocurrency, to your point, is different, even

17  if, you know, we know that banks aren't necessarily moving

18  bags of money from one place to another or from New York to

19  Montreal or something like that.  When money lands in an

20  account, it is, for -- as a matter of law, located somewhere.

21          MR. HAUSS:  That's right.

22          THE COURT:  Is that --

23          MR. HAUSS:  And it's --

24          THE COURT:  Is that a fair assessment?

25          MR. HAUSS:  I think that's right.

1          And so, for example, if Citibank in New York is

2    holding the sanctioned funds and the Iranian resident or

3    Cuban resident or any other sanctioned person says please

4    transfer it to my account at Credit Suisse in Zurich,

5    Citibank can verify that Credit Suisse is not on the

6    sanctions list, that it's not in a sanctioned jurisdiction,

7    and that it's not in the United States.  It's very clear from

8    the instructions of where it's going.

9          THE COURT:  And that the individual making the

10   request is not, in fact, blocked.

11         MR. HAUSS:  Correct.

12         THE COURT:  Okay.

13         MR. HAUSS:  By contrast, providing a new wallet

14   address, because of the nature of a wallet address, it would

15   not be obvious that it's not in North Korea or Cuba or

16   Crimea.

17         THE COURT:  Okay.

18         MR. HAUSS:  It's not obvious it's on the U.S., it's

19   not sanctioned, it's not blocked.

20         So, because of that, Bittrex's assessment was that

21   it would have to provide additional services or activities

22   beyond what this frequently asked question envisions of

23   simply transferring the funds outside the United States,

24   which is why, in consultation with OFAC itself -- and so, as

25   reflected in the license application, the OFAC Enforcement

1  Division told Bittrex to go apply for a license allowing it

2  to withdraw and transfer the digital currencies because of

3  the unique nature of digital currency.

4         And that's what Bittrex did.  In April of 2018, it

5  applied for a license.  And the license was ultimately

6  granted, which is important because OFAC could have responded

7  to the application by saying --

8         THE COURT:  No.

9         MR. HAUSS:  -- oh, no, you don't need a license,

10  just go ahead and transfer it outside the U.S.  But they

11  didn't.  They said you may transfer it in the following way -

12  -

13         THE COURT:  For five --

14         MR. HAUSS:  -- for the --

15         THE COURT:  -- months.

16         MR. HAUSS:  -- following, specified period of time.

17  It was very specific what you are allowed to do and, by

18  implication, what you were not allowed to do.  So that, the

19  fact that they granted that specific license confirms that

20  Bittrex was correct in its assessment that a license was

21  needed.

22         Now they couldn't -- Bittrex could not make any

23  transfers while that license was pending.  And the OFAC

24  process is extremely long and arduous.  In this case, it took

25  18 months to get the license.  Nor can they make any

1  transfers after that five-month period expired.  That's by

2  the terms of the license itself.  So, as of today, it would

3  be unlawful for Bittrex to engage in the services that would

4  be necessary to withdraw and transfer additional currency.

5          Now the claimants or any other individual who's,

6  you know, in a sanctioned jurisdiction, whose currency is

7  still on the platform, is free to go themselves to OFAC and

8  apply for an additional license allowing Bittrex to engage in

9  the services that it was previously licensed to engage in,

10 but no one has done that.  So, as of today, with no license

11 in place and the period having expired, Bittrex cannot

12 withdraw and transfer the funds.

13         Now the final thing I will say is the claimants

14 seem to be seeking discovery to show that the manner in which

15 Bittrex went about applying for the license, getting the

16 license, and dealing with the situation was incorrect and

17 violated the OFAC rules.

18         Number one, we would submit that that's not

19 correct, given, again, the fact that they consulted with

20 OFAC, they applied for and were granted a license, and

21 ultimately reached a settlement with OFAC that acknowledged

22 that what they did was mitigation and remediated the

23 situation, so we believe that Bittrex handled it the right

24 way.

25         But even assuming that their position was correct,

1   that somehow the manner in which they applied for the license

2   or how they went about this procedure was not correct, that

3   wouldn't be relevant to their claims because the sanctions do

4   not create any private right of actions.  What the sanctions

5   say is, U.S. person, you cannot do the following.

6          They do not provide any rights or entitlements to

7   the sanctioned persons.  And indeed, that would go against

8   the entire purpose of the sanctions.  If a sanctioned people

9   could act as police and essentially be deputized to enforce

10  the OFAC rules and could bring lawsuits arguing that the

11  manner in which U.S. persons attempted to comply with the

12  sanctions was improper, that would really defeat the purposes

13  of the sanctions to cut these people off from the U.S.

14  system.

15         So, even -- we submit that they are wrong, that

16  Bittrex handled this the right way.  But even if they -- you

17  know, accepting for purposes of argument that they were

18  correct, there would be no basis for their claims because

19  there's no private right of action under the OFAC

20  regulations.

21              THE COURT:  Okay.  I understand.

22              MR. HAUSS:  Great.  Thank you, Your Honor.

23              THE COURT:  Thank you, Mr. Hauss.

24              All right.  I do believe that the affected

25  claimants that are identified in the motion for a protective

1  order are participating today via Zoom.  I believe that that

2  is Mr. Arabpour, Mr. Abbasi, and Mr. Momenzadeh.  And I would

3  be prepared to hear from you in response to the issues that -

4  - the specific threshold issue raised by the debtor, which is

5  a request for a protective order from certain discovery

6  requests that have been interposed in connection with the

7  claim objection.

8           Are the claimants present or participating via

9  Zoom?

10          MR. MOMENZADEH:  Yes, I am here.

11          UNIDENTIFIED:  (Indiscernible)

12          THE COURT:  All right.  Mr. Momenzadeh, this is

13  Judge Shannon.  I assume you can hear me.  I can see you.

14     (No verbal response)

15          THE COURT:  Oh, sir, I'm sorry.  Your microphone is

16  muted.  Can you unmute?

17          UNIDENTIFIED:  (Indiscernible)

18          MR. ABBASI:  Greeting.  Greeting.  My name is Abel

19  Abbasi and I am -- greeting.  My name is Adel Abbasi, and I

20  am here and I am the creditor of (indiscernible) Bittrex,

21  Inc. and Bittrex Malta.

22          THE COURT:  Okay.

23          MR. ABBASI:  I would like to preface my speech to

24  expressing -- expressing my apologize for potential language

25  barriers.

1          THE COURT:  That's --

2          MR. ABBASI:  As my primary --

3          THE COURT:  That's fine, sir.  I can hear you just

4    fine and I can certainly understand you.  You may proceed.

5    This is Judge Shannon.

6          MR. ABBASI:  As my -- as my primary language is not

7    English, having been born and raised in Iran, I regret any

8    misunderstanding or any issue that may have arisen due to

9    debtor and their legal counsel's obtained for a hearing

10   without before discussion and appointing a mediator.  I was,

11   in fact, open to resolving the matter through mediation,

12   which could have beneficial -- beneficial for both parties to

13   saving time and preserving the bankruptcy estate.

14          I appreciate your understanding and thank you for

15   your time.

16          In light of my language limitation and potential

17   accent and misunderstanding, I request your permission to

18   play prepared voice recorded of me.

19          THE COURT:  That --

20          MR. ABBASI:  This app --

21          THE COURT:  Yes.  If you would -- if you have a

22   recording, I would ask you, before you would play it, can you

23   tell me how long the recording is, just so that the Court

24   understands what we're starting.

25          MR. ABBASI:  Yes.  It is about ten minutes.

1          THE COURT:  Okay.

2          MR. ABBASI:  Thank you.

3          THE COURT:  Here's what we're going to do.  I'm

4   going to ask that we -- everybody just stay on the line for

5   just a moment.  We're going to have to take a short break.

6          I think counsel in the courtroom were informed I

7   have another hearing that should be about five minutes.  I

8   don't want to risk having people, particularly those that are

9   not in the country, get off of the Zoom and try to get back

10  in, so I want to leave the Zoom open.  It may be that I can

11  do that from my desk -- from either my desk -- it's a status

12  conference -- or I would do it from the courtroom.

13         I'm going to consult for a moment.  We're going to

14  take a very short break and I'm going to consult with the

15  court reporter, just to make sure.  But I'm going to ask

16  nobody turn off your cameras or -- I'm sorry -- nobody leave

17  the Zoom line just because we've had issues, you know,

18  obviously, over the years, in the past, and I don't want to

19  take any risk that we lose some of the people that are

20  participating remotely, acknowledging that they are in other

21  countries.

22         So, Mr. Abbasi, you have made a request to present

23  a recording.  I assume, sir, this is a recording that you

24  have made and it's a recording of you.  Is that correct?

25         MR. ABBASI:  Yes.

1            THE COURT:  Okay.  I think that's fine with me, I

2    will permit that.  But I want to take just a moment.

3            So I'm going to ask everyone to sit tight.  I'm

4    going to confer with the court reporter, and I will back to

5    you in just a moment with what our -- with what our plan is.

6    We are briefly adjourned.  Thank you.

7        (Off the record at 10:54 a.m.)

8        (Proceedings resume at 10:56 a.m.)

9            THE COURT:  Good morning, again.  This is Judge

10   Shannon.

11           I have conferred with the court reporter.  In order

12   to avoid any risk of disruption to the parties that in

13   today's hearing, I am going to take my 11 a.m. status

14   conference in chambers, and I expect it to be very brief.

15   I'm going to ask that parties simply remain on the Zoom line

16   and we will be able to reconvene, again, presumably and

17   hopefully with disruption.

18           I think, when we reconvene, Mr. Abbasi has asked

19   for the opportunity to present a recording that he has made.

20   The Court has permitted or will permit that to occur.  But

21   I'm just going to ask everyone to be patient while I deal

22   with another particular matter.

23           With that, we are adjourned for a few minutes.  We

24   will reconvene at the conclusion of my status conference.

25   Stand in recess.

1        (Recess taken at 10:57 a.m.)

2        (Proceedings resume at 11:10 a.m.)

3            THE COURT:  Okay.  Good morning again.  This is

4    Judge Shannon.  I understand from the court reporter that all

5    parties remain on the line.  I have debtors' counsel in the

6    courtroom, as well as the debtors' representative.

7            I apologize again for the interruption.  I have

8    dealt with my other matter.  And again, the Court asks that

9    the parties simply wait on the line, in order to reconvene.

10           I would ask:  Mr. Abbasi, are you still on the

11   line, sir?  Mr. Abbasi?

12           MR. ABBASI:  Your Honor --

13           THE COURT:  Mr. Abbasi --

14           MR. ABBASI:  Yes.

15           THE COURT:  -- this is Judge Shannon.  You're on --

16           MR. ABBASI:  Yes.

17           THE COURT:  -- correct?

18           MR. ABBASI:  Yes.  And Your Honor (indiscernible) I

19   have some comment and I'm using translator to present here

20   before I play that machined voice.  May I?

21           THE COURT:  I'm sorry.  Hang on.  When we -- before

22   we broke, you advised that you had a recording that you were

23   asking to play that would take about ten minutes, that would

24   set out your argument and your position.  Is that correct?

25           MR. ABBASI:  Yes.  Yes, it's correct.  But I want

1  to mention a small -- a small note about OFAC.  I want to

2  note small note about OFAC before play that voice.  Is it

3  possible?

4          THE COURT:  Okay.  You may proceed.

5          MR. ABBASI:  Yes.

6      (Recording played at 11:11:29 as follows:)

7          "The USA regularities have extended that their

8  finish in a bank to crypto exchanges, as bank secrecy act to

9  applies to then FinCEN and SEC and other regulatory have

10 jurisdiction over Bittrex and it proves that their finishing

11 of bank is extended to the crypto exchanges, considering the

12 fact that this FAQ is explained by OFAC in 2002.  At that

13 particular time, there was no crypto exchange, does it

14 include all financial related vehicles of future.  Otherwise,

15 OFAC would delete that FAQ.  It means this explained issue is

16 inclusive that debtors' counsel used debtors' products.  He

17 should use discovery to prove that OFAC required a license."

18     (Recording concluded at 11:12 a.m.)

19         MR. ABBASI:  Okay.  Now I want to play that

20 mentioned voice.  May I?

21         THE COURT:  Yes.  But I think I need to understand

22 what you are going to be providing.

23         The -- you have asked to present a recording, and I

24 think, from your comments, it was a recording that you have

25 prepared because of your concern that English is not your

1  first language.  Is that correct?

2         MR. ABBASI:  Yes, it's correct.  I prepare a note

3  in Persian and all -- and after that, I use an application to

4  translate to present here.

5         THE COURT:  Okay.  So I just want to be clear of

6  what we're doing.

7         You have prepared a statement in your native

8  language, Farsi or Persian, correct?

9         MR. ABBASI:  Yes.

10        THE COURT:  And then you have used a translation

11 software to translate it, and you would ask to present that

12 today, correct?

13        MR. ABBASI:  Yes.

14        THE COURT:  Okay.  I am going to permit that.  And

15 I will make a couple observations in connection with this:

16        The first is that, as a practical matter, federal

17 courts are encouraged to treat individuals that are

18 representing themselves with a measure of flexibility, and I

19 will permit you to do that because I think that it will

20 assist the Court in understanding the issues that are being

21 presented and allowing for the development of a full record.

22        There are obviously concerns with respect to the

23 presentation of evidence that is essentially being run

24 through a translation application.  But cognizant -- I'm

25 aware of that, but I will permit you to do so.

1          The following observation I am -- doesn't

2    necessarily affect you, Mr. Abbasi, but I think I am obliged

3    to say that my ruling today does not impact how the Court

4    would deal with this kind of a question at any point in the

5    future.  And it's important that I make that observation

6    because we are in something of a brave new world that is

7    evolving rapidly, both with -- certainly with translation,

8    but even more importantly with artificial intelligence, and

9    courts are struggling to deal with that.

10          You have represented that you have prepared a

11    statement and you have run it through a translation software

12    in hopes that I would be able to understand more clearly your

13    presentation.  For purposes of this hearing, I will permit

14    that to occur.

15          You may proceed, Mr. Abbasi.

16          MR. ABBASI:  Thank you for this chance.  Okay.  Now

17    I play that mentioned voiced.

18        (Recording played at 11:15 a.m. as follows:)

19          "This is a voice recording of Mr. Adel Abbasi,

20    delivered in an American accent to maintain clear

21    communication for the Court in the matter of Desolation

22    Holdings, Case Number 23-10597.

23          "The recording highlighted his objections to the

24    debtors'" (indiscernible) "ongoing production and

25    incorporated his statement for the proof of claim hearing.

1    "I respectfully challenge the depiction and

2 assertions that the debtors' counsel is attempting to make of

3 me" (indiscernible) "to begin with, I am unsure about how the

4 debtor or nondebtor entities have managed my assets and

5 accounts since 2017; therefore, to safeguard my interests in

6 claims, I personally submitted several claims through the

7 authorized agent Omni Agent Solutions' website.  In the

8 spirit of good faith, I have withdrawn duplicate claims,

9 leaving only four claims currently in dispute.

10    "Furthermore, I have two customer claims and two

11 general claims.  Nonetheless, the debtors' counsel appears to

12 dismiss the general claims concerning the damages I have

13 incurred.  As an act of good faith, I am setting the cap of

14 my general claims at 140,000 USD.  This is designed to be a

15 single recovery from the debtors and no duplicate claims are

16 to be made.  As a result, I am open to negotiations and

17 assessments concerning the precise figure.

18    "As part of the customer claims, I hold L-M-C LAMA

19 coin, a type of digital currency, which I exchanged for

20 Bitcoin in 2017.  As a consequence, LAMA coin, as a customer

21 asset, belongs to me.  And Bittrex, Incorporated and Bittrex

22 Malta OpCo should be held liable for it.

23    "Finally, regarding the general claims, I

24 experienced damages due to the" (indiscernible) "actions and

25 misleading points from Bittrex founders in 2017.  Bittrex

1  knowingly, intentionally, purposefully provided services to

2  Iranian residents, for which we have evidence to

3  substantiate.  Thus, the OFAC issue is beyond the presented

4  proceedings and we first need to comprehend how Bittrex and

5  the debtors targeted Iranian users residing in Iran.

6       "Your Honor, we have evidence demonstrating Bittrex

7  and its founders' intentions, but this cannot be fully

8  explored in this short hearing.  Your Honor, given the

9  limited time frame, it is challenging for me to defend my

10  rights as English is not my first language.  Moreover, the

11  opposing party is equipped with numerous lawyers and they

12  amended the hearing agenda just a few hours before it

13  commenced, Docket Number 761.

14       "Your Honor, they did not produce all documents

15  that support my proof of claim and their objections while

16  they had them all in possession.  Instead, they threatened me

17  with sanctions.  At this hearing, I am respectfully seeking:

18       "One, to compel them to produce the documentation

19  in question, Docket Number 632, Exhibit 1 and Exhibit C-2;

20       "Two, their request to adjourn the hearing in

21  relation to the response to the objection, Docket Number 632,

22  Exhibit S-1 and Exhibit S-2;

23       "Three, to seek sanctions against the debtors'

24  counsels, debtors, and its plan administrator.  This is

25  because:

1        "One, the debtors' counsel is attempting to"

2   (indiscernible) "this bankruptcy case with false statements

3   and misleading the Court.  I have LAMA coin, L-M-C, a type of

4   digital currency in my account.  The counsel stated that L-M-

5   C is non-recoverable and non-transferrable.  Objection

6   Paragraph 23, and also, August 14th, 2023 letter signed by

7   Ms. Patricia Tomasco.  However, there are many transactions

8   related to LAMA coin and other alleged de-listed coins in

9   Docket Number" (indiscernible) "some of which were

10  transferred to debtors' customers and some of which were

11  transferred" (indiscernible) "debtor entity Bittrex"

12  (indiscernible) "few months ago.

13        "The aforementioned Docket 92, filed by Mr. Enos,

14  Kenneth expresses that all of debtors' counsel were cognizant

15  of the fact that the L-M-C was transferrable and recoverable

16  post June 21st, 2019.  Debtor has transferred assets to

17  nondebtor entities and also to customers' wallets, which

18  contradicts Mr. Enos, Kenneth.  And Ms. Patricia Tomasco

19  claimed to the Court that the L-M-C was non-transferrable or

20  unrecoverable.

21        "Which statement is true and which is false?  If

22  Ms. Tomasco's initial statement is true, it implies that

23  Docket Number 92 is filled with false transactions,

24  inaccurate accounting records.  And Mr. Enos, Kenneth, stated

25  in Docket 92 is false.  If Docket Number 92 is accurate and

 1 true, then Ms. Tomasco's statement on objection in her

 2 letter" (indiscernible) "is false and incorrect.  If these

 3 assets are transferrable to other customers or to Bittrex's

 4 nondebtor entities that shut down a few days ago, why can't

 5 they be transferred to me?

 6          "I request Ms. Tomasco provide a clear statement on

 7 this matter as to Docket Number 632, Exhibit E and Exhibit F,

 8 and also to answer these questions.  And as I asked on

 9 November 30th, the following questions by email:

10          "One, when was the most recent transaction

11 involving LAMA coin L-M-C conducted on Bittrex?  According to

12 Docket Number 92-2, were the L-M-C assets transferred to

13 customer wallets or an affiliate entity of Bittrex, as per

14 Docket Number 92-3?  What kind of evidence was taken into

15 consideration when filing Docket 92 and the objection to

16 claims?

17          "Two, Your Honor, I am an Iranian.  I was living in

18 Iran in 2017 and opened an account with an Iranian phone

19 number, Iranian passport, and Iranian IP Internet"

20 (indiscernible) "Bittrex was founded by four technical

21 experts who had all the information needed to reject

22 transactions as per OFAC rules and regulation"

23 (indiscernible) "and at least 30,000 other Iranian users

24 before opening accounts.  However, Bittrex knowingly and

25 intentionally provided crypto and trading services to Iranian

1  residents.

2      "For example, I personally asked Bill, who I

3  recently understood Bill is the former CEO of Bittrex,

4  Incorporated and his full name is Bill Shihara, in 2017 on

5  Slack platform if I could trade from Iran.  Answer was yes.

6  He confirmed that I could trade without limitations.  And

7  many other Iranians did the same on Slacker on the support.

8  Thus, I asked debtors' counsel to provide Bittrex Slack

9  communication, but debtors' counsel refused to do so because

10 they knew it would go against them.

11      "Your Honor, we also have evidence that shows

12 Iranians could trade and be permitted by Bittrex founders.

13 Your Honor, as an Iranian, I live in a country where failing

14 to validate simple things can cost you your life.  So, in

15 trusting in Bittrex's statements as a regulated exchange and

16 relied on the statements of Bittrex's former CEO Mr. Bill

17 Shihara and Director of Support Mr. Ryan Hentz's to open an

18 account and use Bittrex and trade on Bittrex exchange, Doc.

19 632, Exhibit" (indiscernible) "without notice, causing damage

20 and numerous issues and distresses to me and all Iranian

21 users.

22      "Three, Your Honor, my account was disabled,

23 locked, and barred in October 2017, after which I didn't use

24 any services from Bittrex, Incorporated or Bittrex Malta"

25 (indiscernible) "the counsel argues that I accepted new terms

1 │ of service in 2018.

2 │         "Firstly, I don't remember doing so.

3 │         "Secondly, I was ineligible, thus unable to accept

4 │ such terms as my account was suspended and I was residing in

5 │ Iran at the time.

6 │         "Last and foremost, referring to Bittrex 2018 terms

7 │ of service is wrong because account opening and blocking in

8 │ 2017 occurred before releasing that and cannot apply to our

9 │ relationship with Bittrex, Incorporated.  So all objections

10 │ in this regard are irrelevant.  If they are providing any

11 │ records contrary to my belief, they are false and merely an

12 │ attempt to" (indiscernible) "updated terms and conditions.

13 │         "Four, Your Honor, my account and assets were

14 │ blocked in October 2017.  According to OFAC rules, these

15 │ assets and accounts should have remained with Bittrex,

16 │ Incorporated.  However, the counsel states that my assets and

17 │ accounts were transferred to Bittrex Malta OpCo.  Under which

18 │ rules and regulations was this transfer of block assets to an

19 │ offshore entity Bittrex Malta authorized?  If we accept that

20 │ this transfer is true, it implies that both Bittrex,

21 │ Incorporated and Bittrex Malta" (indiscernible) "violated

22 │ OFAC rules again in 2018.

23 │         "Your Honor, this objection is filled with false

24 │ statements.  Bittrex, Incorporated is the entity that

25 │ obtained the license, not Bittrex Malta.  In the objection,

 1  Ms. Tomasco states that Bittrex Malta obtained the license.

 2  Your Honor, this is false and misleading to the Court.

 3  Docket Number 632, Exhibit I and Exhibit J.  I am seeking

 4  answers from Ms. Tomasco on this statement.  Based on which

 5  document and evidence did she claim that Bittrex Malta

 6  obtained the license, even though the entity was"

 7  (indiscernible) "four months after the license application.

 8  Your Honor, I am requesting clarity from the debtors' counsel

 9  and seeking sanctions against these false statements by Ms.

10  Tomasco.

11          "And Your Honor, I understand the importance of the

12  bankruptcy estate, and it is apparent that you and many other

13  bankruptcy judge are sensitive about it.  And it's equally

14  significant to all of us because it represents the assets for

15  our creditors.  I am not seeking assets or damages outside my

16  relationship with Bittrex entities.  I have demonstrated my

17  good faith by reporting discrepancies in the assets belonging

18  to debtors, which led to the immediate shutdown of Bittrex

19  Global's operations after my report, providing evidence that

20  the estate reported to the Bankruptcy Court is hundreds of

21  millions of dollars less than what is only a portion of

22  debtors' Bittrex entities have in possession assets.  Docket

23  Number 632, Exhibit K and Exhibit L.

24          "This is blockchain and everything is transparent

25  to everyone.  Simple calculations demonstrate this, which I

1  did and sent to the debtors' counsel.  Docket Number 632,

2  Exhibit K and Exhibit L.

3        "I respectfully ask, please ask the examiner or

4  counsel to provide information.  This false statement of the

5  debtors would matter the most to all creditors, the Court,

6  and U.S." (indiscernible) "Your Honor, Mr. David Maria should

7  be aware of the assets belonging to debtors, as he is working

8  with Bittrex since May 2021.  He is well versed in blockchain

9  and he was the person I've emailed.  If he was informed, why

10 did he conceal this point.

11       "Sixth, Your Honor, as thoroughly outlined in

12 Docket Number 632, Exhibit G and Exhibit H, I have submitted

13 all my claims via the authorized agent's website.  This

14 submission was done in accordance with the guidelines

15 stipulated on the aforementioned site and was signed

16 electronically.  To clarify, all these proofs of claim were

17 submitted through the dashboard and were appropriately signed

18 and authorized and in line with the Omni Agent platform

19 requirements.

20       "Despite this, debtors and the debtors' counsel

21 knowingly and intentionally chose to reject the claims due to

22 signature issues with, even though they are aware that all of

23 them were" (indiscernible) "case management website by typing

24 the name as mandated.  However, they are wilfully and

25 knowingly using this objection as a reason to disregard all

1  claims, a pattern of behavior that has been consistent since

2  2017 with my account.

3           "Your Honor, again, this short period is not one in

4  which we can defend ourselves, especially without any

5  document production and full of false statements by the

6  debtors.

7           "Finally, in closing, I respectfully request the

8  Court to issue an order instructing the debtors, their legal

9  counsels, and plan administrator to:

10          "One, to compel them to produce the documentation"

11 (indiscernible) "to Docket Number 632, Exhibit C-1 and

12 Exhibit C-2;

13          "Two, to adjourn the hearing in relation to the

14 response to the objection, Docket Number 632, Exhibit S-1 and

15 Exhibit S-2;

16          "Three, I am seeking priority on points provided

17 with evidence to debtors' counsel for exhibits of Docket

18 Number 632;

19          "Four, lastly, I am advocating for the Court to

20 impose sanctions on the debtors, their legal counsels, and

21 the plan administrator for misleading and false statements.

22          "Your Honor, thank you once again for your time and

23 the opportunity.  I feel it's important to clarify that I

24 disagree with the image of me pictured before the Court by

25 the debtors and their counsels regarding me and my claims.  I

1  have four claims and set a limit of 132,000 USD for one

2  recovery, and I'm open to negotiation and mediation.  Thank

3  you."

4         THE COURT:  Thank you, Mr. Abbasi.  I appreciate

5  the presentation.  I actually think that that was probably

6  helpful compared to trying to do that directly yourself.

7         I would note that the Court might deal with such a

8  request differently in a different proceeding.  But I

9  appreciate the comments.  I was able to follow the argument

10  and to take careful notes in your presentation.

11        MR. ABBASI:  Thank you, Your Honor.

12        THE COURT:  The issue that is before the Court is

13  the debtor's request for a protective order limiting

14  discovery. I have heard from Mr. Abbasi. The relief requested

15  is also directed at Mr. Arabpour and Mr. Momenzadeh.  I would

16  be happy to hear from those gentlemen at this point.

17        MR. ARABPOUR:  Hello.  Can you hear my voice?

18        THE COURT:  Yes.  I can hear you.  This is Judge

19  Shannon.  Would you please identify yourself for the record.

20        MR. ARABPOUR:  Yes.  Your Honor, I am Shahriar

21  Arabpour. I am grateful to the Court for giving me the

22  opportunity to speak.

23        THE COURT:  Okay. The specific issue that is before

24  us is the debtor's request to not be required to provide

25  documentation and discovery that has been requested by you

1   and some of the other claimants.  I would be happy to hear

2   from you at this point if you wish to be heard.

3          MR. ARABPOUR:  Yes.  I have a statement and I

4   answered these objections in my statement.  I have a brief

5   for my case.  May I read this?

6          THE COURT:  Yes.  You may proceed.

7          MR. ARABPOUR:  Thank you.  I became a member of

8   Bittrex website on June 3rd, 2017.  At this time I easily

9   joined Bittrex via an Iranian IP and was trading on this

10  website.  In 2017 Bittrex readily accepted Iranian users and

11  even included Iran in the (indiscernible) countries in the

12  registration form.  They also accepted Iranian mobile

13  numbers. I can provide the Court with a photo of my profile

14  and a file sent by Bittrex which contains my Iranian IP log.

15         At the time Bittrex didn't mention Iran as a country

16  for which membership is not possible in their terms of

17  service section.  Only stating any country to which the

18  United States has embargoed goods or services. In fact,

19  Bittrex knowingly violated US laws by providing services to

20  Iranian users and trying not to lose the large Iranian user

21  market.  Even at the time many Iranian users asked them if

22  they also provided services to Iranians which Bittrex

23  confirmed, knowing that it was illegal.

24         By us, an ordinary user, with no affiliation with

25  the Iranian Government or Government affiliated companies I

1  brought my life savings to Bittrex for trading and

2  investment.  When I saw the website mentioning US based

3  exchange (indiscernible) use of relations as evidence, I

4  thought that if Bittrex, an American company is easily

5  working with Iranian users then there must be no legal

6  problem in this regard, but Bittrex deceived Iranian users

7  and ignored American laws.

8      I was trading on the Bittrex site until October 2017

9  when my account was disabled without any prior notice and

10  there was no possibility of withdrawing assets.  In Ticket

11  No. 304131 I asked why my account closed.  The

12  (indiscernible) replied that first sent a picture and your

13  identity information like passport, and after 24 hours the

14  information will be revealed and your account will be

15  activated.  But after sending the requested items this didn't

16  happen. I followed up again and Mr. Brian Lee from Bittrex

17  support said that they were investigating and not to open new

18  tickets.

19      After a few days the ticket (indiscernible) changed

20  to (indiscernible).  No answer had been given to me.  They

21  even didn't answer my question about what the problem was and

22  why the tickets (indiscernible).  For months after what I was

23  (indiscernible) debt the account closure was due to the

24  sanction and Bittrex initially hide this issue from me and

25  other Iranian users to stop them from hiding the fact and

1 revealing the truth.

2         Bittrex claims to have froze our accounts based on

3 OFAC but Bittrex not only froze our accounts, but limited our

4 accounts withdrawal.  Unlike many other exchanges like

5 (indiscernible), which is in compliance with OFAC a fake

6 number 37 restricted services to Iranians, they let them

7 withdrawal their digital assets and later closed the

8 accounts.

9         (Indiscernible) No. 37 explains my bank operates

10 accounts for individual living (indiscernible).

11 (Indiscernible) has told us that these accounts cannot be

12 operated.  Does this mean that the accounts are blocked?  No,

13 the accounts are restricted.  The Iranian sanctions would

14 restrict of goods or services to Iran by operating an account

15 for an individual or company in Iran.  The bank would be

16 exporting services to the person or entity in relation of the

17 Iranian transactions, liquidations.

18         The accounts, however, are not blocked.  The account

19 holder can close the account and have the funds transferred

20 to his or her accounts outside the United States.  Date

21 released September 10th, 2022.  In contracts with OFAC

22 Bittrex has held its large amount of Iranian capital in the

23 exchange for years.  This capital is a significant amount for

24 any exchange that place the rule for a liquidation provider

25 for (indiscernible).

1        Bittrex announced that based on OFAC permission it

2   hold open a place for users to withdrawal their accounts.  I

3   didn't understand this matter at the time.  At the time, due

4   to the global pandemic and the problem it caused for me

5   including unemployment, financial difficulties and my

6   mother's contraction of the virus I acted later then the

7   stated deadline.  July 8th, 2020 I messaged Bittrex and sent

8   a fill-out form explaining why I was delayed, but they didn't

9   accept the release of my capital because of the delay in

10  sending.

11       On November 1st, 2022, before Bittrex had declared

12  bankruptcy, I informed Bittrex support in Ticket No. 3079816

13  that I am currently residing in Turkey.  I am not living in

14  Europe; however, they responded that due to sanctions and

15  OFAC regulations my account would remain deactivated. I asked

16  again under what law can you close the account of someone who

17  resides in a country not on the sanctions list.  They didn't

18  respond again.

19       I even sent a picture of my Turkish driving license

20  as a legal document.  Bittrex claims that I didn't go through

21  the process of verification identity and residence in Turkey,

22  but my account was inactive and I didn't have the opportunity

23  to go through this process like regular users through the

24  website.  I made this request to (indiscernible) and they

25  announced that the account would remain closed.  They didn't

1   pay attention to my request.

2        The question is how does Bittrex close users

3   accounts based on their nationality and not their place of

4   residence at its discretion and block their assets.  Is their

5   action based on the race and blood of the users or legal

6   grounds.

7        I have requested certain documents from Bittrex for

8   this complaint which they didn't provide in the specified

9   time.  In return they argued that based on federal rules the

10  time period for document production is 30 days.  They gave me

11  just 14 days for response.  Response deadline November 27th,

12  2023 at 4 p.m.  Ironically, they emailed me a few documents

13  on 20th of November leaving me less then seven days to

14  respond.  This was unfair despite facts that these documents

15  were incomplete.  For example, when Bittrex informed OFAC

16  about the closure of Iranian accounts or has my account

17  specifically being reported to OFAC or not.  Even access as a

18  user to profile information and previous sites have been

19  closed. I couldn't see the amount of tokens I had and I could

20  only see the amount of tokens I had on one page.

21       Bittrex registered different companies to ease its

22  legal and tax problems.  As an ordinary user who registered

23  on their site in 2017 I was unaware of how this company

24  operated and handled my assets. I only knew that I registered

25  with Bittrex.com and that my assets (indiscernible) website.

1  Even when filling the claim, giving my experience with

2  Bittrex I felt complete to register the claim in various ways

3  available on Omni Agent Solutions to ensure my request was

4  (indiscernible). I later (indiscernible) to show

5  (indiscernible) and say that I am only seeking to receive my

6  rights and not to disrupt the bankruptcy proceeding.

7        My assets, including the following tokens, Dogecoin,

8  Zen, SC, REPO, BTC and BCH at the peak value its assets were

9  brought about $19,000.  This money represents the years of

10 worth for me living in a country where the local currency has

11 significantly less value compared to the dollar.

12        In essence, it was all my savings and capital for

13 the life of my (indiscernible).  Bittrex by blocking my

14 assets caused serious financial and emotional damage to me,

15 my family life.  At the time where I had just had a child,

16 suffered (indiscernible) damage and I am still suffering from

17 this financial and emotional injuries.

18        I am (indiscernible) the argument of debtors causes

19 in regards to the terms of service are not saying as it

20 doesn't mean anything that I was obligated to access terms

21 and foundation.  Thus, I am under governance of those terms.

22 So, in my perspective my relationship with the debtors are

23 not under general rules and regulations of trade.  I repeat

24 again, my relationship with the debtors are under general

25 rules and regulations of using.

1      Two, the contracts are unenforceable because I

2  didn't sign them as expressed in the debtor's objection to my

3  claims. I was resident of a sanction country providing

4  services to me and in (indiscernible) with a US entity was

5  forbidden by laws.  Thus, such contracts are against US law

6  and are unenforceable.

7      Three, in case the Court finds those legal and

8  enforceable in such case I would like to emphasize that the

9  account opening and blocking happened in 2017 and its not

10 covered by Bittrex 2018 terms and conditions.  Ms. Tomasco

11 knowingly and intentionally mentioned the 2018 terms to

12 mislead and the other (indiscernible).

13     So, these are my causes of action.  One, illegal

14 account disabling and asset freezing back to 2017.  Honorable

15 Judge, if the intention of Bittrex was compliance with OFAC

16 rules and regulations they would let me know that my account

17 is disabled for the reason of my Iranian sanctions from

18 beginning, not concerning security or accounts.

19     They report my account to OFAC in 10 days, never a

20 period of time, not in April of 2018 when Bittrex had an

21 obligation with OFAC.  (Indiscernible) after I provide my

22 full resident document providing I live (indiscernible) on

23 November 1st, 2022.

24     In brief, I am seeking damage in the amount of

25 $300,000.  This figure is to compensate for the loss

1  resulting from the inability to access my assets since 2017,

2  financial damage, and the emotional, and phycological harm I

3  experienced due to the Bittrex (indiscernible) admissions.

4  It also serves a purpose against the debtors. I am not asking

5  for anything more.

6       I humbly request that the Court appoint a mediator

7  and (indiscernible) so I will have enough time for discussion

8  with the debtors (indiscernible) and have 30 days required to

9  produce our required documents.

10      THE COURT:  Very good.  Thank you, Mr. Arabpour.

11      MR. ARABPOUR:  You're welcome.

12      THE COURT:  I believe -- is Mr. Momenzadeh also on

13  the line?

14      MR. MOMENZADEH:  Yes, I am online.

15      THE COURT:  Welcome, sir. I hope that you were able

16  to hear and understand Mr. Abbasi and Mr. Arabpour, and,

17  obviously, to have heard counsel for Bittrex for the company.

18  I would be happy to hear from you at this time.  I have had

19  the opportunity to review your submissions.

20      MR. MOMENZADEH:  Okay.  Thank you very much.  Your

21  Honorable, Judge, I am humbly presenting my case before this

22  esteemed Court seeking your fair consideration. I am a user

23  of Bittrex and Bittrex (indiscernible), a cryptocurrency

24  exchange.  When my account was illegally disabled back in

25  2017 when I was residing in Iran causing significant

1 financial and emotional damage.

2        Right now, I cannot in English fluency, so I read

3 from a document.  There is no problem, right?

4        THE COURT:  That is fine.

5        MR. MOMENZADEH:  Thank you very much.  The US

6 regulators have extended the depletion of (indiscernible)

7 applies to (indiscernible) SEC and other regulators have

8 restrictions over Bittrex and it proves that the

9 (indiscernible) is extended to the (indiscernible).

10 Considering the fact that this (indiscernible), explained by

11 OFAC in 2002, at that particular time there was no bitcoin

12 exchange.  Thus, it concludes all financial related

13 (indiscernible); otherwise, OFAC would delete this

14 (indiscernible).

15        It means this exchange is inclusive.  The debtor's

16 counsel used Bittrex's products (indiscernible) discovery to

17 prove that OFAC required a license.  In addition, I think Ms.

18 Tomasco was talking about Malta Holding Company, not Malta

19 Ltd.  Docket (indiscernible) prove the assets are transferred

20 to Bittrex Malta Ltd.

21        The crucial documents related to my (indiscernible)

22 of my account, which Bittrex declined, I did not complete

23 were not provided in a timely manner.  When they were

24 provided they were incomplete. I kindly ask the Court to

25 consider granting additional time for these important

1  documents to be produced as the counsel of the debtor's asked

2  for 30 days to produce all such documents in their objection

3  and I have just seven days to file a response because they

4  provided the information documents which had in their

5  possession late.

6         Moreover, there is a lack of clarity regarding when

7  and why my assets were transferred from Bittrex to Bittrex

8  Malta Ltd., as I couldn't find my assets on Bittrex. I

9  request the Court's help in compelling Bittrex to provide the

10 necessary documents that can shed light on this transaction.

11 The fact is they could not move an asset which is frozen

12 because of OFAC regulations to an entity outside the USA.

13         My claim comprises (indiscernible) due to the

14 curious situation of my assets including both customer proof

15 of claims for the coins and general proofs of claim for the

16 damages that I sustained.  I have to pay to put a cap on my

17 claims valuing up to $23,839.

18         THE COURT:  I'm sorry, could you repeat that number?

19         MR. MOMENZADEH:  Yes, $23,839 which includes

20 actualized based on conversion theory, and emotional, and

21 punitive damages.  My holding on Bittrex includes 0.1104

22 bitcoin (indiscernible) and 143 (indiscernible) tokens.  At

23 the peek value the assets total $7,946.  I am seeking three

24 times this amount as compensation for the emotional and

25 psychological harm caused by Bittrex actions based on the

1  (indiscernible) damage and conversion theory or whatever

2  legal grounds that the Court finds just and proper.

3       The disabling of my account has caused me

4  significant distress leading to health issues such as high

5  blood pressure and chronic depression. It has also strained

6  my relationship with my family and friends.  I registered on

7  Bittrex in January 2017 as an Iranian resident.  There was no

8  mention of Iran's status or sanctions in terms of conditions.

9  After reaching out to Bittrex support I received misleading

10  guidance from cofounder of Bittrex, Brian Lee.

11       I upgraded my account (indiscernible) in June 2017

12  using my Iranian passport, mobile number and residential

13  address; however, in October of 2017 my account was

14  inexplicably made inactive.  In September 2022, as a Turkish

15  resident, I provided all necessary documents to Bittrex.

16  Despite proving my residency Bittrex denied my request

17  without cause marking the second violation of my rights.

18       Given the short preparation time for the Court and

19  documents produced, I request the Court's consideration for

20  another hearing.  This is crucial for the protection of my

21  rights and the pursuit of a fair resolution with the debtors.

22  I appreciate the Court's attention for this matter.  Thank

23  you very much.  Sincerely, Amirali Momenzadeh.

24       THE COURT:  Thank you, sir.

25       Ms. Tomasco.

1          MS. TOMASCO:  Your Honor, the matter before the

2    Court specifically is whether or not Bittrex should be

3    subjected to far-flung discovery with respect to the OFAC

4    regulations or other transactions with other Iranians or

5    other sanctioned residents.  We are here to talk about

6    proportionality and proportionality under the cases that we

7    cite has various components.

8          One is does the information that the claimants seek

9    bear any relationship to the matters before the Court.  We

10   have explained -- and part of this also has to do with even

11   if they got the information would it create -- would it be

12   more burdensome rather then probative of the issues before

13   the Court.  So, I want to point out a couple of things.

14         All three Iranian claimants have stated in their

15   claim objection responses, those are at Exhibits 18, 24, and

16   31, that they signed the 2015 terms of service. That is a

17   judicial admission or a statement against interest.  They

18   have admitted that they signed those terms of service.  We

19   can also prove that they signed the 2018 terms of service.

20   We can put up a screen shot that is going to show that when

21   they logged in on X date they accepted them, but we don't

22   need to go there.  We are going to go with what they have

23   admitted in their pleadings.

24         The 2015 terms of service disclaim consequential

25   damages.  So, anything to do with emotional distress, or the

1  fact that you couldn't trade your coins when they were at

2  their peak, or that you couldn't withdraw your coins is

3  specifically disclaimed under the 2015 terms of service. They

4  had their accounts blocked -- wrong term, disabled in 2017 as

5  a result of the OFAC subpoena.  So, Bittrex voluntarily

6  disclosed their trading information to OFAC.  This is the

7  exact documents that they have already gotten which is a line

8  by line itemization of every trade they ever made.  So, they

9  have all of that information anyway.  So, delving into the

10 OFAC issues is irrelevant because it is not going to change

11 the fact that they signed the 2015 terms of service.

12          Proportionality also concerns the amount of the

13 claims.  What you have heard from the claimants are wildly

14 speculative, unsupported, with no documentation to support

15 claims that are round amounts, $300,000, $200,000.  This is

16 clearly lottery seeking behavior.  They are trying to hit the

17 lottery here.

18          We have made it clear, if they can come back with

19 documents that show that they are no longer ordinarily

20 residents in Iran, if they can show us what Mr. Ghader showed

21 us, a lease, a utility bill, not just a driver's license, but

22 this is what is required so that we are not inadvertently

23 violating the OFAC sanctions.

24          Now that is the claim objection and so the question

25 before Your Honor on this agenda item, which is only the

1   motion for protective order, is does Bittrex  or the plan

2   administrator have to produce volumes of information with

3   respect to the OFAC sanctions that have nothing to do with

4   whether or not these claims can be allowed because this is

5   simply a terms of service, what kind of coins do you have in

6   there, and what is it that we are supposed to do for you as a

7   customer.  So, we have already said we still have your

8   crypto, its still there.

9          With respect to the defunct crypto we have a plan

10   provision that says we will not pay out defunct crypto. We

11   can't be paying fees to third parties to deliver crypto that

12   is not worth the process of mining that coin and delivering

13   it to somebody else.  That is a given fact.  The

14   (indiscernible) coin issue that Mr. Abbasi alleges its

15   between $2 and $4 dollars' worth of coins.  He seems to think

16   that the fact that it was transferred from Bittrex Inc., to

17   Bittrex Malta, to Bittrex Global is of some moment, but the

18   transfer doesn't actually occur.

19          When customers transferred off of Bittrex Inc., to

20   Bittrex Global, as they were allowed to do as part of this

21   process if they were not residents in the US, that was an

22   accounting entry because there is a single omnibus wallet

23   that covers all Bittrex entities.  So, its an accounting

24   entry.  The coin doesn't actually move.  Its all still there

25   at the same wallet address.  So, the fact that those

1 transferred defunct coins transferred with those customers

2 doesn't prove anything.

3        Mr. Abbasi also seems to think that Bittrex is

4 engaging in some kind of depletion of its assets. Well, as

5 the Court well knows Bittrex allowed from June 15th to August

6 31st its customers to withdraw their cryptocurrency.

7 Something that Mr. Ghader took advantage of during that

8 period.  So, those wallet amounts are going to decrease.  It

9 doesn't mean that anything is happening with these crypto

10 customers' crypto. Their crypto is still there.

11        So, what do we have to decide. This is about

12 proportionality and about getting some boundaries around what

13 we are going to decide with respect to the claim objection.

14 We cannot be engaging in volumes of discovery.  They are

15 requesting a privilege log that is hundreds of thousands of

16 dollars worth of cost to the debtors to produce something

17 that cannot support a cause of action because they signed the

18 2015 terms of service and the 2018, but I don't need to go

19 there.

20        So, what is it that we are doing here by providing

21 discovery to discover unavailable causes of action that they

22 have signed away already.  For that reason, Your Honor, we

23 ask that you grant the motion for protective order.

24        THE COURT:  Here is what we are going to do.  The

25 matter that is before the Court today, there are several

1  matters, the first are claim objections to claims -- to a

2  collection of claims filed by creditors Mr. Abbasi, Mr.

3  Momenzadeh, and Mr. Arabpour. I very much appreciate those

4  parties participating today and taking the significant steps

5  to try to advise the Court of their positions and, obviously,

6  we will turn to their claim objections at the appropriate

7  time.

8         The threshold question though that is raised by the

9  debtor, the gating question, is the extent to which

10  additional discovery is necessary or appropriate in

11  connection with the claim objections.  I am going to grant

12  the debtor's request for a protective order that would

13  preclude the discovery that has been identified and requested

14  either formally or informally by the claimants.  I will give

15  you my reasons.

16         First, discovery is subject to regulation by the

17  Court within the sound discretion of the Court managing the

18  litigation that is before the Court.  I am satisfied --

19  actually, I do believe that Ms. Tomasco's description is, in

20  fact, accurate that the claim objections themselves present

21  relatively narrow disputes before the Court, hotly contested,

22  but nevertheless primarily narrow disputes about the status

23  of certain claims and the treatment of those claims from when

24  the investments were made, really all the way to today.

25         I am not satisfied that the proceeding would be

1 meaningfully informed or aided by what is clearly broad and

2 expansive discovery that would be both voluminous, may

3 involve third parties, and by the Court's experience would

4 certainly be an expensive exercise posited against asserted

5 claims that, at least, in nominal terms are relatively

6 modest. It is not beyond the Court's assessment that while

7 there are additional claims that have been challenged by the

8 debtor that might be for consequential damages or injury

9 suffered because of a lack of ability to access accounts or

10 investment on the debtor's representation that inability was

11 a function of Government action, not a corporate policy or an

12 executive decision.

13        That is a decision or that is an issue that is

14 before the Court in the context of the claim objections.  But

15 I don't believe that extensive inquiry into the how the OFAC

16 regulations came into effect, the debtor's engagement or

17 involvement with OFAC or its internal communications

18 regarding compliance with applicable Government regulation, I

19 am not satisfied that that would meaningfully inform the

20 Court's analysis of the claim objections.

21        So, based upon the record before me I am satisfied

22 that the debtors have carried their burden and the Court

23 would be prepared to enter an order providing for a

24 protective order precluding additional further discovery

25 beyond that which is identified in the debtor's response.

1      That leaves us, though, with having ruled on the

2  protective order we will need to reschedule the claim

3  objection hearings with respect to Mr. Arabpour, Mr. Abbasi,

4  and Mr. Momenzadeh.  The Court has another matter scheduled

5  for noon East Coast time and another matters scheduled for

6  one.  I apologize for the inconvenience and the disruption,

7  but I agree with debtor's counsel that the question of

8  available or appropriate discovery was, in fact, a gating

9  question today. Had the Court directed additional further

10  discovery under any circumstances these matters would have

11  been adjourned.

12      While precluding additional further discovery, I

13  simply don't have time today to deal with the claim

14  objections on the merits. I acknowledge and note that the

15  claimants have gone to significant personal effort to engage

16  in this proceeding and I would, again, express my

17  appreciation to those parties for their efforts in doing so

18  and I want to make sure that I have the opportunity to

19  conduct a hearing in which they can challenge the debtor's

20  objection to their claims on a record and in a proceeding

21  that I simply do not have time to accommodate today.

22      So, where we are is that the debtors motion for a

23  protective order is granted and I would direct that the

24  debtor promptly provide a form of order under certification

25  of counsel so providing. I would ask further that the debtor

1  coordinate and communicate with the claimants that I have

2  identified that have been the subject of our colloquy today

3  and identify a convenient time for a hearing.  I believe we

4  have -- given the holidays it seems unlikely that we would be

5  able to gather before year end.  I believe the debtor already

6  has dates on my calendar in January and, again, the Court

7  would confirm that those parties that would wish to

8  participate by Zoom will be permitted to do so and that would

9  afford me then the opportunity to conduct a hearing on the

10 merits.

11      Again, circling back the debtors -- Ms. Tomasco's

12 suggestion that the discovery question was a gating question

13 I agree. I have answered that question for the parties and I

14 would look for the parties to confer regarding scheduling a

15 hearing on the substance or merits of the claim objections.

16      With that we are adjourned.  Thank you, counsel.

17   (Proceedings concluded at 12:05 p.m.)

18

19

20

21

22

23

24

25

1                           CERTIFICATION

2           We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ Coleen Rand                         December 16, 2023

8    Coleen Rand, CET-341

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tammy L. Kelly                      December 16, 2023

13   Tammy L. Kelly

14   Court Transcriptionist For Reliable

15

16

17

18

19

20

21

22

23

24

25