## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Desolation Holdings LLC, *et al.*,[1] | Case No. 23-10597 (BLS) |
| Wind Down Entity. | (Jointly Administered) |
| | **Obj. Deadline: January 12, 2024 at 4:00 p.m. (ET)**<br>**Hrg. Date: January 31, 2024 at 10:00 a.m. (ET)** |

## PLAN ADMINISTRATOR'S OBJECTION TO CLAIM C598-1167 FILED BY FORGEY LAW GROUP, PLLC, JASON M. FORGEY, AND EXCEL TITLE GROUP, LLC PURSUANT TO SECTION 502 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3007

Pursuant to sections 502 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), David Maria, as plan administrator (the "Plan Administrator") in the chapter 11 cases of the above-captioned debtors and each of their debtor affiliates (collectively, the "Debtors" or the "Wind Down Entity"), through undersigned counsel, hereby files this objection (the "Objection") to Claim C598-1167 filed by Forgey Law Group, PLLC, Jason M. Forgey, and Excel Title Group, LLC ("FLG," "Forgey," "Excel," and collectively, the "Claimants") (the "Forgey Claim" or the "Claim").  The Plan Administrator requests entry of the Proposed Order attached hereto as **Exhibit A**, disallowing the Forgey Claim.

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Holdings Ltd. (2227); and Bittrex Malta Ltd. (1764). The mailing and service address of the Debtors is 701 5th Avenue, Suite 4200, Seattle, WA 98104.

§ 157(b)(2), and pursuant to Bankruptcy Rule 7008 and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Wind Down Entity consents to the entry of a final order by the Court in connection with this Objection to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and legal predicates for the relief sought herein are sections 105 and 502 of the Bankruptcy Code, and Bankruptcy Rule 3007.

## PRELIMINARY STATEMENT

4.      Prepetition, BUS operated Bittrex's U.S. cryptocurrency exchange, a business that allowed customers to purchase and sell cryptocurrencies for fiat currency or other cryptocurrencies.  The interactions between customers and BUS are straightforward:  customers sign up for the platform and create accounts, deposit fiat or cryptocurrencies which are then reflected in their accounts, purchase and sell cryptocurrencies on the platform, and then withdraw cryptocurrencies or fiat associated with their accounts or leave those assets in their BUS accounts.

5.      In early September 2020, a BUS accountholder created an account with BUS, deposited $448,840.92, purchased cryptocurrencies using those funds, and then withdrew those cryptocurrencies.  After withdrawing the cryptocurrencies, the accountholder had nothing (fiat currency or cryptocurrencies) left in her account.  From BUS' perspective, there was nothing unusual about this sequence of events.

6.      After the accountholder withdrew the cryptocurrencies, BUS learned that the accountholder may have taken the original $448,840.92 from Claimants.  The Claimants are not

and never were BUS customers (nor are/were they customers of Malta OpCo or Bittrex Global).

Instead, the Claimants operate an escrow company that handles funds for real estate transactions.

During one such transaction, the Claimants fell for an e-mail scheme and wired over $1 million to

an individual, who in turn, was a victim of a "Romance Scam" (that individual believed that she

was facilitating bank transfers for a person she had met on an online dating site).  The Claimants

retrieved most of the funds, but they did not retrieve $448,840.92 and learned that it had been

transferred to an account held by Prime Trust, LLC for BUS' benefit.

7.     The Claimants then coordinated with federal authorities, and the Secret Service

seized $448,840.92 from that account ("Seized Funds").  The United States then initiated a

forfeiture action in U.S. District Court in the Eastern District of Texas.  Ultimately, the U.S.

Attorney's Office for the Eastern District of Texas agreed with BUS' position regarding the Seized

Funds and filed a Motion to Dismiss the Forfeiture Complaint on September 3, 2021.  However,

because Claimants objected to that motion, the Court initially denied the motion.  The United

States then filed a motion for reconsideration, explaining that the Seized Funds were not

forfeitable, and that even if they were, BUS was an "innocent owner" that could not be liable.

Upon reconsideration, in June 2022, the Court granted the motion but ordered the government to

file an interpleader action and deposit the funds with the Court's registry.

8.     Subsequently, BUS filed bankruptcy, and while the interpleader action in the

Eastern District of Texas is pending, there has been no activity due to the automatic stay.  The Plan

Administrator now files this Objection to disallow the Forgey Claim and to gain possession of the

Seized Funds.  The Forgey Claim should be disallowed, and the funds released to the Plan

Administrator, for the following reasons:

9.      *First,* there can be no dispute that BUS owns the Seized Funds.  Assuming all of the facts asserted by the Claimants to be true, it is clear that the Seized Funds *are not* the same funds that the Claimants wired to the fraudster.  The reason is simple.  The accountholder had purchased cryptocurrencies and withdrew those cryptocurrencies well before the Secret Service took the Seized Funds.  The Seized Funds, in other words, are BUS' property that *other* customers use to purchase and sell cryptocurrencies.  Even the governmental entities that seized the funds realized this point and sought to release the funds to BUS.

10.     *Second*, the Claimants have asserted a constructive trust over the Seized Funds. This claim fails because BUS had no reason to suspect that the accountholder was using money obtained from the Claimants, and indeed, only learned about the underlying real estate transaction *after* the accountholder had withdrawn cryptocurrencies.

11.     *Third*, the Claimants' argument that BUS was unjustly enriched falls flat for the simple reason that BUS has not been "enriched."  The accountholder used the funds to purchase cryptocurrency, and then withdrew that cryptocurrency.  The Claimants should bring an unjust enrichment claim against the accountholder, not BUS.

12.     *Fourth*, the Claimants argument that they should take the Seized Funds based on "money had and received" fails for the same reason—BUS does not have the Claimants' funds.

13.     *Fifth*, the Claimants argue that BUS is the recipient of a fraudulent transfer.  This cause of action fails for multiple reasons, including that BUS at all times acted in good faith and provided reasonably equivalent value to the accountholder.

## BACKGROUND

### I.     BUS' Account With Prime Trust

14.    Prime Trust, LLC ("Prime Trust") is a Nevada retail trust company that provided money services to cryptocurrency companies, including BUS.[2]  BUS Forfeiture Claim ¶ 3.[3]  BUS and Prime Trust were parties to a Self-Directed Account Agreement ("Custodial Agreement"), pursuant to which BUS maintained an account at Prime Trust ("Custodial Account").  *Id.*  BUS used the Custodial Account to hold fiat currencies deposited by its customers and would credit those amounts to customer accounts, which the customers could then use to purchase cryptocurrencies on the BUS platform.  D.I. 8 at 7 (Cash Management Motion ¶ 17).  The Prime Trust FBO Account held the majority of cash transferred by the Debtors' customers.  *Id.* at 8 (Cash Management Motion ¶ 20).

15.    The Custodial Agreement authorized Prime Trust to open other accounts for the benefit of BUS and to "hold as custodian [for BUS] all assets deposited to, or collected with respect to such Account."  BUS Forfeiture Claim ¶ 4.  Prime Trust, in turn, had opened an account at Pacific Mercantile Bank ("PMB Account") for the benefit of BUS.  *Id.* ¶ 5.  Indeed, Prime Trust's name for the PMB Account was "Prime Trust FBO PMB 355924" and Prime Trust identified the PMB Account as "Bittrex Clearing."  *Id.* ¶ 6.

### II.     The Claimed Funds And The Seized Funds

16.    In August 2020, Jason Forgey, the owner and operator of FLG and Excel, was acting as an escrow agent in a property refinance transaction between NASK Investments, LLC

---

[2]  Prime Trust, along with certain of its affiliates, have filed chapter 11 petitions that pending in this District.  *In re Prime Core Techs., Inc. et al.*, Case No. 23-11161 (Bankr. D. Del.).

[3]  "BUS Forfeiture Claim" means the *Verified Claim* filed by BUS on June 22, 2021 in *United States of America v. $448,840.92 in United States Currency*, Case No. 4:21-CV00202, D.I. 8 (E.D. Tex.).

and Hunt Servicing Company.  Forfeiture Affidavit ¶ 4.[4]  On August 28, 2023, Forgey purportedly received an email purportedly from Hunt Servicing Company ("Hunt") that contained new wiring instructions for the transaction ("August 28 Email").  *Id.*  Forgey contends that he believed the August 28 Email was genuine, and, on September 1, 2020, wired $1,237,792.41 from Excel's account at First United Bank ("Excel Account") to a JP Morgan Chase Bank account ("Chase Account").  *Id.*

17.    The August 28 Email was purportedly fraudulent.  *Id.*  According to the Claimants, the Chase Account was owned by an individual named ███████████, who was a victim of a "Romance Scam," in which ██████ believed she was facilitating bank transfers for an individual she met online.  *Id.* ¶ 5.

18.    Forgey learned that $448,840.92 of the funds ("Claimed Funds") were forwarded to the PMB Account.  Forgey Forfeiture Claim ¶ 7.[5]  ██████, a BUS accountholder, had deposited the Claimed Funds with BUS, which were placed in the PMB Account via Prime Trust.  BUS Forfeiture Claim ¶ 7.  BUS credited that amount to the ██████ BUS account, who then purchased cryptocurrencies from other BUS accountholders and then withdrew the cryptocurrencies from the BUS platform.  *Id.* ¶ 7.  In other words, the accountholder converted the Claimed Funds into cryptocurrencies and withdrew the cryptocurrencies from the BUS platform.  The accountholder took all of these actions before BUS was notified of the potential fraud on

---

[4]  "Forfeiture Affidavit" means the *Affidavit in Support of Complaint for Forfeiture* filed by the United States of America on March 16, 2021 in *United States of America v. $448,840.92 in United States Currency*, Case No. 4:21-CV00202, D.I. 1 (E.D. Tex.).

[5]  "Forgey Forfeiture Claim" means the *Verified Claim to Assert Interest in $448,840.92 in United States Currency* filed by Forgey on June 21, 2021 in *United States of America v. $448,840.92 in United States Currency*, Case No. 4:21-CV00202, D.I. 5 (E.D. Tex.).

September 3, 2020, by which time there was a zero balance in the Nguyen account.  *Id.*; Maria Decl. ¶¶ 11-12.

19.     On September 2, 2020, Forgey learned that Hunt had not received the funds and that the funds were sent to an account not owned by Hunt.  Forgey Forfeiture Claim ¶ 5.  Forgey attempted to get back the funds, and JP Morgan Chase Bank returned $797,817.92 on September 22, 2020.  *Id.* ¶ 6.  On September 3, 2020, First United Bank contacted PMB to alert it of the potential fraud.  Maria Decl. ¶ 12.  PMB then contacted Prime Trust, which in turn, contacted BUS.  *Id.*  But by the time BUS was notified of the potential fraud, the accountholder had already withdrawn the purchased cryptocurrencies from the BUS platform.  *Id.*

20.     The United States Secret Service executed a warrant on Pacific Mercantile Bank and the PMB Account was frozen.  $448,840.92 of funds in the PMB Account were then seized on September 23, 2020, pursuant to a federal seizure warrant.  Forgey Forfeiture Claim ¶ 8.  But, by that time, the accountholder's account at BUS had no money or cryptocurrencies.  BUS Forfeiture Claim ¶ 9.  In other words, the government seized BUS' funds *that were not the Claimed Funds*.

21.     On December 18, 2020, Excel submitted a Petition for Remission/Mitigation to the United States, asserting an interest in the Seized Funds.  See Forgey Claim.

## III.    The Forfeiture Action

22.     On March 16, 2021, the United States of America filed a *Verified Complaint for Forfeiture in Rem* ("Forfeiture Complaint") and the Forfeiture Affidavit with respect to the Seized Funds.  *United States of America v. $448,840.92 in United States Currency*, Case No. 4:21-CV00202, (E.D. Tex.) ("Forfeiture Action").

23.     On June 21, 2021, the Claimants filed a claim to the Seized Funds ("Claimants Forgey Forfeiture Claim"), asserting that they used their personal funds to make up the shortfall in the refinance transaction. Forgey Forfeiture Claim ¶ 10. The next day, BUS filed a claim to the Seized Funds ("BUS Forfeiture Claim"), explaining that it owned the Seized Funds, and that because the accountholder had purchased and withdrawn cryptocurrencies, the government had seized funds *other* than the Claimed Funds. BUS Forfeiture Claim ¶ 11. The United States has recognized that BUS demonstrated "a custodial relationship between PMB and [BUS], namely that PMB was holding the funds as custodian for [BUS] while [BUS] had already credited their customer's—the fraudster's—account with an equal value of cryptocurrency." Reconsideration Motion at 3.[6] BUS also provided documents to the United States showing that BUS "had a customer to whose account the fraudulent proceeds were credited, and [BUS] allowed that customer to trade those funds as cryptocurrency immediately upon deposit of the fiat currency into the Prime Trust Account at PMB and before [BUS] was put on notice by law enforcement of any fraud. These transactions took place without moving the fiat currency out of PMB, which is why the bank still showed the funds on deposit." Reconsideration Motion at 4.

24.     The United States moved to dismiss the Forfeiture Action, but the Court denied that motion. The United States then filed the Reconsideration Motion. It explained in the Reconsideration Motion that the U.S. Attorney's Office has consulted with the Money Laundering Asset Recovery Section of the Department of Justice and was advised that it could not legally prevail with respect to the Seized Funds. Reconsideration Motion at 3-4.

---

[6]  "Reconsideration Motion" means the *United States's Motion for Reconsideration* filed by the United States on December 20, 2021 in *United States of America v. $448,840.92 in United States Currency*, Case No. 4:21-CV00202, D.I. 17 (E.D. Tex.).

25.    In the Reconsideration Motion, the United States set out the reasons why BUS is entitled to the Seized Funds, and the Claimants are not.  The United States explained that it could not establish forfeitability for the simple reason that the Seized Funds were not the Claimants' funds.  It detailed that the "forfeitable" proceeds are the cryptocurrencies in ███████ possession and used an apt analogy: "Much like when a drug dealer uses his ill-gotten proceeds to purchase a car from a legitimate car dealership, the government cannot seize the cash from the car dealership just because the car is long gone."  *Id.* at 6-7.

26.    The United States also explained that even if the Seized Funds were forfeitable, the Claimants were not entitled to them because BUS is an "innocent owner."  It set out why: (i) BUS acquired the funds by a valid assignment when ███████ transferred the money to the PMB Account; (ii) BUS acquired the funds and exchanged equivalent value to ██████; and (iii) BUS exchanged the funds before it knew about the fraudulent origin.  *Id.* at 7-8.

27.    On June 22, 2022, the District Court granted the Reconsideration Motion and dismissed the Forfeiture Action, on the condition that the United States of America file an interpleader action and deposit the Seized Funds following the filing of an interpleader action. *United States of America v. $448,840.92 in United States Currency*, Case No. 4:21-CV00202, D.I. 24 (E.D. Tex.).

IV.    **The Interpleader Action**

28.    On July 22, 2022, the United States filed a *Complaint for Interpleader and Injunctive Relief* ("Interpleader Complaint").  *United States of America v. Bittrex, Inc. et al.*, Case No. 4:22-cv-626, D.I. 1 (E.D. Tex.) ("Interpleader Action").  It asserted that it had possession of the Seized Funds, that both the Claimants and BUS had asserted an ownership interest in the Seized Funds, and that it would deposit the Seized Funds into the court's register.  Interpleader Complaint

¶¶ 5-6, 13-14.  The United States then deposited the funds into the Court's registry.  *United States of America v. Bittrex, Inc. et al.*, Case No. 4:22-cv-626, D.I. 2, 3 (E.D. Tex.).  Both BUS and Claimants then filed answers to the Interpleader Complaint with claims to the Seized Funds.  *Id.*, D.I. 4, 5.

29.    On October 11, 2022, Claimants filed an amended answer and cross-claims ("Interpleader Cross Claims"), setting out largely the same facts as in the Claimants' Forfeiture Claim, and asserting claims for constructive trust, unjust enrichment, and money had and received over the Seized Funds, or in the alternative, any cryptocurrencies remaining on the BUS platform "traceable to the underlying fraud."  Interpleader Cross Claims ¶¶ 28-43.  For all these claims, Claimants alleged that BUS either knew or should have known through reasonable diligence that the Claimed Funds were obtained through fraud.  *Id.*  The Claimants also asserted a claim to the Seized Funds under the Texas Uniform Fraudulent Transfer Act, asserting that the transfer of the Claimed Funds from the accountholder to BUS was a fraudulent transfer, and were made with actual intent to hinder, delay, or defraud Claimants.  *Id.* ¶¶ 44-49.

30.    On November 11, 2022, BUS filed an answer to the Interpleader Cross Claims ("Interpleader Answer"), explaining, among other things, that the Interpleader Cross Claims were barred because BUS had no part in the underlying conduct and BUS was an innocent owner of the Seized Funds, since the fraudster had already purchased and withdrawn cryptocurrencies before BUS was alerted to the fraud.  Interpleader Answer at 1-2.

31.    The Interpleader Action was stayed when BUS filed bankruptcy (see below).  Since that time, no discovery has taken place and all deadlines have been abated.

### V.        The Bankruptcy Cases and Bar Date

32.        On May 8, 2023 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  Prior to the Petition Date through the Effective Date of the Plan (defined below), the Debtors managed and operated their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  An official committee of unsecured creditors was not appointed in the Chapter 11 Cases.

33.        Additional factual background relating to the Debtors' businesses, capital structure, and circumstances leading to the filing of the Chapter 11 Cases is set forth in the *Declaration of Evan Hengel, Co-Chief Restructuring Officer of the Debtors in Support of Chapter 11 Petitions and First-Day Motions* [D.I. 11] (the "First Day Declaration").

34.        On October 31, 2023, the Court entered its order [D.I. 517] (the "Confirmation Order") confirming the *Amended Chapter 11 Plan of Liquidation of Desolation Holdings LLC and its Debtor Affiliates* (the "Plan").[7]

35.        On November 15, 2023, the Debtors filed a *Notice of Effective Date* [D.I. 563], setting the effective date to the same day (the "Effective Date").  As set forth in the Confirmation Order, as of the Effective Date, all Wind Down Assets vested in the Wind Down Entity, and David Maria was appointed to serve as the Plan Administrator managing the Wind Down Entity.  *See* Confirmation Order ¶¶ 17.G, 52.

36.        Now that the Effective Date has occurred, the Plan Administrator is continuing the claims reconciliation process, and the wind down of the business operations and affairs of the Wind Down Entity.

---

[7] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

### VI.    Schedules and Bar Date Order

37.    On June 5, 2023, the Debtors filed their schedules of assets and liabilities and statements of financial affairs [D.I.s 85–92] (collectively, the "Schedules").  On June 14, 2023, and June 23, 2023, the Debtors filed their amended schedules of assets and liabilities and statements of financial affairs [D.I.s 7–8 filed in Case No. 23-10598-BLS; D.I. 129 filed in Case No. 23-10597-BLS; D.I.s 142–143 filed in Case No. 23-10597-BLS] (collectively, the "Amended Schedules").

38.    On May 24, 2023, the Debtors filed the *Motion of Debtors for Authority to (I) Establish Deadlines for Filing Proofs of Claim, (II) Establishing the Form and Manner of Notice Thereof, and (III) Approving Procedures for Providing Notice of Bar Date* (the "Bar Date Motion") [D.I. 65], which the Court granted on June 7, 2023, setting August 31, 2023 as the general bar date for filing proofs of claim.  [D.I. 107.]

39.    In accordance with the Bar Date Order, the Debtors engaged in extensive noticing of the Bar Dates to provide notice to known and unknown creditors and customers.  Through Omni Agent Solutions ("Omni"), the Debtors' Court-appointed claims and noticing agent, the Debtors promptly served notice of the bar date on all creditors and customers, additionally providing the Debtors' customers with a customized Customer Proof Of Claim Form.  [D.I. 201.]  The Debtors further published the *Notice of Deadlines for Filing of Proofs of Claim* in CoinDesk's The Protocol Email Newsletter on June 14, 2023, June 21, 2023, June 28, 2023; in the Financial Times on June 16, 2023; in the Times of Malta on June 16, 2023; and in The Wall Street Journal on June 15, 2023.  [D.I. 187.]

## VII.    The Forgey Claim

40.     On August 29, 2023, the Claimants filed the Forgey Claim, asserting a claim of

$448,840.92 secured by the Seized Funds, and attaching the Forfeiture Complaint, the Forgey

Forfeiture Claim, the Interpleader Complaint, and Claimants' petition for remission/mitigation.

## OBJECTIONS

### I.    The Forgey Claim Should Be Disallowed Pursuant to Section 502(b)(1)

41.     Section 502(b)(1) of the Bankruptcy Code requires disallowance of a claim if "such

claim is unenforceable against the debtor and property of the debtor, under any agreement or

applicable law[.]"  11 U.S.C. § 502(b)(1).  Section 502(b)(1) "is most naturally understood to

provide that, with limited exceptions, any defense to a claim that is available outside of the

bankruptcy context is also available in bankruptcy." *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas

& Elec. Co.*, 549 U.S. 443, 450 (2007).

### II.    BUS Owns The Seized Funds And Claimants Have No Other Basis For A Claim Against BUS Because BUS Had No Knowledge Of The Underlying Fraud

42.     As explained in detail above, the accountholder deposited the Claimed Funds,

purchased cryptocurrencies, and withdrew all of those cryptocurrencies from the BUS platform

before BUS was notified that the accountholder obtained those funds from the Claimants.  BUS

had no reason to suspect that accountholder had wrongfully obtained the funds from the Claimants,

since there was nothing unusual about the sequence of events from BUS' perspective. *See MLSMK

Inv. Co. v. JP Morgan Chase & Co.*, 431 F. App'x 17, 20 (2d Cir. 2011) ("Banks generally do not

owe non-customers a duty to protect them from fraud perpetrated by customers" unless they have

received "clear evidence" of misappropriation, and that transfers of money, "even of large

accounts," do not constitute "clear evidence" of misappropriation because "it is not unusual for

money to be transferred into and out of investment accounts").  Following the accountholder's

withdrawal of the cryptocurrencies on September 3, 2020, BUS held no assets (fiat or crypto) associated with the accountholder, meaning that the accountholder's account was empty. Therefore, the funds that were seized have no connection to the accountholder, and by extension, the Claimants. As the United States explained, much like when a drug-dealer uses fraudulently obtained proceeds to purchase a car from a legitimate car dealership, the fraud victim cannot seize cash from the car dealership just because he cannot find the car.

43.    The Forgey Claim appears to recognize implicitly that BUS is not in possession of the Claimed Funds and instead suggests that BUS should be liable for failing to prevent the fraud. However, the Third Circuit and courts across the country have held, in analogous circumstances, that banks have no duty to protect noncustomers from fraudulent behavior by third parties absent exceptional circumstances. *Adkins v. Sogliuzzo*, 625 F. App'x 565, 569 (3d Cir. 2015) (holding that bank owed no duty to a non-customer for withdrawals from a customer's account that harmed the customer); *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 519 (5th Cir. 2018) (stating that banks generally owe no duty to non-customers, but may in the limited circumstances where "the bank knows or ought to know of the fiduciary relationship [between the customer and non-customer], and the bank has actual knowledge of its customer's misappropriation"); *SFS Check, LLC v. First Bank of Del.*, 774 F.3d 351, 357 (6th Cir. 2014) ("The almost-universal law in this country is that banks owe a duty of care only to their customers."); *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 225 (4th Cir. 2002) ("Courts in numerous jurisdictions have held that a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship."); *Fragele v. Wells Fargo Bank, N.A.*, 480 F. Supp. 3d 653, 661 (E.D. Pa. 2020) (dismissing negligence action against bank where third party engaged in wire fraud against the plaintiff).

44.     There is no reason to reach a different result here.  BUS had no knowledge of the underlying e-mail scheme until well after the accountholder had withdrawn all of the cryptocurrencies in her account.  Due to this simple fact, the claim against BUS must be disallowed.

## III.    The Claimants' Causes of Action Lack Merit

### A.    There Is No Basis For A Constructive Trust Because BUS Had No Duty To Claimants And Had Nothing To Do With The Fraud

45.     Constructive trusts are equitable, court-created remedies that are designed to prevent unjust enrichment.  *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015).  The party requesting the constructive trust must demonstrate: (1) the breach of a special trust or fiduciary relationship or actual or constructive fraud; (2) unjust enrichment of the wrongdoer; and (3) an identifiable res that can be traced back to the original property.  *Id.*; *see Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993) ("A constructive trust is not designed to effectuate the presumed intent of the parties, but to redress a wrong.  When one party, by virtue of unfair or unconscionable conduct, is enriched at the expense of another to whom she owes some duty, a constructive trust will be imposed."); *see, e.g.*, *In re Green Field Energy Servs., Inc.*, 2018 WL 6191949, at *81 (Bankr. D. Del. Nov. 28, 2018 (denying request for constructive trust because there was no evidence that the defendant received a benefit).  These requirements, particularly the last one, are necessary because a constructive trust "is not merely a vehicle for collecting assets as a form of damages."  *KCM*, 457 S.W.3d at 87; *Matter of Haber Oil Co.*, 12 F.3d 426, 442-43 (5th Cir. 1994) ("[A] constructive trust can attach only to a specific res, or to some identifiable property that can be traced back to the original res acquired by fraud."); *Meadows v. Bierschwale*, 516 S.W.2d 125, 129 (Tex. 1974) ("We agree that a constructive trust on unidentifiable cash proceeds is inappropriate.").

15

46.    The Claimants cannot satisfy their burden.  As detailed above, BUS had no duty to Claimants, who were not BUS customers, and, in any event, had no reason to believe that any of the funds deposited by the accountholder originated from the Claimants.  Moreover, BUS was not unjustly enriched, as the accountholder purchased cryptocurrencies with the Claimed Funds and then withdrew the cryptocurrencies from the BUS platform.  For the same reason, Claimants cannot satisfy the third element, as the only res that can be traced to the Claimed Funds are the cryptocurrencies, which are in the possession of the accountholder, not BUS.  For these reasons, the Forgey Claim must be disallowed.

**B.  Unjust Enrichment And "Money Had And Received" Do Not Apply Because BUS Was Not Enriched**

47.    The Claimants' unjust enrichment theory also fails.  A party may only recovery on a theory of unjust enrichment when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.  *Heldenfels Bros, Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).  Unjust enrichment is not appropriate "merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss."  *In re General Motors LLC Ignition Switch Litig*, 257 F. Supp. 2d 372, 454-55 (S.D.N.Y. 2017)  (Texas law); *see Nemec v. Shrader*, 991 A.2d 1120, 991 A.2d 1120, 1130 (Del. 2010) (defining unjust enrichment as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience" and requiring proof of enrichment, impoverishment, a relation between enrichment and impoverishment, the absence of justification, and the absence of a remedy provided by law).

48.    Similarly, a claim for "money had and received" only exists when "defendant obtains money which in equity and good conscience belongs to the plaintiff" and asks whether "the defendant has received money which rightfully belongs to another."  *Amoco Prod. Co. v.*

16

*Smith*, 946 S.W.2d 162, 164 (Tex. Ct. App. 1997).   This claim "belongs conceptually to the

doctrine of unjust enrichment."  *Id.*; *Deloitte (Cayman) Corp. Recovery Servs., Ltd. v. Sandalwood*

*Debt Fund A, LP*, 2011 WL 1833282, at *10 (N.Y. Sup. Ct. May 6, 2011) (under Delaware law,

cause of action for money had and received is the "legal equivalent of an equitable claim for unjust

enrichment").

49.      As is the case with the Claimant's constructive trust theory, these two additional

theories fail for the simple reason that BUS has not been enriched.  The accountholder purchased

cryptocurrencies with the Claimed Funds and withdrew those cryptocurrencies from the BUS

platform.  While this claim may have some merit against the accountholder, it has none against

BUS.

### C. The Fraudulent Transfer Claim Fails Because The Accountholder Has Withdrawn The Cryptocurrencies Purchased With The Claimed Funds

50.      Claimant's final theory is that they can recover the Seized Funds under Texas'

Uniform Fraudulent Transfer Act.  They assert that they are a "creditor" of the accountholder, and

that the accountholder transferred funds to BUS.

51.      The problem with this argument is that, even if Claimants can prove that the transfer

of the funds to BUS was fraudulent,[8] BUS took the transfer in good faith and for reasonably

equivalent value, meaning that the transfer of the funds from the account holder to BUS is not

voidable under either Texas Business & Professions Code §§ 24.005 or 24.006.[9]  As detailed

---

[8]  The Claimants bear the burden of proof of demonstrating that the requirement of Texas Bus. & Com. Code § 24.005 or §24.006.  *In re SMTC Mfg. of Texas*, 421 B.R. 251, 278-79 (Bankr. W.D. Tex. 2009).

[9]   Texas Bus. & Com. Code § 24.005(a)(2) and 24.006 requires that the Claimants prove the accountholder did not receive reasonably equivalent value in exchange for the transfer.  Moreover, transfers are not voidable under Texas Bus. & Com. Code § 24.005(a)(1) if the transferee received the transfer in good faith and for reasonably equivalent value.  Texas Bus. & Com. Code § 24.009(a).

above, the accountholder deposited the Claimed Funds with BUS, which were placed in the PMB Account via Prime Trust, BUS credited that amount to the accountholder's BUS account, the accountholder purchased cryptocurrencies from other BUS accountholders, and the accountholder withdrew the cryptocurrencies from the BUS platform.  There was nothing unusual about this sequence of events from BUS' perspective, and they were all completed before BUS learned that the funds may have originated from Claimants.  Under these facts, there can be no doubt that BUS was acting in good faith.  Moreover, BUS provided reasonably equivalent value in exchange for the transfer.[10]  After depositing the funds, the accountholder used those funds to purchase cryptocurrencies, and then withdrew those cryptocurrencies.

## CONCLUSION

WHEREFORE, the Plan Administrator respectfully requests that the Court: (i) sustain this Objection; (ii) find that the Claimants have no interest in the Seized Funds and that the Wind Down Entity owns the Seized Funds; and (iii) disallow the Forgey Claim.

---

[10]  The United States agrees, having conceded in the Forfeiture Action that BUS was a "bona fide purchaser" meaning that it obtained the funds "in good faith and fore equivalent value."  Reconsideration Motion at 8.

Date: December 29, 2023
Wilmington, DE

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/  Kenneth J. Enos*

Robert S. Brady (Delaware Bar No. 2847)
Kenneth J. Enos (Delaware Bar No. 4544)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: 302-571-6600
Facsimile: 302-571-1253
Email: rbrady@ycst.com
Email: kenos@ycst.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Susheel Kirpalani *(admitted pro hac vice)*
Patricia B. Tomasco *(admitted pro hac vice)*
Daniel Holzman *(admitted pro hac vice)*
Alain Jaquet *(admitted pro hac vice)*
Razmig Izakelian *(admitted pro hac vice)*
Joanna D. Caytas *(admitted pro hac vice)*
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: 212-849-7000
Facsimile: 212-849-7100
Email: susheelkirpalani@quinnemanuel.com
Email: pattytomasco@quinnemanuel.com
Email: danielholzman@quinnemanuel.com
Email: alainjaquet@quinnemanuel.com
Email: razmigizakelian@quinnemanuel.com
Email: joannacaytas@quinnemanuel.com

**COUNSEL FOR THE PLAN ADMINISTRATOR**