# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Desolation Holdings LLC, *et al.,*[1]<br><br>Wind Down Entity. | Chapter 11<br><br>Case No. 23-10597 (BLS)<br><br>(Jointly Administered)<br><br>Re: Docket No. 862 |

### DECLARATION OF DAVID MARIA IN SUPPORT OF
### BITTREX INC.'S SUBSTANTIVE OBJECTION TO PROOF OF CLAIM
### FILED BY FTX TRADING LTD., *ET AL.* (CLAIM NO. 1099)

I, David Maria, of Bittrex, Inc. ("BUS"), pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge information, and belief:

1. I am the General Counsel and Chief Legal Officer for BUS, and the Plan Administrator for the Debtors. I joined BUS in May 2021 as Head of Litigation and Regulatory Affairs. I was appointed as General Counsel and Chief Legal Officer in December 2022. Before joining BUS, I was a principal at Squire Patton Boggs, where I focused my practice on government investigations and white collar crime. Previously I served as an Assistant United States Attorney in the District of Minnesota, a partner at Shook Hardy & Bacon L.L.P., and as a trial attorney at the United States Department of Justice, Criminal Division. I received a J.D. from Georgetown University Law Center, a Master of Science in Physiology from Georgetown University, and a Bachelor of Arts from the University of Virginia. Accordingly, I am in all respects competent to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor entity's tax identification number, are: Desolation Holdings LLC (0439); Bittrex, Inc. (0908); Bittrex Malta Holdings Ltd. (2227); and Bittrex Malta Ltd. (1764). The mailing and service address of the Debtors is 701 5th Avenue, Suite 4200, Seattle WA 98104.

make this declaration (the "Declaration").

2.      I submit this Declaration in support of *Bittrex's Substantive Objection to Proof of Claim filed by FTX Trading, Ltd., et al. (Claim No. 1099)* (the "Objection"), dated as of the date hereof and filed contemporaneously herewith.[2]

3.      I am over the age of eighteen and am authorized, by BUS, to submit this Declaration. All statements in this Declaration are based upon my personal knowledge, information I learned from others at BUS, and/or my review (or the review of others under my supervision) of (i) business books and records maintained by BUS in the ordinary course of business; (ii) proof of claim No. 1099, (iii) the Schedules, and/or (iv) the official register of claims filed in these chapter 11 cases. If called as a witness, I could and would competently testify to the facts set forth in this Declaration.

4.      The Claim was carefully reviewed and analyzed in good faith using due diligence by myself, and BUS's counsel at Potter Anderson & Corroon LLP.

5.      In December 2018, Alameda Research LLC and BUS entered into the Loan Agreement under which BUS agreed to lend Alameda Research LLC certain digital currency, with an original value of approximately $3.5 million, upon the terms of certain concurrently issued term sheets. Loan Agreement, Ex. B. A true and correct copy of the Loan Agreement is attached hereto as **Exhibit 1**.

6.      The Loan Agreement provides that:

> Borrower shall, at all times during which any Loans remain outstanding, maintain on deposit in the Collateral Account an amount in Digital Currency (the "Digital Currency Collateral")[3] no less than the Collateral Margin Call Rate specified in the Loan Term sheet multiplied by the aggregate value of the Digital Currency loaned

---

[2]  Capitalized terms used but not defined herein shall have the meanings given to them in the Objection.
[3]  Per the Loan Agreement, "Digital Currency" means the digital currency specified in the Loan Term Sheet.

to Borrower under all outstanding Loans as of the Loan Effective Date for such loans calculated at the Spot Rate.[4]

Loan Agreement, 5.3(a).

7. Furthermore, it provides that:

If at any time while a Loan is outstanding, (x) the value of the Digital Currency borrowed pursuant to such Loan as calculated at the Spot Rate (such rate, the "Margin Call Spot Rate") is greater than (y) (i) the value of the Digital Currency at the "Collateral Spot Price" indicated in the Loan Term Sheet or (ii) the prior Margin Call Spot Rate, as applicable, by the Margin Differential or more, Lender shall have the right to require Borrower to deposit additional Digital Currency Collateral so that the value of the Collateral in the Collateral Account with respect to such loan is at least the "Collateral Margin Call Rate" indicated in the Loan Term Sheet relative to the value of the borrowed Digital Currency at the Margin Call Spot Rate (the "Additional Collateral").

Loan Agreement, 5.3(b)(1).

8. The Loan Agreement contained a provision that a Margin Call may result if 75% of Digital Currency Loan USD Equivalent Value at time of disbursement (issuance value) is not met in the account (the "Margin Call Rate").  Loan Agreement, Ex. B.  Moreover, the Borrower's failure to deposit Additional Collateral in the Collateral Account[5] within "six (6) hours (twelve (12) hours on a day that is not a Business Day)" from the time the Lender sends a Notification[6] to deposit Additional Collateral in the Collateral Account (as defined in the Agreement) constituted an Event of Default.  Loan Agreement, 5.3(b)(ii).

9. The digital currency loaned by BUS to Alameda Research LLC was placed into the Collateral Account on BUS's crypto exchange and served as collateral for the loans.  In other

---

[4] Per the Loan Agreement, "Spot Rate" means the spot rate published by Lender for the applicable Digital Currency.

[5] Per the Loan Agreement, "Collateral Account" means an account of Borrower maintained with BUS specified in the Loan Term Sheet.

[6] Per the Loan Agreement, if the Lender required the Borrower to contribute Additional Collateral, Lender shall send an email notification (the "Notification") to the Borrower's email address setting forth: (y) the Margin Call Spot Rate and (z) the amount of Additional Collateral required based on the Margin Call Spot Rate.

words, BUS provided Alameda Research LLC with the collateral for its own loan obligations; the digital currency placed into the Collateral Account was never separate property of Alameda Research LLC or any of the other FTX Debtors.

10. In early 2019, Alameda Research LLC informed Bittrex that it intended to operate primarily out of offices in Hong Kong. Because BUS had ceased servicing non-U.S. customers upon establishing its international arm, Alameda Research LLC applied for a corporate account at Bittrex International in April 2019. The application was approved, the Collateral Account was moved to Bittrex International, and Alameda adopted the Bittrex International Terms of Service. When Bittrex Global became operational in October 2019, the Collateral Account was moved from Bittrex International to Bittrex Global. As with all customers that were moved from Bittrex International to Bittrex Global, Alameda adopted the Bittrex Global Terms of Service.

11. On March 14, 2022, Alameda Research LLC and BUS entered into an amended term sheet (the "Amended Term Sheet"). On April 8, 2022, Alameda Research LLC assigned its obligations under the Loan Agreement and any term sheets issued pursuant thereto, to Alameda (the "Assignment"). A true and correct copy of the Assignment is attached hereto as **Exhibit 2**. At the time of the Assignment, the value of the Collateral Account was approximately $69.8 million. The Amended Term Sheet provided that a:

> Margin Call may result if 35% of Digital Currency Loan USD Equivalent Value not met in the account. Since loan payback required in the cryptocurrency provided, drop due to market conditions only may not result in Margin Call. Bittrex has discretion whether to Margin Call if account USD value drops below 35% of issuance value.

Amended Term Sheet, Ex. B.

12. Thus, following the Assignment (and in fact much earlier), the Collateral Account was held on the Bittrex Global exchange, separate and apart from the exchange maintained by

BUS.  BUS had no right to access the digital currency in the Collateral Account once it was hosted on the Bittrex Global exchange, nor did BUS have the ability to control Bittrex Global's decisions with respect to the Collateral Account.

13.    As the eventual collapse of the FTX Debtors approached, Alameda began withdrawing large amounts of digital currency from the Collateral Account.  Bittrex Global froze the Collateral Account on or about November 8, 2022.  The digital currency that was frozen at that time remains with Bittrex Global, and, at no point was the digital currency, or the value thereof, transferred from Bittrex Global to BUS.  BUS does not have access to those assets, as they remain in the possession and control of Bittrex Global.  These assets are not identified on BUS's Schedules or Amended Schedules and quite simply are not assets of its estate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements true and correct to the best of my knowledge, information and belief.

Dated: December 29, 2023

*/s/ David Maria*
David Maria
General Counsel and Chief Legal Officer for Bittrex, Inc.