**<u>EXHIBIT 1</u>**

**Loan Agreement**

# MASTER DIGITAL CURRENCY LOAN AND SECURITY AGREEMENT

This Master Digital Currency Loan and Security Agreement ("Agreement") is made on **12/11/2018** ("Effective Date") by and between Bittrex, Inc. (together with its successors and assigns, "Lender"), a Delaware corporation with its principal place of business at 800 Fifth St., Suite 4100, Seattle, WA 98104, and Alameda Research LLC ("Borrower"), a Delaware corporation with its registered office at 2000 Center Street Floor 4, Berkeley, CA 94704.

## RECITALS

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend Digital Currency to Borrower and Borrower will return such Digital Currency to Lender upon the termination of the Loan; and

**NOW, THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, Borrower and Lender hereby agree as follows:

## 1.    DEFINITIONS

*"Affiliate"* means, with respect to any Person, each other Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, that Person's managers and members.

*"Agreement"* has the meaning set forth in the introductory paragraph hereof, as the same may be amended, supplemented, replaced or otherwise modified from time to time.

*"Authorized Agent"* means the authorized agents of Borrower set forth in Exhibit A.

*"Availability Amount"* means (a) the Revolving Line minus (b) the outstanding principal balance of any Loans.

*"Borrower"* has the meaning set forth in the introductory paragraph hereof.

*"Business Day"* means a day on which Lender is open for business. Lender follows the New York Stock Exchange calendar of holidays.

*"Code"* means the Uniform Commercial Code, as the same may, from time to time, be enacted and in effect in the State of Washington; provided, that, to the extent that the Code is used to define any term herein and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, or priority of, or remedies with respect to, Lender's security interest in any Collateral is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of Washington, the term *"Code"* shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof

DocuSign Envelope ID: 503E9DD9-0BE7-41EC-B8DA-FD45897A3A71

relating to such attachment, perfection, priority, or remedies and for purposes of definitions relating to such provisions.

"*Collateral*" means the Collateral Account and all amounts on deposit therein and all proceeds thereof, including any Digital Currency Collateral and Additional Collateral.[1]

"*Collateral Account*" means an account of Borrower maintained with Bittrex, Inc. specified in the Loan Term Sheet.

"*Digital Currency*" means the Digital Currency specified in the Loan Term Sheet.

"*Digital Currency Address*" means an identifier of 26-34 alphanumeric characters that represents a possible destination for a transfer of Digital Currency.

"*Dollars*," "*dollars*" or use of the sign "$" means only lawful money of the United States and not any other currency, regardless of whether that currency uses the "$" sign to denote its currency or may be readily converted into lawful money of the United States.

"*Effective Date*" has the meaning set forth in the introductory paragraph hereof.

"*Governmental Approval*" is any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

"*Governmental Authority*" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"*Hard Fork*" means a permanent divergence in the block chain.[2]  Notwithstanding the foregoing, for purposes of this Agreement, a Hard Fork will have been deemed to have occurred if any two of the following four conditions are met:

(a)    *Hash Power*: the average hash power mining the New Token on the 30th day following the occurrence of the Hard Fork (calculated as a 30-day average on such date) is at least 5% of the hash power mining the relevant Digital Currency on the day preceding the Hard Fork (calculated as a 3-day average of the 3 days preceding the Hard Fork).  The source for the relevant Digital Currency hash power will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source)

---

[1] Bittrex:  Consider making the collateral for the loan not just the amount required to be maintained in the collateral account but all digital currencies maintained in both the collateral account and any other account maintained with Bittex or its affiliates.

[2] *For informational purposes only*: Hardforks commonly occur when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules or an airdrop or any other event which results in the creation of a new token.

OMM_US:76486450.5

and the source for the hash power of the New Token will be bitinfocharts.com (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).

(b)  *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the relevant Digital Currency (defined as the total value of the relevant Digital Currency) (calculated as a 30-day average on such date). The source for the relevant Digital Currency market capitalization will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the market capitalization of the New Token will be (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).

(c)  *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the relevant Digital Currency (calculated as a 30-day average on such date). The source for the relevant Digital Currency 24-hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the 24-hour trading volume of the New Token will be (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).

(d)  *Wallet Compatibility*: the New Token is supported by either BitGo wallets or Ledger wallets[3] within 30 days of the Hard Fork.

"*Lender*" has the meaning set forth in the introductory paragraph hereof.

"*Lender Expenses*" are all costs and expenses of Lender (including attorneys' fees and expenses (whether generated in-house or by outside counsel), audit fees and expenses, court costs, whether or not suit is instituted, and, if suit is instituted, whether at trial court level, appellate court level, in a bankruptcy, probate or administrative proceeding or otherwise) for preparing, amending, negotiating, administering, defending and enforcing this Agreement or any documents entered into in connection with this Agreement or otherwise incurred with respect to Borrower.

"*Lien*" is a claim, mortgage, deed of trust, levy, charge, pledge, security interest or other encumbrance of any kind, whether voluntarily incurred or arising by operation of law or otherwise against any property.

---

[3] NTD: Bittrex finance team to consider defining "BitGo wallets" and "Ledger wallets".
OMM_US:76486450.5

DocuSign Envelope ID: 503E9DD9-0BE7-41EC-B8DA-FD45897A3A71

"***Loan***" means a loan of Digital Currency made pursuant to and subject to this Agreement.

"***Loan Documents***" are, collectively, this Agreement, the Loan Term Sheet and any schedules, exhibits, certificates, notices, and any other documents related to this Agreement.

"***Loan Effective Date***" means, with respect to each Loan, the date upon which a Loan begins.

"***Loan Term***", with respect to each Loan, has the meaning set forth in the Loan Term Sheet.

"***Loan Term Sheet***" means, with respect to each Loan, the Loan Term Sheet attached hereto as Exhibit B.

"***Makewhole Premium***" means, with respect to a Loan, an amount equal to the amount of interest that would have otherwise accrued and been payable on the principal amount of the Loan from the Redelivery Day through and including the last day of the Minimum Loan Term.

"***Margin Differential***" means the percentage indicated under "Margin Differential" in the Loan Term Sheet.

"***Material Adverse Effect***" means (a) a material adverse effect on the business, operations, properties, assets or condition of Borrower and its subsidiaries, taken as a whole, (b) a material impairment of the rights, remedies or benefits available to Lender, or (c) a material impairment in the perfection and priority of Lender's Lien in the Collateral.

"***Minimum Term***" means, with respect to each Loan, a period commencing on the Loan Effective Date of such Loan and ending on the date that is the number of days after such Loan Effective Date set forth in the "Minimum Term" section of the Loan Term Sheet.

"***Obligations***" mean Borrower's obligations to pay when due any debts, principal, interest, fees, fees, expenses, costs, Lender Expenses, Late Fees, the Makewhole Premium, and other amounts Borrower owes Lender, whether now existing or hereafter arising, whether under this Agreement, the other Loan Documents, or otherwise, and including interest accruing after insolvency proceedings begin, and to perform Borrower's duties under this Agreement and the other Loan Documents.

"***Person***" means any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"***Redelivery Option***" means the option of Borrower to redeliver the amount of Digital Currency loaned to Borrower at any time during the term of the Loan pursuant to the terms of Section 2.2(b).

"***Recall Option***" means the option of Lender to recall a Loan at any time during the term of the deal pursuant to the terms of Section 2.2(a).

"***Requirement of Law***" means, as to any Person, the organizational or governing documents of such Person, and any law (statutory or common), treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"***Responsible Officer***" means any of the Chief Executive Officer, President, Chief Financial Officer and Controller of Borrower.

"***Revolving Line***" means the amount specified in the Loan Term Sheet under "Amount of Digital Currency.

"***Spot Rate***" means the spot rate published by Lender for the applicable Digital Currency.

"***Term***" means the period from the Effective Date to the date that this Agreement is terminated in accordance with its terms.

**1.2    Times of Day.** Unless otherwise specified, all references herein to times of day shall be references to [Eastern] time (daylight or standard, as applicable).

## 2.    GENERAL OPERATION.

**2.1    Loans of Digital Currency.** Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request Lender to make a Loan to Borrower a specified amount of Digital Currency not to exceed the Availability Amount, and Lender may, in its sole and absolute discretion, extend such Loan or decline to extend such Loan. Amounts borrowed under the Revolving Line may be repaid and, during the Term of this Agreement, reborrowed, subject to the applicable terms and conditions precedent herein. Nothing herein shall be construed as a commitment by Lender to make any Loans requested.

(a)    Loan Procedure. From time to time during the Term of this Agreement, at any time from the hours of 9:00 am to 3:00 pm on a Business Day (the "Request Day"), an Authorized Agent may request from Lender a Loan of a specific number of Digital Currency (a "Lending Request") by sending electronic mail to Lender's email address provided in Section 11.2. Lending Requests received after 3:00 pm shall be deemed received at the opening of business on the next Business Day. Lender shall inform Borrower whether Lender agrees to make such a Loan by sending an email to Borrower's email address provided in the Loan Term Sheet. Lender's failure to respond prior to 5:00 pm on the day of the Lending Request shall be deemed as a denial of such Lending Request.

(b)    As part of its Lending Request, Borrower shall provide the following information:

(i)    the amount and type of Digital Currency requested;

(ii)     the proposed Loan Effective Date, which shall be no sooner than [___] days following the date of the Lending Request; [4]

(iii)     a certification that (a) all representations and warranties set forth in this agreement remain true in all material respects as of the date of such Lending Request and the proposed Loan Effective Date and (b) no Event of Default exists as of the date of the proposed Loan Effective Date and no Event of Default will exist after or as a result of the making of the requested Loan.

(c)     If Lender agrees to make a Loan, Lender shall inform Borrower whether Lender agrees to make such a Loan by sending an email to Borrower's email address provided in the Loan Term Sheet and commence transmission to Borrower's Digital Currency Address the amount of Digital Currency set forth in the Lending Request (the "<u>Borrowed Amount</u>") on or before 5:00 pm on the proposed Loan Effective Date.

## 2.2     Recall Option and Redelivery Option.

(a)     <u>Lender Recall Option</u>. Lender may, upon written notice to Borrower, at any time from 9:00 am until 5:00 pm on a Business Day (the "<u>Recall Request Day</u>") exercise the Recall Option and recall all or any portion of Borrowed Amount of any Loan together with all interest accrued thereon and all Late Fees (if any) in connection therewith (the "<u>Recall Amount</u>"). Borrower shall deliver the Recall Amount no later than 5:00 pm on the date that is the later of (i) seven (7) days following the Recall Request Day and (ii) the end of the Minimum Term for such Loan (the "<u>Recall Delivery Day</u>").

(b)     <u>Buyer Redelivery Option</u>. Borrower may, upon seven (7) days' prior written notice to Lender (a "<u>Redelivery Notice</u>"), which shall be irrevocable, at any time from 9:00 am until 5:00 pm on [a Business Day] (the "<u>Redelivery Day</u>") exercise the Redelivery Option to deliver to Lender all or any portion of the Borrowed Amount of any Loan. On the Redelivery Day, the amount of the Digital Currency loaned to Borrower set forth in such Redelivery Notice together with all accrued interest thereon and all Late Fees in connection therewith and, if the Redelivery Day occurs prior to the end of the Minimum Term, the Makewhole Premium.

## 2.3     Termination of Loans. A Loan outstanding hereunder shall terminate upon the occurrence of any of the following (each, a "<u>**Termination**</u>"):

(a)     The Recall Delivery Day of such Loan;

(b)     the Redelivery Day of such Loan;

(c)     at the termination of this Agreement in accordance with its terms; and

(d)     upon acceleration after the occurrence of an Event of Default.

---

[4] Bittrex to confirm.
OMM_US:76486450.5

DocuSign Envelope ID: 503E9DD9-0BE7-41EC-B8DA-FD45897A3A71

**2.4**     **Redelivery of Borrowed Digital Currency**.

(a)     Redelivery Upon Termination. Upon Termination of any Loan pursuant to Section 2.3, Borrower shall, on or before 5:00 pm of the day that such Termination occurs (the "Termination Date"), redeliver to Lender the Borrowed Amount of such Loan together with all accrued interest thereon, all Late Fees in connection therewith, and, if the Termination occurs prior to the end of the Minimum Term for such Loan (whether before or after the occurrence of an Event of Default or an acceleration of the Obligations hereunder), the Makewhole Premium. For the avoidance of doubt, all Loans and all other outstanding Obligations shall immediately terminate and be repayable in full upon (i) termination of this Agreement in accordance with its terms or (ii) acceleration by Lender after the occurrence of an Event of Default.

(b)     Application of Payments. Lender has the exclusive right to determine the order and manner in which all payments with respect to the Obligations may be applied. Borrower shall have no right to specify the order or the accounts to which Lender shall allocate or apply any payments required to be made by Borrower to Lender or otherwise received by Lender under this Agreement when any such allocation or application is not specified elsewhere in this Agreement.

(c)     Manner and Time of Payment. Redelivery by Borrower of the Borrowed Amount of a Loan shall be made in the same form as the Digital Currency borrowed under such Loan, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to Lender not later than 5:00 pm on the date due at an account designated by Lender; funds received by Lender after that time on such due date shall be deemed to have been paid by Borrower on the next succeeding day. Borrower hereby authorizes Lender to charge its accounts with Lender in order to cause timely payment to be made to Lender of all principal, interest, fees and expenses due hereunder (subject to sufficient funds being available in its accounts for that purpose).

(d)     [Redelivery in an Illiquid Market. If the market for the borrowed Digital Currency becomes Illiquid (as defined below), Borrower may repay any Loan when due in U.S. Dollars at the Illiquid Market Spot Rate (as defined below) (the "Cash Repayment Option"). The market in the borrowed Digital Currency is deemed "Illiquid" if the seven-day average daily trading volume across each of the top three exchanges, as determined by Lender, reporting prices for the borrowed Digital Currency (as measured by the 30-day average daily trading volume on the Loan Effective Date) (such exchanges, the "Liquidity Exchanges") has decreased by [90]%, measured from such Loan's Loan Effective Date to such Loan's Termination Date, or if the borrowed Digital Currency ceases to be listed on any of the Liquidity Exchanges. If Borrower elects to exercise the Cash Repayment Option, Borrower shall repay an amount in Dollars equal to the volume-weighted average price on the Liquidity Exchanges (measured at 4:00 p.m.) of the borrowed Digital Currency during the time the market is Illiquid, [up to a maximum of 30 days], on the applicable Termination Date (the "Illiquid Market Spot Rate").] [5]

---

[5] NTD: Bittrex finance team to confirm whether to include the Illiquid Market provision.
OMM_US:76486450.5

3.     **CONDITIONS PRECEDENT.**

    **3.1     Conditions Precedent to Closing.** The effectiveness of this Agreement is subject to the condition precedent that Lender shall have received, in form and substance satisfactory to Lender, such documents, and completion of such other matters, as Lender may reasonably deem necessary or appropriate, including, without limitation:

        (a)     copies of duly executed original signatures to the Loan Documents;

        (b)     Borrower's formation documents and good standing certificates of Borrower, each certified by the Secretary of State of the jurisdiction of formation of such entity and Borrower's operating agreement (or similar agreement), with all current amendments or modifications thereto; and

        (c)     payment of the fees, including without limitation Lender Expenses, then due as specified by Section 4 hereof.[6]

    **3.2     Conditions Precedent to all Loans.** The making of each Loan by Lender is subject to the following conditions precedent:

        (a)     Borrower shall have completed the onboarding procedures as a corporate account on Bittrex, Inc.;

        (b)     the representations and warranties in this Agreement shall be true, accurate, and complete in all material respects on the proposed Loan Effective Date, provided that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date;

        (c)     since the Effective Date, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency that, individually or in the aggregate, constitutes a Material Adverse Effect; and

        (d)     no Event of Default shall have occurred or be continuing.

4.     **INTEREST AND FEES.**

    **4.1     Interest.** The aggregate amount of the value of the Loans outstanding under the Revolving Line, as determined at the Spot Rate, shall accrue interest at a per annum rate equal to the rate set forth in the Loan Term Sheet (the "***Interest Rate***"), provided that if the borrowed Digital Currency has been transferred or traded more than the "Interest Free Turnover Minimum" as specified in the Loan Term Sheet during the Minimum Term, no interest shall be payable with respect to such Loan. Interest shall be payable, unless otherwise agreed in writing by Borrower and Lender, in Dollars. Interest shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed. In computing interest, (i) all payments received after 5:00 p.m. on any day shall be deemed received at the opening of business on the next Business Day, and (ii) the date of the making of any Loan shall be included

---

[6] Bittrex to confirm any additional requirements, for example, lien searches, KYC information, etc.
OMM_US:76486450.5

and the date of payment shall be excluded; provided, however, that if any Loan is repaid on the same day on which it is made, such day shall be included in computing interest on such Loan. Lender's determination of the interest payments shall, absent manifest error, be conclusive and binding upon all parties.

**4.2     Late Fee.** For each calendar day following the Maturity Date, the Recall Delivery Day, the Redelivery Day, or date on which an Event of Default occurs (whichever is applicable) in which Borrower has not returned any Digital Currency, Borrower shall incur an additional fee (the "Late Fee") of 10% (annualized, calculated daily) of the notional amount of the Loan. Fees and expenses which are required to be paid by Borrower pursuant to this Agreement (including, without limitation, Lender Expenses) but are not paid when due shall bear an additional charge of 10% per annum until paid in full. Payment or acceptance of the Late Fee is not an acceptable alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Lender. The Late Fee shall be payable on demand in Dollars, unless otherwise agreed in writing by Borrower and Lender.

**4.3     Makewhole Premium.** The Makewhole Premium, when due and payable hereunder, shall be paid by Borrower to an account designated by Lender in Dollars, unless otherwise agreed in writing by Lender.

**4.4     Taxes and Fees.** All transfer or other taxes or third party fees payable with respect to the transfer and/or return of any Loan of Digital Currency hereunder shall be paid by Borrower. Payments received by Lender from Borrower under this Agreement will be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any governmental authority (including any interest, additions to tax or penalties applicable thereto).

**4.5     Lender Expenses.** Borrower shall pay to Lender, on the Effective Date, all Lender Expenses incurred through the Effective Date, and, after the Effective Date, all Lender Expenses, as and when they become due (or, if no stated due date, upon demand by Lender).

**4.6     Manner and Time of Payment.** Accrued interest and Late Fees shall be paid by Borrower to an account designated by Lender on the earlier of (i) last day of each month and (ii) such Loan's Termination Date. Borrower hereby authorizes Lender to charge its accounts with Lender in order to cause timely payment to be made to Lender of all interest, Late Fees, Makewhole Premium, Lender Expenses, fees and expenses due hereunder (subject to sufficient funds being available in its accounts for that purpose).

## 5.    COLLATERAL REQUIREMENTS

**5.1    Grant of Security Interest.**  Borrower hereby grants Lender, to secure the payment and performance in full, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, of all of the Obligations, a continuing security interest in, and pledges to Lender, the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof.

**5.2    Priority of Security Interest.**  Borrower represents, warrants, and covenants that the security interest granted herein is and shall at all times continue to be a first priority perfected security interest in the Collateral.

**5.3    Collateral Maintenance.**

(a)    Borrower shall, at all times during which any Loans remain outstanding, maintain on deposit in the Collateral Account an amount in Digital Currency (the "*Digital Currency Collateral*") no less than the Collateral Margin Call Rate specified in the Loan Term Sheet multiplied by the aggregate value of the Digital Currency loaned to Borrower under all outstanding Loans as of the Loan Effective Date for such Loans calculated at the Spot Rate. The primary purpose of the loan is use for trading activity only on the Bittrex exchange. Any withdrawals for portfolio rebalancing or arbitrage should only be made to support primary trading activities on Bittrex. Any Digital Currency Collateral, as applicable, shall be deposited into the Collateral Account on the Loan Effective Date of each Loan.

(b)    **Margin Calls**.

(i)    If at any time while a Loan is outstanding, (x) the value of the Digital Currency borrowed pursuant to such Loan as calculated at the Spot Rate (such rate, the "*Margin Call Spot Rate*") is greater than (y) (i) the value of the Digital Currency at the "Collateral Spot Price" indicated in the Loan Term Sheet or (ii) the prior Margin Call Spot Rate, as applicable, by the Margin Differential or more, Lender shall have the right to require Borrower to deposit additional Digital Currency Collateral so that the value of the Collateral in the Collateral Account with respect to such Loan is at least the "Collateral Margin Call Rate" indicated in the Loan Term Sheet relative to the value of the borrowed Digital Currency at the Margin Call Spot Rate (the "*Additional Collateral*").

(ii)    If Lender requires Borrower to contribute Additional Collateral, Lender shall send an email notification (the "*Notification*") to Borrower's email address indicated in the Loan Term Sheet that sets forth: (y) the Margin Call Spot Rate and (z) the amount of Additional Collateral required based on the Margin Call Spot Rate. Borrower shall have six (6) hours (twelve (12) hours on a day that is not a Business Day) from the time Lender sends such Notification to deposit the Additional Collateral in the Collateral Account. Failure by Borrower to deposit the Additional Collateral in the Collateral Account within the time period specified herein shall constitute an Event of Default.

OMM_US:76486450.5

DocuSign Envelope ID: 503E9DD9-0BE7-41EC-B8DA-FD45897A3A71

**5.4** **Borrower Authorization.** Borrower hereby authorizes Lender to, and Lender shall be entitled to:

(a)    transfer all or any portion of the Collateral to any account of Lender or Lender's Affiliates;

(b)    use all or any portion of the Collateral to conduct its digital currency lending and borrowing business, including transferring such Collateral to other non-Lender bank accounts; and

(c)    upon an Event of Default, deny Borrower's ability to access or withdraw from the Collateral Account.

**5.5** **Lender Control of Collateral Account.** Borrower acknowledges that Lender has "control" over the Collateral Account as defined in the Code.

**5.6** **Authorization to File Financing Statements.** Borrower hereby authorizes Lender to file financing statements and amendments to and continuations thereof without notice to Borrower, with all appropriate jurisdictions to perfect or protect Lender's interest or rights hereunder, including a notice that any disposition of the Collateral, by either Borrower or any other person, shall be deemed to violate the rights of Lender under the Code.

**5.7** **Default or Failure to Return Loan.** In the event that Borrower does not return a Loan upon its Termination, including upon acceleration after the occurrence of Event of Default, Lender may cause the Collateral to be transferred from the Collateral Account to Lender's operating account, and Lender shall have the right to apply the Collateral in any order to the payment of any or all Obligations, including, but not limited to using the Collateral to purchase the relevant Digital Currency to replenish Lender's supply of the relevant Digital Currency. Borrower hereby consents to Lender giving notices of exclusive control, entitlement orders, and other directions or instructions to any of its Affiliates regarding the disposition of any balance in the Collateral Account and to the Lender complying with the same in order to effectuate the foregoing. Lender or any of its Affiliates may rely on this Section 5.7 as an intended third party beneficiary.

**5.8    Return of Collateral.** So long as no Event of Default then exists, upon Borrower's redelivery of the Loan and acceptance of Lender of the borrowed Digital Currency into Lender's wallet address, with such delivery being confirmed on the relevant Digital Currency blockchain ten times, Lender shall initiate the return of the portion of the Collateral deposited with respect to such Loan to an account designated in writing by Borrower.

## 6.    HARD FORKS.

**6.1    Notification.** In the event of a Hard Fork in the Digital Currency blockchain, Lender shall provide email notification to Borrower.

**6.2    No Immediate Termination of Loans Due to Hard Fork.** In the event of a Hard Fork in the Digital Currency blockchain, any outstanding Loans will not be immediately terminated.

**6.3    Redelivery of Borrowed Digital Currency.** Lender shall receive the benefit of any incremental tokens generated as a result of a Hard Fork in the Digital Currency protocol that results in a second token (the "New Token") being created.

**6.4    Payment of New Tokens.** [In the event of a Hard Fork][7], Borrower shall pay Lender the New Tokens issued in respect of the borrowed Digital Currency no later than 60 days following the Hard Fork; provided that Borrower may reimburse Lender for the value of the New Tokens with any combination of the following:

(a)    a one-time Digital Currency payment reflecting the amount of the New Tokens due using the agreed upon spot rate at the time of repayment;

(b)    returning the borrowed Digital Currency so that Lender can split the tokens themselves, sending the New Tokens directly to Lender; or

(c)    a U.S. Dollar cash payment at the agreed upon spot rate of the New Token at the time of repayment.

## 7.    REPRESENTATIONS AND WARRANTIES.

**7.1    Borrower represents to Lender on the date hereof and each Loan Effective Date that:**

(a)    **Due Organization, Authorization; Power and Authority.** Borrower is duly existing and in good standing in its jurisdiction of formation and is qualified and licensed to do business and is in good standing in any jurisdiction in which the conduct of its business or its ownership of property requires that it be qualified except where the failure to do so could not reasonably be expected to have a material adverse effect on Borrower's business. The execution, delivery and performance by Borrower of this Agreement and each Loan Term Sheet has been duly and validly authorized, executed and delivered on behalf of Borrower, and constitutes the

---

[7] Note to Bittrex: Please confirm that the payment of New Tokens occurs with any Hard Fork and not only Hard Forks that consist of two out of the four enumerated conditions.

OMM_US:76486450.5

legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with its terms (except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and subject to the availability of equitable remedies).

(b)     **Borrower Name and Organization Information**. Borrower's exact legal name, organization type and jurisdiction of organization are as set forth in the introductory paragraph of this Agreement, and Borrower's organizational identification number and place of business (or, if more than one, its chief executive office) is set forth in Schedule 6.1(b) hereto. Borrower (and each of its predecessors) has not, in the past five (5) years, changed its jurisdiction of formation, organizational structure or type, or any organizational number assigned by its jurisdiction.

(c)     **No Conflicts**. The execution, delivery and performance by Borrower of this Agreement and each Loan Term Sheet do not (ii) conflict with Borrower's organizational documents, (iii) contravene, conflict with, constitute a default under or violate any material law applicable to Borrower or its properties, (iv) contravene, conflict or violate any applicable order, writ, judgment, injunction, decree, determination or award of any governmental authority by which Borrower or any of its property may be bound or affected, (v) require any action by, filing, registration, or qualification with, or approval from, any governmental authority (except such approvals which have already been obtained and are in full force and effect), or (vi) conflict with, contravene, constitute a default or breach under, or result in or permit the termination or acceleration of, any material agreement by which Borrower is bound.

(d)     **Litigation**. There exists no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality that could reasonably be expected to have a Material Adverse Effect.

(e)     **Financial Statements; Financial Condition.** All financial statements for Borrower delivered to Lender fairly present in all material respects Borrower's financial condition and Borrower's results of operations. There has not been any material deterioration in Borrower's financial condition since the date of the most recent financial statements submitted to Lender.

(f)     **No Reliance**. Borrower has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan or any Digital Currency or funds received hereunder.

(g)     **Rights to Digital Currency**. Borrower has, or will have at the time of return of any Digital Currency, the right to transfer such Digital Currency subject to the terms and conditions hereof, and, free and clear of all liens and encumbrances other than those arising under this Agreement.

(h)     **Collateral**. (i) Borrower has good title to, rights in, and the power to transfer each item of the Collateral upon which it purports to grant a security interest hereunder,

OMM_US:76486450.5

DocuSign Envelope ID: 503E9DD9-0BE7-41EC-B8DA-FD45897A3A71

free and clear of any and all Liens other than those arising under this Agreement and (ii) the security interest granted herein is and shall at all times continue to be a first priority perfected security interest in the Collateral.

(i)     **Solvency**. The fair salable value of Borrower's assets exceeds the fair value of Borrower's liabilities; Borrower is not left with unreasonably small capital after the transactions in this Agreement; and Borrower is able to pay its debts (including trade debts) as they mature.

(j)     **Investment Company Act**. Borrower is not an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended, and Borrower is not engaged as one of its important activities in extending credit for margin stock (under Regulations X, T and U of the Federal Reserve Board of Governors).

(k)     **Compliance With Laws**. Borrower (a) has complied in all material respects with all Requirements of Law, and (b) has not violated any Requirements of Law the violation of which could reasonably be expected to have a material adverse effect on its business.

(l)     **Definition of "Knowledge."** For purposes of the Loan Documents, whenever a representation or warranty is made to Borrower's knowledge or awareness, to the "best of" Borrower's knowledge, or with a similar qualification, knowledge or awareness means the actual knowledge, after reasonable investigation, of any Responsible Officer.

(m)     **Assets**. Borrower is a corporation, partnership, proprietorship, organization, trust or other entity that has total assets exceeding $10,000,000.

(n)     **Forward Contracts**. Within the meaning of the U.S. Bankruptcy Code, (i) all transactions pursuant to this Agreement constitute "forward contracts", (ii) the Lender is a "forward contract merchant", and (iii) all payments made or to be made pursuant to this Agreement constitute "settlement payments".

(o)     **Eligible Contract Participant; Market Participant**. Borrower is (i) an "eligible contract participant" as defined in the Commodity Exchange Act, as amended, 7 U.S.C. §1a(12), (ii) a "market participant" under applicable exchange and market rules; (iii) a producer, processor, or commercial user of, or a merchant handling, the commodity which is the subject of this Agreement, or the products or by products thereof; and (iv) entering into this Agreement solely for purposes related to its business as such.

**7.2     Lender Representations**. Lender represents to Borrower on the date hereof and each Loan Effective Date that:

(a)     **No Reliance**. Lender has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan or any Digital Currency or funds received hereunder.

(b)     **Rights to Digital Currency**.  Lender represents and warrants that it has, or will have at the time of transfer of any Digital Currency, the right to transfer such Digital Currency subject to the terms and conditions hereof, and that it owns the Digital Currency, free and clear of all Liens.

## 8.    COVENANTS.

**8.1     Affirmative Covenants**.  So long as any Obligations remain outstanding, Borrower shall do all of the following:

(a)     maintain its legal existence and good standing in its jurisdiction of formation;

(b)     comply in all material respects, with all laws, ordinances and regulations to which it is subject;

(c)     obtain and maintain all of the governmental and other approvals necessary for the performance by Borrower of its obligations under this Agreement and the grant of a security interest to Lender in the Collateral;

(d)     timely file all required tax returns and reports and timely pay all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower;

(e)     provide Lender with the following:[8]

(i)     as soon as available, but no later than thirty (30) days after the last day of each month, a company prepared balance sheet and income statement for such month;

(ii)     as soon as available, but no later than one hundred eighty (180) days after the last day of Borrower's fiscal year, audited consolidated financial statements prepared under GAAP, consistently applied;

(iii)     in the event that Borrower is subject to the reporting requirements under the Securities Exchange Act of 1934 within five (5) days of filing, copies of all periodic and other reports, proxy statements and other materials filed by Borrower with the SEC;

(iv)     promptly upon occurrence thereof, notice of the existence of an Event of Default; and

(v)     other financial information reasonably requested by Lender;

(f)     allow Lender, or its agents, at reasonable times, on one (1) Business Days' notice (provided no notice is required if an Event of Default has occurred and is continuing), to

---

[8] NTD:  Bittrex finance team to confirm which reports it would like to receive.
OMM_US:76486450.5

inspect the Collateral and audit and copy Borrower's books and records. The foregoing inspections and audits shall be at Borrower's expense;

(g)     comply with and perform the covenants set forth under "Additional Covenants" in the Loan Term Sheet, if any; and

(h)     execute any further instruments and take further action as Lender reasonably requests to perfect or continue Lender's security interest in the Collateral or to effect the purposes of this Agreement.

**8.2     Negative Covenants.** So long as any Obligations remain outstanding, Borrower shall not do any of the following:

(a)     without at least thirty (30) days' prior written notice to Lender, change its jurisdiction of organization, change its organizational structure or type, or change its legal name;

(b)     create, incur, allow, or suffer any Lien on any of the Collateral, or assign or convey any right to receive income therefrom other than the security interest in favor of Lender created in this Agreement, or permit any Collateral not to be subject to the first priority security interest granted herein;

(c)     sell, transfer, assign or otherwise dispose of the Collateral other than in accordance with the terms hereof;

(d)     use any of the Borrowed Amount of any Loan for any purpose other than to acquire Digital Currency available on Bittrex, Inc. trading platform;

(e)     merge or consolidate with any other Person, or suffer a change of control.

**9.     DEFAULT**

It is further understood that the following defaults shall constitute events of default hereunder (each, an "Event of Default"):

(a)     **Payment Default**. The failure of Borrower to return any Loans or repay any other Obligation when due hereunder, including payment of required Additional Collateral in accordance with Section 5.3;

(b)     **Covenant Default**. Borrower defaults in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement or any of the Loan Documents;

(c)     **Insolvency**. (i) Borrower is unable to pay its debts (including trade debts) as they become due or otherwise becomes insolvent; (ii) any bankruptcy, insolvency, reorganization, liquidation proceedings, receivership, assignment for the benefit of creditors or other proceedings for the relief of debtors or dissolution proceedings shall be instituted by Borrower; or (iii) any bankruptcy, insolvency, reorganization or liquidation proceedings,

receivership or other proceedings for the relief of debtors or dissolution proceedings shall be instituted against Borrower and shall not be dismissed within thirty (30) days of their initiation;

(d)     **Attachment; Levy; Restraint on Business**. (i) The service of process seeking to attach, by trustee or similar process, any funds of Borrower or of any entity under the control of Borrower (including a Subsidiary), or (ii) a notice of lien or levy is filed against any of Borrower's assets by any Governmental Authority, and the same under subclauses (i) and (ii) hereof are not, within ten (7) days after the occurrence thereof, discharged or stayed (whether through the posting of a bond or otherwise); or (iii) any material portion of Borrower's assets is attached, seized, levied on, or comes into possession of a trustee or receiver, or (iv) any court order enjoins, restrains, or prevents Borrower from conducting all or any material part of its business;

(e)     **Misrepresentations**. Any representation or warranty made by Borrower or any of its Affiliates in any of the Loan Documents proves to be untrue in any material respect as of the date when made or deemed made;

(f)     **Impairment of Security Interest**. There occurs a material impairment in the perfection or priority of Lender's security interest in the Collateral; or

(g)     **Governmental Approvals**. Lender determines that any Loan is in violation of any governmental rules, laws, or regulations applicable to Lender, Borrower or their respective properties.

### 10.     REMEDIES

Upon the occurrence and during the continuation of any Event of Default by Borrower, Lender may, at its option, (a) declare all Loans and all other Obligations outstanding hereunder immediately due and payable, (b) stop advancing Digital Currency under this Agreement, (c) terminate this Agreement upon notice to Borrower, (d) apply to the Obligations any Collateral or other balances and deposits of Borrower that Lender or any of its affiliates holds, (e) deliver a notice of exclusive control, any entitlement order, or other directions or instructions with respect to the Collateral Account or pursuant to any agreements providing control of any Collateral, (f) demand and receive possession of Borrower's books and records, (g) set off and appropriate and apply any and all deposits and any other indebtedness at any time held or owing by Lender or any affiliate of Lender to or for the credit or the account of Borrower against and on account of the Obligations to Lender (or any affiliate of Lender) under this Agreement, and (h) exercise all other rights and remedies available to Lender hereunder, under applicable law, or in equity, including all remedies provided under the Code (including disposal of the Collateral pursuant to the terms thereof); provided, that upon any Event of Default pursuant to Section 9(c), the Loans and any accrued interest thereunder, the amount of any Late Fee then outstanding hereunder, the Makewhole Premium for each Loan for which the Minimum Term has not then lapsed, and all other Obligations shall automatically become and be immediately due and payable.

**10.1     Rights and Remedies Cumulative.** No delay or omission by Lender in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of Lender stated herein

OMM_US:76486450.5

are cumulative and in addition to all other rights provided by law, in equity.

**10.2    Lender's Liability for Collateral.**  Lender shall not be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage to the Collateral; (c) any diminution in the value of the Collateral, whether due to investment decisions of any person or otherwise; or (d) any act or default of any other Person. Borrower bears all risk of loss, damage or destruction of the Collateral.

**10.3    Collection Costs.**  In the event Borrower fails to pay any amounts due or to return any Digital Currency hereunder, Borrower shall pay to Lender upon demand all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs incurred by Lender in connection with the enforcement of its rights hereunder.

## 11.    GENERAL PROVISIONS.

**11.1    Governing Law; Dispute Resolution.**[9]  This Agreement is governed by, and shall be construed and enforced under, the laws of the State of Washington applicable to contracts made and to be performed wholly within such State, without regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the City of Seattle, State of Washington by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

**11.2    Notices.**  Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or to the respective address set forth below:

Borrower: The notice information indicated in the Loan Term Sheet

Lender:
Bittrex, Inc.
800 5th St., Suite 4100, Seattle, WA 98104
Attn: Devin Wilhelm
Email: ▮▮▮▮▮▮▮▮▮

with a copy to (which shall not constitute notice):

O'Melveny & Myers LLP
Two Embarcadero Ctr., 28th Floor

---

[9] NTD: Consider whether NY is the appropriate jurisdiction
OMM_US:76486450.5

DocuSign Envelope ID: 503E9DD9-0BE7-41EC-B8DA-FD45897A3A71

San Francisco, CA 94111
Attn: Jennifer Taylor, Esq.

Either party may change its address by giving the other party written notice of its new address as herein provided.

### 11.3    Modifications.

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by Borrower and Lender.

### 11.4    Entire Agreement.

This Agreement and each exhibit referenced herein constitutes the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.

### 11.5    Successors and Assigns.

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that Lender may assign this Agreement or any rights or duties hereunder without the prior written consent of the Borrower. Neither Borrower's rights or obligations hereunder nor any interest therein may be assigned or delegated by Borrower without the prior written consent of Lender (and any attempted assignment or transfer by Borrower without such consent shall be null and void). Notwithstanding the foregoing, in the event of a change of control of Lender, prior written consent shall not be required so long as such party provides the other party with written notice prior to the consummation of such change of control. For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the party shares representing more than fifty percent (50%) of the outstanding voting stock of such party.

### 11.6    Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

### 11.7    Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this

Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

### 11.8   Relationship of Parties.

Nothing contained in this Agreement shall be deemed or construed by the parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

### 11.9   No Waiver.

The failure of or delay by Lender to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent Lender from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties

### 11.10   Indemnification.

Borrower shall indemnify and hold harmless Lender and its Affiliates from and against any and all claims, demands, losses, expenses and liabilities of any and every nature (including attorneys' fees of an attorney of Lender's or its Affiliate's choosing to defend against any such claims, demands, losses, expenses and liabilities) that Lender or its Affiliate may sustain or incur or that may be asserted against Lender or its Affiliate arising out of Lender's lending of Digital Currency to Borrower and any other transactions under this Agreement, except for any and all claims, demands, losses, expenses and liabilities caused by Lender's gross negligence or willful misconduct in the performance of its duties under this Agreement.  This indemnity shall be a continuing obligation of Borrower, its successors and assigns, and shall survive notwithstanding the termination of this Agreement.

### 11.11   Term and Termination.

The Term of this Agreement shall commence on the date hereof for a period of 30 days, and shall automatically renew for successive 30 day terms annually, unless either party provides notice of a desire to terminate the contract no less than ten (7) days prior to the end of such 30 day period.  The foregoing notwithstanding, this Agreement may be terminated after an initial 20 days as set forth in Section 9 with ten (7) days' notice by either party to the other.

In the event of a termination of this Agreement, any loaned Digital Currency shall be redelivered immediately and any interest accrued, fees, Lender Expenses and other Obligations owed shall be due and payable immediately.  Borrower's obligations under Sections 2.4(a) and 4 are continuing obligations of Borrower, its successors and assigns, and shall survive notwithstanding the termination of this Agreement.

OMM_US:76486450.5

### 11.12  Miscellaneous.

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders.  This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.  The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement.  The Parties acknowledge that the Agreement and any Loan Documents are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

**BORROWER:**
Alameda Research LLC

By: Samuel Bankman-Fried
24A1FE75CBF4440...

Name: Samuel Bankman-Fried

Title: CEO

**LENDER**:
Bittrex, Inc.

By: James CWaschak

Name: JAMES CWASCHAIC

Title: COO, SECRETARY.

## EXHIBIT A

### Authorized Agents

The following names are authorized to deliver Lending Requests on behalf of Borrower in accordance with Section 2.1(a) hereof:

Name: Samuel Bankman-Fried
Email: ██████████████████

Name: Andrew Croghan
Email: ██████████████████

Borrower may change its Authorized Agents by notice given to Lender as provided herein.

DocuSign Envelope ID: 503E9DD9-0BE7-41EC-B8DA-FD45897A3A71

**EXHIBIT B**
**LOAN TERM SHEET**

The following Loan Term Sheet incorporates all of the terms of the Master Digital Currency Loan Agreement entered into by Bittrex, Inc. and [Alameda Research LLC] ("Borrower") on [12/11/18] and the following specific terms:

| Lender | Bittrex, Inc. | | | |
|---|---|---|---|---|
| Borrower: | Alameda Research LLC | | | |
| Bittrex Borrower Account: | info@alameda-research.com | | | |
| Amount of Digital Currency: | USD Equivalent Value = ~$3.5M | | | |
| | | Amount | | Recent USD value |
| | ETH | 12,000.00 | $ | 1,072,921.28 |
| | XLM | 5,000,000.00 | $ | 584,460.00 |
| | BCH | 4,000.00 | $ | 406,515.72 |
| | BSV | 4,000.00 | $ | 377,165.93 |
| | XRP | 1,000,000.00 | $ | 298,177.74 |
| | XMR | 2,000.00 | $ | 90,082.48 |
| | NEO | 10,000.00 | $ | 60,477.86 |
| | XEM | 1,600,000.00 | $ | 112,381.34 |
| | LTC | 2,500.00 | $ | 61,024.50 |
| | TRX | 5,000,000.00 | $ | 64,290.60 |
| | ETC | 12,000.00 | $ | 56,559.09 |
| | BAT | 200,000.00 | $ | 27,277.09 |
| | BURST | 6,000,000.00 | $ | 31,560.84 |
| | OMG | 20,000.00 | $ | 25,655.73 |
| | XWC | 700,000.00 | $ | 26,809.52 |
| | NXT | 1,000,000.00 | $ | 27,813.42 |
| | WAVES | 30,000.00 | $ | 45,907.61 |
| | BTS | 1,000,000.00 | $ | 32,420.34 |
| | AEON | 150,000.00 | $ | 33,174.98 |
| | FCT | 3,000.00 | $ | 37,542.96 |
| | MANA | 600,000.00 | $ | 36,490.93 |
| | | **Total** | $ | **3,508,709.96** |
| | Bittrex intends to transfer cryptocurrency to Borrower in the amounts listed above. Technical or market conditions may require amounts transferred to be lowered on the date of the transfer. Loan amount will be actual amount deposited into Borrower's cryptocurrency wallets at info@alameda-research.com | | | |
| Loan Purpose: | The purpose of the loan is for trading activity only on the Bittrex trading platform. Any withdrawals for portfolio rebalancing or arbitrage to external wallets or | | | |

|  | other trading venues should only be made to support trading activities on Bittrex. Every intention should be made to keep the balance on Bittrex at 100% |
|---|---|
| Interest Rate: | 0% interest rate per annum for first 30 days if volume requirement met, 10% if volume requirement not met. Longer-term interest rate structure to be determined prior to extension beyond 30 days |
| Trading fees | Trading fees will be 0 for the first 30 days regardless of volume generated on all trades made in the info@alameda-reserearch.com account. All trading fees (25 basis points charged at time of trade) will be refunded in the month following the trading activity in the base currency of the trade (BTC trades refunded in BTC, ETH trades refunded in ETH, USDT trades refunded in USDT, and USD trades refunded in USD) |
| Loan Type: | Cryptocurrency deposited to Bittrex wallet address of info@alameda-research.com |
| Volume requirement | The total volume driven by the loan proceeds equivalent value in USD at time of disbursement should be at least **10x per 30 day period** |
| Minimum Term: | 30 days, option to extend with 7 day notice to terminate by either Lender or Borrower. Loan term extends indefinitely (up to 1 year) until notice is given to terminate or extend. |
| Repayment | Repayment will be sent to either 1) cryptocurrency wallet address provided by Lender upon notice by either party, or 2) origin cryptocurrency transaction source wallet if no wallet address provided by Lender |
| Collateral: | Alameda's main Bittrex account, alamedaresearch@gmail.com, to be disabled if margin call on info@alameda-research.com not fulfilled within 12 hours. |
| Collateral Margin Call Rate: | Margin Call may result if 75% of Digital Currency Loan USD Equivalent Value at time of disbursement (issuance value) not met in the account. Since loan payback required in the cryptocurrency provided, drop to due market conditions only may not result in Margin call. Bittrex has discretion whether to call if account USD value drops below 75% of issuance value. Margin call must result in deposit to bring account value back to or above the 75% level within 12 hours. |
| Additional Covenants: | All loan trading activity of Borrower must take place in info@alameda-research.com on Bittrex exchange, unless deposits/withdrawals are necessary for arbitrage or rebalancing purposes. Co-mingling of other funds into info@alameda-research.com not permitted. |

DocuSign Envelope ID: 503E9DD9-0BE7-41EC-B8DA-FD45897A3A71

| | Withdrawals that result in account balance falling below 50% USD equivalent value at time of issuance for more than 12 hours can result in margin call. |
|---|---|

Alameda Research LLC

By: Samuel Bankman-Fried
— DocuSigned by: Samuel Bankman-Fried
— 24A1FE75CBF4440...

Name: Samuel Bankman-Fried

Title: CEO

Borrower's Address for Notices:

Alameda Research
2000 Center Street Floor 4
Berkeley, CA 94704

Email: info@alameda-research.com

Bittrex, Inc.

By: [signature]

Name: James Waschak

Title: COO

## Schedule 6.1(b)

Borrower's Organizational Identification Number: 83-2084063

Principal Place of Business:   2000 Center Street floor 4, Berkeley, CA 94704