1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

3   IN RE:                         .  Chapter 11
                                    .  Case No. 23-10597 (BLS)
4   DESOLATION HOLDINGS LLC,        .
    *et al.,*                       .  (Jointly Administered)
5                                   .
                                    .  Courtroom No. 1
6                                   .  824 Market Street
            Wind Down Entity.  .  Wilmington, Delaware 19801
7                                   .
                                    .  Monday, January 8, 2024
8   . . . . . . . . . . . . . . .  2:02 p.m.

9
                        TRANSCRIPT OF ZOOM HEARING
10          BEFORE THE HONORABLE BRENDAN L. SHANNON
                UNITED STATES BANKRUPTCY JUDGE
11

12  APPEARANCES:

13  For the Plan
    Administrator:             Razmig Izakelian, Esquire
14                             QUINN EMANUEL URQUHART
                                 & SULLIVAN, LLP
15                             865 South Figueroa Street
                               10th Floor
16                             Los Angeles, California 90017

17

18

19  (APPEARANCES CONTINUED)

20  Audio Operator:            Sean Moran, ECRO

21  Transcription Company:     Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.

APPEARANCES (CONTINUED):

For Azim Ghader:          Donald J. Detweiler, Esquire
                          WOMBLE BOND DICKINSON (US), LLP
                          1313 North Market Street
                          Suite 1200
                          Wilmington, Delaware 19801


                          M. Rhett DeHart, Esquire
                          5 Exchange Street
                          Charleston, South Carolina 29401

1                                  INDEX

2     MOTIONS:                                                    PAGE

3     Agenda
      Item 1:     Debtors' Objection to Claims 597-238, 597-296,    4
4                 598-998, 598-1021, 598-10408, 599-35, 599-38,
                  599-10018, 600-87, 600-96, and 600-10052 Filed
5                 by Azim Ghader Pursuant to Section 502 of the
                  Bankruptcy Code, Bankruptcy Rule 3007, and
6                 Local Rule 3007-1 [D.I. 411, 9/29/23]

7                 Court's Ruling:                                  21

8

9     Transcriptionist's Certificate                              41

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Proceedings commenced at 2:02 p.m.)

2              THE COURT:  Good afternoon, counsel.  This is

3   Judge Shannon.  I understand from the operator that necessary

4   parties have joined.

5              This is a status and discovery conference in the

6   matter of Desolation Holdings, Inc., known as "Bittrex," Case

7   Number 23-10597.

8              This, I believe, started with an email request by

9   counsel for the debtor for a discovery conference with the

10   Court regarding Mr. Ghader's claim and related claim

11   litigation.

12              I apologize for the delay in getting together with

13   the parties.  I think the request came in last Tuesday, but I

14   was otherwise traveling and kind of jammed up, so I was not

15   able to meet with the parties until today.

16              But I will hear first from counsel for the debtor.

17              MR. IZAKELIAN:  Good afternoon, Your Honor.

18              Razmig Izakelian, Quinn Emanuel, for the plan

19   administrator.

20              Your Honor, we have three discovery issues for

21   today.  The first two are document related and the last one

22   has to do with third-party discovery.

23              So the first issue is a document request of ours.

24   We requested documents relating to a project called

25   "Visionex," which is something that Mr. Ghader had created

1  apparently to help people who think they have been wronged by

2  cryptocurrency exchanges in the past.

3         So in responses to requests, counsel told us that

4  this project was not specific to Bittrex.  It did not relate

5  to Mr. Ghader's claims and then Mr. Ghader, himself, did not

6  communicate with anyone -- contacted this entity called

7  Visionex.

8         Well, during Mr. Ghader's deposition last week, we

9  learned that his attorney in Turkey is an advisor to Visionex

10 and that this attorney had spoken to people who had contacted

11 Visionex and passed along those documents to Mr. Ghader.  One

12 of them is another claimant in this case and what we want now

13 is for Mr. Ghader to search for and produce responsive

14 documents.

15        The second document request has to do with

16 Mr. Ghader's proof of claim.  So, he stated in his proof of

17 claim that he had started a cryptocurrency exchange in 2017

18 and he sought damages for the failure of that exchange, so we

19 asked for documents related to this exchange and in response,

20 Mr. Ghader said, Well, I'm going to withdraw this theory of

21 damages.

22        That's all well and good, but as Your Honor knows,

23 proofs of claim are signed under penalty of perjury.

24 Mr. Ghader asserted he started a cryptocurrency exchange, but

25 as soon as we started to ask questions about it, he withdrew

1   that.  So, he will be testifying at the hearing on the claim

2   objection in a week and we think we're entitled to these

3   documents to attest his propensity to tell the truth.

4           Now, the final issue has to do with third-party

5   discovery.  So last week, Mr. Ghader sent us a notice that he

6   intended to serve subpoenas on an entity called "Blocksport"

7   and an individual named Ryan Hentz.  So --

8           THE COURT:  I'm sorry, an individual named what?

9           MR. IZAKELIAN:  His name is Ryan Hentz.

10          THE COURT:  Okay.

11          MR. IZAKELIAN:  So, at the outset, we think that

12  this third-party discovery is irrelevant.  Blocksport was an

13  entity to which Bittrex had outsourced some compliance issues

14  before 2017.

15          We discussed last month with Your Honor how these

16  kinds of far-reaching (indiscernible) brazen to historic OFAC

17  compliance issues are just tangential to the case's increased

18  costs and are not important here.

19          What the real issues on this claim objection are

20  going to be what the terms of service say, whether claims are

21  time-barred, and if Mr. Ghader was able to demonstrate when

22  he was trying to withdraw assets, whether or not he was a

23  resident of Iran at that time; in fact, Mr. Ghader has now

24  admitted that he was a resident of Iran when he opened his

25  account until early 2019.

1          So all this subpoena is going to do is create more

2    costs where, really, all in, Mr. Ghader has $3200 associated

3    with his account.

4          As for Mr. Hentz, the only evidence we have

5    concerning Mr. Hentz is one slack message that he exchanged

6    with another European customer.  We have no evidence that he

7    ever communicated with Mr. Ghader, so we don't see how that

8    could be relevant at all.

9          Now, the question is why are we bringing this up

10   now?  Well, Mr. Ghader stated during his deposition that he

11   would be fine moving forward with the January 16 hearing only

12   if his discovery was complete.  Well, he served the subpoena

13   on Mr. Hentz, apparently, on January 3, and then on

14   Blocksport on January 5; that's 5 days ago and 3 days ago.

15         Mr. Ghader filed the response to the claim

16   objection back in October.  He filed the motion to continue

17   the hearing back in November and, at that time, he argued he

18   needed third-party discovery.

19         This claim objection has already cost the wind-

20   down estate a lot for a customer who only has $3200

21   associated with his account.  We don't think it's proper or

22   fair for Mr. Ghader to continue to drag this out and to run

23   up the wind-down estate's expenses when he is the one who's

24   been sitting on his hands for months.

25         So all we're asking here is for the Court to

1  confirm that the hearing will go forward on the 16th,

2  regardless of this third-party discovery.

3         THE COURT:  Okay.  Before I hear from

4  Mr. Detweiler, just circling back, the first item related to

5  a document request by the debtors looking for documents

6  relating to a product called Visionex.  And I think I want to

7  make sure I understand the connection between Visionex and

8  the claim objection that the debtor is seeking to prosecute

9  next week.

10         MR. IZAKELIAN:  Yes.

11         So our understanding is that Visionex is some sort

12  of charitable entity that Mr. Ghader created to help people

13  who think they've been wronged by cryptocurrency exchanges.

14  We have learned that another claimant in this case sent

15  documents to Visionex, which were then sent to Mr. Ghader

16  about Bittrex.

17         We have been told in response to the document

18  request that Visionex was not specific to Bittrex; it did not

19  relate to Mr. Ghader's claims.

20         What we've now learned is that there are

21  documents, at least there, that do relate to Bittrex and that

22  Mr. Ghader actually attached to his response to the claim

23  objection.  So what we're asking for is for Mr. Ghader to

24  search for and produce documents relating to Visionex.

25         THE COURT:  Okay.  I understand.

1          MR. IZAKELIAN:  Thank you.

2          THE COURT:  All right.  Mr. Detweiler, good

3 afternoon, and happy New Year.

4          MR. DETWEILER:  Happy New Year, Your Honor, and

5 may I please the Court, Donald Detweiler and Rhett DeHart of

6 Womble Bond on behalf of Mr. Azim Ghader.

7          Your Honor, I'll just start by saying I take issue

8 with the characterization of what was told to counsel or not.

9 This case is a case about the debtors' violation of the OFAC

10 regulations in 2017, receiving and administering a subpoena

11 from OFAC in 2017 telling them they could not do business

12 with citizens of Iran.  That's the crux of what -- how the

13 dispute arises.  There's a very long, windy road to get to

14 Mr. Ghader's claims and the value of his claims.

15          What is important is that no dispute exists that

16 the debtors did violate the Iranian sanctions.  We have an

17 expert who will come in and testify as to OFAC and the

18 regulations that were in place and how they applied, if at

19 all, to Mr. Ghader.

20          You're going to hear a lot about the Iranian

21 sanctions.  You're going to hear, as counsel said, about the

22 terms of service and how Bittrex signed up Mr. Ghader and

23 other Iranian customers for their cryptocurrency exchange;

24 what terms of service were offered by whom; what those terms

25 of service provide; and how Mr. Ghader, you know, either

1  complied or didn't comply, or if they complied at all to

2  Mr. Ghader.

3          You're going to hear a lot about the proofs of

4  claim.  You're going to hear about his various claims from

5  breach of contract, conversion, breach of implied covenant of

6  good faith and fair dealing, and so on.

7          The discovery dispute before you that the debtors

8  raise -- and, again, I take issue with the characterization

9  of counsel as to what was said about Visionex and what was

10  produced or not produced -- but here's what Visionex is.

11  Visionex is a nonprofit organization/foundation that was

12  established by Mr. Ghader to help disenfranchised crypto

13  customers, those who have been experience harm and pain as a

14  result of the failure of crypto exchanges throughout the

15  world.

16          He established that, and yes, he did receive, and

17  we produced in discovery, a piece of correspondence that we

18  discovered that was produced to Mr. Ghader by his counsel

19  that provided that Mr. Ryan Hentz, who was an authorized

20  agent of the debtors, was telling Iranian customers way back

21  when in June of 2017, when Mr. Ghader opened his account -- I

22  don't have the exact date of Mr. Hentz's email in front of

23  me, but that Bittrex was telling the Iranian customers, yes,

24  they could trade on the Bittrex exchange.  And as Your Honor

25  knows from the record in this case, a thousand -- over a

1    thousand -- I think it's 770 or perhaps more, Iranians signed

2    up and began trading on the Bittrex exchange.

3           And so we had that email that Mr. Ghader had and

4    we've also confirmed that that email is posted on Twitter,

5    and we produced it to the debtors.  It was, I believe,

6    testified to at the hearing from the three Iranian citizens

7    who you heard last month, Your Honor, on objection to claim.

8    So we simply have that email.

9           What they're seeking with regard to request 30 is

10   information from Visionex, which is not ours to give.

11   Mr. Ghader is an individual; Visionex is a separate entity.

12   And the information that was received by Visionex is not in

13   our custody or control.  We have one piece of paper that we

14   have and we've produced it.  But any information there

15   Visionex is not ours and is not something that we can produce

16   and, in fact, may be subject to confidentiality.

17          The debtors questioned Mr. Ghader on this email

18   correspondence last week and he provided answers with regard

19   to that.  So, with regard to the Visionex, it's simply one

20   document that Mr. Ghader produced to us that we have provided

21   to counsel and believe that's been totally responsive.

22          With regard to the Estonian license, request for

23   production 31, in his proof of claim, where Mr. Ghader, as

24   Your Honor will hear the evidence at the trial, Mr. Ghader

25   tried to be as complete as possible in his proof of claim.

1   And he mentioned in his proof of claim that he had applied

2   for and received the license for opening up a crypto exchange

3   in Estonia.  He had produced the license as part of his proof

4   of claim.

5          During the case, and, again, I think perhaps

6   counsel is not indicating with each other, there was an issue

7   raised saying that, well, we want damages or he's asserting

8   damages relating to the Estonian license and the failure of

9   the Estonian license.

10         We told counsel at the initial meet-and-confer and

11  we've been telling throughout the case, that Mr. Ghader's

12  damages that are in his proof of claim are calculated based

13  on his cryptocurrency.  They're not based on the failure or

14  the lapse in the license in Estonia.  He's not seeking

15  damages in any way, shape, or form relating to the Estonian

16  crypto exchange and then the expiration of the license.

17         THE COURT:  Can I ask it confirm, because there

18  are a number of proofs of claim -- I've been through them in

19  connection with prior hearings, but I confess I have not gone

20  through them line-by-line in advance of today's discovery

21  call -- but I want to make sure there's not a disconnect

22  between you and Mr. Izakelian's description of the state of

23  play.  I do recall a description and a reference to the

24  Estonian license and the idea of starting an exchange in the

25  proof of claim and in the parties' submissions.

1       And I guess the question I would ask is, was the

2  failure or the lack of success or progress with the Estonian

3  exchange part of the proof of claim that is now the debtor

4  has simply backed off of and said I'm not going to argue that

5  I've got damages or resulting from that, or was it never part

6  of the calculus; it was just part of a history of what this

7  debtor has done.  I hope I'm being clear in my question.

8       MR. DETWEILER:  You are, Your Honor.  I think you

9  are, and that's how we've explained it.

10       Mr. Ghader was trying to be as complete as

11  possible in his proof of claim and he's telling his story

12  when you read his proof of claim.  It is not -- part of, I

13  think, Your Honor's question is, Is the Estonian license part

14  of his proof of claim?  It is contained within their

15  description of it, but it is not part of the calculus, as

16  Your Honor said, of the proof of claim.

17       The proof of claim is calculated based on the

18  cryptocurrency and the failure to honor his continued request

19  for the cryptocurrency.  We told the debtors that repeatedly

20  in this case and we made it even clearer at Friday's

21  deposition, which, by the way, went for 10 hours and

22  Mr. Ghader tried to make that clear to them, as well, that

23  he's trying to be complete in his proof of claim, but it is

24  not part of the damage calculation that we will present to

25  the Court.

1       So those are the two issues, Your Honor.  We have

2  some discovery issues, as well, which we want to discuss, but

3  let me just throw something else out, because the debtors

4  continually put bogeymen before Your Honor.  They said, Oh,

5  we're going to seek a continuance.

6       We're not seeking a continuance; we're ready to go

7  forward on this proof of claim and it's going to take a long

8  time to get through this proof of claim and his damages, Your

9  Honor.

10      So they come before you and say something that we

11 never even requested a continuance or we're seeking a

12 continuance.  The hearing is going to start on the 16th.

13 Your Honor made that clear.  I'm telling you it's going to go

14 past the 16th and, you know, we'll see how things develop.

15 But in no way, shape or form have we requested a continuance

16 or do we seek a continuance at this time.

17      But what's important, Your Honor, here, is that

18 with regard to Blocksport, in discovery, debtors have

19 produced certain information regarding Blocksport.  And in

20 their objection to the proof of claim, or response to the

21 proof of claim -- somewhere in the pleadings -- they make the

22 bold assertion that Blocksport was their OFAC consultant,

23 their OFAC consultant.  They want to blame Blocksport for

24 what they did to these Iranians in opening up these Bittrex

25 accounts.

1      Your Honor, we have the right to test that.  So we

2 sent out a subpoena to Blocksport to find out what, if

3 anything, the debtors said to Blocksport, what Blocksport was

4 hired to do, and so on.  We hope to get the information from

5 Blocksport so we can prove-up what the debtors say in their

6 pleadings with respect to Blocksport.  But we just simply

7 don't know.

8      So we have a right to do that.  We're not -- that

9 discovery was served by us.  It's going to be a document

10 discovery.  We'll get the documents, we'll send them on to

11 the debtors, people can look at it.

12      They know the true story about Blocksport.  They

13 make bold statements about Blocksport, but they don't put in

14 evidence to us with regard to Blocksport and the contracts,

15 et cetera.  So we're doing the best we can to get that

16 information to see if what they say about Blocksport is true.

17      With regard to Ryan Hentz, Mr. Hentz's stuff was

18 produced in discovery.  His -- specifically, his email, and

19 it's publicly available on Twitter.  This is an agent of the

20 debtors who is telling Iranians they could trade on the

21 Bittrex exchange.

22      We sent out a deposition notice for Mr. Hentz and

23 we said, we want to take -- we haven't talked to them.  We

24 asked the debtors if they were representing him:  Did you,

25 Debtors, get him counsel?

1    They said they haven't gotten him counsel.  They

2  don't represent him.

3    So we sent out a subpoena saying, we better find

4  out what Mr. Hentz has to say, because that could be relevant

5  here, because these OFAC violations and what these people

6  did, Your Honor, is highly relevant.  So if Mr. Hentz is

7  available for deposition, we want to take his deposition --

8  again, we haven't talked to him -- find out what he's going

9  to tell us about the OFAC sanctions and what the debtors were

10  doing.

11    More importantly, Your Honor, if we don't get

12  Mr. Hentz for a deposition, we're going to issue a trial

13  subpoena for Mr. Hentz and we're going to ask that he appear

14  before Your Honor so that he could tell you the full story.

15    Quite frankly, Your Honor, you haven't heard the

16  full story.  There's a story to tell here and Mr. Ghader's

17  claims are valid.

18    So let me stop there and then I'll talk about our

19  discovery, but let's go to request for production 30 and 31.

20  We think the Estonian license is a red herring.  It's not

21  part of the calculus of the damages.

22    With regard to Visionex, it's not ours to give.

23  What we did get from Visionex, we produced over.

24    So, I'll stop there, Your Honor.

25    THE COURT:  Great.

1          MR. DEHART:  Judge Shannon, Mr. Detweiler -- Judge

2     Shannon, this is Rhett DeHart from the Womble Bond Dickinson

3     office in Charleston.  I'm Mr. Detweiler's partner, although,

4     junior partner, but I wanted to add a couple of notes about

5     Ryan Hentz to what Mr. Detweiler already explained.

6          Just for background, Your Honor, Mr. Hentz is a

7     former executive at Bittrex and the correspondence in

8     question occurred on April 6th, 2017, and it's highly

9     relevant, Your Honor.  An Iranian named Amirali wrote the

10    following to Mr. Hentz -- all of this is in Bittrex's

11    official correspondence and their official tickets -- this

12    Iranian citizen said:

13          "Thanks for your great site and astonishing

14    platform.  I am from Iran and will trade from my country.

15    Isn't that a problem on your side?

16          Best wishes, Amirali."

17          Ryan Hentz responded shortly thereafter:

18          "Hi, you can trade, but please make sure to

19    perform an enhanced verification.

20          Thank you, Ryan Hentz."

21          Again, Your Honor, he was an executive at Bittrex

22    and, you know, he told an Iranian citizen on official Bittrex

23    correspondence, that an Iranian citizen could trade from his

24    country.  And not surprisingly, Your Honor, a lot of Iranian

25    customers were so happy about that, they posted this on

1  Twitter, which partially explains why more than 1700 Iranians

2  joined Bittrex.  So to say that Mr. Hentz is an important

3  witness is an understatement.

4      And lastly, Your Honor, originally, we were going

5  to (indiscernible) the former Bittrex CEO, William Shihara,

6  who was sued by the Securities and Exchange Commission and

7  forced to pay millions in fines.  But, in any event, Quinn

8  Emanuel asked us to reconsider that.  They thought it was --

9  that Mr. Shihara wasn't necessary.

10      So we thought about it and we decided, perhaps

11  they're right.  In an effort to streamline the proceedings

12  before Your Honor, we would just call Mr. Hentz.  But if we

13  can't call Mr. Hentz, we're going to need to call

14  Mr. Shihara.

15      But again, Your Honor, I do want you to know that

16  we have tried to cooperate with Quinn Emanuel on this patter.

17  We backed off from Mr. Shihara at their request.

18      But you can understand why Mr. Hentz is so

19  important, Your Honor.  He's a former executive and in

20  writing, he told Iranians that they could join Bittrex and

21  trade on the platform.

22      And we don't necessarily have to depose him,

23  Judge.  We'd like to depose him, but we're happy to just

24  bring him in and have him a witness at trial.  But I did want

25  to give Your Honor a little bit of background on Mr. Hentz

1   and why he's so important.

2          THE COURT:  Thank you, sir.

3          Mr. Izakelian?

4          MR. IZAKELIAN:  Yes, Your Honor.

5          I would like to respond to a number of points that

6   have been raised.  First, with respect to counsel's

7   characterization that this hearing is about OFAC issues, I

8   want to emphasize, first, OFAC does not create a private

9   cause of action.  There's no claim for violations of OFAC.

10          THE COURT:  Can I ask you a question about

11   Mr. Hentz and the subpoena?  I guess I'm asking --

12          MR. IZAKELIAN:  Yes, of course.

13          THE COURT:  -- what is the debtor looking for

14   today?  Are you asking that I quash a subpoena?  Are you

15   asking -- I mean, I think I heard from Mr. Detweiler, the

16   debtor has propounded subpoenas looking for documents.  The

17   debtor -- or, I'm sorry -- that Mr. Ghader has propounded

18   those documents.  That Mr. Ghader is prepared to issue a

19   trial subpoena to try to require Mr. Hentz's testimony.

20          But I'm not sure what is in front of me today, and

21   I would start or I would frame that observation with a

22   comment responsive to Mr. Detweiler, which is, this hearing

23   is going forward on the 16th.  If -- you know, and I expect

24   both parties to be ready and I expect to commence and God

25   willing, at some point, conclude this proceeding, whether

1  it's on the 16th or after.

2          So I would need -- and, frankly, we should talk a

3  little bit about that -- but I think I want to understand

4  what it is that you're asking from me today about Blocksport

5  and, specifically, Mr. Hentz.

6          MR. IZAKELIAN:  Yes.

7          So, specifically, on Blocksport and Mr. Hentz, our

8  request was to confirm (indiscernible) that the hearing would

9  go forward on the 16th, regardless of whether Mr. Ghader is

10  able to get a deposition or get these documents, because he's

11  served these so late.  If that is --

12          THE COURT:  So let me start with -- and I think

13  I've heard enough on these issues -- but unless I'm mistaken,

14  and I don't mean to be flip, but this issue is not my problem

15  right now.  If Mr. Detweiler comes in and says, Mr. Hentz is

16  not available today, but is available next week and we think

17  he's critical, that's a question I'm going to have to make

18  and I will hear from the debtor in response about whether or

19  not it is appropriate to leave the proceeding open.

20          Similarly, if there's a question where Mr. Hentz

21  is not available and Mr. Detweiler is going to argue that

22  this hearing can't go forward or we need to adjourn or I need

23  some extraordinary relief, then that's a discussion that we

24  would have on the 16th.

25          If Mr. Hentz is available and agrees to testify,

1 the debtor, I assume, has the right to seek to bar or

2 preclude his testimony and, again, I would have to answer

3 that question, but I'm not certain I have to answer that

4 question today.

5        The hearing will start on the 16th.  Presumably,

6 we'll have some sense of whether Mr. Hentz is part of the

7 exercise or not and that would be where I would be guided by

8 able counsel in the hearing, but I don't think there's a

9 ruling that you need from me or that would be appropriate for

10 me to make today.

11        Is that fair?

12        MR. IZAKELIAN:  Understood, Your Honor.

13        THE COURT:  Okay.  Let's turn to the other two

14 items, though, and I think that I've heard enough.

15        As to the Visionex issue, I'm not going to require

16 discovery with respect to it.  I understand the description.

17 It may be that it is part of -- and I would certainly allow

18 some latitude on cross-examination -- but it does not seem to

19 me to be a central feature of the proof of claim being

20 asserted by Mr. Ghader.  It may be relevant to how he has

21 information about other claimants, but, again, I think the

22 debtor has carefully insisted that today's hearing, or the

23 upcoming hearing, is about his claims and his rights to

24 recovery against the debtor.  And I think the Visionex issue

25 is simply too attenuated for me to require a direct, further

1  discovery.

2          With respect to the information in the proof of

3  claim regarding his efforts to start a crypto exchange, I

4  will permit discovery into that and I will give my reasons.

5  I don't necessarily disagree with Mr. Detweiler that it is,

6  perhaps, not necessarily part of his proof of claim.  As I

7  said, I don't have all of the proofs of claim in front of me,

8  but I do recall that Mr. Ghader's papers certainly reflected

9  that he had considered pursuing this and, indeed, had gotten

10  the licensing from Estonia.  And, at least, I recall there

11  was something of an overhang suggesting that the difficulties

12  with Bittrex and the inability to access, meaningfully

13  impaired his ability to pursue that opportunity.

14          So me, I think I would observe that it is of

15  relatively limited significance and relevance to the issues

16  that are going to be in front of me.  And, again, I think

17  that the debtor has been careful and disciplined in inviting

18  those issues.

19          But Mr. Ghader has clearly stated that there is

20  not any notional or expectation damages claim or anything

21  educational that would arise from the failure to pursue that

22  business opportunity.  I will allow an inquiry into it

23  because I do think that it is relevant, but I think it is of

24  relatively limited significance to the issues that we have.

25          Again, with respect to the third-party discovery,

1  I don't think that there is anything right now for me to

2  touch on that.  The parties have asked whether we're going

3  forward.  You know that we're going forward.  If Mr. Hentz is

4  around or participating or otherwise available, we'll deal

5  with that.  If he's not, then, again, we'll deal with that

6  and arguments are reserved on both sides.

7            And, again, I've heard loud and clear from the

8  debtor their concern about whether this is a claim of

9  relatively limited value as to which significance resources

10  are being attributed.  I get that argument.  I understand.

11  And, obviously, I hear from Mr. Ghader seeking to pursue the

12  claims that he's articulated.  But I think that answers the

13  two questions and the third-party question.

14            Mr. Detweiler, I think you had said you have some

15  discovery issues or trial-prep issues?

16            MR. DETWEILER:  Yes, Your Honor, and thank you.

17            Again, may I please the Court?

18            Your Honor, Mr. Ghader in his discovery, because

19  the OFAC issue is so critical to this case in understanding

20  his proof of claim, he requested information from the debtors

21  relating to the OFAC issues and the communications that the

22  debtors had with OFAC.

23            What we know is that OFAC issued an administrative

24  subpoena on or around October 10 or October 11th, 2017.  That

25  put the debtors on notice that they were in violation of the

1  Iranian sanctions.  That started, and ultimately resulted in,

2  October 12th, the debtor freezing the accounts of all Iranian

3  citizens.

4         So what happens is the debtors have told you that

5  they applied for a license, that Bittrex U.S. applied for a

6  license so that it could return or allow for those Iranian

7  customers who got caught up with Bittrex, that they could

8  allow for the return of their cryptocurrency to them.

9         What happens is there's a series of communications

10  that have not all been produced to us and, specifically, Your

11  Honor, we're referring to an April 17th, 2018, letter from

12  Bittrex's then-counsel, Perkins Coie, to the Office of

13  Foreign Assets Control advising them that they were counsel

14  to Bittrex and that they would be applying for a license,

15  which you've heard about, to return the cryptocurrency to the

16  Iranian customers.

17         In that letter, the OFAC -- or the Perkins Coie

18  firm referred to a January 10th, 2018, letter that they had

19  sent to OFAC, as well as a January 17, 2018, letter that they

20  had sent to OFAC, as well as a November 9th, 2017, production

21  that they gave to OFAC regarding Iranian accounts.

22         We've asked for those communications because

23  what's important here, Your Honor, is what OFAC was telling

24  the debtors.  We know that the license was ultimately issued

25  in late 2019 and it expired on March 31, 2020.  So quite some

1  time goes by from October of '17 when the subpoena came, to,

2  ultimately, when they got the OFAC license to deal with the

3  Iranian customers.  And, yeah, they had other licenses, as

4  well, but we're focused only on the OFAC-Iranian issues.

5         Your Honor, we believe it's important that this

6  January 10th response that was prepared by the debtors to the

7  OFAC -- to OFAC is important and we'd like to see it.  They

8  won't produce it.  We believe that the January 17th, 2018,

9  letter that the debtors sent to OFAC that's also referenced

10 in the documents, that that be produced so we can see what

11 they were telling OFAC and what OFAC was saying back to them.

12        And then, finally, we've told the debtors, We're

13 not looking to get every Iranian customer's names.  We don't

14 want any of that.  But what we want is the November 9, 2017,

15 information that they had provided to OFAC regarding what was

16 then described as 1,770 existing accounts opened by Iranian

17 persons.  And we want that document and information as it

18 relates to Mr. Ghader to confirm that they, in fact, did

19 report Mr. Ghader's account at the time.

20        We also understand -- the last point is -- we also

21 understand -- recently, we learned from Mr. Ghader actually

22 over the weekend, that there were videos that may have been

23 taken by Mr. Ghader with regard to the verification process.

24 Specifically, in June of 2023, you've heard about that Ghader

25 was able to withdraw some currency, but there was a video,

1  apparently, that the debtors took of him that we have not

2  seen that we would want.  And we would want any recorded

3  communications or video, whether it goes back to the 2017,

4  when he opened the account and he did the verification

5  process, or all the way to the time that there was the

6  withdrawal of currency.

7           THE COURT:  Mr. Detweiler, I think I want to

8  understand a little bit better.  The -- are these videos that

9  were taken with Mr. Ghader's knowledge and were these part of

10 the, I guess, verification process that, you know, you're on

11 the website and just, you know, in the same way that when you

12 call the insurance company, they say, "We're on a recorded

13 line," I'm not -- this is new one on me and I think I want to

14 understand it a little bit better.

15          MR. DETWEILER:  Yeah.  So my understanding, Your

16 Honor, from Mr. Ghader -- and, again, this was June of 2023,

17 when he was doing the withdrawal, there was a video that was

18 done of him and I think it was part of their final, you know,

19 verification process to get the crypto out to him.  So that's

20 my understanding.

21          I don't know, and I wasn't able to get a clear

22 understanding of whether or not any other videos existed

23 earlier.  I know there was -- Your Honor is going to hear a

24 lot about the extensive communications that went back and

25 forth and him telling them where he lived and why the OFAC

1  regulations, et cetera.  You're going to hear all kinds of

2  stuff on that.

3          But there may be -- we don't know -- but we want

4  to know from the debtors if there are, because he did ask for

5  all communications.  If there are communications where

6  there's videos or recorded communications with Mr. Ghader, we

7  certainly want them.  We haven't found any in the files.

8          THE COURT:  Okay.  I understand.

9          Mr. Izakelian?

10          MR. IZAKELIAN:  Yes.

11          So, first, Your Honor, this is a complete surprise

12  to me.  This is out of left field.  Counsel did not inform

13  any of us that they were planning to raise any of their

14  discovery issues at this conference.  This is the first I'm

15  hearing of any of this.  Especially the videos, I've never

16  heard about this before.

17          As for these OFAC letters that counsel mentioned,

18  we actually spoke about these with counsel at a meet-and-

19  confer on December 15 and on December 20, we put our

20  positions to them in an email and I have not heard back from

21  them since on this issue until now.  So this issue was not

22  raised to us.  We didn't know that Mr. Ghader was intending

23  to seek these documents.  He had stood down, for all intents

24  and purposes, what, three weeks ago.

25          Now, as for the specific issues on OFAC, I want to

1  emphasize, again, that OFAC does not create a private cause

2  of action.  There is no claim for violating OFAC.  And any

3  issues relating to OFAC, that 2016/2017, those have been long

4  barred by the statute of limitations, which is just three

5  years on all of the claims.

6          THE COURT:  I think -- here's what I --

7          MR. IZAKELIAN:  Yeah, so --

8          THE COURT:  Hang on.

9          I guess I would ask, look, I'm not asking anybody

10 to shoot from the hip.

11         Mr. Detweiler, I think I want to ask, is it your

12 understanding that these issues were at least the subject of

13 a meet-and-confer on the 20th and it's been quiet since then

14 on these issues or has there been a live back-and-forth?

15         I will answer this question.  I just may not

16 answer it today, because, again, I think I want Mr. Izakelian

17 to make sure that he has a chance to make sure he knows the

18 documents we're talking about and his client's position as to

19 the production of those documents before I direct it.  So we

20 may reconvene in fairly short order, you know, in the next

21 day or two, but I don't necessarily want anybody surprised.

22         But I'd like some guidance.

23         MR. DETWEILER:  Well, just -- so, Your Honor --

24 yeah, and may I please the Court?

25         Your Honor, after going through the discovery,

1   yes, we requested it.  They put their position on the record.

2           Discovery has been ongoing.

3           THE COURT:  And what was -- just out of curiosity,

4   was there any substance to the opposition?  And, again, I

5   realize I'm asking you to characterize your opponent's

6   comment, but was it just, you know, "not relevant, we're not

7   producing," or was it something specific as to, "this is

8   burdensome and privileged" or something else?

9           MR. DETWEILER:  Yeah, I don't have the response in

10  front of me, Your Honor.

11          THE COURT:  Okay.

12          MR. DETWEILER:  We can -- and I think maybe,

13  perhaps then, not to put Your Honor in a difficult position,

14  as well, today -- is we can convene with counsel regarding

15  that outstanding request to their response and we can deal --

16  see where we stand prior to the hearing.  But we do think --

17          THE COURT:  Yeah, I think that's where I'd like to

18  leave it.

19          MR. DETWEILER:  -- that would probably be a fair

20  way to play it.

21          THE COURT:  And I'm not going to fault anybody

22  for, you know, surprise or anything else.  And I would not

23  want to put Mr. Izakelian at a point where, you know, he's

24  got issues he's not prepared for.  The debtor had requested

25  this conference.  I've conducted it.  I've answered the

 1 | questions that have been raised.

 2 |         I certainly don't fault, you know, the kind of

 3 | "while we're at it" approach to raising these, especially

 4 | when we're just a few days away from trial.  But I think what

 5 | I'd like to do is have the parties confer and try to figure

 6 | out -- I make no comment on any of this.

 7 |         I haven't seen these letters.  If the letters turn

 8 | into a substantial dispute or there's no consensus, then my

 9 | instinct would be I probably need to see these letters in

10 | order to make that decision --

11 |         MR. DETWEILER:  Well --

12 |         THE COURT:  -- and that's something that we could

13 | manage.

14 |         And as for the videos, I don't even know where to

15 | begin.  I don't know exactly what that's about and I think,

16 | again, Mr. Izakelian, I think, has to have a fair opportunity

17 | to figure out exactly what that's about.

18 |         So I'm reluctant to head down this path, but I'm

19 | also not going to foreclose it and I'm certainly available

20 | all week to the extent that the parties would wish to get

21 | together, again, on pretty short notice.

22 |         MR. DETWEILER:  Thank you, Your Honor.

23 |         We will confer with counsel.

24 |         Your Honor, you mentioned two things:  one about a

25 | hearing going forward on the 16th, and as you know, also on

1  the 16th, we have a motion for protective order that's before

2  the Court and also seeking sanctions under 105.  I don't know

3  if Your Honor has had a chance to review that, but that deals

4  with certain things that were noted by the Court -- that we

5  briefly noted by the Court, with regard to disclosure of

6  certain personally identifiable information regarding

7  Mr. Ghader.

8          So, we had filed a motion that's also scheduled to

9  be heard for the 16th.  That's a significant motion, Your

10  Honor, as well, in the case.

11         So we have two things.  We have a trial that's

12  going to start.  Mr. Ghader is hoping to get his visa so he

13  can personally appear before Your Honor and you can assess

14  his credibility in what happened here.

15         I don't know how Your Honor wants me to do it, but

16  what we were thinking for purposes of to assist Your Honor in

17  understanding these claims, because we think kind of half-

18  stories have been told here, is to prepare a pretrial brief

19  for Your Honor that will lay out the facts as we understand

20  them and then provide kind of a roadmap as to what happened

21  here and how Mr. Ghader's damages have been calculated.  I

22  don't know if that would assist Your Honor, but that's what

23  we would like to do.

24         And then we have to certainly meet and confer

25  regarding exhibits.  We have two depositions over the next

1    couple of days here.  They're their people and they have our

2    depositions at the end of the week.

3              THE COURT:  All right.  Mr. Izakelian?

4              MR. IZAKELIAN:  Yes, Your Honor.

5              Again, this is the first I'm hearing of this,

6    counsel has not conferred with anyone at Quinn Emanuel about

7    this before bringing this up today.  We can confer with them

8    about it.

9              My instinct is to say the parties have already

10   filed their briefs.  Mr. Ghader has already put his positions

11   in a response.  I don't know what a pretrial brief would add,

12   other than given him a chance to change his positions where

13   he thinks it's favorable, but --

14             THE COURT:  No, here's what we're going to do.

15             No, I appreciate the heads-up and, again, I

16   certainly don't want to put you in a position where you need

17   to shoot from the hip.

18             This is a discussion that counsel should have and

19   I expect that counsel is going to have a discussion about the

20   discovery issues that I've punted a little bit on and about

21   the trial-prep issues.

22             A couple things.  First, I make no comment on the

23   proposal to file a pretrial brief.  It seems to me, actually,

24   that a post-trial brief might make more sense than anything

25   else.  And part of the reason for that is there are a

1  significant number of submissions that are in front of me.

2  And, Mr. Detweiler, you've raised concerns about whether they

3  tell the whole story, et cetera.  There's a lot in front of

4  me, both on the debtors' side and responded to for

5  Mr. Ghader.

6          I don't know, particularly given the relatively

7  short timeline that we have, that it would make sense.  I

8  wouldn't let you file a pretrial brief without letting the

9  other side file one.  But I also think if I had you both do

10 it simultaneously, it would be like ships passing in the

11 night and I don't think that I would benefit from that.

12         I think that there is a good deal already in the

13 record.  We've had a number of calls and hearings on these

14 issues, so again, I think I have a general and pretty good

15 grasp on the disputes that are in front of me and both, the

16 legal and the factual disputes.

17         So I will at least share with you that my instinct

18 is that a pretrial brief is probably not going to be as

19 helpful to me that, as perhaps something at the conclusion of

20 the trial, that we, again, can discuss.  It may not be

21 necessary.  Sometimes it's helpful to put together all the

22 dots.  Sometimes the dots are clear enough to the Court that

23 the Court just takes it under advisement.  But I would ask

24 you to confer on that.

25         I have every expectation that I'm likely to be on

 1 | the phone with you folks within the next few days.  I would
 2 | like you to confer with respect to the trial issues.

 3 |         I am aware of the motion for sanctions and for the
 4 | protective order, which, again, seems independent of the
 5 | issues to be tried in connection with the proof of claim.  So
 6 | they are two different matters involving the same parties,
 7 | involving, certainly, conduct relating to the prosecution of
 8 | the bankruptcy case, but they don't necessarily travel -- you
 9 | know, there are lots of times where I've got two motions that
10 | are basically adducing the same thing.  This is not that
11 | case.  So I would ask that the parties confer.

12 |         That motion is, I believe, submitted and fully
13 | briefed.  You could correct my understanding on that.

14 |         And I think I would like guidance from the parties
15 | about how you would intend to proceed and then, again, also,
16 | just on some of the mechanics of the trial.  I appreciate
17 | that the parties are looking.  I usually look to counsel to
18 | engage and agree on the exhibits, you know, order of
19 | witnesses, stuff like that.  Some of the order of witnesses,
20 | especially in a situation like this, half of it is a matter
21 | of courtesy, that I don't necessarily want somebody to come
22 | and sit for a whole day if they're not likely to get on.  And
23 | I'm in counsel's hands on that.  Nobody can perfectly predict
24 | a trial, but you've got a better sense of what somebody is
25 | coming to.

1          The other thing about your discussion that I think

2    will mean you should circle back to me is, again, how much

3    time we are looking at.  This is a trial.  The debtor wants

4    to move forward.  The claimant wants to move forward.  There

5    are a number of moving parts, but we are moving forward.

6          The -- you know, at this point, I think the Court

7    needs to be guided by the parties as to who the witnesses

8    are, how many there are.  If there are gating questions or

9    disputes that are out there, I ought to at least be generally

10   aware of them.

11         I would not want to have a bunch of witnesses come

12   in -- and I only say this, because I've had -- I've done it

13   and it's happened -- but I wouldn't want to spend, you

14   know, 90 minutes on the morning of the 16th of what should be

15   trial and evidence time sparring over whether exhibits come

16   in or what order a witness comes in and those sorts of

17   things.  I don't minimize the significance of them, but I

18   rely upon counsel in the first instance to try to sort that

19   out.

20         So, to me, I think that the wisest course might be

21   for us to, right now, schedule a further status conference,

22   and, effectively, a pretrial conference for a couple of days

23   out, because I think it should be this week, so that people

24   know what it is that they are preparing for.  And because we

25   would do it by Zoom, I'm pretty much at your pleasure.

1          Is Wednesday too soon for these discussions?

2          I want -- and I think it's clear, I want counsel

3    to have those discussions about, one, the discovery stuff

4    that we talked about, and, two, how it is that this trial is

5    going to be presented and make sense.  I could hear you on

6    Wednesday at 11:00 a.m. or I could hear you Thursday, first

7    thing in the morning at 9:00 a.m.

8          So I'll ask you, Mr. Detweiler, do you have

9    thoughts?

10         MR. DETWEILER:  I think we should confer with

11   opposing counsel and let us have some conversations and then

12   we could report back to Your Honor's chambers, if it's

13   acceptable to you, as to what day for the pretrial

14   conference.

15         THE COURT:  I think that makes good sense.

16         And, again, I'm not -- you know, obviously, I

17   would try to accomplish as much as I could when we get

18   together in a hearing like this.  And, again, I've given you

19   guidance on the specific discovery issues that we've got, but

20   I think we would benefit from y'all having some of these

21   discussions with the expectation that we're going to circle

22   back up and you're going to explain it to me in a few days.

23         So Wednesday or Thursday works.  I would look for

24   guidance.  Once the parties confer on that date, the only

25   thing I would need from the debtor would be an agenda filed

1  that just says there's a status conference coming.  That it

2  should reflect that it would be via Zoom and we'll go from

3  there, okay.

4          MR. DETWEILER:  Your Honor, one last issue.

5          I know Mr. Ghader's name has been disclosed, you

6  know, as part of this hearing today.  There was reference to

7  another Iranian customer.  Given the motion for protective

8  order, we'd like to at least seal today's transcript or at

9  least keep that off the docket until the parties have had a

10 chance to kind of go through it and make sure names are

11 redacted, et cetera.

12         I know the agenda listed Mr. Ghader's name.  I

13 think the objection to the proof of claim was redacted; it

14 didn't have his name shown.  But my client has a real

15 sensitivity to any time his name is of the public record and

16 we certainly have a sensitivity with regard to where that

17 letter came from.

18         THE COURT:  Mr. Izakelian, any objection?

19         For purposes of today to sealing the transcript

20 today, any objection?

21         MR. IZAKELIAN:  Well, we can speak with counsel

22 about that.  I understand that, ordinarily, they'd want it

23 sealed, but we'll speak to counsel about that and see if we

24 have any issues.  I just have to think about that some more.

25         THE COURT:  That's fine.  I'm happy to have

1  counsel confer.

2          The Court will at least have a minute order that

3  will accompany this.  I could be wrong, but I think that

4  our -- are the audio recordings posted immediately?

5          THE CLERK:  I can hold off.

6          THE COURT:  Okay.  My understanding is that there

7  is, at least in some cases, audio recordings are posted on to

8  the docket immediately.  You probably -- you folks probably

9  know that better than I do.

10          I have directed the court reporter to not post the

11  audio recording of today's hearing.  The transcript, itself,

12  will take some time, but the Court will direct, via a minute

13  order in the docket, that the transcript is not to be

14  docketed, absent further order of the Court.  That will

15  preserve the *status quo* while you have this discussion.

16          And I would note just one other observation, and,

17  again, it doesn't feed into the contempt motion or otherwise,

18  but if this is a -- the parties need to figure out how to

19  move forward with this litigation.  I'm not sealing the

20  courtroom.  I will not do that.

21          And it seems to me a complicated proposition,

22  because I believe I've used the claimant's name a number of

23  times in this hearing and, obviously, to the extent that I've

24  done so indiscreetly, then I apologize, but I'm going to need

25  some guidance from you folks about how to proceed,

1 particularly, with that level of sensitivity.  But I'll leave

2 that to the parties and I would be guided.

3          As to the transcript, I think that issue is

4 protected for our purposes until we reconvene, okay.

5          MR. DETWEILER:  That's great, Your Honor.  Thank

6 you very much.

7          THE COURT:  Sure.

8          Mr. Izakelian, do we have anything else?

9          MR. IZAKELIAN:  Yes, one final point before we

10 adjourn, Your Honor.  I just wanted to let both, the Court

11 and Mister -- and the claimant's counsel know in advance of

12 the pretrial conference, we are planning on filing motions to

13 exclude the testimony of their expert witnesses.  They will

14 come soon.  Their depositions are scheduled towards the end

15 of this week.  So I just wanted to make sure everyone is

16 aware of that.

17          THE COURT:  Okay.  Well, we can discuss that when

18 we reconvene and we'll go from there.  I appreciate it.

19          All right.  So, again, I will look to gather with

20 the parties on Wednesday or Thursday.  I appreciate the

21 discussions that you'll have and I will look forward to

22 seeing you again soon.

23          But with that, we are adjourned.

24          Thank you, counsel.  I appreciate your patience.

25          MR. IZAKELIAN:  Thank you, Your Honor, very much

1  for your time.  Have a great day.

2            THE COURT:  Thank you.

3            MR. DETWEILER:  Thank you, Your Honor.

4        (Proceedings concluded at 2:54 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                             CERTIFICATION

2          I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7    /s/ William J. Garling                    January 8, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25